UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :

                          **INDICTMENT**

      -v-                              :

ALBERTO WILLIAM VILAR,             :       S1 05 Cr. 621 (KMK)
    a/k/a "Albert Vilar,"
GARY ALAN TANAKA,                  :



         Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE

(Conspiracy to Commit Securities Fraud, Investment Adviser Fraud,
Mail Fraud, Wire Fraud, and Money Laundering)

    The Grand Jury charges:

### Relevant Persons and Entities

    1.    At all times relevant to this Indictment, Amerindo Investment Advisors

Inc. ("Amerindo U.S."), was a corporation organized under the laws of the State of California.

Amerindo U.S. had its principal offices in San Francisco and New York, New York.  Amerindo

U.S. managed assets of institutional clients and, for a period of time also was the investment

adviser to one and more U.S. mutual funds.  Amerindo U.S. was, at all times relevant to this

Indictment, registered with the United States Securities and Exchange Commission ("SEC") as

an investment adviser.

    2.    At all times relevant to this Indictment, Amerindo Investment Advisors,

Inc. ("Amerindo Panama"), purported to be a corporation organized under the laws of Panama.

Amerindo Panama was, among other things, purportedly the investment manager of the

Amerindo Technology Growth Fund ("ATGF"), an off-shore, Panamanian investment fund offered to investors by Amerindo Panama.

      3.     At all times relevant to this Indictment, Amerindo Investment Advisors (UK) Ltd. ("Amerindo U.K."), purported to be a company that managed portfolios of U.S. emerging growth stocks for U.K. based clients. Amerindo U.K. had an office in London where the founders of Amerindo worked, and where certain administrative functions related to Amerindo Panama were performed, including meeting with and corresponding with investors, preparation of client account statements, processing investor redemption requests, and directing equity trades and financial transactions involving Amerindo Panama investor funds. Amerindo U.S., Amerindo Panama, and Amerindo U.K., and subsets of that group of entitities and their predecessors, are collectively referred to hereafter as "Amerindo."

      4.     ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, was one of the original founders of Amerindo U.S. and of the predecessor companies to Amerindo Panama and Amerindo UK, and was, at all times relevant to this Indictment, a shareholder, officer and director of Amerindo U.S., and one of the two shareholders, directors, and officers of Amerindo Panama and Amerindo UK. VILAR received an undergraduate degree from Washington & Jefferson College, and subsequently pledged and donated millions of dollars to his alma mater. VILAR also pledged and contributed millions of dollars to various organizations that supported opera and the arts, including the Metropolitan Opera in Manhattan, and the American Academy in Berlin.

      5.     GARY ALAN TANAKA, the defendant, was one of the original founders of Amerindo U.S., and was, at all times relevant to this indictment, a shareholder, officer and

2

director of Amerindo U.S., and one of the two shareholders, directors, and officers of Amerindo Panama and Amerindo UK. TANAKA directed the actions of the Amerindo traders based in both London and San Francisco, California, and was responsible for allocating the securities purchased by Amerindo among Amerindo's clients and the funds which Amerindo U.S., Amerindo Panama and Amerindo UK advised and managed.

### The Scheme to Defraud

6.    From at least as early as in or about 2002 to on or about May 26, 2005, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, perpetrated a scheme to defraud an individual investor (the "Victim") by soliciting millions of dollars of funds from the Victim under false pretenses, failing to invest the Victim's funds as promised, and converting the Victim's funds to their own benefit and the benefit of others without the knowledge or authorization of the Victim.

### The Victim's Investments With Amerindo

7.    Beginning in or about 1987, and continuing up to in or about February 2005, the Victim entrusted millions of dollars of investments to Amerindo.

8.    Beginning in or about 1987, the Victim received numerous account statements from Amerindo. Until in or about August 1995, those statements were printed on stationery bearing the name "Amerindo Investment Advisors Inc.", the name of Amerindo U.S., and included the address of Amerindo U.K. Beginning in or about September 1995, the Victim received account statements from Amerindo that were printed on stationery bearing the name "Amerindo Investment Advisors, Inc.", the name of Amerindo Panama, and including the address of a post office box in Panama. The purported value of the Victim's investments

3

managed by Amerindo, as reflected in the account statements provided by Amerindo, peaked at approximately $18 million in or about September 2000, and then sharply dropped over approximately the following two years.

