Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York  10017
Tel: 212.999.5800

*Attorneys for Defendant*
*Gary Alan Tanaka*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | S1 05 Cr. 621 (KMK) |
| - against - | ECF CASE |
| ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA<br><br>            Defendants. | |

## MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS

Defendant Gary Alan Tanaka ("Tanaka"), by his attorneys, hereby moves to suppress statements allegedly made by Tanaka at the time of his arrest.[1]  A hearing on the issues raised in this motion is requested.

---

[1] Mr. Tanaka reserves the right to file additional motions to suppress upon receiving further discovery from the Government.

## FACTS

The facts relevant to this motion are set forth in the Declaration of Gary Alan Tanaka ("Tanaka Decl."), submitted herewith.

## ARGUMENT

I.   STATEMENTS MADE PRIOR TO THE ADMINISTRATION OF MIRANDA RIGHTS SHOULD BE SUPPRESSED

It is axiomatic that a suspect must be advised of the rights specified in *Miranda v. Arizona* ("Miranda rights" or "Miranda warnings") before being subjected to custodial interrogation. 384 U.S. 436, 479 (1966). Absent a waiver of these rights, statements made by a defendant in the course of custodial interrogation are inadmissible in the prosecution's case-in-chief. *Id.*; *United States v. Manthurin*, 148 F.3d 68, 69 (2d Cir. 1998) ("'Failure to administer Miranda warnings creates a presumption of compulsion,' and that 'presumption . . . [is] irrebuttable for the purposes of the prosecution's case in chief.'") (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)). Moreover, a waiver of Miranda rights is valid only if it was the product of a knowing and voluntary choice, *i.e.*, if the defendant was advised of and understood his or her rights and then chose to relinquish them without governmental coercion. *Colorado v. Spring*, 479 U.S. 564, 572-73 (1987).

Here, the postal inspectors who interviewed Tanaka acknowledge that Tanaka was not advised of his Miranda rights prior to speaking with them ("pre-Miranda statements"). Memorandum of Interview dated May 26, 2005, p. 1 (attached to Declaration of Justin M. Sher as Exhibit A) (hereinafter, "Interview Mem."); Tanaka Decl. at ¶ 6. The only question, therefore, is whether these pre-Miranda statements were made during the course of "custodial interrogation." As discussed below, because these statements were made (1) after Tanaka was

formally arrested or otherwise restrained, and (2) as a result of interrogation or, at the very least, its functional equivalent, the failure to advise Tanaka of his Miranda rights renders these statements inadmissible.

      A.    <u>Tanaka Was "In Custody" At The Time Of Any Pre-Miranda Statements</u>.

It cannot seriously be disputed that Tanaka was "in custody" at the time the pre-Miranda statements were made. The postal inspectors' own Memorandum of Interview concedes that Tanaka was placed under arrest immediately and prior to the utterance of any statements. Interview Mem. at 1. This in itself establishes custody for the purposes of Miranda. *See Yarborough v. Alvarado*, 124 S. Ct. 2140, 2149 (2004) (defendant is in custody where there was "a formal arrest") (quoting *Thompson v. Keohane*, 116 S. Ct. 457 (1995)).

Even absent formal arrest, Tanaka's freedom was sufficiently compromised such that he was effectively "in custody." The postal inspectors entered Tanaka's hotel room without asking permission, informed him that they were going to "take him downtown" and instructed him to gather his things. Tanaka Decl. ¶¶ 4-6. Moreover, both prior to and after identifying themselves as postal inspectors and presenting their badges, the inspectors conducted themselves with an air of authority that made clear they were acting on behalf of law enforcement. Tanaka Decl. ¶¶ 6-7. Given these circumstances, it was apparent that Tanaka was not free to terminate the conversation and leave the hotel room or to ask the inspectors to leave. Tanaka Decl. ¶ 5. The law is clear that such restraint of freedom is tantamount to being held "in custody" for the purposes of Miranda. *Yarborough*, 124 S. Ct. at 2149 (defendant is in custody where he "was not at liberty to terminate the interrogation and leave") (quoting *Thompson v. Keohane*, 116 S. Ct. at 465); *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) ("An accused is in custody

when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.") (internal quotations and citation omitted).

B.  <u>The Pre-Miranda Statements Were The Result Of Interrogation By The Authorities</u>.

The postal inspectors cast Tanaka's pre-Miranda statements as "spontaneous utterance[s]," Interview Mem. at 1, but Tanaka's statements were actually the product of interrogation. The Supreme Court has interpreted "interrogation" for the purposes of Miranda broadly to refer "not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 100 S. Ct. 1682, 1689-90 (1980). Here, not only were the statements made during the course of a fifteen-minute conversation initiated by the inspectors, but also they were in ***direct response*** to a question posed by the postal inspectors during this conversation. Tanaka Decl. ¶ 6. Clearly, such circumstances constitute interrogation.

