Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York  10017
Tel: 212.999.5800

*Attorneys for Defendant*
*Gary Alan Tanaka*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | S1 05 Cr. 621 (KMK) |
| - against - | ECF CASE |
| ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA | |
| Defendants. | |

## MEMORANDUM IN FURTHER SUPPORT OF MOTION TO SUPPRESS

This Memorandum is submitted in further support of defendant Gary Alan Tanaka's motion to suppress the evidence seized during the Government's May 26, 2005, search of Amerindo Investment Advisors Inc.'s ("Amerindo U.S.") offices, located at 399 Park Avenue in New York City (the "Premises").  On September 12, 2005, defendant Alberto Vilar filed a motion seeking to suppress the fruits of the Government's search, of which defendant Tanaka later joined.  On December 14, 2005, the Court ruled that defendant Tanaka had standing to

contest the search of Amerindo U.S.'s premises and then held a factual hearing relating to the search.[1]  Tr. at 3.  Based upon the evidence adduced at the hearing, Mr. Tanaka respectfully moves this Court to suppress the fruits of the search.[2]

## FACTS

Defendant Tanaka relies upon the factual recitation provided in co-defendant Vilar's post-hearing memorandum in further support of his motion to suppress.

## ARGUMENT[3]

The warrant used by the Government in support of the search of the premises of Amerindo U.S. (the "Warrant") was overly broad and permitted the seizure of all records of four large international entities, including an entity for which there was no evidence of wrongdoing in the supporting affidavit ("Affidavit").[4]  As the warrant at issue in this case was overbroad and, therefore, invalid, defendant Tanaka respectfully requests that the Court suppress the fruits of the search.

---

[1] On the evening prior to the hearing, the Government informed Mr. Tanaka that it had determined not to use any statements made by Mr. Tanaka post arrest up to the time of presentment in its case in chief at trial.  Transcript of December 14, 2005, hearing ("Tr.") at 14-15.  Based upon the Government's change of position, there was no need for a hearing on the issues relating to statements allegedly made by Mr. Tanaka.

[2] Defendant Tanaka reserves his right to contest the search of the premises of the Amerindo entity located in the United Kingdom as the Government has not yet completed discovery on the search issue to date.

[3] This memorandum is intended to supplement and/or join the various memoranda of law filed by defendants Vilar and Tanaka prior to and after the hearing.  Defendant Tanaka joins Vilar in the motions to suppress the evidence seized from the Premises, including the computer evidence and the evidence taken pursuant to the Grand Jury subpoena.

[4] The affidavit incorporates the criminal complaints filed against defendants Tanaka and Vilar (hereinafter "Complaint" and "Vilar Complaint," respectively).

**A.      The Warrant Is Overly Broad**

The warrant, by its terms, is an overly broad, general warrant that calls for the seizure of every kind of corporate record that relates to at least four different entities: Amerindo U.S., Amerindo Investment Advisors (Cayman) Limited ("Amerindo Cayman"), Amerindo Investment Advisors (U.K.) Limited ("Amerindo U.K."), and Amerindo Investment Advisors (Panama), Inc. ("Amerindo Panama").  <u>See</u> Warrant at ¶¶ 1, 17, 14.  According to the Government, "Amerindo Panama was the investment advisor to an off-shore investment fund, Amerindo U.K. managed portfolios of merging growth stocks for U.K. based clients, and its London office served as the location where certain administrative functions related to Amerindo Panama were performed, including meeting with and corresponding with investors, preparing client account statements, processing investor redemption requests, and directing the trading and financial transactions involving Amerindo Panama investor funds."  Government's brief in opposition to motion to suppress ("Gov't br.") at 3.  While generally not discerning between the entities, the Complaint notes that Amerindo recently had approximately $1.2 Billion assets under management. Complaint at ¶ 6.

On its face, the warrant permits the search and seizure of evidence relating to the four separate Amerindo entities as well as all of the clients and employees of the four entities.  The employees are not identified in the Affidavit or the Warrant and only two clients are identified as well.  Moreover, the broad Warrant permits the seizure of evidence relating to "participants" of

"fraud schemes" of which the Warrant neither identifies the participants nor the fraud schemes.[5]
Aff. at 2; <u>see</u> Warrant at ¶ 16.  The Warrant clearly is overly broad.

### 1.      Paragraph 1 of the Attachment to the Warrant is Overbroad

The first paragraph of the attachment to the Warrant is overbroad and evidence seized
thereto should be suppressed.  Paragraph 1, by its terms, permits inspectors to seize the business
records of the four Amerindo entities.  The paragraph provides examples of certain types of
documents that are covered by the paragraph.  The examples are not preceded by a limitation, but
rather the preamble to the examples specifically states that the search items are "not limited to. .
." the examples.  Warrant at 1.

"A failure to describe the items to be seized with as much particularity as the
circumstances reasonably allow offends the Fourth Amendment because there is no assurance
that the permitted invasion of a suspect's privacy and property are no more than absolutely
necessary."  <u>United States v. George</u>, 975 F.2d 72, 76 (2d Cir. 1992).  The Supreme Court has
stated that the particularity requirement "makes general searches . . . impossible and prevents the
seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left
to the discretion of the officer executing the warrant."  <u>Marron v. United States</u>, 275 U.S. 192,
196 (1927).  While the language from the <u>Marron</u> case has not been applied in such a literal

---

[5] While the caption to the Warrant refers to the Premises as the "Offices of Amerindo Investment
Advisors Inc.," there is no such limitation in the text of the Warrant or the Affidavit.  The Affidavit
actually describes the Premises as the offices of the four Amerindo entities.  Conversely, the caption to
the attachment to the Warrant actually refers to the premises as the offices of "Amerindo Investment
Management Inc.," a fifth entity.  There is no mention in the text of the Warrant or Affidavit of Amerindo
Investment Management Inc., nor any substantive reference to Amerindo Cayman in these documents as
well.

manner, courts will permit some discretion to be exercised.  United States v. Buck, 813 F.2d 588, 590 (2d Cir. 1987).  "Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant."  Id. (citation omitted).  As discussed infra, as the Government failed to produce any evidence relating to the investigation or the level of its knowledge at the time it obtained the warrant, the Government is without the benefit of a more lenient view of the Warrant.

