USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____ JAN 3 1 2006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :          **INDICTMENT**

          -v-          :

ALBERTO WILLIAM VILAR,          :          S2 05 Cr. 621 (KMK)
          a/k/a "Albert Vilar,"
GARY ALAN TANAKA,          :

                    Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE

(Conspiracy to Commit Securities Fraud, Investment Adviser Fraud,
Mail Fraud, Wire Fraud, and Money Laundering)

The Grand Jury charges:

### Relevant Persons and Entities

1.          At all times relevant to this Indictment, Amerindo Investment Advisors
Inc. ("Amerindo U.S.") was a corporation organized under the laws of the State of California.
Amerindo U.S. had its principal offices in San Francisco and New York, New York.  Amerindo
U.S. managed assets of institutional clients and at certain times was the investment adviser to one
or more U.S. mutual funds.  Amerindo U.S. was, at all times relevant to this Indictment,
registered with the United States Securities and Exchange Commission ("SEC") as an investment
adviser.

2.          At all times relevant to this Indictment, Amerindo Investment Advisors,
Inc. ("Amerindo Panama") purported to be a corporation organized under the laws of Panama.
Amerindo Panama was, among other things, purportedly the investment manager of the
Amerindo Technology Growth Fund ("ATGF"), an off-shore, Panamanian investment fund

offered to investors. The defendants named Amerindo Panama in such a way to confuse

investors about the identity of the investment advisor with which they were dealing. The only

difference between the name of Amerindo Panama and that of Amerindo U.S. was the presence

of a comma between the words "Advisors" and "Inc."

      3.    At all times relevant to this Indictment, Amerindo Investment Advisors

(UK) Ltd. ("Amerindo U.K.") purported to be a company that managed portfolios of U.S.

emerging growth stocks for U.K.-based clients. Amerindo U.K. had an office in London where

the founders of Amerindo worked, and where certain administrative and other functions related

to Amerindo Panama were performed, including meeting with and corresponding with investors,

preparation of client account statements, processing investor redemption requests, and directing

equity trades and financial transactions involving investor funds. Amerindo U.S., Amerindo

Panama, Amerindo U.K., and subsets of that group of entitities and their predecessors, are

collectively referred to hereafter as "Amerindo."

      4.    ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, was

one of the original founders of Amerindo U.S. and of the predecessor companies to Amerindo

Panama and Amerindo UK, and was, at all times relevant to this Indictment, a shareholder,

officer and director of Amerindo U.S., and one of the two shareholders, directors, and officers of

Amerindo Panama and Amerindo UK. VILAR received an undergraduate degree from

Washington & Jefferson College, and subsequently pledged and donated millions of dollars to

his alma mater. VILAR also pledged and contributed millions of dollars to various organizations

that supported opera and the arts, including the Metropolitan Opera in Manhattan, and the

American Academy in Berlin.

5.    GARY ALAN TANAKA, the defendant, was one of the original founders of Amerindo U.S., and was, at all times relevant to this Indictment, a shareholder, officer and director of Amerindo U.S., and one of the two shareholders, directors, and officers of Amerindo Panama and Amerindo UK. TANAKA directed the actions of the Amerindo traders based in both London and San Francisco, California, and was responsible for allocating the securities purchased by Amerindo among Amerindo's clients and the funds which Amerindo U.S., Amerindo Panama and Amerindo UK advised and managed.

### The Scheme to Defraud

6.    From at least as early as in or about July 1986 to on or about May 26, 2005, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, perpetrated a scheme to defraud investors by soliciting millions of dollars of funds under false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to their own benefit and the benefit of others without the knowledge or authorization of the investors. To execute the scheme, VILAR and TANAKA solicited and caused others to solicit victims to invest in fraudulent investment products, including the Amerindo SBIC Venture Fund LP and the Guaranteed Fixed Rate Deposit Account Program ("GFRDAs"). VILAR and TANAKA induced victims to invest in these products by, among other things, promising high rates of return, with little or no risk, within short periods of time. In truth and in fact, as VILAR and TANAKA well knew, these investment opportunities were fraudulent. VILAR and TANAKA failed to fulfill their promises to the investors by, among other things, failing to invest the funds as promised, unilaterally changing the terms of the investments, and failing to redeem the investments upon the investors' requests.

3

## Victim No. 1's Investments With Amerindo

7.        Beginning in or about 1987, and continuing up to in or about February 2005, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, met with Victim No. 1 and described various investment opportunities to her.  As a result of these solicitations by VILAR, Victim No. 1 entrusted millions of dollars of investments to Amerindo.

8.        Beginning in or about 1987, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused numerous account statements to be sent to Victim No. 1 from Amerindo.  Until in or about September 1995, those statements were printed on stationery bearing the name "Amerindo Investment Advisors Inc.," the name of Amerindo U.S., and the address of Amerindo U.K.  Beginning in or about October 1995, Victim No. 1 received account statements from Amerindo that were printed on stationery bearing the name "Amerindo Investment Advisors, Inc.," the name of Amerindo Panama, and the address of a post office box in Panama.  The purported value of Victim No. 1's investments managed by Amerindo, as reflected in the account statements provided by Amerindo, peaked at approximately $18 million in or about September 2000, and then sharply dropped over approximately the following two years.

