Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York  10017
Tel: 212.999.5800

*Attorneys for Defendant*
*Gary Alan Tanaka*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | S2 05 Cr. 621 (KMK) |
| - against - | ECF CASE |
| ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA<br><br>Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GARY A. TANAKA'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE UNITED KINGDOM**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ ii

**PRELIMINARY STATEMENT** ........................................................................................ 1

**STATEMENT OF FACTS** ................................................................................................ 3

      1.      **Gary Tanaka and Amerindo UK** ...................................................................... 3

      2.      **The Government's Investigation and the Search of Cadogan Tate** ...................... 4

**ARGUMENT** ...................................................................................................................... 9

      1.      **The Evidence Seized From Cadogan Tate Should Be Suppressed Because the Government Conducted a Warrantless Search In Violation of the Fourth Amendment** ...................................................... 9

      2.      **The Evidence Seized From Cadogan Tate Should Be Suppressed Because the Government's Search Was Unreasonable In Violation of the Fourth Amendment** ................................................................ 15

      3.      **The Good-Faith Exception Does Not Apply** ................................................ 19

      4.      **The Court Should Order a Hearing** ................................................................ 25

**CONCLUSION** .................................................................................................................. 26

# TABLE OF AUTHORITIES

**CASES**

Barr v. United States Department of Justice, 819 F.2d 25 (2d. Cir. 1987) .................................. 10

Best v. United States, 186 F.2d 131 (1st Cir. 1950) ...................................................... 14

Colello v. Securities and Exchange Commission, 908 F. Supp. 738 (C.D. Cal. 1995) ........... 13,14

Franks v. Delaware, 438 U.S. 154 (1978) ............................................................... 26

United States v. Ajlouni, 629 F.2d 830 (2d Cir. 1980) ................................................. 20

United States v. Angelos, 433 F.3d 738 (10th Cir. 2006) ............................................ 23n.

United States v. Barona, 56 F.3d 1087 (9th Cir. 1995) ............................................... 17

United States v. Bin Laden, 126 F. Supp. 2d 264 (S.D.N.Y. 2000) ............... 10-11, 14, 15, 20, 21

United States v. Burke, 718 F. Supp 1130 (S.D.N.Y. 1989) .......................................... 26

United States v. George, 975 F.2d 72 (2d Cir. 1992) ............................................... 15-16

United States v. Johns, 851 F.2d 1131 (9th Cir. 1988) ................................................ 12

United States v. Juda, 46 F.3d 961 (9th Cir. 1995) .................................................... 17

United States v. Leon, 468 U.S. 897 (1984) ............................................... 19, 20, 25-26

United States v. Perea, 986 F.2d 633 (2d Cir. 1993). ............................................. 10, 13

United States v. Peterson, 812 F.2d 486 (9th Cir. 1987) ....................................... 12, 17, 26

United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974) ......................................... 10, 14

United States v. Verdugo-Urquidez, 856 F.2d 1214 (9th Cir. 1988) .............................. 11-12

**CONSTITUTIONAL PROVISIONS**

U.S. Const Amend. IV .............................................................................. 10, 13

**STATUTES**

18 U.S.C. § 3504 ...................................................................................... 10

**TREATIES**

28 U.S.T. 227, art. VII, ¶ 3 ........................................................................... 15

**RULES**

FED. R. CRIM. P. 4 .................................................................................................15

FED. R. CRIM. P. 41 ...............................................................................................15

**MANUALS**

United States Attorneys' Manual § 9-15.240 ........................................................15

United States Attorneys' Criminal Resource Manual § 604........................................15

Defendant Gary Alan Tanaka respectfully submits this memorandum in support of his motion to suppress evidence seized by agents of the United States Postal Inspection Service on October 13 and October 14, 2006 from a storage facility located at 239 Acton Lane in the city of London, United Kingdom.

## PRELIMINARY STATEMENT

In October 2005, the Government sent three postal inspectors to the United Kingdom to enter a locked storage facility leased by Amerindo Investment Advisors (U.K.) Ltd. ("Amerindo U.K.") and search through 320 boxes of documents and 17 computers.  (Shaw Information of 10/10/05, at 3, hereinafter the "Information," attached as Sher Decl. Ex. A.)  The three postal inspectors seized 43 boxes' worth of material[1] and *all 17 computers*[2] and had them shipped to the United States.  (Inventory, attached as Sher Decl. Ex. B;  Letter from Shaw of 1/4/06, attached as Sher Decl. Ex. C.)  The Government executed this two-day, exploratory search and seizure for the sole purpose of collecting evidence in connection with its criminal prosecution and civil enforcement action against Alberto Vilar and Gary Tanaka. (Letter from Burnett of 7/25/05, at 1, hereinafter the "MLAT Request," attached as Sher Decl. Ex. D.)  Despite having eight months between the initiation of its criminal investigation[3] and the execution of the search in the United Kingdom, the Government never obtained a warrant or otherwise sought authority from an American court to execute the search.  By conducting this warrantless search and seizure, the Government violated the Fourth Amendment rights of Mr. Tanaka, a citizen of the United States.

---

[1] The Inventory suggests that the postal inspectors seized materials from far more than the 43 boxes transferred to the United States.

[2] This estimate of the number of computers is calculated as the sum of all references to objects in the Inventory labeled "CPU," "laptop," or "computer."

[3] According to the Government, the investigation of Alberto Vilar and Gary Tanaka began as early as February 2005.  (5/27/05 Tr. at 11, attached as Sher Decl. Ex. E.)

The Government committed a second violation of the Fourth Amendment by conducting a search that was plainly unreasonable. First, the search was overbroad and lacked sufficient particularity under American standards. Like the general warrant that was executed in the offices of Amerindo U.S. in New York, the warrant issued by the magistrate in the United Kingdom was unconstitutionally overbroad and purported to authorize the United States postal inspectors to seize *any documents relating to the operation of Amerindo's investment advisory businesses* and documents relating to "*any participants" in unspecified "fraudulent investment schemes."* (Warrant at 5, ¶¶ 15, 17, hereinafter the "U.K. Warrant," attached as Sher Decl. Ex. F.)

