**EXHIBIT O**

```
                                                                          1
     57sdvilc

 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   UNITED STATES OF AMERICA,              New York, N.Y.
 3
 4            v.                            05 Cr. 621 (KMK)
 4
 5   ALBERTO VILAR and GARY TANAKA,
 5
 6              Defendants.
 6
 7   ------------------------------x
 7
 8
 8                                          July 28, 2005
 9                                          4:35 p.m.
 9
10
10   Before:
11
11                    HON. KENNETH M. KARAS,
12
12                                          District Judge
13
13
14                        APPEARANCES
14
15   DAVID N. KELLEY
15        United States Attorney for the
16        Southern District of New York
16   BY:  MARC O. LITT
17        Assistant United States Attorney
17
18   HOFFMAN & POLLOK
18        Attorneys for Defendant Alberto Vilar
19   BY:  JEFFREY C. HOFFMAN
19        SUSAN WOLFE
20
20   WILSON SONSINI GOODRICH & ROSATI
21        Attorneys for Defendant Gary Tanaka
21   BY:  GLENN C. COLTON
22            - and -
22   KOBRE & KIM LLP
23   BY:  STEVEN G. KOBRE
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    3
           57sdvilc

    1              DEFENDANT TANAKA:  I have.
    2              THE CLERK:  Have you discussed it with your attorneys?
    3              DEFENDANT TANAKA:  Yes, I have.
    4              THE CLERK:  Do you waive the public reading of the
    5    Indictment?
    6              DEFENDANT TANAKA:  Yes, I do.
    7              THE CLERK:  And how do you plead, guilty or not
    8    guilty?
    9              DEFENDANT TANAKA:  Not guilty.
    10             THE CLERK:  Thank you.
    11             THE COURT:  All right.  How are we doing on discovery,
    12   Mr. Litt?
    13             MR. LITT:  We are where we were last week other than
    14   we continue to go through boxes doing the privilege review.  We
    15   continue to do analysis of computers.  There have been some
    16   difficulties, I understand, with the server, not surprisingly,
    17   because it is large.  There is apparently additional software
    18   that needs to be purchased.  An order has been put in with
    19   Postal to try to get the kind of software that is needed to do
    20   the searches for potential privilege documents that we
    21   discussed the last time.
    22             We did have some communication with counsel for
    23   Amerindo U.S., who supplied us with a list of names of lawyers
    24   that went well beyond what we knew of to begin with.  So that
    25   is helpful and that's factoring into the process.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

4

57sdvilc

1          On the MLAT front there are MLATs out there and still
2     more to come.
3          THE COURT:  One of the issues that came up last week
4     was the privilege review, and Ms. Wolfe had indicated she would
5     speak with co-counsel and make sure that she and co-counsel are
6     copacetic with what the government was doing.
7          Is that not an issue at this point?
8          MR. LITT:  I have not heard anything definitive from
9     Ms. Wolfe or Mr. Hoffman, nor has the issue yet been broached
10    with Mr. Kobre or Mr. Colton.  I think there are a number of
11    discovery issues that the parties probably ought to sit down
12    very early next week, perhaps, and discuss so that we can get
13    on the same page, or different pages, about how things will
14    run.  I would suggest after that we might be in a better
15    position to come to the Court with a proposed, or with an idea,
16    at least, of what the issues are and what a reasonable schedule
17    is.
18         THE COURT:  OK.  Yes, I will encourage that that be
19    done.
20         Mr. Hoffman, you had asserted --
21         MR. HOFFMAN:  Your Honor, if I may, I have a request,
22    and it may tend to speed this up so I will make it and we will
23    see where we go.
24         This Superseding Indictment appears to be pretty much
25    the same as the original charges in the first indictment

```
                                                                          1
     58BCVILC

1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,              New York, N.Y.
3
4              v.                           05 Cr. 006212
4
5    ALBERTO VILAR,
5    GARY TANAKA,
6
6                   Defendants.
7
7    ------------------------------x
8
8                                           August 11, 2005
9                                           11:15 a.m.
9
10
10   Before:
11
11                   HON. KENNETH M. KARAS,
12
12                                          District Judge
13
13                          APPEARANCES
14
14   DAVID N. KELLEY,
15        United States Attorney for the
15        Southern District of New York,
16   MARC O. LITT,
16        Assistant United States Attorney.
17
17   JEFFREY HOFFMAN,
18        Attorney for Defendant Vilar.
18
19   WILSON, SONSINI, GOODRICH & ROSATI,
19   GLENN C. COLTON, of Counsel.
20        -
20   KOBRE & KIM, LLP,
21   STEVEN G. KOBRE,
21        of Counsel.
