Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200

Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York  10017
Tel: 212.999.5800

*Attorneys for Defendant*
*Gary Alan Tanaka*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | S2 05 Cr. 621 (KMK) |
| - against - | ECF CASE |
| ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT GARY A. TANAKA'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE UNITED KINGDOM**

## TABLE OF CONTENTS

**SUPPLEMENTAL STATEMENT OF FACTS** ................................................. 1

**ARGUMENT** ................................................................................. 4

   **1.**   **Gary Tanaka Has Standing to Challenge the Search of Cadogan Tate** .................................................................. 4

   **2.**   **The Fourth Amendment Applies to The Search of Cadogan Tate** ................................................................. 10

   **3.**   **The Government Was Required to Obtain a Warrant Before Executing the Search of Cadogan Tate** ................................... 11

   **4.**   **The Government's Search of Cadogan Tate Was Unreasonable** .................................................................. 17

   **5.**   **The Good-Faith Exception Does Not Apply** ....................................... 18

   **6.**   **The Court Should Order A Hearing** ................................................. 20

**CONCLUSION** ............................................................................. 22

# TABLE OF AUTHORITIES

## CASES

*Barr v. United States Dept. of Justice*, 819 F.2d 25 (2nd Cir. 1987) ............................11, 12

*Colello v. Securities and Exchange Comm'n,* 908 F. Supp. 738 (C.D. Cal. 1995) ...........12

*Franks v. Delaware,* 438 U.S. 154 (1978)................................................................. 20-21

*Ohio ex rel. Eaton v. Price*, 364 U.S. 263 (1960)..............................................................13

*Rosado v. Civiletti*, 621 F.2d 1179 (2nd Cir. 1980) ..................................................... 10-11

*Simpson v. Saroff*, 741 F. Supp. 1073 (S.D.N.Y. 1990) .....................................................7

*United States v. Abiodun*, No. 04 Cr. 1316 (DC), 2005 WL 3117305

    (S.D.N.Y. Nov. 22, 2005) ................................................................................4, 5, 6

*United States v. Baez*, 349 F.3d 90 (2nd Cir. 2003)..........................................................15

*United States v. Bin Laden*, 126 F. Supp. 2d 264 (S.D.N.Y. 2000)...................... 12, 19-20

*United States v. Deturbiville*, 238 F.3d 432, 2000 WL 1290350

    (9th Cir. Sept. 12, 2000)........................................................................................7

*United States v. Leon*, 468 U.S. 897 (1984)...............................................................19, 21

*United States v. Maturo*, 982 F.2d 57 (2nd Cir. 1992).......................................................10

*United States v. Melucci,* 888 F.2d 200 (1st Cir. 1989)................................................4, 5, 6

*United States v. Paroutian*, 299 F.2d 486 (2nd Cir. 1962) ..................................................7

*United States v. Perea*, 986 F.2d 633 (2nd Cir. 1993) .......................................................12

*United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987) ....................................................12

*United States v. Poulsen*, 41 F.3d 1330 (9th Cir. 1994) ...............................................4, 5, 6

*United States v. Rahme*, 813 F.2d 31 (2nd Cir. 1987)......................................................7n.

*United States v. Salameh*, No. 93 Cr. 0180 (KTD), 1993 WL 364486

    (S.D.N.Y. Sept. 15, 1993) ................................................................. 4-5, 6

*United States v. Toscanino*, 500 F.2d 267 (2nd Cir. 1974) ................................................10

*United States v. U.S. Dist. Court for E. D. Michigan*, 407 U.S. 297 (1972) ............... 13-14

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).......................................... 12-13

*Walter v. United States*, 447 U.S. 649 (1980)................................................................. 8-9

## CONSTITUTIONAL PROVISIONS

U.S. CONST AMEND. IV ........................................................................... *passim*

## TREATIES

S. Treaty Doc. No. 104-2, 1994 WL 855115 (Dec.  2, 1996)...........................................12

## RULES

Fed. R. Crim. P. 41(b)(3) .................................................................................16

Defendant Gary Alan Tanaka respectfully submits this reply memorandum in further support of his motion to suppress evidence seized by agents of the United States Postal Inspection Service on October 13 and October 14, 2006 from Cadogan Tate[1] in the United Kingdom.

## SUPPLEMENTAL STATEMENT OF FACTS

In light of the Government's claim that Mr. Tanaka lacks standing to bring this motion to suppress, the following additional facts are being presented to the Court.

