Glenn C. Colton (GC-2493)
Jessica L. Margolis (JM-7786)
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
12 E. 49th Street, 30th Floor
New York, New York  10017
Tel: 212.999.5800

Steven Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1234

*Attorneys for Defendant*
*Gary Alan Tanaka*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br> - against -<br><br>ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA<br><br><div align="center">Defendants.</div> | S3 05 Cr. 621 (KMK)<br><br>ECF CASE |

## MEMORANDUM IN SUPPORT OF MOTION FOR A *FRANKS* HEARING

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 4

A.  THE LATE NIGHT SEARCH WARRANT APPLICATION ............................... 4

B.  THE EXTREMELY BROAD SEARCH WARRANT AND NARROW
     "SUPPORTING" FACTS .......................................................................... 5

C.  THE JOINT SEC INVESTIGATION AND INDEPENDENT MONITOR'S
     REPORT ................................................................................................ 8

D.  THE MOTIONS TO SUPPRESS AND SUBSEQUENT HEARINGS .................... 9

ARGUMENT ..................................................................................................... 11

A.  INSPECTOR FRATERRIGO INTENTIONALLY OMITTED MATERIAL
     FACTS FROM THE WARRANT APPLICATION ......................................... 14

     1.  Inspector Fraterrigo Knew Or Should Have Known That Defendants'
         Alleged Scheme Could Not Have Been Widespread Because Defendants
         Did Not Have The Authority To Withdraw The Vast Majority Of The
         Assets Managed By Amerindo. .......................................................... 15

     2.  Inspector Fraterrigo Knew Or Should Have Known That, Contrary To The
         Hearsay Statement Of Lily Cates, Paul Marcus And Joy Urich Never Had
         Any Problems Redeeming Their Investments With Amerindo ................ 20

     3.  Contrary To Her Suggestion In The Warrant Application, Inspector
         Fraterrigo Knew That, From 1987 Until At Least 2001, Both Lily Cates
         And Lisa Mayer Received Payments From And Were Pleased With The
         Services Provided By Amerindo........................................................ 22

B.  INSPECTOR FRATERRIGO REPEATEDLY ADMITTED TO MAKING
     INTENTIONAL AND AFFIRMATIVE MISREPRESENTATIONS IN THE
     WARRANT APPLICATION ..................................................................... 24

     1.  Throughout Her Testimony, Inspector Fraterrigo Repeatedly Admitted
         Misleading Magistrate Judge Maas About The Existence Of Probable
         Cause................................................................................................ 24

     2.  Inspector Fraterrigo's Attempt To Write Off Her Own Testimony As The
         Result Of "Confusion" Was Patently Incredible And Provides An
         Independent Basis For Questioning Her Veracity. .............................. 27

     3.  Inspector Fraterrigo's Testimony Gave Rise To Additional Reasons To
         Question Her Veracity. ..................................................................... 31

CONCLUSION.................................................................................................. 32

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*Franks v. Delaware,*
    438 U.S. 154 (1978)........................................................................ *passim*

*Miranda v. Arizona,*
    384 U.S. 436 (1966)...............................................................................7

*Rivera v. United States,*
    928 F.2d 592 (2d Cir. 1991)..........................................................10, 11

*United States v. Canfield,*
    212 F.3d 713 (2d Cir. 2000)....................................................10, 11, 20

*United States v. Harding,*
    273 F. Supp. 2d 411 (S.D.N.Y. 2003)............................................10, 11

*United States v. Leon,*
    468 U.S. 897 (1984)......................................................................2, 13, 14

*United States v. Lopez,*
    1997 WL 205294 (N.D.N.Y. Apr. 23, 1997)....................................10

*United States v. Reilly,*
    76 F.3d 1271 (2d Cir. 1996)...............................................................11

Defendant Gary Alan Tanaka, by his attorneys, respectfully submits this memorandum in

support of his motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## PRELIMINARY STATEMENT

On May 26, 2005, nineteen armed Federal Agents, led by United States Postal Inspector

Cynthia Fraterrigo, executed an invasive and pervasive search at the offices of Amerindo

Investment Advisors Inc. ("Amerindo U.S."). This raid, conducted after a hasty investigation and

based on a warrant obtained during an irregular late-night trip to a United States Magistrate's home

where the Government claimed an emergent need to search an SEC regulated business that, merely

four months earlier, had received a no-action letter from that agency, sounded the death knell for a

company that had been in business for two decades. The raid and attendant front-page publicity it

engendered not only destroyed the business, but also put approximately 30 people out of work.

Now, after a suppression hearing that featured testimony that could only be described as

remarkable, we know that this sorry episode should never have happened. This hearing confirmed

that such an overbroad warrant should never have been issued. More importantly, it confirmed that

the very dangers of Government intrusion into the private business and private papers of the

citizenry that the framers of the Constitution sought to prevent were visited on Amerindo U.S. and

its employees.

Defendant Gary Tanaka now asks this Court to hold a hearing, pursuant to *Franks v.*

*Delaware*, 438 U.S. 154 (1978), in order to determine how the system failed, or more accurately, to

confirm Mr. Tanaka's preliminary showing that the system failed because Inspector Fraterrigo

violated her sworn duty to uphold the law and obey and defend the Constitution by intentionally, or at the very least recklessly, omitting critical facts from the warrant application. Had these facts been disclosed, Magistrate Judge Maas clearly would have refused to grant Inspector Fraterrigo and the Government the right to seize and rummage through basically every piece of paper and computer file at Amerindo U.S.[1]

Defendant Gary Tanaka submits that in the instant motion, he more than satisfies the preliminary showing required to obtain a *Franks* hearing. The affidavit Inspector Fraterrigo submitted to the Magistrate Judge provides information about only two alleged "victims," who collectively invested in only three of the various investment vehicles offered or managed by the Amerindo entities. From those bare allegations, Inspector Fraterrigo swore under oath to the Magistrate Judge that there was probable cause to seize **all** business records, **all** client files, **all** marketing materials, **all** correspondence sent to or received from clients, and **any** documents "reflecting the identities of and communications with clients who have investments managed or advised by Amerindo."

Despite her representations to the Magistrate Judge about the existence of probable cause, however, in brazen testimony repeated countless times at the suppression hearings earlier this summer, Inspector Fraterrigo admitted that there in fact was **no** probable cause provided to the Magistrate to support the seizure of an overwhelming majority of the documents called for by the warrant. To make matters worse, Inspector Fraterrigo admitted that she **knew** at the time she

---

[1] As argued in his motion to suppress the fruits of the Amerindo U.S. search, Mr. Tanaka also maintains that suppression is appropriate because Federal Agents executed the search warrant despite the fact that the Affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984).

submitted her affidavit to the Magistrate Judge that her sworn representations regarding probable cause were false.

In addition to misleading the Magistrate Judge about the existence of evidence supporting probable cause, Inspector Fraterrigo intentionally or recklessly omitted material facts from the warrant application that clearly would have prevented such a broad warrant from issuing.  For example, in asking the Magistrate Judge to infer that the transgressions Defendants allegedly committed with respect to the $18 million invested by the two alleged victims specified in the Affidavit gave "reason to be concerned" that other investors may also have been victimized, Inspector Fraterrigo intentionally or recklessly omitted the fact that, as to the additional $1.2 billion of assets under management, *Defendants could not have committed the same transgressions*. Specifically, Inspector Fraterrigo intentionally or recklessly omitted the fact that such assets were held in "closed-loop" accounts with respect to which neither Amerindo U.S. nor its principals (the Defendants) had the authority to withdraw or transfer out funds.

