Exhibit G

12-14-05 hearing transcript.txt

1

5CESVILAR
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    -----------------------------x
2
3    UNITED STATES OF AMERICA,
3
4
5              v.                           05 Cr. 621
6
6    ALBERTO VILAR and GARY TANAKA,
7
7              Defendants.
8
8    -----------------------------x
9
9                                     December 14, 2005
10                                    9:45 a.m.
10
11   Before:
11
12                   HON. KENNETH M. KARAS,
12
13                                     District Judge
13
14                        APPEARANCES
14
15   MICHAEL J. GARCIA
15        United States Attorney for the
16        Southern District of New York
16   MARC LITT,
17        Assistant United States Attorney
17
18   SUSAN WOLFE, ESQ.
18   JEFFREY HOFFMAN, ESQ.
19        Attorneys for Defendant Alberto Vilar
19
20   GLENN COLTON, ESQ.
20   STEVEN KOBRE, ESQ.
21        Attorneys for Defendant Gary Tanaka
21
22
22
23
24
25
25

                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                           2

     5CESVILAR
1              (Case called)
2              MR. LITT:  Marc Litt for the United States.
3              Good morning, your Honor.
4              With me is U.S. Postal Inspector Cynthia Fraterrigo.
5              MR. HOFFMAN:  Good morning, Jeff Hoffman and Susan
6    Wolfe for Mr. Vilar.
7              THE COURT:  Were you on trial, Mr. Hoffman?
8              MR. HOFFMAN:  I was.
9              THE COURT:  Welcome back.
10             MS. WOLFE:  With us is Joanna Evans, an attorney not
11   yet admitted to the bar.
                        Page 1

12-14-05 hearing transcript.txt

12    THE COURT:  Good morning, Ms. Evans and welcome.
13    MR. KOBRE:  Steven Kobre for Mr. Tanaka along with
14  Glenn Colton and Jessica Margolies.
15    THE COURT:  Good morning to you all.
16    Of course, we scheduled this to have a hearing on the
17  defendants' motion to suppress both the fruits of a search, a
18  court-authorized search, as well as statements.  I had issued
19  an order last week indicating that I was denying the defense
20  motion for a Franks hearing and I also had asked Mr. Tanaka to
21  brief the question of his standing to challenge the search as
22  he joined in with Mr. Vilar's motion to suppress the fruits of
23  the search.
24    Mr. Litt, I assume you have had a chance to read Mr.
25  Kobre's letter?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

5CESVILAR
1    MR. LITT:  I have.
2    THE COURT:  Is there anything you want to say in
3  response to it?
4    MR. LITT:  No, your Honor.
5    THE COURT:  I think Mr. Kobre persuasively made the
6  case that Mr. Tanaka has standing to challenge the search and
7  so I thank you for that, Mr. Kobre, for enlightening me on
8  that.  And so he will obviously be allowed to participate in
9  the part of the hearing that relates to the search in addition
10  to the part that relates to his own statements with respect to
11  the Franks hearing, the primary argument that is made in
12  support of the Franks hearing, and I want to be very
13  specific --
14    MS. WOLFE:  Page 19, your Honor.
15    THE COURT:  Yes.  I was thrown off because I think the
16  table of contents says 16.
17    The thrust of the claim here is that the allegations
18  in the affidavit, referring to the affidavit in support of the
19  search, concerning the Mayer investments have never been the
20  subject of a criminal complaint and are not included in the
21  current indictment.  And what Vilar argues, and I am reading
22  here, "This circumstance suggests that there is some
23  information in the government's possession that contradicts the
24  allegation of criminality in connection with the Mayer
25  investments.  If such exculpatory evidence was in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

5CESVILAR
1  government's possession at the time of the search warrant
2  affidavit it would have been misleading to withhold that
3  information from the magistrate."
4    And really what that amounts to is comparing the
5  affidavit and the allegations in the absence of any actual
6  charge in the indictment.  And then the conjecture, and really
7  that is what it is, is that there must be some sort of
8  exculpatory information which by virtue of its omission is
9  somehow then misleading.  And of course as counsel knows the
10  requirement for a Franks hearing is much more exacting than
11  that.  There has to be a "substantial showing that the affiant
12  knowingly, intentionally or recklessly misled the magistrate
13  judge."  And there is nothing in the allegation and, as I say,
14  it really is conjecture.
15    The fact that there are certain allegations made that
16  support, in the government's view, probable cause to believe
Page 2

12-14-05 hearing transcript.txt

17  that there might be evidence in the searched premises of a
18  crime and the fact that the crime is not ultimately charged
19  does not mean there wasn't probable cause, nor does it mean
20  that the government withheld anything.  To the extent that the
21  defense does not identify anything in particular that was
22  withheld, it really is precisely the type of conjecture that
23  routinely is rejected as basis for a Franks hearing.  Among
24  other cases I note is the Singh case which discusses this
25  concept.  So I don't think that the defense has met its burden

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

5CESVILAR
1  for a Franks hearing.
2           Now, of course, if in the course of the discovery as
3  this case progresses that changes, then the defense can reopen
4  the issue.
5           I want to do the hearing first and then we can talk.
6  I have some questions with respect, some of which may be
7  clarified by the hearing, but I don't want to get into legal
8  argument now.  Let's get started with witness testimony.
9           Is there anything we can take up, however, beforehand?
10          MS. WOLFE:  I did want to make some very brief
11  prefatory comments just to put before you something that the
12  court is not aware of that is not addressed in the papers.  And
13  that is the fact that on the day of the search, we understand
14  that a subpoena was served on counsel for Amerindo, and at the
15  time we submitted our papers and our reply we weren't aware of
16  that, and the government doesn't mention in their papers, and
17  my understanding is that there was an agreement between the
18  government and counsel for Amerindo that the agents would not
19  continue their search and take everything that they believed
20  they were entitled to take if counsel for Amerindo would agree
21  to preserve the premises and accept service of the subpoena.
22          We have prepared a motion to quash the subpoena, which
23  we can serve on the government today, and I understand that
24  there has been no production made on that subpoena yet.
25  Although some resources have certainly gone in to attempting to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

5CESVILAR
1  put together the material.  And the government certainly should
2  have an opportunity to respond and I can give them papers later
3  in the day.
4           That doesn't change our argument that the search
5  warrant was overbroad and that is an issue which the court will
6  have to determine based on the search warrant and the affidavit
7  establishing probable cause for the search.  It also doesn't
8  change our argument that the execution of the warrant was
9  overbroad and that is obviously an issue that is going to be
10  addressed at the hearing.
11          THE COURT:  I understand it doesn't change that you
12  want the motions granted but how would you say it affects the
13  consideration of the motion, if at all?
14          MS. WOLFE:  Well, it affects it in this respect:  When
15  we originally filed our papers based on a probably cursory
16  review of Mr. Vilar's office space, we had represented that the
17  government had taken everything.  We didn't go through all the
18  file cabinets that time because we looked at the warrant and I
19  assume they had taken everything.
20          It turns out that instead of taking everything, they
21  served a subpoena which gave the employees and the counsel for

