Exhibit I

5-31-06 suppresion hearing transcript.txt

1

65VVVILH
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  -----------------------------x
2
3  UNITED STATES OF AMERICA,
3
4             v.                          05 CR 621 (KMK)
4
5  ALBERTO VILAR,
5  GARY TANAKA                           SUPPRESSION HEARING
6
6             Defendants.
7
7  -----------------------------x
8
8                                         New York, N.Y.
9                                         May 31, 2006
9                                         10:05 a.m.
10
10
11  Before:
11
12                  HON. KENNETH M. KARAS,
12
13                                         District Judge
13
14
14                    APPEARANCES
15
15  MICHAEL J. GARCIA
16        United States Attorney for the
16        Southern District of New York
17  DEIRDRE MCEVOY
17  MARC LITT
18        Assistant United States Attorneys
18
19  HOFFMAN & POLLOK
19        Attorneys for Defendant Alberto Vilar
20  JEFFREY C. HOFFMAN
20  SUSAN C. WOLFE
21
21  Attorneys for Defendant Gary Tanaka:
22
22  WILSON SONSINI GOODRICH & ROSATI
23        GLENN CHARLES COLTON
23           -AND-
24  KOBRE & KIM
24        STEVEN GARY KOBRE
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

2

65VVVILH
1          (In open court)
2          (Case called)
3          THE DEPUTY CLERK:  United States of America versus
4  Alberto Vilar and Gary Tanaka.  Criminal cause for suppression
5  hearing.  If counsel can state their appearances for the record
6  please.
7          MS. MCEVOY:  Deirdre McEvoy and Marc Litt for the
8  government.  Good morning, your Honor.  With us is Postal
                          Page 1

5-31-06 suppresion hearing transcript.txt

15  Q.  Mr. Licker, you mentioned that you don't believe you were
16  the one who brought up the topic of receiving a subpoena and
17  calling off the search for that day?
18  A.  Correct.
19  Q.  Had that ever happened before in your career, that a
20  subpoena was exchanged for the completion or the calling off of
21  the search?
22  A.  I had not had any prior experience in that regard.
23  Q.  Had you ever heard of that happening?
24  A.  I don't believe so.
25          MS. WOLFE:  Thank you.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                18

    65VVVILH              Licker - direct
1           THE COURT:  Mr. Colton.
2   DIRECT EXAMINATION
3   BY MR. COLTON:
4   Q.  Good morning, Mr. Licker.
5   A.  Good morning.
6   Q.  When you said on direct with Ms. Wolfe that you're counsel
7   to Amerindo, specifically what Amerindo entity were you and are
8   you counsel for?
9   A.  Amerindo Investment Advisors, Inc., a California
10  corporation.
11  Q.  What has been come to be known in this case and in the
12  joint S.E.C. case as Amerindo-U.S.?
13  A.  That's how I refer to it.
14  Q.  And at any time from May 26th, 2005 to today, have you
15  represented Amerindo-U.K.?
16  A.  No.
17  Q.  At any time between May 26, 2005 and today, have you
18  represented Amerindo-Panama?
19  A.  No.
20  Q.  At any time between May 26, 2005 and today, had you
21  represented Amerindo-Cayman?
22  A.  No.
23  Q.  You said in response to a question by Ms. Wolfe that you
24  had early on agreed to preserve documents.  Were you discussing
25  the search with Mr. Litt, is that correct?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                19

    65VVVILH              Licker - direct
1   A.  Correct.
2   Q.  Did you agree to preserve documents and other information
3   before the subject of a subpoena even came up?
4   A.  Yes.
5   Q.  When you say you agreed to preserve documents and
6   information, did that include computerized information?
7   A.  I didn't draw any limitation on it.
8   Q.  Was it your intent in making a representation to Mr. Litt
9   that you would preserve information that you would do what you
10  could also to preserve computerized or electronic
11  information --
12  A.  Yes.
13  Q.  -- for Amerindo U.S.?
14  A.  Yes.
15  Q.  Now, after you received service of the subpoena from
16  Mr. Litt and the government, the government told you to hold
17  off on complying with the subpoena because employees of
18  Amerindo were helping the government in other capacities, isn't
19  that correct?
                        Page 9

5-31-06 suppresion hearing transcript.txt
20  A.  Mr. Litt indicated to me that the date on the subpoena, the
21  return date on the subpoena, would not be binding; he wouldn't
22  hold me to it.  And so I don't think he said I should
23  affirmatively hold off, but he certainly indicated to me that I
24  didn't have to comply at that time.
25  Q.  And during the summer of 2005, after accepting service of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    20

    65VVVILH                    Licker - direct
 1  the subpoena, employees of Amerindo and yourself were being
 2  cooperative with the government in their investigation,
 3  correct?
 4  A.  Yes.
 5  Q.  At no time from May 26, 2005 to today did any attorney for
 6  Gary Tanaka instruct you not to comply with the subpoena,
 7  correct?
 8  A.  Correct.
 9  Q.  When you were at the offices of Amerindo U.S. on May 26,
10  2005, did any government employees outside of the postal
11  inspection service or the Department of Justice show up at the
12  search?
13  A.  Yes.  I believe it was that day, I'm not 100 percent sure,
14  but I believe it was that day.
15  Q.  And who do you believe showed up at the search?
16  A.  The S.E.C. conducted an on-site examination.
17  Q.  And who from the S.E.C. do you recall being present at the
18  search?
19  A.  I believe -- I know that Mark Salzberg was there, I think.
20  You know, I've gotten at that age where I forget things.  But I
21  believe -- I believe Kaye Lackey was there, but she might not
22  have been.  I might be wrong.  There were about four people
23  there.  I'm not so great with names.
24  Q.  What about Paul -- I'm sorry.  Go ahead.
25  A.  I'm not so great with names.  And I didn't know those
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    21

    65VVVILH                    Licker - direct
 1  people at the time, so --
 2  Q.  What about Paul Gizzi?  G-i-z-z-i.
 3  A.  Paul I actually know.  And I don't recall that Paul was
 4  present at that time.
 5  Q.
 6          MR. COLTON:  Let the record reflect that when the
 7  discussion of what happened at the search occurred, Ms. McEvoy
 8  and Ms. Fraterrigo were discussing the testimony that
 9  Mr. Licker just gave, or at least had a conversation.
10          THE COURT:  How do you know what they were talking
11  about?
12          MR. COLTON:  I take it back.  I said at least had a
13  conversation immediately following the comment that Mr. Licker
14  made about the evens of the search.
15          THE COURT:  What's the purpose of that?
16          MR. COLTON:  Because, your Honor, I made a motion
17  about the exclusion --
18          THE COURT:  She could be commenting on his tie.
19          MR. COLTON:  Could be.
20          THE COURT:  It's pure speculation.  She's represented
21  she's not going to testify about the subpoena.  She's here
22  presumably to assist Ms. McEvoy, and there's nothing improper
23  about that.  So you can have the record reflect what you want,
24  but I don't think it reflects anything other than two people
                                Page 10

