Exhibit J

7-7-06 hearing transcript.txt

1

```
                6775VILH                    hearing
 1       UNITED STATES DISTRICT COURT
 1       SOUTHERN DISTRICT OF NEW YORK
 2       ------------------------------x
 2
 3       UNITED STATES OF AMERICA,
 3
 4              v.                              05 Cr. 621 (KMK)
 4
 5       ALBERTO VILAR and GARY TANAKA,
 5
 6                Defendants.
 6
 7       ------------------------------x
 7
 8                                              July 7, 2006
 8                                              10:30 a.m.
 9
 9
10       Before:
10
11
11                      HON. KENNETH M. KARAS,
12
12                                              District Judge
13
13
14                           APPEARANCES
14
15       MICHAEL J. GARCIA
15            United States Attorney for the
16            Southern District of New York
16       BY:  MARC LITT
17            DEIRDRE McEVOY
17            Assistant United States Attorneys
18
18       HOFFMAN & POLLOK, L.L.P.
19            Attorneys for Defendant Vilar
19       BY:  JEFFREY C. HOFFMAN
20            SUSAN C. WOLFE
20
21       WILSON, SONSINI, GOODRICH & ROSATI
21            Attorneys for Defendant Tanaka
22       BY:  GLENN CHARLES COLTON
22            JESSICA MARGOLIS
23            and
23       KOBRE & KIM, L.L.P.
24       BY:  STEVEN GARY KOBRE
24            JUSTIN SHER
25
25
                SOUTHERN DISTRICT REPORTERS (212) 805-0300
```

2

```
                6775VILH                    hearing
 1              (Case called)
 2              MR. LITT:  Marc Litt and Deirdre McEvoy for the United
 3       States.  With us at counsel table are U.S. Postal Inspector
 4       Cynthia Fraterrigo and Jeff Jarrett.
 5              THE COURT:  Good morning.
 6              MR. HOFFMAN:  Good morning, your Honor.  Jeffrey
 7       Hoffman and Susan Wolfe.  And with us is Joanna Eftychiou, who
 8       is awaiting addition to the bar who is the only member of the
                                 Page 1
```

```
                      7-7-06 hearing transcript.txt
 9            MS. McEVOY:  The government will abide by that.
10            THE COURT:  So, we will start off with the Inspector
11   and then why don't we just take it from there?
12            Who is the other person, Mr. Hoffman?  You were
13   referring to another law enforcement person?
14            MS. McEVOY:  Inspector Golden.
15            THE COURT:  Okay.
16            Do you all care if Inspector Golden goes next or
17   Mr. Litt, just so there is no surprise?
18            MR. COLTON:  We are ready for Inspector Golden, too.
19   Of course we want him excluded from the courtroom until his
20   turn.
21            THE COURT:  That's a given.
22            So, Fraterrigo and Golden.  And who else is left,
23   other than Mr. Litt?
24            MS. McEVOY:  Former Postal Inspector Thomas Feeney,
25   Inspector Williamson, and I think that's all from the
                    SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                        39
     6775VILH                      hearing
 1   government.
 2            THE COURT:  All right.
 3            We have the whole day.  I assume if we go through the
 4   first two Inspectors are we going to -- are the other
 5   inspectors available today?  Are they available on Monday?
 6            MS. McEVOY:  Monday.
 7            THE COURT:  So then Mr. Litt may go today,
 8   Mr. Hoffman.
 9            MR. HOFFMAN:  I understand.
10            THE COURT:  During the lunch break maybe you can go
11   through your notes.
12            MR. HOFFMAN:  Thank you.
13            THE COURT:  Why don't we take a five-minute break.
14            MS. McEVOY:  Your Honor, if I may before the break,
15   hand you up the additional e-mails?
