Exhibit K

1

```
        67arvilh
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA
3
4               v.                        05 Cr. 621 (KMK)
4
5    ALBERTO VILAR                        Hearing
5    GARY TANAKA,
6               Defendant.
6    ------------------------------x
7                                         New York, N.Y.
7                                         July 10, 2006
8                                         9:45 a.m.
8    Before:
9
9         KENNETH M. KARAS
10                                        District Judge
10
11   MICHAEL J. GARCIA
11   United States Attorney for the
12   Southern District of New York
12        One St. Andrew's Plaza
13        New York, N.Y.  10007
13   DEIRDRE A. McEVOY
14   MARC O. LITT
14        Assistant United States Attorneys
15
15   JEFFREY C. HOFFMAN, ESQ.
16   SUSAN C. WOLFE, ESQ.
16   Attorneys for Defendant Vilar
17        Hoffman & Pollik, LLP
17        260 Madison Avenue, 22nd Floor
18        New York, New York  10016
18        (212) 679-2900
19
19   GLENN C. COLTON, ESQ.
20   Attorney for Defendant Tanaka
20        Wilson Sonsini Goodrich & Rosati (NYC)
21        12 East 49th Street, 30th Floor
21        New York, New York  10017
22        (212) 999-5804
22
23   STEVEN G. KOBRE, ESQ.
23   Attorney for Defendant Tanaka
24        Kobre & Kim LLP
24        800 Third Avenue
25        New York, New York  10022
25        (212) 488-1200
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

2

        67arvilh

15  Q.  What I am asking you is, other than paragraph 6A, there is
16  nothing else in your submission to the magistrate to support
17  your belief that there was probable cause to show that the
18  Mayers invested in Amerindo U.S., correct?
19  A.  That's correct.
20  Q.  On page 4, paragraph B as in "boy," you describe an
21  investment made by Lily Cates of a million dollars in or about
22  1988, correct?
23  A.  That's correct.
24  Q.  Do you anywhere in this affidavit describe that as a result
25  of that million-dollar investment made in or about 1988 by Lily

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

67arvilh              Fraterrigo - cross
1   Cates, she withdrew 6 to $7 million from, quote-unquote, any of
2   the Amerindo entities?
3   A.  No.
4   Q.  Did you intentionally leave that information out?
5           MS. McEVOY:  Objection.
6           THE COURT:  Overruled.
7   A.  No.
8   Q.  On page 6, paragraph F as in Frank, which begins on the
9   bottom of page 5, if you go four lines down on the bottom of
10  page 6, you state, "Tens of millions of dollars were being
11  funneled to overseas accounts."  Do you see that?
12  A.  On page 6?
13  Q.  6, four lines down from the top.
14  A.  Yes.
15  Q.  Can you describe what you meant by the word "funneled."
16          MS. McEVOY:  Objection.
17          THE COURT:  Overruled.
18  A.  Transferred.
19  Q.  Did you use the word "transferred" in other places in the
20  affidavit?
21  A.  I believe so.
22  Q.  Can you tell us why you didn't use it there.
23  A.  I don't know.  I don't recall.
24  Q.  Was it your choice to put in the word "funneled" or was
25  that put in by whoever made up the affidavit?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

67arvilh              Fraterrigo - cross
1   A.  It wasn't my choice.
2   Q.  If you look at page 6, in the same paragraph, the next to
3   the last line of that paragraph, you say there is reason
4   to be concerned that other investors are likewise being
5   victimized by Vilar and Tanaka.  Do you see that?
6   A.  Yes.
7   Q.  You understood when you signed this sworn affidavit, did
8   you not, that there is a significant different between the
9   standard described here, "reason to be concerned," as opposed
10  to the much higher standard probable cause, correct?
11  A.  That's correct.
12  Q.  So you knew that the reason you used the term "reason to be
13  concerned that other investors are likewise being victimized by
14  Vilar and Tanaka" was because you didn't have probable cause to
15  believe that other victims -- excuse me -- that other investors
16  were being likewise victimized by Vilar and Tanaka, correct?

17  A.  I felt this was a reason to be concerned, as it is worded
18  in the affidavit.
19  Q.  Had you had probable cause to believe that other investors
20  were being victimized had you had information that went to that
21  higher level, then you would have used that term if, you had
22  it, correct?
23  A.  That's correct.
24  Q.  If you would looked page 7, paragraph numbered 8, you
25  state, the fourth line from the bottom of paragraph number 8,

                                                                    19
      67arvilh           Fraterrigo - cross
 1  based on your training and experience, you know that
 2  individuals involved in financial fraud schemes like that
 3  described above frequently maintain at their places of business
 4  for substantial periods of time records and materials which
 5  evidence the operation of such schemes.  Do you see that?
 6  A.  Yes.
 7  Q.  The investigation that you had been doing had revealed to
 8  you, had it not, at the time that you made this affidavit and
 9  as described in this affidavit (1) that there were guaranteed
10  fixed rate deposits that certain people said they cannot redeem
11  their money from -- correct?
12  A.  Correct.
13  Q.  -- and (2) that Lily Cates indicated she had invested a
14  million dollars in 1988, approximately, and then later 5
15  million in what was to be an SBIC investment, correct?
16          MS. McEVOY:  Your Honor, no objection as to what is in
17  the affidavit, but to the extent that Mr. Hoffman's question is
18  going beyond that.
19          THE COURT:  Let's wait until he gets there.  That is
20  what is in the affidavit.
21  Q.  That is what is in the affidavit, correct?
22  A.  Yes, that's correct.
23  Q.  Have you ever had any prior experience, as you described in
24  the line I just read to you, concerning other, quote-unquote,
25  frauds that involved guaranteed fixed-rate deposits?

                                                                    20
      67arvilh           Fraterrigo - cross
 1  A.  No.
 2  Q.  Or that involved SBIC investments?
 3  A.  No.
 4  Q.  In paragraph number 9 on page 7 you say there is probable
 5  cause to believe that the following records and
 6  instrumentalities of the fraudulent schemed described above and
 7  other evidence related to and evidencing such crimes are
 8  located at the premises.
 9          Other than Lily Cates having told you that at some
10  time between 2002 and 2004, as stated in your affidavit, she
11  had been at the premises on Park Avenue and had seen
12  approximately 80 boxes that she said Mr. Vilar told her had
13  information that would be used in evaluating her investment --
14  are you with me?
15  A.  Yes.  I am just making sure that is what is in the
16  affidavit.
17  Q.  Let me ask you this.  Do you remember putting that in the
18  affidavit?

(212) 805-0300

29

67arvilh                Fraterrigo - cross
1  about information showing that you had information concerning
2  the Mayers guaranteed fixed-rate deposits, correct?
3  A.  Yes.
4  Q.  In the document you show information concerning two
5  investments by Lily Cates, one in an SBIC fund, correct?
6  A.  That's correct.
7  Q.  And the other in Rhoades Capital, correct?
8  A.  That's correct.
9  Q.  Other than those three specific investments, isn't it true
10 that you put nothing in the documents that you submitted to the
11 magistrate to show any probable cause as to believe that there
12 was any criminality concerning any other of the many
13 investments of the various Amerindo companies?
14 A.  That's correct.
15 Q.  Was there anything preventing you, when you submitted this
16 affidavit and used the term "investment brochures," to limit
17 that description to say investment brochures concerning Rhoades
18 Capital, SBIC, and guaranteed fixed-rate deposits?
19 A.  No.
20 Q.  Next, when you say "marketing materials," did you mean by
21 "marketing materials," as you said a moment ago you meant by
22 "investment brochures," all marketing materials from all the
23 Amerindo companies?
24 A.  That's correct.
25 Q.  By "marketing materials," we are talking about documents
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

30

67arvilh                Fraterrigo - cross
1  and/or; it doesn't have to just be documents, right?  It could
2  be DVD's or other things that describe and explain the various
3  companies of Amerindo and what they do, correct?
4  A.  That's correct.
5  Q.  Again, other than the three investments we just
6  described -- SBIC, Rhoades Capital, and guaranteed fixed-rate
7  deposits -- would it be accurate to say that you put no
8  information in the documents put before the magistrate to
9  support probable cause to believe that any of the other various
10 things that the Amerindo companies did for which they would
11 have marketing materials, that there was any illegality,
12 correct?
13 A.  That's correct.
14 Q.  Again, was there anything limiting you when you signed this
15 affidavit and used the term "marketing materials" to describe
16 the marketing materials and those concerning certain specific
17 situations?
18 A.  No.
19 Q.  Investment advisory agreements, the next category.  There
20 is nothing in the documents that you put before the magistrate
21 to get the search warrant that contains any information
22 concerning investment advisory agreements between Amerindo U.S.
23 and all of its institutional clients, correct?
24 A.  That's correct.
25 Q.  There is nothing in the information you put before the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

31

