Exhibit L

8-8-06 hearing.txt

1

```
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   UNITED STATES OF AMERICA
 3
 4              v.                      05 Cr. 621 (KMK)
 4
 5   ALBERTO VILAR                     Hearing
 5   GARY TANAKA,
 6              Defendant.
 6   ------------------------------x
 7                                     New York, N.Y.
 7                                     August 8, 2006
 8                                     11:30 a.m.
 8   Before:
 9
 9        KENNETH M. KARAS
10                                     District Judge
10
11   MICHAEL J. GARCIA
11   United States Attorney for the
12   Southern District of New York
12        One St. Andrew's Plaza
13        New York, N.Y. 10007
13   DEIRDRE A. MCEVOY
14   MARC O. LITT
14        Assistant United States Attorneys
15
15   JEFFREY C. HOFFMAN, ESQ.
16   Attorneys for Defendant Vilar
16        Hoffman & Pollik, LLP
17        260 Madison Avenue, 22nd Floor
17        New York, New York 10016
18        (212) 679-2900
18
19   GLENN C. COLTON, ESQ.
19   Attorney for Defendant Tanaka
20        Wilson Sonsini Goodrich & Rosati (NYC)
20        12 East 49th Street, 30th Floor
21        New York, New York 10017
21        (212) 999-5804
22
22   STEVEN G. KOBRE, ESQ.
23   Attorney for Defendant Tanaka
23        Kobre & Kim LLP
24        800 Third Avenue
24        New York, New York 10022
25        (212) 488-1200
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
```

2

```
 1        (Hearing resumed)
 2        THE DEPUTY CLERK:  Counsel, state their appearances.
 3        MS. MCEVOY:  Deirdre McEvoy and Marc Litt for the
 4   government with us is U.S. Postal Inspector Cynthia Fraterrigo
 5   and Eric Glenn from the paralegal office.
 6        MS. HOFFMAN:  Mr. Hoffman and Ms. Eftychiou is here.
 7        MR. KOBRE:  Steven Kobre and with me is Glenn Colton
 8   and Justin Sher and Jessica Mergolis for Mr. Tanaka.
 9        THE COURT:  Good morning, all.
10        We left off, I believe, with inspector Fraterrigo on
```

Page 1

8-8-06 hearing.txt

```
2   BY MR. KOBRE:
3   Q.  Inspector, in connection with your presence at Mr. Tanaka's
4   room, did you fill out a memorandum of interview?
5   A.  Yes.
6   Q.  And I am going to show you -- actually, after filling out a
7   memorandum interview, did you then at a later time make an
8   adjustment or a change to the memorandum of interview?
9   A.  Yes.
10  Q.  Do you remember when you actually made that change?
11  A.  It was within, like, two weeks after, I think.
12          MR. KOBRE:  May I approach, your Honor?
13          THE COURT:  You may.
14          MR. KOBRE:  Your Honor, we had put up a binder for
15  your Honor right if front there, because we have been using two
16  letters, DD, EE.  It only shows as one D or E.
17          THE COURT:  Yes.  Actually, I have got two sets of Ds
18  and Es.
19          MR. KOBRE:  It would be the first set.
20          THE COURT:  One set is the secret of staying young.  I
21  don't imagine that is it.  And the other is an article called
22  300 calories.  I don't know if that is a hint to me, Mr. Kobre,
23  or what.
24          MR. KOBRE:  I am going to hand you up another copy and
25  take that back.  I apologize.  That was my mistake, your Honor.
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

                                                                    12

```
    6886tan1               C. Fraterrigo - cross
1   It is W and X.
2           THE COURT:  Got it.  Although, I will take the 300
3   calories under advisement.
4           For the record are these actually WW and XX?
5           MR. KOBRE:  Yes.  That picks up from the sequence from
6   the last date.
7           THE COURT:  Yes.
8   BY MR. KOBRE:
9   Q.  You see the document marked 3501-D?
10  A.  Yes.
11  Q.  Take a look at that document.  That document was prepared
12  by you in relationship to your observations of Mr. Tanaka's
13  interview, is that correct?
14  A.  Yes.
15          THE COURT:  Which is for the record is WW.
16          MR. KOBRE:  Yes, WW.
17  Q.  And take a look at the last page.  You signed that
18  document, right?
19  A.  Yes, I did.
20  Q.  Now, on XX, which is 3501-E, that is the later version of
21  the document, correct?
22  A.  Yes.
23  Q.  And one of the things that you changed in the document was
24  on the second page at the top.  It talks about something that
25  Mr. Tanaka had stated that he had no involvement?
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

                                                                    13

```
    6886tan1               C. Fraterrigo - cross
1   A.  Yes.
2   Q.  That is the distinction between the two documents, correct?
3   A.  Also, there was no space between five and a million.
4   Q.  Say that one more time.
5   A.  On page 1, there was a space between -- an added space
6   between five and million.
```
                            Page 6

8-8-06 hearing.txt

```
 7  Q.  I see.  You made this change approximately two weeks later?
 8  A.  I am -- within two weeks.  I don't know when.
 9  Q.  Do you see at the top of WW there is a fax line and a date?
10  A.  Yes.
11  Q.  At the top of XX there is a fax line and a date?
12  A.  Yes.
13  Q.  Does that refresh your recollection as to when you might
14  have made the changes to the documents?
15  A.  No.
16  Q.  Although you are saying it is within two weeks, it is fair
17  to say they were not actually created on the same day?
18  A.  These two documents?
19  Q.  Yes.
20  A.  No.  I don't think so.
21  Q.  Do you see that on XX which is 3501-E that document is
22  signed by you, correct?
23  A.  Yes.
24  Q.  Can you see the date that you put next to your name?
25  A.  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

6886tan1                C. Fraterrigo - cross
```
 1  Q.  It says May 28?
 2  A.  Yes.
 3  Q.  That wasn't the date that you actually signed this
 4  document, was it?
 5  A.  No.  This is part of the form and I had just signed it.
 6  Q.  Well, this document was a form document?
 7  A.  It is a template in our system.  So when I had this -- this
 8  one was a draft.  The first one was a draft.  I signed it and
 9  then when I realized that I had from my notes on this second
10  one, I didn't add that statement, so I added that statement and
11  I just signed it.  I didn't change the date.
12  Q.  On other memoranda of interview when you have a draft
13  document, you have actually indicated on it "draft," haven't
14  you?
15  A.  Not particularly.  Sometimes I don't sign it if it is a
16  draft.
17  Q.  Is it fair to say whatever is on this 3501, which is the
18  final version, it says May 28, 2005, and that date is wrong?
19  A.  That date is wrong, that's correct.
20  Q.  And while you are using a template, it is also true that
21  you had the ability to change the template to actually put the
22  correct date, isn't that right?
23  A.  Yes.
24  Q.  But the way the final version appears, it appears that you
25  actually wrote this report up just two days after the date of
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

6886tan1                C. Fraterrigo - cross
```
 1  interview, isn't that right?
 2  A.  Yes.
 3  Q.  That is not the case, isn't that correct?
 4  A.  No.  Not on the second draft.
 5  Q.  So you spent 45 minutes in Mr. Tanaka's room?
 6          MS. McEVOY:  Objection.  Mischaracterizes the witness'
 7  testimony.
 8          THE COURT:  Really?  That is what I thought she said.
 9          MS. McEVOY:  She said "approximately."
10          THE COURT:  Okay.
11          MR. KOBRE:  Noted.
```

