# Exhibit A

```
65VVVILH
```

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                        05 CR 621 (KMK)

 5   ALBERTO VILAR,
     GARY TANAKA                        SUPPRESSION HEARING
 6
                  Defendants.
 7
     ------------------------------x
 8
                                        New York, N.Y.
 9                                      May 31, 2006
                                        10:05 a.m.
10

11   Before:

12                   HON.  KENNETH M. KARAS,

13                                      District Judge

14
                        APPEARANCES
15
     MICHAEL J. GARCIA
16        United States Attorney for the
          Southern District of New York
17   DEIRDRE McEVOY
     MARC LITT
18        Assistant United States Attorneys

19   HOFFMAN & POLLOK
          Attorneys for Defendant Alberto Vilar
20   JEFFREY C. HOFFMAN
     SUSAN C. WOLFE
21
     Attorneys for Defendant Gary Tanaka:
22
     WILSON SONSINI GOODRICH & ROSATI
23        GLENN CHARLES COLTON
               -AND-
24   KOBRE & KIM
          STEVEN GARY KOBRE
25
```

65VVVILH                          Litt - direct

1   delete the thing that you typed, that that would register as a

2   modification to the document.  But I'm not -- I want to qualify

3   that by saying I'm not --

4            THE COURT:  You're not qualified as a computer expert,

5   okay.

6            THE WITNESS:  Computer expert.

7   BY MS. McEVOY:

8   Q.  Mr. Litt, what was your purpose in issuing the grand jury

9   subpoena on Amerindo on May 26, 2005?

10  A.  My purpose was to achieve the two objectives that

11  Mr. Esseks had outlined to me when I asked him the question

12  about whether it was appropriate to issue a grand jury

13  subpoena, and whether it would be a good idea to do so.

14  Q.  And what were those reasons?

15           THE COURT:  I mean he just went over those a minute

16  ago, all right.  So let's just move on.

17  Q.  At the time you issued the grand jury subpoena, were you

18  aware of any defects in the search warrant?

19  A.  No.

20  Q.  What, if any, approval process had the search warrant gone

21  through?

22  A.  Well, I had drafted it; Inspector Fraterrigo had reviewed

23  it; we had gone to Magistrate Judge Maas's home the night

24  before -- excuse me.  It had been shown to Mr. Esseks, who is

25  my supervisor, who was well aware of the investigation and the

1   information that had been developed over the course of the

2   approximately six weeks that we'd been investigating this case.

3   And so he was not coming to it fresh, but was very well

4   familiar with it.  And he had reviewed it and approved it.

5          And then we went to Magistrate Judge Maas from

6   approximately sometime between 9 and 9:30 on May 25, till

7   10:30, when he issued the warrant.

8          And I observed Magistrate Maas read the two criminal

9   complaints, the search warrant affidavit, and the search

10  warrant and rider in my presence during that approximately hour

11  to hour-and-15-minute time period.

12  Q.  Was your purpose in serving the subpoena to correct any

13  defects in the search warrant?

14  A.  No.

15  Q.  Did there come a time on May 26 when you served the grand

16  jury subpoena on Amerindo Investment Advisors, Inc.?

17  A.  Yes.

18  Q.  And how did you serve the subpoena?

19  A.  I served it by fax, to a fax number at Kirkpatrick &

20  Lockhart.

21  Q.  And for what reason did you serve it by fax to Kirkpatrick

22  & Lockhart?

23  A.  I recall during a conversation with Mr. Licker that

24  morning, and it may have been the first conversation, where he

25  asked the question, Are you going to serve a grand jury

65VVVILH                    Litt - cross

1    Q.  There may have been some, you just don't know?

2    A.  To his chambers?  It's possible.

3    Q.  And there's no recording of those representations anywhere,

4    are there?

5    A.  You'd have to ask chambers.  I don't have any recording.

6    Q.  And you didn't ask to get a recording?

7    A.  No, I did not.

8    Q.  Who went with you to Magistrate Judge Maas's apartment?

9    A.  U.S. Postal Inspector Cynthia Fraterrigo.

10   Q.  Anybody else?

11   A.  Not that I'm aware of, no.

12   Q.  Is it your testimony that Magistrate Judge Maas took the

13   papers and read over them for over an hour before issuing the

14   warrants?

15   A.  At least approximately one hour.

16   Q.  What questions, if any, did he ask you or Inspector

17   Fraterrigo?

18   A.  I recall Magistrate Maas -- well, strike that.  About the

19   warrant?

20   Q.  About the warrant -- any of the three warrants you were

21   seeking, or any of the supporting papers, therefore.

22              MS. McEVOY:  Objection, your Honor, as to relevance.

23              THE COURT:  What's the relevance?

24              MR. COLTON:  The Court's already ruled that we have a

25   right to the information that was presented to the magistrate