# Exhibit G

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4            v.                          05 Cr. 621 (KMK)

 5   ALBERTO VILAR                       Hearing
     GARY TANAKA,
 6                  Defendant.
     ------------------------------x
 7                                       New York, N.Y.
                                         July 10, 2006
 8                                       9:45 a.m.
     Before:
 9
                KENNETH M. KARAS
10                                       District Judge

11   MICHAEL J. GARCIA
     United States Attorney for the
12   Southern District of New York
           One St. Andrew's Plaza
13         New York, N.Y.  10007
     DEIRDRE A. McEVOY
14   MARC O. LITT
           Assistant United States Attorneys
15
     JEFFREY C. HOFFMAN, ESQ.
16   SUSAN C. WOLFE, ESQ.
     Attorneys for Defendant Vilar
17         Hoffman & Pollik, LLP
           260 Madison Avenue, 22nd Floor
18         New York, New York  10016
           (212) 679-2900
19
     GLENN C. COLTON, ESQ.
20   Attorney for Defendant Tanaka
           Wilson Sonsini Goodrich & Rosati (NYC)
21         12 East 49th Street, 30th Floor
           New York, New York  10017
22         (212) 999-5804

23   STEVEN G. KOBRE, ESQ.
     Attorney for Defendant Tanaka
24         Kobre & Kim LLP
           800 Third Avenue
25         New York, New York  10022
           (212) 488-1200
```

1    other than the statement by the Mayers that they invested in

2    guaranteed fixed rate deposits, which are not part of Amerindo

3    U.S.

4           THE COURT:  But that doesn't mean that her statement

5    that there was PC that they invested in Amerindo U.S. is

6    somehow intentionally false.  It doesn't mean that.  I

7    understand you have one view of the evidence, but that doesn't

8    by itself mean that that is proof that somehow she has

9    intentionally misrepresented something to the magistrate judge.

10          MR. HOFFMAN:  All right.

11          THE COURT:  Mr. Kobre, did you want to say anything?

12          MR. KOBRE:  No.

13          (In open court)

14   BY MR. HOFFMAN:

15   Q.  If you would look at page 3 of the affidavit, paragraph 6A,

16   you state in substance in that paragraph that you were informed

17   by Lisa Mayer that she and her family, in essence, invested in

18   guaranteed fixed rate deposits, correct?

19   A.  That's correct.

20   Q.  You also state that their money was managed in an offshore

21   account with PTC Management Limited in Nassau, correct?

22          MS. McEVOY:  Your Honor, if Mr. Hoffman is going to

23   read from the affidavit, the government would ask that he read

24   it accurately.  I think it says to manage much of their

25   Amerindo investment.

1  A.  No.

2  Q.  Or that involved SBIC investments?

3  A.  No.

4  Q.  In paragraph number 9 on page 7 you say there is probable

5  cause to believe that the following records and

6  instrumentalities of the fraudulent schemed described above and

7  other evidence related to and evidencing such crimes are

8  located at the premises.

9        Other than Lily Cates having told you that at some

10 time between 2002 and 2004, as stated in your affidavit, she

11 had been at the premises on Park Avenue and had seen

12 approximately 80 boxes that she said Mr. Vilar told her had

13 information that would be used in evaluating her investment --

14 are you with me?

15 A.  Yes.  I am just making sure that is what is in the

16 affidavit.

17 Q.  Let me ask you this.  Do you remember putting that in the

18 affidavit?

19 A.  I was just making sure that what you are saying is

20 accurately in the affidavit.

21 Q.  Go ahead.

22 A.  Go ahead.

23 Q.  Other than that, and other than your statement that we just

24 went through on page 7, paragraph 8, that in your training and

25 experience there are records kept at places of business for

1  substantial periods of time which would evidence, as you put

2  it, such schemes, other than that background experience you

3  described and Lily Cates's statement that she was once shown

4  sometime between 2002 and 2004 80 boxes by Mr. Vilar of the

5  information which could be used to value her investment, other

6  than those two things, is there anything else in this affidavit

7  that supports -- is there anything else -- have you put

8  anything else in this affidavit concerning what documents you

9  knew to be at the premises on Park Avenue that would show

10  evidence of crimes being committed?

