Glenn C. Colton (GC-2493)
Jessica L. Margolis (JM-7786)
WILSON SONSINI GOODRICH & ROSATI
PROFESSIONAL CORPORATION
1301 Avenue of the Americas, 40th Floor
New York, New York  10019
Tel: 212.999.5800

Steven Kobre
Justin M. Sher
KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: 212.488.1234

*Attorneys for Defendant*
*Gary Alan Tanaka*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          - against -<br><br>ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA<br><br>                    Defendants. | S3 05 Cr. 621 (KMK)<br><br><br>ECF CASE |

**MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR A *FRANKS* HEARING**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..............................................................................................................1

ARGUMENT ....................................................................................................................5

A.  The Government Misconstrues The *Franks* Standard And Asks The Court To
    Impose An Unduly High Burden Of Proof On Mr. Tanaka ....................................5

    1.  Mr. Tanaka More Than Satisfies The Preliminary Showing Required Under
        *Franks* .........................................................................................................5

    2.  Inspector Fraterrigo's Omission Of Material Facts That Should Have Been
        Evident To Her Constitutes "Recklessness" Under *Franks*........................6

        a.  The Government Mischaracterizes Mr. Tanaka's Position............................7

        b.  The Cases Cited By The Government Are Inapposite...................................9

B.  The Government Fails To Rebut Mr. Tanaka's Preliminary Showing That Inspector
    Fraterrigo's Omissions Were Intentional Or Reckless ..........................................12

    1.  The Government Fails To Rebut Mr. Tanaka's Substantial Showing That
        Inspector Fraterrigo Knew Or Was Reckless In Not Knowing That
        Defendants Did Not Have The Authority To Withdraw The Vast Majority
        Of The Assets Managed By Amerindo ....................................................13

    2.  The Government Fails To Rebut Mr. Tanaka's Showing That Inspector
        Fraterrigo Knew But Intentionally Omitted From The Warrant Application
        The Fact That, From 1987 Until At Least 2001, Both Lily Cates And Lisa
        Mayer Received Consistent Payments From Amerindo..........................16

    3.  The Government Fails To Rebut Mr. Tanaka's Substantial Showing That
        Inspector Fraterrigo Recklessly Omitted The Fact That Paul Marcus And
        Joy Urich Did Not Have Trouble Redeeming Their Investments............18

C.  The Omitted Facts Were Material To The Probable Cause Determination.........20

D.  The Government's Attempts To Explain Away Inspector Fraterrigo's Damaging
    Testimony During The Suppression Hearing Fail ..............................................22

CONCLUSION...............................................................................................................26

# TABLE OF AUTHORITIES

<u>Page(s)</u>

*Franks v. Delaware,*
    438 U.S. 154 (1978) ........................................................................... *passim*

*Rivera v. United States,*
    928 F.2d 592 (2d Cir. 1991) ...................................................................5, 8

*United States v. Awadallah*
    349 F.3d 42 (2d Cir. 2003) ........................................................................9

*United States v. Delaware,*
    438 U.S. 154 (1978) ........................................................................... *passim*

*United States v. Chesher,*
    678 F.2d 1353 (9th Cir. 1982) ...................................................................6

*United States v. Dale,*
    991 F.2d 819 (D.C. Cir. 1993) ...........................................................11, 20

*United States v. Harding,*
    273 F. Supp. 2d 411 (S.D.N.Y. 2003) ......................................................5, 8

*United States v. Kyllo,*
    37 F.3d 526 (9th Cir. 1994) .......................................................................6

*United States v. Lopez,*
    1997 WL 205294 (N.D.N.Y. Apr. 23, 1997) ............................................5

*United States v. Mastroianni,*
    749 F.2d 900 (1st Cir. 1984) ...............................................................12, 13

*United States v. Miller,*
    753 F.2d 1475 (9th Cir. 1985) ............................................................10, 11

*United States v. Perez,*
    247 F. Supp. 2d 459 (S.D.N.Y. 2003) .....................................................19

*United States v. Ranney,*
    298 F.3d 74 (1st Cir. 2002) ..................................................................8, 10

*United States v. Reilly*,
     76 F.3d 1271 (2d Cir. 1996)................................................................................8

*United States v. Young Buffalo*,
     591 F.2d 506 (9th Cir. 1979) .........................................................................9, 10

Defendant Gary Alan Tanaka, by his attorneys, respectfully submits this memorandum in further support of his motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).[1]

## **INTRODUCTION**

The Government's 52-page, hyperbole-filled opposition to Mr. Tanaka's motion for a *Franks* hearing is most noteworthy for what the Government does not contest. The Government does not dispute that, with respect to nearly all of the approximately $1.2 billion in assets managed by Amerindo Investment Advisors Inc. ("Amerindo U.S."), Defendants could not have engaged in criminal behavior alleged in the Warrant Application. Nor does the Government dispute that, for at least the first fourteen years of their relationship with Defendants, Lily Cates and the Mayer family – the only two alleged victims specified in the Warrant Application – received consistent and significant payments on their investments. Indeed, not only did Cates receive millions of dollars in payments since she allegedly invested $1 million in 1988, but as recently as January 2001, the Mayers chose to reinvest over $11 million with Amerindo. Nor does the Government dispute Paul Marcus' sworn statement that, contrary to Inspector Fraterrigo's suggestion in the Warrant Application, he in fact never had any problems redeeming his investments with Defendants. Finally, the Government does not dispute that all of this information was omitted from the Warrant Application.

---

[1] For the purposes of this submission, Mr. Tanaka uses the same abbreviations as set forth in the Government's opposition brief (*see* footnote 1). In addition, "Supp. Margolis Decl." refers to the Supplemental Declaration of Jessica L. Margolis filed in connection with this reply brief, and "Gov. Opp." refers to the Government's Memorandum of Law in Opposition to Defendants' Motion for a *Franks* Hearing.

Instead, despite these glaring omissions from the Warrant Application, the Government essentially argues that Mr. Tanaka's motion for a *Franks* hearing should be denied because (1) Mr. Tanaka failed to meet the Government's self-created burden of conclusive proof that Inspector Fraterrigo was aware of these facts, (2) although Inspector Fraterrigo's conduct may have been negligent and her investigation shoddy, her omission of these facts from the Warrant Application was not "reckless" because she had no obligation to investigate this matter prior to seeking the Warrant, and (3) even if the omitted facts were intentionally or recklessly left out of the Warrant Applicatoin, these omissions were not material to the probable cause determination.

