**EXHIBIT A**

```
                                                                        1
       65VVVILH
 1     UNITED STATES DISTRICT COURT
 1     SOUTHERN DISTRICT OF NEW YORK
 2     ------------------------------x
 2
 3     UNITED STATES OF AMERICA,
 3
 4                v.                           05 CR 621 (KMK)
 4
 5     ALBERTO VILAR,
 5     GARY TANAKA                             SUPPRESSION HEARING
 6
 6                Defendants.
 7
 7     ------------------------------x
 8
 8                                             New York, N.Y.
 9                                             May 31, 2006
 9                                             10:05 a.m.
10
10
11     Before:
11
12                      HON. KENNETH M. KARAS,
12
13                                             District Judge
13
14
14                           APPEARANCES
15
15     MICHAEL J. GARCIA
16          United States Attorney for the
16          Southern District of New York
17     DEIRDRE McEVOY
17     MARC LITT
18          Assistant United States Attorneys
18
19     HOFFMAN & POLLOK
19        Attorneys for Defendant Alberto Vilar
20     JEFFREY C. HOFFMAN
20     SUSAN C. WOLFE
21
21     Attorneys for Defendant Gary Tanaka:
22
22     WILSON SONSINI GOODRICH & ROSATI
23          GLENN CHARLES COLTON
23              -AND-
24     KOBRE & KIM
24          STEVEN GARY KOBRE
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

```
65VVVILH                    Licker - direct
```

1  Q.  During the second conversation, did the subject of a
2  subpoena come up?
3  A.  It's hard to number the conversations.  I can't say whether
4  it was the second or the third.  It was sometime after the
5  first.
6  Q.  Okay.  Do you recall what time during the day this subject
7  came up?
8  A.  I believe it came up prior to the time I returned to my
9  office at K&L which, as I said, I thought I place at about 1
10  o'clock.
11  Q.  And what was the substance of the conversation?
12  A.  At some point I became aware, I think, from speaking to Mr.
13  Feiter, Inspector Feiter, Postal Inspector Feiter, that they
14  had doubts about their abilities, the inspector had their
15  doubts about their ability to complete the search that day.
16       And someone, I don't remember if it was me or if it
17  was Marc Litt, I don't believe it was me, but someone suggested
18  that, as an alternative, if we would continue our agreement to
19  preserve the documents, we had already had that conversation,
20  and accept service of a grand jury subpoena that would allow
21  the postal inspectors to leave.
22  Q.  You mentioned that you had a conversation about preserving
23  the contents of the office?
24  A.  We had a general conversation about preserving relevant
25  information, wherever it was found.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
                                                                   246
         65VVVILH                     Shaw - direct
 1                THE COURT:  What was the home office recommendation,
 2       did we get that?
 3                THE WITNESS:  Section 8.
 4                THE COURT:  Okay.  I wasn't clear.  Go ahead.
 5       Q.  Prior to applying for the -- strike that.  Did you wind up
 6       making an application for a Section 8 warrant in this case?
 7       A.  Yes.
 8       Q.  Prior to doing so, did you consider whether it was
 9       necessary to obtain a Schedule 1 order or a Schedule 1 warrant?
10       A.  Yes.
11       Q.  What was the result of that consideration?
12       A.  I rejected that option.
13       Q.  Why?
14       A.  A Schedule 1 order -- I was not looking for special
15       procedure material here, primarily I was not.  And
16       consequently, the Schedule 1 option was not available to me.  I
17       was not looking for excluded material, either.
18       Q.  Why do you say you weren't looking primarily for special
19       procedure material?
20       A.  I was looking at -- my view was that I was looking at
21       premises controlled by named suspects for material that they
22       had used to facilitate their own criminal activity.  I was
23       searching, if you like, in simple terms, I was searching the
24       address of a suspect, for evidence of his criminality.
25       Q.  Why does that -- what's the import of that for your
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

250

65VVVILH                          Shaw - direct

1   maybe just happen to be in possession of material that I need
2   access to. And that's why they're inter parte. That's why the
3   bank would be given notice by me that I intend to make this
4   application, and they have a right of audience and to object.
5            THE COURT: Can I ask a follow-up? In the example you
6   gave in the Italian request, if the lawyer was a solo
7   practitioner who had his or her own office, their own computer,
8   own file cabinets, under your view of your authority under
9   Section 8, would it have been proper to go the Section 8 route
10  rather than the Schedule 1 route?
11           THE WITNESS: Yes.
12           THE COURT: Even though the lawyer obviously has
13  privileged information, and the privilege belongs to the
14  clients of that lawyer?
15           THE WITNESS: One can't obtain a warrant to access
16  privileged material. The warrant would be to access special
17  procedure material or exclude material only. I would be aware
18  that there was likely to be privileged material at the lawyer's
19  office, but I would not be applying for a warrant to access
20  privileged material.
21           THE COURT: So when you execute the search, how would
22  you decide what to take and what not to take? How would you
23  know what's privileged and what isn't privileged?
24           THE WITNESS: With the lawyer's office, I actually
25  took independent counsel with me in that particular situation,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

254

65VVVILH                    Shaw - direct

1    Q. Any other reason?
2    A. I don't recall anything in the MLAT that would suggest I
3    was going to find legal privileged material there. I have
4    no -- I don't recall -- thinking back to October last year, I
5    don't recall anything that gave me specific cause to believe
6    that.
7    Q. Did you ask anyone from the United States, either directly
8    or through the home office, whether they believed that it was
9    likely that potentially legally privileged material under U.S.
10   law might be found among the Amerindo documents at Cadogan
11   Tate?
12   A. No. I repeat that I was not searching -- I was not getting
13   a warrant to search for legal privileged material. There's no
14   facility to do that under English law.
15   Q. How did you determine to which court to take the warrant
16   application on October 10, 2005?
17   A. Having decided that I was going to apply for a Section 8
18   warrant, having seen that the home office also concurred with
19   that view, I had to apply before magistrate's court. I chose
20   Bow Street Magistrate's Court to do that.
21   Q. Why did you choose Bow Street Magistrate Court?
22   A. Bow Street Magistrate Court is the premier magistrate court
23   for the country. It's not too far from my office. I have
24   regular work at the court as part of my mutual assistance
25   function. And that's the court where the expertise lies in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

255

```
65VVVILH                    Shaw - direct
1    field of mutual assistance.
2    Q.  Did you show the warrant application to anyone prior to
3    taking it to court on October 10, 2005?
4    A.  My senior supervisor.
5    Q.  Who's that?
6    A.  Detective Inspector Fuller.
7    Q.  Why did you do that?
8    A.  I'm not entitled to make an application for search warrant
9    without the approval of an independent supervising police
10   officer.
11   Q.  Was he an independent supervising police officer?
12   A.  Yes.
13   Q.  Did you discuss the application with him?
14   A.  I'm sure I did, but I can't remember the nature of the
15   conversation.  But I wouldn't have just handed it to him and
16   walked off.
17   Q.  Do you recall any questions that Detective Inspector Fuller
18   asked you about the application?
19   A.  He asked -- I do recall him asking me logistical questions.
20   We were short of staff, as I mentioned earlier.  This was
21   probably going to be a two-day event.  Where was I going to get
22   the staff from to do it?  I remember those questions.  I don't
23   remember if there were further questions.
24   Q.  Did Detective Inspector Fuller express any concerns about
25   the application?
```