**EXHIBIT D**

1

67arvilh

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  UNITED STATES OF AMERICA
3
4           v.                          05 Cr. 621 (KMK)
4
5  ALBERTO VILAR                        Hearing
5  GARY TANAKA,
6              Defendant.
6  ------------------------------x
7                                       New York, N.Y.
7                                       July 10, 2006
8                                       9:45 a.m.
8  Before:
9
9        KENNETH M. KARAS
10                                      District Judge
10
11  MICHAEL J. GARCIA
11  United States Attorney for the
12  Southern District of New York
12      One St. Andrew's Plaza
13      New York, N.Y.  10007
13  DEIRDRE A. McEVOY
14  MARC O. LITT
14      Assistant United States Attorneys
15
15  JEFFREY C. HOFFMAN, ESQ.
16  SUSAN C. WOLFE, ESQ.
16  Attorneys for Defendant Vilar
17      Hoffman & Pollik, LLP
17      260 Madison Avenue, 22nd Floor
18      New York, New York  10016
18      (212) 679-2900
19
19  GLENN C. COLTON, ESQ.
20  Attorney for Defendant Tanaka
20      Wilson Sonsini Goodrich & Rosati (NYC)
21      12 East 49th Street, 30th Floor
21      New York, New York  10017
22      (212) 999-5804
22
23  STEVEN G. KOBRE, ESQ.
23  Attorney for Defendant Tanaka
24      Kobre & Kim LLP
24      800 Third Avenue
25      New York, New York  10022
25      (212) 488-1200
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

2

67arvilh

15    Q.  What I am asking you is, other than paragraph 6A, there is
16    nothing else in your submission to the magistrate to support
17    your belief that there was probable cause to show that the
18    Mayers invested in Amerindo U.S., correct?
19    A.  That's correct.
20    Q.  On page 4, paragraph B as in "boy," you describe an
21    investment made by Lily Cates of a million dollars in or about
22    1988, correct?
23    A.. That's correct.
24    Q.  Do you anywhere in this affidavit describe that as a result
25    of that million-dollar investment made in or about 1988 by Lily

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

67arvilh              Fraterrigo - cross
1     Cates, she withdrew 6 to $7 million from, quote-unquote, any of
2     the Amerindo entities?
3     A.  No.
4     Q.  Did you intentionally leave that information out?
5              MS. McEVOY:  Objection.
6              THE COURT:  Overruled.
7     A.  No.
8     Q.  On page 6, paragraph F as in Frank, which begins on the
9     bottom of page 5, if you go four lines down on the bottom of
10    page 6, you state, "Tens of millions of dollars were being
11    funneled to overseas accounts."  Do you see that?
12    A.  On page 6?
13    Q.  6, four lines down from the top.
14    A.  Yes.
15    Q.  Can you describe what you meant by the word "funneled."
16              MS. McEVOY:  Objection.
17              THE COURT:  Overruled.
18    A.  Transferred.
19    Q.  Did you use the word "transferred" in other places in the
20    affidavit?
21    A.  I believe so.
22    Q.  Can you tell us why you didn't use it there.
23    A.  I don't know.  I don't recall.
24    Q.  Was it your choice to put in the word "funneled" or was
25    that put in by whoever made up the affidavit?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

67arvilh              Fraterrigo - cross
1     A.  It wasn't my choice.
2     Q.  If you look at page 6, in the same paragraph, the next to
3     the last line of that paragraph, you say that there is reason
4     to be concerned that other investors are likewise being
5     victimized by Vilar and Tanaka.  Do you see that?
6     A.  Yes.
7     Q.  You understood when you signed this sworn affidavit, did
8     you not, that there is a significant different between the
9     standard described here, "reason to be concerned," as opposed
10    to the much higher standard probable cause, correct?
11    A.  That's correct.
12    Q.  So you knew that the reason you used the term "reason to be
13    concerned that other investors are likewise being victimized by
14    Vilar and Tanaka" was because you didn't have probable cause to
15    believe that other victims -- excuse me -- that other investors
16    were being likewise victimized by Vilar and Tanaka, correct?

17    A.  I felt this was a reason to be concerned, as it is worded
18    in the affidavit.
19    Q.  Had you had probable cause to believe that other investors
20    were being victimized had you had information that went to that
21    higher level, then you would have used that term if, you had
22    it, correct?
23    A.  That's correct.
24    Q.  If you would looked page 7, paragraph numbered 8, you
25    state, the fourth line from the bottom of paragraph number 8,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

67arvilh              Fraterrigo - cross
1    based on your training and experience, you know that
2    individuals involved in financial fraud schemes like that
3    described above frequently maintain at their places of business
4    for substantial periods of time records and materials which
5    evidence the operation of such schemes.  Do you see that?
6    A.  Yes.
7    Q.  The investigation that you had been doing had revealed to
8    you, had it not, at the time that you made this affidavit and
9    as described in this affidavit (1) that there were guaranteed
10   fixed rate deposits that certain people said they cannot redeem
11   their money from -- correct?
12   A.  Correct.
13   Q.  -- and (2) that Lily Cates indicated she had invested a
14   million dollars in 1988, approximately, and then later 5
15   million in what was to be an SBIC investment, correct?
16        MS. McEVOY:  Your Honor, no objection as to what is in
17   the affidavit, but to the extent that Mr. Hoffman's question is
18   going beyond that.
19        THE COURT:  Let's wait until he gets there.  That is
20   what is in the affidavit?
21   Q.  That is what is in the affidavit, correct?
22   A.  Yes, that's correct.
23   Q.  Have you ever had any prior experience, as you described in
24   the line I just read to you, concerning other, quote-unquote,
25   frauds that involved guaranteed fixed-rate deposits?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

67arvilh              Fraterrigo - cross
1    A.  No.
2    Q.  Or that involved SBIC investments?
3    A.  No.
4    Q.  In paragraph number 9 on page 7 you say there is probable
5    cause to believe that the following records and
6    instrumentalities of the fraudulent schemed described above and
7    other evidence related to and evidencing such crimes are
8    located at the premises.
9        Other than Lily Cates having told you that at some
10   time between 2002 and 2004, as stated in your affidavit, she
11   had been at the premises on Park Avenue and had seen
12   approximately 80 boxes that she said Mr. Vilar told her had
13   information that would be used in evaluating her investment --
14   are you with me?
15   A.  Yes.  I am just making sure that is what is in the
16   affidavit.
17   Q.  Let me ask you this.  Do you remember putting that in the
18   affidavit?

29

67arvilh                    Fraterrigo - cross

1    about information showing that you had information concerning
2    the Mayers guaranteed fixed-rate deposits, correct?
3    A.   Yes.
4    Q.   In the document you show information concerning two
5    investments by Lily Cates, one in an SBIC fund, correct?
6    A.   That's correct.
7    Q.   And the other in Rhoades Capital, correct?
8    A.   That's correct.
9    Q.   Other than those three specific investments, isn't it true
10   that you put nothing in the documents that you submitted to the
11   magistrate to show any probable cause as to believe that there
12   was any criminality concerning any other of the many
13   investments of the various Amerindo companies?
14   A.   That's correct.
15   Q.   Was there anything preventing you, when you submitted this
16   affidavit and used the term "investment brochures," to limit
17   that description to say investment brochures concerning Rhoades
18   Capital, SBIC, and guaranteed fixed-rate deposits?
19   A.   No.
20   Q.   Next, when you say "marketing materials," did you mean by
21   "marketing materials," as you said a moment ago you meant by
22   "investment brochures," all marketing materials from all the
23   Amerindo companies?
24   A.   That's correct.
25   Q.   By "marketing materials," we are talking about documents

30

67arvilh                    Fraterrigo - cross

1    and/or; it doesn't have to just be documents, right? It could
2    be DVD's or other things that describe and explain the various
3    companies of Amerindo and what they do, correct?
4    A.   That's correct.
5    Q.   Again, other than the three investments we just
6    described -- SBIC, Rhoades Capital, and guaranteed fixed-rate
7    deposits -- would it be accurate to say that you put no
8    information in the documents put before the magistrate to
9    support probable cause to believe that any of the other various
10   things that the Amerindo companies did for which they would
11   have marketing materials, that there was any illegality,
12   correct?
13   A.   That's correct.
14   Q.   Again, was there anything limiting you when you signed this
15   affidavit and used the term "marketing materials" to describe
16   the marketing materials and those concerning certain specific
17   situations?
18   A.   No.
19   Q.   Investment advisory agreements, the next category.  There
20   is nothing in the documents that you put before the magistrate
21   to get the search warrant that contains any information
22   concerning investment advisory agreements between Amerindo U.S.
23   and all of its institutional clients, correct?
24   A.   That's correct.
25   Q.   There is nothing in the information you put before the

