**EXHIBIT E**

6886tanF.txt

1

```
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ----------------------------x
2
3    UNITED STATES OF AMERICA
3
4         v.                      05 Cr. 621 (KMK)
4
5    ALBERTO VILAR                     Hearing
5    GARY TANAKA,
6             Defendant.
6    ----------------------------x
7                          New York, N.Y.
7                          August 8, 2006
8                          11:30 a.m.
8    Before:
9
9         KENNETH M. KARAS
10                          District Judge
10
11   MICHAEL J. GARCIA
11   United States Attorney for the
12   Southern District of New York
12       One St. Andrew's Plaza
13       New York, N.Y.  10007
13   DEIRDRE A. McEVOY
14   MARC O. LITT
14       Assistant United States Attorneys
15
15   JEFFREY C. HOFFMAN, ESQ.
16   Attorneys for Defendant Vilar
16       Hoffman & Pollik, LLP
17       260 Madison Avenue, 22nd Floor
17       New York, New York  10016
18       (212) 679-2900
18
19   GLENN C. COLTON, ESQ.
19   Attorney for Defendant Tanaka
20       Wilson Sonsini Goodrich & Rosati (NYC)
20       12 East 49th Street, 30th Floor
21       New York, New York  10017
21       (212) 999-5804
22
22   STEVEN G. KOBRE, ESQ.
23   Attorney for Defendant Tanaka
23       Kobre & Kim LLP
24       800 Third Avenue
24       New York, New York  10022
25       (212) 488-1200
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 1

6886tanF.txt

2

1      (Hearing resumed)
2      THE DEPUTY CLERK:  Counsel, state their appearances.
3      MS. McEVOY:  Deirdre McEvoy and Marc Litt for the
4  government with us is U.S. Postal Inspector Cynthia Fraterrigo
5  and Eric Glenn from the paralegal office.
6      MS. HOFFMAN:  Mr. Hoffman and Ms. Eftychiou is here.
7      MR. KOBRE:  Steven Kobre and with me is Glenn Colton
8  and Justin Sher and Jessica Mergolis for Mr. Tanaka.
9      THE COURT:  Good morning, all.
10      We left off, I believe, with inspector Fraterrigo on
11  the stand.  Mr. Kobre, you were on cross.
12      Inspector, I will remind you once again you are still
13  under oath.
14  CROSS-EXAMINATION (Cont'd)
15  BY MR. KOBRE:
16  Q.  Inspector, good morning.
17  A.  Good morning.
18  Q.  Between the last court date and today, have you had any
19  conversations with anyone regarding the substance of your
20  testimony, the searches that took place in the U.S. or the
21  U.K.?
22  A.  No, I have not.
23  Q.  And after the court date, Mr. Tanaka had sent a letter to
24  the government seeking additional irrelevant material and
25  material that was nonresponsive to the search warrant to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

6886tan1          C. Fraterrigo - cross

1  returned by the government.  Are you familiar with that letter
2  being sent?
3  A.  No, I am not.
4  Q.  After your testimony last time, did you go back between
5  the -- from the last date to today, did you go back and look
6  through the box to find additional material that was either
7  nonresponsive to the search warrant or in your words not
8  useful?
9  A.  No, I have not.
10  Q.  When we left off the last time we were just about to get
11  into the day of May 26, the day of the actual search.  Can you
12  just take us through in relationship to the search itself what
13  was the first thing that you actually did?
14  A.  I arrived at the search.  I spoke with my supervisor.  He
15  explained to me that employees were from Amerindo.
16  Q.  Let me stop you there and back you up.  Do you recall
17  testifying about a briefing that occurred that morning?
18  A.  Yes, a briefing.
19  Q.  Was the briefing the first occurrence relating to the
20  execution of the search that occurred on May 26?
21  A.  Yes.
22  Q.  Can you tell us what time you arrived at the briefing and

Page 2

6886tanF.txt

23   as you remember what actually occurred at the briefing?
24   A. It was approximately 6:00 we had briefing. A little after
25   that I gave a summary of my investigation to the postal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

6886tan1        C. Fraterrigo - cross

1   inspectors. I handed the search warrant affidavits and the
2   complaints to my team leader to make copies. He made copies
3   and as I did the briefing, he handed it out and they were
4   reading it and then they asked me questions.
5   Q. Was there a sign-in sheet that day?
6   A. Not at the briefing.
7   Q. Where was the sign-in sheet?
8   A. I believe first time I saw it was at the location.
9   Q. You said that you handed the search warrant affidavit and
10   the complaints to your team leader; is that right?
11   A. Yes. John Feiter, F-e-i-t-e-r.
12   Q. That was for him to make copies?
13   A. Yes.
14   Q. And where was the actual briefing?
15   A. It was in division headquarters, conference room.
16   Q. Where is that?
17   A. 33rd and 8th.
18   Q. When you say you gave it to him to make copies, I take it
19   there was a copy machine in that location?
20   A. Yes.
21   Q. Did you actually see Inspector Feiter actually hand out
22   copies of the complaints at the briefing?
23   A. I believe he either -- he gave me -- I can't recall for
24   sure if he handed some to some. I remember him handing out
25   paperwork, but I know I gave the complaints to the arresting

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

6886tan1        C. Fraterrigo - cross

1   officer and search warrants to some of the searching
2   inspectors.
3   Q. So is it your testimony that you actually don't know what
4   Inspector Feiter actually handed out to the inspectors?
5   A. He may have handed out some and then gave me the rest. As
6   I was talking, I was handing it out.
7   Q. You don't know what he actually handed out?
8   A. Yes -- no.
9   Q. It could have been the affidavits, it could have been the
10   affidavit complaints, you have no idea?
11   A. No, I don't.
12   Q. As far as what you actually handed out to the inspectors
13   who were executing the search warrant, you handed out the
14   search warrant affidavit but not the complaints and that was
15   the oversight that you testified to, is that right?
16   A. That's correct.

6886tanF.txt

17   Q.  Other than what you testified to on direct examination
18   about your briefing of the other inspectors, are there any
19   other facts that you relayed to the inspectors regarding the
20   substance of the investigation that you didn't mention in the
21   direct examination?
22   A.  Not that I can really recall.  I don't recall everything I
23   said during the briefing, but what I said on direct is what I
24   recall.
25   Q.  Did you take notes or prepared notes before you actually
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    6
     6886tan1          C. Fraterrigo - cross
 1   gave the briefing?
 2   A.  No, I did not.
 3   Q.  How long was the briefing?
 4   A.  Approximately 20 minutes.
 5   Q.  And who was actually at the briefing itself?
 6   A.  There were postal inspectors from my team.  The ones I
 7   recall was Tom Feeney, Curtis Roinestad, Heather Tucci, and
 8   there were other inspectors from other teams.  Daniel Sullivan,
 9   and I can't recall who else.
10   Q.  Anybody else other than postal inspectors?
11   A.  No.
12   Q.  Did anybody else brief the team -- or sorry -- brief the
13   inspectors that were there to execute the search?
14   A.  No.
15   Q.  So am I right there were two teams that were present that
16   day?
17   A.  Two fraud teams, yes.
18   Q.  After leaving the location where the briefing was, where
19   did you go next?
20   A.  I left with inspector Roinestad to the Lombardy hotel.
21   Q.  And did you go to the Lombardy hotel because that is where
22   you thought Mr. Tanaka would be?
23   A.  Yes.
24   Q.  Did you go up into -- withdrawn.
25        Did you see Mr. Tanaka at the hotel?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    7
     6886tan1          C. Fraterrigo - cross
 1        MS. McEVOY:  Objection, relevance.
 2        MR. KOBRE:  I am trying to actually clarify the actual
 3   chain of events for the day and as to her timing.
 4   Q.  What did you do next after you got to the hotel?
 5   A.  When I arrived to the hotel, I went up to Tanaka's hotel
 6   room and I knocked on his door.
 7   Q.  And then what happened?
 8        MS. McEVOY:  Objection.  Relevance, your Honor.
 9        THE COURT:  I am not sure if you want to establish
10   when she got to the premises, why don't you ask her.  That is
                        Page 4

6886tanF.txt

16  draft.
17  Q.  Is it fair to say whatever is on this 3501, which is the
18  final version, it says May 28, 2005, and that date is wrong?
19  A.  That date is wrong, that's correct.
20  Q.  And while you are using a template, it is also true that
21  you had the ability to change the template to actually put the
22  correct date, isn't that right?
23  A.  Yes.
24  Q.  But the way the final version appears, it appears that you
25  actually wrote this report up just two days after the date of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                    15
        6886tan1          C. Fraterrigo - cross
 1  interview, isn't that right?
 2  A.  Yes.
 3  Q.  That is not the case, isn't that correct?
 4  A.  No.  Not on the second draft.
 5  Q.  So you spent 45 minutes in Mr. Tanaka's room?
 6          MS. McEVOY:  Objection.  Mischaracterizes the witness'
 7  testimony.
 8          THE COURT:  Really?  That is what I thought she said.
 9          MS. McEVOY:  She said "approximately."
10          THE COURT:  Okay.
11          MR. KOBRE:  Noted.
12  Q.  You spent approximately 45 minutes in Mr. Tanaka's room, is
13  that right?
14  A.  Yes.
15  Q.  Then what did you do immediately after leaving Mr. Tanaka's
16  room?
