UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA            :

            -v.-                    :      S3 05 Cr. 621 (KMK)

ALBERTO WILLIAM VILAR,              :
   a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,                   :

            Defendants.            :
-------------------------------------------------------x


GOVERNMENT'S OMNIBUS POST-HEARING MEMORANDUM
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS
TO SUPPRESS EVIDENCE SEIZED IN SEARCHES CONDUCTED
IN THE UNITED STATES AND THE UNITED KINGDOM
AND TO QUASH A GRAND JURY SUBPOENA


                              MICHAEL J. GARCIA
                              *United States Attorney for the*
                              *Southern District of New York*

                              *Attorney for the United States of America*


Marc Litt
Deirdre A. McEvoy
*Assistant United States Attorneys*
*Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.      The Search Of Amerindo U.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

              1.      The Warrant Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

              2.      The Pre-Search Briefing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              3.      The Execution of the Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              4.      The Return of Certain Seized Items . . . . . . . . . . . . . . . . . . . . . . 15

        B.      The *Franks* Motion And Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

              1.      Defendants' *Franks* Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

              2.      The *Franks* Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.      The May 26, 2005 Grand Jury Subpoena . . . . . . . . . . . . . . . . . . . . . . 22

        D.      The Search Of Amerindo Materials Stored In A U.K. Warehouse . . . . . 28

              1.      The MLAT Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

              2.      The U.K. Warrant Application . . . . . . . . . . . . . . . . . . . . . . . . . . 31

              3.      The Search At Cadogan Tate . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

              4.      The Second U.K. Warrant Application . . . . . . . . . . . . . . . . . . . 36

              5.      The Completion Of The Search At Cadogan Tate . . . . . . . . . . . 37

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    POINT I:      DEFENDANTS' MOTION TO QUASH IS WITHOUT MERIT
                   AND SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

              A.      The Grand Jury Subpoena Was Issued For A Legitimate
                    Governmental Purpose In Furtherance Of The Grand
                    Jury's Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

              B.      The Standards Of Probable Cause Should Not Be Applied
                      In The Court's Evaluation Of The Subpoena . . . . . . . . . . . . . . 44

C.  Defendants Have Failed To Meet Their Burden
Of Demonstrating That The Subpoena Is Unreasonable
Or Oppressive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

1.  Defendants Have Failed To Show That
The Subpoena Is Unreasonable . . . . . . . . . . . . . . . . . . . . 47

2.  Defendants Have Failed To Show That
The Subpoena Is Oppressive . . . . . . . . . . . . . . . . . . . . . . . 49

D.  The Subpoena Is Reasonably Particular . . . . . . . . . . . . . . . . . . 54

POINT II:   EVIDENCE SEIZED FROM THE SEARCH
OF AMERINDO U.S. SHOULD NOT BE SUPPRESSED . . . . . . . . . . 56

A.  The Warrant Was Appropriately Broad And
Reasonably Particularized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

1.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

B.  Even If The Warrant Was Unlawful, The *Leon* Good Faith
Exception Applies And The Seized Evidence
Should Not Be Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

1.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

2.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

a.  The Warrant Appeared To Be Valid . . . . . . . . . . 76

b.  The Circumstances Of The Search Show
That The Warrant Was Executed In A
Manner Evidencing Good Faith . . . . . . . . . . . . . . 78

C.  Even If The Good Faith Exception Does Not Save
The Entire Warrant, The Court Should Only Suppress
So Much Of The Seized Evidence That Was Beyond The
Scope Of The Valid Portions Of The Warrant . . . . . . . . . . . . . . 82

1.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

2.  Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

ii

D.     The Government's Seizure And Search Of Amerindo
Computers Complied With The Requirements Of The
Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

      1.     Background: The Warrant And Warrant Affidavit . . . . . 88

      2.     Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

      3.     Magistrate Judge Maas Did Not Err By Failing To
Require The Inclusion Of A Search Protocol
And The Court Should Not Now Impose One
After The Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

POINT III:     DEFENDANTS' *FRANKS* MOTION SHOULD BE DENIED . . . . . . . 95

    A.     Defendants Have Failed To Prove That Inspector Fraterrigo
Intentionally Or Recklessly Omitted From The Warrant
Affidavit Information About Prior Redemptions
Of Investments By Cates And The Mayers . . . . . . . . . . . . . . . . . 95

    B.     Defendants Have Failed To Prove That the Alleged
Omissions Were Necessary To The Finding
Of Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

POINT IV:     THE U.K. SEARCH WAS ENTIRELY LAWFUL AND
DEFENDANTS' MOTION TO SUPPRESS
SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

    A.     The Government's Failure To Obtain A Search Warrant
From A U.S. Court Did Not Violate The Fourth Amendment . 111

    B.     The Search Conducted By The Metropolitan Police
With The Assistance Of The U.S. Postal Inspectors
Fully Complied With U.K. Law And Was, Therefore,
"Reasonable" Under The Fourth Amendment . . . . . . . . . . . . . . 114

      1.     The Search Complied With U.K. Law . . . . . . . . . . . . . . 116

          a.     U.K. Law Of Search Warrants . . . . . . . . . . . . . . 117
          b.     U.K. Law Concerning Search Warrants
And Privileged Materials . . . . . . . . . . . . . . . . . . 118

          c.     Detective Sergeant Shaw
Obtained The Proper Warrant . . . . . . . . . . . . . . 119

iii

           d.     Detective Sergeant Shaw's Warrant
                  Application Was Entirely Truthful . . . . . . . . . 122

       2.     The Warrant Was Executed In A Reasonable Manner . 127

C.     Even Were The Court To Conclude That The Search Of
      Cadogan Tate Was Unconstitutional, The Evidence Should
      Not Be Suppressed Because The Postal Inspectors
      Acted In Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

D.     The Amerindo Materials Seized In The U.K. Are Not
      "Fruit Of The Poisonous Tree" . . . . . . . . . . . . . . . . . . . . . . . . 135

       1.     Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

       2.     There Is No "Poisonous Tree" And The U.K.
           Evidence Should Not Be Suppressed . . . . . . . . . . . . . . . 139

       3.     Even Were The Court To Suppress The U.S. Search
           Evidence And Quash The Grand Jury Subpoena, The
           Materials Obtained From the U.K. Search Should Not
           Be Suppressed As "Fruit Of The Poisonous Tree" . . . . 140

       4.     In Any Event, The Policies Underlying
           The Exclusionary Rule Do Not Support Suppression
           Of The U.K. Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . 141

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

## TABLE OF AUTHORITIES

Andresen v. Maryland, 427 U.S. 463 (1976)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Armstrong v. Guccione, Nos. 04-5448-PR(L), 05-0280-PR(CON),
    2006 WL 3404803 (2d Cir. Nov. 27, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Brown v. Illinois, 422 U.S. 590 (1975)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

CAB v. Herman, 353 U.S. 322 (1957)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Coolidge v. New Hampshire, 403 U.S. 443 (1971)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 114

Elkins v. United States, 364 U.S. 206 (1960)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hudson v. Michigan, 126 S.Ct. 2159 (2006) . . . . . . . . . . . . . . . . . . . . . 72, 130, 137, 138, 141

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

In re August, 1993 Regular Grand Jury (Medical Corp. Subpoena II),
    854 F. Supp. 1392 (S.D. Ind. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 52

In re Corrado Brothers, Inc., 367 F. Supp. 1126 (D. Del. 1973) . . . . . . . . . . . . . . . . . . . . 46

In re Grand Jury, 286 F.3d 153 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

In re Grand Jury 95-1, 59 F. Supp. 2d (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

In re Grand Jury Investigation, 459 F. Supp. 1335 (E.D. Pa. 1978)  . . . . . . . . . . . . . . . . 46, 51

In re Grand Jury Proceedings, 115 F.3d 1240 (5th Cir. 1997)  . . . . . . . . . . . . . . . . . . . . 44, 52

In re Grand Jury Subpoena Duces Tecum Dated May 29, 1987,
    834 F.2d 1128 (2d Cir. 1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

In re Grand Jury Subpoena Duces Tecum Dated November 15, 1993,
    846 F. Supp. 11 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

In re Grand Jury Subpoena Duces Tecum to John Doe Corp.,
    570 F. Supp. 1476 (S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

In re Grand Jury Subpoena, No. CV-92-1279, 1992 WL 142014

(E.D.N.Y. June 11, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 56

In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002,
     318 F.3d 379 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

In re Grand Jury Subpoena Served Upon Doe, 781 F.2d 238 (2d Cir. 1986) . . . . . . . . . . . 45-46

In re Grand Jury Subpoenas to Mark Fainaru-Wada and Lance Williams,
     No. CR 06-90225 JSW, 2006 WL 2734273 (N.D. Ca. Sept. 25, 2006) . . . . . . . . . . . . 56

In Re Horowitz, 482 F.2d 72 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 48, 53, 54, 56

In re Manhattan Investment Fund Ltd., 310 B.R. 500 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . 106

In re Search of: 3817 W. West End, 321 F. Supp. 2d 953 (N.D. Ill. 2004) . . . . . . . . . . . . . . . 90

In re Subpoena Duces Tecum, 228 F.3d 341 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . 44, 50, 51, 53

Laaman v. United States, 973 F.2d 107 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 138-139

Marron v. United States, 275 U.S. 192 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Nardone v. United States, 308 U.S. 338 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 138

National City Trading Corp. v. United States, 635 F.2d 1020 (2d Cir. 1980) . . . . . . . . . . . . . . 59

New York v. Burger, 482 U.S. 691 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

New York v. Harris, 495 U.S. 14 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

Nix v. Williams, 467 U.S. 431 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

Ohio v. Robinette, 519 U.S. 33 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186 (1946) . . . . . . . . . . . . . . . . . . . . . . . . 46, 52

Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357 (1998) . . . . . . . . . . . . . . . 141

Rakas v. Illinois, 439 U.S. 128 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Rivera v. United States, 928 F.2d 592 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96-97

Segura v. United States, 468 U.S. 796 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920) . . . . . . . . . . . . . . . . . 136, 138

Texas v. Brown, 460 U.S. 730 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

(Under Seal) v. United States, 634 F. Supp. 732 (E.D.N.Y. 1986) . . . . . . . . . . . . . . . . . . . . . . 54

United States v. Adjani, 452 F.3d 1140 (9th Cir.), cert. denied, 127 S.Ct. 568 (2006) . . . . . . . 89

United States v. Aljouny, 629 F.2d 830 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

United States v. Awadallah, 349 F.3d 42 (2d Cir. 2003) . . . . . . . . . . . . 96, 98, 99, 100, 102, 105

United States v. Barona, 56 F.3d 1087 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112, 115

United States v. Bin Laden, 126 F. Supp. 2d 264 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . 129

United States v. Brooks, 427 F.3d 1246 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 89, 91

United States v. Buck, 813 F.2d 588 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 94

United States v. Burke, 718 F. Supp. 1130 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . 60, 75, 75

United States v. Bynum, 293 F.3d 192 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

United States v. Calandra, 414 U.S. 338 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 141

United States v. Calimlim, No. 04-C-248, 2005 WL 2922193
        (E.D. Wis. Nov. 4, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89-90

United States v. Canfield, 212 F.3d 713 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 106

United States v. Ceccolini, 435 U.S. 268 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

United States v. Colkley, 899 F.2d 297 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . 98, 100, 102, 108

United States v. Cook, 348 F. Supp. 2d 22 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 82, 97

United States v. Crews, 445 U.S. 463 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

United States v. Davis, 617 F.2d 677 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

United States v. Doe, 457 F.2d 895 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

United States v. Eng, 971 F.2d 854 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Frost, 999 F.2d 737 (3rd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

United States v. George, 975 F.2d 72 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82, 83, 87

United States v. Gotti, 42 F. Supp. 2d 252 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States v. Gray, 78 F. Supp. 2d 524 (E.D. Va. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 91

United States v. Harding, 273 F. Supp. 2d 411 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . 97, 104

United States v. Heath, 455 F.3d 52 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

United States v. Herbin, No. Crim. 204-93, 2005 WL 2789047
   (D. Vt. Oct. 26, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

United States v. Hill, 459 F.3d 966, 978 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 89, 90-91

United States v. Hunter, 13 F. Supp. 2d 574 (D. Vt. 1998) . . . . . . . . . . . . . . . . . . . 90, 91, 92, 94

United States v. Jacobs, 986 F.2d 1231 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 97, 103

United States v. Juda, 46 F.3d 961 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 115, 122, 132

United States v. Kaechele, No. 05-80441, 2006 WL 3510898
   (E.D. Mich. Nov. 29, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

United States v. Koerth, 312 F.3d 862 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

United States v. Leon, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Lloyd, No. 98 Cr. 529 (ILG), 1998 WL 846822
   (E.D.N.Y. Oct. 5, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

United States v. Lopez, No. 96 Cr. 105 (RSP), 1997 WL 567937
   (N.D.N.Y. Sept. 11, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

United States v. Maali, 346 F.Supp.2d 1226 (M.D. Fla. 2004) . . . . . . . . . . . . . . . . . . . . . . . 90

United States v. Marcus, 807 F. Supp. 934 (E.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 83
United States v. Martin, 426 F.3d 68 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 105

United States v. Martin, 615 F.2d 318 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 96, 102

United States v. Masten, 170 F.3d 790 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

viii

United States v. Montoya de Hernandez, 473 U.S. 531 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 114

United States v. Moore, 968 F.2d 216 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

United States v. Ozar, 50 F.3d 1440 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 104

United States v. Perez, 247 F. Supp. 2d 459 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . 97, 103

United States v. Peterson, 812 F.2d 486 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . 115, 122, 132, 134

United States v. R. Enterprises, Inc., 498 U.S. 292 (1991) . . . . . . . . . . . . . 44, 45, 47, 49, 51, 53

United States v. Riley, 906 F.2d 841 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 91

United States v. Rollack, 90 F. Supp. 2d 263 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . 84, 85-86

United States v. Rosa, 11 F.3d 315 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

United States v. Salameh, 152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Sasso, 59 F.3d 341 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Sells, 463 F.3d 1148, 1151 n.1 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 82

United States v. Shinderman, No. Crim. 05-67-P-H, 2006 WL 522105
     (D. Me. Mar. 2, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

United States v. Singh, 390 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 96

United States v. Sissler, 1991 WL 239000 (W.D. Mich. Jan. 25, 1991) . . . . . . . . . . . . . . . . . 91

United States v. Staino, 690 F. Supp. 406 (E.D. Pa. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 132-33

United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

United States v. Triumph Capital Group, Inc., 211 F.R.D. 31 (D. Conn. 2002) . . . . . . . . . . . . 90

United States v. Trzaska, 111 F.3d 1019 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

United States v. Verdugo-Urquidez, 494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 112

United States v. Wilson, 11 F.3d 346 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 97, 103, 136

United States v. Wuagneux, 683 F.2d 1343 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 94

ix

United States v. Young, 745 F.2d 733 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

United States Postal Service v. CEC Services, 869 F.2d 184 (2d Cir. 1989) . . . . . . . . . . . . . . 59

Vernonia School District 47J v. Acton, 515 U.S. 646 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . 114

Weeks v. United States, 232 U.S. 383 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Wilson v. Russo, 212 F.3d 781 (3rd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 103

Wong Sun v. United States, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136, 137

Other Authorities

2 W. LaFave, Search and Seizure § 4.6(f) (4th ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA          :

            -v.-                   :        S3 05 Cr. 621 (KMK)

ALBERTO WILLIAM VILAR,            :
   a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,                 :

                 Defendants.       :
--------------------------------------------------------x

### GOVERNMENT'S OMNIBUS POST-HEARING MEMORANDUM IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS TO SUPPRESS EVIDENCE SEIZED IN SEARCHES CONDUCTED IN THE UNITED STATES AND THE UNITED KINGDOM AND TO QUASH A GRAND JURY SUBPOENA

### PRELIMINARY STATEMENT

            The Government respectfully submits this memorandum in opposition to the pretrial

motions to suppress evidence seized from Amerindo pursuant to search warrants issued by U.S.

Magistrate Judge Frank Maas and two U.K. District Judges, respectively, and to quash a grand

jury subpoena issued to Amerindo U.S. on May 26, 2005.  For the reasons set forth below, the

Court should deny defendants' motions, should uphold the U.S. and U.K. searches, and should

require Amerindo U.S. to comply with the validly-issued grand jury subpoena.

### Background

**A.    The Search Of Amerindo U.S.**

            On May 25, 2005, at between approximately 9:00 and 9:30 p.m., U.S. Postal Inspector

1

Cynthia M. Fraterrigo[1] and AUSA Marc Litt went to the residence of U.S. Magistrate Judge

Frank Maas and presented him with an application for a warrant to search the offices of

Amerindo Investment Advisors Inc. ("Amerindo U.S.") located on the twenty-second floor of

399 Park Avenue, New York, New York (the "Amerindo U.S. Office").  (5/31 Tr. 100-01, 172;

7/7 Tr. 43).  The Warrant Application consisted of: (1) an affidavit (the "Warrant Affidavit"); (2)

separate criminal complaints seeking the arrests of the defendants (the "Vilar Complaint" and the

"Tanaka Complaint," respectively) which were incorporated by reference in the Warrant

Affidavit; and (3) a proposed warrant and rider (the "Warrant").  (GX 33, 33A, 33B; Vilar Ex.

E).  The Warrant Affidavit had been drafted by AUSA Litt, with input from Inspector Fraterrigo.

(5/31 Tr. 60, 177; 7/7 Tr. 142-43; 7/10 Tr. 55-56; 8/9 Tr. 228-29, 312).  Inspector Fraterrigo

---

[1]     As of July 7, 2006, when she first testified in this matter, Inspector Fraterrigo had
been a U.S. Postal Inspector for approximately seven years, and was then assigned to a team that
investigated complex white collar and corporate fraud cases, including mail fraud and securities
fraud.  (7/7 Tr. 40).  She had also investigated identity theft and other fraud cases as part of a
U.S. Postal Inspection Service external fraud team, and had served as a special agent with the
U.S. Secret Service for approximately four and one-half years.  (7/7 Tr. 41; 8/8 Tr. 142-43).
Inspector Fraterrigo had participated in approximately 40-50 searches during her law
enforcement career, including approximately ten as a Postal Inspector, of which she was the
affiant on four or five occasions.  (7/7 Tr. 41; 7/10 Tr. 136-37).  Inspector Fraterrigo was the
affiant for approximately 20 to 25 search warrants during the course of her entire law
enforcement career, and supervised approximately 20 searches.  (7/10 Tr. 136, 140).

Inspector Fraterrigo transferred from the U.S. Postal Inspection Service to the U.S. Postal
Service Office of the Inspector General on or about August 19, 2006, where she is now
employed as a Special Agent.  (11/15 Tr. 3).  Because she was a U.S. Postal Inspector at the time
of the U.S. and U.K. searches, and to avoid confusion, she is referred to throughout this brief as
"Inspector Fraterrigo."

Transcript cites are to the hearings held on December 14, 2005 ("12/14 Tr."), May 31,
2006 ("5/31 Tr."), June 1, 2006 ("6/1 Tr."), July 7, 2006 ("7/7 Tr."), July 10, 2006 ("7/10 Tr."),
August 8, 2006 ("8/8 Tr."), August 9, 2006 ("8/9 Tr."), and November 15, 2006 ("11/15 Tr.").
Government and defense exhibits from the hearings are cited "GX [no.]" and "DX [letter]",
respectively.

reviewed the Warrant Affidavit and confirmed the accuracy of its contents prior to presenting it to Magistrate Judge Maas, and subsequently swore to the truth of the Warrant Affidavit in the presence of Magistrate Judge Maas.  (7/7 Tr. 44; 7/10 Tr. 143; 11/15 Tr. 20; Vilar Ex. E).

At the time she applied for the Warrant, Inspector Fraterrigo believed that she had probable cause to search for and seize the items listed in the Warrant and rider.  (8/8 Tr. 108, 110-11).  On cross-examination, Inspector Fraterrigo answered numerous questions in a way that suggested that there was no basis presented to Judge Maas to authorize the seizure of many categories of documents identified in the Warrant and certain specific documents introduced by defendants as exhibits, and that she knew that at the time she submitted the Warrant Application.  (7/7 Tr. 150-56; 7/10 Tr. 23, 30-39, 49-54, 64-72, 93-94, 100, 104-06, 108, 110; DX MM, OO, QQ, RR).  However, Inspector Fraterrigo recognized that she had been confused by Mr. Hoffman's questions, and attempted to clarify her answers concerning probable cause while she was still on cross-examination.  (7/10 Tr. 27-28, 37, 97-98; Gov't Franks Opp. at 38-46).  For example, Inspector Fraterrigo testified on cross-examination:

> Q:  It is the same question I have asked you about the other matters.  As to the client files, there were no clients whose files other than the five people we just mentioned – the Mayers, the Cateses, Urich, Marcus, and Harvey – that you had probable cause to believe had been victimized, correct?
>
> A.  I did not list them in the affidavit, but had probable cause –
>
> Q.  But not in the papers, correct?
>
> A.  Not in the papers, correct.

(7/7 Tr. 27-28).

On another occasion, Inspector Fraterrigo testified:

Q: Would it be accurate to say that there are a number of brokerage accounts in addition to the ones I just showed you whose documents were received which accounts were not named in paragraph B as in "boy" page 8 and for which there was no probable cause submitted to the magistrate?

A.  They were seized, but they were seized under a different paragraph of the affidavit.  I had authority to seize it.

(Id. at 37).

Finally, and most significantly, in the middle of cross-examination, Inspector Fraterrigo realized that there seemed to be a misunderstanding about her testimony regarding probable cause and attempted to clarify that testimony:

Q.  Let me ask the question again.  Does that document MM fall within the category of documents such as those we discussed before where there was not any material put before the magistrate to support probable cause to seize that document?

A.  This falls along the part of the affidavit that I did not specifically put this item in, have evidence specifically for this.  But there was probable cause that this was covered under.  What I submitted in my affidavit – and I think I need to clarify my answers that I have said before, because I think there is – in part of my affidavit I put down those five individuals.

Q.  Correct.

A.  Those five individuals were, in the probable cause I submitted, defrauded by these two individuals.  I put in my affidavit that there is probable cause and reason to believe that there are other investors, other clients, other victims, other possible investments that could have also been defrauded by these individuals.

    So when you are asking me if I put specific probable cause on this particular item or investment or Amerindo Tech D, I think it is a bad assumption.  What I have this under is it is probable cause to believe that there were other particular items.  I had reason and probable cause that I submitted before the judge that there are investors that invested with Amerindo and that there are other possible and potential other victims and investors.  I think this is

4

<u>covered under that part of the affidavit, if I made myself clear.</u>[2]

(7/10 Tr. at 97-98 (emphases added)).

Moreover, during re-direct and re-cross-examination, Inspector Fraterrigo forcefully reiterated that she had been confused during cross-examination, that she had not lied to Magistrate Judge Maas, and that she believed that she had probable cause to obtain the Warrant and to search for and seize, the items listed in the Warrant.  (8/8 Tr. 96-97, 99, 100, 108-11). Specifically, Inspector Fraterrigo testified as follows:

> Q:  At the time you applied for the search warrant, did you believe that probable cause existed to search for the items described in your search war[ra]n[t]?
>
> A:  Yes.
>
> Q: When you seized items during the search, did you believe probable cause existed to search those items?
>
> A: Yes.

(8/8 Tr. 108-09).

More importantly, Inspector Fraterrigo emphatically testified that she did not lie to, nor did she intentionally mislead, the Magistrate Judge about whether she believed she had probable cause to seize the items she asked for in her search warrant application:

> Q: When you were asked by the Court on cross-examination when you [sic] knew you didn't have probable cause [sic] of every client list at the time you got the warrant, were you saying you tried to mislead the magistrate judge about that?
>
> A: No, I was not.

---

[2]     This statement by Inspector Fraterrigo was the basis for the Government's view that her testimony on cross-examination about probable cause was a product of confusion.

. . .

Q: When the Court asked you is it a fact that you knew you didn't have possible [sic] cause to get every client list at the time you went and got the warrant, were you saying that you lied to the magistrate judge about whether you believed you had probable cause to get the items you requested to be seized?

A: No.  I was not lying to the judge.  I did not lie to the judge.

(Id. at 110-11).

1.    **The Warrant Application**

The Warrant Application alleged facts concerning fraudulent schemes perpetrated by the defendants in their capacities as investment advisers.  It summarized the results of an investigation into an ongoing scheme that had led to losses of at least approximately $17 million by Cates and the Mayers who had entrusted their funds to Amerindo and the defendants for more than fifteen years.  The Warrant Affidavit, through the Vilar Complaint, which was incorporated by reference, outlined substantially all of the factual allegations contained in the Indictment concerning the SBIC fraud and the misappropriation of $250,000 from Cates.  (GX 33 ¶ 6; GX 33A).  When Cates attempted to redeem her entire investment portfolio at Amerindo, including her $5 million investment in the Amerindo SBIC and her $1 million investment in Rhodes, Amerindo and Vilar refused to move her portfolio to a Bear, Stearns account.  (GX 33 ¶ 6.B).  Moreover, Vilar informed Cates for the first time in their nearly twenty-year relationship that she was a client of Amerindo Panama and that any redemption request would have to be submitted to that entity.  (Id. ¶ 6.D).  Vilar also informed Cates that any redemption would be reduced by unspecified fees and taxes – a significant matter that had never been previously mentioned to Cates.  (Id.).  Finally, in a May 20, 2005 letter to the SEC, in response to a complaint about his

6

handling of the Cates account, Vilar stated that Cates had always been a client of Amerindo Panama, not Amerindo U.S., that Amerindo Panama had been sold in 2001, and that there was currently no overlap between the directors, officers and employees of the two separate entities. (Id.).

The Warrant Affidavit also summarized the information provided to Inspector Fraterrigo by Lisa Mayer.  According to the affidavit, Lisa Mayer had informed Inspector Fraterrigo that the Mayer family had invested approximately $12 million in Guaranteed Fixed Rate Deposit Accounts ("GFRDAs") – accounts which had been described by Vilar, in writing, as being "invested largely in bank certificates of deposit, government securities and other investments 'which are absolutely safe and liquid.'" (Id. ¶ 6.A).  The Warrant Affidavit further reported that the Mayers' efforts to redeem their $12 million investment, beginning in 2003, were rebuffed by Vilar, Tanaka, Tanaka's wife, and Amerindo, and that Vilar had threatened to create tax problems for the Mayers were they to continue in their efforts to do so.  (Id.).  The Affidavit also stated that "Mayer told me that Vilar and Amerindo were holding the family's money hostage, had threatened to create tax problems for the Mayers were they to fight him, and was dribbling out to them as little money from their multi-million investment as possible."  (Id.).  The Vilar Complaint alleged that approximately $2.85 million of Lily Cates's Amerindo SBIC investment was wire transferred to an overseas bank account based on written instructions.  (GX 33A ¶ 13(e)).  Based on that fact, among others – including defendants' stonewalling and threatening behavior toward long-time clients, arbitrary reductions in payments from purported guaranteed fixed rate investments, and, ultimately, refusal to comply with obligations to redeem investments in their entirety – the Warrant Affidavit concluded that there was probable cause to believe that

7

Vilar and Tanaka "have converted investor funds to their own personal use, and are conducting a Ponzi-type scheme in which investor funds are not being properly accounted for and segregated." (GX 33 ¶ 8).

The Warrant Affidavit stated that tens of millions of dollars had been wire transferred from four Amerindo brokerage accounts at Bear, Stearns, each of which had been opened by Amerindo, Tanaka and Vilar, on behalf of Panamanian entities (the "Amerindo Brokerage Accounts" which are further defined in the Tanaka Complaint) to a Bahamian bank account in the name of PTC Management Limited – the same entity through which Vilar induced the Mayers to manage much of their Amerindo investments. (GX 33 ¶¶ 6.A, 6.C). The Amerindo Brokerage Accounts were also used to convert approximately $5.25 million of Cates's funds to the defendants' use. (GX 33A ¶¶ 13, 14, 22). Approximately $717,000 of Cates's Amerindo SBIC investment was used by Vilar to make charitable contributions to Washington & Jefferson College, his alma mater, and to the American Academy in Berlin. (Id. ¶¶ 13-14).[3] Furthermore, more than $15 million of wire transfers were made from the Amerindo Brokerage Accounts to the same Amerindo business checking account to which $650,000 of Cates's Amerindo SBIC investment was transferred to pay Amerindo business expenses including taxes, payroll and rent. (Id. ¶ 15).

Finally, through the incorporation of the Tanaka Complaint, the Warrant Affidavit provided information about another scheme by which Tanaka purchased at least five thoroughbred racehorses using approximately $3.4 million of investor money from the Amerindo

---

[3]    Vilar had reportedly made approximately $200 million in charitable donations to various organizations around the world. (GX 33A ¶ 7).

8

Brokerage Accounts between on or about June 29, 2001 and April, 13, 2005. (GX 33B ¶¶ 7-15).

In the course of reviewing the application, Magistrate Judge Maas confirmed with AUSA Litt that the evidence that Tanaka had used investor funds to purchase the thoroughbred racehorses described in the Tanaka Complaint was not direct evidence, but rather was circumstantial evidence based on a chain of inferences. (5/31 Tr. 175; 7/7 Tr. 43-44; 7/10 Tr. 139-40). In the presence of Inspector Fraterrigo and AUSA Litt, after reviewing the application for at least approximately one hour, Magistrate Judge Maas approved and signed the Warrant at approximately 10:30 p.m. (5/31 Tr. 61, 171, 172; 7/7 Tr. 44; DX E).

### 2.    The Pre-Search Briefing

The following morning, at the U.S. Postal Inspection Service's Division Headquarters, Inspector Fraterrigo and Team Leader John Feiter led a pre-search briefing for the approximately 12-13 individuals designated to participate in the search of Amerindo U.S. and/or the arrests of Vilar and Tanaka. (12/14 Tr. 77-78, 93-95, 130; 7/7 Tr. 46; 8/8 Tr. 3-6, 17-22; DX YY).[4] The briefing began at approximately 6 a.m., and was approximately twenty to twenty-five minutes in duration. (12/14 Tr. 93; 7/7/ Tr. 46; 8/8 Tr. 3, 6). Copies of the Warrant Affidavit (not including the Vilar Complaint and the Tanaka Complaint) and the Warrant were distributed to the search team. (12/14 Tr. 77, 128-29; 7/7 Tr. 49-50; 8/8 Tr. 4).[5] The four agents assigned to participate

---

[4]    Inspector Feiter testified that he had been a Postal Inspector for almost 27 years, and had for approximately five years been the team leader supervisor for a fraud team in Manhattan that conducts securities and commodities fraud investigations in the Southern District of New York. (12/14 Tr. 75-76). Inspector Feiter reported that he had participated in approximately 200 searches during the course of his career and that the majority of them were related to fraud investigations. (12/14 Tr. 76).

[5]    Inspector Fraterrigo testified that she was accustomed to having the language of the complaints actually replicated in search warrant affidavits rather than incorporated by

in the anticipated arrests of Vilar and Tanaka, including Inspectors Fraterrigo, Feeney, Roinestad and Wright, also received copies of the Complaints and arrest warrants.  (12/14 Tr. 78, 123; 8/8 Tr. 4-5).[6]  Inspector Fraterrigo instructed her colleagues to read the materials and to consult her or Inspector Feiter if they had questions.  (12/14 Tr. 78-79; 7/7 Tr. 51).   Inspector Fraterrigo observed the other Inspectors reading the Warrant Affidavit and Warrant rider, and fielded questions from them.  (7/7 Tr. 50).  The search team members were instructed to keep the Warrant rider with them as they performed the search.  (12/14 Tr. 79).  Both Inspector Fraterrigo and Inspector Feiter reviewed the Warrant and rider prior to the search and believed that it was a valid search warrant.  (12/14 Tr. 91; 7/7 Tr. 44; 8/8 Tr. 108, 110-11).  When he reviewed the Warrant, Inspector Feiter noted that, "[t]here was a seal and a . . . signature, rather, by a magistrate.  It had a magistrate's number on it and the rider called for documents that went to the investigation."  (12/14 Tr. 91, 124).

