AO
(Rev. 8/97)

# AFFIDAVIT FOR SEARCH WARRANT

GOVERNMENT
EXHIBIT
33
S2 05 Cr. 621 (KMK) **(ID)**

## United States District Court

**DISTRICT:** Southern District of New York

UNITED STATES OF AMERICA
v.
PREMISES KNOWN AND DESCRIBED AS

THE OFFICES OF AMERINDO INVESTMENT ADVISORS INC., LOCATED AT 399 PARK AVENUE, 22ND FLOOR, NEW YORK, NEW YORK

| DOCKET NO | MAGISTRATE'S CASE NO |
|---|---|

**TO:** Honorable FRANK MAAS
United States Magistrate Judge

The undersigned being duly sworn deposes and says: That he/she has reason to believe that

☐ on the person of    ☐ on the premises    **DISTRICT** Southern District of New York

PREMISES KNOWN AND DESCRIBED AS
THE OFFICES OF AMERINDO INVESTMENT ADVISORS INC., LOCATED AT
399 PARK AVENUE, 22ND FLOOR, NEW YORK, NEW YORK

The following property is concealed:

SEE ATTACHED AFFIDAVIT

Affiant alleges the following grounds for search and seizure[2]

SEE ATTACHED AFFIDAVIT

See attached affidavit which is incorporated as part of this affidavit for search warrant

Affiant states the following facts establishing the foregoing grounds for issuance of a Search Warrant

SEE ATTACHED AFFIDAVIT

**SIGNATURE OF AFFIANT** [signature]

**OFFICIAL TITLE, IF ANY**
Postal Inspector Cynthia M. Fraterrigo
U.S. Postal Inspection Service

Sworn to before me, and subscribed in my presence:

**DATE** 5/25/05

**JUDGE OR FEDERAL MAGISTRATE** [signature]

---
[1] United States Judge or Judge of a State Court of Record
[2] If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure 41(c), show reasonable cause therefor

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT Of NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X    **UNDER SEAL**

IN THE MATTER OF THE                          :    AFFIDAVIT IN SUPPORT
APPLICATION OF THE UNITED                          OF AN APPLICATION FOR
STATES FOR A SEARCH WARRANT       :    SEARCH WARRANT
FOR: PREMISES KNOWN AND
DESCRIBED AS THE OFFICES OF           :
AMERINDO INVESTMENT ADVISORS INC.,
399 PARK AVENUE, 22ND FLOOR,            :
NEW YORK, NEW YORK
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

STATE OF NEW YORK                        )
                                                        ) ss.:
SOUTHERN DISTRICT OF NEW YORK  )

      I, CYNTHIA M. FRATERRIGO, being duly sworn, depose and say:

      1.    I am a United States Postal Inspector. I have been a Postal Inspector for approximately 6 years, and I am assigned to a unit of the Postal Inspection Service that investigates all types of fraud including, among other things, securities and complex corporate fraud.

      2.    I have participated in the investigation of this matter, and am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, and conversations I have had with other federal agents and other individuals. Because this affidavit is submitted for the limited purposes of establishing probable cause to search the premises described below and seize certain items as specified in Schedule A hereto, I have not included the details of every aspect of the investigation. I make this affidavit, in part, on personal knowledge based on my participation in this investigation, and, in part, upon information provided to me by witnesses and other law enforcement officers.

Where actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

3.   As set forth below, there is probable cause to believe that certain individuals, including the principals and other employees of Amerindo Investment Advisors Inc. ("Amerindo U.S."), a California corporation, Amerindo Investment Advisors (Cayman) Limited ("Amerindo Cayman"), Amerindo Investment Advisors (U.K.) Limited ("Amerindo U.K."), and Amerindo Investment Advisors (Panama), Inc. ("Amerindo Panama") (Amerindo U.S., Amerindo Cayman, Amerindo U.K. and Amerindo Panama are hereinafter referred to collectively as "Amerindo"), including Alberto William Vilar, a/k/a Albert Vilar, and Gary Alan Tanaka, have been engaged in a fraudulent scheme which has resulted in the conversion of investor funds to the benefit of Vilar and Tanaka without the consent or authorization of the investor-victims.

