# EXHIBIT B

```
                                                                          1
     65VVVILH
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   UNITED STATES OF AMERICA,
 3
 4              v.                            05 CR 621 (KMK)
 4
 5   ALBERTO VILAR,
 5   GARY TANAKA                              SUPPRESSION HEARING
 6
 6              Defendants.
 7
 7   ------------------------------x
 8
 8                                            New York, N.Y.
 9                                            May 31, 2006
 9                                            10:05 a.m.
10
10
11   Before:
11
12                 HON. KENNETH M. KARAS,
12
13                                            District Judge
13
14
14                      APPEARANCES
15
15   MICHAEL J. GARCIA
16        United States Attorney for the
16        Southern District of New York
17   DEIRDRE McEVOY
17   MARC LITT
18        Assistant United States Attorneys
18
19   HOFFMAN & POLLOK
19        Attorneys for Defendant Alberto Vilar
20   JEFFREY C. HOFFMAN
20   SUSAN C. WOLFE
21
21   Attorneys for Defendant Gary Tanaka:
22
22   WILSON SONSINI GOODRICH & ROSATI
23        GLENN CHARLES COLTON
23             -AND-
24   KOBRE & KIM
24        STEVEN GARY KOBRE
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

```
65VVVILH                Litt - direct
```

1   couldn't instruct him to tell his employees what to do or what
2   not to do. But that at this point the government would prefer
3   if they did not have contact with Mr. Vilar.
4           And I should back up, because I recall one other part
5   of our first conversation that I distinctly recall. And that
6   is, Mr. Licker indicating to me that he wanted to be
7   cooperative with the government; and he also in that first
8   call, after saying that, he mentioned to me that in other
9   cases, he had sometimes put into place a procedure to prevent
10  documents from being destroyed, and things of that nature. And
11  he asked me -- or sort of a document retention policy. And
12  asked whether the government would like him to do so in this
13  case. And I told him that I thought that would be a good idea.
14  Q. What, if any, other subjects do you recall discussing with
15  Mr. Licker during one of those two morning calls?
16  A. During one of those two morning calls, Mr. Licker asked me
17  whether the government intended to serve Amerindo with a grand
18  jury subpoena.
19  Q. How did you respond to Mr. Licker's question about whether
20  the government intended to serve Amerindo with the grand jury
21  subpoena?
22  A. I responded that I didn't know, and that I'd have to get
23  back to him.
24  Q. Who first raised the issue of a grand jury subpoena?
25  A. Mr. Licker.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

```
                                                                   93
         65VVVILH                Litt - direct
 1   Q.   At that point of that conversation, had a grand jury
 2   subpoena been issued?
 3   A.   No.
 4   Q.   Before that phone call with Mr. Licker, had you discussed
 5   the possibility of issuing a grand jury subpoena with anyone?
 6   A.   No.
 7   Q.   Prior to the phone call of Mr. Licker, had you considered
 8   issuing a grand jury subpoena to Amerindo?
 9   A.   No.
10   Q.   After that phone call with Mr. Licker, who, if anyone, did
11   you consult with about whether to issue a grand jury subpoena?
12   A.   I consulted with the supervisor in the securities and
13   commodities fraud unit.
14   Q.   And who was that?
15   A.   David Esseks, E-s-s-e-k-s.
16   Q.   What, if anything, did you discuss with Mr. Esseks about
17   the subject of a grand jury subpoena?
18   A.   I told Mr. Esseks the substance of the phone call with
19   Mr. Licker; that Mr. Licker had raised that question.  And I
20   asked him whether he thought that was a good idea or not.
21   Q.   When you say "a good idea," what was a good idea?
22   A.   To issue a grand jury subpoena.
23   Q.   And what was his response with respect to your question
24   about whether it was a good idea to issue a grand jury
25   subpoena?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
         65VVVILH               Litt - direct
 1   A.  I tried to communicate the substance of it, a summary of
 2   what I just said:  That Mr. Licker said everyone was tired and
 3   wanted to go home, and there was a lot of work left to be done;
 4   and his offer to complete the process through the grand jury
 5   subpoena rather than through the search.
 6           And there's one other thing that I recall that he said
 7   to me, which was that it would be more efficient -- was another
 8   thing that he said to me, that it would be more efficient and
 9   we wouldn't -- and less disruptive to Amerindo's business to
10   proceed in that way.  And that if we proceeded by government
11   subpoena, the government would get what it really wanted I
12   believe is the phrase that he used, instead of having to take
13   so much material.
14   Q.  Do you recall the postal inspector's response?
15   A.  Not specifically, no.
16   Q.  What, if anything, did you communicate with Mr. Licker
17   about whether you agreed to his suggestion?
18   A.  I don't recall whether I spoke to Mr. Licker again that
19   day.
20   Q.  And what, if any, instructions do you recall giving the
21   postal inspectors about terminating the search?
22   A.  I don't recall.
23   Q.  Do you know if the postal inspectors terminated the search
24   nearly after the conversation you had with Mr. Licker about
25   terminating the search in lieu of the grand jury subpoena?
```