# EXHIBIT A

```
                                                                    1
     65VVVILH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              05 CR 621 (KMK)

5    ALBERTO VILAR,
     GARY TANAKA                               SUPPRESSION HEARING
6
                    Defendants.
7
     ------------------------------x
8
                                               New York, N.Y.
9                                              May 31, 2006
                                               10:05 a.m.
10

11   Before:

12                    HON. KENNETH M. KARAS,

13                                     District Judge

14
                             APPEARANCES
15
     MICHAEL J. GARCIA
16        United States Attorney for the
          Southern District of New York
17   DEIRDRE McEVOY
     MARC LITT
18        Assistant United States Attorneys

19   HOFFMAN & POLLOK
          Attorneys for Defendant Alberto Vilar
20   JEFFREY C. HOFFMAN
     SUSAN C. WOLFE
21
     Attorneys for Defendant Gary Tanaka:
22
     WILSON SONSINI GOODRICH & ROSATI
23        GLENN CHARLES COLTON
               -AND-
24   KOBRE & KIM
          STEVEN GARY KOBRE
25
```

    1    couldn't instruct him to tell his employees what to do or what

    2    not to do. But that at this point the government would prefer

    3    if they did not have contact with Mr. Vilar.

    4          And I should back up, because I recall one other part

    5    of our first conversation that I distinctly recall. And that

    6    is, Mr. Licker indicating to me that he wanted to be

    7    cooperative with the government; and he also in that first

    8    call, after saying that, he mentioned to me that in other

    9    cases, he had sometimes put into place a procedure to prevent

  10    documents from being destroyed, and things of that nature. And

  11    he asked me -- or sort of a document retention policy. And

  12    asked whether the government would like him to do so in this

  13    case. And I told him that I thought that would be a good idea.

  14    Q. What, if any, other subjects do you recall discussing with

  15    Mr. Licker during one of those two morning calls?

  16    A. During one of those two morning calls, Mr. Licker asked me

  17    whether the government intended to serve Amerindo with a grand

  18    jury subpoena.

  19    Q. How did you respond to Mr. Licker's question about whether

  20    the government intended to serve Amerindo with the grand jury

  21    subpoena?

  22    A. I responded that I didn't know, and that I'd have to get

  23    back to him.

  24    Q. Who first raised the issue of a grand jury subpoena?

  25    A. Mr. Licker.

Q. At that point of that conversation, had a grand jury subpoena been issued?
A. No.
Q. Before that phone call with Mr. Licker, had you discussed the possibility of issuing a grand jury subpoena with anyone?
A. No.
Q. Prior to the phone call of Mr. Licker, had you considered issuing a grand jury subpoena to Amerindo?
A. No.
Q. After that phone call with Mr. Licker, who, if anyone, did you consult with about whether to issue a grand jury subpoena?
A. I consulted with the supervisor in the securities and commodities fraud unit.
Q. And who was that?
A. David Esseks, E-s-s-e-k-s.
Q. What, if anything, did you discuss with Mr. Esseks about the subject of a grand jury subpoena?
A. I told Mr. Esseks the substance of the phone call with Mr. Licker; that Mr. Licker had raised that question. And I asked him whether he thought that was a good idea or not.
Q. When you say "a good idea," what was a good idea?
A. To issue a grand jury subpoena.
Q. And what was his response with respect to your question about whether it was a good idea to issue a grand jury subpoena?

```
65VVVILH                    Litt - direct
```

1   one of the postal inspectors.

2   Q.  After the subpoena was served, do you recall the substance

3   of any particular conversation you had with Mr. Licker?

4   A.  I do.

5   Q.  Approximately what time do you recall that conversation

6   happening?

7   A.  Sometime in the afternoon or early evening of May 26.

8   Q.  What is your recollection about the timing of the

9   conversation based on?

10  A.  My recollection of the timing is based on the substance of

11  the communication, and my review of the phone records.

12  Q.  And did --

13            MR. COLTON:  Your Honor, I'd like to just interrupt

14  for a second here.  And I think I foresee what's about to

15  happen.

