UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA            :

          -v.-            :            S3 05 Cr. 621 (RJS)

ALBERTO WILLIAM VILAR,            :
  a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,            :

             Defendants.            :
------------------------------------------------------x


## GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO PRECLUDE THE USE OF "TAINTED" EVIDENCE


MICHAEL J. GARCIA
*United States Attorney for the*
*Southern District of New York*

*Attorney for the United States of America*


Marc Litt
Benjamin A. Naftalis
Joshua Klein
*Assistant United States Attorneys*
    *Of Counsel*

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Point I:       Vilar's Motion Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Vilar Is Barred By The "Law Of The Case" From Raising Claims
             That Evidence Obtained From The UK Search Or Evidence Called
             For By The Revised Subpoena is "Tainted." . . . . . . . . . . . . . . . . . . . . . 5

        B.      The Court Should Reject Vilar's Motion To Suppress All Exhibits
             Derived From The US Search Dated Prior To May 26, 2000 . . . . . . . . . 7

        C.      Vilar's Motion To Preclude The Use Of Certain Bank Records
             Should Be Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        D.      The Documents Obtained From The Internal Revenue Service Were
             Lawfully Obtained And Should Not Be Suppressed . . . . . . . . . . . . . . . 12

        E.      The Tara Colburn Evidence Was Lawfully Obtained And
             Should Not Be Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        F.      The Bombo Sports Litigation Documents Were Lawfully Obtained . . . . 15

        G.      Vilar's "Catch-All" Motion To Suppress Hundreds Of Lawfully
             Obtained Exhibits Is Without Merit And Should Be Denied . . . . . . . . . 16

             1.      Documents Obtained From Victims . . . . . . . . . . . . . . . . . . . . . 17

                    a.      The Mayers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                    b.      Lily Cates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                    c.      Tara Colburn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                    d.      Graciela Lecube-Chavez . . . . . . . . . . . . . . . . . . . . . 18

                    e.      Ana Acevedo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     f.  Elizabeth Knope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     g.  Alfred Heitkoenig  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    2.  Documents Obtained From Banks And Financial Institutions  . . 20

     a.  SunTrust Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     b.  U.S. Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

     c.  Banco Popular  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     d.  Bank of New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     e.  Bear, Stearns & Co. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    3.  Documents Obtained From Foreign Governments Pursuant
      To MLATS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    4.  Documents Obtained From U.S. Government Agencies . . . . . . . 24

     a.  The U.S. Securities and Exchange Commission  . . . . . . . 24

     b.  The U.S. Small Business Administration  . . . . . . . . . . . 24

    5.  Documents Obtained From The UK Search  . . . . . . . . . . . . . . 24

    6.  Documents Obtained From The US Search . . . . . . . . . . . . . . . 25

    7.  Documents Obtained From Former Amerindo Employee
      Matthew Fitzmaurice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    8.  Vilar's Transcript Obtained From Washington & Jefferson
      College . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    9.  Documents Obtained From Cohen & Schaeffer  . . . . . . . . . . . 26

  H.  Vilar's Motion To Preclude Witness Testimony Should Be Denied . . . . 27

Point II:  Tanaka's Motion Should Be Denied  . . . . . . . . . . . . . . . . . . . . . . . . . 29

  A.  The Eight Challenged Documents . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B.    Tanaka's Request For Additional Information About The
      Government's Exhibits And Witnesses Should Be Denied  . . . . . . . . . 31

**CONCLUSION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

UNITED STATES OF AMERICA            :

            -v.-                    :        S3 05 Cr. 621 (KMK)

ALBERTO WILLIAM VILAR,              :
    a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,                   :

                    Defendants.     :
-----------------------------------------------------x

## GOVERNMENT'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO PRECLUDE THE USE OF "TAINTED" EVIDENCE

### PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the

defendants' motions to preclude the Government from introducing or otherwise using "tainted"

evidence.[1]

### Background

On May 26, 2005, a search was conducted at Amerindo's U.S. offices (the "US

Search") pursuant to a search warrant (the "Warrant"). The same day, in the early afternoon, a

grand jury subpoena was served on Amerindo U.S. (the "Subpoena"). The Subpoena called for

production of substantially the same categories of documents listed in the Warrant, plus several

additional categories of documents. The Subpoena also called for production of all responsive

documents in Amerindo U.S.'s possession, custody or control, not just those documents

---

[1]        "Tanaka Mem." refers to the July 31, 2008 memorandum filed by defendant Gary
Alan Tanaka in support of the Motion. "Vilar Mem." refers to the memorandum of law filed by
defendant Alberto Vilar on July 31, 2008. This memorandum addresses the arguments raised by
both defendants.

physically located at Amerindo's New York office. On September 12, 2005, defendants

challenged the legality of the search and moved to suppress its fruits. On or about December 15,

2005, defendants moved to quash the Subpoena, and on or about March 9 and 13, 2006,

defendants moved to suppress the fruits of a search conducted by authorities in the United

Kingdom (the "UK Search") pursuant to search warrants obtained in response to an MLAT

request from the Government. Extensive hearings on these and other issues, including

defendants' *Franks* motion, were held between December 14, 2005 and November 15, 2006.

Following post-hearing briefing, the Court issued its Opinion and Order dated April 4, 2007.

The Court found part of the Warrant and part of the Subpoena to be overbroad, and narrowed the

scope of both documents.[2] The Court denied in its entirety defendants' motion to suppress

evidence obtained from the UK Search, finding that, "Defendants have failed to establish that the

allegations in the MLAT request are tainted by the illegal fruits of the Amerindo U.S. search,

even assuming the entire U.S. Warrant pursuant to which that search was executed was invalid."

(April 4, 2007 Order at 120). The Court also denied the *Franks* motion in its entirety.

        Shortly thereafter, Vilar requested and received a lengthy briefing schedule to

brief "taint" issues.[3] Following extensive briefing and argument on defendants' "taint" motion,

the Court issued a Memorandum and Order on January 14, 2008 in which it: (1) held that the

Government could use documents seized in the search that fell within the scope of the Revised

---

[2]        The terms of the narrowed Warrant and Subpoena are referred to herein as the
"Revised Warrant" and the "Revised Subpoena," respectively.

[3]        In justifying the lengthy briefing schedule he sought, counsel for Vilar
acknowledged that he had "the obligation of identifying, connecting items that were suppressed
to the application. In other words, I cannot just go in and ask you to find poison willy-nilly. I
need to be as specific as possible." (4/27/07 Tr. 50; *see id*. at 46-47).

Subpoena, but outside the scope of the Revised Warrant and; (2) rejected defendants' request for

an immediate pretrial "taint" hearing;  (3) rejected defendants' request for broad pretrial

disclosures to assist in the evaluation of evidence for "taint"; (4) required the Government to

identify its exhibits and witnesses, and to provide Rule 404(b) notice, 60 days prior to trial; (5)

permitted the defendants, based upon their review of the pretrial disclosures, to request a pre-

motion conference before the Court in anticipation of filing a motion to suppress tainted

evidence; and (6) held that, although there is no pre-hearing burden on defendants to demonstrate

taint in a substantial portion of the Government's case, defendants have an initial burden of going

forward with specific evidence demonstrating taint, before any burden shifts to the Government

to show that it obtained the challenged evidence from an independent source.  (January 14, 2008

Order at 27).

