UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA            :

            -v.-                    :        S3 05 Cr. 621 (RJS)

ALBERTO WILLIAM VILAR,              :
   a/k/a, "Albert Vilar," and
GARY ALAN TANAKA,                   :

                Defendants.         :
-------------------------------------------------------x


## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO PRECLUDE THE USE OF "OTHER ACTS" EVIDENCE AT TRIAL


MICHAEL J. GARCIA
*United States Attorney for the*
*Southern District of New York*

*Attorney for the United States of America*


Marc Litt
Benjamin A. Naftalis
Joshua Klein
*Assistant United States Attorneys*
       *Of Counsel*

**U.S. Department of Justice**



*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 11, 2008

BY FACSIMILE

The Honorable Richard J. Sullivan
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
White Plains, NY  10601

> Re:  United States v. Alberto W. Vilar and Gary A.
>      Tanaka, S3 05 Cr. 621 (RJS)

Dear Judge Sullivan:

  The Government respectfully submits this letter in response to the defendants' motions seeking to preclude the Government from introducing certain evidence at trial as "inextricably intertwined" with the conduct charged in the Indictment or, in the alternative as evidence of other wrongful acts under F.R.Evid. 404(b).  The Government opposes the foregoing defense motions and hereby seeks an in limine order permitting the Government to offer evidence at trial of uncharged criminal conduct and other wrongful acts of defendants Alberto Vilar and Gary Tanaka pursuant to Rule 404(b) of the Federal Rules of Evidence, or, in the alternative, as "inextricably intertwined" conduct that is part of the charged conspiracy.  The Government has previously provided notice to the defendants of its intent to offer such evidence at trial.  The Government also hereby responds to Vilar's belated and baseless claims that the Indictment should be dismissed on grounds that it is duplicitous.

## BACKGROUND

## NATURE OF THE CHARGES IN THIS CASE

As set forth in the Indictment, the defendants perpetrated a scheme to defraud investors by soliciting millions of dollars of funds under false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to their own benefit and the benefit of others without the knowledge or authorization of the investors. To execute the scheme, the defendants solicited and caused others to solicit victims to invest in fraudulent investment products, including the Amerindo SBIC Venture Fund LP and Amerindo's Guaranteed Fixed Rate Deposit Account Program. The defendants induced victims to invest in these products by, among other things, promising high rates of return, with little or no risk. In truth, as the defendants well knew, these investment opportunities were fraudulent. The defendants failed to fulfill their promises to the investors by, among other things, failing to invest the funds as promised, unilaterally changing the terms of the investments, and failing to redeem the investments upon the investors' requests.

One of the frauds perpetrated by the defendants related to a $5 million investment by an Amerindo client named Lily Cates. In or about June 2002, Cates was induced to invest $5 million in a purported new venture involving investments in small businesses (the "Amerindo SBIC") that she was told, falsely, would be supported by the United States Small Business Administration. Cates' $5 million investment was deposited into an account at Bear Stearns that was controlled by Vilar and Tanaka on behalf of a Panamanian corporation named "Amerindo Management Inc." (the "AMI Account"). Within approximately three weeks of this money being deposited into the AMI Account, $1 million of it had been spent on charitable contributions and personal expenses of Vilar, including contributions to Washington & Jefferson College and the American Academy in Berlin, approximately $650,000 had been spent on Amerindo corporate expenses, and approximately $2.85 million had been used to partially redeem an unrelated investor's investment in an Amerindo Guaranteed Fixed Rate Deposit Account. None of the funds transferred to the AMI Account were invested in the Amerindo SBIC. Following Cates' transfer of the $5 million to the AMI Account, Vilar and Tanaka made several false statements to Cates concerning the Amerindo SBIC including that the funds had been "put into escrow."

Another fraud perpetrated by the defendants involved

2

the misappropriation of $250,000 from a Bear, Stearns brokerage
account belonging to Lily Cates, which the defendants managed on
her behalf.   On or about September 25, 2003, the defendants
caused a letter of authorization to be sent from Amerindo to
Bear, Stearns, which bore an unauthorized copy of Cates'
signature, directing that approximately $250,000 be transferred
from Cates' Bear, Stearns account to an Amerindo account at Bear,
Stearns (the "Fraudulent 2003 Transfer").   The next day the
defendants transferred these funds to one of Vilar's personal
accounts, and Vilar subsequently spent those funds on personal
expenses.

        A third fraudulent scheme perpetrated by the defendants
involved their solicitation of investments in the Amerindo
Guaranteed Fixed Rate Deposit Accounts ("GFRDAs") - which were
sham products offered by the defendants to various Amerindo
clients.   The defendants induced clients to invest in GFRDAs by
promising to invest the majority of each investor's funds in
short-term debt instruments, with little or no risk, that would
earn a fixed interest rate, generally at a rate substantially
above the prevailing rates available from banks and other
institutions.   The defendants further promised the investors that
the balance of their funds in their GFRDA accounts -- generally
no more than 25 percent of the account value -- would be invested
in publicly traded emerging growth stocks.   In truth and in fact,
as the defendants well knew, Amerindo did not purchase short-term
debt instruments as had been promised to GFRDA investors and
failed to allow certain GFRDA investors to redeem their invested
principal.

        The defendants are also charged with making false
statements to the Securities and Exchange Commission ("SEC").
Specifically, on or about May 20, 2005, the defendants submitted
a letter to the SEC, in response to a complaint filed by Lily
Cates, in which the defendants falsely stated that: (i) "there
[wa]s no common ownership" between Amerindo and its Panamanian
affiliate, "Amerindo Panama," (ii) "there [wa]s no overlap
between the directors, officers and employees of Amerindo and
Amerindo Panama," and (iii) "[t]he present owners of Amerindo
formerly owned Amerindo Panama but they sold it to its present
owners in 2001."

**THE EVIDENCE THE GOVERNMENT SEEKS TO OFFER AT TRIAL**

A.    <u>Evidence Of Misappropriation Of $175,000 From Lily
      Cates' Amerindo-Managed Account At Bear, Stearns</u>

The Government seeks to offer evidence that on or about
August 9, 2004, the defendants effected a transfer of $175,000
from Lily Cates' Bear, Stearns account (the "Fraudulent 2004
Transfer"), which Amerindo was managing on her behalf, by causing
a copy of Cates' signature to be placed on a wire instruction
directed to Bear, Stearns without Cates' authorization.  The
defendants used this money to pay down a margin call in an
Amerindo brokerage account.

