UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

ALBERTO WILLIAM VILAR and
GARY ALAN TANAKA,

Defendants.

No. 05 Crim. 621 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

The Clerk of the Court is respectfully directed to docket the attached letters, which have been sent to the Court by certain non-parties regarding sentencing and which have been redacted pursuant to Fed R. Crim P. 49.1.

Dated: December 7, 2009
New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ________
DATE FILED: 12/7/09

Honorable Richard J Sullivan
Daniel Patrick Moynihan
United States Court House
500 Pearl Street
New York, NY 10007-1312

MAY 19 2009

Dear Judge Sullivan

**Gary Tanaka**

I am writing to lend my support to a plea for leniency in the sentencing of Gary Tanaka.

I have known Gary since the late 1980s, when the fund of funds I founded was seeking an investment manager to invest in newly public, US technology stocks. Together with colleagues, I spent a great deal of time getting to know Gary and his partner, Alberto Vilar, before hiring their firm to manage funds on behalf of Knightsbridge Advisers.

From the beginning I was very impressed with Gary. I found him to be extremely bright, very dedicated to his business mission, professional, and responsible. I never had the slightest reason to question his integrity. Quite the contrary; Gary's presence in the firm, especially his work ethic and his focus, were reassuring to me and my colleagues in the face of the well-publicized external interests of his flamboyant partner.

The investment business in which Gary engaged had a lot of potential upside but was extremely difficult to get right. In my view, he was one of the best of the rare specialists globally who pursued this type of investment. For many years, he and his firm were very successful on behalf of our fund. Our relationship lasted in excess of a decade. Although Amerindo suffered heavily from the technology bust beginning in 2000, and our fund subsequently terminated our relationship, we remained in occasional contact. My impression is that even under great pressure Gary remained hard at work on behalf of his investors and was beginning a successful recovery post the crash.

We all found it extremely hard to believe that Gary was found guilty of wrongdoing. While we accept the verdict of the court, we nevertheless believe that these actions were aberrations in an otherwise exemplary career, and urge you to sentence him accordingly.

Sincerely yours,

Joel Romines

Bartlesville, Ok



RECEIVED
CHAMBERS OF
RICHARD J. SULLIVAN
U.S.D.J.

Edythe M. Holbrook
New York, NY

25 November 2008

The Honorable Richard Sullivan
United States District Court
Seven Sisters of New York
500 Pearl Street
Room 615
New York, NY 10007

Dear Judge Sullivan,

I am writing in my capacity as cofounder and president emeritus of the American Russian Young Artists Orchestra (ARYO) and in connection with Alberto Vilar, a friend of many years.

I am sure many have written on his behalf in connection with the world of the arts in general. I would like to stand up for his noble work with young people, to whom he devoted a great deal of his resources and time. ARYO never solicited support from Alberto Vilar, not did it receive any from him. Instead, he gave us something far more valuable: his loyal support of an idea that engaged Russia in a productive dialogue with this country through its young people. He became part of the ARYO family, and, more recently a loyal fan and advocate of its finest legacy, a young violinist from Siberia, who is now making it to the top, offering to help him in any way he could, short of funds. I know of other young people who have gone on to fine jobs in the field of arts management, having benefited from the program he funded at the Kennedy Center. Indeed, they inhabit some of the top posts in universities, and performing arts centers worldwide. That is quite a tribute to Mr. Vilar. And this is but the tip of the iceberg.

I do hope you will consider how much he has helped so many people, despite the charges against him and the fact that there came a point when he could not deliver on his pledges.

Sincerely,

Edythe M. Holbrook



November 25, 2008

Honorable Richard Sullivan
United States District Court
Southern District of New York
500 Pearl St.
Room 615
New York, N.Y. 10007

Dear Judge Sullivan,

As a musician and a long time opera goer, concert goer, and a profound music lover, I would ask you to consider the great contributions Alberto Vilar has made for the performing arts and for artists throughout the world. These contributions were pledges he made good on and they amount to approximately 100 million dollars.

As you know, the United States government gives minimally to the classical arts. It is only through the generosity of patrons and private funds that we are able, here in America, and especially in New York, to be a leader in this very noble endeavor.

For myself, and at this Thanksgiving Day, I am grateful to people such as Mr. Vilar, for all he has done and for his generosity. I humbly and respectfully ask you to take this into consideration regarding his sentencing.

Thank you for your time and consideration. It is much appreciated.

Sincerely,
Marianne Wyman
Marianne Wyman

**MARIO R. GAZTAMBIDE**

RECEIVED
NOV 26 2008

November 22, 2008

Honorable Judge Richard Sullivan
United States District Court
Southern District of New York
500 Pearl Street Room 615
New York, NY 10007

Honorable Judge Sullivan:

Your Honor, I am writing to you as an old friend of Alberto W. Vilar. I have known Alberto as well as his immediate family for a little over 58 years. I am burdened by sadness over his current troubles.

I am not one to judge what the courts have determined. Yet, I feel that in some way he does not deserve the unevenhandness of the jury's decision to find one defendant guiltier than the other. However, I do not have the legal training to determine the culpability of one or the other.

I am writing to inform you about the Alberto that I have known. Throughout his life Alberto Vilar has been a deeply religious man, a good and generous son and brother to his parents and two sisters. He has been very generous to all his relatives and friends also.

Alberto Vilar's greatest defect has been that he so much wanted to give that he overcommitted himself in his promised gifts to world renowned institutions of learning, great opera houses, music festivals, universities and scholarships he provided to many relatives and the children of friends as well as outstanding students of medicine, the arts and sciences. Alberto Vilar was truly a Renaissance man.

Your Honor, my family and I appeal to your sense of justice and equality for all in the case of Alberto Vilar. We ask that you take into consideration all the good deeds that he has done for humanity and bear in mind that he has lived in a restricted home prison since his arrest for the past several years.

Alas, I pray that God in his infinite wisdom guide you in your decision which I am sure will be just. Thank you for taking the time to read this plea of mercy for my downfallen friend.

Sincerely,

Mario Gaztambide

**MARIO R. GAZTAMBIDE**

November 22, 2008

Honorable Judge Richard Sullivan
United States District Court
Southern District of New York
500 Pearl Street Room 615
New York, NY 10007

Honorable Judge Sullivan:

Your Honor, I am writing to you as an old friend of Alberto W. Vilar. I have known Alberto as well as his immediate family for a little over 58 years. I am burdened by sadness over his current troubles.

I am not one to judge what the courts have determined. Yet, I feel that in some way he does not deserve the unevenhandness of the jury's decision to find one defendant guiltier than the other. However, I do not have the legal training to determine the culpability of one or the other.

