UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v-

ALBERTO WILLIAM VILAR and
GARY ALAN TANAKA,

              Defendants.

No. 05 Crim. 621 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

    The Clerk of the Court is respectfully directed to docket the attached letter.

Dated:      February 2, 2010
            New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/1/10

January 15, 2010

Hon. Richard J. Sullivan
U.S. District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Dear Judge Sullivan:

When we had a conference call in April 2008 about
substituting Herald Fahringer for Ivan Fisher as my defense counsel, you
told me I should feel free to contact you about the case, if I felt a need for it.
It is with your generous offer in mind that I am writing this letter.

Since my incarceration more than a year ago and the
three-and-a-half years under semi-house arrest, I have spent endless hours
trying to understand how, after building a successful business and an
enviable reputation for business acumen, integrity and philanthropy, I could
have fallen so far. Much of what happened resulted from lack of supervision
on my part of the relations between the London and New York operations.
Our clumsy 50-50 partnership fostered its share of mistakes.

For a long time, I was in denial, convinced that I had
done nothing wrong. Only recently have I come to understand that, based on
the evidence presented in court, the jury had no choice but to find me guilty.

To come to this conclusion took a lot of soul-searching on my part. For a
long time, I felt I was the victim, not the wrongdoer. Today, I know that I
am to blame for my fall.

While it seemed otherwise at trial, I consider myself a person of deep moral
conviction. I realize now that I became careless in running Amerindo and
that I let the rules be bent at times. While most of our clients prospered,
including some of those who testified against me at trial, my actions caused
grief to a few clients and friends alike.

I apologize to those whose lives have been affected
by my actions. Nevertheless, I cannot accept the conclusion that I intended
to steal money from anyone. Not from the Mayers, not from Lily Cates.

Neither did I act with the intention of breaking the law. I have always tried to live according to the tenets of my Christian faith. To hear the prosecutors trash me as a thief and a liar and belittle the motives of my charities was devastating.

In the end, I have lost everything – my freedom, my home, my career, most of my friends and my personal fortune.

At age 69, I have little to look forward to. I am not in the greatest health. I ask Your Honor to grant me some time outside of prison during the few years left to me.

I apologize for the length of the document that follows. The purpose is not to take exception to the jury's verdict. Rather, I am addressing issues that have been taken out of context at trial and I reject the accusation that I have lied about a number of things. I am also submitting a special request for public service.

I wrote this document largely from memory and under difficult circumstances. Friends typed it for me. With no access to a computer, a typewriter and my files, there could be factual errors. But whatever I said is what I believe the truth to be.

Thank you for the time and trouble in reading my letter and the attachments.

Respectfully yours,

Alberto W. Vilar Jr

~~if not all hedge funds; they simply report a new asset value (NAV) amount on client statements.~~

## Offering Circular

The reason the first Offering Circular (O.C.), issued in 1984, listed bonds as eligible investments was not to lower risk vis-à-vis equities, but rather to lower volatility. There was no risk to the Fixed Depositors, as they were fully guaranteed by Amerindo. The only risk would have been the demise of Amerindo. The depositors wanted to get the highest yield possible that we were willing to guarantee, without assuming any real risk whatsoever.

The initial allotment for equities was far lower than the allotment for debt because the available universe of technology equities in 1984 to invest in was miniscule. This was before Microsoft, Oracle, Cisco microprocessors, the Internet, cell phones, and HDTV came into being. Over the next two decades, the universe of technology companies exploded, increasing several thousand fold in size. The bond market did the opposite, as explained below. It expanded greatly, but in areas we considered unsafe.

Investing in young technology companies growing at 50-100% a year forces one to be very responsive to change. It was the changes that took place in the bond market, however, that forced us to change the  investment strategy for fixed deposits.  When President Reagan appointed Paul Volcker as Chairman of the Fed, the latter's mandate was to break the back of inflation, when interest rates yielded an unprecedented 21 % in 1981. A deep recession ensued and short-term rates declined. We could have gone back to our handful of fixed-income depositors and told them that the rates they would receive henceforth would be much lower. I discussed this at length with Mr. Heitkoenig. He said that we should alter the mix between stocks and bonds as we saw fit, provided we continued to guarantee the principal and the interest rate.

There were several misconceptions at trial over the question of bonds. First, the Offering Circular listed in 1984 a fixed suggested range of debt instruments: the list was never intended to be unique or exhaustive. Coming off of 21% short-term interest rates and a long Treasury bond rate of 14%, we mistakenly believed in 1984 that we could capture high yields from short-term debt, and top this off with our high performing equity returns.

Pursuant to 1985, it became mathematically impossible to earn the high yields clients wanted from bonds. This was the situation we faced. On the other hand, the equity sector we specialized in exploded in size pursuant to 1984, and our extraordinary performance was indicative of high returns we were able to achieve in our specialty sectors that we were comfortable with. We made the decision to increase equities at the expense of low yielding, bonds because the clients relied on the firm's guarantee.

Next there were a number of debt sectors identified as being eligible in the O.C. in 1984 that subsequently blew up.   The three most notorious sectors were the Government Sponsored Enterprises (GSEs), namely Fannie Mae, Freddie Mac and Ginny Mae; sovereign dollar debt, and ultimately  commercial paper.  The financial system, principally the bond market, blew up in 1986, 1994, and 1998— and then completely imploded in 2007-8, each time greater than the time before.

The most egregious sector proved to be the GSEs, Fannie Mae and Freddie Mac, subsequently labeled the toxic twins, because of their fraudulent misstatement of income on the order of $12 billion, and their forced takeover through conservatorship by the Government, which indicated its insolvency, bankruptcy or both.

By 2008, Fannie Mae and Freddie Mac owned or guaranteed $5.2 trillion of American mortgages, roughly half of the $12 trillion total. In addition to having a Congressional mandate to aid home ownership, both were government-sponsored enterprises (GSE's) that were also public-share-holding companies. They managed, however, to retain an array of special perks that came with their Congressional charters. Their sizable lines of credit implied that the full faith and credit of the government stood behind them. For a long time, they guaranteed issuing banks the mortgages they made, then sold them off through securitized bonds.

Fannie Mae was forced by the SEC and the **Office of Federal Housing Enterprise Oversight (OFHEO)** to restate billions in prior-year profits. An OFHEO report claimed that Fannie Mae deliberately and systematically created earnings "illusions" to fit aggressive earnings targets from 1998-2004. The SEC labeled this as extensive financial fraud. Subsequently, Fannie executives paid $31 million in fines to settle the changes against them. Fannie Mae paid for all legal bills of its former chairman. (I don't believe any criminal charges levied.)

Once the bull market in sub-prime mortgages took off in early 2000s, Fannie & Freddie decided to get into the game as well. They bought mortgage debt securitized by banks for their own portfolio, and guaranteed so-called ALT-A mortgages, loans made to people with substandard credit scores known as "teaser loans." They quickly acquired almost $1 trillion of this poor quality paper. They went on to buy 80% of all mortgages, roughly double their share in a two year period. By early 2008, the two GSEs reported combined losses of $9.5 billion, with total capital of $81 billion, which was only 1.5% of the $5.2 trillion they were guaranteeing.

They justified their purchases of risky loans based on their need to meet HUD's affordable housing goals. Under enormous pressure from banks, the Treasury announced a plan that would backstop all of their debt if needed in mid-2005. The next stop was conservatorship, which wiped out existing shareholders. One of the great paradoxes of these GSE's is that they ended up being a case of the privatization of profits and the socialization of risks, which, it turns out, is about how the nation's entire financial system was operating under the same premise.

Jim Dimon, Chairman of JP Morgan Chase, the nation's largest bank, stated in the bank's annual report in 2008 that the biggest failure of all in the bond market implosion was the inadequate regulation of Fannie May and Freddie Mac. These government-sponsored entities had grown to become larger than the Federal Reserve; their collapse into forced conservatorship caused damage to the mortgage market and the financial system, and implicitly to the credit itself of the United States.

Sovereign foreign debt or bonds was another disastrous area for bond investments during the entire time the Fixed Deposits were in existence. Country after country defaulted on its debt between 1982-2005. In the 1980s, more than 50 countries, roughly 40% of all nations that owed money to private foreign creditors, failed to pay in full on schedule, according to Michael Tomz of Stanford University and Mark Wright of UCLA.

In 1994 Mexico plunged into its worst financial crisis ever and defaulted on its debt. GDP plunged 7%, interest rates spiked to 75%. The US Treasury had to make use of the Exchange Stabilization Fund (ESF), to float a credit line to foreign exchange of $50 billion.

In the late 1990s, several Asian economies, representing one quarter of the world's output and two-thirds of a billion people, experienced a slump resembling

the Great Depression. This proved to be, in retrospect, a rehearsal for the
subsequent global crisis of this decade.

The 1997 devaluation of Thailand's currency, the baht, triggered a financial
avalanche that buried much of Asia. This was followed by a deep recession that
spread across Asia. Within 3 months, Indonesia was in even worse shape than the
rest of Southeast Asia, the crisis spread to South Korea. Their collective lending
was the fact that their debts were in dollars.

In the summer of 1998, Russia's financial situation unraveled and it defaulted
on its debt, setting off a global domino effect across the bond markets.

Brazil and Argentina were next, but worse. Argentina's currency declined by
70%. GDP fell 11% in 2002, overall it declined 18% between 1998-2002.

Amerindo could have invested the entire amount initially targeted for bonds in
any one of the above disastrous sectors, which would have incurred massive losses.

Asset-backed commercial paper, another de facto banking sector, dropped by
almost $750 billion, when Lehman Brothers filed for bankruptcy, as they were the
largest issuer. This forced the Government to provide $1.8 trillion in guarantees.

