```
E4O9VILS                    Sentence
```

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              05 CR 621 (RJS)

5   GARY ALAN TANAKA AND ALBERTO
    WILLIAM VILAR,
6
                 Defendants.
7
    ------------------------------x

8
                                            New York, N.Y.
9                                           April 24, 2014
                                            9:51 a.m.
10

11  Before:

12                    HON. RICHARD J. SULLIVAN

13                                          District Judge

14
                          APPEARANCES
15
    PREET BHARARA
16       United States Attorney for the
         Southern District of New York
17  BENJAMIN NAFTALIS
    JUSTIN ANDERSON
18       Assistant United States Attorneys

19  FREDERICK H. COHN
         Attorney for Defendant Gary Alan Tanaka
20
    VIVIAN SHEVITZ
21  YING STAFFORD
         Attorneys for Defendant Alberto William Vilar
22

23

24

25

E4O9VILS                      Sentence

```
 1              (In open court; case called)
 2              MR. NAFTALIS:  Good morning, your Honor.
 3              Benjamin Naftalis, Justin Anderson and Sharon Cohen
 4    Levin for the government.
 5              THE COURT:  Good morning to each of you.
 6              And for the defendants.
 7              MS. SHEVITZ:  Vivian Shevitz and Ying Stafford for
 8    Mr. Vilar.
 9              THE COURT:  Good morning to each of you.
10              Mr. Vilar, good morning.
11              MR. COHN:  Fred Cohn and Angela Lipsman, my associate,
12    for Mr. Tanaka.
13              THE COURT:  Good morning to each of you.
14              And Mr. Tanaka, good morning to you.
15              We have a number of others here today; some I
16    recognize.  I think there are some victims who wish to be
17    heard.  They'll have that opportunity.
18              Let me welcome all who are here.  This is a public
19    courtroom so everybody is welcome here but I thank those of you
20    who took the time to be here today.
21              We're here for sentencing.  I apologize for the late
22    start.  I was just collecting my thoughts and collecting my
23    papers which takes a little time in a case like this.  I
24    decided to have the sentencings go forward together just
25    because there's so many overlapping issues and motions and
```

1    arguments that are joined by the two defendants.  It struck me

2    as sort of unfair to have somebody go second where, you know,

3    all -- much of the decision-making would have been done by the

4    time the second person went.  So I thought we'd do it this way.

5    I'm very mindful, of course, that I'm sentencing two

6    individuals.  And I'll keep that in mind throughout.  But I

7    just want to make sure that's okay with all of you.

8              MR. COHN:  That's the only way to fly as far as I'm

9    concerned.

10             THE COURT:  I think that's right.

11             Good.  I should also mention occasionally we have

12   school groups come in and out of the court.  So, the district

13   executive told me there is a group I think coming from Midwood

14   High School at some point today.  If they come in -- you're

15   already here.  Welcome.  So I thought you were going to be here

16   at 10:00.  Well, welcome.  You're welcome here as well.  So

17   thanks for being here early.

18             So I want to go over with the parties what I've

19   reviewed in connection with sentencing.  And, of course, let me

20   know if I've left anything out.  This is a case with a lot of

21   history.  And so I have reviewed everything from the prior

22   sentencing.  I stated on the record what that was.  I don't

23   think I need to restate it.  That includes the sentencing

24   submissions from the defendants and the government.  It

25   includes numerous letters.  It includes trial testimony.  We

E4O9VILS                          Sentence

```
 1   had a hearing.  There was hearing testimony.  So I've reviewed

 2   all of that again.

 3           I've also reviewed the transcript from the last

 4   sentencing hearing.  I have rereviewed portions of the

 5   transcript from the criminal trial.  I've reviewed, of course,

 6   the Second Circuit's opinion in the appeal in this case, U.S.

 7   v. Vilar which is at 729 F.3d 62.

 8           And then I just want to go over quickly what I've

 9   reviewed that has been submitted more recently in connection

10   with the resentencing.  I have reviewed, of course, the

11   government's submission of March 31, which is a 16-page

12   single-space submission with a number of attachments.  I've

13   reviewed that.

14           I have reviewed also the government's April 1

15   submission with respect to forfeiture.  That is a 6-page

16   single-space submission with a preliminary order of

17   forfeiture/money judgment that is proposed and attached.

18           I have reviewed the Rule 33 motion filed by

19   Ms. Shevitz that is joined by Mr. Tanaka.  I guess that was

20   dated April 14.

21           I have also reviewed the sentencing memoranda of

22   Ms. Shevitz ands Ms. Stafford on behalf of Mr. Vilar.  It's an

23   80-page, double-space submission.

24           I've also reviewed the April 14 sentencing submission

25   from Mr. Cohn which is a 7-page, single-space submission,
```

1   includes attachments.  Among them is a 12-page, single-space

2   letter from Mr. Tanaka's wife, Renata, as well as a letter from

3   his mother that I've read.  I thank them for taking the time to

4   write.

5           I have reviewed an April 21 letter, one sentence

6   letter from the government just indicating the attachment of

7   the victim impact statement from Ms. Graciela Lecube-Chavez,

8   which I've read.

9           I then have a letter that I received from Mr. Begos on

10  behalf of the Mayers in connection with the SEC matter that I

11  issue an order asking the parties to just respond to

12  attachment.  So I received an April 23 letter from the

13  government on that subject.

14          I think there's a reference to a trial transcript

15  page.  I think it's actually inaccurate.  I think it should be

16  trial transcript page 1385 to 1368 not 1285 to 1268, a one-page

17  letter.

18          I then have an April 23 letter from Ms. Shevitz which

19  is also a one-page letter.

20          I then received late yesterday afternoon government's

21  reply memorandum dated April 23.  It's a 7-page, single-space

22  letter with a variety of attachments.

23          Then I also received a response to that by Ms. Shevitz

24  dated April 23 as well.  It's a 3-page response.

25          I should say that I didn't authorize any reply

E4O9VILS                        Sentence

memorandums here.  So you should have checked with me first.  I

have read these submissions.  They haven't altered my view on

anything.  I've been thinking about this for a while.  So the

issues addressed haven't altered my conclusions or at least my

tentative conclusions on those things.  So, I've read them.

They're part of the record.  But I did think that was worth

pointing out.

          I've also, I guess, reviewed materials from the SEC

case that are publicly docketed that I may reference as we go.

But there is a related SEC case that has spawned a lot of

submissions from counsel here and others and I'm familiar with

that case.  I'm presiding over it.  And I've reviewed a number

of submissions in connection with that case as well.

          Are there any other submissions or things that I've

overlooked?

          Ms. Shevitz?

          MS. SHEVITZ:  Mr. Cohn's response to your order

yesterday.  I don't think you mentioned that.

          MR. COHN:  It's hardly relevant, Judge.  I said that

the thing that you were asking us to submit to was out of time

and that was my response.

          THE COURT:  Right.

          MR. COHN:  And if that affects your sentencing, I'm

checking out.

          THE COURT:  All right.  I should have mentioned that.

1    But thank you.

2            MS. SHEVITZ:  I'm just wondering whether we could

3    identify the documents by the ECF filing numbers as opposed to

4    how many pages they are just to make the record extremely

5    clear.

6            THE COURT:  To go back over the documents I just

7    mentioned by the ECF filing number?

8            MS. SHEVITZ:  My cocounsel thinks that that's

9    unnecessary.

10           MR. COHN:  I think it's burdensome actually.

11           THE COURT:  I'll agree that it's burdensome.  I think

12   I'd have trouble probably doing that just because I haven't

13   scribbled it.  But everything has been docketed, I believe, so

14   I think it's all pretty clear.

15           Government, anything that I've left out?

16           MR. NAFTALIS:  Not that we're aware of, your Honor.

17           THE COURT:  All right.  So, let me start with the Rule

18   33 motion.  I've reviewed the parties' submissions on that.  So

19   I'm prepared to rule.  If anybody has anything they want to say

20   now before I do, I will give you an opportunity.  But I think

21   you've made your arguments and your points.

22           Anyone?

23           MS. SHEVITZ:  Are you saying you're prepared to rule?

24           THE COURT:  On the Rule 33.

25           MS. SHEVITZ:  The substance of the motion now?

E4O9VILS                         Sentence

1            THE COURT:  I'm prepared to rule on the motion.

2            MS. SHEVITZ:  Okay.

3            MR. NAFTALIS:  Nothing from the government aside from

4     what we've already written, your Honor.

5            THE COURT:  I find the motion is untimely, in fact

6     very untimely.  Rule 33 requires motions to be submitted within

7     14 days of conviction or three years after conviction if based

8     on new evidence.  Either way the deadline has long passed.  I

9     fine that there is no excusable neglect for the delay.  The

10    defendants have been making many of these same or similar

11    arguments for years.  They've had access to all the relevant

12    documents for the entire period.  So I'm going to deny the Rule

13    33 motion.

14           That doesn't prejudice the defendants' ability to

15    bring a 2255 on at least some of the issues, and that was

16    referenced also in the Circuit's opinion.  But the Rule 33

17    motion I'm going to deny.  Okay.

18           MS. SHEVITZ:  Your Honor, we did say in the motion

19    that it's alternatively broad under 2255.

20           THE COURT:  I'm not going to resolve the 2255 now.

21    I'm just ruling on the Rule 33.

22           MS. SHEVITZ:  Okay.

23           THE COURT:  I now want to just go back to the

24    presentence reports.  I didn't order new presentence reports in

25    this case.  I think the parties have had opportunities to

1    review the old presentence reports.  They've made objections to

2    them and developed a full record in relation to the presentence

3    reports.  I just want to make sure, Mr. Cohn, you weren't here,

4    Ms. Shevitz you weren't here at the last sentencing, but you've

5    reviewed the presentence reports and discussed them with your

6    clients?

7             MR. COHN:  I have reviewed it, your Honor.  Your order

8    appointing me -- your order said that there would not be a new

9    presentence report.  I did challenge, due to the appeal and the

10   ruling of the Second Circuit, two levels that the presentence

11   report assigned at the last hearing and I dealt with that

12   separately and I don't know whether that was a challenge to the

13   prior report or not.  But that's the only issue that I have

14   with the report.

15            THE COURT:  Look, I think there are a number of

16   arguments that have been made about the report and the proper

17   application of the sentencing guidelines.  We'll talk about

18   that in a moment.