9.       In or about June 2002, VILAR advised the Victim to invest in an Amerindo venture (the Amerindo SBIC Venture Fund LP) designed to take advantage of a U.S. government program designed to promote venture capital investment in small businesses (the "Amerindo SBIC"). Relying on VILAR's false and fraudulent representations regarding the Amerindo SBIC investment, the Victim agreed to invest approximately $5 million in the Amerindo SBIC.

### The SBIC Program

10.      During a period between in or about 2000 and on or about September 30, 2004, the United States Small Business Administration (the "SBA") provided funding for the Participating Securities SBIC Program (the "SBIC Program"). Under the SBIC Program, a qualified private venture capital firm that had received an SBIC license from the SBA was eligible to receive matching funds through SBA guarantees. Those matching funds allowed the SBICs to gain the benefits of "leverage" to the invested private capital.

11.      The first step in the applicable SBIC licensure process was to complete a Management Assessment Questionnaire ("MAQ"). If a MAQ satisfied the SBA's criteria, an applicant may have received a "go forth" letter, inviting the applicant to apply for an SBIC license within the following 18 months. If an applicant did not receive a "go forth" letter, it could not apply for an SBIC license.

4

12.     An applicant that was invited to apply for an SBIC license was required to submit with its application commitment letters from institutions and individuals that had agreed to invest a minimum of $10 million in the SBIC if it was licensed, of which no more than 30% was permitted to come from the principals or affiliated or associated individuals or entities. After an applicant applied for an SBIC license, but prior to that application being approved, the applicant was required to demonstrate that it had $2.5 million of the $10 million minimum deposited in a separate bank account set up for the SBIC.

**Amerindo's Failed Efforts To Obtain An SBIC License**

13.     Amerindo made approximately four unsuccessful attempts to obtain an SBIC license beginning in or about 2000, with the assistance of experienced legal counsel. Amerindo first submitted a MAQ to the SBA in or about January 2000. Although Amerindo received a "go forth" letter in or about April 2000, based on a presentation made by VILAR to the SBA Investment Committee on or about April 18, 2000, its license application was rejected. Amerindo submitted a second, and subsequently a third, MAQ, in or about May and September 2002, respectively.

14.     On or about December 27, 2002, the Chief Administrative Officer of the SBA's Investment Division sent a letter to VILAR in which she stated, among other things, "Review of the third MAQ by the Investment Committee produced numerous areas of concern." Those concerns included, among other things, the facts that the principals were located in three different geographic areas (New York, London, and Virginia), and the fact that VILAR would be spending a small fraction of his time on the Amerindo SBIC compared to his interest in the SBIC. That letter concluded, "I am sorry to have to write this letter to you, but we feel that if we

5

proceeded, after receiving three submissions to date, that it would be at considerable time and expense to your team (as well as ourselves), and that ultimately, the Agency Licensing Committee would reject your application." Amerindo did not receive a "go forth" letter as a result of its submission of the third MAQ.

15.     In or about January 2004, VILAR and Amerindo filed a fourth MAQ with the SBA. In each of the four MAQs submitted by Amerindo in an effort to obtain a license for an Amerindo SBIC, VILAR and TANAKA were listed as principals of the entity to be licensed.

16.     In or about February 2004, the SBA posted on its website a notice indicating that, due to a lack of funding by Congress of the SBIC Program, there was no guarantee that applications submitted after approximately the end of March 2004, would be eligible to receive leverage funding. Amerindo abandoned its fourth attempt to obtain an SBIC license after on or about May 28, 2004, and neither VILAR, TANAKA, Amerindo U.S., nor any of the affiliated Amerindo entities ever received the license required to apply for leverage funds under the SBIC Program.