Moreover, according to the postal inspectors' own Memorandum of Interview, Tanaka's pre-Miranda statements were uttered only after the inspectors confronted Tanaka with information concerning the accusations against him. Interview Mem. at 1. Although the Memorandum of Interview fails to provide any details about what was said to Tanaka with respect to the charges against him, it is well-settled that such conversations can constitute "interrogation" for the purposes of Miranda.[2] *See, e.g., United States v. Perez*, 948 F. Supp.

---

[2] The Memorandum of Interview contains only the vague statement that the postal inspectors gave Tanaka "a brief explanation of charges for his arrest." The inspectors do not

4

1191, 1198 (S.D.N.Y. 1996) ("posit[ing] the guilt" of a person in custody, or confronting a suspect with evidence of or a belief in his guilt, have been deemed the functional equivalent of interrogation) (collecting cases).

II.   STATEMENTS MADE SUBSEQUENT TO THE ADMINISTRATION OF MIRANDA RIGHTS SHOULD ALSO BE EXCLUDED

In addition to requiring the suppression of Tanaka's pre-Miranda statements, the failure to advise Tanaka of his Miranda rights until fifteen minutes into his interrogation also requires suppression of statements made *after* the rights were administered. The Supreme Court has held that, in certain circumstances, Miranda rights administered after interrogation has begun do not suffice to protect defendant with respect to statements made after the warnings are given. *Missouri v. Seibert*, 124 S. Ct. 2601 (2004). To determine whether Miranda warnings delivered "mid-stream" are sufficiently effective to accomplish their object, courts should consider (i) the completeness and detail of the questions and answers in the first round of interrogation, (ii) the overlapping content of the two statements, (iii) the timing and setting of the first and the second rounds, (iv) the continuity of police personnel, and (v) the degree to which the interrogator's questions treated the second round as continuous with the first. *Id*. at 2612; *United States v. Cohen*, 372 F. Supp.2d 340, 355 (E.D.N.Y. 2005).

Applying the above factors to the circumstances presented here, it is clear that the failure to advise Tanaka of his Miranda rights in a timely manner rendered these warnings ineffective. This is not a case where there were two separate instances of questioning separated by a block of time or change in circumstances. To the contrary, the questioning of Tanaka took place during

---

allege that Tanaka requested such an explanation; to the contrary, the Memorandum of Interview supports that the conversation was initiated by the inspectors.

the course of one, continuous conversation over a thirty minute period. The entire interrogation was conducted by the same two postal inspectors in the same hotel room around the same table. That there was no meaningful break or pause before Tanaka was advised of his Miranda rights is further confirmed by the alleged content of Tanaka's pre- and post-Miranda statements. According to the Memorandum of Interview, after administering Miranda warnings the postal inspectors simply picked up where they left off, *i.e.*, the subject of Lily Cates. Interview Mem. at 1. Given these circumstances, the administration of Miranda warnings – nearly fifteen minutes after the interrogation began and only after Tanaka began responding to the inspectors' questions – could not have secured a knowing and intelligent waiver.

III.   TANAKA IS ENTITLED TO A HEARING

Under the well-settled law of this Circuit, if the Government puts facts in dispute, Tanaka is entitled to a hearing on the issues raised by this motion. In support of the motion, Mr. Tanaka has submitted a declaration setting forth specific factual assertions as to why certain statements allegedly made during the course of custodial interrogation should be suppressed. Without evidence to the contrary, Mr. Tanaka is entitled to the suppression of his alleged statements. If the Government seeks to present evidence in response to this motion, Mr. Tanaka's declaration creates a factual dispute that cannot be resolved without an evidentiary hearing. *United States v. Manthurin*, 148 F.3d 68, 69 (2d Cir. 1998).

## **CONCLUSION**

For the foregoing reasons, defendant Gary Alan Tanaka respectfully requests that the Court order a hearing to resolve the factual issues raised by this motion, and, based on the evidence adduced at that hearing, order that any and all statements made by Tanaka prior to and after the administration of Miranda rights be suppressed.

Dated: September 12, 2005
      New York, New York

By:   /s/  Steven G. Kobre

Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200


Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York  10017
Tel: 212.999.5800

Attorneys for Defendant
Gary Alan Tanaka

Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York 10017
Tel: 212.999.5800

*Attorneys for Defendant*
*Gary Alan Tanaka*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | S1 05 Cr. 621 (KMK) |
| - against - | ECF CASE |
| ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA<br><br>Defendants. | |

## DECLARATION OF GARY ALAN TANAKA

I, Gary Alan Tanaka, declare as follows:

1.  I am a defendant in the above-captioned action. I submit this declaration in support of my motion to suppress statements made at the time of my arrest. Because I am submitting this declaration for the limited purpose of supporting my motion to suppress, I have not included every fact known to me relating to the subject matter of this action.

2.      On May 26, 2005, I was visiting New York from London, where I reside with my wife and young son. The purpose of the visit was to conduct business in New York and to receive cancer treatments at Memorial Sloan-Kettering Cancer Center, located in New York City. While in New York I was staying at the Lombardy Hotel, New York, New York.