That paragraph 1 is overbroad was confirmed by the Government's only witness to testify.  U.S. Postal Inspector John Feiter testified that paragraph 1 does not provide a "total limitation" to the items searched.  Indeed, Inspector Feiter interpreted the paragraph as permitting the seizure of any items listed and "anything that is related to" the items as well.  Tr. at 161.  When pressed further by the Court, Inspector Feiter noted that as long as a document had "writing on it," it "would go."  Tr. at 162.  Inspector Feiter viewed the warrant as authorizing the seizure of any document containing letterhead of any one of the four entities, even business cards.  Tr. at 113, 136, 162.

Tellingly, and perhaps indicative of its awareness of the overbreadth of its own warrant, the Government now attempts to walk away from the text of paragraph 1 in its brief.  In relation to paragraph 1 of the Warrant, the Government claims that "Read in context of the Warrant, and the Warrant Affidavit, it is clear that [paragraph 1] sought to authorize the seizure of a limited category of documents concerning who controlled the Amerindo entities, the structure and ownership of the companies, and the promises made to clients through marketing materials, investment adviser agreements and correspondence."  Gov't br. at 31.  If paragraph 1 of the

Warrant was supposed to be clearly limited in application, that "clear limitation" was lost on the supervising U.S. Postal Inspector present at the search warrant execution who testified at the hearing. At a minimum, Inspector Feiter's reading undercuts the Government's view of its own warrant.

Paragraph 1 of the Warrant is precisely the type of provision that is prohibited because it bears no relation to the probable cause established in the Warrant. This paragraph, by the Government witness's own admission, permitted the carting off of all business records of all four Amerindo entities. The problem is that, as discussed infra, the Affidavit in no way supports the view that all of the entities were enveloped by fraud, not to mention one of them. The problem at bar is that the Warrant allowed for the entire Premises to be searched, Tr. at 97, with one of the supervisors recognizing that all printed records could be seized. The only limitation that the witness could identify was not to take some personal items. Tr. at 105.

In United States v. Lafayette Academy, 610 F.2d 1, 3 (1st Cir. 1979), the warrant there permitted the seizure of almost every sort of book or paper at the described premises. The records to be seized were not limited to the crime at issue, but rather crimes generally. The court there found the warrant to be unconstitutionally broad as it "purport[ed] to authorize not just a search and seizure of [evidence of the specific crime] as the government contends but a general rummaging for evidence of any type of federal conspiracy or fraud." United States v. Lafayette Academy, 610 F.2d at 3; see United States v. George, 975 F.2d 72, 76 (2d Cir. 1992); United States v. Maxwell, 920 F.2d 1028, 1032 (D.C. Cir. 1990) (overbroad warrant authorized seizure of appellant's business records).

In <u>Klitzman v. Krut</u>, 744 F.2d 955, 960 (3rd Cir. 1984), the court found that a warrant authorizing postal inspectors to search all client files was impermissible.  The warrants allowed the seizure of all of the firm's financial records, file lists, and appointment books, regardless of whether those documents were connected to the Grand Jury's investigation.  "In effect, the warrants authorized virtually a wholesale search and seizure of the business records of the firm." <u>Klitzman v. Krut</u>, 744 F.2d at 960.

In the case at bar, the evidence at the hearing confirmed that paragraph 1 similarly justifies the seizure of all of the corporate records of not one, but four companies.  Moreover, nothing in the text of the remainder of the Warrant further limits the scope of the overly broad grant of authority.  Compounding the problem is that, as discussed more fully below, because the Warrant fails to incorporate the Affidavit, and other protections are not assured, the broad provisions of paragraph 1 of the Warrant cannot be cured by the Affidavit.  <u>See</u> discussion <u>infra</u>. Accordingly, the provisions of paragraph 1 are overbroad and evidence seized pursuant to it should be suppressed.

It is not necessary to discuss whether the Affidavit limits paragraph 1 of the Warrant. The Government's own witness, who reviewed the Warrant and Affidavit, believed that paragraph 1 of the Warrant justified seizing all corporate records from bills to business cards. Moreover, to demonstrate just how broad the Warrant and Affidavit are, as a combination or taken separately, the Warrant authorized the seizure of evidence relating to an entity for which there was no substantive evidence alleged in the Affidavit – Amerindo Cayman.  Accordingly, the evidence seized pursuant to paragraph 1 should be suppressed.

### 2.     Paragraph 16 of the Attachment to the Warrant is Overbroad

The first paragraph 16 of the Warrant (hereinafter referred to as "paragraph 16") also is overbroad and the fruits of the search pursuant thereto should be suppressed.  Paragraph 16 involves a form of a catch-all phrase.  That paragraph permits the seizure of "Photographs, address books, Rolodex indices, diaries, calendars, identification documents, travel documents, *and other documents concerning or reflecting information concerning the identities of participants in the fraud schemes."*  Warrant at ¶ 16 (emphasis added).  The Warrant does not identify the *participants* or describe the *fraud schemes.*  Nor does the Warrant refer to the Affidavit for clarification.  Indeed, the only paragraphs that reference defendants Vilar and Tanaka are in paragraphs 9, 11, and 14, of which all three are innocuous references.  Id. at 9, 11, 14.  Inspectors executing the Warrant were simply left to their unfettered discretion, when using the Warrant only, as to the identification of the participants of the fraud schemes and what crimes were committed.[6]  See Warrant at ¶¶ 9, 11; Tr. at 105 (Feiter believed that personal items should not be seized but he was unsure what to do with photographs).