9.        In or about June 2002, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, advised Victim No. 1 to invest in an Amerindo venture (the Amerindo SBIC Venture Fund LP) to take advantage of a U.S. government program designed to promote venture capital investment in small businesses (the "Amerindo SBIC").  Relying on VILAR's false and fraudulent representations regarding the Amerindo SBIC investment, as described below, Victim No. 1 agreed to invest approximately $5 million in the Amerindo SBIC.

4

### The SBIC Program

10.     During a period between in or about 2000 and on or about September 30, 2004, the United States Small Business Administration (the "SBA") provided funding for the Participating Securities SBIC Program (the "SBIC Program"). Under the SBIC Program, a qualified private venture capital firm that had received an SBIC license from the SBA was eligible to receive matching funds through SBA guarantees. Those matching funds allowed the SBICs to gain the benefits of increasing the amount of available investment funds without the need to raise additional private capital.

11.     The first step in the applicable SBIC licensing process was to complete a Management Assessment Questionnaire ("MAQ"). If a MAQ satisfied the SBA's criteria, an applicant would then receive a "go forth" letter, inviting the applicant to apply for an SBIC license within the following 18 months. If an applicant did not receive a "go forth" letter, it could not apply for an SBIC license.

12.     An applicant that was invited to apply for an SBIC license was required to submit with its application commitment letters from institutions and individuals that had agreed to invest a minimum of $10 million in the SBIC if it was licensed, of which no more than 30% was permitted to come from the principals or affiliated or associated individuals or entities. After an applicant applied for an SBIC license, but prior to that application being approved, the applicant was required to demonstrate that it had $2.5 million of the $10 million minimum deposited in a separate bank account set up for the SBIC.

5

**Amerindo's Failed Efforts To Obtain An SBIC License**

13.    Amerindo made approximately four unsuccessful attempts to obtain an

SBIC license for an Amerindo SBIC beginning in or about 2000, with the assistance of

experienced legal counsel.  Amerindo first submitted a MAQ to the SBA in or about January

2000.  Although Amerindo received a "go forth" letter in or about April 2000, based on a

presentation made by VILAR to the SBA Investment Committee on or about April 18, 2000, its

license application was rejected.  Amerindo submitted a second, and subsequently a third MAQ,

in or about May and September 2002, respectively.

14.    On or about December 27, 2002, the Chief Administrative Officer of the

SBA's Investment Division sent a letter to VILAR in which she stated, among other things,

"Review of the third MAQ by the Investment Committee produced numerous areas of concern."

Those concerns included, among other things, the facts that the principals were located in three

different geographic areas (New York, London, and Virginia), and the fact that VILAR would be

spending a small fraction of his time on the Amerindo SBIC compared to his interest in the

SBIC.  That letter concluded, "I am sorry to have to write this letter to you, but we feel that if we

proceeded, after receiving three submissions to date, that it would be at considerable time and

expense to your team (as well as ourselves), and that ultimately, the Agency Licensing

Committee would reject your application."  Amerindo did not receive a "go forth" letter as a

result of its submission of the third MAQ.

15.    In or about January 2004, ALBERTO WILLIAM VILAR, a/k/a "Albert

Vilar," and GARY ALAN TANAKA, the defendants, and Amerindo, filed a fourth MAQ with

6

the SBA. In each of the four MAQs submitted by Amerindo in an effort to obtain a license for an Amerindo SBIC, VILAR and TANAKA were listed as principals of the entity to be licensed.

16.    In or about February 2004, the SBA posted on its website a notice indicating that, due to a lack of funding by Congress of the SBIC Program, there was no guarantee that applications submitted after approximately the end of March 2004 would be eligible to receive leverage funding. Amerindo abandoned its fourth attempt to obtain an SBIC license after on or about May 28, 2004, and neither ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, Amerindo U.S., nor any of the affiliated Amerindo entities ever received the license required to apply for leverage funds under the SBIC Program.

### Defendant Vilar's False And Fraudulent Statements
### To Victim No. 1 Regarding The Amerindo SBIC Investment

17.    In or about June 2002, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, told Victim No. 1 that VILAR and GARY ALAN TANAKA, the defendant, were personally investing in a new venture involving investments in small businesses, including biotechnology companies, that would be supported by the government. VILAR told Victim No. 1 that the venture had been approved by the government, and invited Victim No. 1 to join VILAR and TANAKA in the venture as the only outside partner. VILAR recommended that Victim No. 1 invest approximately $5 million in the venture. VILAR promised Victim No. 1 that Victim No. 1 would earn approximately $250,000 each quarter from the investment.

7

**The Defendants' Unauthorized Conversion**
**Of Victim No. 1's $5 Million SBIC Investment**

18.     Victim No. 1's approximately $5 million investment in the Amerindo

SBIC was deposited into an account at a New York City brokerage firm (the "Brokerage Firm")

that was opened by ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN

TANAKA, the defendants, in or about 1987, on behalf of a Panamanian corporation named

"Amerindo Management Inc." (the "AMI Account"), of which VILAR held the title of President

and TANAKA held the title of Vice President.  On or about June 20, 2002, the AMI Account

held numerous equity positions in technology stocks, and had a negative cash balance of

approximately $428,122, prior to the incoming transfer of Victim No. 1's approximately $5

million SBIC investment.