Second, the search was unreasonable under the Fourth Amendment because it violated the law of the United Kingdom. Among the 43 boxes and 17 computers that the postal inspectors seized were confidential materials that contained legally privileged and private, financial information relating to investors. Before authorities may search through such materials in the United Kingdom, they are required to satisfy special requirements. (Sibson Op. ¶¶ 15-20, 24-26, attached as Sher Decl. Ex. G.) According to the Information and the U.K. Warrant, these requirements were ignored, and the search was unlawful under British law.

Any claim by the Government that its agents executed the search in good faith cannot be sustained. The three postal inspectors knew that the Government had not obtained a warrant in the United States and, therefore, could not have relied on any legal determination made by a U.S. magistrate. Nor could they have relied in good faith on the warrant that was issued by the British court. The British detective who applied for the U.K. Warrant represented to the British magistrate that the storage facility would not contain materials that were legally privileged or confidential. The postal inspectors had every reason to believe that Amerindo U.K.'s materials

2

would include substantial amounts of these very materials and should have known that the U.K. Warrant had issued upon false information.

As discussed in greater detail below, the Government's conduct violated the Fourth Amendment, and the evidence obtained from the United Kingdom should be suppressed.

## STATEMENT OF FACTS

### 1.  Gary Tanaka and Amerindo U.K.

Gary Tanaka is a citizen of the United States and, in 2005, served as a director, shareholder and officer of Amerindo U.K.  Mr. Tanaka maintains a permanent residence in London with his wife and children and, prior to recent events, conducted regular business and personal affairs from the offices of Amerindo U.K. at 43 Upper Grosvenor Street.  Mr. Tanaka stored both personal and professional belongings in this office, some of which were private, confidential and legally privileged.  (Tanaka Decl. ¶¶ 2-4.)

On May 26, 2005, during a visit to New York for the purpose of receiving medical treatment at Memorial Sloan-Kettering Cancer Center, Mr. Tanaka was arrested by agents of the United States Postal Inspection Service.  Mr. Vilar, who is also a director, shareholder and officer of Amerindo U.K., was arrested on the same day.  Since that date, Messrs. Vilar and Tanaka have been indicted and confined to home detention.  The Securities and Exchange Commission has filed a separate civil enforcement action against Messrs. Vilar and Tanaka, Amerindo U.K., Amerindo Investment Advisors Inc. ("Amerindo U.S.") and several other entities.

Subsequent to these disruptive events, Amerindo U.K. assigned the lease of the property at 43 Grosvenor Street to a third party in an effort to reduce its expenses.  Before Amerindo U.K.

vacated the property, the contents of the office were collected, packed in boxes and transferred to a storage facility located at Cadogan Tate, 239 Acton Lane in London ("Cadogan Tate").  Mr. Tanaka understood that Amerindo U.K.'s items would be stored in a private, secure space at Cadogan Tate and that only counsel for Amerindo U.K. and other agents of Amerindo U.K. would have access to the stored materials.  (Tanaka Decl. ¶¶ 5-6.)

On August 23, 2005, counsel to Amerindo U.K., Michael Cooper, informed the Financial Services Authority (the "FSA"), a regulatory authority in the United Kingdom, that Amerindo U.K.'s items had been moved to Cadogan Tate.  (Letter from Cooper to FSA of 8/23/05, attached as Sher Decl. Ex. H.)  The FSA had previously ordered Amerindo U.K. to preserve all of its documents.  (Letter from Greenhalgh of 5/26/05, attached as Sher Decl. Ex. I.)

### 2.  The Government's Investigation and the Search of Cadogan Tate

The Government's investigation of Alberto Vilar and Gary Tanaka began in February 2005.  In May 2005, the Government informed U.S. Magistrate Judge Pitman that it was seeking materials from Amerindo U.K.  (Sher Decl. Ex. E at 12.)  On July 25, 2005 – two months after informing Magistrate Judge Pitman of its interest in Amerindo U.K.'s materials and five months after initiating its investigation – the Government issued a request for assistance pursuant to the Mutual Legal Assistance Treaty (the "MLAT") between the United States and the United Kingdom.  (Sher Decl. Ex. D.)

In describing the allegations against Messrs. Vilar and Tanaka in the MLAT Request, the Government named only one alleged victim, Beulah Birrd, whom the Government acknowledged actually *profited* from her investments with Amerindo Investment Advisors, Inc. ("Amerindo Panama").  (Sher Decl. Ex. D at 2-3.)  The MLAT Request specifies only three other investors as potential victims and does not provide their names.  (Id. at 4-5.)  In addition to

4

Messrs. Vilar and Tanaka, the MLAT Request identified Renata Tanaka and James Stableford as persons "involved"[4] and identified Amerindo U.K., Amerindo Panama and Amerindo U.S. as the relevant entities.  (Id. at 8-9.)  It is unclear what, if any, personal knowledge the author of the MLAT Request, Lisa Burnett of the U.S. Office of International Affairs ("OIA"), possessed in connection with these allegations.  Indeed, the MLAT Request contained multiple inaccuracies. For instance, Mr. Tanaka has never met Ms. Birrd let alone discussed investments with her. (Tanaka Decl. ¶ 7.)

Despite the uncertain source and limited nature of the allegations described in the MLAT Request, the Government demanded "*all records, files, and other evidence in Amerindo UK's office that relate to Amerindo's investment services . . . .*"  (Sher Decl. Ex. D at 10 (emphasis added).)  The Government explained that this request *included but was not limited to* the following expansive list of items:

- Corporate records relating to bylaws, resolutions, client lists, client files and marketing materials (Id. at 10, ¶ 1);
- Documents concerning communications with "any clients" (Id.);
- Documents reflecting any private bank accounts held by Messrs. Vilar and Tanaka (Id. at 11, ¶ 11);
- Documents relating to "the operation and supervision of Amerindo's investment advisory business(es)" (Id. at 12, ¶ 15);
- Documents relating to "any participants in the fraudulent investment schemes" (Id. at 12, ¶ 17);
- Computers, hard drives and "any other devices or equipment capable of storing data" (Id. at 12, ¶ 19);
- Documents relating to the "training and maintenance of thoroughbred horses" (Id. at 13, ¶ 21);

---

[4] It is noteworthy that, during a court conference that took place on March 9, 2006, the Government indicated that it was *not* prepared to allege that Mrs. Tanaka and Mr. Stableford were co-conspirators who acted with unlawful intent.  [No transcript was available as of the date of this motion.]