22   Attorneys for Defendant Tanaka.
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

6

58BCVILC

```
 1   unforeseen things that come up, maybe we cross that bridge when
 2   we come to it, but whether you get 90, 80, 60 days or zero
 3   days, at least taking your estimate for what it is at this
 4   point, day 89 comes around and you are not done, then what?
 5            MR. LITT:  I would hope I would know in advance of day
 6   89.  If something comes up and our best faith aggressive
 7   estimate turns out to be wrong for some reason and we believe
 8   that we have been diligent and it would be justified to come
 9   and ask for further exclusion of time, we would come to the
10   court and do that.
11            THE COURT:  What is the status of the MLAT to the
12   Brits?
13            MR. LITT:  They have it.  I have had more
14   conversations this morning and numerous e-mail exchanges with
15   them, with various people this morning about trying to push it
16   forward and get -- and locate the documents.  I have gotten
17   conflicting information about where those documents may be.
18   Some information that I received indicates that the documents
19   and six more computers may be in the office where we thought
20   they were.  Other information tends to indicate otherwise,
21   so --
22            THE COURT:  That is a little different because in the
23   letter to me, I think the first letter or the second letter,
24   the information you got was that the office at Upper Grosvenor
25   Street or Square, or whatever it is, was vacated.  You allowed
```

```
                                                                  7
     58BCVILC

 1    for the possibility that it had been burglarized and you seemed
 2    to be somewhat facetious in that, so the latest information is
 3    the data may be there.
 4            MR. LITT:  I allowed for -- I have been pressing to
 5    get that information, to get clarification on what vacated
 6    meant, whether that meant that the people were no longer
 7    reporting to work there or whether the office had been cleaned
 8    out.
 9            THE COURT:  Right.
10            MR. LITT:  And it is literally as of this morning that
11    I finally got some feedback and learned that the vacated that
12    was reported to me basically was unclear, that the Metropolitan
13    Police did not set foot inside the office nor did they
14    apparently look in a window to see what was there; but there
15    have been other communications between employees or
16    representatives of employees of Amerindo U.K. and the FSA,
17    which is a U.K. regulatory authority as late as July 29, which
18    indicate to the FSA at least that there may be 50 boxes of
19    documents and six computers at 43 Upper Grosvenor Street.  I
20    learned that as of this morning.
21            THE COURT:  Is the implicit assumption that that's all
22    the documents and computers that were ever there, or some are
23    there and some aren't there, or you just don't know?
24            MR. LITT:  I don't know, nor do I know what portion of
25    those would be responsive to the search warrant that we
```

58BCVILC

1   requested to be executed.
2              THE COURT:  What is so relevant or important about
3   getting the Amerindo U.K. documents?  I signed a letter.  There
4   is some suggestion that, at least according to the government,
5   the money from the victim that was supposed to be targeted to a
6   certain investment but was not, is due to Amerindo Panama, and
7   there may be some documentation in England of all this?  Do I
8   have that right?
9              MR. LITT:  Yes.  Mr. Vilar has represented in letters
10  both himself personally and through representatives that the
11  victim identified as the victim in the indictment was an
12  investor in Amerindo Panama.  It's also represented in that
13  correspondence that, and we have other information to suggest
14  that sort of the back office operations or the administrative
15  functions of Amerindo Panama were conducted in the United
16  Kingdom at the Amerindo U.K. office, and therefore we have
17  reason to believe that -- and we also have information that
18  account statements were prepared for the victim in Amerindo
19  U.K. and sent to the victim from Amerindo U.K.'s offices, and
20  that other investors who invested in other things through
21  Amerindo Panama got their information from employees and from
22  documents prepared in the Amerindo U.K. office.  That is our
23  basis for believing that documents relevant to Amerindo Panama
24  its operations, investments -- I should also add that
25  Mr. Tanaka, who was an owner of Amerindo U.K. and was primarily

9

58BCVILC

1  located in the Amerindo U.K. office, was responsible for
2  directing the trading activities, as the government understands
3  it, for all the Amerindo entities, Amerindo U.S. U.K., and
4  Panama.  So investments that were undertaken on behalf of --
5  securities that were bought and sold and investments made on
6  behalf of Amerindo Panama investors were made and originated at
7  Amerindo U.K. offices.
8            It's for all those reasons that we believe that there
9  is information relevant to the victim, the victim's investment,
10 the operations more generally of Amerindo Panama, and the
11 context there of the Amerindo U.K. office.