In or about August 2005, Amerindo U.K. and Cadogan Tate negotiated an arrangement whereby Cadogan Tate would collect all of the materials found in Amerindo U.K.'s offices at 43 Upper Grosvenor Street, including all documents, decorations and furniture, and deliver some items to Christie's, the auction house, and other items to the Cadogan Tate storage facility located at 239 Acton Lane. According to the arrangement, Christie's would auction off certain pieces of furniture and art, and the remaining materials would be stored at Cadogan Tate in the name of Amerindo U.K. Amerindo U.K. and Cadogan Tate agreed that Cadogan Tate would receive payment for these services, including the long-term storage of Amerindo U.K.'s files, by collecting a portion of the proceeds of the auction. (Tanaka Reply Decl. ¶¶ 2-4.)

On August 2, 2005, Paul Higgs of Cadogan Tate provided written estimates of the cost of these services to Amerindo U.K. (Letter of 8/2/05 from Higgs to Tanaka;

---

[1] All abbreviated terms in this memorandum are defined in Defendant Tanaka's initial memorandum of law in support of this motion, which was filed on March 9, 2006.

attached as Tanaka Reply Decl. Ex. A.).[2]  The estimate for the storage service indicated that the minimum storage period was four weeks and that invoices were generated on a monthly basis.  (Id. at 9.)  In the same correspondence, Mr. Higgs enclosed a list of terms and conditions, which advised, "[i]n respect of all sums which are overdue to us, we will charge interest on a daily basis calculated at 4% per annum above due prevailing base rate for the time being of the Bank of England."  (Id. at 11.)  None of terms and conditions indicated that Cadogan Tate would seize or dispose of Amerindo U.K.'s property in the event of non-payment.

Also attached to Mr. Higgs' letter was a description of Cadogan Tate's storage services, which detailed the storage facility's sophisticated security system:

> Our storage facility is modern and external security is provided by CCTV linked to a 24/7 central monitoring station.  All external areas are well lit.  Internal security is provided by a modern intruder alarm system linked to a 24 hour central monitoring station using BT's RedCare service.  The main loading bay is also covered by CCTV and movements in and out are digitally recorded.  We have secure access control into the building . . . .

(Id. at 14.)  The description also indicated, "[i]f items are to be containerised, the container number will be noted and the *container will be sealed*."  (Id. (emphasis added).)

By August 23, 2005, Cadogan Tate had collected and delivered Amerindo U.K.'s items to Christie's and the storage facility as planned.  (Tanaka Reply Decl. ¶ 5; Sher Decl. Ex. H.)  In or about September 2005, Mr. Tanaka learned that the Christie's auction had not taken place as scheduled.  Nevertheless, as of October 14, 2005, Christie's continued to hold assets of Amerindo U.K. that were supposed to be sold and gave no

---

[2] The letter of August 2, 2005 to Renata Tanaka from Paul Higgs indicates that Cadogan Tate also intended to deliver items to Lloyds International Auctioneers.  Mr. Tanaka does not know whether this occurred.

indication to Mr. Tanaka or other agents of Amerindo U.K. that the auction would not take place in the future.  (Tanaka Reply Decl. ¶ 6.)

At no point prior to October 14, 2005, when United States postal inspectors conducted the search of Cadogan Tate, did anyone from Cadogan Tate demand that Amerindo U.K. modify the payment arrangement for the storage of Amerindo U.K.'s documents.  Nor did anyone from Cadogan Tate, prior to October 14, 2005, indicate to Mr. Tanaka or any other agent of Amerindo U.K. that Amerindo U.K.'s materials would be seized or disposed of in the absence of immediate payment.  As of October 14, 2005, Mr. Tanaka had no reason to believe that the arrangement between Amerindo U.K. and Cadogan Tate has changed.  Indeed, materials of Amerindo U.K. that were not seized by agents of the Government continue to be stored at Cadogan Tate in the same secure location.  (Tanaka Reply Decl. ¶¶ 7-11.)

Since the arrest of Messrs. Tanaka and Vilar, Amerindo U.K. has experienced financial difficulties.  Messrs. Tanaka and Vilar were required to post millions of dollars in bail and have been confined to their homes, where their ability to manage their businesses has been limited.  Separately, the Securities and Exchange Commission brought an action against Amerindo U.S., and Amerindo U.S. lost all but one of its clients.  As a result of these events, Amerindo U.S. did not make payments to Amerindo U.K. pursuant to a service arrangement between the two entities.  These payments were Amerindo U.K.'s primary source of income.  (Tanaka Reply Decl. ¶¶ 12-13.)  Although Amerindo U.K. endured these conditions since May 2005, it was not until November 30, 2005, six weeks after the search of Cadogan Tate, that a British court entered a winding-

up order against Amerindo U.K.  (Letter of December 13, 2005 from O'Shea to Tanaka, attached as Tanaka Reply Decl. Ex. B.)