Similarly, in her attempt to get the Magistrate to extrapolate allegations as to two investors to all investors who ever invested with any of the Amerindo entities (including Amerindo U.S.), Inspector Fraterrigo recounted the unsupported conjecture of Lily Cates (one of the specified alleged "victims") that three other investors (Paul Marcus, Joy Urich and Brian Harvey) "*may have had trouble* redeeming all or part of their investments."  However as demonstrated below, Inspector Fraterrigo knew or should have known that (a) Paul Marcus never had any trouble redeeming his investments (as he stated in a sworn declaration), and (b) Joy Urich's investment was fully redeemed years before the search warrant was issued (as she told a Bloomberg reporter shortly after the search warrant was executed).  Either Inspector Fraterrigo interviewed these witnesses and knew that Lily Cates was wrong, or she recklessly neglected to take the most basic investigative steps and

interview Marcus and Urich.  Either way, Inspector Fraterrigo intentionally or in reckless disregard

for the truth submitted a materially false affidavit.

In sum, as demonstrated below, this is precisely the kind of case in which a *Franks* hearing

should be held – one where the law enforcement affiant admitted to lying to the Magistrate and

omitted critical facts that, if divulged, would have prevented the destruction of a business without so

much as a hearing at which people or the company could defend themselves.

## BACKGROUND

**A.    THE LATE NIGHT SEARCH WARRANT APPLICATION**

On May 25, 2005, at approximately 10:00 p.m., Assistant United States Attorney Marc Litt

and United States Postal Inspector Cynthia Fraterrigo, the case agent for the investigation, went to

the apartment of United States Magistrate Judge Frank Maas to apply for a warrant to search the

New York office of Amerindo Investment Advisors Inc. ("Amerindo U.S."), located at 399 Park

Avenue, New York, New York.  In support of the warrant, the Government presented Magistrate

Judge Maas with an affidavit sworn to by Inspector Fraterrigo ("Affidavit"), as well as copies of the

criminal complaints against Alberto Vilar and Gary Tanaka (also sworn to by Inspector Fraterrigo),

which were incorporated by reference into the Affidavit.[2]  *See* Declaration of Jessica L. Margolis

("Margolis Decl.), Exs. B, C, and D.  Neither Inspector Fraterrigo nor AUSA Litt took notes or

---

[2] Although Magistrate Judge Maas was provided with copies of the criminal complaints against
Mr. Tanaka and Mr. Vilar, with the exception of the arresting officers, Inspector Fraterrigo never
provided the officers executing the search with copies of the criminal complaints.  *See* Margolis
Decl., Ex. J at 50-51.  Included among those who did not receive copies of the complaints was
Inspector John Feiter, who was Inspector Fraterrigo's supervisor and who assisted in briefing the
executing officers and answering questions during the search.  *See* Margolis Decl., Ex. G at 123,
128.

otherwise recorded the meeting at Magistrate Judge Maas' apartment. Margolis Decl. Ex. I at 191-92; Ex. K at 137-38.

After reviewing the Affidavit and complaints, and prior to signing the warrant, Magistrate Judge Maas noted the lack of direct evidence supporting the Government's contention that Mr. Tanaka improperly used client money to purchase horses, as is alleged in the criminal complaint. *See* Margolis Decl. Ex. I at 175, 191-92; Ex. K at 139-40. AUSA Litt responded that the allegation was based on "a series of inferences from certain paragraphs in the complaint" against Mr. Tanaka. *Id.* Ultimately, at approximately 10:30 p.m., Magistrate Judge Maas signed the search warrant. *See* Margolis Decl., Ex. A.

## B. THE EXTREMELY BROAD SEARCH WARRANT AND NARROW "SUPPORTING" FACTS

It is difficult to conceive of a broader warrant than that which Inspector Fraterrigo presented to Magistrate Judge Maas.[3] Among the categories of documents called for by the warrant are ***all*** business records, ***all*** client files, ***all*** marketing materials, ***all*** correspondence sent to or received from clients, and ***any*** documents "reflecting the identities of and communications with clients who have investments managed or advised by Amerindo." Margolis Decl., Ex. A at ¶ 1. Not only is the language of the warrant extremely broad, but also the warrant contains no time limitation whatsoever, despite the fact that Amerindo U.S. had been in existence for approximately twenty years. In other words, as the Government's own witnesses conceded, the warrant calls for seizure of nearly every single document relating to any of the five Amerindo entities listed in the warrant created from the beginning of time forward. *See* Margolis Decl., Ex. G at 136, 161-63; Ex. L at

---

[3] References to the warrant should be construed as including Attachment A to the warrant, which sets forth the categories of items to be seized.

133-35. Indeed, as stated by supervisory United States Postal Inspector Feiter,[4] as long as a document was related to Amerindo and "had writing on it," it "would go." Margolis Decl., Ex. G at 161-62.

In stark contrast to the sweeping scope of the all-inclusive warrant, the allegations offered in support of the warrant are extremely narrow. The Affidavit (including the complaints incorporated therein) names only two individual investors as alleged victims – Lily Cates and Lisa Mayer.[5] Moreover, the Affidavit alleges that these two individuals were involved with only three specific types of investments: an entity called Rhodes Capital, an SBIC investment and a "guaranteed fixed rate deposit account" or "GFRDA." Margolis Decl., Ex. B at ¶¶ 6.A. and 6.B. The Affidavit does not name any of Amerindo's many other clients or investments as part of the alleged "scheme," though it suggests without factual support that there may be "reason to be concerned that other investors are likewise being victimized by Vilar and Tanaka." *Id.* at ¶ 6.F.

The allegations in the Affidavit are also narrow in that they pertain only to a three-year period, beginning in 2002 and extending to 2005. More specifically, other than the vague suggestion that Lily Cates may have had issues with an investment between 1988 and 2002,[6] the

---

[4] Inspector Feiter, who himself participated in the search, was the supervisor of Inspector Fraterrigo, the case agent for this investigation. He also participated in the briefing and fielded questions asked by other officials during the search regarding the scope of the warrant. Margolis Decl., Ex. G at 93-95, 119.

[5] The Affidavit also represents that, according to one of the alleged victims, other investors "*may have had trouble* redeeming all or part of their investments," including Brian Harvey, Joy Urich and Paul Marcus. Margolis Decl., Ex. B at ¶ 6.E. (emphasis added). As demonstrated in section A(2), *infra*, Marcus and Urich had no trouble redeeming their investments with Amerindo and Inspector Fraterrigo knew or should have known those facts.

[6] Specifically, the Affidavit alleges that although account statements received by Cates between 1988 and 2002 "reflected growth in [her] Rhodes investment, the investment was never described to her, she never has received a private placement memorandum, nor has she signed a subscription agreement for Rhodes, and her efforts to learn more about the investment were ignored or rejected

Affidavit does not contain any allegations that Defendants engaged in any misconduct until June

2002, when Lily Cates allegedly invested $5 million in an SBIC investment. *See* Margolis Decl.,

Ex. B at ¶ 6.B.; Ex. C at ¶¶ 9, 13-17. The Affidavit goes on to allege that, beginning in or about

February 2005, Cates had difficulties redeeming her investments with Amerindo, including her

SBIC investment. *See* Margolis Decl., Ex. B at ¶ 6.B. With respect to Lisa Mayer, the Affidavit

does not allege any wrongdoing by Defendants prior to 2003, when the Mayers allegedly had

difficulties redeeming their investments with Amerindo. *Id.* at ¶ 6.A. Although the alleged criminal

conduct purportedly took place in the three years prior to the search, the search warrant contains no

time limitations whatsoever – despite the fact that the business whose office was to be searched had

been in existence for over twenty years.

The search warrant was executed at Amerindo U.S. on May 26, 2006. During the search,

the Government seized over 160 boxes of hard copy documents and approximately 30 computers

and servers containing over 1.6 terabytes of information – ***roughly the equivalent of 125 million***

***hard-copy pages***. Moreover, the Government expected to receive additional documents in response

to a subpoena it served on Amerindo U.S. contemporaneously with the search – presumably

documents that agents executing a search warrant that covered "everything with writing on it"

would have seized had the subpoena not been issued.[7] Indeed, the language of the subpoena is at

least as broad as the search warrant, with many of the paragraphs – including the all-encompassing

first paragraph – copying verbatim the language of the search warrant. *See* Margolis Decl., Ex. E.