Page 3

12-14-05 hearing transcript.txt
```
 3   officials carrying out the search had taken what they thought
 4   they were allowed to take pursuant to the warrant?
 5           MR. LITT:  They thought from the areas that they
 6   searched, they thought they had taken what they were permitted
 7   to take.  There was a large area that they had not yet started
 8   to search and they did not search that area because Mr. Licker
 9   proposed this alternative route to get documents and the
10   government agreed.
11           THE COURT:  Okay.
12           MR. LITT:  Had the search continued the agents would
13   have gone through all of those cabinets, boxes, documents and
14   made a determination as to whether or not it fell under the
15   warrant.
16           THE COURT:  Thinking in terms of the discovery that is
17   left to be produced, and I am not sure where things stand on
18   the privilege issue, in October when Mr. Licker was apparently
19   ready to hand over the first wave of documents that he thought
20   were responsive to the subpoena had he done a privilege review
21   or was that still something that had to be done?
22           MR. LITT:  For those documents?
23           THE COURT:  Correct.
24           MR. LITT:  I had no discussions with Mr. Licker about
25   that with respect to those documents.  The issue of privilege
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    12

5CESVILAR
```
 1   has been lingering over this case from almost the outset.
 2           THE COURT:  Lingering is one word, yes.
 3           MR. LITT:  And Mr. Licker I believe was well aware of
 4   the fact that there were privilege issues and that there would
 5   be privilege issues with respect to documents responsive to the
 6   subpoena, but I never had a specific conversation with him
 7   about privilege and the subpoena.
 8           THE COURT:  All right.  We need to tee this up because
 9   obviously the -- and I will hear from Mr. Tanaka's counsel, but
10   there are an number of layers to this.  There is the motion to
11   quash, which is coming I gather.  There is its impact, the
12   subpoenas impact on the execution of the search and how that
13   relates to the claim of overbreadth, and then there is the
14   discovery issue and the trial date issue because what I am
15   concerned about is that it sounds like a volume of documents
16   that the government has yet to receive and it may never receive
17   if I grant the motion to quash.
18           If I deny the motion to quash, then it receives it and
19   then we have the privilege issue and we have to get it copied
20   and turned over to the defendants ASAP.  And it sounds like
21   it's some volume of material right, Mr. Litt?  We are not
22   talking about a box.  We are talking about maybe many, many
23   boxes.
24           MR. LITT:  As I say, my best recollection of what Mr.
25   Licker told me it was on the order of 20, 25 boxes.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    13

5CESVILAR
```
 1           THE COURT:  Are we talking electronically-stored
 2   materials as well or just hard copies?
 3           MR. LITT:  I believe it's hard copy.  I don't know
 4   what Mr. Licker decided to do.  He at one point mentioned he
 5   might be having those documents scanned onto DVDs as opposed to
 6   copying the hard documents.  I don't know what he decided
 7   because I haven't seen anything.
```
Page 6

12-14-05 hearing transcript.txt

```
 8              THE COURT:  All right.
 9              Mr. Colton, you were about to stand up.
10              MR. COLTON:  If your Honor wants a further update on
11   the privilege issue now I am happy to do it, unless you wanted
12   to get to the hearing and do it after.
13              THE COURT:  Let's get to the hearing.  I don't know
14   how much of this is new to you or not and obviously you are
15   hearing Mr. Litt's recitation I presume for the first time.
16   Why don't we get to the hearing because then you all may want
17   to huddle and think about how you would want to respond to what
18   Mr. Litt said.  And we ought to talk about a schedule for the
19   motion to quash in terms of when it gets filed.  I don't know
20   if you want to join the motion.  I presume you might.
21              MR. COLTON:  Yes.
22              THE COURT:  Then, of course, we have to tee it up.  Is
23   that all right with you, Mr. Colton?
24              MR. COLTON:  That is fine.  I will change gears and
25   tell you something you will be happy to hear.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

5CESVILAR

```
 1              THE COURT:  Okay.
 2              MR. COLTON:  In discussions with Mr. Litt last night,
 3   the government had, after evaluating its options, informed
 4   counsel for Mr. Tanaka that they will not use any statements
 5   made by Mr. Tanaka post arrest up to the time of presentment
 6   with counsel attached in its case in chief, which by my reading
 7   obviates the need to have an evidentiary hearing on the
 8   question of whether Mr. Tanaka was given his Miranda rights and
 9   warnings and whether those statements were voluntary because
10   the government is saying they won't use them in the case in
11   chief.  So we of course are prepared, but my guess is there is
12   no need for that portion of the hearing.
13              THE COURT:  I think that is right.  The only question
14   for you is as you know what the law says is to the extent that
15   the statements are merely un-Mirandized but otherwise not
16   coerced, to the extent the government would want to use either
17   the fruits of any statements or to use the statements, for
18   example, on cross examination should your client take the
19   stand, then the question of voluntariness becomes material.
20   And I don't know, and I didn't read your motion to say that
21   there was some sort of coercive tactics employed by the postal
22   inspectors, but merely focusing on the un-Mirandized
23   statements.
24              Mr. Colton.
25              MR. COLTON:  Yes, the motion was based on the failure
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

5CESVILAR

```
 1   to properly give Miranda warnings and then the argument that
 2   the second post Miranda statements were tainted under Siebert
 3   by virtue of the first set of statements.  We recognize that if
 4   it's only a failure to give Miranda and Mr. Tanaka chose to
 5   take the stand in his own defense, those statements could be
 6   used to cross examine him.
 7              If the government proposes some other use besides case
 8   in chief and besides cross examination of Mr. Tanaka, assuming
 9   he takes the stand, we can revisit the issue of voluntariness
10   at that time but I think that is an unlikely scenario to come
11   up, and given the court's valuable time it's probably not worth
12   having a hearing.
```