5-31-06 suppresion hearing transcript.txt
25    having a conversation.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    22

♀

       65VVVILH                 Licker - direct
1             MR. COLTON:  Just a temporal, and that's fine, your
2      Honor.  I'll move on.
3             THE COURT:  Please.
4      BY MR. COLTON:
5      Q.  Mr. Licker, in your 27 years of practice, had you ever seen
6      S.E.C. civil attorneys show up at a search conducted by the
7      Department of Justice or criminal investigators?
8      A.  No.
9      Q.  To your knowledge, did S.E.C. personnel show up at any
10     other Amerindo offices on the day of the search, May 26, 2005?
11     A.  Once again, I believe it was that day, it could have been
12     the next day, but I believe it was that day, that someone
13     showed up at the Amerindo office in San Francisco, as well.
14     Q.  Did you have a discussion with the S.E.C. attorneys at the
15     search, or at Amerindo-U.S.?
16     A.  I spoke to the individual in San Francisco on the
17     telephone, and I certainly spoke to the individuals who were
18     present at Amerindo, whether it was the 26th or the 27th.  And
19     they were there for a couple of days.
20     Q.  And during the S.E.C.'s visit to Amerindo, did they make
21     any requests of you for relief?
22     A.  I'm not sure it was there at the visit.  I know that the
23     S.E.C. wanted to have a receiver appointed, and that there were
24     conversations, some of which involved me, a number of which
25     involved my then partner, Rick Marshall at K&L, on behalf of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    23

♀

       65VVVILH                 Licker - direct
1      Amerindo in that regard.
2      Q.  And in requesting a receiver, did they specify what
3      Amerindo entities they were seeking your consent for a
4      receiver?
5      A.  Amerindo-U.S.
6      Q.  Did they limit it to Amerindo-U.S., or is that your
7      understanding?
8      A.  It's difficult.  The parlance became -- everyone
9      particularly on the S.E.C. side became very comfortable simply
10     referring to Amerindo and not drawing distinctions.  I tried to
11     draw distinctions whenever I could.
12     Q.  During the course of your attendance at Amerindo-U.S. on
13     May 26, 2005, did anybody for the U.S. government ever give you
14     a copy of the complaint against Gary Tanaka?
15     A.  No.
16     Q.  At any point during that day, did they give you the
17     complaint against Alberto Vilar?
18     A.  No.
19     Q.  At any point during this day of the search, May 26, 2005,
20     did anyone from the U.S. government give you a copy of the
21     search warrant affidavit?
22     A.  I don't believe so.
23     Q.  In conducting your representation of Amerindo-U.S. from May
24     26, 2005 to today, did you ever have an intent in the way in
25     which the subpoena was accepted or complied with or not
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    24

♀

       65VVVILH                 Licker - direct
                              Page 11

5-31-06 suppresion hearing transcript.txt
1  complied with to help achieve a strategic advantage for the
2  defendants in this criminal case?
3  A.  My intent was only to cooperate with the government's
4  investigation.
5  Q.  For how long have you represented Amerindo-U.S. prior to
6  the day of the search?
7  A.  I had been involved in the representation of Amerindo in
8  connection with an S.E.C. inquiry beginning in May of 2003.
9  And there were a couple of inquiries.  There was an S.E.C.
10  investigation of another entity, not Amerindo, for which
11  Amerindo received a nonparty subpoena.  I was involved in that,
12  as well.  So from May of '03 through May of '05 I had
13  involvement in matters.
14  Q.  In the two years between May of '03 and May of '05, did you
15  become familiar with the business of Amerindo-U.S.?
16  A.  Basically, yes.
17  Q.  Prior to May 26, 2005, had you ever heard the phrase
18  "guaranteed fixed rate deposit account"?
19  A.  I had not.  I had not.
20  Q.  Had you ever been familiar with an Amerindo investment
21  product called the SBIC Venture Fund?
22  A.  I was not.
23  Q.  To your understanding, what was the business of
24  Amerindo-U.S. in May 2005?
25  A.  It was an investment adviser; it had -- it advised a public
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                25
65VVVILH                    Licker - direct
1  fund; and some number, I later came to know that number was
2  something around 20, individually-managed accounts held by
3  institutions.
4  Q.  And they were also the investment adviser to a mutual fund?
5  A.  I said that, right.
6  Q.  And they had individual clients for whom they would make
7  investment decisions, but not necessarily have authority to
8  take money out of accounts, is that correct?
9  A.  You have to watch the parlance.  They were
10  individually-managed accounts.  They weren't individual
11  investors, they were institutional investors.
12  Q.  In your representation of what you learned factually about
13  the company, was it your opinion that fixed rate accounts and
14  SBIC was a small, if not unknown, percentage of what was this
15  business?
16          MS. McEVOY:  Objection.
17          THE COURT:  Basis of the objection?
18          MS. McEVOY:  His legal opinion.
19          MR. COLTON:  I'm asking factually.
20          THE COURT:  Go ahead.  Overruled.
21  A.  I knew nothing about guaranteed fixed rate deposit
22  accounts, so I couldn't place any percentage.
23  Q.  At any time during the course of your interaction with
24  Mr. Litt on May 26, 2005, did you ever promise him, No matter
25  what, we are going to give you every single thing called for by
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                26
65VVVILH                    Licker - direct
1  this subpoena, or did you promise to accept service of the
2  subpoena and work with the government to provide the documents
3  that the two sides thought were necessary to the investigation?
4  A.  I'm sorry to be indirect in my answer, but I have to be.  I
5  accepted service, I agreed to do that.  And I made it
                        Page 12