16            THE COURT:  Please.  Thank you.
17            (Recess)
18            THE COURT:  All right, the long awaited moment.
19   Inspector Fraterrigo, right?
20            MS. McEVOY:  Yes.
21    CYNTHIA FRATERRIGO,
22         called as a witness by the Government,
23         having been duly sworn, testified as follows:
24            THE WITNESS:  Cynthia Fraterrigo.
25            THE COURT:  You may proceed.  Go ahead.
                    SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                        40
     6775VILH                      hearing
 1            MS. McEVOY:  Thank you, your Honor.
 2   DIRECT EXAMINATION
 3   BY MS. McEVOY::
 4   Q.  Are you employed?
 5   A.  I'm employed with the United States Postal Inspection
 6   Service as a postal inspector.
 7   Q.  How long have you been a U.S. postal inspector?
 8   A.  Approximately seven years.
 9   Q.  What is your current assignment?
10   A.  I'm assigned to the Church Street fraud team in the New
11   York division.
12   Q.  What are your responsibilities with that team?
13   A.  I am a -- I investigate complex white collar crime cases,
14   corporate fraud cases, securities fraud cases, mail securities
15   fraud cases.
```

```
                      7-7-06 hearing transcript.txt
16    Q.   Inspector, if you could keep your voice up a little.  It is
17    a little hard to hear.
18    A.   Of course.
19    Q.   Thank you.
20             Prior to being on that team, what did you do?
21    A.   I was a special agent with the United States Secret
22    Service.
23    Q.   And before, between when you were on the Church Street
24    fraud team and the Secret Service, were you on any other teams
25    with the Postal Inspection Service?
                SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                       41
      6775VILH                 Fraterrigo - direct
 1    A.   Yes, I was.  I was on the external fraud team.
 2    Q.   As part of that team, what were your primary
 3    responsibilities?
 4    A.   We conducted cases involving mail theft, identity theft,
 5    credit card fraud, mail fraud and bank fraud.
 6    Q.   And you said that prior to being a postal inspector you
 7    were a special agent with the United States Secret Service?
 8    A.   Yes, I was.
 9    Q.   How long were you a Secret Service agent?
10    A.   Approximately four and a half years.
11    Q.   What were your duties as a Secret Service agent?
12    A.   I was assigned to electronic crimes team, I conducted
13    investigations involving cyber crimes, and also I did
14    protection of the President of the United States, Vice
15    President and foreign dignitaries visiting New York.
16    Q.   Approximately how many searches have you participated in
17    during the course of your law enforcement career?
18    A.   Approximately 40 to 50 cases, searches.
19    Q.   Did you say 40 to 50?
20    A.   Searches.
21    Q.   And, since joining the U.S. Postal Inspection Service
22    approximately how many searches have you participated in?
23    A.   In 10.
24    Q.   Are you familiar with an investigation in the case
25    involving Alberto Vilar and Gary Tanaka?
                SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                       42
      6775VILH                 Fraterrigo - direct
 1    A.   Yes, ma'am.
 2    Q.   What has been your role in that investigation?
 3    A.   I am the lead case agent.
 4    Q.   What are your duties and responsibilities as lead case
 5    agent?
 6    A.   I follow up on the investigative leads.  I conduct
 7    interviews.  Serve subpoenas.  Review documents.
 8    Q.   And, in connection with that investigation, did there come
 9    a time when you swore out a complaint and obtained an arrest
10    warrant for Alberto Vilar?
11    A.   Yes, I did.
12    Q.   When did that occur?
13    A.   On May 25, 2005.
14    Q.   What charges against Alberto Vilar were contained in the
15    complaint?
16    A.   Alberto Vilar was charged with mail fraud, wire fraud and
17    investment advisor fraud.
18    Q.   Did there also come a time when you swore out a complaint
19    and obtained an arrest warrant for Gary Tanaka?
20    A.   Yes.
21    Q.   When did that occur?
22    A.   May 25th, 2005.
                                Page 19
```

7-7-06 hearing transcript.txt
9  used in that investment was wired to a -- wired from -- wired
10 to a brokerage account at Bear Stearns. That money was held in
11 that brokerage account and then shortly after it was wired out
12 to the Amerindo operating account -- portions of it was wired
13 out to the operating account. The rest was divided up into
14 other wires to Alberto Vilar's personal checking account and
15 also to another wire going overseas. And the wire that went to
16 Alberto Vilar's personal checking account was, later he --
17 Alberto Vilar had sent out checks to pay for personal expenses
18 and make charitable donations.
19 Q. And this is information you provided postal inspectors
20 during the briefing?