```
        67arvilh              Fraterrigo - cross
 1  magistrate that talks about any of the investment advisory
 2  agreements between any of the other Amerindo companies and any
 3  of their clients other than Cates, Mayer, Urich, Marcus, and
 4  Harvey, correct?
 5  A.  That's correct.
 6  Q.  So isn't it accurate that you had no probable cause that
 7  you put into the documents submitted before the magistrate
 8  concerning any investment advisory agreements or any wrongdoing
 9  involving investment advisory agreements with all the various
10  Amerindos, with all their various other clients other than the
11  five I just mentioned, correct?
12  A.  That's correct.
13  Q.  Was there anything limiting you from describing in this
14  affidavit that you signed which investment advisory agreements,
15  specific investment advisory agreements I should say, that you
16  wanted?
17  A.  No.
18  Q.  Pardon me?
19  A.  No.
20  Q.  Next, you asked for copies of correspondence sent to or
21  received from clients.  That, just like all the rest of the
22  categories I described, is not limited by any date, correct?
23  A.  That's correct.
24  Q.  So you are asking for all of these things -- the client
25  lists, files, investment brochures, marketing materials,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
        67arvilh              Fraterrigo - cross
 1  investment advisory agreements, and copies of correspondence
 2  sent to or received from clients -- from the beginning of time
 3  until the time that you submitted this affidavit, correct?
 4  A.  From the beginning of time?
 5  Q.  From whenever they first came into existence.
 6  A.  Yes.
 7  Q.  Whether that was 10 years ago or 20 years ago or 30 years
 8  ago, correct?
 9  A.  That's correct, yes.
10  Q.  Isn't it accurate to say that other than five individuals
11  we have been mentioning -- maybe I can do it this way so I
12  don't have to keep repeating it -- the five individuals
13  mentioned in paragraph E, page 5, that you did not put any
14  information in the documents you submitted to the magistrate
15  that would support probable cause to get copies of
16  correspondence sent to or received from clients other than
17  those five from whenever those documents originated 10, 20, 30
18  years ago to the time that you submitted this affidavit,
19  correct?
20          MS. McEVOY:  Your Honor, objection.  There aren't five
21  individuals listed in paragraph E.  The government has no
22  objection to the general question.
23          MR. HOFFMAN:  I'm sorry.  That's correct.
24  Q.  From now on, when I say "the five individuals," I am
25  referring to Cates, Mayer, Brian Harvey, Joy Urich, and Paul
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

```
        67arvilh              Fraterrigo - cross
 1  Marcus.  Got that?
```

2   A.   Yes.
3   Q.   One of them was not listed in paragraph E, that's correct.
4   So I will repeat the question.  Isn't it accurate to say that
5   you put no information in your submission to the magistrate for
6   this warrant that would support probable cause to seize copies
7   of correspondence sent to or received from clients other than
8   those five from whenever the material originated 10, 20, 30
9   years ago to the date you filed this, correct?
10  A.   That's correct.
11  Q.   Once again, it would be correct that there was nothing
12  limiting you, nothing restricting you from being specific as to
13  the specific clients whose copies of correspondence you wanted,
14  correct?
15  A.   That's correct.
16  Q.   The same answer would be forthcoming from you regarding the
17  next category of other documents, correct?
18  A.   That's correct.
19  Q.   If you would look at paragraph B as in "boy" on page 8.
20  There you ask for documents concerning specific entities, to
21  wit, Bear Stearns, Amerindo Management, Inc., Sub ACM 26, which
22  you then call AM1, Amerindo Technology Growth Fund, Inc.,
23  Amerindo Technology Growth Fund II, Inc., and Techno Raquia
24  S.A., and you call those collectively the Amerindo brokerage
25  accounts, correct?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              34
    67arvilh            Fraterrigo - cross
1   A.   That's correct.
2   Q.   Is the reason you specifically state those entities that
3   you referred to as the Amerindo brokerage accounts because
4   those are the only brokerage account entities that you put
5   information in this affidavit for that would support probable
6   cause to take the documents underlying those accounts?
7            MS. McEVOY:  Objection.
8            THE COURT:  Sustained.
9   Q.   Would it be accurate to say that other than in those
10  accounts, in your view, there is no information in your
11  submission to the magistrate for this warrant that would
12  support probable cause for any other brokerage account
13  documents than the ones named in paragraph B as in "boy"?
14  A.   That's correct.
15  Q.   This is redundant, but to be clear, because my own question
16  was a little hazy, what you have just sworn to is that other
17  than these named brokerage accounts in paragraph B as in "boy"
18  on page 8, there was no information in the documents you
19  submitted to the magistrate that would support probable cause
20  of wrongdoing concerning any other brokerage accounts, correct?
21  A.   That's correct.
22           MR. HOFFMAN:  May I have one moment, your Honor?
23           THE COURT:  Of course.
24  Q.   Looking at the paragraph we were just talking about, page
25  8, paragraph B as in "boy", would it be accurate to say that

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              35
    67arvilh            Fraterrigo - cross
1   Amerindo Internet Fund is not mentioned there.
2   A.   That's correct.
3   Q.   Let me show you what is being taken from the box labeled

```
 4    A01144105, one of the boxes that you supplied to us with
 5    documents taken from the Amerindo offices on Park Avenue.
 6              MR. HOFFMAN:  May I approach, your Honor?
 7              THE COURT:  You may.
 8    Q.  Let me ask you to look at that and tell me if those
 9    documents seized are from an entity not named in paragraph B as
10    in "boy", "Amerindo Internet Fund."
11    A.  That's correct.
12    Q.  Parenthetically, if there are documents of brokerage
13    accounts.
14    A.  Yes, but it is covered on another paragraph in the
15    affidavit.
16    Q.  Did you not tell us a moment ago that other than those
17    brokerage accounts named in paragraph B, did you not tell us
18    this two minutes ago that you did not have probable cause --
19    A.  I did not submit probable cause.
20    Q.  You did not submit probable cause in the affidavit
21    concerning any other brokerage accounts, correct?
22    A.  That's correct.
23    Q.  From the same box I am bringing you --
24              MR. HOFFMAN:  If I may approach, your Honor?
25              THE COURT:  You may.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

67arvilh              Fraterrigo - cross