Page 7

8-8-06 hearing.txt

12    Q.  You spent approximately 45 minutes in Mr. Tanaka's room, is
13    that right?
14    A.  Yes.
15    Q.  Then what did you do immediately after leaving Mr. Tanaka's
16    room?
17    A.  We brought him back to our office at 90 Church Street to
18    process him after he was in the back.  We brought him to the
19    back of our offices.  Curtis Roinestad, the postal inspector,
20    handle all the processing and I was in my office trying to take
21    care of other matters.
22    Q.  Matters relating to this case?
23    A.  Yes.
24    Q.  Approximately how long did it take you from the time you
25    left the hotel room to the time that you left the location, the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          16
     6886tan1                    C. Fraterrigo - cross
1    postal inspection service, I guess?
2    A.  Form the time that I left the hotel to my office, I don't
3    recall how long it took.
4    Q.  I am trying to figure out do you remember approximately
5    what time you left your office?
6              MS. McEVOY:  Your Honor, to do what?
7    Q.  Imagine sometime thereafter you left your office?
8    A.  To go to the search, yes.
9    Q.  What time did you leave?
10   A.  Approximately 11:00 or so.  I don't recall exactly.
11   Q.  Then you headed over to the search?
12   A.  Yes.
13   Q.  To your recollection you got to the search at approximately
14   12:00, about noontime?
15   A.  It was around lunchtime.  I recall that.
16   Q.  When you arrived actually at the search, tell us now what
17   it is that you observed?
18   A.  I observed postal inspectors in offices searching, going
19   through file cabinets and desks.  I saw Amerindo employees in
20   the lobby area and other inspectors in the conference room
21   filling out inventory sheets.
22   Q.  Did you go to Inspector Feiter to talk to him at that time?
23   A.  Yes.
24   Q.  Tell us what he told you and what you told him?
25   A.  He told me that the Amerindo employees were here, some of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                          17
     6886tan1                    C. Fraterrigo - cross
1    the employees were still here and that Amerindo's attorney was
2    present, Eugene Licker and that he left Alberto Vilar's office
3    for me to search.  He also told me that other inspectors were
4    called in to assist in the search.  And we were discussing
5    Alberto Vilar's arrest.
6    Q.  Now, I just want to focus briefly on those other inspectors
7    you were called in to assist in the search.  Do you recall off
8    the top of your head who some of them -- inspectors I take it,
9    right?
10   A.  Yes.
11   Q.  Do you recall off the top of your head who some of those
12   inspectors were?
13   A.  I believe one was my husband Robert Fraterrigo, Ralph
14   Nardo, Steve Barrientos, Jimmy Jinn.  And I can't recall the
15   others if there were.
16   Q.  J-i-n-n?
                        Page 8

8-8-06 hearing.txt
(212) 805-0300

688ztan2                    C. Fraterrigo - cross
1            THE COURT:  She said it doesn't refresh her, so I'm
2    not sure why they should be marked at all.  They're in the
3    folder.  Presumably the folder will be kept in the condition
4    it's in now.
5            MR. KOBRE:  Okay.
6    Q.  So just so I understand it, Inspector, you know there is
7    something that's inaccurate in this MLAT, but you have -- you
8    do not have a specific recollection as to what it is that's
9    inaccurate, is that right?
10   A.  No, I -- the -- I don't have a specific recollection of --
11   I just know that there was something regarding the meeting.  I
12   just can't --
13   Q.  Something regarding the meeting?
14   A.  Who was present at the December 2000 -- I think it was
15   relating to that.  I can't be sure.
16   Q.  Just to -- finish.
17   A.  It's nothing -- it's nothing on the fact of what's in here.
18   I think it was just those who were present.
19   Q.  Okay.  And is it, essentially, that something about the way
20   that meeting is described in this MLAT that you believed to be
21   inaccurate?
22           THE COURT:  She was asked and answered that.
23   A.  I said no, who was present --
24           THE COURT:  Hang on, Inspector.  As to who was there
25   she's asked and answered -- it's been asked and answered.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

688ztan2                    C. Fraterrigo - cross
1    Q.  Well, if I may just as far as who was there, say, just so I
2    understand, you're saying that you believe that as to who was
3    there is not accurately described in this MLAT; is that your
4    understanding?
5    A.  I think one of the individuals, yes, that was there --
6    Q.  Okay.
7            THE COURT:  Okay.
8    A.  -- it's not accurate.
9            MR. KOBRE:  Thank you.
10           THE COURT:  Sure.  All right, Miss McEvoy, redirect.
11           MS. McEVOY:  Your Honor, may I have a brief sidebar?
12           THE COURT:  Why not.
13           (At the sidebar)
14           MS. McEVOY:  Your Honor, at the July 7th and July 10th
15   hearings, the inspector gave some answer that the government
16   did not anticipate which the government believes it was a
17   product of confusion or misunderstanding, but the government
18   would ask for 10 or 15 minutes with the Inspector prior to
19   redirect to confirm that.
20           MR. HOFFMAN:  Can we be present?  Have you any
21   objections to us being present during that conversation?
22           MS. McEVOY:  I mean -- to the extent that it is a
23   product of confusion and misunderstanding, the defense
24   counsel's presence might intimidate the witness, and not clear
25   up whether or not in fact it was confusion.  The government
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

688ztan2                    C. Fraterrigo - cross
1    just has to satisfy itself that that's correct, and the
2    government does not expect to prep her during this time period.
                              Page 40

8-8-06 hearing.txt

3   It's just --
4            THE COURT:  Well, but if it's not prep, then what is
5   it?
6            MS. McEVOY:  It's to clarify, for our purposes, the
7   fact that it was a misunderstanding as opposed to something
8   else.  We need to know that.
9            THE COURT:  As opposed to something that she
10  intentionally misstated, is that what you're worried about?
11           MS. McEVOY:  I don't -- if you read some of her
12  answers literally, I think the record is not clear right now,
13  and I -- exactly that -- not that she intentionally misstated,
14  but that she didn't mean what the --
15           THE COURT:  That's what redirect is for.  I mean
16  that's -- I don't understand what you're asking.  If you take
17  her in the witness room and you ask her some questions to
18  satisfy yourself whether or not there was confusion or
19  something more nefarious than that, the first thing that's
20  going to be asked on recross is what it is that she was asked
21  back in the witness room.
22           MCEVOY:  And in fact, your Honor, I plan to elicit
23  from her what I ask her.
24           THE COURT:  So what's the problem with having counsel
25  there to begin with?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                            88
     688ztan2               C. Fraterrigo - cross
1            McEVOY:  Just for the -- it's to the extent she's
2    confused and not understanding, and I think counsel's presence
3    is not going to --
4            THE COURT:  But if they're not going to say
5    anything -- I mean, it's not like they're mean people.  I don't
6    really understand what the problem is.  If they're just
7    standing there and they're not asking her questions, what is it
8    that you're worried about?  She doesn't strike me as the kind
9    of person that who gets intimidated by the mere presence of
10   other adults.
11           MS. McEVOY:  I would disagree, your Honor.  Based on
12   the --
13           THE COURT:  A United States Postal Inspector is afraid
14   of what?
15           MS. McEVOY:  I'm not --
16           THE COURT:  Come on.
17           MR. HOFFMAN:  I was just going to say, I have no
18   objection if Colton is not there.
19           MR. KOBRE:  Nor do I.
20           THE COURT:  I am glad that's on the record.  Go ahead.
21           Go ahead.  It's an unusual request.  You'll have to
22   admit it's an unusual request.  You're seeking to prep a
23   witness in the middle of her testimony.
24           MS. McEVOY:  No, your Honor.  In fact, I've been given
25   the opportunity many times to -- not to prep a witness, to ask
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                            89
     688ztan2               C. Fraterrigo - cross
1    a few clarifying questions before redirect.  It's -- cross is
2    finished.  We haven't been allowed to, you know, to prep the
3    witness.
4            THE COURT:  It's not as if she's on cross.  I mean, I
5    don't think there's any bar like there is when she's on cross.
6    To the extent that Miss McEvoy is going to elicit what it is
7    that she asked her in the back, you're going to -- in the
                          Page 41