11          MS. McEVOY:  Objection:  Compound and unclear.

12  Q.  Do you understand the question?

13  A.  No.

14          THE COURT:  Why don't you try to break it down.  I am

15  not sure that it was improper, but go ahead, Mr. Hoffman.

16  Q.  You state that Lily Cates told you that sometime between

17  2002 and 2004 Mr. Vilar showed her 80 boxes of materials that

18  he said contained information that could be used to evaluate

19  her investment, correct?

20  A.  That's correct.

21  Q.  You also state that based on your prior experience, you

22  believe that people involved in what you call such schemes,

23  referring to what you have described in the affidavit as

24  illegal schemes, keep records of those schemes at their

25  businesses, correct?

```
 1    probable cause to believe that any client other than those
 2    already mentioned, as you said a moment ago, had been
 3    victimized?
 4    A.    That's correct.
 5    Q.    When you put, third line down in paragraph 8, client files
 6    as documents to appropriately be seized, likewise, as you said
 7    a moment ago, you had no probable cause to believe that any
 8    clients' files would show evidence of victimization of those
 9    clients other than the people you described to us a moment ago:
10    The Mayers, Ms. Cates, Brian Harvey, Joy Urich, and Paul
11    Marcus?
12               MS. McEVOY:  Your Honor, objection.  These questions
13    were asked and answered on Friday, I believe.
14               MR. HOFFMAN:  These were asked and answered on Friday
15    as to attachment A.
16               THE COURT:  I am going to overrule.  They may have
17    been asked and answered on Friday, but overruled.
18    Q.    Is that correct?
19    A.    Can you repeat the question, please.
20    Q.    It is the same question I have asked you about the other
21    matters.  As to the client files, there were no clients whose
22    files other than the five people we just mentioned -- the
23    Mayers, the Cateses, Urich, Marcus, and Harvey -- that you had
24    probable cause to believe had been victimized, correct?
25    A.    I did not list them in the affidavit, but had probable
```

1    cause --

2    Q.  But not in the papers, correct?

3    A.  Not in the papers, correct.

4    Q.  When you called for investment brochures on page 8, the

5    next category after client files, can you tell us what you

6    meant by "investment brochures."

7    A.  I don't have any brochure describing the type of

8    investment, a description of the investment, any pamphlet that

9    describes the nature of the investment, how it is going to be

10   invested.

11   Q.  When you say "the investment," you are talking about any

12   investments that any of the Amerindo companies offered,

13   correct?

14   A.  That is correct.

15   Q.  Did you put any information in the documents that you put

16   before the magistrate, your affidavit and its attachments, that

17   would support probable cause to seize documents concerning any

18   improper investment other than investments in the guaranteed

19   fixed-rate deposit and investment in the SBIC by Lily Cates and

20   her $1 million investment in the other entity that she invested

21   in?

22   A.  That seems unclear.  I can't answer that.

23   Q.  Because the question is unclear?

24   A.  Yes.

25   Q.  Let me rephrase the question.  In the affidavit you talk

1   investment advisory agreements, and copies of correspondence

2   sent to or received from clients -- from the beginning of time

3   until the time that you submitted this affidavit, correct?

4   A.   From the beginning of time?

5   Q.   From whenever they first came into existence.

6   A.   Yes.

7   Q.   Whether that was 10 years ago or 20 years ago or 30 years

8   ago, correct?

9   A.   That's correct, yes.

10  Q.   Isn't it accurate to say that other than five individuals

11  we have been mentioning -- maybe I can do it this way so I

12  don't have to keep repeating it -- the five individuals

13  mentioned in paragraph E, page 5, that you did not put any

14  information in the documents you submitted to the magistrate

15  that would support probable cause to get copies of

16  correspondence sent to or received from clients other than

17  those five from whenever those documents originated 10, 20, 30

18  years ago to the time that you submitted this affidavit,

19  correct?