The Government's arguments should be rejected. **First**, the burden of proof that the Government seeks to impose on Mr. Tanaka is unreasonable and contrary to governing law in that it fails to take into account that the showing required at this early stage is only "preliminary." Indeed, as the Government itself recognized, until Defendants are permitted to question Inspector Fraterrigo directly on these issues, any proof as to her state of mind is necessarily circumstantial. In any event, the offer of proof Mr. Tanaka presented – including sworn declarations of non-party witnesses, documentary evidence, sworn testimony from the suppression hearing (including testimony from Inspector Fraterrigo herself), as well as Inspector Fraterrigo's own sworn statements in the Affidavit and criminal complaints – more than satisfies the preliminary showing required to merit further inquiry under *Franks*.

**Second**, contrary to the Government's contention, Mr. Tanaka is not arguing that the Government had an obligation to "exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence" prior to seeking the Warrant. Where, however, an affiant omits material facts from the warrant application that were clearly evidenced in documents

and other sources she admits she consulted or that were readily available to her, such conduct constitutes recklessness for the purposes of the preliminary *Franks* showing.  Moreover, the Second Circuit has made clear that the omission of critical facts from a warrant application – such as occurred here – in itself justifies an inference of recklessness.  The Government's citation to inapposite cases from other Circuits cannot change this governing Second Circuit principle.

In any event, any doubt as to Inspector Fraterrigo's state of mind when omitting these material facts is eviscerated by her testimony at the suppression hearing.  At that hearing, Inspector Fraterrigo admitted time and again that, contrary to her representations to Magistrate Judge Maas, there in fact was no probable cause to seize vast categories of the documents called for by the Warrant.  To make matters worse Inspector Fraterrigo, after being asked leading questions in a private meeting with prosecutors, saw the import of her testimony and attempted to backtrack and revise her prior statements.  This provides further reason to question her veracity.  Inspector Fraterrigo's testimony at the suppression hearing substantially supports the notion that her omission of material facts from the Warrant Application  – rather than the product of innocent mistake or negligence – was part of a deliberate attempt to mislead the issuing judge.

***Third***, the Government's contention that the omissions Mr. Tanaka identified were not material to the probable cause determination is without merit.  The Warrant authorized seizure of every single business-related document on the premises, regardless of the particular client or investment to which the document pertained and regardless of whether the document originated in 1985 or 2005.  In other words, as the Government's own witnesses testified, the Warrant authorized seizure of nearly everything with writing on it created from the beginning of time forward.  Although Mr. Tanaka continues to maintain that there was no indicia of probable cause on the face

of the Warrant Application to support such a broad warrant even **with** the omissions identified in this motion, once the Warrant Application is corrected and the omitted facts added, there can be no doubt that probable cause for a warrant of this scope did not exist.

The fact is, on May 26, 2005, the Government burst into the New York office of Amerindo U.S. with nineteen federal agents and a sweeping warrant that called for seizure of nearly everything on site – a maneuver that ultimately led to the demise of a twenty year old business.  Indeed, contrary to Government's unsupported assertion that "it is the height of illogic to suggest that the fate of Amerindo U.S. would have been no [sic] different had the defendants merely been arrested," Gov. Opp. at 49-50,[2] counsel for Amerindo U.S. testified that, had a subpoena been issued in lieu of the Warrant, Amerindo U.S. would still be operating today.  *See* Supp. Margolis Decl., Ex. A at 50. For Inspector Fraterrigo to seek such a broad and ultimately destructive warrant based on a warrant application that omitted critical facts – facts that should have been apparent through sources she actually consulted or through sources readily available to her – is the epitome of recklessness.  At the very least, it justifies further inquiry into misrepresentations and omissions made to Magistrate Judge Maas in securing the Warrant.

---

[2] Presumably, the Government intended to write "would have been different" and the inclusion of the word "no" was a typographical error.

## ARGUMENT

### A.    THE GOVERNMENT MISCONSTRUES THE *FRANKS* STANDARD AND ASKS THE COURT TO IMPOSE AN UNDULY HIGH BURDEN OF PROOF ON MR. TANAKA

#### 1.    Mr. Tanaka More Than Satisfies The Preliminary Showing Required Under *Franks*

In an effort to detract the Court's attention from the weakness of its position, or perhaps hoping that saying something enough times will make it so, the Government peppers its opposition brief with constant references to Mr. Tanaka's allegations as "conclusory," "speculative" and "surmise."  By characterizing Mr. Tanaka's *Franks* application in these terms and suggesting that Mr. Tanaka should be required to present concrete proof as to Inspector Fraterrigo's state of mind, the Government not only ignores that the showing required at this early stage is merely "preliminary," but also it fails to account for the extensive offer of proof Mr. Tanaka presents in support of the instant motion.

Under *Franks* and its progeny, a defendant is entitled to a hearing on the veracity of a warrant application as long as that defendant makes a "substantial ***preliminary*** showing" that (1) the claimed inaccuracies or omissions in the warrant application are the result of the affiant's intentional falsehood or reckless disregard for the truth, and (2) the alleged falsehoods or omissions were necessary to the finding of probable cause.  *See Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (emphasis added); *see also United States v. Lopez*, 1997 WL 205294, *8 (N.D.N.Y. Apr. 23, 1997).  The purpose of this preliminary showing is to weed out those applications that are entirely conclusory and supported by nothing more "than a mere desire to cross-examine."  *United States v. Harding*, 273 F. Supp. 2d 411, 426 (S.D.N.Y. 2003) (quoting *Franks*, 438 U.S. at 171).  That a defendant is not required to meet the "preponderance of the evidence" standard or any other burden

of proof at this stage of the proceedings is entirely appropriate; after all, the very purpose of the

application is to seek permission to conduct an inquiry into whether an affiant intentionally or

recklessly misrepresented or omitted facts from the warrant application.  *See, e.g., United States v.*

*Kyllo*, 37 F.3d 526, 530 (9th Cir. 1994) (to warrant a *Franks* hearing, "[c]lear proof is not required –

***for it is at the evidentiary hearing itself that the defendant, aided by live testimony and cross-***

***examination, must prove actual recklessness or deliberate falsity***") (quoting *United States v.*

*Chesher*, 678 F.2d 1353, 1362 (9th Cir. 1982)) (emphasis added).