31

67arvilh            Fraterrigo - cross
1  magistrate that talks about any of the investment advisory
2  agreements between any of the other Amerindo companies and any
3  of their clients other than Cates, Mayer, Urich, Marcus, and
4  Harvey, correct?
5  A.  That's correct.
6  Q.  So isn't it accurate that you had no probable cause that
7  you put into the documents submitted before the magistrate
8  concerning any investment advisory agreements or any wrongdoing
9  involving investment advisory agreements with all the various
10 Amerindos, with all their various other clients other than the
11 five I just mentioned, correct?
12 A.  That's correct.
13 Q.  Was there anything limiting you from describing in this
14 affidavit that you signed which investment advisory agreements,
15 specific investment advisory agreements I should say, that you
16 wanted?
17 A.  No.
18 Q.  Pardon me?
19 A.  No.
20 Q.  Next, you asked for copies of correspondence sent to or
21 received from clients.  That, just like all the rest of the
22 categories I described, is not limited by any date, correct?
23 A.  That's correct.
24 Q.  So you are asking for all of these things -- the client
25 lists, files, investment brochures, marketing materials,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

67arvilh            Fraterrigo - cross
1  investment advisory agreements, and copies of correspondence
2  sent to or received from clients -- from the beginning of time
3  until the time that you submitted this affidavit, correct?
4  A.  From the beginning of time?
5  Q.  From whenever they first came into existence.
6  A.  Yes.
7  Q.  Whether that was 10 years ago or 20 years ago or 30 years
8  ago, correct?
9  A.  That's correct, yes.
10 Q.  Isn't it accurate to say that other than five individuals
11 we have been mentioning -- maybe I can do it this way so I
12 don't have to keep repeating it -- the five individuals
13 mentioned in paragraph E, page 5, that you did not put any
14 information in the documents you submitted to the magistrate
15 that would support probable cause to get copies of
16 correspondence sent to or received from clients other than
17 those five from whenever those documents originated 10, 20, 30
18 years ago to the time that you submitted this affidavit,
19 correct?
20        MS. McEVOY:  Your Honor, objection.  There aren't five
21 individuals listed in paragraph E.  The government has no
22 objection to the general question.
23        MR. HOFFMAN:  I'm sorry.  That's correct.
24 Q.  From now on, when I say "the five individuals," I am
25 referring to Cates, Mayer, Brian Harvey, Joy Urich, and Paul

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

67arvilh            Fraterrigo - cross
1  Marcus.  Got that?

2  A.  Yes.
3  Q.  One of them was not listed in paragraph E, that's correct.
4  So I will repeat the question.  Isn't it accurate to say that
5  you put no information in your submission to the magistrate for
6  this warrant that would support probable cause to seize copies
7  of correspondence sent to or received from clients other than
8  those five from whenever the material originated 10, 20, 30
9  years ago to the date you filed this, correct?
10  A.  That's correct.
11  Q.  Once again, it would be correct that there was nothing
12  limiting you, nothing restricting you from being specific as to
13  the specific clients whose copies of correspondence you wanted,
14  correct?
15  A.  That's correct.
16  Q.  The same answer would be forthcoming from you regarding the
17  next category of other documents, correct?
18  A.  That's correct.
19  Q.  If you would look at paragraph B as in "boy" on page 8.
20  There you ask for documents concerning specific entities, to
21  wit, Bear Stearns, Amerindo Management, Inc., Sub ACM 26, which
22  you then call AM1, Amerindo Technology Growth Fund, Inc.,
23  Amerindo Technology Growth Fund II, Inc., and Techno Raquia
24  S.A., and you call those collectively the Amerindo brokerage
25  accounts, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

34

67arvilh            Fraterrigo - cross
1  A.  That's correct.
2  Q.  Is the reason you specifically state those entities that
3  you referred to as the Amerindo brokerage accounts because
4  those are the only brokerage account entities that you put
5  information in this affidavit for that would support probable
6  cause to take the documents underlying those accounts?
7       MS. McEVOY:  Objection.
8       THE COURT:  Sustained.
9  Q.  Would it be accurate to say that other than in those
10  accounts, in your view, there is no information in your
11  submission to the magistrate for this warrant that would
12  support probable cause for any other brokerage account
13  documents than the ones named in paragraph B as in "boy"?
14  A.  That's correct.
15  Q.  This is redundant, but to be clear, because my own question
16  was a little hazy, what you have just sworn to is that other
17  than these named brokerage accounts in paragraph B as in "boy"
18  on page 8, there was no information in the documents you
19  submitted to the magistrate that would support probable cause
20  of wrongdoing concerning any other brokerage accounts, correct?
21  A.  That's correct.
22       MR. HOFFMAN:  May I have one moment, your Honor?
23       THE COURT:  Of course.
24  Q.  Looking at the paragraph we were just talking about, page
25  8, paragraph B as in "boy", would it be accurate to say that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

35

67arvilh            Fraterrigo - cross
1  Amerindo Internet Fund is not mentioned there.
2  A.  That's correct.
3  Q.  Let me show you what is being taken from the box labeled

6   correct?
7   A.  Correct.
8   Q.  Let me ask you this.  Since I am not prepared to do these
9   in bulk, have you gone through the documents in the various
10  boxes that you supplied to the defense that were brought here
11  in court?
12  A.  Yes.
13  Q.  Would it be accurate to say that there are a number of
14  brokerage accounts in addition to the ones I just showed you
15  whose documents were received which accounts were not named in
16  paragraph B as in "boy" page 8 and for which there was no
17  probable cause submitted to the magistrate?
18  A.  They were seized, but they were seized under a different
19  paragraph of the affidavit.  I had authority to seize it.
20  Q.  I am not asking you whether or not there was a paragraph
21  that gave you authority to seize a whole bunch of things.  That
22  is not my question.
23  A.  OK.
24  Q.  My question is, as with the ones I just showed you, that
25  there are other brokerage accounts that were seized that are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

38
67arvilh                    Fraterrigo - cross
1   not named in paragraph B as in "boy" on page 8 of the affidavit
2   and for which, as with the others you just testified to, there
3   was no probable cause to support the seizure, correct?
4   A.  There was no probable cause in the --
5   Q.  In the papers submitted to the magistrate?
6   A.  That's correct.
7   Q.  Thank you.  In the same paragraph B as in "boy," page 8, if
8   you look three lines up from the bottom of that paragraph, you
9   stated that there was probable cause to seize, quote, other
10  documents reflecting or relating to securities transactions
11  entered into on behalf of clients by any current or former
12  Amerindo entity, affiliate, principal, officer, and employee.
13  Do you see that?
14  A.  Yes.
15  Q.  Would it be accurate to say that other than the five
16  individuals previously mentioned, there was no probable cause
17  to seize documents reflecting or relating to securities
18  transactions entered into on behalf of clients other than those
19  five that was put before the magistrate, correct?
20  A.  That's correct.
21  Q.  And there was no probable cause that was put before the
22  magistrate to seize any documents other than concerning the
23  five individuals we have mentioned that involved any current or
24  former Amerindo entities, affiliates, principals, officers, and
25  employees, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

39
67arvilh                    Fraterrigo - cross
1   A.  That's correct.
2   Q.  In terms of your instructions to the individuals executing
3   the search warrant, would it be accurate to say that you never
4   instructed them to limit their seizure of materials from the
5   Park Avenue office to materials concerning the five individuals
6   we have been talking about?
7   A.  No, it did not.