17  A.  We brought him back to our office at 90 Church Street to
18  process him after he was in the back.  We brought him to the
19  back of our offices.  Curtis Roinestad, the postal inspector,
20  handle all the processing and I was in my office trying to take
21  care of other matters.
22  Q.  Matters relating to this case?
23  A.  Yes.
24  Q.  Approximately how long did it take you from the time you
25  left the hotel room to the time that you left the location, the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                    16
        6886tan1          C. Fraterrigo - cross
 1  postal inspection service, I guess?
 2  A.  Form the time that I left the hotel to my office, I don't
 3  recall how long it took.
 4  Q.  I am trying to figure out do you remember approximately
 5  what time you left your office?
 6          MS. McEVOY:  Your Honor, to do what?
 7  Q.  Imagine sometime thereafter you left your office?
 8  A.  To go to the search, yes.
 9  Q.  What time did you leave?
                                            Page 9

6886tanF.txt
10   A.  Approximately 11:00 or so.  I don't recall exactly.
11   Q.  Then you headed over to the search?
12   A.  Yes.
13   Q.  To your recollection you got to the search at approximately
14   12:00, about noontime?
15   A.  It was around lunchtime.  I recall that.
16   Q.  When you arrived actually at the search, tell us now what
17   it is that you observed?
18   A.  I observed postal inspectors in offices searching, going
19   through file cabinets and desks.  I saw Amerindo employees in
20   the lobby area and other inspectors in the conference room
21   filling out inventory sheets.
22   Q.  Did you go to Inspector Feiter to talk to him at that time?
23   A.  Yes.
24   Q.  Tell us what he told you and what you told him?
25   A.  He told me that the Amerindo employees were here, some of
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                              17
      6886tan1              C. Fraterrigo - cross
1    the employees were still here and that Amerindo's attorney was
2    present, Eugene Licker and that he left Alberto Vilar's office
3    for me to search.  He also told me that other inspectors were
4    called in to assist in the search.  And we were discussing
5    Alberto Vilar's arrest.
6    Q.  Now, I just want to focus briefly on those other inspectors
7    you were called in to assist in the search.  Do you recall off
8    the top of your head who some of them -- inspectors I take it,
9    right?
10   A.  Yes.
11   Q.  Do you recall off the top of your head who some of those
12   inspectors were?
13   A.  I believe one was my husband Robert Fraterrigo, Ralph
14   Nardo, Steve Barrientos, Jimmy Jinn.  And I can't recall the
15   others if there were.
16   Q.  J-i-n-n?
17   A.  Yes.  Eleanor Lubbi.
18   Q.  When you arrived at the search?
19   A.  Eleanor Berry.
20   Q.  Berry.
21         And am I right that when you arrived at the search
22   these other individuals who had been called in were already
23   sort of taking part in the search?
24   A.  Yes.
25   Q.  Am I correct that after you arrived you didn't call
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                              18
      6886tan1              C. Fraterrigo - cross
1    together all the inspectors again and give them a new briefing,
2    did you?
3    A.  No, I did not.
                       Page 10

6886tanF.txt

20

6886tan1            C. Fraterrigo - cross
1   search warrant and the possible execution of supplemental
2   search warrants."  And then it goes on to give the address.
3         Do you see that?
4   A.  Yes.
5   Q.  Do you see where it says, "I was provided with a search
6   protocol and its attachment, including a copy of the search
7   warrant and its attachments."
8         Do you see that?
9   A.  Yes.
10  Q.  It also reads:  "I also read the affidavit from the search
11  warrant.  I have been given oral instructions relating to the
12  instruction of this warrant and the opportunity to ask
13  clarifying questions."
14        Do you see that?
15        It says, "I understand the scope the warrant"?
16  A.  Yes.
17  Q.  You agree with me that those inspectors that were not at
18  the morning briefing as far as you know and despite the fact
19  they actually signed this document that they -- withdrawn.
20        Will you agree with me that to the extent these
21  inspectors who are not at the morning briefing signed this
22  document certifying that they attended a briefing that their
23  signatures were -- or the fact of their signatures that they
24  would be wrong or inaccurate?
25        MS. McEVOY:  Objection.

21

6886tan1            C. Fraterrigo - cross
1         THE COURT:  Overruled.
2   A.  I can't agree with you on that because I don't know whether
3   John Feiter briefed them without me being present.
4   Q.  So as far as you know these individuals were not at a
5   briefing?
6         THE COURT:  When you say "these individuals," all of
7   them or some of them?
8         MR. KOBRE:  The ones who are not present --
9   Q.  Well, let me ask you this:  If you look through there, tell
10  me from looking at it whether or not there is a clear sort of
11  bifurcation or clear line from people who were at the morning
12  session and people that showed up to help out in the afternoon
13  at the search?
14  A.  No, I cannot.
15  Q.  Are their names, essentially the people that showed up to
16  help, did their names in some instances appear in the top
17  portion of the sign-in sheet?
18        THE COURT:  What about the people's whose name appear
19  after yours below or on the next page, was that part of the
20  relief help that was brought in?  Because some of them don't

Page 12

6886tanF.txt
21  appear to be the ones you mentioned, Berry Jinn, Barrientos,
22  Nardo.
23          THE WITNESS:  I don't -- after Berry, those were the
24  ones that showed up after the briefing.  I don't know Casey
25  whether it was the morning or the afternoon.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                    22
        6886tan1            C. Fraterrigo - cross
1           THE COURT:  So including Berry?
2           THE WITNESS:  Berry down.
3           THE COURT:  People who showed up in the afternoon?
4           THE WITNESS:  Yes.
5   BY MR. KOBRE:
6   Q.  And actually these are people who showed up after you had.
7   They showed up at the search but they were not at the briefing?
8   A.  At my briefing, that's correct.
9   Q.  When you arrived at search location and you learned that
10  there were individuals that were not at the briefing, did you
11  ask Inspector Feiter whether or not he had given those
12  individuals a briefing regarding the search?
13  A.  No, I did not.  I assumed he did.
14  Q.  Has he ever told you that he gave a briefing to those
15  individuals?
16  A.  No, he has not.
17  Q.  Did you speak to those individuals and ever asked them
18  whether or not they had received a briefing from Inspector
19  Feiter?
20  A.  No, I have not.
21  Q.  You see in the language that actually appears in the
22  briefing sheet that it says, "I also read the affidavit from
23  the search warrant.  I have been given oral instructions
24  relating to the execution of this warrant and the opportunity
25  to ask clarifying questions.  I understand the scope of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                    23
        6886tan1            C. Fraterrigo - cross
1   warrant."
2           Do you see that?
3   A.  Yes.
4   Q.  You agree with me that the inspectors that are listed who
5   did not participate in the arrest were not provided with the
6   complaints referred to in the affidavit, right?
7   A.  I can't say for sure.  I don't know if they were.
8   Q.  As far as you know, they weren't provided with the
9   complaints referred to in the affidavit by you at the briefing?
10  A.  The ones that attended my briefing, no, they were not.
11  Q.  You agree with me that in order to understand the scope of
12  the warrant or the scope of the affidavit to be more precise,
13  one would have needed to read the complaints, isn't that right?
14  A.  Yes.
                            Page 13

6886tanF.txt

15  Q.  During your testimony on direct, I believe, and cross, you
16  actually testified to leaving search documents behind because I
17  believe as you said you didn't believe they were useful to the
18  investigation, is that right?
19  A.  That's correct.
20  Q.  When you made a determination as to what was useful and not
21  and therefore what should be left behind and not, did you call
22  together the other postal inspectors who were executing the
23  search and tell them there were certain types of information
24  you were seeing that you didn't think was useful and therefore
25  shouldn't be taken?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                24
    6886tan1              C. Fraterrigo - cross
1   A.  No, I did not.
2   Q.  Is it fair to say that your testimony at this hearing
3   relating to leaving documents behind essentially recount sort
4   of what you did personally, but not necessarily your knowledge
5   as to what any other inspector might have done that day?
6   A.  That is correct.  Besides the inspectors had asked me about
7   particular documents and I instructed them to leave it behind.
8   Q.  And that is sort of the conversation that you relayed
9   already at this hearing?
10  A.  Yes.
11  Q.  So do you recall testifying about daily office -- I think
12  daily office situations, letters relating to that, that you had
13  determined were not useful and that you left behind, do you
14  recall that?
15  A.  Yes.
16  Q.  I am going to show you what has been marked now as triple
17  A.
18          THE COURT:  This will be the second A?
19          MR. KOBRE:  Yes.
20  BY MR. KOBRE:
21  Q.  You are referring to daily office situations, if you will.
22  Is this the type of document you are referring to?
23  A.  I can't recall.
24  Q.  When you said daily letters relating to daily office
25  situations, what were you actually referring to?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                25
    6886tan1              C. Fraterrigo - cross
1   A.  I remember something about the building, the maintenance
2   issues, or something like that.
3   Q.  I will ask you to take a look, if you can, at triple A for
4   a moment.  Just read it.
5          MR. KOBRE:  I may or may not offer it.
6          THE COURT:  Isn't that always the case?
7   BY MR. KOBRE:
8   Q.  After reading that, can you tell us whether or not that is

                        Page 14

6886tanF.txt
12  what was your understanding of the scope of the search?