During the briefing, Inspector Feiter outlined the plans for executing the search at the Amerindo U.S. office.  (12/14 Tr. 77-78).  Inspectors Feiter and Fraterrigo summarized the background of the investigation, including specific information about victims, Lily Cates and her SBIC investment, Rhodes Capital, the Mayers' investments in GFRDAs, and the significance of various accounts at financial institutions including Bear, Stearns, JP Morgan Chase, and a

---

reference as was the case here, and said that the failure to distribute the Complaints to all members of the search team was "an oversight."  (7/7 Tr. 50-51; 8/8 Tr. 5).

[6]    Although Inspector Feiter testified on cross-examination that no member of the search team had the Complaints, the evidence shows that all four members of the arrest teams (Inspectors Fraterrigo, Feeney, Roinestad, and Wright) all participated in the search, and Inspector Feiter corrected that testimony on re-direct.  (12/14 Tr. 78, 123, 135, 160; 8/8 Tr. 4-5; GX 2).

Bahamian account held in the name of PTC, and described some of the evidence that she was

especially interested in locating.  (12/14 Tr. 93-95, 136-39; 7/7 Tr. 47-49; 7/10 Tr. 139-40, 163;

8/8 Tr. 3-4).  Inspector Fraterrigo requested that members of the search team fill out the

inventory sheets with specificity and not rely on general categorizations like "business records."

(7/7 Tr. 51).

### 3.    The Execution Of The Warrant

At approximately 7:30 a.m., the search team left to go to the Amerindo U.S. office.

(12/14 Tr. 79, 93).  At approximately 8:15 a.m., after Tanaka had been arrested by Inspectors

Fraterrigo and Roinestad, members of the search team entered the Amerindo U.S. office.  (5/31

Tr. 133; 12/14 Tr. 79).  Inspector Feiter, who was acting as the supervisor and search

coordinator, identified himself and informed the Amerindo employees that he had a federal

warrant to conduct a search.  (12/14 Tr. 79-80).   The premises were secured, an entry video was

recorded, a sketch of the premises was drawn, search positions (i.e., rooms within the Amerindo

U.S. office, and specific areas within those rooms, such as desks, tables, and cabinets) were

labeled, and boxes and other materials necessary for executing the search were assembled.

(12/14 Tr. 76-77, 80, 92, 96, 110; 7/7 Tr. 59-60; 7/10 Tr. 122; GX 22, 23A; DX D).  At some

point before Inspector Fraterrigo arrived, it was determined that the search team would require

greater resources than expected to search the Amerindo U.S. office, and another group of

approximately six or seven individuals was summoned to assist with the search.  (8/8 Tr. 17-22;

DX YY).[7]  Those Postal Inspectors were given copies of the Warrant and rider.  (DX YY).

_____

[7]        Inspector Fraterrigo testified that she was not certain whether one of the Postal
Inspectors who participated in the search, K.C. Huynh, was part of the initial search team or
whether she was one of the additional people who arrived later to assist with the search.  (8/8 Tr.

Inspector Fraterrigo arrived at the search site at approximately noon. (7/7 Tr. 52; 7/10 Tr. 43; 8/8 Tr. 16). When Inspector Fraterrigo arrived, she observed Postal Inspectors searching the offices, carrying the Warrant Affidavit and Warrant rider, reviewing documents, inventorying items, and imaging computers. (7/7 Tr. 53-54; 8/8 Tr. 16). Likewise, Inspector Feiter observed the search team members "reviewing folders or binders or documents, comparing them to the rider, and filling out inventory sheets if they seized items." (12/14 Tr. 81-82). Inspector Feiter did not see inspectors simply boxing up every document in the room that they were searching. (12/14 Tr. 82).

Inspector Fraterrigo was approached by numerous Inspectors who had questions about whether or not to seize specific documents. (12/14 Tr. 156; 7/7 Tr. 54). Inspector Fraterrigo responded to those inquiries on a case-by-case basis, sometimes advising her colleagues to seize items, and sometimes advising them not to seize items. (7/7 Tr. 54-55; 8/8 Tr. 24). Inspector Feiter also fielded questions from Postal Inspectors about whether particular items were covered by the Warrant. (12/14 Tr. 81, 119). He answered those questions that he could, and referred others to Inspector Fraterrigo. (12/14 Tr. 81, 155). In her testimony, Inspector Fraterrigo specifically recalled advising the Postal Inspector who was searching Tanaka's office not to seize a number of binders of documents that she believed to be covered by the search warrant but that she deemed not relevant to the investigation after leafing through a sampling of them. (7/7 Tr. 55, 81-82; 7/10 Tr. 146-47; 8/8 Tr. 34-35, 39).

During the approximately eight to nine-hour period that she was present at the search, Inspector Fraterrigo spent approximately forty-five minutes searching Vilar's office, answered

21).

12

questions posed by members of the search team, coordinated with other federal authorities concerning the arrest of Vilar – who was then attending a conference in Las Vegas, Nevada – assisted with the inventorying of items seized by other Postal Inspectors, printed out log reports from the fax machines, and conducted a final walk-through of the office prior to exiting at approximately 8:50 p.m.  (7/7 Tr. 55, 81, 84; 7/10 Tr. 77, 102-03; 8/8 Tr. 16).  Inspector Fraterrigo systematically searched nine of the ten labeled positions in Vilar's office, including two tables, the window sill, a desk, and a large wall unit with cabinets and drawers.  (7/7 Tr. 64-79).[8]

Inspector Fraterrigo did not believe that the Warrant authorized her to seize any document with the word "Amerindo" on it, nor did it authorize her to seize every Amerindo business document.  (8/8 Tr. 130-33).  Rather, she read the Warrant as a whole, and did not read the broad authorization of paragraph 1 ("corporate records . . . including, but not limited to . . .") in isolation.  (8/8 Tr. 135).  Inspector Fraterrigo testified that, "as I went through documents, I made a determination whether it was covered under the [W]arrant, and if it was covered under the [W]arrant, I made a determination there whether it was useful to the investigation, and if it was I seized it."  (8/8 Tr. 135-36, 137).  Inspector Fraterrigo estimated that about 80 percent of the contents of Vilar's office consisted of personal items and personal correspondence, that she seized items from only three of the nine positions that she searched, and that she did not seize numerous Amerindo business documents with writing on them including interoffice memos about investments, analyst reports, and resumes of job applicants.  (7/7 Tr. 67-68, 72, 79, 80, 85-86; 7/10 Tr. 117).  Inspector Fraterrigo testified that about 15 percent of the contents of Vilar's

---

[8]        Inspector Fraterrigo did not search the computer.  (7/7 Tr. 58).

office was covered by the Warrant and that she seized approximately two-thirds of those materials, leaving behind approximately 90 percent of the office's contents.  (7/7/ Tr. 78).

Although Inspector Feiter testified that he interpreted the literal terms of paragraph 1 of the Warrant rider to authorize the seizure of all official Amerindo business records (other than blank stationery), it is clear, however, that neither he nor the other members of the search team followed that interpretation and in fact did not seize all Amerindo business records.  (12/14 Tr. 161-62).  Inspector Feiter estimated that they seized approximately 60 to 70 percent of the "paper" from that part of the premises that was searched (as opposed to inventoried as items not taken).  (12/14 Tr. 89).  Inspector Feiter testified that the volume of material taken in the search was comparable "to most of the white collar crime cases that I have performed searches on." (12/14 Tr. 90).  In all, the Postal Inspectors removed approximately 168 boxes of material, and imaged or removed a number of computers from the Amerindo U.S. office pursuant to the Warrant.  (5/31 Tr. 178; 7/10 Tr. 56-58, 116).  According to Tanaka's counsel, the search team left behind approximately 515 boxes of material, including the contents of both areas that were searched and areas that were merely inventoried.  (Nov. 22, 2006 Margolis Ltr.).

Inspector Heather Tucci made an exit video to record the condition in which the office was left just before the search team left the premises.  (7/7 Tr. 59-60; 7/10 Tr. 122; GX 22, 23B). Inspector Fraterrigo did a final ten to fifteen minute walk-through of the office to make sure that the Postal Inspectors had not left any USPIS paperwork behind and observed what appeared to be Amerindo business correspondence, binders, books and other documents on desks and cabinets.  (7/7 Tr. 85-86).

### 4.    <u>The Return Of Certain Seized Items</u>

On two occasions following the execution of the Warrant, Inspector Fraterrigo returned to Amerindo U.S.'s outside counsel, Eugene Licker, Esq., certain of the materials that had been seized in the search.  First, in approximately March 2006, Inspector Fraterrigo, after reviewing the search inventory sheets, returned certain materials not covered by the Warrant.  (7/10 Tr. 126-27).  Second, Inspector Fraterrigo returned to Mr. Licker a small box of materials (documents and a compact disc) on or about June 28, 2006.  (7/10 Tr. 124-25, 12 ; DX UU).  Those materials were drawn from three of approximately twelve boxes of search materials that counsel for Vilar had requested to be brought to the suppression hearing scheduled for May 31, 2006.  (7/10 Tr. 123-24, 127; DX VV).  Inspector Fraterrigo examined the contents of those boxes before bringing them to Court and determined that a small fraction of those items, including purely personal correspondence, was not covered by the Warrant and, therefore, should not have been seized.  (7/7 Tr. 130-34; 8/8 Tr. 153-54, 156).  Inspector Fraterrigo returned the items after discussing with the AUSAs how to proceed.  (7/10 Tr. 133-34; 8/9 Tr. 298).  Inspector Fraterrigo testified that she did not return the items in an effort to impede the defense from conducting cross-examination at the hearing scheduled to re-commence on July 7, 2006.  (7/10 Tr. 132; 8/8 Tr. 156).  AUSA Litt testified that he believed that, when presented with material that the case agent did not believe were covered by the warrant and that were improperly seized, "the correct thing to do was to return them."  (8/9 Tr. 298).

B.        The *Franks* Motion And Hearing

   1.        Defendants' *Franks* Motion

On or about August 30, 2006, the defendants filed a motion for a <u>Franks</u> hearing, arguing

that Inspector Fraterrigo deliberately or recklessly misled U.S. Magistrate Judge Frank Maas in

the affidavit submitted in support of her Warrant Application by, among other things, omitting

certain information that she purportedly knew or should have known about: (1) Amerindo U.S.'s

business and defendants' alleged inability to steal the funds of Amerindo U.S.'s clients because

the nature of those client accounts precluded such theft; (2) the alleged fact that two Amerindo

investors who Cates reportedly believed may have had trouble redeeming all or part of their

investments had not had any such difficulty; (3) the alleged fact that Cates and the Mayers had

not had any difficulty obtaining funds from Amerindo prior to 2001 or 2002; and (4) her own

alleged misrepresentation to the Magistrate about her belief about the existence of probable

cause to issue the Warrant.

    In a ruling issued on October 25, 2006, the Court denied defendants' motion for a <u>Franks</u>

hearing on all grounds except for the limited issue of the ability of the Mayers and Cates to

redeem any of their Amerindo investments prior to 2001.  Based on the Government's

representation that Inspector Fraterrigo knew that the Mayers and Cates had at times successfully

redeemed their investments, the Court ruled that "the remaining question is whether or not these

earlier redemptions were a fact 'that any reasonable person would have known was the kind of

thing the judge would want to know' – this is noted in the <u>Harding</u> case – 'and whether or not

their omission was material,' that is, whether their inclusion might have changed the resulting

warrant."  (10/25 Tr. 70-71).   The Court observed that the breadth of the Warrant Application

16

may have made material the information available to Inspector Fraterrigo about prior

redemptions, at least with respect to whether there would be probable cause to search for

documents relating to investment products or investors other than the Mayers and Cates before

2001.  (Id. at 71).  The Court focused, in particular, on the language in paragraph 6.A of the

Warrant Affidavit which described Lisa Mayer's "years of begging Vilar" to release some of

their investment to pay for the care of her sick father, and paragraph 6.F, which indicated that the

totality of the circumstances that Judge Maas was required to consider included "investors being

prevented from redeeming or transferring their multimillion dollars investment."  (Id.).

### 2. The *Franks* Hearing

A Franks hearing was held on November 15, 2006.  At that hearing, Inspector Fraterrigo

was the sole witness.  Inspector Fraterrigo testified that she had interviewed two long-term

investors of Amerindo, Lily Cates and Lisa Mayer, and had received documents, including

account statements and correspondence, from both the Mayers and Cates prior to obtaining the

Amerindo U.S. search warrant on May 25, 2005.  (11/15 Tr. 3-7).

Inspector Fraterrigo testified at the hearing that she had learned during her investigation

that Cates had started investing with Amerindo in approximately April of 1987.  (11/15 Tr. 7).

Inspector Fraterrigo testified that she knew that Cates had been able to obtain money from her

Amerindo investments to pay for credit card and other personal expenses, and was able  to obtain

money from some of her Amerindo investments prior to June 2002.[9]  (11/15 Tr. 8, 35, 48, 61, 65-

66).  Inspector Fraterrigo testified that she did not add up these amounts, however, and did not

---

[9]        Inspector Fraterrigo's testimony at the Franks hearing concerned her state of
knowledge prior to her swearing to the Warrant Affidavit on May 25, 2005.

17

know at the time she submitted the Warrant Application the exact amount that Cates had been able to redeem from Amerindo.  (<u>Id</u>. at 70-71).

According to the notes of Inspector Fraterrigo's interview of Cates, Alberto Vilar approached Cates about investing in the SBIC fund in June 2002.  Before Cates agreed to invest in the SBIC fund, she sought and received assurances from Vilar that she would receive a quarterly payment in the amount of $250,000 from her other Amerindo investments to pay for her living expenses.  (11/15 Tr. 8-9; DX D).  In September 2002, Cates failed to receive her first quarterly payment from Amerindo.  As a result, Cates met with Gary Tanaka and Alberto Vilar in the Amerindo U.S. office in October 2002 and informed them that she not received her September payment, as she had been promised.  Tanaka advised Cates that he would take care of it when he returned to London.  (<u>Id</u>. at 9).  At the time she swore out the Warrant Affidavit, Inspector Fraterrigo knew that Cates had not succeeded in getting her quarterly funds from Amerindo.  In February 2005, Cates requested the redemption or transfer of all her investments managed by Amerindo.  (<u>Id</u>. at 9-10).   The defendants failed to honor that request, and as of May 25, 2005, Cates had not succeeded in redeeming her Amerindo investments.  (<u>Id</u>. at 10).  The approximate value of Cates's investment as of the last account statement she received from Amerindo was approximately $12 million.  (<u>Id</u>.).

Inspector Fraterrigo testified that she had learned from the Mayer family that they had started investing with Amerindo in approximately April of 1988.  Between 1997 and 2002, the Mayers received regular interest payments from Amerindo.  (11/15 Tr. 10-11, 76-81, 83, 97).  Inspector Fraterrigo testified that at the time she swore to the Warrant Affidavit, she did not know the exact amount of these interest payments, although she knew that the Mayers had

18

received payments from Amerindo (redemptions and interest payments) totaling millions of dollars.  (Id. at 100-01).  Lisa Mayer had told Inspector Fraterrigo that the Mayers' investment experience with Amerindo varied over time and that starting in 1997, the Mayers began experiencing difficulty in redeeming their investments from Amerindo.  In 1997, the Mayers requested the redemption of their GFRDA and ATGF investments.  Although the Mayers were able to redeem their ATGF investments at that time, Vilar discouraged them from redeeming their GFRDA investment.  (Id. at 12, 84, 144; GX 166, 170, 171).

Lisa Mayer told Inspector Fraterrigo that in December 2000, the Mayers again asked Amerindo to redeem their GFRDA investment, and they were told that they had not given the proper 30-day notice to redeem that investment.  According to Lisa Mayer, the Mayers were not aware of any such notice requirement.   After the Mayers were told that they could not redeem their investment, they felt they had no choice but to renew their GFRDA investment, which they subsequently did for a three-year term at an 11 percent annual interest rate.  (11/15 Tr. 12-13).

Lisa Mayer told Inspector Fraterrigo that, in the Spring of 2002, the Mayers were attempting to purchase a house and asked Amerindo for money from their investment so that they could make a down payment.  Vilar told Lisa Mayer that "Gary and I are not a bank," and that if Amerindo were to redeem the Mayers' GFRDA investment, the Mayers would incur a 45 percent penalty – a penalty much greater than the 20 percent penalty for early redemption disclosed in previous correspondence with Amerindo.  (Id. at 13-14).

In September 2002, the Mayers had dinner with Vilar in Westchester.  According to Lisa Mayer, they discussed their investment with Vilar and asked him whether they could rely on the 11 percent interest on their investment.  Vilar replied that they could count on that rate for six to

eight months.  One month later, in October 2002, the Mayers stopped receiving their interest

payments altogether.  The Mayers attempted to contact Vilar and received no response.  In

December 2002, the Mayers had a conversation with Tanaka about this issue.  He was evasive

and mentioned something about "restructuring."   After not receiving a satisfactory response

from Gary Tanaka, the Mayers – Lisa Mayer, Debra Mayer and Dr. Herbert Mayer in a

wheelchair – went to Vilar's residence in Manhattan and spoke to his doorman.  The doorman

indicated that Vilar was upstairs and the Mayers, who believed Vilar was in his apartment, rang

his door bell for an hour pleading with him to give them their money.  (Id. at 16-17).

In January 2003, Lisa Mayer made several phone calls to Amerindo and Vilar, but

received no response.  Lisa Mayer wrote a letter to Vilar and Tanaka, and eventually received a

letter from Renata Tanaka indicating that the Mayers' interest payments were going to be

reduced from $96,000 to $50,000, and that payments would be made to the Mayers on an ad hoc

basis.  (Id. at 17).   According to Lisa Mayer, the Mayers had not agreed to this change to their

investment.  (Id.).

Between January and November 2003, the Mayers made several phone calls and sent

letters to Amerindo asking for interest payments or any redemption of their investments to no

avail.  In November 2003, the Mayers, their attorney, and the director of the Mayers' trust all

requested the redemption or transfer of all the Mayers' investments managed by Amerindo.  The

redemption request complied with the 30-day notice requirement identified by Renata Tanaka in

2000.   Amerindo did not honor the Mayers' request to redeem their entire investment portfolio

with Amerindo.  (Id. at 18).  Instead, after the Tanakas attempted unsuccessfully to negotiate a

settlement with the Mayers' attorney whereby Amerindo would make partial payments to the

Mayer family over time, Amerindo made payments to the Mayer family totaling approximately $600,000, which represented only 5 percent of the approximate $11 million value of the Mayers' investment as of May 25, 2005. (Id. at 19, 135).

Based on interviews of Cates and Lisa Mayer, as described above, along with documents and other information gathered during the course of her investigation, Inspector Fraterrigo and AUSA Litt prepared the Warrant Affidavit. AUSA Litt drafted the Warrant Affidavit, after which Inspector Fraterrigo read, reviewed and verified that its contents were accurate. Inspector Fraterrigo testified that she went through the affidavit line by line, verified each of the statements in the affidavit and made sure that the affidavit was truthful and accurate based on the information, including her notes, that she had available at that time. (11/15 Tr. 20). The Warrant Affidavit explicitly noted that, "[b]ecause this affidavit is submitted for the limited purposes of establishing probable cause to search the premises described below and seize certain items as specified in Schedule A hereto, I have not included the details of every aspect of the investigation." (GX 33 ¶ 2). The Warrant Affidavit also provided that "[w]here actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated." (Id.).

Inspector Fraterrigo testified at the Franks hearing that she believed that the final version of the search warrant affidavit that was presented to Magistrate Judge Maas was accurate. (11/15 Tr. 20). With respect to the sentence in the Affidavit that "Lisa Mayer described years of begging Vilar to release some of their investment to pay for the care of her sick father – who Vilar had known for some 30 years, and who was one of Vilar's original investors – and Vilar's rejection of those requests," (GX 33 ¶ 6A), Inspector Fraterrigo testified that she believed that

21

that statement was accurate because Lisa Mayer told her in an interview that since 2002 when

the Mayers purchased their home in Scarsdale and needed funds to renovate and take care of her

sick father, the Mayers has been trying, without success, to get money from Alberto Vilar.  (Id.

at 22).          Inspector Fraterrigo believed that her statement in the Affidavit that, "[t]he

totality of the circumstances in this case, including investors being prevented from redeeming or

transferring their multimillion dollar investments," was accurate based on her interviews of Lily

Cates and Lisa Mayer, who told her that they were unable to redeem or transfer their Amerindo

investments.  (Id. at 22-23).   Inspector Fraterrigo testified that she did not consider including

information that the Mayers and Cates were able to redeem some of their Amerindo investments

or that the Mayers and Cates did not experience difficulty getting funds from Amerindo until

1997 and the Fall of 2002, respectively, in the Warrant Affidavit.  (Id. at 22-24, 36-37, 48).

Inspector Fraterrigo testified that she did not make a conscious decision to omit that information

from the Warrant Affidavit and did not consider whether that fact would be significant to the

magistrate judge reviewing the warrant application.  (Id. at 22-24, 39, 144).  At the time that she

swore to the search warrant affidavit, Inspector Fraterrigo testified that she did not intend to

mislead the magistrate judge in her description of the Mayers' or Cates's investment history with

Amerindo.  (Id. at 23, 24).

## C.     The May 26, 2005 Grand Jury Subpoena

Assistant United States Attorney Marc Litt, a prosecutor for the past 8 years, testified at

the hearing held on May 31 and August 9, 2006.  (5/31 Tr. 59; 8/9 Tr. 243).  Eugene Licker,

outside counsel for Amerindo, also testified at the hearing held on May 31, 2006.  (5/31 Tr. 10).

On May 26, 2005, U.S. Postal Inspectors conducted a search at the offices of Amerindo U.S. at

399 Park Avenue in New York, New York. The search began at approximately 8:15 a.m. on

May 26, 2005. (5/31 Tr. 133-34). During the course of conducting that search, Eugene Licker,

Esq., outside counsel for Amerindo U.S., spoke to AUSA Litt about the search and assured

AUSA Litt that Amerindo U.S. wanted to cooperate with the Government in its investigation.

(5/31 Tr. 26, 30, 31, 92). Mr. Licker told AUSA Litt that he would issue a preservation notice

and promised to implement policies and procedures that would prevent the company's

documents from being destroyed. (5/31 Tr. 16, 18-19, 32, 92).

Mr. Licker candidly testified that his recollection of these events in question was "not

great." (5/31 Tr. 33). Mr. Licker admitted that May 26, 2005 was a busy day and that he had a

lot going on that day. (5/31 Tr. 28-31). Apart from the issues raised by the search, Mr. Licker

had resigned from Kirkpatrick & Lockhart that very day and was in the process of moving to

another law firm, Loeb and Loeb. (5/31 Tr. 28). Mr. Licker testified that he had several

conversations with AUSA Litt on May 26 about, among other things, potential conflict issues,

arrest warrants that has been issued for the principals of Amerindo and issues related to

Amerindo employees and their contact with the principals. (5/31 Tr. 28-31). Although Mr.

Licker testified that he did not recall who first raised the idea of a grand jury subpoena, he

conceded that he accepted and did not oppose the service of a grand jury subpoena on Amerindo.

(5/31 Tr. 14, 53). AUSA Litt testified that he distinctly remembered that during one of the two

telephone calls he had with Mr. Licker in the morning of May 26, 2005 (as reflected on GX 31),

Mr. Licker asked him whether the Government intended to serve Amerindo with a grand jury

subpoena. (5/31 Tr. 92). AUSA Litt responded that he did not know and he would have to get

back to him. (Id.). In contrast to Mr. Licker who testified that he "can't say one or way or

23

another" who proposed the idea of the grand jury subpoena (5/31 Tr. 53), AUSA Litt had a specific and clear recollection that it was Mr. Licker who first raised the issue of a grand jury subpoena.  (5/31 Tr. 92, 8/9 Tr. 251, 275).  Inspector Feiter also testified that he recalled that it was Mr. Licker who first raised the issue of the grand jury subpoena.  (12/14 Tr. 86).  AUSA Litt testified that prior to his discussion with Mr. Licker, he had not considered or consulted with anyone about issuing a grand jury subpoena to Amerindo.  (5/31 Tr. 93).

AUSA Litt subsequently relayed the substance of his conversation with Mr. Licker to his supervisor, AUSA David Esseks, the chief of the securities unit at the U.S. Attorney's office, and consulted with him about whether to issue a grand jury subpoena.  (5/31 Tr. 93).  AUSA Esseks told AUSA Litt that issuing grand jury subpoenas was done routinely in cases like this one and offered AUSA Litt two reasons why it was appropriate to issue a grand jury subpoena under the circumstances.  (5/31 Tr. 94).   First, AUSA Esseks explained that if searching agents missed items that were covered under the search warrant, those items could be obtained pursuant to a grand jury subpoena.  (Id.).  Second, a grand jury subpoena would create a disincentive for the destruction of documents since an individual who destroys a document that is subject to a grand jury subpoena may face a criminal charge for obstruction of justice.  (Id.).

After receiving this advice from AUSA Esseks, AUSA Litt drafted a grand jury subpoena for Amerindo U.S. (the "Subpoena"), relying in the first instance on the rider for the search warrant.   (5/31 Tr. 94-95).  The Subpoena in large part tracked the language of the search warrant and was framed in terms of specified categories of information.  For example, the Subpoena sought documents concerning the brokerage accounts which lay at the center of the defendants' fraud schemes; victims, suspected victims and investments (e.g., SBIC, GFRDA,

24

Rhodes Capital) involved in those schemes; client communications and marketing materials;

defendants' finances; business expense records; and funds used for the purchase of thoroughbred

racehorses. (GX 12).  The Subpoena was not limited to documents maintained at Amerindo's

office at 399 Park Avenue, but called for the production of documents in Amerindo U.S.'s

"possession, custody, or control."  (Id.).

Computer records admitted into evidence at the hearing reflect that the grand jury

subpoena was created at approximately 11:36 a.m. on May 26, 2005 and was last modified at

approximately 1:27 p.m, and that the rider to the grand jury subpoena was created at

approximately 12:15 p.m. and last modified at approximately 3:42 p.m.[10]  (5/31 Tr. 98; GX 11).

AUSA Litt faxed the Subpoena to Mr. Licker's office (then at Kirkpatrick and Lockhart) at

approximately 1:37 p.m. that day.  (5/31 Tr. 15, 98, 102-03; GX 12).

AUSA Litt testified that his purpose in issuing the grand jury subpoena to Amerindo on

May 26, 2005 was to achieve the two objectives outlined by AUSA Esseks in their conversation

earlier that day, namely, to provide a means to obtain documents from Amerindo U.S. that

searching agents may have missed and to provide an incentive to Amerindo employees not to

destroy documents.  (5/31 Tr. 100-01).  AUSA Litt emphatically testified that he did not issue

the grand jury subpoena to cure any defects in the search warrant or to serve as a substitute for

the search warrant.  (5/31 Tr. 101, 8/9 Tr. 276).  Indeed, at the time that he issued the grand jury

subpoena, AUSA Litt did not perceive there to be any defects in the search warrant.  (5/31 Tr.

100).  AUSA Litt testified that he knew that the search warrant had been vetted through a

---

[10]    AUSA Litt testified that he did not recall making any modification to the rider of
the grand jury subpoena after he served it on May 26, 2005 and did not know why his computer
records reflected that the rider has been last modified as of 3:42 p.m. on that date. (5/31 Tr. 99).

25

rigorous approval process that included review and approval by the chief of the securities fraud

unit before its ultimate review and approval by Magistrate Judge Maas. (5/31 Tr. 100-01).

Moreover, Mr. Licker testified that he never challenged the search warrant on May 26, 2005, or

even discussed its "breadth, enforceability or legality" with AUSA Litt on May 26, 2005. (5/31

Tr. 42).

     The search continued for approximately seven more hours after Mr. Licker was served

with the grand jury subpoena. (5/31 Tr. 15, 16, 133-34). AUSA Litt recalled that at some point

later that day,[11] Mr. Licker suggested to him that it would be more efficient for the Government

to collect the remaining documents it sought from Amerindo U.S. through the grand jury

subpoena process rather than by completing the as yet unfinished search. Mr. Licker pointed out

that it had been a long day, that he was tired and that it would take considerable time for the

Postal Inspectors to complete the search. (5/31 Tr. 106-07; GX 48A, 49). Mr. Licker reminded

AUSA Litt that he had accepted service of the Subpoena and that he had implemented a

document preservation policy that would ensure that no documents or other evidence would be

destroyed were the search to be halted. (5/31 Tr. 107; GX 48A, 49). Mr. Licker noted that not

only would it be less disruptive to Amerindo U.S. to proceed via the Subpoena, but that the

Government would be able to get more efficiently "what it really wanted" through the

---

[11]     It is unclear when precisely this conversation happened. Although AUSA Litt
indicated to the Court at the December 14, 2005 conference that he recalled it happening in the
evening on the train, his recollection at the May 31, 2006 hearing – which had been refreshed by
his phone records, GX 31 – was that he had confused that conversation with another
conversation he had with Mr. Licker when he was on the train. Regardless of where Mr. Litt
was when he had the conversation with Mr. Licker, he nonetheless believed that the conversation
happened in the late afternoon or early evening, particularly in light of Mr. Licker's statement
during that phone call that it had been a long day and that everyone was tired. (5/31 Tr. 105; 8/9
Tr. 270).

company's cooperation with the grand jury subpoena process. (5/31 Tr. 108; GX 49). Both AUSA Litt and Mr. Licker testified that they did not believe that this conversation represented a "deal" to terminate the search and instead proceed by way of the Subpoena. (5/31 Tr. 26-27, 140). AUSA Litt communicated Mr. Licker's proposal to the Postal Inspectors conducting the search[12] and the search ended at approximately 8:50 p.m. that evening. (5/31 Tr. 107-08, 134).

The Government initially agreed to postpone Amerindo's compliance with the Subpoena so that Mr. Licker and certain Amerindo employees could assist the Government with its investigation in other ways. (5/31 Tr. 19). Between when the Subpoena was served and the defense motion to quash, AUSA Litt made several inquiries to Mr. Licker regarding the status of his compliance with the Subpoena. (5/31 Tr. 109-110). In or about the middle of June 2005, Mr. Licker produced approximately 27 pages of documents to AUSA Litt that were responsive to the Subpoena. (8/9 Tr. 249). In or about mid-October, in response to another Government inquiry about when the Government would receive documents responsive to the Subpoena, Mr. Licker stated that he had documents ready to be produced, but that he felt that he had to consult with the defendants prior to producing the documents. (5/31 Tr. 110). In early November, in response to yet another request by the Government for the responsive documents, Mr. Licker informed the Government that he was still awaiting instructions from the defendants. (5/31 Tr. 110-11).

Even though Mr. Licker had informed the defendants about the existence of the Subpoena,[13] his intent to comply with the Subpoena on behalf of Amerindo U.S., and his

---

[12]    AUSA Litt did not recall whether he subsequently gave the Postal Inspectors instructions about terminating the search. (5/31 Tr. 108).

[13]    Mr. Licker testified at the suppression hearing that he told Tanaka's attorneys about the grand jury subpoena in July 2005, but could not recall exactly when he informed

readiness to begin producing documents in response to the subpoena to the Government in

October 2005, the defendants waited until the start of the suppression hearing on December 14,

2005, to file the instant motion to quash. (12/14 Tr. 5). At no time prior to that date had the

Government been given any reason to expect anything less than full compliance with the

Subpoena. (5/31 Tr. 35). Between service of the Subpoena and the defendants' motion to quash,

Mr. Licker conceded that he never told AUSA Litt that the Subpoena was overbroad or unduly

burdensome. (5/31 Tr. 34-35, 111; 8/9 Tr. 274, 278). Similarly, Mr. Licker never made any

attempts to clarify or narrow the scope of the Subpoena. (5/31 Tr. 35, 112). Mr. Licker testified

that he "never challenged the grand jury subpoena in any way." (5/31 Tr. 35).

**D.     The Search Of Amerindo Materials Stored In A U.K. Warehouse**

**1.     The MLAT Request**

On or about July 25, 2005, the Government sent a request to U.K. authorities for

assistance pursuant to the Treaty Between the Government of the United States of America and

the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal

Assistance in Criminal Matters. (GX 13) (the "MLAT"). Through the MLAT, the Government

asked the U.K. authorities to conduct a search of Amerindo U.K.'s offices at 43 Upper

Grosvenor Street in London, England. (Id.). The MLAT request was processed by the U.K.