### The Premises

4.   This affidavit is prepared in support of an application to search the following premises, which is the New York office of Amerindo, and is a location where Vilar regularly works, and where Tanaka works when he is in New York: 399 Park Avenue, 22nd Floor, New York, New York (the "Premises"). I visited the Premises on or about May 9, 2005. The Premises are located within a major New York City office building chiefly occupied by Citigroup. The Premises are situated on the East side of Park Avenue between 53rd and 54th Streets. The Premises occupy approximately two-thirds of the office space on the 22nd floor. The elevator lobby on the 22nd floor leads to two separate entrances on opposite sides of the building. One entrance has glass doors with a frosted etching design bordering clear glass. On one wall

adjacent to that entrance, the word "AMERINDO" is affixed in large gold lettering. When I entered through the glass doors, I saw a reception area, several desks, and black cabinets. The other entrance on the 22nd floor has seemingly identical glass doors; however, there is nothing outside those doors to indicate that the space is occupied by Amerindo. I entered through those doors, and observed the area just long enough to note that the sign above the reception area reflected a name that bore no similarity to "Amerindo." The letter area is not part of the Premises. CF

5.     Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that there are presently concealed in the Premises, evidence and instrumentalities of violations of Federal law, to wit: Title 15, United States Code, Sections Sections 80b-6 and 80b-17 (investment adviser fraud), Title 18, United States Code, Section 1341 (mail fraud), and 1343 (wire fraud). Such evidence consists of the items set forth in Schedule A.

### Background

6.     The Criminal Complaints *annexed to Exhibit A* describing the investigation and schemes to CF defraud are incorporated by reference herein. My investigation has also revealed the following:

A.     I have spoken to Lisa Mayer, an individual who has known Alberto Vilar for approximately two decades, who dated him on and off over the course of approximately a decade, and who, along with her family, invested millions of dollars with Vilar and Amerindo beginning in or about 1987. She informed me that her family had invested millions of dollars in "guaranteed fixed rate depost accounts" ("GFRDAs") which Vilar described in correspondence as being invested largely in bank certificates of deposit, government securities and other investments "which are absolutely safe and liquid." Vilar induced the Mayer family (including

3

her father, Dr. Herbert Mayer, and her sister Debra) to manage much of their Amerindo investment through an offshore account with PTC Management Ltd. in Nassau, Bahamas. In or about 2003, when the Mayers attempted to redeem approximately $12 million invested in GFRDAs, Amerindo, Vilar, Tanaka, and Tanaka's wife (who according to Lisa Mayer, prepares account statements for Amerindo, among other things) all rebuffed their efforts, and refused to release the funds. Ms. Mayer described years of begging Vilar to release some of their investment to pay for the care of her sick father – who Vilar had known for some 30 years, and who was one of Vilar's original investors – and Vilar's rejection of those requests. Mayer told me that Vilar and Amerindo were holding the family's money hostage, had threatened to create tax problems for the Mayers were they to fight him, and was dribbling out to them as little money from their multi-million dollar investment as possible.

    B. Lily Cates, who is the "Victim" described in the Vilar Criminal Complaint, described to me an investment of $1 million that she made in or about 1988 in an entity called Rhodes Capital ("Rhodes"). She received a stock certificate for two shares of stock, which was signed by Vilar and Tanaka. Although her account statements, which she received up until approximately 2002, reflected growth in the Rhodes investment, the investment was never described to her, she never has received a private placement memorandum, nor has she signed a subscription agreement for Rhodes, and her efforts to learn more about the investment were ignored or rejected by Vilar. In approximately February 2005, Cates attempted to redeem her entire investment portfolio at Amerindo, including her SBIC investment described in the Vilar Criminal Complaint, Rhodes, and any other investment with Amerindo, but Amerindo and Vilar

4

have refused to move her investment portfolio to Bear, Stearns & Co. Inc. (defined in the Complaints as the "Brokerage Firm") as requested.