16            And if he's going to testify as to an agent handing

17  him a phone about a call -- or an agent handing somebody --

18  Mr. Licker a cell phone, and if that agent is going to

19  miraculously be Agent Fraterrigo, which is going to be a call

20  that isn't on the cell phone records that's going to be highly

21  in dispute, the representation that nothing he has to say would

22  be relevant to her testimony would now have changed.

23            So before we get into that, I think we can perhaps

24  have a sidebar or try to figure out what the testimony is going

25  to be, and get a proffer from Ms. McEvoy for a mystery call

65VVVILH                    Litt - direct

1    that we never heard about that may very well involve this
2    witness sitting here comes out.
3              THE COURT:  Aren't all the calls mystery calls at this
4    point?  Isn't that the point of the hearing, we're finding out
5    for the first time who made what calls when, to whom, and what
6    they said?  I'm not sure it's fair to -- sort of devious about
7    mystery calls.  I mean we're all learning about this, at least
8    I am.
9              So is your concern that Inspector Fraterrigo -- is
10   this the same thing, that she shouldn't be here?
11             MR. COLTON:  Exactly.  Yes.
12             THE COURT:  Well, I still don't know what you do with
13   Rule 615.  You get to cross her on this if it comes up in her
14   testimony.
15             MR. COLTON:  Okay.
16             THE COURT:  And she's allowed to be here as the case
17   agent.  I mean I just think we've been over this.
18             MR. COLTON:  Okay.
19             THE COURT:  Go ahead, Ms. McEvoy.
20   BY MS. McEVOY:
21   Q.  During the conversation that you recalled having with
22   Mr. Licker after you served the subpoena, what do you recall
23   Mr. Licker saying to you and what do you recall you saying to
24   him?
25   A.  I recall Mr. Licker saying to me that it had been a long

65VVVILH                    Litt - direct

1   day; that he was tired; that either used the words his people
2   were tired, Amerindo employees were tired and wanted to go
3   home.  He indicated that there was a lot of work left to be
4   done with the search.
5           He indicated or reminded me that he had done two
6   things, accepted service of the grand jury subpoena, and had
7   agreed to put in place some kind of document, preservation
8   policy, and he had done that; and that he wanted to cooperate
9   with the government.
10          And he suggested that instead of the postal inspectors
11  and him and whoever else spending the foreseeable future of
12  that evening continuing the search, that rather than do that,
13  the company would produce documents pursuant to the grand jury
14  subpoena.
15  Q.  Did you agree to Mr. Licker's suggestion right after he
16  made it during that phone call?
17  A.  No, I did not.
18  Q.  What do you recall doing after Mr. Licker made that
19  suggestion?
20  A.  I recall wanting to speak to one of the postal inspectors.
21  And I asked Mr. Licker to hand the phone to one of them.
22  Q.  Do you recall who you spoke to?
23  A.  I don't.
24  Q.  What, if anything, did you communicate to the postal
25  inspector about the proposal?

65VVVILH                    Litt - direct

1    A.  I tried to communicate the substance of it, a summary of
2    what I just said:  That Mr. Licker said everyone was tired and
3    wanted to go home, and there was a lot of work left to be done;
4    and his offer to complete the process through the grand jury
5    subpoena rather than through the search.
6            And there's one other thing that I recall that he said
7    to me, which was that it would be more efficient -- was another
8    thing that he said to me, that it would be more efficient and
9    we wouldn't -- and less disruptive to Amerindo's business to
10   proceed in that way.  And that if we proceeded by government
11   subpoena, the government would get what it really wanted I
12   believe is the phrase that he used, instead of having to take
13   so much material.
14   Q.  Do you recall the postal inspector's response?
15   A.  Not specifically, no.
16   Q.  What, if anything, did you communicate with Mr. Licker
17   about whether you agreed to his suggestion?
18   A.  I don't recall whether I spoke to Mr. Licker again that
19   day.
20   Q.  And what, if any, instructions do you recall giving the
21   postal inspectors about terminating the search?
22   A.  I don't recall.
23   Q.  Do you know if the postal inspectors terminated the search
24   nearly after the conversation you had with Mr. Licker about
25   terminating the search in lieu of the grand jury subpoena?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300