On May 5, 2008, the Court issued an Order setting forth pre-trial deadlines

including a deadline of July 31, 2008 for defendants' briefs regarding "potential Taint and 404(b)

issues."  On July 31, 2008, both defendants filed motions and supporting briefs seeking to

suppress tainted evidence.

## ARGUMENT

### I.

### VILAR'S MOTION SHOULD BE DENIED

On an apparent mission to either ignore or completely re-litigate the issues that

were briefed and argued between September 2005 and June 2008, Vilar seeks to preclude the use

by the Government of "virtually everything that followed" the US Search.  (Vilar Mem. at 1).

Vilar moves to suppress: (1) all evidence obtained from the UK Search and the Revised

3

Subpoena; (2) all exhibits derived from the US Search dated prior to May 26, 2000; (3) all

documents obtained from the Internal Revenue Service; (4) bank records obtained from

Wilmington Trust, JP Morgan Chase, and Citibank; (5) documents and testimonial evidence

pertaining to Tara Colburn; (6) three exhibits that relate to litigation between Bombo Sports &

Entertainment LLC and Vilar; and (7) a vast quantity of exhibits on the bare assertion that Vilar

has a good faith basis to believe that they were either directly obtained from the US Search or

derived from documents obtained from the US Search. (*See* Vilar Mem. at 10-12, 13, 15-16, 21).

Vilar takes a similar blunderbuss approach to witnesses, moving to suppress the testimony of at

least 20 former Amerindo employees based on the unsupported assertion that the Government

"must have" learned about their identities through illegally seized documents. (*See* Vilar Mem.

at 18-19). Stripped of its hyperbole, Vilar's essential argument is that because the Court found

defects in the Warrant and the Subpoena, everything the Government obtained during and after

the US search is presumptively tainted, and the burden is on the Government to explain why each

such piece of evidence should not be suppressed. In short, notwithstanding the advance

disclosures made to assist defendants in mounting a viable pretrial "taint" challenge, Vilar's

motion is, in substantial part, only marginally more specific than his original "taint" motion filed

nearly one year ago. Just as the Court denied that motion, so too should this motion be denied.[4]

---

[4]       The irony of Vilar's casting of his argument in terms of Lady Macbeth's line,
"Out, damned spot! Out I say!" is not lost on the Government. (William Shakespeare, <u>Macbeth</u>,
Act V, scene I, at 35. Verdi's opera, <u>Macbeth</u>, based closely on Shakespeare's play, also reprises
the scene in Act IV, including in the aria "Una macchia e qui tuttora!" (roughly translated, "The
stain and still here!")). What Vilar misunderstands, or intentionally omits, is the key context in
which the line is uttered. Consumed by guilt for her participation in a conspiracy to murder King
Duncan, Lady Macbeth teeters on the edge of insanity and experiences fits of sleepwalking and
aberrant behavior including the compulsive washing of her hands. The "spot" that Lady Macbeth
is attempting to wash from her hands when she speaks this line is a figment of her tortured mind.

A.    **Vilar Is Barred By The "Law Of The Case" From Raising Claims That Evidence Obtained From The UK Search Or Evidence Called For By The Revised Subpoena is "Tainted."**

Vilar openly ignores the dispositive prior decisions of this Court in arguing that

the Government should be precluded from using evidence obtained from the UK Search and

evidence obtained from the Revised Subpoena.  The Court should reject these arguments based

on its previous rulings in this case.[5]

The Court's April 4, 2007 Opinion and Order specifically rejected Vilar's

contention that documents seized pursuant to the U.K. search warrants should be suppressed as

---

She sees blood on her hands where there is none, no doubt because of the figurative "blood" on her hands as a consequence of her role in inciting her husband to murder the King.  Just as Lady Macbeth sees blood where there is none, so too does Vilar see "taint" where there is, in fact, none.

[5]    To the extent Vilar also seeks to exclude all documents obtained pursuant to the Revised Subpoena, or derived therefrom, on grounds of taint, Vilar also ignores the fact that the defendants explicitly waived the right to make such a claim in the June 6, 2007 Limited Waiver Stipulation and Order (the "Limited Waiver Order") in which defendants:

> waive the right to (a) argue that any member of the prosecution team has been improperly exposed to the Subject Materials [*i.e.*, the 170 boxes produced to the Government], (b) move to disqualify a witness on the ground that the witness has been improperly exposed to the Subject Materials, or (c) object to the prosecution team's use or derivative use of materials derived from review of the Subject Materials (except that Defendants may object to the use or derivative use of the Subject Materials in any proceeding . . . [on privilege grounds] as described in Paragraph 5 [of the limited waiver Stipulation and Order].

(Limited Waiver Order ¶ 6).  On July 17, 2007, the Court conducted a proceeding in which the defendants, under oath, acknowledged their understanding of, and intention to waive, the rights described in Paragraph 6.  (*See* 7/17/07 Tr. at 4, 10-11).  (Copies of the Limited Waiver Order and pertinent transcripts cites were attached to the Government's July 15, 2008 letter opposing Vilar's request for an adjournment).  The Government responds to Vilar and Tanaka's contentions concerning whether certain specifically identified documents fall outside the scope of the Revised Subpoena in Section I.B, below.

5

tainted fruit of the search conducted at Amerindo's New York office.  The Court found that,

"[d]efendants have failed to establish that the allegations in the MLAT request are tainted by the

illegal fruits of the Amerindo U.S. search, even assuming the *entire* U.S. Warrant pursuant to

which that search was executed was invalid."  (April 4, 2007 Op. and Order at 120 (emphasis

added)).  Likewise, the Court's April 4, 2007 Opinion and Order specifically rejected Vilar's

contention that the Subpoena was issued for an improper purpose, finding that the argument that

the Subpoena was an extension of an illegal search "is devoid of both factual and legal support."

(April 4, 2007 Op. and Order at 79-80).

      Notwithstanding these unambiguous rulings, Vilar argues that the evidence

obtained from the UK Search should be suppressed because it was "obtained in reliance upon

evidence that was seized in New York pursuant to the constitutionally defective warrant."  (Vilar

Mem. at 21).  Vilar also argues that "the overbroad and faulty search warrant also prompted the

obtaining of a subpoena.  And, even as revised by the Court, the subpoena was defective and

unjustified."  (*Id.*).  Vilar simply should not be permitted to re-raise these arguments, which have

previously been litigated and definitively rejected by the Court.

      Under the "law of the case" doctrine, parties are precluded from raising claims

that have already been decided in the same case.  *See United States* v. *Vilar*, 530 F. Supp. 2d 616,

629 n. 9 (S.D.N.Y. 2008) (citing *Pescatore* v. *Pan Am. World Airways, Inc.*, 97 F.3d 1, 7-8 (2d

Cir. 1996) ("The law of the case doctrine 'posits that when a court decides upon a rule of law,

that decision should continue to govern the same issues in subsequent stages in the same case.'")