B.    <u>Fraud Concerning Lily Cates' Rhodes Capital Investment</u>

The Government also seeks to offer evidence that Lily
Cates made an investment in or about 1989 in an investment
vehicle called Rhodes Capital Group, Ltd. ("Rhodes Capital").
Starting no later than in or about 2004, Cates (or others acting
on her behalf) requested, at various times, that Amerindo
disburse $250,000 to her from her Amerindo portfolio, including
at least one specific request that $250,000 be taken from Cates'
Rhodes Capital investment and transferred to Cates in or about
January 2005.  The defendants refused to disburse the requested
funds, notwithstanding the fact that account statements supplied
by Amerindo to Cates valued Cates' Rhodes Capital investment far
above $250,000, and that the defendants had made representations
to various Rhodes investors (including Cates), prior to Cates'
request to withdraw these funds, that most if not all of the
Rhodes Capital investment had already been liquidated.

In addition, in or about February 2005, when Cates and
her attorney directed the defendants to transfer all the assets
they were managing on her behalf (including her Rhodes Capital
investment) to an account outside of the defendants' control, the
defendants refused to do so.

C.    <u>False Statements To The IRS</u>

As discussed further below, the Government also intends
to offer evidence that Vilar made false statements to the
Internal Revenue Service about Amerindo's "SBIC fund" that were
nearly identical to the false statements he had made to Cates
concerning her SBIC investment.

## APPLICABLE LEGAL PRINCIPLES

Rule 404(b) of the Federal Rules of evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b).

The Second Circuit has "adopted the inclusionary or positive approach to the Rule." United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984); see United States v. DeVillio, 983 F.2d 1185, 1194 (2d Cir. 1993). Consistent with this approach, "evidence of other crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity." United States v. Brennan, 798 F.2d 581, 589 (2d Cir. 1986) (emphasis added); see also United States v. Pipola, 83 F.3d 556, 565 (2d Cir. 1996) (Second Circuit's "inclusionary interpretation of the rule allows evidence of other wrongs to be admitted so long as it is relevant and is not offered to prove criminal propensity"); Levy, 731 F.2d at 1002.

The Second Circuit has set forth three requirements for the proper admission of evidence of "other crimes" under Rule 404(b). First, the trial court must determine that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity. See United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1989). Second, the trial court must make a determination that the evidence is relevant under Rules 401 and 402 of the Federal Rules of Evidence, and that it is more probative than it is unfairly prejudicial under Rule 403. See United States v. Thomas, 54 F.3d 73, 81 (2d Cir. 1995); Mickens, 926 F.2d at 1328; United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988); United States v. Levy, 731 F.2d at 1002; United States v. Mohel, 604 F.2d 748 (2d Cir. 1979). Third, the court must provide an appropriate limiting instruction to the jury, if one is requested. See Thomas, 54 F.3d at 81; Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002. The district court has broad discretion regarding the admissibility of similar act evidence and such rulings are reversed only for a clear abuse of discretion. See United States v. Pipola, 83 F.3d at 566; United States v. Sappe, 898 F.2d 878, 880 (2d Cir. 1990). To find such an abuse, an appellate court must be persuaded that the trial

5

judge ruled in an arbitrary and irrational fashion. <u>See</u> <u>Pipola</u>, 83 F.3d at 566; <u>United States</u> v. <u>Pitre</u>, 960 F.2d at 1119.

Apart from Rule 404(b), the Second Circuit has held that prior acts are admissible background evidence where used to (i) explain the development of the illegal relationship between co-conspirators; (ii) explain the mutual trust that existed between co-conspirators; and (iii) complete the story of the crime charged. <u>See</u> <u>United States</u> v. <u>Gonzalez</u>, 110 F.3d 936, 942 (2d Cir. 1997); <u>United States</u> v. <u>Pitre</u>, 960 F.2d 1112, 1119 (2d Cir. 1992) (evidence of prior narcotics transactions relevant background information to explain relationship among alleged co-conspirators); <u>United States</u> v. <u>Roldan-Zapata</u>, 916 F.2d 795, 804 (2d Cir. 1990) ("The pre-existing drug-trafficking relationship between [the co-conspirators] furthered the jury's understanding of how the instant transaction came about and their role in it."); <u>United States</u> v. <u>Brennan</u>, 798 F.2d 581, 589 (2d Cir. 1986) (prior-act evidence admitted since it "show[ed] to the jury how [racketeers'] illegal relationship developed," "inform[ed] the jury of the background of the charged conspirac[ies,]" and "show[ed] the basis for [each] defendant's trust of the others"); <u>accord</u> <u>United States</u> v. <u>Leavitt</u>, 878 F.2d 1329, 1338-39 (11th Cir.) ("Evidence of criminal activity other than the offense charged is not extrinsic evidence under rule 404(b) if it is inextricably intertwined with the evidence of the charged offense or is necessary to complete the story of the charged offense."); <u>United States</u> v. <u>Carboni</u>, 204 F.3d 39, 44 (2d Cir. 2000) (upholding admission of evidence on ground that it was "inextricably intertwined with the charged conduct").

The Second Circuit has made clear that "evidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." <u>See</u> <u>United States</u> v. <u>Carboni</u>, 204 F.3d at 44; <u>see</u> <u>also</u> <u>United States</u> v. <u>Baez</u>, 349 F.3d 90, 94 (2d Cir. 2003); <u>United States</u> v. <u>Avendano</u>, 2004 WL 2734435, at *2 (S.D.N.Y. Nov. 30, 2004) (finding defendant's agreement to act as a cocaine courier for a cooperating witness to be "inextricably intertwined with the evidence regarding the charged heroin conspiracy and necessary to complete the story of that alleged offense," "highly probative intrinsic evidence of Defendant's involvement in the conspiracy charged," and not other crime evidence within the meaning of Rule 404(b))).

Rule 403 of the Federal Rules of Evidence ("Rule 403"), which sets forth a balancing test, provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

Other crimes evidence is, like all evidence, inadmissible under Fed. R. Evid. 403 if its probative value is substantially outweighed by the danger of unfair prejudice. Evidence is unfairly prejudicial, however, "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." United States v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980). Other crimes evidence is not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. United States v. Roldan-Zapata, 916 F.2d at 804; see also United States v. Smith, 727 F.2d 214, 220 (2d Cir. 1984) (essential inquiry under Rule 403 for admission of other crimes evidence is whether it involves "conduct likely to arouse irrational passions").

## DISCUSSION

## POINT I

## THE 404(B) EVIDENCE

A.   **The Fraudulent 2004 Transfer**

1.   **Evidence Of The Fraudulent 2004 Transfer Is Admissible Because It Arose Out Of The Same Series Of Transactions As The Charged Crimes And Is Inextricably Intertwined With The Evidence Of The Charged Offenses**

The Government seeks to offer evidence that on or about August 9, 2004, the defendants effected a transfer of $175,000 from Lily Cates' Bear, Stearns account (the "Fraudulent 2004 Transfer"), which Amerindo was managing on her behalf, to an Amerindo trading account, by causing a copy of Cates' signature to be placed on a wire instruction directed to Bear, Stearns

7

without Cates' authorization.  The defendants used this money to pay down a margin call in that Amerindo trading account.  This conduct is admissible because it "arose out of the same transaction or series of transactions as the charged offense," is "inextricably intertwined with evidence regarding the charged offense," and "is necessary to complete the story of the crime on trial."  United States v. Carboni, 204 F.3d at 44.