I am writing to inform you about the Alberto that I have known. Throughout his life Alberto Vilar has been a deeply religious man, a good and generous son and brother to his parents and two sisters. He has been very generous to all his relatives and friends also.

Alberto Vilar's greatest defect has been that he so much wanted to give that he overcommitted himself in his promised gifts to world renowned institutions of learning, great opera houses, music festivals, universities and scholarships he provided to many relatives and the children of friends as well as outstanding students of medicine, the arts and sciences. Alberto Vilar was truly a Renaissance man.

Your Honor, my family and I appeal to your sense of justice and equality for all in the case of Alberto Vilar. We ask that you take into consideration all the good deeds that he has done for humanity and bear in mind that he has lived in a restricted home prison since his arrest for the past several years.

Alas, I pray that God in his infinite wisdom guide you in your decision which I am sure will be just. Thank you for taking the time to read this plea of mercy for my downfallen friend.

Sincerely,

Mario Gaztambide



MRS. M.W. PERCOPO

NEW YORK, NEW YORK

Hon. Richard J. Sullivan
United States District Court
Southern District of NY
500 Pearl St. Rm 615
New York, NY 10007

Nov. 23rd, 2008

Dear Judge Sullivan,

My name is Christa Percopo. I am writing to you on behalf of Mr. Alberto Vilar, whom I have known for the past eight years as a kind and quiet neighbor and friend.
It has been well quoted that he was once the largest single donor to the art and music world, and hoped to do so much more. What a loss to these wonderful causes!

I do not wish to interfere with the wheels of justice. If a crime has been committed, it should be punished appropriately. Having read the potential punishment of 20 yrs incarceration, I was very much saddened by the severity of the punishment. I beseech you to please consider that Mr. Vilar has already been punished severely over the past three years with international shame brought upon him after his much publicized arrest and admonishment from the art world, his three year house arrest, and financial demise.

Reading the newspaper articles, I noted an indictment stating he promised save investments with Amerindo. A euphoric promise by a successful financier who may have come to believe in his invincibility. However, as an investor, I am surprised. Investing in the market always carries risks, even with bonds. No one forces the investor's hand to invest. It is an investors responsibility and duty to do due diligence. Who at the time did not know that tech investments were not the most risky vehicle on the market? To assume such risk, you must be able to tolerate severe volatility. I have never heard a complaint when investors make money, only with losses incurred do they plead ignorance and victimization. Of course, fraud is another issue. I am asking you to please sentence commensurate with the crime and to consider Mr. Vilar's punishment served over the past three years.

Honorable Judge Sullivan, please have it in your heart to judge with compassion.

Thank you,

Respectfully,

Christa Percopo

KEITH D. JEWELL
NEWYORK, NEW YORK

September 1, 2009

Hon. Richard J. Sullivan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, N. Y. 10007-1312

Dear Judge Sullivan,

I am writing you in regard to my friend, Mr. Alberto Vilar. Alberto was found guilty of serious financial misbehavior in your court several months ago. I would like to bring to your attention factors in partial exculpation when you consider his sentence.

By way of background, Alberto and I met in 1964 when we were trainees in the international division of First National City Bank, the predecessor of CitiBank. I recall Alberto as a friendly, outgoing and cooperative colleague. He was always eager to help out, stay late and work hard on our projects without seeking any special recognition. In short, Alberto was a fine team player and universally respected.

I was eventually sent overseas by the bank and Alberto and I lost touch for many years. Around 1985, when I was living in California, Alberto called and asked me to provide a letter of recommendation. I was very happy to write on his behalf, so great was my respect for his abilities and character.

After my return to New York in 1997, I became aware of Alberto's prominence as the founder of Amerindo and of his great financial success. I especially admired his unparalleled generosity as a patron of the opera in New York and worldwide.

I am a volunteer director of The Chopin Society of New York, a non-profit organization sponsoring concerts and the development of young artists. Thus, I am keenly aware of the need for financial support for the arts and the importance of major benefactors of the arts, of which Alberto Vilar was one of the greatest.

To conclude, I request you take into account Alberto Vilar's past great contributions to culture and the arts and consider a reduced sentence followed by community service for which Alberto is extremely well-equipped to perform in a very beneficial manner.

(Continued)

Hon. Richard J. Sullivan -- Sept. 1, 2009, page 2

Perhaps I should add that I have never had any business relationship with Alberto Vilar and that my interest in his case is strictly personal.

Thank you for your kind attention to what I have written.

Respectfully yours,
Keith D. Jewell



Laguna Beach, CA

September 15, 2009

Hon. Richard J. Sullivan
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Sullivan:

This is intended to provide some information to assist you in determining a fair & equitable sentence of Alberto W. Vilar.

I have known Alberto since 1958 when we attended college together at Washington & Jefferson College in Washington, PA. We were both enrolled as cadets in ROTC and, after graduating & receiving our commissions as Second Lieutenants in the Army in 1962, took training as Armor Officers together at Fort Knox, KY. My oldest daughter was born there; Alberto told my wife & me that she was the first baby he ever held. These were proud moments in the lives of two young men intent on serving their country & embarking on the productive lives for which their training & educations had prepared them. Before beginning our civilian careers in New York, Alberto served in Germany; I went to Vietnam. Our business dealings were ones of complete mutual trust. He bought a car for me in London, had it shipped to our home in California & never even asked for payment until it was safely delivered. I invested in his mutual fund & rode it to the top & unfortunately held it all the way back down. He felt badly but we both knew this often happens in business &, of course, it affected our friendship not one iota.

He asked me to be an usher in his wedding which I was honored to do. Alberto & his wife got to know all three of our children & he was more than generous in so many ways to our whole family. (This was well before he acquired the wealth he achieved later in life.) I know he regretted not having children of his own so he invested in the lives of others' children. Although I never asked for financial assistance from him, I know he funded the advanced educations of literally dozens of other children over the years; some were friends & family, others barley acquaintances who touched his life in some way that he appreciated. When I retired several years ago, I asked him when he would. He said, not until

**he assured himself that he would be able to continue his philanthropies in art & medicine each year for life & in perpetuity. He always wanted to give back to the country we both love; this is all he lived & worked for. I have never known him to be anything other than an honorable man in word & deed always with the utmost of integrity; it's why & how he lived his life.**

**If I could provide you with any additional details that you might find useful, please to not hesitate to contact me.**

**Yours very truly,**

**William G. Halbert**

Brooklyn
Academy
of
Music

Peter Jay Sharp Building
30 Lafayette Avenue
Brooklyn NY 11217—1486
Telephone: 718.636.4135
Fax: 718.230.4352
khopkins@BAM.org
BAM.org

Karen Brooks Hopkins
President

September 22, 2009

Hon. Richard J. Sullivan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Sullivan,

I am writing to you today to provide a character reference for Alberto Vilar. While I understand that Mr. Vilar has been convicted of a crime, I would like to register a good word on behalf of the man I knew before this situation arose.