Unfortunately, many Money Market Funds purchased commercial paper and
mortgage-backed securities. When the nation's largest fund, the Reserve Fund, 60
billion, broke par and suffered a run on its assets, the Federal Government was
forced to provide a $3 trillion guarantee for all money market funds.

The Jury was repeatedly told to assess whether Amerindo had invested the
Fixed Deposits in "super-safe Treasury bills." This was not correct. Amerindo
could have invested 100% of the Deposits in Treasuries, just as it could have
invested nothing in treasuries. There was no express requirement to invest any
amount in treasuries, long or short.  They were an option amongst many others.

Several lawyers who reviewed our Offering Circular confirmed to us that the
manager of the Fund had authorization to alter the mix between stocks and bonds
to meet changing market conditions.

I have to respectfully take exception to the analogy made in Court on
December 14th, which equated not investing in bonds to "putting the money on
horses" and hoping for the best.  This is incorrect.  The Offering Circular allowed a

mix of debt and equities. There is a specific paragraph in the O.C. that allows the Manager to alter that mix, depending on his views of a host of variables that impact financial markets, such as policies, the economy, and rates. The bond portion was never invested in anything even remotely similar to horses. Cash and equities were employed, at the expense of bonds, because we felt it was the prudent investment course of action to take—and we had at all times guaranteed the principal and interest returns. We could have been unlucky and lost 80% in both bonds and equities by following the O.C., and yet clients, legally, would have looked to us to make their deposits whole. Amerindo could have lost the bulk of the corpus invested in bonds if it had purchased AAA rated securitized bonds, sovereign debt, the GSEs, and later on, even commercial paper.

The prosecutors argued that the GFRDAs were a Ponzi scheme. How could this be when no new deposits were taken on after 2000, and almost 90% had been fully redeemed?

The strongest economic cycle in American history, 1982-2007, was driven principally by new technologies, followed by innovations in structured finance, and lastly by population growth. New engineered finance enabled banks to make additional loans, without the need to reserve capital against them, as Wall Street figured out how to spread risk to others, facilitated by changes in regulation, and authorized leverage. As an investment firm, we could not afford to be indifferent to these profound changes.

Well over half of the bond market of the 1990s and 2000s did not exist when the Fixed Deposits were launched. The biggest change in 100 years, far greater than junk bonds, was the securitization of bank assets into bonds. The securitization of credit borne assets from mortgages to credit card receivables, became half of the bond market. They were largely unregulated. An entire new, unregulated shadow banking industry was spawned to securitize bank assets into bonds at lucrative fees to banks. They offered much higher yields on both short and long term bond instruments. They were considered as safe as treasuries, given that they were virtually all (90%) rated triple A (AAA); were insured by publicly listed stock exchange companies, and were underwritten by the likes of JP Morgan Chase, Citigroup, Bank America, UBS, Merrill Lynch, Morgan Stanley, Bear Stearns and Lehman. This made them very attractive to bond buyers seeking higher yields in a world of secularly declining interest rates.

Banks like Citigroup went a step further to create Structured Investment Vehicles, SIVs, that were labeled 'super-senior' to denote they were safer than

treasuries, and were financed with short term notes to attract a greater investor following. They also blew up when the bond market imploded. (We had a very close relationship with Citigroup because we managed funds for them)

Amerindo had an unusual ability to critically assess the risks of the AAA rated, new securitized bonds. First, the industry kicked off in London to get around Glass Steagall, where we were in the 1980s. Second, my partner and I had advanced degrees in math, and saw through their engineered structures, especially the so-called synthetic bonds and swaps. I had worked at Drexel Burnham in the 1960s and early 1970s, which pioneered junk bonds. I also managed Yale University's huge bond portfolio throughout the 1970s.

The structural changes in bonds, which we considered speculative, led us to make our third investment call in our 25 year history, after calling correctly the emerging technology and biotechnology revolutions. Our final call was to avoid the bond market.

I think it is inconceivable that Amerindo would not have purchased these new, higher yielding securitized bonds, as everyone else did, starting with the underwriting banks themselves, unless in fact we were fearful of the new inherent risks more than half of all bonds had taken on due to securitization, most of which blew up. (Overall bond losses are widely estimated at $4 trillion.) The technology equity market we invested in changed by several orders of magnitude during the life of the Fixed Deposits, but the O.C. was never reissued to reflect these truly profound changes.

The story of the triple A credit ratings on securitized bonds is a story of colossal failure. Congressman Henry Waxman, at a hearing of his Committee on Oversight and Government Reform in 2008 said that the rating agencies broke their bond of trust, federal regulators ignored the warning signs, and did nothing to protect the public. The results were disastrous.

I have not even mentioned the huge credit derivatives (debt) market, which acts as an insurance market for bonds, which was in the tens of trillions of dollars.

The bond market implosion this decade that fueled the biggest financial and economic crisis since the Great Depression, resulted from 3 decades of Wall Street greed and government mismanagement. Securitization was started in the late 1970s by Ginny Mae. Opaque, financially engineered leverage was the key to its

success, which the government helped enable, that saw leverage increase from 5 to 1 to 38 to 1 in the case of Bear Stearns and Lehman.

Overturning Glass-Steagall helped the bankers be able to issue risky new bonds, as did the SEC when it passed an amendment to allow big firms on Wall Street to self-monitor their risk, using any measure of risk management they wanted. It allowed all triple A securities to be treated the same, effectively allowing banks to hold the same amount of capital to support them—as they did for ultrasafe treasuries!

The housing crisis and bond market debacle were able to spread because regulators, bond raters, risk modelers, and the business media didn't really understand the perils of risk and leverage. Wall Street, government watchdogs, the Federal Reserve, and the Treasury were in retrospect largely clueless about the potential for massive losses and a large system-wide meltdown of the financial system, even as every major firm on Wall Street held tens of billions worth of illiquid, difficult to value, toxic mortgage bonds.

Every investment fund I have ever seen contains a standard *force majeure*-clause. These clauses are designed to protect the investors, precisely when market upheavals take place for whatever reasons. It is human nature to sell on weakness, into falling markets, and *force majeure*-provisos give the Fund Manager authorization to suspend redemptions precisely so that they will not have to liquidate assets in declining markets.

I would have to believe that this feature was put into Amerindo's domestic fund, and its Cayman Island fund. That it didn't appear in the Panama Fund was an oversight by the local lawyers, as all funds contain this protection. Perhaps it's conceded automatically in Panama?

When the bond and stock markets imploded this decade, many, if not most, hedge funds, real estate funds, and the like, invoked *force majeure*. In fact, most hedge funds told investors that they could not redeem for 3 years.

After the technology bubble burst followed by the recession of 2001 and the 9.11. attack on the World Trade Center, liquidity dried up in public and private technology companies.

The worst decline technology ever sustained with Nasdaq off in 2002-2002 80% plus, warranted the firm not selling into the protracted tech bear market.

Notwithstanding this, all of Steven Gray's clients, representing 75% of all deposits, were made whole. The only major account not made whole was the Mayers, although they were paid over a million at that time, I believed, and told that they would be made whole, with interest, within 4-5 years. I believe London paid them $600,000 the first year, 2005, against the terms of a negotiated settlement done in London.

As I indicated above, when the bond market implosion we sought to avoid finally happened, the government had to guarantee $3 trillion in money market funds; $1.7 trillion in commercial paper. The nation's largest money market fund, The Reserve Primary Fund, at $60 billion, took almost 20 months to redeem 92% of its assets. When Bear Stearns' bond fund, the High Grade Structured Fund, which had been marketed as a very safe, low risk fund got into severe difficulty, all redemptions were arbitrarily halted, as well as redemptions on at least two other large bond funds. The High Grade fund lost virtually everything, close to $1.5 billion. I do not recall that the indictment against the 2 fund managers at Bear Stearns included charges for their enforcement of *force majeure*. The High Grade Fund was 90% in AAA rated bonds. The limited partners were seeking to withdraw $300 million at the next available redemption date. The other 2 funds, also suspended for redemptions, had over $1 billion in client funds.

I've cited my reasons above for why I believed bonds had become inappropriate to use, notwithstanding the firm's guarantee to make all deposits whole. (The clients benefited enormously by our decision not to ride the yield curve down; clients likely earned 200-300% higher overall returns over available short term rates.)

I also had no involvement whatsoever in the daily investment management of the Fixed Deposits run by London. Mr. Tanaka, unfortunately, did not always follow my investment directives, which occasionally proved costly to us.

When I made numerous bearish outlook pronouncements on technology on TV and in press conferences in late 1999 and Spring of 2000, he failed to quickly raise significant cash levels as the Investment Committee I chaired had directed. (Mr. Tanaka was a trader, while I, with an MBA and being a Chartered Financial Analyst, CFA, exclusive of my math's graduate work, did all fundamental research on technology and the economy and stock market.)

(A) We effectively ran 98% plus of the firm's assets, including research, client services and marketing. America ranked No. 2 in the 1980s, No 1 in the 1990s

I asked my partner on numerous occasions about bonds, and he always responded that the clients were very pleased with what they were getting, and relied on the firm's guarantee and no one ever inquired about bonds. He also felt, as I did, that the Offering Circular allowed us to alter the mix between debt and equity if warranted.

The government argued that we had solicited clients under false representations. The truth is that virtually all of our small number of Fixed deposit clients were either referrals or "walk-ins." This was the case with, for example, Dextra, Coburn, Cox, Lecube-Chavez. I never met any of Steven Gray's clients. My partner and I both felt we were doing these clients, mostly friends of the firm, a major service that they could not get elsewhere. We were responsible for any losses suffered by our investments, as the deposits were guaranteed. No one ever lost a cent in over 20 years. We were guilty of unintentional clumsiness, but not criminal intent.