19            Ms. Shevitz you've reviewed the presentence report

20   with your client and discussed it?

21            MS. SHEVITZ:  Yes.

22            THE COURT:  And I think -- I'm confident but you tell

23   me if you're less confident that objections to the presentence

24   report, to the conclusions and findings in that report have

25   been developed as part of your sentencing submissions?  Is

E4O9VILS                    Sentence

1   there anything else you'd like to say with respect to the

2   presentence report that isn't in your submissions?  Let me put

3   it that way.

4              MS. SHEVITZ:  I have to think about that.

5              Not really, except that a presentence report with so

6   many conclusions that are not accurate really shouldn't be

7   following the defendants into an institution.  That's my

8   objection to that.

9              THE COURT:  So let me remind Mr. Vilar and Tanaka

10  about the different factors that a court has to take into

11  consideration.  And this is for everyone, I guess.  Judges are

12  required to consider different factors or objectives of

13  sentencing.  And I went through them at the first sentencing

14  that we had.

15             Among those factors are the history and

16  characteristics of the defendants.  I have to consider each of

17  you as individuals.  And your entire lives.  Not just this

18  crime.  I have to take into account all that you've done, good

19  and generous and in between and bad, everything.  Everybody's

20  complicated.  And that it's important to look at the entire

21  person and to sentence a person based on their entire life.

22             I also have to consider the facts and circumstances of

23  these crimes.  Not just what the crimes are named; the actual

24  details of what took place, over how long a period of time, who

25  did what to whom.  And it's important that the sentence imposed

E4O9VILS                        Sentence

reflects and -- well reflects the seriousness of the crime and
promotes respect for the law and provides a just punishment for
the crime.

         I also have to consider another factor that's related
but I think different and that's the need to deter or
discourage you and others from committing crimes like this in
the future.  The notion there is that a judge in imposing a
sentence sends a message and the message, hopefully, that is
received by the defendants but also by a larger public is that
crime doesn't pay, that it's not worth engaging in criminal
conduct and that people might be discouraged and there will be
less crime in the future.  That's the hope.  It's sometimes
hard to predict.  It's kind of speculating in some ways about
future conduct.  But Congress has said that courts should
consider this.  I think most of us recognize that there's
something to that.  So that's a factor that I also have to
consider.

         I have to consider your own needs while you're in
custody.  Each of you have health issues and those are things
that have to be addressed.  Many defendants have other issues
that also need to be addressed while they're in custody and
judges should take that into account.

         I need also to consider the United States Sentencing
Guidelines, and I think you're probably familiar with those by
now.  Others here may be less familiar.  The Sentencing

1   Guidelines are a big book that is put out by a commission, and

2   that's a commission that includes some judges and lawyers and

3   experts in the field.  And the way it works is that a judge

4   like me is directed to look to that book for guidance.  It's

5   not a mandatory guideline but it's -- it's something the courts

6   are directed to look to and consider.

7           And the way it works is that every crime or type of

8   crime has a chapter or chapters in that book.  And the judge is

9   directed to go to the proper chapter and make certain findings

10  of fact and, based on those findings of fact, assign points.

11  And it becomes a fairly mathematical exercise of adding and

12  subtracting.  And on the basis of that adding and subtracting,

13  the judge comes up with a number.  And that number is referred

14  to as the offense level.  The judge then does a different

15  calculation under a different chapter in the book that relates

16  to criminal history and that's, generally speaking, so that

17  people who have prior convictions and have previously been

18  engaged in crime are typically going to be treated more harshly

19  than people with no prior convictions.

20          So the judge goes through, finds if there are any

21  prior convictions; if so, when they were, for how long, and

22  does another exercise of adding points and comes up with

23  another number.  And that number is referred to as the Criminal

24  History Category.  There are six criminal history categories.

25  Category I is the lowest.  Category VI is the highest.

1            Then on the basis of those two numbers, the offense

2    level on the one hand and the Criminal History Category on the

3    other, the judge goes to the back of this book where there's a

4    grid, a table, and simply goes down this column which is the

5    offense level and across these columns which are the criminal

6    history categories.  And where they intersect that's the spot

7    that in the view of the commission would be the appropriate

8    sentence according to this book.

9            Now a judge is not required to follow the book.  But

10   that's usually where sentencing begins.  The judge starts

11   there, makes findings under the guidelines and then we go back

12   and talk about these other factors.

13           I guess the last factor that judges are asked to

14   consider is the need to avoid unwarranted disparity in the

15   sentence of defendants in one case as opposed to other

16   similarity situated defendants.  And that's simply the sense

17   that it's important for a judge to take a step back and make

18   sure the sentence imposed in one case is not wildly out of line

19   with what is imposed in other cases that are similar with

20   defendants that are similar, recognizing no two cases are

21   exactly alike and no two defendants are exactly similar.

22           So those are the factors that I have to consider and I

23   have to weigh them and balance them.  And sometimes that's a

24   tricky process because some of these are in tension with each

25   other.

1          We're going to start now with the guidelines

2     calculations.  Once I've done that, I'll then ask the lawyers

3     if they wish to be heard beyond what they have submitted.  I

4     will give them a chance to address any of these other factors

5     that they think relevant.  I will give the government a chance

6     to respond.  I'll then give the victims an opportunity to speak

7     if they wish.  And then finally I will give each of you an

8     opportunity to speak.  You have a right to speak.  You're not

9     required to but you're certainly welcome to and, as I said, you

10    have a right to.  So I will give you that opportunity.

11          Ms. Shevitz.

12          MS. SHEVITZ:  Judge, I need to backup for a minute

13    because when you asked if the defendants had read the

14    presentence report, yes, but they did not see yesterday's

15    submission by the government.

16          THE COURT:  Yesterday's.

17          MS. SHEVITZ:  At all.  The one that came in last night

18    at 5:00 yesterday, they did not see that.

19          THE COURT:  All right.  Well if you want them to take

20    a look at that now you can.  As I said, it's not going to have

21    a material impact on my sentence.  But if they want to take a

22    few minutes to read it, it's about seven pages long, so they

23    can do that.  As I said, I didn't give any permission to file a

24    reply and so I hadn't expected it either.  But it shouldn't

25    take too long to read.

1          Do you want to do that?  Mr. Cohn, do you?

2          MR. COHN:  I take your representation that it doesn't

3     affect your sentence at all at face value and therefore I don't

4     care.

5          THE COURT:  Ms. Shevitz.

6          MS. SHEVITZ:  I don't know if it affects your Honor's

7     decision or not in reality, and I'd just like to have my

8     clients at least read what's here before they're sentenced.

9          THE COURT:  You can take a look.  That's fine.

10         (Pause)

11         MR. COHN:  Your Honor, with respect, if they're 'going

12    to read the seven page, single-space document I don't know that

13    you want to sit there while they do it.

14         THE COURT:  We can take a short break if you'd like.

15         MR. COHN:  Well it's up to you, your Honor.

16         THE COURT:  We'll take about a ten-minute break.

17         MR. COHN:  I've been through Mr. Tanaka's reading of

18    stuff.  He's very thorough and it takes some time.  And I just

19    want to advise the court that you might find it more convenient

20    for you, not for me, that if you want to leave the bench until

21    we're ready.

22         THE COURT:  That's fine.  So we'll take --

23         MS. SHEVITZ:  I apologize but I have not had an

24    opportunity to review this with them.

25         THE COURT:  You don't have to apologize.  That's fine.

E4O9VILS                    Sentence

1   Your client is in custody so it's harder to get in things than

2   would otherwise be the case.  So that's fine if you want to

3   take a minute or a few minutes to do that.

4           MS. SHEVITZ:  Thank you.

5           THE COURT:  We'll take a short adjournment.  All

6   right.  About ten minutes I expect should probably be

7   sufficient.  Thanks.

8           (Recess)

9           THE COURT:  So defendants have had a chance to read

10  the government's reply.

11          So let's go forward then with the sentencing

12  guidelines.  I'm going to make my findings under the

13  guidelines.  There is no dispute -- first of all, there are

14  twelve counts in the indictment.  Mr. Vilar was convicted on

15  all twelve; Mr. Tanaka on three.

16          Each of the counts should be grouped together for

17  guidelines purposes and so there is no dispute that the base

18  offense level is level 7 pursuant to section 2B1.1(a)(1) of the

19  guidelines.

20          The next enhancement relates to loss.  There is a

21  table under section 2B1.1 that relates to the amount of loss in

22  the fraud.  In 2010, I found that the total was about $22

23  million in loss, which therefore yielded a guidelines increase

24  of 22 levels.

25          This time around the defendants are arguing that there

1    is no loss or alternatively that the only loss is the lost

2    interest from 2003 or 2004 to 2005 on the ground that the money

3    to pay investors was never lost because it was always in

4    Amerindo's accounts.

5           Although the defendants argue that they're focusing on

6    loss amounts instead of credits against loss or deductions from

7    loss, this is really the same argument that was raised last

8    time.  I think it's the same argument that was raised on

9    appeal.  I reject it for the same reasons that I rejected it

10   before and for the same reasons that the circuit gave when it

11   rejected this argument on the appeal.  I also don't agree that

12   as a factual matter that there were always sufficient assets to

13   pay investors.  But I think that's not even relevant for

14   purposes of calculating the loss.

15          So with respect to the loss, my calculations are as

16   follows.  There was Graciela Lecube-Chavez, the government

17   wants to use the same amount of loss as was found in 2010,

18   which is equal to the unpaid balance left in her account.  The

19   defendants didn't raise any specific objections to this amount

20   other than to say that it should be zero or close to zero.  So

21   I find that the amount is proper -- is appropriately

22   $48,434.12.

23          With respect to the Mayers, again, the government

24   wants to use the loss amount that was used in 2010 which was

25   equal to the Mayers last investment in the GFRDA account in

1    2001.  Now the Court has recently received a letter from the

2    Mayers' attorney containing a more recent statement from June

3    of 2004 showing a balance of $11,224,936.46.  From trial

4    testimony, including Tanaka Exhibit FZ, this appears to be a

5    statement that was faxed from Renata Tanaka to the Mayers in

6    August of 2004.  That amount includes interest that accrued

7    over time.  But as the circuit -- Second Circuit has held in

8    United States v. Hsu, at 669 F.3d 112 at 120 through 122, a

9    case that was cited approvingly by the circuit in the Vilar

10   appeal, "When investors are told that their account has accrued

11   interest, that interest counts towards loss."  So to be more

12   consistent with the Lecube-Chavez calculation, it seems

13   appropriate that the calculation here should be the amount of

14   the last statement perhaps minus subsequent distributions.