## Defendant Vilar's False And Fraudulent Statements
## To The Victim Regarding The Amerindo SBIC Investment

17.     In or about June 2002, VILAR told the Victim that VILAR and TANAKA were personally investing in a new venture involving investments in small businesses, including biotechnology companies, that would be supported by the government. VILAR told the Victim that the venture had been approved by the government, and invited the Victim to join VILAR and TANAKA in the venture as the only outside partner. VILAR recommended that the Victim

6

invest $5 million in the venture. VILAR promised the Victim that the Victim would earn
approximately $250,000 each quarter from the investment.

## The Defendants' Unauthorized Conversion
## Of The Victim's $5 Million SBIC Investment

18.     The Victim's $5 million investment in the Amerindo SBIC was deposited
into an account at a New York City brokerage firm (the "Brokerage Firm") that was opened by
VILAR and TANAKA in or about 1987, on behalf of a Panamanian corporation named
"Amerindo Management Inc." (the "AMI Account"), of which VILAR held the title of President
and TANAKA held the title of Vice President. On or about June 20, 2002, the AMI Account
held numerous equity positions in technology stocks, and had a negative cash balance of
approximately $428,122, prior to the incoming transfer of the Victim's $5 million SBIC
investment.

19.     On or about June 25 and June 26, 2002, the Brokerage Firm received
letters of authorization ("LOAs") signed by TANAKA directing the Brokerage Firm to transfer
by wire from the AMI Account approximately:

a.     $1 million to an account at Chase Manhattan Bank held in the
name of "A.W. Vilar" (the "Vilar Account");

b.     $650,000.00 to an account at Chase Manhattan Bank held in the
name of Amerindo Investment Advisors Inc. (the "Amerindo Account"); and

c.     $500,000.00 to a trust account at Bank of New York (the "Trust
Account").

7

20.    On or about July 9, 2002, the Brokerage Firm received an LOA signed by TANAKA directing the Brokerage Firm to transfer a sum of approximately $3,102,958.85 from the AMI Account to an overseas account in Luxemburg (the "Luxemburg Account").

21.    The Brokerage Firm executed the wire transfer instructions described in paragraphs 19 and 20, above, on or about the respective dates it received the LOAs.

22.    All but approximately $45,000 of the approximately $1 million from the Victim's Amerindo SBIC investment that was wire transferred to the Vilar Account was spent within two weeks on charitable contributions and personal expenses of VILAR, including contributions to Washington & Jefferson College and the American Academy in Berlin. The remainder of that portion of the Victim's investment was dissipated soon thereafter, and none of the funds transferred to the Vilar Account were invested in the Amerindo SBIC.

23.    The approximately $650,000.00 of the Victim's investment in the Amerindo SBIC that was transferred into the Amerindo Account was spent on Amerindo business expenses, and none of those funds were invested in the Amerindo SBIC.

24.    At least approximately $400,000.00 of the approximately $500,000.00 of the Victim's Amerindo SBIC investment that was transferred to the Trust Account was used to make an investment on behalf of the Victim that was unrelated to the Amerindo SBIC, and which investment the Victim believed would be paid for by funds invested with Amerindo separate and apart from the $5 million investment the Victim had made in the Amerindo SBIC. None of the approximately $500,000.00 was invested in the Amerindo SBIC.

25.    The remainder of the Victim's investment in the Amerindo SBIC, amounting to approximately $2.85 million, was part of the approximately $3,102,958.85 wire

8

transfer to the Luxemburg Account, which funds were used to partially redeem an unrelated

investor's investment in an Amerindo Panama investment product.