3.      At approximately 7:00 a.m. on May 26, 2005, I was awakened by a series of loud knocks at the door. Given the early hour, and that I was not expecting any visitors, I was confused and assumed it must be hotel housekeeping. I therefore got out of bed and opened the door without asking who was there.

4.      When I opened the door, there were two individuals – one male and one female – standing in the doorway. Without asking whether they could enter, the two individuals stepped into my hotel room.

5.      The man was the first to speak and asked whether I was Gary Tanaka. When I responded "yes," the two individuals came further into the room, again without seeking permission. We ended up standing around a table located near the entrance of the room. Following their lead, I took a seat at the table. At no time did I feel as if I was free to leave or that I could order them to leave my hotel room.

6.      The individuals began by stating that "we have to go downtown." It was clear to me from the beginning of our conversation that they were operating as if they had governmental authority. They informed me that I should grab my things. They also asked if I knew why they were here and I responded to their question. This took place prior to the individuals advising me of what I now know to be my Miranda Rights.

2

7. About five to ten minutes into our conversation, the individuals identified themselves as postal inspectors and displayed their badges.

8. About ten minutes into our conversation, the postal inspectors also presented me with a piece of paper that they described as a warrant. Although they allowed me to review the document, they did not elaborate on it or otherwise explain the charges against me.

9. About five minutes later – nearly fifteen minutes after they entered my hotel room – the inspectors advised me of what I now know to be my Miranda Rights.

10. After I was advised of my Miranda Rights, the same postal inspectors continued to ask me questions for another five to ten minutes at the same table. I perceived this as simply a continuation of our prior conversation and provided some additional statements. Eventually, I advised them that I did not want to speak any further without consulting an attorney.

11. Before being removed from the hotel room by the postal inspectors, I changed into a business suit and brushed my teeth. The male postal inspector observed me during both of these activities.

12. The postal inspectors explained that I would need to be handcuffed, but that they did not think it necessary to handcuff me until we got to the police vehicle. Once downstairs and outside the hotel, they handcuffed me and put me in the police vehicle. We did not have any further conversations.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed the twelfth day of September, 2005, at New York, New York.

Gary Alan Tanaka

Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York 10017
212.999.5800

*Attorneys for Defendant*
*Gary Alan Tanaka*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | S1 05 Cr. 621 (KMK) |
| - against - | ECF CASE |
| ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA <br> Defendants. | |

**DECLARATION OF JUSTIN M. SHER**

I, Justin M. Sher, declare as follows:

1. I am an attorney for Gary Alan Tanaka, a defendant in the above-captioned action. I submit this declaration in support of Mr. Tanaka's Motion to Suppress.

2. Attached as Exhibit A to this declaration is a copy of a document, entitled the Memorandum of Interview, which the Government produced on August 3, 2005.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed the twelfth day of September 2005, at New York, New York.

_____
Justin M. Sher

EXHIBIT A

MEMORANDUM OF INTERVIEW

| | |
|---|---|
| CASE NUMBER | : |
| PERSON INTERVIEWED | : GARY TANAKA |
| PLACE OF INTERVIEW | : LOMBARDY HOTEL, 111 E. 56th ST New York, NY |
| DATE OF INTERVIEW | : 5/26/05 |
| TIME OF INTERVIEW | : 7:20 AM |
| INTERVIEWED BY | : C.M. FRATERRIGO, US POSTAL INSPECTOR K. S. ROINESTAD |

GARY TANAKA was placed under arrest in his hotel room #304 at the Lombardy Hotel, New York, New York. TANAKA was given a brief explanation of charges for his arrest. While giving him an explanation TANAKA spontaneously uttered he believed this was related to a client, LILY CATES. He mentioned that LILY CATES stated that he used her signature illegally.

He was then advised of his Miranda Rights. TANAKA agreed to cooperate with the government and he provided the following statements.

He stated that he was the Investment manager at Amerindo. Alberto VILAR was his partner. He has been in the business since 1970. Also, CATES has been a client for approximately 18 years and she granted VILLAR and TANAKA full discretion and control over her account. He recalled she invested on two occasions one investment for approximately $5 million dollars and the other investment was $1.8 million dollars. He stated CATES $5 Million dollar investment was issued to VILAR. The monies were to be used in non traded stocks. The 1.8 Million dollar investment was the initial capital investment from 18 years ago.

TANAKA stated CATES was sent quarterly statements. He also indicated that CATES withdrew $9 Million dollars in cash from her investments with him and VILAR.

The $5 Million dollar investment was part of a "SBIC scheme". TANAKA stated they were looking for matching monies from their investors.

TANAKA stated CATES has 1 or 2 shares of Rhodes Capital. He explained Rhodes Capital to be an investment with an offshore PANAMA holding company.

TANAKA stated that he had no involvement with LISA MAYER or the MAYER family. He indicated the MAYER'S were clients of VILAR.

TANAKA stated he travels from London to New York every 5 to 6 weeks.

TANAKA stated he was planning to return to London Friday.

TANAKA decided to consult with an attorney before answering further questions.

Interview concluded at 7:51 PM.


Cynthia M. Fraterrigo
U.S. Postal Inspector

5/28/05
Date