In United States v. George, 975 F.2d at 75, the Second Circuit found a warrant that permitted authorities to search for "any other evidence relating to the commission of a crime" to constitute an impermissible general warrant.  In George, the warrant included a long laundry list of items that could be seized pursuant to the warrant and concluded with the above general search command.  The court found that the warrant "effectively granted the executing officers'

---

[6] While Inspector Feiter noted that he read the reference to "participants" in the Warrant to refer to defendants Vilar and Tanaka, the Warrant actually only identifies Vilar and Tanaka as at least two of the principals of the four Amerindo entities.  Warrant at ¶ 9.

'virtually unfettered discretion to seize anything they [saw].'" Id. (citations omitted).  The court

noted that reference to evidence of a violation of criminal activity provides no readily

ascertainable guidelines for the executing officers as to what items to seize.  "As a consequence,

authorization to search for 'evidence of *a* crime,' that is to say, any crime, is so broad as to

constitute a general warrant."  Id. at 76.

As in George, nothing on the face of the warrant informed the searching officers for what

crime the search was being undertaken.  Predictably, as the Government did in George, the

Government here attempts to "blunt" the implications of this indiscriminate Warrant by arguing

that it should be read "in context" of the Affidavit.  The Government, however, is not entitled to

such an accommodation as no evidence has been presented to justify providing the Government

with such a saving contrivance.  See id. (noting that courts can look to the circumstances of

obtaining the warrant and the Government's then ability to clarify the nature of the crimes when

determining if the scope of the warrant is permissible).

Furthermore, just as the Court held in George, consideration of the search warrant

affidavit as a limitation on the scope of the warrant is not permissible in this case.  "Resort to an

affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by

reference in the warrant itself and attached to it."  George, 975 F.2d at 76.  "The recitation in the

instant warrant that it is 'issued upon the basis of an application and affidavit[] of' [the patrolman

did] not direct the executing officers to refer to the affidavit for guidance concerning the scope of

the search and hence does not amount to incorporation by reference."  Id. at 76;  United States v.

Maxwell, 920 F.2d 1028, 1032 (D.C. Cir. 1990) ("something more is required than a boilerplate

statement that the affidavit . . . presented to the magistrate constitute[s] probable cause for

issuing the warrant.");  United States v. Lafayette Academy, 610 F.2d 1, 4 (1st Cir. 1979) (warrant

did not use suitable words incorporating affidavit and affidavit was not served with the warrant, as such, it constitutes an impermissible grant of authority).  The Warrant here does not incorporate the search warrant Affidavit and, therefore, the Affidavit cannot save the Warrant. United States v. Lafayette Academy, 610 F.2d at 7 (Kunzig, J., concurring) ("too many errors (such as failure to incorporate the affidavit in the warrant)" prevent a narrower interpretation of the Fourth Amendment to save warrant).[7]

While the Second Circuit has relaxed the incorporation and attachment requirements to the warrant, a warrant lacking particularity can be saved if "the involved parties were aware of the scope of and limitations on the search."  United States v. Bianco, 998 F.2d 1112, 1116-17 (2d Cir. 1993).  In Bianco, the court upheld the search based upon an overly broad warrant because the circumstances indicated that the searching officers were aware of the scope of and limitations on their search.  United States v. Bianco, 998 F.2d at 1116-17 (citing United States v. Wuagneux, 683 F.2d 1343, 1351 n.6 (11th Cir. 1982) (use of underlying affidavit permissible even where not attached to warrant, where searchers were adequately informed of limitations on search)).  In Bianco, the Court identified as important the fact that it was clear that both the federal agents and the defendant were apprised of the scope of and limitations on the search.  In Bianco, the affidavit was present at the time of the search, and clearly spelled out the nature and purpose of the search.  The court also recognized that the presence and activity of an agent who had read the affidavit and was aware that he was looking for the crime of loansharking helped satisfy the court that the limitations included in the affidavit were observed.  Finally, that agent approved each seizure.  Bianco, 998 F.2d at 1117.

---

[7] See United States v. Rollack, 90 F. Supp.2d 263, 273-74 (S.D.N.Y. 1999) (warrant that failed to incorporate affidavit and did not specify nature of the crimes investigated was overly broad).

10

The facts of the instance case fall well short of providing the protections in <u>Bianco</u>.  First, while in <u>Bianco</u> it was "quite clear" that the subject of the warrant was apprised of the contents of the affidavit, there is no evidence in the record that the Affidavit was attached to the Warrant. Indeed, there is no suggestion that representatives of any of the Amerindo entities were provided with a copy of the Affidavit at the time of the search.[8]  Moreover, Inspector Feiter testified that many of the inspectors searching had not seen the criminal complaints that were specifically incorporated into the Affidavit.  Second, even taking the Warrant, Affidavit and criminal complaints together, they could hardly be described as spelling out "quite clearly the nature and purpose of the proposed search."  <u>See</u> <u>Bianco</u>, 998 F.2d at 1117.  Indeed, the documents were presumably so unclear that Magistrate Judge Maas needed the Government to explain the inferences to be drawn from the Tanaka complaint.  The Government revealed for the first time at the hearing that Judge Maas asked questions "with respect to the Tanaka complaint" and had the Government "walk[] through the chain of inferences that it was investor funds, that there was probable cause to believe that investor funds were being used to purchase the horses."  Tr. at 187.  Judge Maas was left to ask whether "essentially this is a chain of inferences you are drawing, correct?"  Tr. at 187.[9]

Third, defendant Tanaka submits that the Court should draw no inference from the presence and activity of Inspectors Feiter or Fraterrigo.  Inspector Feiter testified that he had no

---

[8] While defendant Tanaka has reason to believe that the Government failed to leave a copy of the Affidavit, there is no evidence in the record to support the view that one was left behind.