19.     On or about June 25 and June 26, 2002, the Brokerage Firm received

letters of authorization ("LOAs") signed by GARY ALAN TANAKA, the defendant, directing

the Brokerage Firm to transfer by wire from the AMI Account approximately:

a.     $1 million to an account at Chase Manhattan Bank held in the

name of  "A.W. Vilar" (the "Vilar Account");

b.     $650,000.00 to an account at Chase Manhattan Bank held in the

name of Amerindo Investment Advisors Inc. (the "Amerindo Account"); and

c.     $500,000.00 to a trust account at Bank of New York (the "Trust

Account").

20.     On or about July 9, 2002, the Brokerage Firm received an LOA signed by

GARY ALAN TANAKA, the defendant, directing the Brokerage Firm to transfer a sum of

8

approximately $3,102,958.85 from the AMI Account to an overseas account maintained by another investor (Victim No. 2) in Luxembourg (the "Luxembourg Account").

21.     The Brokerage Firm executed the wire transfer instructions described in paragraphs 19 and 20, above, on or about the respective dates it received the LOAs.

22.     All but approximately $45,000 of the approximately $1 million from Victim No. 1's Amerindo SBIC investment that was wire transferred to the Vilar Account was spent within two weeks on charitable contributions and personal expenses of ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, including contributions to Washington & Jefferson College and the American Academy in Berlin. The remainder of that portion of Victim No. 1's investment was dissipated soon thereafter, and none of the funds transferred to the Vilar Account were invested in the Amerindo SBIC.

23.     The approximately $650,000.00 of Victim No. 1's investment in the Amerindo SBIC that was transferred into the Amerindo Account was spent on Amerindo business expenses, and none of those funds was invested in the Amerindo SBIC.

24.     At least approximately $400,000.00 of the approximately $500,000.00 of Victim No. 1's Amerindo SBIC investment that was transferred to the Trust Account was used to make an investment on behalf of Victim No. 1 that was unrelated to the Amerindo SBIC, and which investment Victim No. 1 believed would be paid for by funds Victim No. 1 had invested with Amerindo separate and apart from the approximately $5 million investment Victim No. 1 had made in the Amerindo SBIC. None of the approximately $500,000.00 was invested in the Amerindo SBIC.

25.     The remainder of Victim No. 1's investment in the Amerindo SBIC, amounting to approximately $2.85 million, was part of the approximately $3,102,958.85 wire transfer to the Luxembourg Account, which funds were used to partially redeem Victim No. 2's investment in an Amerindo GFRDA, as described below.

**The Defendants' False and Misleading Statements
Concerning Victim No. 1's $5 Million Amerindo SBIC Investment**

26.     After obtaining Victim No. 1's approximately $5 million investment in the Amerindo SBIC venture, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar, the defendant, repeatedly made false and fraudulent statements to Victim No. 1 concerning her investment in the Amerindo SBIC, including the following:

a.     On or about March 13, 2003, VILAR wrote a letter on Amerindo U.S. letterhead to Victim No. 1 in which he stated that although there had been an "unprecedented bear market [for] the last three years . . . the monies put into escrow for the new SBIC fund remain at full value." Later in the same letter he stated that, "We are now awaiting permission to commence investing the funds we have placed into escrow, which we expect to happen fairly soon." In fact, as described above, Amerindo, VILAR and GARY ALAN TANAKA, the defendants, had been repeatedly rebuffed in their efforts to obtain an SBIC license; Victim No. 1's funds were not placed in escrow; and VILAR and TANAKA had long since spent Victim No. 1's approximately $5 million investment on, among other things, personal and business expenses.

b.     On or about March 25, 2004, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, caused a letter to be sent on Amerindo U.S. letterhead to the

10

accountant of Victim No. 1 in which he stated in part that he had been required "to deposit the requisite key money" in connection with Amerindo's efforts to obtain an SBIC license.  In that letter, VILAR also stated that while waiting for the license, "the prices of technology private-placements continued to decline . . . .  This means that we did not use a single penny of [Victim No. 1's] investment during this declining period, and if and when, as expected, we start to make investments upon securing the renewal of our license later this year, we will be looking at the best prices probably ever seen in the four decade plus history of technology based, venture capital."  At the time VILAR signed this letter, and as described above: (i) an applicant at the MAQ stage of the SBIC licensing process need not have capital on deposit until it is invited to apply for a license, which Amerindo was never invited to do during the period following Victim No. 1's approximately $5 million investment; (ii) Amerindo's third and fourth MAQs did not report the investment of approximately $5 million by Victim No. 1 in the Amerindo SBIC; and (iii) VILAR and GARY ALAN TANAKA, the defendant, had long since spent Victim No. 1's approximately $5 million investment on, among other things, personal and business expenses.

       c.      On or about October 25, 2004, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, caused a memo on Amerindo U.S. letterhead to be sent to Victim No. 1's lawyer, in which he wrote in part:

> Funds on deposit with SBIC, for $5 million.  Technically this represents an escrow deposit for a technology-based SBIC. [Victim] has effectively coinvested with [me] in a new fund that has been approved for investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war.