- Records identifying all current and former employees of Amerindo and "personal identifiers (e.g. date of birth, social security number, and passport number)" (Id. at 13, ¶ 22).

On September 8, 2005, the Government asked the U.K. authorities to expedite the MLAT Request so that the Government could comply with discovery deadlines set by the Court. (Letter from Warlow to Blackley of 9/8/05, attached as Sher Decl. Ex. J.) The Government reiterated its request that U.K. authorities search the London offices of Amerindo U.K. and seize "*all documents records, files, computers, facsimile machines, photographs and other physical evidence . . . .*" (Sher Decl. Ex. J (emphasis added).)

On or about October 10, 2005, Detective Sergeant Howard Shaw of the Metropolitan Police in London submitted to a British magistrate a sworn information in support of the application to search Cadogan Tate. (Sher Decl. Ex. A.)[5] Detective Shaw explained in the Information that his application arose from "a formal request from the Judicial Authorities of the United States [sic]" and that "no separate UK investigation" was being conducted. (Id. at 2-3.) The Information summarized the allegations in general terms and attached the Government's MLAT Request. In addition, Detective Shaw represented to the British magistrate that the material sought "is likely to be relevant and *does not consist of, or include items of legal privilege, excluded material or special procedure material.*" (Id. at 1 (emphasis added).) Detective Shaw restated this view on the last page of the Information: "*I am satisfied that the material does not include items subject to legal privilege, excluded material or special procedure material.*" (Id. at 4 (emphasis added).) Detective Shaw further represented that "it would not be practicable to communicate with any person entitled to grant entry to the premises." (Id.)

---

[5] The Government has represented that a signed version of the Information exists but has not produced it to date.

Attached to the Information was a draft warrant which again indicated that Detective Shaw had sworn that the material to be searched "*does not consist of or include items subject to legal privilege, excluded material or special procedure material*."  (Sher Decl. Ex. A at 5 (emphasis added).)

On or about the same date that Detective Shaw submitted the Information in which he made these representations, the Government and the Defendants were engaged in discussions relating to the substantial volume of privilege materials that had been collected from the offices of Amerindo U.S.  (Letter from Litt of 10/7/05, attached as Sher Decl. Ex. K.)  The complex process of having a special team of postal inspectors segregate and review the privileged materials was first addressed at a July 2005 court conference, which was attended by Postal Inspector Fraterrigo.  (7/20/05 Tr. at 2, 3-8, 10-11, attached as Sher Decl. Ex. L.)  The Government indicated that it expected to go through the same privilege-screening process for documents seized from Amerindo U.K.  (Letter from Litt of 11/3/05; attached as Sher Decl. Ex. M at 6.)  Indeed the Government anticipated that privilege issues relating to such documents would be "particularly thorny."  (Id.)

On October 10, 2005, based on the Information submitted by Detective Shaw, a judge of a British court issued a warrant to search Cadogan Tate for "[d]ocuments relating to the activities of Amerindo (UK) and associated companies along with documents relating to the activities of Alberto Vilar (Vilar), Gary Tanaka (Tanaka), Renata Tanaka and James Stableford."  (Sher Decl. Ex. F at 1, 2.)[6]  The warrant attached and incorporated the same expansive list of documents that was set forth in the MLAT Request.  (Id. at 3-6.)  Finally, the U.K. Warrant

---

[6] The British court appears to have issued an identical, second warrant on October 14, 2005 for the purpose of renewing any authority that had been granted on October 10, 2005.  For ease of reference, this memorandum will refer to only one "U.K. Warrant."

purported to authorize three U.S. postal inspectors to participate in the search:  Cynthia Fraterrigo, Thomas Feeney and Annmarie Williamson.  (Id. at 1, 2.)

The three postal inspectors, with assistance from the London Metropolitan Police, executed the search of Cadogan Tate on October 13 and October 14, 2005.  (Sher Decl. Ex. C.). It is likely, although uncertain, that the Government searched through all 320 boxes of documents that were stored in Cadogan Tate.  After searching through the materials, the Government seized 43 boxes of documents and all 17 of Amerindo U.K.'s computers.  (Sher Decl. Exs. B, C.)  Among these materials were attorney-client correspondence, private financial data relating to investors, and documents, such as files relating to institutional clients of Amerindo U.S., that were well beyond the scope of the Government's allegations.[7]

That the search and seizure at Cadogan Tate was conducted for the sole purpose of assisting the U.S. Government's criminal prosecution and civil enforcement action was acknowledged by the Government at the February 9, 2006 conference before the Court:

> THE COURT:  Was the search done solely at the request of the United States government, or other did the British have their own law enforcement interest in conducting the search?
>
> MR. LITT:  My understanding is it was done at the request of the U.S. government.
>
> THE COURT:  So but for your MLAT request, they wouldn't have done any search, as far as you know, of Amerindo UK?
>
> MR. LITT:  Correct.

---

[7] In the interests of preserving Mr. Tanaka's rights under the attorney-client privilege and maintaining the confidentiality of certain financial information, examples of documents containing privileged communications and private financial data have not been attached to this publicly filed memorandum.  Defendant Tanaka will produce such materials for an *in camera* inspection upon request.  In addition, because counsel has endeavored to limit expenses by attempting to copy only relevant documents that were seized by the Government from Cadogan Tate, counsel for Mr. Tanaka is not in a position to attach examples of materials that do not relate to the Government's allegations.  Nevertheless, based on the review of the documents seized from Cadogan Tate, which are in the Government's possession, counsel for Mr. Tanaka believes that such irrelevant materials were in fact seized.

(2/9/06 Tr. at 29, attached as Sher Decl. Ex. N.)