12           THE COURT:  Let's get back for a second about the
13 status of documents.  In your letter you represent that the
14 court-appointed monitor that Judge Swain appointed in
15 connection with the SEC action as well as Amerindo U.S. counsel
16 had made overtures to try to locate the documents in the U.K.
17 and were unsuccessful.  In light of what you apparently learned
18 this morning, do you know what efforts they undertook to find
19 out where the documents were?
20           MR. LITT:  I believe they asked for access -- I
21 believe that Mr. Knut and Mr. Licker had communications
22 with -- I am not sure which defendant's counsel, I think
23 Mr. Tanaka's counsel -- in an effort to get access to the
24 office to be able to look for documents.
25           THE COURT:  Did they call Amerindo U.K. employees --

```
                                                                    1
     5B74VILC
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   UNITED STATES OF AMERICA
 3
 4         v.                                05CR621(KMK)
 4
 5   ALBERTO VILAR,
 5   GARY TANAKA,
 6
 6               Defendants.
 7
 7   ------------------------------x
 8
 8                                           New York, NY
 9                                           November 7, 2005
 9                                           4:45 p.m.
10
10   Before:
11
11                    HON. KENNETH M. KARAS
12
12                                           District Judge
13
13                        APPEARANCES
14
14   MICHAEL J. GARCIA
15        United States Attorney for the
15        Southern District of New York
16   MARC LITT
16        Assistant United States Attorney
17
17   SUSAN WOLFE
18        Attorney for Defendant Vilar
18
19   GLENN COLTON
19   STEVEN KOBRE
20        Attorneys for Defendant Tanaka
20
21   ALSO PRESENT:
21        Cynthia Fraterrigo (U.S. Postal Inspector)
22        Leo Barrios (Pretrial Services)
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

28

```
     5B7PVIL2
1              THE COURT::  All right, now, we need to talk about
2    discovery slash speedy trial, slash MLAT, they are all tied up
3    together.
4              Is there anything that's happened, Mr. Litt, since you
5    last heard?
6              The UK, the first wave of the UK materials is due to
7    arrive next week, is that right?
8              MR. LITT:  They are supposed to arrive in New York
9    customs either the 10th or the 11th.  And we are trying to make
10   arrangements, obviously, to get them through customs.
11             THE COURT:  If you don't have hooks.
12             MR. LITT:  We're trying .  So that is why I
13   represented what I did, which is that by the 15th we should
14   have them.
15             THE COURT:  And your letter was a little unclear as to
16   the Bahamas.  I mean, have you heard from Bahamian officials as
17   to when to expect the materials?
18             MR. LITT:  Only through OIA.  And what I reported was
19   the information I had, which is, I believe they are waiting for
20   a court date in the Bahamas for a Court order to issue, and
21   which would order them to.
22             THE COURT:  Do you have any indication as to when?
23             MR. LITT:  Testing my memory, at the time we made the
24   request in August, I believe, with the Bahamas, I was told ten
25   to 12 weeks.  Which is sort of the average time to get
```



U.S. Department of Justice

United States Attorney
Southern District of New York

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

August 2, 2005

BY HAND

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 920
New York, New York 10007

　　　　　Re:　United States. v. Alberto William Vilar and Gary Alan Tanaka,
　　　　　　　S1 05 Cr. 621 (KMK)

Dear Judge Karas:

　　　At the Court's request, the Government respectfully submits this letter brief in support of its July 28, 2005, oral motion to exclude time pursuant to 18 U.S.C. §§ 3161(h)(8)(A). The Government contends that a 90-day exclusion of time is warranted to allow the Government sufficient time to screen documents and computers obtained as a result of the execution of a search warrant at Amerindo Investment Advisors Inc. to protect the attorney-client privileges of the defendants and Amerindo, so that it can comply with its obligations under, *inter alia*, Fed. R. Crim. P. 16, and *Brady v. Maryland*, 373 U.S. 83 (1963). The Government also hereby seeks a 120-day exclusion of time pursuant to 18 U.S.C. § 3161(h)(9) to obtain evidence of the offenses charged in the Indictment through an official request made to the Central Authority of the United Kingdom, as well as certain additional requests which are, or are soon to be, pending with the Department of Justice's Office of International Affairs for transmittal to foreign authorities.[1]

Background

The Complaints and Indictments

　　　Defendant Tanaka was arrested on May 26, 2005, on a criminal complaint charging him

---

　　　[1] Because the additional requests have not yet been transmitted to foreign authorities, the Government respectfully requests that if the Court requires additional information about those requests, that the Government be permitted to provide such information *ex parte*.