## ARGUMENT

### 1.  Gary Tanaka Has Standing to Challenge the Search of Cadogan Tate

Gary Tanaka had a reasonable expectation of privacy in the storage facility at Cadogan Tate and has standing to challenge the Government's search and seizure.  Mr. Tanaka had a subjective belief that the items stored at Cadogan Tate would be kept private, secure and free from unlawful, official intrusion, and this belief was objectively reasonable.  (Tanaka Decl. ¶ 6.)

In its opposition to Mr. Tanaka's motion to suppress, the Government argues that Mr. Tanaka does not have standing because a statement by Mr. Vilar's counsel "suggests" that Amerindo U.K. defaulted on its lease payment obligations.  (Gov't Mem. in Resp. at 10.)   The Government does not submit any evidence other than Mr. Hoffman's statement to support this claim.  Instead, the Government cites four cases in which a court denied standing to a defendant challenging a search of a storage facility. (Id. at 9.)  Each of these cases involved circumstances which were entirely different from the circumstances in this case.

First, all four of the cases cited by the Government involved defendants who *provided false names to the storage facility.  United States v. Abiodun*, No. 04 Cr. 1316 (DC), 2005 WL 3117305, at *3 (S.D.N.Y. Nov. 22, 2005) (false name and false identification); *United States v. Salameh*, No. 93 Cr. 0180 (KTD), 1993 WL 364486, at *5 (S.D.N.Y. Sept. 15, 1993) (false name); *United States v. Poulsen*, 41 F.3d 1330, 1331-32 (9th Cir. 1994) (false name and two false addresses); *United States v. Melucci*,  888

4

F.2d 200, 202 (1st Cir. 1989) (false name and address). The fact that, in each of these cases, the defendant had provided false information to the storage facility that was searched was critical to the court's decision to deny standing. As the court stated in *Salameh*, "[i]t seems contrary to reason to let a person use an alias to hide his connection with leased property and yet maintain that he has standing to challenge a search of the premises." *Salameh.* 1993 WL 364486, at *5.[3]

Second, in each of the cases cited by the Government, the storage company had notified the defendant that his right to the storage unit would terminate, and the defendant failed to take action in response. For example, in *Poulsen*, before the challenged search took place, the storage company mailed to the defendant a lien notice which indicated the amount that was owned and warned:

> If this sum is not paid in full within 14 days from the date of this notice your right to use the storage space and/or facility will terminate, you will be denied access, and an owner's lien on any stored property will be imposed.

*Poulsen*, 41 F.3d at 1332. Notwithstanding the notice, the defendant failed to pay the amount owed. *See also*, *Abiodun*, 2005 WL 3117305, at *1 n.1 (defendant failed to pay for storage unit after company made multiple attempts to notify him that contents of the storage facility would be sold); *Melucci*, 888 F.2d at 201-02 (defendant failed to pay rent in timely fashion despite owner's attempt to notify him and rental agreement that permitted storage company to take possession of unit upon default). Similarly, in *Salameh*, the defendant stored highly flammable explosives in a rented locker notwithstanding a rental agreement that prohibited the storage of such items and

---

[3] The court in *Salameh* noted that its decision to deny standing was not based solely on the fact that the defendant had provided an alias. *Id.* at *5.

permitted the owner to terminate the rental agreement in the event that the defendant breached this condition. *Id.* 1993 WL 364486, at *6 n. 8.

Third, in each of the cases cited by the Government, by the time the search in question took place, the storage company had taken some action to assert possession over the defendant's property. For instance, in *Abiodun*, at the time the search took place, the company had scheduled an auction of the defendant's stored property and had placed an "overlock" on the storage unit. *Abiodun*, 2005 WL 3117305, at *1 n. 1, *3. *See also*, *Salameh*, 1993 WL 364486, at *6 (storage company terminated defendant's rights to locker upon discovering explosives); *Poulsen*, 41 F.3d at 1332 (manager of storage facility obtained statutory lien, entered unit and removed contents); *Melucci*, 888 F.2d at 201-02 (owner of storage facility removed lock and took possession of storage unit).

None of the factors which caused the courts to deny standing in the cases cited by the Government was present in this case. Amerindo U.K. stored its materials under its own name and address, and there is no evidence that Mr. Tanaka attempted to hide his connection with the stored property. (Tanaka Reply Decl. ¶ 3.) The terms and conditions of the storage did not warn that Cadogan Tate could seize, sell or otherwise dispose of Amerindo U.K.'s property in the event of non-payment. The only provision relating to non-payment indicated that Cadogan Tate would charge substantial interest for overdue payments. (Tanaka Reply Decl. Ex. A at 11.) Nor is there evidence that Cadogan Tate made any attempt to notify Mr. Tanaka that it would take such action. (Tanaka Reply Decl. ¶¶ 7-8.) Finally, there is no evidence that Cadogan Tate ever attempted to take possession of Amerindo U.K.'s belongings before the search took place on October 14,

2005, and the British court did not exercise any authority with respect to Amerindo U.K.'s property until November 30, 2005.  (Tanaka Reply Decl. Ex. B.)