---

by Vilar." Margolis Decl., Ex. B at ¶ 6.B. As discussed *infra*, this representation was an deliberate
attempt by Inspector Fraterrigo to give the impression that Cates received no benefit from her
Rhodes investment, when in actuality the evidence supports that she received significant return on
the investment.

[7] The subpoena, which the Government served on Amerindo U.S. the afternoon of the search,
enabled the Government to effectively continue its search without having to secure the site
overnight and return the next day. *See* Margolis Decl., Ex. I at 136-37.

Although the Government has been in possession of vast quantities of Amerindo U.S.'s documents (both hard copy and electronic) since the search was executed well over a year ago, the Government has returned only a small portion (approximately two boxes) as non-responsive.[8] In fact, despite Defendants' repeated objections to the Government's continued possession of items that fall outside the scope of the search warrant, as well as the Government's own acknowledgement that it has absolutely no authority to retain such items, *see* Margolis Decl., Ex. K at 127, the Government has refused to review the items in its possession and return that which is beyond the scope of the search warrant.

**C.    THE JOINT SEC INVESTIGATION AND INDEPENDENT MONITOR'S REPORT**

Concurrently with the criminal investigation, the Securities and Exchange Commission ("SEC") also was conducting an investigation into the activities of Defendants and the Amerindo entities. In pursuing their investigations, the SEC and United States Attorney's Office often acted jointly, interviewing witnesses together or otherwise sharing information with one another. *See, e.g.*, Margolis Decl., Ex. I at 66-67, 181, 188. In fact, the SEC served a subpoena on Amerindo U.S. on May 26, 2005, the very same day that the search was executed, and officials from the SEC were present at the offices of Amerindo U.S. in both New York and San Francisco either the day of or the day after the search. *See* Margolis Decl., Ex. F; Affidavit of Eugene Licker ("Licker Aff.") at ¶ 9.

---

[8] That the quantity of documents returned to Amerindo U.S. falls far short of that which is beyond the scope of the warrant cannot be disputed. Although the Government seized the entire Amerindo U.S. computer system – approximately 1.6 terabytes of information (i.e., 125 million pages) – the Government has yet to return a single electronic file to Amerindo U.S.

Shortly after the execution of the search, on June 1, 2005, the SEC filed a civil action against Amerindo U.S. and Defendants, which action was assigned to Judge Laura Taylor Swain. Although Judge Swain ultimately stayed the civil action pending the conclusion of these criminal proceedings, on December 5, 2005 – several days prior to the stay order – the monitor that had been appointed by Judge Swain to effectively oversee the winding down of Amerindo U.S. issued his report.[9]

## D.     THE MOTIONS TO SUPPRESS AND SUBSEQUENT HEARINGS

On September 12, 2005, defendant Vilar timely moved to suppress the evidence seized pursuant to the Amerindo U.S. search warrant, which motion was joined by Mr. Tanaka. In the motion, Defendants requested, among other things, that the Court conduct a hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the issue of whether material misrepresentations or omissions were made in the warrant application. Although the Court denied Defendants' application for a *Franks* hearing, the Court did so without prejudice to revisiting the issue should circumstances warrant it. *See* Margolis Decl., Ex. G at 5.

On September 12, 2005, Defendants also moved to suppress their post-arrest statements, asserting that they had not been given the requisite warnings and statements of rights, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. The night before the hearing, however,

---

[9] Although the monitor's report was publicly filed with the Clerk of Court and the exhibits were served on the Court and all parties in the civil action, the exhibits to the report were not filed with the Clerk of Court, but rather were withheld pending Judge Swain's decision on whether, due to confidentiality concerns, these exhibits should be filed under seal. Because she ultimately stayed the civil action, Judge Swain never ruled on the sealing issue. Accordingly, so as not to run afoul of any confidentiality concerns, Mr. Tanaka has served copies of the exhibits upon counsel for all parties and has transmitted courtesy copies to the Court, but has not at this time filed a set of exhibits with the Clerk of Court.

AUSA Marc Litt informed Mr. Tanaka's counsel that there was no longer a need for a hearing on Mr. Tanaka's motion because the Government would not attempt to use Mr. Tanaka's alleged post-arrest statements, which had been memorialized in a Memorandum of Interview allegedly written by the case agent, Inspector Fraterrigo. *See* Margolis Decl., Ex. G at 13-16.

A hearing on the motions to suppress (including Defendants' motion to suppress the fruits of the Amerindo U.S. search and Mr. Vilar's motion to suppress his post-arrest statements) was held on December 14, 2005. At the hearing, the Government called only one witness with respect to the motion to suppress the Amerindo U.S. search: supervising Postal Inspector John Feiter. Despite the fact that Inspector Feiter could not remember many important facts and events (including such basic information as what was said during the briefing to Inspectors who had no connection with or knowledge of the case and what questions were asked by other Inspectors during the search),[10] the Government declined to call Inspector Fraterrigo to testify, even though she was the case agent in charge of the investigation and was sitting in the courtroom the day of the hearing.[11] The Government also moved to preclude Defendants from calling Inspector Fraterrigo, despite Defendants' claim that Inspector Fraterrigo possessed information relevant to Defendants' motion.

On December 16, 2005, the Court ruled that Defendants could not call Inspector Fraterrigo. On March 9, 2006, the Court held oral argument on the motion to suppress the fruits of the Amerindo U.S. search. At the argument, the Court specifically noted that it was the Government's burden to show that the search was valid, and that the Government's decision not to call Inspector

---

[10] *See* Margolis Decl., Ex. G at 94-95, 119, 136-38.

[11] Included among Inspector Fraterrigo's responsibilities in her capacity as case agent were swearing out the Affidavit and criminal complaints, briefing other postal inspectors participating in the search, fielding questions from other postal inspectors during the search and executing the search in critical areas including Mr. Vilar's office.

Fraterrigo left the record either unfavorable or unclear on several issues relevant to this determination. Margolis Dec., Ex. H at 43-46. In response, on March 10, 2006 – nearly three months after the suppression hearing concluded and despite its previous claim that Defendants' attempt to call Inspector Fraterrigo was nothing more than a "fishing expedition" – the Government requested that the hearing be reopened to permit Inspector Fraterrigo to testify. Over Defendants' objection, by order dated April 4, 2006, the Court granted the Government's request and the hearing was re-opened.

The "second phase" of the suppression hearing, which began on May 31, 2006, took place on select days over course of several months, ending on August 9, 2006. During this second phase, two additional motions filed by Defendants were also addressed: Defendants' motion to quash the subpoena served on Amerindo U.S. the day of the search, and Defendants' motion to suppress evidence seized from a Cadogan Tate storage facility in the United Kingdom in October 2005. At the conclusion of the hearing, the Court set a schedule for Defendants to renew their application for a *Franks* hearing. On behalf of Mr. Tanaka, this is that application.

## ARGUMENT

It is well-settled that a defendant may challenge the validity of a search warrant on the ground that the warrant application contains deliberately or recklessly false or misleading information. *See Franks v. Delaware*, 438 U.S. 154, 164-72 (1978); *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). Moreover, a defendant is entitled to a hearing on the veracity of a search warrant application where that defendant makes a "substantial preliminary showing" that (1) the claimed inaccuracies or omissions in the warrant application are the result of the affiant's intentional falsehood or reckless disregard for the truth, and (2) the alleged falsehoods or omissions

were necessary to the finding of probable cause. *See Rivera v. United States*, 928 F.2d 592, 604 (2d

Cir. 1991); *United States v. Lopez*, 1997 WL 205294, *8 (N.D.N.Y. Apr. 23, 1997).