Page 7

12-14-05 hearing transcript.txt
13        THE COURT:  My time is worth almost nothing.  I don't
14   want to delay the case.  I don't know what other use there
15   would be.  I don't know enough about the case or your case.  If
16   there is some fruits of the statements, for example --
17        MR. COLTON:  I think unlikely given it's a one-page
18   memo.
19        THE COURT:  I agree but I don't want to presume it.
20        MR. COLTON:  If we get totally surprised, then we want
21   to have that reservation, but I frankly can't foresee that.
22        THE COURT:  I think that is fair.
23        Mr. Litt, I think they preserve their options if there
24   is something they are not aware of now.
25        MR. LITT:  That is acceptable to the government.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              16
5CESVILAR
1         THE COURT:  So you are here to talk about the search
2    only, referring to Mr. Tanaka's counsel.
3         MR. COLTON:  That is right, and the other pretrial
4    issues.
5         THE COURT:  All right.  So then who is going to
6    testify for the government?
7         MR. LITT:  The government intends to call three
8    witnesses, U.S. Postal Inspectors Jean Wright and Thomas Feeney
9    with respect to the Vilar Miranda issue, and then U.S. Postal
10   Inspector John Feiter, who supervised the search.
11        THE COURT:  I saw Mr. Feiter's name and that is why I
12   asked.  I should let everybody know that in my prior life I
13   worked, I don't know, a couple of cases, a few cases, I am not
14   sure how many, with Mr. Feiter when he was employed at the
15   Postal Inspector's office, which is probably 12, 13 years ago.
16   And I haven't had any contact with him in many, many years.  I
17   never did anything socially with him.
18        I can assure counsel it's not going to affect my
19   impartiality in this matter but I did want to disclose that
20   because I did see his name in some of the materials and that is
21   why I asked the question.  If anybody wants to discuss it I am
22   happy to discuss the issue.
23        MR. COLTON:  We don't believe that raises an issue
24   vis-a-vis Mr. Tanaka.
25        THE COURT:  Okay.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              17
5CESVILAR
1         MR. LITT:  The government has no problem.
2         THE COURT:  All right.
3         MS. WOLFE:  No objection, your Honor.
4         THE COURT:  Mr. Kobre, you were standing.
5         MR. KOBRE:  Yes.
6         Your Honor, I understand from Mr. Litt, and I am sure
7    it will be subject to your Honor's direction, that it was the
8    government's intent to call the witnesses relating to Mr.
9    Vilar's statement first and then handle the issue related to
10   the search.  Subject to whatever your Honor's ruling is that is
11   obviously acceptable to us.  The only points is I do note there
12   is at least one witness that Mr. Litt just mentioned that does
13   appear to have been present at the search as well and I just
14   wanted to ensure if we are going to handle Mr. Vilar's
15   statement issues first that I obviously will not be questioning
16   the witness, that I at least be able to have reserved or not
17   waived the opportunity to call that witness in relationship to
Page 8

12-14-05 hearing transcript.txt

18    the search.
19            THE COURT:  That seems eminently reasonable.
20            Mr. Litt?
21            MR. LITT:  Well --
22            THE COURT:  Unless you want him crossed in the middle
23    of the Vilar statement testimony.
24            MR. LITT:  There is one witness I would like to confer
25    with if I could because she came up from Washington for this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

5CESVILAR
1    and as of yesterday had things to do back in Washington and I
2    was going to put her on first.  If I can just check.
3            MR. KOBRE:  I can talk to Mr. Litt and we might be
4    able to narrow it as to who the witness is.
5            THE COURT:  Of course.
6            (Pause)
7            MR. KOBRE:  It turns out it's the witness he was
8    concerned about and so Mr. Litt has to check.
9            THE COURT:  All right.
10            MR. LITT:  Your Honor, I have talked to the agent and
11    Mr. Kobre.  The agent apparently does not need to get back to
12    Washington and I think it would be best to keep the two pieces
13    separate.
14            THE COURT:  Okay.
15            So with that, then, you want to call your first
16    witness, Mr. Litt?
17            MR. LITT:  Yes, the government calls U.S. Postal
18    Inspector Jean Wright.
19            THE COURT:  Okay.
20     JEAN WRIGHT,
21        called as a witness by the Government,
22        having been duly sworn, testified as follows:
23    DIRECT EXAMINATION
24    BY MR. LITT:
25    Q.  Good morning.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

5CESVILAR                    Wright - direct
1    A.  Good morning.
2    Q.  Ms. Wright, how are you employed?
3    A.  United States postal inspector.
4    Q.  How long have you been a United States postal inspector?
5    A.  13 years.
6    Q.  What is your current assignment?
7    A.  I am the team leader of the Manhattan mail theft team.
8    Q.  I am sorry, if you can speak up a little bit.
9    A.  I am the team leader of the Manhattan mail theft team.
10    Q.  How long have you been the team leader of that team?
11    A.  Since June of this year.
12    Q.  What was your assignment prior to that?
13    A.  I was a member of the securities fraud team.
14    Q.  How long were you a member of the securities fraud team?
15    A.  From August 2004.
16    Q.  In your 13 years as a U.S. postal inspector, approximately
17    how many arrests have you participated in, if you can estimate?
18    A.  Probably a couple of hundred.
19    Q.  Did you participate in the arrest of an individual named
20    Alberto Vilar on May 26, 2005?
21    A.  Yes, I did.
22    Q.  If you saw Mr. Vilar again do you think would you be able
Page 9

12-14-05 hearing transcript.txt
```
14  Q.  What about what you saw and read led to you that
15  conclusion?
16  A.  There was a seal and a sign -- and a signature, rather, by
17  a magistrate.  It had a magistrate's number on it and the rider
18  called for documents that went to the investigation.
19  Q.  Did the rider stand out as being different from or similar
20  to -- strike that.
21
22          MR. LITT:  No further questions.
23          THE COURT:  Cross examination.
24          MS. WOLFE:  Thank you, your Honor.
25          (Continued on next page)
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
92
```
    5CESVILAR                Feiter - direct
 1  CROSS EXAMINATION
 2  BY MS. WOLFE:
 3  Q.  Inspector Feiter, good afternoon.  I am Susan Wolfe and I
 4  will be asking you some questions.
 5          When you talk about a rider, are you actually
 6  referring to the search warrant?  In other words, is the rider
 7  a document which describes what can be seized during the
 8  search?
 9  A.  Yes.
10  Q.  And that rider is actually attached to the physical search
11  warrant?
12  A.  Yes, it is.
13  Q.  And the warrant, the actual warrant commands the agents to
14  seize the documents in the search warrant or in the attached
15  rider, is that correct?
16  A.  Correct.
17  Q.  Okay.
18          You mentioned that there was a sketch of the offices
19  made prior to the agents doing the actual search.
20  A.  Well, it was being drawn up before the search started.  By
21  the time it was completed the search would have been already
22  commenced.
23  Q.  Do you have a copy of that sketch with you?
24  A.  I do not, no.
25          MS. WOLFE:  Can I ask the government if it has a copy
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
93
```
    5CESVILAR                Feiter - cross
 1  and if we can review it?
 2          MR. LITT:  I don't have a copy with me.  I do have one
 3  in my office.
 4          THE COURT:  Maybe at the lunch break.  Okay.
 5  Q.  During the meeting at headquarters before all of the agents
 6  went out to search, they were advised of a search protocol?
 7  A.  Yes.
 8  Q.  What is a search protocol?
 9  A.  They are given their assignments for what each of them will
10  be responsible for.  They are instructed on who will be
11  entering the building first or the premises first.  They are
12  given a copy of the rider and the affidavit that supports the
13  search warrant and instructed to read it so that the items that
14  they will be attempting to seize or that they decide to seize
15  are in compliance with that.
16  Q.  And what time did this meeting start that morning?
17  A.  I don't have a definite time, but I believe we met about 6
18  o'clock.
```
Page 43