5-31-06 suppresion hearing transcript.txt

11  May 26, 2005?
12  A.  212-536-3916.
13  Q.  Your testimony is that you received a call at your offices
14  at Kirkpatrick & Lockhart sometime that morning regarding a
15  search that was to occur at Amerindo's offices?
16  A.  I did receive a call that morning, and I did come to
17  understand that a search was being conducted at that time.
18  Q.  And you went down to Amerindo's offices then, is that
19  correct?
20  A.  Correct.
21  Q.  And when you went to Amerindo's offices, is it fair to say
22  that you saw a copy of the search warrant?
23  A.  I believe I did, yes.
24  Q.  You satisfied yourself that the postal inspectors had the
25  right to be on the premises to search it, correct?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                29
     65VVVILH            Licker - cross
1   A.  I didn't have any doubt about that.
2   Q.  And you went back and forth from Kirkpatrick & Lockhart to
3   Amerindo that day; correct?
4   A.  I returned to Kirkpatrick & Lockhart one time during the
5   day between about 1 and 2.  I went back to Amerindo until
6   about, I guess, about 9 or 9:30.
7   Q.  And do you recall whether you had your cell phone on you
8   that day?
9   A.  I believe I did.
10  Q.  And what about your BlackBerry?
11  A.  I must have.  I don't recall one way or the other.
12  Q.  And prior to May 26, you only had been to Amerindo's
13  offices on a couple of occasions, correct?
14  A.  That's correct.
15  Q.  And you weren't familiar with which Amerindo employees
16  occupied which offices, correct?
17  A.  I wasn't familiar with all of them, that's correct.
18  Q.  And you weren't familiar with the identity and location of
19  particular files at Amerindo, correct?
20  A.  That's correct.
21  Q.  You testified that you had a number of conversations with
22  Mr. Litt on that day, is that right?
23  A.  Correct.
24  Q.  And did you speak to Mr. Litt about the fact that Mr. Vilar
25  had contacted Amerindo employees?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                30
     65VVVILH            Licker - cross
1   A.  I definitely recall speaking to Mr. Litt about whether or
2   not Amerindo employees could speak to Mr. Vilar.  I just don't
3   recall at that point whether -- whether Mr. Vilar had called in
4   or somebody wanted to call him.  I don't remember the details.
5   But I know we talked about contacting Mr. Vilar.
6   Q.  When you say Mr. Vilar called him, who's the "him" that
7   you're referring to?
8   A.  I'm sorry, I said "called in."
9   Q.  Oh, called in.  Sorry.  And do you recall Mr. Litt's
10  response?
11  A.  Yes.
12  Q.  What do you recall -- how do you recall him responding?
13  A.  The burden of the conversation was the employees wanted --
14  they were aware that Mr. Tanaka had been arrested; they were
15  aware that Mr. Vilar was out of town on a business trip.  And
                            Page 14

5-31-06 suppresion hearing transcript.txt
16    they wanted to let him know what was going on.  And I asked
17    Mr. Litt what the government's view would be if Amerindo
18    employees did that.
19          I asked him that question because I had made it clear
20    to him that we intended to cooperate, and it was very important
21    to me that we do whatever we possibly could to avoid having the
22    company indicted.  And he indicated to me that he would
23    strongly prefer that we not let Mr. Vilar know about that.
24    Q.   And is it fair to say that you also talked to Mr. Litt that
25    day about the arrest warrants that had been issued in the case?
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                  31

      65VVVILH              Licker - cross
1     A.   We certainly spoke about the fact of an arrest, and the
2     fact that there would be another arrest.  I don't know that we
3     talked about the warrants.
4     Q.   And you were also dealing with a number of issues with
5     regard to potential conflicts that day, is that correct --
6     A.   That's correct.
7     Q.   -- relating to the representation of the company and the
8     U.S. mutual fund?
9     A.   That's correct.  Kirkpatrick & Lockhart had historically
10    represented both mutual fund and the company.  And at this
11    point it became clear that that could not continue.
12    Q.   You spent a lot of time that day dealing with those
13    conflict issues, is that correct?
14    A.   I believe so.
15    Q.   Did you discuss any of those conflict issues with Mr. Litt?
16    A.   I imagine I did, yes.
17    Q.   And when you spoke to Mr. Litt that day, you asked Mr. Litt
18    about the reasons for executing a search warrant, in light of
19    the fact that the -- that Amerindo had been cooperating with
20    the S.E.C., is that true?
21    A.   I suspect I did.
22    Q.   And you testified that you indicated to Mr. Litt that
23    Amerindo wanted to cooperate fully with the government in its
24    investigation, correct?
25    A.   I might have mentioned that several times.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                  32

      65VVVILH              Licker - cross
1     Q.   And your testimony is that it was your initiative to issue
2     the preservation notice, correct?
3     A.   I believe so, yes.
4     Q.   And that was your practice in these types of circumstances,
5     correct?
6     A.   Right.
7     Q.   And that discussion regarding the preservation notice was
8     apart from any discussion about a grand jury subpoena, correct?
9     A.   Correct.
10    Q.   It's your testimony that you believe a conversation about
11    terminating the search in lieu of the grand jury subpoena
12    happened at approximately 1 o'clock that day, is that right?
13    A.   I don't remember exactly when it did happen.  Frankly, had
14    I not seen the time stamp on the grand jury subpoena, I would
15    have placed it later.
16          But that does refresh my recollection that Marc Litt
17    and I had a conversation -- a conversation about it when I was
18    back at my office at Kirkpatrick & Lockhart, which would have
19    been between 1 and 2.  And I believe that that was our first
20    conversation about it.
                           Page 15

5-31-06 suppresion hearing transcript.txt

4     MR. COLTON:  Well, he shouldn't be -- he should be
5  saying -- maybe he could say what his understanding is.  But to
6  say somebody else told me, it's -- I mean I don't know what
7  these records are.  They have redactions.  How do we know what
8  it is?  Seriously.  They're going to rely on the phone records
9  to prove up apparently something that they're doing.  At least
10  I'd like the record to be clear that he's testifying not from
11  personal knowledge.
12     THE COURT:  Okay.  I think that's a given.  But my
13  question remains:  Are you going to make them bring in the
14  telephone records person from the U.S. Attorney's Office?
15     MR. COLTON:  It is not my intention at this minute,
16  I'll hear the rest of the testimony to see if we think it's
17  relevant.  But it's not my intention at this minute.
18     THE COURT:  Hearsay can come in at this point,
19  anyways, can it not?
20     MR. COLTON:  It can.  And the Court has the authority
21  whether to take that evidence or not.
22     THE COURT:  All right.  Technically speaking, I can
23  sustain the objection.  But at the end of the day, the question
24  is whether or not Exhibit 29 is coming in.  That's where this
25  is all leading to.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

64

65VVVILH             Litt - direct
1     Are you going to object to 29 coming in?
2     MR. COLTON:  I'll just hear the rest of the testimony.
3  My guess is probably not, as long as we know what it is.
4     THE COURT:  I'm going to overrule the objection then,
5  and we'll wait for the exhibit to come in.
6     Go ahead, Ms. McEvoy.
7  BY MS. McEVOY:
8  Q.  Mr. Litt, did you have a conversation or communication with
9  an administrative officer at the U.S. Attorney's Office
10  regarding the source of this record, this Government Exhibit
11  29?
12  A.  Yes, I did.
13  Q.  And what, if anything, did that communication reveal about
14  whether Government Exhibit 29 was created and maintained in the
15  ordinary course of U.S. Attorney's Office business?
16  A.  It revealed Government Exhibit 29 was kept -- was created
17  and kept in the ordinary course of the U.S. Attorney's Office
18  business.
19     MS. McEVOY:  Your Honor, the government offers Exhibit
20  29.
21     MR. COLTON:  I would say, your Honor, that if the
22  government's proffering this for calls that did happen, we have
23  no objection.  But to proffer this for potentially calls that
24  didn't happen when they've redacted information from calls, it
25  would be an unreliable document to prove out it didn't happen.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