21 A. Yes.
22 Q. What, if anything, did you explain to the postal inspectors
23 during the briefing about an entity or product calls Rhodes
24 Capital?
25 A. I also informed the inspectors that this particular
               SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                    48
       6775VILH           Fraterrigo - direct
1  investor provided -- also invested in an entity calls Rhodes
2  Capital and that she was not -- this investor was not able to
3  redeem her investments.
4  Q. And, did you provide the postal inspectors during the
5  briefing, with the name of that investor?
6  A. Yes, I did. Her name is Lily Cates.
7  Q. What, if anything, did you tell the inspectors during the
8  brief about guaranteed fixed rate deposits?
9  A. I told the inspectors that there was another investor who
10 was a very long-time friend and good friend of Alberto Vilar,
11 invested approximately $11 million in guaranteed fixed rate
12 deposits, her name was Lisa Mayer. And her family is Herbert
13 Mayer and Deborah Mayer, the Mayer family.
14 Q. What, if any things, did you explain to the postal
15 inspectors during the briefing about specific account
16 information that was covered by the search warrant?
17 A. I explained to the postal inspectors that the two
18 individuals, Gary Tanaka and Alberto Vilar, used the Bear
19 Stearns brokerage accounts and used the Chase Manhattan Bank,
20 JP Morgan Chase bank accounts to wire money back and forth.
21 Q. What, if anything, did you tell the postal inspectors about
22 an account in the name of PTC?
23 A. I explained to the inspectors that the money was -- some
24 portions of money that was in the brokerage account was wired
25 to an offshore account to an account called PTC, Private Trust
               SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                    49
       6775VILH           Fraterrigo - direct
1  Company, in the Bahamas.
2           MR. HOFFMAN: Your Honor, I'm going to object at this
3  point. I have no objection to a question what did you say, but
4  as opposed to telling her -- as opposed to leading her into
5  each thing saying what did you say about that. I would like
6  her memory as to what did you say.
7           THE COURT: Overruled.
8           Go ahead.
9  BY MS. McEVOY::
10 Q. What, if anything, did you explain to the postal inspectors
11 about the charges against Gary Tanaka?
12 A. I explained that Gary Tanaka was charged with wire fraud
13 and that investors' money that was held in the Bear Stearns
14 brokerage account was being wired out to purchase horses.
15          There were several horses that were in the complaint
                              Page 22

7-7-06 hearing transcript.txt
16  and that if, you know, while they're conducting the search if
17  they came across any material involving any wire transfers, to
18  look for any purchase agreements or any documentation
19  surrounding the wire transfers.
20  Q.  What, if anything, did you distribute to the postal
21  inspectors during the briefing?
22  A.  I distributed the search warrants to the inspectors and the
23  search warrant affidavits to the inspectors that were
24  conducting the search.
25          And I distributed the arrest warrants and the
            SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                    50
    6775VILH                Fraterrigo - direct
 1  complaints to the inspectors that were participating in the
 2  arrests.
 3  Q.  At what point were the complaints and search warrants and
 4  affidavits distributed during the briefing?
 5  A.  Toward the end of the briefing.
 6  Q.  What, if anything, did you see the postal inspectors do
 7  with the documents you handed out?
 8  A.  I recall them reading, going through it, and asking
 9  questions.
10  Q.  And, with respect to you recall them reading, how did you
11  know they were reading?
12  A.  I observed them going through the documents, reviewing the
13  warrants in the affidavits.
14  Q.  Did you distribute the complaints to all the postal
15  inspectors?
16  A.  No, I did not.
17  Q.  Why not?
18  A.  It was based on my past experience with search warrants
19  the -- I failed to give it -- it was an oversight that I should
20  have given the complaints to all the inspectors.  At the time I
21  didn't realize that the -- I didn't remember that the
22  complaint -- that the search warrant referred to the complaint
23  as an attachment.
24          I have always been accustomed to having a search
25  warrant that incorporates the language of the complaint in the
            SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                    51
    6775VILH                Fraterrigo - direct
 1  actual search warrant affidavit and in this instance I
 2  separated the two and did not think it -- did not recall it was
 3  referred to in this search warrant affidavit.
 4  Q.  What, if any instructions, did you give to the inspectors
 5  when you handed out the search warrants and affidavits?