```
 1    Q.  -- documents seized by the government from an entity,
 2    brokerage account, called Dextra, D as in "dog" E-X-T as in
 3    "Tom" R-A II.  I ask you to look at that and tell me if in fact
 4    that is a file with brokerage accounts from an entity called
 5    Dextra II.
 6    A.  That's correct.
 7    Q.  Again, that is not one of the entities named in paragraph
 8    B, page 8, that we just talked about, correct?
 9    A.  That's correct.
10    Q.  That would fall into the category, as you said a moment
11    ago, of brokerage accounts other than those named in paragraph
12    B for which you did not submit probable cause in the affidavit,
13    correct?
14    A.  That's correct.
15    Q.  Let me show you from the same box of documents seized by
16    the government a file for a company called O-L-A-F as in
17    "Frank" S as in "Sam" --
18              THE COURT:  Do you have a bunch of them?  Why don't
19    you show them all to her at once and move this along.
20              MR. HOFFMAN:  I think that's it from this box.
21              THE COURT:  OK.  You were spelling Olafson.  Go ahead.
22    Q.  O-L-A-F as in "Frank" S as in "Sam" O-N as in "Nancy."
23    Would this also be documents from a brokerage account not named
24    in paragraph B as in "boy" on page 8 and one of those accounts
25    for which you have told us there was no probable cause to seize
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

67arvilh              Fraterrigo - cross

```
 1    the documents?
 2    A.  That's correct, no.
 3    Q.  Correct?
 4    A.  I did not submit probable cause.
 5    Q.  You did not submit probable cause to seize these documents,
```

```
 6   correct?
 7   A.  Correct.
 8   Q.  Let me ask you this.  Since I am not prepared to do these
 9   in bulk, have you gone through the documents in the various
10   boxes that you supplied to the defense that were brought here
11   in court?
12   A.  Yes.
13   Q.  Would it be accurate to say that there are a number of
14   brokerage accounts in addition to the ones I just showed you
15   whose documents were received which accounts were not named in
16   paragraph B as in "boy" page 8 and for which there was no
17   probable cause submitted to the magistrate?
18   A.  They were seized, but they were seized under a different
19   paragraph of the affidavit.  I had authority to seize it.
20   Q.  I am not asking you whether or not there was a paragraph
21   that gave you authority to seize a whole bunch of things.  That
22   is not my question.
23   A.  OK.
24   Q.  My question is, as with the ones I just showed you, that
25   there are other brokerage accounts that were seized that are
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    38
67arvilh                Fraterrigo - cross

```
 1   not named in paragraph B as in "boy" on page 8 of the affidavit
 2   and for which, as with the others you just testified to, there
 3   was no probable cause to support the seizure, correct?
 4   A.  There was no probable cause in the --
 5   Q.  In the papers submitted to the magistrate?
 6   A.  That's correct.
 7   Q.  Thank you.  In the same paragraph B as in "boy," page 8, if
 8   you look three lines up from the bottom of that paragraph, you
 9   stated that there was probable cause to seize, quote, other
10   documents reflecting or relating to securities transactions
11   entered into on behalf of clients by any current or former
12   Amerindo entity, affiliate, principal, officer, and employee.
13   Do you see that?
14   A.  Yes.
15   Q.  Would it be accurate to say that other than the five
16   individuals previously mentioned, there was no probable cause
17   to seize documents reflecting or relating to securities
18   transactions entered into on behalf of clients other than those
19   five that was put before the magistrate, correct?
20   A.  That's correct.
21   Q.  And there was no probable cause that was put before the
22   magistrate to seize any documents other than concerning the
23   five individuals we have mentioned that involved any current or
24   former Amerindo entities, affiliates, principals, officers, and
25   employees, correct?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

                                                                    39
67arvilh                Fraterrigo - cross
```
 1   A.  That's correct.
 2   Q.  In terms of your instructions to the individuals executing
 3   the search warrant, would it be accurate to say that you never
 4   instructed them to limit their seizure of materials from the
 5   Park Avenue office to materials concerning the five individuals
 6   we have been talking about?
 7   A.  No, it did not.
```

```
 8   Q.  Would it be accurate to say that you never instructed the
 9   individuals who executed the search warrant that, other than
10   those five individuals, there was no probable cause in the
11   written material they had to support the seizure of any
12   materials other than for the five individuals we have named?
13   A.  No.
14   Q.  "No" meaning you never told them that?
15   A.  No.
16   Q.  I think you told us, did you not, that a number of the
17   individuals who were involved in the execution of the search
18   warrants had copies of the warrant and the underlying
19   affidavit, your affidavit, but not complaints concerning Vilar
20   and Tanaka, correct?
21   A.  That's correct.
22   Q.  In fact, and correct me if I am wrong, I think it was that
23   none of the officers, both inspectors, who were executing the
24   warrant had the Vilar and Tanaka complaints as part of the
25   paperwork they had when they were executing the warrant?
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    40
        67arvilh               Fraterrigo - cross
```
 1   A.  That's correct.
 2   Q.  So the totality of the paperwork they had, "they" meaning
 3   the officers executing the warrant, was your affidavit that we
 4   have just gone through and attachment A, which was a part of
 5   it, correct?
 6   A.  Yes.
 7   Q.  You told us that you answered questions of a number of the
 8   individuals who were executing the search warrant, correct?
 9   A.  Yes.
10   Q.  Did any of those individuals ask you, in words or
11   substance, since only five individuals were named in here,
12   should material referring to those five individuals be the only
13   material that they should take?
14   A.  I don't recall, no.
15   Q.  Did any of the postal inspectors who executed the warrant
16   ask you what time limitation they should look for when seizing
17   the documents, since there was none put in the material they
18   had in front of them?
19   A.  No, I don't recall.
20   Q.  When you say you don't recall, you don't recall anyone
21   asking you that?
22   A.  No, I don't recall.
23   Q.  Was it your instructions to the individuals who were
24   executing the search warrant that any and all material that
25   would come within the description of things to be seized
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    41
        67arvilh               Fraterrigo - cross
```
 1   contained in attachment A were appropriate to be seized?
 2   A.  I don't recall.
 3   Q.  You have just been shown some documents from various
 4   brokerage accounts not named on page 8, paragraph B, correct?
 5   A.  Yes.
 6   Q.  You also testified on Friday that after the defense sent in
 7   a notification of certain boxes that we wanted brought to
 8   court, you went through some of those boxes and culled out
 9   materials that you thought were improperly seized and sent
```

16  the government would like to reflect that Mr. Litt left the
17  courtroom during the portion of Inspector Fraterrigo's
18  testimony regarding what was told to her regarding the grand
19  jury subpoena.  But he has now returned to the courtroom.
20      THE COURT:  OK.  I thought maybe he had forgotten his
21  No. 2 pencil.  Go ahead, Mr. Hoffman.  How much longer do you
22  think you have?
23      MR. HOFFMAN:  You are the sixth person to ask me that.
24  I guess I am getting very boring.  About 45 minutes I should
25  think.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

67arvilh                  Fraterrigo - cross
1       THE COURT:  That's fine.  You all should be thinking
2   about when we are going to continue this, because even I
3   realize we are not going to finish today.
4       MR. HOFFMAN:  I did have one on that realm, one
5   hopefully time-saving aspect.  I asked about brokerage accounts
6   similar to the ones that we had put in evidence, and I received
7   an answer.  But I was wondering in terms of volume if it would
8   be a time saver, because I am thinking of the record as well,
9   rather than going through all of the other ones, if there would
10  be some way where we could just identify them by letter or
11  whatever the Court would suggest and make it a part of the
12  hearing.  I just don't want to take the time to continue to go
13  through those.  I just mention that to the Court.
14      THE COURT:  That is fine.  But even with that, we are
15  not going to finish today.  You all can think about it at lunch
16  and we will talk about it at the end of the day.
17      Go ahead, Mr. Hoffman.
18  BY MR. HOFFMAN:
19  Q.  If you look at page 8, paragraph D as in David of your
20  sworn affidavit submitted to the magistrate in this matter, you
21  will see on the bottom of page 8 paragraph D as in David is
22  part of the things you say you have probable cause for, to wit,
23  current and former client lists, client files, investment
24  brochures, marketing materials, etc.
25      I asked you certain questions and you gave me certain