8-8-06 hearing.txt

```
 8    witness room --
 9              MS. McEVOY:  Yes, yes, very briefly.
10              THE COURT:  So what's the problem, gentlemen?
11              MR. HOFFMAN:  It just seems, frankly, somewhat
12    unseemly, and it's going to open up on recross, you know, the
13    question of what were you told, et cetera, et cetera.  I think
14    it's --
15              THE COURT:  But that's true of any prep.  I mean, if
16    they took her in the witness room right before they started
17    direct, no doubt you would ask her what she was asked.
18              MR. HOFFMAN:  That's true.  I'm just trying to do a
19    process that doesn't require that.  I mean, if she simply is
20    going to say, were you asked this, did you answer that and did
21    you understand the question, and is that your proper answer,
22    what's the difference if we're sitting there?  I mean then we
23    don't have to be concerned then she was nudged or told or
24    might -- you know, it's just --
25              THE COURT:  But that's true of any witness.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

90

688ztan2                    C. Fraterrigo - cross

```
 1              MR. HOFFMAN:  I understand.
 2              THE COURT:  I mean, I do think with all the lawyers in
 3    this case, as I do in all cases, I personally, lawyers will
 4    follow their ethical obligations and there is no reason
 5    whatsoever to doubt that here.  I think it might --
 6              MS. McEVOY:  That's exactly why I come to ask for
 7    this.
 8              THE COURT:  I think it might be more efficient, in
 9    fact, to do it this way.  And to the extent that you all are
10    going to get a chance to -- I'll give you leeway on recross --
11              MR. HOFFMAN:  Okay.
12              THE COURT:  -- as to what was done in the witness
13    room.  I don't have a problem with that.  And, Miss McEvoy, I'm
14    going to trust you to give us a full recitation of what went on
15    back there when you are examining the witness on redirect.
16    Okay.
17              MS. McEVOY:  Yes, your Honor.  And prior to actually
18    asking the witness any questions in the room, I will let her
19    know that I will be asking her what we talked about.
20              THE COURT:  Okay.
21              MR. KOBRE:  The only thing I would say is that I think
22    it's one thing if your Honor's going to grant the government to
23    take five or ten minutes to meet, and I'm not sure there is a
24    prohibition if the witness is still on cross-examination.  The
25    only -- I guess the only part of the objection I would have to
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

91

688ztan2                    C. Fraterrigo - cross

```
 1    it is if in any way -- the reason is because is the government
 2    believes this witness was mistaken and not like was confused
 3    and not mistaken.  I don't think that should form a basis of
 4    what the government should be allowed to speak to the witness
 5    or not.
 6              THE COURT:  If the government is concerned about the
 7    veracity of its witness, I'm not talking about this case, but
 8    in general, they have ethical obligations to address that,
 9    sooner rather than later.  If, because of the way this has been
10    broken up, they haven't had a chance to address this with her
11    until now.  And, look, I'm going to let them do it.  They're
12    telling me it's going to take 10 or 15 minutes.  I'm going to
```

Page 42

8-8-06 hearing.txt

```
13    give leeway on cross.
14              MR. KOBRE:  Okay.
15              THE COURT:  I made it clear to Miss McEvoy what my
16    expectations is.
17              MR. KOBRE:  Right.
18              THE COURT:  So I don't have a problem with it, all
19    right.  So let's go ahead and take a 15 minute break and go in
20    the back with the witness go ahead, Miss McEvoy.
21              MR. KOBRE:  Actually one other thing before we break.
22    Will it be just Miss McEvoy or Mr. Litt as well who might
23    ultimately be having to testify to the interaction between the
24    two of them?
25              THE COURT:  I would expect you would have somebody
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    92

```
      688ztan2             C. Fraterrigo - cross
 1    else, other than yourself there.
 2              MS. McEVOY:  Yes.
 3              THE COURT:  I don't know it needs to be Mr. Litt,
 4    especially if you're going to go over things that were done
 5    with Mr. Litt.
 6              MR. HOFFMAN:  I'll go with you.
 7              THE COURT:  I mean, you have somebody else here.
 8              MS. McEVOY:  Actually, I wasn't planning on going over
 9    anything with Mr. Litt.
10              THE COURT:  You have another person at your table you
11    may want to bring in --
12              MS. McEVOY:  Okay.
13              THE COURT:  -- as a witness to the conversation.
14    That's a good suggestion.
15              MS. McEVOY:  Okay.
16              THE COURT:  Okay, all right.  Thank you.
17              MR. LITT:  May I just ask a question?  Am I precluded
18    from going in then, even if the discussion doesn't concern
19    anything about me?
20              MR. KOBRE:  It would be -- he's not -- this isn't his
21    witness.  It would be our preference -- he is still technically
22    on cross from his other testimony.  I just think, frankly, if
23    they're going to be asking someone extraordinary relief, it
24    seems like we can at least just have Miss McEvoy and the
25    witness as opposed to having Mr. Litt there as well.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

                                                                    93

```
      688ztan2             C. Fraterrigo - cross
 1              MR. HOFFMAN:  Because there were questions about
 2    conversations between them.
 3              MR. KOBRE:  Right.
 4              THE COURT:  But that's not going to be the subject of
 5    your inquiry.
 6              MS. McEVOY:  That's not a subject --
 7              THE COURT:  I don't think it matters.  He's already a
 8    witness.  But in all seriousness, to the extent she's not, Miss
 9    McEvoy is going to go over material with the Inspector that we
10    have been having Mr. Litt excuse himself from, then I don't see
11    that it's any different from him being in the courtroom during
12    the examination.
13              MR. KOBRE:  Okay, that's fine.
14              THE COURT:  As long as it's not going to involve
15    anything --
16              MS. McEVOY:  It won't.  I make that representation.
17              THE COURT:  I still think it would be prudent to have
```
                                Page 43

8-8-06 hearing.txt
```
18    the other person at your table.
19              MS. McEVOY:  I agree, your Honor.
20              THE COURT:  Okay, all right.  So we'll take 15
21    minutes.
22              All right, we'll take a 15 minute recess.
23              (Recess taken)
24              (Continued on next page)
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

94

```
      6886TAN3              Fraterrigo - redirect
1              (In open court)
2              THE COURT:  Ms. McEvoy, are you prepared to go ahead?
3              MS. McEVOY:  Yes, your Honor.  May I proceed?
4              THE COURT:  You may.
5    BY MS. McEVOY:
6    Q.  Inspector Fraterrigo, after cross-examination but prior to
7    your testimony now on redirect, did we spend some time together
8    in the jury room?
9    A.  Yes.
10   Q.  Approximately how long did we spend together?
11   A.  About 10 minutes.
12   Q.  Were two other AUSAs present?
13   A.  Yes.
14   Q.  To the best of your recollection can you recount for the
15   Court what I said to you and what you said to me?
16   A.  You pointed out a question that the Court asked me on one
17   of the days I testified regarding clients, if there was
18   probable cause with the client list.  I indicated to you that
19   my answer was incorrect.
20              There were also questions --
21   Q.  Before we get to the other questions, can you turn to the
22   transcript before you, July 10 transcript, page 94.
23   A.  Yes.
24   Q.  Lines 4 through 8 where the Court asked the question:  Is
25   it a fact that you knew you didn't have probable cause to get
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