20        MS. McEVOY:   Your Honor, objection.   There aren't five

21  individuals listed in paragraph E.   The government has no

22  objection to the general question.

23        MR. HOFFMAN:   I'm sorry.   That's correct.

24  Q.   From now on, when I say "the five individuals," I am

25  referring to Cates, Mayer, Brian Harvey, Joy Urich, and Paul

1   the documents?

2   A.   That's correct, no.

3   Q.   Correct?

4   A.   I did not submit probable cause.

5   Q.   You did not submit probable cause to seize these documents,

6   correct?

7   A.   Correct.

8   Q.   Let me ask you this.  Since I am not prepared to do these

9   in bulk, have you gone through the documents in the various

10  boxes that you supplied to the defense that were brought here

11  in court?

12  A.   Yes.

13  Q.   Would it be accurate to say that there are a number of

14  brokerage accounts in addition to the ones I just showed you

15  whose documents were received which accounts were not named in

16  paragraph B as in "boy" page 8 and for which there was no

17  probable cause submitted to the magistrate?

18  A.   They were seized, but they were seized under a different

19  paragraph of the affidavit.  I had authority to seize it.

20  Q.   I am not asking you whether or not there was a paragraph

21  that gave you authority to seize a whole bunch of things.  That

22  is not my question.

23  A.   OK.

24  Q.   My question is, as with the ones I just showed you, that

25  there are other brokerage accounts that were seized that are

67arvlin        Fraterrigo - cross

```
 1    information before the magistrate you knew that as to all those
 2    things that were mentioned that you had not put before the
 3    magistrate any probable cause, any information supporting
 4    probable cause to seize them, you knew that at that time as
 5    well, correct?
 6            MS. McEVOY:  Objection as to ambiguity.
 7            THE COURT:  It is wordy but not ambiguous.
 8            MR. HOFFMAN:  That is stereotypical, so I will
 9    rephrase it.
10            THE COURT:  You can rephrase it if you want.  Go
11    ahead.
12    Q.  Isn't it a fact that at the time you put this material
13    before the magistrate to get a search warrant, you had the same
14    basic knowledge you have today in that you knew that you had
15    not given the magistrate a basis to support probable cause to
16    seize certain documents that you described yesterday and today
17    as not having given the magistrate probable cause to seize?
18            MS. McEVOY:  Objection, your Honor.
19            THE COURT:  Overruled.  Do you understand the
20    question?
21            THE WITNESS:  No.
22    Q.  I will narrow it down, and then we will hopefully go to
23    lunch.  I asked you about a bunch of various categories of
24    document that were in the materials you put before the
25    magistrate where you asked for those categories of documents to
```

67arvilh                        Fraterrigo - cross

1    be seized.  Do you remember those questions?

2    A.  Yes.

3    Q.  Excluding the five individuals, I asked you if in fact you

4    had no materials put before the magistrate that would give the

5    magistrate probable cause to have you seize these various

6    categories, and question after question you answered by saying

7    that's correct, exclusive of the five individuals there was no

8    material put before the magistrate to support probable cause to

9    seize those documents.  Do you remember those questions and

10   answers?

11   A.  Yes.

12   Q.  What I am asking you is that information which you just

13   gave us as to those categories where there was no information

14   put before the magistrate to support probable cause to seize

15   those documents, you had the same awareness at the time you put

16   the information before the magistrate, you knew at that time,

17   just as you have testified here under oath, that you were not

18   putting in the documents before the magistrate material to

19   support probable cause to seize those documents, correct?

20          MS. McEVOY:  Objection.

21          THE COURT:  Inspector, do you remember giving

22   testimony about client lists?

23          THE WITNESS:  Yes.

24          THE COURT:  And that there was probable cause.  You

25   said that there was not probable cause to get all the client

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                    Have you looked through it?

2    A.  Yes.

3    Q.  Would it be accurate to say that there is nothing contained

4    in defense M as in "mother" M as in "mother" that relates to

5    the five people we discussed?