As discussed in Mr. Tanaka's moving brief and again below, Mr. Tanaka more than satisfies

the preliminary showing required to justify further inquiry into the veracity of the Warrant

Application.  Contrary to the Government's constant allusion to Mr. Tanaka's submission as mere

"speculation," Mr. Tanaka's application is supported by a substantial offer of proof, including sworn

witness declarations, documentary evidence, sworn testimony elicited during the suppression hearing

and Inspector Fraterrigo's own sworn statements in the Affidavit and Criminal Complaints

(including statements as to the sources she consulted in conducting her investigation).  This evidence

clearly supports Mr. Tanaka's assertion that material facts were omitted from the Warrant

Application, and that Inspector Fraterrigo's omission of these facts was intentional or – at the very

least – highly reckless.  To require further proof at this stage – before Mr. Tanaka has had the

opportunity to question one witness on these issues – is both unsupported and unreasonable.

### 2.     Inspector Fraterrigo's Omission Of Material Facts That Were Or Should Have Been Evident To Her Constitutes "Recklessness" Under *Franks*

After dismissing Mr. Tanaka's extensive offer of proof as mere "speculation" insofar as it

failed to conclusively demonstrate Inspector Fraterrigo's state of mind, the Government goes on to

assert that Mr. Tanaka's allegations essentially "amount to an argument that Inspector Fraterrigo

conducted insufficient investigation prior to seeking the warrant," Gov. Opp. at 2, and that "simple

failure to fully investigate is not sufficient for the required showing of reckless disregard." Gov.

Opp. at 13.  Not only does the Government mischaracterize Mr. Tanaka's position, but also the

Government's suggestion that Inspector Fraterrigo's omission of facts that should have been

apparent to her exempts her from a finding of recklessness disregards relevant case law from this

Circuit.  In any event, the cases relied on by the Government for the proposition that deficiencies in

Inspector Fraterrigo's investigation, shoddy as it may have been, cannot form the basis for a *Franks*

hearing are both not controlling and readily distinguishable.

> a.    The Government Mischaracterizes Mr. Tanaka's Position

In an entirely self-serving maneuver, the Government attempts to reframe Mr. Tanaka's

entire argument as essentially alleging that Inspector Fraterrigo's failure to conduct a full

investigation prior to seeking the Warrant in itself constitutes recklessness.  Contrary to the

Government's suggestion, however, Mr. Tanaka is not arguing that Inspector Fraterrigo had an

obligation to fully investigate every possible lead or interview all potential witnesses prior to seeking

the Warrant.  Instead, Mr. Tanaka simply contends that Inspector Fraterrigo's omission of certain

material facts – facts that were either evident from documents or witnesses she actually consulted or

that would have been evident had she undertaken the most basic investigative steps – at the very

least constitutes recklessness for the purposes of the preliminary *Franks* showing.

Mr. Tanaka's position is supported by both Second Circuit and Southern District precedent.

As noted in Mr. Tanaka's moving brief, the Second Circuit has made clear that recklessness may be

inferred where the omitted information was "clearly critical" to the probable cause determination.

*United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996); *Rivera*, 928 F.2d at 604; *see also* Tanaka

Mem. at 12. Surely, facts that, for example, conclusively demonstrate that Defendants could not have engaged in the alleged misconduct with respect to the vast majority of Amerindo U.S.'s business were "critical" to the issuing judge's assessment of the legality of a warrant that permitted seizure of every single business-related document on the premises. The Government's failure even to address the controlling authority of *Reilly* and *Rivera*, pursuant to which a presumption of recklessness applies in this case, speaks volumes about the weakness of the Government's suggestion that an affiant's deficient investigation regarding crucial facts is irrelevant to the affiant's state of mind. In fact, it is not.

Similarly, although the Government cites cases applying the recklessness standard where a defendant alleges ***misstatements*** in a warrant application, *see* Gov. Opp. at 12 (citing *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002), the Government ignores cases in the Second Circuit that address the recklessness standard in the context of ***omissions***. These cases make clear that omissions are deemed reckless where the affiant "withholds a fact in his ken that any reasonable person would have known [ ] was the kind of thing the judge would wish to know. Embedded in this standard is the requirement that the affiant knew ***or, presumably, had reason to know*** the fact that she or he omitted." *See, e.g., Harding*, 273 F. Supp.2d at 426 (Kaplan, J.) (internal quotations and citation omitted) (brackets in original) (emphasis added). Clearly, where, as here, the omitted facts were evidenced in sources admittedly consulted by the affiant, or where these facts would have been evident had the affiant undertaken the most basic investigative steps, the affiant had "reason to

know" these facts and her omission of them from the warrant application constitutes recklessness

under *Franks* as applied within the Second Circuit.[3]

        b.      The Cases Cited By The Government Are Inapposite

Although the Government reliance does not address the Second Circuit and Southern District cases

cited by Mr. Tanaka above, the Government does cite several cases outside of the Second Circuit,

purportedly for the proposition that failure to fully investigate does not in itself constitute

recklessness under *Franks* (again, a point different from that which Mr. Tanaka makes in his

application). Not only are the cases cited by the Government not controlling on this Court, but each

of these cases is readily distinguishable from the situation presented here.