16    the government would like to reflect that Mr. Litt left the
17    courtroom during the portion of Inspector Fraterrigo's
18    testimony regarding what was told to her regarding the grand
19    jury subpoena.  But he has now returned to the courtroom.
20          THE COURT:  OK.  I thought maybe he had forgotten his
21    No. 2 pencil.  Go ahead, Mr. Hoffman.  How much longer do you
22    think you have?
23          MR. HOFFMAN:  You are the sixth person to ask me that.
24    I guess I am getting very boring.  About 45 minutes I should
25    think.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

67arvilh                Fraterrigo - cross
1          THE COURT:  That's fine.  You all should be thinking
2     about when we are going to continue this, because even I
3     realize we are not going to finish today.
4          MR. HOFFMAN:  I did have one on that realm, one
5     hopefully time-saving aspect.  I asked about brokerage accounts
6     similar to the ones that we had put in evidence, and I received
7     an answer.  But I was wondering in terms of volume if it would
8     be a time saver, because I am thinking of the record as well,
9     rather than going through all of the other ones, if there would
10    be some way where we could just identify them by letter or
11    whatever the Court would suggest and make it a part of the
12    hearing.  I just don't want to take the time to continue to go
13    through those.  I just mention that to the Court.
14          THE COURT:  That is fine.  But even with that, we are
15    not going to finish today.  You all can think about it at lunch
16    and we will talk about it at the end of the day.
17          Go ahead, Mr. Hoffman.
18    BY MR. HOFFMAN:
19    Q.  If you look at page 8, paragraph D as in David of your
20    sworn affidavit submitted to the magistrate in this matter, you
21    will see on the bottom of page 8 paragraph D as in David is
22    part of the things you say you have probable cause for, to wit,
23    current and former client lists, client files, investment
24    brochures, marketing materials, etc.
25          I asked you certain questions and you gave me certain

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

67arvilh                Fraterrigo - cross
1     answers to that, correct?
2     A.  Yes.
3     Q.  In the same vein, paragraph E on page 9 calls for client
4     list, client files, investment brochures, marketing materials,
5     investment advisory agreements, copies of correspondence sent
6     to or received from clients and other documents concerning or
7     reflecting the identities of and communications with clients.
8          Up to that point, that is basically the same
9     description of materials for which you say you have probable
10    cause that was in the prior paragraph?
11          MS. McEVOY:  Objection as to reading half the clause.
12          MR. HOFFMAN:  I am going to continue on.
13    Q.  I am saying up to that point it is the same description as
14    you had in the prior paragraph, right?
15    A.  That's correct.
16    Q.  Then it goes on to say, "concerning or reflecting the
17    identities of and communications with clients who have

18    investments managed by Amerindo, who receive redemptions
19    through or make investments through overseas bank accounts and
20    trust accounts."  Do you see that?
21    A.  Yes.
22    Q.  Would it be accurate to say, as it was for the other
23    paragraph, that other than the five named individuals we talked
24    about, you submitted no probable cause to the magistrate to
25    support the seizure of the documents I just described?

SOUTHERN DISTRICT REPORTERS, P.C.<br/>(212) 805-0300

50

67arvilh                    Fraterrigo - cross
1    A.  That's correct.
2    Q.  Again, there was nothing stopping you from more narrowly
3    describing these documents, for example, by saying as they
4    relate to those five individuals, correct?
5    A.  That's correct.
6    Q.  Paragraph H, bottom of page 9, for which you say there is
7    probable cause to seize documents reflecting any Amerindo
8    investment in guaranteed fixed-rate deposit accounts, including
9    lists of clients with investments in GFRDAs, account statements
10   reflecting investments in GFRDAs, documents reflecting the
11   holdings of any Amerindo entity in certificates of deposit or
12   government entities, and documents reflecting all securities
13   underlying any investment in GFRDA.
14           Would it be accurate to say again that other than the
15   five individuals mentioned, there was no information put in the
16   material put before the magistrate for the search warrant that
17   would support probable cause for this material called for in
18   paragraph H other than as to those five individuals, correct?
19   A.  That's correct.
20   Q.  Again, there was nothing stopping you from limiting or
21   circumscribing the description on a narrower basis, correct?
22   A.  That's correct.
23   Q.  Paragraph I, documents reflecting any private bank,
24   brokerage, or other account with any financial institution held
25   by Amerindo principals, including Alberto Vilar and Gary

SOUTHERN DISTRICT REPORTERS, P.C.<br/>(212) 805-0300

51

67arvilh                    Fraterrigo - cross
1    Tanaka.  Isn't it a fact that you had no probable cause to
2    support the seizure of documents described in that paragraph as
3    to Amerindo principals other than Alberto Vilar and Gary
4    Tanaka?
5           MS. McEVOY:  Objection.
6           THE COURT:  Overruled.
7    A.  That's correct.
8    Q.  Going to paragraph J, documents reflecting or relating to
9    the cancellation of completed trades and rebooking of those
10   canceled trades in other accounts managed or controlled by
11   Amerindo.
12           Would it be accurate to say that you had no probable
13   cause -- withdrawn -- that there was no probable cause
14   submitted to the magistrate to seize documents referred to in
15   paragraph J that I just described concerning cancellation of
16   completed trades and rebooking of those canceled trades in
17   other accounts managed or controlled by Amerindo as to anyone
18   other than the five individuals mentioned, correct?
19   A.  That's correct.

20  Q.  Paragraph L, which calls for documents reflecting brokerage
21  accounts maintained by Amerindo at any broker-dealer other than
22  Bear Stearns & Company.  Would it be accurate to say that you
23  had not submitted any probable cause to the magistrate to
24  support the seizing of such documents concerning anyone other
25  than the five individuals mentioned?

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

52

67arvilh                   Fraterrigo - cross
1   A.  That's correct.
2   Q.  Paragraph M as in "mother," bank account statements,
3   brokerage account statement, transaction records, wire transfer
4   instructions and records, copies of checks sent to or received
5   from client, notes, ledgers, cash receipt journals, deposit
6   tickets and records, and other documents reflecting or relating
7   to movements of funds into or out of the Amerindo brokerage
8   accounts.
9           Would it be accurate to say that there was no
10  information included in the material you submitted to the
11  magistrate that would support probable cause to take or get
12  documents at the Park Avenue premises concerning any entities
13  or people other than the five that you have mentioned, is that
14  correct?
15  A.  That's correct.
16  Q.  Paragraph N as in "Nancy," page 10, records of expenses
17  such as copies of checks and/or wires sent to landlords.  Would
18  it be accurate to say that there was no information submitted
19  to the magistrate that would support probable cause to take
20  copies of checks and/or wires sent to landlords?
21  A.  That's correct.
22  Q.  There would be no probable cause submitted to the
23  magistrate for records of expenses such as copies of checks
24  and/or wires sent to counsel, correct?
25  A.  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

53

67arvilh                   Fraterrigo - cross
1   Q.  The same, there is no probable cause for that material sent
2   to accountants, correct?  Bottom of the page.
3   A.  That's correct.
4   Q.  Or to brokers?
5   A.  Correct.
6   Q.  Or to utility companies?
7   A.  That's correct.
8   Q.  Or to other organizations and individuals who provide goods
9   and services to Amerindo?
10  A.  That's correct.
11  Q.  Or corporation and government documents related to the
12  various entities with which Amerindo and Vilar conduct business
13  other than as to the five individuals?
14  A.  That's correct.
15  Q.  No probable cause put in the material put before the
16  magistrate for documents representing or reflecting
17  communication with accountants, correct?  No probable cause for
18  that, correct?
19  A.  If it is reflecting communications regarding the
20  individuals.
21  Q.  Other than the five individuals?

24    A.  I don't recall.
25    Q.  Did you make any changes on that draft?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    56
      67arvilh              Fraterrigo - cross
1     A.  I don't recall.  I know there were several changes.
2     Q.  Did there come a time when you saw a third draft, or were
3     the first two --
4     A.  I did.  There were several changes.  I don't know how many.
5     There were several drafts of it.
6     Q.  You don't remember the changes that you made?
7     A.  No.
8              MR. HOFFMAN:  I would ask if the government has copies
9     of those drafts with the changes.
10             THE COURT:  Do you know?
11             MS. McEVOY:  I don't know.
12             THE COURT:  They will check over the lunch break.
13    Q.  When you got these drafts and made these changes, there was
14    nothing limiting you or stopping you from making whatever
15    changes you thought were appropriate, correct?
16    A.  No.
17    Q.  Is that correct?
18    A.  That's correct.
19    Q.  When the search was going on at the premises, you told us
20    that certain materials involved computers, correct, certain of
21    the seizures involved computers, correct?
22    A.  That's correct.
23    Q.  Do you know whether or not any of the computers were imaged
24    on the premises?
25    A.  Some were, yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    57
      67arvilh              Fraterrigo - cross
1     Q.  Do you know whether or not, when those computers were
2     imaged, all of the information on the computer was simply taken
3     from it or whether there was anything not imaged from the
4     computer?
5     A.  My understanding was there was a mirror image of the hard
6     drive.
7     Q.  A mirror image?
8     A.  Yes.
9     Q.  By that you mean everything that was on it was taken?
10    A.  Yes.
11    Q.  Would it be accurate to say that when the computers were
12    mirror-imaged, so to speak, nobody was looking at the --
13    withdrawn.  That is a bad question.  As far as you know, when
14    the computers were mirror-imaged, when you say everything was
15    taken, there was no looking at the warrant and Exhibit A that
16    described what can be taken and comparing those categories to
17    what was on the computer; it was just taken in bulk, correct?
18    A.  My understanding was a mirror image was conducted of the
19    hard drive and that was it.
20    Q.  Were there other computers that were not mirror-imaged that
21    were taken off the premises?
22    A.  Yes, that's correct.
23    Q.  Do you know the reason that was done as opposed to mirror
24    imaging those?
25    A.  I think there were issues with the size of the server.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