13       MS. HOFFMAN:  I am going to object only because I
14  think if she is going to describe discussions with Mr. Litt
15  perhaps he should --
16       THE COURT:  He is on his way out the door.
17  Q.  What was your understanding what the scope of the search
18  after talking to Mr. Litt but before actually executing the
19  search?
20  A.  We discussed the fact that the U.K. office was where Gary
21  Tanaka was probably working out of and we discussed trading
22  documents.  Things like that.  And when I reviewed this
23  document, I reviewed it in the U.K.  So I understood what the
24  scope was exactly when I was in the U.K.
25  Q.  During your conversations with Mr. Litt, you weren't
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                    51
     6886tan1          C. Fraterrigo - cross
1   looking at this document to help you with the scope, is that
2   right?
3   A.  Prior to leaving, no.
4   Q.  It is your testimony the way you obtained the document you
5   actually obtained it from the U.K. officials?
6   A.  No.
7   Q.  You brought it with you?
8   A.  Yes.  I obtained it from Marc Litt.
9   Q.  You obtained it from him just before you left?
10  A.  Yes.
11  Q.  There came a time prior to the execution of the search that
12  you had conversations with Inspector Feeney and Williamson, is
13  that right?
14  A.  Yes.
15  Q.  Did you describe the case to Feeney and Williamson?
16  A.  Yes, on numerous occasions.
17  Q.  What did you actually tell them about what they should be
18  searching for?
19  A.  I recall having many conversations with them about the case
20  itself and how the case was progressing after the Amerindo U.S.
21  search.  I explained to them that what we learned is that Gary
22  Tanaka was trading from the U.K. office that documents relating
23  to Panama should be in that location, documents relating to PTC
24  in Bahamas was at that location.  I gave them -- I think I gave
25  them -- told them about guaranteed fixed rate deposits and I
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                    52
     6886tan1          C. Fraterrigo - cross
1   think I mentioned to them that that is where we should see a
2   lot of documents.
3   Q.  Did you tell them what they shouldn't take?
4   A.  No.
5   Q.  Did you talk to them about what is useful to the
                     Page 29

6886tanF.txt

6 investigation?
7 A. No, I did not.
8 Q. When you were actually executing the MLAT -- withdrawn.
9      When you were participating in the search in the U.K.
10 facility, did you apply in determining what to seize, in your
11 view of what was useful to the investigation?
12      MS. McEVOY: Objection.
13      THE COURT: Overruled.
14 A. Yes.
15 Q. What standard did you apply for what is useful to the
16 investigation when you participated in the U.K. search?
17 A. Same as I did before with the U.S.
18 Q. You noticed when you looked at the MLAT request that the
19 assistance requested or the documents that were requested under
20 the section assistance requested were almost exactly the same
21 as the documents that were requested in the U.S. search
22 warrant, isn't that right?
23 A. Yes, that's correct.
24 Q. During and just after the execution of the U.S. search
25 warrant, you learned that many of the terms that were generally

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

53
6886tan1          C. Fraterrigo - cross
1 described in the U.S. search warrant were sufficiently broad
2 enough to actually call for the seizure of documents that were
3 not actually useful to the investigation, isn't that right?
4      MS. McEVOY: Objection, ambiguous.
5      THE COURT: Overruled.
6      THE WITNESS: I don't think I understand the question.
7      THE COURT: Let me try to help out here.  You
8 testified earlier that there were documents that although they
9 were called for by the search warrant were not helpful to the
10 investigation.  Do you remember that?
11      THE WITNESS: Yes.
12      THE COURT: That is something you would have learned
13 during the execution of a search or soon thereafter, correct?
14      THE WITNESS: Yes.
15 BY MR. KOBRE:
16 Q. So my question is in executing the search in the U.K.
17 facility, what steps did you take to insure that Feeney and
18 Williamson would not be seizing documents that you believed
19 were not useful to the investigation?
20      MS. McEVOY: Objection.  I don't believe the inspector
21 testified she executed the search.
22      MR. KOBRE: Participated in.
23      THE COURT: Fine.  Fair enough.
24 A. I didn't instruct them.  I just -- I told them to focus on
25 particular documents and if they had questions, they asked me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

54
Page 30

6886tanF.txt

23  Q.  But just to finish this one thought out when you told them
24  to focus on particular documents, I take it you didn't say,
25  Focus on these documents at the exclusion of others, right?  In
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                56
6886tan1            C. Fraterrigo - cross
1  other words focus on these and don't take others?
2  A.  No.  I didn't say that.
3  Q.  Is it also fair for say you didn't describe to them what
4  had happened in the U.S. search?  In other words, the fact that
5  you had come across material that was not useful to the
6  investigation but covered by the broad language of the warrant,
7  correct?
8  A.  That's correct.
9  Q.  Now, you said that you told them to focus on certain
10  documents.  What documents did you tell them to focus on?
11  A.  I already said it.  It was Panama documents relating to
12  Panama, wire transfers.  I believe I mentioned guaranteed fixed
13  rate deposits and I mentioned PTC in Bahamas.  I can't
14  remember.  There might have been more that I mentioned.
15  Q.  Do you remember having any conversations with them about --
16  I am going to take a couple of these investment brochures,
17  client files -- not including the five that were addressed by
18  Mr. Hoffman and Ms. Bird -- investment brochures, do you
19  remember talking to them about any of those things?
20          MS. McEVOY:  Objection.
21          THE COURT:  Overruled.
22  A.  No.  I don't recall.
23          THE COURT:  We are coming up on the lunch hour.
24          MR. KOBRE:  This might be a good time.
25          THE COURT:  Let's break now.  How much longer do you
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                57
6886tan1            C. Fraterrigo - cross
1  think you have?
2          MR. KOBRE:  I would say about half hour, 45 minutes,
3  probably.
4          THE COURT:  Let's take our lunch break.  We will come
5  back at 2:00.  We will start tomorrow by the way at 9:30.  I
6  assume that is okay with the government, your witness will be
7  available?
8          MS. McEVOY:  Yes, your Honor.
9          THE COURT:  We will take a break until 2:00.
10          MS. McEVOY:  Can I ask what time you expect to finish
11  to today?
12          THE COURT:  I can go to about 5:30.
13          MS. McEVOY:  Thank you.
14          (Continued on next page)
15
16

                        Page 32

6886tanF.txt

6886tan1              C. Fraterrigo - cross
1   questions about particular documents and I made my decision to
2   whether it should be given to the U.K. police to seize it or
3   not.
4   Q.  We will come back to that.
5        My question is whether or not you took any steps to
6   make sure that the information you had learned was called for
7   by the language of the U.S. warrant would not be taken --
8   similar type of information would not be taken from the U.K.
9   facility?
10  A.  No.  I did not.
11  Q.  When this MLAT would basically contain the same description
12  of the documents was used as a guide for the U.K. search, did
13  you understand at that time that all the extraneous material
14  that had been sort of collected in the U.S. search that same
15  type of material would be collected in the U.K. search?
16  A.  No.  No.
17  Q.  Why not?  It was the same language or almost the exact same
18  language?
19  A.  I understand it was the same language, but I didn't believe
20  at the time that there were other documents that were taken
21  that were outside of the scope of the warrant.  I didn't know
22  at the time.
23  Q.  I thought you testified that you actually participated in
24  the U.S. search and during the participation in the U.S. search
25  you actually came across documents that you believed were not
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                        55
6886tan1              C. Fraterrigo - cross
1   useful to the investigation but were covered by the scope of
2   the warrant?
3   A.  Yes.
4   Q.  So by the time the U.K. search came along, you knew that it
5   was extremely likely that the same type of material, in other
6   words, the material that was not useful to the investigation
7   could be scooped up under the broad language of the request, is
8   that right?
9   A.  Yes.
10  Q.  You didn't do anything about it as far as bringing that
11  fact to Feeney and Williamson's attention, right?
12  A.  No.  I gave them specifics on what to really focus on,
13  certain companies and certain documents.
14  Q.  But it wasn't your expectation that they were just going to
15  focus on those particular documents and exclude other documents
16  that were actually covered by the MLAT, was it, Inspector?
17  A.  I think from my discussions I had with them I think I was
18  telling them -- instructing them to focus on particular
19  documents.  And if there were certain documents they
20  requested -- and they asked me a lot of questions that day,
21  both days -- that this is covered under the MLAT and should I
22  take it or should I not and I made the judgment call.
                           Page 31

6886tanF.txt

16   inventory sheet indicated that a U.K. law enforcement official
17   was responsible for the inventory collection and inventorying,
18   if you will, that there would be no way to determine whether or
19   not a postal inspector ever looked at that document?
20   A.  No.
21   Q.  Meaning that you are aware of no document?
22   A.  I don't -- no, I don't know.  There's -- on their inventory
23   sheets, I don't know how -- the way they provided me the
24   inventory sheets, I don't know whether they have certain codes
25   there or to indicate it was reviewed.  I don't know.  I can't

67

688ztan2              C. Fraterrigo - cross
1   answer that.  I didn't -- I wasn't part of the inventory
2   process.
3   Q.  Okay.  So is it fair to say, then, that when a postal
4   inspector would review a document, the postal inspector did
5   not, let's say, put their initials on the back of the document,
6   or somehow record the fact that the postal inspector in the
7   first instance sort of selected the document or approved the
8   document to be inventoried?
9        MS. McEVOY:  I have no problem if it's just directed
10   to what she did.