Central Authority ("UKCA") in accordance with standard procedures. (5/31 Tr. 204-06). On or

about July 27, 2005 the MLAT was referred to Detective Sergeant Howard Shaw, a 23-year

---

Vilar's various sets of attorneys about the existence of the grand jury subpoena. (5/31 Tr. 37;
GX 48A). In any event, the defendants received a copy of the Subpoena no later than November
15, 2005 according to the fax date and time stamp on the copy of the Subpoena attached to
Defendants' motion to quash.

veteran of the Metropolitan Police who was then the senior Detective Sergeant of the
International Assistance Unit within the Economic and Specialist Crime Unit of Scotland Yard.
(5/31 Tr. 198, 207, 228).  Detective Sergeant Shaw had served in that capacity for approximately
four years and during that period had been responsible for "executing incoming requests for
assistance to provide evidence and intelligence to foreign law enforcement agencies."  (5/31 Tr.
199).[14]

Detective Sergeant Detective Sergeant Shaw immediately read and assessed the MLAT
request, and found it to be "comprehensive and sound."  (5/31 Tr. 228).  Based on his
preliminary assessment, Detective Sergeant Shaw made background inquiries about the premises
and Amerindo Investment Advisors (UK) Ltd. (Id. at 229-30).  Detective Sergeant Shaw then
visited the premises on July 27, 2005 and was told by a woman who he encountered there that
Amerindo UK had moved out.  (5/31 Tr. 229).  Detective Sergeant Shaw also attempted to reach
a representative of Amerindo UK by telephone and heard a recorded message indicating that the
company had closed.  (Id. at 231).  As a consequence, Detective Sergeant Shaw informed the
UKCA that he would not seek a search warrant because he would not be able to satisfy a court
that he was likely to find evidence at the premises.  (Id. at 230).

In late August 2005, Detective Sergeant Shaw learned that Amerindo UK business
records had been moved from the 43 Upper Grosvenor Street address to a warehouse in a suburb

---

[14]    During Detective Sergeant Shaw's career with the Metropolitan Police, he had
been personally responsible for approximately 30 major fraud investigations, and had supervised
approximately 100 more. (5/31 Tr. 202-03).  Detective Sergeant Shaw had received training
concerning U.K. law pertinent to search warrants throughout his career, and also had extensive
training concerning the U.K. legal concept of "special procedure material" which, in Detective
Sergeant Shaw's words, "form[ed] a large part of the fraud squad training course."  (Id. at 201-
02).

of London owned by a company called "Cadogan Tate."  (5/31 Tr. 232-33).  Detective Sergeant

Shaw had a series of communications with Cadogan Tate and, in approximately mid-September,

he established that Cadogan Tate did, in fact, have possession of eight storage crates rented by

Amerindo UK and containing approximately 320 boxes of materials.  (Id. at 234-35).  Detective

Sergeant Shaw informed the UKCA of his findings and indicated that the U.S. authorities would

have to submit a supplemental MLAT request properly identifying the location to be searched if

the U.S. still sought to have the Metropolitan Police conduct a search of the Amerindo materials.

(Id. at 235).  On or about September 26, 2005, the UKCA sent Detective Sergeant Shaw a

supplemental MLAT request that it had received from the U.S. Government.  (Id. at 237-38; GX

24, Annex C).  Detective Sergeant Shaw informed the UKCA that he "was satisfied [and] in a

position to proceed," and asked that the UKCA consider issuing the necessary "direction"

authorizing him to submit a search warrant application in response to the MLAT request.  (Id. at

211, 238).  A few days later, the UKCA sent Detective Sergeant Shaw a draft direction

specifically instructing him to seek a "Section 8" search warrant – the type of U.K. warrant

typically employed when searching for evidence that is neither contraband (e.g., drugs or guns)

nor "special procedure material" – and Detective Sergeant Shaw began drafting the search

warrant application.  (Id. at 218-22, 238-39, 243).  Detective Sergeant Shaw also made logistical

arrangements with Cadogan Tate, including reserving a viewing area at the warehouse for

October 10 and 11, 2005.  (Id. at 239-40).

Detective Sergeant Shaw told the UKCA about the arrangements that he had made, and

requested that the UKCA inform the U.S. authorities of those plans.  (5/31 Tr. 240).  The UKCA,

however, did not do so until on or about October 3 or 4, when Detective Sergeant Shaw, who by

then still hadn't heard anything from U.S. authorities, reminded the UKCA to do so.  (Id. at 240-41; 6/1 Tr. 316).  On or about October 5, 2005, Inspector Fraterrigo learned that the Metropolitan Police were planning to conduct a search on October 10 pursuant to the MLAT request.  (7/7 Tr. 94).  In response to a request from U.K. authorities for the assistance of the case agent and other Postal Inspectors, Inspector Fraterrigo made preparations to travel to London, and sent an e-mail to Detective Sergeant Shaw on October 7 informing him of the identities of the U.S. Postal Inspectors who would be traveling to London to assist the Metropolitan Police with the search. (Id. at 95).[15]  Aside from that e-mail, which Detective Sergeant Shaw did not receive until the morning of October 10, Inspector Fraterrigo had no communication with Detective Sergeant Shaw, and Detective Sergeant Shaw had no communication with any U.S. law enforcement official prior to October 10.  (5/31 Tr. 242-44, 275-76; 7/7 Tr. 96, 98, 100-03).  Because he did not know whether the U.S. Postal Inspectors would be able to attend the search scheduled for October 10 and 11, Detective Sergeant Shaw had already canceled the reservation to use the viewing area at Cadogan Tate on those days by the time he learned that the U.S. Postal Inspectors had arrived in London.  (5/31 Tr. 242).

### 2.    The U.K. Warrant Application

Upon learning that the U.S. Postal Inspectors had arrived in London, Detective Sergeant

---

[15]    Although Detective Sergeant Shaw did not recall whether he (or others in the U.K.) had requested assistance from U.S. investigators, or whether they had volunteered to assist, he testified that when executing search warrants obtained pursuant to MLAT requests he would "invariably invite the investigators . . . close to the inquiry to be present during the search."  (5/31 Tr. 236-37; see 6/1 Tr. 319-20).  Detective Sergeant Shaw further testified that he had no reason to believe that he had deviated from that practice in this case.  (5/31 Tr. 237).  As Detective Sergeant Shaw explained, he had two reasons for doing so: "They're more familiar with the case than I am; and, secondly, I want to be in a position to reassure a court that we're only going to seize material that's likely to be relevant to the investigation."  (Id.).

Shaw took immediate steps to finalize his search warrant application. (5/31 Tr. 242). He requested and received a signed direction from the UKCA directing the Metropolitan Police to apply for a "Section 8" search warrant. (Id. at 218-23, 243). Detective Sergeant Shaw, too, had made an independent determination that the Section 8 warrant was the appropriate type of warrant to seek, after considering and rejecting the option of seeking a Schedule 1 production order and/or Schedule 1 warrant. (Id. at 245-47). As Detective Sergeant Shaw explained repeatedly both on direct and cross-examination, he believed that it was unnecessary to seek a Schedule 1 warrant in this case because the materials for which he was searching were not special procedure material, but rather were evidence of criminal activities, were within the control of the defendants and, as a result, had lost any status they might otherwise have had as special procedure material because, "there is no confidence in iniquity." (Id. at 245-49; 6/1 Tr. 321-22, 364-65, 384-88, 400, 402-03, 416, 420-21, and 427-29). Detective Sergeant Shaw subsequently asked Detective Inspector Paul Fuller, his senior supervisor, to review the application, in accordance with standard Metropolitan Police procedures.[16] (Id. at 212, 255-56). Detective Inspector Fuller subsequently signed off on the warrant application. (Id. at 256; GX 24).

Detective Sergeant Shaw then took the warrant application to the Bow Street Magistrates' Court ("BSMC") – "the premier magistrate court for the country . . . where the expertise lies in the field of mutual [legal] assistance" – and left it with Ms. Elizabeth Franey ), a senior legal adviser to the court. (5/31 Tr. 254-55, 265). According to Detective Sergeant Shaw,

---

[16]     Applicable U.K. legislation requires that all search warrant applications be reviewed and approved by a senior officer not affiliated with the investigation before they are presented to a judge. (5/31 Tr. 212).

Ms. Franey is:  a lawyer with approximately 20 years' experience as a legal adviser to U.K.

courts; has applied to become a district judge; and, is the "most proficient [legal adviser] in the

field of mutual assistance."  (Id. at 265-66).  Detective Sergeant Shaw returned to the BSMC

approximately five hours later.  (Id. at 266).  Franey told Detective Sergeant Shaw that she had

considered the application, and that she had forwarded it to a judge for his consideration.  (Id. at

266-67).[17]

Detective Sergeant Shaw then swore out the warrant before Senior District Judge

Timothy Workman.  (5/31 Tr. 271).  Judge Workman was appointed the most senior District

Judge in all of England and Wales by the Lord Chancellor –  a position which grants him the

power, unique among all District Judges, to issue Schedule 1 orders and warrants.  (Id. at 269-

70).[18]  Judge Workman is also a Circuit Court Judge, and therefore has the capacity to issue

Schedule 1 orders and warrants pursuant to that authority.  (Id. at 270).  While under oath,

Detective Sergeant Shaw answered a series of questions posed by Judge Workman which, based

on Detective Sergeant Shaw's experience, seemed designed to "determine in his own mind

whether [Detective Sergeant Shaw] was likely to find special procedure material . . . on the site."

(5/31 Tr. 272, 273).  Judge Workman approved the warrant and signed it at approximately 3:25

p.m.  (Id. at 274).  When he left the BSMC that day, Detective Sergeant Shaw believed that he

"was in possession of a lawfully-obtained, lawfully-issued warrant; and that entitled [him] . . . to

---

[17]     The application bears Ms. Franey's initials, indicating that she had reviewed it.
(5/31 Tr. 267; GX 24).

[18]     District Judges do not ordinarily have the power to issue Schedule 1 orders and
warrants, which must be applied for in front of a circuit judge at a Crown Court.  (5/31 Tr. 224-
25).

search the Amerindo property at Cadogan Tate."  (Id. at 274-75).

At approximately 4 p.m. on October 10, Detective Sergeant Shaw met for the first time

with Inspector Fraterrigo, and U.S. Postal Inspectors Feeney and Williamson.  (5/31 Tr. 275-76;

6/1 Tr. 370; 7/7 Tr. 103).  According to Inspector Fraterrigo, Detective Sergeant Shaw showed

her the signed warrant, which she quickly leafed through.  (7/7 Tr. 104; 8/8 Tr. 69-70, 72; 8/9 Tr.

221).[19]  Detective Sergeant Shaw told Inspector Fraterrigo that the MLAT request was "very

detailed" and that, "in the U.K. warrants do not require that much detail."  (7/7 Tr. 105).  During

that afternoon meeting, Detective Sergeant Shaw told the Postal Inspectors that "they were

entitled to partake in the search, but that they were under our supervision and direction, that we

remained in control of the procedure, and [that] the ultimate decision to seize anything would be

ours, and ours alone, based upon their opinion, in part."  (5/31 Tr. 278).

### 3.    The Search At Cadogan Tate

The subsequent search at Cadogan Tate was conducted over the course of two days,

October 13 and 14, 2005.  (5/31 Tr. 279, 288, 291-96; 7/7 Tr. 106, 121-25; GX 24, 25, 52).

Detective Sergeant Shaw designated Detective Constable Andrew Bonafont to supervise the

execution of the warrant on October 13.  (5/31 Tr. 279-81; 6/1 Tr. 318).  Detective Constable

Bonafont had significant experience handling white collar investigations, as did the other

member of the Metropolitan Police who participated in the searches, Detective Constable

Durrant, who had 22 years of law enforcement experience including approximately eight years'

---

[19]    Detective Sergeant Shaw did not specifically recall whether or not he showed
Inspector Fraterrigo the warrant on October 10.  (5/31 Tr. 277-78; 6/1 Tr. 370, 371).  Detective
Sergeant Shaw and Inspector Fraterrigo both testified that Detective Sergeant Shaw did not show
Inspector Fraterrigo the warrant application.  (7/7 Tr. 105).

service on the fraud squad.  (Id. at 281).  Detective Constable Durrant was designated to be the

"exhibits officer."  (Id. at 280; 6/1 Tr. 318).  Detective Sergeant Shaw "made clear to everyone

that the ultimate decision [about what to seize would] be made by the . . . senior Metropolitan

police officer at the scene, the person in charge.  It was his responsibility to make the final

determination."  (5/31 Tr. 285, 295).  Detective Sergeant Shaw expected that Bonafont and

Detective Constable Durrant would follow standard Metropolitan Police procedures in

conducting the search, and did not instruct Bonafont and Detective Constable Durrant to do

anything out of the ordinary.  (Id. at 282).  The role of the U.S. Postal Inspectors was sharply

circumscribed; according to Detective Sergeant Shaw, their role was "to identify to us material

that they considered to be relevant to their investigation."  (6/1 Tr. 318).

On the morning of October 13, Detective Constable Bonafant, Detective Constable

Durrant, Inspector Fraterrigo and U.S. Postal Inspectors Feeney and Williamson went to

Cadogan Tate to execute the warrant.  (7/7 Tr. 106-07).  While at the warehouse, Inspector

Fraterrigo reviewed a copy of the warrant and compared it with the enumerated list of items to be

seized that was contained in the MLAT request.  (Id. at 108; 8/8 Tr. 71-73).  Inspector Fraterrigo

recognized that the lists of items to be seized were identical.  (7/7 Tr. 108-09; GX 13, 24).

Postal Inspector Williamson also reviewed the MLAT request.  (7/7 Tr. 110).  Inspector

Fraterrigo directed Inspectors Williamson and Feeney to especially focus on locating items

relating to Panama, a Bahamian entity called Private Trust Company and investors in Guaranteed

Fixed Rate Deposit Accounts.  (Id. at 110-11; 8/8 Tr. 56, 61-62).  Detective Constable Durrant

informed the four other law enforcement officers that they would all search the crates, "and if

there were any items that were identified to be seized, those items would have to be handed to

35

the Metropolitan Police detective for him to review it, identify it, inventory, and bag it and tag it and put it into a box to be shipped."  (Id. at 112).

At the start of the search, both the Metropolitan Police officers and the U.S. Postal Inspectors actively searched through the contents of the crates.  (7/7 Tr. 114; 8/8 Tr. 63, 64).  The crates contained documents, furniture and office equipment.  (7/7 Tr. 127).  Approximately 80 percent of the crates' contents were documents, and Inspector Fraterrigo estimated that ultimately approximately 20-25 percent of those documents were seized.  (Id. at 127-28).  When documents were identified to be seized, they were placed on top of the box in which they were found, so that the Metropolitan Police officer reviewing the materials would know from where the items were taken, and so that inventory forms could be filled out properly.  (Id. at 7/7 Tr. 112-13; 8/8 Tr. 67; 8/9 Tr. 169).  At some point during the October 13 search, Detective Constable Durrant decided that it would be more efficient for the three Postal Inspectors, who were more familiar with the investigation, to take the first pass through the boxes to review and identify materials relevant to the investigation and covered by the warrant, and that the Metropolitan Police would then review that subset of material and inventory those items that the Metropolitan Police believed to be appropriate to seize.  (7/7 Tr. 114-15; 8/8 Tr. 64-65; 8/9 Tr. 169).  By the end of the day, they had completed reviewing materials from approximately five and one-half of the eight crates.  The search ended at approximately 4:45 p.m. that day.  (7/7 Tr. 120-21).  The materials that the Metropolitan Police had decided to seize were boxed and stored in a separate crate.  (5/31 Tr. 293; 6/1 Tr. 373; 7/7 Tr. 125-26; GX 21).

### 4.    The Second U.K. Warrant Application

Throughout the first day of the search, Detective Sergeant Shaw was in telephone contact

with Detective Constable Bonafant and Detective Constable Durrant.  (5/31 Tr. 282).  Detective

Sergeant Shaw learned that, "the execution of the warrant was running smoothly, and that they

were unlikely to finish in that day."  (Id. at 282-83).  As a consequence, Detective Sergeant

Shaw determined that he would need to obtain a second search warrant to complete the search,

and Detective Constable Durrant informed Inspector Fraterrigo of that decision.  (Id. at 283; 7/7

Tr. 121).  Accordingly, in the early morning hours of October 14, Detective Sergeant Shaw

prepared a second warrant application.  (5/31 Tr. 286; GX 25).  After obtaining verbal authority

from Detective Inspector Fuller to make the application, Detective Sergeant Shaw took the

second warrant application to the BSMC.  (Id. at 287-88).  Detective Sergeant Shaw did not

show the second warrant application to any of the U.S. Postal Inspectors before taking it to court.

(Id. at 288). Once again, he presented the application to Ms. Franey, and left it with her to

consider.  (Id. at 288-89).  Later that morning, Ms. Franey informed Detective Sergeant Shaw

that she believed it to be a "proper application," and subsequently took Detective Sergeant Shaw

to the chambers of District Judge Nicholas Evans.  Detective Sergeant Shaw presented the

application to Judge Evans, who approved the warrant.  (Id. at 289, 291).  When Detective

Sergeant Shaw left the Court, he once again "believed [he] was in possession of a lawfully –

properly applied for warrant."  (Id. at 292).

     **5.**       **The Completion Of The Search At Cadogan Tate**

After obtaining the second warrant, which was identical in all material respects to the

first, Detective Sergeant Shaw picked up Detective Constable Durrant and the three Postal

Inspectors and traveled to Cadogan Tate, arriving at approximately 11:30 a.m.  (5/31 Tr. 292; 6/1

Tr. 372; compare GX 24 and 25).  The Metropolitan Police and Postal Inspectors completed their

examination of the contents of the Amerindo crates following the same procedures that had been employed on the first day of the search. (5/31 Tr. 293, 301; 6/1 Tr. 373; 7/7 Tr. 124). The three Postal Inspectors looked through the materials and identified for the Metropolitan Police certain items that they considered to be relevant to their investigation by placing them on top of the box in which they were found, or, in the case of entire boxes, identifying the entire box. (5/31 Tr. 293; 6/1 Tr. 375; 7/7 Tr. 119-20, 124, 128; GX 18). Detective Sergeant Shaw, who was present for approximately three hours on October 14, recalled at least one occasion when he decided not to seize documents that had been identified by Postal Inspector Feeney. (5/31 Tr. 294, 295, 301; 6/1 Tr. 403). The search was completed on October 14, and the items seized by the Metropolitan Police, including approximately 43 boxes of documents and Amerindo computer equipment, were sealed in a separate crate held at Cadogan Tate for the Metropolitan Police. (7/7 Tr. 125). The seized materials were subsequently shipped to the United States by the Metropolitan Police in fulfillment of the Government's MLAT request.

## ARGUMENT

In the Government's view, defendants' motions can most efficiently be handled by dealing first with their motion to quash the grand jury subpoena. Because the grand jury subpoena was in large part co-extensive with the search warrant, were the Court to deny defendants' motion to quash – as the Government submits it should – the Court would not need to decide the defendants' motions concerning the breadth and particularity of the Warrant, the applicability of the Leon good faith exception and the related Franks issue. The sole remaining issue for the Court to decide – with the possible exception of defendants' motion concerning the lack of a specified computer keyword search protocol – would be the lawfulness of the U.K.

search. Accordingly, although all of the above arguments will be addressed, this brief first sets forth the Government's position with respect to defendants' motion to quash the grand jury subpoena, followed by briefing on the validity of the U.S. search, the issues raised by the <u>Franks</u> hearing, and the lawfulness of the U.K. search. For all the reasons set forth below, the Government respectfully submits that each of defendants' motions should be denied.

**I.**

**DEFENDANTS' MOTION TO QUASH**
**IS WITHOUT MERIT AND SHOULD BE DENIED**

Defendants' argument that the Subpoena should be quashed because it was: (1) issued for improper purposes; (2) overbroad and oppressive; and (3) unreasonable under the Fourth Amendment, is without merit and should be rejected by the Court. The Subpoena was issued as part of the grand jury's broad investigation into a range of the defendants' activities, and those of other possible co-conspirators between in or about 1986 and May 26, 2005. For the reasons discussed below, the Government submits that the Subpoena was properly issued in furtherance of the grand jury investigation, was appropriate in its scope (and to the extent that the corporation had believed otherwise, could have been refined had Amerindo engaged in a dialogue with the Government about the scope of the materials sought), and did not violate the Fourth Amendment. The Government respectfully submits that the Court should reject this belated ploy by the defendants to delay or deny the grand jury and the Government timely access to information pertinent to its ongoing investigation. Moreover, defendants have utterly failed to demonstrate that compliance with the Subpoena would be unreasonable or oppressive. The Subpoena was issued for a proper purpose. It called for the production of documents relevant to the grand jury investigation and was made with reasonable particularity. Accordingly,

39

defendants' motion to quash should be denied.

**A.    The Grand Jury Subpoena Was Issued For A Legitimate Governmental Purpose In Furtherance Of The Grand Jury's Investigation**

Defendants' argument that the Subpoena should be quashed because it was issued for the improper purpose of substituting for a potentially invalid search warrant has no basis in fact or law.  Defendants' contention that "[t]he timing of the service of the subpoena, virtually simultaneously with the execution of the search warrant, suggests that the government issued the subpoena in order to avoid the consequences of possible suppression of seized documents" (Def. Mem. at 8) is completely belied by the evidence in the record and should be rejected.

United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992), upon which defendants rely for the proposition that "subpoenas must not serve as an after the fact 'insurance policy' to 'validate an unlawful search under the inevitable discovery doctrine'" (Def.'s Mem. at 8) is distinguishable:  in that case, a series of subpoenas were issued in the months following the warrantless search of the defendant's safe.   Id. at 857 (emphasis added).  The district court denied defendant's motion to suppress, holding that each item of evidence would have been discovered through lawful means absent the search.  Id. at 859.  Here, the Subpoena was issued concurrently with the execution of the search warrant and there is no evidence whatsoever that the Subpoena was issued because of any problem related to the search or for the purpose of curing possible defects in the search warrant.

To the contrary, AUSA Litt unequivocally testified that it was Mr. Licker who first broached the subject of a grand jury subpoena when he asked AUSA Litt whether he planned to serve a grand jury subpoena on Amerindo.  (5/31 Tr. 92, 8/9 Tr. 251, 275).  Inspector Feiter similarly testified that it was Mr. Licker who first raised the subject of a grand jury subpoena

40

with him.  (12/14 Tr. 86).  Although Mr. Licker testified that he did not recall "one way or

another" who first mentioned the idea of a grand jury subpoena, he conceded that he accepted –

and did not challenge – service of a grand jury subpoena on Amerindo.  (5/31 Tr. 14, 53).  Prior

to his discussion with Mr. Licker, AUSA Litt had not considered or consulted with anyone about

issuing a grand jury subpoena to Amerindo.  (5/31 Tr. 93).

      Notably, AUSA Litt testified that his purpose in issuing the Subpoena to Amerindo on

May 26, 2005 was to achieve the two objectives outlined by his supervisor in their conversation

earlier that day, namely, to provide a means to obtain documents from Amerindo U.S. that

searching agents may have missed and to provide an incentive to Amerindo employees not to

destroy documents.   (5/31 Tr. 100-01).  AUSA Litt was emphatic in his testimony that he did

not issue the Subpoena to cure any defects in the search warrant or to serve as a substitute for the

search warrant.  (5/31 Tr. 101, 8/9 Tr. 276).  Indeed, at the time that he issued the Subpoena,

AUSA Litt was unaware of any defects in the search warrant.  (5/31 Tr. 100).  AUSA Litt

testified that he knew that the search warrant had been vetted through a rigorous approval

process that included review and approval by the chief of the securities fraud unit before its

ultimate review and approval by Magistrate Judge Maas.  (5/31 Tr. 100-01).  Moreover, Mr.

Licker testified that he never challenged the search warrant on May 26, 2005, or even discussed

its "breadth, enforceability or legality" with AUSA Litt on May 26, 2005.  (5/31 Tr. 42).

      Defendants' arguments that AUSA Litt issued the grand jury subpoena to cure what he

knew to be a defective search warrant are further refuted by the evidence in the record indicating

that the search continued for several more hours after Mr. Licker was served with the grand jury

subpoena.  (5/31 Tr. 15, 16, 133-34).  The evidence adduced at the hearing shows that it was

41

Amerindo's counsel who suggested substituting compliance with the Subpoena for completion of the search, not the Government.  Mr. Licker broached the subject, and persuaded the Government that proceeding via subpoena was in the interest of all concerned.  (5/31 Tr. 106-07; GX 48-A, 49).  Defendants conveniently ignore those facts and, instead raise several "red herring" arguments that should be summarily rejected by the Court.

Furthermore, defendants' contention that "[e]nforcement of the subpoena now would only serve to provide the government with evidence for use at trial," (Def.'s Mem. at 9), is simply untrue.  Not only is the grand jury investigation ongoing with respect to others who may have been involved in the conduct charged in the third Superseding Indictment, but the grand jury is also investigating other financial fraud crimes as yet uncharged which the defendants or others may have committed.  Moreover, the sole example provided by the defendants on this point is unpersuasive.  Defendants complain that paragraph F of the Subpoena, which seeks production of documents concerning Cates's investments, could only have relevance for trial because "those investments are the subject of the pending indictment."  Id.  The pending indictment does not charge the defendants with any crime in connection with Cates's investment in Rhodes Capital, although that investment too, is a subject of the grand jury's ongoing investigation.  Likewise, the grand jury is continuing to investigate other seeming improprieties committed with respect to Cates's Amerindo-advised investment vehicles other than SBIC, GFRDAs and Rhodes Capital.  Finally, but for the defendants' actions over an approximately two-month period from mid-October to mid-December, part or all of the documents responsive to the Subpoena would have been produced prior to the grand jury's consideration of the second and third superseding indictments.  Defendants' complaint that materials responsive to the

Subpoena have become less relevant to the grand jury's investigation as it has gone about its

work while being stonewalled by the defendants should be rejected outright by the Court.

Most importantly, courts have made it clear that they will not interfere with post-

indictment grand jury proceedings so long as the sole or dominant purpose of those proceedings

is not to discover facts relating to a defendant's pending prosecution.  See United States v.

Salameh, 152 F.3d 88, 109 (2d Cir. 1998) (per curiam) (no abuse of grand jury power for

government to introduce at trial evidence obtained from post-indictment subpoena if there is

"some proper dominant purpose for the . . . subpoena") (emphasis added).  Since the Subpoena

was issued in May 2005, the grand jury has investigated, and continues to investigate, a broad

variety of possible crimes including, but certainly not limited to, the SBIC and GFRDA

investment scams detailed in the second superseding indictment returned by the grand jury on

January 31, 2006.  The grand jury is also continuing to investigate criminal activity by other

possible targets besides the defendants.  See United States v. Sasso, 59 F.3d 341, 351-52 (2d Cir.

1995) (post-indictment grand jury subpoena valid because dominant purpose of subpoena was to

investigate non-indicted individuals).

In sum, the Subpoena was issued for the proper purpose of gathering evidence for an

ongoing grand jury investigation into a variety of possible crimes including wire fraud, securities

fraud, money laundering, and false statements, perpetrated by the defendants and others.  This

grand jury investigation is still ongoing.  The defendants should not be permitted to gain tactical

advantage by knowingly allowing the Government to expect compliance with the Subpoena,

sitting on their rights, and then filing a motion to quash the Subpoena based in part on an

argument that the Government's delay in enforcing the Subpoena has converted its purpose to

one that is improper.  The defendants' argument should be rejected.

**B.**      **The Standards Of Probable Cause Should Not Be Applied**
        **In The Court's Evaluation Of The Subpoena**

The defendants are essentially urging the Court to require the Government to justify the

issuance of the Subpoena by establishing probable cause, a notion which was squarely rejected

by the Supreme Court in <u>United States</u> v. <u>R. Enterprises, Inc.</u>, 498 U.S. 292, 297 (1991).   In <u>R.</u>

<u>Enterprises</u>, the Supreme Court found that the "Government cannot be required to justify the

issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause

because the very purpose of requesting the information is to ascertain whether probable cause

exists."  <u>Id</u>. (citing <u>Hale</u> v. <u>Hensel</u>, 201 U.S. 43, 65 (1906)).   Thus, even were the Court to

conclude that the search warrant was overbroad in this case, the standard for the proper scope of

a grand jury subpoena is far different from those standards governing the proper issuance and/or

reliance on a search warrant.  The Government does not need to establish probable cause to issue

a grand jury subpoena.  <u>See</u> <u>In re Subpoena Duces Tecum</u>, 228 F.3d 341, 348 (4th Cir. 2000)

(administrative subpoena issued by the federal government in a health care fraud investigation

must be reasonable but does not have to be supported by probable cause).

In a case analogous to this one, the Fifth Circuit rejected movants' argument that

"because the subpoenas were issued simultaneously with a search warrant, they evidenced an

attempt to seize and secure items belonging to [them] without showing probable cause for the

issuance of a search warrant" as a "red herring."  <u>In re Grand Jury Proceedings</u>, 115 F.3d 1240,

1244 (5th Cir. 1997).  Citing <u>R. Enterprises</u>, the Fifth Circuit concluded that, "even if the search

warrant was defective, there is no probable cause requirement for the issuance of a grand jury

subpoena."  <u>Id</u>.  The Court further reasoned that "[i]ssues of probable cause relate solely to the

validity of the search warrant, not the subpoenas." Id.

Because a grand jury subpoena is vastly different from a search warrant, and even a subpoena issued in the context of a prospective trial where a specific offense has been identified and a particular defendant has been charged, see R. Enterprises, 498 U.S. at 297, it is important that this Court evaluate defendants' motion to quash against the backdrop of the grand jury's function. In R. Enterprises, the Supreme Court described the grand jury's role as follows:

> The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed . . . the grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." (citation omitted). The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred. As a necessary consequence of its investigatory function, the grand jury paints with a broad brush. "A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime had been committed.'" Branzburg v. Hayes, 408 U.S. 665, 701 (1972) (quoting United States v. Stone, 429 F.2d 138, 140 (2d Cir. 1970).

R. Enterprises, 498 U.S. at 297. See also In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003) (grand jury subpoena supports public's fundamental right to evidence); In re Grand Jury, 286 F.3d 153, 159 (3rd Cir. 2002) (subpoena is most important tool of grand jury investigation); In re Grand Jury Subpoena Served Upon Doe, 781 F.2d 238, 248-49 (2d Cir. 1986) ("The investigative powers of the grand jury necessarily are broad so that it may carry out adequately its task of determining the existence of criminal activity and returning well-founded indictments."); United States v. Doe, 457 F.2d 895, 901 (2d Cir. 1972) ("[T]he grand jury's scope of inquiry is not limited to events which may themselves result

45

in criminal prosecution, but is properly concerned with any evidence which may afford valuable

leads for investigation of suspected criminal activity during the limitations period.") (internal

quotations omitted).

In sum, the Government need not establish probable cause to issue a grand jury

subpoena. The protection provided by the Fourth Amendment with respect to subpoenas <u>duces

tecum</u> is narrowly limited to overbreadth and indefiniteness.  <u>See</u> <u>Oklahoma Press Pub. Co</u>. v.

<u>Walling</u>, 327 U.S. 186, 208 (1946); <u>In re Grand Jury Subpoena Duces Tecum Dated May 29,

1987</u>, 834 F.2d 1128, 1134 (2d Cir. 1987); <u>In re Horowitz</u>, 482 F.2d 72, 77 (2d Cir. 1973).  For

the reasons described in sections C.2 and D, <u>infra</u>, the Subpoena was neither overbroad nor

indefinite.

**C.    Defendants Have Failed To Meet Their Burden Of Demonstrating
        That The Subpoena Is Unreasonable Or Oppressive**

Rule 17(c) of the Federal Rules of Criminal Procedure provides a remedy for

 individuals or entities served with an unreasonable or oppressive subpoena.  Under that rule,

"On motion made <u>promptly</u>, the court may quash or modify the subpoena if compliance would

be unreasonable or oppressive." (emphasis supplied).   Courts have exercised the power to quash

or modify "only where there has been a clear showing of unreasonableness or oppressiveness."