        C.     My review of letters of authorization associated with Amerindo's Brokerage Accounts at Bear, Stearns shows tens of millions of dollars being wire transferred to PTC Management Limited's account at Barclays Bank PLC, Nassau, Bahamas, Account No. 3308442.

        D.     In a May 20, 2005, letter to the SEC, responding to a complaint about his handling of the Cates account, Vilar wrote that Cates had always been a client of Amerindo Investment Advisors, Inc. (a Panamania corporation), not Amerindo Investment Advisors Inc. (a California corporation), that Amerindo U.S. had sold Amerindo Panama in 2001, and that there was currently no overlap between the directors, officers and employees of the two separate entities. When Cates's attorney wrote to Vilar to redeem Cates's entire investment in Amerindo, Vilar informed Cates for the first time in their nearly 20 year relationship, that she was a client of Amerindo Panama, and that any redemption request would need to be submitted to that entity. He also informed Cates that any redemption would be reduced by unspecified fees and taxes – something which had never been discussed in the course of their relationship.

        E.     Cates told me about other individuals who she believed to be investors with Amerindo, some of whom may have had trouble redeeming all or part of their investments, including Brian Harvey, Joy Urich, and Paul Marcus.

        F.     The totality of the circumstances in this case, including investors being prevented from redeeming or transferring their multi-million dollar investments, investors

5

lacking basic information about their investments, an investment adviser who has made demonstrably false statements to an investor about the status of a $5 million investment (the Cates SBIC investment described in the Vilar Criminal Complaint), tens of millions of dollars being funneled to overseas bank accounts, an investor having been induced to arrange financial affairs through an overseas entity, an investment adviser misappropriating client funds from high technology investment funds to purchase thoroughbred racehorses for himself out of several different investment fund accounts (as described in the Tanaka Criminal Complaint), profitable trades being moved from one account to another (only to have the proceeds wired out to purchase a horse for one of the principals of Amerindo), all suggest that there is reason to be concerned that other investors are likewise being victimized by Vilar and Tanaka.

### The Location of Documents

7.      When I visited the Premises on or about May 9, 2005, I could not observe enough of the office to describe the specific location of documents. The space appeared to be a typical large New York City office, with multiple rooms within the office. I did see at least one computer on a desk, and several file cabinets. According to Lily Cates, who has visited the Premises numerous times over approximately the past decade, Alberto Vilar has a large personal office within the Premises. Cates observed numerous computers, desks, and office equipment. in the Premises on several occasions, most recently in or about the Fall of 2004. During one visit to the Premises between in or about 2002 and in or about 2004, Alberto Vilar showed Cates approximately 80 boxes of documents which he claimed were related to Amerindo's private investments and contained documents necessary to properly value Cates's investment.

## MATERIALS TO BE SEARCHED AND SEIZED

8.   Based on the facts set forth above, and my experience and training, it appears that Amerindo and its principals, Vilar and Tanaka, have defrauded investors, have converted investor funds to their own personal use, and are conducting a Ponzi-type scheme in which investor funds are not being properly accounted for and segregated.  As a result, there is probable cause to believe that there have been numerous violations of Title 18, United States Code, Sections 1341 (mail fraud) and 1343 (wire fraud) and Title 15, United States Code, Sections 80b-6 and 80b-17 (investor adviser fraud).  The use of domestic and overseas financial institutions to convert the investors' money to Vilar's and Tanaka's personal benefit also gives rise to probable cause to believe that there have been violations of anti-money laundering statutes including Title 18 United States Code, Sections 1956 and 1957.  Further, based upon my training and experience, I know that individuals involved in financial fraud schemes like that described above frequently maintain at their places of business for substantial periods of time, records and materials which evidence the operation of such schemes.