(quoting *DiLaura* v. *Power Auth.*, 982 F.2d 73, 76 (2d Cir. 1992))).  Because the Court has

already found that neither the UK Search nor the Revised Subpoena was "fruit" of any poisonous

tree, Vilar should be precluded from re-litigating these decided issues. Accordingly, GX 3001-3468, 4601-4642, 4801-4840, and 4901-4992, all of which were obtained from the UK Search, should not be suppressed. Likewise, GX 2001-2258, all of which were obtained in response to the Revised Subpoena should not be suppressed to the extent that they are responsive to the categories of documents described in the Revised Subpoena. Finally, GX 4001-4102, 4401-4406, 4501-4503, 4701-4798, and 5701-5709, all of which were obtained in the US Search, should not be suppressed to the extent that they fall within the scope of the Revised Warrant and/or the Revised Subpoena.

**B.    The Court Should Reject Vilar's Motion To Suppress All Exhibits Derived From The US Search Dated Prior To May 26, 2000**

Vilar's general assertion that all exhibits derived from the US Search that are dated prior to May 26, 2000 should be suppressed is deeply flawed and ignores the prior decisions of this Court. First, although the Court added a time restriction to several categories of documents listed in the Warrant,[6] it did not place any time restriction whatever on certain categories including those set forth in ¶¶ 1, 2, 6, 7, 8, 16A, 16B, and 17. With respect to the Subpoena, the Court placed no time restriction on categories of documents falling under ¶¶ II.A, II.B, II.C, II.F, II.G, II.H, II.I, II.K, II.P, II.Q, II.R, II.S, and II.T. In light of the Court's January 14, 2008 Order holding that the Government is entitled to use any documents seized pursuant to the Warrant that fall within the scope of the Revised Subpoena, there is no basis to suppress documents that fall under ¶¶ II.A, II.B, II.C, II.F, II.G, II.H, II.I, II.K, II.P, II.Q, II.R, II.S, or II.T

---

[6]      With respect to certain categories of documents in the Subpoena, the Court imposed a date restriction going back five years to May 26, 2000 (*see* ¶¶ II.D, II.E, II.J, II.L, II.W, II.Y, and II.Z), and with respect to others in the Warrant, the Court added a date restriction going back to January 1, 2001 (¶¶ 5, 9, 10, and 11).

of the Revised Subpoena, regardless of when they were created or how they were obtained.

Moreover, Vilar's motion apparently seeks to suppress documents that were created prior to May

26, 2000 even if they were derived from documents lawfully obtained by the Government

regardless of the date on which the "source" documents were created. For example, had the

Government lawfully seized a document dated on May 27, 2000 and obtained a lead that led it to

obtain from a victim a document dated May 25, 2000, Vilar argues that the product of the lead

should be suppressed merely because it is dated prior to May 26, 2000. That result is completely

illogical and contrary to the Court's April 4, 2007 Order. As a consequence, this overbroad

argument should be summarily rejected.

   With respect to the specific contentions of Vilar and Tanaka that certain

Government exhibits obtained under the Revised Subpoena fall outside its scope (*see* Vilar Mem.

at 16 & n. 14; Tanaka Mem. at 5-6), the Government responds as follows:

-  **GX 2092**: One page of this seven-page document appears to have been created in late April or early May 2000. The pages that comprised this document were found paper-clipped together and stored (by themselves) in a clear plastic folder. Accordingly, the Government treated the pages as one document and marked it as a single exhibit. At most, a single page of this document should be removed from the exhibit, although the Government does not believe that such a redaction is warranted.

-  **GX 2094**: Six pages of this 32-page document are dated prior to May 26, 2000. The pages that comprised this document were found stored together, by themselves, in a clear plastic folder. Accordingly, the Government treated the

pages as one document and marked it as a single exhibit.  At most, the six pages

of this document dated prior to May 26, 2000 should be removed from the exhibit,

although the Government does not believe that such redaction is warranted.

- **GX 2095**: The same six pages described in GX 2094, above, are found in this

  seventeen-page document.  The pages that comprised this document were found

  stored paper-clipped together, by themselves, within a clear plastic folder.

  Accordingly, the Government treated the correspondence as one document and

  marked it as a single exhibit.  At most, the six pages of this document dated prior

  to May 26, 2000 should be removed from the exhibit, although the Government

  does not believe that such redaction is warranted.

- **GX 2098**: This eight-page document, which was found stapled together consists

  of pages which are dated between December 6, 1999 and January 24, 2000.  One

  of those pages reflects a wire deposit by an Amerindo GFRDA client of $2

  million into one of the Amerindo Brokerage Accounts (specifically, Techno

  Raquia).  Both the Revised Warrant and Revised Subpoena permit seizure of

  documents concerning the Amerindo Brokerage Accounts, "including account

  opening documents, account statements, wire transfer requests, correspondence . .

  . and other documents reflecting or relating to securities transactions entered into

  on behalf of clients by an . . . Amerindo entity, affiliate, principal, officer and

  employee" without any time restriction.  (Revised Warrant ¶ 2; Revised Subpoena

  ¶ II.B).  The Government contends that this document falls squarely within the

  Revised Warrant and Revised Subpoena and consequently should not be

9

suppressed.

- **GX 2102, 2104, 2126, 2197-2201, 2206-2211, 2234** : The Government acknowledges that these documents do not fall within the time restrictions of the Revised Subpoena. The Government reserves its rights to: (a) use identical documents found in the UK Search; and (b) issue a trial subpoena for any document that was produced under the terms of the Limited Waiver Order, that falls outside the scope of the Revised Subpoena, but that is nevertheless relevant and admissible at trial.

- **GX 2103**: Five pages of this sixteen-page document are dated prior to May 26, 2000. The pages that comprised this document were found stored together, by themselves, within a clear plastic folder. Accordingly, the Government treated the correspondence as one document and marked it as a single exhibit. At most, the five pages of this document dated prior to May 26, 2000 should be removed from the exhibit, although the Government does not believe that such redaction is warranted.

- **GX 2201**: This document reflects an investment by the Mayers in Amerindo's GFRDA. It clearly falls under ¶ 6 of the Revised Warrant and ¶ II.F of the Revised Subpoena, and should not be suppressed.

- **GX 2202**: This one-page document reflects a wire deposit by an Amerindo GFRDA client of $400,000 into one of the Amerindo Brokerage Accounts. Both the Revised Warrant and Revised Subpoena permit seizure of documents concerning the Amerindo Brokerage Accounts, "including account opening

documents, account statements, wire transfer requests, correspondence . . . and

other documents reflecting or relating to securities transactions entered into on

behalf of clients by an . . . Amerindo entity, affiliate, principal, officer and

employee" without any time restriction.  (Revised Warrant ¶ 2; Revised Subpoena

¶ II.B).  This document falls squarely within the Revised Warrant and Revised

Subpoena and should not be suppressed.

- **GX 2203**: *see* explanation for GX 2202, above.

- **GX 2205**: *see* explanation for GX 2202, above (in this case reflecting wires into

  two of the four Amerindo Brokerage Accounts).