As an initial matter, the Superseding Indictment charges, in part, that:

> From at least as early as in or about July
> 1986 to no or about May 26, 2005 . . . the
> defendants perpetrated a scheme to defraud
> investors by soliciting millions of dollars
> of funds under false pretenses, failing to
> invest investors' funds as promised, and
> misappropriating and converting investors'
> funds to their own benefit and the benefit of
> others without the knowledge or authorization
> of the investors.  To execute the scheme,
> Vilar and Tanaka solicited and caused others
> to solicit victims to invest in fraudulent
> investment products, including the Amerindo
> SBIC Venture Fund LP and the Guaranteed Fixed
> Rate Deposit Account Program ("GFRDAs").
> Vilar and Tanaka induced victims to invest in
> these products by, among other things,
> promising high rates of return, with little
> or no risk, within short periods of time.  In
> truth and in fact, as Vilar and Tanaka well
> knew, these investment opportunities were
> fraudulent.  Vilar and Tanaka failed to
> fulfill their promises to the investors by,
> among other things, failing to invest the
> funds as promised, unilaterally changing the
> terms of the investments, and failing to
> redeem the investments upon the investors'
> requests.

(Indictment ¶ 6).  Although this portion of the Indictment does not expressly identify the Fraudulent 2004 Transfer, it specifically covers the time period during which the Fraudulent 2004 Transfer occurred, and expressly indicates that the defendants implemented the charged fraud, in part, by "misappropriating and converting investors' funds to their own benefit and the benefit of others without the knowledge or authorization of the investors."

Paragraph 6 of the Indictment expressly references the GFRDA fraud and the SBIC fraud, but makes no mention of either the Fraudulent 2003 Transfer or the Fraudulent 2004 Transfer. Nevertheless, both the Fraudulent 2003 Transfer and the Fraudulent 2004 Transfer are squarely covered by paragraph 6 of the Indictment. Indeed, if the Fraudulent 2004 Transfer does not form a part of the charged conduct then the Double Jeopardy clause of the Constitution would not foreclose the Government from prosecuting the defendants for the Fraudulent 2004 Transfer should they be acquitted of the other charged fraudulent transactions. Such a conclusion seems far fetched given that the Fraudulent 2004 Transfer occurred during the course of the charged conspiracy, was implemented by the same two conspirators, targeted the same victim, was accomplished through identical means and methods as the Fraudulent 2003 Transfer, and, as discussed further below, was inextricably intertwined with the charged conspiracy.

In any event, even if the Court finds that the Fraudulent 2004 Transfer does not fall within the contours of the Indictment, it is nevertheless inextricably intertwined with the charged conspiracy for several reasons. First, the Fraudulent 2004 Transfer, which began in August 2004 and continued through the spring of 2005 occurred during the course of the charged conspiracy. The charged conspiracy included the SBIC Fraud, which occurred from in or about June 2002 through the spring of 2005, and the Fraudulent September 2003 Transfer, which spanned the period from September 2003 through the spring of 2005. Thus, the Fraudulent 2004 Transfer overlapped with other fraudulent conduct the defendants perpetrated in furtherance of the charged conspiracy. See United States v. Dolney, No. 04 Cr. 159 (NGG); 2005 WL 2129169 (E.D.N.Y. Sept. 1, 2005) ("Close timing between intrinsic evidence and the charged conduct has featured significantly in the Second Circuit's decisions applying the standard" for determining whether conduct is inextricably intertwined with the charged offense). Second, the Fraudulent 2004 Transfer was perpetrated by the same conspirators, and was implemented through identical means and methods as the Fraudulent 2003 Transfer.

Third, as the evidence will show at trial, the Fraudulent 2004 Transfer prompted a dialogue between Cates' attorney, Edward Swanson, and Amerindo from in or about September 2004 through in or about the spring of 2005. During the course of that dialogue the defendants made numerous misrepresentations to Swanson as well as to Cates herself. Thus, barring the admission of evidence relating to the Fraudulent 2004 Transfer would severely hamper the Government's ability to explain to the

jury how Vilar and Tanaka came to make many of the
misrepresentations they made to Cates and her representatives
concerning the charged conspiracy (which misrepresentations form
a key portion of the evidence against Vilar and Tanaka), and
would thereby impede the jury from learning the complete story of
the crime on trial.

A brief review of certain evidence in this case further
demonstrates the degree to which the Fraudulent 2004 Transfer is
intertwined with the charged conspiracy.  For example, the
evidence will show that Vilar had several conversations with
Cates and her representatives between late 2004 and the spring of
2005 in which they discussed both the Fraudulent 2004 Transfer
and the SBIC fraud.  In addition, a number of the documents the
Government intends to offer into evidence discuss both the
Fraudulent 2004 Transfer and the SBIC fraud.  Furthermore, a
conversation that included Cates, her broker Eugene Ross, Vilar
and Tanaka was directly prompted by the Fraudulent 2004 Transfer.
Also, as mentioned above, Swanson's communications with Vilar on
Cates' behalf, as well as Cates' own communications with Vilar
involved both the Fraudulent 2004 Transfer as well as other
issues pertaining to Amerindo's management of Cates' account.[1]
Thus, any attempt to excise evidence of the Fraudulent 2004
Transfer from the testimonial and documentary proof with which it
is inextricably intertwined would deprive the jury of the
complete story of the charged crime.  See United States v. Chan,
No. S1 1197 Cr. 1053 (PKL), 2002 WL 46994 (S.D.N.Y. Jan. 14,
2002) (admitting evidence of the defendant's gambling activity in
a case charging narcotics conspiracy because "the proffered
evidence regarding defendant's gambling activities and check
fraud scheme overlaps with evidence the government intends to
introduce in order to prove defendant's guilt with respect to the
charges in the indictment.  For example, the government intends
to submit several taped phone conversations wherein in addition
to references to narcotics trafficking, the defendant makes
explicit references to gambling and check fraud activities.").