When Alberto was successful, the entire music and cultural community greatly benefitted from that apparent success. At that time, Alberto was an extremely generous, deeply committed patron of the arts. His love and passion for the arts went beyond mere financial contributions. He believed in and nurtured young artists, supported arts institutions both large and small, and helped arts administrators to improve their organizations. Alberto gave critical project support to many vital artists, allowing them to take risks and develop new approaches.

The cultural life of New York is much more than a trifling pastime for the wealthy. Arts organizations are a critical component in the City's economy, generating tourism dollars and playing a role in educating hundreds of thousands of young students. There are very few patrons who understand the complexity of keeping these organizations running, and Alberto was among them. One would hope that the good deeds of a man like Alberto Vilar would be taken into consideration when passing judgment.

Cordially,

Karen Brooks Hopkins
President, Brooklyn Academy of Music

ALFRED HEITKONIG
[redacted] SAN JUAN, PR [redacted]

November 7, 2009

Honorable Richard J Sullivan
Daniel Patrick Moynihan US Courthouse
500 Pearl Street
NY, NY 10007-1312

Dear Honorable Judge Sullivan,
I am writing you regarding the sentencing of Alberto Vilar (AV) and Gary Tanaka (GT). I have been contacted by their attorneys to write letters on their behalf. Please be advised that I provided personal property as part of AV's bail package. I knew AV's father, a very fine man, and my father knew both AV and his father well. This weighed heavily in my decision to participate in AV's bail package. My father established an account with Amerindo many years ago and my mother, sister and I became Amerindo clients (or rather victims) through the family account my father established and upon his untimely death. The last Statement of Account about 5+ years ago showed approximately $5 million in both the Guaranteed Fixed Deposit and the Amerindo Technology Growth Fund. I have had no further information regarding the actual value of said account, if it still exists or if there are any assets to back it up.

During the trial, I was present for several sessions and I heard disturbing testimony. I had hoped this had all been a big mistake and that AV and GT would be found innocent and all would be well and our money safe. Evidently, that has not been the case. After the trial, a man named Bernie Madoff surfaced in the news. The stories about his betrayal of trust to friends and clients stung hard. It made me realize I may have been terribly naïve in my views on AV and GT.

I have recently been contacted by attorneys and individuals that claim they have knowledge of hidden Amerindo assets, GT's impending divorce and ideas about how to obtain Amerindo funds. Obviously, this will all cost a lot of money and who knows if in the end it will bring forth any restitution.

Despite all of the above, GT and AV, through their attorneys, have asked for leniency. Yes, I like both gentlemen and they seem like morally upstanding men, GT a father and both men were generous in their philanthropic efforts. So was Bernie Madoff. So my view now would be to forget about what "seems" and rather focus on what "Is" or "Isn't". I am aware that certain investors (victims of Amerindo) may favor GT remaining free on probation

to assist victims of the Amerindo debacle regain their funds. I would support this assuming Amerindo assets/funds actually exist and can be accounted for today. "Is" there assets and funds or "Isn't" there? That, in my mind is question number one. Ground zero.

In my humble opinion, should your Honor be in a position to consider leniency in their sentencing, perhaps it could be based on GT and/or AV's willingness to communicate and show that Amerindo assets actually exist and their location. Thus far, I have been told repeatedly that no account information could be given to me due to the on going proceedings. In contrast to their stoic silence to date, their coming forward now could be interpreted as a gesture of goodwill and a show of remorse. Information and assistance that lead to the recovery of missing or hidden assets would save millions of dollars in legal and professional fees that would otherwise have to be spent by Amerindo victims such as myself trying to find and secure said assets/funds. If they truly don't know if assets exist or their exact location, and can't give an answer, then that is a violation of their fiduciary duty to people like myself right there because they should know. If they just don't give an answer, then they just don't care about their clients. In either instance, no info or no answer casts a dark shadow indeed and not an image worthy of leniency consideration. "Is" there funds or "Isn't" there? Under these circumstances, offering them a final chance to come forward could be considered.

I would like to close by informing you that I still have a $600,000- US government lien against me due to my bail assistance to AV. During his house arrest, I visited him several times, including bringing him sushi from my favorite restaurant in the hope he was innocent. I tried to be compassionate. Unfortunately this has not been reciprocated. I do feel foolish that I ignored the writing on the wall back then and doubted Mr Litt's library of evidence. Regarding my bail funds, I understand his attorney must initiate my bail fund release. I remain disillusioned that to date (almost a year since his conviction) neither AV or his attorney has made an effort to help me get my bail funds back. Hopefully GT and /or AV will choose to communicate their knowledge of existing assets and their location in exchange for any leniency the court may consider.

Thank you, Honorable Judge Sullivan for your kind and just consideration.

Respectfully Yours.

Alfred Heitkonig

Dear Judge Sullivan,

My name is Laurice Helmer, and I have been teaching music at Cloonan Middle School in Stamford Ct. since 1973.

I had the pleasure of meeting Mr. Vilar in Salzburg during the music festival in 1990. I attended many of the superb operas that he so generously underwrote. We have all benefitted from his generosity in the field of arts. How fortunate for us.

I have been instructing Alberto in piano lessons for the past two years and have found him to be totally prepared for each lesson, and eager to perform accurately and artistically.

We hope that our letters of support for Alberto will help you make a decision.

Sincerely,
Laurice Helmer

Nov. 22, 2008

Dear Judge Sullivan,

My name is Rita Mehos and I have been dedicated to music my entire life. I have been a pianist, organist and choral director. Member of Boston University Women's Guild, a former trustee of Boston University and currently on the Board of Visitors at the Medical Center and a member of Overseers of Boston University.

I have been connected for many years with the Friends of Salzburg Festival. I have been on the Board of this organization and I met Alberto Vilar when I began my affiliation about 20 years ago.

In my estimation Alberto contributed more to world of music than anyone I have met. His generosity is unmatched. How fortunate we all were to benefit from his support.

He underwrote complete operas that were magnificent.

Hopefully you will consider his contribution to the music world and be fair.