The final tally of 3 decades of risk taking and leverage through bonds is daunting. Banks are still saddled with conceivably as much as $5 trillion in problem debt and assorted securitized bonds, mostly downgraded.

The government has had to provide direct bail-outs and guarantees of $7-9 trillion. More than $13 trillion in household wealth was destroyed. The final cost with continued weakness in commercial real estate and housing, could reach $30 trillion.

The bond market implosion has left the US crippled. Unprecedented federal spending, unending fiscal deficits, virtually unheard of accumulated debt levels, are the trends shaping the nation's future. A weak dollar is in store. By 2019, the Federal debt is projected to reach $23 trillion, a doubling from now. The deficit will exceed GDP by next year. This accounts for why only China, Russia, Brazil and the oil Gulf States are angling to invent a new global currency to preserve assets. The US recession has sapped state tax receipts. Budget shortfalls are projected to reach $350 billion next year, threatening the $3 trillion dollar deficit.

The technology-biotechnology investment calls we successfully made were difficult because there was no precedent. This was not the case with the rank speculation in housing and structured debt that could only end in pain.

<u>Lily Cates</u>

I mentioned above that our awkward partnership structure played a major role in our client relationship with Lily Cates. Ms Cates was one of our first two US based clients in 1986. She commenced her account at Amerindo with the sale proceeds of a bond portfolio worth $1.2 million. She increased her initial contribution some 15 years later by $4.3 million, net of withdrawals, which collectively grew through capital appreciation to roughly $20 million. She took out more than twice what she put in, and her balance at the time the firm was closed, was just over $9 million, which is at JP Morgan now.

My partner and I had equal shares in the firm that I had started in 1980. Over the years, especially when the firm's growth in assets exploded on the upside, the equal ownership created voting problems whenever there was policy disagreement. I have already mentioned the 10-year running battle we had over closing Panama and London. I searched high and low, and consulted our outside lawyer Rick Cohen many times, for a solution to the voting-blockage problem. Short of buying out my partner's share of ownership, which I tried to do, there was no solution to the problem, except by changing the ownership structure.

When Lily Cates contacted me in the summer of 2002, after she had returned to New York, following the sudden death of her third husband after nine months of marriage, she asked me for my opinion as to how to invest the money she expected to receive from her late husband's estate, which would be between $5-10 million.

I told her that the timing could not be better for our specialty technology sector, owing to the four consecutive blows technology had suffered in the prior two years from the Y2K issue, the bubble-burst in technology, the recession and 9/11. Prices were at historic lows in both public and private companies, with NASDAQ having declined close to 85% between 2000-2002.

Lily Cates wanted to invest $5 million with us. She expressly wanted to be formally accepted as a partner and expressly co-invest in our private securities. In fact, she had a very aggressive financial goal, which was to increase her account from roughly $10 million to $50 million in five years. I told her that we did not make representations about future performance, but that the timing was incredibly unique and that she could quite possibly realize those goals over a 7-year period by co-investing with us in privates. Again, bonds were never an option for her.

We had never given or sold equity in Amerindo to anyone before, much less to an existing client. However, I saw the possibility of solving the partnership structure problem by bringing Ms Cates on as a partner. At trial, Gary Tanaka's attorney, Glen Colton, said that I had made a special deal with Ms Cates. This was true, but it was one I had discussed very thoroughly with GaryTanaka. (This was his authorization to dispose of her $5 million.)

Under the 2002 deal, Cates' $5 million would get her a 2% equity in Amerindo (US); she would become an equal (1/3) general partner in a new private equity technology fund we were expecting to launch, and we would immediately sell her $5 million of our private holdings, which would be contributed as equity for a limited partnership investment for her in her new proposed fund.)

Amerindo would be selling her $5 million of privates, thus increasing our own liquidity after the bear market in technology which appealed to Gary Tanaka. Cates would have $5 million in privates, which would be reflected immediately on her account statements to be used as "currency" for the new technology venture fund. Moreover, Cates  would get a 2% equity stake in Amerindo, and would be an equal General Partner in the new private equity fund. This would represent a one-third interest in the general partnership, which would earn a 2% management fee, and 20% of all capital gains. This was an extremely generous offer, no one else even remotely received in our 25-year old history.

I instructed our outside US counsel, Rick Cohen, to give Lily the 2% equity. I only learned at trial that GaryTanaka had told her this transfer of equity was impossible to do. Neither Rick Cohen, nor Lily Cates, nor Gary Tanaka ever told me that the transfer had been stopped. I would never have gone back on my word about the equity arrangement I promised.

As though we couldn't do enough for Cates, the second tranche of $5 million we told her would be guaranteed up to the actual launching of the new private-equity fund. At first I told Gary Tanaka to transfer $5 million of privates to her name. He correctly responded that it would cost a 2% transfer fee for privates and that the $5 million would be guaranteed. He also argued, again correctly so, that we would have a better idea of which privates we intended to give her as we got closer to the funding-launch date of the new fund. I completely agreed with his thinking.

I initially also told Cates that the SBIC fund had been approved subject to final funding. I told her this because it was what I was given to understand

incorrectly by Carlos Castellanos at our firm. Cates said she wanted us to put her money to work in the private co-investments she was going to be making as a partner with us right away, and didn't want to wait for the final funding approval. I agreed to do this.

I subsequently realized I was wrong about the status of the SBIC approval, and had numerous discussions with her and Joey Salerno about it. Lily did not give us the $5 million because of the SBIC. She did it because we had done a spectacularly good job for her, because she wanted to be a partner in the firm, and because she believed we could multiply her account several fold in value. It would not have made any difference to her if we had ended up going to market with the Smith Barney-Amerindo underwritten private-equity fund, or our own internal fund with Amerindo pension clients. In short, what Lily asked for and got was co-investing in privates and an equity stake.

During the next two years, I kept Lily Cates apprised of the $5 million principally through her boy friend, Joel Salerno. In all the 17 years I knew Cates and had her as a client, I never directly discussed her portfolio, her holdings, or the market. Our lunch or dinner meetings, usually about three a year, were strictly social. Cates had no interest in the world of investments per se. Joel Salerno did.

The one exception was an investment she made in a medical software company called Hamilton Software. As a favor to her, I had our staff meet with the founder of the company from South Orange N.J. in our office. We recommended she not increase her investment in Hamilton, which would have been significant. I believe her investment did very poorly.

Cates was always treated as an insider at Amerindo. She was never charged any fee in all the years she was with the firm. She used the offices at will, had Amerindo calling cards made up, and might even have had medical coverage.

In sum, I did make a "special arrangement" with Lily Cates in 2002, which I informed my partner Gary about, in an effort to get her a voting entitlement to break the frequent logjams we had. There was, of course, no certainty as to how Lily would vote on any issue, but at least decisions would not continue to be log jammed. For the generous offer of equity and the division of profits Cates was made, we received no financial consideration. The $5 million did not buy her equity in the firm; it bought her $5 million of private equities.

Cates also had a residual interest in a private investment called Rhodes. This dated back to 1989. I believe it returned about 500%. When the fund was wound down, the handful of investors was offered a cash redemption, or the ability to have us reinvest the proceeds in our sector. Lily chose us. When she decided to redeem in 2005, she had to wait for the investments to be liquidated, as there is no public market for private placements.

I told Cates' lawyer Ed Swanson that we could also send Cates the private securities for them to hold or sell, although I did not recommend this. They can only be sold to another qualified investor, which is quite likely to be another institutional investor like Amerindo, which probably had invested in prior rounds of the companies we held.

At a Franks hearing in Court under Judge Karas, I believe in summer 2006, the prosecutor Marc Litt testified that Cates had been stonewalled by me for 17 years; that she had received only $170,000 from Amerindo, and that she knew nothing about Rhodes. Fortunately for us, Jeff Hoffman, my attorney at the time, produced substantial documentation in court that showed the monies she had received from Amerindo came to nearly $12 million, and all the letters she had received over the years on how successful Rhodes had been. (Lily claimed she was dyslectic and could not read.)

Cates did very well at Amerindo. Her gross return was over 300%, but the time-weighted rate of return was several times was substantially higher: $1.5 million going to almost $12 million. As Tom Lopez of the Los Angeles Fire & police said, performance was spectacular. Returns on Rhodes were around $500;% she was only one of six people allowed in. She expressly wanted to see high turnover activity, which really wasn't consistent with our buy-and-hold strategy – but it was what she wanted.

I believed our bases were covered with Cates. We had full discretion to buy private and public securities and invest her account in various funds we had. The investment business is based on oral agreements which are legally binding. (B)

In retrospect I failed to appreciate in 2004 that Cates was annoyed with both Gary Tanaka and his wife, Renata for three separate reasons. First was her fear of not getting the equity she had been promised . Second was the $2 million adjustment London had debited to her account in the 2003 period, which I had argued against. Third was that Gene Ross, her bond broker at Bear Stearns, who tried to get her to transfer her account with Amerindo to Bear Stearns, had raised

(B). No securities, public or private, were ever held in Cates' name, during her 17 years with us. The $5 million in Lily would have been registered in letter a funds name or Amerindo

questions about a debit-transfer to her account, which I did not know about. I told her, as I later told Gene Ross, that Gary had authorization to debit her account and intermediate the proceeds to her Amerindo investments, whether they be privates or funds. Such a transaction would appear with an immediate value-credit on her statement. I thought nothing more of the matter and harbored no doubt that Gary Tanaka had the authority to carry out any such transaction. Cates, at her own request, was increasingly being treated as a partner.