15          Now from the SEC case and from trial testimony in this

16   case, we know that the Mayers received a little over $800,000

17   from Amerindo between June of 2004 and May of 2005.  The

18   documents supporting those distributions can be found in the

19   declaration of Neal Jacobson in the SEC case at docket number

20   333, Exhibit F, which the defendants had an opportunity to

21   respond to in the SEC case, and also Lisa Mayer testified about

22   these payments at the trial, and that testimony is in the trial

23   transcript at pages 1292 to 1297.

24          So, I think it could be argued that subtracting those

25   distributions from the statement amount would be appropriate,

1    although one could argue, frankly, that the credit shouldn't be

2    deducted since it was paid after the Mayers had realized that

3    something was wrong in Amerindo and were already considering

4    legal options.  And I'll refer the parties to Section 2B1.1,

5    application note 3(E)(i), which says that money returned

6    shouldn't be counted towards loss if it was returned to the

7    victim before the offense was detected, and then defines what

8    that means.  So, that doesn't really matter for purposes of

9    loss.  I find that the amount is $10,418,089.98.  But whether

10   it's eleven million or ten-and-a-half million doesn't really

11   affect the loss calculation.

12           With respect to Lily Cates.  Again, the government

13   wants to use the same loss amount as in 2010.  In reviewing the

14   presentence report, the submissions in the SEC case and the

15   trial testimony, I find that $500,000 from the SBIC investment

16   was transferred to the Lawrence Appet Trust at Ms. Cates's

17   direction.  And I think evidence of that transfer can be found

18   in the Jacobson declaration in the civil case at, again, docket

19   number 333, Exhibit C, and in the presentence report at

20   paragraphs 39 and 43.  Since that money was returned to Cates's

21   control before disclosure of the fraud, I think that should be

22   deducted from loss.  So for Lily Cates I calculate loss to be

23   $9,270,133.85.  And I find that this loss applies to both

24   defendants even though Mr. Tanaka was acquitted at trial on the

25   substantive count relating to this transaction.  I find that,

E4O9VILS                        Sentence

1    first of all, Mr. Tanaka was convicted of the conspiracy and

2    the investment adviser fraud counts.  I also find by a

3    preponderance of the evidence that Mr. Tanaka was involved in

4    that fraud and certainly under Second Circuit precedent United

5    States v. Vaughn, 430 F.3d 518 at 527 courts may consider

6    acquitted conduct in sentencing.  So, that amount will apply to

7    Mr. Tanaka as well as to Mr. Vilar.

8            Now the government doesn't seek to include loss for

9    Tara Colburn or Robert Cox, presumably because the circuit

10   didn't explicitly find that they were in America when their

11   transactions were engaged in.  I've since, however, granted

12   summary judgment to the SEC in the civil case finding that both

13   of those investors were in America when they invested and I now

14   find by a preponderance of the evidence that they were both in

15   America.  That is both for the reasons set forth in the summary

16   judgment reconsideration opinion, in the SEC case, and based

17   also on the evidence at trial including Government Exhibit

18   3331-15, which is an application from Tara Colburn for her $1

19   million GFRDA investment and it also listed her address at Los

20   Angeles.  So for Tara Colburn I find the loss to be the same as

21   I did in 2010 which is $936,371.78.

22           Robert Cox, I find the loss to be the same as last

23   time, which is $105,825.55.

24           So that is a total loss, if you add them up, of

25   $20,778,855.28.

1          Now, there are numerous other GFRDA investors.  Just

2     one minute.  It could be argued that they too were victims.

3     The government made that argument at the last sentence.  I

4     denied it finding there wasn't sufficient evidence in the

5     record to make those findings.

6          The government is no longer making that argument and

7     I'm not going to add any other GFRDA investors among the

8     victims or include their losses as part of the loss under the

9     sentencing guidelines.  Certainly those investors will be able

10    to participate in any distribution in the SEC case.  But I'm

11    not counting them as included in the loss.

12         So that yields a guidelines increase of 22 under

13    section 2B1.1(b)(1)(L).

14         MS. SHEVITZ:  Judge.

15         THE COURT:  Ms. Shevitz.

16         MS. SHEVITZ:  The court of appeals said that on remand

17    the district court must decide what acts -- what acts

18    constitute the offense conduct for the purpose of calculating

19    the appropriate loss amount at sentencing.  I'm reading from

20    729 F.3d at 67.  And I ask the Court to state expressly what

21    acts constitute the offense conduct that support this loss

22    figure, these loss figures.

23         THE COURT:  All right.  I mean I'm relying on the same

24    evidence and the same conclusions that are set forth in my SEC

25    reconsideration opinion.  So that's the basis for the finding.

1              MS. SHEVITZ:  But I don't know what -- I'm asking,

2    because the court of appeals directed that there be a finding

3    specifically on what acts constitute the offense conduct.  I

4    don't believe those acts have been specified in anything.  And

5    I think for this proceeding, so that I have a record, I would

6    like to ask the court to specify the acts that constitute the

7    offense conduct.

8              THE COURT:  The acts are the --

9              MS. SHEVITZ:  The acts.

10             THE COURT:  The acts are the reaching out to those

11   victims and their investment in the GFRDA during the life of

12   the conspiracy while they were in the United States, which is

13   really I think what the focus was, whether or not this was a --

14   this presented a Morrison problem.  So I think I've laid that

15   out in the SEC decision.  If you disagree, obviously you can

16   take that up with the Court of Appeals.  But I think -- I think

17   that should be sufficient.

18             MS. SHEVITZ:  You won't -- there is no further

19   specification of the act because the Court of Appeals I believe

20   was asking this because there has to be a nexus between the

21   acts causing the loss and that's why the Court of Appeals said

22   on remand that the district court must decide what acts

23   constitute the offense conduct for the purpose of calculating

24   the loss.  I still don't know how any specific act is related

25   to proximately causing any particular loss.

1          THE COURT:  All right.  I think -- I think you and I

2    may disagree on that.  I think I've made my record.

3          In any event, so that is the finding with respect to

4    the loss amount.

5          Now, there are other enhancements that the government

6    seeks.  The government seeks a two-level increase under Section

7    2B1.1(b)(10)(B) because a substantial part of the scheme was

8    conducted abroad.  The defendants argue that this increase

9    shouldn't apply because of the Supreme Court's decision in

10   Morrison.  I don't agree.  Where a victim is in America and the

11   perpetrator was abroad, there is no Morrison problem and

12   Section 2B1.1(b)(10)(B) is appropriate as an enhancement.  The

13   application notes for 2B1.1 make clear that this increase is

14   about dealing with individuals who seek to avoid U.S. law by

15   operating abroad and I certainly find that that is what

16   happened here.  So I do think that two-level enhancement is

17   appropriate.

18         The government seeks a four-level increase under

19   section 2B1.1(b)(19)(A)(iii) because the defendants were

20   investment advisers.  The defendants I think concede as much

21   and don't object to this enhancement.  I find it's appropriate.

22   So I will add a four-level enhancement for the defendants being

23   investment advisers.

24         The government also seeks a two-level enhancement

25   under 3B1.1(c) because the defendants were organizers, leaders

in this criminal activity.  The defendants argue that this

enhancement should not apply because the two of them were equal

partners in a two-person scheme.

          I find that the defendants managed or supervised

Renata Tanaka who was a participant in the scheme and was an

unindicted coconspirator and that this enhancement is,

therefore, appropriate.  I also note that arguably a four-level

enhancement under Section 3B1.1(a) would be appropriate because

the scheme was otherwise extensive and that it spanned many

years, was highly sophisticated, involved several of Amerindo's

offices and entities, and many of Amerindo's numerous employees

as unwitting participants.  But I don't think I need to go

there.  I think the two-level adjustment is appropriate and

sufficient under the circumstances.

          So adding all of these up yields an offense level of

37 for both defendants.

          Each of the defendants has no prior criminal history

so they're in Criminal History Category I.

          So with an offense level of 37 and a Criminal History

Category of I, the guidelines range is 210 to 262 months, which

is about 17-and-a-half years to about 22 years.  That's the

same guidelines range I found applied back at the sentencing in

2010.  So, those are my findings with respect to the

guidelines.

          Now while we're at it and while I've spent a fair

amount of time talking about loss, I think it makes sense now

to talk about restitution and forfeiture, just because they're

similar but distinct calculations.

　　　　The government seeks restitution to the victims in the

amount of the loss for each victim plus 3.25% compounding

interest through 2013.  The defendants have objected that there

shouldn't be any restitution because there isn't any loss.

I've already rejected that argument.

　　　　With respect to interest, I find that 3.25% is a

reasonable amount for prejudgment interest.  Arguably the

higher IRS refund rate would be more appropriate.  I had

previously ordered nine percent the last time.  The Circuit

seemed to suggest without ruling that that might be high.  So

I'm going to scale it back to 3.25% compounding.

　　　　That means that with respect to Graciela

Lecube-Chavez, I find restitution for the loss amount of

$484,344.12 plus 3.25% compounding interest from 2005 to 2013.

　　　　For the Mayers, I find restitution for the loss amount

of $10,418,089.98, plus 3.25% compounding interest from 2005 to

2013, minus the $200,000 that has already been paid to the

Mayers as hardship payments under the SEC case.

　　　　For Lily Cates, I find restitution for the loss amount

of $9,270,133.85 plus 3.25 compounding interest from 2005 to

2013.  Again, I find that Mr. Tanaka is responsible for this

restitution because of his convictions on the conspiracy count

E4O9VILS                        Sentence

and the investment adviser fraud count.  And I refer the

parties to Title 18 of the United States Code Section 3664(a)

which provides that if a court finds that more than one

defendant has contributed to the loss of a victim, the court

may make each defendant liable for payment of the full amount

of restitution or may apportion liability among the defendants

to reflect the level of contribution to the victim's loss and

economic circumstances of each defendant.  I also refer the

parties to United States v. Boyd which is 222 F.3d 47 at 51

which, again, recognizes a court may order a participant in a

conspiracy to pay restitution even on uncharged or acquitted

counts, substantive counts.