### The Defendants' False and Misleading Statements
### Concerning The Victim's $5 Million Amerindo SBIC Investment

26.    After obtaining the Victim's $5 million investment in the Amerindo SBIC

venture, VILAR repeatedly made false and fraudulent statements to the Victim concerning the

Victim's investment in the Amerindo SBIC, including the following:

a.    On or about March 13, 2003, ALBERTO WILLIAM VILAR, a/k/a

"Albert Vilar," the defendant, wrote a letter to the Victim in which he stated that although there

had been an "unprecedented bear market [for] the last three years . . . the monies put into escrow

for the new SBIC fund remain at full value." Later in the same letter he stated that, "We are now

awaiting permission to commence investing the funds we have placed into escrow, which we

expect to happen fairly soon." In fact, as described above, Amerindo, VILAR and TANAKA had

been repeatedly rebuffed in their efforts to obtain an SBIC license, the Victim's funds were not

placed in escrow, and VILAR and TANAKA had long since spent the Victim's $5 million

investment on, among other things, personal and business expenses.

b.    On or about March 25, 2004, ALBERTO WILLIAM VILAR, a/k/a

"Albert Vilar," the defendant, signed a letter to the accountant of the Victim in which he stated in

part that he had been required "to deposit the requisite key money" in connection with

Amerindo's efforts to obtain an SBIC license. In that letter, VILAR also stated that while

waiting for the license, "the prices of technology private-placements continued to decline . . . .

This means that we did not use a single penny of [Victim's] investment during this declining

9

period, and if and when, as expected, we start to make investments upon securing the renewal of our license later this year, we will be looking at the best prices probably ever seen in the four decade plus history of technology based, venture capital." At the time VILAR signed this letter, and as described above: (i) an applicant at the MAQ stage of the SBIC licensing process need not have capital on deposit until it is invited to apply for a license, which Amerindo was never invited to do during the period following the Victim's $5 million investment; (ii) Amerindo's third and fourth MAQs did not report the investment of $5 million by the Victim in the Amerindo SBIC; and (iii) VILAR and TANAKA had long since spent the Victim's $5 million investment on, among other things, personal and business expenses.

        c.     On or about October 25, 2004, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, signed a memo written to Victim's lawyer, in which he wrote in part:

> <u>Funds on deposit with SBIC, for $5 million</u>. Technically this represents an escrow deposit for a technology-based SBIC. [Victim] has effectively coinvested with [me] in a new fund that has been approved for investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war.

In fact, as described above: (i) the Victim's $5 million investment in the Amerindo SBIC was not on deposit with the SBIC, and was not being held in escrow; (ii) Amerindo had not received an SBIC license and was not likely to receive such a license in the near future; (iii) SBA funding for the SBIC Program was not "delayed," but rather had been canceled; and (iv) VILAR and TANAKA had long since spent the Victim's $5 million investment on, among other things, personal and business expenses.

d.      On or about November 8, 2004, VILAR and TANAKA caused an

account statement to be sent from London, England, to the Victim in New York, New York, via a

private commercial courier, in which the Victim's $5 million investment was described as

"FUNDS ON DEPOSIT WITH SBIC," and which reflected "INTEREST ON SBIC DEPOSIT"

in the amount of approximately $225,000.00.

### The Defendants' Conversion Of Additional Funds Invested By Victim

27.      As of on or about June 30, 2003, according to an account statement

furnished to the Victim by VILAR, TANAKA and Amerindo, the Victim had entrusted a total of

approximately $11,045,370.02 in investment funds to VILAR, TANAKA and Amerindo,

including approximately $2,067,597.00 held in the Victim's account at the Brokerage Firm (the

"Victim's Account").

28.      On or about September 25, 2003, VILAR and TANAKA caused an LOA

to be sent from Amerindo to the Brokerage Firm.  The LOA bore the signature of TANAKA and

the forged signature of the Victim and directed that approximately $250,000.00 be transferred

from the Victim's Account to an account held at the Brokerage Firm in the name of "Amerindo

Technology Growth Fund Inc." ("ATGF I").

29.      On or about September 26, 2003, VILAR and TANAKA caused another

LOA signed by TANAKA to be sent from Amerindo to the Brokerage Firm directing that

approximately $250,000.00 be transferred from ATGF I to a personal account held by VILAR at

Wilmington Trust Company, in Wilmington, Delaware  (the "Wilmington Trust Account").