[9] The defendants were not permitted to call Inspector Fraterrigo to provide evidence regarding the information supplied to Judge Maas.  Despite the lack of evidence in the record regarding the Government's colloquy with the Magistrate Judge, the defendant respectfully requests that the Court take notice of the Magistrate Judge's difficulty with the Affidavit.

recollection of (1) what he told inspectors performing the search, Tr. at 94, 136,[10] (2) who were

the suspects of the alleged scheme, Tr. at 138, (3) what inspectors were told about the identity of

"victims" of the alleged scheme, Tr. at 94, 139-40 (recognizing names that "might" have been

identified as victims), (4) what he was told by Ms. Fraterrigo when she briefed *him* about the

investigation prior to the search, Tr. at 138, (5) what Ms. Fraterrigo told inspectors in her

briefing prior to the search, Tr. at 130, 138, (6) what questions were posed to Inspector Feiter

during the search and how he answered them, Tr. at 119, (7) what questions were posed to Ms.

Fraterrigo and how she answered them, Tr. at 130, 155-56, and (8) what documents the

Inspectors had in their possession during the search, Tr. at 135.  Finally, rather than approve each

seizure as in Bianco, Inspector Feiter walked through the Premises, answered questions based on

only a partial reading of the Affidavit, and did not review each document seized but rather

inventoried the amounts of documents seized.  Tr. at 81-82, 115.

As for Inspector Fraterrigo, as the Government decided not to provide her evidence at the

hearing and defendants were prohibited from doing so.  Accordingly, defendant Tanaka asserts

that any inferences drawn from her presence at or conduct during the execution of the Warrant is

inappropriate.  It is unfair to draw such inferences while at the same time prohibiting the

defendants from testing them.  In Bianco, the court recognized as important the fact that based

upon the documents and testimony, "the agents *knew* what they were looking for, and that in

executing the search they took only that which they needed and which was contemplated by the

authorizing papers."  Bianco, 998 F.2d at 1117 (emphasis added).  There is no evidence as to

---

[10] While Inspector Freiter testified that the agents were directed to review both the warrant and affidavit, Tr. at 100, he later admitted that he had no recollection of what the inspectors were told.  Tr. at 130, 136, 138.

what the Inspectors knew and what they were told by their team leaders.  What is known is that

only four of the nineteen Inspectors even had a complete version of the Affidavit.  Tr. at 160,

165.  Moreover, as discussed in the brief submitted by defendant Vilar, the Government took

documents that went far beyond what was contemplated by any probable cause assertion in the

Affidavit and complaints.  In conclusion, there is no evidence that the "involved parties were

aware of the scope of and limitations on the search" and, therefore, there is no basis to deviate

from the dictates of the incorporation and attachment rules.

Even assuming <u>arguendo</u> that the Warrant incorporated the Affidavit, the Affidavit here

did not narrow the scope of paragraph 16 of the Warrant.  Indeed, paragraph 3 of the Affidavit

notes that "there is probable cause to believe that certain individuals, including the principals *and*

*other employees of [the four Amerindo companies],* including Alberto William Vilar, a/k/a

Albert Vilar, and Gary Alan Tanaka, have been engaged in a fraudulent scheme . . . Aff. at 3

(emphasis added).  Taken together with the Warrant, a Postal Inspector in possession of the

Warrant and Affidavit could seize any document concerning or reflecting information

concerning the identities of any employee of any of the four Amerindo entities, including

Amerindo Cayman for which no allegations even exist.  No comfort can be drawn from the

presence of the case agent at the search location as the only witness to testify to this issue had no

recollection of what the case agent told Inspectors at the pre-search briefing or individually.  Tr.

at 130.[11]

---

[11] Notably, there is no evidence demonstrating that the Inspectors who carried out the search were
briefed at the same time as those carrying out the arrests.  Tr. at 130.  Moreover, even though Inspector
Feiter testified that the four Inspectors who carried out the arrests also participated in the search, there is
no record of whether those inspectors shared information with the other fifteen Inspectors who carried out
the search, including the substance of the criminal complaints.

The fact that the Affidavit did not limit the application of the Warrant regarding the "participants" of the crimes charged, or the identity of the crimes themselves was confirmed by the testimony of Inspector Feiter.  Inspector Feiter conceded that the combination of the Warrant and the Affidavit could lead an Inspector executing the search warrant to seize evidence concerning any employee of any of the four Amerindo entities.[12]  Consider the following colloquy:

> Q.    Do you agree with me, Inspector, that were one to read [paragraph 3 of the Affidavit] it certainly leaves open the possibility that there are other participants in the scheme other than Mr. Vilar and Mr. Tanaka?
>
> A.    Yes.
>
>        .  .  .
>
> Q.    And it is also your testimony that those inspectors were expected to read the warrant, read the affidavit, and to exercise judgment as to whether or not certain documents actually were covered by or called for by the warrant and the affidavit, correct.
>
> A.    Correct.
>
> Q.    So whether or not an inspector from reading paragraph 3 viewed the word participants broader than you view it, you have no basis for that knowledge, isn't that correct?
>
> A.    No.
>
> Q.    As you sit here today you have no basis for saying what other people viewed it as, correct?
>
> A.    Correct.
>
> Q.    All that you can say is that from reading paragraph 3 it's possible they could have had a view of participants that is broader than yours, fair to say?
>
> A.    Yes.

Tr. at 132-33.

---

[12] Inspector Feiter testified that he assumed that Vilar and Tanaka were "participants" in the fraud because their names were mentioned in the Warrant.  Tr. at 131.