11

In fact, as described above: (i) Victim No. 1's approximately $5 million investment in the Amerindo SBIC was not on deposit with the SBIC, and was not being held in escrow; (ii) Amerindo had not received an SBIC license and was not likely to receive such a license in the near future; (iii) SBA funding for the SBIC Program was not "delayed," but rather had been canceled; and (iv) VILAR and GARY ALAN TANAKA, the defendants, had long since spent Victim No. 1's approximately $5 million investment on, among other things, personal and business expenses.

    d.  On or about November 8, 2004, VILAR and TANAKA caused an account statement to be sent from London, England, to Victim No. 1 in New York, New York, via a private commercial courier, in which Victim No. 1's approximately $5 million investment was described as "FUNDS ON DEPOSIT WITH SBIC," and which reflected "INTEREST ON SBIC DEPOSIT" in the amount of approximately $225,000.00.

### The Defendants' Conversion Of Additional Funds Invested By Victim No. 1

    27.  As of on or about June 30, 2003, according to an account statement furnished to Victim No. 1, Victim No. 1 had entrusted a total of approximately $11,045,370.02 in investment funds to VILAR, TANAKA and Amerindo, including approximately $2,067,597.00 held in Victim No. 1's account at the Brokerage Firm ("Victim No. 1's Account").

    28.  On or about September 25, 2003, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused an LOA to be sent from Amerindo to the Brokerage Firm.  The LOA bore the signature of TANAKA and the forged signature of Victim No. 1 and directed that approximately $250,000.00 be transferred from

Victim No. 1's Account to an account held at the Brokerage Firm in the name of "Amerindo Technology Growth Fund Inc." ("ATGF I").

29.     On or about September 26, 2003, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused another LOA signed by TANAKA to be sent from Amerindo to the Brokerage Firm directing that approximately $250,000.00 be transferred from ATGF I to a personal account held by VILAR at Wilmington Trust Company, in Wilmington, Delaware  (the "Wilmington Trust Account").

30.     During an approximately one-month period following the transfer of the approximately $250,000.00 described in paragraph 29 into the Wilmington Trust Account, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, spent the funds on, among other things, the personal expenses of VILAR, including the repayment of a mortgage obligation in the amount of approximately $53,042.83.

### The GFRDA Program

31.     Beginning in or about 1986, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, solicited and caused others to solicit victims to invest in Amerindo Guaranteed Fixed Rate Deposit Accounts ("GFRDAs") – a sham product offered by the defendants to Amerindo clients.  The defendants induced clients to invest in GFRDAs by promising to invest the majority of each investor's funds in short-term debt instruments, with little or no risk, that would earn a fixed interest rate, generally at a rate substantially above the prevailing rates available from banks and other institutions.  The defendants further promised the investors that the balance of their funds in their GFRDA accounts – generally no more than 25 percent of the account value – would be invested in

publicly traded emerging growth stocks.  In truth and in fact, as the defendants well knew,

Amerindo did not purchase short-term debt instruments as had been promised to GFRDA

investors and failed to provide GFRDA investors with the promised rate of return on their

GFRDA investments.

32.    From in or about July 1986 through in or about June 2002, in order to

induce Amerindo clients to invest in GFRDAs, ALBERTO WILLIAM VILAR, a/k/a "Albert

Vilar," and GARY ALAN TANAKA, the defendants, prepared, distributed, and caused to be

distributed, offering circulars dated July 1, 1986 ("1986 Offering Circular"), December 19, 1988

("1988 Offering Circular"), September 1998 ("1998 Offering Circular") and June 2002 ("2002

Offering Circular").  The offering circulars contained numerous false and misleading statements

of material facts including, among others, the following:

a.    The 1986, 1988, 1998 and 2002 Offering Circulars identified various

Amerindo investment entities as having a role in the GFRDA offering and were drafted in such a

way as to mislead investors about the identities of the offeror and guarantor of the GFRDA

investment product.  For example, the cover of the 2002 Offering Circular indicated that

"Amerindo" had locations in New York, San Francisco, Minneapolis and London.  The cover

page of the 2002 Offering Circular identified the "offeree" as "Amerindo Investment Advisors,

Inc." (Amerindo Panama) and stated, "The investments of the Deposit Account are managed by

Amerindo Investment Advisors, Inc."  The contents of the 2002 Offering Circular referred to

"Amerindo" as the investment manager of GFRDAs and stated that the deposit and interest rate

of a client's GFRDA investment would be guaranteed by "Amerindo," which was backed by its

two founding partners (VILAR and TANAKA).  The final page of the 2002 Offering Circular

14

listed addresses for "Amerindo Investment Advisors Inc." in New York and San Francisco, an address for "Amerindo Advisors (UK) Limited" in London, and "Amerindo Investment Advisors, Inc." in Panama.