During repeated appearances before the Court and in several court submissions, the Government indicated that it had issued an MLAT request and was seeking materials from Amerindo U.K.  (7/28/05 Tr. at 4, 8/11/05 Tr. at 6-9, 11/7/05 Tr. at 28, Letter from Litt to Judge Karas of 8/2/05 at 4-5, Letter from Litt to Judge Karas of 8/8/05 at 2-3, collectively attached as Sher Decl. Ex. O.)  Despite these multiple opportunities and the Government's focus on the collection of materials from Amerindo U.K., at no time in the eight months between the initiation of the investigation and the execution of the search did the Government ask the Court or any other magistrate of the United States for authority to conduct the search.  Instead, the Government bypassed the United States District Court by unilaterally invoking the MLAT between the United States and the United Kingdom and obtaining authority from a British court to seize materials that were sought for the sole purpose of using them in legal proceedings in the United States.

## ARGUMENT

The Government's seizure of materials from Cadogan Tate in the United Kingdom violated Mr. Tanaka's rights under the Fourth Amendment.  The Government failed to obtain a warrant from a court of the United States prior to executing the search and conducted the search in violation of both American and British law.  As a consequence of these violations, the evidence seized from Cadogan Tate should be suppressed.

### 1.  The Evidence Seized From Cadogan Tate Should Be Suppressed Because the Government Conducted a Warrantless Search In Violation of the Fourth Amendment

The evidence seized from Cadogan Tate should be suppressed because it was obtained through an unlawful, warrantless search.  Prior to executing a search or seizure, the Fourth

Amendment generally requires the Government to obtain a warrant issued upon probable cause. U.S. CONST AMEND. IV; *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993). A warrantless search is *per se* unreasonable under the Fourth Amendment subject only to a few well-delineated exceptions. *Perea*, 986 F.2d at 639. To support a motion to suppress evidence obtained from a warrantless search, the defendant must show that he or she had a reasonable expectation of privacy in the place or object searched. Once such a privacy interest is established, the Government has the burden of showing that the search was valid based on one of the exceptions to the warrant requirement. *Id.*

The Second Circuit has stated unequivocally that "the Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed against United States citizens." *United States v. Toscanino*, 500 F.2d 267, 280 (2d Cir. 1974) (holding that defendant's allegations that U.S. Government engaged in warrantless wiretapping in Uruguay constituted allegations of Fourth Amendment violation pursuant to 18 U.S.C. § 3504.) Indeed, in *Barr v. United States Department of Justice*, 819 F.2d 25 (2d. Cir. 1987), the Second Circuit ruled that, where foreign authorities take action at the request of American officials pursuant to an MLAT request, the U.S. Constitution applies, and a litigant may successfully claim that he or she has been the victim of a constitutional violation regardless of whether the Government obeyed the terms of the treaty. *Id.* at 27.

In *United States v. Bin Laden*, 126 F. Supp. 2d 264, 270-271 (S.D.N.Y. 2000), this Court ruled that the Warrant Clause of the Fourth Amendment *applied* to searches executed by the U.S. Government against an American citizen living in Kenya. The defendant, who was accused of participating in international terrorism, challenged two warrantless searches. With respect to the first search, the Court held that the Government was not required to obtain a warrant from a U.S.

magistrate before searching the defendant's residence because the search fell under the "foreign-intelligence exception" to the warrant requirement.  *Id.* at 277.  The Court explained that, before satisfying the foreign-intelligence exception, the Government must show that (1) the defendant was an agent of a foreign power, (2) the search in question was conducted primarily for foreign intelligence purposes, and (3) the searches were authorized by the President or the Attorney General.  *Id.*

With respect to the second search, however, the court agreed with the defendant that the Government *was required to obtain a warrant* before conducting electronic surveillance of the defendant's telephone calls because the Government had failed to obtain authorization from the President or Attorney General and, therefore, the search fell outside the scope of the foreign-intelligence exception.  *Id.* at 282, 288.  After determining that the warrantless search was unlawful, the court held that the exclusionary rule did not apply because it was not likely to have a deterrent effect.  The court reasoned that, the intelligence agents were concerned with national security and would likely have conducted the surveillance even if they had known that the recordings would be inadmissible at a future criminal trial.  *Id.* at 283.

The Ninth Circuit has also applied the Fourth Amendment's warrant requirement to overseas searches.  In *United States v. Verdugo-Urquidez*, 856 F.2d 1214 (9th Cir. 1988),  the court held that, prior to executing a search in Mexico, the Drug Enforcement Authority was required to obtain a warrant from a magistrate judge in the United States even though the warrant would not have legal effect in Mexico.  The court explained, "we cannot relieve the government from its obligation to obtain a search warrant simply because the place to be searched by the government is outside this country.  To do so would be to treat foreign searches differently from domestic searches just because they are foreign."  *Id.* at 1230.

The Supreme Court subsequently reversed on the grounds that the Fourth Amendment did not apply to *non-resident aliens* because the text and the history of the Fourth Amendment make clear that its protections extend only to "the people," i.e. citizens and other members of the national community. *United States v. Verdugo-Uriquedez*, 494 U.S. 259, 265-66. Importantly, the Supreme Court did not address the Ninth Circuit's conclusion – that the Government was required to obtain a warrant from a U.S. magistrate prior to conducting a foreign search – with respect to foreign searches involving *American citizens*. On the contrary, the Supreme Court acknowledged that the Fourth Amendment would apply differently to U.S. citizens. *Id.* at 273.

Gary Tanaka is an American citizen who had a reasonable expectation of privacy in the secure space at Cadogan Tate where he stored both personal and professional belongings. *See, e.g. United States v. Johns*, 851 F.2d 1131, 1136 (9th Cir. 1988) (holding that co-owner of materials found in storage unit had reasonable expectation of privacy and standing to challenge search). It is undisputed that the Government executed a warrantless search of Cadogan Tate. It is also undisputed that this was not a foreign search by foreign officials but a search initiated and effected by the United States Government.