Hon. Kenneth M. Karas
August 2, 2005
Page 2

with three counts of wire fraud in violation of 18 U.S.C. § 1343. Defendant Vilar was arrested the same day on a separate criminal complaint charging him with investment adviser fraud, mail fraud and wire fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17, and 18 U.S.C. §§ 1341, 1343, and 2. An indictment was returned on June 9, charging Vilar with investment adviser fraud, securities fraud, mail fraud, wire fraud, and money laundering, in violation of 15 U.S.C. §§ 80b-6 and 80b-17, 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5, and 18 U.S.C. §§ 1341, 1343, 1957 and 2. On July 26, 2005, a superseding indictment (the "Indictment") was filed charging Vilar and Tanaka in a conspiracy to commit securities fraud, investment adviser fraud, mail fraud, wire fraud, and money laundering, in violation of 18 U.S.C. § 371. The defendants were also charged with substantive counts of the above-listed offenses.

The charges in the Indictment relate to the misappropriation of approximately $5.25 million from the Victim – $5 million of which was solicited from the Victim as an investment in an Amerindo Small Business Investment Company ("SBIC") to be licensed by the U.S. Small Business Administration. The Indictment alleges that rather than invest that $5 million in the SBIC as promised, the defendants misappropriated the funds, and used them instead to benefit themselves by using those funds to pay the operating expenses of Amerindo Investment Advisors Inc. ("Amerindo US"), to redeem the investment made by another investor (the "Investor") in an unrelated investment offered by Amerindo Investment Advisors, Inc. ("Amerindo Panama"), and to fund the personal expenses and charitable contributions of Vilar by transferring $1 million of the Victim's funds to one of Vilar's personal checking accounts.

The Amerindo Affiliated Entities And the Amerindo UK Office

Vilar and Tanaka were partners who owned Amerindo US, an investment adviser registered with the U.S. Securities and Exchange Commission ("SEC"), and its affiliates, Amerindo Panama, and Amerindo Investment Advisors (UK) Ltd. ("Amerindo UK"). Amerindo US primarily served large institutional clients, and was the adviser to one or more U.S. mutual funds. Amerindo Panama had a variety of U.S. and foreign clients, who were offered investments in private funds, private placements (directly or indirectly), and fixed rate deposits, among other things. Tanaka generally worked out of the Amerindo UK office at 43 Upper Grosvenor Street in London, where he directed the trading activities for all Amerindo affiliated entities, including Amerindo US and Amerindo Panama. Tanaka also made decisions about how to allocate purchased securities between and among the clients and accounts advised by Amerindo US and Amerindo Panama. Many other administrative functions related to the operation of Amerindo Panama were also conducted by Tanaka, his wife, Renata Tanaka, and others at the Amerindo UK office. For example, Amerindo Panama client account statements were prepared and mailed from the Amerindo UK office, and correspondence with and about Amerindo Panama clients was also generated in the Amerindo UK office.

Vilar has asserted that the Victim was a client of Amerindo Panama. The Government

Hon. Kenneth M. Karas
August 2, 2005
Page 3

believes that the Investor was solicited in, or from, the Amerindo UK office and invested in a product purportedly offered by Amerindo Panama.

On May 26, 2005, the day of the defendants' arrests, the Financial Services Authority ("FSA") of the United Kingdom sent a letter addressed to "The Chief Executive, Amerindo Advisors (UK) Ltd." at 43 Upper Grosvenor Street in London. That letter stated in pertinent part:

> **PRESERVATION OF DOCUMENTS**
>
> The Financial Services Authority ("FSA") has been contacted by the US Securities and Exchange Commission ("SEC") in connection with its interest in certain activities of Amerindo Investment Advisers Inc and potentially Amerindo Advisers (UK) Limited.