In the absence of factors such as these, courts have stated that a defendant's reasonable expectation of privacy will not be extinguished by a defendant's failure to pay rent alone.  In *United States v. Deturbiville*, 238 F.3d 432, 2000 WL 1290350, * 1 (9th Cir. Sept. 12, 2000) (unreported), the Ninth Circuit reversed the district court's ruling that the defendant lacked standing to challenge a search of his storage unit because he had failed to pay rent.  Distinguishing the case from *Poulsen*, where the storage facility owner had obtained a lien on the contents of the storage unit, the court concluded that the defendant's mere failure to pay rent did not rise to the level of voluntary abandonment of the property.  *Id.*  Similarly, in the context of a search of an apartment, the Second Circuit held that that the mere fact that the defendant may not have paid rent was insufficient to defeat his legitimate expectation of privacy where the landlord had not attempted to evict the defendant and the defendant had exhibited an intent to return to the apartment. *United States v. Paroutian*, 299 F.2d 486, 488 (2d Cir. 1962).  *See also*, *Simpson v. Saroff*, 741 F. Supp. 1073, 1078-9 (S.D.N.Y. 1990) (holding that school had standing to challenge search of school property despite nonpayment of rent and pending eviction proceedings).[4]

In any event, the Government has not presented any evidence to show that, by October 14, 2005, Amerindo U.K. had defaulted on payments to Cadogan Tate.  On the

---

[4] Several courts have come to contrary conclusions in the context of hotel rooms rented on a day-to-day basis, where expectations of privacy are necessarily diminished and limited to a shorter duration. *See, e.g.*, *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987).  Nevertheless, it is clear that the lease of a long-term storage facility rented on a month-to-month basis is more analogous to an apartment than to a hotel room.

contrary, the evidence suggests that the payment arrangement that Cadogan Tate and Amerindo U.K. had entered into was still in effect in October 2005 and may still be in effect today. (Tanaka Reply Decl. ¶¶ 10-11.)   The fact that five months after the search, on March 9, 2006, counsel for Defendant Vilar indicated that he was having difficulty accessing the documents at Cadogan Tate does not extinguish the legitimate expectation of privacy that Mr. Tanaka had in October 2005.

It is also worth noting that any financial difficulties that Amerindo U.K. may have had in October 2005 were largely a result of the actions of the Government and the Securities and Exchange Commission.  The directors of Amerindo U.K. were required to post millions of dollars in bail and have been confined to apartments in New York since their arrest.  Amerindo U.K.'s income has been virtually eliminated as a consequence of the civil enforcement action against its main customer, Amerindo U.S.  Denying standing in these circumstances would create a troubling precedent that would encourage the Government to use its resources to financially weaken defendants until they can no longer afford to protect their private spaces.

Even if the Court determines that Amerindo U.K. failed to pay rent owed to Cadogan Tate and that, by October 14, 2005, Gary Tanaka had voluntarily abandoned his property interest in the storage area, Mr. Tanaka maintained a separate, legitimate expectation of privacy over the sealed boxes which were stored at Cadogan Tate.  Upon opening these boxes and reviewing the materials therein, the Government executed a second unauthorized search that was distinct from its initial unauthorized entrance into the storage area.  *See Walter v. United States*, 447 U.S. 649, 654 (1980) (holding that the fact that FBI agents obtained lawful possession of boxes of film did not give them

authority to search contents of boxes).    Regardless of the Government's purported justification for the search of Amerindo U.K.'s rented storage area, the Government cannot justify its unlawful search of the sealed boxes.

The Government also argues that Mr. Tanaka does not have standing to challenge the seizure of documents relating to Amerindo Panama because he and Mr. Vilar previously stated that they had sold Amerindo Panama in 2001.  (Gov't Mem. in Resp. at 10-11.)[5]  The Government's argument should fail for at least two reasons.  First, the January 31, 2006 Indictment alleges that the statement that Messrs. Tanaka and Vilar no longer owned Amerindo Panama was *false*.  Thus, the Government appears to take the position that Mr. Tanaka does, in fact, own Amerindo Panama.  To the extent that the Government intends to argue that Mr. Tanaka has forfeited his legitimate expectation of privacy based exclusively on some theory of estoppel, *i.e.,* that he cannot claim a legitimate expectation of privacy over certain documents for the sole reason that he previously represented that he did not own the company which generated the documents, the Government has not presented any authority to support such a theory.