To satisfy the first prong of this test, a defendant must demonstrate that the affiant

intentionally, or in reckless disregard for the truth, made a false statement or omission in the search

warrant affidavit. Omissions are deemed "reckless" where the affiant "withholds a fact in his ken

that any reasonable person would have known [ ] was the kind of thing the judge would wish to

know." *United States v. Harding*, 273 F. Supp.2d 411, 426 (S.D.N.Y. 2003) (internal quotations

and citation omitted) (brackets in original). "Embedded in this standard is the requirement that the

affiant knew or, presumably, had reason to know the fact that she or he omitted." *Id. See also*

*Lopez*, 1997 WL 205294, at *8 (ordering *Franks* hearing where affiant "may have had facts in his

possession from which he should have known that" certain information in the affidavit was likely to

be inaccurate). The Second Circuit has made clear that, where the omitted information was "clearly

critical" to the probable cause determination, recklessness may be inferred. *United States v. Reilly*,

76 F.3d 1271, 1280 (2d Cir. 1996); *Rivera*, 928 F.2d at 604.

The second prong of the *Franks* test is satisfied where a defendant demonstrates that the

alleged misstatements or omissions were "material" to the probable cause determination. *Canfield*,

212 F.3d at 718. Misrepresentations or omissions are material where, after having corrected the

affidavit to account for the alleged misstatements or omissions, the warrant application fails to

support probable cause. *Id.* ("The ultimate inquiry is whether, after putting aside erroneous

information and material omissions, "there remains a residue of independent and lawful information

sufficient to support probable cause.").

Although "a defendant's attack must be more than conclusory and must be supported by

more than a mere desire to cross-examine," the showing required to warrant a *Franks* hearing is

merely "preliminary." *Harding*, 273 F. Supp. 2d at 426 (quoting *Franks*, 438 U.S. at 171). Thus, for example, a defendant who seeks a *Franks* hearing does not need to meet the "preponderance of the evidence" standard or any other burden of proof.

As discussed below, Mr. Tanaka has more than satisfied the preliminary showing required to justify a hearing as to the veracity of the warrant application in this case. *First*, the evidence supports that Inspector Fraterrigo intentionally – or, at the very least, recklessly – withheld critical facts from the issuing judge that, once added, make clear that there was no probable cause to support such a broad and all-encompassing warrant. *Second*, Inspector Fraterrigo herself admitted that, despite her representations in the Affidavit as to the existence of probable cause, there in fact was *no* probable cause in the warrant application to take large categories of documents called for by the warrant. This remarkable admission – made countless times during her testimony – goes to the very heart of the issue Inspector Fraterrigo was asking Magistrate Judge Maas to decide and therefore is reason alone to conduct a hearing into this and other possible misrepresentations or omissions in the warrant application.[12]  At the very least, Inspector Fraterrigo's admissions that she knew there was no probable cause to seize vast quantities of items requested in the warrant, as well as her disingenuous and incredible attempt to backtrack on these admissions, provide strong reason to doubt her veracity and thus further support the position that Inspector Fraterrigo's omission of critical facts from the warrant application was knowing and intentional, or at the very least, reckless.

---

[12] Although Mr. Tanaka requests a *Franks* hearing in this application, it is his position that Inspector Fraterrigo's admissions that there was no probable cause in themselves are sufficient to demonstrate that the Amerindo U.S. search warrant was executed in bad faith. *See United States v. Leon*, 468 U.S. 897 (1984).

## A.  INSPECTOR FRATERRIGO INTENTIONALLY OMITTED MATERIAL FACTS FROM THE WARRANT APPLICATION

As noted above, the late night warrant application presented to Magistrate Judge Maas consisted of Inspector Fraterrigo's sworn Affidavit, as well as the criminal complaints against Defendants, also sworn to by Inspector Fraterrigo.  These documents contained specific information supplied by Inspector Fraterrigo presumably obtained during the course of her investigation – an investigation that began approximately six weeks earlier and that included such investigative activities as a review of documents (including but not limited to documents obtained from various financial institutions, the Securities and Exchange Commission and those issued by Amerindo), conversations with individuals (including Lily Cates and Lisa Mayer), a review of Amerindo U.S.'s web site (www.amerindo.com) and a review of the financial web site www.morningstar.com.[13]

Although the warrant application includes certain information obtained by Inspector Fraterrigo during her investigation, Inspector Fraterrigo omitted several key facts – facts that were either known to Inspector Fraterrigo at the time of the application, or clearly should have been known to her prior to submitting the warrant application.  Had Inspector Fraterrigo disclosed these critical facts to Magistrate Judge Maas, it would have been beyond dispute that there was no probable cause to support the vast warrant in this case.[14]

---

[13] According to its web site, Morningstar "is a trusted source for insightful information on stocks, mutual funds, variable annuities, closed-end funds, exchange-traded funds, separate accounts, hedge funds, and 529 college savings plans." http://corporate.morningstar.com/US/asp/subject.aspx?xmlfile=177.xml

[14] It is Mr. Tanaka's position that, even in its current form – i.e., without accounting for the omissions and misrepresentations alleged in this memorandum – the warrant application does not come close to demonstrating probable cause for the Amerindo U.S. warrant, which purports to authorize seizure of nearly every business document held at Amerindo U.S.'s New York office. This in itself is sufficient to warrant suppression of the evidence seized from Amerindo U.S. *See United States v. Leon*, 468 U.S. 897, 923 (suppression appropriate where warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"). Nevertheless, certain intentional or reckless material misrepresentations and

1. **Inspector Fraterrigo Knew Or Should Have Known That Defendants' Alleged Scheme Could Not Have Been Widespread Because Defendants Did Not Have The Authority To Withdraw The Vast Majority Of The Assets Managed By Amerindo.**

Considering that the warrant executed at Amerindo U.S. purports to authorize the seizure of nearly every single business-related document on the premises, including those that were created over two decades earlier, the specific allegations underlying the warrant application are remarkably limited. These allegations specify only two alleged "victims": Lily Cates, who allegedly invested $1 million in an entity called Rhodes Capital and $5 million in an SBIC investment, and Lisa Mayer, whose family allegedly had approximately $12 million invested in guaranteed fixed rate deposit accounts or GFRDAs. *See* Margolis Decl., Ex. B at ¶¶ 6.A. and 6.B. The warrant application also states that, according to Lily Cates, three other individual investors – Brian Harvey, Joy Urich and Paul Marcus – "*may have had trouble* redeeming all or part of their investments." *Id.* at ¶ 6.E. (emphasis added).

Aside from the two alleged "victims," and the three individuals who "may have had trouble" (hardly the stuff of probable cause), the warrant application fails to provide any information as to other Amerindo clients. Nevertheless, Inspector Fraterrigo represents that the "totality of the circumstances in this case . . . suggest that there is *reason to be concerned* that other investors are likewise being victimized by Vilar and Tanaka." *Id.* at ¶ 6.F. (emphasis added). The clear intent of this statement is to make the alleged scheme appear more pervasive and widespread than specified in the Affidavit by raising the possibility that other clients of Amerindo – a company described as

---

omissions were made in the warrant application, thereby providing additional bases for suppressing the evidence in this case.

managing approximately $1.2 billion in assets[15] – may likewise have been "victimized" by Defendants.

What Inspector Fraterrigo failed to reveal, however, is that with respect to nearly all of the approximately $1.2 billion in assets managed by Amerindo U.S., ***Defendants could not have engaged in the misconduct alleged in the warrant application***.[16] The assets managed by Amerindo U.S. fell into two general categories: funds for which Amerindo U.S. served as an investment advisor, such as the Amerindo Technology Fund,[17] and institutional client accounts that were individually managed by Amerindo U.S. *See* Licker Aff. ¶ 3-4; Margolis Decl., Ex. T at Tab 1. In both cases, the assets managed by Amerindo U.S. were custodied at well-known financial institutions, where the assets were held in "closed-loop" brokerage accounts. *Id.* In other words, although Amerindo U.S. in some instances had the power to direct trades in these accounts, ***Amerindo U.S. did not have the authority to withdraw or otherwise transfer funds out of or among these accounts***. *See* Licker Aff. ¶ 5. Accordingly, with respect to nearly all (if not all) of the approximately $1.2 billion in assets managed by Amerindo U.S., ***Defendants simply could not have misappropriated clients' funds as alleged in the warrant application***.