12-14-05 hearing transcript.txt

19  Q.  And what time did you leave to go to the search premises?
20  A.  Probably about 7:30.
21  Q.  Is there a written document that describes the search
22  protocol in this case?
23  A.  No.  Other than the sign-in sheet that each inspector
24  signed to acknowledge reading and attending the briefing.
25  Q.  You testified that during this meeting you gave the agents

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

94

5CESVILAR                    Feiter - cross
1  an overview of the case.
2  A.  Yes, myself and the case agent, yes.
3  Q.  Which means that you summarized what the allegations of
4  alleged wrongdoing were, is that right?
5  A.  Correct.
6  Q.  Is that contained or is that overview contained in any
7  document?
8  A.  No.
9  Q.  Can you tell us or summarize for us what that overview was?
10  A.  I can't remember exactly.  It would have given the names of
11  the suspects in the case, names of victims, and the general
12  thought for myself because I wasn't the case agent, this was an
13  investment fraud and you have the rider to refer to names that
14  we are looking for.
15  Q.  And when you say names of victims, how many names of
16  victims were given during that meeting?
17  A.  I don't know exactly.  I probably would have read that or I
18  know I would have read that off of the complaint, the complaint
19  for the search warrant for the affidavit.
20  Q.  So as far as the agents were instructed, there were certain
21  victims who were identified in the search warrant affidavit,
22  correct?
23  A.  Yes, there were.
24  Q.  And it was records pertaining to those victims that the
25  agents were more specifically directed to seize, is that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

95

5CESVILAR                    Feiter - cross
1  correct?
2  A.  No.
3  Q.  Your overview gave the names of the victims, the names of
4  the suspects and a general description of the fraud, correct?
5  A.  It gave the names of some of the victims that were
6  mentioned in the affidavit that was submitted for the search
7  warrant.
8  Q.  Well, let me ask you again:  Can you tell me what the
9  overview was that you gave the agents?
10  A.  I gave them a brief description of the case as an
11  investment fraud investigation.  I gave them the names of the
12  two targets of the investigation who were being sought at that
13  time with arrest warrants, and I read to them some of the names
14  of the victims of the fraud or of the alleged fraud that were
15  listed in the search warrant affidavit.
16  Q.  And is it your testimony that you said these are some of
17  the names of the victims?
18  A.  I can't recall how exactly I put that, no.
19  Q.  And you also said that the agents had an opportunity to ask
20  questions.
21  A.  Yes.
22  Q.  Did any agents ask questions at that time?
23  A.  At the briefing?

Page 44

12-14-05 hearing transcript.txt
24  Q.  Yes.
25  A.  I cannot recall.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96

5CESVILAR                    Feiter - cross
1   Q.  You mentioned -- and I am going to jump an ahead a little
2   bit.  You mentioned having conversations with an attorney for
3   the firm.  On the premises you had a conversation with an
4   attorney from the firm.  You were referring to a gentleman
5   named Eugene Licker?
6   A.  Yes.
7   Q.  And when during the day did he arrive?
8   A.  Early on, if I remember correctly.
9   Q.  Early on is before noon or afternoon?
10  A.  I believe it was before noon.
11  Q.  And I ask you this:  If you know, how is it that he became
12  aware that his presence might be needed on the premises?
13  A.  That I don't know.
14  Q.  There were individuals on the premises and I am not talking
15  about the agents, and one of them asked if he could call the
16  company's lawyer, isn't that correct?
17  A.  I just don't recall that.
18  Q.  You don't recall anyone asking you personally if the
19  company's lawyer could be called?
20  A.  Correct.
21  Q.  Do you know whether that was asked of any other agent?
22  A.  I have no knowledge of that.
23  Q.  You mentioned that one of the first tasks was to label the
24  areas that would be searched.
25  A.  Correct.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

97

5CESVILAR                    Feiter - cross
1   Q.  How many areas were to be searched?
2   A.  The entire premises.
3   Q.  How many areas, breaking them down if it's A through X or A
4   through double S, how many areas needed to be searched that
5   day?
6   A.  Without seeing the master position list, I can't recall the
7   exact number.
8   Q.  Do you have a copy of the master position list with you?
9   A.  No, I do not.
10         MS. WOLFE:  Your Honor, I would like to have marked or
11  deemed marked for identification Defendant Vilar Exhibit A.  It
12  is identified as 3505D.
13         THE COURT:  Okay.
14         MS. WOLFE:  May I approach the witness?
15         THE COURT:  You certainly may.
16  Q.  Agent Feiter, let me show you what is marked as 3505D and
17  ask to you take a look at it.
18  A.  All right.
19  Q.  Is that document what you just described as a master
20  position list?
21  A.  No.
22  Q.  There is another document that you were referring to?
23  A.  Yes.
24  Q.  Okay, thank you.
25         MS. WOLFE:  May I ask that the government produce the
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98

Page 45

12-14-05 hearing transcript.txt
16    Amerindo entities' brokerage records for an indeterminate time
17    period other than brokerage records at Bear Stearns?
18    A.  No, I don't believe so.
19    Q.  What is your understanding of what this paragraph directed
20    your agents to seize?
21    A.  Those records from any broker that were trades were
22    conducted away and then settled in the Bear Stearns accounts.
23    Q.  And how do you determine or how would you go about finding
24    such records?
25    A.  You would have to review the files to see if there were
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    such records there.
2    Q.  And did the agents review on the premises that day all the
3    files of all the brokerage records?  And we are talking about
4    the ones other than Bear Stearns.
5    A.  As I said, I did not conduct, other than several small
6    positions, any other search.  The agents were instructed to use
7    this rider in the positions that they were searching.
8    Q.  But you would agree that in order to determine what falls
9    into this category it would require an analysis of trade
10   records?
11   A.  I can't say that, no.
12   Q.  Would you look at paragraph 14 for me please.  And that
13   paragraph calls for records of expenses of any type --
14   withdrawn.
15          That paragraph calls for records of any expenses for
16   goods and services provided to  Amerindo which includes the
17   Amerindo entities described in paragraph 1.
18   A.  To me it calls for records of expenses and payments for
19   goods and services to  Amerindo.
20   Q.  And what time period does that cover?
21   A.  There is no time period.
22   Q.  Could you look at paragraph 16 please.  And that paragraph
23   calls for photographs, diaries and other items concerning the
24   identities of participants in the fraud schemes.
25   A.  I have two paragraph 16s on this.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  The first paragraph 16.
2    A.  Yes.
3    Q.  Who were the participants according to the search warrant
4    rider in the fraud scheme?
5    A.  The two targets of the investigation.
6    Q.  So that paragraph would be limited to photographs, address
7    books, Rolodexes and diaries that reflect information about the
8    two targets, is that your understanding?
9    A.  Yes.
10   Q.  Just to go back for one minute, during the time period of
11   the search it was approximately more than 12 hours, until 9:30?
12   A.  Somewhere around 12 hours.
13   Q.  Were you there the entire time?
14   A.  Yes.
15   Q.  Other than what we discussed before about photographs, did
16   any of the executing agents ask you any questions?
17   A.  Yes.
18   Q.  And can you tell us the questions that you recall being
19   asked?
20   A.  Specific questions, no.
Page 55