65

65VVVILH             Litt - direct
1     THE COURT:  If you want to do voir dire on the
2  redactions, knock yourself out.  I mean the question is --
3  there are two separate questions in terms of whether the
4  document itself comes in as a business record, and then also
5  whether or not the redactions should remain as redactions.  How
6  the redactions were done, what criteria was used, the latter
7  point, I think it's something you can explore if you want.
8     MR. HOFFMAN:  Can I ask the Court if we can have an

Page 30

5-31-06 suppresion hearing transcript.txt
```
 9   offer of proof as to relevancy to make it easy?
10          THE COURT:  Okay.  That's fair enough.
11          MS. McEVOY:  The government is proffering these
12   records, your Honor, to help explain what calls occurred to and
13   from Mr. Litt's office phone on the day of May 26, 2005.
14          THE COURT:  Would these include telephone
15   conversations with Mr. Licker?
16          MS. McEVOY:  That's correct, your Honor.
17          THE COURT:  And Inspector Fraterrigo?
18          MS. McEVOY:  That's correct, your Honor.
19          THE COURT:  Anybody else?
20          MS. McEVOY:  Mr. Litt -- perhaps I could ask the
21   witness questions about what he did and what he did not redact.
22   BY MS. McEVOY:
23   Q.  Mr. Litt, what types of calls did you leave on the exhibit
24   and that you did not redact?
25   A.  I left calls that came to -- that were made to or came from
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              66
```
     65VVVILH           Litt - direct
 1   phone numbers that I could associate with U.S. postal
 2   inspectors; voice mail, both incoming and outgoing; or my
 3   calling voice mail to pick up messages; calls to and from the
 4   Court; calls to and from supervisors at the U.S. Attorney's
 5   Office; calls to and from telephone numbers associated with --
 6   that I knew to be associated with Eugene Licker; calls to and
 7   from a phone number that I believe is associated with
 8   Amerindo-U.S.
 9   Q.  And what did you redact?
10   A.  And that's -- I mean without looking absolutely
11   line-by-line going through it, that's the best I can say.
12          THE COURT:  Did you redact other work-related calls
13   that were unrelated to this investigation?
14          THE WITNESS:  I'm not sure.
15          THE COURT:  I'm trying to understand what criteria you
16   used to redact.  Did you redact personal calls?
17          THE WITNESS:  I redacted calls to my wife, home, and
18   cell phone.  I redacted --
19   BY MS. McEVOY:
20   Q.  Did you redact calls to the S.E.C.?
21   A.  I redacted calls to the S.E.C. on the grounds that they had
22   nothing to do with the issuance of a grand jury subpoena or the
23   search that was being conducted that day.
24          THE COURT:  All right.  Mr. Colton's standing.  I know
25   what he's going to say.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              67
```
     65VVVILH           Litt - direct
 1          It seems to me that calls to the S.E.C. are relevant
 2   here.  Calls to your wife, of course not.  And if you were
 3   working on some other case that's got nothing to do with the
 4   events of that day or this case, I don't think there would be
 5   an objection to that.
 6          But calls to the S.E.C. on this case by definition
 7   relate to this case.  So I think that, at a minimum, this needs
 8   to be modified to include calls to the S.E.C.
 9          I assume that was what you were going to say,
10   Mr. Colton, among other things.
11          MR. COLTON:  That was the first and most relevant
12   part.  Your Honor got the best part.
13          THE COURT:  All right.
```
                            Page 31

5-31-06 suppresion hearing transcript.txt
```
14          MR. COLTON:  Is this an opportune time to do the voir
15     dire?
16          THE COURT:  Sure.  Why not.  Let's just get it over
17     with.
18     VOIR DIRE EXAMINATION
19     BY MR. COLTON:
20     Q.  Mr. Litt, did you also redact calls where you couldn't tell
21     what the number was; in other words, a phone number associated
22     with someplace you didn't know?
23     A.  I need to see the unredacted -- or the version of the
24     document that has the white tape on it so I can look at it
25     before I can answer that question.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

68

```
       65VVVILH              Litt - direct
1           MR. COLTON:  Your Honor, we don't want to get the
2      redacted document.  But for the sake of completeness of the
3      record, if it can be marked for identification, it will not be
4      given to defense without further order of the Court.  But at
5      least we have --
6           THE COURT:  All right.  So the unredacted -- I think
7      that's right.  I think we should mark that 29O, for original,
8      for identification purposes.  And then that's what's going to
9      be shown to Mr. Litt.  So the record's clear.
10          THE WITNESS:  The document that I'm asking for is not
11     the original, but, rather, the one that has -- it's an original
12     with redactant tape on it.
13          THE COURT:  Right.  But we're still going to call it
14     29O.  We can call it 29QQ, it doesn't matter.  The point is
15     it's the document that you're going to use to review your
16     redactions.
17          MS. McEVOY:  I'm handing you, Mr. Litt, what's been
18     marked for identification as Government Exhibit 29O, which is
19     the unredacted original records, and Government Exhibit 29R,
20     which is your original redacted office phone records.
21          (Pause)
22          THE COURT:  Mr. Colton.
23          MR. COLTON:  Well, Mr. Litt looked up as if he
24     was ready to answer the question about calls shown on 29O, so I
25     stood up to continue the voir dire.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

69

```
       65VVVILH              Litt - direct
1           THE COURT:  Mr. Litt, are you ready to proceed?
2           THE WITNESS:  Yes.
3           THE COURT:  Fire away, Mr. Colton.
4      VOIR DIRE EXAMINATION
5      BY MR. COLTON:
6      Q.  The question, Mr. Litt, was did you redact from Exhibit 29
7      for identification numbers where you just couldn't identify
8      whose phone number it was that was either incoming or outgoing?
9      A.  There are only two numbers of that sort that were redacted.
10     One of them was a misdial, a five-second call, and it was a
11     misdial.  It has the last four digits of a number that I do
12     know, and I believe it was -- well, anyway, it was a misdial, a
13     five-second call.
14          THE COURT:  The person that you intended to dial, was
15     that somebody related to this case?
16          THE WITNESS:  Loosely.  In the sense that it was a
17     defense lawyer for an individual -- not a defense lawyer.  It
18     was a lawyer for an individual that I had spoken to in
```
Page 32