 6  A.  I explained to them to read it over and that if they had
 7  any questions, that I would be at the search site later in the
 8  morning or early afternoon and, if they had any questions, they
 9  can ask myself or Inspector John Feiter.
10          I also explained to them while they were conducting
11  the search to pay attention to the inventory sheets.  In our
12  inventory sheets it lists the items that are seized and not to
13  generalize the item that they were seizing as a business record
14  or corporate record and to specifically indicate what it is:
15  The name of the file, the name of the item or a better.  A
16  detailed description of the item on the inventory sheet.
17  Q.  You mentioned that there were questions from postal
18  inspectors at the briefing or after the briefing?
19  A.  Yes, there were.
20  Q.  Do you recall the nature of the questions that the postal
21  inspectors asked you after the briefing?
22  A.  I recall there were several questions but I don't recall
                              Page 23

```
                    7-7-06 hearing transcript.txt
23   all of them what were said.
24          The few that I do remember was there was a question
25   about Gary Tanaka and the horses. The inspector asked me what
              SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                    52
     6775VILH              Fraterrigo - direct
 1   in particular would -- what particular documents should we --
 2   should they focus on while they were conducting a search on
 3   that -- on his horses. And I explained to them that the charge
 4   in the complaint was that Gary Tanaka was charged with wire
 5   fraud and he was purchasing horses from brokerage accounts and
 6   that money belonged to investors and if they found any
 7   documentation surrounding that wire transfer to purchase a
 8   horse and any purchase agreements or ownership papers, that
 9   they should focus on that and that should be seized.
10   Q.  Do you recall the nature of any of the other questions that
11   postal inspectors asked after the briefing?
12   A.  I recall there was another question about Alberto Vilar and
13   his charitable donations.
14          I made mention that Alberto Vilar was donating to
15   several opera houses around the world and that in this -- in
16   the complaint he was charged with -- charged with making a
17   charitable donation with investors' money.
18   Q.  After the briefing, what did you do?
19   A.  After the briefing, I left with Postal Inspector Kurt
20   Roinestad to the Lombardi Hotel to arrest Gary Tanaka.
21   Q.  Did there come a time that day when you arrived at
22   Amerindo's offices at 399 Park Avenue?
23   A.  Yes.
24   Q.  Approximately when did you arrive at 399 Park Avenue?
25   A.  That was approximately around lunchtime, around noon.
              SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                    53
     6775VILH              Fraterrigo - direct
 1   Q.  Who was at the location when you arrived?
 2   A.  I recall seeing John Feiter, my supervisor; postal
 3   inspectors from my team; postal inspectors from another fraud
 4   team; Amerindo employees; and I later learned Amerindo's
 5   attorney, Eugene Licker.
 6   Q.  Was that at the location?
 7   A.  That was at the location, yes.
 8   Q.  After you arrived at the location who, if anyone, did you
 9   speak with?
10   A.  I spoke with my team leader and he informed me that Eugene
11   Licker, the attorney for Amerindo, was present.
12          He also informed me that other inspectors from another
13   fraud team came to assist in the search and that they did not
14   search Alberto Vilar's office and that they left it for me to
15   search it.
16   Q.  And when you say "they" who is they?
17   A.  The postal inspectors. John also.
18   Q.  After speaking to your team leader, what did you do next?
19   A.  After I spoke with him I walked around the office, you
20   know, observed postal inspectors searching in desks, cabinets,
21   inventorying items, going through documents and binders.
22          I walked around the back of the office. I observed
23   the computer, forensic inspectors conducting images of the
24   computers, and I observed the Amerindo employees sitting at the
25   receptionist area.
              SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                    54
     6775VILH              Fraterrigo - direct
 1   Q.  What, if anything, did you observe postal inspectors
                              Page 24
```

```
                          7-7-06 hearing transcript.txt
  9     but I felt that they were not useful to the investigation.
 10     Q.   Would it be accurate to say that when you made an
 11     application to seize documents it was your understanding that
 12     you were -- one of the things you were swearing to was to seize
 13     documents that were evidence of criminality, correct?
 14     A.   Yes.
 15     Q.   When this attachment A says investment brochures, it
 16     doesn't describe any particular kind of investment brochure,
 17     correct?