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

67arvilh                  Fraterrigo - cross
1   answers to that, correct?
2   A.  Yes.
3   Q.  In the same vein, paragraph E on page 9 calls for client
4   list, client files, investment brochures, marketing materials,
5   investment advisory agreements, copies of correspondence sent
6   to or received from clients and other documents concerning or
7   reflecting the identities of and communications with clients.
8       Up to that point, that is basically the same
9   description of materials for which you say you have probable
10  cause that was in the prior paragraph, right?
11      MS. McEVOY:  Objection as to reading half the clause.
12      MR. HOFFMAN:  I am going to continue on.
13  Q.  I am saying up to that point it is the same description as
14  you had in the prior paragraph, right?
15  A.  That's correct.
16  Q.  Then it goes on to say, "concerning or reflecting the
17  identities of and communications with clients who have

18    investments managed by Amerindo, who receive redemptions
19    through or make investments through overseas bank accounts and
20    trust accounts."  Do you see that?
21    A.   Yes.
22    Q.   Would it be accurate to say, as it was for the other
23    paragraph, that other than the five named individuals we talked
24    about, you submitted no probable cause to the magistrate to
25    support the seizure of the documents I just described?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

67arvilh                    Fraterrigo - cross
1    A.   That's correct.
2    Q.   Again, there was nothing stopping you from more narrowly
3    describing these documents, for example, by saying as they
4    relate to those five individuals, correct?
5    A.   That's correct.
6    Q.   Paragraph H, bottom of page 9, for which you say there is
7    probable cause to seize documents reflecting any Amerindo
8    investment in guaranteed fixed-rate deposit accounts, including
9    lists of clients with investments in GFRDAs, account statements
10   reflecting investments in GFRDAs, documents reflecting the
11   holdings of any Amerindo entity in certificates of deposit or
12   government entities, and documents reflecting all securities
13   underlying any investment in GFRDA.
14          Would it be accurate to say again that other than the
15   five individuals mentioned, there was no information put in the
16   material put before the magistrate for the search warrant that
17   would support probable cause for this material called for in
18   paragraph H other than as to those five individuals, correct?
19   A.   That's correct.
20   Q.   Again, there was nothing stopping you from limiting or
21   circumscribing the description on a narrower basis, correct?
22   A.   That's correct.
23   Q.   Paragraph I, documents reflecting any private bank,
24   brokerage, or other account with any financial institution held
25   by Amerindo principals, including Alberto Vilar and Gary

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

51

67arvilh                    Fraterrigo - cross
1    Tanaka.  Isn't it a fact that you had no probable cause to
2    support the seizure of documents described in that paragraph as
3    to Amerindo principals other than Alberto Vilar and Gary
4    Tanaka?
5          MS. McEVOY:  Objection.
6          THE COURT:  Overruled.
7    A.   That's correct.
8    Q.   Going to paragraph J, documents reflecting or relating to
9    the cancellation of completed trades and rebooking of those
10   canceled trades in other accounts managed or controlled by
11   Amerindo.
12          Would it be accurate to say that you had no probable
13   cause -- withdrawn -- that there was no probable cause
14   submitted to the magistrate to seize documents referred to in
15   paragraph J that I just described concerning cancellation of
16   completed trades and rebooking of those canceled trades in
17   other accounts managed or controlled by Amerindo as to anyone
18   other than the five individuals mentioned, correct?
19   A.   That's correct.

20  Q.  Paragraph L, which calls for documents reflecting brokerage
21  accounts maintained by Amerindo at any broker-dealer other than
22  Bear Stearns & Company.  Would it be accurate to say that you
23  had not submitted any probable cause to the magistrate to
24  support the seizing of such documents concerning anyone other
25  than the five individuals mentioned?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

52

67arvilh                    Fraterrigo - cross
1  A.  That's correct.
2  Q.  Paragraph M as in "mother," bank account statements,
3  brokerage account statement, transaction records, wire transfer
4  instructions and records, copies of checks sent to or received
5  from client, notes, ledgers, cash receipt journals, deposit
6  tickets and records, and other documents reflecting or relating
7  to movements of funds into or out of the Amerindo brokerage
8  accounts.
9        Would it be accurate to say that there was no
10  information included in the material you submitted to the
11  magistrate that would support probable cause to take or get
12  documents at the Park Avenue premises concerning any entities
13  or people other than the five that you have mentioned, is that
14  correct?
15  A.  That's correct.
16  Q.  Paragraph N as in "Nancy," page 10, records of expenses
17  such as copies of checks and/or wires sent to landlords.  Would
18  it be accurate to say that there was no information submitted
19  to the magistrate that would support probable cause to take
20  copies of checks and/or wires sent to landlords?
21  A.  That's correct.
22  Q.  There would be no probable cause submitted to the
23  magistrate for records of expenses such as copies of checks
24  and/or wires sent to counsel, correct?
25  A.  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53

67arvilh                    Fraterrigo - cross
1  Q.  The same, there is no probable cause for that material sent
2  to accountants, correct?  Bottom of the page.
3  A.  That's correct.
4  Q.  Or to brokers?
5  A.  Correct.
6  Q.  Or to utility companies?
7  A.  That's correct.
8  Q.  Or to other organizations and individuals who provide goods
9  and services to Amerindo?
10  A.  That's correct.
11  Q.  Or corporation and government documents related to the
12  various entities with which Amerindo and Vilar conduct business
13  other than as to the five individuals?
14  A.  That's correct.
15  Q.  No probable cause put in the material put before the
16  magistrate for documents representing or reflecting
17  communication with accountants, correct?  No probable cause for
18  that, correct?
19  A.  If it is reflecting communications regarding the
20  individuals.
21  Q.  Other than the five individuals?

2   A.  Yes.
3   Q.  Excluding the five individuals, I asked you if in fact you
4   had no materials put before the magistrate that would give the
5   magistrate probable cause to have you seize these various
6   categories, and question after question you answered by saying
7   that's correct, exclusive of the five individuals there was no
8   material put before the magistrate to support probable cause to
9   seize those documents.  Do you remember those questions and
10  answers?
11  A.  Yes.
12  Q.  What I am asking you is that information which you just
13  gave us as to those categories where there was no information
14  put before the magistrate to support probable cause to seize
15  those documents, you had the same awareness at the time you put
16  the information before the magistrate, you knew at that time,
17  just as you have testified here under oath, that you were not
18  putting in the documents before the magistrate material to
19  support probable cause to seize those documents, correct?
20          MS. McEVOY:  Objection.
21          THE COURT:  Inspector, do you remember giving
22  testimony about client lists?
23          THE WITNESS:  Yes.
24          THE COURT:  And that there was probable cause.  You
25  said that there was not probable cause to get all the client

67arvilh              Fraterrigo - cross
1   lists, there were only some client lists that you had specific
2   information.  Do you recall that?
3           THE WITNESS:  Yes.
4           THE COURT:  The question is, is it a fact that you
5   knew you didn't have probable cause to get every client list at
6   the time you went and got the warrant?
7           MR. HOFFMAN:  Correct.
8           THE WITNESS:  That's correct.
9   Q.  That's correct?
10  A.  Mm-hm.
11  Q.  It would be the same for all the other things that we asked
12  you, the other categories, not just client lists, but we went
13  through many categories, correct?
14  A.  That's correct.
15          THE COURT:  Breaking point here?
16          MR. HOFFMAN:  Yes, sir.
17          THE COURT:  Let's break for lunch.  Come back at 2:15.
18  Everybody should give some thought to all your calendars.  I am
19  not going to eliminate summer vacations, but we do need to take
20  some more time to finish this one.
21          You are still on cross.
22          (Luncheon recess)
23                      AFTERNOON SESSION
24                         2:15 p.m.
25  CYNTHIA FRATERRIGO, resumed.
25