95

```
      6886TAN3              Fraterrigo - redirect
1    every client list at the time you went and got the warrant?
2              Mr. Hoffman says, Correct.  And you say, That's
3    correct.
4    A.  Yes.
5    Q.  Is that the question you were referring to that I asked you
6    about in the jury room?
7    A.  Yes.
8    Q.  And with respect to the --
9              MS. HOFFMAN:  Can I have one second to find --
10             THE COURT:  Sure.
11             MS. HOFFMAN:  Thank you.
12             THE COURT:  Go ahead.
13   Q.  With respect to the part of the question where the Court
14   asks you:  Is it a fact that you knew you didn't have probable
15   cause to get every client list at the time you went and got the
16   warrant, what do you recall me asking you about?
17   A.  You asked me if, you know, about the question, if there was
18   any confusion in the question that was asked and I recall
19   stating that, yes, that during that series of questioning that
20   specific client names were asked of me during my cross and I
21   believe what was said was that it was specific questions about
22   particular clients.
```

Page 44

8-8-06 hearing.txt
23  Q.  Sorry.  When you say "what was said," what are you
24  referring to?
25  A.  What I had previously testified about.  I mentioned
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

96

6886TAN3            Fraterrigo - redirect
1   particular -- I was asked about particular clients and I
2   believe that there is probable cause to get client lists at the
3   time I had the warrant.
4   Q.  In the robing room just now, did I ask you questions about
5   whether you believed probable cause existed?
6   A.  Yes.
7   Q.  At the time you got the warrant?
8   A.  Yes.
9   Q.  And did I ask you when you answered the Court's question,
10  specifically the question on page 94 whether you were saying
11  that at the time you got the warrant you knew you didn't have
12  probable cause but told the magistrate anyway --
13          MS. HOFFMAN:  I am going to object to the leading.  I
14  don't want her asking what did I ask and what did you answer.
15          THE COURT:  It is as leading as it gets.  Rephrase the
16  question.
17  Q.  What did I ask you, Inspector Fraterrigo, about your state
18  of knowledge at the time -- let me finish -- at the time you
19  got the warrant, and second what you meant when you answered
20  this question?
21  A.  At the time I got the warrant, I knew I had probable cause
22  to get every client.
23          MS. HOFFMAN:  Objection.
24          THE COURT:  That is not the question what it is Ms.
25  McEvoy asked you in the jury room questioning.  It was a
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

97

6886TAN3            Fraterrigo - redirect
1   compound question.  Let's start with the first point.  What is
2   it that you Ms. McEvoy asked you back in the jury room about
3   your answer to my question on July 10?
4           THE WITNESS:  You asked me to read the question.  I
5   read the question and I said to you that at the time I got the
6   warrant I knew I had probable cause for every client list.  And
7   you asked me if there was a confusion with the question at the
8   time and I said yes.  And I explained to you that during my
9   cross with Hoffman I had tried to explain to myself and in a
10  brief moment in one of his questions about the client list.  I
11  explained about the clients that he was specifically pointing
12  out to me.  I said at the time I knew I had probable cause and
13  I said this statement here what I answered the Court was
14  incorrect.
15  BY MS. McEVOY:
16  Q.  What did you tell me in the robing room about how it was
17  incorrect?
18  A.  That I -- that in the affidavit I knew I stated that there
19  was probable cause to believe that to take client lists, other
20  than the clients that were mentioned, because these two
21  individuals were investment advisors, they had clients that
22  were investors, and that I had probable cause on particular
23  clients and I had information on particular clients and I had
24  reason to believe that other investors and other clients were
25  being defrauded.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
Page 45

8-8-06 hearing.txt

98

6886TAN3                    Fraterrigo - redirect
1  Q.  Before we get there, let's just finish up with the topic of
2  what was discussed in the robing room.  Other than this
3  question that was asked by the Court of you and what your
4  answer was what, if any, other questions did I ask you?
5  A.  You asked me if -- did I believe -- there was a question
6  about probable cause and fact.
7           MR. KOBRE:  Objection.  It looks like the witness is
8  reading something.  I am asking what she is reading.
9           THE WITNESS:  The transcript.
10          THE COURT:  She is reading the transcript.
11          MR. KOBRE:  I would ask that either she not read from
12 it.  The question was what did Ms. McEvoy ask which had no
13 bearing on the transcript.
14          MS. McEVOY:  I believe the inspector testified she was
15 asked about a specific question in the transcript.
16          THE COURT:  That is what I thought.  The point is
17 taken.  Go ahead.
18          THE WITNESS:  I can't recall the question.  What is
19 the question?
20 BY MS. McEVOY:
21 Q.  In addition to the specific question pointed out on page 94
22 what, if any, other questions were you asked in the robing
23 room?
24          THE COURT:  The jury room.
25 Q.  The jury room.  Sorry.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

99

6886TAN3                    Fraterrigo - redirect
1  A.  I was asked if I was confusing the probable cause and fact
2  in the search warrant affidavit.  I was also asked -- when I
3  provided my answer, I was also asked about the link between the
4  investors that were named in the affidavit and those who were
5  not named.
6  Q.  And is that what you recall discussing in the totality in
7  the jury room?
8  A.  No.
9  Q.  What else do you recall?
10 A.  I recall explaining in the affidavit I did not specifically
11 mention particular clients, particular investors, particular
12 funds.  I said in the series of questions that I was answering
13 to Hoffman about, for instance, L.A.P.D. client.  When he asked
14 if there was probable cause to take this, it was not -- my
15 answer was not focused on what was in the affidavit.  The
16 affidavit did not specifically say L.A.P.D. Fire.  But what I
17 was answering to him is that it did not say it specific.
18          However, it was mentioned in the affidavit as these
19 are clients, these are investors, and I had probable cause to
20 believe that other investors were possibly being defrauded.  I
21 had reason to believe that based on my information of these
22 other victims and facts that I provided to magistrate that the
23 purpose of this search warrant was to identify other investors,
24 i.e., other clients that were possibly defrauded.
25 Q.  What, if anything, else do you recall discussing in the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

100

6886TAN3                    Fraterrigo - redirect
1  jury room?
2  A.  I recall discussing that the -- one of these days of
3  this -- of the -- one of the two days that I testified that I
                           Page 46

8-8-06 hearing.txt
```
 4   remembered being frustrated that I wanted to state this to the
 5   Court and I had came back in one instance and tried to clarify
 6   my statement and tried to clarify what I meant that I was being
 7   specifically asked particular investments about particular
 8   clients and they are not typed in the affidavit.  However, it
 9   is mentioned as -- as a -- there was reason to believe and
10   there was probable cause to believe that these two individuals
11   could be defrauding other investors and other clients, and that
12   is what I explained to you in the jury room.
13   Q.  In the jury room did anyone from the government tell you
14   what to say either on redirect or examination or on recross?
15   A.  No.
16   Q.  Is there anything else you recall from the robing room
17   before we get onto another topic?
18   A.  No.
19   Q.  Let's start with you mentioned just now trying to clarify
20   at one point during your previous testimony what you meant.
21   A.  Yes.
22   Q.  Can you turn to the transcript before you, July 10, pages
23   97 and 98.  On 97 it starts with line 16 and page 98 I think it
24   ends with line 17.  If you could take a moment and read that to
25   yourself?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

101

6886TAN3                    Fraterrigo - redirect
```
 1   A.  Page 97?
 2   Q.  Yes.  And 98.  Starting with line 16 on 97.
 3   A.  Yes.
 4   Q.  Is this the first time you had an opportunity to read this?
 5   A.  Yes.
 6   Q.  Did you discuss this portion -- any of the transcript other
 7   than with the government other than the question I asked you
 8   about on page 94?
 9   A.  Yes.
10   Q.  So other than the question on 94 did you discuss any of
11   this transcript with anyone from the government prior to right
12   now?
13   A.  Correct.
14   Q.  Correct what?
15   A.  You only asked me about that one particular question on the
16   transcript not about this, or any other part of my transcript.
17   Q.  When you were saying a time in your prior testimony where
18   you were trying to clarify what you meant, is this the part of
19   the proceeding where you were trying to do that?
20   A.  Yes.
21   Q.  What were you trying to convey here?
22   A.  What I was trying to --
23           MS. HOFFMAN:  I object, your Honor, to what she was
24   trying to convey.  It says what it says.
25           THE COURT:  Just rephrase the question.  I don't have
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