6    A.  Yes.

7    Q.  Would it be accurate to say that that Exhibit M as in

8    "mother" M as in "mother" falls within the category of those

9    documents that you requested that the magistrate allow you to

10   seize for which you knew at the time you made that request that

11   you were not putting any evidence before the magistrate to

12   support such probable cause?

13                  MS. McEVOY:  Objection.

14                  THE COURT:  Overruled.

15   A.  I don't understand the question.  Could you repeat it?

16   Q.  Let me ask the question again.  Does that document MM fall

17   within the category of documents such as those we discussed

18   before where there was not any material put before the

19   magistrate to support probable cause to seize that document?

20   A.  This falls along the part of the affidavit that I did not

21   specifically put this item in, have evidence specifically for

22   this.  But there was probable cause that this was covered

23   under.  What I submitted in my affidavit -- and I think I need

24   to clarify my answers that I have said before, because I think

25   there is -- in part of my affidavit I put down those five

1    individuals.

2    Q.   Correct.

3    A.   Those five individuals were, in the probable cause I

4    submitted, defrauded by these two individuals.   I put in my

5    affidavit that there is probable cause and reason to believe

6    that there are other investors, other clients, other victims,

7    other possible investments that could have also been defrauded

8    by these individuals.

9            So when you are asking me if I put specific probable

10   cause on this particular item or investment or Amerindo Tech D,

11   I think it is a bad assumption.   What I have this under is it

12   is probable cause to believe that there were other particular

13   items.   I had reason and probable cause that I submitted before

14   the judge that there are investors that invested with Amerindo

15   and that there are other possible and potential other victims

16   and investors.   I think this is covered under that part of the

17   affidavit, if I made myself clear.

18   Q.   After your testimony this morning, before you took the

19   stand this afternoon, did you discuss your testimony with

20   anybody?

21   A.   No, I did not.

22   Q.   In your affidavit that was put before the magistrate for

23   the search warrant, you described information concerning Lily

24   Cates, correct?

25   A.   That's correct.

1    were never made aware of any phone calls or requests from

2    Amerindo U.S. to return any of the material that  Amerindo U.S.

3    during the time that Ms. Wolfe made her request and the time

4    that you went into the boxes and sent the material back to

5    Amerindo U.S., correct?

6    A.   That is correct.

7    Q.   And you were aware at the time -- withdrawn.

8              You have been aware pretty much since the time this

9    case has commenced that the defense in this case has been

10   requesting the return of irrelevant materials to it, correct?

11   A.   That is correct.

12   Q.   And there have been numerous conferences where the defense

13   has actually publicly requested that material be returned to

14   it, correct?

15   A.   That is right.

16   Q.   And even as recently as back in March Mr. Colton had

17   actually asked that material be returned, correct?

18   A.   That is correct.

19   Q.   And at that time you didn't go through the 12 boxes and

20   return what you thought to be irrelevant material, did you?

21   A.   At that time I don't recall the exact date but I did go

22   through the inventory sheets of all the boxes and based on what

23   was on the inventory sheets I pulled out stuff that was not

24   covered under the search warrant and I did return some

25   materials.

1   Q.   Did you actually go through the boxes?

2   A.   No, I actually went through the inventory sheets.

3   Q.   And can you explain what it was that compelled you in the

4   last week to go through the materials that the defense wanted

5   to use at this hearing and disturb them, if you will, and send

6   them to Amerindo U.S.?

7           MS. McEVOY:   Objection to the characterization of the

8   testimony.  I don't think it was the last week.

9           THE COURT:   Whenever it was.

10          MR. KOBRE:   Friday.

11          THE COURT:   Whenever it was.

12          Go ahead.

13  A.   When I reviewed the boxes for the purpose of the hearing,

14  as I went through the boxes I realized there were some items in

15  there that were not covered under the warrant.

16  Q.   And was there something that you felt that there was

17  suddenly an urgency that those items needed to be returned and

18  couldn't wait the 6 days until this hearing that they had to be

19  sent back immediately?

20  A.   I believe there was a discussion that it was just -- we had

21  no authority to be in possession of that material.