For example, in *United States v. Young Buffalo*, 591 F.2d 506 (9th Cir. 1979), the defendant

had ***already been granted*** a "full evidentiary hearing . . . on whether the misstatements in the

affidavit were material and made with the intent to deceive." *Id.* at 510. Thus, rather than simply

satisfy the "preliminary" showing applicable to Mr. Tanaka's motion, defendant in *Young Buffalo*

---

[3] The Government's reliance on *United States v. Awadallah* for the proposition that "the mere intent to exclude information is insufficient" to warrant suppression under *Franks* is unavailing. 349 F.3d 42, 67-68 (2d Cir. 2003). As initial matter, *Awadallah* applies the *Franks* standard ***post-hearing***, where defendant must prove the affiant's state of mind by a "preponderance of the evidence." *Franks*, 438 U.S. at 156. Such is not the case here. Moreover, *Awadallah* holds that the mere fact that an affiant knows but fails to include something in the warrant application does not in itself satisfy *Franks*, but rather a defendant must show that the omission was "designed to mislead" the magistrate judge. 349 F.3d at 68 (specifically noting that the lower court "made no finding of recklessness or bad intent"). Thus, for example, where an affiant knows but omits an immaterial detail from a warrant application that otherwise provides substantial support for the requested warrant, the mere fact of the omission – though indisputably "knowing" – does not necessarily rise to the level of intentional or reckless for the purposes of *Franks*. By contrast, where, as here, critical facts were omitted from the warrant application, or where the omissions were part of a deliberate attempt to mislead the issuing judge as to the scope of the alleged crime, then a finding of reckless or intentional conduct is appropriate.

had to meet the higher post-hearing "preponderance of the evidence standard" when demonstrating the recklessness of the affiant. *Franks*, 438 U.S. at 156. *Young Buffalo* is further distinguishable in that, far from being critical to the probable cause determination, the misrepresentation in question was just "one of many facts linking [the defendant] to the robberies" at issue. 591 F.2d at 510. By contrast, had the Warrant Application disclosed that Defendants could not have engaged in the alleged misconduct with respect to the vast majority of Amerindo U.S.'s business, including the Amerindo Technology Fund and institutional clients referenced in the criminal complaints, it would have been indisputable that there was no probable cause to seize documents relating to these clients and investments.[4]

Similarly inapposite is *United States v. Miller*, 753 F.2d 1475 (9th Cir. 1985). In *Miller*, the court found that failure to uncover an informant's prior conviction in Oregon for perjury did not constitute recklessness under *Franks*. 753 F.2d at 1478. Like in *Young Buffalo*, however, the *Miller* Court reached this conclusion ***after*** the benefit of a full-blown *Franks* hearing, when a higher standard of proof applies. 753 F.2d at 1476-77. Moreover, although the officers in *Miller* did not uncover the perjury conviction, which failed to appear on both a report provided by Oregon authorities and a California rap sheet, the Court found that the officers ***had*** made "diligent efforts" to find out the informant's background. *Id.* at 1478. By contrast, to the extent that the Government alleges that Inspector Fraterrigo was unaware of the omitted information, the Government provides

_____

[4] *United States v. Ranney*, 298 F.3d 74 (1st Cir. 2002), can similarly be distinguished in that the alleged misrepresentation involved a tangential issue not material to the probable cause determination. *Id.* at 77-79.

no evidence that she made *any* attempt to uncover these facts – let alone a "diligent effort[]" as was the case in *Miller*.

*United States v. Dale*, 991 F.2d 819 (D.C. Cir. 1993), can also be distinguished. As an initial matter, the Government cites *Dale* for the proposition that probable cause "does not require an officer to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence." *Id.* at 844. Here, however, the omitted facts were either apparent from evidence actually consulted by Inspector Fratterigo or else she failed to undertake even the most rudimentary investigatory steps to uncover those facts. *Dale* is further distinguishable in that there was reason to believe that documents at the search location would be destroyed if the company learned of the investigation. *Id.* (according to the affidavit in support of warrant, one informant "indicated that [defendants] would certainly destroy any incriminating records if they were subpoenaed"). No such allegations exist here. To the contrary, the Government was so confident that those associated with Amerindo would *not* destroy documents that it negotiated an agreement whereby the Government would halt execution of the Warrant (leaving the site unsecured) and obtain the rest of the documents via subpoena at some later date. Supp. Margolis Decl., Ex. A at 14.

The final case cited by the Government on this point, *United States v. Mastroianni*, 749 F.2d 900 (1st Cir. 1984), is also unavailing. *Mastroianni* held that the lower court did not abuse its discretion when it refused to find that the affiant's failure to become aware of a development that had occurred five days prior to the submission of the warrant affidavit was reckless. *Id.* at 908-10. Specifically, although the warrant affidavit, which was sworn to by a state trooper, stated that "[a]s of this date efforts to successfully penetrate [defendants'] organization and other techniques have

-11-

failed," five days earlier a DEA Agent also investigating defendants had met with a cooperator.  *Id*. at 908.  The First Circuit held that, although the DEA Agent "was unwise in failing to notify" the state trooper of the meeting with the cooperator, given the circumstances of the case, the lower court did not abuse its discretion in failing to find recklessness.  *Id*. at 910.  The court, however, "expressed [its] concern about delayed communications between [the] government investigators," and stated "[i]t may be that in other circumstances, a five-day delay in transmitting such information would be too long to avoid a finding of recklessness."  *Id*.

In stark contrast to the situation presented in *Mastroianni*, the facts Inspector Fraterrigo omitted in this case were not new developments that occurred just prior to her submission of the Warrant Application.  To the contrary, the omitted facts were available to Inspector Fraterrigo long before the Warrant Application was submitted from a variety of sources, including the SEC, with whom the United States Postal Inspection Service and the United States Attorney's Office were working closely in their investigation of Defendants.  *See* Tanaka Mem. at 8.  Indeed, given these circumstances, it is likely that the *Mastroianni* court would have found Inspector Fraterrigo's conduct to be reckless, if not intentional.

**B.    THE GOVERNMENT FAILS TO REBUT MR. TANAKA'S PRELIMINARY SHOWING THAT INSPECTOR FRATERRIGO'S OMISSIONS WERE INTENTIONAL OR RECKLESS**

In the instant motion, Mr. Tanaka alleges three material omissions:  First, with respect to nearly all of the approximately $1.2 billion managed by Amerindo U.S., Defendants could not have engaged in the misconduct alleged in the Warrant Application.  Second, from the beginning of their relationships with Amerindo until at least 2001, both Lily Cates and the Mayer family received consistent payments from and were pleased with the services provided by Amerindo.  Third, contrary to Inspector Fraterrigo's suggestion in the Affidavit, Paul Marcus never had any trouble

redeeming his investments with Defendants, and Joy Urich was fully redeemed prior to the

commencement of Inspector Fraterrigo's investigation.  With respect to each of Inspector

Fraterrigo's omissions, the Government fails to refute Mr. Tanaka's preliminary showing that she

acted intentionally or, at the very least, recklessly.