58

67arvilh                    Fraterrigo - cross

1   Some of the servers were pretty large, and they couldn't finish
2   mirror-imaging some of the other computers.
3   Q.  So as far as you know, it was a bulk problem, the amount of
4   information contained?
5   A.  Yes.
6   Q.  Did there come a time when those computers were mirror-
7   imaged?
8   A.  Yes.
9   Q.  Again, when the information was taken off those computers,
10  it was taken off in bulk as opposed to going through it and
11  seeing what information was covered by attachment A, correct?
12  A.  That's correct.
13          MS. McEVOY:  Let the record reflect that Mr. Litt has
14  reentered the courtroom.
15          THE COURT:  So noted.
16  Q.  Did you ever go through the computer material that was
17  taken in bulk, or mirror-imaged as you put it, either at the
18  site or subsequently as to those computers that were taken off
19  site, in a similar manner that you went through some of the
20  boxes to see if any of the information taken was improperly
21  seized?
22  A.  No, I did not.
23  Q.  Do you know if anybody has?
24  A.  No, I don't know.
25  Q.  You are the case agent.  You are in charge of this, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

59

67arvilh                    Fraterrigo - cross

1   A.  Yes.
2   Q.  Did you tell anyone to do that?
3   A.  No, I didn't.
4   Q.  So as far as you know, no one has, correct?
5   A.  As far as I know, I don't think anyone has.
6   Q.  Thank you.  When you submitted materials to the magistrate
7   to get the search warrant, you were aware, were you not, that
8   some of the materials that would be part of the package would
9   be the complaints that you signed and swore to involving Mr.
10  Vilar and Mr. Tanaka, correct?
11  A.  Yes.
12  Q.  As to those complaints, did you participate in the drafting
13  of them?
14  A.  Yes.
15  Q.  If you will turn to 3501-H, a copy of which, if I may
16  approach, your Honor --
17          THE COURT:  Yes, you may.
18  Q.  -- I will put before you.
19          MR. HOFFMAN:  Let the record reflect I am returning
20  3501-J, hopefully in exactly the form I was given it.
21  Q.  Look through that and tell me if that is the complaint you
22  signed and swore to and made a part of the documents put before
23  the magistrate.  That complaint is concerning U.S. v. Alberto
24  Vilar?
25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3   A.   Correct.
4   Q.   About how long before you first worked on this complaint
5   had you been getting information from the SEC?
6            MS. McEVOY:   Objection.
7            THE COURT:   Sustained.
8   Q.   Would it be accurate to say that nowhere in the complaints
9   that were made part of the material that went before the
10  magistrate, complaints against Mr. Vilar and Mr. Tanaka, that
11  nowhere in those documents did you state that there was any
12  probable cause to seize any documents from the Park Avenue
13  premises?   Correct?
14  A.   These were complaints.
15  Q.   I understand what they are.   I am simply asking you --
16  A.   It doesn't indicated a seized amount.   I didn't state that.
17  Q.   So all of the information that you put before the
18  magistrate where you said you had probable cause to seize
19  material, that information was contained either in your
20  affidavit or attachment A, correct?
21  A.   Probable cause, this part of the probable cause is the
22  complaints, the two --
23  Q.   Let me ask you again.   Did you put any statements in the
24  complaint of either Vilar or Tanaka alleging probable cause to
25  seize any particular material from the Park Avenue office?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

65

67arvilh          Fraterrigo - cross
1   A.   No.
2   Q.   So would it be accurate to say that the only probable cause
3   you specified to seize specific materials from the Park Avenue
4   office was contained in your affidavit and attachment A?
5   A.   That's correct.
6   Q.   Do you remember describing on direct examination certain
7   materials that you personally seized from the premises?
8   A.   Which premises?
9   Q.   Park Avenue.
10  A.   Yes.
11  Q.   That is the premises that is the subject of the search
12  warrant as opposed to London.
13  A.   All right.
14  Q.   Can you tell us if any of the materials you seized
15  personally from the premises at Park Avenue concerned
16  individuals other than the five that we have been mentioning?
17  A.   Individuals?
18           THE COURT:   Do you mean investors?
19  Q.   People.
20  A.   Individuals, like just people in general?
21  Q.   Yes.
22  A.   Yes.
23  Q.   Can you tell us whether or not any of the materials you
24  personally took from the Park Avenue premises related to
25  entities, corporate entities, other than those that you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

66

67arvilh          Fraterrigo - cross
1   described in your affidavit as involving any of the five
2   individuals?
3            MS. McEVOY:   Your Honor, objection as ambiguous
4   regarding "entities."

```
 5              THE COURT:  I think that's right.  Mr. Hoffman, you
 6   might want to rephrase it.
 7   Q.  Did you take any materials when you searched the Park
 8   Avenue premises that concerned any corporations other than
 9   those that you described in your affidavit as involving the
10   five individuals?
11              MS. McEVOY:  Objection on the same grounds.
12              THE COURT:  Are you talking about institutional
13   clients?
14              MR. HOFFMAN:  No.
15              THE COURT:  I think you may need to tell her a little
16   bit more.
17   Q.  Excluding institutional clients, did you take any materials
18   from the Park Avenue office, you personally, that involved
19   business corporations that were other than those described in
20   your affidavit concerning the five individuals?
21   A.  I don't understand.  It is not very clear what you are
22   asking.
23   Q.  Do you have a copy of 3501-L?
24   A.  No.
25   Q.  Government Exhibit 54, also identified as 3501-L, is that
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67

67arvilh                    Fraterrigo - cross

```
 1   your inventory?
 2   A.  Yes, it is.
 3   Q.  Would you look at page 2 of 2.  The bottom right-hand
 4   corner says 2 of 2.  Do you see that?
 5   A.  Yes.
 6   Q.  On that page it says S-A-E-E-P, correct?
 7   A.  Yes.
 8   Q.  M-A-S-O-U-D letter re Citibank, private bank, and Amerindo
 9   Investment Advisors, Inc., correct?
10   A.  Yes.
11   Q.  Did that letter, that document, concern Cates, Lily Cates?
12   A.  No, it did not.
13   Q.  Did it concern any of the other aforementioned individuals
14   that we have been talking about as the five individuals?
15   A.  No, it did not.
16   Q.  Do you remember what it referenced?
17   A.  No, I don't recall.
18   Q.  Do you remember testifying earlier today, and Friday for
19   that matter, that you submitted no probable cause, submitted no
20   probable cause, to the magistrate for any material concerning
21   anything other than the five individuals?
22   A.  That's correct.
23   Q.  Would this document fall within the category of there being
24   no probable cause submitted to the magistrate for this
25   document, since it doesn't apply to any of the five
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

68

67arvilh                    Fraterrigo - cross

```
 1   individuals?
 2   A.  That's correct.
 3   Q.  Would you go to the next page, which says page 1 of 2.  By
 4   the way, just a curiosity question that drove me crazy.  Was
 5   there another Fraterrigo that was involved in the search?
 6   A.  Yes.
```

```
 7   Q.  Page 1 of 2.  I am now referring to the search warrant
 8   inventory that you filled out.
 9   A.  Yes.
10   Q.  It says, "Quantity 1 Goldman Sachs letter Richard Menschel
11   5/1/2000."  Do you see that?
12   A.  Yes.
13   Q.  Did that have anything to do with the five individuals we
14   mentioned?
15   A.  No.
16   Q.  Would that fall into the category of documents for which
17   you supplied no probable cause to the magistrate?
18   A.  That's correct.
19   Q.  Look at the next document, which says, "Richard Menschel
20   letter."  Would that also have no reference to the five
21   individuals?
22   A.  That's correct.
23   Q.  That also would fall into the category of documents for
24   which you gave the magistrate no probable cause for you to
25   seize, correct?
```

69

```
     67arvilh              Fraterrigo - cross
 1   A.  That's correct.
 2   Q.  Would you look down, the fifth one down.  What is the next
 3   word?  Osman?  The next word.
 4   A.  Goldman.
 5   Q.  I'm sorry.  "Letter Goldman Sachs group 12/4/02."
 6   A.  Yes.
 7   Q.  Would that also not have applied to any of the five
 8   individuals and also have fallen into the category of documents
 9   which you supplied to the magistrate for probable cause?
10   A.  I can't recall.
11   Q.  Let's look down farther, where it says, "notes typed
12   J-O-A-Q-U-I-N re original and new deal."  Do you see that?
13   A.  Yes.
14   Q.  Would that also not have pertained to any of the five
15   individuals?
16   A.  Without looking it over again, I can't recall.  I don't
17   know.
18   Q.  Do you have these documents that are reflected in your
19   search warrant inventory in a specific place?
20   A.  Yes.
21   Q.  Are they readily accessible?
22   A.  They would be in the evidence room in my office n my
23   building.
24   Q.  Would you be able to bring them over today?
25   A.  I will have to get someone to get them.
```