11        THE COURT:  Or what she's aware of.
12        MR. KOBRE:  Right.
13        THE COURT:  Personally aware of.
14   A.  No.  We were instructed by the metropolitan police to take
15   the documents out -- we could not modify it, alter it in any
16   kind of way -- and provide it to them for them to review it.
17   There was no initialing or dating by myself, and I can't speak
18   about the other postal inspectors, but I believe that didn't
19   happen.
20   Q.  Okay.  And despite that instruction from the U.K. law
21   enforcement officials about marking on the document, there was
22   nothing from actually stopping you from, let's say, from
23   keeping a log of the materials that you and that your other
24   postal inspectors had reviewed, was there?
25   A.  No.

68

688ztan2              C. Fraterrigo - cross
1   Q.  Did you or any of the other postal inspectors, if you heard
2   it, make any representation to the U.K. law enforcement
3   officials about probable cause with respect to the items
4   requested in the MLAT?
5   A.  No.
6   Q.  We'd like you also, however, to look at the MLAT if you
7   would for a moment and just turn to page five.  And it's
8   exhibit 13.  Are you there?
9   A.  Yes.

Page 38

6886tanF.txt

10  Q. Okay. It was your understanding, once you read the MLAT
11  and prior to your participation in the search, that one of the
12  things that formed the basis of the MLAT request was the --
13  were the documents in files that were actually seized from
14  Amerindo U.S. pursuant to the search warrant; isn't that right?
15  A. I'm sorry, I don't understand that. Repeat that.
16  Q. You learned prior to your search of the U.K. facility --
17  A. Yes.
18  Q. -- that one of the bases, if you will, for the U.S.
19  government requesting assistance from the U.K. government was
20  evidence that had been obtained from the U.S. search, correct?
21       MS. McEVOY: Objection.
22       THE COURT: Overruled.
23  A. That's part of the information.
24  Q. That was used, correct?
25  A. Part of the information was from the U.S. search.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    69
       688ztan2          C. Fraterrigo - cross
1   Q. Okay. And, in fact, on the bottom of page five, what you
2   learned was it says there, based on interviews of current and
3   former Amerindo employees and investors, as well as documents
4   and files seized from Amerindo U.S.'s New York offices, New
5   York -- I'm sorry -- U.S. law enforcement officers have also
6   discovered, and then it goes onto list a number of things. You
7   see that?
8   A. Yes.
9   Q. Okay. Did you understand when you read that, that the
10  reference to U.S. law enforcement officers to include you?
11  A. Yes.
12  Q. And, therefore, you also understood it to mean to include
13  information, documents or files that were recovered by other
14  postal inspectors that you learned about; is that right?
15  A. Yes.
16  Q. I just briefly want to now go through sort of when you got
17  to the U.K. how you learned of the warrant and under what
18  circumstances you actually saw the warrant?
19  A. When I met with Detective Shaw in the afternoon of, I
20  believe it was October 10th, he explained to me that he was --
21  got a warrant from the Magistrate, from the Judge, U.K. Judge,
22  and that, unfortunately, we wouldn't be able to do the search
23  the following day, that Cadogan Tate wouldn't be available to
24  provide us a document -- documents until Thursday.
25  Q. And he gave you a copy of the warrant, didn't he?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    70
       688ztan2          C. Fraterrigo - cross
1   A. He had it in a folder, yes.
2   Q. And he gave you the folder, didn't he?
3   A. Yes.

                        Page 39

6886tanF.txt

4   Q.  Did you look at the warrant?
5   A.  I recall looking at the cover page, and I remember seeing a
6   seal, Cadogan Tate, and a signature, and that was it.  I kind
7   of flipped through it.  I know I went through it, but I don't
8   recall actually what I saw.
9   Q.  Is it that you actually don't recall ever reading the
10  warrant; in other words, you flipped through it, but you don't
11  actually recall sitting down reading it, is that right?
12  A.  I didn't read it verbatim.  I remember going through it,
13  scanning it.
14  Q.  You understood that what governed the execution of the U.K.
15  search was the warrant and not the MLAT request; is that right?
16  A.  Yes.
17  Q.  And didn't you think it was important that if you were
18  going to be participating in the search that you should at
19  least read the warrant?
20  A.  Well, when we were -- when he handed it to me, we were
21  talking about the warrant, and we were talking about the whole
22  Cadogan Tate, and instead of sitting there reading in front of
23  him and ignoring what he was saying, I just scanned through it
24  and put it to the side and just continued talking to him.
25  Q.  Did you maintain the warrant or give it back to him?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

71

688ztan2              C. Fraterrigo - cross

1   A.  No, I couldn't keep the warrant.
2   Q.  Say it again?
3   A.  I could not take the warrant.  It was his.
4   Q.  Were you in a rush during this conversation?
5   A.  No, I was not.
6   Q.  Okay.  So is it fair to say after he was done speaking to
7   you, if you wanted to review the warrant, you could've just
8   reviewed the warrant, correct?
9   A.  Yes.
10  Q.  You chose not to?
11  A.  No, I did not.
12  Q.  No, you did not choose not?
13  A.  No, I did not look at the warrant after.
14  Q.  Although not actually reading the warrant, it was your
15  understanding, wasn't it, that the items enumerated in the
16  warrant were, essentially, the same items that were enumerated
17  in the U.S. search warrant, isn't that right?
18  A.  Yes.  On the day of the search is when I had a copy -- when
19  I was given the warrant.  That's when I was able to look at it,
20  and I realized the items to be seized was exact same thing as
21  the items to be seized in the MLAT.
22  Q.  Okay.  And I take it the questions I asked you about the
23  discussions with the U.K. officials relating to probable cause
24  or the scope of the warrant, you didn't have any conversation
25  with them about that at that time as well, correct?

SOUTHERN DISTRICT REPORTERS, P.C.

Page 40

6886tanF.txt

(212) 805-0300

♀

72

688ztan2          C. Fraterrigo - cross

1   A.  That's correct.
2   Q.  So you have -- I think you're testifying that you had the
3   warrant, you looked at it, you scanned it, you gave it back to
4   Shaw; is that right?
5   A.  Yes.
6   Q.  Okay.  And then what's the next thing that happened in
7   relationship to the warrant itself?
8   A.  We planned for Thursday, he was going to pick us up on
9   Thursday morning from our hotel, and that's when the next time
10  I saw the warrant.
11  Q.  Okay.  When you say Thursday, I have to confess, I don't
12  know October 10th; you recall?
13  A.  Thursday I think was the 14th.
14  Q.  Okay.  So a couple of days later?
15  A.  Yes.
16  Q.  Okay.  And tell us what happened.  You -- Shaw picked you
17  up?
18  A.  No.  The two detectives, detective Bonafont and Durrant
19  picked us up from our hotel, took us over to Cadogan Tate, and
20  brought us to the -- we sat down in the office, and he provided
21  the warrant to the supervisor there, and that's when I
22  requested a copy, and he said I could not have a copy, but I
23  could look at it.
24  Q.  Okay.  But, and he gave you a copy of the warrant to look
25  at?

♀

73

688ztan2          C. Fraterrigo - cross

1   A.  Yes.
2   Q.  Did you review the warrant?
3   A.  Yes.
4   Q.  Did you see references in the warrant to legal privilege?
5   A.  No.  I, I don't recall.
6   Q.  Did you see references to special procedure material?
7   A.  No.
8   Q.  Did you have any discussions with the U.K. officials about
9   how to handle privileged material?
10  A.  No.
11  Q.  Did you have a plan as to how you were going to handle
12  privileged material?
13  A.  I discussed it with the postal inspectors that they were
14  going to review the documents, prior to me going through it, so
15  there wouldn't be any issues of me being tainted.
16  Q.  Okay.  I'm sorry.  This -- so the plan was, essentially,
17  that Williamson, and Feeney would go through the material?
18  A.  They would go through the boxes, the material before I did
19  to prevent me from being tainted, and I would review the
20  documents.

6886tanF.txt

21   Q.  So, essentially, Williamson and Feeney were doing sort of a
22   taint review, if you will?
23   A.  No.  They were search -- they were going to go through the
24   material, and what they were going to do is if there was
25   anything as they went through it, if they saw something, they'd
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                              74
        688ztan2            C. Fraterrigo - cross
1    pull it out and give to it me give me the non-privileged stuff.
2    Q.  So one of the -- in the first instance they were going to
3    look for privileged material, correct?
4    A.  They, they were just -- it wasn't their plan just to go
5    through the boxes just for the sake of doing privilege.  They
6    were going through the boxes to see if there was anything
7    relating to the MLAT.
8    Q.  Okay.  Did you give them a name of the lawyers Amerindo so
9    they would be able to sort of spot whether or not the
10   information was privileged and shouldn't be provided to you?
11   A.  No.
12   Q.  And are you aware of an individual named Rick Cohen?
13   A.  Yes.
14   Q.  Are you aware at the time who Rick Cohen was?
15   A.  I believe so, yes.
16   Q.  You knew Rick Cohen was a lawyer for Amerindo, isn't that
17   right?
18   A.  Yes.
19   Q.  Did you tell Feeney and Williamson that Rick Cohen was a
20   lawyer for Amerindo and that you -- they should not be passing
21   information to you from Rick Cohen?