<u>In re Grand Jury Investigation</u>, 459 F. Supp. 1335, 1340 (E.D. Pa. 1978) (citing <u>In re Morgan</u>,

377 F. Supp. 281, 284-85 (S.D.N.Y. 1974); <u>In re Corrado Brothers, Inc.</u>, 367 F. Supp. 1126,

1132-33 (D. Del. 1973)).

The Supreme Court has recognized that there are "strong governmental interests in

affording grand juries wide latitude, avoiding minitrials on peripheral matters, and preserving a

necessary level of secrecy." <u>R. Enterprises</u>, 498 U.S. at 300. Consequently, "the law presumes,

absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority." Id. (citing United States v. Mechanik, 475 U.S. 66, 75 (1986)). The Supreme Court has made it clear that "a grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." Id. at 301. In R. Enterprises, the Supreme Court also held that where a subpoena is challenged on relevancy grounds "the motion to quash must be denied unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." Id. (emphasis added).

> 1.    **Defendants Have Failed To Show That The Subpoena Is Unreasonable**

Defendants' arguments with respect to the reasonableness of the grand jury subpoena served on Amerindo U.S. must fail in light of the standard articulated by the Supreme Court in R. Enterprises. The Subpoena was issued through normal channels prior to the return of an indictment and defendants have wholly failed to meet their burden of demonstrating that the categories of documents and information sought by the Subpoena are unreasonable or oppressive.

First, the defendants have not met their burden of showing unreasonableness because they have failed to demonstrate that there is no possibility that the subpoenaed materials could produce evidence relevant to the subject of the investigation. The Subpoena seeks documents and other materials from an entity owned by the targets of the investigation about matters which are the subject of the investigation: documents concerning the brokerage accounts which lay at the center of the defendants' fraud schemes; victims, suspected victims and investments (e.g.,

47

SBIC, GFRDA, Rhodes Capital) involved in those schemes; client communications and

marketing materials; defendants' finances; business expense records; and funds used for the

purchase of thoroughbred racehorses.  (GX 12).  There is plainly a "logical connection" between

the subpoenaed documents and the charges that comprise the subject matter of the grand jury

investigation.  In re August, 1993 Regular Grand Jury (Medical Corp. Subpoena II), 854 F.

Supp. 1392, 1400 (S.D. Ind. 1993) (citing cases).  Records of the type sought in the Subpoena

have a "reasonable possibility" of producing information regarding Amerindo's financial and

investment activity, which is undeniably related to the grand jury's investigation of securities

and investment adviser fraud, wire and mail fraud, money laundering and false statements.


Judge Friendly's reasoning in In Re Horowitz, 482 F.2d 72 (2d Cir. 1973), which

involved an investigation into whether any of the funds loaned by a development fund had been

misapplied and diverted, is particularly apt here.  In reviewing the district court's denial of a

motion to quash the contents of all file cabinets at the target's accountant's office, Judge

Friendly observed that "any document relating to the [target's] finances, or any that sheds light

on the complex corporate structure of [the target's] enterprises, which he allegedly used to

conceal the misapplication of funds in The Pas project, may turn out to be relevant to the grand

jury's inquiry."  Id. at 79.  Here, any document relating to the defendants' or Amerindo's

finances or any document that sheds light on the complex corporate structure of the Amerindo

entities, particularly the offshore entities, and the various investment products purportedly

offered through them, have a reasonable possibility of producing information relevant to the

general subject of the grand jury's investigation.

48

In short, in a complex financial fraud such as this, where the targets of the grand jury's investigation – the founders and principals and of the Amerindo investment adviser firms – converted millions of dollars of investor funds to their own benefit and that of others through the use of various Amerindo-affiliated entities and myriad brokerage and bank accounts, the defendants have failed to demonstrate that "there is <u>no</u> reasonable possibility that the <u>category</u> of materials the Government seeks will produce information relevant to the <u>general</u> subject of the grand jury's investigation." <u>R. Enterprises</u>, 498 U.S. at 301 (emphases added); <u>see also</u> <u>In re Grand Jury 95-1</u>, 59 F. Supp. 2d 1, 8, 9 (D.D.C. 1996).

Moreover, the return of the second superseding indictment, which broadened the scope and duration of the conspiracy and charged the defendants with false statements to the SEC and an additional count of securities fraud relating to the GFRDA fraud, refutes the defendants' argument that many of the documents requested in the Subpoena are not relevant to the grand jury's investigation.  Even assuming <u>arguendo</u> that the documents sought by the Subpoena are not relevant to the SBIC fraud charged in the original indictment – and that is not the standard by which the propriety of the Subpoena should be measured – the defendants can hardly now claim that there is <u>no</u> reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation.

## 2.    <u>Defendants Have Failed To Show That The Subpoena Is Oppressive</u>

Second, the defendants have utterly failed to meet their burden of demonstrating that the production of such documents would be unduly burdensome or that the subpoena was overly broad as to be oppressive.  In fact, counsel for Amerindo, on which the Subpoena was served, has not once in eight and one-half months complained that compliance with the existing

subpoena is unduly burdensome, requested clarification of its terms, or challenged its

overbreadth or insufficient particularity.   (5/31 Tr. 34-35, 11-12; 8/9 Tr. 274, 278).   Notably,

Mr. Licker testified that he "never challenged the grand jury subpoena in any way." (5/31 Tr.

35).  This clear testimony from Mr. Licker and AUSA Litt seriously undermines  – if not defeats

– defendants' contention that the subpoena at issue is oppressive.   As the Fourth Circuit

reasoned, the requirement that a subpoena be "not overly broad for the purposes of the inquiry as

to be oppressive . . . may support a motion to quash a subpoena only if the movant has first

sought reasonable conditions from the government to ameliorate the subpoena's breadth."  In re

Subpoena Duces Tecum, 228 F.3d at 349 (emphasis added).  It is undisputed that between

service of the Subpoena and defendants' motion to quash, Mr. Licker never asked the

Government to limit the Subpoena's breadth.[20]   Defendants have identified no efforts on their

part to reach accommodation with the Government prior to filing their motion to quash.  Id. at

351 ("Yet, as a condition to maintaining the argument that an investigative subpoena is overly

broad and oppressive, [the movant] would have to be able to point to reasonable efforts on his

behalf to reach accommodation with the government.") (citing United States v. Morton Salt Co.,

338 U.S. 632, 642-43 (1950)).  Accordingly, defendants' motion to quash must fail.

To the extent that defendants argue that the Subpoena is oppressive because it requests

---

[20]      Mr. Licker certainly knew how to challenge the breadth of a document request if
he was so inclined.  In the affidavit he submitted in support of defendants' motion for a Franks
hearing, Mr. Licker indicated that in May 2003, the SEC served an informal request for
documents and that "[i]n response, after some negotiation to try to narrow the breadth of the
requests and manage the burden of compliance, Amerindo provided thousands of pages of
documents."  (8/29/06 Licker Aff. ¶ 6).  There is no reason to think that an experienced attorney
like Mr. Licker would treat a grand jury subpoena any differently from the SEC's document
request and hesitate to negotiate its scope with the Government.

virtually every business record over an unlimited time frame, the question of the permissible

scope of the subpoena cannot be determined in the abstract.  It is well-established that what is

"reasonable" depends on the circumstances of the particular investigation.  R. Enterprises, 498

U.S. at 298-300; Oklahoma Press Pub. Co., 327 U.S. at 209; In re Grand Jury Investigation, 459

F. Supp. at 1343.  In this regard, the Fourth Circuit's reasoning in its analysis of the subpoena at

issue in that case is instructive:

> Thus, if [the defendant, a doctor] had treated 15,000 patients over a
> period of several years and all of them were reimbursed on claims
> he submitted, a suspicion of fraud on these claims would justify a
> review of [the defendant's] documentation of services to these
> patients, of the claims submitted on their behalf, and of the
> reimbursements collected.  Even though these documents might be
> numerous, they would reasonably relate to and further the
> government's legitimate inquiry, which might be defined by any of
> 13 federal statutory offenses, including fraud.

In re Subpoena Duces Tecum, 228 F.3d at 349.

Here, a subpoena that requests several years of corporate records is not unreasonable in

light of the fact that known victims invested in Amerindo starting in the late 1980s and the grand

jury is entitled "to inquire into all information that might possibly bear onto its investigation

until it has identified an offense or has satisfied itself that none has occurred."  R. Enterprises,

498 U.S. at 297.  Certainly at the time the Subpoena was issued, the grand jury had more than "a

suspicion of fraud" with respect to defendants' investment adviser relationship with long-time

clients which would justify inquiry into the defendants' documentation of investments made on

behalf of those individuals and other clients who were offered similar investment products.   An

examination of documents reflecting the defendants' relationship with clients with other

Amerindo-managed investments is obviously relevant to an investigation of defendants' motive

51

and intent, as is an examination of the financials of the defendants and the companies they

owned and controlled.  Moreover, even though the documents might be numerous, they would

reasonably relate to and further the grand jury's legitimate inquiry, which might be defined by a

number of federal offenses, including investment adviser fraud, securities fraud, mail and wire

fraud, money laundering and false statements.

Defendants offer absolutely no evidence to substantiate their conclusory assertion

concerning the subpoena's oppressiveness other than their argument that the subpoena calls for

virtually every corporate record to the beginning of time.  This assertion, without more, "is

insufficient to prove oppressiveness under Rule 17(c) and to overcome the strong presumption of

validity which surrounds grand jury subpoenas." In re August, 1993 Regular Grand Jury

(Medical Corp. Subpoena II), 854 F. Supp. at 1402.  Indeed, in In re Grand Jury Proceedings,

115 F.3d 1240 (5th Cir. 1997), the Fifth Circuit, in rejecting a similar claim, reasoned that

"[s]imply citing the types of information sought by the government [defendants cited that the

subpoena requested at least eighty-five kinds of documents relating to approximately one

hundred and seventy-eight different persons and entities] does not alone constitute a 'strong

showing' sufficient to counter the presumption that the grand jury was acting within the proper

scope of its authority."  Id. at 1244 (citation omitted); see also Oklahoma Press, 327 U.S. 186

(enforcing subpoenas issued by the Wage and Hours Administrator investigating possible

violations of the Fair Labor Standards Act which called for the production of all corporate books,

papers and documents showing the hours worked by and the wages paid to all employees over a

five year period, as well as several other categories of documents); CAB v. Herman, 353 U.S.

322 (1957) (enforcing subpoenas characterized by the Ninth Circuit in Herman v. CAB, 237 F.2d

359, 361 (9th Cir. 1956), as calling for "practically all records, books and documents of or concerning the companies"); In re Horowitz, 482 F.2d at 79 ("[A]lthough the Constitution undoubtedly protects against overly broad subpoenas duces tecum the subpoena issued in Hale v. Hensel would not likely be deemed too broad today in light of Oklahoma Press, Morton Salt, and CAB v. Hermann."); In re Grand Jury Subpoena Duces Tecum To John Doe Corp., 570 F. Supp. 1476, 1478 (S.D.N.Y. 1983) ("Although the subpoena issued herein calls for the production of a substantial quantity of Doe Corp.'s records, this Court finds that it is neither unreasonable nor oppressive.").

In sum, in arguing that the breadth of the Subpoena demonstrates its unreasonableness and oppressiveness, defendants wholly ignore the guiding principle articulated by the Supreme Court in R. Enterprises that a grand jury has broad powers and is charged with the responsibility of determining whether or not a crime has been committed.  A grand jury is entitled to run down every lead and investigate every suspicion.  Significantly, "in the grand jury context the law enforcement interest will almost always prevail."  R. Enterprises, 498 U.S. at 306 (Stevens, J., concurring).  Accordingly, because defendants have not sustained their burden of showing that the subpoena is "overly broad as to be oppressive or lacking in relevance as to be unreasonable," their motion to quash the Subpoena should be denied.  In re Subpoena Duces Tecum, 228 F.3d at 351.

Even were the Court to find that portions of the Subpoena were overbroad, it is well-established, as this Court acknowledged at the hearing held on May 31, 2006 (5/31 Tr. 159), that the overbroad portions can be severed.  See Fed. R. Crim. P. 17(c) ("On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or

oppressive.") (emphasis added). The remedy is to quash the overbroad portions but to order that

Amerindo produce the remaining documents that are responsive to the Subpoena. See In re

Horowitz, 482 F.2d at 75, 79-80; In re Grand Jury Subpoena Duces Tecum Dated November 15,

1993, 846 F. Supp. 11, 13-14 (S.D.N.Y. 1994).

**D.    The Subpoena Is Reasonably Particular**

Defendants' contentions that the Subpoena was insufficiently particularized are simply

belied by a fair reading of the Subpoena which clearly identifies specific categories of

documents to be produced.  The Subpoena is not indefinite because the items requested in the

Subpoena are specified with sufficient particularity so that Amerindo will know what it is being

directed to produce.  See In re Horowitz, 482 F.2d at 79; (Under Seal) v. United States, 634 F.

Supp. 732, 733 (E.D.N.Y. 1986); In re Grand Jury Subpoena Duces Tecum to John Doe Corp.,

570 F. Supp. 1476, 1478 (S.D.N.Y. 1983); In re Grand Jury Subpoena, No. CV-92-1279, 1992

WL 142014, at *7 (E.D.N.Y. June 11, 1992).

The defendants' reliance on In re Grand Jury Subpoena Duces Tecum Dated

November 15, 1993, 846 F. Supp. 11 (S.D.N.Y. 1994), is misplaced.  The subpoena at issue in

that case was not framed in terms of specified categories of information but, rather, demanded

specified information storage devices including all computer hard drives and floppy disks.  846

F. Supp. at 12.  Similarly, in In Re Horowitz, 482 F.2d 72 (2d Cir. 1973), the subpoena at issue

demanded the entire contents of particular filing cabinets "without any attempt to define classes

of potentially relevant documents or any limitations as to subject matter or time period."  Id. at

79.  In contrast, the subpoena that was served on Amerindo U.S. specified limited categories of

information and defined classes of potentially relevant documents by subject matter.  For

example, paragraphs B, D and M and O of the grand jury subpoena rider request documents

relating to four specific Bear Stearns accounts (collectively, the "Amerindo Brokerage

Accounts") into which victims of the schemes charged in the second superseding indictment

placed their money, paragraph C requests documents concerning Rhodes Capital, which,

according to relevant offering documents received by Cates, was an investment vehicle that Vilar

and Tanaka managed, paragraph E requests documents relating to client investments in overseas

bank accounts, including PTC Management Limited in the Bahamas, an account into which

investor money was diverted, and paragraph H requests documents relating to GFRDA

investments, which form the basis of the conspiracy and additional securities fraud charge in the

second superseding indictment.  The Subpoena also limits the specified categories of information

sought in many cases and excludes documents pertaining solely to any publicly traded Amerindo

mutual fund.  See paragraphs U, V, W, X and Z.

        To the extent that the defendants complain about the lack of specificity with respect to a

time period, even they acknowledge that modification of the Subpoena is a potential remedy and

simply argue that "neither the Court nor Amerindo should be required to redraft the Subpoena so

as to limit it to a demand for the production of relevant documents."  (Def. Mem. at 14).

Defendants ask that "the government [be] required to specify a reasonable production period,"

(Def. Mem. at 14) but fail to acknowledge that this request was never made of the Government

prior to defendants' filing their motion to quash almost seven months after the Subpoena was

served on Amerindo.  Notwithstanding Amerindo's failure to negotiate a time period for the

subpoena with the Government, the Government is willing to limit the time period of the

subpoena to the time period of the conspiracy charged in the superseding indictment, that is from

1986 through May 26, 2005.

Significantly, relevant precedent, and particularly Rule 17(c) itself, contemplates that a grand jury subpoena may be modified before resorting to the more severe remedy of quashing the subpoena in its entirety.  See Fed R. Crim. P. 17(c); In re Horowitz, 482 F.2d at 79-80; In re Grand Jury Subpoena Duces Tecum Dated November 15, 1993, 846 F. Supp. at 14; In re Grand Jury Subpoena, 1992 WL 142014, at *4; In re Grand Jury Subpoenas to Mark Fainaru-Wada and Lance Williams, No. CR 06-90225 JSW, 2006 WL 2734273, at * 3 (N.D. Ca. Sept. 25, 2006). Particularly where as here, the Government is willing to consent to such an accommodation, the policies underlying the grand jury's broad investigatory powers support modifying, instead of quashing, the Subpoena.

In sum, defendants have failed to meet their burden of showing that compliance with the Subpoena would be unreasonable or oppressive.  The Subpoena was issued for a proper purpose, called for the production of documents relevant to the grand jury investigation, and was made with reasonable particularity.  Accordingly, defendants' motion should be denied.

## II.

### EVIDENCE SEIZED FROM THE SEARCH
### OF AMERINDO U.S. SHOULD NOT BE SUPPRESSED

Defendants move to suppress all items seized in the search of the Amerindo U.S. office in New York on the grounds that the Warrant was unconstitutionally overbroad, insufficiently particularized, and that it was executed as a "general warrant."  Moreover, defendants assert that the exception to the Exclusionary Rule provided by United States v. Leon, 468 U.S. 897, 922 (1984) is unavailable, because the Warrant was deficient on its face, and because Inspector Fraterrigo deliberately or recklessly misled Magistrate Judge Maas about allegedly material facts

that were omitted from the Warrant Application.[21]   The evidence elicited at the suppression

hearing, however, demonstrates that these arguments are without merit.

　　　The breadth of the Warrant was justified by the facts that had been developed in the

investigation, and the Warrant was sufficiently particularized given the nature of the fraudulent

schemes being investigated.  Furthermore, even were the Court to find that the Warrant was

overbroad and/or insufficiently particularized, the strong preference for warrants, the narrow

circumstances in which the Exclusionary Rule should be applied, and the good faith of the

searching agents, as demonstrated by the conduct of the search, all provide strong support for the

application of the <u>Leon</u> good faith exception here.  Finally, even were the Court to find <u>Leon</u>

inapplicable, the drastic remedy of suppressing all the evidence seized in the search should be

rejected.  There can be no doubt that there was probable cause to conduct a search of the

Amerindo U.S. New York office.  The only question is about what was the legitimate scope of

that search. If the Court finds that the Warrant was overbroad or insufficiently particularized, and

that no reasonable well-trained Postal Inspector could have relied on the Warrant in good faith,

then the Court should not suppress all the evidence but, rather, should only suppress that

evidence which exceeded the proper bounds of the Warrant.  The costs to society of suppressing

all the evidence would far outweigh the deterrent value of doing so.[22]

_____

　　　[21]　　Defendants' <u>Franks</u> arguments are discussed in Point III, <u>infra</u>.

　　　[22]　　Defendants have also challenged the Warrant on the ground that it failed to
mandate a procedure for searching the computer evidence seized pursuant to the Warrant, and
requested that the Court impose a list of limited search terms to cabin the Government's
examination of that evidence.  The issue was fully briefed as of on or about January 3, 2006.
The Government is unaware of any evidence adduced at the suppression hearing that touches on
this issue.  Counsel for Vilar, Susan Wolfe, Esq., however, during the November 17, 2006
pretrial conference, stated that:  "the other issue which I don't think has been fully briefed is the

A.    **The Warrant Was Appropriately Broad And Reasonably Particularized**

1.    **Applicable Law**

The legal standard for determining whether a particular warrant application is supported by probable cause is well established. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Such determinations must be approached in a practical way, id. at 232, because "probable cause is a flexible, common-sense standard." Texas v. Brown, 460 U.S. 730, 742 (1983). A warrant issued by a neutral and detached magistrate is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993) (quotation omitted).

The Fourth Amendment requires that warrants "particularly describe[e ] . . . the person or things to be seized." U.S. Const. amend. IV. The particularity requirement "makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another." Marron v. United States, 275 U.S. 192, 196 (1927). It prevents a "general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).

Although nothing should be left to the discretion of the officer executing the warrant,

---

search of the Amerindo U.S. computer system, and there's been a development of the law in that area. I have read a number of applications that the government has submitted to search computers that are elaborate; whereas, there was no protocol in this search warrant for application for the search of the computer system. And I'll be briefing that issue much more extensively." (11/17 Tr. 23-24). The Government again addresses this issue at II.D, infra, and may request the opportunity to supplement its brief in light of the unspecified "development of the law" alluded to by Ms. Wolfe in court.

"[c]ourts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant."  United States v. Young, 745 F.2d 733, 759 (2d Cir. 1984).  Accordingly, "where a particularly complex scheme is alleged to exist, it may be appropriate to use more generic terms to describe what is to be seized."  United States v. Gotti, 42 F. Supp. 2d 252, 274 (S.D.N.Y. 1999) (Parker, J .) (citing United States v. Regan, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989 ) ("The degree to which a warrant must state its terms with particularity varies inversely with the complexity of the criminal activity investigated.")).  Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgement as to whether a particular document falls within the described category."  United States v. Riley, 906 F.2d 841, 844-45 (2d Cir. 1990).

The Second Circuit has expressly held that where "there was probable cause to believe that [a] business was permeated with fraud . . . the agents could properly seize all of the business records."  National City Trading Corp. v. United States, 635 F.2d 1020, 1026 (2d Cir. 1980); accord United States Postal Service v. CEC Services, 869 F.2d 184, 187 (2d Cir. 1989) ("When the criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements").  "In order to fall within the 'all records' exception, it is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that

59

every part of the enterprise in question is engaged in fraud.  Rather, the affidavit need contain

only sufficient factual evidence of fraudulent activity from which a magistrate could infer that

those activities are 'just the tip of the iceberg.'" United States v. Burke, 718 F. Supp. 1130,

1139-40 (S.D.N.Y. 1989) (quoting United States v. Offices Known as 50 State Distributing Co.,

708 F.2d 1371, 1372-75 (9th Cir. 1983) (quoting United States v. Brien, 617 F.2d 299, 308 (1st

Cir. 1980)).

      **2.**    **Analysis**

      The Warrant Application contained specific facts demonstrating that the defendants – two

investment advisers who were founders, directors and shareholders of Amerindo U.S., and who

were also the sole shareholders, directors and officers of Amerindo U.S.'s United Kingdom,

Panamanian, and Cayman affiliates – had engaged in a pattern of fraudulent activity including:

(1) misrepresenting to Cates how her funds would be invested; (2) stealing $5 million of Lily

Cates's SBIC investment in June 2002, and using the funds for personal and Amerindo U.S.

expenses; (3) stealing an additional $250,000, by forging Cates's signature, from an altogether

separate Cates investment in September 2003, and using those stolen funds for personal

expenses; (4) brazenly lying to Cates, in writing, about the status of her Amerindo SBIC

investment; (5) failing to give basic documents to Cates concerning her Rhodes Capital

investment, and refusing to provide her with information about that investment, which she made

in approximately 1988; (6) refusing a legitimate February 2005 request either to transfer or to

liquidate Cates's entire portfolio of Amerindo investments, including Rhodes Capital; (7) hiding

behind the corporate veil of Amerindo Panama when forced to respond to Cates's complaints in

a letter to the SEC; (8) misrepresenting to the Mayer family how their funds would be invested;

(9) stonewalling and threatening the Mayer family when faced with requests to redeem approximately $11 million of GFRDA investments in 2003; (10) misappropriating millions of dollars of other investor funds to pay for the purchase of thoroughbred racehorses; and (11) engaging in a Ponzi-type scheme in which investor funds were not being properly segregated and accounted for.

In light of this ongoing pattern of fraudulent practices perpetrated by reportedly very wealthy individuals against clients whom they had known for more than 15 years, and in light of the variety of types of fraud (misrepresentations, forgery, theft), the apparent wholesale abandonment of their fiduciary duties, the number of investments involved (SBIC, GFRDA, Cates's Bear Stearns brokerage account, ATGF Inc., ATGF II, and Rhodes Capital Ltd.), the duration of these activities, the number of entities through which the schemes were being perpetrated (Amerindo U.S., Amerindo U.K., and Amerindo Panama), and the number of offshore and domestic accounts being used to facilitate the fraud, it was appropriate to seek a broad warrant covering Amerindo U.S. and its affiliates.[23]  In short, there was, based on the

_____

[23]    The reasons for including Amerindo Cayman in the Warrant's definition of "Amerindo" have already been briefed and will not be repeated here.  With respect to the propriety of referring to "Amerindo" in the Warrant – a defined term including the U.S., U.K., Panamanian, and Cayman entities – it is noteworthy that even Vilar, who presumably knows more about the companies that he founded, owned and operated than did the Government as a result of its investigation, acknowledges that Amerindo U.S. consists of more than one corporation.  In paragraph 2 of the September 12, 2005 Declaration submitted with his initial motion to suppress, Vilar defines "Amerindo Investment Advisors, Inc." –  a lessor of offices on the 22nd Floor of 399 Park Avenue, meaning, presumably, Amerindo U.S. (not Amerindo Panama as the presence of the comma between "Advisors" and "Inc." would suggest) – as "Amerindo."  In paragraph 3, Vilar discusses his expectation of privacy in the "premises where I worked and of the corporate entities comprising Amerindo."  (Vilar Decl. ¶¶ 2, 3) (emphasis added).  Although Vilar does not specify which other corporate entities comprise Amerindo U.S., which was incorporated in California in 1985, his sworn declaration makes clear that he believes that there are at least two.  Moreover, the Warrant Application makes clear that Amerindo U.S.,

61

totality of the circumstances, probable cause to believe that the fraud that had been uncovered

was the "the tip of the iceberg," that there were likely to exist other investors who had been (or

were being) victimized by the defendants through similar schemes, and that only by obtaining a

comprehensive set of Amerindo business documents could the full extent of the defendants'

criminal activity be uncovered.

An examination of the text of the Warrant demonstrates that the vast majority of its

provisions were narrowly crafted to seek evidence of the specific crimes described in the

Warrant Application, and the broader specifications were justified by the broader probable cause

established by the totality of the circumstances.

Paragraph 1, which invited the most attention in defendants' motion and the suppression

hearing permitted the seizure of:

> Corporate records concerning Amerindo Investment Advisors Inc.
> ("Amerindo U.S."), Amerindo Investment Advisors (Cayman)
> Limited ("Amerindo Cayman"), Amerindo Investment
> Advisors (U.K.) Limited ("Amerindo U.K."), and Amerindo
> Investment Advisors (Panama), Inc. ("Amerindo Panama")
> (Amerindo U.S., Amerindo Cayman, Amerindo U.K. and
> Amerindo Panama are hereinafter referred to collectively as
> "Amerindo"), including but not limited to records concerning the
> formation of each of the above-listed Amerindo entities, its
> shareholders, principals, officers, directors, and employees,
> changes in ownership, bylaws, resolutions, client lists, client files,
> investment brochures, marketing materials, investment advisory
> agreements, copies of correspondence sent to or received from
> clients, and other documents concerning or reflecting the identities
> of and communications with clients who have investments

---

Amerindo Panama, and Amerindo U.K. apparently played roles in the frauds perpetrated on
Cates and the Mayers.  Most telling, of course, is the refuge Vilar ultimately seeks in Amerindo
Panama when responding to the SEC about Cates's complaints – claiming that she had always
been a client of Amerindo Panama and that he no longer was responsible for its actions.  (GX 33,
¶ 6.D).

managed or advised by Amerindo.

(Vilar Ex. E, ¶ 1).  The first category of "corporate records" identified include core documents about the corporate structure of the four closely-held Amerindo corporations.  Given the involvement of at least three of the four entities in the defendants' activities, the fact that Amerindo U.S. directly benefitted from the theft of Cates's SBIC investment, and the contention by Vilar after nearly twenty years that Cates had been a client of Amerindo Panama all along, all gave rise to probable cause to believe that these basic documents would contain evidence of the crimes under investigation.  Furthermore, there was probable cause to believe that the other business records identified in the paragraph – including client lists, client files, investment brochures, and the like – would likewise contain evidence of these or similar crimes.

Paragraph 2 of the Warrant authorized the seizure of:

> Documents concerning the following accounts at Bear, Stearns & Company Inc.:   Amerindo Management Inc., Sub A/C M26 ("AMI"); Amerindo Technology Growth Fund Inc. ("ATGF I"); Amerindo Technology Growth Fund II, Inc. ("ATGF II"); and, Techno Raquia, SA (collectively, the "Amerindo Brokerage Accounts"), including account opening documents, account statements, wire transfer requests, correspondence, electronic mail messages, trade tickets, trade blotters, trade confirmations, trade allocation sheets, trade memoranda, trade notes, client account statements, memoranda and notes and other documents reflecting or relating to investment performance, and other documents reflecting or relating to securities transactions entered into on behalf of clients, by any current or former Amerindo entity, affiliate, principal, officer and employee;

(Vilar Ex. E, ¶ 2).[24]  There was abundant probable cause demonstrated in the Warrant

---

[24]     Paragraph 13 permitted the seizure of "[b]ank account statements, brokerage account statements, transaction records, wire transfer instructions and records, copies of checks sent to or received from clients, notes, ledgers, cash receipt journals, deposit tickets and records, and other documents reflecting or relating to movements of funds into or out of the Amerindo

Application to seize all documents related to the Amerindo Brokerage Accounts – the accounts used: (1) to steal $5.25 million from Cates in 2002 and 2003; (2) to fund the purchase of five thoroughbred racehorses by Tanaka in 2001-2005, including through the cancellation and rebooking of profitable options trades; and (3) to transfer tens of millions of dollars to a Bahamian bank account held in the name of the entity through which Vilar had induced the Mayer family to invest.[25]  (GX 33, 33A, 33B).

Paragraph 3 of the Warrant authorized the seizure of: "[d]ocuments concerning Rhodes Capital ("Rhodes"), including copies of prospectuses, private placement memoranda, subscription agreements, descriptions of the Rhodes investment, lists of investors in Rhodes, returns on the Rhodes investment, allocation of the returns on the Rhodes investment."  (Vilar Ex. E, ¶ 3).  There was probable cause to seize documents concerning Rhodes because: (1) defendants had victimized Cates, who was a Rhodes investor, in at least three ways: (a) stealing her $5 million SBIC investment; (b) stealing $250,000 from a Bear Stearns brokerage account that they managed on her behalf; and (c) failing to honor her February 2005 request to redeem or transfer all her investments with Amerindo, including her remaining investment in Rhodes; and

---

Brokerage Accounts."  That specification makes clear that the search team could seize documents not only related to the Amerindo Brokerage Accounts, but also documents related to other accounts into which, or from which, Amerindo Brokerage Account funds and securities were transferred.

[25]    Paragraph 10 of the Warrant authorized the seizure of "[d]ocuments reflecting or relating to the cancelation [sic] of completed trades and rebooking of those canceled trades in other accounts managed or controlled by Amerindo . . . ."  (Vilar Ex. E, ¶ 10).  The allegation in the Tanaka Complaint concerning the cancellation and re-booking of profitable trades to buy a horse flatly contradicts Vilar's assertion in his initial post-hearing reply brief that, "[t]here are no allegations suggesting that Amerindo . . . engaged in [such] conduct," and provides the necessary probable cause, in light of the totality of the circumstances, to seize the listed documents.  (Vilar Post-Hrg. Reply Br. at 2; see GX 33B, ¶ 15(e)).

(2) she had not been given any kind of description of the Rhodes investment before investing in

approximately 1988.  Based on the totality of these circumstances, as well as all the other

circumstances described in the Warrant Application (e.g., the GFRDA fraud, Tanaka's purchase

of racehorses with investor funds, and the stonewalling and threatening nature of Amerindo's

responses to the Mayers' legitimate requests) there was probable cause to believe that Rhodes

was part of the defendants' fraudulent schemes.  Accordingly, paragraph 3 was wholly justified.

      Paragraph 4 of the Warrant authorized the seizure of:

> Current and former client lists, client files, investment brochures,
> marketing materials, investment advisory agreements, copies of
> correspondence sent to or received from clients including
> redemption requests received from clients, and other documents
> concerning or reflecting the identities of and communications with
> clients who have investments in the Amerindo Brokerage
> Accounts.

(Vilar Ex. E, ¶4).  Again, because of the significance of the Amerindo Brokerage Accounts to the

fraudulent activities of defendants, and the totality of the circumstances described in the Warrant

Affidavit, there was probable cause to seize information about other Amerindo clients whose

funds were invested in the Amerindo Brokerage Accounts.