9.   There is probable cause to believe that the following records and instrumentalities of the fraudulent schemes described above, and other items related to and evidencing such crimes, are located at the Premises

A.   Corporate records concerning Amerindo Investment Advisors Inc. ("Amerindo U.S."), Amerindo Investment Advisors (Cayman) Limited ("Amerindo Cayman"), Amerindo Investment Advisors (U.K.) Limited ("Amerindo U.K."), and Amerindo Investment Advisors (Panama), Inc. ("Amerindo Panama") (Amerindo U.S., Amerindo Cayman, Amerindo U.K. and Amerindo Panama are hereinafter referred to collectively as "Amerindo"), including

but not limited to records concerning the formation of each of the above-listed Amerindo entities, its shareholders, principals, officers, directors, and employees, changes in ownership, bylaws, resolutions, client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, and other documents concerning or reflecting the identities of and communications with clients who have investments managed or advised by Amerindo.

    B.  Documents concerning the following accounts at Bear, Stearns & Company Inc.: Amerindo Management Inc., Sub A/C M26 ("AMI"); Amerindo Technology Growth Fund Inc. ("ATGF I"); Amerindo Technology Growth Fund II, Inc. ("ATGF II"); and, Techno Raquia, SA (collectively, the "Amerindo Brokerage Accounts"), including account opening documents, account statements, wire transfer requests, correspondence, electronic mail messages, trade tickets, trade blotters, trade confirmations, trade allocation sheets, trade memoranda, trade notes, client account statements, memoranda and notes and other documents reflecting or relating to investment performance, and other documents reflecting or relating to securities transactions entered into on behalf of clients, by any current or former Amerindo entity, affiliate, principal, officer and employee;

    C.  Documents concerning Rhodes Capital ("Rhodes"), including copies of prospectuses, private placement memoranda, subscription agreements, descriptions of the Rhodes investment, lists of investors in Rhodes, returns on the Rhodes investment, allocation of the returns on the Rhodes investment.

    D.  Current and former client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or

received from clients including redemption requests received from clients, and other documents concerning or reflecting the identities of and communications with clients who have investments in the Amerindo Brokerage Accounts;

    E.    Client lists, client files, investment brochures, marketing materials, investment advisory agreements, copies of correspondence sent to or received from clients, and other documents concerning or reflecting the identities of and communications with clients who have investments managed by Amerindo who receive redemptions through or make investments through overseas bank accounts, and trust accounts, including PTC Management Limited, and Barclays Bank PLC, Nassau, Bahamas, Account No. 3308442.

    F.    Documents reflecting all investments in which Lily Cates, Lisa Mayer, Debra Mayer, Herbert Mayer, Brian Harvey, Joy Urich, or Paul Marcus have a beneficial interest, including descriptions of the investment, account statements, and returns on the investment.

    G.    Documents reflecting any effort made by any Amerindo entity, including Amerindo SBIC Venture Fund LP to obtain an SBIC license from the U.S. Small Business Administration, including correspondence, Management Assessment Questionnaires, license applications, efforts to obtain investor funds or commitments from investors to invest funds, records reflecting capital commitments and investments, investments undertaken prior to licensure and any documents reflecting how any funds received prior to licensure were invested pending licensure.

    H.    Documents reflecting any Amerindo investment in Guaranteed Fixed Rate Deposit Accounts ("GFRDAs"), including lists of clients with investments in

GFRDAs, account statements reflecting investments in GFRDAs, documents reflecting the holdings of any Amerindo entity in certificates of deposit or government securities, and documents reflecting all securities underlying any investment in a GFRDA.

   I. Documents reflecting any private bank, brokerage or other account with any financial institution held by Amerindo principals including Alberto William Vilar and Gary Alan Tanaka.

   J. Documents reflecting or relating to the cancelation of completed trades and rebooking of those canceled trades in other accounts managed or controlled by Amerindo, or in which Amerindo or its principals have a beneficial ownership interest.

   K. Documents reflecting any direct financial or beneficial ownership interest held by Alberto William Vilar or Gary Alan Tanaka in Amerindo and the Amerindo Accounts.

   L. Documents reflecting brokerage accounts maintained by Amerindo at any broker-dealer other than Bear, Stearns & Co. Inc., including documents reflecting trades done "away" from Bear, Stearns, and settled in Amerindo accounts at Bear, Stearns.