**C.     Vilar's Motion To Preclude The Use Of Certain Bank Records Should Be Denied.**

Vilar moves to suppress bank records obtained from Wilmington Trust (GX 51-

53), JP Morgan Chase (GX 75-83) and Citibank (GX 5051-5065), on the basis of his conclusory

allegation that the Government "learned of the accounts and statements through the illicit

search." This unsupported argument is without merit and should be rejected.[7]

First, as Vilar well knows, the Wilmington Trust account and two of the JP

Morgan Chase accounts were identified in the May 25, 2005 criminal complaint against Vilar

that was incorporated by reference in the Warrant application.  (*See* Vilar Complaint ¶¶ 13.c.i,

---

[7]     The Government does not believe that Vilar has met his burden of going forward
with respect to this, or any other, category of documents he seeks to suppress.  Accordingly, the
Government does not believe that any burden has been shifted to the Government to demonstrate
that any of the specific evidence identified by Vilar as "tainted" was, in fact, obtained by the
Government in a "taint"-free manner.  Nevertheless, the Government herein responds to at least
certain of Vilar's specious arguments in an effort to resolve these issues.  In so doing, the
Government reserves its right to provide a fuller response, including additional documentation
with respect to each exhibit at issue, should the Court so require.

13.c.ii, 22.c., 23).  In light of that indisputable fact, Vilar's motion must fail.  Moreover, the

Citibank documents were obtained as a consequence of tracing transfers from Vilar's

Wilmington Trust account (among others), including the transfer for $53,042.83 identified in

paragraph 23.b. of the Vilar Complaint.  Accordingly, Vilar's allegation of "taint" with respect to

this account likewise falls short.

       Second, even had the Government identified these accounts from records obtained

on the basis of the Revised Warrant or the Revised Subpoena, it would have been fully entitled to

do so under ¶ 9 of the Revised Warrant or ¶ II.I of the Revised Subpoena, which covered

"[d]ocuments reflecting any private bank, brokerage or other account with any financial

institution held by Alberto William Vilar and Gary Alan Tanaka."[8]

       There is simply no credible evidence that any of these exhibits were obtained or

derived from an improper source.  Accordingly, Vilar's motion with respect to these exhibits

should be rejected.

**D.**    **The Documents Obtained From The Internal Revenue Service Were Lawfully
Obtained And Should Not Be Suppressed**

       Vilar claims that GX 8001-8015 – records obtained from the Internal Revenue

Service ("IRS") – should be suppressed "because, *in reality*, the prosecution learned of Alberto

Vilar's tax issues through records seized during the New York search."  (Vilar Mem. at 15)

(emphasis added).  Vilar's wholly unsupported allegation is as divorced from reality as Lady

Macbeth visions of non-existent blood.

       First, prior to the US Search, the Government had learned of Vilar's "tax issues"

---

[8]    The Revised Warrant included a time restriction beginning in 2001.  The Revised
Subpoena did not include any time restriction for such documents.

from victim-investors who were aware of the huge tax lien that had been filed by the IRS against Vilar.

Second, the Revised Subpoena called for the production of "Tax documents and records, other than those documents and records that pertain solely to any publicly traded Amerindo mutual fund" for the five-year period ending on May 26, 2005. Accordingly, the Government was entitled to any tax records pertaining to Vilar during that five-year period. Vilar's categorical statement to the contrary – "There was no authorization for the seizure of these tax records, nor were they covered by the subpoena" (Vilar Mem. at 15) – is flat wrong.

Third, because Vilar's tax records, including Schedule A of his 1040 forms, contained references to Vilar's accounts with financial institutions, the Government was entitled to any tax records containing such references without any time restriction pursuant to ¶ 9 of the Revised Warrant and ¶ II.I of the Revised Subpoena.

Fourth, because the April 20, 2004 letter to IRS employee Harold Campbell contained a reference to Vilar's ownership of shares in Eyetech and Cancervax, two companies whose shares were purchased in one or more of the Amerindo Brokerage Accounts (a defined term that related to four Bear, Stearns brokerage accounts held in the names of several Panamanian entities), that document was subject to seizure and/or production pursuant to ¶ 11 of the Revised Warrant and ¶ II.K of the Revised Subpoena ("[d]ocuments reflecting any direct financial or beneficial ownership interest held by [] Vilar [] in Amerindo and the Amerindo [Brokerage] Accounts.").[9] Having lawfully obtained that letter, which also contains information

---

[9]     This letter, which contained numerous false statements, is described in the Government's July 9, 2008 Rule 404(b) notice letter.

13

about Amerindo's purported efforts to obtain an SBIC license (to which the Government was

entitled pursuant to ¶ 7 of the Revised Warrant and ¶ II.G of the Revised Subpoena), the

Government inevitably would have obtained the IRS's copy of that letter as well as any other

documents related to Vilar.

      Vilar's motion to suppress the IRS documents simply has no basis and should

summarily be rejected.

**E.     The Tara Colburn Evidence Was Lawfully Obtained And Should Not Be
         Suppressed**

      Vilar contends that the Government learned of the identity of Tara Colburn from

documents illegally seized during the US Search and claims that the Court struck the only

provision pursuant to which the Government was entitled to learn of Ms. Colburn's identity.

Vilar is wrong.  Although the Court did strike paragraph 4 of the Warrant, the Court found that

paragraph II.D of the Subpoena described documents relevant to the investigation.  (April 4,

2007 Order at 91).  The Court modified slightly the language of paragraph II.D which, under the

terms of the Revised Subpoena, called for production of:

> Current and former client lists, client files,
> investment advisory agreements, copies of
> correspondence sent to or received from clients
> including redemption requests received from
> clients, and other documents concerning or
> reflecting the identities of and communications with
> clients who have investments in the Amerindo
> Brokerage Accounts.

(*Id.* (excising references to "investment brochures" and "marketing materials" from ¶ II.D of the

Subpoena)).  As a client who had invested with Amerindo through one of the Amerindo

Brokerage Accounts, the Government was entitled under the Revised Subpoena to all documents

concerning or reflecting communications with Colburn during the five-year period beginning

May 26, 2000. Moreover, Ms. Colburn's entire client file maintained by Amerindo's London

office was lawfully obtained in the UK Search. Vilar has failed to show that any of the

documents concerning Ms. Colburn that were either seized in the search (GX 4403),[10] obtained

from the Colburn estate (GX 475-493), obtained from the New York State Supreme Court

Clerk's Office (GX 1151-1168), obtained from the UK Search (GX 3331 and its subdivisions,

3388, 3410, 3436, 3439, and 4805), or obtained under the auspices of the Revised Subpoena (GX

2183-94, 2216 and its subdivisions, and 2217), were obtained unlawfully or derived from

unlawfully obtained materials. Accordingly, Vilar's challenge to the introduction of evidence,

including the testimony of Nicholas Ciriello, the executor of the Colburn estate, should be

denied.

## F.    The Bombo Sports Litigation Documents Were Lawfully Obtained

Vilar's effort to suppress GX 1801-1803, which relate to litigation between

Bombo Sports & Entertainment LLC and Vilar, should be denied. First, these exhibits were not

seized during the US Search; they were obtained from plaintiff's counsel. Second, as reported in

the New York Times on July 6, 2005, the issue of the judgment entered against Vilar in the

Bombo litigation emerged as an issue in connection with Vilar's efforts to fulfill his bail

conditions. Indeed, on July 5, 2005, Susan R. Necheles, Esq., Vilar's first counsel in this matter,

sent the Court and the Government a copy of the restraining notice in the *Bombo* litigation, which

notice identified Plaintiff's counsel. Having delivered the information concerning the *Bombo*

---

[10]    GX 4403 is undated, but reflects, in large measure, a list of individuals with investments in the Amerindo Brokerage Accounts who received redemptions through overseas bank accounts and, therefore, falls under ¶ II.D-E of the Revised Subpoena.

litigation directly to the Government, it is incomprehensible that Vilar would here maintain that the Government's knowledge of that matter could somehow have been "tainted" by any document found in the US Search  Third, there were documents lawfully obtained during the US Search, including calendars of Vilar that referred to one or more meetings with plaintiff's counsel in this lawsuit.  (*See* Revised Warrant ¶ 16A; Revised Subpoena ¶ II.P ("calendars and other documents reflecting the activities of . . . Vilar")).  Vilar's conclusory assertion that these exhibits were derived from unlawfully obtained materials is belied by the record, and his motion to suppress should be denied.

**G.     Vilar's "Catch-All" Motion To Suppress Hundreds Of Lawfully Obtained Exhibits Is Without Merit And Should Be Denied.**

        Vilar also seeks to preclude the Government from using hundreds of exhibits based on little more than his assertion that he has a "good faith basis to believe that most of them were taken directly from Amerindo's New York offices during the search, or derived from information obtained as a result of the seizure." (Vilar Mem. at 10 & n. 9).[11]  Such an unsupported allegation can not be sufficient to shift the burden to the Government to explain where every piece of evidence came from and to prove that each such piece of evidence was not derived from illegally obtained evidence.  Moreover, the patent lack of a good faith basis to make this claim with respect to hundreds of these exhibits is evident even upon a cursory review of the exhibit index, let alone review of the documents themselves and the voluminous previously produced discovery.  Notwithstanding Vilar's failure to produce any specific evidence

---

        [11]     On this basis, Vilar seeks to suppress GX 301-555, 733-737, 751-1168, 1251-1360, 1609-1610, 1612-1614, 1620-1803, 3204-3212, 3300(1)-3300(89), 3301(1)-3301(83), 3396-3398, 4001-4503, 4701-4798, 5021-5023, 5101, 5201-5709, and 7001-7203. (*Id.*).

demonstrating "taint," and without prejudice to the Government's right to supplement these

arguments with additional evidence and argument if required by the Court, the Government

responds as follows.

1.    **Documents Obtained From Victims**

a.    **The Mayers**

The description of nearly every exhibit in the ranges of GX 301-400B and 1001-

1025, contains the word "Mayer" or the name of an entity through which Vilar knows the Mayers

invested with Amerindo.  Even had these documents been seized in the US Search – and they

were not, they were obtained from the Mayers – Vilar concedes that the Government would have

been entitled to obtain these documents under the authority of the Revised Warrant or Revised

Subpoena.  (*See* Vilar Mem. at 12-13 ("Judge Karas found that there was <u>insufficient</u> probable

cause in the search warrant affidavit to justify the seizure of any client files, *with the exception of*

*Lily Cates and the Mayers*.") (emphasis added)).  Therefore, Vilar's effort to preclude the

Government from using these exhibits must fail.

b.    **Lily Cates**

Similarly, the description of nearly every exhibit in the range of 901-925 contains

a reference to the name "Swanson" – an individual with whom Vilar repeatedly communicated

concerning Ms. Cates – and the contents of those exhibits all relate to Ms. Cates and her

investments with Amerindo.  Although the Government obtained these documents from Mr.

Swanson, not from the Revised Warrant or the Revised Subpoena, there can be no question but

that the Government would have been entitled to obtain these documents under the authority of

the Revised Warrant or Revised Subpoena.  (*See* Revised Warrant ¶¶ 2, 5-8; Revised Subpoena

17

¶¶ II.B-H).  Vilar's bald assertion of a "good faith basis" to believe that this evidence was

improperly obtained is simply not credible.  Likewise, GX 1251-53 were obtained from Ms.

Cates, and there is no conceivable basis to suppress them.

      **c.**    **Tara Colburn**

Government Exhibits 475-493, all of which relate to the investment of Tara

Colburn in an Amerindo GFRDA, were obtained from the executor of her estate and, for the

reasons set forth in Section E, above, were lawfully obtained by the Government.  So too were

GX 1151-1168 lawfully obtained.  These certified court records relate to a civil lawsuit filed by

Ms. Colburn's estate against Amerindo arising out of Amerindo's refusal to return more than $1

million invested by Ms. Colburn in an Amerindo GFRDA at the expiration of the investment's

fixed term.  As an investor who sent money to one of the Amerindo Brokerage Accounts, the

Government was entitled to obtain documents, including correspondence with Ms. Colburn,

pursuant to paragraph II.D of the Revised Subpoena and, as a consequence, documents derived

from those documents, or the Colburn client file obtained from the UK Search, are not "tainted"

and should not be suppressed.

      **d.**    **Graciela Lecube-Chavez**

Government Exhibits 502-555, all of which relate to the investment of Graciela

Lecube-Chavez in an Amerindo GFRDA, were obtained from Ms. Chavez and were not obtained

under the Revised Warrant or the Revised Subpoena.  The Government was, in any event,

entitled to seize documents relating to Ms. Chavez because she was a client who received

redemptions from Amerindo through overseas bank accounts, including Account No. 3308442 of

18

Barclay's Bank in the Bahamas.[12]  (*See* Revised Warrant ¶ 5; Revised Subpoena ¶ II.E).

Moreover, the Government lawfully obtained the client file of Ms. Chavez from the UK Search,

and would in any event have obtained these documents from Ms. Chavez after reviewing that

file, which included documents reflecting the difficulty Ms. Chavez was having redeeming her

GFRDA investment.

### e.    **Ana Acevedo**

Government Exhibits 801-807, all of which relate to the investment of Ana

Acevedo in an Amerindo GFRDA, were obtained from Ms. Acevedo, and were not obtained

from the Revised Warrant or the Revised Subpoena.  Vilar has not identified any improperly

obtained evidence from which he contends this evidence was derived.  In any event, Ms.

Acevedo's client file was obtained from the UK Search, and the contents of that file, including

evidence of Ms. Acevedo's inability to redeem her investment, would inevitably have led the

Government to obtain this evidence from her.  Accordingly, GX 801-807 should not be

suppressed.

### f.    **Elizabeth Knope**

Government Exhibits 5021-5023 were obtained from Elizabeth Knope and were

not obtained from the Revised Warrant or the Revised Subpoena.  Vilar has not identified any

improperly obtained evidence from which he contends this evidence was derived.  In any event,

Ms. Knope's client file was obtained from the UK Search, and the contents of that file, including

evidence of Ms. Knope's inability to obtain information about the status of her investment in

---

[12]      It cannot be disputed that the Government knew about the Bahamian bank account
prior to May 26, 2005.  It was referenced in paragraph 6.C of the Warrant Affidavit.

Rhodes Capital would inevitably have led the Government to obtain this evidence from her.

      **g.**     **Alfred Heitkoenig**

Government Exhibits 5201-5205 were obtained from Alfred Heitkoenig and were not obtained from the Revised Warrant or the Revised Subpoena. The Government was aware prior to May 26, 2005 that the Heitkoenigs were clients of Amerindo, and Vilar has not identified any improperly obtained evidence from which he contends these exhibits were derived. The Government was, in any event, entitled to seize documents relating to the Heitkoenigs because they were clients who received redemptions from Amerindo through overseas bank accounts, including Account No. 3308442 of Barclay's Bank in the Bahamas. (*See* Revised Warrant ¶ 5; Revised Subpoena ¶ II.E). The Government was also entitled to seize documents because it had evidence that the Heitkoenigs had investments in the Amerindo Brokerage Accounts. (*See* Revised Subpoena ¶ II.D). It is especially ironic that Vilar alleges "taint" with respect to these documents since Vilar sent Mr. Heitkoenig to the U.S. Attorney's Office to be interviewed to be a cosigner on, or to pledge assets as partial security for, Vilar's $10 million bond in June or July 2005. Even had the Government not had other legitimate bases to identify and obtain documents from Mr. Heitkoenig, the Government inevitably would have had such basis after interviewing Mr. Heitkoenig. Vilar's motion with respect to these documents is without merit and should be denied.

      **2.**     **Records Obtained From Banks And Financial Institutions**

      **a.**     **SunTrust Bank**

For the same reasons set forth in Section I.C, above, there is simply no basis to believe that GX 751-753 were obtained unlawfully. These documents were obtained through a

grand jury subpoena to SunTrust Bank seeking records related to an account identified from various Bear, Stearns and J.P. Morgan Chase account records that the Government either had obtained prior to May 26, 2005, as evidenced by the fact that those records were referenced in the Vilar Complaint. Even if the Government did not have that independent basis for obtaining these documents, GX 751-752 relate to accounts in the name of Gary Tanaka, fall squarely within the terms of the Revised Warrant and Revised Subpoena, and should not be suppressed. (*See* ¶ 9 of the Revised Warrant and ¶ II.I of the Revised Subpoena permitting seizure of "[d]ocuments reflecting any private bank, brokerage or other account with any financial institution held by Alberto William Vilar and Gary Alan Tanaka")). The Government inevitably would have obtained GX 753 in the course of obtaining GX 751-752. Accordingly, none of the SunTrust records should be suppressed.

        **b.**        <u>**U.S. Trust**</u>

        Government Exhibits 5401-5403 were obtained from U.S. Trust pursuant to a subpoena for documents seeking, among other things, records relating to an account identified in documents (including account records from Bear, Stearns and J.P. Morgan Chase) that were either in the Government's possession prior to May 26, 2005 or which had been subpoenaed prior to May 26, 2005. Moreover, because there is evidence that the account holder had investments in the Amerindo Brokerage Accounts, the Government would have been entitled to obtain these records and/or identify the pertinent account during the search. (*See* Revised Subpoena ¶ II.D). Finally, numerous documents, including U.S. Trust account statements, were obtained in the UK Search and would have inevitably led to the Government seeking and obtaining these documents from U.S. Trust. Accordingly, these exhibits should not be

21

suppressed.

    c.    **Banco Popular**

       Government Exhibit 5311, which consists of records pertaining to an account held

by Graciela Lecube-Chavez at Banco Popular, was obtained from Banco Popular.  Whether the

Government obtained these documents as a consequence of obtaining:  (a)  information about the

account from Ms. Chavez (*see* Section I.G.1.d., above); (b) records through an MLAT to the

Bahamas (seeking records concerning the Bahamian bank account through which Amerindo sent

funds to the Banco Popular account for the benefit of Ms. Chavez); or (c) documents in the US

Search or the UK Search that referenced the account, there is no evidence that these documents

were obtained from an unlawful source, and they should not be suppressed.

    d.    **Bank of New York**

       Government Exhibits 5301 and 5302 were obtained from the Bank of New York

and relate to an account referenced in the May 25, 2005 Vilar Complaint.  (*See* Vilar Complaint

¶¶ 13.c.iii, 16).  The fax line bearing the date May 19, 2005 on two of the pages within GX 5302

provides further evidence that these documents were in the Government's possession prior to

May 26, 2005.  Moreover, this account received funds from one of the Amerindo Brokerage

Accounts, about which the Government in fact already had information and about which the

Government was entitled to collect information under the Revised Subpoena and Revised

Warrant.  Therefore, in any event, the Government would inevitably have obtained these

documents.  There is no basis whatever, let alone any "good faith" basis to assert that these

documents were derived from any illegality, and Vilar's motion to suppress these exhibits should

be denied.

e.    **Bear, Stearns & Co.**

Government Exhibits 733-737 were obtained from Bear, Stearns, with whom the Government had been in contact, and from whom the Government had received certain documents, prior to May 26, 2005, as should be obvious from the Vilar Complaint. The Government also was aware prior to May 26, 2005 of the negotiations over the sale of part of Amerindo US to Bear, Stearns. It was during those negotiations that Bear, Stearns received the documents that were subsequently produced to the Government and marked as GX 733-737. These exhibits are not "tainted" and should not be suppressed.

3.    **Documents Obtained From Foreign Governments Pursuant To MLATs**

The exhibits obtained from MLATs sent to Panama (GX 7101) and the Bahamas (GX 7201-7203) generally relate to companies and accounts about which the Government had information prior to May 26, 2005. Indeed, the Barclay's PTC account was referred to in the Warrant affidavit, and most of the companies for which the Government obtained official records from Panama were identified in the Vilar Complaint. With respect to Morton Financial – a Panamanian company not referred to in the Vilar Complaint but about which the Government also obtained official records – the Government believes that it first learned of its identity from a former Amerindo employee on June 6, 2005. Because the Government inevitably would have spoken to that employee regardless of the breadth of the Warrant or Subpoena, and because the Government knew of the negotiations to sell Amerindo to Bear, Stearns at the time it spoke to that employee, there is no reason to believe that the Government would not have learned of the existence of Morton Financial independent of any documents obtained pursuant to the Warrant or Subpoena. Moreover, because both the Revised Warrant and Revised Subpoena permitted the

Government to obtain documents concerning changes of ownership in Amerindo Panama (*see* Revised Warrant ¶ 1; Revised Subpoena ¶ II.A), and because the defendants used documents relating to a transaction involving Morton Financial to demonstrate a purported change of ownership in Amerindo Panama, the Government would, in any event, have been entitled to documents referring to Morton Financial, and therefore none of these exhibits should be suppressed.

### 4.    Documents Obtained From U.S. Government Agencies

#### a.    The U.S. Securities and Exchange Commission

As is clear from the first page of each exhibit, GX 1301-1360 are certified copies of documents filed by and on behalf of various Amerindo entities with the U.S. Securities and Exchange Commission.  There is no basis whatsoever, let alone any "good faith basis," to believe that those documents are in any way "tainted" and Vilar's motion should be denied.

#### b.    The U.S. Small Business Administration

Government Exhibits 1609-1610, 1612-14, 1616-17, and 1620-21 were obtained from the U.S. Small Business Administration.  Even if they had been seized in the US Search, their seizure would have been lawful because the Government was entitled to "documents reflecting any effort made by any Amerindo entity . . . to obtain an SBIC license from the U.S. Small Business Administration."  (Revised Warrant ¶ 7; Revised Subpoena ¶ II.G).  There is no basis whatsoever, let alone any "good faith basis," to believe that those documents are in any way "tainted" and Vilar's motion should be rejected.

### 5.    Documents Obtained From The UK Search

Government Exhibits 3001-3468 were obtained from the UK Search and the

Government should not be precluded from using them at trial for the reasons stated in Section I.A, above.

**6.    Documents Obtained From The US Search**

Government Exhibits 4001-4102, 4401-4406, 4501-4503,[13] 4701-4798, and 5701-5709 were seized in the US Search. Absent more detailed allegations of why the Government is not entitled to these documents under the Revised Warrant or Revised Subpoena, or an order of the Court requiring such a response, the Government will not here take the time and space to explain why each of these more than 100 exhibits falls under one or more provisions of the Revised Warrant and/or Revised Subpoena.

**7.    Documents Obtained From Former Amerindo Employee Matthew Fitzmaurice**

Government Exhibits 1102-1103 were obtained from Matthew Fitzmaurice, and were not obtained from the Revised Warrant or the Revised Subpoena. The identity of Mr. Fitzmaurice was known to the Government prior to May 26, 2005 and there were numerous provisions of the Revised Warrant and Revised Subpoena that permitted the Government to obtain documents relating to Mr. Fitzmaurice, including ¶ 7 of the Revised Warrant and ¶ II.G of the Revised Subpoena ("Documents reflecting any effort made by any Amerindo entity . . . to obtain an SBIC license from the U.S. Small Business Administration"),[14] and ¶ II.Y ("Documents and records concerning all current and former employees of Amerindo"). Vilar has offered no

---

[13]    GX 4501-4503 were obtained from the privilege review conducted by Wilson, Sonsini on behalf of defendants with respect to certain e-documents residing on computers seized in the US Search.

[14]    During part of his tenure at Amerindo, Mr. Fitzmaurice led the effort to license and establish an Amerindo SBIC.

evidence that these exhibits were the fruit of any illegality and they should not be suppressed.

### 8.     Vilar's Transcript Obtained From Washington & Jefferson College

The Government obtained GX 5101, a certified copy of Vilar's transcript from Washington & Jefferson College, from Washington & Jefferson College.  It is clear from the allegations in the Vilar Complaint that the Government was aware of Washington & Jefferson College, and Vilar's connections thereto prior tot he US Search.  (*See* Vilar Complaint ¶¶ 7, 14.a., 18 (describing Vilar's charitable pledges to his *alma mater* and his use of some of Ms. Cates' SBIC investment to partially fulfill a charitable pledge to Washington & Jefferson)).  This document was not obtained as a consequence of any illegally obtained documents and there is no reason to suppress this document.

### 9.     Documents Obtained From Cohen & Schaeffer

Government Exhibits 1705-1707 were obtained from an accounting firm that was engaged by Vilar in connection with the re-filing of his personal income taxes, and by Amerindo for other purposes.  The Government was entitled to obtain Vilar's tax documents and records under ¶ II.W of the Revised Subpoena and, potentially, under ¶ 9 of the Revised Warrant or ¶ II.I of the Revised Subpoena ("Documents reflecting any private bank, brokerage or other account with any financial institution held by Alberto William Vilar and Gary Alan Tanaka.") to the extent those documents reflected any of Vilar's personal bank accounts.  The Government lawfully seized such records in the US Search, which records identified Cohen & Schaeffer as Vilar's tax preparer, and there is no basis whatsoever, let alone any "good faith basis," to believe that those documents are in any way "tainted" and Vilar's motion should be denied.

26

**H.     Vilar's Motion To Preclude Witness Testimony Should Be Denied**

Vilar alleges that the testimony of certain former Amerindo employees should be precluded because the Government "must have" learned of their identities through seized records that fell outside the parameters of the Revised Warrant and Revised Subpoena. (Vilar Mem. at 18-20).[15]   Vilar also claims that the Government should be precluded from calling Nicholas Ciriello, the executor of the estate of a deceased defrauded Guaranteed Fixed Rate Deposit Account investor-victim, at trial. (Vilar Mem. at 12-13).  For the reasons set forth below, the Court should reject Vilar's motion.

Vilar concedes that the Government is entitled to use "documents and records concerning all current and former employees of Amerindo" that were created on or after May 26, 2000.  (Vilar Mem. at 20, n. 19 (citing ¶ II.Y of the Revised Subpoena)).  Vilar does not argue that any of the former Amerindo employees were not listed on such a document; rather, he merely makes the conclusory assertion that all of the witnesses' identities must have been obtained by the Government in violation of the defendants' constitutional rights.  Vilar's unsupported assertion is neither supported by logic, nor the facts, and his motion should be denied.

First, each former Amerindo employee listed by Vilar worked at Amerindo after May 26, 2000; accordingly, it is reasonable to conclude that any employee record providing

---

[15]     The list of witnesses identified by Vilar is not an exclusive one.  He states: "These witnesses *include, but are not limited to*, Carlos Castellanos, Daniel Chapey, Anthony Ciulla, Diane Cooper, Mathew Fitzmaurice, Joaquin Garcia-Larrieu, Jillian Greene, Robert Griffin, Susan Kim, Vanessa Laybourn, Darren Leavitt, David Mainzer, Albert Murray, Johanna Olsher, Kristen Robisch, Maxine Rye, Michael Sandifer, Michael Shattner, Dana Smith and James Stableford."  (Vilar Mem. at 18) (emphasis added).  By necessity, the Government here responds only to Vilar's allegations concerning the witnesses he has specifically identified.

information about their identities was lawfully seized during the search at Amerindo's New York office.  Second, several of the employees, including Diane Cooper, Susan Kim, David Mainzer, Kristen Robisch, Michael Shattner, and Dana Smith were present when the search was conducted, and were identified by the searching agents.  Third, Robert Griffin, Vanessa Laybourn, Albert Murray, Maxine Rye and James Stableford all worked in Amerindo's London office, and to the extent that they were not previously known, their identities would have been revealed to the Government in the documents obtained from the UK through the MLAT process.  Fourth, prior to May 26, 2005, the Government already had learned the identities of Amerindo employees including at least Diane Cooper, Matthew Fitzmaurice, Joaquin Garcia-Larrieu, Jillian Greene, David Mainzer, Johanna Olsher, Michael Sandifer, Michael Shattner, Dana Smith and James Stableford from witnesses and documents.  Finally, counsel for defendants' company, Eugene R. Licker, Esq., voluntarily made several of these witnesses, including Diane Cooper, Susan Kim, Darren Leavitt, Kristen Robisch, Michael Shattner, and Dana Smith, available to the Government in connection with the company's effort to cooperate with the Government's investigation.  There is no reason to believe that he would not have voluntarily produced those witnesses to the Government had the Warrant or Subpoena been any narrower.  Indeed, based on his testimony at the suppression hearing, there is every reason to believe that he would have done so.  (*See* 5/31/06 Tr. 24, 31, 47-48 (affirming his overriding intent of cooperating with the Government)).

In light of these facts, there is simply no basis for Vilar's contention, and his motion to preclude these witnesses should be denied.

## II.

## TANAKA'S MOTIONS SHOULD BE DENIED

Tanaka moves to preclude: (1) twenty-three documents that he claims fall outside the time limitations of the Revised Subpoena (*see* Tanaka Mem. at 5-6);[16] and (2) eight documents that he claims fall outside the scope of the Revised Subpoena (*see* Tanaka Mem. at 7). Tanaka also seeks an order requiring the Government to provide additional information about the documents and witnesses it intends to rely upon at trial. (*See* Tanaka Mem. at 8). The Government's response with respect to each of the twenty-three documents identified by Tanaka is set forth in Section I.B, *supra*. For the reasons set forth below, the Government contends that five of the eight documents identified by Tanaka fall within the scope of the Revised Subpoena. Finally, in response to defendants' requests for additional information, the Government provided in Section I information about the sources of the documents on its exhibit list; however, the Court should again deny Tanaka's effort to require the Government to provide even more information about its investigation including the date on which it obtained each exhibit, the date on which it first spoke to each witness, and the chain of events that led the Government came to contact each witness. The Court rejected defendants' requests for such information in its January 14, 2008 Order, and Tanaka should be barred by the "law of the case" doctrine from raising it again now.

### A.      The Eight Challenged Documents

Tanaka identifies eight documents that he contends fall outside the scope of the

---

[16]      Vilar moved to suppress the same documents on the same grounds. (*See* Vilar Mem. at 15-16 & n. 14).

Revised Subpoena. The Government concedes the argument with respect to three of those documents (GX 2015, 2017, and 2213). The other five documents all fall within the scope of ¶¶ I.B and II.A of the Revised Subpoena.

Paragaph I.B defines "records" and "documents" to include "any and all tangible forms of expression in your possession, custody, or control, in any language or format, and include, but are not limited to, writings, papers . . . drafts, finished versions, originals, and copies, however created, produced or stored." Paragraph II.A calls for production of "Corporate records concerning "the formation of each of [Amerindo US, Amerindo Panama, and Amerindo UK], its shareholders, principals, officers, directors, and employees, changes in ownership, bylaws, and resolutions."

- GX 2014 consists of a fax containing a corporate record concerning the costs associated with a prospective change in ownership of Amerindo Panama, and a draft agreement concerning the purported sale of Amerindo Panama, and/or its assets, to a company called Morton Financial Corporation, which transaction was subsequently memorialized on at least two occasions.

- GX 2016 consists of a series of internal memoranda and correspondence concerning the sale of Amerindo Panama to Morton Financial Corporation, and Vilar's efforts to obtain a representation that Morton Financial Corporation was not affiliated with Amerindo Panama or its principals.

- GX 2018 is a financial report for Amerindo Panama that appears to reflect a $1 million payment made in connection with the purported sale of Amerindo Panama to Morton Financial Corporation.

30

- GX 2218 and 2219 each consist of corporate records – specifically official agreements between various Amerindo entities, including Amerindo US, Amerindo Panama and Amerindo UK most of which relate to payments for the provision of support services and the provision of research[17] – that, by virtue of when they were written, and who signed them on behalf of Amerindo Panama (Vilar or Tanaka) evidence that Vilar and Tanaka were shareholders, principals, officers, directors, or employees of Amerindo Panama long after the purported sale of Amerindo Panama to Morton Financial.

Because each of these five exhibits fall within the scope of the Revised Subpoena, Tanaka's motion to preclude their use should be denied. (As noted previously, the Government reserves its right to issue a trial subpoena for any document that was produced under the terms of the Limited Waiver Order, that falls outside the scope of the Revised Subpoena, but that is nevertheless relevant and admissible at trial).

**B.      Tanaka's Request For Additional Information About The Government's Exhibits And Witnesses Should Be Denied**

Tanaka here renews his request for additional information about the Government's investigation to assist with his efforts to preclude evidence. The Court already denied this request in its January 14, 2008 Order (denying defendants' request for an order compelling the Government to disclose "any . . . information relevant to the issue of whether

---

[17]      One of the documents contained within both GX 2218 and GX 2219 is a document created at some point after May 1, 2002 by which Amerindo Panama transferred a receivable owed to Amerindo Panama by Amerindo US in the amount of more than $11.6 million to Gary Tanaka. Vilar signed the document on behalf of Amerindo Panama and himself, personally.

31

evidence to be presented at trial is tainted by the [US Search]") and in its June 22, 2008 Order

(denying defendants' request for an order compelling early disclosure of materials within the

scope of 18 U.S.C. § 3500 in connection with the pretrial briefing of "taint" issues). For the

reasons set forth in Section I.A, *supra*, Tanaka should not be permitted to re-raise these issues.

       Moreover, as the Court noted in rejecting defendants' prior requests for this

information, and as is clear from the failure of Tanaka to cite any case law in support of his

motion, there is simply no precedent or authority for requiring the Government to produce the

information sought in order to facilitate the litigation of these issues. (*See* January 14, 2008

Order at 18-21; June 22, 2008 Order at 5). Accordingly, Tanaka's motion should be denied.

*     *     *

       As the Government has argued from the outset, taint issues are best raised and

resolved post-trial. It is only then that the parties and Court will know what witnesses actually

testified, what exhibits were put into evidence, and what significance the testimony and exhibits

had in the overall case. Two and one-half months prior to trial, the Government narrowed a

massive quantity of evidence to approximately 3,000 exhibits comprised of about 40,000 pages.

Armed with that information, and the discovery that has been produced over the past three years,

defendants have succeeded in identifying a handful of documents that fall outside the scope of

the Revised Subpoena, and another handful of documents about which there is a dispute. Of the

documents that lie outside the temporal scope of the Revised Subpoena, many are available to the

Government because they were also obtained from the UK Search. Moreover, documents that

were produced pursuant to the Limited Waiver Order, but that lie outside the temporal or

substantive scope of the Revised Subpoena may, in any event, properly be the subject of a trial

32

subpoena if they are relevant and admissible at trial.

As the Government continues to prepare for trial, now six weeks away, it will continue to streamline its proof for presentation to the jury. In so doing, it will continue to be mindful of its obligation to comply with the constitutional limits placed on its use of evidence suppressed by, or derived from the materials suppressed by, the Court's April 4, 2007 Order. Providing the information sought by defendants to assist with the continuation of burdensome litigation over documents and evidence that may never see the light of day is unwarranted and inefficient.

## CONCLUSION

For the foregoing reasons, defendants' motions should be denied.

Dated: August 11, 2008
        New York, New York

Respectfully submitted,

MICHAEL J. GARCIA,
United States Attorney for the
Southern District of New York,
*Attorney for the United States of America*

By: ___/s/_____
     Marc Litt
     Benjamin A. Naftalis
     Joshua Klein
     Assistant United States Attorneys
     (212) 637-2295 / -2456 / -2397

33