For the foregoing reasons, the jury should be permitted
to consider evidence of the Fraudulent 2004 Transfer because it
"arose out of the same transaction or series of transactions as
the charged offense," is "inextricably intertwined with evidence
regarding the charged offense," and "is necessary to complete the

---

[1]  In addition, it is the very dialogue between Cates (and
her representatives) and Vilar, catalyzed by the Fraudulent 2004
Transfer, that resulted in Vilar making the misrepresentations to
the SEC that are the subject of Count Twelve of the Indictment.

story of the crime on trial." United States v. Carboni, 204 F.3d
at 44.  See United States v. Towne, 870 F.2d 880, 886 (2d Cir.
1989 (finding that defendant's possession of a handgun on days
other than the single date specifically charged in the indictment
was not "other crimes" evidence within the meaning of 404(b)
because the "continuous possession of the same gun does not
amount to a series of crimes, but rather constitutes a single
offense."); United States v. Chen Xiang, No. S1 02 Cr. 271 (RCC),
2003 WL 21180400, *3 (S.D.N.Y. May 20, 2003) (prior robberies
similar to charged conduct that were either first criminal acts
engaged in by defendants with cooperating witnesses or robberies
that immediately preceded charged robberies and conspiracy held
admissible to show background.").

> 2.  **Evidence Of The Fraudulent 2004 Transfer Is Admissible
>     To Show Knowledge, Intent, And Absence Of Mistake**

        The Government submits that evidence of the Fraudulent
2004 Transfer is not only admissible for the reasons set forth
above, but is also admissible pursuant to Fed. R. Evid. 404(b) to
show that the defendants committed the charged crimes knowingly,
intentionally, and not as a result of accident or mistake.  See
e.g., United States v. Smith, 727 F.2d 214, 219-20 (2d Cir. 1984
(affirming admission of similar acts of securities fraud to show
defendant's knowledge of, and intent to engage in, "free-riding"
securities scheme."); United States v. Lauersen, No. S2 98 Cr.
1134 (WHP); 2000 WL 1677931, *3 (S.D.N.Y. Nov. 8, 2000)
(evidence of false diagnoses attributed by defendant to patients
not undergoing fertility treatments admitted to show intent and
lack of mistake when making identical false representations
attributable to patients undergoing fertility treatments).

        The Fraudulent 2004 Transfer is highly probative of the
defendants' knowledge and intent to commit the charged crimes.
This transaction mirrored the Fraudulent September 2003 Transfer,
which is part of the charged conspiracy. In both cases the money
was stolen from Cates' separately managed account.  In both cases
Tanaka caused a letter of authorization to be provided to Bear,
Stearns which contained a copy of Cates' signature without her
authorization.  And in both cases the money was transferred to an
Amerindo account that they controlled.  Consequently, evidence of
the Fraudulent 2004 Transfer is admissible to prove that the
defendants acted intentionally, knowingly, and without mistake in
perpetrating the charged fraud.  See United States v.
Lombardozzi, No. S1 02 Cr. 273 (PKL), 2003 WL 1907969 (S.D.N.Y.
April 17, 2003) (in extortion case charging loansharking,
evidence of uncharged loansharking activity held admissible to
show knowledge as the government had established the relevance of

11

the other acts evidence "based on the similarities between the roles played by [defendant] and [a conspirator] in these prior loans, and the roles they allegedly played in the crimes charged in the superseding indictment, and the fact that these prior loans occurred during the same period of time as the crime alleged in the indictment.").

          Furthermore, the Fraudulent 2004 Transfer is also relevant to show that Tanaka and Vilar acted in concert to further the charged conspiracy.  For example, the evidence will show that Vilar induced Cates to make the $5 million SBIC investment, but that it was Tanaka who caused the transfers of the money which was used by the defendants for improper purposes. Similarly, the evidence will show that it was Tanaka who directed the Fraudulent 2003 Transfer.  Should Vilar claim he lacked knowledge that the money Tanaka transferred to his account came from Cates' $5 million investment, or should Tanaka claim he lacked knowledge that Cates' $5 million was intended for the SBIC investment, the Government should be permitted to introduce evidence of the Fraudulent 2004 Transfer, and the correspondence between Vilar and Tanaka that related to that transaction, to prove that Vilar and Tanaka likewise acted together with respect to the SBIC fraud.  Similarly, should Vilar claim he lacked knowledge of Tanaka's actions with respect to the Fraudulent 2003 Transfer, the Government should be permitted to introduce evidence of the Fraudulent 2004 Transaction to show that the defendants acted together with respect to the Fraudulent 2003 Transfer.  See United States v. Lombardozzi, 2003 WL 1907969 at *4-5 ("Prior act evidence held admissible for the purpose of contesting Lombardozzi's defense that . . . while he may have loaned money to [one conspirator], he was unaware of the debt collection practices being employed by [another conspirator] Isoldi to collect upon that loan - i.e. a defense of innocent association . . . The government believes it most likely that Lombardozzi's defense will consist of trying to distance himself from Isoldi's loansharking activities . . . If that is the case, the Court agrees that the proffered evidence of Lombardozzi and Isoldi using extortionate means to collect other loans is significantly probative of Lombardozzi's intent and knowledge of the crime in the indictment."); United States v. Ramirez-Amaya, 812 F.2d 813, 817 (2d Cir. 1987) (where defendant denied an intention to involve himself in the unlawful activities of his business associate, "proof that [defendant] had previously sought to engage in precisely such activities was admissible on the issue of his intent."); United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) ("Where a defendant claims that his conduct has an innocent explanation, prior act evidence is generally admissible to prove that the defendant acted with the state of

mind necessary to commit the charged offense.").

The fact that the Fraudulent 2004 Transfer occurred subsequent to the Fraudulent 2003 Transfer and the SBIC fraud does not preclude its admissibility to show intent and knowledge with respect to the prior transactions.  Indeed, such subsequent act evidence is admissible under reasoning similar to that which justifies the admission of prior act evidence.  See e.g., United States v. Van Putten, No. 04 Cr. 803 (PKL), 2005 WL 612723, *5 (S.D.N.Y. March 15, 2005) (Evidence of a confrontation that occurred after a murder in furtherance of the charged conspiracy held admissible because "it seems clear that evidence tending to show a conspiracy existed after . . . the charged crime also tends to show that a conspiracy existed when the charged crime occurred."); United States v. Koppers Co., Inc., 652 F.2d 290, 298 (2d Cir. 1981) (admitting evidence of acts which occurred after the end of the charged conspiracy because "post-conspiracy evidence is admissible if it is probative of the existence of the conspiracy."); United States v. Brennan, 798 F.2d 581, 590 (2d Cir. 1986) (admitting, in a bribery case, evidence of bribes that occurred both prior to and in the midst of the charged conduct on grounds that the latter explained the context of some of the later transactions).

Moreover, the Fraudulent 2004 Transfer is relevant to proving knowledge and intent with respect to the Fraudulent 2003 Transfer because it demonstrates a pattern of conduct that makes it less likely the defendants acted due to mistake.  This would be equally true regardless of whether the Fraudulent 2004 Transaction had occurred prior to, instead of subsequent to, the Fraudulent 2003 Transfer.  Similarly, the Fraudulent 2004 Transfer is no less relevant to the question of whether the defendants acted in unison with respect to the SBIC fraud because it post-dated, rather than pre-dated, the SBIC investment.  The relevant point is that the Fraudulent 2004 Transaction demonstrates a pattern of activity that makes it less likely the defendants acted due to mistake.

Finally, it is true that Cates' SBIC investment and the Fraudulent 2003 Transfer both pre-dated the Fraudulent 2004 Transfer.  However, both the SBIC fraud and the Fraudulent 2003 Transfer involved ongoing misrepresentations and omissions by the defendants to Cates and her representatives which continued past the August 9, 2004 date on which the Fraudulent 2004 Transfer occurred.  Thus, while the misappropriation of funds that related to both the SBIC fraud and the Fraudulent 2003 Transfer pre-dated the misappropriation of funds that related to the Fraudulent 2004 Transfer, the misrepresentations and omissions Vilar and Tanaka

13

made in furtherance of, and to conceal, the SBIC fraud and the Fraudulent 2003 Transfer post-dated the misappropriation related to the Fraudulent 2004 Transfer.  Moreover, the defendants made similar misrepresentations to Cates and her representatives concerning the Fraudulent 2004 Transfer.  Consequently, the Fraudulent 2004 Transfer is relevant to proving not only that the defendants acted with knowledge and intent with respect to the Fraudulent 2003 Transfer, but also that they acted with knowledge and intent when they lied to Cates and her representatives about the status of the SBIC investment and the maintenance of her funds in an escrow account.

For the foregoing reasons, the Fraudulent 2004 Transfer is admissible to prove the defendants' knowledge, intent and absence of mistake.

**B.**  **Evidence Of Lily Cates' Rhodes Capital Investment Is Inextricably Intertwined With The Charged Conduct Or, In The Alternative, Admissible Under 404(b) To Show Knowledge, Intent And Absence Of Mistake**

The Government also seeks to offer evidence that in or about 1989 Lily Cates placed money into an investment vehicle called Rhodes Capital Group, Ltd. ("Rhodes Capital").  The Government would offer evidence that starting no later than in or about 2004, Cates (or others acting on her behalf) requested, at various times, that Amerindo disburse $250,000 to her from her Amerindo portfolio, including at least one specific request that $250,000 be taken from Cates' Rhodes Capital investment and transferred to Cates in or about January 2005.

The defendants refused to disburse the requested funds, notwithstanding the fact that account statements supplied by Amerindo to Cates valued Cates' Rhodes Capital investment far above $250,000, and that the defendants had made representations to various Rhodes investors (including Cates), prior to Cates' request to withdraw these funds, that most if not all of the Rhodes Capital investment had already been liquidated.  In addition, in or about February 2005, when Cates and her attorney directed the defendants to transfer all the assets they were managing on her behalf (including her Rhodes Capital investment) to an account outside of the defendants' control, the defendants refused to do so.

This evidence, like the Fraudulent 2004 Transfer, is inextricably intertwined with the charged conduct.  As an initial matter, evidence of the Rhodes Capital fraud falls squarely within the broad language set forth in paragraph 6 of the

14

Indictment, which alleges that the defendants defrauded investors, in part, by failing to redeem their investments. Furthermore, Cates' Rhodes Capital investment is also necessary to complete the story of the charged crime because much of the correspondence between Swanson and Vilar that pertains to the SBIC investment also discusses a request that Cates made of Amerindo to provide her with $250,000 from her Rhodes Capital investment by January 2005.

In fact, because most of Cates' account statements contain references to her Rhodes investment, it would be confusing to introduce these statements, as the Government must do to prove its case, without introducing any evidence relating to the Rhodes investment. It would be misleading to suggest to the jury that Cates continued to maintain substantial assets in her Rhodes account given that she never received any money back from the defendants after making the June 2002 SBIC investment (except for the funds contained within her Bear, Stearns account, with respect to which Cates retained the ability to revoke the defendants' discretionary authority). The Government should be permitted to explain to the jury that Cates was never able to redeem her Rhodes investment.

In addition, this evidence is admissible to show the defendants knowingly and intentionally misrepresented information set forth in Cates' account statements. For example, in a memorandum from Vilar to Tanaka and his wife, Renata, dated April 10, 2003, concerning "Lily Cates' Statements," Vilar stated, in relevant part, the following:

> Because of the Bear Stearns losses, I do not believe we should make any adjustment in Rhodes at this time. If the Bear Stearns account does well, we can subsequently make an adjustment on Rhodes. I have also told Lily that we were required to put the SBA Investment into an escrow account and it should be shown as such, with a token interest rate being earned.

(GX 4607). The fact that the defendants were discussing making an adjustment in the Rhodes line item of Cates' account statement based on the performance of her Bear, Stearns account demonstrates that the Rhodes entry on Cates' account statement was fraudulent. Similarly, Vilar's instruction that the SBA investment -- which is a reference to the SBIC investment -- should show "a token interest rate being earned" demonstrates that the line item on Cates' account statement relating to SBIC

15

interest was similarly fraudulent.  Permitting the Government to
prove that the line item relating to the SBIC investment was
fraudulent but foreclosing the Government from introducing
evidence concerning the fraudulent line item relating to the
Rhodes investment would distort the defendants' true conduct,
particularly in light of the fact that both of these topics were
discussed in the very same document and pertain to entries that
appeared together on Cates' Amerindo account statements.

     Clearly Exhibit 4607 provides evidence of the
defendants plotting to defraud Cates by making misrepresentations
to her about both her Rhodes investment as well as her SBIC
investment.  In any event, the portion of the above-referenced
memorandum relating to the Rhodes investment is necessary to
complete the story of how the defendants went about defrauding
Cates.  Moreover, the fraudulent manner in which the defendants
treated the Rhodes line item on Cates' statement demonstrates
that the fraudulent "token" rate of interest shown on the SBIC
line item could not have been due to mistake, but was implemented
knowingly and intentionally.

     The defendants assert that the Government lacks proof
that the funds invested in Rhodes were misappropriated "other
than the claim that they were not remitted upon request" and that
"this by itself is not proof of any illegality."  (Vilar Br. at
10).  Consequently, the defense claims the conduct relating to
Rhodes neither constitutes prior bad acts nor is inextricably
intertwined with the charged conduct.  The Government disagrees.
As discussed above, the proof will show that the defendants
discussed plugging numbers into the Rhodes line item on Cates'
account as they saw fit given her returns in an account for which
she received statements directly from Bear, Stearns and which the
defendants could not manipulate.  Such conduct certainly
constitutes fraud.  Moreover, the failure to remit the Rhodes
funds to Cates certainly appears to constitute undeniable proof
that the defendants had perpetrated a fraud.  Either the account
statements were false in showing a value for the Rhodes
investment that was overstated, or the account statements were
accurate but the assets were misappropriated.  There is simply no
plausible explanation why Cates' Rhodes investment could not have
been transferred out of the defendants' control even if it could
not be immediately liquidated.  In any event, as mentioned above,
such evidence is also admissible to guard against the jury being
misled into believing that the defendants returned this money to

16

Cates.[2]

      The defendants further argue that it would be improper to admit evidence of the Rhodes account in light of Judge Karas's ruling suppressing evidence relating to Rhodes seized during the search of the defendants' New York office.  (Vilar Br. at 10). This argument is meritless.  Judge Karas's ruling relating to the proper breadth of the search warrant has no bearing on whether this evidence falls within the charged conduct set forth in the Indictment, is inextricably intertwined with the charged conduct, or is admissible to prove intent and knowledge.

**C.**   **False Statements To The IRS Are Admissible To Show Knowledge, Intent, And Absence of Mistake On The Part Of Vilar When Vilar Made The Same False Statements To Cates In Furtherance Of The Charged Fraud**

      As mentioned above, the Government also intends to offer evidence that Vilar lied to the Internal Revenue Service (the "IRS") about Amerindo's "SBIC fund."  This evidence is admissible to show that when Vilar made false statements to Cates and her representatives to the effect that Amerindo had received an SBIC license from the SBA he did so knowingly and intentionally and not as a result of mistake.

      As discussed above, Vilar made several false statements to the IRS in an April 20, 2004 letter.  Vilar stated:

> I should also like to mention that three years ago Amerindo was awarded a license by the Small Business Administration for an SBIC fund. . . .  In retrospect, Amerindo correctly withheld making any investments during the three-year bear market.  But as a result of not having invested the funds raised during this period, we have had to reapply for an extension of our original license.  The Commissioner of the SBA, the Honorable Roberto Barreto, has met with me twice to tell me that we should expect this

---

   [2]  The Government also provided notice to the defense of its intention to offer evidence that another investor, Elizabeth Knope was defrauded in connection with the Rhodes vehicle.  The Government has decided not to offer such evidence at trial and, consequently, does not here address the admissibility of any evidence relating to Knope.

> licenses [sic] to be renewed.  Given the
> turmoil of the market over the past few
> years, I am proud of the vote of confidence a
> US government agency has given my firm and
> the future of technology investing.

First, Vilar's assertion that Amerindo had received an SBIC
license was false.  In fact, Amerindo was never awarded an SBIC
license by the U.S. Small Business Administration ("SBA").  Vilar
made an identical misrepresentation to Cates in or about June
2002 when he induced her to make the SBIC investment.  Vilar
subsequently repeated this misrepresentation to Cates in a March
13, 2003 letter.  (GX 270).  Second, Amerindo did not "correctly
withhold making investments through its SBIC vehicle because of
the three-year bear market."  In fact, at the time the April 20,
2004 letter to the IRS was written, Amerindo had attempted a
total of three times to obtain an SBIC license and had either
failed to complete the steps necessary to obtain the license, or
had been rejected by the SBA.[3]  The only monies ever raised under
the guise of an Amerindo SBIC that were not returned to investors
consisted of the $5 million of Cates, which the defendants
converted to their own benefit and that of others as described in
the Indictment.[4]  Vilar also repeated this misrepresentation to
Cates when he stated in the March 13, 2003 letter to Cates that
"we did not proceed . . . with the [SBIC] investment because of
the bear market."  (GX 270 p. 2).

      These misrepresentations that Vilar made to the IRS are
substantially similar to misrepresentations he made to Cates
concerning the SBIC investment in 2002 and 2003, and, therefore,
are admissible to show that the misrepresentations made to Cates
were made knowingly, intentionally, and not as the result of

---

      [3]  In addition, the Administrator of the SBA at the time,
Hector Barreto, never told Vilar that Amerindo should expect to
be awarded an SBIC license by renewal or otherwise.  Vilar's
statement that Barreto told him he could expect Amerindo's
license to be renewed falsely implies that Amerindo had been
granted a license in the first place.  Finally, the SBA had never
given Amerindo a "vote of confidence" other than giving Amerindo
a "go-forth" letter in 2001 in which it invited Amerindo to
complete the SBIC license application process - something which
Amerindo never succeeded in doing.

      [4]  A fourth effort to obtain an SBIC license was pending at
the time the Letter was written.  Amerindo wound up abandoning
that fourth attempt shortly thereafter in or about May 2004.

mistake.

Vilar claims that because the misrepresentations Vilar made to Cates concerning the SBIC investment preceded his statements to the IRS, evidence of his false statements to the IRS are inadmissible. (Vilar Br. at 8). This claim is baseless. Although Vilar's statements to the IRS post-dated the identical statements he made to Cates and her representatives, his statements to the IRS were made while the conspiracy to defraud Cates was in progress. Consequently, unlike the hypothetical circumstance in which the Government might seek to introduce subsequent conduct involving bad acts that occurred after the conclusion of the charged conspiracy, here, by contrast, the proffered conduct occurred during the course of the charged conspiracy. Moreover, the sequence of the charged conduct and the "bad acts" evidence is not dispositive with respect to the admissibility of the bad acts. In fact, courts often admit evidence of other wrongful acts that occur <u>after</u> the charged conduct. See e.g., <u>United States</u> v. <u>Van Putten</u>, 2005 WL 612723, *5 (discussed above); <u>United States</u> v. <u>Koppers Co., Inc.</u>, 652 F.2d at 298 (discussed above).

For the foregoing reasons the Court should admit the evidence of Vilar's false statements to the IRS for the purpose of showing that the identical false statements he made to Cates were made intentionally and knowingly and were not made due to any mistake.

D.   <u>**The Proffered 404(b) Evidence Is Not Unduly Prejudicial**</u>

The defendants also argue that the proffered evidence should be excluded under Federal Rule of Evidence 403. (Vilar Br. at 16-18; Tanaka Br. at 5-6). This argument is without merit.

As discussed above, the probative value of the proffered evidence is substantial. The defense, however, cannot claim prejudice based on the substantial probative value of this evidence. Indeed, "evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." <u>United States</u> v. <u>Gilliam</u>, 994 F.2d 97, 100 (2d Cir. 1993). Moreover, Rule 403 does not require exclusion of prior bad acts on grounds of prejudice when they "involve[d] conduct [no] more sensational or disturbing than the crimes with which [the defendant] was charged." <u>United States</u> v. <u>Roldan-Zapata</u>, 916 F.2d 795, 804 (2d Cir. 1990). The proffered evidence is no more sensational than the conspiracy charged in the Indictment.

Moreover, insofar as the proffered evidence is admissible under Rule 404(b), any potential danger of the jury using the evidence as propensity evidence will be dispelled by an instruction from the Court regarding the limited purpose for which the evidence is being offered.  <u>See United States</u> v. <u>Ramirez</u>, 894 F.2d 565, 570 (2d Cir. 1990).

Finally, the Government also notes that the evidence of the Fraudulent 2004 Transfer and Cates' Rhodes investment would not consume significant additional trial time nor require any evidence beyond that which is necessary to prove the charges set forth in the Indictment.  The evidence of Vilar's false statements to the IRS would require the introduction of one letter, the testimony of Hector Barreto, which is anticipated to last no more than approximately 20 minutes, and, possibly, 10 minutes of testimony from a custodial witness.

**E.**     **<u>A Ruling On The Government's In Limine Motion To Admit The Foregoing Evidence Should Not Await The Completion Of The Defense Case</u>**

The defendants also argue that the Court should await the completion of the defense case before ruling on the admissibility of the evidence the Government seeks to offer to prove intent.  First, should the Court agree that the Fraudulent 2004 Transfer and the Rhodes evidence are admissible as evidence of the charged conspiracy or are inextricably intertwined with the charged conduct and admissible to complete the story of the charged crimes, there would be no basis to delay a ruling until the completion of the Government's case.

Second, even if the Court deems the proffered evidence admissible only pursuant to Rule 404(b), and exclusively for the purpose of proving knowledge and intent, the Court should not await the completion of the defense case to render such a ruling. As Your Honor well knows, Courts in this District virtually always rule on the admissibility of 404(b) evidence prior to the defense case.  Indeed, in most circumstances the defense rests without even putting on a case.

Should the Court construe the defense's argument as a request for the Court to delay ruling on the admissibility of 404(b) evidence until the defenses are more clearly articulated through opening statements and/or cross-examinations of the Government's witnesses, the Government would oppose such a delay on grounds that it is inconceivable that intent and/or knowledge would not be at issue in this case.  Intent is an element of every count charged in the Indictment.  Consequently, intent <u>is</u>

at issue in this case.  Although there may be circumstances in which, as a practical matter, knowledge or intent is not an issue (e.g., where a defendant stipulates to the element of intent or) this does not appear to be one of those cases.  Neither defendant has offered to stipulate to the element of intent.  Moreover, because this case involves extensive documentary evidence relating to the charged frauds, intent will necessarily be at issue because the defendants will be unable to articulate a defense centered around the claim that the defendants did not engage in the conduct the Government deems to be fraudulent.

Indeed, in United States v. Colon, 880 F.2d 650 (2d Cir. 1989), the case Vilar cites in support of his claim that the Court should delay its 404(b) ruling, the Court reversed a conviction based on the admission of 404(b) evidence because it found that the defendant's pre-trial "presentation of his amended defense theory" constituted "an offer to stipulate intent out of the case."  The defense has made no such offer here.  Should the defense convincingly stipulate intent out of the case in advance of trial, the Government would concede that the proffered evidence should be admissible only for the alternative purposes for which it is offered and not to prove knowledge and intent. See Colon, 880 F.2d at 659 ("to take such an issue [as intent] out of the case, a defendant must make some statement to the court of sufficient clarity to indicate that the issue will not be disputed . . .  A defendant may not purposely use ambiguity tactically, seeking to gain the one advantage of barring admission of prior acts evidence by proffering a particular defense theory, only to later seek the additional advantages stemming from arguing lack of intent to the jury.").  Absent such a stipulation, the Government respectfully submits that the proffered evidence should be admitted pursuant to Rule 404(b) to show knowledge, intent and absence of mistake.

## POINT II

### THE INDICTMENT IS NOT DUPLICITOUS

The defendants argue that Count One of the Indictment is "fatally defective" because it charges multiple conspiracies and Counts Two through Twelve are duplicitous because they each incorporate the allegations set forth in Count One.  (Vilar Br. at 19-22); Tanaka Letter dated August 7, 2008).  Lastly, the defendants contend that some of the charged conduct cannot form the basis of a criminal prosecution because it falls within in the ambit of civil contract law.  (Vilar Br. at 21).  For the reasons set forth below, defendants' challenges are meritless. Furthermore, it is for the jury to decide whether the defendants

committed a crime once they are properly instructed on the law.

**A.    The Defendants' Challenges to the Face of the Indictment Are Meritless**

**1.    Legal Framework**

"An indictment is impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and (2) the defendant is prejudiced thereby." United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001). Duplicitous pleading is not, however, presumptively invalid. See United States v. Olmeda, 461 F.3d 271, 281 (2d Cir. 2006). Indeed, the Second Circuit has long held that "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989); see also United States v. Sturdivant, 244 F.3d at 77. In other words, "[a]s long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." United States v. Tutino, 883 F.2d at 1141. When determining whether fraudulent conduct over a period of time constitutes a single scheme, courts focus the inquiry on the intent of the defendant. United States v. Mastelotto, 717 F.2d 1238, 1245 (9th Cir. 1983), overruled on other grounds by United States v. Miller, 471 U.S. 130 (1985); Weiss v. United States, 122 F.2d 675, 680-81 (5th Cir. 1941).

Duplicitous counts pose three types of potential prejudice: (1) a potential lack of notice of the crime charged and its maximum penalty; (2) the potential that a second trial on the same offense would not be barred by the Double Jeopardy Clause; and (3) the potential uncertainty with respect to the crime of which the jury convicted the defendant, and the attendant sentencing implications of the verdict. See Sturdivant, 244 F.3d at 77.

The Second Circuit has recognized that "if the doctrine of duplicity is to be more than an exercise in mere formalism it must be invoked only when an indictment affects the policy considerations" underlying the same. See United States v. Murray, 618 F.2d 892, 897 (2d Cir. 1980). Such policy considerations include the protection of a defendant's rights to notice of the charges he must defend himself against, to a unanimous jury verdict and to assert double jeopardy in a subsequent prosecution

22

for the same offense. See United States v. Margiotta, 646 F.2d
729, 733 (2d Cir. 1981).  If more than one crime is pled in one
count of an indictment, the policy considerations listed above
are implicated, and the Court should dismiss that count as
duplicitous. See Murray, 618 F.2d at 896. However, if a count
merely charges the commission of one offense vis-a-vis different
means, it will not be duplicitous. See United States v. Berardi,
675 F.2d 894, 897 (7th Cir. 1992); United States v. Schwartz, 899
F.2d 243, 246 (3rd Cir. 1990); United States v. Droms, 566 F.2d
361, 363 (2d Cir. 1977).

2.    **Discussion**

Defendants' duplicity argument is without merit.  Count
One of the Indictment properly charges one conspiracy and Counts
Two through Twelve of the Indictment properly charge the
defendants with separate substantive crimes.

a.    **Count One Properly Charges A Single Conspiracy**

The defense claims that Count One of the Indictment is
duplicitous because it charges multiple conspiracies within a
single count.  An indictment is duplicitous only "if it joins two
or more distinct crimes in a single count." United States v.
Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992).  When a duplicity
challenge is raised before trial, the inquiry is limited to
whether the indictment may be read to alleged a single unified
scheme in each count. United States v. Mastelotto, 717 F.2d 1238,
1244 (9th Cir. 1983) (citing Worthington v. United States, 64
F.2d 936, 938-39 (7th Cir. 1933), and McLendon v. United States,
2 F.2d 660, 661 (6th Cir. 1924)).  The question of whether the
government's proof shows a single conspiracy or multiple
conspiracies is "a question of fact for a properly instructed
jury." United States v. Berger, 224 F.3d 107, 113 (2d Cir.
2000).

A single conspiracy may have multiple objects which
involve a number of sub-agreements to commit each of the
objectives, so long as there is one overall agreement which
embraces and defines the objects of the conspiracy. Braverman v.
United States, 317 U.S. 49, 53-54 (1942). "'A single conspiracy
is not transformed into multiple conspiracies merely by virtue of
the fact that it may involve two or more phases or spheres of
operation, so long as there is sufficient proof of mutual
dependence and assistance.'" United States v. Berger, 224 F.3d at
114-15; see also United States v. Vazquez, 113 F.3d 383, 387 (2d
Cir. 1997) ("one conspiracy is not transformed into multiple
conspiracies simply because it occurs in more than one stage and

23

at different times"); <u>United States</u> v. <u>Aracri</u>, 968 F.2d 1512,
1521 (2d Cir. 1990) (same).

Moreover, it is not required that each participant be
aware of all of the acts committed in furtherance of the
conspiracy. <u>United States</u> v. <u>Alessi</u>, 638 F.2d 466, 473 (2d Cir.
1980). The law does not require that "each member of the
conspiracy conspire directly with each other member of it."
<u>United States</u> v. <u>Rooney</u>, 866 F.2d 28, 31 (2d Cir. 1981). Indeed,
the law does not require that each member agree "on the details
of the conspiracy, so long as they have agreed on the essential
nature of the plans." <u>United States</u> v. <u>Rea</u>, 958 F.2d 1206, 1213
(2d Cir. 1992). The goals of the conspirators need not be
congruent, so long as they are not at cross-purposes."

Here, Count One sufficiently alleged a single
conspiracy -- or "essential plan" -- with five charged objects
including securities fraud, investment adviser's fraud, mail
fraud, wire fraud, and money laundering. The essential plan, as
described in the Indictment, involved defrauding certain Amerindo
clients by making misrepresentations to them about how their
money would be invested, misappropriating their investments, and
failing to redeem investments upon the request of the investors.
Although the conduct involved multiple victims, and while the
Indictment identifies specific dates and transactions in which
investors were defrauded, this conduct is properly alleged as a
single conspiracy.

Vilar claims that "victims 1, 2, 3, 4, and 5, all acted
through a distinct transaction, at different times and places."
(Vilar Br. at 19). A similar claim can be made, however, of
virtually any conspiracy through which the conspirators agree to
defraud multiple investors. Thus, the fact that the charged
conspiracy victimized several individuals on different dates, and
through independent fraudulent dealings, is of no moment
whatsoever. Vilar's additional claim, however, that these
various victims were defrauded under "dramatically dissimilar
circumstances," is flatly wrong and should be summarily rejected.
All of the victims identified in Count One of the Indictment were
victimized by the same two defendants, through the same entity,
Amerindo, during the same time frame. Furthermore, the means and
methods by which the defendants defrauded these victims were
quite similar. All of these victims were induced to invest money
through false representations. In all cases the defendants did
not invest the funds in accordance with their representations to
the victims. And, in all cases, the defendants failed to fully
redeem the investments of these victims.

Most of the victims identified in the Indictment were defrauded in connection with an investment product known as the "GFRDA." Lily Cates too was induced, initially, to invest in the "GFRDA" product, but subsequently she was persuaded to invest in other investment products, namely, Rhodes Capital and the SBIC fund. However, the fact that Cates was induced to part with her money based on fraudulent claims relating to Rhodes or the SBIC fund, as opposed to the GFRDA product, is a distinction without a difference. Just as victims of "boiler room" conspiracies are induced to invest in different securities offerings, at different times, and through different misrepresentations, so too were the victims of this conspiracy defrauded at different times and, in some cases, through different misrepresentations. The relevant point is that the defendants entered into an agreement to defraud all of these victims through the means and methods identified in the Indictment, and during the time frame alleged in the Indictment. Count One of the Indictment, therefore, alleges a single conspiracy, by common participants who shared knowledge of the frauds, and the same means and methods. Consequently, the Court should deny the defendants' motion to dismiss Count One of the Indictment. See United States v. Murray, 618 F.2d 892, 896 (2d Cir. 1980) ("the allegation in a single count of the commission of a crime by several means should be distinguished from the allegation of several offenses in the same count .... [T]he latter type of allegation is duplicitous, while the former is not.").

### b.  Counts Two Through Twelve Are Not Duplicitous

The defendants' claim that Counts Two through Twelve are duplicitous because they reallege the "speaking" paragraphs in Count One is similarly baseless. The S3 Indictment does not reallege either the statutory allegations of the conspiracy or the objects of the conspiracy. Rather, the substantive counts only reallege paragraphs 1 through 34 (the speaking part of the indictment), paragraph 41 (means and methods of the conspiracy) and paragraph 42 (overt acts). (See S3 Indictment ¶¶ 43, 45, 47, 49, 51, 53, 55, 57). Accordingly, defendants' claim that the S3 Indictment is duplicitous because it lumps the a conspiracy together with substantive charges borders on the frivolous.

## B.  It Is For The Jury To Decide Whether The Defendants' Failure to Redeem Investors' Funds Constituted A Fraud

Lastly, Vilar claims the Government should be precluded from contending that the failure to redeem investor funds constituted a fraud because "refunds of the investments are regulated by contractual law and cannot be considered criminal

25

under the governing law of the Second Circuit." (Vilar Br. at
22). This claim should be flatly rejected. The jury will be
properly instructed as to the elements of each of the charged
crimes. Should the Government contend, in summation, that the
defendants' failure to redeem investor funds constituted a fraud,
the jury will be in a position to render its own judgment about
whether this failure constituted a fraud under the circumstances
presented by this case.

## CONCLUSION

For the reasons stated above, the evidence described
herein should be admissible at trial and the defendants'
challenges to the face of the S3 Indictment should be summarily
rejected.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney


By:_____/s/_____
    Joshua Klein
    Marc Litt
    Benjamin A. Naftalis
    Assistant United States Attorneys
    (212) 637-2397/2295/2456

cc:  Glenn C. Colton, Esq.
     Herald Price Fahringer, Esq.