Sincerely
Rita Mehos

[redacted]
Darien, CT [redacted]
[redacted]

Begos Horgan & Brown LLP
Attorneys At Law

Patrick W Begos
Christopher G Brown
Michael F Horgan Jr

www.begoshorgan.com

327 Riverside Avenue
Westport Connecticut 06880
Tel 203.226.9990
Fax 203.222.4833

7 Pondfield Road
P O Box 369
Bronxville New York 10708.0369
Tel 914.961.4441
Fax 914.961.4442

November 16, 2009

RECEIVED NOV 17 2009 CHAMBERS OF RICHARD J. SULLIVAN U.S.D.J.

Hon. Richard J. Sullivan
United States District Court
500 Pearl Street
New York, NY 10007

**Re: U.S. v. Vilar and Tanaka**
**05 Cr. 0631 (RJS)**

Dear Judge Sullivan:

This firm represents the victims, Lisa, Debra and Herbert Mayer. I write to supplement my February 3, 2009 submission, and particularly to respond to various statements in Gary Tanaka's Reply Sentencing Memorandum.

**Restitution to the Mayers**

The government and Tanaka agree that the Mayers are entitled to mandatory restitution in the amount of at least $11,066,713.44 (Govt. Sentencing Memo at 80; Tanaka Reply Memo at 32). Vilar does not oppose the government's restitution calculation. I note that this is the amount that the Mayers invested in the Guaranteed Fixed Rate Deposit Account ("GFRDA") on January 1, 2001.

**Pre-judgment Interest on Restitution**

The government correctly asserts that the Mayers are entitled to pre-judgment interest on their restitution, at the rate of interest promised to them (11% per annum for the Mayers) (Govt. Sentencing Memo at 81). *See also U.S. v. Scott*, 2009 WL 983032, 1 (2d Cir. Apr. 14, 2009) (prejudgment interest is properly included in an award of restitution for the wrongful taking of money or investment assets).

Tanaka does not dispute the holding of *Scott*, but claims that pre-judgment interest is not appropriate because "Amerindo was making payments on the amount owed up until the government shut down Amerindo" (Tanaka Reply Memo at 32). While this statement, even if it were true, would not distinguish this case from *Scott*, it is noteworthy that the statement is demonstrably false. The government did not indict Vilar and Tanaka until May 2005, and certainly did not "shut down Amerindo" before that date. Long before that date, Tanaka and Vilar had lied to the Mayers, defaulted on their obligations, and stopped making any payments to them:


- In January 2003, Tanaka and Vilar defaulted on their obligation to pay 11% interest on the Mayers' GFRDA (January 28, 2003 letter from Renata Tanaka to Mayers).

- In May 2003, the Mayers asked Tanaka and Vilar to return to them $850,000 of their funds on deposit that they "urgently need" to provide "[h]andicap facilities for Dr. [Herbert] Mayer (one of your earliest clients), certified as medically necessary to avoid catastrophic accidents[.]" (May 16, 2003 letter from Mayers to Vilar and Tanaka). Vilar and Tanaka refused, with Tanaka telling the Mayers, falsely, that he had "taken a very close look at the list of deposits in our fixed portfolio and there is nothing we see that can be broken right now." (August 18, 2003 memoranda). As the evidence introduced at trial made clear, Tanaka and Amerindo had access to more than enough money to satisfy the Mayers' request; they chose not to do so, and to lie about the reason.[1]

- In December 2003, after the Mayers gave notice of redemption of their GFRDA, Tanaka and Vilar refused to honor the redemption, even though (as I understand was made clear at trial), they had the money available to do so. Tanaka's wife and co-conspirator, Renata Tanaka, threatened the Mayers with "enormous problems beyond description" if they continued to demand redemption of their money (December 19, 2003 letter).

Tanaka also claims that interest is not appropriate because the Mayers "refrained from seeking repayment during the pendency of the criminal case." (Tanaka Reply Memo. at 32). This is disingenuous, at best. The Mayers agreed to stay their civil action at the government's request. Tanaka, who now claims that he championed repaying the Mayers what they are owed (*id.*, at 24, 25), appears to suggest that, but for that agreement, the Mayers would have been paid by now. But Tanaka's position, when the stay on the civil action was lifted after the criminal verdict, was to deny that he owed the Mayers any money, and to seek to dismiss the action (*see* my February 23, 2009 letter to the Court; copy is enclosed).

In my February 23, 2009 letter, I had calculated the total amount of restitution due to the Mayers on the GFRDA, including interest at 11% (compounded annually), to be $18,651,108.47, as of December 31, 2008. An additional $ 1,821,165.12 in interest will have accrued from January 1, 2009 to November 20, 2009, bringing the total amount of restitution to $20,472,273.59 as of that date. Interest continues to accrue at the rate of $5,620.88 per day thereafter (through December 31, 2009, at which time the per diem will increase due to compounding of interest).

---

[1] Tanaka's cold dismissal of the Mayers' plea for help puts the lie to his attorneys' efforts to portray him as someone who is "constantly going the extra mile to care for ... those who needed him." (Tanaka Reply Br. at 1).


Begos Horgan & Brown LLP
Attorneys At Law

Accordingly, on behalf of the Mayers, I respectfully request that the Court enter an order of mandatory restitution on behalf of the Mayers and against Vilar and Tanaka in an amount no less than $20,472,273.59.

Respectfully submitted,

Patrick W. Begos

PWB:mtf
Enclosures

cc: (by email; w/ attachments)
Marc Litt, Esq.
Glenn C. Colton, Esq.
Jonathan Marks, Esq.

# AMERINDO INVESTMENT ADVISORS, INC.

Avenida Samuel Lewis
Edificio Plaza Obarrio
Apartado 5215
Panama 5, Panama
Tel: (507) 264-9673
Fax: (507) 264-9667

January 28, 2003

The Mayer Family
71 Malvern Road
Scarsdale, NY 10583

Dear Dr Mayer, Lisa and Debbie:

The purpose of this letter is to summarise the telephone discussions we have had over the last two weeks.

First of all I am pleased to confirm that a wire transfer in the sum of $100,000.00 was sent to your bank, as promised, on January 24, 2003. You should have received cleared funds on Monday, January 27, 2003.

With regard to your monthly interest withdrawal we confirm that as a temporary measure a regular payment of $50,000.00 in lieu of your monthly interest payment, will be sent on the 25th of each month unless it falls on the weekend or national holidays. In addition to the monthly payment we would endeavour to send you additional sums of money whenever our cash flow situation allows for it. Those payments would be ad hock and they are intended to bring your total amount of interest payments up to date. Please be advised that we are not able to guarantee the frequency and the amount of the additional payments.

We confirm that the reduced monthly withdrawals would be reflected on your statements. The outstanding balance due would be shown for the first time on your February Statement under the heading of "Miscellaneous Account". This account will have the rate of return of 8% per annum.

As explained during our various conversations you have always enjoyed the highest rates of return that we offered to our clients. Over the last two years we have gradually reduced the interest rates for all our clients. This was due to the drastic drop in interest rates. We must be aware that the Federal Reserve Prime Rate is at 30 years lowest of 1.5% per annum. As we discussed on the telephone we are no longer able to offer you an interest rate of 11% per annum. We propose a rate of 8% per annum for a one-year investment. This is the highest rate of return that we can offer in the current time and it is 2% above what we are offering to other clients this year. This would be effective from January 1, 2003 and your investment would mature on December 31, 2003. In monetary

value it means that your monthly interest payment would be in the amount of $71,825.19.

We have the pleasure in enclosing your statements of accounts. Please note that for easy reference we have issued statements for the end of January 2003 as well. On the January statement you will see various small interest payments which are additional payments for the delayed monthly interest payments in respect of the annual interest payment for the year ending December 31, 2002. Please note that your principal as of January 1, 2003 was increased by the one-month interest payment, which you did not received as of the end of year 2002.

I will call you at the end of this week once you have a chance to review the enclosed statements. Then I would be only happy to discuss any questions you may have regarding the above.

In the meantime I wish you all the very best.

With kind regards,

Renata Tanaka

enc. 6 pages.

The Mayer Family
71 Malverne Road
Scarsdale, NY 10583

May 16, 2003

Mr. Alberto Vilar
Mr. Gary Tanaka
Amerindo Investment Advisors
43 Upper Grosvenor Street
London, England WIX9PG

Dear Alberto and Gary:

Herbert, Debra and Lisa Mayer now request, in writing, the sum of $850,000.00.

We urgently need this portion of our funds at this time to resolve circumstances which are at a state of crisis:

1) Handicap facilitilies for Dr. Mayer (one of your earliest clients), certified as medically necessary to avoid catastrophic accidents;

2) Legal expenses to cover liens filed against us, resulting from our inability to cover pre-allocated expenses; and

3) Physical property: to bring our nearly uninhabitable home to a liveable condition, and up to code, we need funds. At this time, we have only been able to obtain building permits and secure bonded and licensed contractors. We cannot proceed without money.

Alberto and Gary, you are internationally recognized as men with extraordinary humanitarian traits. We implore you to wire money as soon as possible.

We thank you in advance for your cooperation.

Sincerely,

Dr. Herbert, Debra and Lisa Mayer

cc: Renata Tanaka

AMERINDO
INVESTMENT ADVISORS INC.

399 Park Avenue • 22nd Floor
New York, New York 10022
TEL (212) 371-6360
FAX (212) 371-6988
www.amerindo.com

August 18, 2003

TO: Debra Mayer
Lisa Mayer

FAX#: 914-723-8343

FROM: Gary Tanaka

Dear Debra and Lisa:

It is extremely important for you to understand how difficult, it not literally impossible, it is to break a fixed deposit. Fixed deposits are typically made for one-to-two year periods of time. This means that investments earn a specific yield precisely because they are on deposit for a fixed period of time. Short-term deposits literally earn nothing, because nobody wants them. It is almost never possible to break, i.e. terminate prematurely, a fixed-time deposit. Once in a while, a fixed deposit has a callable option, which means that the issuer wants to redeem the investment prematurely. This happens very, very rarely. The bottom line is that we have taken a very close look at the list of deposits in our fixed portfolio and there is nothing we see that can be broken right now. However, we will make every effort to review this portfolio on a monthly basis to see if some investment is called in by the issuer prior to its maturity, which would free up cash.

As you can well appreciate, Amerindo has survived the worst bear market in its specialty sector, emerging technology, since its inception 23 years ago. The firm's capital sustained considerable market losses during this period, as did the Amerindo Technology Growth Fund. On the other hand, your fixed deposits have hardly suffered. Moreover, the interest rate you are earning today is dramatically above bank, money market, and other short-term treasury rates, which are about 1%. When you include the tax advantage of having the money located offshore, and the fact that the payments are made on a monthly basis, you really are in an enviable position in terms of getting a very high yield, when interest rates are at 40-year lows.

We are very encouraged that technology has led the stock market's recovery, so far this year. This suggests that the prospects for capital appreciation in our sector over the next several years remain a distinct possibility. Notwithstanding the

current difficulties you face on a short-term basis from your sizable home remodeling program, the truth is that the next 12-24 months are likely to be dramatically different, for the better, from what they have been over the past three years.

Please rest assured that we will do everything possible to help you get through your current liquidity problems. Having lived through and survived the worst bear market in the post-war (WW II) period, we well know the pain that is created by a liquidity squeeze, and empathize with you while you sort through this difficult period.

We are not, however, in the position to offer you personal loans. First of all, Amerindo does not have a license to lend monies, and is thus prohibited by law from doing so. Secondly, on a personal level, for all the well known reasons we cited above, we are not in a position to facilitate your request, even if it were legally possible to do so. We, like most of the equity investing world, have suffered personally through the drastic market decline. Many of the firms we have worked with for years are no longer in business. The Telco sector alone declined over 90% and over $10 trillion was lost in the stock market.

We are surprised that while we have personally ensured, under extraordinarily difficult circumstances, that the monthly payment of 50,000 US dollars is sent to you in a timely fashion, this appears to be overlooked and unappreciated.

Best regards,

Gary Tanaka

AMERINDO
INVESTMENT ADVISORS INC.

399 Park Avenue, 22nd Floor
New York, NY 10022
TEL (212) 371-6360
FAX (212) 371-6988

Alberto W. Vilar
President

August 18, 2003

TO: Debra Mayer
Lisa Mayer

FAX #: 914-723-8343

FROM: Alberto Vilar

Dear Debra and Lisa:

Gary is traveling in the US now and asked me to make sure you got his memo to you. I expect to see him shortly in California and assure you we will discuss the contents of his memo in detail.

I agree with Gary's view that you appear to have underestimated the impact of the severe three-year market decline on us. Frankly, we are fortunate to have survived. In the 1990's, the Savings and Loan industry went out of business; most of the telecommunications industry has just gone into Chapter 11, and Wall Street's big investment banks are being forced to merge and few will remain. Thus, we consider ourselves fortunate to have survived the horrific stock market decline that was on a par with the Great Depression. The next few years look encouraging to us.

I am not indifferent to your home remodeling problems. I had to freeze the work I was doing on two homes last year. Moreover, I will soon have three homes on the market. Have you considered selling something in Puerto Rico, since you have effectively resettled in Scarsdale?

Alberto

# AMERINDO INVESTMENT ADVISORS, INC.

Avenida Samuel Lewis
Edificio Plaza Obarrio
Apartado 5215
Panama 5, Panama
Tel: (507) 264-9673
Fax: (507) 264-9667

December 19, 2003

The Mayer Family
71 Malvern Road,
Scarsdale, NY 10583

Via Facsimile: 914-723-8343

Dear Dr. Mayer, Lisa and Debbie,

Following receipt of a recent letter from Mr. Jennings, the tone of which was markedly unprofessional, we are writing directly to you regarding our understanding of your desire to redeem your off-shore deposit at maturity at the year-end.

From our perspective, your decision is incredibly abrupt and insensitive to our lengthy relationship and does not take into consideration that a) you are the only client that had previously left the firm whom we agreed to take back; b) you are the only client we ever went out of our way at considerable inconvenience to make advance monthly payments to, and c) the extraordinary financial difficulties of the last three years, when all financial markets turned in their worst performance since the Great Depression, have left virtually all investments made during this period under water. It is obvious, by any stretch of the imagination, that the financial markets have not fully recovered, which makes redemption at par now an impossibility. It is not clear to us how you would have expected your deposit to be redeemed in full at year-end, given the unforeseen pressures most financial markets have had for the past three-and-a-half years.

The redemption also overlooks the extreme scrutiny we had been subjected to, on behalf of the Mayer family, by several US federal regulatory agencies, who now demand that all money managers disclose the full identity of their offshore clients. While this relates in part to concerns over money laundering and understandable fallout from 9/11, we have put ourselves at considerable risk not to have to divulge your identity to federal authorities in the US. Making such a disclosure would create enormous problems beyond description for you vis-a-vis federal and state taxation, both present and for the past some 15 years. (We are concerned on your behalf about the possible repercussions such large wire transfer could create.)

What should also not be taken lightly by yourselves is the direction and level of interest rates going forward. There is no near term prospect of interest rates rising significantly any time soon. By spending more on a monthly basis than you are earning in interest, which will clearly be the case going forward, you will be eating into your capital, which will then be declining on a permanent basis. This is a deadly combination of a) living off of declining capital, and b) not seeking growth. You have also previously led us to believe that the investments you made elsewhere were not good.

At this stage of your life, you should be seeking the growth for your capital, especially after the horrific three-year bear market that ended late last year.

Before receipt of your last communication, based upon my conversations with you sometime in October, we were moving forward to remit $500,000 to you in January. This was a figure which you indicated would "tide you over" for the time being with regards to your home refurbishments and care of your father. The $50,000 monthly interest payments would, of course, be maintained. This implies you are continuing to receive 5% tax-free from Amerindo in a 1% taxed financial world.

In view of the above and that the investments that we have made in both equity and debt on behalf of your funds, your portfolio cannot immediately be redeemed at full face value. If however, you have no flexibility at this time we could redeem your portfolio for the actual market values of the securities invested on your behalf. An approximate expectation at this time would be that the value of your investments would be in line with NASDAQ's decline from its peak, which is still off 45%. While equities have begun to recover, most investments are still all under water now. You would accept this amount in full liquidation of your deposit account. This seems imprudent because this would not come close to generate your required income level and would necessarily lead to rapid depletion of your funds.

Should you wish to discuss the above please do not hesitate to contact me. As a long valued client it is, needless to say, in our mutual interest to satisfactorily resolve your current financial dilemma.

Best wishes for the holidays to all, Deborah, Lisa and Dr. Mayer!

Best regards,

Renata Tanaka

Begos Horgan & Brown LLP
Attorneys At Law

Patrick W Begos
Christopher G Brown
Michael F Horgan Jr

www.begoshorgan.com

327 Riverside Avenue
Westport Connecticut 06880
Tel 203.226.9990
Fax 203.222.4833

7 Pondfield Road
P O Box 369
Bronxville New York 10708.0369
Tel 914.961.4441
Fax 914.961.4442

February 3, 2009

Hon. Richard J. Sullivan
United States District Court
500 Pearl Street
New York, NY 10007

**Re: U.S. v. Vilar and Tanaka
05 Cr. 0631 (RJS)**

Dear Judge Sullivan:

This firm represents the victims, Lisa, Debra and Herbert Mayer. I enclose victim impact statements provided by Lisa Mayer (individually and on behalf of her father, Herbert Mayer) and Debra Mayer.

I also write to provide, on my clients' behalf, additional information that may be pertinent to sentencing, and details regarding the amount of restitution I believe my clients are entitled to.

**Vilar and Tanaka's Activities in the Civil Action**

My firm represents the Mayers in a civil lawsuit against Alberto Vilar, Gary Tanaka and their Amerindo entities. This lawsuit pre-dated the indictment, and was stayed pending the criminal trial.

During his closing arguments, Tanaka's lawyer made a point of asserting that Tanaka had never disavowed his obligations to the Mayers. Specifically, he said:

> Now, I mentioned earlier that there was no denying – nobody has said that Gary Tanaka denied that money was owed to investors. ... **[N]obody, Mr. Tanaka at the forefront, is trying to deny that these people are investors, deny that they're owed money, or deny that there was a guarantee.** In fact, when Lisa Mayer took the stand, there was discussion of the guarantee. And the Mayer family, when they rejoined Amerindo in 1998, asked for an affirmance that the principals, Gary Tanaka and Alberto Vilar, guaranteed their investment. And they got exactly what they asked for, government Exhibit 6128. If we could put that up. ... And it says, in no uncertain terms, Dear Dr. Mayer, Lisa and Debra, I write to confirm that the guarantee for the fixed rate deposit account includes myself, Gary and the various Amerindo companies separate as guarantors. And lower it's signed by Alberto Vilar.



**There's just no attempt to run away from obligations. There never was.**

(Transcript, pp. 5371-72; emphasis added).

However, after the verdict, Tanaka did *exactly* what his lawyer claimed he had never done – attempt to run away from his obligations. Specifically, Tanaka filed a motion to dismiss each claim the Mayers had asserted against him in the civil action, telling Supreme Court, among other things, that the Mayers have "absolutely no basis for any cause of action against Tanaka." (Brief in support of motion to dismiss, dated January 16, 2009, at page 1; a copy is attached as Exhibit A).

Vilar, for his part, has denied every fact having anything to do with the Mayers. In response to the Mayers' detailed Amended Complaint (Exhibit B), Vilar submitted an answer in which he made a "general denial" (Exhibit C). In his answer, Vilar denied, among other things, the existence of the Amerindo entities, that the Mayers invested money with Amerindo, that Vilar and Amerindo wrote numerous letters to the Mayers about their investments (many of which were introduced as exhibits in the criminal trial), and that Amerindo defaulted on the Mayers' Guaranteed Fixed Rate Deposit Account in December 2003. This directly contradicts Vilar's position at trial, which, like Tanaka, was based on the premise that Vilar was (in the words of his attorney): "committed to the obligations and want[s] to pay them." (Transcript, p. 5346).

Tanaka and Vilar thus continue to demonstrate that their words, and the words of their agents, cannot be trusted. Instead, they will say whatever they think is expedient to minimize the reckoning for their actions, and allow them to keep the money they took from the Mayers. Their statements in the civil action also strongly demonstrate that neither one of them feels any remorse, or desires to make amends, for their fraudulent conduct.

**Statement of Damages**

Under 18 U.S.C. § 3663A, the Court must order defendants to make restitution to the Mayers. With one exception, discussed below, the return of property the Mayers invested with defendants is "impossible, impracticable, or inadequate," 18 U.S.C. § 3663A(b)(1)(B), so that defendants must be ordered to " pay an amount equal to (i) the greater of (I) the value of the property on the date of the damage, loss, or destruction; or (II) the value of the property on the date of sentencing, less (ii) the value (as of the date the property is returned) of any part of the property that is returned[.]" *id.*

**Guaranteed Deposit**

The Mayers purchased a Guaranteed Fixed-Rate Deposit Account ("Guaranteed Deposit") from Amerindo in the amount of $11,066,713.44 in January 2001, earning 11% interest, to mature December 31, 2003 (Exhibit D). Defendants personally guaranteed the Guaranteed Deposit.

The Mayers submit that restitution should be in the amount of "the value of the property on the date of sentencing[.]" As of December 31, 2008, the Mayers' loss on that Guaranteed Deposit is $18,651,108.47, as calculated on the chart attached hereto (Exhibit E). Interest continues to accrue

 on that amount at 11%, or at the rate of $5,620.88 per day. As of March 20, 2009, the date presently scheduled for sentencing, that debt will be $19,061,457.11.[1]

**Amerindo Technology Growth Fund**

In a June 30, 2004 statement (Exhibit F), Amerindo advised the Mayers that they owned 14,784.21 shares of Amerindo Technology Growth Fund ("ATGF"), which Amerindo then valued at $341,472.37, and Amerindo stated that the Mayers were entitled to an additional $104,696.42 for what defendants described as a "2.00 rebate on purchase of 52,348.21 shares of Amerindo Technology Growth Fund on 7.15.98." The Mayers have not received any return of their investment in ATGF.

There is reason to believe that ATGF shares are worth substantially more today than they were in June 2004 (or that defendants have reaped substantial gains since June 2004 from securities which they represented to be owned by ATGF).

For example, Amerindo disclosed that ATGF owned shares of Imclone and Medimmune, Inc. (Exhibit G). Medimmune was purchased by Astra Zeneca in April 2007 for $15.2 billion, and Imclone was purchased by Eli Lilly in November 2008 for $6 billion. Other stocks allegedly in the portfolio have improved dramatically: Gilead Science, Inc. improved from $16.75 as of June 30, 2004) to 50.93 (as of January 28, 2009); and Homestore.com improved from $0.25 to $1.77. Other stocks allegedly in the portfolio lost value, and still others (like Amazon, Red Hat, and Onyx Pharmeceuticals) kept pace with the market.

Barring proof of a different value for ATGF as of the date of sentencing, the Court should determine that the Mayers have been damaged for at least the amount set forth in the June 30, 2004 statement: $446,168.79.

**intouch Group, Inc.**

Amerindo's June 30, 2004 statement also stated that the Mayers owned 243,902.42 shares of Series A Preferred Shares issued by intouch Group, Inc. ("intouch"). The Mayers requested that Amerindo deliver those shares to them as early as 1997, to which Vilar responded:

> Your investment in intouch was made the way we make all of our private placement investments, which is that we effect a single globus purchase, and distribute the shares upon liquidation of the same to our private clients. ... We can request the Transfer Agent of the company to re-issue your pro-rata portion of our globus holding directly to you.

(Exhibit H).

---

[1] The attached calculation uses compound interest, which is necessary to make them whole. *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir.1993) ("Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded").



Amerindo never transferred those shares to the Mayers. The Court should order Vilar and Tanaka to direct the transfer of these shares to the Mayers.

**Attorneys' Fees**

The Second Circuit has recently held that a restitution order under 18 U.S.C. § 3663A may include attorneys' fees, as long as those fees are "'necessary,' and [are] 'incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.'" *U.S. v. Amato*, 540 F.3d 153, 159-60 (2d Cir. 2008).

The Mayers retained Bernard Mark, of the firm of Ketstenbaum & Mark, specifically to represent them in connection with the government's investigation and prosecution of the defendants. The Mayers retained Mr. Mark only after the government contacted them about its investigation, and Mr. Mark represented them in connection with matters that arose during the course of the government's investigation and prosecution. Mr. Mark had no role in the civil lawsuit filed by the Mayers against Vilar and Tanaka.

Kestenbaum & Mark has billed the Mayers $57,092.38 for their services, for which the Mayers have paid in full. The Court should order Vilar and Tanaka to reimburse the Mayers for these fees.

Respectfully submitted,

Patrick W. Begos

PWB:mtf
Enclosures

**EDWARD T. SWANSON**
Attorney At Law
2071 N. Altadena Drive
Altadena, California 91001
Phone: (310) 283-1035 Fax: (866) 397-0114

September 30, 2009

Via Mail and Email

The Honorable Richard J. Sullivan
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 21C
New York, New York 10007-1312

Re: Sentencing of Alberto Vilar and Gary Tanaka

This letter is being written on behalf of Lily Cates in connection with the sentencing of Alberto Vilar and Gary Tanaka. Lily has asked me to provide you with the following statement:

As a result of the criminal activities of Alberto Vilar and Gary Tanaka, Lily Cates has lost $5 million she provided in 2002 for an SBIC investment. These funds instead were used for personal expenses and charitable contributions by Alberto Vilar.

The $5 million was only one part of Lily's investments with Amerindo. According to the statement provided by Vilar and Tanaka to Lily for September 30, 2004, her total account at Amerindo at that time totaled slightly more than $12.2 million.

Of this enormous sum, Lily has recovered only approximately $3 million, and that due to her own efforts in 2005 without any assistance from Alberto Vilar or Gary Tanaka. Her loss is more than $9 million, not including any interest, and not taking into account the hundreds of thousands of dollars Lily has expended in legal costs in pursuing justice against Alberto Vilar and Gary Tanaka since 2004. In order to make up for the lost income from her Amerindo account, Lily was forced to sell her apartment on West 77th Street, where she had intended to spend the rest of her life, and move back to her former apartment.

However, more important than the financial loss that Lily has suffered is the physical and emotional toll on Lily from the criminal conduct of Vilar and Tanaka. Lily had known Alberto Vilar since 1987, and considered him like family and a brother. Lily believed Gary Tanaka was a trusted friend. She then learned that Vilar and Tanaka stole from her, that her account with them was a sham. This was an emotional bombshell for Lily. Who, now, can she trust? The stress on Lily from these revelations has been almost overwhelming at times. She not only has had trouble sleeping but has lost significant weight.

Lily is concerned with justice as much as with the recovery of her funds. If there is no punishment for criminal behavior, what incentive is there for others not to break the law? It has been more than five years since Lily first discovered that Amerindo had forged her signature to a document transferring $175,000 from her Bear Stearns account to an Amerindo account. Alberto Vilar and Gary Tanaka have never admitted their wrongdoing. If now, these many years later, Vilar and Tanaka can avoid any meaningful jail sentence, how does this discourage others from breaking the law? If a person

steals, and when caught is merely forced to return what he stole, he has every incentive to steal again and hope that this time he is not caught.

I have seen a copy of the letter to you from Paul Marcus. I have read it to Lily, and she is adamant that Mr. Marcus does not speak for her and was never authorized to do so. In fact, Lily strongly disagrees with the urging by Mr. Marcus that Gary Tanaka be given probation. Mr. Tanaka knows where assets are hidden, and should be obligated to help in their recovery as part of his sentence. Indeed, Mr. Tanaka apparently owns over 20 thoroughbred racehorses that have been racing around the world. If Mr. Tanaka cares so much about his defrauded investors, why weren't the horses sold years ago and the proceeds placed in trust for the investors? Unless Mr. Tanaka's sentence includes meaningful jail time, Mr. Tanaka will have made a mockery of the justice system. How can a man who was involved for years in the misuse of millions of dollars of funds entrusted with him and his partner now be described by Mr. Marcus as a person of personal character?

In conclusion, Alberto Vilar told Lily years ago that only stupid people paid their taxes. Alberto told her that if you don't pay your taxes and you are later sued by the IRS, you can then settle for some fraction of what was owed. This seems to be a major trait of Alberto Vilar and Gary Tanaka – wait until you are caught, then settle for less than what you stole. There has been no remorse by Vilar or Tanaka. They have consistently denied any wrongdoing, despite overwhelming evidence to the contrary. Lily asks that you make the time fit the crime. Please send a message that theft by trusted advisors is no less heinous than theft by a burglar.

Very truly yours,

Edward T. Swanson

Edward T. Swanson

cc: Ms. Lily Cates



FEB 2 4 2009

February 19, 2009

Hon. Richard J. Sullivan
United States District Judge
United States Courthouse
500 Pearl St., Room 615
New York, NY 10007-1312

RE: United States v. Vilar, 05-CR-0621(RJS)

Dear Judge Sullivan:

I am writing in connection with the sentencing of Alberto Vilar. I have been told that the Court will consider letters from Mr. Vilar's family and friends, as well as members of the community. I am submitting this letter because I am concerned that the Court will be influenced by claims from Vilar partisans that his crimes were aberrational acts which do not accurately reflect Mr. Vilar's character.

In my judgment, the acts for which Mr. Vilar stands convicted are entirely consistent with the Vilar I know. I am the owner of 3-D Laboratory, Inc. ("3-D"), a local construction firm located on Water Street, a short distance from the Courthouse. In 2000, 3-D was hired by Mr. Vilar to renovate his home at 860 U.N. Plaza. Mr. Vilar acknowledged that 3-D did an excellent job, yet he refused to pay 3-D what he owed, despite many excuses and repeated promises of payment. In 2005, 3-D was finally forced to obtain a judgment against Mr. Vilar all of which remains unpaid. We are not a large firm, and to get stiffed for over $90,000 by Mr. Vilar was a real hardship to the company and its employees.

I am sure that Mr. Vilar, from his position of wealth and power, believed we were a small company that he could treat badly with impunity and without consequence. But it would be adding insult to injury if the Court gave credence to any letters calling Mr. Vilar a man of integrity, a man of honor or a man of his word. That is not the Vilar I know.

Thank you for your time.

Respectfully Submitted,

RANDY POLUMBO

Randy Polumbo
President, 3-D Laboratory, Inc.

cc: Herald P. Fahringer, Esq.
Marc O. Litt, Esq.

268 Water Street New York, New York 10038 Phone: 212.791.7070 Fax: 212.791.7071 Email: LAB@3-DCON.COM

SOUTHWESTERN PENNSYLVANIA EYE CENTER E. Ronald Salvitti, M.D., Inc.
"committed to excellence in eye care"

April 7, 2009

APR 13 2009

Honorable Richard J. Sullivan
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

RE: Alberto Vilar and Gary Tanaka

Dear Judge Sullivan:

I am an investor with Amerindo Technology Growth Fund as evidenced by the attached correspondence executed by Renata Tanaka. I am asking for your assistance to compel Alberto Vilar and Gary Tanaka to provide any information necessary for me to recover my investments.

If probation is a consideration, I would ask that the probation period be kept to a minimum and for the specific purpose of advising the investors of the location of their assets.

If Mr. Vilar and/or Mr. Tanaka do not wish to assist us in locating the assets that we entrusted with them, I would respectfully request that they remain incarcerated for a very long period of time.

Very truly yours,

E. Ronald Salvitti, M.D.

/dcg
Enclosure

750 East Beau Street • Washington, PA 15301 • (724) 228-2982 • (800) 336-2020

# AMERINDO INVESTMENT ADVISORS, INC.

Avenida Samuel Lewis
Edificio Plaza Obarrio
Apartado 5215
Panama 5, Panama
Tel: (507) 264-9673
Fax: (507) 264-9667

April 15, 2004

Dr. E Ronald Salvitti
750 East Beau Street
Washington, PA 15301
USA

**VIA FACSIMILE: 724-228-4367**

Dear Dr. Salvitti:

**Re: Amerindo Technology Growth Fund**

We are pleased to confirm that you currently hold **91,993.83** shares of Amerindo Technology Growth Fund.

Please find below the details of your subscription:

| | |
|---|---|
| Net Asset Value @ 03/31/04: | $21.8900 |
| Total Value of Holding as at 03/31/04: | $2,013,744.94 |

Please do not hesitate to contact me should you have any questions.

With kind regards,

p.p. [signature]

Renata Tanaka