Also not raised at trial by my attorney, Mr Fahringer, was the fact that Amerindo had been losing interest in the SBIC fund, owing to ongoing delays, and Amerindo's remarkable recovery of 240% since the 2002 technology-NASDAQ bottom. If anything, the SBIC needed Amerindo far more than Amerindo needed them, given the technology investments they had admitted to us were well under water. I had been told at different times over the course of five meetings by the two most senior officials at the Small Business Administration, Mr. Christiansen and Mr Barreto, that approval of Amerindo was a matter of when, not if..

In January 2001, an administrative law judge, seemingly deep in the bowels of the SBIC, enacted new policy reversing existing law on SBIC investments. The judge ruled that companies could not have more than 50% of their equity capital owed by venture capitalists, like Amerindo, fund many of the most innovative companies in Silicon Valley. Venture ownership is very different from large corporations, as the former are generally required to sell their equity stakes within a decade or less of initial investment. In certain industries, such as biotechnologies, venture financing is not a choice, as the complexity of the business requires sophisticated investors. This ruling led to an uproar in the industry and gave Amerindo great cause for concern about the SBA. In 2005, the SBA issued a new ruling, largely retracting the 2001 decision. It required the venture capital firm doing the investing employed fewer than 500. But the SBA's staffers continued to do all they could to frustrate participation of venture-backed firms. Harvard professor J. Lerner describes SBA attitudes toward venture capital as a kind of madness that reflects a deep failure on understanding how entrepreneurial finance works. This was all very unfortunate for all parties. A single dollar of venture capital has been estimated to generate as much innovation as three dollars of traditional corporate research and development.

The SBA had been a major factor during the 1960s promoting venture activity, with federally guaranteed risk-capital pools. Economists have well understood since the late 1950s that innovation fuels economic growth. Technology has been the principal driver of productivity growth, as it changed how

## II. CONTRIBUTIONS TO SOCIETY

a) Military Service – 1958-1970 inclusive

Volunteered for active duty.  Served 4 years in R.O.T.C, 2 ½ years of active duty. 5 ½ years on Reserves call-up. Platoon leader in Armored Battalion Company, assigned to field duty on East German border at the height of the Cold War. Promoted to Battalion Supply Officer, Custodian of Nuclear Weapons—with Special Clearance.

_____ Note: I might well have stayed in the Military and made it my career were it not for a family financial crisis. My family lost all business assets and income from Cuba due to expropriation by Mr. Castro. This situation put pressure on me to return home to Puerto Rico, where my family had settled, and help out financially. One of the great regrets of my life was not to have stayed in the active Reserves; the military was a natural fit for me, where I served with distinction.

b) Pioneering Role in Helping Unknown and Unproven US Companies Establish Global Leadership in Electronics and Biotechnology.

I enabled US start-up companies to garner global leadership roles in electronics and medical technology. The company I founded, Amerindo, was the first pension fund investment management company in the early 1980's to establish large equity ownership positions in venture-backed technology companies in Silicon Valley.

These were unknown and unheard of fledging companies that had no access to bank financing or the credit/bond markets. Only two very specialized investment companies, one in venture capital, Kleiner Perkins Caufield & Byers, and the other Amerindo, played pioneering roles in helping these US companies by investing pension funds in them. They were: Microsoft, Oracle, Adobe, Symantec, Cisco, Yahoo, EBay, Google, AOL and Dell (to name only a few, among more). Today, these corporations are household names.

In biotechnology, examples of companies that Amerindo helped to establish global leadership positions were: Genetech, Chiron, Amigen, and Medimune. These companies would not have been able to conduct research, develop their new drugs, and eventually succeed, without major pension fund investment. In the process, Amerindo's daring foresight and investment capabilities made billions of dollars for its pension and endowment clients. Amerindo's huge investments in

these emerging technology companies attracted other pension fund managers to invest in them.

When hedge funds came into their own in 1990s and grew to $2 trillion, it would have been easy for Amerindo to change its specialist mandate to that of a technology hedge fund. We had the record and the resources to carry this out. Instead, we continued to manage long-standing public retirement funds such as Seattle, Michigan, Houston, California and the Los Angeles Fire and Police Department for a fraction of the fee hedge funds charge. Our public fund fees were typically 40 basis points, 4/10's of 1%, versus hedge fund fees of 2% management fee and 20% of profits. These public funds, plus endowments, became a form of public service to society for us.

c) Charitable Contributions

Over a 30-year period, I contributed tens of millions of dollars to the following groups and institutions:

1) Education 2) medical research and the 3) performing arts.

Over the 25-year history of the pension investment management company I founded, that pioneered and specialized in electronics and medical science and technology, I only accessed 15% of the wealth I accumulated and gave away roughly 80% of that amount. The record of charitable contributions made by the entire U.S. population is about 2% of personal income.

d) Highlights of my charitable work:

- I invested 1 day a week in non-profit Board activities

- I contributed monies that often served as leadership gifts and in turn enabled the respective organizations to launch fund-raising campaigns, which cannot be done without leadership gifts.

   - Usually I was the only outside Board member with a background in science & technology, which placed me on numerous additional operational committees.

<u>Principal Charities supported:</u>

-New York City:

      Metropolitan Opera
      New York Philharmonic
      Carnegie Hall
      Brooklyn Academy of Music
      New York University
      St. Thomas Church
      Hospital for Special Surgery
      ~~Columbia Medical Center~~
      Maazel-Vilar Conductors Competition

- Outside NYC:

| | |
|---|---|
| Bravo Colorado | (Vail, Colorado) |
| Vilar Center for the Arts | (Beaver Creek, Colo.) |
| Washington & Jefferson College | (Washington, Pa.) |

- International:

| | |
|---|---|
| Royal Opera House | (London) |
| Mariinsky Opera & Ballet | (St. Petersburg, Russia) |
| Prince Wales Foundation | (England) |
| Salzburg Festival | (Austria) |
| Vienna State Opera | (Austria) |
| Musikverein Concert Hall | (Austria) |
| La Scala | (Milan, Italy) |
| Spoleto Music Festival | (Italy) |
| Glyndebourne Opera | (England) |
| Salzburg Seminars | (Austria) |
| Festspielhaus | (Germany) |
| Austrian American Medical Foundation | (Salzburg, Austria) |
| Bayreuth Festival | (Bayreuth, Germany) |

-Full Student Scholarships were provided at the following:

University of North Carolina
Harvard University
Duke Medical School
Northeastern University
Reenselear Polytechnic Institute
Cornell University
Boston College
~~Fordham University~~
University College (Dublin)
Richmond College (University of London)
Bristol University (England)
Chinese Universities (Beijing & Shanghai)
Hamilton College (partial)
Dennison University
University of Connecticut (at Storrs)

-These are the students whose college education I paid for:

Panjak Uppal (partial)
John Burke
Pat Walsh
Caroline McOustra (Veterinary Medicine)
John Walsh
~~Daniel Walsh~~
Emily Walsh
Hunter Cherwick
Mario Gaztambide
Karl Gaztambide
Josephine Sciarrino

- Summer School Tuition:

Harvard University (3 students, 2 summers)
Middlebury College (Language Study)

- Prep School Tuition

Middlesex School (Concord, MA.)

-Board Directorships:

Vail Valley Foundation
Hospital for Special Surgery
Columbia Medical Hospital
Metropolitan Opera
Austrian American Foundation
Washington & Jefferson College
Los Angeles Opera
Chicago Lyric Opera
Institute for International Education (Fulbright)

I financed the undergraduate college education and graduate and professional education of two students I was especially very proud of; their respective graduation days were two of the happiest days of my life.

John Walsh – Harvard University – B.A. (cum laude) & an M.A. in Middle Eastern Studies (Arabic). Mr. Walsh now works for the C.I.A.

Hunter Cherwick - Duke Medical School (graduated 2nd in his class). Dr. Cherwick works for a U.N.-affiliated medical organization, ORBIS, treating blindness in Africa, China & the Middle East.

I purchased or built eight homes for needy family members, low-income friends, and loyal and deserving staff:

Mario & Jacqueline Gatzambide
Sheila Hanna
Peer Berg
Bryan Harvey
Pilar Perez
Diana Cooper
Father, stepmother & sister

As a result of my wide-scale philanthropy, I have been publicly recognized and have been bestowed honors for contributions to the Arts, Medical Research and Education.

In many ways, I became an "Ambassador-of-Goodwill" for the US in Europe, England and Russia. American-style philanthropy in the Arts, Health Care and Education is largely unknown in Europe and Russia. This led to widespread

recognition by Prince Charles and the late Queen Mother of England, the Ministry of Culture of Germany, and the President and Chancellor of Austria, as well as the Governor of the Province of Salzburg, and the former President of Russia, Mr. Putin. I had many grateful friends in Europe for my contributions to their culture and lifestyle.

In the Arts, I helped develop, at a cost of several million dollars, the technology that allowed simultaneous translation of opera productions into 8 languages. These subtitles appear on screens installed on the back of seats for close view by the audience. The installation of the translation titles was immensely costly. The company that developed the software for simultaneous language translations went bankrupt. I acquired the company and became its only client for a number of years. In addition, this technology was also installed through my efforts at 3 major houses of opera in Europe.

The bulk of my giving in the classical performing arts, namely opera, ballet and classical-orchestra music, which was done to preserve this great legacy of our cultural past, took three forms. I underwrote the cost of many operas, which included production sets and costumes.

I supported 5 international programs to grant 2-year scholarship awards to emerging young artists. I also paid for the training of managers to run Arts institutions. These training programs took place in the U.S., England and Russia. Lastly, I sponsored summer tours, which included the Metropolitan Opera Orchestra to Europe, and the NY Philharmonic Orchestra Concerts in the Parks in NYC boroughs.

I provided principal funding for the best-known opera annual contest in the world, based in Paris, known as Operalia, co-managed with Placido Domingo.

I provided substantial funding for the principal Opera & Ballet Company of Russia, the Mariinsky, to perform in the US and Baden-Baden, Germany.

I received in 2002 the European Arts Award and 2 gold medals from Austria for my numerous gifts of philanthropy to that country. The German government sponsored a film on my philanthropic giving in Europe that was widely shown on German TV.

I funded the entire office cost, including staff, for three cultural organizations for over 3 years:

- Salzburg Festival (Austria) US office

-White Nights Foundation of US (St. Petersburg, Russia)

> I was the President of the Foundation
> Prince Charles of England the Chair.

-Maazel-Vilar Conductors Competition

I was especially active at the Board level in the health care field. For example, at the Hospital for Special Surgery, ranked #1 nationwide for orthopedics, I served on the Board, the Executive Committee, and was the only lay Board member on the Graduate Medical Education Committee. HSS receives 800 applications a year for residences in orthopedics; to fill 8 slots a year. As a Board Member, I oversaw the Department in charge of all clinical trials, technology investments, and technology transfer.

I was on the Scientific Advisory Committee of Columbia Medical School. I was affiliated with two other very prominent medical institutions at the committee level, and it is likely I would have eventually assumed a Board role, at Harvard Medical and at the National Jewish Medical Center in Denver.

I was fortunate to have received three Honorary Doctorates for achievement in the Arts and Science and Technology.

I was named Citizen of the Year in 2001 in Vail, Colorado.

I was honored as a naming founder for a performing arts center in Vail (Beaver Creek, Colorado) that carries my name, I also sponsored an outdoor park with the late President Gerald Ford, which was named after both of us.

I funded three undertakings for Washington & Jefferson College (my alma mater). I provided a leadership gift for a 70,000 sq. ft. Center for Computer Technology.

I organized an independent, outside committee at a cost of $500,000 to undertake a 3 year study of the curriculum with the expressed goal of increasing that college's national ranking. Four of five recommendations for curriculum change were, be coincidence, similarly adopted by both Harvard and Yale in their

first major undergraduate curriculum change in 25 years. The changes included life sciences, foreign languages study, overseas study and computer science. My alma mater, having a limited endowment, chose not adopt the proposed changes.

In 2000 and 2002, I was featured as the "Hispanic Businessman of the Year" on the front covers of Hispanic Business and Hispanic Magazine respectively.

## III. Special Request for Public Service ( C )

The Department of Veterans Affairs runs the nation's largest health care system and is the second largest agency after Defense. Eight of the nation's 24 million veterans are enrolled, with enrollments itself growing robustly as a result of two wards, the recent expansion of certain programs and the reinstatement of benefits for hundreds of thousands that had been discontinued. It has 300,000 employees, servicing 153 hospitals and hundreds of outpatient clinics.

While its critics have complained of a system with antiquated technology, to its credit, it was early to switch to digital records with impressively good results. (The government has just authorized $20 billion to help hospitals and doctors switch to digitized records.) The VA's electronic system allows the sharing of patient information at all its myriad facilities, which amongst its benefits, reduces repeat ordering of many unnecessary tests. It also keeps the VA to monitor outpatient care at home, especially for chronically ill patients with diabetes and heart failure. Automatic reminders have boosted performance in many areas. Admission and stays have been substantially reduced through electronic monitoring, as have medical errors.

The VA turned to electronic records out of necessity, given its huge patient population and widespread scattered facilities. It has been sharing lab results and medical information through its Vista systems for the past two decades (The VA is now run by retired former Army Chief-of-Staff, General Eric Schinseki, whose lustrous cancer I have followed and who does not have a medical or life sciences background.

With critical care specialists increasingly in short supply and 90% of medical graduates going into specialty fields, plus the coming shortage of doctors owing to the aging of the population, the VA is a prime candidate to adopt remote electronics, intensive care monitoring. The Department of Human Health & Services projects the demand for intensivists will continue to outstrip the supply for the next several decades. One doctor and 3-4 nurses in a remote center can oversee the care of 75-100 patients. 40,000 alone are enrolled in the VA's home monitoring program, where automated reminders boost performance in many areas and reduce errors by an electronic monitoring system.

(C) This section should have started with the second paragraph on the next page; This page should have appeared further on under Public health organizations + social service

While science is at the threshold of identifying the genetic susceptibilities and predispositions for many common diseases and it is within our near term reach to create drugs that could predict, diagnose and treat some of the world's deadliest and debilitating diseases, US spending for biomedical research has been steadily declining, on a per-capita basis, for years. Spending had been stagnant since the early 2000s. Many other nations, especially Europe have increased their spending and have dramatically closed the science gap that long existed with the US. This is a critical time to reassure US global leaderships in biomedical research which I was fortunate enough to be a key participant in. I feel assured I could help a major organization like the VA to exploit the changes that lie ahead.

In the last part of this letter, I am respectfully requesting that I be allowed to undertake a very specific role in public health service in lieu of incarceration. What I propose is putting the very specific technical skills and knowledge I acquired in electronics and genetics over 3 ½ decades, to helping the US usher in the biggest revolution in science in its history, that is expected take place over the next two decades.

I was very fortunate to have played a key enabling role in the successful scientific and technological development and commercialization of the two dominant sciences of our day, electronics and biotechnology, in which the US garnered an unrivaled global leadership position. As explained below, the nation's ability to repeat its earlier achievements in the next 2 decades, will largely determine its economic fate over the next several decades, especially after having sustained its biggest financial crisis in 70 years, still with us.

The first half of the 21st Century will witness three overlapping revolutions: in genetics, nanotechnology and robotics (artificial intelligence). Genetics will eliminate many diseases and usher in radical life extension. Regenerative diseases, i.e. progressive diseases such as heart disease, stroke, cancer, diabetes, liver and kidney disease account for about 90% of deaths, and consume 80% of healthcare expenditures. Significant results have already been demonstrated in attacking the key biochemical steps underlying the progress of such diseases.

The coming ability to carry out targeted medical procedures at the molecular level will bring unprecedented power to medicine. Nanotechnology is used to describe a variety of nano-scale technologies that

can construct objects with atomic-scale control, in which things are built atom-by-atom. There are no tools today for working with three-dimensional control at the molecular level. The Human Genome Project, once thought impossible, is now widely regarded as routine and destined to revolutionize medical science. So, too, will nano-medicine come to dominate medical technology during the first half of the 21st century.

Humanity is poised at the brink of completion of one of its greatest enterprises. Our growing ability to repair traumatic physical injury, eliminate pathogens, and alleviate suffering using molecular tools will begin to coalesce in nano-medicine. This will include working on all human biological systems at the molecular level, using engineered nano-devices and nano-structures.

Molecular biology became the premier scientific discipline of the late 20th Century, centered around the common language of chemistry. I take considerable personal pride in having provided my company's investment funds that contributed to the launching of the molecular age of basic biological science. The molecular influence pervades all the traditional disciplines underlying clinical medicine.

Human health is fundamentally biological and biology is fundamentally molecular and chemical. The ongoing revolutions, in genomics, proteomics, and bioinformatics, provide detached and precise knowledge of the workings of the human body at the molecular level. The understanding of life advanced from organs, to tissues, to cells, and finally to molecules, in the 20th Century. This deep molecular familiarity, with the human body will set the stage for a major shift to medical engineering.

We are now set to embark upon an era in which our natural physiological equipment may for the first time in history become capable of being altered or improved due to advances in medical technology. Nano-medicine requires the ability to build structures and devices to atomic precision, making molecular nanotechnology and molecular manufacturing key enabling technologies for it.

As the last century was coming to a close (circa 1997), the Department of Defense, The National Institute of Health, and the National Science Foundation began to seriously consider the potential future applications of molecular nanotechnology in medicine. While planning

beyond a decade is rare, in any society, our lives span over the better part of a century. How are early decisions be made when the field has no experts? Who lays claim to expertise in nano-medicine? No one! Who has spent their career in a field just being conceived? No one. (This was the landscape Amerindo faced in 1980 in electronics and biotechnology).

Nanotechnology, the sub-atomic world of the manipulation of atoms, promises the tools to rebuild the physical world, including ourselves, molecular fragment by molecular fragment. With the advent of full-scale nanotechnology only a decade from now, the potential will exist to replace biology's genetic-information repository in the cell nucleus with a nano-engineered system that could maintain the genetic code and simulate the actions of the computer in the biology's own assembler.

The molecular manufacture of nanobots that can travel inside the bloodstream thousands of times faster and stronger than biological cells. The switching speed of nanotube-based computation will be millions of times faster than the extremely slow transaction speed of the electrochemical switching used in mammalian interneuronal connections.  By the 2020s, molecular assembly will provide tools to effectively combat poverty, assist in cleaning up the environment, overcome many diseases, and extend human longevity.

Nanoparticles will be harnessed to deliver treatments to specific sites in the body. Nanoparticles can guide drugs into cell walls and through the blood brain barrier. Computerized devices implanted under the skin can deliver precise mixtures of medicines from hundreds of nano-scale wells inside the device.

In the next 1 ½ decades, the price-performance of computation and communication will increase by an 'x' factor of 10 to 100 million compared to today. The law of accelerating returns will govern all technologies, including physical technologies such as manufacturing and energy. All technologies will essentially become information technologies, including energy.

A prime example of the application of precise molecular control in manufacturing will be the deployment of billions of nanobots. Reconfiguring biological systems through engineering on a molecular scale will usher in the age of nanomedicine. Nanobots in the bloodstream, which will be under

our control, will destroy pathogens such as bacteria, viruses, and cancer cells, and will communicate with one another through the Internet. When nanotechnology matures, it's going to solve the problems of biology by overcoming biological pathogens, removing toxins, correcting DNA errors and even reversing some of the sources of aging.

Of the three primary revolutions underway, robots could be the most profound. This is essentially another word for artificial intelligence, AI. The internet is evolving into a worldwide grid of computing resources that can instantly be brought together to form massive supercomputers.

Paradigm shifts in technology typically start with a period of unrealistic expectations based on a lack of understanding of all the enabling facts required. While utilization of the new paradigm increases exponentially, early growth is slow until the knee of the exponential curve is realized. When the prospects do not quickly pan out, disillusionment sets in. Yet today, many thousands of AI applications are deeply embedded in the infrastructure of every industry.

The advent of strong AI is likely to be the most important transformation this century will see. It's comparable in importance to the advent of biology itself. It will mean that a creation of biology has finally mastered its own intelligence, and discovered the means to overcome its limitations.

The intertwined revolutions of Genomics, Nanotechnology and Robotics will transform our presently frail bodies into a far more durable, disease-free, and capable version. Billions of nanobots will travel through the bloodstream of our bodies and brains. The role of work will be to create knowledge of all kinds, from music and art to math and science.

Computers started out as large, remote machines(mainframe) in air-conditioned rooms tended by white-coat technicians. They moved into our desks (desktop), then under our arms (laptop), and now into our pockets (Blackberry). Soon we'll routinely put them inside our bodies and brains. In time we will become more non-biological than biological. Computers in the next decade will be essentially invisible: woven into our clothing, and embedded in our furniture and environment. They will tap into the worldwide mesh, which is what the World Wide Web will become, once all of its linked devices become communicating Web servers, thereby forming

vast supercomputers and memory banks.

Non-biological intelligence is fully derived from human machine civilization and will be based on the reverse engineering of human intelligence. There will be a merger of the two worlds of intelligence, biological and non-biological. The non-biological portion of our thinking will become predominant, as we move beyond the basic architecture of the brain's neural regions. Brain implants based on massively distributed intelligent nanobots will greatly expand our memories and vastly improve all of our sensory, pattern-recognition, and cognitive abilities. Since the nanobots will be communication with each other, they will be able to create an set of now neural connections, or break existing connections, create new hybrid biological-non-biological networks, and add completely non-biological networks.

In the next 2 decades we will approach a paradigm shift in the means we will have available to preserve the patterns underlying our existence. We are already in the early stages of reverse engineering: the information processes underlying life and disease. The full realization of the biotechnology and nanotechnology revolutions will enable us to eliminate or ameliorate many medical causes of death.

We are about to witness what took place in the period 2000-2002. The economy underwent a recession, and even after the bursting of the Internet bubble and the stock market, the Internet made continued extraordinary gains. I was one of the earliest "bulls" on the Internet, and in retrospect, my biggest error was in underestimating its accomplishments. The Internet has transformed the way science is practiced in virtually all fields. I also have developed a keen interest in public digital libraries which act as compendiums of research articles, journals and science books. They constitute databases of published work that can be rapidly searched with any Internet connection.

The convergence of biology and engineering is turning health care into an information industry. It is being transformed by the introduction of electronic health records that can be turned into searchable medical databases that produce a smart grid for medicine. Devices and diagnostics are also going digital, advancing telemedicine, personal medical devices for the home and smart pills. The sequencing of the human genome a decade ago is starting to help identify the origins of diseases.

Biology and engineering are clearly converging. The adoption of information technology, advanced materials, imaging nanotechnology and sophisticated modeling and simulation are being brought to bear on biology. The developing convergence of biology and engineering will be led principally by information technologies, namely the digitization of medical records and the establishment of an intelligent network for sharing those records. This will enable many other big technological changes to occur.

HIT (Health Information Technology) systems have reduced deaths by 15% and have lowered complications by 10%. Health care this year garnered almost one-third of the fiscal stimulus monies for science. The giant fiscal stimulus package rolled out by Congress earlier this year includes $20 billion to create a national health information network, including incentives for hospitals and doctors to adopt EHRs. The National Institute of Health saw its budget increase by a third, from $27 billion, to almost $37 billion.

A report by the Institute of Medicine estimated that up to 100,000 Americans are killed each year by preventable mishaps such as wrong side surgery, medication errors and hospital -- acquired infection -- a larger number than die from heart disease, or AIDS. An effective fix is the electronic tracking of medications and patients with radio-frequency identification (RFID) tags on bar codes, all of which require HIT system.

Sequencing equipment has been improving even faster than microprocessor performance, which doubles roughly ever y 18 months. The sequencing technology works by figuring out the precise sequence of letters that make up the genetic code of life. Next generation sequencing technologies, borrowing ides from silicon-chip manufacturing, will have a profound impact on the economics of healthcare.

In poor countries, advances in basic health care are being made through M-health, or mobile health technology using cell phones. The most promising applications of M-Health for now are public health messaging, stitching together smart medical grids, extending the reach of scarce health workers and establishing surveillance networks for infectious diseases. Another promising application of M-Health involves integrating mobiles into HER and software for clinical decision support.

Robotics is making surgery more precise. The next wave is likely to be micro-sized, with tiny robot motors that can roam around the body and deliver radio waves to kill tumors. Nanorobots should also be operating within a decade at the molecular scale. The advances in genomics and information and communication technologies are enabling other fields - including diagnostics and micro-fluidics, advance much more rapidly. The shift opens new ways to cope with the huge problems of aging populations and surges in chronic ailments such as diabetes and heart disease.

Portable and rapid diagnostic tools are on the way, thanks to the fusion of genomics, proteomics and information technologies. The impact of point-of-care diagnostics will be as big as that of mobile phones. Thanks to much-improved technology for remote communication, telemedicine is at last jus taking off. Thanks to cheaper and ubiquitous consumer electronics, medical devices in the home are also about to take off. Cheap sensors and smart phones are allowing a shift to body computing.

The revolution in digital-genomic fields will run parallel with healthcare reform. Healthcare is the largest industry in the country at close to 17% of GNP, or almost $2.5 trillion. Unfortunately, most of the efforts underway in Washington, spearheaded by President Obama to reform healthcare, largely center on expanded coverage for the 45 million uninsured and how to pay for it. While this is legitimate and pressing issue that needs rectifying, the problems of healthcare itself remain unaddressed. Unless healthcare costs are reigned in, the unfunded long-term liability could reach $50 trillion.

The US health care system remains largely as it was decades ago. True reform necessary to change the unsustainable trajectory of the system, in part due to tax inequities for insurance will require universal coverage and restructuring the care delivery system and payment mechanism.

The current delivery system is not organized around cost-effective value for patients, but rather fee-for-services determined by providers and not patients. Such a system would be predicated on the measurement and dissemination of health outcomes. This will have to happen, and no doubt will take a decade to change. Health institutions will thus be saddled with the onset of truly revolutionary breakthrough discoveries and technologies affecting healthcare, plus mandated structural changes in care delivery measurement and accountability. The pubic service health care system will

need all the qualified help it can get.

A runaway reactor called fee-for-service reimbursement fuels the U.S. health care system's costs. By some estimates, a staggering 50 percent of health care appears to be driven by physician and hospital supply, not patient need or demand. The technological enablers of disruption in health care include the ability to precisely diagnose the causes of a patient's condition, rather than the physical symptoms. These technologies include molecular diagnostics, diagnostic imaging technology and ubiquitous telecommunications.

Health care is still delivered in 2 business models designed a century ago, the general hospital and the physician's practice, when almost all care was in the realm of intuitive medicines. There is no silver bullet that can cure what ails healthcare. However, one by one, disorders that could be treated only through the judgment and skills of experienced physicians in expensive hospitals are becoming diagnosable and treatable by less experienced caregivers in more affordable venues of care.

Technological enablers form the backbone of disruptive business models. At the heart of a technology revolution is the conversion of complex, intuitive processes into simple, rules-based work, and the handoff of this work from expensive, highly trained experts to less costly technicians.

The revolution in scientific publishing that has been promised since the 1980s is also about to take place, which is a field I have been involved with for the past 2 decades. Scientists read strategically, so that many articles can be simultaneously searched, filtered, linked, annotated and analyzed. This helpful, if not outright essential development, will be enhanced by the widespread use of digital indexing, retrieval, and navigation resources plus the emergence of interoperable ontologisms. Public health service organizations will need to direct critical resources to this area.

Cancer, for example, has begun to yield to a similar revolution in the precision of diagnosis and efficiency of treatment. A deeper understanding of molecular biology and the human genome is enabling scientists and clinicians to begin diagnosing and treating cancers based on their molecular characteristics, rather than gross anatomical observations.

Cancer can be characterized by chemical changes in the molecular pathways by which the cancer propagates, and often can be detected by a pattern in which certain genes express themselves. Up to one half of all men and one third of all women in the US will receive a diagnosis of cancer in their lives, and about half of all the patients who develop cancer, other than the common skin cancers, will die of it. This was the disease field I was most involved with. It would be difficult to think of any new treatment for cancer over the past 2 decades that Amerindo was not involved with. I was very disappointed not to be granted permission 2 years in a row by the Court to attend the largest dancer conference in the world, the American Society of Clinical Oncology, ASCO. In the study of cancers, science has yet to learn the full repertoire  of events that drive a normal cell to adopt a malignant behavior or to identify the changes in most cancer cells that are realistic targets for intervention.

When former President Richard Nixon declared war on cancer in 1971, scientists did not have the tools or understanding of the disease to wage war. They do now. We need to supplement our current understanding of genetic mutations, with an understanding of the chemical reactions within cancer cells and cancer pathways. Biochemists will now work with the great advances geneticists have made to bring forth an understanding of how cancer cells behave chemically.

Scientific progress in imaging molecular medicine and biochemistry has been shifting from diagnosing diseases from an intuitive perspective to one of precision.  Diagnosis will now become much more critical than it was in the past. As scientific progress continues to move more diseases along the spectrum from intuitive medicine toward precision medicine, we will see fewer of them.

Seven problems -- upper respiratory infection, including common cold, sinusitis, bronchitis, immunization, ear infection, urinary tract infection, and monitoring blood pressure -- account for 90% of patients visits to retail clinics. These are rules-based illnesses that can be attended by nurse practitioners. These problems can be aided by analytical and imaging capabilities, the emergence of online decision tools, i.e., expert system software, and telemedicine.

Ninety (90) million Americans suffer from chronic conditions such as diabetes, hypertension, arthritis and dementia. They account for three-

fourths of medical costs. Five chronic diseases, diabetes, congestive heart failure (CHF), coronary artery disease, asthma and depression account for the bulk of medical costs. Many of these diseases have their genesis in 2 other underlying chronic conditions: obesity and tobacco addiction. A great deal is spent in the last 18 months of life due to the setting in of complications. Any progress for reigning in costs must have a credible plan for changing the handling of the chronically ill.

Bypasses, stents, and statins have now transformed heart disease into a chronic illness. AIDS and some cancers have become chronic conditions as well. Five percent of the population accounts for 50% of all medical costs. Eighty ( 80 %) of health care costs are spent by 20% of the population. Diagnostics is where most of the money will be made in the future. Two hundred (200) companies account for $29 billion in revenue. Pharmaceuticals generate $300-400 billion in profits.

Precision medicine involves diseases that can be precisely diagnosed treated with rules-based therapies that are predictably effective. For example, leukemia could be one of 38 different types of blood cancer. The diagnosis of a disease lies in what is labeled precision medicine. The latter is the result of scientific progress in imaging, molecular medicine and biochemistry. Three specific streams of technology that can enable a revolution are molecular medicine, imaging technologies and ubiquitous connectivity.

The vested interests in present state health care are so huge that reform can likely only be done over a decade. This leaves the US in a precarious position of having to do the right thing twice -- one, in achieving yet again, global leadership in the GNR revolution, and two, reform 17% of its economy to reign in costs, by exploiting the new technologies that will advance the delivery of health care, and facilitate extending coverage to more people.

Healthcare reform unfortunately hasn't even broached the issue of the American food diet, which is the culprit directly behind obesity, and partially responsible for a host of other preventable chronic diseases from cardiovascular to certain cancers. Three-quarters of healthcare spending goes to treat largely preventable chronic disease, most of which are diet related. Health care reform demands a major restructuring of the food industry if costs are going to be reined in. This is not even on the "table" now.

Submission of a Proposal

As I have stated at the start of this section, I have demonstrated a record of public service through my philanthropy and active personal involvement. Moreover, I have a unique experience because I was present and actively participated in seeing the three technologies of the past 4 decades, electronics, genetics, and nanotechnology, reach commercialization.

Just as we knew of no other pension manager like Amerindo in private and public technology and biotechnology, there will be a great scarcity of people with the needed backgrounds to usher in the new sciences and together with healthcare reform. The type of role I visualize for myself in public health service does not exist today. It will have to be created. In many ways it will resemble what I did for 25 years at Amerindo, where I networked and did research in the nascent fields of electronics and biotechnology.

What I have described above are two major game changers in science and healthcare. As so often happens when something new and significant happens, the public sector can be expected to lag seriously behind the private sector, for all the apparent reasons of funding, career choices, and the like.

I had the good fortune to be affiliated with three world-class teaching hospitals. I was on the Board of Hospital for Special Surgery (HSS), ranked first in the nation in orthopedics and rheumatoid arthritis. I was on the Scientific Advisory Board of Columbia Medical, and I was on the Committee System at Harvard Medical. At Harvard my interest was in system biology, where I expected to play a role at the time I was arrested.

Because the mechanism of human disease, starting with cancer, have proved to be far more complex than anticipated, system biology is rising supercomputers to model (Mathematically) complex systems involving the biochemical interactions of genes and proteins. That form metabolic pathways in major diseases like cancer, amongst others.

The role I visualize undertaking in Public Health Service was what I accomplished at HSS. In addition to being on the Board of Directors and the Executive Committee, I was the only non-MD on the Graduate Medical Education Committee. HSS offers residency positions to 8 candidates a year out of a pool of 800 that apply.

The most important role I undertook was to structure a Department at the Hospital that oversaw all clinical trials, technology transfer, and venture investing. HSS has 135 doctors on their staffs that perform many clinical trials. This department was expected to become a major earner for the hospital over time. HSS was one of the few profitable hospitals in NYC.

There are at least two major health organizations where I believe I could play a significant role in helping them to adapt to the profound changes I cited above that will transform the delivery of health services: The Veterans Hospital Administration and the US Public Health Service. One of the things I had wanted to do for Washington & Jefferson College when I undertook the curriculum independent study was to create a course in the three overlapping GNR technologies. I felt uniquely qualified to do this in an advisory capacity at the college.

I believe creating such a forum would be very helpful in Public Health Service at all levels of staff. This unfolding subject matter could be transmitted by videoconferencing or via Internet throughout any part of the organization.

Additional extenuating factors that argue for community service over incarceration include the deteriorating status of my health. Health deteriorates with age, likely accelerating after age 70. All five pathologies I suffer from have deteriorated since my remand.

The worst is my spine; the enormous quantity of hardware bolting my four lower lumbar require, on doctor's orders, that I walk 2 hours a day. I haven't walked 2 hours in 10 months at MCC. There are days I cannot stand up. I have suffered from serious allergies for 45 years, and they have only markedly deteriorated at MCC, especially with no access to fresh air. I cannot get the medications I've used for years. Impairment of hearing in my left ear has worsened.

I suffer from recurring bouts of herpes simplex, and have been on a

prescribed medication of Valtrax 3 times daily, which I cannot get at MCC.

I have a genetic predisposition to colonic polypopsis, one of the two cancers that killed my father. I should have annual colonoscopy, which I don't have access to.

I have reported to Dr. Glover at MCC recurring episodes of TIA, temporary ischemic attacks which can be early warnings signs of stroke. Nothing has been done so far. I have suffered for most of my life from allergies. I took four medications for the past several decades, none of which are available at the MCC. There are many days at the MCC when breathing is a problem.

I have already been punished by more than 4 years of home detention, the revocation of my business license, the loss of my company of 25 years, the total loss of business assets and sole source of income. There are collateral lawsuits pursuant to the trial's guilty verdict.

I have avoided violating any law for the first 65 years of my life. I cannot work again in my chosen career and profession - the securities industry. No compelling rehabilitation is needed because I am not likely to re-offend, due to the nature of my offense (securities fraud) and because I have reached retirement age (not employable). I pose no danger to the public. My incarceration is not necessary to protect the public.

Since I have no prior criminal record (first offender), I plead mercy from the Court (probation with mandatory community service). Since I suffer from a serious medical condition, I would also become a burden on the criminal justice system. I have been found guilty on all counts within the same category of offense. The nature of my offense is non-violent.

While I stand ready to accept sentencing, I would ask the Court to consider that the financial damage to me has been devastating. In addition to the destruction of my business (Amerindo), which had a considerable franchise value for its unrivaled performance in science and technology investing, I have suffered additional losses from related venues. Amerindo's mutual fund was given away to Munder for no value. The New York and London offices had deposits, plus furniture and fixtures assessed at $5 million. These have all disappeared or been lost through mismanagement of my business assets.

My Manhattan home was foreclosed and sold off at auction for a fraction of its value. Its market value was last assessed at $10 million. There is no chance I could start another investment company at my age (69) and with a criminal record. The expected life span for someone born in 1940, as I was, is only 63 years. There could be precious little time left.

The US truly stands at a critical inflexion point as regards its economy and future. It is very likely that the great unwinding of leverage will take a good decade and damper any recovery. The massive government deficits that have to be financed to stimulate the economy and make up for lost tax revenues (from companies like mine) will put upward pressure on long term interest rates, crowd out private borrowing and endanger the exchange value of the dollar ($1 is worth only 0.71 of an euro).

Great Britain has already been warned of a possible downgrading of the country's credit rating. There will likely be auction fatigue from the trillions of dollars in debt (Treasury securities) the U.S. government expects to issue over the next decade. Unemployment is expected to stay historically high, in the double-digit range. With states running huge deficits, it is quite likely that crime will increase.

Paradoxically, the engines of economic salvation, admittedly a decade away, are the fields of science and technology, that I helped pioneer 3 ½ decades. There is little question that the country's future will importantly depend on its ability to forge a leadership position in the impending 3 part technological revolution I described above. This is an once-in-a-lifetime challenge ready to be exploited by those with the very specialized knowledge that is required.

I think that at such a historic time of great scientific opportunity and dire economic need, the United Negro College Fund would say it best, if I may take the liberty of paraphrasing: To waste a productive mind, where that person could uniquely make a real difference for the public good, would indeed be a crime.

The many people who knew me well and worked with me in Europe and the US would not believe all the charges against me. My four decades of philanthropic giving, surely in the top 1% of the country, plus my devout bond with the church I attended thrice weekly, are not consistent with my serious business mistakes.

Below is my response to a list of the so-called 'lies' I was charged with and accused of by the prosecution. These distorted lies, supposedly made by me, were purposely used on two occasions: at trial and at the bail hearing.

Lie #1:    I lied about improperly administered Miranda rights.

Upon my arrest at the Newark airport in May 2005, one of two postal inspectors waited until he was driving the car that would take me to 8th Ave. & 34th St. (Post Office) to supposedly read me my rights. He stated that he used the rear view mirror to look at me in the back seat to comply with this procedure. However, earlier upon disembarking from the plane, I was approached by this same inspector who told me I was under arrest. When I asked why, I was told I would be informed later.

I have a hearing loss on my left ear, which was closest to the driver and I sat in the back seat on the right side. I was 65 years old at the time of my arrest. The inspector was talking and driving the car at the same time, in busy and noisy Newark Airport traffic, on his way to Manhattan. I was never asked by either inspector if I understood my rights.

At the Motion-to-Suppress-Evidence hearing (2006), the postal inspector testified that he had read me my rights, (albeit in this haphazard way) and the presiding judge ruled in his favor. If indeed he had read me my rights, I didn't hear him, and he surely never asked me to acknowledge the same.

Lie #2:    I lied in order to be excused from jury duty in 2003.

When the jury duty notice arrived, I was convalescing, after 10 consecutive surgeries, the latest from spinal surgery at home. My secretary notified the Court about my ailment and requested a postponement. She also advised the Court that the nature of my work often took me out of the country to England, where I had an office and where I had legal residency. In other words, I was not a full-time resident in NYC (except for my recent illness that had grounded me in NYC).

My company, Amerindo, was founded in England where I had resided for 10 years and had obtained permanent residency (comparable to a US green card) as a result of my business affairs in that country.

The jury Court granted my request in 2003 and I was never contacted again.

Years later, when my lawyer requested a relaxation of my home detention, the government opposed this request on the grounds that I had 'lied' to get off jury duty. At the time of my request, I had been filing 1040NR and also UK tax forms for years.

The presiding judge effectively ruled that I had lied to get off from jury duty when I was in crutches and in a wheel chair from spinal surgery, and that I had lied about filing my taxes as a non-resident (1040NR), and that I had lied about my UK "green card" (all without verying or requesting proof from the government). All of this deliberate misinformation could have been checked out by the Court.   It is a fact that one can obtain a legal right to reside in two countries and move back and forth for business or pleasure.

Lie #3:     I lied about being a UK resident.

During a deposition concerning a civil lawsuit in NYC, I stated that I was a resident in the United Kingdom. I also stated I wanted a frivolous lawsuit litigated in England.

### BACKGROUND

I had provided the funding for the Maazel-Vilar Conductors' Competition, roughly $1.5 million.   Lorin Maazel wanted the competition filmed, and he lined up a film company, Bombo Entertainment, whose only experience was in filming sports events.   When I learned that the cost of filming the competition was going to be $1.7 million, I indicated that it was excessive and way beyond the budget we had agreed.   I reluctantly paid Bombo $250,000 to stop filming.

The night before I went into the Hospital for Special Surgery, for spine surgery, Bombo presented a second demand for an additional million dollars.   I declined payment for a film I didn't get, and neither did the competition.   The matter was finally settled when I paid an additional $500,000.

As a legal resident of the United Kingdom, which I was, I had the right to have any litigation take place there. Again, I did not lie about my status.   I was a legal resident in the U.K.

Lie #4:    I lied about my relationship with Maria Alvarado.

At the time of my arrest in 2005, Ms Alvarado was very sick from chemotherapy treatment and 6 surgeries for cancer.  As a result, she rested all day and night.  I was asked on the night of my arrest to give a list of three people I considered friends that I most often talked to.  I did not give Ms Alvarado's name.  Instead I gave the names of two people in my company, and a third party I don't recall now.

In 2007, when my lawyer requested permission for me to spend week-ends at Ms Alvarado's home so I could help her take care of her 7-year old son, and at the same time work on my case with Ms Alvarado's father, a lawyer from Puerto Rico, the prosecutor opposed my bail change on the grounds that I had lied about my relationship with Ms Alvarado, because I hadn't mentioned her name in connection with the night I was arrested.  This was simply a preposterous allegation on the part of the prosecution.

I repeat, the question I was asked on the night of my arrest, unequivocably was: "Who are three people you consider 'friends' you most frequently talk to?"


Lie #5:    I have lied about my income and therefore I would be able to flee.

The government argued that I should not remain out on bail until sentencing because I had a substantial source of foreign income and could flee.  The government cited that I was receiving $18,000 a month as a subsidy to pay the maintenance fee in my apartment. At the time of this assertion by the government, I had already subdivided my apartment into 2 units (maintenance fees for both apartments were $17,500), and sold one of those units because I could not pay the mortgage and maintenance fees.

An investor bought the mortgage of the remaining unit where I lived and paid the maintenance fee of about $9,000, to the building, and promptly arranged to foreclose on this unit. I was not evicted as part of this process because I had been remanded to MCC.

My home was sold at auction in May 2009, and I'll be a homeless veteran when I leave jail.

Lie # 6:    I lied about funds I might have in Kuwait where I
            worked 29 years ago, and again, represented a risk of
            flight.

            I have no funds in Kuwait. I first went to Kuwait in
            1981 to manage a technology portfolio in a joint
            venture and left in 1983 at the end of my business
            affairs there.  Foreigners are, to my knowledge, not
            allowed to own property or shares in Kuwait.
            This was an unfounded, unproven, and preposterous
            allegation made by the government to make me look
            like a flight risk.

            I was quite surprised to hear the Court state, in no
            uncertain terms, that I had access to funds abroad,
            which led to my being remanded to MCC.


Lie #7:     I lied about the SBIC program application and to Ms
            Cates.

            I met with Mr. Hector Barreto, the SBA Administrator,
            for lunch to discuss our SBIC license application.
            I also met with Mr. Barreto once more for dinner in
            NYC and he told me that final approval of a license was
            a matter of when, not if, for Amerindo.  He explained
            to me that the Middle East war had grounded all new
            funding to a halt.

            Mr. Castellanos and Mr. Dupont were in charge of the
            SBIC application at Amerindo.  Mr. Castellanos led me
            to believe that we had received preliminary approval by
            the SBA, subject to final funding. We had received a
            Go-Forth letter.  My partner, Mr. Tanaka and I were
            asked to spend 3 days at the SBA headquarters, one day
            for a 9-5 p.m. training session on how to run the
            program.

            Mr. Christiansen, the Chief Investment Officer at SBA,
            personally told me that the SBA was keenly interested
            in Amerindo because of its stellar reputation in
            technology.  He also told me to expect delays because
            the SBA had had a lot of losses from other technology
            investment SBIC's. I initially made the mistake of
            thinking that the right signals for approval of my
            company's application were coming our way.

            My second mistake was contacting a long time client,
            and friend, Ms Cates, who had just spoken to me about
            investing her entitlement to her late husband's estate
            of $5 million. I wrote a letter to Ms Cates about the
            SBIC program.  I followed up that letter with a phone
            call to let Ms Cates know we were awaiting final

funding for the program.

Ms Cates wanted her monies to be put to work right away in private securities.

At trial, the government made the SBIC 'fraud' the centerpiece of their case against me and my partner.

Lie #8:    I lied about the sale of Amerindo Panama.

Amerindo Panama went by the same name as the US Company, although it was incorporated in Panama. Our Panama attorney, Mr. Berguido dealt directly with the London office.  Papers were drawn for the sale of our company and a sale date was scheduled for December 2005.

My partner, Mr. Tanaka, and I were arrested in May 2005.  At trial, the prosecution brought in a witness, Ms Denoso, who testified the sale did not go through after my arrest and I was charged with "lying" about a sale that did not take place as planned.

I reviewed the legal papers Mr. Tanaka had sent me that were prepared by Mr. Berguido.  At the time they looked to me to be in order and I had no reason to think otherwise.

Lie #9:    I lied about being Hispanic.

At birth, my Cuban father, whose first name is also Alberto, anglicized my name to 'Albert.'  This was a common practice back in the 1940's when being Hispanic was not popular.  I have no reason to question my father's decision.  Parents can write whatever name they want in the birth certificate of their child.

I was born in New Jersey which has the largest concentration of Cubans in the U.S. outside of Miami, Florida. New Jersey is the second largest community of Cuban immigrants and their offsprings in the U.S. My father left me in the custody of my grandmother, also Cuban, who at the time was living in Cuba and then Puerto Rico, to where my father was transferred by his  Head Office in Cuba in 1948.  He remained there until his death in 1987 from cancer.

I went to grammar school and high school in Puerto Rico. I speak Spanish with native fluency.  In the 2000 Census, I identified myself as Hispanic.  When I worked for the international division of Citibank early on

during my career, I was posted to Venezuela and Colombia, where I worked for three years, precisely because of my Hispanic background and skills.

My sister and stepmother live in Puerto Rico.  I had a home in Puerto Rico and my last known girlfriend before I was incarcerated is Puerto Rican.  My last name, Vilar is from Spain, my ancestors' homeland.

Why Mr. Litt believes I'm not Hispanic is beyond my imagination.  Perhaps he was afraid I would use the 'race' card to curry favor with the Hispanic members of the jury.

Lie #10:  I lied about Ms Cates' profits from her investment in our company.

At a Franks hearing, Mr. Litt testified under oath that Ms Cates had received only $170,000 in profits in 17 years from her $1.2 million initial investment. He also testified that Ms Cates had never agreed to invest in a partnership called Rhodes.  Mr. Hoffman, my lawyer, introduced considerable evidence proving that Ms Cates' investment had risen over 500% in Rhodes, and that she had been well informed about the investment, and that she had received from Amerindo almost 70 times the amount of money Mr. Litt alledged.

The prosecution's strategy, both at the hearings and during trial, was to attack my credibility and good reputation as an outstanding citizen and an upright businessman.

Lie #11:  The PSR report erroneously states that I own 2 properties in Florida.  I have no idea of how the Probation Office came up with this mistake, which was never discussed with me, but it is patently wrong.  I have never owned property in Florida.

I was advised that there is a well-known athlete living in Florida named Alberto Vilar.  He's an eight-time champion rower with the Biltmore Club and supposedly he owns property in his home state.