          Because I find that Ms. Colburn and Mr. Cox were also

in America when they made their investments, I'm going to grant

them restitution.  So I find restitution in the amount of

$936,371.78 plus 3.25% compounding interest for Ms. Colburn and

$105,825.55 plus 3.25% compounding interest for Mr. Cox.

          Now since there is some recalculation here with

respect to the numbers and the interest compounding, I'm going

to direct the government to submit a proposed restitution order

and an affidavit setting forth the interest calculations by

close of business today.

          With respect to forfeiture, the government is also

seeking forfeiture equal to the loss amounts.  The defendants

raise a few objections.  First, they argue that they have a

E4O9VILS                     Sentence

1      jury right to determine forfeiture.

2              Did you want to say something about restitution?

3              MS. SHEVITZ:  Yes, I do.

4              In the Razmilovic case, I think --

5              THE COURT:  The case that's been cited, not

6      pronounced.

7              MS. SHEVITZ:  Yes.  I can't pronounce it.  The court

8      there discussed how when money is frozen that is going to go

9      there with disgorgement, that it applies equally to

10     restitution.  There is no money that's been earning interest.

11     Consequently, in that case, which we can't pronounce, the Court

12     said that it was not appropriate to award interest.  We have

13     raised that again for the restitution issue.  There is no money

14     that has been earning interest.  The defendants have not been

15     able to earn interest.  JP Morgan is earning interest.  That's

16     the only one who is earning interest.  So, I will object,

17     again, under that theory.  It is impossible to pay interest

18     when there has been no way of earning interest on that money.

19             THE COURT:  I think you made this point in your

20     papers.

21             Mr. Cohn, did you want to say anything?

22             MR. COHN:  I just join in that.

23             THE COURT:  All right.  Government want to be heard on

24     that issue?

25             MR. NAFTALIS:  Only if you want us to, your Honor.  I

1    think there was evidence put in in the SEC case that the

2    accounts were accruing interest, as I recall.

3              THE COURT:  In any event --

4              MR. NAFTALIS:  Regardless, I don't think that's

5    relevant to the question of the defendant -- the victims being

6    deprived of their funds, which is the point of restitution.

7              THE COURT:  I think that there's a distinction between

8    disgorgement and restitution and I think that's the distinction

9    that Ms. Shevitz is blurring.  In any event, I think the

10   objection is preserved.  You've made your points.  But that's

11   my finding with respect to restitution.

12             With respect to forfeiture, as I said, there are a

13   number of arguments that the defendants raise.  First, they

14   argue that they have a jury right to determine forfeiture.  I

15   reject that argument.  I think it's counter to the Supreme

16   Court's holding in Libretti v. United States, 516 U.S. 29 at 48

17   through 49.  I don't think Apprendi has undermined that case.

18   Certainly the Supreme Court hasn't held so.  So until they

19   overrule it, I feel bound by it.

20             Second, the defendants argue that forfeiture should be

21   for profits not for gross receipts.  The Second Circuit has

22   rejected that argument in United States v. Peters, 732 F.3d 93

23   at 102.  So I reject it as well.

24             Third, the defendants say that the Court never entered

25   a preliminary order of forfeiture in violation of Rule

E4O9VILS                         Sentence

1    32.2(b)(2)(B).  That rule says that, "Unless doing so is

2    impractical, the Court must enter the preliminary order

3    sufficiently in advance of sentencing to allow parties to

4    suggest revisions or modifications before the order becomes

5    final as to the defendant."

6          Here, because we're doing a resentencing on a -- after

7    appeal, on a shortened timeline, I find that it was impractical

8    to do a new preliminary forfeiture order.  In any event,

9    failure to enter a preliminary forfeiture order doesn't prevent

10   an entry of a forfeiture order as long as the defendants had

11   notice and an opportunity to respond.  Here, I think the

12   defendants clearly had a full opportunity and notice, and, in

13   fact, did argue against the forfeiture.  So I find that any

14   failure to enter a preliminary order of forfeiture was

15   harmless.

16         For forfeiture, Ms. Shevitz --

17         MS. SHEVITZ:  Yes.  Aside from Libretti, we argue that

18   there's a right to a jury trial on forfeiture under Rule 32--

19         THE COURT:  No.  You've preserved -- you've made that

20   argument.  So you don't have to renew it each time.  I mean I

21   disagree.  But, so if you're just doing it to preserve your

22   appeal, you don't need to do that.  If you think I've

23   overlooked something, then certainly --

24         MS. SHEVITZ:  Well I didn't know if you overlooked it

25   because you had not discussed that as opposed to the Libretti

1   point.

2           THE COURT:  All right.  So I've certainly reviewed the

3   materials and I think you and I disagree with respect to

4   whether you have a right to a jury trial on the forfeiture.

5           With respect to forfeiture, I find that the

6   appropriate amount is the full loss amount minus the $200,000

7   that's already been paid to the Mayers.  So that adds up to

8   $20,578,855.28.

9           There is no interest on forfeiture.

10          So, I'm going to direct the government also to submit

11  a proposed forfeiture order reflecting that amount.

12          All right.  I should also note to the extent that some

13  of the proceeds were obtained by the Amerindo corporations, I

14  find that the defendants indirectly obtained everything gained

15  by Amerindo because they entirely dominated and controlled the

16  companies and used the companies' assets for their own personal

17  expenses and I'm referring to language in United States v.

18  Peters, which I've already given the cite for.  So, those are

19  my findings with respect to the guidelines, forfeiture, and

20  restitution.

21          Before I impose sentence I want to hear from counsel

22  and anybody else who wishes to speak, including the defendants.

23  So we'll go in the order of indictment.

24          Ms. Shevitz, I've read your submission and

25  Ms. Stafford's.  Very thorough.  About 70 pages.  Very long.

E4O9VILS                        Sentence

1   I've read it all.  But I'm happy to hear anything else you'd

2   like to say today.

3              MS. SHEVITZ:  I have nothing to add, Judge.

4              THE COURT:  All right.  Mr. Cohn.

5              MR. COHN:  Well, briefly, your Honor.

6              I note, as I think I said in the past, in my

7   submission that the guidelines from the standpoint of

8   sentencing for you seem to be not terribly important.  You

9   imposed a sentence under 3553 that was 75 percent of what the

10  guidelines authorized.

11             THE COURT:  For Mr. Tanaka.  That's right.

12             And I think I explained myself before which is that

13  this was not -- that the sentencing guidelines make no

14  distinction between a fraud that says you want to buy

15  beachfront and then sells you property in the Everglades, you

16  know, swampland and then you run off to Mexico with the money;

17  or a Ponzi scheme where the thing has to crash inevitably.

18  This I don't think was that kind of a fraud.  But there were

19  victims and there were losses.

20             MR. COHN:  I understand, your Honor.  And please don't

21  take that comment that I just started with as criticism.  In

22  fact, I'm applauding the Court for saying -- for doing

23  something which harsher judges might have done otherwise, let

24  me put it that way.

25             So, I start with the proposition that Ms. Shevitz has

1   dealt with economic issues in a much more thorough way than I

2   was capable of given that she was involved in the SEC

3   litigation and I was not and I saw nothing under the Criminal

4   Justice Act which would have allowed me to expend the kind of

5   money to participate in that had I even applied for you to let

6   me.  But, the question occurs to me, as somebody who's been

7   around for a long time, is having given that kind of

8   consideration under 3553(a) in the past, and imposed a

9   five-year sentence when you could have imposed a 20-year

10  sentence and been safe on appeal, why you should cut it now,

11  which I'm urging.

12          I'm urging that Mr. Tanaka be released essentially to

13  do what he could have done -- and the government has seemed to

14  make some hay somehow on the fact that restitution, or

15  disgorgement, or giving money back, or whatever hasn't happened

16  over a ten-year period.  And seems to imply that Mr. Tanaka

17  could have done that, although I'm not exactly sure how, given

18  that he was in jail, where a receiver is appointed, and

19  everybody was going forward with their hand out and saying give

20  us more money than we put in, all of which they're entitled to

21  put forward, I guess.  But the fact is that that money in

22  the Amerindo accounts is still sitting there.

23          The receiver seemed to have said that there's plenty

24  of money to make full restitution at the 2005 rates.  And maybe

25  there is and maybe there isn't quite enough.  But certainly if

the accounts are not managed properly there will be less money

than if they are.

I'm not suggesting that people shouldn't want their

money now.  But, I'm also suggesting that, particularly for the

smaller investor but even for the larger ones, that getting the

full amount with additional interest, if the 3.25% you know

holds water, is something that they would want to pursue

otherwise.  Unfortunately, as my standing here represents a

finding of the Court, Mr. Tanaka's assets have been wiped out

since otherwise he would have had a private counsel.  And you

ruled that he's indigent for the purposes of assigning counsel.

But I think what I suggest -- you know when I started to write

it, it seems that I had great temerity in saying

three-and-a-half years is enough already.  But I think it is.

If, indeed, you're to order that he assists the receiver in

finally coming to a conclusion and managing the accounts so

that in an orderly way restitution or whatever you want to call

it -- whether you want to call it disgorgement, whether you

want to call it repayment, I don't really care what you call

it.  I care that the money appears to be there to pay these

people and they should get the money at the earliest possible

date in the way most calculated to give them the most money.

It seems to me that given that Mr. Tanaka only has

about a year left to serve in an institution since in about a

year he'll be put into what used to be called a halfway house,

1    that that balances out for a reason that the Court has an

2    opportunity to do something which jail is not designed to do.

3    Jail here is sheer punishment, it seems to me.  I think the

4    Court's comments on the deterrent value, given what people in

5    the financial industry seem to do, has very little value.  And

6    what it is, is that it's punishment.  And you're entitled to

7    punish a miscreant for his misconduct.

8            But there is another issue that we should do.  And

9    we're starting to recognize it in other areas of law like in

10   drugs and rehabilitation as opposed to jail.  I'm not

11   suggesting that Mr. Tanaka even needs rehabilitation or not.

12   But he can assist getting the money back to the people in the

13   most orderly way and the most complete way.

14           Leaving him in jail while they sell out the accounts

15   that they're seizing, at great loss, leaving big gaps in

16   restitution makes no earthly to me.  It seems to me that if

17   we're concerned about the victims, then there's a balance to be

18   struck between getting them the most money the fastest way

19   possible or leaving them holding the bag on something, for

20   something they'll never see because there are no other assets

21   to seize.

22           So, what I am suggesting to the Court -- and I realize

23   that it's radical -- is that the Court essentially sentence him

24   to time served and put him on postrelease probation essentially

25   with strong conditions on his cooperation in managing the

 1   account and making sure that the money goes to the victims in

 2   the most efficient way and most complete way.  So that's why

 3   I'm suggesting that to the Court.  And I hope the Court will at

 4   least consider it.

 5            THE COURT:  Thank you, Mr. Cohn.

 6            Government wish to be heard?

 7            MR. NAFTALIS:  Just briefly, your Honor.  I'm not

 8   going to retread over the defendants' conduct in this case.

 9   Your Honor is well aware of it.  It was extensively argued at

10   the original sentencing.  I want to instead address the

11   defendants' postconviction conduct and why it supports the

12   reimposition of the Court's original sentence.

13            I appreciate what Mr. Cohn is saying.  I think it's --

14            MR. COHN:  I'm just standing so I can hear him.  He's

15   facing the Court.

16            THE COURT:  Let's make sure you're using a microphone

17   so you can be heard.  In fact, maybe even that one would be

18   better.  I think it's easier for the defense table to see you

19   and that that mic I think is a little --

20            MR. COHN:  I'm sorry to interrupt but I have aged ears

21   as they are.

22            THE COURT:  Well this is a beautiful courtroom but the

23   acoustics are challenging so we have to do what we can.  So, go

24   ahead.

25            MR. NAFTALIS:  Nice perspective, your Honor.

1            I appreciate what Mr. Cohn is saying and the

2     hypothetical that the defendants would like to help where they

3     can.  But this is the very same claim that Tanaka advanced at

4     the original sentencing and I think what the Court took into

5     account at that time:  That he would do what he could to get

6     the defendants -- the victims their money back.  And this has

7     been a refrain for some five years now.

8            But just because you say it doesn't mean it's true.

9     And if you look at the defendants' postconviction conduct, in

10    particular Mr. Tanaka, they have done nothing to aid the return

11    of money to investors.  The government cites an e-mail sent by

12    Mr. Tanaka from prison where he says, this is in connection

13    with giving the Mayers money back, who are owed ten plus

14    million dollars, whose house is being foreclosed upon, "These

15    people, the Mayers, will whittle -- whittle, moan, cry and wail

16    for the almighty shekel.  I'm sure their grandmother, who

17    accumulated this largess for their granddaughters by way of her

18    Puerto Rican department stores, would not be very proud to hear

19    of such spendthrifts malingering in the family tree.  My gut

20    feeling is to just let them fester."

21            So, your Honor, what Mr. Cohn is saying, it's nice to

22    hear.  But in practice it's just not true.  Mr. Tanaka and

23    Mr. Vilar have repeatedly tried to obstruct the return of their

24    clients' monies and they should get no credit or not be

25    involved in any process here at this present time.

1        I think we see -- we've seen what has happened.

2    They're not going to participate meaningfully in any way.  And

3    all they want to do is obstruct the return of investor funds.

4        So, in light of that, they should be -- the original

5    sentence should be reimposed because of their postconviction

6    conduct.  Their inability to say the most basic words to the

7    victims like the Mayers, Lecube-Chavez who is literally

8    penniless, the most basic words that, "I'm sorry."  Instead,

9    they blame the government repeatedly for their predicament.

10   They blame the court for their predicament.  They blame every

11   attorney who has represented them for their predicament rather

12   than saying:  I never invested a penny the way I was supposed

13   to.  I never gave my clients their money back when they asked,

14   parens, even though there was -- now they claim money in the

15   accounts or sufficient money.  And even after conviction, they

16   have never done anything to help the return of investor funds.

17   They have thrown up roadblock, after roadblock.

18        And that's what I want the Court to focus on here,

19   your Honor, is that fact:  Why the reimposition of sentence of

20   the original sentence is important, because the defendants have

21   in no way accepted responsibility for their actions, said I'm

22   sorry, or in any way helped the process.  The convictions are

23   final and have been so and they still fight tooth and nail to

24   prevent their victims from getting their money back.

25        Unless the court has any other questions, your Honor,

1   this has been extensively briefed and you, of all people, know

2   the record better than anyone in this courtroom and know

3   defendants' crimes and their conduct.  So I think with that,

4   we'll rest on our papers.

5              THE COURT:  All right.  Ms. Shevitz.

6              MS. SHEVITZ:  May I just be heard for one minute on

7   never doing anything to get the money back.  We made a proposal

8   for a payout while the defendants were in jail previously in

9   July 2002.  It was along the same lines that Mr. Gazes has

10  adopted two years later.  The amounts we said were subject to

11  checking with the Amerindo records, which was what Sharon Levin

12  used.  These defendants have had no ability to do anything to

13  accomplish the payout.  The government's statement that they

14  are obstructing it is completely untrue and unfair.  We have

15  been trying in both cases to get the money paid back, to get a

16  valuation that is fair and to get a process.  We and Julian

17  Friedman for Mr. Marcus suggested that the magistrate judge be

18  used or anything else.  That was in January 2012 after the

19  Court convened a joint combined matter.  We made these

20  suggestions.  Everybody else has been saying no.  And there is

21  absolutely not one thing that either defendant could have done

22  differently.

23             At the last sentencing your Honor asked about that,

24  couldn't anything have been done.  And Mr. Colton said, which

25  I've quoted repeatedly from the sentencing transcript, "No,

 1   because I intuited that the SEC wouldn't allow them to manage

 2   anything," and that's exactly what happened.

 3          On June 1, 2005 the SEC took them out of business of

 4   being able to do anything and has been standing in the way of

 5   getting -- letting them do anything.  Whatever Mr. Tanaka said

 6   previously was in regard to a hardship request.  We don't want

 7   hardship requests.  We want to get the money back to the

 8   investors.  There is no reason to stand in the way.  We wanted

 9   to show from the beginning -- I wasn't there -- but they wanted

10   to show that the money was there.  There has been no possible

11   way to do this.  And our proposal of July 2012 was the first

12   proposal that was rejected for no reason by the SEC only to

13   have Mr. Gazes, in his first iteration of what should be

14   returned, come back with substantially the same things except

15   he omitted some of the investors who were on Sharon Levin's

16   list.  Our payout proposal came from Sharon Levin's list.

17   That's where it came from.

18          I just have to object to that because the defendants

19   have been in no way obstructive of this and I ask the Court to

20   review the record of this, to be absolutely fair about this.

21   If we could do something, we would do something to get that

22   money back.

23          Could Mr. Colton have done something?  Maybe.  Maybe

24   he could.  And he said in that sentencing transcript that we

25   would have done something differently.  I think he and Mr. Litt

1   decided that it wasn't worth doing -- I don't know what they

2   decided.  The point is, these men stand sitting here today

3   before you to be sentenced could do nothing about it once it

4   was frozen.  And it remains frozen.  And nobody will say let's

5   unfreeze it.  Let's have JP Morgan pay interest.  We can't do

6   anything.  We can't do anything.  Their hands have been totally

7   cuffed behind them.

8              THE COURT:  Okay.  Thank you.  I mean I guess I will

9   give you a chance to respond, Mr. Naftalis, if you want.

10             MR. NAFTALIS:  No, thank you, your Honor.

11             THE COURT:  All right.  I know that there are a couple

12  of victims who wish to be heard.  Now is the time for that.

13  Who are --

14             MR. NAFTALIS:  Your Honor, in the courtroom are Lisa

15  and Debra Mayer.  And your Honor has Ms. Lecube-Chavez's letter

16  to the Court.

17             THE COURT:  I think there was some indication that it

18  should be read aloud.  Is there --

19             MR. NAFTALIS:  That was the request.  It's obviously

20  your discretion.  She just asked that it be read aloud.

21             THE COURT:  I don't think I need it read aloud.  I

22  certainly have read it.  It's part of the record.  So I think

23  that that's sufficient but if someone disagrees certainly I'm

24  happy to hear.  I mean no disrespect to Ms. Lecube-Chavez.  If

25  she were here, she would have the right to speak.  She's not

E4O9VILS                        Sentence

1   here.  I think the letter is part of the record and certainly

2   has been read by me.

3           MR. NAFTALIS:  Yes, your Honor.  So your preference,

4   or the witness's preference.

5           MS. SHEVITZ:  I do want to hand up to the Court with

6   regard to Ms. Lecube-Chavez two pieces of 3500 material that

7   may also be read where in 2005 and 2007, speaking of not being

8   able to do anything, Ms. Lecube-Chavez contacted the

9   government.  First Cindy Fraterrigo and then Edward Gallashaw.

10  I guess he's also a postal inspector.  Saying:  I'm Graciela

11  Lecube-Chavez, one of the victims.  Two years she asked for the

12  government to help get her money back and that's while it had

13  been frozen.  So I don't have extra copies of this.  But 3520-6

14  and 3520-13.  Because they bear on how the, quote,

15  victimization perpetuated.

16          THE COURT:  Do you want to hand those up?

17          MS. SHEVITZ:  Yes.

18          THE COURT:  You can give them to my law clerk.  He'll

19  meet you halfway.

20          So I have two Ms. Mayers.  Whatever order you prefer.

21          Go over there to the microphone over there.  If you

22  could just state your name and spell your name so the court

23  reporter has it down.  And then just remember that the

24  acoustics here are not great and everybody has a tendency to

25  talk too fast in court, myself included.  So keep your voice up

E4O9VILS                          Sentence

nice and loud and speak nice and slow.

MS. DEBRA MAYER:  Thank you, your Honor.  My name is
Debra Mayer.  And thank you for having us speak here today.

THE COURT:  Good morning, Ms. Mayer.

MS. DEBRA MAYER:  Good morning.  I wrote some things
down and put them in sequence in order to speak here today.

I was with my father on February 2, 2014 when he took
his last breath.

On Friday, January 31, 2014 he asked me:  What has the
judge said today?  I answered:  Nothing new today, dad.

He tightly shut his eyes and cringed.  He left this
world with excruciating and agonizing mental torment that
exasperated the physical stress.

For example, in 2008 he was in desire need of complex
dental and gum surgeries in order to eventually obtain proper
fitting dentures.  We could not provide the appropriate medical
care he so desperately needed.  As time went on, he could no
longer enjoy his favorite foods.  With just a few teeth and
nutritional deficiencies setting in, it translated into further
physical deterioration.  The quality of life was greatly
diminished, a deep depression set in along with a severe mental
torture that accelerated his death.

My sister, Lisa, and I live with acute stressful
trauma.  We live with the threat of being evicted from our home
along with utilities being shut off.  We have incurred

1   tremendous debts that haunt us daily.  Thanks to the incredible

2   benevolence of a few friends and family, we feel extremely

3   grateful.  Alberto Vilar and Gary Tanaka have had more than

4   ample time to reconsider their actions and the painful

5   consequences they have caused others.

6           Awhile ago I read a statement among the documents from

7   Mr. Tanaka that said something to the effect, which was just

8   said but I'll repeat it:  Let the Mayers fester.  They scream,

9   wail, moan, and scamper for every shekel.

10          Well, may I remind them that every hard-earned shekel

11   contributed to their business.  Every hard-earned shekel they

12   pilfered to fund their exaggerated, greedy needs and lifestyles

13   all along with deceit, lies and ill wishes towards us.  It came

14   back to bite them.

15          Your Honor, I pray for fairness, truth, and justice.

16   Thank you very much, your Honor.

17          THE COURT:  Thank you, Ms. Mayer.

18          MS. LISA MAYER:  Judge Sullivan, good morning.  My

19   name is Lisa Mayer.

20          The last time my father stood before you in the

21   previous sentencing he said:  Alberto Vilar and Gary Tanaka

22   were aloof, dishonest, and deceitful.  To this day, your Honor,

23   Alberto Vilar and Gary Tanaka continue to lie with no remorse.

24   After breaching our GFRDA contract and defaulting in 2003,

25   Vilar, Tanaka, and his wife, Renata, threatened us and lied to

E4O9VILS                              Sentence

1    us and cheated us.  They tried to browbeat us into submission

2    to their way or the highway.  And now we know that they had the

3    money to pay us back every dollar they owed us.  Instead, they

4    chose, out of greed, to fund their opulent lifestyles.  And

5    they continue to lie through their counsel Vivian Shevitz by

6    stating that we had reached a repayment agreement

7    with Amerindo.  No agreement was ever reached.  Ever.

8           In February, 2004 I flew to London with my sister and

9    our adviser to meet with Gary and Renata Tanaka.  We insisted

10   that a full payment was required along with our condition of

11   collateral.  There was no agreement reached at that time except

12   for reduced and incomplete interest payments.  Again, we were

13   lied to and told that this was a temporary measure.

14          In September 2004 Vilar sued us for defamation in the

15   State Supreme Court of New York.

16          The following year, in March of 2005 Vilar and

17   Tanaka's lawyer Toner sent us some e-mails inviting us back to

18   London to see if we could reach an agreement.  We responded in

19   April 2005 by saying that a trip to London would be useless

20   unless accompanied by an escrow account of one million in

21   collateral and an agenda for the meeting.  No collateral ever

22   materialized.  No agreement was ever reached.  One month later

23   on May 26, 2005 Vilar and Tanaka were arrested by federal

24   agents.

25          Your Honor, we just learned by the sentencing brief of

1    Vivian Shevitz that in June of 2005 clients of Amerindo known

2    as Dextra were paid in full in England by Renata Tanaka from

3    her personal stash of money.  As Renata was a person who dealt

4    with clients, someone should investigate the source of her

5    funds used to redeem clients.

6            Your Honor, Alberto Vilar and Gary Tanaka are arrogant

7    liars and cheaters.  They prevented the return of our money for

8    so many years, inflicting pain and suffering on us.  We have

9    enormous debts that accrue and compound daily interest.  We

10   have experienced hunger, anguish and depression.  Fortunately,

11   there are wonderful, kind individuals who helped us survive.

12   As we found ourselves with no power after hurricane Sandy and

13   no money for food or gas, one kind person emptied all her

14   kitchen cabinets and showed up with groceries to our home.

15   Other volunteers showed up and showed us love and kindness.

16   Even as our dad deteriorated and I rode more times than I can

17   remember by ambulance to the hospital, he eagerly awaited all

18   news from the court.  Only when reading to him the disgusting

19   letters from Shevitz would he cry.  You must persevere he told

20   us.  We loved our father deeply and will honor his life with a

21   successful outcome he so deserved and wished for.

22           Thank you, your Honor.

23           THE COURT:  All right.  Thank you.  Thank you very

24   much.

25           As I said before, the defendants themselves have the

1    right to address the court.  Not required to, but certainly

2    have a right to and are welcome to.

3              Mr. Vilar, is there anything you'd like to say before

4    I impose sentence?

5              DEFENDANT VILAR:  No, your Honor.

6              THE COURT:  Mr. Tanaka, is there anything you'd like

7    to say before I impose sentence.

8              DEFENDANT TANAKA:  No, your Honor.

9              THE COURT:  Well, let me tell you the sentence that I

10   intend to impose and my reasons for it.  This is an atypical

11   sentencing in a lot of ways because we had done this once

12   before and I spent a fair amount of time discussing my reasons

13   for the sentence I imposed then.  I've told you and others here

14   today what the different factors are that I have to consider

15   and these are things that have to be balanced against each

16   other and are often in tension with each other.  Last time I

17   sentenced Mr. Vilar to nine years and Mr. Tanaka to five years

18   which was well below the sentencing guidelines of 17-and-a-half

19   to 22 years.  And I did that for a variety of reasons, one of

20   which was, as I said to Mr. Cohn a moment ago, my sense was

21   that the sentencing guidelines made no distinction and still

22   make no distinction between various types of fraud and -- that

23   make no distinction between a pure Ponzi scheme which would

24   collapse of its own weight where no funds were ever invested or

25   a scheme that was sort of a con artist scheme to take money

from someone and then flee or disappear before they knew what

hit them.

          This was not that kind of a scheme.  Mr. Vilar and

Mr. Tanaka were successful investment advisers who built

careers and companies that did much good.  I don't think

there's any question about that.  They had skill.  They had

ability.  And they were able to help create wealth for their

clients who were fabulously successful, certainly for a time.

And I credit that.  They had no prior criminal histories.  Many

people made a lot of money because of stocks that were picked

by Mr. Vilar and Tanaka.  So I recognize that.  And I think

that's a reason why a sentence below 17-and-a-half to 22 years

is appropriate.  I'm just sort of replowing old ground, but I

think that's true.

          I've also looked at the individual lives of these men.

So, Mr. Vilar, in his case I commented on him being a

complicated person.  I think that's true.  I don't think it's

any less true today than it was on the day that I sentenced him

in 2010; a man capable of great generosity who has helped

individuals and institutions in very meaningful ways from his

own wealth which was considerable.  I don't think there's any

dispute about that.  I've read the letters that people attest

to that kind of generosity and charity.  A man capable of charm

and a man with, you know, taste and culture and all the sorts

of things that people associate with what is good in life.  And

```
 1    I give him credit for that.  And taste and culture are
 2    important.
 3          Mr. Tanaka is a person who began his life in a
 4    internment camp under the worst of circumstances in a part of
 5    American history that is not a proud part of it.  He was born
 6    there.  His parents were sort of stripped away from everything
 7    they knew and owned and put in a camp for the duration of the
 8    war.  His mother has written a very moving letter.  She wrote
 9    another letter previously.  Mr. Tanaka's wife writes very
10    movingly in a very long letter about Mr. Tanaka, about his
11    illnesses, about his spirits, about his complex personality and
12    what separation has meant for Mr. Tanaka's family, for his
13    child, his boy who is now 14 whom he hasn't seen in years.
14    I've I considered all of that before and I took that certainly
15    into account.  And it was what led me to conclude that the
16    sentence that I imposed of nine and five years was appropriate.
17    And I don't think these factors, these 3553(a) factors that
18    were discussed in 2010 have changed that much.  So I certainly
19    intend to impose a below-guidelines sentence.
20          Nevertheless, I certainly don't think a lower sentence
21    is appropriate now.  In fact, considering all of the factors
22    and all of the circumstances in this case I believe that a
23    higher sentence or really less of a guidelines reduction is
24    necessary and appropriate.  And I want to make this very clear.
25    This is a resentencing.  But I certainly have the authority to
```

1   impose a higher sentence where there is "objective information

2   in the record justifying the increased sentence."  That's

3   United States v. Bryce, 287 F.3d 249 at 256 from the Second

4   Circuit.  I certainly can't hold it against the defendants that

5   they appealed and I certainly don't.  They have -- you have the

6   right to appeal.  You have the right to defend yourselves in

7   civil cases.  You have the right to protect your legal rights.

8   Of course you do.  But the circuit has held that a higher

9   sentence on resentencing is appropriate where the defendant

10  engages in anti-social conduct following the initial sentence.

11  And I think that -- that's the same case, the Bryce case -- but

12  I think that that is what happened here.

13          At the last sentencing I was very influenced and

14  affected by what each of you said in open court and in your

15  submissions, that you really wanted to get investors paid.  To

16  give a couple of examples Mr. Vilar said that "I deeply regret

17  any inconvenience that our 14,000 clients might have suffered.

18  Fortunately, there are only five victims, and I am 95 percent

19  confident that they will be paid and that they will not have

20  been lost anything."  That's the sentencing, transcript of the

21  sentencing, 60 lines 5 through 8.

22          Mr. Colton who was then the attorney for Mr. Tanaka

23  stated that Mr. Tanaka had a "Commitment to get these people

24  paid."  And he has "spearheaded the effort to get the Mayers

25  paid."  That's the transcript at 107 to 108.

1           Mr. Tanaka himself said "Our private clients for

2    whatever reason have had their money tied up for five years or

3    so and I feel that they definitely are victims."  That's the

4    transcript at 139, line 24 to 140, line 1.

5           Mr. Tanaka continued, "I would like to get into trying

6    my best to restore client assets."  Page 142.

7           And again, "I hope to get the opportunity in the near

8    term, again, to restore these client assets because I do feel

9    deeply responsible."  That's the transcript at page 144.

10          Since then, I have to agree with the government, that

11   the defendants' conduct has seemed designed at every step to

12   slow down the distribution process and to punish the investors,

13   particularly those who testified against you at trial.  Those

14   words that were made at the sentencing in 2010, which I

15   credited, I think have been demonstrated to be false.

16          Just a few examples of that.  You refused to consent

17   to allowing a distribution to investors in the civil case back

18   in January of 2012.  Ms. Shevitz, on your behalf, submitted

19   letters refusing that consent.  The government submitted

20   letters saying that you were obstructing any attempts to get

21   early payment.  This is in the civil case, the docket 177, 187,

22   190, and 187.  At the hearing I held with Judge Swain on

23   January 10 of 2012 there was a lot of talk about saying you

24   wanted to get investors paid but you shot down every idea that

25   was proposed with the inevitable result that nothing happened.

E4O9VILS                        Sentence

1   That's the transcript from January 10 on the joint conference,

2   page 15, lines 13 to 21, 20 -- page 20 lines 13 to 19.

3           You've made numerous attempts to stay the civil case.

4   That's docket number 275.

5           You've opposed the appointment of a receiver

6   insisting, what I can only say preposterously, that you be

7   given control of the funds or that you be allowed to chose the

8   receiver.  This was a point made as recently as April 14 in

9   Mr. Cohn's sentencing memorandum at page four.

10          You've refused to cooperate with the receiver at every

11  turn, have consistently endeavored to slow him down and delay

12  the return of assets to the investors.  I'll point to the

13  hearing of October 25 in the civil case, line -- page 15, line

14  22 to 18, line 4; page 22, lines 5 through 23, line 2; page 27,

15  line 15 to page 28, line 5.

16          You've written letters to investors that seemed

17  designed to confuse them and to undermine the legitimacy of the

18  process.  Those letters are Exhibits B and C to the

19  government's sentencing submission.

20          You at various times insisted that you were the true

21  owners of the assets in the funds contrary to all the evidence

22  and to your own statements at the 2010 sentencing.

23          And in some ways worst of all I think you have

24  consistently refused hardship distributions to the Mayers or

25  any other victims even though you knew that the Mayers have

1    really been left in very difficult financial circumstances.

2    I'll point to the civil case docket number 360, 186, transcript

3    of the January 10 conference at page 54, line 22 to 55, line

4    17; as well as page 58, lines 8 through 11; 61, lines 14

5    through 24; page 62, lines 21 to 24; and page 63, lines 11 to

6    25.

7             I think your attitudes towards the Mayers has been

8    exactly what Mr. Tanaka said in the communication that was

9    quoted by the government here today, which is also included as

10   Exhibit A in their submission, the Mayers should just fester.

11   You wanted them to do what Ms. Lecube-Chavez testified at trial

12   you did to her, which is to turn them, like you turned her,

13   into a beggar for their own money.

14            I think that's unfair.  I think it's unjust.

15   Dr. Mayer came to the last sentencing.  He talked about the

16   harm that you had done to him.  And it seems to me that you've

17   done everything in your power since to make sure that he didn't

18   get paid before he died.  He died earlier this year, still

19   waiting for justice.  That was described by the Mayer sisters,

20   still waiting a return for his money, earned by him and others,

21   I gather, but certainly his money.  Ms. Colburn is also dead.

22   The other victims are five years older and no better off.

23            Ms. Lecube-Chavez in her letter to the court I think

24   well captures the consequences of that delay and the reneging

25   of the promises made by Mr. Tanaka and Vilar at the sentencing.

1   She writes "After years living as the victim in the money

2   dealings of a trusted professional like Mr. Alberto Vilar, I

3   find myself with 89 years of age, facing diabetes and

4   arthritis.  I'm a proud woman, humble and grateful, who planned

5   for a simple future, never thinking that a can of soup would be

6   my dinner, unable to pay for medicine I need, or forced to

7   cancel dental work for lack of funds."

8        Those are the real consequences of this scheme.  And

9   those are consequences that I think have been exacerbated over

10   the past five years since 2010 when the defendants asserted

11   their determination to make sure that investors like

12   Ms. Lecube-Chavez would be paid.

13        Now the defendants and their counsel are quick to

14   blame the government, the court, past lawyers, the receiver,

15   the SEC, and the victims themselves for these delays.  I think

16   that's dishonest.  I think it shows lack of remorse.  I think

17   it shows their continued bad faith and their continuing desire

18   to inflict pain on those who dare to challenge them and dare to

19   bring them to justice.  I think that's consistent with what

20   took place throughout the scheme, which I commented on at the

21   last sentencing, that this was a scheme that was basically

22   designed to take advantage of unsophisticated people, people

23   who could be intimidated, people who could be pushed around or

24   stonewalled.  The institutional investors didn't get treated

25   this way.  The sophisticated investors who would push back and

1    cry foul quickly weren't treated that way.  It was a certain

2    type of investor who they thought that they could get over on

3    while their economic circumstances were dire.  I think that was

4    part of the scheme.  I think that they're still doing that

5    today against victims that they now are acting vindictively

6    toward.  That's I think the only conclusion I can draw from

7    these facts.

8         Now I don't suggest that all of the delay is

9    attributable to the defendants.  The wheels of justice

10   sometimes move slowly.  I don't suggest for a moment that this

11   is entirely attributable to the defendants, but I do think

12   they're responsible for much of it.  I think it was

13   intentional.  I think it was designed to inflict pain and

14   hardship on those who testified against them.  I think it's

15   been in direct tension with the pronouncements made by the

16   defendants that they would do everything in their power to

17   repay their investors.  I can't ignore that.  I won't ignore

18   that.

19        In 2010 I sentenced Mr. Vilar to nine years, about

20   half of what the sentencing guidelines called for.  I sentenced

21   Mr. Tanaka to five years, which was about three-quarters below

22   the bottom end of the sentencing guidelines range.

23        The defendants' conduct since then persuades me that

24   such a reduction was unwarranted, or put another way, that

25   their subsequent conduct justifies a higher sentence; that the

1    defendants words at sentencing were false and designed to

2    mislead the Court and the victims; that the defendants have no

3    remorse and they are, in fact, determined to act vindictively

4    towards those who testified against them at trial.

5          So for that reason I intend to sentence Mr. Vilar to

6    120 months or ten years.  That's a year more than what I

7    sentenced before.  I think I would be justified in going much

8    higher, but I don't want there to be the appearance of

9    vindictiveness on my part even though I think I've rebutted

10   that amply in the record here.  I think it's important

11   nevertheless to send a message to the victims that I haven't

12   been oblivious to this and that this is something that has to

13   be acknowledged.

14         So I intend to impose a sentence of ten years on

15   Mr. Vilar and six years on Mr. Tanaka, in each case a year more

16   than what I imposed last time.

17         In Mr. Vilar's case it will be sentences of 60 months

18   on Counts One, Four, Five and Twelve which are capped at five

19   years, and 120 months on Counts Two, Three, Six through Eleven,

20   all to run concurrently.

21         For Mr. Tanaka I'm going to impose a sentence of five

22   years on Counts One and Four, which again are capped at five

23   years, and six years on Count Three, again, to run

24   concurrently.

25         In addition to those terms of imprisonment I will

E4O9VILS                          Sentence

impose a three-year term of supervised release for each

defendant with the same terms and conditions I've previously

imposed before.

       With respect to the fine, previously I imposed a very

modest fine.  I think for the reasons I've articulated here

today that a higher fine is appropriate.  I think more

importantly with respect to a fine, I think that at the last

sentencings the defendants each said or argued that they had

virtually no assets.  They are now claiming the residual amount

in the Amerindo accounts which they claim could be worth

millions or tens of millions of dollars and that may, in fact,

be true.  I think those accounts have not yet been fully valued

and so there may be a remainder.  To the extent that millions

of dollars or tens of millions of dollars fall to these

defendants, then I think the higher fine is warranted,

particularly in light of the conduct that I talked about today.

So, in light of that, I intend to impose a fine of $10 million

on top of the restitution and forfeiture that I've already

articulated.

       In addition, then, I will impose a special assessment

totaling $1,200 for Mr. Vilar, one hundred dollars on each

count; and $300 on Mr. Tanaka, one hundred dollars on each

count.

       So, that's the sentence I intend to impose.  I should

state that I find these sentences appropriate.  They're well

 1   below the guidelines.  But I think that a lower sentence would

 2   not be appropriate in light of all of the objectives of

 3   sentencing set forth in Section 3553(a) of Title 18.

 4          I would also note for the record that I would reach

 5   this same sentence even if the guidelines range were lower, if

 6   the losses to -- that I've attributed to Cox and Colburn were

 7   not included in the loss amount, and even if the enhancement

 8   for role and oversees activity would not apply.

 9          The guidelines are a guide.  They're a tool.  They're

10   advisory.  But ultimately on the entire record I think this is

11   an appropriate sentence.  And if my guidelines calculations

12   were to be deemed incorrect in any way, I can say that candidly

13   it wouldn't have made a difference for purposes of the sentence

14   that I intend to impose.

15          So is there any legal impediment to my imposing such a

16   sentence?  Ms. Shevitz?

17          MS. SHEVITZ:  Let me think for a minute.

18          THE COURT:  While you're thinking I'll ask the same

19   question to Mr. Cohn.

20          MR. COHN:  No.

21          THE COURT:  I'll ask the government.  Any legal

22   impediment to my imposing that sentence?

23          MR. NAFTALIS:  No, your Honor.

24          THE COURT:  Ms. Shevitz.

25          MS. SHEVITZ:  I have asked for hearings on certain

1    issues and your Honor has said no.

2                THE COURT:  Right.

3                MS. SHEVITZ:  So that being said and preserving my

4    objections to that, I guess there is no other specific legal

5    reason to -- for you not to impose a higher sentence except

6    under North Carolina v. Pearce and other cases of that nature.

7                THE COURT:  So then Mr. Vilar let me ask you please to

8    stand.

9                Mr. Vilar, having presided over your trial at which

10   the jury returned a guilty verdict I now sentence you as

11   follows.  I sentence you to a term of incarceration that will

12   total ten years.  And it will be accounted as follows:  Five

13   years each on Counts One, Four, Five and Twelve of the

14   indictment, those counts have a five-year maximum; as well as

15   ten years on Counts Two, Three, and Six through Eleven, all to

16   run concurrent.

17               In addition, I impose a three-year term of supervised

18   release to include the terms and conditions that were set forth

19   in the presentence report that I already stated on the record.

20   I'm happy to restate them if anybody wants me to.  But if you

21   don't think it's necessary, I won't.

22               Do you have a thought on that Ms. Shevitz?

23               MS. SHEVITZ:  I'm sorry.  What?

24               THE COURT:  For the terms and conditions of supervised

25   release.  I'm imposing the exact same terms I imposed before.

1          MS. SHEVITZ:  Having not been at the prior sentence

2     and not focused on them, yes, I'd like to hear them again.

3          THE COURT:  Let me just get them here and I'll read

4     them.

5          So, the conditions of supervised release will include

6     the following mandatory standard and special conditions.

7          First, you're not to commit any additional federal,

8     state, or local crimes.

9          You shall not possess a firearm or destructive device

10    of any kind.

11         You shall not possess or use drugs of any kind.

12         In addition, I'm going to impose the following special

13    conditions.  First, that you shall provide the probation

14    officer with access to any requested financial information.

15    You shall not incur new credit charges or open additional lines

16    of credit without the approval of the probation officer.

17         You shall submit your person, your residence, your

18    place of business, your vehicle or any other premises under

19    your control to a search on the basis that the probation

20    officer has reasonable belief that contraband or evidence of a

21    violation of the conditions of supervised release may be found.

22    That search must be conducted at a reasonable time and in a

23    reasonable manner but failure to submit to a search may be

24    grounds for revocation.  And the defendant shall inform any

25    other residents that the premises that he shares with them may

1    be subject to a search pursuant to this condition.

2              I'm not going to require drug testing for Mr. Vilar.

3    I don't think he possesses any risk of drug use.

4              There are 13 standard conditions that are imposed in

5    virtually every case involving supervised release.  I will

6    impose those here as well.  And I will order that Mr. Vilar be

7    supervised in the district of his residence.  All right.

8              As I said, I'm going to impose a $10 million fine

9    joint and several with -- well, a $10 million fine, excuse me.

10             I'm going to impose restitution in the amount that I

11   announced before to each of the victims.  I'll issue a separate

12   order for restitution but I've announced what those amounts

13   are.

14             I'm also going to order forfeiture in the amounts that

15   I've already recited as well as a special assessment of $1200,

16   one hundred dollars for each count of conviction.

17             So that's the sentence of the Court.

18             Please have a seat.

19             MS. SHEVITZ:  And we have asked for the recommendation

20   of designation to the Otisville camp.

21             THE COURT:  I will make that recommendation.  It's

22   only a recommendation.  I can't order the Bureau of Prisons to

23   move defendants or prisoners to any particular place but I'll

24   certainly make that recommendation and hopefully they can

25   accommodate it.

E4O9VILS                         Sentence

1           MS. SHEVITZ:  Or if not close to this.

2           THE COURT:  Close to the New York area.

3           MS. SHEVITZ:  Yes.

4           THE COURT:  So I'll refer -- I'll specifically ask for

5   Otisville's camp or such other facilities as are as close as

6   possible to the New York area.

7           MS. SHEVITZ:  But that of course is preferred.  Thank

8   you.

9           THE COURT:  Mr. Tanaka, would you please stand.

10          Mr. Tanaka, having presided over your trial and

11  received a guilty verdict from the jury on three of the counts

12  of the indictment, I sentence you as follows.

13          I sentence you to a term of incarceration of six years

14  in total, to be broken down as follows.  Five years on Counts

15  One and Four, and six years on Count Three, all to run

16  concurrently.

17          In addition, to that term of imprisonment I also

18  impose a three-year term of supervised release with the same

19  conditions I imposed last time which are the same conditions

20  that I just recited for Mr. Vilar.  I'm happy to recite them

21  again if you think it helps.

22          MR. COHN:  Not necessary.

23          THE COURT:  As I said, I'm going to order restitution

24  for each of the victims in the amount that I previously stated

25  and forfeiture in the amount that I've previously stated as

1    well as a special assessment of $300, one hundred dollars for

2    each count of conviction.

3              Are there any recommendations you would like me to

4    make?

5              MR. COHN:  Otisville, your Honor, the camp.  And in

6    your recommendation I would suggest that you add the reason for

7    it is because of continuing litigation and access to local

8    counsel being the reason for it.

9              THE COURT:  I can put that.  I don't know if that has

10   any magic effect.

11             MR. COHN:  I don't know either.

12             THE COURT:  I don't think it does but in fact --

13             MR. COHN:  It's like chicken soup, Judge, it can't

14   hurt.

15             THE COURT:  I'll mention it but, again, I don't think

16   it's -- it's not up to me ultimately what the Bureau of Prisons

17   does but they generally try to honor these requests and I'll

18   certainly make the request but that's New York for purposes of

19   an appeal, which I'll remind the defendants of their right to

20   appeal this sentence in a moment.  But otherwise, Mr. Tanaka

21   has family in California.  Once that's done, does he wish to be

22   in California?

23             MR. COHN:  No.

24             THE COURT:  Okay.  So, that's the sentence of the

25   Court.  I will make the recommendation.  Please have a seat.

E4O9VILS                    Sentence

1           MR. COHN:  Thank you, your Honor.

2           THE COURT:  So let me remind each of you -- is there

3    something you wanted to say?

4           MR. NAFTALIS:  Two things, your Honor.  One, I just

5    wanted to make sure that your Honor impose the ten million

6    dollar fine as to --

7           THE COURT:  Yes.  Ten million dollar fine as to

8    Mr. Tanaka.  If I didn't say that, I'm sorry.

9           MR. NAFTALIS:  Just to clarify as to Mr. Vilar had

10   some objections with respect to hearings that were preserved.

11   Aside from the hearing on Dextra, is there any other hearing

12   that we're talking about?

13          THE COURT:  I understood -- you're asking Ms. Shevitz

14   to clarify?  Is that what you mean?

15          MR. NAFTALIS:  I'm asking your Honor, yes.

16          THE COURT:  Well I think my sense was Ms. Shevitz was

17   referring to a trial for forfeiture and a hearing with respect

18   to some -- the loss amounts or loss circumstances but

19   Ms. Shevitz can speak for herself.  The hearings you were

20   referring to before?

21          MS. SHEVITZ:  Well the other hearing that I think

22   would be appropriate is the hearing on what motivation that you

23   are ascribing a motivation to the defendants to obstruct the

24   return of investor funds.  I asked -- I asked for a hearing on

25   that because the reasons for that obviously have driven the

1    Court to increase the sentence.  I think those reasons should

2    be subjected to an adversary analysis and witnesses.

3            THE COURT:  Okay.  So let me remind the defendants

4    that they have a right to appeal this sentence.  You appealed

5    once before.  But you have a right to appeal the sentence,

6    certainly.  I mean many of the arguments that were appealed

7    with respect to the trial are over.  But you certainly have a

8    right to appeal the sentence.  If you wish to appeal, you would

9    need to file a notice of appeal within two weeks.  So talk to

10   your attorneys about that.  That's just a notice, it doesn't

11   require the full briefing, but the notice within two weeks.

12           MS. SHEVITZ:  We have notice right here.

13           THE COURT:  Okay.  In any event, within two weeks.

14           MS. SHEVITZ:  Do I hand it up --

15           THE COURT:  No.  Don't hand it up to me.  You should

16   deal with the clerk's office on all of that.

17           Is there anything else that we should cover today?

18           MR. COHN:  Nothing.

19           MR. NAFTALIS:  No, thank you, your Honor.

20           MR. COHN:  I was speaking to Ms. Shevitz.

21           THE COURT:  Anything else you'd like to cover today,

22   Ms. Shevitz?

23           MS. SHEVITZ:  I would like, if possible, ten minutes

24   to talk to the clients after we're through before the marshals

25   take them back.

1          THE COURT:  Can I -- I defer to the marshals on this

2     just because they have tough restrictions on them.  Is that all

3     right?  Can the lawyers and clients have a couple of minutes

4     before they're taken back?

5          THE MARSHAL:  She can speak to her clients downstairs

6     in the interview room, sir.

7          MS. SHEVITZ:  That's very difficult because I have to

8     talk to both of them and you can only have one there at a time.

9     It's impossible to do that there.

10          THE COURT:  Could you give them a couple of minutes?

11          THE MARSHAL:  Give them five minutes.

12          THE COURT:  Thank you very much.  I appreciate that.

13     I generally defer to the marshals because they have a tough job

14     and a lot of demands.

15          MS. SHEVITZ:  I understand but it just -- the

16     circumstances are not possible.

17          THE COURT:  So five minutes.  After that then you'll

18     need to probably just take it up with them subsequently either

19     downstairs today or at the institution later.

20          Well let me say this then.  It's been a long

21     proceeding.  It's been a long case.  I don't wish either of you

22     ill.  As I've said before, I think there's much admirable in

23     each of you.  I imposed a sentence that I think was just.  I

24     explained my reasons for it.  I don't pretend for a moment that

25     it makes everyone happy.  It perhaps makes no one happy.  But

E4O9VILS                        Sentence

1    my job is to impose a sentence that I think is appropriate in

2    light of all the different factors that I mentioned.  I don't

3    believe in hiding the ball or I think I am obligated to tell

4    you my reasons and I've endeavored to do that.  I do wish you

5    the best.  I wish you health and I wish you happiness and that

6    ultimately you put this behind you and resume your lives with

7    your families and loved ones.  So that's my hope for you.  But

8    I can't stress enough how there were real victims here.  You

9    don't seem to think so.  But I think it's just so obvious and

10   so palpable that I hope you will reflect on that.  A lot of

11   pain was caused.  And it needn't have been.

12           So with that I want to thank all who came here today.

13   I want to thank the marshals and the court reporter.  And for

14   the students, maybe we'll just meet in the jury room just so I

15   can say hello and thank you for coming.  My law clerk will take

16   you over.  Thanks.  Have a good day.

17           (Adjourned)

18

19

20

21

22

23

24

25