30.      During an approximately one-month period following the transfer of the

approximately $250,000.00 into the Wilmington Trust Account, VILAR spent the funds on,

11

among other things, the personal expenses of VILAR, including the repayment of a mortgage obligation in the amount of approximately $53,042.83, and others.

## STATUTORY ALLEGATIONS

### The Conspiracy

31.     From in or about June 2002 to on or about May 26, 2005, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely, (a) to commit fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to commit investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; (c) to commit mail fraud, in violation of Title 18, United States Code, Section 1341; (d) to commit wire fraud, in violation of Title 18, United States Code, Section1343; and (e) to commit money laundering, in violation of Title 18, United States Code, Section 1957.

### The Objects of the Conspiracy

### Fraud In Connection With The Purchase Or Sale of Securities

32.     It was a part and an object of the conspiracy that VILAR and TANAKA, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Title 17, Code of

12

Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to

defraud; (b) making and causing Amerindo to make untrue statements of material facts and

omitting to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and (c) engaging in acts, practices,

and courses of business which operated and would operate as a fraud and deceit upon persons

who invested in and through Amerindo, in violation of Title 15, United States Code, Sections

78j(b) and 78ff.

## Investment Adviser Fraud

33.     It was further a part and an object of the conspiracy that VILAR and

TANAKA, the defendants, acting as investment advisers with respect to one and more investors

and potential investors in Amerindo Investment Advisors Inc. and its affiliated entities, including

Amerindo Panama, unlawfully, willfully, and knowingly, by the use of the means and

instrumentalities of interstate commerce, directly and indirectly, did: (a) employ devices,

schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions,

practices, and courses of business which operated as a fraud and deceit upon clients and

prospective clients; and (c) engage in acts, practices, and courses of business that were

fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections

80b-6 and 80b-17.

## Mail Fraud

34.     It was further a part and an object of the conspiracy that VILAR and

TANAKA, the defendants, unlawfully, willfully and knowingly, having devised and intending to

devise a scheme and artifice to defraud, and for obtaining money and property by means of false

13

and fraudulent pretenses, representations, and promises, did cause to be deposited any matter or thing whatever to be sent or delivered by any private and commercial interstate carrier, and took and received therefrom, any such matter and thing, and knowingly caused to be delivered by such carrier according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter and thing, in violation of Title 18, United States Code, Section 1341.

## Wire Fraud

35.    It was further a part and an object of the conspiracy that VILAR and TANAKA, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Money Laundering

36.    It was further a part and an object of the conspiracy that VILAR and TANAKA, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly engaged and attempted to engage in and cause others to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

14

## Means And Methods Of The Conspiracy

37.    Among the means and methods by which VILAR and TANAKA would and did carry out the conspiracy were the following:

a.    VILAR and TANAKA opened brokerage accounts in New York, New York, in the names of Panamanian entities, which accounts were controlled by VILAR and TANAKA;

b.    VILAR solicited funds from the Victim by making false and misleading oral representations about the investment for which the Victim's funds were solicited;

c.    VILAR and TANAKA deposited money received from the Victim as a result of false and misleading representations into a brokerage account opened by VILAR and TANAKA in the name of a Panamanian entity;

d.    VILAR and TANAKA caused the Victim's investment funds to be converted to the use of VILAR, TANAKA and others by causing the Victim's investment funds to be wire transferred to bank accounts controlled by VILAR, TANAKA and others.

## Overt Acts

38.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about November 1, 1987, VILAR and TANAKA opened the AMI Account in New York, New York;

b.    In or about June 2002, VILAR met the Victim at VILAR's New York City apartment to solicit an investment of approximately $5 million in an Amerindo SBIC;

15

     c.  On or about June 25, 2002, VILAR and TANAKA caused

approximately $1 million of the Victim's Amerindo SBIC investment to be wire transferred to

the Vilar Account;

     d.  On or about June 25, 2002, VILAR and TANAKA caused

approximately $500,000.00 of the Victim's Amerindo SBIC investment to be wire transferred to

the Trust Account;

     e.  On or about June 26, 2002, VILAR and TANAKA caused

approximately $650,000.00 of the Victim's Amerindo SBIC investment to be transferred to the

Amerindo U.S. Account;

     f.  On or about June 27, 2002, VILAR caused a check in the amount

of approximately $540,000.00, drawn on the Vilar Account, to be sent to Washington and

Jefferson College;

     g.  On or about July 1, 2002, VILAR caused a check in the amount of

approximately $177,000.00, drawn on the Vilar Account, to be sent to the American Academy in

Berlin;

     h.  On or about July 9, 2002, VILAR and TANAKA caused

approximately $3,102,958.85 to be wire transferred from the AMI Account to the Luxemburg

Account to redeem another investor's investment in an Amerindo Panama investment product;

     i.  On or about September 25, 2003, VILAR and TANAKA caused

approximately $250,000.00 to be transferred from the Victim's Account to ATGF I;

     j.  On or about September 26, 2003, VILAR and TANAKA caused

approximately $250,000.00 to be transferred from ATGF I to the Wilmington Trust Account;

k.      On or about September 30, 2003, VILAR caused approximately

$53,042.83 to be transferred from the Wilmington Trust Account to repay a mortgage obligation

of VILAR; and

l.      On or about November 8, 2004, VILAR and TANAKA caused a

false and misleading account statement to be sent from London, England, via private commercial

carrier, to the Victim in New York, New York.

(Title 18, United States Code, Section 371).

## COUNT TWO
(Securities Fraud)

The Grand Jury further charges:

39.      The allegations contained in paragraphs 1 through 30 and 37 through 38

above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as

setting forth a scheme to defraud.

40.      From in or about June 2002 through on or about May 26, 2005, in the

Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert

Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly,

directly and indirectly, by the use of means and instrumentalities of interstate commerce, the

mails, and the facilities of national securities exchanges, did use and employ manipulative and

deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations,

Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making

untrue statements of material facts and omitting to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading;

17

and (c) engaging in transactions, acts, practices, and courses of business which operated and

would operate as a fraud and deceit upon persons in connection with the purchase and sale of

limited partnership interests in Amerindo SBIC Venture Fund LP.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

## COUNT THREE
(Investment Adviser Fraud)

The Grand Jury further charges:

41.    The allegations contained in paragraphs 1 through 30 and 37 through 38

above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as

setting forth a scheme to defraud.

42.    From in or about June 2002 through on or about May 26, 2005,

ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the

defendants, acting as investment advisers with respect to investors and potential investors in

Amerindo Investment Advisors Inc. and its affiliated entities, unlawfully, willfully, and

knowingly, by the use of the means and instrumentalities of interstate commerce, directly and

indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and prospective

clients; (b) engage in transactions, practices, and courses of business which operated as a fraud

18

and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative.

(Title 15, United States Code, Sections 80b-6 and 80b-17; and Title 18, United States Code, Section 2).

## COUNT FOUR
(Mail Fraud)

The Grand Jury further alleges:

43.     The allegations contained in paragraphs 1 through 30 and 37 through 38 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

44.     On or about November 8, 2004, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did cause to be deposited any matter or thing whatever to be sent or delivered by any private and commercial interstate carrier, and took and received therefrom, any such matter and thing, and knowingly caused to be delivered by such carrier according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter and thing; to wit, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, sent and caused to be sent and delivered via a private and commericial interstate carrier a false and fradulent account statement from London, England, to the Victim in New York, New York.

(Title 18, United States Code, Sections 1341 and 2).

19

## COUNT FIVE
(Wire Fraud)

The Grand Jury further alleges:

45.    The allegations contained in paragraphs 1 through 30 and 37 through 38 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

46.    On or about June 25, 2002, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice; to wit, on or about June 25, 2002, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused approximately $1,000,000.00 of investor funds to be sent by wire from outside New York State, to a bank in New York, New York, which funds were subsequently converted to the defendant's own use without the knowledge, authorization, or permission of the investor.

(Title 18, United States Code, Sections 1343 and 2).

20

## COUNT SIX
(Wire Fraud)

The Grand Jury further alleges:

47.    The allegations contained in paragraphs 1 through 30 and 37 through 38 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

48.    On or about July 9, 2002, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice; to wit, on or about July 9, 2002, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused approximately $2.85 million of investor funds to be sent by wire from outside New York State, to a bank in New York, New York, which funds were subsequently converted to the defendants' use and the use of others without the knowledge, authorization, or permission of the investor.

(Title 18, United States Code, Sections 1343 and 2).

## COUNTS SEVEN THROUGH TEN
(Money Laundering)

The Grand Jury further charges:

49.     The allegations contained in paragraphs 1 through 30 and 37 through 38 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

50.     On or about the dates set forth below, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly engaged and attempted to engage in and cause others to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, to wit, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, mail fraud in violation of Title 18, United States Code, Section 1341 and wire fraud in violation of Title 18, United States Code, Section 1343, as set forth below:

| COUNT | APPROXIMATE DATE | TRANSACTION |
|-------|------------------|-------------|
| SEVEN | June 25, 2002 | Wire transfer in the amount of $1,000,000.00 from the AMI Account to the Vilar Account |
| EIGHT | June 25, 2002 | Wire transfer in the amount of $500,000.00 from the AMI Account to the Trust Account |
| NINE | June 26, 2002 | Wire transfer in the amount of $650,000.00 from the AMI Account to the Amerindo Account |

22

| COUNT | APPROXIMATE DATE | TRANSACTION |
|-------|------------------|-------------|
| TEN | July 9, 2002 | Wire transfer in the amount of $3,102,958.85 from the AMI Account to an account at Lloyd's TSB Bank (Luxemburg) |

(Title 18, United States Code, Sections 1957 and 2).

## FORFEITURE ALLEGATIONS

51.     As a result of committing conspiracy to commit investment adviser fraud,

securities fraud, mail fraud and wire fraud, and the substantive offenses of investment adviser

fraud, securities fraud, mail fraud and wire fraud, as alleged in Counts One through Six of this

Indictment, in violation of Title 15, United States Code, Sections 80b-6, 80b-17, 78j(b) and 78ff,

Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code,

Sections 371, 1341, 1343 and 2, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY

ALAN TANAKA, the defendants, shall forfeit to the United States, pursuant to Title 18, United

States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all

property, real and personal, that constitutes or is derived from proceeds traceable to the

commission of the offenses, including but not limited to a sum of money equal to $5,250,000.00

in United States currency, representing the amount of money fraudulently obtained as a result of

the securities, mail and wire fraud schemes alleged in this Indictment.

52.     As a result the offense of committing money laundering, as alleged in

Counts Seven through Ten of this Indictment, in violation of Title 18, United States Code,

Sections 1957 and 2, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN

TANAKA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States

Code, Section 982(a)(1), any and all property, real and personal, involved in the offense, and any property traceable to such property, including but not limited to a sum of money equal to $5,000,000.00 in United States currency, representing the amount of money fraudulently obtained as a result of the money laundering crimes alleged in this Indictment.

Substitute Asset Provision

53.     If any of the forfeitable property, as a result of any act or omission of the defendant:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third person;

    c.     has been placed beyond the jurisdiction of the Court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be
           subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

        (Title 18, United States Code, Sections 981(a)(1), 982,
        and Title 28, United States Code, Section 2461).

_____
FOREPERSON

_____
DAVID N. KELLEY
United States Attorney

24

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### ALBERTO WILLIAM VILAR,
a/k/a "Albert Vilar,"
### GARY ALAN TANAKA,

**Defendants.**

### INDICTMENT

S1 05 Cr. 621 (KMK)

15 U.S.C. §§ 80b-6, 80b-17, 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
18 U.S.C. §§ 371, 1341, 1343, 1957 and 2

DAVID N. KELLEY
United States Attorney.

*July 26, 2005 - Fld. Superseding Indictment*
*S1 05 Cr. 621 (KMK)*

*S/ Eaton, J. U.S.M.J.*