This testimony provides another example of how the Government's view of the Warrant in its brief in opposition to the motion does not comport with its own evidence. In its brief, regarding paragraph 16, the Government argues that "In context, however, the agents were authorized to seize the listed items belonging to, or reflecting the activities of, Vilar and Tanaka, who were clearly identified in the Warrant Affidavit as the key participants in the fraud scheme." Gov't br. at 31-32. The Government somehow sees this language as limiting the collection of evidence to just Vilar and Tanaka. As recognized by Inspector Feiter, that simply is not the case. The Affidavit actually expands the list of possible participants to all employees of all four Amerindo entities. Indeed, presumably as a hedge to save the Warrant, the Government has offered that "[t]o the extent that the Government seized documents on the basis of this paragraph alone that neither belonged to, nor reflected activities of, Vilar or Tanaka, the Government is prepared to return those documents to Amerindo." Gov't br. at 32. While laudable, the Government to date has not separated and returned evidence improperly seized pursuant to this impermissibly broad paragraph of the Warrant. Indeed, as repeatedly complained of by defendants, the Government's wholesale gathering of documents without separating those for which it is entitled has placed an incredible burden upon the defense to perform conflict reviews, review evidence and to prepare its defense while ensuring the defendants' right to a speedy trial.

Similar to the problem regarding "participants," the Warrant provides no definition of what is meant by "fraud schemes." See United States v. Lafayette Academy, 610 F.2d at 3 ("Here, at a minimum, the precise nature of the fraud and conspiracy offenses for evidence of which the search was authorized fraud and conspiracy . .. needed to be stated in order to delimit the broad categories of documentary material and thus to meet the particularity requirement."). Moreover, even assuming it is permissible to consider the Affidavit, the Affidavit did not

sufficiently narrow or identify the fraud schemes. First, understanding the scope of the schemes alleged required a reading of the incorporated criminal complaints. See Aff. at ¶ 6. Indeed, Inspector Feiter, who was one of the supervisors of the search, was not provided with the complaints prior to searching the premises and, therefore, did not even read the complaints. Tr. at 123, 128. To compound the problem, most of the Inspectors carrying out the search also were not provided with the complaints. Tr. at 128.[13]  On this point, Inspector Feiter testified that to the extent that the two complaints described aspects of the scheme that were not described in the Affidavit, the inspectors reading the Affidavit would not have understood them.[14]  Tr. at 129. Inspector Feiter admitted that,

> Q.    So would you agree that as it refers to the definition or how one might interpret the word [sic] fraud schemes, it's fair to say that individual postal inspectors might have had different views as to what the actual fraud schemes were, correct?
>
> A.    Correct.

Tr. at 135. It also is important to note that Inspector Feiter could not have briefed the other

Postal Inspectors as to the contents of the complaints as he had not seen the complaints prior to

---

[13] Although Inspector Feiter later claimed that inspectors who carried out the arrests arrived with copies of the complaints, he admitted that he actually could not recall if they in fact had copies. Tr. at 135. Even if said inspectors possessed a copy of the criminal complaints, only 4 of 19 would have been in possession of them during the search. Tr. at 160, 165. As the Inspectors were spread throughout the offices, there is no support or evidence that the complaints were shared by Inspector Fraterrigo or other Inspectors.

[14] Inspector Feiter indicated that agents could have fully appreciated the scheme from reading the Affidavit and speaking with the case agent. Inspector Feiter testified that the inspectors did not need to read the complaints to comprehend the nature of the schemes "[b]ecause if you continue on and read the rest of this affidavit along with the rider, and knowing that you have a case agent there to answer any questions. I think you have a pretty sound basis [for understanding the nature of the criminal schemes.]" Tr. at 129. Accordingly, as the Government declined to call the case agent to explain what she told Inspectors and the defendants were prohibited from doing so, defendant Tanaka respectfully argues again that consideration of what the case agent told the inspectors is completely inappropriate. In the alternative, the defendants should be permitted to call the case agent.

or at the briefing and there is no evidence establishing what Inspector Fraterrigo possessed at the time of the briefing or what she specifically told the Inspectors at anytime.  Tr. at 130.

Finally, as for the nature and confines of the scheme described in the Tanaka complaint, as noted earlier, those allegations are so abstract that even Magistrate Judge Maas needed the Government to provide an off-the-record explanation of the inferences to understand the scheme allegedly carried out by defendant Tanaka.  If Judge Maas had trouble, Inspectors carrying out the search certainly could not be counted upon to grasp the allegations in the Tanaka complaint as a means of limiting the search authorization.[15]

### 3.    Paragraphs 14 and 17 of the Attachment to the Warrant is Overbroad

Paragraphs 14 and 17 provide similarly impermissible broad grants of authority for the Government to seize evidence.  Specifically, those two paragraphs permit the Government to take, among other things, "documents relating to" and  "prepared in connection with" the "running and supervision of the operations of the investment advisory business"(es) of Amerindo.  Warrant at ¶¶ 14, 17.   By the Government's admission, Amerindo was in the

---

[15] In Andresen v. Maryland, 427 U.S. 463, 480-81 (1976), the Court was able to limit the scope of the catch-all phrase in the text of the Warrant as the phrase specifically referred to one particular crime. Andresen v. Maryland involved a fraud investigation concerning the sale of a certain parcel of real estate. The warrant authorized a search for items pertaining that that parcel, listed several categories and types of evidence separated by semicolons, and concluded with the phrase "together with other fruits, instrumentalities and evidence of crime [which is unknown at this time]."  Id.  The Supreme Court held that the last catch-all phrase did not convert the warrant into a general warrant as the phrase "pertaining to [the parcel]" was followed by a colon and the clauses that followed were separated by semicolons so they were appropriately limited.  Id. at 480-82.  Here, the Warrant at issue does permit such a limitation. Among other things, paragraph 16 seeks photographs, "identification documents," and "other documents concerning or reflecting information concerning the identities of participants in the fraud schemes." Warrant at ¶ 16.  Not only is paragraph 16 not limited as in Andresen, but rather the entire warrant does not disclose a crime that was committed – either directly or by reference.

business of providing investment advisory services and, therefore, these paragraphs provide a further overly broad general grant of authority to seize all the corporate records of the four Amerindo entities.  See Complaint and Vilar Complaint, ¶¶ 4.

In an effort to save paragraph 17, the Government argues that the language at the end of the paragraph was meant to apply only to electronically stored drafts of the documents found in the files, not just final versions that were reduced to paper and stored in physical files.  The Government asserts that it was unreasonable to interpret paragraph 17 as expanding every preceding specification.  Gov't br. at 32.  The problem with the Government's analysis is that, first, it is contrary to the plain meaning of the provision, and second, the Warrant begins with a general grant of authority to seize all corporate documents of the four Amerindo entities and ends with another broad provision.   This general grant is repeated, in one form or another in paragraphs 1, 14, 16 and 17.  Interpreting the Warrant to support a broad reading is consistent with its clear text.  There is no basis to limit these provisions as there is no support in the record to undercut the Inspectors' interpretation of them in a manner that was consistent with their plain meaning.

In any case, based upon how Inspector Feiter's testimony differed from the Government's tortured interpretations of other provisions of the Warrant, the Government's view here of how the Warrant should be interpreted is dubious.  Indeed, the most reliable test is to look at what the provisions say and what the Inspectors did.[16]  In doing so, paragraphs 1, 14, 16 and 17 provide blanket broad grants of authority to the Postal Inspectors that, as evidenced by

---

[16] Vilar's memorandum provides numerous examples of evidence seized beyond the scope of any probable cause established in the Affidavit.  The fact that the Government left behind documents does not create an irrebuttable presumption that the Warrant was sufficiently tailored.

Inspector Freiter's reading, permitted the taking of all of Amerindo's business records. The scope of such a seizure was not supported by the probable cause showing in the Affidavit. As a result, the Warrant was impermissibly broad and the evidence seized thereto should be suppressed.

Defendant Tanaka, therefore, respectfully requests that the evidence seized pursuant to the overly broad search warrant be suppressed.

**B.    The All-Records Exception to Overbreadth**

The Government argues that the Court should not find that the Warrant was overbroad as Amerindo was "permeated by fraud" and, therefore, the Government was justified in seizing all of its business records. Gov't br. at 25. Returning to its consistent theme, the Government again asserts that the fraud uncovered as described in the Affidavit was "just the tip of the iceberg." Id. Under this exception to the particularity requirement, when there is probable cause to believe that a business is pervaded with fraud, seizure of all records is appropriate and thus a broad warrant passes constitutional scrutiny.

The Government's argument here is baseless. The allegations in the Affidavit do not even approach the standard necessary to show that Amerindo, however it is defined, was permeated by fraud. Indeed, perhaps most revealing, the Government did not argue in the Affidavit or Warrant that it sought all of the records of the four Amerindo entities because the companies constituted a pervasively fraudulent enterprise. United States v. Maxwell, 920 F.2d at 1033 (affidavit "made no assertions concerning the nature or extent of appellant's business dealings as a whole"); National City Trading Corp. v. United States, 635 F.2d 1020, 1024-26 (2d Cir. 1980). Indeed, in its opposition brief, far from seeking a broad grant of authority to take all

records of the fraudulent enterprise, the Government takes pains to try to limit the scope of the provisions of the Warrant to certain business records.

When reviewing whether a business was so permeated by fraud, courts look to such factors as whether there was a large number of fraudulent transactions alleged or whether the allegedly fraudulent operations were inseparable from the other business operations. See United States v. Burke, 718 F. Supp. 1130, 1141 (S.D.N.Y. 1989). Here, the substantive allegations in the Affidavit relate only to two victims, Lisa Mayer and Lily Cates. Ms. Mayer, a prior girlfriend of defendant Vilar, claims to have had difficulty getting her family's $12 Million released in a timely manner from their Amerindo investments. Affidavit at ¶ 6A. Ms. Cates asserts that she also had trouble obtaining her $5 Million from Amerindo. Affidavit at ¶¶ 6B, 6F, Vilar Complaint at ¶ 8. The Affidavit and the criminal complaints do not refer to any other victims who allegedly lost money. Indeed, the documents do not claim that any other clients of the Amerindo entities had complained to the Government regarding problems with Amerindo despite the easily obtainable identity of accountholders.

Further, the Tanaka criminal complaint suggests that he misappropriated $4 Million for personal gain to purchase horses.[17] Complaint at ¶¶ 15a, b, c, d, e. Even applying a generous reading of the Affidavit and criminal complaints, the specific obtainable loss figure amounts to $36 Million, which relates to Mayer, Cates and Tanaka. Conversely, the criminal complaints informed the Magistrate Judge that Amerindo had approximately $1.2 billion in assets under

---

[17] The Tanaka criminal complaint also claims that $15 Million was transferred to fund "seemingly legitimate business expenses" of Amerindo U.S. Moreover, the Complaint alleges "tens of millions of dollars of redemptions by what appears to be a private trust corporation located in Nassau, Bahamas." The Complaint does not identify a single victim or individual against whom the transfer allegedly victimized. Complaint at ¶¶ 13, 14.

management.  Complaint at ¶ 6, Vilar Complaint at ¶ 6.  In addition, as described in the Vilar

Complaint, one or more of the Amerindo entities served as the investment advisor to the

Amerindo mutual fund which currently had $99 Million in assets.

Moreover, the number of victim-clients addressed by the allegations in the Affidavit and

criminal complaints pales in comparison to the number of clients of the Amerindo entities.  Only

two "victims" were referred in the Affidavit and the Vilar Complaint and no victims were

specifically identified in the Tanaka criminal complaint.  Conversely, the Tanaka criminal

complaint refers to Amerindo having "institutional clients" and "high net worth individuals"

serviced by the defendants.  Moreover, Tanaka is identified as one of "three private equity

professionals at Amerindo."  Complaint at ¶ 4.  While the Government failed to proffer evidence

in its submissions regarding the specific number of customers of the Amerindo entities, it

certainly is the only reasonable inference that the Amerindo entities had many more clients than

the two listed in the Affidavit.  Simply, the Government's argument here that, according to the

Affidavit and the complaints, the four Amerindo entities are so pervaded by fraud is absurd.  The

Warrant was overbroad and the fruits of the search therefrom should be suppressed.  See United

States v. Burke, 718 F. Supp. at 1141; United States v. Brien, 617 F.2d 299, 309 (1st Cir. 1980)

(affidavit stated that government had received 250 complaints and had interviewed 20 former

employees); National City Trading Corp., 635 F.2d at 1021-22 (affidavit listed 40 complaints);

United States Postal Service v. C.E.C. Servs., 1988 WL 81766 (W.D.N.Y. August 3, 1988)

(affidavits alleged that all or most of company's activities were illegal); see also United States v.

Oloyede, 982 F.2d 133 (4th Cir. 1992) (review of 26 files disclosed that each file contained

fraudulent documents).

**C.      The Good Faith Exception**

The Government argues that even if the Court finds the Warrant to be overbroad, the fruits of the search should not be suppressed because the agents acted in objective, good faith reliance upon the Warrant.  The Government notes that the exclusionary rule does not apply where evidence is obtained in reasonable reliance on a subsequently invalidated warrant.  United States v. Leon, 468 U.S. 897, 922 (1984).  The test applied in determining whether to suppress evidence obtained as result of executing a warrant is, "whether a reasonably well-trained officer would have known that the search was illegal despite the [judicial officer's] authorization." United States v. Leon, 468 U.S. at 922 n.23.  The burden is on the Government to establish good faith.  United States v. Maggitt, 778 F.2d 1029, 1034 (5th Cir. 1985).

Under Leon, there are only four situations in which evidence seized in objective good faith pursuant to a defective search warrant will be suppressed: (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" (3) where the issuing magistrate "abandoned his detached and neutral role;" and (4) where, "depending on the circumstances of the particular case, a warrant may be so facially deficient- *i.e.,* in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid."  468 U.S. at 923.

The Government failed to establish that the second and fourth items above were satisfied to overcome the remedy of exclusion.

### 1.     Facial deficiency that fails to particularize things to be seized.

There are a few reasons why it was unreasonable for the postal inspectors here to rely upon the face of the Warrant.  First, as noted above, paragraph 1 of the Warrant provides no limitation on the corporate records to be searched.  That is, as Inspector Feiter testified, the Warrant permitted Government agents to seize essentially every document containing corporate letterhead, from bills to business cards.  The only thing apparently safe from Inspector Feiter's grasp was personal records and papers with no printing on them.  Tr. at 162.  Moreover, the Warrant permitted the search of corporate records of four separate entities from the United States to Panama, to Cayman, to London.   Indeed, the Warrant permitted the seizure of evidence from Amerindo Cayman for which there was no discussion in the Affidavit.[18]  Paragraphs 14 and 17 are similarly inappropriately broad.

During the hearing, Inspector Feiter confirmed that the face of the Warrant justified taking every business document that had ink on the page.  A well-trained officer should have known that such a wholesale grant of authority, that is, to cart off every document in the location, was not permissible.  Further, in light of the circumstances here, that is, that the executing Inspectors did not all have the underlying Affidavit, a reasonable officer should have known that such a wholesale grant of authority would be limitless.

Second, in paragraph 16, the Warrant permitted the seizure of documents concerning the identities of participants in fraud schemes, but failed to limit the meaning of the term "participants" or "fraud schemes."  Warrant at ¶ 16.  Reliance on this provision was

---

[18] A similar argument applies to paragraphs 14 and 17 of the Warrant.

unreasonable, as the provision provided absolutely no basis to particularize the evidence to be seized. Indeed, the Warrant does not identify *any* "fraud schemes" alleged. Significantly, the Warrant does not incorporate the Search Warrant Affidavit, and thereby, leaves the reader completely devoid of the ability to determine the nature and scope of the allegations. See Leon, 468 U.S. at 923; United States v. Buck, 813 F.2d 588, 593 n.2 (2d Cir. 1987) (good faith not apply when warrants only contain a catchall description of the property to be seized).

A reasonable well-trained officer should have known that the Warrant was invalid from its face after reading paragraph 16. Inspector Feiter admitted that he needed to turn to the Affidavit to understand what criminal schemes were being referenced. However, by not incorporating the Affidavit, such a reading was not mandatory. Indeed, as the Warrant here failed to direct the Inspectors to read the Affidavit, many of them, including Inspector Feiter, failed to do so (as incorporating the complaints). It is plain from the testimony that Inspector Feiter could not have known the scope of the "fraudulent schemes" because he did not read the underlying documents. Indeed, Inspector Feiter admitted that different Inspectors could have had different understandings of the schemes charged. Accordingly, in considering the "circumstances of the particular case," Leon, 468 U.S. at 923, the facial deficiency in the Warrant is fatal. See George, 975 F.2d at 77 ("it is obvious that a general warrant authorizing the seizure of 'evidence' without mentioning a particular crime or criminal activity to which the evidence must relate is void under the Fourth Amendment.")

Even if the Court were to consider the Affidavit, the Affidavit also fails to provide a sufficient limit of what is meant by the term "participants" of the fraud schemes. As noted above, the Affidavit actually permits the seizure of documents relating to employees of all 4

24

Amerindo entities spanning four countries.  See George, 975 F.2d at 77.  Moreover, the

Affidavit is at best unclear as to the nature of the allegations against Mr. Tanaka.

Regardless, considering the circumstances of the instant case, relying upon the Affidavit

to limit the Warrant is a fiction.  The evidence suggests that at most, four of nineteen Inspectors

were provided with the entire Affidavit.  For most, the critical piece of the Affidavits were

missing, that is, the complaints that described the schemes to defraud.  Indeed, without the

complaints, there essentially is no evidence regarding defendant Tanaka's alleged criminal

conduct and little regarding Vilar's.   Accordingly, a reasonable officer should not have relied

upon the face of the Warrant and the evidence seized thereto should be suppressed.

> **2.     The warrant was based on an affidavit so lacking in indicia of
> probable cause as to render official belief in its existence entirely
> unreasonable**

The Affidavit in the instant case is so lacking in probable cause in a number of areas so as

to render any reliance upon it unreasonable.  Specifically, the Affidavit fails to establish probable

cause for the seizure of evidence relating to Amerindo Cayman and evidence relating to alleged

victims Harvey, Urich and Marcus.

The Affidavit fails to include any substantive allegations relating to Amerindo Cayman.

Indeed, paragraphs 3 of the Affidavit, and the Tanaka and Vilar Complaints explain that

Amerindo Cayman is subsumed in future references of "Amerindo".  Affidavit at ¶ 3, Complaint

at ¶ 3, Vilar Complaint at ¶ 3.   Thereafter, the Affidavit and Complaints never mention

Amerindo Cayman again.  The three paragraph 3's establish merely that defendants were

shareholders, directors and officers of Amerindo Cayman.  Paragraph 3 of the Affidavit then

concludes that "As set forth below," there is probable cause to believe that certain individuals,

including the principals and other employees of Amerindo U.S., Amerindo Cayman, Amerindo U.K. and Amerindo Panama, including the defendants, have been engaged in a fraudulent scheme. Notably, nothing "set forth below" refers to Amerindo Cayman.

The Government in its brief all but concedes the nonexistence of the Cayman evidence. The Government states that "On July 26, 2005, a Grand Jury in the Southern District of New York returned a ten-count superseding indictment . . . charging the defendants with crimes arising from their activities as investment advisers, owners and operators of three affiliated entities" Gov't br. at 2 (excluding Amerindo Cayman). At the hearing, the Government had no real explanation for how the Affidavit established probable cause relating to Amerindo Cayman. The Government essentially argued at the hearing that because the Amerindo companies are "closely held companies," then if the defendants committed a fraud in three of the entities, they must have committed a fraud in the fourth entity. Tr. at 193. First, there is no evidence alleged in the Affidavit that the Amerindo entities were "closely held." Second, even if such an allegation was made, the Affidavit is so barren of allegations relating to Amerindo Cayman that any belief in the existence of probable cause to seize records of Amerindo Cayman was unreasonable. United States v. Maggitt, 778 F.2d at 1035 (application for a warrant was supported by a "bare bones" affidavit containing "wholly conclusory statements"). Accordingly, while defendant Tanaka seeks suppression of all evidence seized pursuant to this infirm Warrant and Affidavit, at a minimum, evidence seized relating to Amerindo Cayman should be suppressed.

The Affidavit also failed to provide probable cause for the seizure of evidence relating to Brian Harvey, Joy Urich, and Paul Marcus. The Affidavit refers to these three individuals in one paragraph and fails to allege that they are clients of any of the Amerindo entities. Tr. at 143

26

(Government concedes only one reference to Harvey, Urich and Marcus).  The Affidavit alleges

only that Lily Cates, who is a "victim" described in the Affidavit and Vilar criminal complaint,

told the affiant "about other individuals who she believed to be investors with Amerindo, some

of whom may have had trouble redeeming all or part of their investments, including Brian

Harvey, Joy Urich, and Paul Marcus."  Affidavit at ¶ 5.

The paragraph relating to Harvey, Urich and Marcus fails to allege that they are victims

of alleged schemes.  The allegation merely claims that they *may have* had trouble redeeming all

or part of their investments.  Indeed, Cates does not even appear to be sure that they are clients of

Amerindo or that they even dealt with defendants Vilar or Tanaka.  There certainly is no

allegation that the defendants committed any wrongdoing.   The allegation does not establish

anything more than that Harvey, Urich and Marcus constitute a list of names provided in a

hearsay statement referring to persons who possibly had difficulty redeeming investments.

To compound the problem, Inspector Fraterrigo's statement at paragraph 9 that there was

probable cause to believe that the records in paragraph 9F which relate to Harvey, Urich and

Marcus constituted "records and instrumentalities of [] fraudulent schemes" or were "related to

and evidenc[ed] such crimes" was simply wrong.  Affidavit at ¶ 9F.  Defendant Tanaka

respectfully submits that no reasonable officer could characterize the allegations in the Affidavit

as supporting the view that probable cause existed to believe any meaningful characterization of

the records relating to Harvey, Urich and Marcus.  Indeed, the only evidence relating to the three

individuals was Lily Cates' third-party statement that she *believed* that they *may have* had

difficulty redeeming their investments.  A well-trained officer would have noted that the

Affidavit is silent as to any direct allegations regarding Harvey, Urich, and Marcus, including

some corroborative evidence that they complained of or were clients of Amerindo, or that they

even knew Vilar or Tanaka.  Indeed, the Affidavit's silence as to this corroboration, to the well-trained officer, speaks louder than the affirmative baseless allegation.  In sum, there was no probable cause to permit the seizure of evidence relating to these three persons.  See Affidavit at ¶6F (evidence suggests that there only is reason to be "concerned" that other investors are likewise being victimized by Vilar and Tanaka).

## CONCLUSION

For the foregoing reasons, Defendant Gary Alan Tanaka respectfully requests that the Court order that evidence seized from Amerindo U.S.'s offices be suppressed.

Dated: January 10, 2006
     New York, New York

By:___/s/  Steven G. Kobre__

Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200


Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York  10017
Tel: 212.999.5800

Attorneys for Defendant
Gary Alan Tanaka