       b.      The 1986, 1988, 1998 and 2002 Offering Circulars stated that the investment product being offered to investors through the GFRDA Program would have: (i) "High Guaranteed Income"; (ii) "Stability of Principal"; (iii) "Liquidity"; and (iv) "Immediate Confirmation of Purchases, Redemption and Quarterly Interest Payments," when in truth and in fact VILAR and TANAKA failed to provide investors with their guaranteed fixed rate of return on their GFRDA investments and failed to liquidate and redeem GFRDA investments when requested by investors;

       c.      The 1986, 1988 and 1998 Offering Circulars explained that investors in GFRDAs would deposit cash into a designated account in either the investor's name or an Amerindo sub-account when in fact all of GFRDA investors' funds were deposited and commingled in Amerindo's brokerage accounts, including an account held in the name of a Panamanian corporation named  "Techno Raquia, S.A." (the "Techno Raquia Account"), without such designations;

       d.      The 1986, 1988, 1988 and 2002 Offering Circulars described a GFDRA as a "diversified" fixed rate account consisting of predominantly "high grade money market instruments supplemented by a limited number of select common stocks," when in fact GFRDA investors' funds were not invested in high grade money market instruments; and

       e.      The 1986, 1988, and 1998 Offering Circulars stated, respectively, that

"approximately two-thirds," "over three-fourths," and a "majority" of funds invested in GFRDAs would be invested in a range of short-term investments such as Treasury bills, Government National Mortgage Association Certificates (GNMA's), Government bonds, Certificates of Deposit (CD's), and money market funds. The 2002 Offering Circular stated that "[t]he Fixed Rate Deposit Accounts invest principally in a broad range of high grade money market and debt instruments, with maturities generally of one year or less," and further represented that "[a] relatively small portion of the account, generally limited to 25%, will be invested in public companies perceived to have the capacity to undergo exceptional growth of earnings." In fact, none of the funds raised through the GFRDA Program were used to purchase any such short-term debt securities.

33.     ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, sent and caused account statements and other correspondence to be sent to GFRDA investors. Those account statements and correspondence were printed on the letterheads of various Amerindo entities, including Amerindo U.S. and Amerindo Panama, which misled GFRDA investors about which Amerindo entity was responsible for their investment. For example, up until in or about September 1995, account statements were printed on Amerindo U.S. stationery; beginning in or about October 1995, account statements were printed on Amerindo Panama stationery.

34.     Instead of redeeming GFRDA investments upon investors' requests, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused the terms of the GFRDA program to be changed without the investors' consent, discouraged investors from redeeming their GFRDA investments, and diverted funds

16

from other Amerindo clients to repay Amerindo's obligations to GFRDA investors. For example, from in or about January 2003 through in or about 2005, another group of investors ("Victim No. 3") made repeated attempts to redeem part and all of their GFRDA investments. Instead of redeeming Victim No. 3's investments, VILAR and TANAKA caused a series of communications to be sent to Victim No. 3 to discourage members of Victim No. 3 from redeeming their investments and to attempt to explain why redemption was not possible. In addition, in or about January 2003, VILAR and TANAKA caused the interest rate on Victim No. 3's GFRDA investment to be unilaterally and retroactively lowered to approximately 8 percent per year through the maturity date of their GFRDA.

## STATUTORY ALLEGATIONS

### The Conspiracy

35.    From at least in or about 1986 to on or about May 26, 2005, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely, (a) to commit fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to commit investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; (c) to commit mail fraud, in violation of Title 18, United States Code, Section 1341; (d) to commit wire fraud, in violation of Title 18, United States Code, Section1343; and (e) to commit money laundering, in violation of Title 18, United States Code, Section 1957.

17

## The Objects of the Conspiracy

### Fraud In Connection With The Purchase Or Sale of Securities

36.    It was a part and an object of the conspiracy that ALBERTO WILLIAM

VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully,

willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of

interstate commerce, the mails, and the facilities of national securities exchanges, would and did

use and employ manipulative and deceptive devices and contrivances in connection with the

purchase and sale of securities, in contravention of Title 17, Code of Federal Regulations,

Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and

causing Amerindo to make untrue statements of material facts and omitting to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; and (c) engaging in acts, practices, and courses of business which

operated and would operate as a fraud and deceit upon persons who invested in and through

Amerindo, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Investment Adviser Fraud

37.    It was further a part and an object of the conspiracy that ALBERTO

WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, acting as

investment advisers with respect to one and more investors and potential investors in products

offered by Amerindo Investment Advisors Inc. and its affiliated entities, including Amerindo

Panama, unlawfully, willfully, and knowingly, by the use of the mails and means and

instrumentalities of interstate commerce, directly and indirectly, would and did: (a) employ

devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in

18

transactions, practices, and courses of business which operated as a fraud and deceit upon clients

and prospective clients; and (c) engage in acts, practices, and courses of business that were

fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections

80b-6 and 80b-17.

## Mail Fraud

38.    It was further a part and an object of the conspiracy that ALBERTO

WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants,

unlawfully, willfully and knowingly, having devised and intending to devise a scheme and

artifice to defraud, and for obtaining money and property by means of false and fraudulent

pretenses, representations, and promises, would and did cause to be deposited any matter or thing

whatever to be sent and delivered by any private and commercial interstate carrier, and would

and did take and receive therefrom, any such matter and thing, and knowingly would and did

cause to be delivered by such carrier according to the direction thereon, and at the place at which

it is directed to be delivered by the person to whom it is addressed, any such matter and thing, in

violation of Title 18, United States Code, Section 1341.

## Wire Fraud

39.    It was further a part and an object of the conspiracy that ALBERTO

WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants,

unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and

artifice to defraud, and for obtaining money by means of false and fraudulent pretenses,

representations and promises, would and did transmit and cause to be transmitted by means of

wire and radio communication in interstate and foreign commerce, writings, signs, signals,

19

pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## Money Laundering

40.    It was further a part and an object of the conspiracy that ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly would and did engage and attempt to engage in and cause others to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

## Means And Methods Of The Conspiracy

41.    Among the means and methods by which ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, would and did carry out the conspiracy were the following:

a.    VILAR and TANAKA opened brokerage accounts in New York, New York, in the names of Panamanian entities, which accounts were controlled by VILAR and TANAKA.

b.    VILAR and TANAKA solicited funds from investors by making false and misleading oral and written representations about the investment for which the investors' funds were solicited, including false representations about (i) the types of securities in which investors' funds would be invested, and (ii) the "guaranteed" rate of return that would be generated by their accounts.

20

c.      VILAR and TANAKA deposited money received from investors as a result of false and misleading representations into brokerage accounts opened by VILAR and TANAKA in the name of Panamanian entities.

d.      VILAR and TANAKA misappropriated investors' funds from those brokerage accounts and caused investment funds to be converted to the use of VILAR, TANAKA and others by causing investors' investment funds to be wire transferred to bank accounts controlled by VILAR, TANAKA and others.

e.      VILAR and TANAKA caused Amerindo investors' funds to be used to repay Amerindo's obligations to other Amerindo investors, rather than in the manner promised to the Amerindo investors.

f.      VILAR and TANAKA used facilities of interstate and foreign commerce, including the mails and interstate and foreign wire transfers, in furtherance of the objects of the conspiracy.

## **Overt Acts**

42.      In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.      In or about September 1987, VILAR and TANAKA opened and caused the Techno  Raquia Account to be opened in New York, New York;

b.      On or about November 1, 1987, VILAR and TANAKA opened and caused the AMI Account to be opened in New York, New York;

21

        c.        In or about 1987, VILAR met Victim No. 3 and provided and caused Victim No. 3 to be provided with the 1986 Offering Circular for an Amerindo GFRDA;

        d.        In or about 1989, VILAR met with an investor ("Victim No. 4") in New York, New York, to solicit an investment of approximately $74,000 in an Amerindo GFRDA;

        e.        In or about December 1992, VILAR and TANAKA caused an account statement to be sent to Victim No. 3 from Amerindo showing the purported value of Victim No. 3's account;

        f.        On or about June 9, 1998, VILAR and TANAKA caused an account statement to be sent to Victim No. 4 from Amerindo showing the purported value of Victim No. 4's GFRDA;

        g.        In or about early 2000, VILAR caused an investor ("Victim No. 5") to be provided with the 1998 Offering Circular for an Amerindo GFRDA;

        h.        On or about February 10, 2000,  VILAR and TANAKA caused Victim No. 5 to deposit approximately $1 million with Amerindo for a GFRDA;

        i.        On or about December 21, 2000, VILAR and TANAKA caused Victim No. 2 to wire approximately $6 million to Amerindo's Techno Raquia Account to invest in an Amerindo GFRDA;

        j.        In or about December 2000 and January 2001, VILAR and TANAKA caused Victim No. 3 to reinvest approximately $11,066,713.44 in an Amerindo GFRDA;

k.      On or about January 18, 2001, VILAR and TANAKA caused an LOA to be sent to the Brokerage Firm directing the Brokerage Firm to transfer by wire from the Techno Raquia Account approximately $5 million to an account at Barclay's Bank PLC in The Bahamas held in the name of "PTC Management" (the "PTC Account");

l.      On or about January 29, 2001, VILAR caused approximately $3.5 million to be wired from the PTC account to the Vilar Account;

m.      On or about February 1, 2001, VILAR caused a check in the amount of approximately $1.575 million, drawn on the Vilar Account, to be sent to the Metropolitan Opera Association;

n.      In or about June 2002, VILAR met Victim No. 1 at VILAR's New York City apartment to solicit an investment of approximately $5 million in an Amerindo SBIC;

o.      On or about June 25, 2002, VILAR and TANAKA caused approximately $1 million of Victim No. 1's Amerindo SBIC investment to be wire transferred to the Vilar Account;

p.      On or about June 25, 2002, VILAR and TANAKA caused approximately $500,000.00 of Victim No. 1's Amerindo SBIC investment to be wire transferred to the Trust Account;

q.      On or about June 26, 2002, VILAR and TANAKA caused approximately $650,000.00 of Victim No. 1's Amerindo SBIC investment to be transferred to the Amerindo U.S. Account;

r.      On or about June 27, 2002, VILAR caused a check in the amount of approximately $540,000.00, drawn on the Vilar Account, to be sent to Washington and Jefferson College;

s.      On or about July 1, 2002, VILAR caused a check in the amount of approximately $177,000.00, drawn on the Vilar Account, to be sent to the American Academy in Berlin;

t.      On or about July 9, 2002, VILAR and TANAKA caused approximately $3,102,958.85, including approximately $2.85 million of Victim No. 1's Amerindo SBIC investment, to be wire transferred from the AMI Account to the Luxembourg Account to redeem part of Victim No. 3's investment in an Amerindo GFRDA;

u.      On or about August 18, 2003, VILAR and TANAKA caused a false and misleading letter concerning Victim No. 3's Amerindo GFRDA investment to be sent on Amerindo U.S. letterhead to Victim No. 3 in Scarsdale, New York;

v.      On or about September 25, 2003, VILAR and TANAKA caused approximately $250,000.00 to be transferred from Victim No. 1's Account to ATGF I;

w.      On or about September 26, 2003, VILAR and TANAKA caused approximately $250,000.00 to be transferred from ATGF I to the Wilmington Trust Account;

x.      On or about September 30, 2003, VILAR caused approximately $53,042.83 to be transferred from the Wilmington Trust Account to repay a mortgage obligation of VILAR;

y.        On or about December 19, 2003, VILAR and TANAKA caused a letter to be sent from the Amerindo U.K. office on Amerindo Panama letterhead to Victim No. 3 in Scarsdale, New York;

z.        On or about November 8, 2004, VILAR and TANAKA caused a false and misleading account statement to be sent from London, England, via private commercial carrier, to Victim No. 1 in New York, New York.

(Title 18, United States Code, Section 371).

## COUNT TWO
(Securities Fraud)

The Grand Jury further charges:

43.        The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

44.        From in or about June 2002 through on or about May 26, 2005, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

25

and (c) engaging in transactions, acts, practices, and courses of business which operated and

would operate as a fraud and deceit upon persons in connection with the purchase and sale of

limited partnership interests in Amerindo SBIC Venture Fund LP.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

### COUNT THREE
(Securities Fraud)

The Grand Jury further charges:

45.    The allegations contained in paragraphs 1 through 34 and 41 through 42

above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as

setting forth a scheme to defraud.

46.    From in or about 1986 through on or about May 26, 2005, in the Southern

District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and

GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, directly and

indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the

facilities of national securities exchanges, did use and employ manipulative and deceptive

devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-

5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of

material facts and omitting to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and (c) engaging in

transactions, acts, practices, and courses of business which operated and would operate as a fraud

26

and deceit upon persons in connection with the purchase and sale of notes in the form of

Amerindo Guaranteed Fixed Rate Deposit Accounts.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

### COUNT FOUR
(Investment Adviser Fraud)

The Grand Jury further charges:

47.    The allegations contained in paragraphs 1 through 34 and 41 through 42

above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as

setting forth a scheme to defraud.

48.    From in or about June 2002 through on or about May 26, 2005,

ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the

defendants, acting as investment advisers with respect to investors and potential investors in

Amerindo Investment Advisors Inc. and its affiliated entities, unlawfully, willfully, and

knowingly, by the use of the mails and means and instrumentalities of interstate commerce,

directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and

prospective clients; (b) engage in transactions, practices, and courses of business which operated

as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and

courses of business that were fraudulent, deceptive, and manipulative.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
and Title 18, United States Code, Section 2).

## COUNT FIVE
### (Mail Fraud)

The Grand Jury further alleges:

49.     The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

50.     On or about November 8, 2004, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, caused to be deposited any matter or thing whatever to be sent and delivered by any private and commercial interstate carrier, and took and received therefrom, any such matter and thing, and knowingly caused to be delivered by such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it is addressed, any such matter and thing; to wit, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, sent and caused to be sent and delivered via a private and commercial interstate carrier a false and fraudulent account statement from London, England, to Victim No. 1 in New York, New York.

(Title 18, United States Code, Sections 1341 and 2).

**COUNT SIX**
(Wire Fraud)

The Grand Jury further alleges:

51.    The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

52.    On or about June 25, 2002, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice; to wit, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused approximately $1,000,000.00 of Victim No. 1's investor funds to be sent by wire from outside New York State, to a bank in New York, New York, which funds were subsequently converted to the defendants' own use without the knowledge, authorization, or permission of Victim No. 1.

(Title 18, United States Code, Sections 1343 and 2).

29

## COUNT SEVEN
(Wire Fraud)

The Grand Jury further alleges:

53.     The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

54.     On or about July 9, 2002, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice; to wit, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused approximately $2.85 million of Victim No. 1's investor funds to be sent by wire from outside New York State, to a bank in New York, New York, which funds were subsequently converted to the defendants' use and the use of others without the knowledge, authorization, or permission of Victim No. 1.

(Title 18, United States Code, Sections 1343 and 2).

30

## COUNTS EIGHT THROUGH ELEVEN
(Money Laundering)

The Grand Jury further charges:

      55.     The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

      56.     On or about the dates set forth below, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly engaged and attempted to engage in and cause others to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, to wit, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343, as set forth below:

| COUNT | APPROXIMATE DATE | TRANSACTION |
|---|---|---|
| EIGHT | June 25, 2002 | Wire transfer in the amount of approximately $1,000,000.00 from the AMI Account to the Vilar Account |
| NINE | June 25, 2002 | Wire transfer in the amount of approximately $500,000.00 from the AMI Account to the Trust Account |

31

| COUNT | APPROXIMATE DATE | TRANSACTION |
|-------|-----------------|-------------|
| TEN | June 26, 2002 | Wire transfer in the amount of approximately $650,000.00 from the AMI Account to the Amerindo Account |
| ELEVEN | July 9, 2002 | Wire transfer in the amount of approximately $3,102,958.85 from the AMI Account to an account at Lloyd's TSB Bank (Luxembourg) |

(Title 18, United States Code, Sections 1957 and 2).

### COUNT TWELVE
(False Statements)

57.     The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

58.     At all relevant times, as described in paragraph 1 above, Amerindo U.S. was an investment adviser registered with the SEC.  As such, Amerindo U.S. was subject to periodic examinations by the SEC.

59.     In a letter dated on or about April 8, 2005 (the "SEC Letter"), the SEC notified the Chief Compliance Officer of Amerindo U.S. that the SEC had received a complaint letter on behalf of Victim No. 1, and requested a response to the issues raised in that letter.  The complaint letter, which was attached to the SEC correspondence sent to Amerindo U.S., stated in substance that: (a) Amerindo had ignored written instructions from Victim No. 1 to transfer all securities and funds in Victim No. 1's account with Amerindo to another account at the Brokerage Firm; (b) ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, had responded to Victim No. 1's request by contending that Victim No. 1 needed to send a letter to the Amerindo office in Panama; and (c) Amerindo would first deduct unspecified fees that had

accrued during the approximately 18 years that Victim No. 1's Amerindo account had been in

existence. The SEC Letter stated, "Please analyze the complaint carefully and prepare a written

report addressing all the issues raised in the complaint. Your report should describe clearly the

actions you are taking in response to the complaint. If appropriate, provide us with complete

documentation supporting your findings."

       60.     ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN

TANAKA, the defendants, prepared a letter responding to the SEC Letter and Victim No. 1's

complaint, and caused that letter (the "Response") to be sent by facsimile on or about May 20,

2005, from Amerindo's offices in New York, New York, to an SEC office in San Francisco,

California. The Response contained numerous false statements made for the purpose of

deceiving the SEC and hiding the defendants' unlawful conduct described in paragraphs 1

through 34 and 41 through 42, above. The Response stated, among other things, in substance,

that: (a) Victim No. 1 had always been a client of Amerindo Panama; (b) Amerindo Panama had

previously been owned by VILAR and TANAKA, but had been sold in or about 2001 to

unrelated third parties; (c) as of on or about May 20, 2005, there was no common ownership of

Amerindo U.S. and Amerindo Panama; and (d) as of on or about May 20, 2005, there was no

overlap between the directors, officers and employees of Amerindo U.S. and Amerindo Panama.

       61.     On or about May 20, 2005, in the Southern District of New York,

ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the

defendants, unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the

executive branch of the Government of the United States, namely, the SEC, falsified, concealed,

and covered up by trick, scheme, and device material facts, and made materially false, fictitious,

and fraudulent statements and representations, and made and used a document knowing it to contain materially false, fictitious, and fraudulent statements, to wit, VILAR and TANAKA sent a letter to the SEC, in which they made the following false statements and concealed and covered up facts that were material to the SEC's investigation:

### Specification One

VILAR and TANAKA falsely stated that as of May 20, 2005, "there [wa]s no common ownership with respect to Amerindo and Amerindo Panama."

### Specification Two

VILAR and TANAKA falsely stated that as of May 20, 2005, "there [wa]s no overlap between the directors, officers and employees of Amerindo and Amerindo Panama."

### Specification Three

VILAR and TANAKA falsely stated that, "[t]he present owners of Amerindo formerly owned Amerindo Panama but they sold it to its present owners in 2001."

(Title 18, United States Code, Sections 1001(a) and 2).

### FORFEITURE ALLEGATIONS

62.    As a result of committing one or more of the investment adviser fraud, securities fraud, mail fraud and wire fraud offenses, alleged in Counts One through Seven of this Indictment, in violation of Title 15, United States Code, Sections 80b-6, 80b-17, 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Sections 371, 1341, 1343 and 2, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all

34

property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to at least $19,706,363.74 in United States currency, representing the proceeds obtained as a result of the charged securities, mail and wire fraud offenses alleged in this Indictment, for which the defendants are jointly and severally liable.

63.    As a result of committing one or more of the money laundering offenses, alleged in Counts Eight through Eleven of this Indictment, in violation of Title 18, United States Code, Sections 1957 and 2, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982, any and all property, real and personal, involved in the money laundering offenses alleged in this Indictment, and all property traceable to such property, including but not limited to at least $5,000,000.00 in United States currency, in that such sum in aggregate is property which was involved in the money laundering offenses or is traceable to such property, for which the defendants are jointly and severally liable.

<u>Substitute Asset Provision</u>

64.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above including but not limited to the following:

 (1) Any and all right, title and interest in the following companies:

  a. Techno Raquia, S.A.;

  b. Amerindo Management Inc.;

  c. Amerindo Technology Growth Fund Inc.;

  d. Amerindo Technology Growth Fund II, Inc.; and

  e. Olafson Inc.

 (2) Any and all right, title and interest in Bear Stearns & Co., Inc. brokerage account numbers:

  a. 102-17995, held in the name of Techno Raquia, S.A.;

  b. 102-01485, held in the name of Amerindo Management Inc., sub-Account M26;

  c. 102-01490, held in the name of Amerindo Technology Growth Fund Inc.;

  d. 102-01495 , held in the name of Amerindo Technology Growth Fund II, Inc.; and

  e. 102-15833, held in the name of Olafson, Inc.

 (3) Any and all right, title and interest in one or more apartment units located at 860 United Nations Plaza, New York, New York;

(4)    Any and all right, title and interest in 7 High Coombe Place, Warren

Cutting, Kingston Upon Thames, Surrey, England.

(Title 18, United States Code, Sections 981(a)(1)(C) and 982, Title 21, United States Code,
Section 853, and Title 28, United States Code, Section 2461).

_____
FOREPERSON

_____
MICHAEL J. GARCIA

37