The Government cannot meet its burden of demonstrating that its warrantless search at Cadogan Tate was valid according to one of the established exceptions to the Fourth Amendment's Warrant Clause. Unlike the intelligence agents in *Bin Laden*, the U.S. postal inspectors did not execute the search for the purpose of collecting foreign intelligence. The sole purpose of their search was to gather evidence for this criminal case and for a related civil enforcement action filed by the Securities and Exchange Commission. (Sher Decl. Ex. D at 1.)

Nor was this a case involving exigent circumstances. *See, e,g, United States v. Peterson*, 812 F.2d 486, 494 (9th Cir. 1987) (holding that Coast Guard's warrantless search of vessel in

international waters was permissible due to exigent circumstances).  Prior to the Government's search, the documents had been sitting undisturbed in the storage facility at Cadogan Tate for approximately two months.  The FSA had ordered Amerindo U.K. to preserve its documents and had been informed of their exact location.  During these two months, Messrs. Vilar and Tanaka were confined to home detention thousands of miles away in New York.  The Government has never asserted that exigent circumstances were present and has never attempted to demonstrate any risk of spoliation.  Indeed, the Government's own conduct suggests that exigent circumstances were not present.  At multiple court appearances in the presence of the Defendants, the Government repeatedly referred to its efforts to obtain documents from Amerindo U.K.  It would be absurd for the Government to now claim that exigent circumstances justified its warrantless search.

The fact that the Government's search was executed pursuant to a warrant issued by a British court does not satisfy the Fourth Amendment.  The Fourth Amendment requires warrants to issue upon probable cause and requires particular descriptions of items to be searched.  U.S. CONST AMEND. IV; *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993).  To satisfy the probable cause standard, "mere suspicion, common rumor, or even strong reason to suspect are not enough."  *Colello v. Securities and Exchange Commission*, 908 F. Supp. 738, 753 (C.D. Cal. 1995) (citations omitted).  Probable cause requires some objective evidence which would allow a reasonable officer to deduce that a particular individual has committed or is in the process of committing a criminal offense.  *Id.*

In general, in order to obtain a warrant from a British court, British authorities need only establish that there are "reasonable grounds for believing" that an offense has been committed – a standard which is lower than the Fourth Amendment's requirement of probable cause.  (Sher

13

Decl. Ex. G ¶¶ 5-9.)  Moreover, there is no requirement under British law that the items to be searched be specified with "particularity" as there is under U.S. law.  (Sher Decl. Ex. G ¶¶ 9-11.) In these circumstances, the search cannot be said to have comported with the Warrant Clause of the Fourth Amendment.  *See Colello*, 908 F. Supp. at 755 (holding that search and seizure pursuant to Swiss MLAT based on standard of "reasonable suspicion" violated Fourth Amendment).[8]

As a consequence of the Government's failure to obtain a warrant issued upon probable cause by a U.S. magistrate, the exclusionary rule should apply.  Unlike in *Bin Laden*, suppressing the evidence in this case would undoubtedly have a deterrent effect on postal inspectors and other law enforcement agents who seek evidence from American citizens living abroad.  An application of the exclusionary rule in this case would encourage prosecutors and law enforcement agents to obtain judicial authority prior to executing such a search.

The fact that Congress has not yet established a specific mechanism for obtaining warrants for overseas searches does not favor a contrary result.  The Court retains the inherent power to issue warrants even without a specific statutory mechanism.  *Bin Laden*, 126 F. Supp. 2d at 276, n. 16 (citing cases).  As the Second Circuit stated, "Congress may not nullify the guarantees of the Fourth Amendment by the simple expedient of not empowering any judicial officer to act on application for a warrant.  If the search is one which would otherwise be unreasonable, and hence in violation of the Fourth Amendment, without the sanction of a search warrant, then in such a case, for lack of a warrant, no search could lawfully be made." *Toscanino*, 500 F.2d at 280 (quoting *Best v. United States*, 184 F.2d 131, 138 (1st Cir. 1950)).

---

[8] As discussed in the next section, the British warrant was also invalid under British law and, for that reason as well, would not satisfy the Fourth Amendment's Warrant Clause.

Moreover, it is not clear that the current statutory mechanism for search warrants, set forth in Rule 41 of the Federal Rules of Criminal Procedure, is inadequate to address applications by the Government for warrants authorizing overseas searches. In analogous circumstances in which the Government seeks custody of a fugitive located in the United Kingdom, the Government is *required* to obtain an arrest warrant from a magistrate in the U.S. before invoking the applicable extradition treaty. *See* Extradition Treaty, June 8, 1972, U.S.-U.K., 28 U.S.T. 227, Art. VII ¶ 3. The Government employs the standard procedures set forth in Rule 4 of the Federal Rules of Criminal Procedure to obtain arrest warrants in such circumstances. *See generally* United States Attorneys' Manual § 9-15.240 ("Documents Required in Support of Request for Extradition); United States Attorneys' Criminal Resource Manual § 604 ("Form – Request for Provisional Arrest"). If the Government can obtain arrest warrants before invoking extradition treaties, there is no reason that the Government could not obtain a search warrant pursuant to Rule 41 before issuing an MLAT request.

### 2.   The Evidence Seized From Cadogan Tate Should Be Suppressed Because the Government's Search Was Unreasonable In Violation of the Fourth Amendment

The evidence seized from Cadogan Tate should be suppressed for the additional reason that the Government's search was unreasonable separate and apart from the Government's failure to obtain a warrant. The Fourth Amendment prohibits the Government from executing unreasonable searches and seizures regardless of whether the Government obtains a warrant. U.S. CONST AMEND. IV; *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992); *United States v. Bin Laden*, 126 F. Supp. 2d at 284 ("Even if the Government was not required to secure a warrant in advance of the searches, the Fourth Amendment still requires that the searches be reasonable."). The Government's search at Cadogan Tate was unreasonable under both American and British law.

Under American law, the Fourth Amendment itself prohibits general, overbroad searches in which agents of the Government indiscriminately rummage through a target's belongings. *George*, 975 F.2d at 75.  By this standard, the search of Cadogan Tate that was conducted by U.S. postal inspectors was clearly overbroad and unreasonable.  Like the general warrant that was executed in the offices of Amerindo U.S. in New York, the warrant issued by the magistrate in the United Kingdom purported to authorize the United States postal inspectors to seize virtually unlimited categories of documents.  For instance, paragraph one of the U.K. Warrant described *documents reflecting communications with "any clients."*  (Sher Decl. Ex. F at 3, ¶ 1.)  Paragraph 15 purported to authorize the postal inspectors to seize *any documents relating to the operation of Amerindo's investment advisory businesses.*  (Id. at 8, ¶ 15.)  Similarly vague and unrestricted was paragraph 17, which targeted *documents relating to "any participants" in unspecified "fraudulent investment schemes."*  (Id. at 8, ¶ 17.)  It is unclear what types of documents found among Amerindo U.K.'s materials at Cadogan Tate would *not* be included in these broad categories.[9]

The U.S. postal inspectors appear to have executed the overbroad U.K. warrant without any restriction.  After searching through all 320 boxes at Cadogan Tate, the Government seized 43 boxes of documents and all 17 of Amerindo U.K.'s computers.  (Sher Decl. Exs. B, C.)  Among these materials were personal holiday cards, telephone messages and files relating to Amerindo Investment Advisors (Cayman) Limited ("Amerindo Cayman"), that have no relation whatsoever to any of the Government's allegations.  The search was clearly overbroad and unreasonable under American law.

---

[9] The unlawfulness of warrants which purport to authorize the seizure of such broad categories of documents is addressed in greater detail in Defendant Tanaka's post-hearing motion to suppress dated January 10, 2006.

As suggested by the accompanying expert opinion, the Government's search of Cadogan Tate also violated British law. In determining whether a search executed overseas is unreasonable, several courts have ruled that foreign law must be consulted. *See, e.g., Peterson*, 812 F.2d at 490-91; *United States v. Juda*, 46 F.3d 961, 968 (9th Cir. 1995); *United States v. Barona*, 56 F.3d 1087, 1093 n.1 (9th Cir. 1995). A search is unreasonable under the Fourth Amendment if it violates foreign law. *Barona*, 56 F.3d at 1093 n.1.

First, as in the United States, a warrant issued in the United Kingdom on the basis of a sworn information that contains materially false representations is generally invalid and unlawful under British law. (Sher Decl. Ex. G ¶ 27.) The Information on which the U.K. Warrant was based contained *several false statements*. Detective Shaw represented to the British magistrate that the material sought "*does not consist of, or include items of legal privilege, excluded material or special procedure material*." (Sher Decl. Ex. A at 1.) Detective Shaw restated this view on the last page of the Information: "*I am satisfied that the material does not include items subject to legal privilege, excluded material or special procedure material*." (Id. at 4.)

In reality, the documents stored by Amerindo U.K. at Cadogan Tate *were* likely to contain both legally privileged and "special procedure material," and the American and British officials knew it. Special procedure materials are materials that are confidential and held according to an express or implied agreement to maintain them in confidence. (Sher Decl. Ex. G ¶ 13.) Examples of such materials include documents that contain private financial data or personal information such as social security numbers. (Sher Decl. Ex. G ¶ 14.) Investment advisory companies typically possess special procedure materials. (Id.) Based on their review of the Amerindo U.S. materials, the U.S. postal inspectors knew that the boxes in Cadogan Tate

were likely to include such materials,[10] and Detective Shaw either knew or should have known as well.  Indeed, some of the examples of items identified in the MLAT Request and the U.K. Warrant, such as documents reflecting social security numbers and passport numbers, themselves constituted special procedure material.  (Sher Decl. Ex. D at 13, ¶ 22; Sher Decl. Ex. G ¶¶ 13-14.)

Detective Shaw further falsely represented that "*it would not be practicable to communicate with any person entitled to grant entry to the premises*."  (Id.)  Amerindo U.K. was represented by counsel, Michael Cooper, who had access to Cadogan Tate.  Mr. Cooper had contacted the British authorities to identify himself and to update them on the location of Amerindo U.K.'s documents.  It was plainly false to assert that it was not practicable to communicate with anyone entitled to grant entry to the premises.

Second, as a result of the false statements contained in the Information, the warrant issued upon the wrong U.K. statute and was not authorized according to the correct U.K. legal standards.  Among the 43 boxes and 17 computers that the postal inspectors seized were confidential materials that contained personal and proprietary information relating to investors, Amerindo U.K.'s directors and employees, and the business of Amerindo U.K. itself.  In order to obtain authorization to search a facility that contains such special procedure material, U.K. authorities must follow the procedures set forth in a separate provision of the U.K. Police and Criminal Evidence Act of 1984, referred to as "Schedule 1."  (Sher Decl. Ex. G ¶ 15.)  Schedule 1 requires officials to seek authority from a circuit judge rather than a magistrate.  (Id. ¶ 16.)  In this case, the U.K. Warrant was apparently issued by the "Bow Street Magistrates' Court" rather

---

[10] That the U.S. postal inspectors knew or should have known that the Amerindo U.K. materials were likely to contain special procedure and legally privileged materials is discussed in greater detail below in the discussion relating to the good-faith exception.

than a circuit court.  (Sher Decl. Ex. F at 1, 2.)  Before obtaining a U.K. warrant, Schedule 1 also requires British authorities to demonstrate that the public interest in investigating crime outweighs the public interest in the confidentiality of the private materials at issue.  (Id. at 5, ¶ 19.)  No such showing was made in this case.  Finally, under Schedule 1, authorities must serve advance notice upon the subject of the search.  (Id. at 5, ¶ 20.)  According to the U.K. Warrant and the Information produced by the Government, these provisions of Schedule 1 were ignored, and Defendant Tanaka maintains that the search was, therefore, unlawful under British law.

### 3.  <u>The Good-Faith Exception Does Not Apply</u>

The Government cannot escape the consequences of its violations of the Fourth Amendment through the good-faith exception.  As an initial matter, the good-faith exception identified in *United States v. Leon*, 468 U.S. 897 (1984), applies in cases involving warrants issued by a U.S. court that have been subsequently invalidated.  The Supreme Court recognized this exception because a search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer…"  *Id.* at 913-14.  According to the Court, an officer proceeding on such a warrant "cannot be expected to question the magistrate's probable-cause determination" and may thus possess an objectively reasonable belief that his or her conduct comports with the Fourth Amendment.  *Id.* at 921.

The policies behind the good-faith exception do not apply in this case.  The officers who executed the search were not proceeding pursuant to a warrant issued by a U.S. magistrate and, therefore, did not have a compelling reason to believe that their conduct comported with the Fourth Amendment.  Nor could the officers have gained any comfort from the fact that a British court had issued a warrant.  A British magistrate, applying principles of U.K. law, could not have

given any consideration to the Fourth Amendment, a provision of U.S. law.  The good-faith exception is a narrow rule that was conceived to apply to searches conducted pursuant to a subsequently invalidated warrant; it was not intended to apply to warrantless searches or searches executed under foreign law.  For this reason alone, the Court should decline to apply the good-faith exception.  *Cf. United States v. Ajlouny*, 629 F.2d 830, 840 (2d Cir. 1980) (declining to apply exclusionary rule to warrantless foreign intelligence where agents acted in good-faith); *Bin Laden*, 126 F. Supp. 2d at 283.

Even if the Court takes the view that the good-faith exception applies in cases other than those involving subsequently invalidated U.S. warrants, the good-faith exception certainly should not apply in this case.  The Government cannot demonstrate that the prosecutors, OIA officials and postal inspectors who effected the search of Cadogan Tate held an objectively reasonable view that their actions complied with the Fourth Amendment.  On the contrary, the facts suggest that agents of the Government disregarded their Fourth Amendment obligations and may have knowingly executed a U.K. warrant that had been issued upon false information.

Apparently, the decision to search Cadogan Tate without a U.S. warrant was initially made by lawyers at the United States Attorney's Office and OIA.  Since the good-faith exception is concerned with whether the deterrent effect of the exclusionary rule may be achieved, the Court should consider whether these agents of the Government acted according to an objectively reasonable belief that their conduct comported with the Fourth Amendment and whether their conduct could be deterred by the application of the exclusionary rule in this case.  In *Leon*, the Supreme Court rejected as "speculative" the argument that applying the exclusionary rule to searches conducted in good faith would deter inadequate warrant applications.  468 U.S. 897, 918.  In this case, *where no warrant application was made at all*, no empirical evidence is

necessary to conclude that applying the exclusionary rule would deter such violations of the Fourth Amendment in the future.

Lawyers for the Government, who regularly handle MLAT requests, should have known that they were obligated to obtain a warrant before executing the search in Cadogan Tate. As noted, in *Bin Laden*, the court ruled that federal authorities were generally *required* to obtain U.S. warrants when executing overseas searches against American citizens. The court declined to apply the exclusionary rule because of the particular facts of that case and the unique context of foreign-intelligence gathering. The *Bin Laden* opinion was issued in December 2000, approximately six years before the search at issue in this case. That decision related to a high-profile case of international terrorism and was published in both Westlaw and the second edition of the Federal Supplement. Several courts, including the Ninth Circuit and the Supreme Court itself, also have addressed this issue and have issued rulings that suggest that U.S. warrants are required before the Government may execute a search against an American citizen living abroad. In short, the Fourth Amendment's Warrant Clause applied to the search of Cadogan Tate. It was not objectively reasonable for these agents of the Government to assume that no warrant was necessary. Applying the exclusionary rule would undoubtedly encourage lawyers at the United States Attorney's Office and OIA to obtain U.S. warrants before executing future foreign searches against American citizens.

The postal inspectors who physically executed the search at Cadogan Tate similarly could not have had an objectively reasonable belief that the search comported with the Fourth Amendment. First, like the U.S. warrant, the U.K. warrant was so facially deficient in failing to

particularize the things to be seized that the postal inspectors could not have presumed it to be valid under Fourth Amendment standards.[11]

Second, Defendants Vilar and Tanaka had filed motions to suppress on September 12, 2005 – four weeks before the postal inspectors searched the Cadogan Tate storage facility.  In his memorandum of law, Defendant Vilar challenged the search of the offices of Amerindo U.S. on the ground that it was an unlawful, overbroad search and was conducted pursuant to an invalid, general warrant.  Although the Court had not resolved the motions, the postal inspectors were presumably aware that there was a challenge to the lawfulness of their search of Amerindo U.S.

Nevertheless, the postal inspectors moved ahead and executed the U.K. Warrant, which replicated the very language that was challenged in the September 12 motion to suppress.  For instance, Defendant Vilar argued that the U.S. warrant's description of documents "prepared in connection with the running and supervision of the operations of the investment advisory business" was unlawful because it purported to authorize the seizure of essentially everything in the office.  (9/12/02 Vilar Mem. at 12.)  This provision is virtually identical to the provision in the U.K. Warrant, which purported to authorize the seizure of "documents relating to . . . the operation and supervision of Amerindo's investment advisory business(es)." (Sher Decl. Ex. F at 5, ¶ 15.)  The postal inspectors could not have had an objectively reasonable belief that the search of Cadogan Tate was lawful in light of the fact that the Government and the Defendants were contemporaneously litigating the constitutionality of a similar search in the same case based on a virtually identical warrant.

---

[11] This argument is set forth in greater detail in Defendant Tanaka's post-hearing memoranda in support of his motion to suppress documents seized from Amerindo U.S.  (Tanaka Mem. at 22-28; Tanaka Reply Mem. at 9-11.)

Finally, and most alarmingly, the evidence suggests that the postal inspectors who executed the search at Cadogan Tate were aware that the U.K. Warrant had issued upon false representations.  The draft warrant that was attached to the Information indicated that the warrant would issue upon an oath that the material to be seized from Cadogan Tate "*does not consist of or include items subject to legal privilege, excluded material or special procedure material.*" (Sher Decl. Ex. A at 5 (emphasis added).)  Similarly, in the Information itself, Detective Shaw twice represented to the British magistrate that Amerindo U.K.'s materials at Cadogan Tate would not include documents subject to legal privilege or documents that were otherwise confidential. (Id. at 1, 4.)

Had the postal inspectors reviewed the U.K. Warrant and the Information that supported it, the postal inspectors would have known that it had issued upon false representations.[12]  Five months before she searched Cadogan Tate, Inspector Fraterrigo participated in the search of Amerindo U.S., where multiple documents that contained sensitive financial information and legally privileged correspondence were seized.  (12/14/05 Tr. at 194, attached as Sher Decl. Ex. P.)  Inspector Fraterrigo was also present at the court conference when the Government discussed the various issues associated with managing the substantial volume of privileged materials that had been collected from Amerindo U.S.  (Sher Decl. Ex. L at 2, 3-8, 10-11.)  In short, Inspector Fraterrigo was well aware that Amerindo U.S. had in its possession documents that would be characterized as "items subject to legal privilege" and "special procedure materials."

---

[12] It is presumed that the good-faith exception would not apply if the postal inspectors did not bother to review the U.K. Warrant and the Information.  *See United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006) (holding that good-faith exception did not apply where officers either did not read warrant or disregarded it.)

The evidence also suggests that the Government and its agents knew that the documents stored by Amerindo U.K. at Cadogan Tate were likely to include the very same categories of documents that were seized from Amerindo U.S., including special procedure materials. The Government understood that Amerindo U.K. functioned as the administrative office for Amerindo U.S. and expected to find similar client files and correspondence. (Sher Decl. Ex. D at 2, 5.) The postal inspectors knew or should have known that, as a consequence of Amerindo U.K.'s administrative functions, it was likely to possess correspondence that contained sensitive financial information. The fact that the U.K. Warrant was virtually identical to the U.S. warrant is further evidence that the Government and its agents believed that they would find similar categories of documents at Amerindo U.K. Indeed, among the very documents that were described in the U.K. Warrant were documents with "personal identifiers," such as social security numbers and passport numbers. (Sher Decl. Exs. D at 13, ¶ 22, F at 6, ¶ 22.) These are the very materials which fall into the category of "special procedure materials" under British law. (Sher Decl. Ex. G ¶ 14.)

The evidence that the Government and its agents knew that they were likely to find legally privileged materials at Amerindo U.K. is even more compelling. In July 2005, in connection with the process of screening privileged documents that had been seized from Amerindo U.S., the Government sent to counsel for Mr. Tanaka a list of lawyers. (E-mail from Litt of 7/25/05, attached as Sher Decl. Ex. Q.) Among the law firms listed were firms, such as Herbert Smith and Wedlake Bell, which are *headquartered in London and have no offices in the United States, Panama or the Cayman Islands.*[13] (Id.) As noted, the evidence suggests that

---

[13] Information taken from Wedlake Bell (visited 3/9/06) <http://www.wedlakebell.com/wheretofind.html> and Herbert Smith – Locations (visited 3/9/06) <http://www.herbertsmith.com/Locations/>.

Inspector Fraterrigo was familiar with the details of this privilege-review process. (Sher Decl. Ex. L at 2, 3-8, 10-11.)  Moreover, before the Government had seen any of the documents or computer data seized from Cadogan Tate, the Government indicated that it anticipated that the materials would present privilege issues that were "*particularly thorny*."  (Sher Decl. Ex. M at 6 (emphasis added).)

Aware that Amerindo U.K.'s materials at Cadogan Tate were likely to include both legally privileged and special procedure materials, the postal inspectors nevertheless proceeded to search Cadogan Tate based on a warrant that had been procured through representations that no such materials would be found.  As expected, these representations proved false, and the postal inspectors seized substantial amounts of both legally privileged and special procedure materials.[14]

As the Supreme Court stated in *Leon*, suppression "remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id*. at 923.  The postal inspectors knew or should have known that the British magistrate who issued the U.K. Warrant was misled by false information.  The evidence demonstrates that the Government cannot support any claim that the postal inspectors had an objectively reasonable belief that their actions were lawful, and the good-faith exception should not apply.

### 4.  **The Court Should Order a Hearing**

In the event that the Government argues in its opposition brief that the good-faith exception applies and presents sufficient evidence for the Court to consider this argument,

---

[14] As noted, Defendant Tanaka has not attached examples of privileged documents or special procedure materials that were seized by the Government but would be willing to do so *in camera.*

Defendant Tanaka respectfully requests a hearing to determine whether the Government and its agents, in light of the circumstances, could have had an objectively reasonable belief that their search comported with the Fourth Amendment. *Leon*, 468 U.S. at 922-23 ("in some circumstances the officer will have no reasonable grounds for believing hat the warrant was properly issued"). For instance, the Court may need to determine whether the postal inspectors consulted certain documents, such as the Information, when they conducted the search of Cadogan Tate. *See United States v. Burke*, 718 F. Supp 1130, 1141 (S.D.N.Y. 1989). The Court may also need to determine what, if any, representations were made to the postal inspectors with respect to the legality of the U.K. Warrant. *Peterson*, 812 F.2d at 492 (holding that good-faith exception applied where U.S. agents received assurances from high-ranking Philippine authorities that the search at issue was legal).

Alternatively, Defendant Tanaka respectfully requests a hearing to challenge the validity of the search of Cadogan Tate on the grounds that the U.K. Warrant contained deliberately or recklessly false or misleading information. Defendant Tanaka has properly alleged evidence of reckless disregard for the truth and has identified the specific portions of the U.K. Warrant that are false. In such circumstances, a hearing is proper under *Franks v. Delaware,* 438 U.S. 154, 171-72 (1978).

## **CONCLUSION**

For the foregoing reasons, Defendant Gary Alan Tanaka respectfully requests that the Court order that any evidence seized from Amerindo U.K.'s offices be suppressed or, in the alternative, that a hearing be held to determine the issues raised by this motion.

Dated:  March 9, 2006
   New York, New York

By:        /s/  Steven G. Kobre

Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200


Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI GOODRICH &
ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York  10017
Tel: 212.999.5800

Attorneys for Defendant Gary Alan
Tanaka