>
> We understand that the SEC will shortly be making a request for assistance to the FSA in order to obtain responsive information and documents from Amerindo Advisers (UK) Limited in which event the FSA will consider whether to use its powers set out in Part XI of the Financial Services and Markets Act 2000. Part XI provides the FSA with powers to require the provision of information and the production of documents.
>
> I should be grateful if you would immediately ensure that all documents and records, including computer records, pertaining to Amerindo Advisers (UK) Limited are preserved.

<u>The Search Warrant Executed At Amerindo US</u>

On May 26, 2005, a team of U.S. Postal Inspectors executed a search warrant at the Amerindo U.S. offices on the 22nd Floor of 399 Park Avenue, New York, New York. The Inspectors removed more than approximately 100 boxes of documents, and approximately 31 computers including three large servers. Since that time the Government has been making efforts to have a team of individuals unconnected with this criminal case cull out those documents (both hard copy and digital) that are potentially protected by an attorney-client or work product privilege belonging to Amerindo U.S. or individually to Vilar and/or Tanaka. The Government's efforts have been slowed by the volume of material, the time required to perform forensic analysis on a large number of computer hard drives, including a server with a large storage capacity, and the need to obtain special computer software to assist with its efforts. The Government has obtained a list of approximately 100 lawyers and law firms from counsel for Amerindo US, and is attempting through a combination of manual and electronic means to

Hon. Kenneth M. Karas
August 2, 2005
Page 4

segregate potentially privileged documents so that documents which apparently are not subject to any privilege promptly can be reviewed by both the prosecution team and the defendants, so that the status of potentially privileged documents can be determined so that additional documents can be made available to the parties, and so that the Government can fulfill its obligations under Fed. R. Crim. P. 16 and *Brady* while minimizing the risk that the prosecution team will be tainted by the receipt of information protected by attorney-client or work product privileges.[2]

<u>Efforts To Obtain Documents From The Amerindo UK Office</u>

On or about June 2, 2005, in response to the filing of a Complaint and and application for injunctive relief brought by the SEC in the Southern District of New York, 05 Civ. 5231 (LTS), U.S. District Judge Laura Taylor Swain appointed Robert Knuts, Esq. to be a monitor for Amerindo US. Among other things, Knuts was empowered to "determine the names of all individuals and entities owning securities accounts or initiating securities transactions over which Amerindo [US], Alberto William Vilar [], Gary Alan Tanaka [] or any other Amerindo employee have maintained and/or exercised discretionary authority, how these individuals' and entities' funds were invested, . . . the types of investments they held, where their investments were custodied, and who maintained discretionary authority over the account." Knuts was also empowered to "determine the relationship between or among Amerindo, Amerindo Investment Advis[o]rs, Inc. (Panama), Amerindo Advisors (U.K.) Limited, and Amerindo Investment Advisors (Cayman) Limited," and to "determine the source, amount, disposition and location of all money, property, assets, or other income received by Amerindo, or for its direct or indirect benefit, from January 1, 2002 to the present."

Shortly after assuming the duties of court-appointed monitor, Knuts sought access to the Amerindo UK office through Amerindo U.S., its counsel, and Tanaka's counsel, but was unsuccessful. The Government, for its part, asked Amerindo U.S.'s counsel, Eugene Licker, Esq., whether he could get access to relevant documents at the Amerindo UK office. Licker attempted to obtain access to the Amerindo UK office, but failed in his efforts. The Government also asked Tanaka's current defense counsel, within days of their retention, whether their client would assist with the Government's efforts to obtain evidence from the Amerindo UK office. They have never responded to the Government's request.

While the Government was engaged in informal, and what it hoped would be more expeditious, efforts to obtain information from the Amerindo UK office, the Government also prepared a formal request pursuant to a Mutual Legal Assistance Treaty ("MLAT") for the Office of International Affairs of the U.S. Department of Justice ("OIA") to serve on the Central Authority for the United Kingdom. That MLAT request, dated July 25, 2005, was served on the

---

[2] One of the individuals on that list is the chief financial officer of Amerindo US who, for a period of time, also served as its General Counsel.

Hon. Kenneth M. Karas
August 2, 2005
Page 5

appropriate authorities in the UK, seeking assistance with the conduct of a search of the Amerindo UK office, and the seizure of documents and computer evidence relevant to the Government's ongoing investigation, including among other things evidence related to the Victim, and the Victim's investments, including those investments reflected on the account statements described in the Indictment, the SBIC investment, and the investor who received approximately $2.85 million of the Victim's investment in the Amerindo SBIC.

On or about July 28, 2005, the Government received an e-mail from an OIA employee stationed in London which indicated that the Metropolitan Police would not be able to assist with the search at 43 Upper Grosvenor Street because the premises had been vacated approximately two months ago (coinciding closely to the timing of the defendants' arrests). Since then, the Government has been attempting to obtain more information from the UK authorities, including whether the Amerindo UK offices were empty, or whether they were "vacated" in the sense that employees stopped reporting for work. The Government is also in the process of obtaining the assistance of the UK authorities to determine where the documents from the Amerindo UK office went, and to seize those documents if they have not been destroyed. To date the Government has been unable to obtain additional information about the initial investigation conducted by the Metropolitan Police. According to a representative from OIA, the Government's MLAT request is still pending with the Central Authority of the United Kingdom.

### Pertinent Provisions of the Speedy Trial Act

The Speedy Trial Act, 18 U.S.C. § 3161, *et seq.* (the "STA"), provides that the trial of a defendant charged in an indictment with the commission of an offense shall commence within seventy days of the filing date of the indictment. 18 U.S.C. §3161(c)(1). The STA further provides for the exclusion of time from the running of the STA clock in certain circumstances. The pertinent sections of the STA are set forth in full below:

> (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
>> (1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to --
>
>     . . . .
>
>>> (F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;
>
>     . . . .
>
>> (8)(A) Any period of delay resulting from a continuance



*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 8, 2005

BY HAND

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 920
New York, New York 10007

   Re: United States. v. Alberto William Vilar and Gary Alan Tanaka,
      S1 05 Cr. 621 (KMK)

Dear Judge Karas:

  The Government respectfully submits this letter brief in reply to the August 5, 2005 letter brief filed by defendants in opposition to the Government's motion to exclude time under the Speedy Trial Act ("STA").

  The defendants' opposition brief, in essence, asserts that because the Government has failed to act diligently in discovery matters in this case, the Government's motion should be denied. The defendants' submission ignores the full context of the Government's motion and, instead, presents a caricature of the relevant history in an effort to portray the Government's efforts in the worst possible light. In fact, the Government has acted diligently both with respect to its review of the seized documents and its efforts to obtain relevant evidence from abroad; indeed, a significant cause of the "luxurious pace" decried by the defendants is the apparent lack of interest in moving the discovery process forward exhibited by the defendants themselves.

  First, for over one month after their arrests, the defendants did not have counsel retained to represent them for purposes beyond presentment and detention hearings. As the Court well knows, Mr. Vilar did not have counsel retained for all purposes until July 20, 2005. On that day, the Government made the Court and Susan Wolfe, Esq., who was appearing on behalf of Mr. Vilar aware of what the Government was doing with respect to discovery and the need to conduct a review for potentially privileged documents. The Court sought input from Ms. Wolfe with respect to the privilege review issues and process, as did the Government. Subsequently, the Government provided Mr. Vilar's counsel with the list of approximately 100 lawyers and law firms that the Government was using to screen documents for potential privilege. The

Kenneth M. Karas
August 8, 2005
Page 2

Government requested constructive feedback on the list: was it appropriate, too broad or too narrow. The Government has received no response. Indeed, the Government has heard nothing from Mr. Vilar's counsel with respect to these issues other than Mr. Hoffman's August 5, 2005, letter by which Mr. Vilar joined the opposition brief filed by Mr. Tanaka's attorneys.

The record is similar with respect to Mr. Tanaka. Within days of learning of their retention, the Government met with Mr. Tanaka's counsel on July 6, 2005, to discuss the status of the case. Mr. Tanaka's counsel, despite being new to the case, must have appreciated the privilege and discovery issues, yet did not give the Government any indication of their position on the issues until the arraignment on July 28, 2005, when Mr. Colton announced that the Government should have completed its review, that Mr. Tanaka opposed any exclusion of time to permit the Government to review documents for privilege, and that any issues of privilege could be easily resolved. The Government also solicited Mr. Tanaka's counsel's input on the list of lawyers being used to screen for potentially privileged documents. To date, the Government has yet to receive a response. Indeed, as recently as August 3, 2005, Mr. Tanaka's counsel told the Government that there was a serious possibility that the defendants would waive the privilege on behalf of themselves and Amerindo, thereby negating the need for the very privilege review that counsel now claim the Government "had to know was coming" and that the Government should have devoted the resources to completing long ago.[1]

In these circumstances, it was patently reasonable for the Government to review the documents at less than "full capacity", while waiting for guidance from the defendants before wasting resources on a potentially unnecessary exercise. Accordingly, defendants' argument that the Government's alleged lack of diligence should preclude an exclusion of time under the STA should be rejected.

Second, it was reasonable for the Government to wait to submit its MLAT request to the United Kingdom until it appeared that less cumbersome methods would fail. Prior to the defendants' arrests, the Government was aware that the SEC was going to apply for a receivership that would have given it access to the Amerindo Panama documents in London, and

---

[1] With respect to the review of computer data, the Government had to purchase special software to conduct the privilege review on approximately 450,000 e-mails residing on a network exchange server seized during the search warrant. Notwithstanding defendants' apparent view that the Government is, or should be, omniscient, the Government did not know (and could not have known) the structure and details of Amerindo's computer system prior to to seizing the computers and beginning the forensic analysis process. It is unreasonable for defendants to suggest that the Government should have had on hand software to meet every eventuality. The Government has proposed an aggressive and reasonable schedule to complete its review of the massive amount of data recovered from Amerindo US, and an exclusion of time to permit the Government the opportunity to complete that process is warranted.

Kenneth M. Karas
August 8, 2005
Page 3

the Government understood that there was a fair probability that the receiver would share those documents with the Court, the SEC, and the Government. The Government was also aware that a United Kingdom government regulator (the FSA) intended to request that Amerindo preserve its documents, and knew that the MLAT process was unlikely to be the most expeditious means of obtaining the documents sought by the Government. In fact, a monitor was appointed, and the monitor was given the authority necessary to obtain access to those documents. Unfortunately, neither the monitor, nor Amerindo US's counsel was able to gain access to the Amerindo UK office (notwithstanding the fact that according to Amerindo US's records, it was the guarantor on the Amerindo UK lease). Finally, according to the preliminary information received in response to its MLAT request – a response obtained just two days after the Indictment was filed – it would not have much mattered had the Government proceeded more quickly in connection with the MLAT request to the UK, because employees of the defendants apparently vacated the office nearly contemporaneously with the defendants' arrests. Although it is possible that there was a burglary at the office, it appears more likely that the defendants' employees closed down the office and removed the documents. Part of the time that the Government now needs to investigate the circumstances of the emptying of the office, and to attempt to track down the documents, is likely a result of actions undertaken by the defendants' own employees.

In these circumstances, the Government should not have held against it the diligent efforts it made to obtain evidence from the Amerindo UK office in the most efficient way possible. The 120-day exclusion of time sought by the Government is appropriate and this Court should exercise its discretion to grant the Government's application.[2]

---

[2] The case relied upon by defendants in opposition to the Government's motion, *United States v. Zabady*, 546 F. Supp. 35 (M.D.Pa. 1982) is not nearly as "instructive" as defendants contend. In *Zabady*, the Court dismissed an indictment without prejudice after the Government sought an extension of time of "six months or more" to complete pretrial discovery and prepare its case-in-chief following a three-year pre-indictment investigation. The circumstances here are not comparable. First, unlike the circumstances in *Zabady*, the Government's investigation began six weeks prior to the defendants' arrests, not years earlier. Second, the Government has not sought an open-ended exclusion of time; rather, it has sought a 120-day exclusion of time based on the best information at its disposal concerning the likely response time from foreign governments.

Kenneth M. Karas
August 8, 2005
Page 4

      The Government respectfully requests that, if the Court believes it is necessary to hold a pretrial conference on this matter before August 29, that such a conference be scheduled for a time before noon on August 11.

                                      Respectfully submitted,

                                      DAVID N. KELLEY
                                      UNITED STATES ATTORNEY

                           By: _____
                                 Marc Litt
                                 Assistant United States Attorney
                                 (212) 637-2295

cc:    Glenn C. Colton, Esq. (By facsimile)
        Steven Kobre, Esq. (By facsimile)
        Jeffrey Hoffman, Esq. (By facsimile)