Second, regardless of whether Mr. Tanaka owned Amerindo Panama, there is no dispute that Mr. Tanaka was a shareholder, director and officer of Amerindo U.K.  It is also undisputed that Amerindo U.K. performed certain administrative functions for Amerindo Panama.  According to the Government's own allegations, it was in Amerindo U.K.'s office in London "where certain administrative functions related to Amerindo Panama were performed, including meeting with and corresponding with investors,

[5] Rather than attach the letter in which this statement was allegedly made, the Government cites the allegation in the January 31, 2006 Indictment that refers to this statement.

9

preparation of client account statements, processing investor redemption requests, and directing equity trades and financial transactions involving Amerindo Panama investor funds." (Gov't Mem. in Resp. at 4 (citing July 26, 2005 Indictment).) As a shareholder, director and officer of Amerindo U.K., Gary Tanaka clearly had a legitimate expectation of privacy in Amerindo Panama documents that were maintained by Amerindo U.K. for legitimate business purposes.

Gary Tanaka has established that, at the time of the Government's search, he had a legitimate expectation of privacy with respect to all of the documents that were stored by Amerindo U.K. at Cadogan Tate. The Government has failed to present any evidence that calls this into question. The Court should, therefore, find that Gary Tanaka has standing to challenge the search and seizure that took place at Cadogan Tate.

### 2.  The Fourth Amendment Applies to The Search of Cadogan Tate

The Fourth Amendment applies to the Government's search of Cadogan Tate regardless of whether the Court employs the "agency" test, the "joint venture" doctrine or some other analysis. The Government's contention that the Second Circuit has not squarely addressed the extraterritorial application of the Fourth Amendment is incorrect. (Gov't Mem. in Resp. at 13.) The Second Circuit has repeatedly applied the agency test to determine the applicability of the Constitution to the extraterritorial conduct of the United States Government against an American citizen. In *United States v. Toscanino*, the Second Circuit ruled that that the Fourth Amendment "applies to the conduct abroad of *agents acting on behalf of the United States*." *Toscanino*, 500 F.2d 267, 280 n.9 (2d Cir. 1974) (emphasis added). *See also*, *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992) (applying agency test to wiretap search in Turkey); *Rosado v. Civiletti*, 621 F.2d

1179, 1189 (2d Cir. 1980) ("the Bill of Rights does apply extraterritorially to protect American citizens against the illegal conduct of United States *agents*") (emphasis added). Similarly, in considering whether the Fifth Amendment applied to an MLAT request executed in Switzerland, the Second Circuit looked to "agency principles" and whether the actions of the Swiss government were carried out at the request of the American government.  *Barr v. United States Department of Justice*, 819 F.2d 25, 27 (2d. Cir. 1987).

Applying the agency test – or any other approach – it is clear that the Fourth Amendment applies to the search of Cadogan Tate.  Indeed, if there were ever circumstances that justified the application of the Fourth Amendment to an overseas search, such circumstances are present in this case.  The search of Cadogan Tate was carried out directly by employees of the United States Postal Inspection Service.  The search was done for the sole purpose of collecting evidence against American citizens for the Government's criminal action and the Securities and Exchange Commission's civil enforcement action in New York.  The only difference between the search of Cadogan Tate and the search of Amerindo U.S. is the location of Cadogan Tate in the United Kingdom.  The Second Circuit has plainly ruled that geography alone does not eliminate the restraints imposed upon the Government by the Constitution, and the Court should not hold otherwise.

### 3.  <u>The Government Was Required to Obtain a Warrant Before Executing the Search of Cadogan Tate</u>

In the event that the Court determines that the Fourth Amendment applies to the search of Cadogan Tate, the Court should impose all of its provisions, including the warrant requirement.  The Fourth Amendment requires the Government to obtain a

warrant prior to executing a search, and a search conducted without a warrant is *per se* unreasonable unless the Government can demonstrate that it falls under one of the few recognized exceptions. *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993).

The fact that the Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters, S. Treaty Doc. No. 104-2, 1994 WL 855115 (Dec. 2, 1996) ("U.S.-U.K. MLAT"), does not require the Government to obtain such a warrant is immaterial. It is "unquestionably the law that a treaty may authorize only such governmental action as is in conformity with the Constitution." *Barr*, 819 F.2d at 27. *See also Colello v. Securities and Exchange Commission,* 908 F. Supp. 738, 753-4 (C.D. Cal. 1995) (holding that the Government may not circumvent constitutional limitations by invoking an international treaty).

The Government does not contend that the search of Cadogan Tate was valid according to any of the established exceptions to the warrant requirement. Instead, the Government appears to be asking the Court to recognize an entirely new exception to the warrant requirement for *all extraterritorial searches*, an exception for which no authority exists. In similar circumstances, courts have declined to recognize such an exception. *See United States v. Bin Laden*, 126 F. Supp. 2d 264, 282, 288 (S.D.N.Y. 2000) (ruling that warrant requirement applied to extraterritorial search); *United States v. Peterson*, 812 F.2d 486, 494 (9th Cir. 1987) (holding that Coast Guard's warrantless search of vessel in international waters was permissible because of exigent circumstances).

Contrary to the Government's suggestion, the Supreme Court's holding in *United States v. Verdugo-Urquidez* does not support an exception to the warrant requirement for

all extraterritorial searches.  In that case, the Court held that the *entire* Fourth Amendment did not apply to the search of a *non-resident alien*.  The Court did not recognize a special exception to the warrant requirement for extraterritorial searches. Nor did the opinions of seven of the nine justices espouse such an exception.  In his concurring opinion, Justice Kennedy made clear that his opinion was limited to the search of a "foreign home of a *nonresident alien*" and that "[t]he rights of a citizen, as to whom the United States has continuing obligations, *are not presented by this case*."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990) (Kennedy, J., concurring) (emphasis added).

The Government's focus on the concern, expressed by three of the justices, that American magistrates do not have the power to authorize searches in foreign jurisdictions and that an American warrant would be a "dead letter outside of the United States" misses the point.  The purpose of the Fourth Amendment is to enable the judiciary, through antecedent oversight, to check the power of the Executive Branch to conduct searches and seizures.  *Ohio ex rel. Eaton v. Price*, 364 U.S. 263, 272-74 (1960) (opinion of Brennan, J.)  As Justice Brennan explained:

> As a matter of United States constitutional law, a warrant serves the same primary function overseas as it does domestically:  it assures that a neutral magistrate has authorized the search and limited its scope.  The need to protect those suspected of criminal activity from the unbridled discretion of investigating officers is no less important abroad than at home.

*Verdugo-Urquidez*, 494 U.S. at 296 (Brennan, J., dissenting).

The Government's suggestion that law enforcement agents acting abroad are adequately overseen by officials within the Executive Branch, (Gov't Mem. in Resp. at 27), ignores decades of separation-of-powers jurisprudence.  *See*, *e.g.*, *United States v.*

*United States District Court for the Eastern District of Michigan*, 407 U.S. 297, 316-17 (1972) ("The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech."). Even more absurd is the Government's suggestion that, in the context of MLAT requests, the Fourth Amendment rights of Americans living abroad are somehow protected by foreign governments.[6] (Gov't Mem. in Resp. at 27.) The Government cites no authority for these propositions.

The Court should not cede its role of overseeing searches and seizures to the Executive Branch or to foreign governments. The Court should apply the warrant requirement to the Government's search of Cadogan Tate, not because a warrant issued by an American magistrate would have meaning in the United Kingdom, but because the warrant is the primary means by which the Judicial Branch protects American citizens from unreasonable searches.

Ironically, the Government argues that applying the warrant requirement to this case would somehow *offend* separation-of-powers principles because it would interfere with the Executive Branch's conduct of foreign affairs. The notion that this case involves foreign affairs is ridiculous. This is an American criminal proceeding against American citizens in connection with their alleged violation of American law. The fact that one of the Defendants happened to live in London does not cause the matter to be transferred from the purview of the Department of Justice to the State Department.

---

[6] The Government does not appear to contend that the U.K. Warrant satisfied the warrant requirement of the Fourth Amendment.

To the extent the Government suggests that the warrant requirement would somehow interfere with the Executive Branch's ability to combat international terrorism and narcotics cases, the Government fails to explain why existing exceptions are inadequate. Exceptions for foreign-intelligence and exigent circumstances already allow the Government to execute warrantless searches and seizures when obtaining a warrant would be unduly burdensome. When circumstances justifying these exceptions are not present, the warrant requirement *should apply*, and the Government has not presented any compelling argument to the contrary.

Nor does this case somehow implicate international comity. There is nothing about Defendant Tanaka's motion to suppress that affects the sovereignty of the United Kingdom or would require the Court to "pass judgment on an international treaty and the legal system of a foreign country." (Gov't Mem. in Resp. at 24.) The U.S.-U.K. MLAT does not *prohibit* the "requesting party" from obtaining a warrant prior to seeking assistance from the "requested party," and the Court need not opine on the constitutionality of the treaty in order to apply the warrant requirement to this case. Moreover, this is not a case in which the Executive Branch secured the extradition of a defendant by assuring a foreign country that the defendant would receive a particular sentence. *See*, *e.g., United States v. Baez*, 349 F.3d 90 (2d Cir. 2003). In such a case, a violation of an extradition agreement may be "an affront to the surrendering sovereign." *Id.* at 92. In this case, there is no evidence that the United Kingdom received any assurances, and there is no reason to believe that the United Kingdom has any interest in whether the documents seized from Cadogan Tate will be used to prosecute Gary Tanaka.

If anything, applying the warrant requirement to this case will serve the interests of the United Kingdom.  By requiring the Government to first obtain a warrant from an American magistrate, the Court will ensure that the Government satisfies American constitutional standards before it invokes the terms of the U.S.-U.K. MLAT and seeks assistance from the British government.  Such a process will reduce the possibility that British officials unnecessarily expend resources collecting evidence that is later excluded by an American court.  This is virtually the identical concern that exists in the context of extradition and, as the Government acknowledges, is the reason why American arrest warrants are first obtained in such cases.  (Gov't Mem. in Resp. at 21 ("Neither party to an extradition treaty would want to expend the resources to effect an arrest and arrange for extradition to the requesting country if, upon delivery of the individual whose extradition was sought, the requesting country did not have an arrest warrant allowing it to take that individual into custody.").)

Finally, the Government's contention that it would have been impracticable to obtain a warrant prior to executing the search of Cadogan Tate, (Gov't Mem. in Resp. at 22-23), is contradicted by the evidence.  In the eight months between the initiation of the Government's investigation and the execution of the search of Cadogan Tate, the Government had multiple opportunities to request a warrant.  In appearances before the Court and in court submissions, the Government repeatedly indicated that it had issued an MLAT request and was seeking materials from Amerindo U.K.  (Sher Decl. Ex. O.)  Nothing prevented the Government from seeking a warrant pursuant to Fed. R. Crim. P. 41(b)(3) or according to the inherent power of the Court.  Nevertheless, the Government failed to do so and, thereby, violated Gary Tanaka's rights under the Fourth Amendment.

### 4.  **The Government's Search of Cadogan Tate Was Unreasonable**

Defendant Tanaka maintains that the search of Cadogan Tate was unreasonable regardless of whether the Government was required to obtain a warrant.  In its memorandum in opposition, the Government concedes that the reasonableness of the Government's search should be evaluated according to the laws and customs of the United Kingdom.  (Gov't Mem. in Resp. at 29.)  Yet the Government does not present any evidence to contradict the expert opinion of Clare Sibson, which suggests that the search of Cadogan Tate actually violated British law.  (Sher Decl. Ex. G.)

As discussed in detail in Defendant Tanaka's Memorandum of March 9, 2006, the U.K. Warrant issued upon materially false information.  Detective Shaw falsely represented that Amerindo U.K.'s documents were not likely to include special procedure and legally privileged materials.  The Government does not deny that the documents at Cadogan Tate that were the subject of the search *were likely to and did, in fact, include special procedure and legally privileged materials.*  Had the British court known that such materials were likely to be seized from Cadogan Tate, Amerindo U.K. would have received additional protections.  (Id. ¶ 16.)  A judge with greater authority would have been required to carry out a balancing exercise between the public interest in privacy and the public interest in investigating crime.  (Id. ¶ 18-19.)  It is, therefore, far from clear that a British judge would have authorized the search of Cadogan Tate after balancing the British public's interest in protecting the privacy of a British company against the British public's interest in an American criminal investigation.

The Government's search of Cadogan Tate was unreasonable under American legal standards as well.  As the Government acknowledges, at the time of the search of

17

Cadogan Tate, a Grand Jury had found probable cause to believe only that a crime had been committed against a single client, Lily Cates, by two specific individuals, Gary Tanaka and Alberto Vilar. (Gov't Mem. in Resp. at 4.) In contrast, the U.K. Warrant authorized the seizure of documents relating to "*any client*." (Sher Decl. Ex. F at 3, ¶ 1.) Similarly, the U.K. Warrant authorized the seizure of documents relating to "*any participants*" in unspecified "fraudulent investment schemes."[7] (Sher Decl. Ex. F at 5, ¶ 17.) Tellingly, as late as March 9, 2006, five months after the search of Cadogan Tate, the Government indicated that it was *not* prepared to allege that there were any other participants in the alleged conspiracy. (Tr. of 3/9/06 at 87-88.)

Under both British and American standards, the Government's intrusion upon a secure storage facility and its seizure of corporate documents that were unrelated to the alleged criminal conduct amounted to an unreasonable search.

### 5.  **The Good-Faith Exception Does Not Apply**

In asking the Court to apply the good-faith exception to this case, the Government exposes the weaknesses of its argument in what it chooses not to address. The Government does not deny that the postal inspectors knew that they were likely to find special procedure and legally privileged materials at Cadogan Tate. The Government does not claim that the postal inspectors reviewed the provisions of the U.S.-U.K. MLAT or consulted with anyone regarding whether the search complied with American, British and international law. The Government does not even suggest that the postal inspectors reviewed the U.K. Warrant.

---

[7] The Government also acknowledges that the postal inspectors sought documents relating to "other schemes, including the GFRDA fraud scheme, that were not charged in the Indictment pending at the time of the search." (Gov't Mem. in Resp. at 32.)

In essence, the Government appears to argue that the postal inspectors acted in good faith by doing nothing other than executing the search of Cadogan Tate in the presence of a British detective. Such evidence is plainly insufficient to demonstrate that the postal inspectors possessed an objectively reasonable belief that the search comported with the Fourth Amendment. *See United States v. Leon*, 468 U.S. 897, 922-23 (1984) ("in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued"). The Government defends its position by protesting that "U.S. Postal Inspectors are not experts in U.K. law and should not be expected to be versed in the intricacies of foreign law." (Gov't Mem. in Resp. at 36.) Although they are not legal experts, at the very least, the postal inspectors should have been able to recognize the falsity of Detective Shaw's claim that Amerindo U.K.'s documents would not include legally privileged materials. Their failure to read the Information that contained this inaccuracy does not render their conduct objectively reasonable. (Id.) On the contrary, it further undermines the Government's contention that they exercised proper diligence. The Court should require a significantly greater showing before excusing the Government's violations of the Fourth Amendment based on the good-faith exception.

Moreover, it is clear that the suppression of the evidence seized from Cadogan Tate based on the Government's failure to procure a warrant from an American magistrate would have a substantial deterrent effect on the Government's future conduct. The very purpose of the exclusionary rule is to deter unlawful searches. *Bin Laden*, 126 F. Supp. 2d at 282. Unlike the intelligence agents in *Bin Laden,* who would have continued their surveillance even if they had known that their recordings were

inadmissible, *id.* at 283, the postal inspectors had no incentive other than those related to law enforcement. The postal inspectors likely would have immediately discontinued their search of Cadogan Tate upon learning that any documents seized would be inadmissible. Under these circumstances, the Court should apply the exclusionary rule.

### 6. **The Court Should Order A Hearing**

The Court should order a hearing to determine whether agents of the Government acted in reckless disregard of the truth in submitting to a British court a warrant application that contained multiple inaccuracies. The Government maintains that such a hearing is improper because *Franks v. Delaware,* 438 U.S. 154 (1978) is premised on the Warrant Clause and does not authorize a U.S. court to scrutinize the warrant procedures of a foreign sovereign. (Gov't Mem. in Resp. at 39-40.) The Government's argument misses the point. Defendant Tanaka does not contend that the Court should review the warrant application procedures of the United Kingdom to determine whether they comported with the Warrant Clause of the Fourth Amendment. Regardless of the accuracy of Detective Shaw's representations, the U.K. Warrant, because it was issued by a British court, could not have satisfied the Warrant Clause of the U.S. Constitution. There is no dispute that the Government failed to obtain a valid warrant from an American magistrate, and it is clear that the Government's search of Cadogan Tate violated the Warrant Clause of the Fourth Amendment.

Instead, Defendant Tanaka cites *Franks* for the principle that agents of the Government should not be permitted to conduct a search under the "specter of intentional falsification." *Id.* at 168. As the Supreme Court suggested, it would be "unthinkable" to deny a court the ability to review a search that was authorized according to deliberately

or recklessly false statements. *Id.* at 165. In this case, the Court should permit counsel for Defendant Tanaka to examine Detective Shaw as well as the three U.S. postal inspectors who executed the search of Cadogan Tate. All four individuals acted as agents of the United States Government in their pursuit of evidence for use in actions brought by the United States Attorney's Office and the Securities and Exchange Commission. Counsel for Defendant Tanaka is entitled to examine each of these witnesses to determine how false information was communicated to a British court and whether any of these agents of the Government acted in deliberate or reckless disregard for the truth.

Moreover, to the extent the Court is entertaining the Government's argument that the good-faith exception applies, counsel for Defendant Tanaka continues to seek to examine Detective Shaw and the three postal inspectors who executed the search to assess whether they had an objectively reasonable belief that that their conduct comported with the Fourth Amendment. *Leon*, 468 U.S. at 922-23.

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendant Gary Alan Tanaka respectfully requests that

the Court order that any evidence seized from Amerindo U.K.'s offices be suppressed or,

in the alternative, that a hearing be held to determine the issues raised by this motion.


Dated:  April 10, 2006
        New York, New York


By:        /s/  Steven G. Kobre

Steven G. Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1200


Glenn C. Colton
Jessica L. Margolis
WILSON SONSINI
GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York  10017
Tel: 212.999.5800

Attorneys for Defendant
Gary Alan Tanaka