Inspector Fraterrigo's failure to include this critical information in the warrant application was intentional or, at the very least, highly reckless. The omitted information either was or should have been apparent to Inspector Fraterrigo from any semblance of an investigation prior to

---

[15] The complaint bases this assertion on a Form ADV filed by Amerindo U.S. with this SEC on or about July 15, 2004, which lists the amount of assets managed by Amerindo U.S. as $1,219,095,885.00. *See* Margolis Decl. Exs. C and D at ¶ 6; Ex. U at 7.

[16] Mr. Tanaka uses the qualifier "nearly" in this application solely to account for the Government's allegation that Lily Cates understood her $6 million investment to be with Amerindo U.S., as opposed to Amerindo Panama.

[17] In addition to the US mutual fund, the primary funds managed by Amerindo U.S. included Amerindo Internet Growth Fund (as sub-advisor to Amerindo Advisors (Cayman) Ltd.), Emerging Technology Portfolio and Amerindo Internet Fund plc. *See* Licker Aff. ¶ 3.

submitting the warrant application. For example, Inspector Fraterrigo swore under oath that she

received and reviewed records from various financial institutions at which Amerindo or its clients

had accounts, including but not limited to Bear Stearns and Bank of New York. *See Margolis Decl.,*

Ex. C at ¶¶ 13-16, 22. These financial institutions were custodians for several of the "closed-loop"

accounts managed by Amerindo U.S., including Amerindo Internet Growth Fund Ltd., Emerging

Technology Portfolio, and certain individually-managed institutional client accounts. *See Margolis*

Decl., Ex. T at Tab 1. Other accounts managed by Amerindo U.S., including the Amerindo U.S.

mutual fund explicitly noted in the criminal complaints, were custodied at similarly well-known

financial institutions, whose records the Government either did obtain or could easily have obtained.

*Id.* Even a cursory review of records relating to these accounts – records that were either obtained

by or available to Inspector Fraterrigo –would have revealed that (1) these accounts comprised most

if not all of the approximately $1.2 billion in assets managed by Amerindo U.S., and (2) Amerindo

U.S. did not have authority to transfer assets out of these accounts, such that Defendants could not

have misappropriated investors' funds as alleged in the warrant application.

    The same information would have been apparent had Inspector Fraterrigo bothered to

interview any of the institutional clients who had accounts managed by Amerindo U.S.[18]  Not only

would these interviews have revealed that Defendants did not have the authority to transfer funds

out of these accounts, but also they would have confirmed that Defendants did not engage in *any*

misconduct with respect to these clients such as that which is alleged in the warrant application.

*See* Licker Aff. ¶¶ 5, 8. To the contrary, these clients were extremely pleased with services

provided by the Defendants – so much so that many clients were reluctant to terminate their

---

    [18] The notion that Inspector Fraterrigo did not have access to the identities of these clients is
without merit. The identities of Amerindo U.S.'s clients should have been evident from numerous
sources consulted during her investigation, including bank records (discussed above) and
documents obtained by the SEC (discussed below).

relationship with Amerindo U.S. despite the enormous negative publicity engendered by

Defendants' arrests and the joint civil action filed by the SEC.[19]  *See* Licker Aff. ¶ 7-8.

Indeed, Inspector Fraterrigo did not have to look any further than the Government itself to

obtain extensive information about the business of Amerindo U.S.  As Inspector Fraterrigo was well

aware, Amerindo U.S. had been registered with the SEC as an investment advisor since 1985.  *See*

Margolis Decl., Exs. C and D at ¶ 5.  As such, the SEC had access to and possession of documents

relating to the business of Amerindo U.S.  In fact, as recently as January 2005, the Securities and

Exchange Commission was in the process of conducting an investigation of Amerindo U.S.,

pursuant to which it obtained thousands of pages of documents relating to Amerindo U.S.  *See*

Licker Aff. at ¶ 6.  Notably, this nearly two-year SEC investigation concluded on January 14, 2005,

with a no-action letter – a fact that Inspector Fraterrigo also knew or should have known but omitted

from the warrant application.  *See Id.*  In fact, the SEC investigation concluded so soon before the

execution of the search warrant, that when the officers showed up to carry out the warrant,

Amerindo U.S.'s counsel asked why the Government was executing a search warrant when the

company had been cooperating with the SEC.  *See* Margolis Decl., Ex. I at 31.  Given Inspector

Fraterrigo's acknowledgement that she reviewed documents obtained from the SEC prior to

submitting the warrant application, *see* Margolis Decl., Exs. C and D at ¶¶ 5-6, as well as the close

coordination between the SEC, United States Postal Inspectors and United States Attorney's Office

in this investigation,[20] it is inconceivable that Inspector Fraterrigo would not have come across such

---

[19] That these clients did not want to terminate their relationships with Amerindo U.S. is unsurprising.  As of December 2004, nearly each of these clients' portfolios reflected significant gains – in some cases over 100%.  *See* Margolis Decl., Ex. T at Tab 2.

[20] According to Eugene Licker, who was present during the search of Amerindo U.S., SEC officials were present at Amerindo U.S.'s San Francisco and New York offices either the day of or the day after the search.  *See* Licker Aff. at ¶ 9; Margolis Decl., Ex. I at 20-22.  Moreover, AUSA Litt testified that he spoke with three different individuals at the SEC on the day of the search, *see*

basic information as to the nature of Amerindo U.S.'s business and the clients and accounts that it managed. In any event, not asking for and reviewing such information from Government colleagues with whom she was working side-by-side before effectively devastating a twenty year old business is the epitome of recklessness.

In short, even the slightest bit of diligence into the business of the very company Inspector Fraterrigo was seeking permission to invade would have revealed that (1) the vast majority (if not all) of the assets managed by Amerindo U.S. had nothing to do with the three investments specified in the Affidavit, and (2) these assets were held in "closed-loop" accounts over which Amerindo U.S. (and therefore Defendants) had no authority to withdraw funds – facts that any issuing judge clearly would want to know. Indeed, for Inspector Fraterrigo to have applied for a search warrant without having investigated and disclosed these basic facts about the business of Amerindo U.S. – particularly where the clear impact of the warrant she was seeking would be (and, in fact, was) to fatally disrupt the company's operation – is precisely the kind of intentional or reckless conduct that the Fourth Amendment and the exclusionary rule aim to deter. Inspector Fraterrigo's omission of these facts from the warrant application, therefore, was either intentional or, at the very least, exhibited a reckless disregard for the truth. Indeed, had these facts been revealed, it would have been beyond dispute that there was absolutely no basis to seize nearly every single business record created since of the beginning of time and held at Amerindo U.S.'s New York office.

---

Margolis Decl., Ex. I at 66-67, 188, and that he shared information with the SEC throughout the investigation. *See id.* at 181. Indeed, an SEC subpoena was served on Amerindo U.S. the same day as the search, *see* Margolis Decl., Ex. F, and the SEC civil complaint was filed several days later.

**2. Inspector Fraterrigo Knew Or Should Have Known That, Contrary To The Hearsay Statement Of Lily Cates, Paul Marcus And Joy Urich Never Had Any Problems Redeeming Their Investments With Amerindo**

In her Affidavit, Inspector Fraterrigo represented that Lily Cates informed her of other individuals "*who [Cates] believed* to be investors with Amerindo, some of whom *may have had trouble* redeeming all or part of their investments, including Brian Harvey, Joy Urich and Paul Marcus." Margolis Decl., Ex. B at ¶ 6.E (emphasis added). What Inspector Fraterrigo failed to disclose, however, is that -- contrary to Lily Cates' suggestion -- *Paul Marcus never had any problems redeeming his investments with Amerindo*. According to Marcus, Defendants "successfully managed [his] money throughout the years and have never failed to return assets upon [his] request." Margolis Decl., Ex. N at ¶ 3. Moreover, Marcus *told this information to the Government*, stating (in substance) "I am not aware of anything indicating that Gary Tanaka or Alberto Vilar has done anything wrong." *Id*. In drafting the warrant application, therefore, Inspector Fraterrigo knew that Lily Cates' speculation as to any "trouble" Marcus "may" have had with Amerindo was entirely unfounded, and hid this fact from the Magistrate.

Although it is possible that the Government did not speak with Paul Marcus until after the warrant application was submitted, this would not excuse Inspector Fraterrigo's conduct in failing to identify and disclose this critical information to Magistrate Judge Maas. For Inspector Fraterrigo to rely on Cates' hearsay statement that specific other individuals were victimized, without taking the most basic steps to corroborate that allegation, is the epitome of recklessness. This is particularly so in this case, where Marcus, who resides in New Jersey, was available and willing to speak to the Government.

Similarly, had Inspector Fraterrigo bothered to interview Joy Urich -- another investor that Cates speculated "may" have had troubles – Inspector Fraterrigo would have discovered that

-20-

Urich's investment with Amerindo was fully redeemed several years earlier. *See* Margolis Decl.,

Ex. O. Urich, who was willing to talk to the press about her investment, resides in San Diego,

California, and should have been easily accessible to Inspector Fraterrigo had she bothered to take

such an elementary investigative step.

These key facts (i.e., that both Paul Marcus and Joy Urich had no trouble redeeming their

investments), which Inspector Fraterrigo knew but intentionally omitted from the warrant

application, are clearly material to the probable cause determination. Aside from the two alleged

"victims" identified in the Affidavit, the warrant application names only three other individuals as

potentially having had problems with Amerindo: Paul Marcus, Joy Urich and Brian Harvey. Not

only does the information omitted by Inspector Fraterrigo directly contradict the suggestion that

Paul Marcus and Joy Urich are potential "victims," but also it calls into serious question Cates'

credibility and reliability in general. [21] Had this information about Marcus and Urich been included

in the warrant application, therefore, it would have been clear that (1) although explicitly called for

by the warrant (see paragraph 6), there was no basis to seize documents relating to Paul Marcus,

Brian Harvey or Joy Urich, and (2) with only two alleged "victims" named in the warrant

application, and no credible suggestion that anyone else was wronged (to the contrary, the evidence

shows that at least one other individual client of Amerindo – namely, Paul Marcus – was ***pleased***

with Defendants' services), there is absolutely no basis to seize documents relating to every single

client or investment of Amerindo from the beginning of time forward.

---

[21] Inspector Fraterrigo conceded that the only probable cause set forth in the warrant application
to support the allegation that Marcus, Urich and Harvey were "victims" is Cates' hearsay statement
that these individuals "may" have had trouble redeeming their investments. *See* Margolis Decl., Ex.
L at 157-61. Notably, the Affidavit does not provide any information as to Cates' basis of
knowledge for this allegation. *See Canfield*, 212 F.3d at 718 (in determining whether probable
cause exists one must take into account "all the circumstances set forth in the affidavit..., including
the veracity and basis of knowledge of persons supplying hearsay information") (internal quotations
and citation omitted).

**3.** **Contrary To Her Suggestion In The Warrant Application, Inspector Fraterrigo Knew That, From 1987 Until At Least 2001, Both Lily Cates And Lisa Mayer Received Payments From And Were Pleased With The Services Provided By Amerindo**

In her Affidavit, Inspector Fraterrigo asserted that, in or about 1988, Lily Cates invested $1 million with Amerindo in an entity called Rhodes Capital. Fraterrigo went on to allege that, "[a]lthough her account statements, which she received up until approximately 2002, reflected growth in the Rhodes investment, the investment was never described to her, she never has received a private placement memorandum, nor has she signed a subscription agreement for Rhodes, and her efforts to learn more about the investment were ignored or rejected by Vilar." Margolis Decl., Ex. B at ¶ 6.B. The clear intended negative implication of Inspector Fraterrigo's statement is that, although account statements sent by Amerindo to Cates between 1988 and 2002 "reflected" growth in her investment, Cates never actually received any benefit from her investment.

What Inspector Fraterrigo knew but failed to include in the Affidavit, however, was that, between 1988 and 2002, *Lily Cates actually received millions of dollars in payments from Amerindo*. *See* Margolis Decl., Ex. P; Ex. Q (demonstrating approximately $6.5 million in payments to Cates). That Inspector Fraterrigo knew about these payments but chose to omit them from the warrant application cannot seriously be disputed. First, according to Inspector Fraterrigo's sworn statement, she interviewed Lily Cates at least once prior to submitting the warrant application. Even the most basic interrogation would have uncovered extensive payments to Cates between 1988 and 2002. *See* Margolis Decl., Ex. Q. Second, many of these payments are reflected on client confirmations that were provided by Lily Cates to the Government.[22] *Id.* These

---

[22] Notably, Inspector Fraterrigo chose to reference in the Affidavit other documents provided to the Government by Lily Cates – namely, Amerindo account statements received by Cates – to imply (incorrectly) that Cates did not receive any benefit from her investment with Amerindo between 1988 and 2002. *See* Margolis Decl., Ex. B at ¶ 6.B.

confirmations contain specific information about transfers from Amerindo to Lily Cates, such as the account from which the money came, the account to which the money was transferred and a description of the transfer. *See* Margolis Decl., Ex. P.

Moreover, Inspector Fraterrigo intentionally omitted similar information with respect to Lisa Mayer, the other alleged "victim" named in the warrant application. Specifically, although the Affidavit asserts that Lisa Mayer and her family were clients of Amerindo since 1987, the Affidavit fails to disclose that, prior to 2001 (and possibly afterwards), the Mayers received regular payments from Amerindo. *See* Margolis Decl., Ex. R ("We are happy to continue to pay your interest on a monthly basis should you still require this service."). Indeed, the Mayers were so pleased with the services provided by Amerindo that in January 2001, they elected to renew their guaranteed fixed rate deposit account. *See id.* Again, these facts were evident in documents provided by Lisa Mayer to the Government, not to mention that they should have been apparent based on Inspector Fraterrigo's conversations with Ms. Mayer.[23]

The omitted facts, which demonstrate that neither of the alleged "victims" had any problems or issues with Amerindo prior to 2001 (to the contrary, these clients received consistent payments during this period), are critical because they directly contradict the suggestion that there is probable cause to seize documents from the beginning of time until the date of the search, as was called for by the warrant. Indeed, once corrected to account for Inspector Fraterrigo's omissions, the warrant application is entirely devoid of any allegations that would even suggest a basis for seizing documents created prior to 2001 – let alone documents that date back to Amerindo U.S.'s inception nearly two decades earlier.

---

[23] These documents also confirm the Mayers' understanding that they were off shore clients whose relationship was with Amerindo Investment Advisors, Inc., or "Amerindo Panama." *See* Margolis Decl., Ex. R.

**B.    INSPECTOR FRATERRIGO REPEATEDLY ADMITTED TO MAKING INTENTIONAL AND AFFIRMATIVE MISREPRESENTATIONS IN THE WARRANT APPLICATION**

> **1. <u>Throughout Her Testimony, Inspector Fraterrigo Repeatedly Admitted Misleading Magistrate Judge Maas About The Existence Of Probable Cause.</u>**

Throughout her testimony at the suppression hearing, Inspector Fraterrigo repeatedly admitted to lying in the warrant application about the single most critical issue facing Magistrate Judge Maas: whether there was probable cause to seize the items called for by the warrant. These repeated admissions have two major effects here. First, Inspector Fraterrigo's testimony demonstrates her propensity to play fast and loose with facts and truth – a trait clearly relevant in assessing her state of mind. Second, her misrepresentations to the Magistrate Judge, which she admitted to time and again, standing alone provide an independent basis upon which to grant a *Franks* hearing. Colloquially put, after hearing Inspector Fraterrigo's testimony about misleading the Magistrate Judge on the key issue of probable cause, one cannot help but wonder what other falsehoods she perpetrated in order to secure the warrant.

In paragraph 5 of the Affidavit, Inspector Fraterrigo states: "Based on the facts set forth in this affidavit…there is probable cause to believe that there are presently concealed in the Premises, evidence and instrumentalities of violations of Federal law…consist[ing] of the items set forth in Schedule A." Margolis Decl., Ex. B at ¶ 5. Similarly, in paragraph 9 of the Affidavit, Inspector Fraterrigo states: "There is probable cause to believe that the following records and instrumentalities of the fraudulent schemes described above" – that is, the records and instrumentalities listed in the warrant rider – "are located at the Premises." Margolis Decl., Ex. B at ¶ 9.

The fact that Inspector Fraterrigo would represent in the warrant application that there is probable cause to seize the items called for by the warrant is not in itself surprising; after all, she

-24-

was requesting that Magistrate Judge Maas sign the warrant, which in turn required a finding of probable cause. What *is* surprising, however, is that Inspector Fraterrigo made these representations ***despite her knowledge that there in fact was* no *probable cause to seize large categories of documents called for by the warrant***. Indeed, throughout her cross-examination, Inspector Fraterrigo repeatedly acknowledged that, contrary to her assertions to Magistrate Judge Maas, there was *no* probable cause in the warrant application to seize large categories of items called for by the warrant.

Specifically, with the exception of documents relating to the five individuals and three investment types specifically identified in the Affidavit, Inspector Fraterrigo admitted that even *she* did not believe that there was probable cause in the warrant application to seize documents relating to any other clients or investments of Amerindo, including but not limited to client files, marketing materials, investment advisory agreements, correspondence sent to or received from clients, brokerage account documents (with the exception of documents relating to the accounts specifically noted in the affidavit), documents relating to securities transactions entered into by Amerindo on behalf of clients, records of expenses (such as copies of checks and/or wires sent to landlords, utility companies, counsel, or other organizations that provided goods or services to Amerindo) and documents reflecting communications with boards of directors. *See* Margolis Decl., Ex. K at 30-34, 38, 49 and 52.

Moreover, at the time she sought the warrant, Inspector Fraterrigo *knew* there was no probable cause in the warrant application to support seizing these documents. Specifically, Inspector Fraterrigo testified as follows:

> The Court: Inspector, do you remember giving testimony about client list?

The Witness:  Yes.

The Court:  And that there was probable cause.  You said that there was not probable cause to get all the client lists, there were only some client lists that you had specific information.  Do you recall that?

The Witness:  Yes.

The Court:  The question is, is it a fact that you knew you didn't have probable cause to get every client list at the time you went and got the warrant?

Mr. Hoffman:  Correct.

The Witness:  That's correct.

Q:  That's correct?

A:  Mm-hm.

Q:  It would be the same for all the other things that we asked you, the other categories, not just client lists, but we went through many categories, correct?

A:  That's correct.

*See* Margolis Decl., Ex. K at 94.

In fact, not only did Inspector Fraterrigo admit that she knew there was no probable cause in the warrant application to seize large groups of items, but also she conceded that there was ***no probable cause whatsoever*** – whether included in the warrant application or otherwise – to seize certain items called for by the warrant, including client lists reflecting Amerindo U.S.'s current or former institutional clients, and items sent to or received from these clients, such as investment brochures, marketing materials, investment advisory agreements and general correspondence.  *See* Margolis Decl., Ex. J at 149-56.  For example, Inspector Fraterrigo testified as follows:

Q:  And my question to you is, of the dozens if not hundreds of institutional clients that this would cover for [Amerindo U.S.], you had zero probable cause to seize marketing materials sent to or from those clients, correct?

A:  That's correct.

Q:  It also says investment advisory agreements from clients, or to or from clients; and the same would be true that you would have no probable cause – zero – to seize investment advisory agreements

> between [Amerindo U.S.] and all the institutional clients it has had over a 20 year period, correct?
>
> A: That's correct.
>
> Q: And, you have asked for all correspondence, copies of correspondence sent to or received from clients, and the same would be true that you have no probable cause to seize copies of correspondence between [Amerindo U.S.] and, let's say, the 20 years' worth of institutional clients that it had, correct?
>
> A: That's correct.

Margolis Decl., Ex. J at 152-53.

Inspector Fraterrigo's remarkable concession that she knowingly misled Magistrate Judge Maas about the very issue he was charged with deciding – namely, whether there was probable cause to support the warrant – in itself justifies further inquiry into this and other possible misrepresentations or omissions. At the very least, it calls into serious question the veracity of Inspector Fraterrigo and provides substantial support for the notion that omissions described above – rather than the product of innocent mistake – were part of a deliberate and intentional attempt to mislead the issuing judge.

**2.  Inspector Fraterrigo's Attempt To Write Off Her Own Testimony As The Result Of "Confusion" Was Patently Incredible And Provides An Independent Basis For Questioning Her Veracity.**

In apparent recognition of the devastating impact of her repeated admissions that there was no probable cause in the warrant application to seize countless documents called for by the warrant, on re-direct examination Inspector Fraterrigo attempted to backtrack on her prior testimony. In her revised testimony, Inspector Fraterrigo asserted that there in fact *was* probable cause in the Affidavit to seize all of the items called for by the warrant – a warrant which, according to Inspector Fraterrigo's own testimony, called for seizure of nearly every business-related document at Amerindo U.S. In particular, on re-direct examination, Inspector Fraterrigo claimed that, although

-27-

the warrant application named only two alleged "victims," the allegations relating to these two

individuals gave "probable cause" and "reason to believe" that other investors has similarly been

defrauded by Defendants. *See* Margolis Decl., Ex. L at 99, 104, 107, 121.

When asked why she had repeatedly testified that there was no probable cause only to

reverse course and claim there was, Inspector Fraterrigo asserted that her prior answers were the

result of "confusion" regarding the questions asked. *See id.* at 95, 97, 103, 107. Specifically,

Inspector Fraterrigo claimed that she mistakenly interpreted these questions as asking whether

particular clients or investments were specifically identified in the Affidavit, not whether the

Affidavit set forth probable cause to seize documents relating to these clients or investments. *See*

*id.* at 102-03.

Inspector Fraterrigo's sudden "epiphany" that there was probable cause to support the

warrant is simply not credible and only further casts doubt on her veracity. *First*, Inspector

Fraterrigo revised her testimony only after a break during which the Government raised the very

explanation now offered by Inspector Fraterrigo for the change in her position.[24]  During this break,

the Government asked Inspector Fraterrigo if she was "confused" by the questions on cross-

examination concerning probable cause, and, more specifically, whether she was "confusing the

probable cause and the fact[s] in the search warrant." *Id.* at 95, 97, 99. The Government further

asked about the "link between the investors that were named in the affidavit and those that were not

named." *Id.* at 99. For Inspector Fraterrigo to emerge from this meeting only to claim that she

indeed had been "confused" by the questions asked, and that the probable cause she had previously

---

[24] It is worth noting that the AUSAs representing the Government specifically requested a
private meeting with Inspector Fraterrigo prior to beginning re-direct examination. *See* Margolis
Decl., Ex. L at 86-93.

testified did not exist was in fact derived from the allegations pertaining to the two alleged
"victims" named in the Affidavit, which in turn gave rise to a concern that others had been
defrauded, is suspect at best.  In truth, her sudden shift just demonstrates that Inspector Fraterrigo
adopted the suggestions inherent in questions asked by the AUSAs in the private meeting prior to
her re-direct testimony.

*Second*, regardless of its source, the notion that the questions posed to Inspector Fraterrigo
during cross-examination were confusing or otherwise subject to misinterpretation in the manner
described by Inspector Fraterrigo is simply not believable.  According to Inspector Fraterrigo, she
mistakenly interpreted these questions as asking not whether there was probable cause to take
documents relating to particular clients or investments, but rather whether those clients or
investments were specifically identified in the Affidavit.  *See, e.g.*, Margolis Decl., Ex. L at 102-03.
Many of the questions at issue, however, did not even reference the Affidavit, but rather asked
generally whether there was probable cause to seize a certain categories of documents.  *See*
Margolis Decl., Ex. J at 149-56.  Those questions that did reference the Affidavit clearly asked
whether there was any information in the Affidavit or its attachments that would support probable
cause to seize certain documents, not whether particular clients or investments were named in the
Affidavit.  *See* Margolis Decl., Ex. J at 149-56.  The notion that such a straightforward line of
questioning somehow confused Inspector Fraterrigo – who has been in law enforcement for over
eleven years and has participated in between 40 and 50 searches (approximately 25 of which she
supervised and served as the affiant) (*see* Margolis Decl., Ex. J at 40-41; Ex. K at 136-37, 140) – is
dubious at best.

*Third*, and perhaps most importantly, Inspector Fraterrigo's newfound explanation as to *why*
there was probable cause to seize documents relating to every single client or investment of

Amerindo over a twenty year period is itself flatly contradicted both by the Affidavit and Inspector

Fraterrigo's testimony.  According to Inspector Fraterrigo's revised testimony, probable cause for

the search warrant stemmed from the allegations pertaining to Lily Cates and Lisa Mayer, which in

turn gave rise to "probable cause and reason to believe" that other investors, including but not

limited to institutional and mutual fund clients of Amerindo U.S, were being defrauded.  *See, e.g.,*

Margolis Decl., Ex. L at 102-04, 121.  During the hearing, however, Inspector Fraterrigo testified

that, although there may have been probable cause to seize documents relating to the five

individuals actually named in the Affidavit, there was only "reason to be concerned" that other

investors had been defrauded – *a standard that Inspector Fraterrigo herself testified was less*

*stringent than the "higher" standard of probable cause.  See* Margolis Decl., Ex. K at 18

(acknowledging that there is a significant difference between the "higher" standard of probable

cause and "reason to be concerned"); Ex. L at 97 (although she had probable cause to believe

certain particular clients were being defrauded, she had only "reason to believe" that other victims

existed), 105-06 ("probable cause" pertained to the investors she specifically named in particular in

the affidavit, though she had "reason to believe" there could be other investors who were victims).

Indeed, Inspector Fraterrigo testified that had probable cause existed to seize documents related to

investors other than those specifically mentioned in the Affidavit, she would have used that term in

her Affidavit and not the lesser standard of "reason to be concerned."[25]  *See* Margolis Decl., Ex. K

at 18; *see also* Margolis Decl., Ex. B at ¶ 6.F.  In short, not only is Inspector Fraterrigo's testimony

---

[25] Apparently realizing the significance of her testimony on the distinction between "reason to be concerned" and "probable cause," on re-cross examination Inspector Fraterrigo once again attempted to reverse position by claiming that there is no distinction between the two standards.  *See* Margolis Decl., Ex. M at 210-212.  Inspector Fraterrigo offered no sound explanation for the sudden change in her testimony on this point, thus providing yet another reason to question her veracity.

as to the ***existence*** probable cause entirely incredible, but her explanation as to the ***basis*** of this newfound probable cause is equally unsound.

### 3. **Inspector Fraterrigo's Testimony Gave Rise To Additional Reasons To Question Her Veracity.**

Inspector Fraterrigo's testimony during the suppression hearing gave rise to at least two additional reasons to question her truthfulness. First, Inspector Fraterrigo admitted that she intentionally altered boxes of evidence specifically requested by Defendants for the purposes of the suppression hearing. Prior to the commencement of "phase two" of the suppression hearing on May 31, 2006, counsel for Mr. Vilar wrote to the Government requesting that twelve specified boxes of evidence – identified by serial number – be brought to the hearing for use by Defendants during cross examination. *See* Margolis Decl., Ex. S.

Despite Defendants' request that these particular boxes of evidence be made available for use at the hearing regarding, *inter alia*, the method of execution of the search warrant, between the beginning of phase two on May 31, 2006 and July 7, 2006, the date to which the hearing was adjourned, Inspector Fraterrigo went through these boxes and removed certain items that she believed fell outside the scope of the warrant.[26] *See* Margolis Decl., Ex. K at 123-133. Furthermore, on June 28, 2006 – a mere seven days before the continuation of the hearing (and the Friday before the July 4 holiday) – Inspector Fraterrigo sent these items to Eugene Licker, counsel for Amerindo U.S. *Id.* Although Inspector Fraterrigo copied Defendants' counsel on the cover letter, Inspector Fraterrigo did not provide Defendants with copies of the returned items. Nor did the letter set forth an inventory of the items that had been removed by Inspector Fraterrigo. In fact,

---

[26] Notably, during this period, Inspector Fraterrigo did not review any evidence other than the twelve boxes specifically requested by Defendants to assess whether there were items that fell outside the scope of the search warrant. *See* Margolis Decl., Ex. K at 127-28.

Inspector Fraterrigo did not keep any record as to which items she removed from the boxes requested by Defendants. *Id*. The fact that Inspector Fraterrigo tampered with the very evidence upon which Defendants had made clear they intended to rely at the suppression hearing provides yet another reason to question her credibility.

Second, and equally disturbing, Inspector Fraterrigo admitted to backdating the Memorandum of Interview ("MOI") prepared in connection with Mr. Tanaka's arrest. During her testimony, Inspector Fraterrigo acknowledged that, although the MOI was dated May 28, 2005 – two days after Mr. Tanaka's arrest – she did not actually sign the MOI until approximately two weeks later. *See* Margolis Decl., Ex. L at 13-15. Thus, the MOI was incorrectly dated in a manner that falsely gave the impression the memo was drafted within two days of Mr. Tanaka's arrest, when in actuality it was not finalized until some time later.

## CONCLUSION

The situation presented in this case is both unusual and troubling. Not only did the Inspector Fraterrigo intentionally (or at the very least recklessly) omit material information from the search warrant application, but also she admitted to seeking a warrant even though she knew there was no probable cause set forth in the application to support seizing a vast majority of what she sought. To make matters worse, after a private meeting with the AUSAs in which suggestive questions were posed to her, Inspector Fraterrigo attempted to reverse her testimony under the guise that she had been "confused" by the questioning. Not only did this transparent attempt to re-write her testimony fail, but also it raised additional and serious questions concerning Inspector Fraterrigo's veracity. Under these circumstances, a *Franks* hearing is warranted. It is only appropriate that the events that

led to the issuance of such a vastly overbroad warrant, and the subsequent search that destroyed a

twenty year old company, come to light.

Dated: August 30, 2006                          By:    /s/  Glenn C. Colton
       New York, New York

                                              Glenn C. Colton (GC-2493)
                                              Jessica L. Margolis (JM-7786)
                                                WILSON SONSINI GOODRICH & ROSATI, PC
                                              PROFESSIONAL CORPORATION
                                              12 E. 49th Street, 30th Floor
                                              New York, New York  10017
                                              Tel: 212.999.5800

                                              Steven Kobre
                                              Justin M. Sher
                                              KOBRE & KIM LLP
                                              800 Third Avenue
                                              New York, New York 10022
                                              Tel: 212.488.1234

                                              *Attorneys for Defendant*
                                              *Gary Alan Tanaka*