12-14-05 hearing transcript.txt
21   Q.  There is no specific questions that you recall being asked
22   on that date?
23   A.  No.
24   Q.  Do you know whether Agent Fraterrigo entertained questions
25   from the agents who were executing the search warrant on that
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

120

1    day?
2    A.  Yes, she did.
3    Q.  And did you have occasion to refer questions to Agent
4    Fraterrigo?
5    A.  Yes.
6    Q.  Agent Feiter, you remember this morning you looked at the
7    inventory of the search?
8    A.  Photocopies, yes.
9    Q.  And there were certain pages towards the end where there is
10   a big line that says nil, nothing was taken.
11   A.  Correct.
12   Q.  And would it be fair to say that in most of those -- you
13   know what, withdrawn.
14          Let me show you a document that I have previously
15   marked Defendant Vilar Exhibit F.
16          MS. WOLFE:  May I approach, your Honor?
17          THE COURT:  You may.
18          MS. WOLFE:  Your Honor, I am showing the witness
19   3505B.
20   Q.  And do you recognize that document?
21   A.  Yes.
22   Q.  Is that an inventory of a search you actually conducted?
23   A.  Yes.
24   Q.  And do you see an item there that says GL2001?
25   A.  Yes.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

121

1    Q.  What is that item?
2    A.  General ledger 2001.
3    Q.  And whose general ledger was that?
4    A.  Without seeing the file I couldn't be sure.
5    Q.  Agent Feiter, I am going to give you a copy of Government
6    Exhibit 2, which is the inventory, and -- oh, you have it.
7    A.  Yes.
8    Q.  Good.
9          And I ask you to look at page F5.
10   A.  You know where that might be? Because these are totally
11   out of order.
12   Q.  Let me hand you a copy of a document that I am marking
13   Defendant Vilar Exhibit G.
14          Could you take a look at that document and
15   specifically let me direct your attention to the entry that
16   says "USPS" -- now I have forgotten -- "envelope".
17          MS. WOLFE:  May I approach, your Honor?
18          THE COURT:  You may.
19   Q.  Yes, can you read that entry for us, the first part of the
20   entry before the semicolon.
21   A.  "USPIS envelope containing invoice number 50174, Dr. John
22   Rutledge, travel expenses to attend board meetings."
23   Q.  And can you tell us what section of the warrant rider that
24   would be covered by?
25   A.  No, because I didn't seize this.
Page 56

12-14-05 hearing transcript.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

122

1   Q.  Okay.
2              And I assume that would be true for all other
3   inventory sheets except for the one that I showed you where you
4   actually did the seizures?
5   A.  Correct.
6              MS. WOLFE:  I think I am almost done, your Honor.
7              THE COURT:  Okay.  Take your time.
8   Q.  Agent Feiter, would you take a look, if you still have it
9   up there, at Government Exhibit I believe it's 3.  It's the
10  items not taken.  It's Government Exhibit 3.
11             Do you have that?
12  A.  Yes.
13  Q.  Is there any indication on each sheet regarding who
14  actually did the inventory?
15  A.  Yes.
16  Q.  And would that be the initial right under the date?
17  A.  On some it's under the date and on some it might be at the
18  top of the sheet.
19  Q.  Did you do any of the inventory for these positions?
20  A.  Not that I remember, no.
21             MS. WOLFE:  No further questions.
22             Thank you.
23             THE COURT:  All right, Mr. Kobre, cross examination.
24             MR. KOBRE:  Thank you, your Honor.
25             (Continued on next page)
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

123

1
2   CROSS EXAMINATION
3   BY MR. KOBRE:
4   Q.  Inspector Feiter, as you know, my name is Steven Kobre and
5   in the interest of full disclosure in my prior life we have
6   worked together a number of times, is that correct?
7   A.  Correct.
8   Q.  I am just going to ask you some questions along the same
9   lines that you have been asked earlier today, okay?
10             When you were preparing to search the premises at
11  Amerindo U.S., and when I refer to  Amerindo U.S. I will be
12  referring to the premises which is the subject of the search
13  warrant.
14             What documents did you review when you were preparing?
15  A.  I reviewed, as I said, the search warrant rider and the
16  affidavit used to obtain the search warrant.
17  Q.  Am I correct that it was also your testimony that the
18  complaints that were attachments to the affidavits were
19  provided to the inspectors who were actually going to conduct
20  arrests?
21  A.  Correct.
22  Q.  And is it fair to say, then, that you were not provided
23  with the complaint, the underlying complaints against Mr. Vilar
24  and Mr. Tanaka, is that right?
25  A.  Correct.
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

124

    5CESVILAR                    Feiter - cross
1   Q.  In preparing to testify today, did you review the
                         Page 57

12-14-05 hearing transcript.txt

2  affidavit?
3  A.  Yes.
4  Q.  And prior to the search, I believe you testified that you
5  reviewed the search warrant in addition to the affidavit to
6  make a determination as to the validity of the warrant, is that
7  accurate?
8  A.  No.
9  Q.  Why did you review the actual search warrant?
10  A.  To get a better feel to read anything I possibly could that
11  would help me hopefully that day to execute the warrant.
12  Q.  And at that time, did you form a view as to whether or not
13  the search warrant was in fact valid?
14  A.  No, my view is that it was valid because it had been issued
15  by a magistrate in the Southern District of New York.
16  Q.  Did you read the warrant?
17  A.  Yes.
18  Q.  Did you read -- when I refer to the warrant, by the way,
19  for now I will be referring to both the warrant and the
20  attachment as well.
21          THE COURT:  The rider.
22          MR. KOBRE:  The rider, thank you.
23  Q.  Did you read the rider?
24  A.  Yes.
25  Q.  Did you read the affidavit?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

125

    5CESVILAR              Feiter - cross
1  A.  Yes.
2  Q.  And did you view as one of your responsibilities to read
3  the warrant and the affidavit to make a determination as to
4  whether or not the warrant and affidavit validly supplied
5  probable cause for a search to support a search of the
6  premises?
7  A.  No.
8  Q.  Did you actually undergo that task of reading it and making
9  that determination?
10  A.  Could you repeat that?
11  Q.  Did you undergo that task?  Did you actually read the
12  documents and make a determination as to whether or not it
13  supported a view of probable cause?
14  A.  No, that was not my determination to make.
15  Q.  Is it your view as to whether any inspector, a postal
16  inspector present prior to the execution of the search warrant
17  was responsible for reviewing the text of the warrant and the
18  affidavit and making determinations as to whether the face of
19  the warrant and affidavit supported probable cause to search
20  the location?
21  A.  Making that determination, no.
22  Q.  When you reviewed the search warrant and affidavit, the
23  purpose of looking at the affidavit again, not the warrant but
24  the affidavit, if we can just expand on that a little bit, why
25  did you look at it?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

126

    5CESVILAR              Feiter - cross
1  A.  It was part of the rider, or the rider was part of it, and
2  I read what was given to me to help me perform the task that I
3  had that day.
4  Q.  And what was it about the affidavit that would help you in
5  performing your task?
6  A.  Nothing specific.  Any piece of information I can pick up
                        Page 58

12-14-05 hearing transcript.txt

7    might help me down the road.
8    Q.  And in your experience of executing search warrants do you
9    read the affidavits typically to provide some additional help
10   as to the scope of the search?
11   A.  Some possible help, yes.
12   Q.  And in this instance was the reason why the inspectors were
13   provided -- withdrawn.
14          What was the reason why the other inspectors who were
15   carrying out the search, what was the reason why they were
16   given copies of the affidavits?
17   A.  For the same purpose, to read it and get a feel for the
18   case.  The rider would tell them what to search for.  The
19   affidavit is just additional information.
20   Q.  Was it your understanding whether the case agent would be
21   reviewing the search warrant to see if it was supported by
22   probable cause?
23   A.  No.
24          MR. KOBRE:  May I approach the witness, your Honor?
25          THE COURT:  You may.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                          127

     5CESVILAR              Feiter - cross
1    Q.  I am showing you what has been marked as defendant Tanaka
2    A, and I will represent to you that that document is a copy of
3    the search warrant affidavit.
4          MR. KOBRE:  I also represent to the court that I
5    believe we are all working off of the same marked-up copy, if
6    you will, and we will replace it as part of the record.
7          THE COURT:  Okay.  Fair enough.
8          This is the same marked-up copy that is the exhibit to
9    the Vilar --
10         MR. KOBRE:  Actually the second piece of it.  The
11   Vilar piece is the search warrant.  This is the affidavit.
12         THE COURT:  But I am talking about what is attached as
13   an exhibit to the Vilar papers.  That is what I have been
14   reading along with as you have been doing this.
15         MR. KOBRE:  Yes.
16         THE COURT:  Okay.
17   Q.  I will ask you to turn to page 3 and look at paragraph 6 of
18   the search warrant affidavit.  Let me first ask you:  Do you
19   recall this being a copy of the affidavit or does this appear
20   to be a copy of the affidavit that you reviewed prior to the
21   search?
22   A.  Yes.
23   Q.  I will ask you now to turn to page 3, paragraph 6.  And do
24   you see there at the beginning of the paragraph it indicates
25   that in describing the schemes forming the basis for probable
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                          128

     5CESVILAR              Feiter - cross
1    cause it refers the reader to the criminal complaints against
2    Mr. Vilar and Mr. Tanaka, do you see that?
3    A.  You mean annexed as Exhibit A, is that what you are
4    referring to?
5    Q.  Yes.
6    A.  Yes.
7    Q.  As I understand your testimony, in reading the affidavits
8    you were not provided with a copy of the complaints against
9    Mr. Vilar and Mr. Tanaka, correct?
10   A.  That is correct.
11   Q.  And the agents that were actually executing the search also
                         Page 59

12-14-05 hearing transcript.txt

```
12  were not provided with those complaints, correct?
13  A.  Correct.
14  Q.  So to the extent that the agents were looking for some
15  definition, if you will, of the nature of the scheme, and they
16  turned to the affidavit, they would not be able to appreciate
17  what the true nature of the scheme is, am I correct?
18  A.  I wouldn't agree with that, no.
19  Q.  Okay.
20        Well, am I correct that paragraph 6 in defining the
21  scheme refers the reader to the allegations against Mr. Tanaka
22  and Mr. Vilar in the complaint?
23  A.  Yes.
24  Q.  So if the reader doesn't actually have the complaint, it's
25  not possible for them to know what is actually alleged in those
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                129
♀
                5CESVILAR              Feiter - cross
```
 1  complaints when reading this affidavit, isn't that right?
 2  A.  I don't think I would agree with that, no.  Because if you
 3  continue on and read the rest of this affidavit along with the
 4  rider, and knowing that you have a case agent there to answer
 5  any questions, I think you have a pretty sound basis.
 6  Q.  We are going to get to the case agent.  I am asking
 7  specifically from the document itself.
 8        Do you agree that a reader who is reading the
 9  affidavit could not fully appreciate the allegations of the
10  scheme engaged in by Mr. Vilar and Mr. Tanaka because 2 of the
11  documents that actually laid out the scheme was missing from
12  their materials?
13  A.  I am sorry, I just can't fully agree with that.
14  Q.  Well, let me try it a different way.
15        The document in defining the scheme refers to 2 other
16  documents, correct?
17  A.  Correct.
18  Q.  And can we agree that those agents didn't have the other 2
19  documents, correct?
20  A.  Correct.
21  Q.  So to the extent that those 2 other documents describe
22  aspects of the scheme and those aspects were not provided in
23  this document here, the reader would not have learned those
24  facts from reading the document here?
25  A.  Correct.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                130
♀
                5CESVILAR              Feiter - cross
```
 1  Q.  And I guess what you were alluding to before when you said
 2  that they would be able to speak to the case agent -- is this
 3  at the initial preparatory review before the actual execution,
 4  the case agent addressed the team, is that right?
 5  A.  Correct.
 6  Q.  And she was also available during the search, correct?
 7  A.  Correct.
 8  Q.  But is it your testimony that you actually have no
 9  recollection as to what she said to the team?
10  A.  That is correct.
11  Q.  And you have no recollection as you sit here today as to
12  what she actually told the team members during the search about
13  the nature or confines of the search, is that correct?
14  A.  Correct.
15        THE COURT:  Inspector Feiter, the people who carried
16  out the search, were they briefed at the same time as the
```
                            Page 60

12-14-05 hearing transcript.txt
(212) 805-0300

135

♀

5CESVILAR                    Feiter - cross
1  possession of those criminal complaints when executing the
2  search warrant, isn't that correct?
3         MR. LITT:  I think that misstates the prior testimony.
4         THE COURT:  It's whether or not it's his recollection.
5         Overruled.
6  A.  Can you repeat that?
7  Q.  Is it correct as you sit hear today you have no
8  recollection of any postal inspector being in possession of the
9  criminal complaints referred to in the affidavit at the time of
10 the exercise of the search warrant, correct?
11 A.  Other than those who were on the arrest teams and had the
12 complaints.
13 Q.  But they weren't executing the search warrant.
14 A.  No, but they were inspectors that had copies of complaints.
15 I want to make that clear.
16 Q.  I am just referring actually to the execution of the search
17 warrant itself.  Do we agree you have no recollection of any
18 postal inspector having those complaints, correct?
19 A.  Correct.
20 Q.  So would you agree that as it refers to the definition or
21 how one might interpret the word fraud schemes, it's fair to
22 say that individual postal inspectors might have had different
23 views as to what the actual fraud schemes were, correct?
24 A.  Correct.
25 Q.  I will ask you looking at the search warrant, paragraph 1,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

136

♀

5CESVILAR                    Feiter - cross
1  do you see after reading paragraph 1, can you just describe
2  sort of generally what documents paragraph 1 -- withdrawn.
3         Can you just describe generally what you understood at
4  the time of the execution of the search warrant paragraph one
5  to refer to?
6  A.  Collectively  Amerindo, the business records that went to
7  the entity itself, its minutes, its shareholders, bylaws,
8  resolutions, things like that, client records, things like
9  that.
10 Q.  Suffice it to say that as it's written as it refers to the
11 corporate records, an inspector might actually interpret that
12 to be any of the records of the 4 entities, is that fair to
13 say?
14 A.  Yes.
15 Q.  Now, you recall testifying earlier about the general
16 overview that inspectors received, do you recall that
17 testimony?
18 A.  Yes.
19 Q.  Did you actually give the general overview in the first
20 instance?
21 A.  I believe I gave just a quick blurb but I actually have no
22 real recollection of what I said.
23 Q.  And earlier I believe you described the blurb, if you will,
24 as something along the lines of investment fraud investigation,
25 is that correct?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

137

♀

5CESVILAR                    Feiter - cross
1  A.  Yes.
2  Q.  Is it fair to say that your description to the inspectors
                         Page 63

12-14-05 hearing transcript.txt
3   might actually have been limited to just that, that this is an
4   investment fraud investigation or scheme, or something along
5   those lines?
6   A.  I believe I would have fleshed it out a little bit more.
7   Q.  And what was your basis for describing the nature of the
8   scheme to the inspectors?
9   A.  It would have come from the affidavit for the search
10  warrant and also in the facts that I knew at the time because I
11  was the supervising agent for the case agent.
12  Q.  So are these facts that you would have learned from the
13  case agent, Ms. Fraterrigo?
14  A.  Yes.
15  Q.  So if I understand this correctly, in relaying the overview
16  to the inspectors, you read the affidavit which was actually
17  signed by the case agent, correct?
18  A.  Yes.
19  Q.  And that had the facts as relayed by the case agent,
20  correct?
21  A.  Yes.
22  Q.  And you also had conversations with the case agent,
23  correct?
24  A.  Yes, as her supervisor.
25  Q.  And then you described to the inspectors the nature of the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                            138
            5CESVILAR              Feiter - cross
1   case and the fact they would be executing the search warrant,
2   is that right?
3   A.  Correct.
4   Q.  Is it your testimony that you have no recollection of your
5   conversations with Ms. Fraterrigo beforehand, in other words,
6   that helped form your basis for talking to them, as well as
7   having no recollection of what Ms. Fraterrigo actually told the
8   inspectors at the time of providing the overview, is that
9   right?
10  A.  That is correct.
11  Q.  And you also had mentioned before I believe on cross, I
12  think, that you might have provided or someone might have
13  provided the inspectors the name of the suspects, is that fair
14  to say?
15  A.  Yes.
16  Q.  Do you actually have a recollection of providing that
17  information?
18  A.  An actual recollection, no.
19  Q.  So is it fair to say you have no actual recollection of
20  what names were actually provided as suspects, correct?
21  A.  No.
22  Q.  And you also have a general recollection, I understand,
23  that names of victims were provided, is that right?
24  A.  I believe so, yes.
25  Q.  And do you recall the fact that the affidavit also alluded
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                            139
            5CESVILAR              Feiter - cross
1   to victims?
2   A.  Yes.
3   Q.  Now, I am going to ask you now to turn to the affidavit,
4   page 5, paragraph E.
5   A.  All right.
6   Q.  Actually I am going to ask you to turn back to page 3,
7   paragraph 6A.
                        Page 64

12-14-05 hearing transcript.txt

```
 8              Is it apparent from reading that that Lisa Meyer may
 9   have been one of the names of the "victims" that were relayed
10   to the inspectors that day?
11   A.  I believe so, yes.
12   Q.  I will ask you to turn the page.  Do you see paragraph B?
13   A.  Yes.
14   Q.  Is it fair to say that Lilly Cates might have been another
15   name who was relayed to the inspectors that day in the
16   briefing?
17   A.  Yes.
18   Q.  I will ask you to turn to the next page.  I ask you to turn
19   the page to paragraph 5 -- I am sorry, page 5, paragraph E, as
20   in Eric.
21              Is it fair to say that Brian Harvey, Joy Urich, and
22   Paul Marcus also might have been names that were provided to
23   the inspectors that day?
24   A.  Yes.
25   Q.  And is it also fair to say that from your own reading of
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

140

5CESVILAR                    Feiter - cross
```
 1   the affidavit prior to the execution of the search warrant you
 2   also looked to pick up the names of the victims or I should say
 3   to learn the names of the victims, is that correct?
 4   A.  Yes.
 5   Q.  And you agree that from looking at paragraphs A, B and E
 6   that you would have picked up those five names?
 7   A.  Yes.
 8   Q.  Can you just briefly explain to me what is your
 9   understanding of the term probable cause?
10   A.  It has been a long time since law school.  Probable cause
11   is a level that a magistrate or a judicial officer will pass on
12   that a crime has been committed.
13   Q.  Is it something that upon making a judgment that probable
14   cause has been reached or found, that you could arrest somebody
15   on that information?
16   A.  If so authorized.
17   Q.  And it's not until you actually acquire probable cause that
18   you would go to a judicial fact finder and ask for a warrant or
19   permission to make an arrest, correct?
20   A.  Correct.
21   Q.  And it's also not until you have that level of or that view
22   of the facts before you would go to a judge and ask a judge to
23   issue a warrant, correct?
24   A.  Correct.
25   Q.  I will ask you to look at paragraph E on page 5.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

141

5CESVILAR                    Feiter - cross
```
 1              Do you see in that paragraph it says, "Cates told me
 2   about other individuals who she believed to be investors with
 3   Amerindo, some of whom may have had trouble redeeming all or
 4   part of their investments, including those three individuals."
 5   A.  Yes.
 6   Q.  You agree with me that based on that allegation alone that
 7   would not support you going to a judge seeking an arrest
 8   relating to those particular victims, correct?
 9   A.  But it doesn't stand on its own.
10   Q.  All I am asking you is standing alone.
11   A.  Standing alone without the rest of the affidavit, with
12   nothing else, no other knowledge, surely, no.
```
                              Page 65

12-14-05 hearing transcript.txt
24    that some employees or the postal inspectors that participated
25    in the arrest received the criminal complaints?
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

159

5CESVILAR                    Feiter - redirect
1     A.   Yes.
2     Q.   Did some or did any or all of the employees who
3     participated in the arrests also participate in the searches?
4     A.   The inspectors you mean?
5     Q.   Inspectors, I am sorry.
6     A.   I believe so but I am I would have to go back and check the
7     list.
8     Q.   Is there some document that would refresh your recollection
9     on that score?
10    A.   I would have to see the seizure lists.
11    Q.   Would your master position list do it?
12    A.   It might.
13    Q.   I would ask if you can look at that document and see if
14    that refreshes your recollection.
15           Do you have that document?
16    A.   I don't know if I have that.
17    Q.   Let me ask this:  Would it be easier for you to look at the
18    master position list or what is Government Exhibit 2, the
19    search warrant inventory sheets?
20    A.   It would be a lot quicker to look at that.
21    Q.   I am handing you then what has been marked for
22    identification as Defendant V -- let me identify it as a
23    document titled master position list marked with a blue sticker
24    Defendant V and it has a number of yellow sticky tabs on the
25    right side.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

160

5CESVILAR                    Feiter - redirect
1           MR. HOFFMAN:  For identification.
2           MR. LITT:  For identification.
3           MR. LITT:  For the court, that is 3505C.
4     Q.   Have you had a chance to look at that document?
5     A.   Yes.
6     Q.   Does that document refresh your recollection as to whether
7     individuals who participated in the arrest of Mr. Vilar and
8     Mr. Tanaka also participated in the search?
9     A.   I believe Inspectors Feeney and Wright and Roinstack were
10    all part of arrest teams and they all were then present at the
11    search.
12    Q.   What about Inspector Fraterrigo, was she part of the arrest
13    team?
14    A.   Yes.
15    Q.   Was she present at the search?
16    A.   Yes.
17    Q.   So is it your belief that at least those members or those
18    inspectors who participated in the search had access to the
19    complaints?
20    A.   Yes.
21    Q.   Finally, I would like to turn your attention to what I
22    believe has been marked as Defendant Exhibit E.  It's the
23    warrant and rider.
24           Do you have that?
25    A.   TA?
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

161

12-14-05 hearing transcript.txt
5CESVILAR              Feiter - redirect
1  Q.  The document which is in your hand, what is that?
2  A.  This is not marked at all.
3  Q.  Handing you what has been marked as Defendant Vilar Exhibit
4  E, is that the search warrant and rider?
5  A.  Yes, it's the actual warrant and the rider attached to it,
6  yes.
7  Q.  And just turning your attention to paragraph 1 on the
8  attachment, in your view did that language permit postal
9  inspectors to seize every business document related to the 4
10  entities listed or was it limited by the examples of documents
11  that are included in paragraph one?
12  A.  I don't think it's a total limitation but it defines what
13  we should be looking for.
14         MR. LITT:  No further questions.
15         THE COURT:  I was going to ask this.  I thought when
16  you were asked by Mr. Kobre about this you said any documents
17  related to the  Amerindo entities could be seized and I was
18  going to ask what that didn't mean but now you are saying you
19  think it's limited by the language?
20         THE WITNESS:  what is the best way to put it?  Without
21  a doubt anything that is listed here as a direct item obviously
22  is going and anything that is related to those is going too.
23         THE COURT:  Related to what?
24         THE WITNESS:  To the already-listed items.  It had to
25  be clearly a business record, a business document, something
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
                                                            162
5CESVILAR              Feiter - redirect
1  related to these businesses, yes, then it's going.
2         THE COURT:  The language says, "including but not
3  limited to."
4         THE WITNESS:  Right.
5         THE COURT:  So it's not limited to the types of items
6  listed there in paragraph one of the rider, correct?
7         THE WITNESS:  Correct.
8         THE COURT:  So anything that would have  Amerindo
9  Cayman stationery on it, would that be something that in your
10  words would go?
11         THE WITNESS:  As long as it had writing on it and it
12  wasn't just blank.
13         THE COURT:  Okay.
14         Any business cards that had  Amerindo Cayman on it,
15  would those go?
16         THE WITNESS:  I probably would take one and leave the
17  other hundred.
18         THE COURT:  Any bills that are sent to  Amerindo
19  Cayman, if they are addressed to  Amerindo Cayman, would those
20  go?
21         THE WITNESS:  Yes.
22         THE COURT:  So what wouldn't go if it had some sort of
23  indication that it was an official business record?
24         THE WITNESS:  Probably all official business records.
25  I just put the limitation on it with the stationery, those type
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
                                                            163
5CESVILAR              Feiter - redirect
1  of objects.
2         THE COURT:  Go ahead, Mr. Litt, if you want to follow
3  up.
4         MR. LITT:  No further questions.
                     Page 75

```
                    12-14-05 hearing transcript.txt
5            THE COURT:  Any recross?
6            MS. WOLFE:  Yes, your Honor, just a few questions.
7    RECROSS EXAMINATION
8    BY MS. WOLFE:
9    Q.   Were there any other entities located on the premises other
10   than the 4 listed in paragraph one?
11   A.   When you --
12   Q.   Of the rider.
13   A.   When you refer to premises do you mean the floor or the
14   area searched?
15   Q.   The area authorized to be searched.
16   A.   Not to my knowledge that I can remember now.
17   Q.   And you mentioned that you searched only one position
18   yourself.
19   A.   I think it was one or two.
20   Q.   Do you remember what the positions consisted of?
21   A.   I believe that they were like call it the secretary area
22   behind the main reception desk.
23            MR. LITT:  Your Honor, this is beyond the scope.
24            THE COURT:  Yes.  In recross you can identify the
25   question asked on redirect and then take it from there.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    164
```
     5CESVILAR              Feiter - recross
1            MS. WOLFE:  It was a question that Mr. Kobre asked but
2    in any event --
3            THE COURT:  I am give you some leeway on that.
4    Q.   You mentioned that some of the computers may have been
5    imaged on the premises?
6    A.   I believe but, again, as I said, I am not a digital
7    evidence person.  Our digital people would have handled that
8    and for me to tell you even what was imaged, how it was done or
9    where, I can't.
10   Q.   Who were the digital people who were present at the search?
11   A.   Inspector Jim Backman was the inspector in charge of that.
12   Q.   And were there people working with him?
13   A.   I believe Mike Ablazer out of our lab was there.
14   Q.   Anyone else?
15   A.   I would have to go back and look at the list.
16   Q.   And how many agents in total were enlisted to conduct the
17   search?
18   A.   I would have to go see the sign-in and count up.  I don't
19   know offhand.
20   Q.   Well, you were present at the morning briefing, right?
21   A.   Yes.
22   Q.   Was it more than 20 agents?
23   A.   Once again, without seeing the sign-in list I don't
24   remember how many were there.
25            THE COURT:  Do you have the sign-in, Mr. Litt?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    165
```
     5CESVILAR              Feiter - recross
1            MR. LITT:  3505A, your Honor.
2            THE COURT:  If the number is relevant I imagine you
3    can get a stipulation on this before the speedy trial clock
4    expires.
5    Q.   Let me show you a document that has been marked 3505A.
6            MS. WOLFE:  May I approach, your Honor?
7            THE COURT:  Is it the number of people?
8            Can you count it up and let's stipulate to it a move
9    on.  I can see myself it's somewhere between 15 and 25 people.
                          Page 76
```