5-31-06 suppresion hearing transcript.txt
```
24   A.  Yes.
25   Q.  And you filed briefs in this action?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              135
```
     65VVVILH                Litt - cross
 1   A.  Yes.
 2   Q.  And when you write briefs to the Court, you intended the
 3   briefs to be accurate, correct?
 4   A.  I do.
 5   Q.  And when you make factual representations, you understand
 6   that the Court is likely to rely on those?
 7   A.  Yes.
 8   Q.  And, therefore, you understand the importance of it being
 9   accurate, correct?
10   A.  Yes.
11           MR. COLTON:  I don't have stickers, your Honor.  But
12   this is a brief with the date that it was filed.  If you want
13   me to sticker it, I can identify it by the precise brief and
14   date that was filed in the case.
15           THE COURT:  We'll call it defense -- oh, looks like
16   somebody has stickers there.
17           MR. COLTON:  I don't know what number we're up to.
18   BY MR. COLTON:
19   Q.  Mr. Litt, I show you what's been marked as Defendant's AA
20   for identification with today's date.
21           THE COURT:  Thank you.  For the record, this is the
22   brief dated February 10, 2006?
23           MR. COLTON:  Yes, your Honor.
24   Q.  This is a brief that you were one of the signatories to?
25   A.  Yes.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              136
```
     65VVVILH                Litt - cross
 1   Q.  And you read it before it was filed?
 2   A.  Yes.
 3   Q.  And had there been errors, you would have -- and you knew
 4   about that after reading it, you would have corrected that?
 5   A.  Yes.
 6   Q.  And isn't it true that you as a signer to this brief
 7   represented on page 3 of the brief toward the bottom of the
 8   first full paragraph, "As a consequence, the search team was
 9   informed that it need not complete the search because
10   Amerindo-U.S. had agreed to comply with the subpoena, and the
11   postal inspectors cut short the search."  Isn't that correct?
12   A.  It says that, and then there are some transcript cites.
13   Q.  So as far as you knew, representing to the Court on
14   February 10, 2006, the search was cut short, and it need not be
15   completed because Amerindo-U.S. agreed to comply with the
16   subpoena, correct?
17   A.  May I see the transcript cites?
18   Q.  Do you have reason to believe that you incorrectly cited
19   the transcript in your brief to the Court?
20   A.  No.  It would help me to answer the question to see what
21   was cited as authority for that statement.
22           THE COURT:  Whatever the authority was, that's what
23   the brief says, correct?
24           THE WITNESS:  Yes.
25           THE COURT:  Mr. Colton read the brief accurately?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              137

5-31-06 suppresion hearing transcript.txt
65VVVILH                Litt - cross
```
1              THE WITNESS:  Yes.
2              THE COURT:  Okay.
3              MR. COLTON:  So if the witness is not going to adopt
4    the statement, I ask that the Court accept the statement as a
5    consequence, the last three lines, the first full paragraph,
6    page 3, Defense AA, as a party admission.
7              THE COURT:  Ms. McEvoy?
8              MS. McEVOY:  The government would object.
9              THE COURT:  Why?  The government signed the brief.
10   It's the government's brief.
11             I mean, look, if you want to cover on redirect the
12   transcript cites, but I think Mr. Colton's right.  I mean it's
13   the government's brief, and it says what it says.
14             MS. McEVOY:  All right.  On that basis, your Honor,
15   the government will direct on that.
16             THE COURT:  All right.  I mean briefs are used for
17   lots of things.  I rarely see them as exhibits.  You want to
18   offer the whole thing really just for the main purpose of that
19   sentence or those two sentences, that one sentence you just
20   read?
21             MR. COLTON:  I don't wish to offer the whole thing.
22   It's not a jury trial.  Your Honor's read the brief anyway.
23             THE COURT:  Right.
24             MR. COLTON:  Technically, I want to offer the
25   admission.  But it's really a distinction about meaning, given
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              138

65VVVILH                Litt - cross
```
1    who the fact finder is, and your Honor has already read it.
2              THE COURT:  The document is already in, really, for
3    the purpose of that last sentence, the bottom of that full
4    paragraph on page 3.  I take it you have no objection,
5    Mr. Hoffman?
6              MR. HOFFMAN:  No objection.
7              THE COURT:  All right.
8    BY MR. COLTON:
9    Q.  You testified earlier about a conversation with Mr. Licker
10   which you described.  He was saying he had a desire to go home
11   because it was late, on May 26, 2005, isn't that correct?
12   A.  Yes.
13   Q.  Isn't it true though that the postal inspectors would have
14   had to cease the search an hour and 10 minutes later, at 10
15   o'clock at night?
16             MS. McEVOY:  Objection.
17             THE COURT:  Basis?
18             MS. McEVOY:  Form.
19             THE COURT:  Overruled.
20             MR. COLTON:  What was the objection?
21             THE COURT:  Form.  Overruled.  Do you remember the
22   question?
23             THE WITNESS:  I think so.
24             THE COURT:  Go ahead.
25   BY MR. COLTON:
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              139

65VVVILH                Litt - cross
```
1    Q.  Isn't it true that the postal inspectors would have had to
2    cease the search at 10 o'clock at night, an hour and 10 minutes
3    after they actually did cease the search?
4    A.  I don't know.
```
                              Page 64

5-31-06 suppresion hearing transcript.txt
(212) 805-0300

174

65VVVILH                    Litt - cross
1   The question of what representations were made is not a Franks
2   hearing.  A Franks hearing is an inquiry into whether
3   misrepresentations were made.
4           THE COURT:  Based on some sort of basis to believe
5   that there was a misrepresentation.  What's your basis here to
6   think there was any misrepresentation?
7           MR. COLTON:  I'm not asserting one at this time.  I'm
8   asserting that we have a right to know what the representations
9   were, and then we can, if we wish, come to the Court and say, I
10  have a basis to say those representations were
11  misrepresentations.
12          THE COURT:  All right.  Maybe you have the transcript
13  already tagged and ready to go on this.  There was some
14  discussion, call it a lucky guess, but there was some
15  discussion on this.  You want to just take Mr. Litt through
16  that?
17          MR. COLTON:  I don't.  Because what I want to know
18  is -- I mean I'll proffer that what Mr. Litt told the Court
19  previously is Magistrate Maas asked the question of, Well,
20  you're asking me to make a series of inferences to conclude
21  that Mr. Tanaka took client money to buy horses.  And that
22  information is in the record.
23          But what I don't know, and what no one's ever asked,
24  is were there any other representations, any other questions?
25  What were the answers?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

175

65VVVILH                    Litt - cross
1           Typically, when there's any other information
2   presented to a judge --
3           THE COURT:  It's preserved somehow.
4           MR. COLTON:  Yes.
5           THE COURT:  Right.
6           MR. COLTON:  And it wasn't.
7           THE COURT:  Right.
8           MR. COLTON:  So now I'm doing the only thing I can,
9   which are asking the people who were there.
10          THE COURT:  All right.  Go ahead.  Ask the question.
11  Overruled.
12  BY MR. COLTON:
13  Q.  Did Magistrate Judge Maas ask any questions about the three
14  warrants you were seeking or any of the supporting papers?
15  A.  Magistrate Maas, in reviewing the Tanaka complaint, made a
16  statement to me that might or might not be viewed as a
17  question, which was to the effect of there's no direct evidence
18  that it was client money that was used to purchase the horses.
19          My response to that statement or question was, No, we
20  are asking the Court or -- no, I didn't say that.
21          The complaint -- that is based on a series of
22  inferences from certain paragraphs in the complaint, which I
23  believe I pointed to.  And that is the sum and substance of
24  substantive conversation that was had with Magistrate Judge
25  Maas about any of the three warrants that were being sought
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

176

65VVVILH                    Litt - cross
1   that evening.
2   Q.  Did Inspector Fraterrigo make any comments of that subject,
                           Page 81

5-31-06 suppresion hearing transcript.txt
```
 3   Tanaka complaint, to Magistrate Judge Maas?
 4   A.  Not that I recall, no.
 5   Q.  Were there times when Inspector Fraterrigo was with
 6   Magistrate Judge Maas that you weren't there?
 7   A.  We were seated around Magistrate Maas's dining room table
 8   in temporary quarters that were rather crowded with boxes.  And
 9   I would say that we were all within 10 feet of each other the
10   entire -- well, Magistrate Maas may have left the room on one
11   or two occasions.  But there was no time that I'm aware of when
12   Postal Inspector Fraterrigo was alone with Magistrate Judge
13   Maas.
14   Q.  There came a time that you went back to Magistrate Judge
15   Maas for a further order with respect to the computers,
16   correct?
17   A.  Yes.
18   Q.  Between the time you got the first warrant and you went for
19   the extension of the warrant, there was an agreement with
20   Mr. Licker to preserve all evidence, correct, to preserve all
21   documents?
22   A.  He said everything.  He wasn't letting garbage leave the
23   office.
24   Q.  And that was your understanding of the promise that was
25   made to you by counsel for Amerindo?
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

65VVVILH              Litt - cross
```
 1   A.  I assumed at some point garbage started leaving the office,
 2   but yes.
 3   Q.  But in seeking further relief from Magistrate Judge Maas,
 4   neither you, nor Inspector Fraterrigo, informed the magistrate
 5   that you had an agreement with counsel for Amerindo that all
 6   things would be preserved, and that the evidence would remain
 7   intact for the government?
 8   A.  That's correct.
 9   Q.  You were the one who typed the search warrant affidavit on
10   May 25th, 2006, correct?
11   A.  I don't know that I typed it on May 25th, 2006.
12   Q.  The one that was presented to Magistrate Judge Maas for May
13   25th 2006?
14   A.  I don't know that I typed that document in its entirety on
15   May 25, 2006.
16           THE COURT:  Regardless of when you typed it, the
17   warrant that was presented to Magistrate Judge Maas, did you
18   type it?
19           THE WITNESS:  Yes.
20           THE COURT:  Okay.
21   Q.  And, in fact, one of the representations made to Magistrate
22   Judge Maas was if it becomes apparent that computer items are
23   no longer necessary to retrieve and preserve as evidence, such
24   materials and equipment will be returned promptly, correct?
25           If you have the search warrant affidavit in front of
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

65VVVILH              Litt - cross
```
 1   you, if not, I'll be happy to get it for you.  ) question ).
 2   A.  I got it.  It sounds familiar.
 3   Q.  But despite the fact that you had an agreement and a
 4   promise from counsel for Amerindo to preserve such evidence,
 5   the computers were, nonetheless, kept for two weeks before
 6   being returned, correct?
 7   A.  Well, I'm struggling because you say "the computers."
```
                        Page 82

5-31-06 suppresion hearing transcript.txt

8  There were certain computers that were imaged on-site and never
9  left the premises.  There were certain computers, it's my
10  understanding, that left the site and were imaged elsewhere and
11  were returned within the time frame set forth in the warrant.
12      And there is a smaller subset of computers that left
13  the site, and for technical or other reasons could not be
14  imaged within the time frame set forth in the warrant.  And it
15  was for that limited subset of computers that went back to
16  the Court and requested additional time to image those, to
17  complete the process of imaging those computers.
18  Q.  I'm making a different point.  And that is, that Inspector
19  Fraterrigo, in a document drafted by you, promised the
20  magistrate that if it is no longer necessary to hold the
21  computers or any computer to preserve evidence, that computer
22  or equipment will be returned promptly.  And nobody ever
23  informed the magistrate that there was an agreement by counsel
24  to preserve that evidence, an agreement accepted by the
25  government, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

179

65VVVILH                    Litt - cross
1  A.  I only pause because Mr. Hoffman stood up.  I thought he
2  might be objecting to your question.
3  Q.  It would be a first to object by custom break.  He's not
4  objecting.
5  A.  Could you restate the question?
6  Q.  I'll break it down.  There was an agreement with
7  Mr. Licker, counsel for Amerindo, to preserve all evidence,
8  correct?
9  A.  Yes, we had an oral agreement.
10  Q.  Okay.  An agreement on which you relied?
11  A.  Yes.
12  Q.  Thus, it would not be necessary to keep any of the
13  business's computers to preserve evidence.  There was an
14  agreement to do so with counsel for Amerindo, correct?
15  A.  I don't think that's true, no.
16  Q.  It is a relevant fact to the magistrate to determine
17  whether to allow you to keep other computer equipment or
18  whether there was a less restrictive means available to achieve
19  the government's evidence preservation ends, correct?
20      MS. McEVOY:  Objection.  Asking for the magistrate
21  judge's views.
22      THE COURT:  Well, I think the question more relates to
23  what it was that was represented to the magistrate in the
24  search warrant application, right?
25  Q.  There's no question that there was a representation that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

180

65VVVILH                    Litt - cross
1  computers will be returned promptly if they're not necessary
2  for preservation of evidence?
3      THE COURT:  And the follow-up question is when the
4  government went back to Magistrate Judge Maas.  It's a fact,
5  Mr. Litt, is it not, that nobody told Magistrate Maas about the
6  agreement to preserve the evidence between the government and
7  Mr. Licker, is that right?
8      THE WITNESS:  Yes.
9      THE COURT:  Okay.
10  BY MR. COLTON:
11  Q.  And you understood that the computers could well be very
12  important to the continuing running of the Amerindo business,

Page 83

5-31-06 suppresion hearing transcript.txt

13 correct?
14 A.  I don't know what I understood about the computers in
15 question; that is, it is my impression that the vast majority
16 of computers seized from Amerindo had been returned within the
17 time frame.  And as I sit here, I neither recall how many
18 computers were at issue, although -- nor do I recall the nature
19 of those computers.
20   THE COURT:  Were there any computers that were not
21 imaged but left behind as of May 26?
22   THE WITNESS:  Yes.
23   THE COURT:  Okay.
24   THE WITNESS:  But to be complete, I have to say that
25 was not an Amerindo computer.

181

65VVVILH     Litt - cross
1   THE COURT:  Okay.  Whose computer was it then?
2   THE WITNESS:  I forget the name of the woman.
3   THE COURT:  All right.  So were there any Amerindo
4 computers that were left behind on May 26 that were not imaged
5 on-site?
6   THE WITNESS:  To the best -- I wasn't -- to the best
7 of my knowledge, no.
8   THE COURT:  Okay.  Go ahead.
9 BY MR. COLTON:
10 Q.  You were coordinating this investigation with the S.E.C.,
11 correct?
12 A.  What do you mean by "coordinating"?
13 Q.  You were sharing information with the S.E.C.?
14 A.  Shared certain information.
15 Q.  And they shared information with you?
16 A.  I'm hesitating only because I'm trying to put -- this is
17 going on --
18 Q.  I'll withdraw the question.
19   Who was it that told the S.E.C. attorneys that a
20 search warrant was going to be -- or was executed on May 26,
21 2005?
22   MS. McEVOY:  Objection.  Relevance.
23   THE COURT:  What's the relevance, Mr. Colton?
24   MR. COLTON:  The relevance -- I'd like to make --
25 Mr. Licker testified that the S.E.C. attorneys were --

182

65VVVILH     Litt - cross
1   MS. McEVOY:  Objection to --
2   MR. COLTON:  Well, I'll tell you --
3   MS. McEVOY:  -- explaining Mr. Licker's testimony in
4 front of the witness.
5   MR. COLTON:  -- at sidebar.
6   THE COURT:  Okay.  Mr. Colton is the one who's been
7 scrupulous in making sure that witnesses don't hear things.  If
8 he doesn't mind saying it, I'm not sure why you would.
9   MR. COLTON:  Sidebar?
10   THE COURT:  Fine.
11   (Continued on next page)
12
13
14
15
16
17

Page 84

5-31-06 suppresion hearing transcript.txt

187

65VVVILH                    Litt - cross
1  clients and other types of clients that were serviced by
2  Amerindo that would have nothing to do with the allegations in
3  the search warrant application.
4          THE COURT:  Okay.  But it seems to me that if that
5  argument holds water, it holds water regardless of whatever
6  conversations were going on between the U.S. Attorney's Office
7  and the S.E.C.
8          MS. WOLFE:  Well, we're trying to elicit what Mr. Litt
9  learned from the S.E.C.
10          THE COURT:  But I still don't understand why that's
11  relevant.  I don't understand --
12          MR. COLTON:  Let me make a suggestion.  I'll leave
13  that question for Ms. Wolfe later.  They're going to do
14  cross-examination out of turn.  We can deal with that.  I
15  understand the Court's ruling.
16          THE COURT:  you know what, we can take it up with
17  Mr. Litt another time.
18          MR. COLTON:  I understand the Court's ruling.  A few
19  more questions, and we can get to Detective Sergeant Shaw.
20          (Continued on next page)
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

188

65VVVILH                    Litt - cross
1          (In open court)
2  BY MR. COLTON:
3  Q.  With respect to the less redacted phone records that are
4  put into evidence, who did you call at the S.E.C. on May 26,
5  2005, or who called you?
6  A.  I believe I spoke with three different people, or at least
7  my phone records reflect calls to three different people at the
8  S.E.C.
9  Q.  Who?
10  A.  Kaye Lackey, Paul Gizzi, and Mark Salzberg.
11  Q.  These are all the attorneys responsible for the enforcement
12  action brought by the S.E.C.?
13  A.  Yes.
14  Q.  Had you done a grand jury subpoena instead of a search
15  warrant application, the documents you received from the grand
16  jury subpoena would be those you would not be entitled to give
17  to the S.E.C., correct?
18  A.  That's correct.
19  Q.  But by doing a search warrant, you would be able to give
20  the documents to the S.E.C., correct?
21  A.  Actually, I have to modify my last answer.
22  Q.  Okay.
23  A.  It's not necessarily correct.
24  Q.  There's a chance that you wouldn't be able to give it to
25  the S.E.C. if you went by grand jury subpoena rather than
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

189

65VVVILH                    Litt - cross
1  search warrant?
2  A.  Correct.
3  Q.  But if you go by search warrant, your understanding is you
                            Page 87

5-31-06 supresion hearing transcript.txt

```
 4  can give documents to the S.E.C.?
 5  A.  Yes.
 6  Q.  And, in fact, the Department of Justice did turn over a
 7  substantial quantity of documents to the S.E.C. to allow them
 8  to review them?
 9  A.  Yes.
10  Q.  And you've conducted joint witness interviews with the
11  S.E.C., correct?
12          MS. McEVOY:  Your Honor, again, I'm not sure why we're
13  going down this road.
14          THE COURT:  Yeah.  We can probably do this another
15  time.
16          MR. COLTON:  I was just clearing up the phone records.
17          THE COURT:  Okay.
18          MR. COLTON:  I'll withdraw that question.  One moment.
19          (Pause)
20  BY MR. COLTON:
21  Q.  Mr. Litt, with respect to your conversation with Magistrate
22  Judge Maas on the evening of May 25th, 2005, can you tell us
23  which inferences, which series of inferences, and which facts
24  you were pointing to in the complaint when you were speaking
25  with Magistrate Judge Maas?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

190

65VVVILH                    Litt - cross

```
 1  A.  Not without reference to the complaint.
 2  Q.  I show you what is entitled "Sealed Complaint, United
 3  States of America v. Gary Alan Tanaka."  For the purpose of
 4  this inquiry, it's a seven-page document signed by Cynthia
 5  Fraterrigo and sworn to before Magistrate Judge Maas on the
 6  25th of May 2005.
 7          THE COURT:  Can we just for the record mark it BB?  Is
 8  that all right?
 9          MR. COLTON:  Sure.  I was trying to expedite things.
10          THE COURT:  No, I appreciate that.  We can do it
11  later, if you want, but for the record, we'll just call it BB.
12          MR. COLTON:  All right.
13  BY MR. COLTON:
14  Q.  What will be marked BB for identification --
15  A.  You've given me a lot more than seven pages.
16  Q.  It is just for ease, in case the other documents you wanted
17  to refer to were presented to Judge Maas.  But now you have
18  just the seven.
19  A.  Thank you.
20          (Pause)
21          MR. COLTON:  Just for the Court, while Mr. Litt is
22  reading, this is the last reading.  Just a couple questions and
23  then we're done.
24          THE COURT:  All right.  Is Detective Shaw available?
25          MS. McEVOY:  Yes, he is.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

191

65VVVILH                    Litt - cross

```
 1          THE COURT:  Then we'll take a short break.
 2  A.  The best of my recollection is paragraphs 9 and 10.
 3  Q.  So it's your testimony that you pointed to paragraphs 9 and
 4  10 in addressing Magistrate Judge Maas on the evening of the
 5  25th of May, 2005?
 6  A.  I believe I testified and stated in open court previously
 7  that I said words to the effect of it's a chain of inferences,
 8  yes.
```

Page 88

5-31-06 suppresion hearing transcript.txt

```
 9          And as I testified today, I recall pointing to
10    language in the complaint, as I said that.  And the best
11    recollection I have as I sit here is that was the paragraphs I
12    just referenced.
13    Q.  9 and 10 you said?  I can ask the court reporter, if you
14    don't mind.
15    A.  9 and 10.
16    Q.  Thank you.  Did Magistrate Judge Maas respond in any way to
17    you pointing to paragraphs 9 and 10 in the complaint, which
18    will be marked as Defendants' BB?
19    A.  Did he respond to my pointing or my statement or both?
20    Q.  Both or either.
21    A.  I don't recall the specific words he used.  It may have
22    been "I understand," but it was something short, and it was
23    something that conveyed his understanding of what I had
24    communicated to him.
25    Q.  And just to be clear, this conversation was in no way
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    192
65VVVILH              Litt - cross
```
 1    recorded either by writing or tape or digitally or any other
 2    way, to your knowledge?
 3    A.  To my knowledge.
 4          MR. COLTON:  Nothing further, your Honor.  I'm just
 5    going to give Mr. Litt a BB sticker for the document he holds.
 6          THE COURT:  Okay.  All right.  Let's take a 10-minute
 7    recess.  We will break with this witness, and then turn to
 8    Detective Shaw.  And it will be my sincere hope that we will
 9    finish with him.
10          MR. HOFFMAN:  It's my understanding, your Honor, that
11    the witness is not to discuss his testimony with anyone until
12    cross has resumed, or read any of the transcript of the
13    proceedings other than that which he testified.
14          THE COURT:  Right.  Or learn about whatever it is
15    Mr. Licker said, as well.  Exactly, yes, that is understood.
16    All right.
17          THE WITNESS:  Understood.
18          THE COURT:  All right.  We'll see you all in 10
19    minutes.
20          (Witness temporarily excused)
21          (Recess)
22          MR. LITT:  Two issues.  One to note that Inspector
23    Fraterrigo has left the courtroom and won't be here for
24    Detective Sergeant Shaw's testimony.
25          THE COURT:  Okay.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    193
65VVVILH              Litt - cross
```
 1          MR. LITT:  Second.  One of the issues raised in
 2    defense papers was a Franks hearing with respect to Detective
 3    Sergeant Shaw.  That matter is fully briefed; the Court has not
 4    ruled.  I don't know if the Court is prepared to rule.
 5          If the Court is not prepared to rule, our intention
 6    was to put on evidence testimony from Detective Sergeant Shaw
 7    that would include testimony that gets to good-faith issues,
 8    I'd just like to make it clear that by doing so, the government
 9    is not conceding that it is either lawful or good policy or
10    anything else to have a Franks hearing with respect to
11    Detective Sergeant Shaw in this case.
12          THE COURT:  Well, you know, some of it is what you
13    mean by a Franks hearing.  I think it's undeniable that
```
                              Page 89

5-31-06 suppresion hearing transcript.txt
14   Detective Sergeant Shaw said something in his affirmation or
15   declaration or whatever it is that they call it in England to
16   get a search warrant that was untrue.  And I'm not suggesting
17   by that that he did it intentionally or anything else, or that
18   it even matters.
19          But at the end of the day, one of the big defense
20   contentions here is that, of course, first they're saying the
21   warrant clause applies, even with a search done abroad.  But
22   beyond that, even if the test is one of reasonability, to the
23   extent that the American government is relying on the
24   lawfulness of the search as the barometer for determining
25   reasonableness, they've got an expert who says the search
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

194

65VVVILH               Litt - cross
1    was -- the search warrant was unlawful because it went to the
2    wrong judge based on the facts that should have been known and
3    maybe were not made known to Detective Shaw, and we'll find
4    out.
5           So I don't know to call it a Franks hearing or if
6    you're calling it testimony that relates to the reasonableness
7    of the warrant.
8           I didn't find a lot case law that dealt with this in
9    the context of a foreign warrant.  And I assume by your all not
10   citing me anything, you didn't either.
11          So I think there needs to be some testimony on this.
12   I'm not sure that makes it a Franks hearing.  I think it goes
13   to the question of reasonableness and the lawfulness of the
14   warrant.  Because even if you're right that the warrant clause
15   doesn't apply, you still have to show that it's a reasonable
16   search.  And the cases you cite unto say that if it's legal in
17   their country and the laws in their country don't shock the
18   American conscience, and I think defense counsel wisely has not
19   argued that British law doesn't shock the conscience, at least
20   in this context, then if it's not a lawful warrant, them I'm
21   not sure what's left of your reasonableness argument.
22          MR. LITT:  We expect testimony from Detective Shaw
23   about the lawfulness of the warrant.
24          THE COURT:  So I don't know if that makes it a Franks
25   hearing or not.  But it does go to whether or not the warrant
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

195

65VVVILH               Litt - cross
1    that he got was lawful.
2           MR. LITT:  All I want to make clear is that we're
3    not -- by whatever testimony we put on that gets to the issues
4    here, we're not conceding a Franks hearing.
5           THE COURT:  And I haven't ruled on it yet because I
6    think I need to hear some testimony as to how far the defense
7    gets to go.  But I think they're entitled to at least ask some
8    questions based on what he said in his affidavit.
9           Mr. Kobre.
10          MR. KOBRE:  Just from a scheduling perspective, is it
11   your Honor's -- would it be your Honor's position that on
12   Monday we would just resolve the -- finish up Detective Shaw's
13   testimony, and that we would set a new date for --
14          THE COURT:  Yes.  Thank you for making that clear.
15          MR. HOFFMAN:  Try and make it even easier, if I might,
16   your Honor.  I just discussed with Ms. Wolfe, if you can do
17   tomorrow from, I think you said, 12 to 2?
18          THE COURT:  Yes, that's what we're shooting for.
                              Page 90