 18     A.   No, it does not.
 19     Q.   It is just a broad statement of investment brochures which
 20     can cover lots of kinds of documents, right?
 21     A.   That's correct.
 22     Q.   So, this statement that there is probable cause to seize
 23     all kinds of investment brochures and that would mean probable
 24     cause that these things would show criminality, or be evidence
 25     of criminality was incorrect, right?
                      SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                             147
        6775VILH                    Fraterrigo - cross
  1     A.   I'm sorry.  Can you repeat that?
  2     Q.   When you swore that there was probable cause to seize any
  3     and all investment brochures not limited here, just investment
  4     brochures on the premises and that they would be evidence of
  5     criminality, that's incorrect, as you stated earlier, correct?
  6     A.   Well, as I -- the reason why I didn't hear you the first
  7     time is because I was reading it.  There is a sort of limiting
  8     factor here because it is sent to or received from clients.
  9          The investment brochures that I reviewed at Amerindo
 10     when I made a determination to leave was not investment
 11     brochures that were sent to or received from clients.  These
 12     were investment brochures that were sent to Amerindo to invest.
 13     These were companies that wanted Amerindo to invest in them or
 14     giving them a company profile.
 15     Q.   Where are you reading from when you say sent to or received
 16     from clients?
 17     A.   Here, paragraph 4, it says:  Currently informed client
 18     list, client files, investment brochures, marketing materials,
 19     investment advisory agreements, copies of correspondence sent
 20     to, from, including --
 21             THE COURT:  When you read, read slow.
 22     A.   -- including redemption requests received from clients.
 23     Q.   Got it.
 24             Now, let me ask you this.  You understood that
 25     Amerindo had been in business for at least over 20 years,
                      SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                             148
        6775VILH                    Fraterrigo - cross
  1     right?
  2     A.   Yes.
  3     Q.   You understood that Amerindo had numerous institutional
  4     clients, correct?
  5     A.   That's correct.
  6     Q.   And so, are you saying that you had probable cause when you
  7     swore that you did, to seize investment brochures that had been
  8     sent to or received from 20 years' worth of institutional
  9     clients?
 10     A.   Yes.
 11     Q.   Tell me that probable cause.  Tell me what it was.
 12     A.   There are two investors that were, had a relationship with
 13     Alberto Vilar and Amerindo for approximately 20 years --
 14     Q.   And, other than those two investors --
 15             THE COURT:  Please don't interrupt the witness.
                                  Page 66
```

```
                          7-7-06 hearing transcript.txt
16              MR. HOFFMAN:  Sorry.  Withdrawn.
17              THE WITNESS:  They had a 20 year relationship and, you
18   know, I had probable cause to believe that there could be other
19   investors.
20   BY MR. HOFFMAN::
21   Q.   Tell me what probable cause you had to believe that
22   investment brochures sent to or from the Los Angeles Fire and
23   Police Department were evidence of criminality?
24   A.   I -- my understanding at the time was that I had probable
25   cause and I still believe to this day I had probable cause to
                    SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                        149
     6775VILH                   Fraterrigo - cross
 1   seize any investment brochures from 20 years ago.
 2   Q.   I'm asking you from the Los Angeles Fire and Police
 3   Department.
 4   A.   That's from the mutual fund.  They're from the U.S. Mutual
 5   Fund, if I understand you.
 6   Q.   Right, and U.S. Mutual Funds' offices were at Park Avenue,
 7   correct?
 8   A.   That's correct.
 9   Q.   And so, what probable cause was there to take investment
10   brochures that were seized to and/or from -- sent to or
11   received from the Los Angeles Fire and Police Department?
12   A.   It was a -- probable cause that I had was these two
13   investment advisors were, failed to redeem two investors, and
14   my understanding was that there was other -- I had other
15   information to believe that I had reason and probable cause at
16   the time to seize any items from that fund.
17   Q.   How about from the Bayer Corporation?
18   A.   I'm sorry?
19   Q.   The Bayer Corporation, another client of the fund, did you
20   have probable cause to believe that you could seize investment
21   brochures that were sent to and from the Bayer Corporation to
22   Amerindo Investment Advisors, the registered investment
23   advisory company?
24              THE COURT:  B-A-Y-E-R?
25              MR. HOFFMAN:  Correct.
                    SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                        150
     6775VILH                   Fraterrigo - cross
 1              THE COURT:  The aspirin?
 2              MR. HOFFMAN:  Yes, sir.
 3   A.   I don't think I had probable cause to seize anything out of
 4   that.
 5   Q.   How about Johnson and Johnson.
 6   A.   No.
 7   Q.   City of Seattle Employees' Retirement?
 8   A.   No.
 9   Q.   City of Stanford Employees' Retirement?
10   A.   No.
11   Q.   Whirlpool Corporation?
12   A.   No.
13   Q.   And if I went down a list of a hundred or so other, other
14   than the two individuals you have mentioned but institutional
15   entities like this that were, whose records were housed at the
16   Park Avenue office and who were clients of Amerindo Investment
17   Advisors, Inc., the registered investment advisory company,
18   would it be accurate to say you had no probable cause to seize
19   their -- I will use the specific words -- investment brochure
20   sent to or gotten from them, correct?
21              MS. MCEVOY:  Your Honor, the government would just
22   object to Mr. Hoffman's testimony on that issue.
                                  Page 67
```

```
                         7-7-06 hearing transcript.txt
       23            THE COURT:  Overruled.
       24            THE WITNESS:  No.
       25   BY MR. HOFFMAN::
                         SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                             151
            6775VILH                   Fraterrigo - cross
        1   Q.  No, meaning that's correct?
        2   A.  That's correct.
        3   Q.  You also asked in paragraph 4 of attachment A for marketing
        4   materials.  What did you mean by that?
        5   A.  Marketing materials?
        6   Q.  Yes.
        7   A.  Any marketing materials from Amerindo, any marketing
        8   materials regarding any of their investments or funds.
        9   Q.  So, when you say marketing materials, you mean any
       10   materials that are sent out to clients or potential clients
       11   that describe what they do, what Amerindo does?
       12   A.  That's what I believed it was, yes.
       13   Q.  And, Amerindo Investment Advisors, Inc., the reason I keep
       14   repeating is of course because you have lumped all the Amerindo
       15   into one so I am sticking with one now, Amerindo Investment
       16   Advisors, Inc., the licensed U.S. investment advisory company;
       17   you've stated a moment ago that you were aware that they had a
       18   lot of institutional clients, correct?
       19   A.  Yes.
       20   Q.  And, would it be accurate to say that you had no probable
       21   cause to seize marketing material from that entity that would
       22   have been sent to all of these institutional clients over 20
       23   years, correct?
       24   A.  That's correct.
       25            If it's not in the warrant, it wasn't seized.  It
                         SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                             152
            6775VILH                   Fraterrigo - cross
        1   wasn't covered.  It wasn't covered.
        2   Q.  Well, the warrant says marketing materials.  It doesn't
        3   say -- it doesn't limit it as to who they were sent to.  It
        4   says marketing materials sent to or received from clients.
        5   A.  That's correct.
        6   Q.  And my question to you is, of the dozens if not hundreds of
        7   institutional clients that this would cover for Amerindo
        8   Investment Advisors, Inc. U.S., licensed investment advisory
        9   company, you had zero probable cause to seize marketing
       10   materials sent to or from those clients, correct?
       11   A.  That's correct.
       12   Q.  It also says investment advisory agreements from clients,
       13   or to or from clients; and the same would be true that you
       14   would have no probable cause -- zero -- to seize investment
       15   advisory agreements between the licensed investment advisor
       16   Amerindo U.S. and Amerindo Investment Advisors U.S. and all the
       17   institutional clients it has had over a 20 year period,
       18   correct?
       19   A.  That's correct.
       20   Q.  And, you have asked for all correspondence, copies of
       21   correspondence sent to or received from clients, and the same
       22   would be true that you have no probable cause to seize copies
       23   of correspondence between the licensed Amerindo Investment
       24   Advisors, Inc., U.S., the licensed investment advisory company
       25   and, let's say, the 20 years' worth of institutional clients
                         SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                             153
            6775VILH                   Fraterrigo - cross
        1   that it had, correct?
                                     Page 68
```

```
                     7-7-06 hearing transcript.txt
 2    A.  That's correct.
 3    Q.  Did you ever tell the people who you briefed on what they
 4    were allowed to seize that they were not allowed to seize any
 5    of the various documents I just went over with you as it
 6    related to clients of institutional clients of Amerindo
 7    Investment Advisors, Inc., the American licensed company?
 8    A.  No, I did not.
 9    Q.  Would it be accurate to say that any of the other
10    paragraphs in attachment A that refer to generic-type documents
11    as I just read to you, broadly described documents that were
12    between Amerindo Investment Advisors, Inc., the licensed
13    American registered investment advisory company, and its 20
14    years' worth of institutional clients, you had no probable
15    cause for the seizure of those documents?
16             MS. McEVOY:  Your Honor, objection.  Just ambiguous
17    question.
18             MR. HOFFMAN:  I can go through it.
19             THE COURT:  Go ahead, Mr. Hoffman.
20             MR. HOFFMAN:  Okay.
21    Q.  Sticking with paragraph 4 you also asked for other
22    documents -- if you look at paragraph 4, after you asked for
23    the documents we just discussed concerning those that were sent
24    to or received from client, you then go on and say:  And other
25    documents concerning or reflecting the identities of and
                    SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                     154
      6775VILH                    Fraterrigo - cross
 1    communications with clients who have investments in the
 2    Amerindo brokerage account.
 3              Do you see that?
 4    A.  Yes.
 5    Q.  Would it be accurate to say that there was no probable
 6    cause to seize documents of any of the institutional clients of
 7    the licensed investment advisor Amerindo Investment Advisors,
 8    Inc., U.S., that had investments in Amerindo brokerage
 9    accounts, is that correct?
10    A.  Yes, that's correct.
11    Q.  And it would be equally correct to say that you never told
12    that to any of the agents who executed the search warrant that
13    those documents, there was no probable cause for and they
14    shouldn't take them, correct?
15    A.  That's correct.
16    Q.  Would it be equally correct that nowhere in your
17    submission, in your sworn affidavit, do you state that there
18    are 20 years' worth, give or take, of institutional clients of
19    Amerindo Investment Advisors, the licensed U.S. company, whose
20    documents should not be taken?
21    A.  I didn't put that in my affidavit.
22    Q.  And, in fact, nowhere in your affidavit do you even say
23    that there are such clients?
24             MS. McEVOY:  Your Honor, objection for -- based on
25    your earlier rulings of what is not in the affidavit.
                    SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                     155
      6775VILH                    Fraterrigo - cross
 1             THE COURT:  Overruled, because that has to do with
 2    something different.  You are talking about a relationship
 3    between what has been sought or not sought and that's what we
 4    are going through --
 5             MR. HOFFMAN:  Correct.
 6             THE COURT:  -- and why?  Overruled.  Go ahead.
 7             THE WITNESS:  Can you repeat it?  I'm sorry.
 8    BY MR. HOFFMAN::
                                Page 69
```

7-7-06 hearing transcript.txt

```
 9  Q.  And, in fact, you never even state in your affidavit and
10  the attachment thereto that there are such institutional
11  clients as Amerindo U.S., the licensed Amerindo investment
12  advisory company that they exist, these institutional clients?
13          You never state that in the affidavit, is that
14  correct?
15  A.  That's correct.
16  Q.  Looking at paragraph 5 you ask for client lists, client
17  files, investment brochures, marketing materials, investment
18  advisory agreements, copies of correspondence sent to or
19  received from clients and other documents concerning or
20  reflecting the identities of an communications with clients who
21  have investments managed by Amerindo who receive redemptions
22  through or make investments through overseas bank accounts and
23  trust companies including PTC Management, Limited, and
24  Barclays.
25          Do you see that?
            SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                156
    6775VILH              Fraterrigo - cross
 1  A.  Yes.
 2  Q.  Did you have any probable cause to ask for client lists
 3  that would include, for example, any of the institutional
 4  clients of Amerindo U.S., the licensed investment advisors
 5  company, whose monies were so invested?
 6  A.  No.
 7  Q.  And that would be the same under that paragraph, you would
 8  have no probable cause to those clients to their client files,
 9  investment brochures, marketing materials, etc., correct?
10  A.  That's correct.
11  Q.  Now, in paragraph 6 you ask for documents reflecting all
12  investments in which Brian Harvey was involved, correct?
13  A.  That's correct.
14  Q.  And, again, you swear and state that you have probable
15  cause to seize all documents reflecting Brian Harvey's
16  investments, correct?
17  A.  That's correct.
18  Q.  And, what was the probable cause that you had, that you
19  swore you had concerning Brian Harvey?
20  A.  I had information to believe that this individual did
21  not -- attempted to redeem an investment, had trouble with his
22  investment.
23  Q.  Was that information you got from Brian Harvey?
24  A.  No, it was not.
25  Q.  Was that a document?
            SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                157
    6775VILH              Fraterrigo - cross
 1          MS. McEVOY:  Objection.
 2          THE COURT:  Sustained.
 3          Mr. Hoffman, if it is in the affidavit it is in the
 4  affidavit, fine, if she wants to point to something in the
 5  affidavit.  What's behind it, we're not going there.
 6          MR. HOFFMAN:  Thank you.
 7  Q.  Show me what in this affidavit supports probable cause that
 8  you swore you had that Brian Harvey documents reflecting
 9  investments should be seized; what probable cause you had --
10  I'm sorry -- what probable cause there was in these documents
11  that show that there was evidence of criminality concerning
12  Brian Harvey, on the premises at Park Avenue?
13  A.  Paragraph E of the affidavit.
14          THE COURT:  Which paragraph?  I'm sorry.
15          THE WITNESS:  E.
```

Page 70

```
                          7-7-06 hearing transcript.txt
16          THE COURT:  E.
17          MR. HOFFMAN:  Can I have one moment?
18          THE COURT:  Sure.
19   BY MR. HOFFMAN::
20   Q.  Are you talking about page 9?
21   A.  I'm sorry.  Page 5 of the affidavit, paragraph E.
22   Q.  Okay, there are two paragraph Es.  They're on different
23   numbers.  There is one on page 9.  But, on paragraph E you are
24   talking about page 5 where you state:  Cates told me about
25   other individuals who she believed to be investors with
                SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                     158
     6775VILH                  Fraterrigo - cross
 1   Amerindo.  Let's stop there.
 2          That is correct?
 3   A.  That's correct.
 4   Q.  So, that statement is that you were told by Cates that she
 5   believed as opposed to knew, is that what you are saying?
 6          MS. McEVOY:  Objection.
 7          THE COURT:  It speaks for itself.
 8          MR. HOFFMAN:  Okay.
 9   Q.  When you wrote down that you were told that she believed
10   was it your understanding, since it is your words, that that
11   meant she wasn't sure?
12          MS. McEVOY:  Objection.
13   A.  She believed.
14          THE COURT:  Sustained.  Sustained.  It speaks for
15   itself.
16   BY MR. HOFFMAN:
17   Q.  She believed to be invested with Amerindo, some of whom may
18   have had trouble redeeming all or part of their investment
19   including Brian Harvey.
20   A.  That's correct.
21   Q.  So, what you swore was your probable cause was a statement
22   that Brian Harvey may have been or was believed to potentially
23   have been an investor and may have had trouble redeeming all of
24   his shares.
25          Is that what are you telling us was your sworn
                SOUTHERN DISTRICT REPORTERS (212) 805-0300
                                                                     159
     6775VILH                  Fraterrigo - cross
 1   statement that that was probable cause?
 2   A.  It's in my affidavit was probable cause, yes.
 3   Q.  And there is nothing else in any of these submitted papers
 4   for this warrant concerning Brian Harvey, correct?
 5   A.  That's correct.
 6          MR. HOFFMAN:  If I can have another second, your
 7   Honor?
 8          THE COURT:  Sure.
 9          (Pause)
10   Q.  Going back to Exhibit A, paragraph 6 --
11          THE COURT:  Attachment A.
12   Q.  -- sorry -- where you say documents reflecting all
13   investments naming certain people including Brian Harvey; you
14   then say Joy Urich.
15          Do you see that?
16   A.  Yes.
17   Q.  So, you are aware that you have probable cause to seize
18   documents reflecting investments of Joy Urich.  Is that right?
19
20   A.  Yes.
21   Q.  And your understanding, again, was that you have probable
22   cause to believe that there are documents that are at the Park
                                  Page 71
```