67arvilh              Fraterrigo - cross
1   CROSS-EXAMINATION (continued)
2   BY MR. HOFFMAN:

```
 3   Q.  Good afternoon, Inspector Fraterrigo.  You or some folks
 4   that assisted you brought over a number of things that we had
 5   talked about this morning, correct?
 6   A.  Yes.
 7   Q.  Let me give you what has been both designated 3501-L and
 8   Government Exhibit 54, which are your search warrant
 9   inventories.  At one point you had talked about or I had asked
10   you some questions about a bunch of red and black books.  I
11   think the number was nine.  N10 is the sheet designated, I
12   believe.  Do you have N10?
13   A.  Yes.
14   Q.  It says "9 black and red record" looks like "ledger
15   notebooks."
16   A.  Yes.
17   Q.  You said that you thought you looked at some, not all, and
18   you didn't remember certain specifics, correct?
19   A.  That's correct.
20   Q.  I have a box that was delivered here that says N10, and in
21   it I see seven -- I'm sorry -- I see nine red and black ledger
22   type books.  I am going to hold them up.  Are these the type
23   books you were referring to?
24   A.  Yes.
25   Q.  You also showed one black folder pad from N as in "Nancy"
```

```
67arvilh              Fraterrigo - cross
 1   10.  And I am holding up what I believe is what you were
 2   referring to.  Is that correct?
 3   A.  Yes.
 4   Q.  After the black folder pad, I am going to put an exhibit
 5   number on MM.  If I may approach, let me show you this.  Let me
 6   ask you to look at defense M as in "mother" M as in "mother"
 7   and tell me whether or not you have looked through that
 8   document before.
 9   A.  Yes, I have looked through it before.
10   Q.  Tell me whether or not that document bears any relevance,
11   any material in it, to any of the five people we have been
12   talking about.  And since we have taken a break, just for the
13   record, for the afternoon, the five people again, when I say
14   five people, the people I am referring are Cates, Mayer,
15   Harvey, Urich, and Marcus.
16          To perhaps speed this up, there is a document at the
17   beginning of this that is just a loose page.  If you look at
18   that, does it appear to you that that was a conference on some
19   type of technical material, that this book is simply notes
20   taken at that conference?
21          MS. McEVOY:  Objection.
22          THE COURT:  She can answer it.  Go ahead.
23   A.  There is a schedule of a conference, but I can't say if
24   these notes are all from this conference.
25   Q.  Then continue.
```

```
67arvilh              Fraterrigo - cross
 1          Have you looked through it?
 2   A.  Yes.
 3   Q.  Would it be accurate to say that there is nothing contained
 4   in defense M as in "mother" M as in "mother" that relates to
```

25   A.  No, I did not.  I am the case agent.  I am closely familiar
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              118
       67arvilh              Fraterrigo - cross
1   with the investigation.  I did not --
2   Q.  So you did not tell them?
3   A.  -- tell any other inspector to do that.
4   Q.  So even though you used that standard -- because you
5   thought that was appropriate, correct?
6   A.  Yes.  I felt I was capable to make that decision.
7   Q.  You did not educate the other people executing the search
8   warrant so that they could use the same standard, you did not
9   do that, correct?
10  A.  No, I did not.
11  Q.  I am going to show you an Exhibit T as in "Tom," defense
12  Exhibit double T as in "Tom," which is government-seized
13  property evidence tag labeled A01144298.
14          THE COURT:  Which, for the record, is a box.
15          MR. HOFFMAN:  It is a box.
16          THE COURT:  Presumably of documents, right?
17          MR. HOFFMAN:  Yes.
18  Q.  Showing you the box Defense Exhibit TT as in "Tom," would
19  you quickly take a look inside.
20  A.  Yes.
21  Q.  And tell me if there are not a number of files in there
22  that are just empty.
23  A.  That's correct.
24  Q.  Do you know if that box of empty files was taken that way
25  or if there was material in it that was taken out?
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              119
       67arvilh              Fraterrigo - cross
1   A.  I can't say for sure, but there might have been materials
2   inside that was taken out based on privilege.
3   Q.  How would we know that if that were the case?
4   A.  I would have to review the privilege boxes and identify
5   those items that belong in here.
6   Q.  Thank you.  Ordinarily, when materials are taken out
7   because they are privileged from some file or folder, is there
8   not some kind of note that is put in saying that that occurred?
9   A.  Some inspectors had a system of doing that.  Others took
10  the item out and on the privileged item indicated where it
11  belonged back in the original box.
12  Q.  Do you remember approximately what time the actual search
13  ended?  Let me make that clear.  Let me withdraw it and make it
14  clear.  The actual active searching at the premises on Park
15  Avenue ended.
16  A.  I believe I was the last one who did the searching, and
17  that was the fax machine, and that was probably approximately
18  between 8:00 and 8:30 that night.
19  Q.  Is it your testimony that it is your understanding that the
20  reason the search ended and that other materials were left
21  there --
22          MS. McEVOY:  Let the record reflect that Mr. Litt is
23  leaving the room.
24          THE COURT:  So noted.
25  A.  Could you repeat the question.
               SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

120

67arvilh                   Fraterrigo - cross
1   Q.  Is it your testimony that the reason that the search ended
2   and that other materials were left behind was because those
3   materials would be gotten by the government through a subpoena
4   that has been served?
5                MS. McEVOY:  Objection.  If he would just clarify what
6   he means by "those materials."
7   Q.  There were materials left behind that you said were
8   indexed, correct?
9   A.  That's correct.
10  Q.  Is it your testimony that the reason those materials were
11  not taken, the search didn't continue and those materials were
12  not taken, was because it was understood that those materials
13  would be gotten by the government through a subpoena that has
14  been served?
15  A.  It was my understanding of the materials that were left
16  behind in specific were covered under a subpoena.  We didn't
17  stop searching once the subpoena was served.
18  Q.  Is it your understanding that the subpoena covered just the
19  materials that were indexed and left behind?
20  A.  At the time I don't recall what I knew specifically about
21  it.  I know that they were inventorying a specific area because
22  of the subpoena being served.
23  Q.  So what you observed happening, I think you said a moment
24  ago, correct me if I am wrong, is that even though a subpoena
25  was served, the search continued?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

121

67arvilh                   Fraterrigo - cross
1   A.  That's correct.
2   Q.  And that at a certain time on the day of the search certain
3   materials were inventoried, and as you understood it that would
4   be the materials that would be gotten by the government
5   pursuant to the subpoena?
6   A.  At the time I did not know what were those documents, what
7   were the exact documents that would be covered under the
8   subpoena.  I knew that a specific area was being inventoried.
9   I asked my team leader about why inspectors were inventorying a
10  specific area, and he explained that those items were covered
11  under a subpoena.  I don't know whether it included other
12  documents in the other offices.
13  Q.  But at least those items, as far as you were told, were the
14  ones to be covered by the subpoena?
15  A.  That's correct.
16  Q.  You told us on direct examination that you read certain
17  Amerindo documents that you left behind.
18  A.  That's correct.
19  Q.  Do you remember the contents of those documents?
20  A.  No, not specifically.
21  Q.  At the time that you were doing your search, your
22  individual search, there was a DVD being made, correct?
23                THE COURT:  A video?
24  Q.  A video.
25                THE COURT:  A video recording.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

122

```
         67arvilh                Fraterrigo - cross
 1   A.  The video was done at the end of the search and the
 2   beginning of the search.
 3   Q.  At the end of the search, when you had already determined
 4   that there were certain Amerindo documents that you left
 5   behind -- are you with me?
 6   A.  Yes.
 7   Q.  -- did you have the person making the video show which
 8   documents those were?
 9   A.  No.  The person doing the video was walking through the
10   office videotaping what was going on.
11   Q.  I understand.
12          THE COURT:  After you did the search of the office?
13          THE WITNESS:  After the search, after all the
14   inspectors were done searching, she went through.
15          THE COURT:  So that is a "no" to your question.
16          MR. HOFFMAN:  I have no further questions, your Honor.
17          THE COURT:  Let's take a break.  I can't say for sure
18   how long we will be, but it will certainly be at least 20
19   minutes, Mr. Kobre.  So if you would stick around the
20   neighborhood in case it is a little longer.
21          (Recess)
22          (Continued on next page)
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

123

```
         67ASVILAR2              Fraterrigo - cross
 1   CROSS EXAMINATION
 2   BY MR. KOBRE:
 3   Q.  Inspector Fraterrigo, good afternoon.
 4   A.  Good afternoon.
 5   Q.  I just want to ask you a few questions going all the way
 6   back actually to the beginning of your cross examination
 7   relating to your search through the 12 boxes of material that
 8   were requested by the defense in preparation.  Okay?
 9   A.  Okay.
10   Q.  There came a time in May of this year that you became aware
11   that there were 12 specific boxes that the defense wanted to be
12   brought to the court so that the materials in those boxes could
13   be used to cross examine witnesses, correct?
14   A.  That is correct.
15   Q.  And specifically --
16          MR. KOBRE:  If I may, your Honor, I would like to
17   offer defense VV, which is a letter, unfortunately I don't have
18   a copy because I got it from Ms. Wolfe today, but I represent
19   to the court that it's a letter Ms. Wolfe sent to the
20   government relating relating to the documents.
21          THE COURT:  Okay.  We will get a copy later.
22   Q.  Inspector Fraterrigo, is it around the time that is on that
23   letter that you were made aware of the fact that the defense
24   wanted you to bring 12 boxes to court relating to cross
25   examination of the ongoing hearing?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

124

```
         67ASVILAR2              Fraterrigo - cross
 1   A.  That is correct.
```

```
 2            MR. KOBRE:  Your Honor, I would offer for purposes of
 3   this hearing Defendant VV.
 4            MS. McEVOY:  No objection.
 5            THE COURT:  I take it there is no objection,
 6   Mr. Hoffman?
 7            MR. HOFFMAN:  No objection.
 8            THE COURT:  VV is received.
 9            (Defendant's Exhibit VV received in evidence)
10   Q.  And when you received that letter did there come a time
11   that you began to pull those boxes to make them available for
12   the hearing?
13   A.  Yes.
14   Q.  Around when did you do that?
15   A.  Shortly after we received the letter, probably the next
16   day.
17   Q.  And you knew when you were collecting them that the purpose
18   that the defense wanted you to bring the boxes was because they
19   wanted to ask the witness or witnesses questions about what was
20   in the boxes, correct?
21   A.  That is correct.
22   Q.  And there came a time -- withdrawn.
23            Approximately Friday of last week you returned
24   material from those boxes to  Amerindo U.S.'s representative,
25   Eugene Licker, correct?
```

```
     67ASVILAR2            Fraterrigo - cross
 1   A.  I believe it was Friday, yes.
 2            MS. McEVOY:  If I can get a clarification, Friday of
 3   what week?
 4            MR. KOBRE:  June 28.
 5   A.  Yes.
 6            MR. KOBRE:  If I may, your Honor, I would offer
 7   Defendant UU, which I represent is a letter from Mr. Litt sent
 8   to Mr. Licker.
 9            MS. McEVOY:  No objection, your Honor.
10            THE COURT:  UU is received.
11            (Defendant's Exhibit UU received in evidence)
12            THE COURT:  What is the date of the letter?
13            MR. KOBRE:  June 28, 2006.
14   Q.  Inspector, the letter that was sent indicates that
15   accompanied with the letter was material that had been removed
16   from the boxes that the defense had asked you to bring for this
17   hearing, is that not right?
18   A.  That is correct.
19   Q.  And am I also correct that between the time that Ms. Wolfe
20   sent the letter to the government and the time that you
21   returned the evidence from the boxes, Mr. Licker never called
22   you and asked you to actually return anything to him, isn't
23   that correct?
24   A.  That is correct.
25   Q.  And it's also correct that during that period of time you
```

```
     67ASVILAR2            Fraterrigo - cross
 1   were never made aware of any phone calls or requests from
 2   Amerindo U.S. to return any of the material that Amerindo U.S.
 3   during the time that Ms. Wolfe made her request and the time
```

```
 4   that you went into the boxes and sent the material back to
 5   Amerindo U.S., correct?
 6   A.  That is correct.
 7   Q.  And you were aware at the time -- withdrawn.
 8         You have been aware pretty much since the time this
 9   case has commenced that the defense in this case has been
10   requesting the return of irrelevant materials to it, correct?
11   A.  That is correct.
12   Q.  And there have been numerous conferences where the defense
13   has actually publicly requested that material be returned to
14   it, correct?
15   A.  That is right.
16   Q.  And even as recently as back in March Mr. Colton had
17   actually asked that material be returned, correct?
18   A.  That is correct.
19   Q.  And at that time you didn't go through the 12 boxes and
20   return what you thought to be irrelevant material, did you?
21   A.  At that time I don't recall the exact date but I did go
22   through the inventory sheets of all the boxes and based on what
23   was on the inventory sheets I pulled out stuff that was not
24   covered under the search warrant and I did return some
25   materials.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

127

```
     67ASVILAR2              Fraterrigo - cross
 1   Q.  Did you actually go through the boxes?
 2   A.  No, I actually went through the inventory sheets.
 3   Q.  And can you explain what it was that compelled you in the
 4   last week to go through the materials that the defense wanted
 5   to use at this hearing and disturb them, if you will, and send
 6   them to Amerindo U.S.?
 7         MS. McEVOY:  Objection to the characterization of the
 8   testimony.  I don't think it was the last week.
 9         THE COURT:  Whenever it was.
10         MR. KOBRE:  Friday.
11         THE COURT:  Whenever it was.
12         Go ahead.
13   A.  When I reviewed the boxes for the purpose of the hearing,
14   as I went through the boxes I realized there were some items in
15   there that were not covered under the warrant.
16   Q.  And was there something that you felt that there was
17   suddenly an urgency that those items needed to be returned and
18   couldn't wait the 6 days until this hearing that they had to be
19   sent back immediately?
20   A.  I believe there was a discussion that it was just -- we had
21   no authority to be in possession of that material.
22   Q.  So I take it, then, after seeing that material, then you
23   went back through the 150 other boxes and looked for material
24   that you didn't have authority to be in possession of as well,
25   is that right?
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

128

```
     67ASVILAR2              Fraterrigo - cross
 1   A.  I did not.
 2   Q.  Inspector Fraterrigo, just before we broke you had stated
 3   that the reason why you felt that there was sudden urgency to
 4   return the documents on Friday of last week was because you had
 5   no authority to possess them, is that right?
```

```
 6   A.  Friday two weeks ago, June 28, exactly, that is correct.
 7   Q.  Just to be clear, the first day of the hearing when it was
 8   supposed to be commenced was on the 7th of July, correct?
 9   A.  Yes.
10           THE COURT:  Hang on.  That is the date we adjourned
11   from the last go-round from May 31-June 1.
12           MR. KOBRE:  Right.
13   Q.  So on June 28 you sent the material back and approximately
14   7 days later it was going to be the continuation of the
15   hearing, correct?
16   A.  Yes.
17   Q.  Again, just before we broke I had asked you whether or not
18   believing that you didn't have the authority to possess
19   irrelevant material you went back at that time to the other 150
20   boxes to make sure that you weren't in possession of material
21   that you didn't have authority to possess?
22   A.  No, I did not.
23   Q.  And at that time realizing that you were in possession of
24   material that you didn't have authority to possess, did you go
25   back through the computers and ensure that the government
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```

                                                                    129

```
     67ASVILAR2              Fraterrigo - cross
 1   wasn't sitting with material that was not relevant to the
 2   search?
 3   A.  No.
 4   Q.  So am I correct that the only evidence that you decided to
 5   return to Amerindo U.S. was from the 12 boxes specifically
 6   requested by the defense to use at the hearing?
 7   A.  No, that is incorrect.
 8   Q.  One of the things you knew was you knew that -- withdrawn.
 9           You sat in court and observed the questioning and the
10   testimony of Inspector Feiter, correct?
11   A.  Yes.
12   Q.  And you were aware that one of the lines of inquiry was
13   whether or not the warrant was overbroad, correct?
14   A.  That is correct.
15   Q.  And, therefore, you knew when you went through the boxes
16   and pulled out what you felt to be irrelevant material that the
17   material in those 12 boxes might be material that the defense
18   wanted to use at the hearing, isn't that right?
19   A.  I don't know specifically you would want to use it at the
20   hearing.
21   Q.  You thought it was a possibility, correct?
22   A.  It could be a possibility, yes, correct.
23   Q.  And you returned it on June 28, right?
24   A.  That is correct.
25   Q.  And you knew that July 4 separated when you returned it to
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```

                                                                    130

```
     67ASVILAR2              Fraterrigo - cross
 1   the beginning of the hearing, right?
 2   A.  I am sorry?
 3   Q.  In other words, between June 28 and July 7 there was a July
 4   4 holiday, right?
 5   A.  Yes.
 6   Q.  So if the defense actually wanted to acquire the material
 7   and prepare from the material the defense would have to track
```

8   down or obtain them from Mr. Licker, correct?
9   A.  I guess so.  I guess that would be the case.
10  Q.  I will ask you to look at the letter before you from Mr.
11  Litt.
12  A.  Yes.
13  Q.  Mr. Litt, do you see, didn't provide to the defense, or
14  even Mr. Licker, an inventory of which items you removed from
15  the 12 boxes that the defense wanted to use at the hearing,
16  correct?
17  A.  That is correct.
18  Q.  Did you create an inventory?
19  A.  No, I did not.
20  Q.  So you removed the items from the 12 boxes?
21  A.  Yes.
22  Q.  And just shipped them to Mr. Licker, correct?
23  A.  That is correct.
24  Q.  Did you make any sort of record of what you actually
25  removed from the boxes?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                        131
    67ASVILAR2              Fraterrigo - cross
1   A.  No, I don't believe I did.
2   Q.  And do you agree that from the letter that you are looking
3   at from Mr. Litt that cc's the defense counsel in this case,
4   you agree with me that from that letter there is actually no
5   way for the defense to determine which items you removed from
6   the boxes?
7   A.  That is correct.
8   Q.  You testified earlier today that one of the things you
9   removed from the 12 boxes was I think an audio tape, is that
10  correct?
11  A.  That is correct.
12  Q.  Do you see how in the letter Mr. Licker indicates that --
13  withdrawn.
14      Do you see that in the letter, one of the things Mr.
15  Litt indicates is that he was returning actually documents to
16  Mr. Licker, correct?
17  A.  That is correct.
18  Q.  Do you know where that tape is that you removed from the 12
19  boxes?
20  A.  I believe it's contained in the envelopes.
21  Q.  That were sent to Mr. Licker?
22  A.  Yes.
23  Q.  I see.
24      Do you know of either another inventory or another
25  cover letter that actually addresses items that were returned

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                        132
    67ASVILAR2              Fraterrigo - cross
1   to Amerindo U.S. that were not documents?
2   A.  No, I don't know of any other letter.
3   Q.  Just so I understand now, 6 days before the hearing you
4   remove the items from the boxes?
5   A.  Yes.
6   Q.  And you sent the items to Amerindo U.S. and at least for
7   some of them, including the tape, there is actually no record
8   of the fact that you had actually removed it and sent it to
9   Amerindo U.S., is that right?

```
10   A.   I didn't make a record, that is right.
11   Q.   Isn't it true, Inspector Fraterrigo, that the real reason
12   why you went through the boxes and you removed items and sent
13   them to Amerindo U.S. was to impede or make it more difficult
14   for the defense to ask you questions about the overly broad
15   material that was in the 12 boxes?
16   A.   No, that is incorrect.
17   Q.   And it's your testimony that the reason why was you had a
18   belief at that time -- withdrawn.
19        It's your testimony that you had a sudden concern at
20   that time that the government had to immediately return
21   irrelevant material to the defense, is that your testimony?
22   A.   As I went through it I think there was a discussion that I
23   had with the assistants and a determination was made to return
24   it.
25   Q.   So in coming to the decision to remove the items from the
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    133

67ASVILAR2              Fraterrigo - cross

```
 1   boxes of evidence, you had conversations with the lawyers in
 2   this case?
 3   A.   That is correct.
 4   Q.   And specifically the two prosecutors here today?
 5   A.   That is correct.
 6   Q.   Did you at any time consider whether any sort of
 7   documentation or record should be sent to the defendants so
 8   that they could adequately prepare for this cross examination?
 9   A.   No.
10        THE COURT:  Do you have the letter?  I just want to
11   get the dates straight, Mr. Kobre.
12        Okay, thank you.
13   Q.   Inspector, did you at any time tell the lawyers in this
14   case -- and when I say lawyers I mean the prosecutors in this
15   case -- what items you were actually removing from the boxes?
16   A.   They reviewed what I removed from the boxes.
17   Q.   I want to do this briefly and move on to another topic.  If
18   you can take us through or take me through, you obtained the
19   boxes after receiving Ms. wolfe's letter, correct?
20   A.   Yes.
21   Q.   You got the boxes and then did you make the decision that
22   you should go through the boxes and start removing items from
23   the boxes?
24   A.   I went through the boxes, looked through it, and I
25   discovered there were items in there that were not covered
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    134

67ASVILAR2              Fraterrigo - cross

```
 1   under the warrant and as I pulled them out I showed them to the
 2   assistants and they reviewed it and a decision was made that
 3   they were going to return them.
 4   Q.   And is it fair to say also that when you reviewed the boxes
 5   and you discovered that there were items in the boxes that were
 6   not responsive, is it fair to say you weren't surprised?
 7   A.   Excuse me?
 8   Q.   Is it fair to say you were not surprised by that fact?
 9   A.   I was surprised.
10   Q.   You were surprised.  Until you actually looked through
11   those 122 boxes it was your expectation that all 168 boxes only
```

```
12   contained responsive material?  Is that your testimony?
13   A.  I assumed they were all responsive material in all the
14   boxes.
15   Q.  That was your assumption, right?
16   A.  Yes.
17   Q.  There came a time in this case when you petitioned to Judge
18   Maas for an extension of the warrant for the purposes relating
19   to returning the server, correct?
20   A.  Yes.
21   Q.  At the time that you actually approached Judge Maas, you
22   were aware of the fact that the government had actually issued
23   a subpoena to cover the material that had been left at Amerindo
24   U.S., correct?
25   A.  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

135

```
     67ASVILAR2              Fraterrigo - cross
1    Q.  And did you at any time inform Judge Maas that the
2    government had, by the time you had approached Judge Maas,
3    issued a subpoena for the material from Amerindo U.S.?
4    A.  I did not inform him, no.
5    Q.  Did you inform Judge Maas that the government had entered
6    into an agreement with Amerindo U.S. to preserve evidence and
7    to provide the evidence pursuant to a subpoena?
8    A.  No, I did not.
9    Q.  So is it fair to say that as far as Judge Maas was
10   concerned the urgency that would have been expressed in your
11   original search warrant affidavit would be one that he still
12   may very well have believed was the case?
13              MS. McEVOY:  Objection.
14              THE COURT:  Sustained as to form.
15   Q.  Is it fair to say that in petitioning Judge Maas for the
16   extension as it relates to the server, it was your
17   understanding that Judge Maas was not aware that the government
18   and Amerindo U.S. had entered into agreements to preserve and
19   produce the evidence?
20              MS. McEVOY:  Objection as to form.
21              THE COURT:  Well, I mean the bottom line is,
22   Inspector, were you aware of any other applications made to
23   Judge Maas in connection with this extension?
24              THE WITNESS:  No.
25              THE COURT:  All right.  And when you went, you didn't
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

136

```
     67ASVILAR2              Fraterrigo - cross
1    tell Judge Maas nor anybody from the government that was with
2    you inform Judge Maas of the subpoena or the preservation
3    agreement, is that right?
4               THE WITNESS:  Not in my presence.
5               THE COURT:  Was there anybody who met with Judge Maas
6    not in your presence that you are aware of?
7               THE WITNESS:  No.
8               THE COURT:  Okay.
9               Go ahead, Mr. Kobre.
10              MR. KOBRE:  Thank you, your Honor.
11   Q.  What training have you received in your experience relating
12   to the drafting of search warrants and search warrant
13   affidavits?
```

```
14  A.  I have had some training in the Secret Service Federal Law
15  Enforcement Training Center at Glencoe, Georgia, and in
16  Potomac, Maryland, the U.S. Postal Inspector training.
17  Q.  How many search warrants have you actually been involved in
18  drafting?
19  A.  Actually typing them up?
20  Q.  How about being the affiant?
21  A.  Being the affiant, several.
22  Q.  Can you give me a ballpark?
23  A.  20, 25 I think.
24          THE COURT:  I am sorry?
25          THE WITNESS:  20, 25 that I have actually had a search
```

137

67ASVILAR2          Fraterrigo - cross
```
 1  warrant of my own.
 2  Q.  In those 20 or 25 you were the agent or inspector that
 3  swore out the warrant, correct?
 4  A.  That is correct.
 5  Q.  And in your experience have you ever been part of a factual
 6  discussion with the magistrate or a magistrate judge issuing
 7  the warrant regarding the substance of the request for a
 8  warrant?  When I say the substance, I mean the actual factual
 9  underpinnings.
10  A.  No.
11  Q.  Is it fair to say, this is the first time this has happened
12  to you?
13  A.  What has happened to me?
14  Q.  In other words, where a judge -- withdrawn.
15          Where you were swearing out a search warrant affidavit
16  and there was a discussion with the judge about substantive
17  aspects of the request.
18  A.  Yes, I believe so.
19  Q.  And --
20  A.  I think so.  I believe so.  I think it is.
21  Q.  You believe it's the first time?
22  A.  Yes.
23  Q.  And after you swore out the warrant, did you write down
24  what Mr. Litt had told Magistrate Judge Maas?
25  A.  No.
```

138

67ASVILAR2          Fraterrigo - cross
```
 1  Q.  Did you write it down at the time?
 2  A.  No.
 3  Q.  Did you write it down at the time you went back to your
 4  office?
 5  A.  No.
 6  Q.  Did you memorialize what had happened in any way?
 7  A.  No, I did not.
 8  Q.  You understood that the facts and -- withdrawn.
 9          You understood from your training, did you not, that
10  the information that was provided to a judge in obtaining a
11  warrant is important information, correct?
12  A.  Yes.
13  Q.  And knowing that, you understood that it would be important
14  to actually have a record of what actually occurred with Judge
15  Maas, isn't that right?
```

16  A.  I don't believe so.
17  Q.  You were the case agent on the case, right?
18  A.  Yes.
19  Q.  And you were the affiant, right?
20  A.  Yes, I am.
21  Q.  And it appeared from the questions that Judge Maas was
22  asking he was struggling a bit with some of the factual
23  allegations that was in the warrant, correct?
24          MS. McEVOY:  Objection.
25          THE COURT:  Sustained as to form.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

139

67ASVILAR2              Fraterrigo - cross
1  Q.  Well, Judge Maas was asking questions about inferences that
2  could be drawn from the affidavit, isn't that correct?
3          MS. McEVOY:  Objection.
4          THE COURT:  Do you want to ask her what kind of
5  questions he asked?
6  Q.  Sure.
7  A.  I don't recall the questions he asked.  I recall he asked a
8  question and I recall he pointed to the chart in Gary Tanaka's
9  complaint.  That is all I recall.
10  Q.  And you agree with me that had you actually written down at
11  the time what he had asked or what Mr. Litt had said, it may
12  very well have refreshed your memory so that you actually could
13  today testify about what happened that day, correct?
14  A.  Yes, that is correct.
15  Q.  Is it your testimony that you do recall Judge Maas actually
16  asking questions?
17  A.  I recall he asked a question.  I don't know how many.  He
18  was referring to the chart.  That is all I recall.
19  Q.  Do you recall whether he was asking it of you or asking it
20  of Mr. Litt?
21  A.  Mr. Litt.
22  Q.  And you recall Mr. Litt, as you say, pointing to the chart
23  and you recall not necessarily what he said but do you recall
24  him actually saying anything?
25  A.  I recall him saying something but I don't recall what it
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

140

67ASVILAR2              Fraterrigo - cross
1  was.  I saw him answering.
2  Q.  And you also I believe testified on direct examination that
3  you had supervised the search of Amerindo U.S. along with team
4  leader Feiter, correct?
5  A.  That is correct.
6  Q.  Approximately how many searches have you supervised?
7  A.  I would say approximately 20.
8  Q.  Is it essentially the same 20 that you were the affiant on
9  the search warrant?
10  A.  Yes.
11  Q.  I want to ask you just a couple of questions about your
12  preparation for your testimony.
13          First, let me just ask you, in between the lunch
14  break, did you have any conversations with anyone relating to
15  your testimony at this hearing?
16  A.  No, I did not.
17  Q.  Did you have any conversations with anyone even just

18    generally relating to testifying?
19    A.  Yes.
20    Q.  Who did you speak to?
21    A.  My husband.
22    Q.  And without getting into the substance of the conversation
23    with your husband, did the conversation at all touch upon the
24    facts or circumstances of this case we are here on?
25    A.  No, it did not.

               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          141
      67ASVILAR2              Fraterrigo - cross
1     Q.  I might as well ask you this now, the burning question is
2     who is R. Fraterrigo?
3     A.  My husband, Robert Fraterrigo.
4     Q.  And so your husband was actually present at the search of
5     Amerindo U.S.?
6     A.  Yes.
7     Q.  Prior to your testimony and your direct examination, what
8     did you do to actually prepare to testify?
9     A.  I reviewed my notes.  I reviewed my complaints.  I reviewed
10    the search warrant affidavit.  I reviewed my investigative
11    notes, and my inventory forms.
12    Q.  When you say your investigative notes, what does that mean?
13    A.  I mean my 3500 material, what has been provided.
14    Q.  Basically the MOIs, the memorandum of interviews?
15    A.  No, my notes that I had of the search, my 3500.
16    Q.  I take it you also met with the government prior to
17    testifying, correct?
18    A.  Yes, I did.
19    Q.  Approximately how many times did you meet with the
20    government in preparing to testify?
21    A.  Several times.
22    Q.  How much is several?
23    A.  Maybe 5 or 6, 7 times, probably more than that.
24    Q.  Approximately how much time would you say you spent with
25    them during each one of those sessions?

               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          142
      67ASVILAR2              Fraterrigo - cross
1     A.  Several hours.
2     Q.  And during those sessions did you rehearse your direct
3     examination?
4     A.  We went over my direct examination.
5     Q.  Did you also go back and -- withdrawn.
6          Inspector Fraterrigo, you were asked a number of
7     questions about inventory and exhibits that were obtained from
8     Alberto Vilar's office, do you recall that?
9     A.  Yes.
10    Q.  And do you recall during one part of your direct
11    examination Ms. McEvoy asking you about a number of items on
12    the inventory sheets and asking you to actually recite what
13    those references on the inventory sheets referred to, do you
14    recall that?
15    A.  Yes.
16    Q.  And do you recall specifically in one instance Ms. McEvoy
17    had asked you if you could recall and recount for the court
18    relating to what was indicated as N6 what three red and black
19    ledger notebooks contained?  Do you recall her asking you