102

6886TAN3                    Fraterrigo - redirect
```
 1   it in front of me.
 2   Q.  Can you explain what you were trying to clarify?
 3   A.  I was trying to clarify that Mr. Hoffman was asking me a
 4   series of questions about particular clients, particular
 5   investments and asked me if I specifically had probable cause
 6   to take this item.
 7   Q.  Let's stop there.  Had probable cause.  What were you
 8   interpreting his question to mean?
```
Page 47

8-8-06 hearing.txt

```
 9  A.  I was interpreting it to mean that if it -- if it was named
10  in the document, if it was named in the affidavit, if it was
11  specifically named by its name in the document.
12  Q.  When you say "by its name"?
13  A.  File name, client name, investor name, fund name.  That is
14  what I interpreted it.  Because --
15  Q.  Let me ask you a follow-up question?
16          THE COURT:  Don't cut her off.
17  Q.  Go ahead.
18  A.  When he asked me a series of questions about the -- when he
19  asked me a series of questions, he followed up with find it in
20  the affidavit.  Specifically, do you see L.A.P.D. or do you see
21  this fund name in the affidavit.  And I did not see that
22  particular fund name.  I did not see that particular client
23  name, but I -- what I was trying to explain here was that I had
24  probable cause and reason to believe there were other
25  investments, other funds that were being defrauded by these two
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    103
```
    6886TAN3              Fraterrigo - redirect
 1  individuals.  That is what I was trying to explain.  That is
 2  what I presented to the magistrate.
 3          MS. HOFFMAN:  Your Honor, one moment.  Can I ask the
 4  stenographer to mark this place so it doesn't take us a long
 5  time on recross to ask her about this question.
 6          THE COURT:  You want the stenographer to put a special
 7  gold star on the page.
 8  BY MS. MCEVOY:
 9  Q.  So I am clear, when Mr. Hoffman asked you a series of
10  questions on cross-examination about whether you had probable
11  cause to see certain items, specifically the words "had
12  probable cause," what was your interpretation of those
13  questions?
14  A.  That if it was written in the actual affidavit, that
15  particular -- that particular file, if it was actually written
16  in the affidavit.  I interpreted as how it was written, if it
17  was written in the affidavit, where was it.  That was a series
18  of questions that followed.  I misinterpreted.  I meant that it
19  may not be mentioned by its name by particular investor, but it
20  is mentioned as there was reason to believe and probable cause
21  that it was in the affidavit.
22  Q.  When you say on lines 20 to 23 on page 97 "This falls along
23  the part of the affidavit that I did not specifically put this
24  item in, have evidence specifically for this, but there was
25  probable cause that this was covered under," can you explain
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    104
```
    6886TAN3              Fraterrigo - redirect
 1  that?
 2  A.  What I was trying to explain before, I don't know what the
 3  document MN is but I didn't -- like I stated, I didn't
 4  specifically name every investor of Amerindo.  I didn't
 5  specifically name every fund or every item.  It was -- what I
 6  was trying to explain was that I had facts -- at the time of
 7  these particular victims that were mentioned by name in the
 8  affidavit, I had facts about particular funds, particular
 9  accounts.  But as I presented to the magistrate and I was
10  trying to explain here that in my affidavit, I had probable
11  cause and reason to believe that other investors and other
12  clients could be defrauded based on the information, based on
13  the facts that I had.  I did not name other investments.  I
```
                            Page 48

8-8-06 hearing.txt

14  didn't specifically name whatever the document MN was.
15  Q.  Turning to the next page, 98, lines 3 to 8.  You say,
16  "Those five individuals were the probable cause I submitted
17  defrauded by these two individual.  I put in the affidavit that
18  there was probable cause and reason to believe there were other
19  investors, other clients, other victims, other possible
20  investments that could have also been defrauded by these two
21  individuals"?
22  A.  Yes.  That's correct.
23  Q.  As you just testified you used the terms "probable cause"
24  and "reason to believe"?
25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

105

6886TAN3                Fraterrigo - redirect
1   Q.  Do you recall being asked by Mr. Hoffman on
2   cross-examination about had you had probable cause to believe
3   that other investors were being victimized?
4           MS. HOFFMAN:  Can we get page and line?
5           MS. McEVOY:  Page 18, line 19 of July 10.
6           MS. HOFFMAN:  Thank you.
7   Q.  Do you recall being asked by Mr. Hoffman on
8   cross-examination, "Inspector Fraterrigo, had you had probable
9   cause to believe that other investors were being victimized.
10  Had you had information that went to that higher level then you
11  would have used that term if you had it, correct?"  And your
12  answer is "That's correct."
13          What, if any, distinction are you making between
14  probable cause and reason to believe or reason to be concerned,
15  if any?
16  A.  I think my distinction is that -- that with --
17  Q.  Let me ask this another way.
18          MS. HOFFMAN:  I object, your Honor.  Let her answer
19  the question.
20          THE COURT:  I agree.
21  A.  With probable cause is what was in the affidavit.  And my
22  interpretation is those are the ones -- the information I had
23  at the time were about particular investors.  That was a
24  probable cause.  The ones I named in particular.  I had reason
25  to believe and as I presented in the affidavit, there could be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

106

6886TAN3                Fraterrigo - redirect
1   other investors based on what I knew at the time and what I
2   knew that there was a crime being committed, and I had reason
3   to believe that other investors could be defrauded.
4   Q.  So when you say here on page 98, when you testified on page
5   98, lines 4 through 8, "I put in my affidavit there is probable
6   cause and reason to believe that there are other investors,
7   other clients, other victims, other possible investments that
8   could have also been defrauded by these individuals" --
9   A.  Yes.
10  Q.  -- what were you saying, if anything, regarding whether
11  there was probable cause to believe that other investors
12  besides the named clients were being defrauded?
13          MS. HOFFMAN:  I respectfully object.  Asked and
14  answered in the last question.
15          THE COURT:  I agree.
16  Q.  I am going to direct your attention, Inspector Fraterrigo,
17  to pages 37 and 38 of July 10, lines 18 to 25 and then the
18  following page 1 to 6.
Page 49

8-8-06 hearing.txt

```
19   A.  37, line 18.
20   Q.  Yes.  To the bottom and then the top of the following page.
21   You should read the question too that starts on line 13 of page
22   37.
23   A.  Okay.
24   Q.  You had a chance to read it?
25   A.  Yes.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

107

6886TAN3                    Fraterrigo - redirect
```
1    Q.  When you said there was no probable cause submitted to the
2    magistrate in the papers submitted to magistrate but you had
3    authority to seize it, what did you mean?
4    A.  What -- I think what I am probably doing is confusing it
5    that because I didn't specifically mention the brokerage
6    account by name in the affidavit.  I think that is what is
7    causing the confusion.
8            What I meant by having the authority to seize it, that
9    there was, as I mentioned in the affidavit that there was
10   reason to believe that other brokerage report accounts, other
11   investors, other clients as well defrauded.  Here it is I
12   didn't specifically -- when I mean there was no probable cause
13   that there was no specific fact or information put in the
14   affidavit for that particular item.
15           But there is probable cause to take it because there
16   was reason to believe that they could be defrauding other
17   investors using other brokerage accounts and using client's
18   money.  I just -- I think that is what is causing the
19   confusion.
20   Q.  At the time you submitted your application -- first of all,
21   a lot of terms have been thrown around.  What does your search
22   warrant application to the magistrate judge include?
23           MS. HOFFMAN:  I am going to object as this being
24   redirect.  We went all through that on direct as to every
25   document that was gone through.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

108

6886TAN3                    Fraterrigo - redirect
```
1            THE COURT:  I think in the context it is appropriate
2    to lay some quick background.  Go ahead.
3            THE WITNESS:  Can you repeat the question?
4    BY MS. McEVOY:
5    Q.  What documents did your search warrant application to the
6    magistrate judge include?
7    A.  It included the complaints on Vilar and Gary Tanaka.
8    Q.  What, if anything, else did your application to the first
9    search warrant include?
10   A.  It also included an attachment of items to be seized, facts
11   of my investigation and probable cause.
12   Q.  When you say "facts of your investigation," what is the
13   name of the document that includes the facts of your
14   investigation?
15   A.  The affidavit.
16   Q.  Did you include in this affidavit all the information you
17   had learned up until this point through the course of your
18   investigation?
19   A.  No.
20   Q.  At the time you applied for the search warrant, did you
21   believe that probable cause existed to search for the items
22   described in your search warn?
23   A.  Yes.
```

Page 50

8-8-06 hearing.txt
20  magistrate judge, I am not sure what its relevance is.
21          MS. McEVOY:  Can I tie it then to whether based on her
22  experience she believed that gave her probable cause?
23          THE COURT:  What difference does it make?  Now you are
24  introducing things inside her head that were not in the
25  affidavit.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

120

6886TAN3              Fraterrigo - redirect
1           MS. McEVOY:  But --
2           MS. HOFFMAN:  I have obviously have no objection to
3   that in view of where we want to go.
4           MS. McEVOY:  I am not asking for the basis of her
5   belief.  I am asking her did she believe.
6           THE COURT:  She already said in the affidavit under
7   oath that she believed whatever it is she believed based on
8   facts known to her and based on things she could extrapolate
9   from those phone facts.  That is your point.
10          MS. McEVOY:  Yes.
11          THE COURT:  So taking out of the context of this case,
12  someone sells a kilogram of cocaine on Tuesday and based on
13  that experiences they may have drug records, they may have
14  scales and other paraphernalia used to sell drugs even though
15  the law enforcement doesn't have specific information that
16  there are drug records or other paraphernalia.
17          MS. McEVOY:  That is my point.
18          THE COURT:  I think you should just move on.
19          MS. McEVOY:  Right.
20  BY MS. McEVOY:
21  Q.  I just want to ask you a couple questions, Inspector
22  Fraterrigo, about the questions you where are asked on
23  cross-examination about whether you didn't have or you didn't
24  submit probable cause to seize certain items.  If you could
25  look at the transcript on July 7, page 150.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

121

6886TAN3              Fraterrigo - redirect
1           THE COURT:  Line?
2           MS. McEVOY:  13.
3   Q.  Do you recall being asked -- you can follow along if you
4   like -- "As I went down a list of a hundred or so other than
5   the two individuals who are mentioned by institutional entities
6   like this whose records were housed at the Park Avenue office
7   and were clients of Amerindo Investment Advisors Inc., the
8   registered investment advisory company, would it be accurate to
9   say you had no probable cause to seize their, I will use the
10  specific words 'investment brochure,' sent to or gotten to
11  correct?  And then you say, "No."  The next page Mr. Hoffman
12  asks:  "No meaning, is that correct?"  And you answer, "That is
13  correct."
14          When you testified just there on cross-examination,
15  what did you mean?
16  A.  Again, it was like a series of questions from Mr. Hoffman
17  about particular investors, particular clients and I think I am
18  confusing the point of probable cause that I didn't
19  specifically mention Whirlpool Corporation, which is mentioned
20  in line 11 or other individuals.  I didn't specifically name
21  them by name in my affidavit, but I did submit to the
22  magistrate that there was probable cause and reason to believe
23  to have to seize information or that there would be information
24  at this location that there are other investors and other
Page 56

8-8-06 hearing.txt
25    clients that could possibly have been defrauded.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

122

6886TAN3                    Fraterrigo - redirect
1    Q.  What did you submit in your application to give you
2    probable cause to seize those items?
3    A.  I submitted an attachment and I submitted a description of
4    the fraud in my complaints and I described particular
5    witnesses, victims that were defrauded.
6    Q.  When you say submitted an attachment, what do you mean?
7    A.  An attachment of description of documents that should be
8    seized.
9    Q.  Right.  But what probable cause did you include your search
10   warrant affidavit to seize those items?
11   A.  I submitted a paragraph describing that -- what I stated
12   above, that there is reason to believe and probable cause that
13   there are other possible investors that had been possibly
14   defrauded.
15            THE COURT:  Did your affidavit or any attachments
16   mention any specific institutional investors that had been the
17   victims of any criminal conduct allegedly by the defendants or
18   just individual investors?
19            THE WITNESS:  Both.  It didn't specifically mention.
20            THE COURT:  It mentions not by name but you
21   specifically identified individual investors who you say had
22   been defrauded by the victim, correct?
23            THE WITNESS:  Correct.
24            THE COURT:  Did your affidavit or any other
25   attachments specify in institutional investors that had been
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

123

6886TAN3                    Fraterrigo - redirect
1    allegedly defrauded by defendants?
2            THE WITNESS:  When you say "specify," you mean name
3    that specific institution?
4            THE COURT:  Did the affidavit mention there was a
5    reason to believe that any institutional investors had been
6    defrauded, or was it just based on the fact they were
7    individual investors defrauded by the defendants?
8            THE WITNESS:  I can't recall without going through it
9    again.  I don't know if --
10            THE COURT:  That's all right.
11   BY MS. McEVOY:
12   Q.  If you can take a look, Inspector Fraterrigo, on page 5 of
13   your affidavit.  When it says the totality of the circumstances
14   in this case, including the investors being prevented from
15   redeeming or transferring the multiple million dollar
16   investors, investors lack basic information about their
17   investments and investment advisor who have made them believe
18   false statements, about the status of a five-million-dollar
19   investment.  Is it fair to say that that portion --
20            MS. HOFFMAN:  Object, your Honor.
21            THE COURT:  Watch the leading nature.
22            (Continued on next page)
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

124

688ztan4                    Fraterrigo - redirect
Page 57

8-8-06 hearing.txt

16  Q.  So was it your view that you could seize any document, any
17  Amerindo business document under paragraph one of that rider?
18  A.  No, no.  I mean I -- I saw it as limiting to those what's
19  followed through in the paragraph.
20  Q.  When you say what's followed through in the paragraph,
21  you're going to have to explain.
22  A.  Within that paragraph what is described as including like
23  shareholders, principals, officers, directors, employees and
24  such, like that.
25  Q.  Did you view paragraph -- whether you executed that
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                            131
            688ztan4                Fraterrigo - redirect
1  warrant, did you view paragraph one as giving you the authority
2  to seize any document with the word Amerindo on it?
3  A.  No.
4  Q.  Why not?
5  A.  Because the way I interpreted it is -- the way I
6  interpreted the entire attachment is, is, you know, each
7  paragraph kind of follows under the others.  Where paragraph
8  one is a general paragraph, it indicates every -- almost every
9  document that's in the search warrant that's in the business;
10  client lists, investment brochures, and then there's like
11  specifics.  The other paragraphs I took it as detailing kind of
12  like an inverted pyramid kind of thing.
13  Q.  All right, let's break down that.  When you said you viewed
14  paragraph one as every item that's in the business?
15  A.  No.  Paragraph one I took it as the -- as these corporate
16  records relating to these entities.
17  Q.  Okay.
18  A.  These particular entities, and there's a description of
19  what types of documents are in that paragraph.
20  Q.  Okay.
21  A.  And then there are following paragraphs that specifically
22  name particular items regarding particular investments, and it
23  follows through.  I didn't -- I didn't interpret it that I had
24  probable cause to take everything or I had the authority to
25  seize everything in Amerindo.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                            132
            688ztan4                Fraterrigo - redirect
1  Q.  What about every, did you believe you had probable cause to
2  seize every Amerindo business document?
3  A.  No.
4          THE COURT:  I want to understand exactly how it is
5  that you think paragraphs below paragraph one limited paragraph
6  one.  That's what you're saying, right?
7          THE WITNESS:  Yes.
8          THE COURT:  Did you say it's a pyramid; it's almost an
9  inverted pyramid, so the most generic description begins in
10  paragraph one and the paragraphs that follow that narrow the
11  scope of the search warrant?
12          THE WITNESS:  That's the way.
13          THE COURT:  So that each paragraph would narrow what
14  precedes it?
15          THE WITNESS:  That's my impression.
16          THE COURT:  So then by that logic, the only thing you
17  could look at is the last paragraph in the rider because that's
18  the -- what defines the scope of the search.
19          THE WITNESS:  No, it's there -- paragraph one is, to
20  me, is a general paragraph that indicates, you know, particular
                                Page 61

8-8-06 hearing.txt
21  entities of Amerindo, and then it states shareholders,
22  principals, officers, and such.  The other documents provide
23  specifics for paragraph one.
24  Q.  I think that's what we're trying to understand, Inspector
25  Fraterrigo?
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                           133
      688ztan4                Fraterrigo - redirect
1   A.  Yes.  It's -- maybe it's not an inverted pyramid, but it's
2   just each paragraph provides specifics for corporate records.
3   Instead of the paragraph number one alone, corporate records
4   can mean any business records in Amerindo; whereas, the other
5   paragraphs provide -- narrows it down, I mean.
6   Q.  I guess what is -- what you can you explain for us on the
7   one hand you just testified that you didn't interpret paragraph
8   one to mean every Amerindo business record that you --
9           MR. HOFFMAN:  Object, your Honor, to -- that's a
10  misstatement of or mischaracterization.
11          THE COURT:  Inspector, do you think -- you think you
12  were entitled to take every single Amerindo business or
13  corporate record under this search warrant?
14          THE WITNESS:  No.
15          THE COURT:  All right.  And what was it that you think
16  limited the scope of which corporate or business records of
17  Amerindo you were allowed to take?
18          THE WITNESS:  The other paragraphs in the attachment.
19          THE COURT:  Okay.  When you say any other paragraphs,
20  what is -- what exactly does that mean here?  Let me -- do you
21  have the rider there with you?
22          THE WITNESS:  Yes.  This is -- these are the
23  paragraphs from two to 17 limited, limited number one.
24          THE COURT:  Okay.  Can I just borrow that for a
25  second.  Was paragraph two limited by paragraph three?
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                           134
      688ztan4                Fraterrigo - redirect
1           THE WITNESS:  No.  Paragraph one was limited by the
2   others.  That's the way I took it.  It's the way I took it.
3           THE COURT:  So by that logic, would you even need to
4   read paragraph one?  You could just get rid of it and then you
5   would be allowed to seize everything in paragraphs two through
6   17.  What purpose does paragraph one serve, then, in your view?
7           THE WITNESS:  It provides a general sense, a general
8   information of what particular documents.
9   BY MS. McEVOY:
10  Q.  Are there any -- when it says corporate records in
11  paragraph one, are there any types of corporate records listed
12  there that you believe paragraph one, standing alone, gave you
13  authority to seize as opposed to any of the other paragraphs in
14  the warrant --
15  A.  Yes.
16  Q.  -- rider?  What types of corporate records did you view
17  paragraph one giving you authority to seize without having to
18  look at the rest of the rider?
19  A.  Shareholder information, bylaws, resolutions, what's listed
20  there.
21          THE COURT:  What's listed in paragraph one?
22          THE WITNESS:  Yes.
23          THE COURT:  So -- I'm sorry.  Could I borrow this
24  again?  So, according to paragraph one, you can seize any and
25  all client files and marketing materials for any of the
                            Page 62

8-8-06 hearing.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

135

688ztan4                    Fraterrigo - redirect
1    Amerindo entities; is that right?
2           THE WITNESS:  Yes.
3           THE COURT:  So then, in other words, what's in
4    paragraph one stands alone and authorizes you to take any and
5    all marketing materials for any of the Amerindo entities?
6           THE WITNESS:  Yes.
7    BY MS. McEVOY:
8    Q.  When you executed the search warrant, did you view
9    paragraph one standing alone?
10   A.  No.  I made determinations when I was searching the office,
11   I made particular determinations whether it was covered under
12   the warrant, and then later determined if it was useful to the
13   investigation, and I seized what.
14   Q.  Right.  But you said you made a determination based on what
15   did you --
16   A.  Based on this attachment, based on my understanding of the
17   attachment.
18   Q.  And my question to you is, Inspector Fraterrigo, did you
19   make that determination based on a particular paragraph?
20   A.  Yes.
21   Q.  Can you just explain for us the process you followed when
22   determining which items to seize?
23   A.  I, as I went through documents, I made a determination
24   whether it was covered under the warrant, and if it was covered
25   under the warrant, I made a determination there whether it was
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

136

688ztan4                    Fraterrigo - redirect
1    useful to the investigation, and if it was I seized it.
2    Q.  Under the Judge's question which he just asked you, client
3    files, if, as you just testified, all Amerindo client files
4    could be seized under paragraph one, what was the process you
5    followed to determine whether or not you were going to seize
6    the client files?
7           MR. HOFFMAN:  I'm going to object to that.  She asked
8    the question before what process did you use.  She answered it
9    very specifically.
10          MS. McEVOY:  I'm asking a specific example here.
11          THE COURT:  I'll allow the question.
12   Q.  If you came across a -- if, as you just testified, you were
13   authorized to seize any client file under paragraph one of the
14   rider?
15   A.  Uh-huh.
16   Q.  Did you, in fact, just seize all client files under
17   paragraph one of the rider?
18   A.  Um, I seized client files that were relating to -- I don't
19   know if I actually seized that particular client files.  I
20   mean, it would be covered under paragraph one.
21          THE COURT:  Can I have this?  All right.  When it says
22   that property that can be seized, paragraph one, court records
23   concerning Amerindo investment advisors, and then it lists the
24   other entities, including but not limited to marketing
25   materials, copies of correspondence sent to or received from
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

137

688ztan4                    Fraterrigo - redirect
1    client -- let's just take those two categories, marketing
Page 63

8-8-06 hearing.txt

13  A.  For purpose of going through it to see what was in it and
14  determining what could be of interest in these boxes.
15  Q.  Were there instances in which you reviewed the boxes, but
16  could not identify the specific items listed in Miss Wolf's
17  letter?
18  A.  Yes.
19  Q.  Approximately, how many types?
20  A.  There was one particular item.
21  Q.  One particular?
22  A.  There was one particular envelope or box that she named in
23  the letter that I could not find.
24  Q.  What did you do in those instances?
25  A.  I tried -- I went through the rest of the boxes and I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    155
        688ztan4              Fraterrigo - redirect
1  believe I located the possible document.
2  Q.  Did there come a time when you had a conversation with
3  Ms. Wolf about which items she specifically wanted you to bring
4  to the hearing?
5  A.  Yes.
6  Q.  Approximately, how many conversations did you have with
7  Miss Wolf about the items listed in her letter?
8  A.  I believe it was may have been one, one conversation, maybe
9  two.  I can't recall.
10  Q.  And between the date of that letter, May 26, 2006 and
11  today, did there also come a time when defense counsel
12  requested access to the search materials?
13  A.  Yes.
14  Q.  Did you accommodate those requests?
15  A.  Yes.
16  Q.  How?
17  A.  I scheduled time to -- for myself to sit with them as they
18  reviewed the boxes, and I also arranged other postal inspectors
19  to sit with them as they viewed the boxes.
20  Q.  And approximately, on approximately how many occasions did
21  you or other postal inspectors provide access to defense
22  counsel so they could review the boxes in preparation for the
23  hearing?
24          MR. KOBRE:  Your Honor, to short circuit this, I don't
25  think defense is at all claiming they didn't have access to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    156
        688ztan4              Fraterrigo - redirect
1  these boxes.
2          The issue is after being identified, defense counsel
3  wanted to use them at the hearing, they were -- the items were
4  removed and sent back to the company.  The government can go
5  through this line, take the time, but we don't contest access.
6          THE COURT:  I assumed that all along, yes.  I
7  didn't -- I agree, and anyway, I think you made the point.
8          MS. MCEVOY:  I'll just ask the question.
9          THE COURT:  Go head, ask the question.
10  Q.  When you were asked on cross-examination by Mr. Kobre
11  whether you were trying to impede the defense from preparing
12  for cross-examination, were you trying to impede them --
13  A.  No, I was not.
14  Q.  -- to prepare for cross-examination?
15          With respect to the items you returned to Amerindo,
16  what was your purpose in returning those items?
17  A.  The purpose was that decision was made that it was not
                            Page 72

8-8-06 hearing.txt
```
18   covered under the warrant and it should have not been seized,
19   and it was returned.
20   Q.  And what was the nature of those items?
21   A.  There were personal letters from Alberto Vilar to a woman,
22   other personal letters of Alberta Vilar.  I believe there was a
23   CD with Spanish language.  I can't recall the others.
24   Q.  Were they business records?
25   A.  No.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

157

688ztan4                    Fraterrigo - redirect
```
 1   Q.  Do you recall being asked a question on cross-examination
 2   about whether you didn't have enough time to search each and
 3   every document in, or each and every note book in Mr. Vilar's
 4   office?
 5   A.  Yes.
 6   Q.  In addition to searching Mr. Vilar's office on May 26,
 7   2005, what, if anything, did you do at Amerindo's's offices
 8   that day?
 9   A.  While I was there, I was trying to make arrangements for
10   the arrest of Alberto Vilar in California.  I was making a lot
11   of calls.  I answered postal inspectors' questions, I assisted
12   in inventorying of documents.  I went through the offices for
13   the fax machines and printed out the journal reports from the
14   fax machines, assisted team leader John Feiter in inventorying
15   the boxes and having them removed by inspectors.  I can't
16   recall --
17   Q.  And --
18   A.  -- what else.
19   Q.  And, approximately, how long do you spend at the premises
20   that day?
21   A.  Approximately eight hours, seven hours to eight hours.
22   Q.  And were you available to answer postal inspectors'
23   questions during that entire period?
24   A.  Yes.
25   Q.  Do you recall being asked a question on cross-examination
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

158

688ztan4                    Fraterrigo - redirect
```
 1   by Mr. Kobre about what probable cause in the search warrant
 2   did you include regarding searching Mr. Tanaka's office; do you
 3   recall that question?
 4   A.  Yes.
 5   Q.  Directing your attention to paragraph four of your search
 6   warrant affidavit, what if any information did you include in
 7   there about where Mr. Tanaka works when he's in New York?
 8   A.  I stated that the affidavits prepared in support of the
 9   application, I indicated that Tanaka works when -- works at the
10   399 Park Avenue, 22nd floor.
11   Q.  Works generally or --
12   A.  Works there when he's in New York.
13   Q.  I'm now going to focus your attention on the U.K search.
14           THE COURT:  Why don't we do this -- we're coming up on
15   the breaking point, so why don't we break for the evening and
16   we'll -- I assume you don't have too much time left.
17           MS. McEVOY:  No.
18           THE COURT:  All right.  So why don't we break now and
19   then we can resume tomorrow morning at 9:30.  Let's table the
20   discussion about where we're at until tomorrow, in terms of
21   when we're going to finish this thing.
22           MR. HOFFMAN:  Your Honor could I just ask that the
```
Page 73

8-8-06 hearing.txt

23   other search warrant that Detective Fraterrigo testified she
24   was involved with, or various statements she made about it,
25   that that search warrant and its underlying affidavit be
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

159

688ztan4                    Fraterrigo - redirect
1   produced to defense?
2            THE COURT:  Mr. Kobre?
3            MR. KOBRE:  I have nothing on this, Judge.  I was
4   going to ask something else.
5            THE COURT:  Let's just get all our requests out on the
6   table.
7            MR. KOBRE:  I just wanted to find out from the
8   government who the witnesses will be for tomorrow.
9            THE COURT:  Yes, that's a fair question.  Who is going
10  to be on tomorrow?
11           MS. McEVOY:  Mr. Litt will resume cross, and then
12  there are three witnesses left, inspector or former postal
13  inspector Feeney, inspectors Golden and Williamson and the
14  Government's not sure exactly what -- where it's going to be,
15  depending on the availability of those witnesses.  They'll all
16  be available, but --
17           THE COURT:  Is there a particular order, though, that
18  you're going to go in or --
19           MS. McEVOY:  Just because Mr. Feeney is now in the
20  private sector --
21           THE COURT:  He's going to go first.
22           MS. McEVOY:  We'll check with him to see if he's
23  available.  Yes.  I don't know how long Mr. Litt's cross
24  Mr. Hoffman anticipates.
25           MR. HOFFMAN:  Couple hours.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

160

688ztan4                    Fraterrigo - redirect
1            THE COURT:  Well, the good news is this trial is going
2   to be shorter than it would have been, I'll tell you that.
3            All right.  So it sounds like we'll still get to
4   Feeney tomorrow, even if Mr. Litt is on cross for a couple of
5   hours.
6            MR. HOFFMAN:  To be more specific, at the outside a
7   couple of hours.  I mean it will be more than an hour, I
8   believe.
9            THE COURT:  All right.  I'm happy to make a pool.  Who
10  wants the over under, three hours?
11           It's not meant to you, Mr. Hoffman.  All right, so
12  we'll go -- we'll finish up with Inspector Fraterrigo, then we
13  go to Mr. Litt, then Mr. Feeney, and then we'll see where we're
14  at.
15           All right.  Now, I don't know, Inspector, that the
16  materials that you -- this money laundering search warrant that
17  you did, are they handy?
18           THE WITNESS:  Yes, I think so.
19           THE COURT:  All right.  If you could go ahead and try
20  to collect those and bring them with you first thing in the
21  morning so that they can be made available to counsel.
22           All right, anything else we need too take up now?
23           MR. COLTON:  Just a technical clarification.  Agent
24  Inspector Fraterrigo is no longer on cross, but Mr. Litt still
25  is, so they should just be careful.  I assume, of course, one
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
Page 74

8-8-06 hearing.txt

161

688ztan4                     Fraterrigo - redirect
1  is released from that.
2              THE COURT:  Come on.
3              MR. COLTON:  I just want to make sure it's clear.
4              THE COURT:  Come on.  That's unnecessary.
5          All right, anything else?
6              MS. McEVOY:  No, your Honor.
7              THE COURT:  All right, then have a pleasant evening.
8  We'll see you all tomorrow morning.
9              (Adjourned to August 9th, 2006 at 9:30 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

162

1                       INDEX OF EXAMINATION
2  Examination of:                              Page
3  Cross By Mr. Kobre . . . . . . . . . . . .      2
4                       DEFENDANT EXHIBITS
5  Exhibit No.                               Received
6   WW and XX   . . . . . . . . . . . . . .      18
7   YY      . . . . . . . . . . . . . . . .      19
8   AAA     . . . . . . . . . . . . . . . .      25
9   BBB     . . . . . . . . . . . . . . . .      27
10  FF      . . . . . . . . . . . . . . . .      28
11  CCC     . . . . . . . . . . . . . . . .      82
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300