22  Q.   So I take it, then, after seeing that material, then you

23  went back through the 150 other boxes and looked for material

24  that you didn't have authority to be in possession of as well,

25  is that right?

1    A.   I did not.

2    Q.   Inspector Fraterrigo, just before we broke you had stated

3    that the reason why you felt that there was sudden urgency to

4    return the documents on Friday of last week was because you had

5    no authority to possess them, is that right?

6    A.   Friday two weeks ago, June 28, exactly, that is correct.

7    Q.   Just to be clear, the first day of the hearing when it was

8    supposed to be commenced was on the 7th of July, correct?

9    A.   Yes.

10              THE COURT:   Hang on.   That is the date we adjourned

11   from the last go-round from May 31-June 1.

12              MR. KOBRE:   Right.

13   Q.   So on June 28 you sent the material back and approximately

14   7 days later it was going to be the continuation of the

15   hearing, correct?

16   A.   Yes.

17   Q.   Again, just before we broke I had asked you whether or not

18   believing that you didn't have the authority to possess

19   irrelevant material you went back at that time to the other 150

20   boxes to make sure that you weren't in possession of material

21   that you didn't have authority to possess?

22   A.   No, I did not.

23   Q.   And at that time realizing that you were in possession of

24   material that you didn't have authority to possess, did you go

25   back through the computers and ensure that the government

1    wasn't sitting with material that was not relevant to the

2    search?

3    A.  No.

4    Q.  So am I correct that the only evidence that you decided to

5    return to Amerindo U.S. was from the 12 boxes specifically

6    requested by the defense to use at the hearing?

7    A.  No, that is incorrect.

8    Q.  One of the things you knew was you knew that -- withdrawn.

9            You sat in court and observed the questioning and the

10   testimony of Inspector Feiter, correct?

11   A.  Yes.

12   Q.  And you were aware that one of the lines of inquiry was

13   whether or not the warrant was overbroad, correct?

14   A.  That is correct.

15   Q.  And, therefore, you knew when you went through the boxes

16   and pulled out what you felt to be irrelevant material that the

17   material in those 12 boxes might be material that the defense

18   wanted to use at the hearing, isn't that right?

19   A.  I don't know specifically you would want to use it at the

20   hearing.

21   Q.  You thought it was a possibility, correct?

22   A.  It could be a possibility, yes, correct.

23   Q.  And you returned it on June 28, right?

24   A.  That is correct.

25   Q.  And you knew that July 4 separated when you returned it to

67ASVILAR2                Fraterrigo - cross

1    the beginning of the hearing, right?

2    A.  I am sorry?

3    Q.  In other words, between June 28 and July 7 there was a July

4    4 holiday, right?

5    A.  Yes.

6    Q.  So if the defense actually wanted to acquire the material

7    and prepare from the material the defense would have to track

8    down or obtain them from Mr. Licker, correct?

9    A.  I guess so.  I guess that would be the case.

10   Q.  I will ask you to look at the letter before you from Mr.

11   Litt.

12   A.  Yes.

13   Q.  Mr. Litt, do you see, didn't provide to the defense, or

14   even Mr. Licker, an inventory of which items you removed from

15   the 12 boxes that the defense wanted to use at the hearing,

16   correct?

17   A.  That is correct.

18   Q.  Did you create an inventory?

19   A.  No, I did not.

20   Q.  So you removed the items from the 12 boxes?

21   A.  Yes.

22   Q.  And just shipped them to Mr. Licker, correct?

23   A.  That is correct.

24   Q.  Did you make any sort of record of what you actually

25   removed from the boxes?

1   A.   No, I don't believe I did.

2   Q.   And do you agree that from the letter that you are looking

3   at from Mr. Litt that cc's the defense counsel in this case,

4   you agree with me that from that letter there is actually no

5   way for the defense to determine which items you removed from

6   the boxes?

7   A.   That is correct.

8   Q.   You testified earlier today that one of the things you

9   removed from the 12 boxes was I think an audio tape, is that

10  correct?

11  A.   That is correct.

12  Q.   Do you see how in the letter Mr. Licker indicates that --

13  withdrawn.

14       Do you see that in the letter, one of the things Mr.

15  Litt indicates is that he was returning actually documents to

16  Mr. Licker, correct?

17  A.   That is correct.

18  Q.   Do you know where that tape is that you removed from the 12

19  boxes?

20  A.   I believe it's contained in the envelopes.

21  Q.   That were sent to Mr. Licker?

22  A.   Yes.

23  Q.   I see.

24       Do you know of either another inventory or another

25  cover letter that actually addresses items that were returned

1    to Amerindo U.S. that were not documents?

2    A.  No, I don't know of any other letter.

3    Q.  Just so I understand now, 6 days before the hearing you

4    remove the items from the boxes?

5    A.  Yes.

6    Q.  And you sent the items to Amerindo U.S. and at least for

7    some of them, including the tape, there is actually no record

8    of the fact that you had actually removed it and sent it to

9    Amerindo U.S., is that right?

10   A.  I didn't make a record, that is right.

11   Q.  Isn't it true, Inspector Fraterrigo, that the real reason

12   why you went through the boxes and you removed items and sent

13   them to Amerindo U.S. was to impede or make it more difficult

14   for the defense to ask you questions about the overly broad

15   material that was in the 12 boxes?

16   A.  No, that is incorrect.

17   Q.  And it's your testimony that the reason why was you had a

18   belief at that time -- withdrawn.

19        It's your testimony that you had a sudden concern at

20   that time that the government had to immediately return

21   irrelevant material to the defense, is that your testimony?

22   A.  As I went through it I think there was a discussion that I

23   had with the assistants and a determination was made to return

24   it.

25   Q.  So in coming to the decision to remove the items from the

1    boxes of evidence, you had conversations with the lawyers in

2    this case?

3    A.   That is correct.

4    Q.   And specifically the two prosecutors here today?

5    A.   That is correct.

6    Q.   Did you at any time consider whether any sort of

7    documentation or record should be sent to the defendants so

8    that they could adequately prepare for this cross examination?

9    A.   No.

10           THE COURT:  Do you have the letter?  I just want to

11   get the dates straight, Mr. Kobre.

12           Okay, thank you.

13   Q.   Inspector, did you at any time tell the lawyers in this

14   case -- and when I say lawyers I mean the prosecutors in this

15   case -- what items you were actually removing from the boxes?

16   A.   They reviewed what I removed from the boxes.

17   Q.   I want to do this briefly and move on to another topic.  If

18   you can take us through or take me through, you obtained the

19   boxes after receiving Ms. wolfe's letter, correct?

20   A.   Yes.

21   Q.   You got the boxes and then did you make the decision that

22   you should go through the boxes and start removing items from

23   the boxes?

24   A.   I went through the boxes, looked through it, and I

25   discovered there were items in there that were not covered

67ASVIIAR2    Fraterrigo - cross

1  under the warrant and as I pulled them out I showed them to the

2  assistants and they reviewed it and a decision was made that

3  they were going to return them.

4  Q.  And is it fair to say also that when you reviewed the boxes

5  and you discovered that there were items in the boxes that were

6  not responsive, is it fair to say you weren't surprised?

7  A.  Excuse me?

8  Q.  Is it fair to say you were not surprised by that fact?

9  A.  I was surprised.

10  Q.  You were surprised.  Until you actually looked through

11  those 122 boxes it was your expectation that all 168 boxes only

12  contained responsive material?  Is that your testimony?

13  A.  I assumed they were all responsive material in all the

14  boxes.

15  Q.  That was your assumption, right?

16  A.  Yes.

17  Q.  There came a time in this case when you petitioned to Judge

18  Maas for an extension of the warrant for the purposes relating

19  to returning the server, correct?

20  A.  Yes.

21  Q.  At the time that you actually approached Judge Maas, you

22  were aware of the fact that the government had actually issued

23  a subpoena to cover the material that had been left at Amerindo

24  U.S., correct?

25  A.  Yes.