> 1.    **The Government Fails To Rebut Mr. Tanaka's Substantial Showing That Inspector Fraterrigo Knew Or Was Reckless In Not Knowing That Defendants Did Not Have The Authority To Withdraw The Vast Majority Of The Assets Managed By Amerindo**

In its opposition, the Government spends no less than five pages refuting the proposition that

Lily Cates was never a client of Amerindo U.S.  Gov. Opp. at 17-22.  Whether Lily Cates was a

client of Amerindo U.S., Amerindo Panama or some other Amerindo entity, however, is irrelevant to

Mr. Tanaka's *Franks* application.  That is, for the purposes of his *Franks* motion, Mr. Tanaka does

not challenge the assertion in the Warrant Application that Lily Cates thought she was a client of

Amerindo U.S.[5]  *See* Tanaka Mem. at 16, n.16 (assuming, for the purposes of his *Franks* motion,

that Cates *was* a client of Amerindo U.S.).

What Mr. Tanaka *does* assert in his *Franks* motion, but what is scarcely addressed by the

Government in its opposition, is that, even accepting that Lily Cates' alleged $6 million investment

was with Amerindo U.S., nearly all of the remaining assets managed by Amerindo U.S. at the time

of the search (totaling approximately $1.2 billion) were kept in closed-loop accounts with respect to

which Defendants did not have the authority to withdraw or transfer funds.  In other words, Cates'

alleged investments in Rhodes and SBIC aside, with respect to vast categories of clients of and

---

[5] Of course, the fact that Mr. Tanaka does not challenge this allegation for the purposes of his *Franks* application does not mean that he is conceding its truth, nor does it mean he is waiving his right to challenge this assertion at a future date or in any other context or proceeding.

investments managed by Amerindo U.S. – including the mutual fund and institutional clients referenced in the criminal complaints – ***Defendants could not have engaged in the misconduct alleged in the Warrant Application***. [6]

In contrast to the six pages spent on Lily Cates' and the Mayers' purported status as clients of Amerindo U.S., the Government spends only one paragraph responding to Mr. Tanaka's actual argument.  In this paragraph, Government does not challenge Mr. Tanaka's assertion, supported by an affidavit from Amerindo U.S. counsel Eugene Licker, that nearly all of the accounts managed by Amerindo U.S. were "closed-loop."  Instead, the Government – regurgitating its adopted mantra – claims that Mr. Tanaka offers "no evidence" apart from mere "surmise[]" that Fraterrigo knew or should have known of the closed-loop nature of these accounts.

The Government's assertion that Mr. Tanaka failed to present evidence that Inspector Fraterrigo knew or should have known of the nature of these accounts is entirely without merit.  In his moving brief, Mr. Tanaka identifies numerous sources through which this information either was or should have been apparent to Inspector Fraterrigo, including sources that Inspector Fraterrigo herself acknowledged consulting in the course of her investigation.  *See* Tanaka Mem. at 16-19.

---

[6] Relying exclusively on correspondence from 1988, the Government spends an additional page suggesting that the Mayers may or may not have thought of themselves as clients of Amerindo U.S. at some point during their relationship with Defendants. Gov. Opp. at 23.  As an initial matter, the warrant application is entirely devoid of any indication that the Mayers were or thought of themselves as clients of Amerindo U.S., and this is the first time that the Government has suggested this possibility.  Moreover, regardless of whether the Mayers may have considered themselves a client of Amerindo U.S. back in 1988, there can be no doubt that the particular investment the warrant application alleges the Mayers had trouble redeeming – a 2001 investment in a guaranteed fixed rate deposit account – was with Amerindo Panama.  Margolis Dec., Ex. R.  In any event, Mr. Tanaka's position with respect to the Mayers is same as with respect to Lily Cates; for the purposes of his *Franks* application, the particular Amerindo entity with which the Mayers were invested is irrelevant.  *See supra*, n.4.

Indeed, Inspector Fraterrigo did not have to look any further than the SEC – with which Amerindo U.S. had been registered since 1985 and which only months earlier had completed a two-year investigation in the course of which thousands of pages of documents were produced – for extensive information about the business of Amerindo U.S. *Id.* at 18-19. Although the Government attempts to dismiss information available through the SEC as having "no bearing" on Mr. Tanaka's *Franks* motion, Inspector Fraterrigo herself acknowledged that she consulted documents obtained from the SEC in conducting her investigation.[7] *See* Margolis Decl., Exs. C and D at ¶¶ 5-6. That Inspector Fraterrigo drew on documents and other information provided by the SEC is not surprising considering the close coordination between the SEC, United States Attorney's Office and United States Postal Inspectors in investigating Defendants. *See* Tanaka Mem. at 18 n.20.

Had Inspector Fraterrigo sought a more tailored warrant authorizing seizure of only those documents relating to the alleged victims and types of investments specifically referenced in the Warrant Application, Mr. Tanaka's position might be different. But such was not the case. Instead, Inspector Fraterrigo sought a warrant that called for every single business-related document located at Amerindo U.S.'s New York office. For her to do so without finding out basic information about

---

[7] The Government's contentions that Inspector Fraterrigo had no reason to know of the two-year SEC investigation, which concluded in January 2005 with a no-action letter, and (relatedly) that Mr. Tanaka failed to proffer any evidence that this SEC investigation had any relevance to Inspector Fraterrigo's criminal investigation, are baseless. Mr. Tanaka's moving submission included the requests for documents served on Amerindo U.S. by the SEC, which sought, among many other items pertaining to the business of Amerindo U.S. and other Amerindo entities, all correspondence between Amerindo U.S. and Amerindo Panama regarding clients of Amerindo Panama, and correspondence between Amerindo U.S. and clients of Amerindo Panama. *See* Licker Aff., ¶ 6. Given the Government's characterization of its investigation of Defendants, including the allegation that Defendants were using Amerindo Panama as part of a "corporate shell game" to further the alleged "Ponzi-type scheme," the Government cannot credibly assert that such documents had no bearing on its investigation. Gov. Opp. 36-37.

Amerindo U.S.'s business – particularly where this information was both critical to the warrant application and available to Inspector Fraterrigo – is the epitome of recklessness.

> **2.    The Government Fails To Rebut Mr. Tanaka's Showing That Inspector Fraterrigo Knew But Intentionally Omitted From The Warrant Application The Fact That, From 1987 Until At Least 2001, Both Lily Cates And Lisa Mayer Received Consistent And Substantial Payments**

The Government does not dispute that, since initially investing $1 million in or around 1988, Lily Cates has received millions of dollars in payments – a fact confirmed by documents provided by Lily Cates to the Government.  *See* Margolis Decl., Ex. P.  Nor does the Government dispute that, at the time she swore out her Affidavit, Inspector Fraterrigo was aware of these payments.  Instead, the Government asserts that Inspector Fraterrigo had no obligation to disclose this information because "the affidavit makes no representation about Cates' ability or inability to obtain funds from her Amerindo investments prior to 2002."  Gov. Opp. at 32.  In particular, the Government focuses on Paragraph 6.B. of the Affidavit, asserting that "[t]here is not even any suggestion that [Cates] specifically sought to redeem any Amerindo investment, let alone Rhodes, prior to 2005."  *Id*. at 32-33.

Although Mr. Tanaka agrees with the Government that the allegations in the Affidavit as to any issues Cates may have had with Amerindo prior to 2002 – including an inability to redeem investments – are weak at best, Mr. Tanaka does not agree that this excuses Inspector Fraterrigo's failure to disclose Cates' receipt of millions of dollars in returns from her Amerindo investments between 1988 and 2002.  The Government's self-serving interpretation aside, the clear intent of Paragraph 6.B. was to give the impression that, while account statements received by Cates between 1988 and 2002 "reflected" growth, Cates did not actually receive any benefit from her investments during this period.  Moreover, this allegation was one of only two in the entire Warrant Application

that even suggested any misconduct by Defendants prior to 2002 – despite the fact that the Warrant sought by Inspector Fraterrigo called for documents created from the beginning of time to the present.[8]  Thus, Inspector Fraterrigo's decision to hide the fact that Cates received significant benefits from her investments at least up until 2002 could only be construed as a calculated attempt to skew the "facts" presented to the issuing judge so as to justify such a broad warrant.

The Warrant Application is equally (if not more) misleading with respect to the other alleged "victim," the Mayer family.  Although the Affidavit alludes to the Mayers' 1987 GFRDA investments and their subsequent alleged inability to redeem in 2003, *see* Margolis Decl., Ex. B, ¶ 6.A., the Affidavit fails to reveal that, in 2001, the Mayers elected to re-invest their funds with Amerindo pursuant to a new GFRDA agreement, and that it was this later investment that the Mayers claim they were unable to redeem.  Tanaka Mem. at 23.  That Inspector Fraterrigo was aware of these critical facts at the time the Affidavit was sworn to cannot be disputed; these facts are clearly evidenced in documents provided by Lisa Mayer to Inspector Fraterrigo.  *See* Margolis Decl., Ex. R.  Indeed, these same documents make clear that, at least until 2001, the Mayers received regular payments, further dispelling the notion that Defendants engaged in any misconduct prior to 2001.  *Id.*  Notably, the Government fails to address these intentional omissions in its opposition, except to suggest that they were not "material."  Gov. Opp. at 35.

---

[8] The other allegation that conceivably could be construed as alleging misconduct prior to 2002 – relating to the Mayers' investment history with Amerindo – is addressed below.

**3.**     **The Government Fails To Rebut Mr. Tanaka's Substantial Showing That Inspector Fraterrigo Recklessly Omitted The Fact That Paul Marcus And Joy Urich Did Not Have Trouble Redeeming Their Investments**

In its opposition brief, the Government concedes that it did not take the basic investigative step of contacting Paul Marcus or Joy Urich to verify the suggestion in the Warrant Application that these individuals may have had trouble redeeming their investments with Amerindo.  *See* Gov. Opp. at 26, 29.  In fact, the Government appears to acknowledge that Inspector Fraterrigo did not take ***any*** steps to verify Lily Cates' contention, reproduced in the Warrant Application, that certain other individuals, including Brian Harvey, Joy Urich and Paul Marcus, "may have had trouble redeeming all or part of their investment."  Margolis Decl., Ex. B at ¶ 6.E.  Inspector Fraterrigo's decision to include this representation in her Affidavit without taking any steps to confirm its accuracy – particularly where this representation was the only allegation in the entire application that even references Marcus and Urich, let alone ***any*** client other than the two alleged victims – presents yet another example of Inspector Fraterrigo's reckless conduct with respect to the Warrant Application.

Unable to point to any diligence undertaken by Inspector Fraterrigo to confirm her representation in the Warrant Application that Paul Marcus and Joy Urich had trouble redeeming investments, the Government focuses on the specific language used by Inspector Fraterrigo to impart this representation.  In particular, the Government emphasizes the qualified nature of the representation and asserts that Inspector Fraterrigo should be credited for "attempting to be careful and accurate" when relaying the information provided to her by Cates.[9]  Gov. Opp. at 25-26.  In

---

[9] Of course, without the benefit of a *Franks* hearing, Defendants have no choice but to rely on the Government's unsupported assertion that the warrant application accurately reflects the information provided by Cates to Inspector Fraterrigo on this issue.

attempting to minimize the impact of this misrepresentation, the Government ignores the clear intent

of Inspector Fraterrigo in including the misrepresentation, which was to make the alleged fraud

appear more wide-spread than the allegations in the Warrant Application otherwise would suggest.

Moreover, the Government's claim that Inspector Fraterrigo should be credited for not embellishing

Cates' words (if, in fact, that is true) misses the point.  Far from justifying its inclusion, the qualified

and uncertain nature of the information provided to Inspector Fraterrigo by Cates should have given

Inspector Fraterrigo "obvious reasons to doubt the veracity of [Cates'] allegation."  *United States v.*

*Perez*, 247 F. Supp. 2d 459, 473 (S.D.N.Y. 2003) ("Because states of mind must be proved

circumstantially, a fact finder may infer reckless disregard from circumstances evincing obvious

reasons to doubt the veracity of the allegations.") (citation and internal quotation marks omitted).

Under such circumstances, Inspector Fraterrigo's inclusion of this inherently suspect allegation in

the Warrant Application without taking any steps to verify its accuracy was clearly reckless.[10]

Recognizing Inspector Fraterrigo's mistake in failing to take ***any*** steps to corroborate Cates'

claim, the Government argues – without any support – that any attempt to corroborate Cates'

(ultimately inaccurate) claim would have "increase[d] the risk that the investigation prematurely will

become known to the subjects," thereby "heighten[ing] the risk that evidence may be altered or

destroyed."  Gov. Opp. at 28.  The Government, however, offers absolutely no evidence that

Defendants, or anyone else associated with Amerindo for that matter, would have destroyed

evidence had the investigation become known.  *Contrast Dale*, 991 F.2d at 844 (according to

affidavit in support of warrant, one informant "indicated that [defendants] would certainly destroy

---

[10] This is particularly so considering that Marcus and Urich both reside in the United States and
were willing to talk about their investments with Amerindo.  Tanaka Mem. at 20-21.

-19-

any incriminating records if they were subpoenaed.  She stated [one of the defendants] would do anything to avoid detection.").  Indeed, far from there being a risk of destruction of evidence, there was every reason to believe that the records sought under the Warrant were and would continue to be completely safe.  As the Government has acknowledged, Amerindo U.S. had been registered with the SEC since 1985, and therefore was subject to periodic SEC inspections and inquiries, including one than concluded only four months before the search and with respect to which Amerindo U.S. was fully cooperating with the SEC – including but not limited to producing thousands of pages of documents.  *See* Licker Aff. ¶6; Margolis Decl., Ex. I at 31.  In fact, the Government was so confident evidence would ***not*** be destroyed that it entered into an agreement with counsel for Amerindo U.S. pursuant to which the Government would halt execution of the search and instead receive documents by subpoena at some later date.  Thus, the Government's suggestion that it was forced to rely on suspect information in order to preserve "the benefits to be gained from obtaining and executing" the Warrant is a red herring that should be rejected by the Court.

## C.    THE OMITTED FACTS WERE MATERIAL TO THE PROBABLE CAUSE DETERMINATION

Contrary to the Government's assertion, once the Warrant Application is corrected to account for Inspector Fraterrigo's intentional or reckless omissions, it is abundantly clear that there was no probable cause for the sweeping, all-inclusive Warrant sought by Inspector Fraterrigo.[11]  For example, had Inspector Fraterrigo disclosed that Defendants could not have engaged in the misconduct alleged in the Warrant Application with respect to nearly all of the approximately $1.2

---

[11] As noted in his moving brief, Mr. Tanaka maintains that, even without these corrections, the Warrant Application does not come close to demonstrating probable cause for the sweeping, all-inclusive warrant sought in this case, thus presenting an independent basis for suppressing the evidence seized from Amerindo U.S.  Tanaka Mem. at 14 n.14.

billion in assets managed by Amerindo U.S. at the time of the search, clearly the issuing judge would not have granted a warrant that called for every single business-related document held on the premises. More specifically, once the Warrant Application is corrected to make clear that Defendants could not have engaged in the alleged misconduct with respect to the funds managed by Amerindo U.S. or the institutional clients for whom Amerindo U.S. managed individual accounts, then it becomes clear that there is no basis to seize clients files, correspondence and other documents relating to these clients and investments, as was called for by the Warrant. *See* Margolis Decl., Ex. A, ¶ 1.

The Government's suggestion that Inspector Fraterrigo's omission of the closed-loop nature of these accounts nevertheless was immaterial because the Warrant Application alleged that Amerindo U.S. had at least some involvement in the alleged fraud should be rejected. The Warrant was in no way tailored to reflect Amerindo U.S.'s supposed involvement in the alleged fraud, but rather called for, in the words of the Government's own witness, nearly everything with "writing on it." *See* Margolis Decl., Ex. G at 161-62. Simply stated, the Government has not and cannot point to any allegation in the Warrant Application that would remotely justify seizing documents relating to the numerous clients and investments with respect to which Amerindo U.S. could not have engaged in the criminal activity alleged.

The Government's contention that the other omissions in the Warrant Application were also immaterial is similarly flawed. Once the Warrant Application is corrected to reflect the facts that Lily Cates and the Mayers received consistent payments for well over a decade after they first began investing, and that the Mayers were so pleased that they voluntarily re-invested their funds with Amerindo in 2001 (which investment, memorialized in a series of letters in early 2001, was the

subject of the Mayers' allegations set forth in the Warrant Application), the Warrant Application is entirely devoid of any allegations that would even suggest misconduct by Defendants prior to 2001. In the absence of such allegations, it is difficult to understand how the Government can continue to contend there was probable cause to seize of every business-related document on the premises from the beginning of time forward. *See* Tanaka Mem. at 22-24. Likewise, after correcting the Affidavit to account for the facts that Marcus never had any problems redeeming his investments with Amerindo, while Urich's investment was fully redeemed before Inspector Fraterrigo's investigation began, it becomes clear that (1) although explicitly called for by the Warrant, there was no basis to seize documents relating to Paul Marcus, Joy Urich or Brian Harvey, and, more importantly, (2) with only two alleged "victims" named in the Warrant Application, and no credible suggestion that anyone else was wronged, there was absolutely no basis to seize documents relating to every single client or investment of Amerindo. *See* Tanaka Mem. at 20-21.

D.     **THE GOVERNMENT'S ATTEMPTS TO EXPLAIN AWAY INSPECTOR FRATERRIGO'S DAMAGING TESTIMONY DURING THE SUPPRESSION HEARING FAIL**

At the suppression hearing, Inspector Fraterrigo repeatedly testified that there was no probable cause set forth in the Warrant Application to seize vast categories of documents called for by the Warrant. Tanaka Mem. at 24-27. Although the Government tries hard to spin this testimony so as to minimize its impact, for several reasons, this attempt fails.

***First***, Government's claim that Inspector Fraterrigo attempted to clarify her supposed "confusion" concerning the probable cause questions during cross-examination and prior to speaking with anyone is belied by Inspector Fraterrigo's own testimony. In support of its assertion, Government points to an exchange during cross-examination where Inspector Fraterrigo, in the Government's words, "without the opportunity to consult with anyone," purportedly "attempted to

-22-

clarify . . . the apparent misunderstanding about what she had meant regarding probable cause."

Gov. Opp. at 43.  As an initial matter, as the Government itself concedes, this brief exchange is at

best unclear, such that it is difficult if not impossible to draw any sound conclusions as to what

Inspector Fraterrigo was attempting to communicate.  Moreover, the exchange took place directly

after a lunch break during which Inspector Fraterrigo admitted speaking to her husband, United

States Postal Inspector Robert Fraterrigo, who also participated in the search at Amerindo U.S.  *See*

Supp. Margolis Decl., Ex. C at 140.  Although Inspector Fraterrigo claims that she and Inspector

Robert Fraterrigo did not discuss her testimony during this conversation, the brief exchange relied on

by the Government was so suspect in terms of its inconsistency with her prior tone and demeanor

that defense counsel immediately asked whether she discussed her testimony with anyone during the

lunch break.  *See* Litt Decl., Ex. G at 98.

      The two other snippets of cross-examination testimony cited by the Government as

"evidence" that Inspector Fraterrigo attempted to "correct" her testimony with respect to probable

cause are likewise unavailing.  *See* Gov. Opp. at 41.  In the first exchange, Inspector Fraterrigo

testified that, although she may have had probable cause to believe a crime had been committed with

respect to clients other than the five individuals mentioned in the Affidavit, Inspector Fraterrigo

admitted that she did not include this information in her Warrant Application.  *See* Litt Decl., Ex. G

at 27-28.  That Inspector Fraterrigo would emphasize this distinction is not surprising:  The Court

has previously held that, absent a *Franks* hearing, Defendants cannot inquire as to what was known

to Inspector Fraterrigo but not included in the Warrant Application.[12]  *See* Supp. Margolis Decl.,

Ex. B at 6-25.

      In the second exchange relied on by the Government, Inspector Fraterrigo essentially testifies

that certain documents were seized under a different paragraph of the Warrant than that which

defense counsel references in the question.[13]  *See* Litt Decl., Ex. G at 37.  In fact, although not

quoted in the Government's opposition brief, Defense counsel immediately went on to ask:

> Q:  I'm not asking you whether or not there was a paragraph that gave
> you the authority to seize a whole bunch of things.  That is not my
> question.
>
> A:  OK.
>
> Q:  My question is, as with the ones I just showed you, that there are
> other brokerage accounts that were seized that are not named in
> paragraph B as in "boy" on page 8 of the affidavit and for which, as
> with the others you just testified to, there was no probable cause to
> support the seizure, correct?
>
> A:  There was no probable cause in the –
>
> Q:  In the papers submitted to the magistrate?
>
> A:  That's correct.

Supp. Margolis Decl., Ex. C at 37-38.  Again, Inspector Fraterrigo is clearly referencing the

distinction – vigorously enforced by the Government – between what she put in her Affidavit and

---

[12] Indeed, in light of this ruling, attempts by defense counsel to inquire into what Inspector
Fraterrigo knew but did not include in the warrant application were closely monitored by the
Government.  *See, e.g.*, Supp. Margolis Decl., Ex. B at 156-57.

[13] Although Inspector Fraterrigo references the "affidavit" in her answer, the section of the
Affidavit she is referring to is that which lists the categories of items to be seized.  Margolis Decl.,
Ex. B at 7-12.  This section is essentially identical to the rider attached to the Amerindo U.S. search
warrant.  Margolis Decl., Ex. A.

what she allegedly knew but did not include.  Neither exchange supports the Government's claim

that Inspector Fraterrigo was attempting to clarify a "confusion" between "whether she submitted or

put probable cause before the magistrate" and "whether she included specific factual information

regarding the particular victim, account or entity referenced in the question in her affidavit."  Gov.

Opp. at 40.  In any event, the Government fails to explain how a few discrete exchanges somehow

nullify two days worth of testimony.

     *Second*, although the Government attempts to downplay the significance of its meeting with

Inspector Fraterrigo prior to her re-direct examination, the Government does not and cannot deny

that during this meeting, Inspector Fraterrigo was asked leading questions.  Nor can it be credibly

denied that, during her re-direct examination directly following the meeting, Inspector Fraterrigo

effectively adopted the suggestions inherent in those leading questions.  *See* Tanaka Mem. at 28-29.

     *Third*, the Government's contention that Inspector Fraterrigo's demeanor and tone during her

cross-examination "refutes the notion that she thought she was admitting to" making

misrepresentations to the issuing judge is inconsistent with an objective assessment of Inspector

Fraterrigo's manner and appearance throughout her testimony.  Throughout the cross-examination,

Inspector Fraterrigo was visibly upset, at times close to tears.  She answered quietly and often in as

few words as possible.  Far from being indicative of someone who does not know the consequences

of her testimony, therefore, Inspector Fraterrigo's tone and demeanor throughout the cross-

examination confirmed that she knew exactly the impact her admissions would have.

<u>**CONCLUSION**</u>

For the reasons stated above, as well as in Gary Tanaka's initial memorandum of law, Mr.

Tanaka respectfully requests that the Court grant his motion for a *Franks* hearing.

Dated:  September 28, 2006                    By:    s/  Glenn C. Colton
           New York, New York

                                             Glenn C. Colton (GC-2493)
                                             Jessica L. Margolis (JM-7786)
                                             WILSON SONSINI GOODRICH & ROSATI, PC
                                           PROFESSIONAL CORPORATION
                                           1301 Avenue of the Americas, 40th Floor
                                           New York, New York  10019
                                           Tel: 212.999.5800

                                           Steven Kobre
                                           Justin M. Sher
                                         KOBRE & KIM LLP
                                         800 Third Avenue
                                         New York, New York 10022
                                         Tel: 212.488.1234
                                         *Attorneys for Defendant*
                                         *Gary Alan Tanaka*