70

```
     67arvilh              Fraterrigo - cross
 1           MR. HOFFMAN:  I would ask the Court for those
 2   documents she has no memory of to allow us after lunch to
 3   continue when she brings the documents so she can refresh her
 4   recollection.
 5           THE COURT:  How many documents are we talking about?
 6           MR. HOFFMAN:  I don't know.  Not that many.  But we
 7   are going to go through the documents to see which she
 8   remembers and which she doesn't.
```

```
 9              THE COURT:  Any objection?
10              MS. McEVOY:  Your Honor, we can do our best to get
11     them over here.
12              THE COURT:  That is assumed.  Do your best and we will
13     see what happens.
14     Q.  Next, one clear yellow folder "John Sweetland."  Would it
15     be accurate to say that that had nothing to do with the five
16     individuals.
17     A.  That's correct.
18     Q.  Would it be accurate to say that that would also fall into
19     the category of documents that you gave the magistrate no
20     probable cause for you to seize?
21     A.  That's correct.
22     Q.  Next is Diane Cooper for Wilmington Trust.  Would it be
23     accurate to say that that has no bearing on any of the five
24     individuals we mentioned?
25     A.  No, that is incorrect.
```

71

```
       67arvilh              Fraterrigo - cross
 1     Q.  To which of the five individuals does that have a bearing
 2     on?
 3     A.  That was involving Alberto Vilar.  I think it was a letter
 4     about his account, his account, wire transfers, related to
 5     that.
 6     Q.  But not to the five individuals we have been mentioning:
 7     Marcus, Cates --
 8     A.  I don't think it was relating to them specifically, no.
 9     Q.  Would it be accurate to say that you did not give the
10     magistrate any information to support probable cause to seize
11     that document?
12     A.  That's correct.
13     Q.  The next one is one clear folder containing letters, notes,
14     emails from various individuals requesting money.  Would it be
15     accurate to say that those documents did not reference any of
16     the five individuals we have been talking about?
17     A.  I can't be sure without looking at it.
18     Q.  Each of the ones you say you can't be sure, I would
19     appreciate that we get those here if we can.
20              The next page where it says, "Amerindo Internet fund
21     file," correct?
22     A.  Correct.
23     Q.  Would it be accurate to say that that does not involve any
24     of the five individuals we have been talking about?
25     A.  That's correct.
```

72

```
       67arvilh              Fraterrigo - cross
 1     Q.  Would it be accurate to say that that, too, falls into the
 2     category of documents for which you did not give the magistrate
 3     any probable cause to seize?
 4     A.  That's correct.
 5     Q.  The next one, one down, "Amerindo Internet fund
 6     presentation file," do you see that?
 7     A.  Correct.
 8     Q.  Do you have a memory of that?
 9     A.  Yes.
10     Q.  Would it be accurate to say that that did not affect any of
```

```
11   the five individuals you mentioned?
12   A.  No, it does not.
13   Q.  Would it be accurate to say that that would fall in the
14   category of documents for which you did not give the magistrate
15   probable cause to seize?
16   A.  That's correct.
17   Q.  Next, Amerindo Internet Technology Partners LLP.  Would it
18   be accurate to say that that did not affect any of the five
19   individuals?
20   A.  No, it does not.
21   Q.  Would it be accurate to say that that falls in the category
22   of documents for which you did not give the magistrate any
23   material to support probable cause for its seizure?  Is that
24   correct?
25   A.  That's correct.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300

73

```
     67arvilh                Fraterrigo - cross
1    Q.  Below, skipping one, we get to contacts file, correct?
2    A.  Yes.
3    Q.  Do you have a memory of what is contained in there?
4    A.  Not specifically.
5    Q.  I would ask that you bring that.
6            The next one, compliance reports, private placement
7    updates, do you see that?
8    A.  Yes.
9    Q.  Would it be accurate to say that that did not involve any
10   of the five individuals you have named?
11   A.  Correct.
12   Q.  Would it be accurate to say that that is a document for
13   which you did not put information to support probable cause
14   before the magistrate for its seizure?  Is that correct?
15   A.  That's correct.
16   Q.  Citibank fund file containing files miscellaneous Citibank
17   funds, performance fund.  Would it be accurate to say that that
18   material had nothing to do with the five individuals that have
19   been named?  Correct?
20   A.  That's correct.
21   Q.  Would it be accurate to say that that material falls within
22   the category of those documents for which you did not put
23   information before the magistrate that would support probable
24   cause for the seizure, correct?
25   A.  That's correct.
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>
(212) 805-0300

74

```
     67arvilh                Fraterrigo - cross
1    Q.  Portfolio review committee file.  Would the answer to the
2    prior questions be the same for that file?
3    A.  I don't know.
4    Q.  That is one you don't recognize?  You don't remember?
5    A.  I don't remember.
6    Q.  I would ask you to bring that, if possible.
7            If you would go to search warrant inventory, in the
8    upper right-hand corner it says N as in "Nancy" 10.  It is a
9    few pages down but it is not marked by a page number.  That is
10   the closest mark I can give you.  It is in the upper right-hand
11   corner.
12   A.  Yes.
```

13    Q.  That says, "quantity 14 black/red record, one ledger
14    notebook."  Do you see that?
15    A.  Yes.
16    Q.  Do you remember whether or not there was information
17    contained in that I guess it is a notebook concerning any of
18    the five individuals mentioned?
19    A.  I went through a sampling of these notebooks at the time,
20    and they mentioned some of the individuals.
21    Q.  When you say you went through a sample, were there 14 of
22    these books?
23    A.  There was 14.
24    Q.  How many did you go through?
25    A.  I think I probably went through 3 or 4.

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

                                                                    75

67arvilh                  Fraterrigo - cross
1    Q.  Would it be accurate to say as to the others that you
2    seized, you have no idea of whether or not there was any
3    mention in them as to the five individuals?
4    A.  No.  I didn't get a chance to look at it on-site.
5    Q.  Have you looked at it since?
6    A.  I believe I have.  Not in its entirety.  Probably more than
7    four.
8    Q.  But you don't know how many more?
9    A.  No.
10   Q.  Could you bring those.
11            "8½-by-11 yellow pads AV notes."  I assume that is
12   Alberto Vilar notes.
13   A.  Yes.
14   Q.  Is there anything in those documents referring to the five
15   individuals?
16   A.  Yes.
17   Q.  That is why you took them, correct?
18   A.  Yes.
19   Q.  If you would go to the next page, "have 9 black/red
20   record/ledger notebook," correct?
21   A.  Yes.
22   Q.  Does that mean there are nine of those?
23   A.  Yes.
24   Q.  Did you go through each of those?
25   A.  No.  I went through a sample of them.

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

                                                                    76

67arvilh                  Fraterrigo - cross
1    Q.  Subsequent to seizing them, have you gone through them?
2    A.  I believe I went through not all of them.  Some of them.
3    Q.  So there may be those that you haven't gone through?
4    A.  Correct.
5    Q.  Of those that you have gone through, did you find in any of
6    them that they did not refer to any of the five individuals?
7    A.  They did not refer?
8    Q.  Yes.
9    A.  I can't say for sure.
10   Q.  So you will bring those, please.
11   A.  Yes.
12   Q.  "One black folder pad."  Do you have any memory of what
13   that is?
14   A.  No.

15  Q.  Could you bring that, please.  "Two address notebooks."
16  Did you go through those?
17  A.  Yes.
18  Q.  Did those have references to the five individuals?
19  A.  I can't recall.
20  Q.  Would you bring those, please.  "One Amerindo Technology
21  Fund registration" -- can you tell me what the next word is?
22  A.  "Securities."  I can't see the rest.
23  Q.  "July 1996," correct?
24  A.  Yes.
25  Q.  Would it be accurate to say that that had no bearing on the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            77
        67arvilh            Fraterrigo - cross
1  five individuals you have mentioned?
2  A.  I can't say for sure.  I would have to look at it.
3  Q.  Would you bring that, please.  Next page, position box O,
4  you say, "room O fax report."  Do you see that?
5  A.  Yes.
6  Q.  Did you go to the fax machine and just empty out whatever
7  information was on it?
8  A.  I printed it out.
9  Q.  Make copies of it, is what I am saying.
10  A.  Printed out the memory.
11  Q.  The memory?
12  A.  Yes.
13  Q.  In doing so, did you look to see if there were any
14  materials contained therein that had anything to do with any of
15  the five individuals?
16  A.  It was a list of telephone numbers.
17  Q.  You don't know whose numbers they were?
18  A.  No.
19  Q.  So at the time you had no basis to believe that they had
20  anything to do with the five individuals, correct?
21  A.  No, I don't know, I can't say for sure.
22  Q.  Under that you say, "Xerox fax center" something.  I don't
23  know what those letters mean.  Can you tell us what that is.
24  A.  I think that is a description of the fax machine.
25  Q.  The next page says, "Room T" as in "Tom," "fax report work
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            78
        67arvilh            Fraterrigo - cross
1  center progress 35."  Can you tell us what that was.
2  A.  That is a fax machine, same thing.  I printed out its
3  memory.
4  Q.  Your answers would be the same?
5  A.  Yes.
6  Q.  If you would go to the next page.  That is "R. Fraterrigo,"
7  correct, as are all the documents?
8  A.  I don't know.
9  Q.  You don't have the next page.  OK.  Thank you.
10        MR. HOFFMAN:  For the record, I am returning
11  Government Exhibit 54.
12  Q.  Were you aware at the time that you submitted the affidavit
13  to the magistrate that the premises at Park Avenue contained
14  materials concerning institutional clients of Amerindo?
15        MS. McEVOY:  Objection.
16        THE COURT:  Overruled.

17    A.   Yes.
18    Q.   Were you aware at the time that you participated in the
19    execution of the search warrant that the premises contained
20    material concerning institutional clients?
21    A.   Yes.
22    Q.   Did you at any point in time ever tell any of the executing
23    postal inspectors not to take those documents?
24    A.   No, I did not.  I don't recall.
25    Q.   Best memory is you did not?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79
67arvilh                    Fraterrigo - cross

1    A.   I don't believe I did.
2    Q.   At the time that you were involved in the drafting, as you
3    described earlier, of the materials to be supplied to the
4    magistrate, did you ever discuss as concerns what should be in
5    that document with Mr. Litt -- he doesn't have to leave -- the
6    fact that there were institutional clients' materials at the
7    Park Avenue address?
8            MS. McEVOY:  Objection.
9            THE COURT:  Sustained.
10           MR. KOBRE:  Your Honor, on that question may we
11    approach for a second to address that last objection?
12           THE COURT:  Sure.
13           (At the sidebar)
14           MR. KOBRE:  I figured this was an appropriate time on
15    the issue he raised so we don't have to come back to it.  The
16    defense has argued in its brief that one reason the inspectors
17    acted that they didn't convey was that the warrants were
18    approved by the Assistant United States Attorney, obviously
19    from the information that was provided.
20           To the extent that Mr. Hoffman is looking to get into
21    inquiry as to the discussion with the United States Attorney
22    and the approval of it and the discussion of facts relating to
23    the affidavit, it is relevant.  They are pressing the argument,
24    making that point, as to the fact that that is one reason why
25    you should find that the government acted in good faith in this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

80
67arvilh                    Fraterrigo - cross

1    instance.
2            But I don't think they can have it both ways.  They
3    can't press that argument and then try to preclude the
4    discussion between the AUSA and the inspectors who executed the
5    warrant.
6            THE COURT:  My take on it was it was getting to
7    whether or not there was some sort of a material omission that
8    led to the warrant being almost fraudulently approved, and
9    presumably that would include Mr. Litt as well.  I don't see
10    that there is a basis for any belief that there has been any
11    misrepresentation to the magistrate.  And I don't think
12    anything the government has said about what Mr. Litt reviewed
13    goes to that question.
14           MR. KOBRE:  Let's say, arguing Mr. Hoffman's point,
15    facts are being withheld from Mr. Litt and he wants to explore
16    that fact, the fact that the government is saying a factor to
17    be considered is the fact that the inspector should have been
18    bolstered by the fact that the AUSA drafted it and approved it.

```
 2  A.  Yes.
 3  Q.  Excluding the five individuals, I asked you if in fact you
 4  had no materials put before the magistrate that would give the
 5  magistrate probable cause to have you seize these various
 6  categories, and question after question you answered by saying
 7  that's correct, exclusive of the five individuals there was no
 8  material put before the magistrate to support probable cause to
 9  seize those documents.  Do you remember those questions and
10  answers?
11  A.  Yes.
12  Q.  What I am asking you is that information which you just
13  gave us as to those categories where there was no information
14  put before the magistrate to support probable cause to seize
15  those documents, you had the same awareness at the time you put
16  the information before the magistrate, you knew at that time,
17  just as you have testified here under oath, that you were not
18  putting in the documents before the magistrate material to
19  support probable cause to seize those documents, correct?
20          MS. McEVOY:  Objection.
21          THE COURT:  Inspector, do you remember giving
22  testimony about client lists?
23          THE WITNESS:  Yes.
24          THE COURT:  And that there was probable cause.  You
25  said that there was not probable cause to get all the client
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

94

67arvilh                    Fraterrigo - cross

```
 1  lists, there were only some client lists that you had specific
 2  information.  Do you recall that?
 3          THE WITNESS:  Yes.
 4          THE COURT:  The question is, is it a fact that you
 5  knew you didn't have probable cause to get every client list at
 6  the time you went and got the warrant?
 7          MR. HOFFMAN:  Correct.
 8          THE WITNESS:  That's correct.
 9  Q.  That's correct?
10  A.  Mm-hm.
11  Q.  It would be the same for all the other things that we asked
12  you, the other categories, not just client lists, but we went
13  through many categories, correct?
14  A.  That's correct.
15          THE COURT:  Breaking point here?
16          MR. HOFFMAN:  Yes, sir.
17          THE COURT:  Let's break for lunch.  Come back at 2:15.
18  Everybody should give some thought to all your calendars.  I am
19  not going to eliminate summer vacations, but we do need to take
20  some more time to finish this one.
21          You are still on cross.
22          (Luncheon recess)
23                    AFTERNOON SESSION
24                      2:15 p.m.
25  CYNTHIA FRATERRIGO, resumed.
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

95

67arvilh                    Fraterrigo - cross

```
 1  CROSS-EXAMINATION (continued)
 2  BY MR. HOFFMAN:
```

11  Q.  Other than what you seized from Mr. Vilar's office.
12  A.  Yes, that's it.
13  Q.  About how long did it take you to run off those memories
14  from those two Xerox machines?
15  A.  Probably 10 to 15 minutes.
16  Q.  So the 45 minutes in Mr. Vilar's office and let's say the
17  30 minutes between the two machines that you were involved in
18  in running off copies of the memory, that is approximately an
19  hour and 15 minutes to an hour and a half, correct, 30 and 45
20  minutes?
21  A.  Correct.
22  Q.  You were in the offices from approximately 12:00 to
23  approximately 8:30 at night, correct?
24  A.  That's correct.
25  Q.  It is your testimony that you did not have enough time to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

104

67arvilh               Fraterrigo - cross
1  look at these additional books in Mr. Vilar's office, correct?
2  A.  That's correct.
3  Q.  It is your testimony that since in a couple of them you saw
4  references to the five individuals, you then seized all 23
5  books, 14 and 9, correct?
6  A.  That's correct.
7  Q.  Thank you.  At the time that you were doing the search, you
8  were aware, were you not, that Amerindo, amongst its various
9  business aspects, had American mutual funds that it owned,
10  correct?
11          MS. McEVOY:  Objection:  Asked and answered.
12          THE COURT:  That's all right.
13  A.  Yes.
14  Q.  You were also aware that none of the five individuals that
15  we have been referring to, as far as you know, had no
16  information that any of the five individuals were investors in
17  any of those mutual funds, correct?
18          MS. McEVOY:  Objection.
19          THE COURT:  Overruled.
20  A.  That's correct.
21  Q.  Let me show you defense OO, a book which I will represent
22  to you was taken from the box marked N as in "Nancy" 10 that
23  relates to the same sheet of the search warrant we are looking
24  at.  Have you seen that before?
25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

105

67arvilh               Fraterrigo - cross
1  Q.  Did you mark that down on the page of the search warrant
2  inventory that you filled out for N10?
3  A.  Yes.
4  Q.  What did you call it on that page?
5  A.  Amerindo Technology Fund registration under the Securities
6  Act, I guess, and then I put July 19, '96.
7  Q.  Did you look at that book and see that it was a compilation
8  of documents concerning the registered mutual funds that
9  Amerindo was involved with?
10  A.  Yes.
11  Q.  It is accurate, is it not, to state, as you did a moment
12  ago, that there was no reference to any of the five individuals

13 that we are discussing, because, amongst other things, they
14 were not investors in the American mutual funds, correct?
15 A.  I don't understand.
16 Q.  You told us a moment ago that the five individuals that you
17 referred to that you had no information that they were
18 investors in the American mutual funds, is that right?
19 A.  That's correct.
20 Q.  This book, as you said also a moment ago, is a compilation
21 of documents referring to those mutual funds, correct?
22 A.  Correct.
23 Q.  So it would be accurate to say, would it not, that you put
24 no information before the magistrate when you asked for the
25 search warrant that would support any probable cause to seize

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

106

67arvilh                    Fraterrigo - cross
1 documents concerning all of the Amerindo registered American
2 mutual funds, correct?
3 A.  That's correct.
4 Q.  But you seized this anyway, correct?
5 A.  It was covered in the warrant.  Yes, I seized it.
6 Q.  When you say it was covered under the warrant, what you are
7 saying is as far as you were concerned, the words in attachment
8 A could be interpreted as to include this Exhibit OO, Defense
9 Exhibit OO, correct?
10 A.  What I said was that that would be covered under attachment
11 A.
12 Q.  Staying on N as in "Nancy" 10, warrant inventory, you
13 indicate a Mead composition book, is that correct?
14 A.  Yes.
15 Q.  Let me show you Defendants' Exhibit PP as in "Peter."  Can
16 you tell me if you went through the black PP as in "Peter" at
17 the time that you seized it?
18 A.  I can't recall for sure.
19 Q.  Inspector, we will get to looking at it.  Can you tell me
20 whether or not you made any notes that would indicate whether
21 or not you read through that Exhibit PP as in "Peter."
22 A.  No, I didn't do any notes.
23 Q.  So as you sit here today, you have no knowledge as to
24 whether or not there was anything contained in defense PP that
25 would relate in any way, shape, or form to the five individuals

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

107

67arvilh                    Fraterrigo - cross
1 that we are talking about, correct?
2 A.  I can't recall either way if I looked at it.
3 Q.  Did you look through Defense Exhibit PP in determining what
4 materials to send back to Amerindo when you looked through
5 various boxes and in fact ultimately did send back materials?
6 A.  Yes.
7 Q.  When you looked through PP to determine whether or not to
8 send it back, did you find anything in PP that related to any
9 of the five individuals?
10 A.  I can't recall.
11 Q.  Would you look at N as in "Nancy" 6, page N as in "Nancy"
12 6.  Do you see on that page you write "one card in envelope
13 Mayer"?
14 A.  Yes.

15   Q.  Can you tell me what you remember that to be.
16   A.  I remember it being a card or from Lisa Mayer to Alberto
17   Vilar.
18   Q.  In N10 do you reference any document that is a letter to
19   Mr. Vilar attention Diane Cooper?
20   A.  No, I do not.
21   Q.  Let me show you what was taken from box N10, one of the
22   three boxes you brought today, and ask you to look at this.
23   I'm sorry.  Defense QQ.
24          THE COURT:  What is this known by, the name, Mr.
25   Hoffman, that is in the letter?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                108
     67arvilh              Fraterrigo - cross
1           MR. HOFFMAN:  I'm sorry?
2           THE COURT:  The spelling of the name in double Q.
3           MR. HOFFMAN:  Diane Cooper, C-O-O-P-E-R.
4    Q.  Let me show you the envelope first before you take out the
5    contents.  Then let me ask you if you remember seizing that
6    document.
7    A.  No, I don't recall.
8    Q.  Do you remember how it got into box N10?
9    A.  I am assuming that it may have been within the binders, the
10   notebooks.
11   Q.  But you don't know?
12   A.  No, I don't know for sure.
13   Q.  And you didn't put it on your search warrant inventory?
14   A.  No.
15   Q.  Would you now look at the contents of that envelope and
16   read it to yourself.  Tell me if it relates to any of the five
17   people.
18   A.  No, it does not.
19   Q.  Does that also fall within the category of documents that
20   you asked to be seized, that you asked the magistrate to allow
21   you to seize but that you did not submit information to the
22   magistrate that would support probable cause to seize that?
23   A.  That's correct.
24   Q.  When you seized books and records and binders and things of
25   that nature, you said a moment ago that you thought this might

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                109
     67arvilh              Fraterrigo - cross
1    have been in one of them, you didn't know but it might have
2    been, correct?
3    A.  Yes.  The reason why I said that, if it was not listed on
4    the inventory sheet, therefore it wasn't a separate item.  If
5    it was in a binder, then I kept it in the binder.
6    Q.  So during the time that you spent gathering materials from
7    Mr. Vilar's office, that 45 minutes, you didn't bother to go
8    through the materials to see if there were things in them such
9    as this, is that correct?
10   A.  I went through, like I said, the sample book, and then the
11   others, I didn't go through the others.
12   Q.  The others just seized in bulk, correct?
13   A.  That's correct.
14   Q.  Whatever was there was there, correct?
15   A.  Whatever was in the binder was there in the binder.
16   Q.  Did you also supply to us today pursuant to my request this

17  morning certain materials from N as in "Nancy" 4 and from N as
18  in "Nancy" 6?
19  A.  Yes.
20  Q.  If you will turn to N as in "Nancy" 4, I am going to show
21  you Defendants' Exhibit RR.  Showing you RR, can you tell me
22  what marking on your search warrant inventory that corresponds
23  with.
24  A.  This is one, the first page, refers to the notes typed
25  "Joaquin regarding new and original new deal." Also, "trade

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

110

67arvilh            Fraterrigo - cross
1   recap" is on here.  "John Sweetland" and the other materials is
2   on here, listed on my inventory sheet.
3   Q.  Would you look at that and go through it and tell me if it
4   refers to any of the five individuals.
5   A.  No, it does not refer to the five individuals.
6   Q.  Would you agree that as to Exhibit RR, Defense Exhibit RR,
7   you put no information before the magistrate that would support
8   a finding of probable cause to seize the warrant?
9   A.  Excuse me?  That doesn't make sense.
10  Q.  I asked you the same question I have been asking you.  Did
11  you say in information that you put before the magistrate that
12  you would seek probable cause to seize that warrant?
13  A.  That's correct.  A warrant?  The documents?
14  Q.  I'm sorry.  To seize RR.
15  A.  OK.
16  Q.  Is that correct?
17  A.  Yes, that's correct.
18  Q.  Showing you a document marked Defendants' Exhibit SS --
19          THE COURT:  Can I ask a question, Mr. Hoffman?
20          MR. HOFFMAN:  Yes.
21          THE COURT:  The point I think has been made.  I don't
22  know if there is value to continuing as we go into the triple
23  lettering of the alphabet.  I am not trying to cut you off.  If
24  there is a point beyond the documents you have made, go ahead.
25  But if it is the same point --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

111

67arvilh            Fraterrigo - cross
1           MR. HOFFMAN:  Same point.
2           THE COURT:  All right.
3           MR. HOFFMAN:  Just for the record's sake --
4           THE COURT:  Put on the record what else you want to
5   talk about.
6           MR. HOFFMAN:  There is another box, N as in "Nancy" 6,
7   that I would be going through that was produced this afternoon
8   by Inspector Fraterrigo that we would go through a number of
9   documents to the same effect.
10          THE COURT:  All right.  Again, I am not trying to cut
11  you off.  I just think it is the same point.
12          MR. HOFFMAN:  As long as the point is made.
13          THE COURT:  I don't think the point gets diluted or
14  strengthened by more documents.
15          MR. HOFFMAN:  Thank you.
16  Q.  While I am looking for a specific reference, perhaps I can
17  ask you the question.  You may remember.  On your direct
18  examination do you remember stating in substance that there

19    were certain documents that you left behind that were covered
20    by the warrant but that you felt were not relevant and so you
21    left them behind?
22    A.  I felt that they were not useful to my investigation,
23    that's correct.
24    Q.  When you say they were not useful to your investigation, I
25    take it what you meant by that was that they would not help

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

112

67arvilh                    Fraterrigo - cross
1     show any kind of violation of law that you were trying to
2     prove, correct?
3     A.  That's correct.
4     Q.  You made that determination when you saw these documents on
5     the day of the search, correct?
6     A.  That's correct.
7     Q.  That was literally the morning after you submitted or the
8     day after you submitted the material you submitted to the
9     magistrate to get the search warrant, correct?
10    A.  That's correct.
11    Q.  So you submitted documents asking the magistrate to allow
12    you to seize certain materials which the following day you
13    determined would not be helpful in proving the crimes that you
14    were looking to prove, correct?
15    A.  That's correct.
16    Q.  You understood at that time, both at the time you made the
17    submission to the magistrate and the next day when you were
18    looking through documents as part of the search, that the only
19    materials you had a right to ask to be seized, asked the
20    magistrate to allow you to seize, were materials that would
21    support a showing of illegal activity, correct?  You understood
22    that, correct?
23    A.  No, I don't understand that question.
24    Q.  Let me ask the question again.  You understood at the time
25    that you went to get a search warrant and submitted materials

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

113

67arvilh                    Fraterrigo - cross
1     to the magistrate to get the search warrant, that what you were
2     asking for was to seize materials that would help you show that
3     crimes were submitted, correct?
4     A.  That evidence or, yes, materials that would indicate a
5     crime has been committed, correct.
6     Q.  Do you remember testifying on direct examination that you
7     left behind documents that concerned potential investments,
8     company profiles, folders concerning net asset value of
9     investments?  Do you remember testifying to that?
10    A.  Yes.
11    Q.  And that you did so because, although they were covered by
12    attachment, they were not relevant to the search, correct?
13    Your term.
14    A.  They were covered under the search.
15    Q.  But not relevant is what you said, not relevant to the
16    search.  I assumed by that you meant not relevant to proving
17    the crimes you were looking to prove, correct?
18    A.  Correct.
19    Q.  Isn't it a fact that there were documents seized by others
20    that concerned potential investments -- you have seen those,

```
21  correct?
22  A.  Correct.
23  Q.  -- that were descriptive of company profiles?  You have
24  seen those, correct?
25  A.  Correct.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

114

67arvilh                     Fraterrigo - cross
```
 1  Q.  That concerned net asset values of certain investments, you
 2  have seen those, correct?
 3  A.  Correct.
 4  Q.  And they were very much, the ones that were seized, similar
 5  in nature to the ones that you decided not to seize, correct?
 6  A.  That's correct.
 7  Q.  In fact, the ones that were seized also, just as the ones
 8  you decided not to seize, would be of no assistance in proving
 9  the crimes you were trying to prove, correct?
10  A.  I can't answer that for sure.  I have to look over those
11  documents again.
12  Q.  You have already looked over them, correct?
13  A.  Yes.  But I can't conclude a statement on all of those
14  documents.
15  Q.  Would it be accurate to say that at least a portion of the
16  documents that you looked over of the ones I just described
17  would be of no assistance in proving the crimes that you were
18  trying to prove, correct?
19  A.  Without reviewing it, I can't make a conclusion right now.
20  Q.  So as not to take the time here, would you agree at an
21  appropriate time, at a break or whenever, I guess a break, to
22  look at those documents so that you can answer that question?
23          MS. McEVOY:  Your Honor, objection.  What documents?
24          THE COURT:  Every other document seized by every other
25  inspector.  You are trying to get what she left behind with
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

115

67arvilh                     Fraterrigo - cross
```
 1  other things seized.
 2          MR. HOFFMAN:  Correct.
 3          THE COURT:  Do you want her to go through the
 4  inventory of however many boxes?
 5  Q.  If I may, you stated that there were, the same categories
 6  that you left behind, documents that you have gone through,
 7  that you have seen?
 8  A.  Yes.
 9  Q.  Just those ones that you have gone through and seen, I am
10  asking you to refresh your recollection by looking at them so
11  that you can answer that question.
12          MS. McEVOY:  Objection, your Honor.
13          THE COURT:  You are asking her at break to go through
14  all the boxes and find something that is similar to what she
15  left behind or that somebody else seized?
16          MR. HOFFMAN:  Correct.
17          THE COURT:  She has already said she did.  Do you want
18  an example?
19          MR. HOFFMAN:  No.  Here is my problem, your Honor.  As
20  to the ones she left behind, the testimony was that they were
21  left behind that although they were covered by words in
22  attachment A --
```

```
23          THE COURT:  They weren't relevant.
24          MR. HOFFMAN:  Right.  I am asking her, the inspector,
25     if she has other materials.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

116

67arvilh               Fraterrigo - cross

```
1          THE COURT:  She said yes.
2          MR. HOFFMAN:  She said yes.  My next question was,
3     would those equally in her opinion, her view, be of no value to
4     support the charges that you are trying to prove.  Her answer
5     as to those was, without looking at them again, I can't answer
6     that.
7          MS. McEVOY:  A couple of things, your Honor.  First of
8     all, I don't believe her testimony was that she found those
9     documents to be of no assistance to her investigation.  I
10    believe her testimony was that they were not relevant, or she
11    made a decision not to seize them on that ground.
12         I don't see what the relevance would be of the
13    inspector going through over a hundred boxes of documents other
14    inspectors seized to make a determination of why they seized it
15    or whether or not it was covered under the search warrant and
16    relevant to her investigation.
17         MR. HOFFMAN:  I am not asking her to go through a
18    hundred boxes.  I am simply asking her to look at the ones she
19    has already looked at which she has described.
20         THE COURT:  Which is how many boxes?
21         THE WITNESS:  168.
22         THE COURT:  How many?
23         THE WITNESS:  Approximately 168.
24         THE COURT:  I don't want to cut you off, but we need
25    to be practical about this.  Mr. Colton is worried about his
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

117

67arvilh               Fraterrigo - cross

```
1     client's speedy trial rights.  You want to go through 168 boxes
2     not her, Inspector Fraterrigo.  If at a break, Mr. Hoffman, you
3     think there is a document that fits that description and you
4     want to take a shot at it, I will certainly let you do that.
5     BY GOVT. COUNSEL:
6     Q.  At another point in time in your direct examination you
7     stated that you left behind business-related paper, again
8     company profiles, again potential investments, and again net
9     value charts.  Can you explain to us what standard you used in
10    determining leaving those behind.
11    A.  I recall going through several documents, folders,
12    reviewing it, making a determination whether it was covered
13    under the warrant.  And in some instances if it was covered
14    under the warrant and if it was relevant or useful to the
15    investigation, I seized it.  In other instances, if it provided
16    no substantive information, I left it.
17    Q.  Did you instruct other inspectors with that standard?  Did
18    you say to them, if you come across documents -- and when I say
19    did you say to them, in substance.  Obviously, I don't mean the
20    exact words, used, if any.  But in substance, did you say to
21    them, if you come across documents that technically fit within
22    the words of attachment A, that were covered by attachment A,
23    but that are not relevant to this case and this investigation,
24    don't take those?
```

```
        25    A.  No, I did not.  I am the case agent.  I am closely familiar
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    118
```
             67arvilh              Fraterrigo - cross
         1  with the investigation.  I did not --
         2  Q.  So you did not tell them?
         3  A.  -- tell any other inspector to do that.
         4  Q.  So even though you used that standard -- because you
         5  thought that was appropriate, correct?
         6  A.  Yes.  I felt I was capable to make that decision.
         7  Q.  You did not educate the other people executing the search
         8  warrant so that they could use the same standard, you did not
         9  do that, correct?
        10  A.  No, I did not.
        11  Q.  I am going to show you an Exhibit T as in "Tom," defense
        12  Exhibit double T as in "Tom," which is government-seized
        13  property evidence tag labeled A01144298.
        14          THE COURT:  Which, for the record, is a box.
        15          MR. HOFFMAN:  It is a box.
        16          THE COURT:  Presumably of documents, right?
        17          MR. HOFFMAN:  Yes.
        18  Q.  Showing you the box Defense Exhibit TT as in "Tom," would
        19  you quickly take a look inside.
        20  A.  Yes.
        21  Q.  And tell me if there are not a number of files in there
        22  that are just empty.
        23  A.  That's correct.
        24  Q.  Do you know if that box of empty files was taken that way
        25  or if there was material in it that was taken out?
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                    119
```
             67arvilh              Fraterrigo - cross
         1  A.  I can't say for sure, but there might have been materials
         2  inside that was taken out based on privilege.
         3  Q.  How would we know that if that were the case?
         4  A.  I would have to review the privilege boxes and identify
         5  those items that belong in here.
         6  Q.  Thank you.  Ordinarily, when materials are taken out
         7  because they are privileged from some file or folder, is there
         8  not some sort of note that is put in saying that that occurred?
         9  A.  Some inspectors had a system of doing that.  Others took
        10  the item out and on the privileged item indicated where it
        11  belonged back in the original box.
        12  Q.  Do you remember approximately what time the actual search
        13  ended?  Let me make that clear.  Let me withdraw it and make it
        14  clear.  The actual active searching at the premises on Park
        15  Avenue ended.
        16  A.  I believe I was the last one who did the searching, and
        17  that was the fax machine, and that was probably approximately
        18  between 8:00 and 8:30 that night.
        19  Q.  Is it your testimony that it is your understanding that the
        20  reason the search ended and that other materials were left
        21  there --
        22          MS. McEVOY:  Let the record reflect that Mr. Litt is
        23  leaving the room.
        24          THE COURT:  So noted.
        25  A.  Could you repeat the question.
                       SOUTHERN DISTRICT REPORTERS, P.C.
```