22   A.  I didn't specifically name Rick Cohen, no.
23   Q.  You know whether or not anyone, including the U.K. law
24   enforcement officials, provided Feeney and Williamson with a
25   list of the lawyers so they could review or sift out
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                              75
        688ztan2            C. Fraterrigo - cross
1    information from you that might be legally privileged?
2    A.  No.
3    Q.  Now, after the first warrant, there came a time -- I'm
4    sorry, withdrawn.  After the first day, there came a time when
5    you learned that you needed a second warrant; isn't that right?
6    A.  I'm sorry?
7    Q.  After the execution of the search warrant, the first day?
8    A.  Yes.
9    Q.  There came a time that you were told or you learned that
10   the U.K. officials had to go back to get a second warrant,
11   isn't that correct?
12   A.  Yes.
13   Q.  Okay.  How did you learn of that fact?
14   A.  It was the end of the first day and I was talking to
                                                      Page 42

6886tanF.txt
15    Detective Bonafont, that if we were going to come back the next
16    day, they would need to get a warrant.
17    Q.  And did you have any conversations with him about what you
18    had found at that point?
19    A.  No.
20    Q.  Is it fair to say that in prior to executing the --
21    withdrawn.  Is it fair to say that prior to the execution of
22    the search warrant at Cadogan Tate, you expected there to be
23    information that would be legally privileged, correct?
24        MS. McEVOY:  Objection.
25        THE COURT:  Overruled.
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300
                                              76
♀
      688ztan2          C. Fraterrigo - cross
1     A.  Um, I expected there would be some privileged documents.
2     Q.  And is it also fair to say that prior to the execution of
3     that warrant, that the warrant in the U.K. on the first day you
4     expected there to be information that would be private to
5     clients; in other words, when I say private, I'll be a little
6     clearer, information like bank account information, Social
7     Security numbers, accounts statements, that type thing?
8     A.  I didn't specifically think of that, but I assumed that
9     would be there.
10    Q.  And the reason why is because you understood that Amerindo
11    was an investment advisor, right?
12    A.  Yes.
13    Q.  And one of the things as an investment advisor is they
14    likely have personal information regarding their clients,
15    correct?
16    A.  That's correct.
17    Q.  And, therefore, you expected that some of that personal
18    information likely would be in Amerindo U.K. 's files, correct?
19    A.  That's correct.
20    Q.  So did you ever discuss with the U.K. officials your
21    expectations of that private client information might be in
22    Amerindo U.K. 's files?
23    A.  No, I did not.
24    Q.  Is it your understanding that -- actually, I guess I
25    should, before I ask this question, let me finish up one other
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300
                                              77
♀
      688ztan2          C. Fraterrigo - cross
1     thing, then I'll ask it.
2         Is it fair to say that prior to the execution of
3     the -- withdrawn.  Is it fair to say that prior to the U.K.
4     search, you had sufficient time to approach a U.S. magistrate
5     and seek out a warrant, correct?
6     A.  For the I.K.?
7     Q.  Yes.
8         THE COURT:  I think -- I don't think there is a
                                         Page 43

6886tanF.txt

13      MR. KOBRE:  Okay, that's fine.
14      THE COURT:  As long as it's not going to involve
15  anything --
16      MS. McEVOY:  It won't.  I make that representation.
17      THE COURT:  I still think it would be prudent to have
18  the other person at your table.
19      MS. McEVOY:  I agree, your Honor.
20      THE COURT:  Okay, all right.  So we'll take 15
21  minutes.
22          All right, we'll take a 15 minute recess.
23      (Recess taken)
24      (Continued on next page)
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                    94
    6886TAN3            Fraterrigo - redirect
1       (In open court)
2       THE COURT:  Ms. McEvoy, are you prepared to go ahead?
3       MS. McEVOY:  Yes, your Honor.  May I proceed?
4       THE COURT:  You may.
5   BY MS. McEVOY:
6   Q.  Inspector Fraterrigo, after cross-examination but prior to
7   your testimony now on redirect, did we spend some time together
8   in the jury room?
9   A.  Yes.
10  Q.  Approximately how long did we spend together?
11  A.  About 10 minutes.
12  Q.  Were two other AUSAs present?
13  A.  Yes.
14  Q.  To the best of your recollection can you recount for the
15  Court what I said to you and what you said to me?
16  A.  You pointed out a question that the Court asked me on one
17  of the days I testified regarding clients, if there was
18  probable cause with the client list.  I indicated to you that
19  my answer was incorrect.
20          There were also questions --
21  Q.  Before we get to the other questions, can you turn to the
22  transcript before you, July 10 transcript, page 94.
23  A.  Yes.
24  Q.  Lines 4 through 8 where the Court asked the question:  Is
25  it a fact that you knew you didn't have probable cause to get

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                    95
    6886TAN3            Fraterrigo - redirect
1   every client list at the time you went and got the warrant?
2           Mr. Hoffman says, Correct.  And you say, That's
3   correct.
4   A.  Yes.
5   Q.  Is that the question you were referring to that I asked you
6   about in the jury room?

                                        Page 53

6886tanF.txt

7   A.  Yes.
8   Q.  And with respect to the --
9        MS. HOFFMAN:  Can I have one second to find --
10       THE COURT:  Sure.
11       MS. HOFFMAN:  Thank you.
12       THE COURT:  Go ahead.
13  Q.  With respect to the part of the question where the Court
14  asks you:  Is it a fact that you knew you didn't have probable
15  cause to get every client list at the time you went and got the
16  warrant, what do you recall me asking you about?
17  A.  You asked me if, you know, about the question, if there was
18  any confusion in the question that was asked and I recall
19  stating that, yes, that during that series of questioning that
20  specific client names were asked of me during my cross and I
21  believe what was said was that it was specific questions about
22  particular clients.
23  Q.  Sorry.  When you say "what was said," what are you
24  referring to?
25  A.  What I had previously testified about.  I mentioned
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    96
        6886TAN3          Fraterrigo - redirect
1   particular -- I was asked about particular clients and I
2   believe that there is probable cause to get client lists at the
3   time I had the warrant.
4   Q.  In the robing room just now, did I ask you questions about
5   whether you believed probable cause existed?
6   A.  Yes.
7   Q.  At the time you got the warrant?
8   A.  Yes.
9   Q.  And did I ask you when you answered the Court's question,
10  specifically the question on page 94 whether you were saying
11  that at the time you got the warrant you knew you didn't have
12  probable cause but told the magistrate anyway --
13       MS. HOFFMAN:  I am going to object to the leading.  I
14  don't want her asking what did I ask and what did I answer.
15       THE COURT:  It is as leading as it gets.  Rephrase the
16  question.
17  Q.  What did I ask you, Inspector Fraterrigo, about your state
18  of knowledge at the time -- let me finish -- at the time you
19  got the warrant, and second what you meant when you answered
20  this question?
21  A.  At the time I got the warrant, I knew I had probable cause
22  to get every client.
23       MS. HOFFMAN:  Objection.
24       THE COURT:  That is not the question what it is Ms.
25  McEvoy asked you in the jury room questioning.  It was a
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    97
        6886TAN3          Fraterrigo - redirect
                        Page 54

6886tanF.txt

1  compound question.  Let's start with the first point.  What is
2  it that you Ms. McEvoy asked you back in the jury room about
3  your answer to my question on July 10?
4          THE WITNESS:  You asked me to read the question.  I
5  read the question and I said to you that at the time I got the
6  warrant I knew I had probable cause for every client list.  And
7  you asked me if there was a confusion with the question at the
8  time and I said yes.  And I explained to you that during my
9  cross with Hoffman I had tried to explain to myself and in a
10 brief moment in one of his questions about the client list.  I
11 explained about the clients that he was specifically pointing
12 out to me.  I said at the time I knew I had probable cause and
13 I said this statement here what I answered the Court was
14 incorrect.
15 BY MS. McEVOY:
16 Q.  What did you tell me in the robing room about how it was
17 incorrect?
18 A.  That I -- that in the affidavit I knew I stated that there
19 was probable cause to believe that to take client lists, other
20 than the clients that were mentioned, because these two
21 individuals were investment advisors, they had clients that
22 were investors, and that I had probable cause on particular
23 clients and I had information on particular clients and I had
24 reason to believe that other investors and other clients were
25 being defrauded.

               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                      98
6886TAN3              Fraterrigo - redirect
1  Q.  Before we get there, let's just finish up with the topic of
2  what was discussed in the robing room.  Other than this
3  question that was asked by the Court of you and what your
4  answer was what, if any, other questions did I ask you?
5  A.  You asked me if -- did I believe -- there was a question
6  about probable cause and fact.
7          MR. KOBRE:  Objection.  It looks like the witness is
8  reading something.  I am asking what she is reading.
9          THE WITNESS:  The transcript.
10         THE COURT:  She is reading the transcript.
11         MR. KOBRE:  I would ask that either she not read from
12 it.  The question was what did Ms. McEvoy ask which had no
13 bearing on the transcript.
14         MS. McEVOY:  I believe the inspector testified she was
15 asked about a specific question in the transcript.
16         THE COURT:  That is what I thought.  The point is
17 taken.  Go ahead.
18         THE WITNESS:  I can't recall the question.  What is
19 the question?
20 BY MS. McEVOY:
21 Q.  In addition to the specific question pointed out on page 94
22 what, if any, other questions were you asked in the robing
23 room?

                                              Page 55

6886tanF.txt
24        THE COURT:  The jury room.
25   Q.  The jury room.  Sorry.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
                                                99
      6886TAN3            Fraterrigo - redirect
 1   A.  I was asked if I was confusing the probable cause and fact
 2   in the search warrant affidavit.  I was also asked -- when I
 3   provided my answer, I was also asked about the link between the
 4   investors that were named in the affidavit and those who were
 5   not named.
 6   Q.  And is that what you recall discussing in the totality in
 7   the jury room?
 8   A.  No.
 9   Q.  What else do you recall?
10   A.  I recall explaining in the affidavit I did not specifically
11   mention particular clients, particular investors, particular
12   funds.  I said in the series of questions that I was answering
13   to Hoffman about, for instance, L.A.P.D. client.  When he asked
14   if there was probable cause to take this, it was not -- my
15   answer was not focused on what was in the affidavit.  The
16   affidavit did not specifically say L.A.P.D. Fire.  But what I
17   was answering to him is that it did not say it specific.
18        However, it was mentioned in the affidavit as these
19   are clients, these are investors, and I had probable cause to
20   believe that other investors were possibly being defrauded.  I
21   had reason to believe that based on my information of these
22   other victims and facts that I provided to magistrate that the
23   purpose of this search warrant was to identify other investors,
24   i.e., other clients that were possibly defrauded.
25   Q.  What, if anything, else do you recall discussing in the
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300
                                               100
      6886TAN3            Fraterrigo - redirect
 1   jury room?
 2   A.  I recall discussing that the -- one of these days of
 3   this -- of the -- one of the two days that I testified that I
 4   remembered being frustrated that I wanted to state this to the
 5   Court and I had came back in one instance and tried to clarify
 6   my statement and tried to clarify what I meant that I was being
 7   specifically asked particular investments about particular
 8   clients and they are not typed in the affidavit.  However, it
 9   is mentioned as -- as a -- there was reason to believe and
10    there was probable cause to believe that these two individuals
11    could be defrauding other investors and other clients, and that
12   is what I explained to you in the jury room.
13   Q.  In the jury room did anyone from the government tell you
14   what to say either on redirect or examination or on recross?
15   A.  No.
16   Q.  Is there anything else you recall from the robing room
17   before we get onto another topic?
                     Page 56

6886tanF.txt

18  A. No.
19  Q. Let's start with you mentioned just now trying to clarify
20  at one point during your previous testimony what you meant.
21  A. Yes.
22  Q. Can you turn to the transcript before you, July 10, pages
23  97 and 98. On 97 it starts with line 16 and page 98 I think it
24  ends with line 17. If you could take a moment and read that to
25  yourself?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

101

6886TAN3            Fraterrigo - redirect
1   A. Page 97?
2   Q. Yes. And 98. Starting with line 16 on 97.
3   A. Yes.
4   Q. Is this the first time you had an opportunity to read this?
5   A. Yes.
6   Q. Did you discuss this portion -- any of the transcript other
7   than with the government other than the question I asked you
8   about on page 94?
9   A. Yes.
10  Q. So other than the question on 94 did you discuss any of
11  this transcript with anyone from the government prior to right
12  now?
13  A. Correct.
14  Q. Correct what?
15  A. You only asked me about that one particular question on the
16  transcript not about this, or any other part of my transcript.
17  Q. When you were saying a time in your prior testimony where
18  you were trying to clarify what you meant, is this the part of
19  the proceeding where you were trying to do that?
20  A. Yes.
21  Q. What were you trying to convey here?
22  A. What I was trying to --
23       MS. HOFFMAN: I object, your Honor, to what she was
24  trying to convey. It says what it says.
25       THE COURT: Just rephrase the question. I don't have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

102

6886TAN3            Fraterrigo - redirect
1   it in front of me.
2   Q. Can you explain what you were trying to clarify?
3   A. I was trying to clarify that Mr. Hoffman was asking me a
4   series of questions about particular clients, particular
5   investments and asked me if I specifically had probable cause
6   to take this item.
7   Q. Let's stop there. Had probable cause. What were you
8   interpreting his question to mean?
9   A. I was interpreting it to mean that if it -- if it was named
10  in the document, if it was named in the affidavit, if it was
11  specifically named by its name in the document.

Page 57

6886tanF.txt

12  Q.  When you say "by its name"?
13  A.  File name, client name, investor name, fund name.  That is
14  what I interpreted it.  Because --
15  Q.  Let me ask you a follow-up question?
16        THE COURT:  Don't cut her off.
17  Q.  Go ahead.
18  A.  When he asked me a series of questions about the -- when he
19  asked me a series of questions, he followed up with find it in
20  the affidavit.  Specifically, do you see L.A.P.D. or do you see
21  this fund name in the affidavit.  And I did not see that
22  particular fund name.  I did not see that particular client
23  name, but I -- what I was trying to explain here was that I had
24  probable cause and reason to believe there were other
25  investments, other funds that were being defrauded by these two

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                        103
    6886TAN3          Fraterrigo - redirect
1  individuals.  That is what I was trying to explain.  That is
2  what I presented to the magistrate.
3        MS. HOFFMAN:  Your Honor, one moment.  Can I ask the
4  stenographer to mark this place so it doesn't take us a long
5  time on recross to ask her about this question.
6        THE COURT:  You want the stenographer to put a special
7  gold star on the page.
8  BY MS. McEVOY:
9  Q.  So I am clear, when Mr. Hoffman asked you a series of
10  questions on cross-examination about whether you had probable
11  cause to see certain items, specifically the words "had
12  probable cause," what was your interpretation of those
13  questions?
14  A.  That if it was written in the actual affidavit, that
15  particular -- that particular file, if it was actually written
16  in the affidavit.  I interpreted as how it was written, if it
17  was written in the affidavit, where was it.  That was a series
18  of questions that followed.  I misinterpreted.  I meant that it
19  may not be mentioned by its name by particular investor, but it
20  is mentioned as there was reason to believe and probable cause
21  that it was in the affidavit.
22  Q.  When you say on lines 20 to 23 on page 97 "This falls along
23  the part of the affidavit that I did not specifically put this
24  item in, have evidence specifically for this, but there was
25  probable cause that this was covered under," can you explain

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                        104
    6886TAN3          Fraterrigo - redirect
1  that?
2  A.  What I was trying to explain before, I don't know what the
3  document MN is but I didn't -- like I stated, I didn't
4  specifically name every investor of Amerindo.  I didn't
5  specifically name every fund or every item.  It was -- what I

                        Page 58

6886tanF.txt

6   was trying to explain was that I had facts -- at the time of
7   these particular victims that were mentioned by name in the
8   affidavit, I had facts about particular funds, particular
9   accounts.  But as I presented to the magistrate and I was
10  trying to explain here that in my affidavit, I had probable
11  cause and reason to believe that other investors and other
12  clients could be defrauded based on the information, based on
13  the facts that I had.  I did not name other investments.  I
14  didn't specifically name whatever the document MN was.
15  Q.  Turning to the next page, 98, lines 3 to 8.  You say,
16  "Those five individuals were the probable cause I submitted
17  defrauded by these two individual.  I put in the affidavit that
18  there was probable cause and reason to believe there were other
19  investors, other clients, other victims, other possible
20  investments that could have also been defrauded by these two
21  individuals"?
22  A.  Yes.  That's correct.
23  Q.  As you just testified you used the terms "probable cause"
24  and "reason to believe"?
25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

105

6886TAN3            Fraterrigo - redirect
1   Q.  Do you recall being asked by Mr. Hoffman on
2   cross-examination about had you had probable cause to believe
3   that other investors were being victimized?
4           MS. HOFFMAN:  Can we get page and line?
5           MS. McEVOY:  Page 18, line 19 of July 10.
6           MS. HOFFMAN:  Thank you.
7   Q.  Do you recall being asked by Mr. Hoffman on
8   cross-examination, "Inspector Fraterrigo, had you had probable
9   cause to believe that other investors were being victimized.
10  Had you had information that went to that higher level then you
11  would have used that term if you had it, correct?"  And your
12  answer is "That's correct."
13          What, if any, distinction are you making between
14  probable cause and reason to believe or reason to be concerned,
15  if any?
16  A.  I think my distinction is that -- that with --
17  Q.  Let me ask this another way.
18          MS. HOFFMAN:  I object, your Honor.  Let her answer
19  the question.
20          THE COURT:  I agree.
21  A.  With probable cause is what was in the affidavit.  And my
22  interpretation is those are the ones -- the information I had
23  at the time were about particular investors.  That was a
24  probable cause.  The ones I named in particular.  I had reason
25  to believe and as I presented in the affidavit, there could be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

106
Page 59

6886tanF.txt

6886TAN3            Fraterrigo - redirect

1    other investors based on what I knew at the time and what I
2    knew that there was a crime being committed, and I had reason
3    to believe that other investors could be defrauded.
4    Q.  So when you say here on page 98, when you testified on page
5    98, lines 4 through 8, "I put in my affidavit there is probable
6    cause and reason to believe that there are other investors,
7    other clients, other victims, other possible investments that
8    could have also been defrauded by these individuals" --
9    A.  Yes.
10   Q.  -- what were you saying, if anything, regarding whether
11   there was probable cause to believe that other investors
12   besides the named clients were being defrauded?
13        MS. HOFFMAN:  I respectfully object.  Asked and
14   answered in the last question.
15        THE COURT:  I agree.
16   Q.  I am going to direct your attention, Inspector Fraterrigo,
17   to pages 37 and 38 of July 10, lines 18 to 25 and then the
18   following page 1 to 6.
19   A.  37, line 18.
20   Q.  Yes.  To the bottom and then the top of the following page.
21   You should read the question too that starts on line 13 of page
22   37.
23   A.  Okay.
24   Q.  You had a chance to read it?
25   A.  Yes.

107

6886TAN3            Fraterrigo - redirect

1    Q.  When you said there was no probable cause submitted to the
2    magistrate in the papers submitted to magistrate but you had
3    authority to seize it, what did you mean?
4    A.  What -- I think what I am probably doing is confusing it
5    that because I didn't specifically mention the brokerage
6    account by name in the affidavit.  I think that is what is
7    causing the confusion.
8        What I meant by having the authority to seize it, that
9    there was, as I mentioned in the affidavit that there was
10   reason to believe that other brokerage report accounts, other
11   investors, other clients as well defrauded.  Here it is I
12   didn't specifically -- when I mean there was no probable cause
13   that there was no specific fact or information put in the
14   affidavit for that particular item.
15        But there is probable cause to take it because there
16   was reason to believe that they could be defrauding other
17   investors using other brokerage accounts and using client's
18   money.  I just -- I think that is what is causing the
19   confusion.
20   Q.  At the time you submitted your application -- first of all,
21   a lot of terms have been thrown around.  What does your search
22   warrant application to the magistrate judge include?

Page 60

6886tanF.txt

23          MS. HOFFMAN:  I am going to object as this being
24  redirect.  We went all through that on direct as to every
25  document that was gone through.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                        108
        6886TAN3            Fraterrigo - redirect
1           THE COURT:  I think in the context it is appropriate
2   to lay some quick background.  Go ahead.
3           THE WITNESS:  Can you repeat the question?
4   BY MS. McEVOY:
5   Q.  What documents did your search warrant application to the
6   magistrate judge include?
7   A.  It included the complaints on Vilar and Gary Tanaka.
8   Q.  What, if anything, else did your application to the first
9   search warrant include?
10  A.  It also included an attachment of items to be seized, facts
11  of my investigation and probable cause.
12  Q.  When you say "facts of your investigation," what is the
13  name of the document that includes the facts of your
14  investigation?
15  A.  The affidavit.
16  Q.  Did you include in this affidavit all the information you
17  had learned up until this point through the course of your
18  investigation?
19  A.  No.
20  Q.  At the time you applied for the search warrant, did you
21  believe that probable cause existed to search for the items
22  described in your search warn?
23  A.  Yes.
24  Q.  When you seized items during the search, did you believe
25  probable cause existed to seize those items?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                        109
        6886TAN3            Fraterrigo - redirect
1   A.  Yes.
2           MR. HOFFMAN:  I am going to object to this line of
3   inquiry or just note I think the government now is opening the
4   door to what is in this witness's mind.  They are asking
5   questions about whether or not she included certain facts in
6   the affidavit that she knows.  To allow these answers to stand,
7   we have to be able to cross-examine this witness.
8           THE COURT:  Inspector, when you say you had probable
9   cause to seize the items you did, are you saying what is in the
10  affidavit and supporting complaints or based on information
11  that was not included in the complaints and affidavit?
12          THE WITNESS:  Based on what is included in the
13  complaints and affidavit.
14          THE COURT:  That is the whole issue about the 11th
15  Circuit and I think the 5th Circuit that allows, to the
16  government's advantage and law enforcement officer to say,
                        Page 61

6886tanF.txt

10      MS. McEVOY:  Yes.
11      THE COURT:  So taking out of the context of this case,
12  someone sells a kilogram of cocaine on Tuesday and based on
13  that experiences they may have drug records, they may have
14  scales and other paraphernalia used to sell drugs even though
15  the law enforcement doesn't have specific information that
16  there are drug records or other paraphernalia.
17      MS. McEVOY:  That is my point.
18      THE COURT:  I think you should just move on.
19      MS. McEVOY:  Right.
20  BY MS. McEVOY:
21  Q.  I just want to ask you a couple questions, Inspector
22  Fraterrigo, about the questions you where are asked on
23  cross-examination about whether you didn't have or you didn't
24  submit probable cause to seize certain items.  If you could
25  look at the transcript on July 7, page 150.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                            121
        6886TAN3            Fraterrigo - redirect
1       THE COURT:  Line?
2       MS. McEVOY:  13.
3   Q.  Do you recall being asked -- you can follow along if you
4   like -- "As I went down a list of a hundred or so other than
5   the two individuals who are mentioned by institutional entities
6   like this whose records were housed at the Park Avenue office
7   and were clients of Amerindo Investment Advisors Inc., the
8   registered investment advisory company, would it be accurate to
9   say you had no probable cause to seize their, I will use the
10  specific words 'investment brochure,' sent to or gotten to
11  correct?  And then you say, "No."  The next page Mr. Hoffman
12  asks:  "No meaning, is that correct?"  And you answer, "That is
13  correct."
14      When you testified just there on cross-examination,
15  what did you mean?
16  A.  Again, it was like a series of questions from Mr. Hoffman
17  about particular investors, particular clients and I think I am
18  confusing the point of probable cause that I didn't
19  specifically mention Whirlpool Corporation, which is mentioned
20  in line 11 or other individuals.  I didn't specifically name
21  them by name in my affidavit, but I did submit to the
22  magistrate that there was probable cause and reason to believe
23  to have to seize information or that there would be information
24  at this location that there are other investors and other
25  clients that could possibly have been defrauded.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                            122
        6886TAN3            Fraterrigo - redirect
1   Q.  What did you submit in your application to give you
2   probable cause to seize those items?
3   A.  I submitted an attachment and I submitted a description of
                        Page 68

6886tanF.txt

9   correct, your Honor.
10          THE COURT:  Okay.
11   Q.  If you could look at the transcript, July 7th, page 141.
12   The specific question, lines 11 through 14, and your answer on
13   15, was it your understanding, do you recall being asked the
14   question:  Was it your understanding that any and all documents
15   that come within the description of corporate records
16   concerning Amerindo Investment Advisors, Inc. no matter how
17   old, those were seizable under this warrant?  And you answered:
18   yes?
19   A.  Yes.
20   Q.  And do you recall being asked the same question with
21   respect to Amerindo Cayman and Panama, next series of
22   questions?
23   A.  Yes.
24   Q.  Okay.  How did you interpret the term "corporate record" as
25   included in that paragraph of the search warrant rider?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                              130
      688ztan4          Fraterrigo - redirect
1    A.  I interpreted it as information about the filing for the
2    business name of entities, like I'm trying to explain,
3    corporate records I determine as documents relating to the
4    structure of the entities.
5    Q.  Could you give us an example?
6    A.  Like a, like a, like a filing, a business certificate of
7    the entity, description of who owns the entity.  I, where
8    interpreted as anything relating to the like minutes, things
9    like that, board minutes, board description of the structure of
10   the entities.
11   Q.  At the time you executed the search warrant, what, if any,
12   distinction did you make between the term corporate records as
13   included in paragraph one of that rider, and business records
14   in general?
15   A.  I didn't make any distinction.
16   Q.  So was it your view that you could seize any document, any
17   Amerindo business document under paragraph one of that rider?
18   A.  No, no.  I mean I -- I saw it as limiting to those what's
19   followed through in the paragraph.
20   Q.  When you say what's followed through in the paragraph,
21   you're going to have to explain.
22   A.  Within that paragraph what is described as including like
23   shareholders, principals, officers, directors, employees and
24   such, like that.
25   Q.  Did you view paragraph -- whether you executed that
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                              131
      688ztan4          Fraterrigo - redirect
1    warrant, did you view paragraph one as giving you the authority
2    to seize any document with the word Amerindo on it?
                           Page 73

6886tanF.txt

3    A. No.
4    Q. Why not?
5    A. Because the way I interpreted it is -- the way I
6    interpreted the entire attachment is, is, you know, each
7    paragraph kind of follows under the others. Where paragraph
8    one is a general paragraph, it indicates every -- almost every
9    document that's in the search warrant that's in the business;
10   client lists, investment brochures, and then there's like
11   specifics. The other paragraphs I took it as detailing kind of
12   like an inverted pyramid kind of thing.
13   Q. All right, let's break down that. When you said you viewed
14   paragraph one as every item that's in the business?
15   A. No. Paragraph one I took it as the -- as these corporate
16   records relating to these entities.
17   Q. Okay.
18   A. These particular entities, and there's a description of
19   what types of documents are in that paragraph.
20   Q. Okay.
21   A. And then there are following paragraphs that specifically
22   name particular items regarding particular investments, and it
23   follows through. I didn't -- I didn't interpret it that I had
24   probable cause to take everything or I had the authority to
25   seize everything in Amerindo.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                            132
     688ztan4            Fraterrigo - redirect
1    Q. What about every, did you believe you had probable cause to
2    seize every Amerindo business document?
3    A. No.
4           THE COURT: I want to understand exactly how it is
5    that you think paragraphs below paragraph one limited paragraph
6    one. That's what you're saying, right?
7           THE WITNESS: Yes.
8           THE COURT: Did you say it's a pyramid; it's almost an
9    inverted pyramid, so the most generic description begins in
10   paragraph one and the paragraphs that follow that narrow the
11   scope of the search warrant?
12          THE WITNESS: That's the way.
13          THE COURT: So that each paragraph would narrow what
14   precedes it?
15          THE WITNESS: That's my impression.
16          THE COURT: So then by that logic, the only thing you
17   could look at is the last paragraph in the rider because that's
18   the -- what defines the scope of the search.
19          THE WITNESS: No, it's there -- paragraph one is, to
20   me, is a general paragraph that indicates, you know, particular
21   entities of Amerindo, and then it states shareholders,
22   principals, officers, and such. The other documents provide
23   specifics for paragraph one.
24   Q. I think that's what we're trying to understand, Inspector
25   Fraterrigo?

                                            Page 74

6886tanF.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

133

688ztan4          Fraterrigo - redirect

1   A.  Yes.  It's -- maybe it's not an inverted pyramid, but it's
2   just each paragraph provides specifics for corporate records.
3   Instead of the paragraph number one alone, corporate records
4   can mean any business records in Amerindo; whereas, the other
5   paragraphs provide -- narrows it down, I mean.
6   Q.  I guess what is -- what you can you explain for us on the
7   one hand you just testified that you didn't interpret paragraph
8   one to mean every Amerindo business record that you --
9          MR. HOFFMAN:  Object, your Honor, to -- that's a
10  misstatement of or mischaracterization.
11         THE COURT:  Inspector, do you think -- you think you
12  were entitled to take every single Amerindo business or
13  corporate record under this search warrant?
14         THE WITNESS:  No.
15         THE COURT:  All right.  And what was it that you think
16  limited the scope of which corporate or business records of
17  Amerindo you were allowed to take?
18         THE WITNESS:  The other paragraphs in the attachment.
19         THE COURT:  Okay.  When you say any other paragraphs,
20  what is -- what exactly does that mean here?  Let me -- do you
21  have the rider there with you?
22         THE WITNESS:  Yes.  This is -- these are the
23  paragraphs from two to 17 limited, limited number one.
24         THE COURT:  Okay.  Can I just borrow that for a
25  second.  Was paragraph two limited by paragraph three?
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

134

688ztan4          Fraterrigo - redirect

1          THE WITNESS:  No.  Paragraph one was limited by the
2   others.  That's the way I took it.  It's the way I took it.
3          THE COURT:  So by that logic, would you even need to
4   read paragraph one?  You could just get rid of it and then you
5   would be allowed to seize everything in paragraphs two through
6   17.  What purpose does paragraph one serve, then, in your view?
7          THE WITNESS:  It provides a general sense, a general
8   information of what particular documents.
9   BY MS. McEVOY:
10  Q.  Are there any -- when it says corporate records in
11  paragraph one, are there any types of corporate records listed
12  there that you believe paragraph one, standing alone, gave you
13  authority to seize as opposed to any of the other paragraphs in
14  the warrant --
15  A.  Yes.
16  Q.  -- rider?  What types of corporate records did you view
17  paragraph one giving you authority to seize without having to
18  look at the rest of the rider?
19  A.  Shareholder information, bylaws, resolutions, what's listed
Page 75

6886tanF.txt
20    there.
21        THE COURT:  What's listed in paragraph one?
22        THE WITNESS:  Yes.
23        THE COURT:  So -- I'm sorry.  Could I borrow this
24    again?  So, according to paragraph one, you can seize any and
25    all client files and marketing materials for any of the
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                  135
         688ztan4          Fraterrigo - redirect
1     Amerindo entities; is that right?
2        THE WITNESS:  Yes.
3        THE COURT:  So then, in other words, what's in
4     paragraph one stands alone and authorizes you to take any and
5     all marketing materials for any of the Amerindo entities?
6        THE WITNESS:  Yes.
7     BY MS. McEVOY:
8     Q.  When you executed the search warrant, did you view
9     paragraph one standing alone?
10    A.  No.  I made determinations when I was searching the office,
11    I made particular determinations whether it was covered under
12    the warrant, and then later determined if it was useful to the
13    investigation, and I seized what.
14    Q.  Right.  But you said you made a determination based on what
15    did you --
16    A.  Based on this attachment, based on my understanding of the
17    attachment.
18    Q.  And my question to you is, Inspector Fraterrigo, did you
19    make that determination based on a particular paragraph?
20    A.  Yes.
21    Q.  Can you just explain for us the process you followed when
22    determining which items to seize?
23    A.  I, as I went through documents, I made a determination
24    whether it was covered under the warrant, and if it was covered
25    under the warrant, I made a determination there whether it was
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                  136
         688ztan4          Fraterrigo - redirect
1     useful to the investigation, and if it was I seized it.
2     Q.  Under the Judge's question which he just asked you, client
3     files, if, as you just testified, all Amerindo client files
4     could be seized under paragraph one, what was the process you
5     followed to determine whether or not you were going to seize
6     the client files?
7        MR. HOFFMAN:  I'm going to object to that.  She asked
8     the question before what process did you use.  She answered it
9     very specifically.
10       MS. McEVOY:  I'm asking a specific example here.
11       THE COURT:  I'll allow the question.
12    Q.  If you came across a -- if, as you just testified, you were
13    authorized to seize any client file under paragraph one of the
                                         Page 76

6886tanF.txt

14 rider?
15 A. Uh-huh.
16 Q. Did you, in fact, just seize all client files under
17 paragraph one of the rider?
18 A. Um, I seized client files that were relating to -- I don't
19 know if I actually seized that particular client files. I
20 mean, it would be covered under paragraph one.
21      THE COURT: Can I have this? All right. When it says
22 that property that can be seized, paragraph one, court records
23 concerning Amerindo investment advisors, and then it lists the
24 other entities, including but not limited to marketing
25 materials, copies of correspondence sent to or received from
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                          137
     688ztan4          Fraterrigo - redirect
1 client -- let's just take those two categories, marketing
2 materials and copies of correspondence sent to or received from
3 clients. What, if any, limitation in that paragraph would
4 there be in your ability to seize any and all correspondence
5 sent to and received from clients or any and all marketing
6 materials?
7      THE WITNESS: There would be no limitation.
8 Q. Is that how you executed the warrant in practice?
9 A. No.
10 Q. How did you execute the warrant?
11 A. I made determinations there. I reviewed the material to --
12 that I was intending to -- that was covered under the warrant,
13 and I made a determination there whether it would be useful to
14 the investigation and, if not, I took it and if not, I left it.
15 Q. And during your briefing to the postal inspectors, did you
16 instruct them to seize every document that related to the
17 businesses of Amerindo U.S. and Panama and Cayman?
18      MR. KOBRE: Objection, leading.
19      THE COURT: No, overruled. It's not leading.
20 A. No, I did not.
21 Q. And executing the search warrant, did you seize all
22 business documents relating to Amerindo, U.S, u.K., Cayman and
23 Panama?
24 A. No.
25      THE COURT: In your briefing to the Inspectors, did
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                          138
     688ztan4          Fraterrigo - redirect
1 you -- did you explain to them what, if any, limits there were
2 on their ability, for example, to seize any and all
3 correspondence between clients?
4      THE WITNESS: No.
5 Q. Did you provide them with information about clients as
6 charged in the complaints?
7 A. Yes. I gave a summary of the clients that were mentioned
              Page 77

6886tanF.txt
8    in the affidavit, and I gave them a copy of the affidavit in
9    the attachment to read.
10   Q.  And do you reference in your affidavit client
11   correspondence?
12   A.  Yes.
13   Q.  During your briefing, did you instruct postal inspectors to
14   seize all Amerindo client files?
15   A.  No.
16          MR. HOFFMAN:  Object your Honor.  It was just asked.
17   I don't care.
18          THE COURT:  Well, but the follow-up question is did
19   she instruct them not to.  I mean, I don't really see the point
20   of the question.  The question is what, if any, limitations
21   were placed on inspectors who executed the search on taking all
22   of the correspondence involving clients.
23   BY MS. McEVOY:
24   Q.  In answering postal inspector's questions, either after the
25   briefing or during the search, did you provide in your answers

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

139
688ztan4          Fraterrigo - redirect
1    limitations on what to seize under the search warrant?
2    A.  I just made determinations what to seize and what not to
3    seize.  I don't recall if I gave an explanation to the
4    inspectors as to why I'm not seizing it.
5    Q.  You say you don't recall.  Do you know one way or another
6    or you recall not providing?
7    A.  I don't recall one way or another.
8    Q.  And in making decisions about particular questions or items
9    that other postal inspectors asked about, were there instances
10   in which you told them not to seize certain items?
11   A.  Yes.
12   Q.  Now going back to page 141 of July 7th, line 16 to through
13   20, when Mr. Hoffman asks you and so -- to get back to the
14   question I asked you earlier.  If there was a corporate record,
15   something having to do with Amerindo U.S., that was in a 1979
16   dated document, your understanding is that that was seizable,
17   is that correct?  And you answered:  Yes.
18          What's your understanding of when you answered this
19   question what Mr. Hoffman meant by seizable?
20   A.  That it was covered under the warrant.
21   Q.  And when you say covered under the warrant, what do you
22   mean?
23   A.  It's allowed to be seized based on what's in the affidavit
24   and the warrant, it was allowed to be seized.
25   Q.  And when you executed the search warrant, did you seize

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

140
688ztan4          Fraterrigo - redirect
1    everything that was seizable?

Page 78