      Paragraph 5 of the Warrant authorized the seizure of:

> Client lists, client files, investment brochures, marketing materials,
> investment advisory agreements, copies of correspondence sent to
> or received from clients, and other documents concerning or
> reflecting the identities of and communications with clients who
> have investments managed by Amerindo who receive redemptions
> through or make investments through overseas bank accounts, and
> trust accounts, including PTC Management Limited, and Barclays
> Bank PLC, Nassau, Bahamas, Account No. 3308442.

(Vilar Ex. E, ¶ 5) (emphasis added).  This extremely narrow specification was based on the facts

set forth in the Warrant Affidavit concerning the experience of the Mayers with their GFRDA

investment (an investment that the Mayers were induced to make through an offshore account

with PTC Management Ltd.), and the fact that PTC apparently had made tens of millions of

dollars of redemptions from the Amerindo Brokerage Accounts (in which neither Tanaka nor any

other Amerindo employee had any beneficial interest).  In light of all the circumstances, there

was probable cause to believe that the defendants were using offshore accounts, especially the

PTC Account, for illegal purposes, and there was, likewise, probable cause to believe that the

Mayers were likely not the only Amerindo investors who were being victimized through the use

of such accounts.

      Paragraph 6 authorized the seizure of:

> Documents reflecting all investments in which Lily Cates, Lisa
> Mayer, Debra Mayer, Herbert Mayer, Brian Harvey, Joy Urich, or
> Paul Marcus have a beneficial interest, including descriptions of
> the investment, account statements, and returns on the investment.

(Vilar Ex. E, ¶ 6).  It is axiomatic that there was probable cause to seize all such documents with

respect to Cates and the Mayers.  The issue of whether there was probable cause to seize

documents related to the investments of Mr. Harvey, Ms. Urich, and Mr. Marcus has already

been fully briefed both in the context of defendants' motion to suppress and defendants' motion

for a <u>Franks</u> hearing, and the Government relies on that previous briefing to justify this

specification of the Warrant.

      Paragraph 7 authorized the seizure of:

> Documents reflecting any effort made by any Amerindo entity,
> including Amerindo SBIC Venture Fund LP to obtain an SBIC
> license from the U.S. Small Business Administration, including
> correspondence, Management Assessment Questionnaires, license
> applications, efforts to obtain investor funds or commitments from
> investors to invest funds, records reflecting capital commitments
> and investments, investments undertaken prior to licensure and any

66

> documents reflecting how any funds received prior to licensure
> were invested pending licensure.

(Vilar Ex. E, ¶ 7). Again, based on the detailed allegations in the Warrant Affidavit concerning

the diversion of Cates's $5 million investment in the Amerindo SBIC, and Vilar's readily

disproven written false statements, there was ample probable cause to seize all Amerindo

documents concerning Amerindo's efforts to obtain an SBIC license, its solicitation of

prospective SBIC investor funds, and its use of SBIC investor funds.

> Paragraph 8 authorized the seizure of:

>> Documents reflecting any Amerindo investment in Guaranteed
>> Fixed Rate Deposit Accounts ("GFRDAs"), including lists of
>> clients with investments in GFRDAs, account statements reflecting
>> investments in GFRDAs, documents reflecting the holdings of any
>> Amerindo entity in certificates of deposit or government securities,
>> and documents reflecting all securities underlying any investment
>> in a GFRDA.

(Vilar Ex. E, ¶ 8). Based on Amerindo's reaction to the Mayers' request to redeem their

GFRDA investment – the bulk of which was to be invested in bank certificates of deposit,

government securities and other investments "which are absolutely safe and liquid" – there was

probable cause to believe that Amerindo had not invested their funds as promised because,

otherwise, Amerindo would have been in a position to return at least that portion of the

investment in short order. In light of the information contained in the Warrant Application

concerning the Mayers' investment, the totality of the circumstances concerning the treatment of

Cates and her investments, and Tanaka's purchases of horses with investor funds, there was

probable cause to seize all documents concerning GFRDAs, investors in GFRDAs, and

documents reflecting securities underlying any investment in the kinds of securities that the bulk

of a GFRDA investor's funds were supposed to be used to purchase.

Paragraph 9 of the Warrant authorized seizure of "[d]ocuments reflecting any private bank, brokerage or other account with any financial institution held by Amerindo principals including Alberto William Vilar and Gary Alan Tanaka." (Vilar Ex. E, ¶ 9). Based on all the allegations in the Warrant Application – including the diversion of $1 million of Cates's SBIC investment to Vilar's personal bank account and $650,000 to the business checking account of Amerindo U.S. (which was owned by Vilar and Tanaka), the theft of $250,000 of Cates's Amerindo-managed investments and the deposit of those funds in another personal bank account of Vilar, and the diversion of client funds to buy racehorses for Tanaka – there was probable cause to believe that financial records of Vilar and Tanaka would contain evidence of the crimes listed in the Warrant Application and it was appropriate to search for and seize that evidence.

Paragraph 11 of the Warrant authorized the seizure of, "[d]ocuments reflecting any direct financial or beneficial ownership interest held by Alberto William Vilar or Gary Alan Tanaka in Amerindo and the Amerindo [Brokerage] Accounts." (Vilar Ex. E, ¶ 11). This specification relates specifically to Tanaka's representation to the SEC that neither he nor any Amerindo employee had any "direct or indirect record or beneficial interest in any client account managed by Amerindo or any affiliate of Amerindo, other than [his] interest[] in fees payable to Amerindo and its affiliates." (GX 33B, ¶ 9) .

Paragraph 12 authorized the seizure of "[d]ocuments reflecting brokerage accounts maintained by Amerindo at any broker-dealer other than Bear, Stearns & Co. Inc., including documents reflecting trades done 'away' from Bear, Stearns, and settled in Amerindo accounts at Bear, Stearns." (Vilar Ex. E, ¶ 1). Although there was no specific mention of such trades in the Warrant Application, there was probable cause to believe that Amerindo engaged in this standard

68

business practice and, given the primacy of the Amerindo Brokerage Accounts (which were

custodied at Bear, Stearns & Co.) to the frauds described in the Warrant Application, there was

probable cause to seize records from other broker-dealers used to purchase the securities in those

accounts.

Paragraph 14 authorized the seizure of:

> Records of expenses such as copies of checks and/or wires sent to
> landlords, employees, counsel, accountants, brokers, utility
> companies, and other organizations and individuals who provide
> goods and services to Amerindo, incorporation and governance
> documents relating to the various entities through which
> Amerindo, Alberto William Vilar and Gary Alan Tanaka conduct
> business, documents representing or reflecting communications
> with accountants, accounting records, documents reflecting
> communications with boards of directors, and other documents
> relating to the running and supervision of the operations of the
> investment advisory business(es) of Amerindo.

(Vilar Ex. E, ¶ 14).  There was probable cause to believe that Amerindo corporate entities were

benefitting from the illegal acts of Vilar and Tanaka, and therefore seizure of their expense,

accounting and operations records were appropriate targets to seize.

Paragraph 15 of the Warrant authorized the seizure of:  "Documents reflecting

information about any current or former Amerindo employee who had any contact with, or

responsibility for the management of, redemptions from, or preparation of account statements

for, any current or former Amerindo client that had a direct or indirect interest in the Amerindo

Brokerage Accounts."  (Vilar Ex. E, ¶ 15).  Given the central role played by the Amerindo

Brokerage Accounts in the fraud described in the Warrant Affidavit, there clearly was probable

cause to seize documents concerning the Amerindo employees who had responsibility for

handling redemptions and account statements for clients with an interest in those Accounts.

Paragraph 16[A] of the Warrant permitted the seizure of: "Photographs, address books, Rolodex indices, diaries, calendars, identification documents, travel documents, and other documents concerning or reflecting information concerning the identities of participants in the fraud schemes." The probable cause to seize these items is patent. Although the "identities of participants in the fraud schemes" were not specifically identified in the Warrant, the Government has previously acknowledged that it should have been limited to Vilar and Tanaka, and previously has returned items that fell outside that limitation.

Finally, Paragraph 16[B] authorized the seizure of: "Facsimile machines used to send and receive documents, which may be analyzed to determine telephone numbers to and from which documents have been sent and which may be also be analyzed to determine whether documents bearing certain "fax lines" were sent from a particular machine." (Vilar Ex. E, ¶ 16[B]). There was probable cause to seize the information from the Amerindo fax machines in light of the standard business practice of using fax machines to transmit correspondence and other documents – particularly when businesses have offices in multiple locations and/or countries – and the likelihood that documentary evidence seized would include fax transmission data that could most readily be analyzed by obtaining information from Amerindo's fax machines.[26]

With respect to defendants' contention that the Warrant was overbroad because it lacked any temporal limitation, the Government maintains that the lack of a time frame in the Warrant was appropriate given the totality of the circumstances. Cates and the Mayers began investing

---

[26]     As discussed above, paragraph 17, concerning the seizure of computer data, is discussed in Point II.D., infra.

with the defendants and their companies in the late 1980s, shortly after Amerindo U.S. was

established.  Cates was not given basic information about the Rhodes Capital investment at the

outset, and was rebuffed when she attempted to transfer that investment to another account in

2005.  Likewise, the fact that the Mayers' could not redeem their <u>guaranteed</u> investments – that

were purportedly largely invested in short-term, secure and liquid investments – provided

powerful probable cause, given the totality of the circumstances, that the defendants had never

invested GFRDA client money as represented.  In light of all the defendants' conduct with

respect to Cates, the Mayers, GFRDAs, and the SBIC, among other things, there was probable

cause to believe that documents stretching back at least to the time of Cates's initial investment

in Rhodes and the Mayers's first investment in an Amerindo GFRDA would include evidence of

crimes perpetrated against those victims among others.

\*     \*     \*

The Warrant issued by Magistrate Judge Maas after careful review of a lengthy,

descriptive, Warrant Application, was supported by probable cause.  The Warrant properly

identified the categories of documents to be seized, most of which were focused on the specific

crimes related to Cates and the Mayers.  Accordingly the Warrant should be upheld, and the

defendants motion to suppress should be denied.

**B.     Even If The Warrant Was Unlawful, The *Leon* Good Faith Exception Applies**
**And The Seized Evidence Should Not Be Suppressed**

Even if some portion of the Warrant is found to be overbroad, the fruits of the search

should not be suppressed because the agents acted in objective, good faith reliance upon the

Warrant.

71

1.    **Applicable Law**

In Weeks v. United States, 232 U.S. 383 (1914), the U.S. Supreme Court adopted the

federal Exclusionary Rule for evidence seized from a home without a warrant in violation of the

Fourth Amendment.  The Exclusionary Rule is neither intended nor able to cure the invasion of

an individual's rights suffered as a result of an illegal search; rather, it operates as "a judicially

created remedy designed to safeguard Fourth Amendment rights generally through its deterrent

effect . . . ."  United States v. Calandra, 414 U.S. 338, 348 (1974).  The Supreme Court recently

reiterated its admonishment that the Rule should operate in limited circumstances because of the

costs of its effects on the criminal justice system:

> Suppression of evidence, however, has always been our last resort,
> not our first impulse.  The exclusionary rule generates "substantial
> social costs," United States v. Leon, 468 U.S. 897, 907 (1984),
> which sometimes include setting the guilty free and the dangerous
> at large.  We have therefore been "cautio[us] against expanding" it,
> Colorado v. Connelly, 479 U.S. 157, 166 (1986), and "have
> repeatedly emphasized that the rule's 'costly toll' upon truth-
> seeking and law enforcement objectives presents a high obstacle
> for those urging [its] application," Pennsylvania Bd. of Probation
> and Parole v. Scott, 524 U.S. 357, 364-65 (1998) (citation
> omitted).  We have rejected "indiscriminate application" of the
> rule, Leon, supra, at 908, and have held it to be applicable only
> "where its remedial objectives are thought most efficaciously
> served," United States v. Calandra, 414 U.S. 338, 348 (1974) – that
> is, "where its deterrence benefits outweigh its 'substantial social
> costs,'" Scott, supra, at 363 (quoting Leon, supra, at 907).

Hudson v. Michigan, --- U.S. ---, 126 S.Ct. 2159, 2163 (2006).

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court created a significant

exception to the Exclusionary Rule, holding that it does not apply where evidence is "obtained in

objectively reasonable reliance on a subsequently invalidated Warrant."  Id. at 922.  In creating

this exception, the Court explicitly noted the criminal justice system's truth-finding function, and

72

found that "[p]articularly when law enforcement transgressions have been minor, the magnitude of the benefit conferred on [] guilty defendants offends basic concepts of the criminal justice system." Leon, 468 U.S. at 907-08 (citing Stone v. Powell, 428 U.S. 465, 490 (1976)).  Thus, the Leon Court recognized that,

> [w]hether the exclusionary sanction is appropriately imposed in a particular case . . . must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective.

Leon, 468 U.S. at 906-07.  Under Leon, the critical question in determining whether to suppress evidence seized upon execution of a warrant is, "whether a reasonably well trained officer would have known that the search was illegal despite the [judicial officer's] authorization." Id. at 922 n. 23.  The Court took care to emphasize that, "suppression . . . should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Id. at 918.

The Leon exception to the Exclusionary Rule does not apply in four circumstances: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.  Id. at 923.  "It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.  In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." Id. at 921.

73

In evaluating whether reliance on the warrant was reasonable, courts have looked to see whether the warrant affidavit was "a bare bones affidavit" or whether it contained "many objective facts." See United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992); United States v. Burke, 718 F. Supp. 1130, 1142 (S.D.N.Y. 1989). Holding that the officers reasonably relied on the warrant at issue in Moore, the Second Circuit noted the great deference that should be accorded a magistrate's determination concerning probable cause:

> As the Supreme Court has noted, "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." Leon, 468 U.S. at 914 (citations omitted). Nor are there mechanical criteria for assessing the amount of information necessary for a probable cause finding: "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)).

Moore, 968 F.3d at 222-23.

Courts have likewise placed considerable weight on the fact that prosecutors were consulted in the warrant application process. See, e.g., United States v. Singh, 390 F.3d 168, 183 (2d Cir. 2004) (where affidavit contained detailed information of criminal activity and agent "had been told by an Assistant United States Attorney that he agreed the information revealed in the affidavit established probable cause for the search . . . it was objectively reasonable for the Special Agent to believe that probable cause for the warrant was stated and for her and the other agents to rely in good faith on the warrant as issued by the Magistrates."); United States v. Koerth, 312 F.3d 862, 868 (7th Cir. 2002) ("An officer's decision to obtain a warrant is prima

74

facie evidence that he or she was acting in good faith.") (citing <u>Leon</u>, 468 U.S. at 921 n. 21);

<u>United States</u> v. <u>Bynum</u>, 293 F.3d 192, 198 (4th Cir. 2002) ("that [the agent] consulted with the

prosecutor prior to applying for the search warrant provides additional evidence of his objective

good faith, like the law enforcement officer in <u>Leon</u>"); <u>United States</u> v. <u>Herbin</u>, No. Crim. 204-

93, 2005 WL 2789047, at * 3 (D. Vt. Oct. 26, 2005) ("Approval of the affidavit by an Assistant

United States Attorney is relevant as part of the totality of the circumstances analysis of the good

faith exception."); <u>Burke</u>, 718 F. Supp. at 1141 (finding good faith reliance where, among other

things, "warrants were approved by no fewer than three federal court magistrates and an

Assistant United States Attorney").

      In <u>United States</u> v. <u>Burke</u>, 718 F. Supp. 1130 (S.D.N.Y. 1989), Judge Mukasey

concluded that "the determination whether a warrant is so deficient that no officer could rely on

it in good faith must be based on all the circumstances of the search, the wording of the warrant

itself, and the state of circuit law at the time the warrant was executed." <u>Id</u>. at 1145. Judge

Mukasey focused in particular on factors including the facts that: (1) the warrants in that case

were approved by three Magistrates and an AUSA; (2) the warrants had been patterned after

other search warrants issued in connection with another investigation; (3) the warrants were

narrower than the oral warrant language rejected in <u>United States</u> v. <u>Buck</u>, 813 F.2d 588, 590 (2d

Cir. 1987), which permitted seizure of "papers, things or property of any kind relating to [the]

previously described crime"; (4) notwithstanding the fact that the warrant affidavits were not

attached to the warrant, all the searching agents read the affidavits; (5) the affiants participated in

the searches, ensuring that the affidavits in fact limited the breadth of the warrants; and (6) the

search did not extend beyond the limitations set out in the affidavits. <u>Id</u>. at 1141-46.

2.    **Analysis**

a.    **The Warrant Appeared To Be Valid**

The face of the Warrant bore no obvious defects.  Inspector Fraterrigo, who supervised the search team along with Inspector Feiter, knew that the Warrant Application had been approved by an Assistant United States Attorney and a supervisor at the U.S. Attorney's Office before it had been presented to Magistrate Judge Maas.  (7/7 Tr. 43, 44, 143; 7/10 Tr. 55-56). Inspector Fraterrigo observed Magistrate Judge Maas review the Warrant Application for at least approximately one hour, heard him ask AUSA Litt a question, and saw him sign the Warrant. (7/7 Tr. 43-44).  In short, there was nothing about the process of obtaining the Warrant that should have raised any suspicions about its legality.  To the contrary, everything suggested that the Warrant had been carefully considered by the Magistrate.

From Inspector Feiter's perspective, and by reasonable inference, the perspective of those who executed the Warrant, the Warrant was facially valid.  It bore: (1) the signature of a U.S. Magistrate Judge in the Southern District of New York, where the premises to be searched were located; and (2) the seal of the Court.  (12/14 Tr. 91).  There was nothing about the form of the Warrant to indicate that it was defective in any way.

Inspector Fraterrigo believed that the content of the Warrant was supported by probable cause.  Her testimony on cross-examination and re-direct examination, see supra, at 3-6, made that abundantly clear, and it is a fair inference that other experienced Inspectors who participated in the search thought so too.  Postal Inspectors Jean Wright and Thomas Feeney – very experienced agents, with thirteen and nine-year careers as Postal Inspectors, respectively – both participated in the search.  (12/14 Tr. 19, 33; GX 2).  Although neither Inspector Wright nor

76

Inspector Feeney testified about their participation in the execution of the Warrant, it is

nevertheless noteworthy that these four Inspectors, with more than 56 combined years of law

enforcement experience, all participated in the search.  Inspectors Wright and Feeney were given

the entire Warrant Application and were instructed to read it.  (12/14 Tr. 78-79, 123, 160; 7/7 Tr.

51; 8/8 Tr. 4-5).  Inspector Feiter, who did not review the Criminal Complaints, had received

additional facts about the investigation from Inspector Fraterrigo in his capacity as her

supervisor.  (12/14 Tr. 137).  The fact that these experienced and knowledgeable Inspectors

participated in the search is a fair indicator that a reasonably trained, objective Inspector would

not have recognized any defect in the Warrant.

Finally, the fact that there is a judicially recognized "all records" exception that allows

for even broader seizures than those made by the search team that executed the Warrant here, is

also relevant to determining whether an objective agent could have relied on the Warrant in good

faith.  The applicability of that doctrine to complicated factual circumstances is precisely the

kind of question about which "reasonable minds frequently may differ."  Leon, 468 U.S. at 914.

Where, as here, the Warrant Application contained a plethora of detailed facts and allegations,

not a "bare-bones" affidavit based on conclusory allegations, and where the Warrant Application

was drafted, reviewed and approved by two experienced Assistant United States Attorneys, it

was reasonable for the search team to rely on Magistrate Judge Maas's determination of probable

cause.  Assistant United States Attorneys and Federal Magistrate Judges may reach judgments

about probable cause that are found, in retrospect, to have been incorrect.  The purpose of the

Exclusionary Rule, however, is not to deter judges and magistrates.  See Leon, 468 U.S. at 917.

It is meant to deter unlawful police action.  See id. at 918.  Where, as here, there is no evidence

that Magistrate Judge Maas abandoned his neutral and detached role, and where there is likewise no evidence that the Assistant United States Attorneys who approved the Warrant Application had any doubt about the sufficiency of probable cause for the Warrant, application of the Exclusionary Rule would only engender social costs to the criminal justice truth-seeking process with no attendant deterrent benefits.  Accordingly, defendants' motion should be denied.

**b.      The Circumstances Of The Search Show That The Warrant Was Executed  In A Manner Evidencing Good Faith**

The evidence from the suppression hearing demonstrates that the Warrant was not executed as a "general warrant," but rather was executed in a reasonable manner in conformity with the Fourth Amendment.  This search was not executed perfectly, but that is not the standard mandated by <u>Burke</u>, or any other case assessing the applicability of <u>Leon</u>.  No search ever is. The totality of the circumstances including the manner in which the Warrant was executed was reasonable, the facial validity of the Warrant and Warrant Application, and the fact that the Warrant was reviewed and approved by Assistant United States Attorneys and a Magistrate Judge, all would permit an objective agent reasonably to rely on the Warrant.

<u>First</u>, Inspectors Feiter and Fraterrigo held a twenty to twenty-five minute briefing to: provide information to the search team, including background on the investigation; highlight items of special interest; distribute copies of the Warrant and Warrant Affidavit, instruct the search team to read and rely on the Warrant and Warrant Affidavit; field questions; and, instruct the members of the search team to consult Inspectors Feiter and Fraterrigo should questions arise during the search.[27]  (<u>See</u>, <u>supra</u>, A.2 at ).

---

[27]      The Government acknowledges that there are things that could have been done differently in the preparations for, and execution of, the Warrant.  For example, it would have

78

Second, Inspector Fraterrigo observed the search team members who attended the morning briefing reading the Warrant and Warrant Affidavit, and both Inspector Feiter and Inspector Fraterrigo observed the members of the search team at the premises carrying the Warrant and rider with them and consulting those documents as they reviewed the materials at the office.  (12/14 Tr. 81-82; 7/7 Tr. 53-54)

Third, search team members asked both Inspector Feiter and Inspector Fraterrigo questions about whether or not to seize specific items while conducting the search.  Inspector Feiter answered whatever questions he could, and deferred others to Inspector Fraterrigo.  (12/14 Tr. 81, 119).  Inspector Fraterrigo was present and available to answer questions for eight and one-half of the twelve hours the search team was at the premises.  (Although the search had begun prior to Inspector Fraterrigo's arrival, it is reasonable to infer that it took time to secure the premises, label rooms and positions, sketch the floor plan, record the entry video, and organize supplies for conducting the search, and that the actual search of Amerindo files did not commence immediately upon entry).  Inspector Fraterrigo separately evaluated each question she was asked – sometimes advising colleagues to seize items, and other times directing them to leave items behind. (12/14 Tr. 156; 7/7 Tr. 54-55, 8/8 Tr. 24).

---

been better practice to distribute the Criminal Complaints to all of the search team members, not just to the four members who also served on arrest teams, and to make sure that the reinforcements who had not attended the early morning briefing received a briefing on the investigation and the Warrant.  The record is clear, however, that none of those shortcomings was intentional.  Based on her prior experience, Inspector Fraterrigo had forgotten that the language from the Vilar and Tanaka Complaints had been replicated in the Warrant Affidavit when, in fact, it had merely been incorporated by reference to the separate Criminal Complaints. (7/7 Tr. 50-51; 8/8 Tr. 5).  Likewise, Inspector Fraterrigo was not present when the additional search team members arrived at the premises and assumed, without confirming with Inspector Feiter, that they too had been briefed by Inspector Feiter.  (8/8 Tr. 20-21).

Fourth, the entry and exit video evidence, testimony about how the search was
conducted, the resources committed to the task, and the volume of materials taken, all indicate
that the search was conducted in a reasonable manner and that the Warrant did not serve as a
"general warrant" in practice.  Inspectors did not simply box up entire offices.  (12/14 Tr. 82).
The evidenced adduced at the hearing plainly shows that they examined the contents, and
consulted the Warrant and rider, asked questions, received direction from supervisors, and seized
only what they believed they were authorized to seize.  (12/14 Tr. 81-82; 7/7 Tr. 53-54, 64-79).
In total, approximately 168 boxes of documents were seized by 19 members of the search team
over the course of the day.  Thus, on average, each participant seized about nine boxes of
material over the course of search.  Inspector Fraterrigo seized approximately ten percent of the
contents of Vilar's office – and estimated one-third less than what was authorized under the
Warrant.  (7/7 Tr. 78-79).  Indeed, in her search of Vilar's office, Inspector Fraterrigo
meticulously searched through every greeting card and note in Vilar's office and seized exactly
one card from Lisa Mayer.  (7/7 Tr. 70-71).

According to Tanaka's counsel, approximately 515 boxes of material were left behind,
including materials in the hallway file cabinets and storage room that were inventoried but not
searched, but presumably not including personal items belonging to employees which they no
doubt recovered before the remaining contents of the office were put into storage or things like
blank stationery and copy paper that are not worth paying storage fees to maintain.  (See Nov.
22, 2006 Margolis Ltr.).  Thus, Inspector Feiter's estimate that 30-40 percent of Amerindo's
business records were left behind seems eminently reasonable.  (12/14 Tr. 89).  Moreover, the
record is clear that those records had writing on them and did not merely consist of blank paper.

(7/7 Tr. 67-68, 72, 79, 80, 85-86).

Of course, as with any search, items were taken that should have been left behind, and items were left behind that should have been seized.  That is not surprising, especially when conducting a search of this magnitude.  Moreover, the evidence offered by defendants to show the alleged overreaching in the execution of the Warrant is not persuasive.  For example, within DX NN (the group of nine red and black notebooks seized from Vilar's office about which Inspector Fraterrigo was questioned at length), each of at least seven of those notebooks contain references to one or more of the following: (1) "Lily"; (2) "Paul" (in a context seeming to indicate a reference to Paul Marcus); (3) "Paul Marcus"; (4) "SBA"; (5) "Mayers"; (6) "Mayer"; (7) "SBIC"; (8) "ATGF"; and (9) "Lily Cates."  (DX NN).  Accordingly, Inspector Fraterrigo exercised appropriate judgment in searching Vilar's office – reviewing a sample of the notebooks and making the judgment to seize all similar notebooks based on the references she observed to investments, Cates, and the Mayers.  (7/7 Tr. 76-77).[28]

In sum, the Warrant was: (1) facially valid; (2) not based on bare-bones factual allegations or conclusory assertions; (3) approved by two Assistant United States Attorneys; (4) signed by a federal Magistrate Judge who reviewed the application for over an hour; and (5) executed under the supervision of the affiant and in a manner that makes clear that it did not operate as a general warrant.  Therefore, the record amply demonstrates the good faith reliance of the law enforcement agents on the Warrant and their good faith in executing the Warrant.

---

[28]    Defense Exhibit MM likewise does not support defendants' argument.  Although Inspector Fraterrigo testified that DX MM contained no reference to Cates, the Mayers, Paul Marcus, Joy Urich, or Brian Harvey – after being given just a few minutes on the witness stand to review the notepad – it in fact contains a page with a list including "Lily" and "Paul."  (7/10 Tr. 96-97; DX MM).

Under the totality of these circumstances, and based on the judicial preference for warrants, the deterrence goals of the Exclusionary Rule, and pertinent case law, this Court should deny defendants' motion to suppress.

**C.     Even If The Good Faith Exception Does Not Save The Entire Warrant, The Court Should Only Suppress So Much Of The Seized Evidence That Was Beyond The Scope Of The Valid Portions Of The Warrant**

**1.     Applicable Law**

In United States v. George, 975 F.2d 72 (1992), the Second Circuit adopted the doctrine of severance: the separation of any constitutionally infirm portion of a warrant from the rest of the warrant, thereby permitting the admission of evidence pursuant to the valid portion of the warrant. See id. at 79 (citing United States v. Riggs, 690 F.2d 298, 300 (1st Cir. 1982); United States v. Christine, 687 F.2d 749, 754 (3d Cir. 1982); United States v. Cook, 657 F.2d 730, 735 (5th Cir. 1981)).[29] The Court noted in George that, although it had not previously "explicitly consider[ed] the appropriateness of severance, as such, we have long accepted the underpinning of that doctrine, noting that 'the remedy with respect to any items exceeding the scope of the warrant [is not] invalidation of the search but suppression of those items.'" Id. at 79 (quoting United States v. Dunloy, 584 F.2d 6, 11 n.4 (2d Cir. 1978)). In so doing, the Second Circuit recognized that, "the social gains of deterring unconstitutional police conduct by suppressing all evidence seized pursuant to a partially invalid warrant often are outweighed by the social costs occasioned by such an across the board ruling." Id. at 79. The Court concluded, "Fourth

---

[29]     Although "[t]he Supreme Court has not expressly addressed or adopted the doctrine of severability[,] . . . all federal circuits have followed the doctrine, synonymously referring to it as 'severability,' 'severance,' 'redaction,' or 'partial suppression.'" United States v. Sells, 463 F.3d 1148, 1151 n.1 (10th Cir. 2006) (citing cases).

Amendment guarantees are adequately protected by suppressing only those items whose seizure

is justified solely on the basis of the constitutionally infirm portion of the warrant, which no

reasonably well-trained officer could presume to be valid." Id.  As noted in the leading treatise

on the law of search and seizure,

> it would be harsh medicine indeed if a warrant which was issued
> on probable cause and which did particularly describe certain
> items were to be invalidated in toto merely because the affiant and
> magistrate erred in seeking and permitting a search for other items
> as well.  In the usual case, of course, all the evidence seized under
> a warrant tainted by some constitutional defect is suppressed
> simply because the seizure of every item is entirely attributable to
> the defect.  When the warrant's fault is not so pervasive, however,
> the same objectives of deterrence and integrity may be served in
> the same way and to the same degree by limiting suppression to
> the fruits of the warrant's unconstitutional component.

2 W. LaFave, Search and Seizure § 4.6(f) (4th ed. 2004).

The severance doctrine "is not available where no part of the warrant is sufficiently

particularized, where no portion of the warrant may be meaningfully severed, or where the

sufficiently particularized portions make up only an insignificant or tangential part of the

warrant." George, 975 F.2d at 79-80 (internal citations omitted).

In United States v. Marcus, 807 F. Supp. 934 (E.D.N.Y. 1992), the district court applied

the severance doctrine adopted in George to a case involving an anticipatory warrant contingent

on acceptance of a suitcase belonging to the defendant that had contained child pornography but

from which all but four pornographic slides had been removed.  The warrant authorized the

search of the business office of the defendant – to which he had directed the delivery of the

suitcase – and permitted seizure of:

> Photographs, magazines, books, videotapes, slides and other
> depictions of children engaging in sexually explicit conduct; and

83

> letters, envelopes, release forms, files, correspondence and notes
> relating to the distribution and receipt of child pornography
> through the United States mail and any other common carrier, all
> of which constitute evidence of violation of Title 18, United States
> Code, Section 2252.

Id. at 935.  In pre-indictment litigation pursuant to Fed. R. Crim. P. 41, the defendant

successfully obtained the return of all of his property that had been seized (other than the four

slides), based on a finding by the court that probable cause to search the business was so totally

lacking that the Leon exception to the Exclusionary Rule did not apply.  Id.  The defendant

subsequently moved to suppress statements made after agents entered his business to execute the

warrant.  The court reasoned that the four slides, which were not specifically described in the

warrant, at best made up only an insignificant or tangential part of the warrant, and that they

were included by the Government as a pretext to support an otherwise unlawful seizure.  Id. at

936-37.  In those circumstances, the court found that it would be inappropriate to treat any part

of the warrant as being valid and suppressed the statements obtained from the defendant that

were "fruit" of the illegal entry.  Id. at 937.

    In United States v. Rollack, 90 F. Supp. 2d 263 (S.D.N.Y. 1999), a search warrant was

obtained that permitted the search of defendant's prison cell for "[a]ll mail matter both

previously received and unmailed except for legal mail.  Also all non legal writing materials,

including but not limited to, notes, address books, lists and other writings."  Id. at 268.  The court

upheld the search and seizure of the defendant's correspondence, but found the warrant to be

insufficiently particularized with respect to the "notes, . . . lists, and other writings" to be seized,

and the Government did not dispute that the officers took all of the defendant's personal papers

and pictures.  Id. at 276.  Citing George, the court suppressed all items seized other than

defendant's letters.

**2.    Analysis**

The Government submits that the Warrant is sufficiently particularized as to the items

seized, see supra II.A.2.  The Warrant described particular categories of documents, primarily

records related to: (1) the Amerindo Brokerage Accounts, as that term is specifically described in

the Warrant Application; (2) the SBIC, GFRDA and Rhodes investments; and (3) likely victims,

including those specifically identified, and other unidentified victims whose investments were

custodied in the Amerindo Brokerage Accounts or had their investment managed through

overseas trusts including the overseas trust company (PTC) through which Vilar had induced the

Mayers to invest.

To the extent, however, that the Court finds that the Warrant was overbroad or

insufficiently particularized in some respects, it could sever appropriate parts of the Warrant

under the doctrine announced in George.  Here, unlike the facts in Marcus, there were numerous

specifications in the Warrant that were detailed, focused specifically on the allegations set forth

in the Warrant Application, and amply supported by probable cause.  Those paragraphs are not

an "insignificant" or "tangential" part of the Warrant, but rather lie at its very core.  Moreover,

there is no evidence here that anything was included in the Warrant as a pretext to support an

otherwise unlawful seizure.  Indeed, a far greater proportion of the Warrant was clearly

sufficiently particularized than was the case in Rollack, where only seizure of the defendant's

correspondence was supported by probable cause, and the warrant at issue there authorized the

seizure of all the defendants' writings.  Accordingly, the remedy of severance is appropriate in

this case.

85

There are several ways that the Court could go about severing or redacting the warrant: by time period, by specific investors, by a class of investors, by investment product, or by a combination of these categories. Were the Court to find the Warrant to be overbroad for its lack of a time restriction, the Court could, for example, impose one. The Government submits that there was probable cause to seize documents concerning the five specifically named investors, going back to the beginning of their relationship with the defendants and Amerindo. Likewise, there was probable cause to seize documents relating to those investments and the accounts associated with those investments (e.g., SBIC, GFRDA, Rhodes, the Amerindo Brokerage Accounts) in which the five specifically named investors participated, going back to at least the date on which those investments were first offered. With respect to documents concerning the corporate structure and financial and other interrelationships between the Amerindo entities, the Government similarly believes that there was probable cause to seize documents going back to the dates on which those entities were formed. Significantly, Cates was surprised when Vilar informed her after nearly 20 years of investing with Vilar and Amerindo that she had always been a client of Amerindo Panama and that taxes and fees would be subtracted from her portfolio as part of any redemption.

With respect to documents concerning the finances of defendants and Amerindo, the Government contends that there was probable cause to seize such records extending back several years prior to the first detected theft of client funds (i.e., the theft of Cates's SBIC investment in June 2002). Finally, with respect to paragraph 1, the Government suggests that, if the Court finds that it is overbroad or insufficiently particularized, any such defect could be remedied by striking the "including but not limited to" language about which defendants complain.

86

In light of the strong preference for warrants and the Supreme Court's admonition about the limited circumstances in which the Exclusionary Rule should be applied, this Court should not suppress the evidence in its entirety. To the extent that the Court finds that there are unconstitutional portions of the warrant, those may be severed, and evidence seized under the valid portion – which the Government vigorously continues to submit is the vast majority of the evidence – may be admitted. See George, 975 F.2d at 79.

**D.**    **The Government's Seizure And Search Of Amerindo Computers**
         **Complied With The Requirements Of The Fourth Amendment**

Defendants contend that the Government's search of the computers seized from Amerindo U.S. violated the Fourth Amendment because paragraph 17 of the Warrant was either overbroad or insufficiently particularized in that it did not contain adequate restrictions on the methodology employed to search the data contained in those computers. Specifically, on or about December 14, 2005, defendants filed a motion requesting that the Court establish a list of specific search terms to which the Government would be limited in performing electronic searches of the Amerindo computers. Defendants' motion is without merit for the reasons set forth in the Government's December 23, 2005 opposition letter brief, as is any claim pressed by defendants that paragraph 17 of the Warrant was defective.

**1.**    **Background:  The Warrant And Warrant Affidavit**

Paragraph 17 of the Warrant provided for the seizure of:

> Computers, hard drives, and any other devices or equipments
> capable of storing data or text in any format, including but not
> limited to cellular telephones, personal digital assistants, and any
> other storage media capable of containing data or text in magnetic,
> electronic, optical, digital, analog, or any other format, used to
> store information described above, as well as drafts and final
> versions of documents and correspondence prepared in connection

> with the running and supervision of the operations of the
> investment advisory business.

(Vilar Ex. E, ¶ 17).  The Warrant Affidavit contained an extensive discussion of how computer

evidence would be handled.  The Warrant Affidavit described the potential need to take

equipment off-site to be processed by a qualified computer specialist, and the fact that a

computer user may "seek to conceal evidence of criminal activity by storing it in random order

with deceptive file names," and that, as a consequence, "[s]earching authorities are thus required

to examine all the stored data to determine which particular files are evidence or

instrumentalities of criminal activity."  (GX 33, ¶ 10).  The Warrant Affidavit also disclosed that:

> The analysis of electronically stored data, whether performed on-
> site or in a laboratory or other controlled environment, may entail
> any or all of several different techniques.  Such techniques may
> include, but shall not be limited to, surveying various file
> "directories" and the individual files they contain (analogous to
> looking at the outside of a file cabinet for the markings it contains
> and opening a drawer believed to contain pertinent files);
> "opening" or reading the first few "pages" of such files in order to
> determine their precise contents; "scanning" storage areas to
> discover and possibly recover recently deleted data; scanning
> storage areas for deliberately hidden files; and performing
> electronic "key-word" searches through all electronic storage areas
> to determine whether occurrences of language contained in such
> storage areas exist that are related to the subject matter of the
> investigation.

(GX 33, ¶ 10).

## 2.  **Applicable Law**

Although the Second Circuit has not decided the question, courts all over the country

have found that the Fourth Amendment does not require a search warrant to specify the strategy

to be employed in searching seized computers.  For example, in United States v. Brooks, 427

F.3d 1246 (10th Cir. 2005), the Tenth Circuit stated, "[t]his court has never required warrants to

contain a particularized computer search strategy." Id. at 1251.  The Ninth Circuit likewise has

declined to impose the requirement of inclusion of a computer search protocol in a search

warrant.  See United States v. Hill, 459 F.3d 966, 978 (9th Cir. 2006) ("there is no case law

holding that an officer must justify the lack of a search protocol to support issuance of the

warrant"); United States v. Adjani, 452 F.3d 1140, 1149-50 (9th Cir.) ("To require such a

pinpointed computer search to an email program or to specific search terms, would likely [fail]

to case a sufficiently wide net to capture the evidence sought."), cert. denied, 127 S.Ct. 568

(2006).

District courts have also routinely rejected the argument advanced by defendants.  See

United States v. Kaechele, No. 05-80441, 2006 WL 3510898 (E.D. Mich. Nov. 29, 2006)

(agreeing with the Ninth Circuit and holding that the case law does not require an approach

narrowly tailored to those file types and locations that are more likely to contain the materials

specified in the warrant, "which would invite a computer-savvy target of such a search to adopt

strategies designed to defeat the Government's chosen protocol.");  United States v. Shinderman,

No. Crim. 05-67-P-H, 2006 WL 522105, at *19 (D. Me. Mar. 2, 2006) ("there is no Fourth

Amendment requirement that search warrants spell out the parameters of computer searches

where the warrant provides particularity as to what is being searched for"); United States v.

Calimlim, No. 04-C-248, 2005 WL 2922193, at *8-11 (E.D. Wis. Nov. 4, 2005) (holding

constitutional Magistrate's delegation to agents of all discretion in how seized computers should

be searched); United States v. Maali, 346 F. Supp. 2d 1226, 1245 (M.D. Fla. 2004) ("lack of

detailed computer 'search strategy' does not render the warrant deficient as to the search and

seizure of computers");  In re Search of: 3817 W. West End, 321 F. Supp. 2d 953, 957-63 (N.D.

Ill. 2004) (recognizing the court's power to require the Government to provide a computer

search protocol but emphasizing that it is not "dictat[ing] the specific criteria that the

government must employ in order to supply particularity to its search and seizure of contents of

the computers.").

The reasons for the courts' response to motions such as that made here by defendants are

persuasive and clear.  Numerous courts have observed the practical problems attendant to such a

self- or court-imposed straitjacket.  As the court observed in United States v. Triumph Capital

Group, Inc., 211 F.R.D. 31, 49-50 (D. Conn. 2002), "[k]eyword searches are limited because

they are literal and search only for an exact sequence of characters.  Thus, they do not pick up

variations for misspellings of words or names.  Keyword searches are also limited because they

cannot be conducted on all files, such as image files that contain scanned documents or faxes."

Id.

Apart from these technological limitations, courts have found that keyword searches

suffer from another weakness in that they are easily evaded by deception and concealment.

"Computer records are extremely susceptible to tampering, hiding, or destruction, whether

deliberate or inadvertent."  United States v. Hunter, 13 F. Supp. 2d 574, 583 (D. Vt. 1998).  In

rejecting the defendant's claim that a search of his computer should have been limited to certain

file extensions more likely to be associated with child pornography, the District Court in Hill

noted that "[f]orcing police to limit their searches to files that the suspect has labeled in a

particular way would be much like saying police may not seize a plastic bag containing a

powdery white substance if it is labeled 'flour' or 'talcum powder.'  There is no way to know

what is in a file without examining its contents, just as there is no sure way of separating talcum

90

from cocaine except by testing it."  322 F. Supp. 2d at 1090-91 (C.D. Cal. 2004); see also United

States v. Riley, 906 F.2d 841, 845 (2d Cir. 1990) (noting that records searches permit agents to

search through many papers because "few people keep documents of their criminal transactions

in a folder marked '[crime] records.'"); United States v. Gray, 78 F. Supp. 2d 524, 530 (E.D. Va.

1999) (noting that agents executing a search for computer files "are not required to accept as

accurate any file name or suffix and [to] limit [their] search accordingly," because criminals may

"intentionally mislabel files, or attempt to bury incriminating files within innocuously named

directories."); United States v. Sissler, 1991 WL 239000, at *4 (W.D. Mich. Jan. 25, 1991)

("[T]he police were not obligated to give deference to the descriptive labels placed on the discs

by [the defendant]. Otherwise, records of illicit activity could be shielded from seizure by simply

placing an innocuous label on the computer disk containing them.").  In short, [g]iven the

numerous ways information is stored on a computer, openly and surreptitiously, a search can be

as much an art as a science." Brooks, 427 F.3d at 1251.

        In limited circumstances, courts have required the Government to follow a search plan in

reviewing computer evidence.  In United States v. Hunter, 13 F. Supp. 2d 574 (D. Vt. 1998), for

example, the Government sought and obtained a warrant to search an attorney's office and to

seize computers and digital evidence.  Because of the special circumstances posed by searching

an attorney's office, and the wealth of potentially privileged information to which those seizing

and analyzing evidence would likely be exposed, the Government proposed a plan which was

included in the warrant application "to ensure that all relevant computer records were retrieved

without undue intrusion into records beyond the scope of the search." Id. at 584.  The warrant

itself, however, included the subsequent search limitations only with respect to certain digital

91

storage devices, but not others.  Id.  After finding that "[c]omputer records searches are no less

constitutional than searches of physical records, where innocuous documents may be scanned to

ascertain their relevancy," id., the court in Hunter held that materials seized pursuant to a

paragraph of the warrant to which the limitations had not been incorporated had been taken in

violation of the particularity requirement of the Fourth Amendment."  Id.  The court went on,

however, to find that the "good faith" exception established in United States v. Leon, 468 U.S.

897 (1984) applied, and that no suppression of evidence was warranted.  Id. at 584-85.[30]

> **3.**     **Magistrate Judge Maas Did Not Err By Failing To
>             Require The Inclusion Of A Search Protocol
>             And The Court Should Not Now Impose One After The Fact**

Here, the warrant approved by Judge Maas permitted the Government to seize certain

computers at Amerindo to search for materials set forth with particularity in the warrant.  As the

cases discussed above make clear, the Fourth Amendment demands nothing more.  Unlike the

circumstances in Hunter, the Government was not here bound by the terms of the warrant to

conduct its search of computer data according to a court-approved protocol.  Rather, the Warrant

Affidavit described for Magistrate Judge Maas a non-exhaustive list of techniques which the

Government intended to use to locate the documents it sought.  Finally, the concerns present in

Hunter – the search of an attorney's office, with a potentially very large proportion of privileged

material – was not present here.  The Warrant Affidavit did describe, in general terms, the

---

[30]     Notably, the holding in Hunter, which was seemingly cited by defendants as
standing for the broad proposition that failure to require such limitations on the search of the
seized computers would run afoul of the particularity requirement of the Fourth Amendment, see
Dec. 13, 2005 Wolfe Ltr. at 2), does not stretch that far.  Indeed, as the court noted in United
States v. Lloyd, No. 98 Cr. 529 (ILG), 1998 WL 846822 at *3 (E.D.N.Y. Oct. 5, 1998), "Hunter
does not hold that the absence of a plan to review computer materials is a per se violation of the
particularity clause."

process by which the computer evidence would be searched.  Nothing more was required.  The Warrant was sufficiently particularized and the Government's search of the seized data through the means described in the Warrant Affidavit was proper.

Moreover, limiting the search to Vilar's proposed search protocol authorizing keywords as the <u>exclusive</u> method of conducting the search likely would have permitted relevant evidence to escape discovery.  It is rare to know with certainty that evidence of the crimes for which a search is conducted will contain specified keywords.  Many businesses, and individuals involved in criminal activity, routinely use codewords and abbreviations to identify individuals, entities, and concepts.  Sometimes, the significance of such terms will not be apparent until after a careful file-by-file review has commenced.  For example, in this case, leaving aside the possibility that codewords were employed, key words and phrases like "Lily Cates," "Techno Raquia," and "Amerindo Investment Advisers, Inc." may be depicted in numerous ways, including: "Cates"; "LC"; "L"; "C"; "TR"; "TechRaq"; "Tech Raq"; "T Raq"; "T.R."; "Panama"; and "AIAP."  It would be futile to try to anticipate all the likely shorthand expressions and misspellings to cover the terms likely to be present in the evidence sought.  Any successful computer search strategy must evolve as the experience of those doing the searching grows, just as when searching a file cabinet, an agent may not realize that the documents she thought were not evidence were, in fact, powerful evidence of a crime until finding a document in a desk drawer that allows the agent to understand the significance of the documents she found in the file cabinet.

Circumscribing computer searches to keyword searches is particularly problematic in an investigation of complex white-collar crime, such as here, which, in the context of search of paper documents, may require the assembly of a "'paper puzzle' from a large number of

seemingly innocuous pieces of individual evidence."  United States v. Wuagneux, 683 F.2d

1343, 1349 (11th Cir. 1982).   As the court found in Hunter, "[t]here is no justification for

favoring those who are capable of storing their records on computer over those who keep hard

copies of their records []. Computer records searches are no less constitutional than searches of

physical records, where innocuous documents may be scanned to ascertain their relevancy."

Hunter, 13 F. Supp. 2d at 584.  See also Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976)

("In searches for papers, it is certain that some innocuous documents will be examined, at least

cursorily, in order to determine whether they are, in fact, among those papers authorized to be

seized.").

        The Fourth Amendment does not require that a Warrant permitting the seizure of a

computer include a search protocol and defendants' motion should be denied.  The Warrant

Affidavit described the documents to be seized with sufficient particularity, and the Warrant

approved by the Magistrate did not place any limitation on how the Government could search

computer evidence seized in the search.  Moreover, given the weight of authority against the

proposition advanced by defendants and the lack of any guidance from the Second Circuit, there

was not reason for the executing agents to believe that they could not rely on the facially valid

Warrant.  Accordingly, even were the Court to find that the Warrant was deficient, the evidence

should not be suppressed because of the good faith reliance on the Warrant.  See Leon, 468 U.S.

at 921-22; see also United States v. Buck, 813 F.2d 588, 592-93 (2d Cir. 1987) (finding warrant

overbroad for use of a catch-all phrase "[o]ther evidence relating to the commission of a crime,"

but relying on Leon in denying the motion to suppress because the resolution of the theretofore

unsettled question of law concerning the use of that catch-all phrase could not have been

94

anticipated by the executing officers).

*     *     *

For all the reasons stated herein, and in the prior briefing on these issues, defendants'
challenges to the Warrant and its execution should be denied.

**III.**

**DEFENDANTS' FRANKS MOTION SHOULD BE DENIED**

Defendants assert that Inspector Fraterrigo knowingly and/or recklessly withheld material
information from Magistrate Judge Maas concerning the ability of the Mayers and Cates to
redeem some of their Amerindo investments prior to 2001. (See Tanaka Mem. 3, 6-7, 14-23).
Defendants' Franks motion should be denied because not only did defendants fail to prove the
requisite level of scienter, but the omitted information was not material to the issuance of the
Warrant.

**A.     Defendants Have Failed to Prove That Inspector Fraterrigo
Intentionally Or Recklessly Omitted From The Warrant Affidavit
Information About Prior Redemptions Of Investments By Cates And The Mayers**

"There is . . . a presumption of validity with respect to the affidavit supporting [a] search
warrant." Franks v. Delaware, 438 U.S. 154, 171 (1978). In order to prevail on a Franks motion,
a defendant must prove by a preponderance of the evidence: (1) that the affiant knowingly and
deliberately, or with a reckless disregard for the truth, made false statements or omissions that
created a falsehood in applying for a warrant; and (2) that such statements or omissions were
material to the probable cause determination. See Franks v. Delaware, 438 U.S. 154, 171
(1978); United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005); United States v. Singh, 390 F.3d
168, 183 (2d Cir. 2004); United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003).

95

Omissions are less likely to present "'a question of impermissible official conduct'" because allegations of omissions may result in "'endless conjecture about investigative leads, fragments of information, or other matters that might . . . have redounded to defendant's benefit'" had they been included."  United States v. Lopez, No. 96 Cr. 105 (RSP), 1997 WL 567937, at *2 (N.D.N.Y. Sept. 11, 1997) (quoting United States v. Atkin, 107 F.3d 1213, 1217 (6th Cir. 1997)). Indeed, several circuit courts have acknowledged that a defendant's burden of proof with respect to scienter will rarely be met where omissions are concerned.  In United States v. Ozar, 50 F.3d 1440, 1445-46 (8th Cir. 1995), the Eighth Circuit reasoned that "[r]arely will an unintentional omission be grounds for Franks v. Delaware relief when complex economic crimes are the subject of the investigation.  In such cases, unless the government has lied to the issuing judge, the suppression issue should turn on what was in the government's affidavits, not on what defendants assert with the benefit of hindsight the government should have known."  Id. 1445-46.  Similarly, in United States v. Martin, 615 F.2d 318 (5th Cir. 1980), the Fifth Circuit observed that "it will often be difficult for an accused to prove than an omission was made intentionally or with reckless disregard rather than negligently unless he has somehow gained independent evidence that the affiant had acted from bad motive or recklessly in conducting his investigation and making the affidavit."  Id. at 329.

Neither the Supreme Court in Franks nor the Second Circuit[31] has fleshed out the

---

[31]     In Rivera v. United States, 928 F.2d 592, 604-606 (2d Cir. 1991), a civil action alleging a violation of Fourth Amendment rights, the Second Circuit upheld summary judgment dismissing plaintiffs' Fourth Amendment claims that the search warrant affiant intentionally or recklessly made false statements or omitted material information.  In reviewing the law of Franks, the Court cited Tenth, Fifth and Eighth Circuit cases for the proposition that "recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination."  Id. at 604.  That was dicta.  The Second Circuit did not apply

"reckless disregard" standard in the search warrant context. Two district courts in the Southern

District, following Third and Eighth Circuit precedents, see Wilson v. Russo, 212 F.3d 781, 788

(3rd Cir. 2000); United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993), have applied the

standard that omissions from a search warrant affidavit are made with reckless disregard if an

officer "withholds a fact in his ken" that "any reasonable person would have known [ ] was the

kind of thing the judge would wish to know." United States v. Perez, 247 F. Supp.2d 459, 474

(S.D.N.Y. 2003) (internal quotations omitted); United States v. Harding, 273 F. Supp. 2d 411,

426 (S.D.N.Y. 2003).

Although the standard for reckless disregard may not be sharply defined in this Circuit, it

is clear nonetheless that "'[a]llegations that amount to negligence or innocent mistake do not

constitute the required showing. The focus is not on whether a mistake was made, but rather the

intention behind the mistake.'" United States v. Cook, 348 F. Supp. 2d 22, 29 (S.D.N.Y. 2004)

(citing United States v. Markey, 131 F. Supp. 2d 316, 324 (D. Conn. 2001)); see also United

States v. Trzaska, 111 F.3d 1019 (2d Cir. 1997) (finding no clear error in district court's finding

that any false statements in the affidavit "were a result of these mistakes and other

misunderstandings, and that these mistakes and misunderstandings did not arise to a deliberate or

reckless disregard for the truth").

---

that standard to infer recklessness in that case. Instead, the Court reviewed plaintiffs' claims,
held that plaintiffs did not meet the "high standard" of Franks, and affirmed the district court's
grant of summary judgment on those claims premised on Franks. In United States v. Canfield,
212 F.3d 713 (2d Cir. 2000), the Second Circuit concluded that "[b]ecause we ultimately decide
that these inaccuracies [including an omission about the confidential informant's criminal
record] are not material to the probable cause determination, we need not decide whether they
are actually erroneous or whether they were the result of the affiant's 'reckless disregard for the
truth.'" Id. at 718.

It is also clear that "the mere intent to exclude information is insufficient." Awadallah, 349 F.3d at 67-68 (citing United States v. Colkley, 899 F.2d 297, 300-01 (4th Cir. 1990)). As the Fourth Circuit observed in Colkley,

> An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation. However, every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly. If . . . this type of 'intentional' omission is all that Franks requires, the Franks intent prerequisite would be satisfied in almost every case . . . . [Rather,] Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate.

Colkley, 899 F.2d at 300-01 (emphases in original). In Awadallah, the Second Circuit held that "even assuming that four of the statements identified by the district court were misleading, there is no basis to conclude that they were intentionally or recklessly so." Awadallah, 349 F.3d at 68. The Court found that the district court's finding that the statements were "not a result of mistake or accident" did not meet the scienter requirement under Franks because the "mere intent to exclude information is insufficient" where there was "no finding of recklessness or bad intent." Id. at 67-68.

Here, defendants have failed to meet their burden under the first prong of Franks of showing that Inspector Fraterrigo acted with the requisite scienter and intentionally, knowingly, or recklessly omitted information about redemptions/payments to the Mayers and Cates prior to 2001 from the Warrant Affidavit. As a preliminary matter, just as was the case in Awadallah, 349 F.3d at 67, the Warrant Affidavit itself "disclaims any pretense of completeness": "Because this affidavit is submitted for the limited purposes of establishing probable cause to search the premises described below and seize certain items as specified in Schedule A hereto, I have not

98

included the details of every aspect of the investigation." (GX 33 ¶ 2). The Warrant Affidavit also provided that "[w]here actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated." (Id.). Inspector Fraterrigo plainly advised Magistrate Judge Maas that the Affidavit, particularly where she recounts conversations and statements of others, did not include all the facts known to her or all the details gathered in the course of the investigation. Inspector Fraterrigo simply could not have – nor does well-established precedent expect her to – include all the details provided by victims to the Government in the search warrant affidavit. Such a requirement would not only be onerous, but would violate the spirit of Franks which requires a high level of scienter to establish a Franks violation on the part of an affiant. "[M]ere intent to exclude information is insufficient." Awadallah, 349 F.3d at 67.

There is absolutely no evidence in the record showing that Inspector Fraterrigo excluded information about prior payments and/or redemptions to Cates and the Mayers from the Affidavit with the intent to mislead the magistrate. To the contrary, Inspector Fraterrigo testified at the Franks hearing that she believed that the final version of the search warrant affidavit that was presented to Magistrate Judge Maas was accurate. (11/15 Tr. 20). Inspector Fraterrigo testified that she went through the affidavit line by line, verified each of the facts and statements in the affidavit and made sure that the affidavit was truthful and accurate based on the information, including her notes, that she had available at that time. (11/15 Tr. 20). Those careful steps taken by Inspector Fraterrigo to review the Affidavit and verify its accuracy belie any claim that she acted with recklessness or bad intent.

Significantly, Inspector Fraterrigo testified at the Franks hearing that she did not consider

99

one way or the other whether to include information that the Mayers and Cates were able to redeem some of their Amerindo investments or that the Mayers and Cates did not experience difficulty getting funds from Amerindo until 1997 and the Fall of 2002, respectively, in the Warrant Affidavit. (11/15 Tr. 22-24, 36-37, 48). Inspector Fraterrigo testified that she did not make a conscious decision to omit that information from the Warrant Affidavit and did not consider whether that fact would be significant to the magistrate judge reviewing the warrant application. (Id. at 22-24, 39, 144). At the time that she swore to the search warrant affidavit, Inspector Fraterrigo testified that she did not intend to mislead the magistrate judge in her description of the Mayers' or Cates's investment history with Amerindo. (Id. at 23, 24). See Awadallah, 349 F.3d at 68 ("Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate.") (quoting Colkley, 889 F.2d at 300-01) (emphasis in original).

With respect to the sentence in the Affidavit that "Lisa Mayer described years of begging Vilar to release some of their investment to pay for the care of her sick father – who Vilar had known for some 30 years, and who was one of Vilar's original investors – and Vilar's rejection of those requests," (GX 33 ¶ 6A), Inspector Fraterrigo testified that she believed that that statement was accurate because Lisa Mayer told her that since 2002 when the Mayers purchased their home in Scarsdale and needed funds to renovate and take care of her sick father, the Mayers has been trying, without success, to get money from Alberto Vilar. (11/15 Tr. 22). In Inspector Fraterrigo's view, by the time she swore out the Affidavit on May 25, 2005, such efforts constituted years of the Mayers trying, without success, to get money. The term "begging" in that sentence stemmed in large part from the incident described by Lisa Mayer to Inspector

100

Fraterrigo in December 2002 in which Lisa Mayer, Debra Mayer and Dr. Herbert Mayer in a

wheelchair went to Vilar's residence in Manhattan and spoke to his doorman.  The doorman

indicated that Vilar was upstairs and the Mayers, who believed Vilar was in his apartment, rang

his door bell for an hour pleading with him to give them their money.  (Id. at 16-17).  Certainly a

disabled man in a wheelchair ringing Vilar's door for over an hour to plead for his family's

money can fairly be described as begging.  Moreover, it is significant that the sentence plainly

advises Magistrate Judge Maas that Inspector Fraterrigo was recounting Lisa Mayer's

description of her interactions with Mr. Vilar, and that it was not Inspector Fraterrigo's

characterization of events.

Inspector Fraterrigo believed that her statement in the Affidavit that, "[t]he totality of the

circumstances in this case, including investors being prevented from redeeming or transferring

their multimillion dollar investments," was accurate based on her interviews of Cates and Lisa

Mayer, who both told her that they were unable to redeem or transfer their Amerindo

investments.  (11/15 Tr. 22-23).  Though defendants may argue that this statement was

misleading because it did not contain a time frame, it was transparent to the Magistrate Judge

that this was a conclusory paragraph summarizing the "totality of the circumstances in this case,"

that had been described in detail in the Warrant Affidavit (including the Vilar and Tanaka

Complaints) (GX 33 ¶ 6.F).  The Affidavit makes clear that it was in 2003 when the Mayers

attempted to redeem approximately $12 million in their GFRDA account but Vilar, Tanaka and

Tanaka's wife rebuffed their efforts.   (GX 33 ¶ 6.A).  Similarly, the Affidavit informs the

Magistrate that "[i]n approximately February 2005, Cates attempted to redeem her entire

investment portfolio at Amerindo . . . but Amerindo and Vilar have refused to move her

investment portfolio to Bear, Stearns & Co. Inc." (GX 33 ¶ 6.B.). Because the Affidavit plainly spelled out when the two victims attempted to redeem or transfer their investment portfolios, defendants have failed to show that Inspector Fraterrigo omitted information, specifically a time period, in paragraph 6.B., with the design to mislead the magistrate.

The most that the record here reveals about Inspector Fraterrigo's failure to include the information about payments to and/or redemptions by the Mayers and Cates prior to 2001 is that Inspector Fraterrigo did not consider the information one way or another. At worst, Inspector Fraterrigo was merely negligent in failing to disclose all potentially relevant facts to the magistrate, although Inspector Fraterrigo expressly disclaimed that she was recounting all facts relevant to her investigation in her Affidavit. See United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980) ("it follows from Franks that the accused bears the burden of showing by a preponderance of the evidence that the omission was more than a negligent act.") In any event, Inspector Fraterrigo's "acts fell far short of the level of flagrant police action Franks is designed to prevent." Colkley, 899 F.2d at 301.

Furthermore, "the nature of the omissions does not itself suggest concealment," Awadallah, 349 F.3d at 68,[32] nor was the omitted information the kind of information "any reasonable person would have known [ ] was the kind of thing the judge would wish to know." Perez, 247 F. Supp. 2d at 474. Courts have inferred or found recklessness only in circumstances where an officer withheld potentially exculpatory information or in the face of coercive or

_____

[32]    In Colkley, the Fourth Circuit expressed "doubts about the validity of inferring bad motive under Franks from the fact of omission alone, for such an inference collapses into a single inquiry the two elements – 'intentionality' and 'materiality' which Franks states are independently necessary." 899 F.2d at 301.

flagrant police conduct.

In <u>Perez</u>, Judge Chin concluded that the agents acted recklessly in omitting the information that Candyman members had e-mail delivery options, including the option of receiving no email at all, "because there was absolutely no support for their assertion that all members automatically received all e-mails" and the consequence of omission was that every Candyman subscriber did not automatically receive emails that forwarded emails of child pornography, which was contrary to the agent's representations in the search warrant affidavit. 247 F. Supp. 2d at 478-481.   In <u>United States</u> v. <u>Jacobs</u>, 986 F.2d 1231 (8th Cir. 1993), the Eighth Circuit found that the officer acted with reckless disregard when he told the magistrate judge that a drug-sniffing dog showed "interest" in the defendant's bag, but omitted the information that the dog had not gone into "alert," as it was trained to do if drugs were present. 986 F.2d at 1234; <u>see also</u> <u>United States</u> v. <u>Frost</u>, 999 F.2d 737 (3rd Cir. 1993) (under similar set of facts reaching only second prong of <u>Franks</u> and holding that affidavit would still have provided probable cause even if it had contained the omitted information).  In <u>Wilson</u> v. <u>Russo</u>, the Third Circuit held that an officer's failure to disclose the differential in height between the defendant (5 foot 11 inches) and the description of the assailant as reported by the two victims (between 6 feet 3 inches and 6 feet 5 inches) was reckless, since any reasonable person would have wanted to know that fact.  212 F.3d 781, 787 (3rd Cir. 2000).

In <u>United States</u> v. <u>Davis</u>, 617 F.2d 677, 694 (D.C. Cir. 1979), the D.C. Circuit suggested that recklessness should be inferred from the omission of information only in the face of flagrant police actions, as when officers take statements out of context or engage in particularly overbearing conduct.  <u>Id</u>. at 694.  Even in that narcotics case where the affidavit omitted

information about alleged coercive tactics used by the police against an informant, including insinuating that harm might befall the informant's female companion, the court held that an inference of recklessness was not warranted because the informant had spoken against penal interest and the police had made some efforts to corroborate him. Id.

Defendants can hardly claim here that the omitted information was potentially exculpatory or the result of flagrant or coercive agent behavior. Any reasonable person would want to know potentially exculpatory information about whether the defendant merely subscribed to a website versus received child pornography through that website, as in Perez, whether the defendant was the one who committed the crime, as in Wilson, or whether a defendant possessed drugs, as in Jacobs. None of those cases involved omitted facts in a fraud case, which bears out the Eight Circuit's conclusion in Ozar: "[r]arely will an unintentional omission be grounds for Franks v. Delaware relief when complex economic crimes are the subject of the investigation." 50 F.3d at 1445.

In this case, the omitted facts regarding the investment history of two long-term clients of Vilar and Amerindo only buttressed, as set forth in section B, infra, the Government's claim that the defendants were engaged in a scheme that defrauded Amerindo investors. In United States v. Harding, 273 F. Supp. 2d 411 (S.D.N.Y. 2003), the court denied a Franks hearing to explore the bias of a cooperating witness against the defendant because that alleged omitted fact was "commonplace." Id. at 426-27 (finding that confidential informants often have strong feelings about the subjects of their cooperation). Here, it is typical for investors in financial fraud schemes to receive returns on their investments early on in their investment relationship with the perpetrators of the scheme, and it is therefore completely natural that Inspector Fraterrigo would

not have thought about including that information in the Warrant Application.  It was not

reckless for Inspector Fraterrigo to fail to include that information because, "it is not clear that

this is something a reasonable person would know a judge would want to know."  Id. at 427.  It

would belie common sense and violate Franks for recklessness to be inferred here with respect to

omitted facts that are commonplace and typical in financial fraud schemes.

Furthermore, it should have been obvious to Magistrate Judge Maas that, had Inspector

Fraterrigo been aware of any other problems encountered by Cates and the Mayers with their

investments, information about those experiences would have been recounted in the Warrant

Application.  Finally, defendants have put forth no evidence demonstrating that Inspector

Fraterrigo had any reason to doubt the allegations in the affidavit regarding the Mayers' and

Cates's investment history with Amerindo or that she intended to mislead the magistrate in

omitting information about pre-2001 redemptions or payments to those victims.  Accordingly,

defendants have failed to sustain their burden under the first prong of Franks.

**B.      Defendants Have Failed To Prove That the Alleged Omissions**
**Were Necessary To The Finding Of Probable Cause**

A statement or omission "is material when 'the alleged falsehoods or omissions were

necessary to the [issuing] judge's probable cause finding.'" Awadallah, 349 F.3d at 64-65

(quoting Canfield, 212 F.3d at 718); see also United States v. Martin, 426 F.3d 68, 73 (2d Cir.

2005) (quoting Awadallah and Canfield for the materiality standard under Franks).  The

standard is not whether the information would be relevant to the probable cause determination

but whether the omitted information would, in essence, defeat probable cause.  See id.  If this

Court finds that there were material omissions in the Affidavit that were made intentionally or

recklessly, the Court must then include the omitted information and then proceed to "determine

whether the remaining portions of the affidavit would support probable cause to issue the warrant." Canfield, 212 F.3d at 718.

Even assuming arguendo that the defendants have satisfied their burden of proving scienter, they have failed to prove that the omitted information was necessary to the issuance of the warrant. The Affidavit in this case provides that based on the facts set forth in the warrant application, along with the training and experience of the agent, it appeared that "Amerindo and its principals, Vilar and Tanaka, defrauded investors, have converted investor funds to their own personal use, and are conducting a Ponzi-type scheme in which investor funds are not being properly accounted for and segregated." (GX 33 ¶ 8). As a result, the Affidavit concludes there is probable cause to believe that a number of federal statutes, including the wire fraud, mail fraud, investment adviser fraud and money laundering statutes, had been violated.

Notably, it is typical in securities fraud cases – and in particular Ponzi-type schemes– for initial investors to be paid promised returns and realize a return on their initial investment. See Armstrong v. Guccione, Nos. 04-5448-PR(L), 05-0280-PR(CON), 2006 WL 3404803, at *1 (2d Cir. Nov. 27, 2006) ("Over time, the investment program turned into a massive pyramid (Ponzi) scheme, in which [the defendant] used the cash flow generated by new-investor money to pay off old investors and mask the massive investment losses."); In re Manhattan Investment Fund Ltd., 310 B.R. 500, 506-507 (S.D.N.Y. 2002) (noting that a Ponzi scheme "cannot work forever," that the "investor pool is a limited resource and will eventually run dry," and that the "perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.") (internal quotation marks omitted).

In United States v. Masten, 170 F.3d 790 (7th Cir. 1999), an appeal of a defendant's

conviction for mail fraud and money laundering following a jury trial, the Seventh Circuit

observed that there were numerous examples in the record of the defendant's intent to defraud,

including the defendant's unilateral alteration of the partnership agreement; the defendant's

misrepresentations about the company's financial situation; and his refusal to return the money

of investors who asked for a refund.  Id. at 795.  The Court described the defendant's technique

of "paying off an earlier investor with the money supplied by subsequent investors" as a "classic

component of the well known fraudulent Ponzi scheme."  Id. at 797 (citing United States v.

Brown, 47 F.3d 198, 201 n. 1 (7th Cir. 1995) ("The classic Ponzi scheme involves individuals . .

.who convince investors to purchase interests in phony or unprofitable . . . partnerships, payoff

off old investors with the money from new investors.")).  The Court reasoned that "[j]ust as the

payoff of an initial Ponzi investor perpetuates a Ponzi scheme, the $20,000 refund to [an earlier

investor] also served to promote [the defendant's fraud], since the refund not only served to

foster good will among the distributors, but it also served to nurture the (false) impression that

distributors who asked for their money back would receive it."  Id. (emphasis in original).  These

observations plainly show that it is common in financial fraud schemes for the defendant to

induce clients to make an investment, show earlier investors satisfactory returns for a period of

time in order to convince them to invest additional money, and then to use new investor money

to pay earlier investors off, particularly when they complain and threaten to sue the defendant or

expose the defendant to regulators.[33]

--------

[33]    This is precisely what happened with respect to Cates in the Amerindo SBIC.  As charged in the superseding indictment, approximately $2.85 million of that investment was part of the approximately $3,102,958.85 wire transfer to the Luxembourg Account, which funds were used to partially redeem another victim's investment in an Amerindo GFRDA.  (Ind. ¶ 25).

Against this backdrop of hallmarks characteristic of financial fraud and Ponzi-type schemes, the omitted facts regarding payments and redemptions to two early investors of Amerindo – the Mayers and Lily Cates – <u>buttress</u>, rather than undermine, the probable cause in the Affidavit.  A Ponzi-type scheme as described in the Affidavit could simply not exist without old investors being paid off.   As is evident from the cases cited above, the point at which the investment pool ran dry and the scheme collapsed is not indicative of when the scheme first started.   To find in this case that the omitted information regarding earlier payments to Cates and the Mayers was material to issuance of a warrant would be tantamount to requiring a detailed listing in search warrant affidavits of all investments and payments to and from victims in every financial fraud case.  That would be counter to the law and spirit of <u>Franks</u>, which protects against omissions that are <u>designed to mislead</u>, or that are made in <u>reckless disregard of whether they would mislead</u>, the magistrate.  <u>Colkley</u>, 899 F.2d at 300-01 (emphases in original).

At the oral argument on the <u>Franks</u> motion, the Court appeared to focus primarily on the "failure to redeem" aspect of the fraud.  But that aspect of the defendants' financial fraud schemes is only a snapshot into Amerindo's myriad fraudulent and deceptive practices as an investment adviser.  It is significant that the defendants could be charged with investment adviser or securities fraud even had they <u>fully</u> redeemed their clients' money from the get-go and not stonewalled investors as the defendants did so here.  In the case of <u>United States</u> v. <u>Alan Bond</u>, Judge Sand charged that in order to find the defendant guilty of violating the Investment Advisers Act (under which Vilar was initially charged in the Complaint and both defendants were ultimately charged in the Indictment), the government must establish, among other things, that "the defendant, acting on behalf of the [investment adviser] employed a devise, scheme or

artifice to defraud the client named in the count that you are considering.  A scheme or artifice to defraud includes <u>any transaction, practice or course of business intended to defraud a client</u>." (<u>United States</u> v. <u>Bond</u>, 01 Cr. 1140 (LBS) 6/5/02 Tr. 1624).  This element, similar to the charge in a 10b-5 securities fraud violation, makes it clear that any practice intended to defraud a client satisfies this element.  A misrepresentation in inducing a client to invest, a unilateral change to the terms of a client's investment and the misappropriation of a client's funds all satisfy this element and are separate and distinct practices from a principal's failure to redeem a client's investment portfolio.

In this case, there were many aspects of the fraud described in the Affidavit involving misrepresentations by the principals, misappropriation of client funds, unilateral changes by Amerindo and the principals to victims' GFRDA investments, all of which had nothing to do with whether or not victims could redeem or transfer their investments.  To suggest that the entire Affidavit and incorporated complaints were premised only on the inability of victims to redeem or transfer their investments is simply belied by a reading of the Warrant Application in its entirety.  For example, the Warrant Affidavit provided evidence that during the course of the fraud scheme, Cates was subjected to a variety of fraudulent and deceptive practices including Vilar's repeated false representations about the status of the SBIC investment (GX 33A ¶¶ 20, 21, 22, 21A) and the forgery of Cates's signature on a wire transfer instruction which resulted in $250,000 being transferred without her knowledge or authorization from an account she held at Bear, Stearns, to a personal bank account held by Vilar (GX 33A ¶¶ 22A-24).  In addition, at the same time that investors who had invested at least $17 million with Amerindo were unsuccessfully attempting to redeem their investments, including the Mayers' $12 million

"absolutely safe and liquid" investment, millions of dollars of investor funds were being used to buy thoroughbred racehorses, tens of millions of dollars were being transferred from the Amerindo Brokerage Accounts (including accounts denominated "Amerindo Technology Growth Fund Inc." and "Amerindo Technology Growth Fund II") to overseas bank accounts, and millions of dollars were being transferred from the Amerindo Brokerage Accounts to fund Amerindo business expenses. (GX 33 ¶¶ 6.A, 6.C; GX 33B ¶¶ 13-15).

In light of this ongoing pattern of fraud and deception involving misrepresentations to investors about the status of their investigations, forgery of a long-time client's signature, the misappropriation of millions of dollars of funds from investors whom the defendants had known for decades, and the use of tens of millions of dollars of other investor funds to purchase horses and for other purposes, the Government sought and obtained a broad search warrant seeking evidence of the fraud including when the fraud began, who was involved, how the fraud was conducted, and who had been victimized. It is in that context which this Court must evaluate Inspector Fraterrigo's "omissions" regarding payments made to Cates and the Mayers prior to 2001 and their materiality to the issuance of the warrant. Because the fraud described in the lengthy complaints and the Affidavit did not just merely describe a failure to redeem investor funds (and even if it did, for the reasons described above, the Government submits that the omitted information supported rather than undermined probable cause), but a complex multi-faceted fraud that spanned many years and some of Amerindo's long-time investors, the omitted information was not necessary to the probable cause determination. If the Court were to include this information in the Affidavit, the corrected affidavit would still support probable cause. Defendants have failed to demonstrate that the omission of this information was material, and

therefore, their <u>Franks</u> motion should be rejected.

**IV.**

**THE U.K. SEARCH WAS ENTIRELY LAWFUL
AND DEFENDANTS' MOTION TO SUPPRESS SHOULD BE DENIED**

Defendants contend that the search of Cadogan Tate was unlawful because: (1) the

Government failed to obtain a <u>U.S.</u> search warrant from a <u>U.S.</u> court so that they could assist

<u>U.K.</u> authorities to search the property of a <u>U.K.</u> company stored in a <u>U.K.</u> storage facility; (2)

the search was not "reasonable" under Fourth Amendment because, among other things, it did

not comply with U.K. law; (3) the Postal Inspectors that assisted with the search acted in bad

faith; and (4) the evidence seized was derived from information obtained from the U.S. search

and therefore constitutes "fruit of the poisonous tree."  Each of defendants' arguments is fatally

flawed and defendants' motion to suppress should be denied.

**A.    The Government's Failure To Obtain A Search Warrant
From A U.S. Court Did Not Violate The Fourth Amendment**

For the reasons discussed in its initial opposition brief, the Government contends that

U.S. law neither allowed nor required the Government to obtain a search warrant from a U.S.

court prior to assisting the Metropolitan Police with their execution of a U.K. search warrant

obtained in response to the Government's MLAT request.  Accordingly, none of the legal

consequences urged upon the Court by defendants should follow from the Government's failure

to do so.  (<u>See</u> Gov't Opp. U.K. Br. Point II.B. at 17-27).

In <u>United States</u> v. <u>Verdugo-Urquidez</u>, 494 U.S. 259 (1990), a case involving the

extraterritorial application of the Fourth Amendment to searches of non-U.S. citizens, a total of

seven justices expressly stated or implicitly agreed that the Warrant Clause of the Fourth

111

Amendment does not apply to extraterritorial searches. Chief Justice Rehnquist, writing for five of six justices in the majority, noted that a warrant "would be a dead letter outside the United States." Id. at 274. The Ninth Circuit, has likewise found that foreign searches could not be subject to the warrant requirement "as a practical matter." United States v. Barona, 56 F.3d 1087, 1093 & n.1 (1995).

The futility of requiring the Government to obtain a domestic search warrant for a foreign search to be conducted by and under the supervision of foreign law enforcement authorities was made clear by testimony elicited at the hearing. Law enforcement witnesses from both sides of the Atlantic Ocean agreed that a U.S. warrant would have no force in the U.K.

Inspector Fraterrigo gave no consideration to applying to a U.S. magistrate judge for a warrant to search the Cadogan Tate warehouse because, in her words, "I'm a U.S. federal agent and I don't have the authority to conduct a search or request for a search for a location abroad in a foreign [country]." (7/7 Tr. 97). Inspector Fraterrigo later reiterated that, based on her understanding of U.S. law and personal experience, as U.S. federal agents, she and her colleagues "didn't have the authority to seize any items in the U.K." (7/7 Tr. 113). Accordingly, she could not swear out a warrant affidavit in support of a warrant seeking authority to do something that she knew that she did not have the authority to do.

Detective Sergeant Shaw's testimony also buttresses the Government's view that any extraterritorial warrant issued by a U.S. court would have been a dead letter in the U.K., would not have allowed anyone access to the Cadogan Tate warehouse, and would have had no discernible impact on whether a U.K. warrant were sought or issued:

> THE COURT: Okay. If Inspector Fraterrigo and her
> colleagues had showed up at Cadogan Tate on October 13th with a

112

warrant issued by an American judge, would they have gotten access to the premises, as far as you know?

THE WITNESS:  Absolutely not, sir.  Some countries – actually, the domestic legislation requires them to obtain a domestic warrant before applying for an MLAT search.  I'm thinking of the Germans in particular.  I get a lot of requests from Germany with an attached domestic warrant.  It has no impact upon my determination or the determination of everybody else in the chain of authority as to whether or not that request should be executed.

THE COURT:  But that wouldn't have given them any legal authority to search?

THE WITNESS:  Absolutely not.

(6/1 Tr. 433).[34]

The assessment of the Supreme Court and the Ninth Circuit is accurate.  Neither the terms of the Fourth Amendment, history, case law, or pragmatic considerations support the extraterritorial application of the Warrant Clause in a case such as this, and this Court should not so hold.

---

[34]     Detective Sergeant Shaw's acknowledgment on re-cross that he would have attached any domestic warrant annexed to an MLAT request to his warrant application, and that he had "no doubt that the [U.K.] magistrate considers [an] application in its entirety," does not detract from the point.  (See id. at 434).  This Court may draw the inference that, as Detective Sergeant Shaw testified, a U.K. judge would likely consider the entirety of any warrant application, but nevertheless would evaluate that application under the applicable standards for obtaining a U.K. warrant.  Detective Sergeant Shaw's testimony offers no insight into what weight, if any, a U.K. magistrate would attach to a U.S. warrant appended to an MLAT request incorporated in a U.K. warrant application.

**B.    The Search Conducted By The Metropolitan Police
With The Assistance Of The U.S. Postal Inspectors
Fully Complied With U.K. Law And Was, Therefore,
"Reasonable" Under The Fourth Amendment**

The Fourth Amendment protects the "[r]ight of the people to be secure in their persons,

houses, papers, and effects, against <u>unreasonable</u> searches and seizures."  U.S. Const., amend. IV

(emphasis added).  "As the text of the Fourth Amendment indicates, the ultimate measure of the

constitutionality of a government search is 'reasonableness.'"  <u>Vernonia School District 47J</u> v.

<u>Acton</u>, 515 U.S. 646, 652 (1995).   The assessment of reasonableness under the Fourth

Amendment is fact-specific and not subject to any bright-line rules.  See <u>Ohio</u> v. <u>Robinette</u>, 519

U.S. 33, 38 (1996) (the Supreme Court has "consistently eschewed bright-line rules, instead

emphasizing the fact specific nature of the reasonableness inquiry"); <u>see</u> <u>also</u> <u>United States</u> v.

<u>Montoya de Hernandez</u>, 473 U.S. 531, 537 (1985) (reasonableness depends on "all of the

circumstances surrounding the search or seizure and the nature of the search or seizure itself");

<u>Coolidge</u> v. <u>New Hampshire</u>, 403 U.S. 443, 509-10 (1971) ("[t]he relevant test is . . . the

reasonableness of the seizure under all the circumstances.").

In evaluating the reasonableness of searches under the Fourth Amendment, courts

consider the affected individual's subjective expectations of privacy, as limited by society's

recognition of those expectations.  <u>See</u>, <u>e.g.</u>, <u>Rakas</u> v. <u>Illinois</u>, 439 U.S. 128, 144 n. 12 (1978)

("Legitimation of expectation of privacy by law must have a source outside of the Fourth

Amendment, either by reference to concepts of real or personal property law or to

understandings that are recognized and permitted by society.").  In cases involving

extraterritorial searches, the pertinent Fourth Amendment concern is the reasonableness of the

search in light of the norms of the country where the search occurred.  In evaluating the

114

reasonableness of foreign searches, courts have found that where the law of the foreign nation is

followed, the reasonableness requirement of the Fourth Amendment is satisfied.  See United

States v. Peterson, 812 F.2d 486, 491 (9th Cir. 1987) (if a foreign "joint venture" search of an

American citizen complies with the requirements of foreign law, that search should be accepted

as reasonable within the meaning of the Fourth Amendment); United States v. Juda, 46 F.3d 961

(9th Cir. 1995) (a search affecting a United States citizen in a foreign country is reasonable if it

conforms to the requirements of foreign law).  Where the circumstances of the search are so

extreme as to "shock the conscience," courts can invoke their supervisory powers to exclude the

evidence obtained from that search.  See, e.g., United States v. Toscanino, 500 F.2d 267, 276 (2d

Cir. 1974); Peterson, 812 F.2d at 490; Barona, 56 F.3d at 1091.

Here, the defendants' expectation of privacy in office materials that were stored at an

offsite storage facility cannot reasonably trump the privacy rights recognized by U.K. law.  The

law recognizes that expectations of privacy with respect to business records stored in non-

residential space are "different from, and less than, a similar expectation in an individual's

home."  New York v. Burger, 482 U.S. 691, 700 (1987).  Defendants' expectations of privacy

were even further reduced under the Fourth Amendment because the search at issue here

involved the records of a business that the defendants chose to establish and operate under U.K.

law, and that the defendants chose to store at a storage facility located in the U.K.  The

government intrusion in this case complied with local law and thus did not violate any

reasonable expectation of privacy as determined by U.K. norms.  The manner in which the

search warrant was executed, and the limited scope of the seizures, demonstrate that the search

was executed in a reasonable manner.  Moreover, there was nothing about the way in which the

search was conducted that "shocks the conscience." In these circumstances, the search was plainly reasonable under the Fourth Amendment.

## 1.     <u>The Search Complied With U.K. Law</u>

In their pre-hearing briefs, defendants contended that the search of Amerindo property at the Cadogan Tate warehouse in which U.S. Postal Inspectors participated was unreasonable under the Fourth Amendment because the search violated U.K. law. (<u>See</u> Def.'s U.K. Br. at 17). Specifically, defendants argued that Detective Sergeant Shaw violated the laws of the United Kingdom by obtaining a Section 8 warrant rather than a Schedule 1 warrant. (<u>See</u> Def.'s U.K. Br. at 2, 17-19; Def.'s U.K. Reply Br. at 17). Their contention was based on a theoretical analysis of U.K. law prepared by U.K. barrister Clare Sibson (the "Sibson Report"). Defendants used the Sibson Report to argue that, because there were likely to special procedure materials at the Cadogan Tate warehouse, Detective Sergeant Shaw should have obtained a Schedule 1 warrant from a circuit court rather than a Section 8 warrant from the Bow Street Magistrates' Court. (<u>See</u> Def.'s U.K. Br. at 17-19 (citing Sibson Rep. at ¶¶ 13-16)). As the testimony of Detective Sergeant Shaw made clear, defendants have a fundamental misunderstanding of U.K. law. Detective Sergeant Shaw's decision to obtain a Section 8 warrant was appropriate. Notably, Detective Sergeant Shaw's decision to obtain a Section 8 warrant was endorsed not only by the UKCA, Detective Inspector Fuller, and a senior legal adviser to the premier Magistrate's Court in the U.K, but by two District Court judges, including Senior Judge Workman – the most senior District Judge in all of England and Wales. Moreover, Senior Judge Workman is also a Circuit Court Judge, and has the authority to issue the very Schedule 1 warrant that defendants claim Detective Sergeant Shaw should have obtained. Had he thought it

116

necessary to obtain a Schedule 1 warrant – and there is evidence that he considered that question – he no doubt would have instructed Detective Sergeant Shaw to return to him with the proper forms, or would have told him to take a Schedule 1 warrant application to another Circuit Court Judge.  Because the execution of the search warrant complied with U.K. law, and because there was nothing about the nature of the U.S. Postal Inspectors' participation in this U.K. court-authorized search that "shocks the conscience" under U.S. legal standards, the search was reasonable and fully complied with the Fourth Amendment.

    a.    **U.K. Law Of Search Warrants**

There are three basic types of warrants authorized under U.K. law, warrants permitting the search for, and seizure of: (1) contraband, such as guns or drugs; (2) evidence of a crime; and (3) "special procedure material."  (5/31 Tr. 218-20).  A warrant seeking authority to search for evidence of a crime is referred to as a "Section 8" warrant.  (Id. at 219).[35]  A warrant seeking authority to search for and seize special procedure material is known as a "Schedule 1" warrant.  (Id. at 220).  "Special procedure material" is, "[i]n a nutshell, [] material created or required in the ordinary course of business, and held with an expectation or a legal obligation to be held in confidence."  (Id. at 222; see 6/1 Tr. 385, 416; Sibson Rep. ¶ 13).  In general, special procedure material is material held by an innocent third party in the course of their ordinary lawful business as in the case of bank records held by a bank.  (5/31 Tr. 249).  Under U.K. law there is a principle that applies in cases involving special procedure material that, "[t]here is no confidence in iniquity.  That means that there is no lawful client confidentiality in material held for the

---

    [35]    Applications for contraband warrants and Section 8 warrants may be made to a District Judge in Magistrates' Court; applications for Schedule 1 warrants must be made to a Circuit Court Judge at Crown Court.  (5/31 Tr. 224).

purpose of criminal conduct." (Id. at 247). Accordingly, when law enforcement officers search materials held by a suspect of a crime for evidence of criminality, they are not searching for special procedure material, and it is appropriate to conduct such a search under the auspices of a Section 8 warrant. (Id. at 246-50; 6/1 Tr. 427-28).[36] When on premises pursuant to the authority granted by a Section 8 warrant, one lawfully may seize special procedure material that was evidence of the crime being investigated pursuant to the Section 8 warrant and a separate Schedule 1 warrant need not be obtained for that purpose. (6/1 Tr. 387 ("There's case law in England that says it's not expected that an investigator should obtain two types of warrants for the same premises. One should obtain a warrant that primarily deals with materials sought."), 402-03, 416).

### b.     U.K. Law Concerning Search Warrants and Privileged Materials

Under U.K. law, there is no warrant available to authorize the search for, and seizure of, legally privileged material. (5/31 Tr. 250, 254, 262-63; 6/1 Tr. 399-401, 416-18, 420-21; Sibson Rep. ¶ 23). Under certain circumstances, for example when conducting a search at a lawyer's office, U.K. law enforcement may bring outside counsel to help preserve legal privilege. (5/31 Tr. 250-52; Sibson Rep. ¶ 25). When searching a business for evidence of a crime, there is no requirement to bring outside counsel to assist with the review of potentially privileged documents that are ancillary to the search. (5/31 Tr. 250-52). There are U.K. statutes that

---

[36]     As Detective Sergeant Shaw explained, the distinction between an innocent third party holding confidential material and a criminal suspect holding confidential material that may be evidence of a crime is critical and explains why search warrants directed at such innocent third parties are a last resort only after determining that a Schedule 1 production order (which appears to be akin to a Court-authorized subpoena) would not suffice, and why Section 8 warrants are available when searching for evidence of crime held by a suspect. (5/31 Tr. 249-50).

govern how to deal with privileged material identified during a search.  (Id. at 251; Sibson Rep. ¶ 26 (describing power to remove items subject to legal professional privilege where impracticable to sift through them on site)).

#### c.    Detective Sergeant Shaw Obtained The Proper Warrant

Because Detective Sergeant Shaw was searching for evidence of criminality held by the suspects, not confidential information created and held by an innocent third party in the course of a lawful business, Detective Sergeant Shaw correctly chose to obtain a Section 8 warrant.  His conclusion about the propriety of seeking a Section 8 warrant in the circumstances here presented was made after "considerable thought," (6/1 Tr. 365-66), and is a conclusion that was shared by senior U.K. government officials, experienced law enforcement officers, a legal adviser to the BSMC, and two U.K. judges.

Detective Sergeant Shaw has a wealth of experience in criminal law enforcement in the U.K.  Over the course of his 23-year career, Detective Sergeant Shaw has obtained approximately 100 warrants of all types, including Section 8 and Schedule 1 warrants.  (5/31 Tr. 203, 223).  The Deputy Head of the UKCA, Stuart Blackley, independently determined that seeking a Section 8 warrant was appropriate, and so indicated in both the draft and signed "directions" that he forwarded to Detective Sergeant Shaw. (5/31 Tr. 243, 254; GX 24). Detective Sergeant Shaw's superior, Detective Inspector Paul Fuller, also independently reviewed and approved the application, thereby endorsing the decision to seek a Section 8 warrant.  Ms. Elizabeth Franey, a lawyer and senior law clerk with approximately 20 years of experience advising U.K. judges, reviewed the application and determined that it was appropriate to forward it to a judge to be considered.  (5/31 Tr. 265-68).  Subsequently, the most

senior District Judge in all of England and Wales – a judge obviously well familiar with the law

surrounding Schedule 1 warrants because he had the authority to issue Schedule 1 warrants

pursuant to both his position as Senior Judge, and in his capacity as a Circuit Court judge –

reviewed the application and asked Detective Sergeant Shaw questions that Detective Sergeant

Shaw believed were designed to determine whether the Section 8 warrant or Schedule 1 warrant

was the more appropriate warrant to issue.  (5/31 Tr. 268-74).  Ultimately, Judge Workman

approved the warrant application for a Section 8 warrant.  (Id. at 274; GX 24).  District Judge

Evans reviewed the second warrant application (which was identical in all material respects to

the first), and he, too, approved it.  (5/31 Tr. 289-91; GX 25).  Finally, the warrant has never

been challenged in a U.K. court, although defendants could readily have done so through the

process of "judicial review," and therefore should be cloaked with a presumption of validity that

defendants have failed to pierce.  (5/31 Tr. 304-05).

        The Sibson Report expresses no view whatsoever about the appropriateness and legality

of the Section 8 warrants obtained by Detective Sergeant Shaw.  Indeed, it could not because, as

Sibson candidly admitted, she "ha[d] not been made aware of the facts of the matter concerning

Mr Tanaka in New York."  (Sibson Rep. ¶ 4).  Thus, the Sibson Report consists entirely of a

theoretical discussion of U.K. law.  In using the abstract principles articulated in the Report,

defendants sow seeds of confusion in their briefs about how those principles apply to this case.

(See, e.g., Def's. U.K. Br. at 17-19; Def's. U.K. Rep. Br. at 17-18).  For example, defendants

contend that Detective Sergeant Shaw should have obtained a Schedule 1 warrant because he

"knew" that there would be special procedure materials among Amerindo's property at Cadogan

Tate.  (See id.).  First, for the reasons stated above, the materials in Amerindo's control lost

whatever status they might have had as special procedure material because they were not held by

innocent third parties, but rather, were being sought as evidence of criminality committed by the

very people who controlled the material.  Second, even assuming arguendo that there were

legitimate special procedure materials held by Amerindo at Cadogan Tate, that is of no moment

because the pertinent issue is what is expected to be the chief object of the search, not whether,

as an ancillary matter, special procedure materials may need to be examined during the search

for evidence.  Detective Sergeant Shaw made that crystal clear in the following testimony:

> THE COURT: Just to clarify this.  See that basket there that's sitting next
> [to] Mr. Litt?  If what you were looking for was a specific document, let's say you
> had a particular interest in one document, but you believe that in that basket there
> might be special procedure material . . . .  If what you're looking for , the one
> document you know is not special pr[ocedure] material, but you think the basket
> might otherwise contain special pr[ocedure] material, are you required to get a
> Schedule 1 warrant or order?

> THE WITNESS: No.

> THE COURT: Even if in searching for the magic document you're
> looking for – you might peruse or review special procedure material?

> THE WITNESS: Correct, your Honor.

> THE COURT: Because you don't intend to take it.

> THE WITNESS: Correct.

(6/1 Tr. 420-21).

In sum, all the evidence in the record, including the independent conclusions reached by

senior and experienced members of the Metropolitan Police, the Deputy Head of the UKCA, a

senior legal adviser to the Bow Street Magistrates' Court, and two U.K. District Judges,

including the senior District Judge in all of England and Wales, demonstrates that it was

appropriate for Detective Sergeant Shaw to obtain and execute a Section 8 warrant.  The

evidence introduced at the hearing showed that the extensive series of reviews of MLAT

requests for U.K. warrants, is by no means a "rubber stamp" process. As Detective Sergeant

Shaw explained, in his experience, MLAT requests for search warrants are rejected at every

stage of the review process. (5/31 Tr. 206, 208-09, 211-16). Moreover, as Detective Sergeant

Shaw testified in response to a question about why he was concerned that the court might not

grant the warrant application, "courts do not grant warrants on the nod. These things are given

due consideration by the courts; and the judge may or may not determine to issue it." (6/1 Tr.

314). Accordingly, there can be no doubt about the validity of the U.K. warrants under U.K.

law, and the attendant reasonableness of the search conducted pursuant to those warrants. See

Peterson, 812 F.2d at 491; Juda, 46 F.3d 961.

### d.    Detective Sergeant Shaw's Warrant Application Was Entirely Truthful

Defendants contend that Detective Sergeant Shaw's warrant application included

materially false statements including: (1) that he had reasonable grounds to believe that the

materials he sought "d[id] not consist of, or include items of legal privilege . . . or special

procedure material; and (2) "it would not be practicable to communicate with any person entitled

to grant entry to the premises." (Def's. U.K. Br. at 17-18; see Def's. UK. Rep. Br. at 17-18).

Defendants' charges are based on a misunderstanding of U.K. law, wrong assumptions about

communications between U.S. authorities and Detective Sergeant Shaw, and a misapprehension

about the meaning of Detective Sergeant Shaw's statements in context.

First, for the reasons described above, the materials Detective Sergeant Shaw was

seeking to seize were not special procedure material, nor were they privileged material.

Detective Sergeant Shaw testified explicitly and repeatedly that he did not believe that there was

122

special procedure material – as that term is defined under U.K. law – among the Amerindo

property at Cadogan Tate and, furthermore, that he did believe that any of the evidence he was

seeking authority to seize consisted of special procedure material.  (5/31 Tr. 246-50, 259, 262-

63; 6/1 Tr. 402-03, 430).  Moreover, as Detective Sergeant Shaw emphatically noted, "I would

have no hesitation and no fear in applying for a Schedule 1 warrant at all.  It was only filling out

separate pieces of paper and going to the court 10 minutes further down the road.  If that was the

proper – if I honestly believe[d] that to be the proper course of action, that's what I would have

done."  (5/31 Tr. 388).

Second, Detective Sergeant Shaw testified that he did not believe that he would come

across legally privileged material at Cadogan Tate.  (5/31 Tr. 253-54, 259, 262-63; 6/1 Tr. 399-

403).  Detective Sergeant Shaw testified that he held that belief in part because he "was

searching an investment adviser's company[,]" and because "[he didn't] recall anything in the

MLAT that would suggest [he] was going to find legal privileged material there."  (5/31 Tr. 253-

54).

Third, Detective Sergeant Shaw had no discussion with U.S. authorities concerning what

they may have expected to find among Amerindo's property at Cadogan Tate and, therefore,

defendants' effort to attribute the purported knowledge of U.S. officials concerning the

likelihood of finding legally privileged material there, must fail.  (5/1 Tr. 243-244, 254; Def's.

U.K. Br. at 17-18 & n. 10).

Fourth, Detective Sergeant Shaw's testimony made clear that his warrant affidavit was

entirely truthful.  On the cover page of the warrant application, Detective Sergeant Shaw was

required to choose to swear to at least one of four descriptive sentences.  He deleted: "(a) it is not

123

practicable to communicate with any person entitled to grant entry to the premises; (b) it is

practicable to communicate with a person entitled to grant entry to the premises but it is not

practicable to communicate with any person entitled to grant access to the evidence; [and] (d) the

purpose of a search may be frustrated or seriously prejudiced unless a Constable arriving at the

premises can secure immediately entry to them."  (GX 24 at 6).  Detective Sergeant Shaw did not

delete: "(c) entry to the premises will not be granted unless a warrant is produced."  (Id.).  On

page 1 of the Information in Support of An Application For Warrant Of Entry To Search (the

"Information"),[37] Detective Sergeant Shaw stated, "Finally I am satisfied that entry and access to

the material will not be granted unless a warrant is produced."  (Information at 1).  Detective

Sergeant Shaw further stated that, "Contact has been made with the [storage facility] company

and the warrant will be executed in full cooperation with the company itself."  (Information at 3).

Finally, Detective Sergeant Shaw averred that, "I am satisfied that it would not be practicable to

communicate with any person entitled to grant entry to the premises."  (Information at 4).

      With respect to his decision to strike the language of subparagraph (a) on the cover page

to the warrant application, Detective Sergeant Shaw testified as follows:

> Q.  Why did you strike out that language?
>
> A.  I identified – of the four options, I identified the option which
> was relevant, which was option C.
>
> Q.  Okay.  Why was that relevant or more relevant than any other
> option?
>
> A.  Because I would not have been granted entry to the premises

---

[37]     The Information is a four-page document beginning on the eighth page of GX 24. The Information has its own page numbers located at the bottom center of each page.  Citations to the Information are to "Information at [page no.]".

without production of a warrant.  That's what it says.

Q.  Well, was it practicable to communicate with any person entitled to grant entry to the premises?  I'm looking at subparagraph A.

A.  A.  Entry to the premises.  I had communicated with people entitled to grant entrance to the premises.  And that was stated in the application for the warrant.

Q.  Why did you cross this out?

A.  Because it wasn't the most relevant of the . . . four options. Either any one or more of these options can be used if they're applicable.

Q.  Is the practice to leave unstricken all of the ones that could be applicable or the one that is most relevant to the application or something else?

A.  Well, there's no – there's no direction on that.  I mean I always identify the one that's most relevant.  And that's what I did here.

Q.  Directing your attention to subparagraph B.  Can you explain why you struck that out?

A.  Because although it may have been possible to speak to a person who could grant entry to Cadogan . . . Tate, it would not have been practicable to communicate with anybody from Amerindo to give me access to material I sought.

Q.  Why not?

A.  Well, it wouldn't have been practicable in the sense that if I told them I was going to search their property, I may have well lost the evidence I was seeking."

(5/31 Tr. 260-61).  On cross examination, Detective Sergeant Shaw clarified the meaning of the

word "practicable" and again explained the contents of the warrant application:

A.  The word "practicable" has to be taken in context.  It's not the word "possible." . . . .  The word "practicable" in a broader sense. Is it the proper course of action.  Is it – can I obtain this material in

125

another way other than getting this warrant.
. . . .

Q.  Okay.  What is the standard by which you came to the
conclusion that entry and access to material would not be granted?

A.  Amerindo – Amerindo – sorry.  Cadogan Tate would not allow
us to enter the premises and gain access to the material without the
production of a warrant.

Q.  How about as it relates to Amerindo, because they could have
granted you access too, correct?

A.  But that wouldn't have been practicable.

Q.  Okay.  So my question for you is when you wrote "I am
satisfied that entry and access to the material will not be granted
unless a warrant is produced," my question for you is as it relates
to Amerindo, is the reason why you were satisfied because you
didn't find it to be practicable?

A.  Yes, that's right.  There's two different – there's two different
parts.  Because I was searching property under the control of
Amerindo.  Although it was physically housed in Cadogan Tate, I
wasn't going to seek the consent of Amerindo or a less intrusive
method by consent.  I needed a search warrant for that aspect of it.

Cadogan Tate, in its own right, wouldn't allow me on-site
without the production of a warrant either.  And so both of the
issues we just discussed cover both of those points.

(6/1 Tr. 404, 405-06).

Based on the record established at the hearing, Detective Sergeant Shaw's veracity is

unassailable.  Detective Sergeant Shaw testified that he did not believe that it would have been

the proper course of action to attempt to gain access to the materials by contacting a

representative of Amerindo and that he further believed that Cadogan Tate would not have

granted access without being presented with a search warrant.  Detective Sergeant Shaw

explained the critical difference between the meaning of the word "possible," and what he meant

126

when he used the word "practicable."  Detective Sergeant Shaw's representations in the

Information about what he judged to be practicable were entirely appropriate.  Moreover,

Detective Sergeant Shaw testified for a total of approximately one full day, and the Court had an

opportunity to judge his veracity and credibility from his measured responses to questions put to

him by the Government, defense counsel and the Court, as well as his demeanor.  The

Government suggests that Detective Sergeant Shaw's testimony and demeanor firmly conveyed

that he would not mislead a court to obtain a warrant, and he did not do so here.

### 2.    The Warrant Was Executed In A Reasonable Manner

Defendants allege that the execution of an overbroad U.K. search warrant by U.S. Postal

Inspectors was unreasonable and therefore violated the Fourth Amendment.  (Def's U.K. Br. at

1, 2, 15, 16).  The evidence adduced at the hearing was clear:  the U.S. Postal Inspectors assisted

the Metropolitan Police with the search, but did not execute the U.K. warrant.  Both Detective

Sergeant Shaw and Inspector Fraterrigo testified consistently that Detective Sergeant Shaw and

the Metropolitan Police were in charge of the search, and that the U.S. contingent was not

authorized to seize anything.  (5/31 Tr. 285, 295, 318; 7/7 Tr. 112-15; 8/8 Tr. 64-65; 8/9 Tr.

169).  The role assigned to the team of Postal Inspectors by Detective Sergeant Shaw was to

identify materials relevant to the U.S. criminal investigation, and it was up to the Metropolitan

Police officers to decide whether such identified materials fit within the scope of the warrant and

whether to seize those items.  (5/31 Tr. 278, 285).  On at least one occasion, while he was

supervising the second day of the search, Detective Sergeant Shaw recalled that he decided not

to seize records that Inspector Feeney had identified as being relevant.  (Id. at 294-95).  Every

document that was identified by the Postal Inspectors was reviewed by one or more experienced

127

Metropolitan Police officers before the Metropolitan Police decided whether or not to inventory and seize the selected item.  Thus, the evidence adduced at the hearing unequivocally established that the search of Cadogan Tate was a search of U.K. premises, pursuant to a U.K. warrant, issued by a U.K. court, under the control and direction of U.K. law enforcement officials. Significantly, even had the U.S. Postal Inspectors not assisted the Metropolitan Police with their search, the warrant nevertheless would have been executed by the Metropolitan Police.  (6/1 Tr. 319-20).

The testimony of Detective Sergeant Shaw and Inspector Fraterrigo, and the photographs and documentary evidence introduced into evidence, show that the search was conducted in a reasonable manner.  In general, all documents that were seized were reviewed first for relevance by one of the three Postal Inspectors, and second by experienced Metropolitan Police Officers (either Detective Sergeant Shaw or Detective Constable Bonafant) to determine whether or not to seize and inventory the documents identified by the Postal Inspectors.  (5/31 Tr. 293; 6/1 Tr. 375; 7/7 Tr. 119-20, 124, 128; GX 18).  The vast majority of the Amerindo materials in the warehouse – approximately 87 percent by volume – was left behind.[38]  Approximately 75-80 percent of the documentary evidence was not seized.  (7/7 Tr. 127-28).[39]  Of course, as can be

---

[38]    Amerindo had eight crates of material at Cadogan Tate; one additional crate of similar size was used by the Metropolitan Police to hold the seized materials.  (5/31 Tr. 235; 7/7 Tr. 125-26; GX 15, 16, 21).  Approximately 43 boxes were seized out of the 320 that were searched.  (5/31 Tr. 235; 7/7 Tr. 127).

[39]    The restraint shown in the conduct of the search was further demonstrated by Detective Sergeant Shaw's decision to obtain a second warrant and return to complete the search of the remaining approximately three crates of material instead of determining to seize the three crates in their entirety and search them in a more leisurely fashion at an off-site locale as was his right to do under U.K. law.  (5/31 Tr. 283; Sibson Rep. at ¶ 11 ("Where it is impracticable to establish during the course of a search whether all items in a particular location fall within the

expected with any search, especially a search of this magnitude conducted over a period of approximately one and one-half days, some material was seized that was irrelevant and clearly fell outside the scope of the warrant; however, defendants introduced precious little of such material in evidence at the hearing.  (6/1 Tr. 380-82; DX CC, DD, EE).  Accordingly, whatever argument defendants may advance about the breadth of the warrant – the appropriateness of which was endorsed by senior U.K. officials in the executive and judicial branches of the U.K. government – there is no viable argument that the warrant operated as a general warrant. Finally, once the seized material was sent to U.S. authorities by the Metropolitan Police, it underwent a rigorous review to screen legally privileged material from the prosecution team. (8/7 Tr. 172-73).

As Judge Sand found in <u>United States</u> v. <u>Bin Laden</u>, 126 F. Supp. 2d 264 (S.D.N.Y. 2000), the scope and nature of an overseas search is pertinent to determining whether the search was reasonable.  <u>Id</u>. at 285 ("the limited scope and overall nature of the search indicate that the search was executed in a reasonable manner and was not, as El-Hage alleges 'conducted as if pursuant to a 'general warrant.''").  Here, from start to finish, the conduct of the search and seizure in this case complied with U.K. law in every respect and was in no respect conducted as if pursuant to a general warrant.  The search was entirely reasonable by Fourth Amendment standards.  Accordingly, defendants' motion to suppress the evidence should be denied.

---

terms of the warrant, section 50 of the 2001 Act entitles police to remove all the material which might reasonably be thought to contain such items, in order to sift through the material and determine that question at a later stage.").

**C.    Even Were The Court To Conclude That The
Search Of Cadogan Tate Was Unconstitutional,
The Evidence Should Not Be Suppressed Because
The Postal Inspectors Acted in Good Faith**

As the Supreme Court recently reiterated in declining to extend operation of the

Exclusionary Rule to a violation of the knock and announce rule, the Exclusionary Rule is a rule

of last resort, which should only be applied when its deterrent benefits outweigh the substantial

social costs attendant to its application:

> Suppression of evidence, . . . has always been our last resort, not
> our first impulse.  The exclusionary rule generates "substantial
> social costs," United States v. Leon, 468 U.S. 897, 907, 104 S.Ct.
> 3405 (1984), which sometimes include setting the guilty free and
> the dangerous at large.  We have therefore been "cautio[us] against
> expanding" it, Colorado v. Connelly, 479 U.S. 157, 166, 107 S.Ct.
> 515, 93 L.Ed.2d 473 (1986), and "have repeatedly emphasized that
> the rule's 'costly toll' upon truth-seeking and law enforcement
> objectives presents a high obstacle for those urging [its]
> application," Pennsylvania Bd. of Probation and Parole v. Scott,
> 524 U.S. 357, 364-365, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)
> (citation omitted).  We have rejected "[i]ndiscriminate application"
> of the rule, Leon, supra, at 908, 104 S.Ct. 3405, and have held it to
> be applicable only "where its remedial objectives are thought most
> efficaciously served," United States v. Calandra, 414 U.S. 338,
> 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) – that is, "where its
> deterrence benefits outweigh its 'substantial social costs,'" Scott,
> supra at 363, 118 S. Ct. 2014 (quoting Leon, supra, at 907, 104
> S.Ct. 3405).

Hudson v. Michigan, 126 S.Ct. 2159, 2163 (2006).

For the reasons set forth in the Government's pre-hearing brief, even if the search at

Cadogan Tate violated the Fourth Amendment, the Exclusionary Rule should not be applied

because doing so would not fulfill its policy goal of deterring unlawful searches and because the

search was conducted in good faith.  (See Gov't U.K. Br. Pt. III at 32-38).  The evidence

adduced at the hearing buttresses those arguments.

130

First, to the extent that the warrants obtained by Detective Sergeant Shaw did not comport with U.K. law, there is absolutely no evidence that Inspector Fraterrigo or any other Government official knew, or could have known, that. The uncontradicted evidence is that the Government followed the U.S.-U.K. MLAT procedures to the letter. From the vantage point of the Government, its MLAT request was reviewed by the UKCA, a Detective Sergeant of the Metropolitan Police, and two U.K. judges who approved search warrants based on the MLAT request. At no time did U.K. officials request any additional information from the U.S. Government, nor did any U.K. official raise an issues of potential concern about the U.S. Government's request. Moreover, Cadogan Tate fully cooperated when presented with the warrants. In these circumstances, there was no reason for U.S. officials to believe that the U.K. authorities had done anything other than to comply fully with U.K. law.

Second, defendants' suggestion that, "the evidence suggests that the postal inspectors who executed the search at Cadogan Tate were aware that the U.K. Warrant had issued upon false representations," (Def's. U.K. Br. at 23), is flatly contradicted by the record established during the hearing. Not only did Detective Sergeant Shaw's testimony make clear that there were no false representations in his warrant applications, see, supra, IV.B.4, but the testimony of both Detective Sergeant Shaw and Inspector Fraterrigo belie defendants' conjecture that the Postal Inspectors were aware of the content of Detective Sergeant Shaw's warrant applications at any time. Inspector Fraterrigo reviewed the U.K. warrant, but was neither asked to review the warrant application nor believed it was her place to do so. As Detective Sergeant Shaw testified, "the original warrant application is left with the court. It's locked in a safe for six years or something. And the only copy I would have would be what I prepared on my PC back in the

office.  So I don't think I did have a copy of the actual application, the information [when I met

with the U.S. Postal Inspectors on October 10]."  (5/31 Tr. 277-78; see 5/31 Tr. 288-89).  Thus,

the warrant application was not available to be reviewed.  Moreover, Inspector Fraterrigo

explained that she did not ask to review the first warrant application because "[f]or one, I didn't

feel it was my place.  This was a U.K. warrant.  He was [] requesting it from a U.K. magistrate

and I was [t]here to assist them in the search."  (7/7 Tr. 102-03).  Likewise, with respect to the

second application, Inspector Fraterrigo explained that she did not ask to see the second warrant

application because, "I didn't think it was my place.  It was, you know, it was . . . his application

to the U.K. magistrate and I just didn't ask."  (7/7 Tr. 123).

Even if Inspector Fraterrigo had seen Detective Sergeant Shaw's warrant application, she

did not, and could not be expected to, have an understanding of concepts of U.K. law (e.g.,

special procedure material, legally privileged material, and the different types of U.K. warrants)

sufficient to judge the propriety of Detective Sergeant Shaw's application.  See Juda, 46 F.3d at

968 ("The DEA agent reasonably relied on [the representations of the Australian Federal Police],

and accordingly, the good faith exception to the exclusionary rule applies."); Peterson, 812 F.2d

at 492 (holding law enforcement officers "to a strict liability standard for failings of their foreign

associates would be even more incongruous than holding law enforcement officials to a strict

liability standard as to the adequacy of domestic warrants."); United States v. Staino, 690 F.

Supp. 406, 411 (E.D. Pa. 1988) (endorsing the holding in Peterson in recognition of the "special

circumstances" facing U.S. law enforcement officers who assist in foreign searches including

"the lack of familiarity with foreign procedures and foreign law.").

On both October 10 and October 14, after presenting warrant applications to Senior

District Judge Workman and District Judge Evans, respectively, Detective Sergeant Shaw – an extremely experienced U.K. law enforcement official – believed that he had obtained a lawfully-obtained, lawfully-issued and valid warrant entitling him to search Amerindo property at Cadogan Tate. (5/31 Tr. 274-75, 292). Detective Sergeant Shaw told the three U.S. Postal Inspectors on October 10 that the court had issued the warrant. (5/31 Tr. 275-76; 6/1 Tr. 372). In explaining why he did not think that he had shown any of the Postal Inspectors the warrant, Detective Sergeant Shaw explained, "I wouldn't normally do such a – show them the warrant. It's of no import to them other than for them to be told that I have obtained such a warrant. (5/31 Tr. 275). According to Inspector Fraterrigo, Detective Sergeant Shaw told her on October 10 that he was able to obtain the warrant from the U.K. magistrate, and he showed her what appeared to be a U.K. search warrant on October 10, 2005 long enough for her to recognize that, "[i]t looked like an official document. It had a seal. It had a signature which I believed to be the signature of the U.K. magistrate and the address of Cadogan Tate." (7/7 Tr. 104; 8/8 Tr. 69-72). With respect to the second search warrant obtained on October 14, 2005, Inspector Fraterrigo was aware of the fact that, as of the end of the day on October 13, Detective Sergeant Shaw believed that he needed to obtain a second warrant to permit a second entry of the Amerindo materials at Cadogan Tate so that the search could be completed. (7/7 Tr. 121-22). Prior to assisting with the search on October 14, Inspector Fraterrigo understood that Detective Sergeant Shaw had obtained a second warrant and that its terms were not materially different from those in the first warrant. (7/7 Tr. 123-24).

Given the Postal Inspectors' reasonable belief, based on Detective Sergeant Shaw's words and actions, and the words and actions of the Detective Constable Bonafant and Detective

133

Constable Durrant, that indicated that Detective Sergeant Shaw had obtained valid U.K. warrants to search the Amerindo materials at Cadogan Tate, the Government is entitled to rely on the good faith exception in the event the Court finds that the U.K. warrants violated either the Fourth Amendment or U.K. law.  See Peterson, 812 F.2d 486 at 488-90 (extending the reasoning of Leon "to reliance on foreign law enforcement officers' representations that there has been compliance with their own law").  See also United States v. Aljouny, 629 F.2d 830, 840-41 (2d Cir. 1980).

To the extent defendants raise an issue about a minor inaccuracy in the MLAT request about who attended a meeting concerning the GFRDA investment of Beulah Birrd, it is of no moment.  (8/8 Tr. 43-48).  There is no evidence of any intent to mislead anyone and, the inaccuracy is, in any event, an insignificant fact in the context of the entire MLAT request.

In sum, defendants misinterpret or mischaracterize the statements in Detective Sergeant Shaw's warrant applications, misconstrue the U.K. law concerning search and seizure of special procedure material, and then seek to have the Court impose the drastic remedy of the Exclusionary Rule where: (1) there is no evidence that the U.S. Government knew anything more than that proper MLAT procedures were followed; (2) senior members of the Metropolitan Police communicated through words and deeds that they had valid U.K. warrants; (3) two U.K. judges issued search warrants permitting U.S. Postal Inspectors to assist Metropolitan Police officers with the searches at Cadogan Tate; and (4) for the reasons discussed in IV.B., supra, there was nothing about the conduct of the Postal Inspectors, or the way in which the search warrants were executed, that indicates anything less than good faith on the part of the Postal Inspectors.  Defendants have pointed to no authority for the proposition that, in these

134

circumstances, the Postal Inspectors were required to obtain an independent legal judgment about the validity of the U.K. search warrants before agreeing to assist the Metropolitan Police with the execution of their warrants. Nor would it have been practicable to do so. This Court should not be the first to impose such a requirement. U.S. law enforcement officers should be able to rely on the MLAT process and the judicially reviewed processes of its treaty partners to be reasonably assured that any overseas activity in which they participate under the direction and supervision of foreign law enforcement, complies with the law of that foreign nation. Accordingly, to the extent the Court finds a Fourth Amendment violation, the Court should apply the exception to the Exclusionary Rule established in <u>United States</u> v. <u>Leon</u>, 468 U.S. 897 (1984), based on the good faith reliance of the Postal Inspectors on the U.K. warrants.

**D.      The Amerindo Materials Seized In The U.K.
             Are Not "Fruit Of The Poisonous Tree"**

At the pretrial conference on November 17, 2006, after eight days of suppression hearings spread over an eleven-month period, counsel for defendant Vilar for the first time articulated the theory that the U.K. search materials should be suppressed because they are "fruit of the poisonous tree." (11/17 Tr. 12 ( "One issue regarding the UK search that we will be briefing is the fruit of the poisonous tree, to the extent that the UK application incorporated search material.")). The Government anticipates that Vilar will claim that because some of the information contained in the MLAT request was obtained from the search of the Amerindo U.S. offices, the U.K. warrants issued on the basis of the MLAT narrative are tainted by the allegedly constitutionally defective U.S. search warrant and are therefore subject to the Exclusionary Rule. <u>See</u> <u>Wong Sun</u> v. <u>United States</u>, 371 U.S. 471, 484-85 (1963); <u>Nardone</u> v. <u>United States</u>, 308 U.S. 338 (1939); <u>Silverthorne Lumber Co.</u> v. <u>United States</u>, 251 U.S. 385 (1920). That argument

135

should be rejected because: (1) the U.S. search was not unlawful and, even if it was, the

Government would have obtained the same information pursuant to the valid grand jury

subpoena issued to Amerindo on May 26, 2005; (2) even were the Court to grant defendants'

motions to suppress the U.S. search evidence and quash the grand jury subpoena, the

Exclusionary Rule does not apply here because any domestic illegality found by the Court was

not the "but for" cause of obtaining the U.K. evidence; and (3) in any event, suppressing the

U.K. evidence would not advance the underlying objectives of the Exclusionary Rule because it

would result in substantial social costs without having any discernible deterrent effect.

Finally, in the event that the Court were to: (1) suppress so much of the U.S. search

evidence and quash so much of the grand jury subpoena that this argument is not moot; (2) find

that defendant's argument has not been waived by failing to raise it within the prescribed

briefing schedule (see Fed. R. Crim. P. 12(b)(3)(C), 12(c), and 12(e); United States v. Wilson, 11

F.3d 346, 353 (2d Cir. 1993) (holding that the failure to make a suppression motion prior to the

deadline set by the trial court constitutes a complete waiver where there is no "reasonable

excuse")); and (3) determine that the evidence proffered herein is insufficient to meet the

Government's burden, the Government would respectfully request the opportunity to supplement

the record on this newly-raised point because, having not been notified of Vilar's intent to raise

this issue at any time prior to the end of the suppression hearings, it did not have a fair

opportunity to introduce evidence to rebut this argument during those hearings.

### 1.    <u>Applicable Law</u>

In determining whether to suppress evidence arguably obtained through government

misconduct, the first question is "whether, granting establishment of the primary illegality, the

136

evidence to which instant objection is made has been come at by exploitation of that illegality."

Wong Sun, 371 U.S. 471 at 488.  The Supreme Court has made "clear that evidence will not be

excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the

evidence."  Segura v. United States, 468 U.S. 796, 815 (1984).  Thus, unless "the challenged

evidence is in some sense the product of illegal governmental activity," United States v. Crews,

445 U.S. 463, 471 (1980) (emphasis added), it is not a tainted fruit, and no further analysis is

required.  New York v. Harris, 495 U.S. 14, 19 (1990) ("We have emphasized, however, that

attenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the

challenged evidence is in some sense the product of illegal governmental activity.'") (quoting

Crews, 445 U.S. at 471)).

     Even if a chain of causation connects the error and the evidence, the evidence may

nevertheless still be admissible.  The Supreme Court has declined "to adopt a per se or but for

rule that would make inadmissible any evidence . . . which somehow came to light through a

chain of causation that began with a [violation of the Fourth of Fifth Amendment]."  Harris, 495

U.S. at 17 (quotation omitted); see Hudson, 126 S.Ct. at 2164 ("Our cases show that but-for

causality is only a necessary, not a sufficient, condition for suppression.").  Rather, evidence

alleged to be traceable in a "but for" sense to unconstitutional conduct remains admissible if it

was derived "by means sufficiently distinguishable to be purged of the primary taint."  Wong

Sun, 371 U.S. at 488.  To make this determination, courts examine, "particularly, the purpose

and flagrancy of the official misconduct."  Brown v. Illinois, 422 U.S. 590, 603-04 ( 1975)

(citations omitted).  Attenuation can occur when the causal connection is remote.  See e.g.,

Nardone v. United States, 308 U.S. 338, 341 (1939).  "Attenuation also occurs when, even given

137

a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." Hudson, 126 S.Ct. at 2164.

Evidence will not be suppressed if the Government can show either that it had the "tainted" information from an independent source, or if the evidence would have been inevitably discovered. See Nix v. Williams, 467 U.S. 431, 444 (1984); Silverthorne, 251 U.S. at 392. The inevitable discovery doctrine permits evidence to be admitted in a criminal trial, even when it was not lawfully seized, if the government establishes "that the information ultimately or inevitably would have been discovered by lawful means." Nix, 467 U.S. at 444. The doctrine reflects the Court's judgment that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred." Id. at 443. As the Second Circuit recently concluded, "illegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." United States v. Heath, 455 F.3d 52, 60 (2d Cir. 2006).

In applying the independent source doctrine, the Second Circuit has held that, "[w]hen an application for a search warrant includes both tainted and untainted evidence, the warrant may be upheld if the untainted evidence, standing alone, establishes probable cause." Laaman v. United States, 973 F.2d 107, 115 (2d Cir. 1992) (citing cases). As the Court held in Laaman, "[t]o suppress evidence under such circumstances would 'put the police (and society) not in the same

138

position they would have occupied if no violation occurred, but in a worse one.'" Id. at 115

(quoting Murray v. United States, 487 U.S. 533, 541 (1988) (citing Nix, 467 U.S. at 443)).

### 2. There Is No "Poisonous Tree" And The U.K. Evidence Should Not Be Suppressed

Before the Court may find something to be "fruit of the poisonous tree," it must first find,

of course, that a "poisonous tree" exists. Here, there is no such tree. For the reasons set forth in

Point II, supra, the search conducted at Amerindo U.S. was lawful, and therefore, to the extent

that the MLAT request contained information derived from documents seized during that search,

it was not "fruit" of any misconduct and nor was any derivative evidence obtained through the

U.K. search. Moreover, even were the Court to suppress the evidence obtained in the search of

Amerindo U.S., the evidence at issue inevitably would have been obtained through the valid

grand jury subpoena issued on May 26, 2005 and, as a consequence, would not have been "fruit"

of the allegedly unlawful search. Accordingly, because none of the information in the MLAT

request emanated from an illegal action of the Government, the U.K. evidence is not "fruit" and

should not be suppressed.

### 3. Even Were The Court To Suppress The U.S. Search Evidence And Quash The Grand Jury Subpoena, The Materials Obtained From The U.K. Search Should Not Be Suppressed As "Fruit Of The Poisonous Tree"

The U.K. warrants would have been issued even had the MLAT request not

"incorporated search material." (11/17 Tr. 12). Based on its review of the MLAT request, and

its recollection of the sources of information on which the request was based, the Government

believes that the only "search material," or material derived from "search material," that was

contained in the MLAT request was incorporated in one clause in a single sentence that appears

on page 6 of that request.  That sentence reads as follows:

> Specifically, the records reflect (1) that Tanaka withdrew approximately $3.3 million from the brokerage accounts and used the funds to purchase at least 5 thoroughbred race horses, (2) that Vilar withdrew approximately $4 million from the brokerage accounts and wire-transferred the funds into his personal bank account, (3) that Vilar and/or Tanaka wire-transferred approximately $173.8 million from the brokerage accounts to PTC account number 3308442 in the Bahamas, and <u>(4) that approximately $19 million of the funds transferred into the PTC account were wire-transferred into Vilar's personal bank accounts at the following four banks – Wilmington Trust Company, JP Morgan Chase, the Bank of Boston, and the Royal Bank of Scotland</u>.

(GX 24, Annex A at 6) (emphasis added).  Had the Government not had information obtained from, or as a result of, the U.S. search, the pertinent part of that sentence would instead have read:  "<u>(4) that approximately $8 million of the funds transferred into the PTC account were wire-transferred into Vilar's personal bank account at JP Morgan Chase.</u>"  Thus, the U.K. judges who reviewed Detective Inspector Shaw's warrant applications would have learned that Vilar received in <u>one</u> of his personal bank accounts approximately <u>$8 million</u> in funds transferred from brokerage accounts (in which he claimed to have no ownership interest) through a Bahamian bank account, instead of learning that he had received approximately <u>$19 million</u> of such funds in <u>four</u> of his personal bank accounts.  In light of the wealth of other evidence contained in the MLAT request, the difference between the sentences is immaterial.  It cannot seriously be argued that the U.K. warrants would not have been issued "but for" the inclusion of information derived from the U.S. search.  Accordingly, the evidence seized in the search of Cadogan Tate should not be suppressed.

**4.      In Any Event, The Policies Underlying The Exclusionary Rule Do Not Support Suppression Of The U.K. Evidence**

140

The U.K. evidence should not be suppressed because doing so would not deter the types of Government conduct that the Exclusionary Rule seeks to prevent.  The main purpose of the Exclusionary Rule is deterrence.  See, e.g., Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 363 (1998) ("[B]ecause the [exclusionary] rule is prudential rather than constitutionally mandated, we have held it to be applicable only where its deterrence benefits outweigh its 'substantial social costs.'"); United States v. Calandra, 414 U.S. 338 (1974) (the Exclusionary Rule's "prime purpose is to deter future unlawful police conduct"); Elkins v. United States, 364 U.S. 206, 217 (1960) ("The rule is calculated to prevent, not to repair."). "[T]he exclusionary rule has never been applied except "where its deterrence benefits outweigh its 'substantial social costs.'" Hudson, 126 S.Ct. at 2165 (quoting Scott, 524 U.S. at 363 (quoting Leon, 468 U.S. at 907)).

Here, Inspector Fraterrigo obtained a search warrant based on an application that had been drafted by an Assistant U.S. Attorney, approved by a supervisor within the U.S. Attorney's Office, and reviewed and approved by a U.S. Magistrate Judge.  The Government then followed MLAT and OIA procedures and requested that the U.K. authorities do whatever was necessary under their laws to effect a search of Amerindo property in the U.K.  At the time the supplemental MLAT request was made, September 8, 2005, the U.S. search had not been challenged.  Vilar's motion to suppress – filed on September 14, 2005 – had obviously not been decided prior to the execution of the two U.K. search warrants; indeed the initial briefing on the motion was not completed until October 10, 2005, the day the first warrant was obtained.  In those circumstances, as a practical matter, there was nothing that the Government could or should have done differently.  In theory, the Government could have sent another urgent

141

supplemental MLAT request informing the U.K. authorities of the unremarkable fact that a defendant had challenged a U.S. search from which the Government had derived evidence wholly inconsequential to the content of the MLAT request.  But that likely would have had no effect whatever on whether the warrant would have issued.

"The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." United States v. Ceccolini, 435 U.S. 268, 279 (1978).  Here, where wholesale suppression of the evidence would be the remedy for using a relatively insignificant piece of evidence that was obtained through a search of a business conducted pursuant to a judicially approved warrant (not, say, the warrantless search of a residence), the cost of applying the remedy of the Exclusionary Rule would bear no relation whatsoever to its deterrent purposes.  The jury would be deprived of important evidence in a criminal prosecution involving serious allegations of fraud.  Because that drastic remedy would have no deterrent value, the Court should decline to suppress the U.K. evidence on the ground that it constitutes "fruit of the poisonous tree."

## CONCLUSION

For the foregoing reasons, defendants' motions to suppress the evidence seized in the

U.S. search and the U.K. search, their <u>Franks</u> motion, and their motion to quash the grand jury

subpoena, should all be denied.

Dated: December 13, 2006
      New York, New York

          Respectfully submitted,

          MICHAEL J. GARCIA,
          United States Attorney for the
          Southern District of New York,
          *Attorney for the United States of America*


By:    /s/  _____
      Marc Litt
      Deirdre A. McEvoy
      Assistant United States Attorneys
      (212) 637-2295 / -2309