   M. Bank account statements, brokerage account statements, transaction records, wire transfer instructions and records, copies of checks sent to or received from clients, notes, ledgers, cash receipt journals, deposit tickets and records, and other documents reflecting or relating to movements of funds into or out of the Amerindo Brokerage Accounts;

   N. Records of expenses such as copies of checks and/or wires sent to landlords, employees, counsel, accountants, brokers, utility companies, and other organizations

and individuals who provide goods and services to Amerindo, incorporation and governance documents relating to the various entities through which Amerindo, Alberto William Vilar and Gary Alan Tanaka conduct business, documents representing or reflecting communications with accountants, accounting records, documents reflecting communications with boards of directors, and other documents relating to the running and supervision of the operations of the investment advisory business(es) of Amerindo;

        O.    Documents reflecting information about any current or former Amerindo employee who had any contact with, or responsibility for the management of, redemptions from, or preparation of account statements for, any current or former Amerindo client that had a direct or indirect interest in the Amerindo Brokerage Accounts.

        P.    Photographs, address books, Rolodex indices, diaries, calendars, identification documents, travel documents, and other documents concerning or reflecting information concerning the identities of participants in the fraud schemes.

        Q.    Facsimile machines used to send and receive documents, which may be analyzed to determine telephone numbers to and from which documents have been sent and which may be also be analyzed to determine whether documents bearing certain "fax lines" were sent from a particular machine; and

        R.    Computers, hard drives, and any other devices or equipments capable of storing data or text in any format, including but not limited to cellular telephones, personal digital assistants, and any other storage media capable of containing data or text in magnetic, electronic, optical, digital, analog, or any other format, used to store information described above, as well as drafts and final versions of documents and correspondence prepared

in connection with the running and supervision of the operations of the investment advisory business.

## COMPUTER RECORDS

10. Based on my experience and on conversations with other law enforcement agents, I believe that it may be necessary that certain computer equipment, including input/output peripheral devices, keyboards, magnetic storage devices, related instructions in the form of manuals and notes, as well as the software utilized to operate such computers, be seized and subsequently processed by a qualified computer specialist in a laboratory setting, for the following reasons:

a. Computer storage devices (such as hard disks, diskettes, compact disks, tapes, etc.) can store the equivalent of thousands of pages of information. In addition, a user may seek to conceal evidence of criminal activity by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending upon the volume of data stored, and it would be impractical to attempt this kind of data analysis "on-site" at the time of the execution of the search.

b. Analyzing computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know prior to the search which expert possesses sufficient specialized skills to best analyze the system and its data. No matter which system is

12

used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive codes embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

    c.  Due to the volume of the data at issue and the technical requirements set forth above, it is usually necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting. It may be the case, however, under appropriate circumstances, that some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises.

    d.  Computers recognized in the computer trade as personal "laptop" or "notebook" computers are often substantially smaller devices capable of being stored in a portable carrying case. While the storage capabilities of such devices vary, they are more often designed to facilitate usage by a single individual. Because of these characteristics, physical removal of personal laptop or notebook computers is usually the more practical alternative, and is often less intrusive than requiring federal agents to remain at the premises for the amount of time reasonably required to review, analyze and copy pertinent data. Thus, a presumption exists that such computers will be seized and subsequently processed by a qualified computer specialist in a laboratory setting for reasons set forth above.

    e.  If, after inspecting the input/output peripheral devices, system software, and pertinent computer related documentation, it becomes apparent that these items are

13

no longer necessary to retrieve and preserve the evidence, such materials and/or equipment will be returned promptly.

        f.     The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

## CONCLUSION

Based upon the foregoing, I believe that probable cause exists to conclude that the items listed in Schedule A hereto will be found at the Premises.

WHEREFORE, I hereby respectfully request that a warrant be issued authorizing federal law enforcement agents, with appropriate assistance from other law enforcement officers and technical experts from the private sector, to enter the Premises and search any closed

containers or other closed items found therein, and therein to search for and seize the items set forth above.

_____
CYNTHIA M. FRATERRIGO
United States Postal Inspector

Sworn to before me this
25th day of May, 2005

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK