ORIGINAL

FILED
U.S. DISTRICT COURT

2017 FEB 24  PM 12: 39

S.D. OF N.Y.W.P.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————X

UNITED STATES OF AMERICA,

           Plaintiff,

  -against-

17cw1492

05 cr 621 (RJS)

ALBERTO WILLIAM VILAR AND GARY TANAKA,

           Defendants.

——————————————————————X

## PETITION AND MEMORANDUM FOR VACATUR OF THE CONVICTIONS PURSUANT TO 28 U.S.C. §2255

Vivian Shevitz
Attorney for ALBERTO VILAR
And For GARY TANAKA
46 Truesdale Lake Drive
South Salem, New York 10590
914 763 2122
Vivian@shevitzlaw.com

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

Application for a writ pursuant to 28 U.S.C. §2255 ...................................3

    This case involved a joint investigation, obligating the SEC under Brady ........8

The Court should vacate the convictions because of ineffective assistance of
trial counsel. .................................................................................19

    ☐ Defense counsel inexplicably failed to move to dismiss Count 3,
added in a superseding indictment, on statute of limitations grounds...............26

    ☐ Defense lawyers failed to cross examine government witnesses to
affirmatively elicit facts that would put the matter in context.  Lisa
Mayer and Lily Cates were not "normal" clients.  Each had a history
with Vilar that should have been demonstrated using unoffered
government exhibits.............................................................................27

    ☐ Defense counsel failed to defend against the allegation that, even if
the SBIC investment was not a "sham", it was made through a company,
Amerindo Panama, that was a "sham."  The legitimacy of the Panama
Company was supported by available evidence in SEC files showing that
the SEC knew about Amerindo Panama for decades and had accepted
limitations on administrative powers it claimed under the "conduct and
effects" test.  Counsel failed to develop this exculpatory evidence, which
should have been used to examine SEC witnesses.  It would have put the
case in a whole new light; counsel also failed to invoke section 30 of the
Securities Exchange Act after the Monitor found defendants' operation
of the US Advisory entity to be faultless, and left the case with offshore
transactions conducted by defendants in their foreign business.  Section
30(b) would have raised a jury issue at least. ...................................30

    ☐ The government knew that the SBIC was a real venture and that it
did not require a license.  Trial counsel failed to show that between the

first SEC complaint and its amendment, the SEC silently removed the allegation that the SBIC did not exist. .............................................................41

☐   Counsel failed to investigate and present evidence of the contract modification defenses that actually existed and failed to establish the background of the Mayer disputes..................................................................46

☐     The Mayers Contract Action .................................................47

☐     Efficient breach ......................................................................50

☐   Counsel failed to rebut the notion of "theft" from Lily Cates by reason of withdrawal from one account that was inaccurately characterized by SEC examiner Wraga in 2005. Wraga should have been cross examined at trial. ..................................................................................51

☐   Counsel failed to investigate facts necessary to properly defend the penalties. ..............................................................................................53

☐   Counsel failed to ask for "reliance" hearings as to "loss" and "restitution"..........................................................................................58

☐   The SEC's withholding of material that induced it to withdraw its charge that the SBIC investment was a "sham" constituted a Brady/ Giglio errors.   Defendants were deprived of Due Process when the government, acting on the false premises that it did not correct, held defendants' money and made it impossible for them to defend.......................61

☐   Defendants were deprived of Due Process in this joint investigation ........62

CONCLUSION..................................................................................................62

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Manzo*, 380 U.S. 545 (1965)................................................................16

*Arvida Corporation v. Sugarman*, 259 F.2d 428 (2d Cir. 1958) ...........................15

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .................50

*Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998) ..................................................25

*City of Pontiac Policemen's and Fireman's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ..........................................................................................32

*Crisp v. Duckworth*, 743 F.2d 580 (7th Cir. 1984)..................................................25

*Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003) ......................................................21

*Fuentes v. Shevin*, 407 U.S. 67 (1972).....................................................................16

*Gutierrez-Brizuela v. Lynch*, 834 F. 3d 1142 (10th Cir. 2016) ..............................33

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ................................................................62

*Kokesh v. SEC, petition for certiorari granted*, Docket 16-529 (Jan.13, 2017)......19

*Kyles v. Whitley*, 514 U.S. 4195 (1995)...................................................................30

*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) ...................................................23

*Loyd v. Whitley*, 977 F.2d 149 (5th Cir. 1992) .......................................................25

*Mayer v. Vilar*, Index 603234/2004 (NY County). .................................................17

*Microsoft Corp.* v. *AT&T Corp.*, 550 U.S. 437 (2007)............................................31

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ...............................22

*Moore v. Johnson*, 194 F.3d 586  (5th Cir. 1999)....................................................24

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999).....................................................24

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .......................16

*Nealy v. Cabana*, 764 F.2d 1173 (5th Cir. 1985).....................................................25

*Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014)........................................................................................................................33

*Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001).........................................................24

*Phoenix v. Matesanz*, 233 F.3d 77 (1st Cir. 2000) ..................................................25

*Rodriguez v. Hoke*, 928 F.2d 534 (2d Cir. 1991).....................................................24

*Smith v. Stewart*, 189 F.3d 1004 (9th Cir. 1999) ....................................................25

*Stouffer v. Reynolds*, 168 F.3d 1155  (10th Cir. 1999) ...........................................24

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................... passim

*Umbach v. Carrington Investment Partners*, 2011 US LEXIS 7250 (D. Conn. 2011)........................................................................................................................22

*United States v. Alzate*, 47 F.3d 1103 (11th Cir. 1995)...........................................61

*United States v. DiPaolo*, 804 F.2d 225 (2d Cir. 1986)...........................................19

*United States v. Ebbers*, 458 F.3d 110  (2d Cir. 2006)..............................60
*United States v. Evans*, 744 F.3d 1192  (10th Cir. 2014) ..........................59
*United States v. Farano*, 749 F.3d 658 (7th Cir. 2014 ...............................59
*United States v. Gray*, 878 F.2d 702  (3d Cir. 1989)..................................25
*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012)................................8
*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012)...........................7, 61
*United States v. Martoma*, 990 F. Supp.2d 458 (S.D.N.Y. 2012) ...................7
*United States v. Motz*, 652 F. Supp.2d 284 (E.D.N.Y. 2009)......................27
*United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013)..............................59
*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ................................58
*United States v. Rosoff*, 242 F.3d 369 (2d Cir. 2000)................................26
*United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390 (4th Cir. 1993).........................................................................27
*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013)......................................4
*United States v. Walsh*, 09cr722(MGC) (SDNY)......................................57
*Williams v. Taylor*, 529 U.S. 362 (2000).................................................25
*Williams v. Washington*, 59 F.3d 673, 682-685 (7th Cir. 1995).....................58

## Statutes

28 USC §2462......................................................................................19

Section 30(a) and (b), Exchange Act, 15 U.S.C. 78dd(a), (b)..................31

## Other Authority

New York Times' Business Day section, entitled *How Delaware Thrives as a Corporate Tax Haven*, http://www.nytimes.com/2012/07/01/business/how-delaware-thrives-as-acorporate-tax-haven.html?_r=0 (June 30, 2012.................45

## Rule

Rule 65(b) of the Federal Rules of Civil Procedure ..................................15

# INTRODUCTION

This is an application for a Writ vacating the convictions of Alberto Vilar and Gary Tanaka in 05 cr 621, because of ineffective assistance of counsel, and because the SEC and US Attorney's office committed *Brady/Giglio* violations by acting on false information and failing to correct the record – achieving convictions based on false premises. The convictions and judgment in 05 cr 621 should be vacated. Collateral consequences of that conviction, including the SEC judgments, continue to harm Petitioner-defendants.

We can predict that when the Court turns to this 2255, "bad facts" will spring to mind. In this 2255, Petitioners challenge these bad facts. Circumstances since the trial concluded show that defense counsel failed to subject the facts to an adversary process, and by doing so, failed to put the entire case in the light most favorable to their clients.[1]

This Petition challenges the Court to ignore pre-conceptions, and ignore the concessions of prior counsel (see Mr. Marks and Mr. Colton at sentencing conceding that the investments were "shams".). Counsel's failure to ascertain the

---

[1] In *Strickland v. Washington,* 466 U.S. 668, 697-98 (1984), the Court wrote: "While the presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment [citations omitted], [a]n ineffectiveness claim … is an attack on the fundamental fairness of the proceeding whose result is being challenged.

true nature of the investments and to appraise the assets at issue about which the Attorneys were aware because they had the Bear Stearns account statements, caused the Court's stated disagreement "as a factual matter that there were always sufficient assets to pay investors." (Tr. 4-24-14, p.17). The Receiver in the SEC case has now **paid** all investors with assets that were always there, invested in the name of Amerindo Panama or one of its entities. There is $27 million in *excess*. (DOC 640, 05cv5231).

Something went amiss in this prosecution. There is no question that Vilar made misstatements. But Lisa Mayer and Lily Cates knew Vilar well, and were aware of his grandiosity. They had relationships with Vilar and with Amerindo that went beyond the "face" presented at the trial, and impeachment was "hidden" in unoffered government exhibits as discussed in the Vilar Reply brief, DOC 271, Appeal 10-521.

There is also no question that Vilar and Tanaka discouraged and slowed redemptions. At sentencing on February 5, 2010, AUSA Litt all but threw up his hands because he could not say why. After the Ross report (see DOC 408, Order attaching Ross reports) showed that there were available assets, AUSA Litt said that it was a crime to not have returned the money to the Mayers.[2]

---

[2] At page 44-45 of the sentencing transcript of February 5 2010, at Vilar' sentence (and in Tanaka's absence), again the prosecutor discussed the available funds, which he had refused to evaluate. AUSA Litt stated he "reject[ed] the contention

Counsel should have shown that it was a business decision that prompted the slow-down of redemptions, made to preserve the ongoing business and stall redemptions temporarily while the market was recovering.   There were defense based on contract, but defense counsel failed to use them.

## Application for a writ pursuant to 28 U.S.C. §2255

Briefly, after a trial in 2008, both Vilar and Tanaka were convicted of securities fraud in connection with "sale" of "GFRDA" (Guaranteed Fixed Rate Deposit Accounts) issued by Amerindo Panama to investors since 1986 through the indictment (Count 3), Investment Advisor fraud based on unspecified "offense conduct" (Count 4), and Conspiracy to commit these offenses (Count 1).

Vilar was also convicted of securities fraud (Count 2) in connection with the sale of the "SBIC" investment to Lily Cates in 2002 and related mail/wire fraud and money laundering counts dealing with Cates' investment.

---

that the money was always there. It wasn't there. There was a $17 million shortfall as of May, 2005."

The prosecutor agreed that there is a "difference, to be sure, between taking money under false pretenses as an investment advisor and  ignoring one's fiduciary duty -- and taking the money and  burning it, or spending it, or, you know, buying a yacht with it, whatever -- and not giving it back. But not giving it back, knowing that you have it, is a serious crime too."  He added that Mr. Vilar had *known* that Herbert Mayer was "suffering", and told the Court he did not know why Mr. Vilar decided to not "give the money back." ("But Mr. Vilar decided that -- I don't know exactly what he decided. He certainly decided not to give the money back.")

Tanaka was acquitted of the Cates fraud and related offenses.

Vilar (but not Tanaka) was also convicted of making a false statement to the SEC in a letter in 2005 (Count 12). The *charged* specifications of fraud consisted of three statements -- that Vilar had sold Amerindo Panama, when the sale of Amerindo Panama, (though contemplated) had not taken place – that the defendants no longer owned it, and there was no overlapping management. It was the government's allegation that this was a "lie" to the SEC that was material to the SEC's investigation into Lily Cates' complaint to the SEC.

Vilar also wrote in that letter that Cates had always been a client of Amerindo Panama. The indictment did not allege that that was a false statement.

On direct appeal, the Court of Appeals affirmed the convictions on the trial record and vacated the sentences, including the forfeiture, for *de novo* sentencing. *United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013).

Vilar had also raised ineffective assistance of counsel based on what successor counsel had learned as of then from 3500 material and government exhibits. The Second Circuit identified claims before it, including "(1) inadequate review of discovery; (2) inadequate development of defenses; (3) failure to cross-examine witnesses; (4) failure to advocate for his client in his summation; and (5) failure to challenge the forfeiture order."

The Court stated it was not reaching the claim -- that defendant(s) could

pursue the claim separately.  (729 F.3d 62, 97-98 (2d Cir. 2013)).

When Vilar and Tanaka attempted to bring a 2255 petition (DOC 671, 05cr621 (4/14/2014) (Exhibit C)) in connection with the April 2014 resentencing, this Court held that the 2255 petition – incorporated herein by reference – was "premature".[3]  (DOC 698, 05cr621).

Counsel attempted an earlier 2255 petition, which counsel concedes could have been clearer but which presented troubling facts that counsel believed put the case in a new light  (DOC 560-1, 05cr621).  This Court dismissed on procedural grounds  (See DOCKET entry 562).

The claims in support of vacatur of the convictions are now mature, and the petition is timely.

---

[3] However, the Second Circuit had held in an Order granting an extension of time on the appeal of the conviction that a 2255 could be undertaken simultaneously with the appeal.  See Order on motion to withdraw appeal or for enlargement of time (*United States v. Vilar*, 645 645 F.3d 543 (2d Cir. 2011) ("[H]abeas petitions filed before the petitioner has exhausted his direct appeal are generally considered premature. … But both measures may be pursued simultaneously.")

The Second Circuit's affirmance/vacatur occurred on August 30, 2013, *United States v. Vilar*, 729 F.3d 62 (DOC 527, 10-521).  An earlier attempt at a 2255 (DOC 560-2) was rejected by Judge Sullivan procedurally.

The second attempt at a 2255 (DOC 671 (Exhibit C)) was rejected by Judge Sullivan as "premature."  (Order, DOC 698).  Vilar remains incarcerated and Tanaka continues to be subject to restrictions from the criminal case.  Both face huge financial penalties that will – and were designed by the government to – render them penniless.  All this was determined by the government at the beginning of the case, when it looked to the government like this was the huge Ponzi scheme that the Bernard Madoff case became.

Vilar and Tanaka hereby incorporate the facts and arguments in <u>DOC 671, 05 cr 621 (4/14/2014)</u> (the most relevant excerpts of which are appended hereto as Exhibit C), and DOC 560-1, as if reiterated and restated fully herein.   They also incorporate (a) the Vilar arguments pertaining to ineffective counsel in the <u>Vilar appellate brief (DOC 178, 9/28/2011, Appeal 10-521)</u> (relevant pages of which are appended hereto as Exhibit A), and (b) the <u>Vilar Reply Brief appeal, DOC 271</u>– excerpted as Exhibit B)) and the Vilar Supplemental Appendices accompanying the Reply Brief (VSA I (Cates); VSA II (Mayer); VSA III (the investigation)).   See <u>Vilar Supplemental Appendix I</u>, <u>II</u>, and <u>III</u>

This material, which the Court of Appeals declined to review, shows what was available for impeachment of witnesses and development of defenses through those witnesses, including SEC witnesses, and to cast doubt on the government's case.

Vilar and Tanaka also incorporate and rely on arguments made by Tanaka's counsel in his brief on appeal, Appeal 10-521, DOC 156-3 (highlighting insufficiency of evidence that investors received the allegedly false statements in the GFRDA offering circulars and arguing that the government's "sham" investment theory as to GFRDAs did not have record support.).

Vilar and Tanaka also incorporate arguments concerning *Brady /Giglio* violations made in the <u>brief **and** reply brief for appellants submitted in the appeal</u>

6

of the parallel civil case, 14-2425. (DOC 14-2425, DOCS 97 and 150).  Petitioners specifically point to the discussion of the hearing on the SEC's *ex parte* emergency motion for the most serious of injunctive and attachment relief against defendants Vilar and Tanaka -- in their total absence. Knowing that they were in jail (see Gizzi Declaration of June 1, 2005), but failing to inform Judge Swain of that fact, the SEC seemed to engineer this June 1-2, 2005 hearings (and then the rest of the case) so that there would be no one there with information to explain and defend.

The SEC held a hearing, the purpose of which was to take defendants' property.  It asked the Court to impose confiscatory remedies, knowing that no one who knew about or could dispute the charges of fraud and theft, had been notified, or was present.

The conclusions drawn from proceedings lacking basic adversary procedures are unreliable and not entitled to credit. The government's failure to afford process and correct the record, as discussed below, justifies a remedy. *See United States v. Mahaffy,* 693 F.3d 113, 119 (2d Cir. 2012) (failure to turn over SEC material from a parallel case, which was in fact a "joint investigation," resulted in the ordering of a new trial for *Brady* violations); *United States v. Martoma*, 990 F. Supp.2d 458 (S.D.N.Y. 2012) (in joint investigation, USAO's "obligation to produce communications ... extends to documents in the sole possession of the SEC");

7

*United States v. Gupta*, 848 F. Supp. 2d 491, 494 (S.D.N.Y. 2012).[4]

> ***This case involved a joint investigation, obligating the SEC under Brady.***

This case had an unusual beginning.  In March 2005, Lily Cates complained

to the SEC through her lawyer, Ed Swanson.  She was having trouble getting her

account released from "Amerindo".  Attorney Swanson claimed that Cates had

always dealt with Alberto Vilar in New York – which was belied by the stack of

Cates' Amerindo Panama account statements she gave to her lawyer.  (GX 105).

She dealt mostly with Renata Tanaka at Amerindo UK in London.

Before the SEC had time to act, Lily Cates went directly to the US Attorney.

AUSA Litt and SEC counsel Salzberg conducted a six-week investigation

consisting primarily of interviews of Lily Cates and/or her lawyer.  Relying on Lily

Cates' understanding of "facts", and flawed analyses by SEC Examiner Elzbieta

Wraga (DOCS 9, 15, 05cv5231) (suggesting that Cates' funds were non-fungible)

---

[4]    According to a November 2012 article in Law360
https://www.law360.com/articles/391355/know-the-prosecution-s-brady-disclosure-obligations, the Justice Department now officially acknowledges that "parallel" investigations may be more than merely on separate rails. "In his Jan. 4, 2010, Memorandum for Department Prosecutors, Deputy Attorney General David W. Ogden advised prosecutors that "in complex cases that involve parallel proceedings with regulatory agencies (U.S. Securities and Exchange Commission, Environmental Protection Agency, FDIC, etc.), or other noncriminal investigative or intelligence agencies, the prosecutor should consider whether the relationship with the other agency is close enough to make it part of the prosecution team for discovery purposes." The Courts have now said "yes" to discovery obligations. This case is a poster child.

and Paul Gizzi (DOC 13), the defendants were arrested, a Monitor was installed, the SEC and US Attorney confirmed Bear Stearns' "plan" to freeze all of defendants' funds, and Vilar and Tanaka were stripped of their business.[5] See the SEC's Memorandum of Law in support of the Preliminary Injunction (DOC 14); Transcript 2/5/10 p.13 (Vilar sentence) (quoted in the note below)

The other main "witness" supporting the arrests and seizure of Amerindo

---

[5] At page 12-13 of the Vilar sentencing transcript (in Mr. Tanaka's absence), the Court stated it was a "fair point" to ask why the assets had been frozen, but counsel waived the important inquiry:

> `THE COURT: I think that's a fair point. Is there any dispute as to why they're frozen?
> MR. LITT: Apparently there is.
> THE COURT: Well --
> MR. LITT: The government did not ask for the funds to be frozen. I had conversations with Bear Stearns at the time, representatives of Bear Stearns, in which I was asked was the government seeking to have the accounts frozen. I responded no. And the reason I responded no was because we did not have a basis to prove that there were fraud proceeds there. And that's what we need before we send a freeze letter or seek a restraining order from a court. If we had been in a position to do that, we would have done it.
>   We said that we were not going to do that. I was told by representatives of Bear Stearns that they were not going to let the money go. I responded that's a business decision of Bear Stearns; the government has no position.
> THE COURT: OK.
> MR. COLTON: Your Honor, I would just note that Mr. Petercsak's testimony on the subject, which I don't have memorized, is at page 3486 of the trial transcript, if it's relevant to the court's determination.
> THE COURT: I don't think it really is. I'm not that interested frankly why it's frozen. But you think I should be, Mr. Marks?
> MR. MARKS: I think it's not an important point.
> THE COURT: All right. We're in agreement then.

US, was the statement of an SBA witness that "Amerindo" had never received a license from the SBA to become an "SBIC". The government concluded (as the SEC wrote in its first complaint) that defendants must have defrauded Cates because the SBIC investment was a "non-existent" "sham." See Declaration of Paul G. Gizzi in support of injunctive relief and a temporary receiver (DOC 13) (see paragraph 25, DOC 13, stating: "The Commission staff has coordinated activities concerning this matter with other agencies, and will advise the Court of those activities should the Court permit an oral presentation of this Application.."

Prior to the arrests on criminal complaints and the "takedown" of Amerindo US, the government interviewed no employees of Amerindo US, and knew little about it except what Postal Inspector Cynthia Fratterigo reported in an affidavit in support of the search warrant.[6] The interviews of Lily Cates and her lawyer, which

---

[6]     Fratterigo annexed the criminal complaints to her affidavit in support of a search warrant. (DOC 138-3, 8/30/06). On the basis of talking to Lily Cates and Lisa Mayer, and "research" by way of looking up "Amerindo" on the internet, Fratterigo said there was cause to call Amerindo a "Ponzi-type scheme" and signed the affidavit resulting in defendants being ousted from their (clean (see SEC Monitor DOC 48, 05 cv 5231)) business.

The Vilar sealed complaint (DOC 32-5) shows that Fratterigo's research had consisted of looking at "Amerindo's website (www.amerindo.com), "document[s] filed with the Securities and Exchange Commission," and a Morningstar.com report/ she also looked at Bear Stearns records.

Fratterigo did not differentiate between the Amerindo entities. Despite Fratterigo's sloppy reporting, Amerindo U.S. had *never* offered services to individuals (except through its mutual funds), and no GFRDA was ever offered through Amerindo U.S.

formed the basis of the arrests and the shutdown, were conducted together by SEC

counsel Mark Salzberg and AUSA Marc Litt.[7]

SEC Counsel Salzberg (and other SEC personnel) were physically present at

Amerindo US offices on May 26, 2005, while 19 armed agents were executing the

search warrant. Their presence and questions during the search induced Eugene

Licker[8] – who was present at to respond to employees calls to his former law office

---

Defendant's own counsel was confused about this, even as late as May 2006, when he asked Eugene Licker at the suppression hearing about the "percentage" of business that consisted of GRFDA's.

The answer is 0%. Amerindo U.S.'s business involved *no* fixed rate CD-type product – *i.e.*, GFRDA's. Defense counsel played into the SEC's playbook by failing to differentiate between the legitimate foreign companies and Amerindo U.S., consistent with the *government's* decision to treat all the separate Amerindo entities as one "enterprise." They were not.

This important "fact" asserted by the government *post hoc* should have been defended. It formed the basis for the penalties against foreign corporations in the SEC case.

[7] See 3500 material, in <u>Vilar Supplemental Appendix I</u>, <u>II</u>, and <u>III</u>, Appeal 10-521.

[8] Eugene Licker purported to represent Amerindo U.S. at this hearing. But he was *never* retained by the two defendants, and *never* spoke with either of them – before, during or after, his "employment." In another crazy aspect of this case, Licker stated his then-firm had been called by employees of Amerindo during the search, but the employees had no authority to hire a lawyer. Licker continued to represent the company, and in concert with the SEC, made concessions that have irreparably harmed the defendants. Defense counsels' failure to challenge the authority of Eugene Licker – when their clients (the defendant-Petitioners) did not know any better – constitutes ineffective passivity, but the representation required inquiry.

during the search.  They, and the coercive situation, induced Licker to take over representation of Amerindo US --without authorization – and commence and allow action that prejudiced the defendants -- including agreeing to confiscatory remedies - *all* without knowing the facts, and without *ever* conferring with the principals:  Vilar and Tanaka were incarcerated pending bail hearings and were not served with papers, nor were notified, and were not represented. (Licker testimony at suppression hearing, May 31, 2006; SEC hearing June 1, 2, 2005)).

Instead, Vilar and Tanaka were fighting for bail.  While the SEC hearing on injunctive relief and seizure of management rights was being arranged between the SEC and the lawyer who appeared for Amerindo US (Eugene Licker, who was not hired by Vilar or Tanaka), on the criminal side AUSA David Esseks and AUSA Marc Litt were telling the Vilar bail courts -- on May 27, 2005 (DOC 706, 05cr621) and June 3, 2005 (DOC 704, 05cr621) – that Lily Cates appeared *not* to be a client of the entity it had just demolished.  It had become apparent (upon looking at documents taken from  Amerindo U.S.'s offices pursuant to the search warrant and speaking to Licker and Amerindo US's COO David Mainzer while the search was in progress) that there were different corporations, and that Lily Cates seemed to be a client of Amerindo Panama.  (See bail transcripts, 05cr621, DOCS 706, 704).

Litt learned that documents maintained for Amerindo Panama were not at

the US offices, but rather in the UK, where the business serving individuals and entities had been operated by Tanaka through Amerindo UK for two decades.[9] AUSA Litt told the Courts that the government had not yet investigated Amerindo UK, and that the SEC was just now "examining" Amerindo US, the regulated agency, out of the SEC's San Francisco offices.

On June 1, 2005, SEC Counsel Kay Lackey and Gizzi were in court to argue the SEC's application for a TRO and a preliminary injunction against Vilar, Tanaka, and Amerindo US – a critical stage in the joint proceedings.   No one appeared for Mr. Vilar or Mr. Tanaka. Only they had knowledge of events that happened with respect to the Panama corporation.   (As they told the SEC, the companies were separate).   SEC counsel Lackey told the Court (see June 1, 2005

---

[9]    Amerindo had an impressive list of clients in Panama even before the US company was established.   Panama clients included: The World Bank, Credit Swiss, Lipton Tea, Chrysler Corp, Hunter-Douglass, The Soros Foundation, The Hausmann Foundation, The Metropolitan Opera, Marc Rich (now Glenmore Corp.), Antilles Shipping Company, Duty Free Shops (DFS), and Forest Labs.

Vilar and Tanaka had always invested based on their unique expertise in emerging technology and biotechnology stocks, likely to gain significantly in value if the market was right.   Vilar and Tanaka invested on behalf of these early Panama clients in such equities.

After 1986, defendants focused on the US Advisory company, with Tanaka, mainly, continuing to administer a small offshore business for individual clients who chose such foreign investment.   The "Panama Papers" have revealed that *lots* of people were making use of offshore investments than met the eye.   The SEC knew about Amerindo Panama since Amerindo US became a registered entity, and could see for itself the "difference" in the name Amerindo U.S. and Amerindo Panama was that the Panama title used a comma.

transcript DOC 525 05cv5231) that Bear Stearns did not want to release defendants' (Panamanian) funds, given the weekend press accusing Vilar and Tanaka of being thieves.  According to a Bear Stearns document, (GX 3582-16), Bear Stearns had "agreed" with the SEC and AUSA that it would hold defendants' funds.[10]

Based on the presentation at that June 1, 2005 hearing, the Court's imprimatur has been placed on the freezing of funds and the ousting of defendants from the business.  No funds have ever been released since that moment and the bank stopped paying interest.

Based on the "joint" allegations, defendants started the case with no assets to

---

BEAR
STEARNS

Bear, Stearns & Co. Inc.
David Toberoff
Vice President

130 Park Avenue
New York, NY 10022
tel (212) 272-4275
fax (917) 368-9137
dtoberoff@bear.com

July 12, 2005

VIA FIRST CLASS MAIL

William J. Sexton, Esq.
Siegler Law Group
9454 Wilshire Boulevard
Suite M-16
Beverly Hills, CA 90212

Re:    Amerindo Technology Growth Fund, Inc. Standstill Demand

Dear Mr. Sexton

I am writing on behalf of Bear, Stearns & Co. Inc. ("Bear Stearns") in response to your letter dated June 17, 2005 to Bear Stearns' Los Angeles office.  While Bear Stearns is unable to confirm any purported investments by your clients in the Amerindo Technology Growth Fund, Inc. please be aware that Bear Stearns is working closely with both the United States Attorney's office and the Securities and Exchange Commission, as well as with the court-appointed monitor, Robert Knuts, regarding the movement of funds from Amerindo accounts at Bear Stearns.  No funds will be transferred or withdrawn from these accounts without first consulting them.

Please feel free to call my colleague Patrick Maloney or me with any questions.  Mr. Maloney may be reached at 212-272-4275.

Sincerely,
BEAR, STEARNS & CO. INC.

David Toberoff

cc:    Marc Litt, Esq. (United States Attorney's Office, via First Class Mail)
       Mark Salzberg, Esq. (Securities and Exchange Commission, via First Class Mail)
       Robert Knuts, Esq. (Day, Berry & Howard LLP, via First Class Mail)
       Patrick Maloney, Esq.

D. Toberoff
3582-16

14

defend themselves and no ability to redeem their clients' account balances.[11] This

---

[11] In *Arvida Corporation v. Sugarman*, 259 F.2d 428, 429 (2d Cir. 1958), Judge Lumbard expressed the impropriety of an agency's proceeding against a defendant without notice and an opportunity to contest confiscatory sanctions:

> PER CURIAM.
> The petition for mandamus is denied as moot. The merits relating to the application for a preliminary injunction are now being heard before the district court. For this reason there is no need of appellate decision as to the temporary restraining order or the order which vacated it.
>     LUMBARD, Circuit Judge (concurring).
>     In the light of the supervisory function of the courts of appeals over the administration of justice in the district courts, … it is appropriate to add a word with respect to applications for temporary restraining orders and the granting of such orders *ex parte* without notice to those who are thus enjoined.
>
>     The district court must keep in mind that Rule 65(b) of the Federal Rules of Civil Procedure,… lays down specific requirements which are designed to give the parties who might be enjoined a chance to be heard before the drastic order of restraint issues. No temporary restraining order is to issue without notice "unless it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon."
>
>     Only a very unusual case should justify an agency of the government in requesting the issuance of such an order without notice when, with a few minutes' effort by telephone, it can so easily notify the parties and their counsel to appear before the district judge for such hearing as may be necessary and desirable to determine whether an injunction should issue. In most cases in New York City such arrangements can be made and the parties can be present before the district court in a brief period of time. Thus, where intended defendants are available for such notice there normally would be little excuse for not giving notice.

confiscatory action was taken without any regard for Due Process.

Due process means that a person may not constitutionally be deprived of "life, liberty or property" by governmental action without notice and a meaningful opportunity to be heard.  *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.").  S*ee also Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) (to same effect); *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (noting that  the "central meaning of procedural due process" is the "right to notice and an opportunity to be heard ... at a meaningful time and in a meaningful manner").

Here, though defense counsel should have challenged the SEC's action, the

---

The reason underlying the rule is that failure to give notice and a chance to be heard offends our customary notions of fair play and violates the spirit and the letter of the Federal Rules, except in the extraordinary cases therein provided for. **Since the administrative agencies of government are charged with the duty of enforcing regulatory statutes often penal in nature, it would be well for the government and its agencies to act with restraint in these matters as they involve not only the use of judicial process, but also the possibility of adverse publicity which may follow the issuance of the order. Thus irreparable harm may be suffered by the adverse parties before they have had an opportunity to be heard. (emphasis added).**

SEC should not have done this in the first place, and the US Attorney should not have allowed it a Joint Investigation. It is tainted.

But there was more, against which defendants' counsel failed to affirmatively defend. On December 5, 2005, AUSA Litt formally intervened in the civil SEC case to stay the case while he "investigated" the criminal case further. This essentially shut down the ability to challenge accusations that resulted in the taking of defendants' property and management rights, as well as their liberty. (See DOC 531, transcript, Dec. 9, 2005, 05cv5231).[12]   While the SEC filed an amended complaint containing inflammatory accusations, the case was stayed shortly thereafter, and no one challenged the case, until the criminal trial.

The trial was over when there were post-sentencing attempts to "loosen" funds for payouts to Amerindo Panama clients. There was a forfeiture order in place and a *substitute* asset forfeiture order "holding" all of defendants' property.

---

[12] AUSA Litt had also officially intervened to stop disclosures in the private civil cases against defendants in State court, one by the Mayers, and one by Cates. Those cases were stayed until the end of the criminal case. Defendants had no funds to defend; without notice to Tanaka the Mayer case went forward with default judgments. *Mayer v. Vilar*, Index 603234/2004 (NY County). Thereafter the Mayers continued to claim entitlement to the amount of their State court judgment in any payout and there was no way to negotiate except by defendants acceding to give up their excess.

The level of the criminal prosecutor's involvement leading to this outcome was unprecedented.   If the prosecutor had not intervened in this matter in 2005, everyone would have been paid out and the excess could have been available. Counsel for the defendants should have fought back.

During the pendency of the criminal appeal, the Court formally joined the SEC and the criminal cases for joint discussions about the forfeited property. (See Tr. 1/10/2012, DOC 214 (05cv5231)).

The Court has placed the assets "forfeited" in the criminal case into an SEC receivership, and rulings have been made in both the civil case and the criminal case respecting disposition of the frozen money.

Amerindo clients have gotten paid – some $54 million – a dollar for dollar payout of claims after a generous determination that ignored Amerindo's client records -- a process that should have occurred in 2005 but for counsel's ineffectiveness and the government's insistence.  There is now an excess, of at least $24,387.214.00 with an expected $3,500,000 in addition (DOC 640 05cv5231, p.4 paragraph 10.)

In the criminal case, defendants challenged the substitute asset forfeiture, and supposedly prevailed with the Court of Appeals ordering that forfeiture vacated.  According to then Chief of Asset Forfeiture AUSA Sharon Levin, who appeared at an SEC conference on 9/23/2011 (DOC 168, p.12, 05cv5231), *all* the funds frozen pursuant to the vacated forfeiture order should have reverted to the defendant/owners, by operation of law.

Present counsel argued this throughout the SEC/DOJ proceedings, but trial counsel had given away the assets with their unknowing tactic of consenting to the

18

restraining order.   Now the world can see that there was no massive fraud, and that all clients were paid with funds there all along.

Now, defendants argue that the excess identified in the SEC case but still held pursuant to the criminal forfeiture order, should revert.  A further taking of defendants' property would work an unconstitutional additional forfeiture and "disgorgement" that has become a punitive device.   (The Supreme Court has accepted *certiorari* in *Kokesh v. SEC, petition for certiorari granted*, Docket 16-529 (Jan.13, 2017) and will decide whether the five-year statute of limitations in 28 USC §2462 applies to "disgorgement", as defendants argued.

### The Court should vacate the convictions because of ineffective assistance of trial counsel.

A claim of ineffective assistance of counsel should be sustained if counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that absent counsel's errors the outcome of the proceedings would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). As long as counsel is prepared with relevant facts and appropriate legal standards, strategic decisions cannot be second-guessed in an effort to support an ineffective assistance of counsel claim. *See United States v. DiPaolo*, 804 F.2d 225, 234 (2d Cir. 1986).  But where counsel is *not* prepared with relevant facts and

law, and prejudice results, a defendant has suffered a Constitutional violation.

> "Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest. *See Cuyler v. Sullivan,* supra, at 346. From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. *See Powell v. Alabama*, 287 U.S., at 68-69."

*Strickland v. Washington,* 466 U.S. 668, 688 (1984).    The "ultimate focus of inquiry" is "whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process." *Strickland*, 466 U.S. at 696.

The *Strickland* Court reiterated that it imposed no "mechanical rules."   It continued: "Although th[]e principles [it set forth in the opinion] should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.  In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id*.

While "the presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment [citations omitted], [a]n ineffectiveness claim, … is an attack on the fundamental fairness of the proceeding whose result is

20

challenged. Since fundamental fairness is the central concern of the writ of habeas corpus, see *id.*, at 126, no special standards ought to apply to ineffectiveness claims made in habeas proceeding." *Id.* at 697-98.

And finally, as stated in *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003), an attorney's failure to investigate premised on a "desire to avoid extra work" is not a sound strategy.  If no sound strategy is apparent from the record, the Court must hold a hearing.

We first discuss the general lack of a defense theory.  We then turn to specifics of ineffective assistance.

There was no theory of defense, except to say that the defendants were good men and had made money for their clients in the past.  Counsel failed to conduct adequate review of the financial penalties defendants would face if they were convicted.  Everything the government charged was taken at face value by defendants' own lawyers.  When the Monitor in the SEC case came back with a report that there was nothing wrong with Amerindo US despite very public accusations of total fraud and theft, defense counsel, even then, said nothing.

Though there were contract modifications executed between Amerindo in the UK and several of "victims", counsel did not develop these actual and true defenses (as will be discussed further below).  Counsel failed to argue or ask for instructions based on the line of cases stating that breach of securities contracts

21

does not connote "fraud" unless defendant intended to not perform the contract at the inception.  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (failure to carry out promise made in connection with a securities transaction "is normally a breach of contract.  It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform."); *Umbach v. Carrington Investment Partners*, 2011 US LEXIS 7250 (D. Conn. 2011) (liquidity concerns caused a "failure to redeem", and did not connote "fraud").[13]

---

[13] The Court wrote about a failure to honor redemptions, contemplating the possibility of non-fraudulent liquidity considerations,  stating:

> [W]ith regard to the characterization of Umbach's claims based on Rose's representations about redemption rights, Umbach alleges that Rose promised him that he would always have quarterly redemption rights, in conformity with his interpretation of the provisions of the Side Letter to the LPA, and that Rose failed to perform that promise. Umbach simply has insufficient evidence to establish that when Rose made that alleged promise, he knew that the LPA would be amended to prevent Umbach from withdrawing funds, or that he secretly intended not to perform that promise. To the contrary, the preponderance of the evidence supports the conclusion that Defendants' decision to amend the LPA to lock up quarterly withdrawals was based on liquidity concerns in the face of late summer 2007 economic conditions and the number of redemption requests received from limited partners - - conditions that Rose could not have known about or predicted in late spring 2005 when he allegedly made a representation to Umbach that he would always be able to redeem his investment on a quarterly basis.

*Umbach v. Carrington Inv. Ptnrs*, 2011 U.S. Dist. LEXIS 7250, *16, Fed. Sec. L. Rep. (CCH) P96,022, 2011 WL 284590 (D. Conn. Jan. 26, 2011)

Counsel *did* nothing – at a time it would have mattered and *could* have been accomplished because there was no forfeiture order yet -- to try to move the process of returning funds.  At sentencing on February 5, 2010, Tanaka's counsel stated that he had not *tried* because, he said, "the SEC would have never allowed it." (Sentence Tr. 2/5/10 p.113).

Pressed further, counsel stated that his client Mr. Tanaka was frustrated by counsel's failure to achieve a payout and to have the assets managed.  But, counsel defended himself:  "Nobody ever imagined in July of 2005 when we requested a trial within 60 days that it would last for this period of time. .... *So, it is easy to say now – I'm not accusing anyone of anything – but just generally speaking it's easy to look back and say, well, it took five years, we should have done something.* But nobody even wildly imagined it would that period of time."

Counsel concluded:  I am confident that the SEC wouldn't have allowed these two people to do this work.  And we never thought it would take this long. Looking back, if I knew that it would be four years, I think I would advise differently, I think everyone would do it differently. (*Id.*p.115).

Counsel *should have* "accused someone", aside from his own client.

The Court should keep in mind the directive of the Second Circuit, *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001), that *Strickland* directs the court directs us to look at the "totality of the evidence before the judge or jury,"

keeping in mind that "[s]ome errors have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. . . ." *Strickland,* at 695-96.   Errors must be considered "in the aggregate."   *See Moore v. Johnson,* 194 F.3d 586, 619 (5th Cir. 1999) (court should examine cumulative effect of errors committed by counsel across both the trial and sentencing); *Stouffer v. Reynolds,* 168 F.3d 1155, 1163-64 (10th Cir. 1999) ("Taken alone, no one instance establishes deficient representation. However, **cumulatively, each failure underscores a fundamental lack of formulation and direction in presenting a coherent defense."** [emphasis added]); *cf. Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir. 1991) (dismissing case for failure to exhaust claims, but noting, "[s]ince Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together."). *Accord, Pavel v. Hollins,* 261 F.3d 210 (2d Cir. 2001) (cumulative flaws, including failure to prepare a defense, failure to call important fact witnesses, stemming from a goal of avoiding work, were "strategic" in *some* sense, but "not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client ....").[14]

---

[14] Judge Cabranes, who authored the *Pavel* opinion, discussed "conscious" and "reasonably informed" decisions in footnote 11:

> As to "conscious" decisions: See, for example, *Moore v. Johnson*, 194 F.3d 586, 610 (5th Cir. 1999) (holding that a particular decision could

not be labeled "strategic" where, inter alia, the attorney had "no idea" why the decision had been taken); *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998) (noting that a decision cannot be characterized as "strategic" where it was a result only of "confusion"); and *Loyd v. Whitley*, 977 F.2d 149, 158 n. 22 (5th Cir. 1992) (distinguishing between "strategic judgment calls" and "plain omissions") (collecting cases); and *compare United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989) ("counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence").

As to "reasonably informed" decisions: *See, for example, Williams v. Taylor,* 529 U.S. 362, 395... (2000) (noting that a decision based on a legal misunderstanding was not animated by "strategic calculation"); *Kimmelman,* 477 U.S. at 368, 106 S.Ct. 2574 (noting that a decision based on ignorance of relevant facts and "mistaken beliefs" was not based on "strategic considerations"); *Smith v. Stewart,* 189 F.3d 1004, 1010 (9th Cir. 1999) (holding that an attorney's decision not to pursue certain evidence was not "strategic" where, *inter alia,* it was based on a lack of understanding of what constituted such evidence); and *Williams,* 59 F.3d at 680 ("[b]ecause of his ignorance, counsel was . . . unable . . . to make any strategic decision"); and *compare Crisp v. Duckworth,* 743 F.2d 580, 587 (7th Cir. 1984) (contrasting an attorney's "general polic[y]" of how to defend a case with "strategic decisions," which are "decisions based on the specific facts of a given case"). As noted, the Supreme Court has explained that "[s]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690-91 .... But "virtually unchallengeable" does not mean wholly unchallengeable, s*ee Phoenix v. Matesanz,* 233 F.3d 77, 82 n. 2 (1st Cir. 2000), and decisions … not reasonably informed have emphatically not been "made after thorough investigation of law and facts."

As to decisions made with an eye to helping a client: See, for example, Moore, 194 F.3d at 615 (describing a "strategic" decision as, inter alia, a decision "that . . . is expected . . . to yield some benefit or avoid some harm to the defense"); and *Nealy v. Cabana,* 764 F.2d 1173, 1178 (5th Cir. 1985) (contrasting a "strategic" choice with an

I turn to specific failures, none of which can be explained by sound strategy.

- ***Defense counsel inexplicably failed to move to dismiss Count 3, added in a superseding indictment, on statute of limitations grounds***

Counsel failed to move to dismiss Count 3, alleging securities fraud in the sale of GFRDAs to investors, as time barred. This count was alleged for the first time in the second superseding indictment, returned January 31, 2006 (just after the SEC Monitor issued his December 2005 report (DOC 48, 05cv5231) essentially exonerating defendants in the operation of Amerindo US).

The statute of limitations for securities fraud is five years. *United States v. Rutkoske,* 506 F.3d 170, 174 (2d Cir. 2007) (citing 18 U.S.C. § 3282). According to the government's proof, the last purchase of a GFRDA was the Mayer's "roll over" in early January 2001. Lisa Mayer testified that the family confirmed the re-investment of $11,066,713.44 on January 4, 2001. (T.921-22; GX-2112; GX-346).

Because this last purchase predated the GFRDA charges by more than five years, defense counsel should have interposed a statute of limitations defense to Count Three, the securities fraud count relating to GFRDA.

The limitation period for securities fraud begins to run upon the purchase and sale of the security. *United States v. Rosoff,* 242 F.3d 369 (2d Cir. 2000), *citing United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1398

---

attorney's "abdicat[ing] his responsibility to advocate his client's cause") (internal quotation marks omitted).

(4th Cir. 1993).   Securities fraud is not a "continuing offense."   *United States v.*

*Motz*, 652 F. Supp.2d 284, 294 (E.D.N.Y. 2009).

Appellate counsel raised the statute of limitations claim on appeal, arguing

plain error, and alternatively argued that trial counsel was ineffective for failing to

raise the issue in the trial court.   The *Vilar* Court of Appeals rejected relief under a

plain error analysis (Opinion, Appeal 10-521, 8/30/2013) citing "sufficiency of

evidence." The Court did not reach ineffective assistance of counsel.

Had defense counsel raised the statute of limitations as a defense prior to

trial on the ground that the last purchase predated the five-year limitation period,

the Court would have dismissed the time-barred fraud charge.   At least a jury

would have decided the issue subject to plenary appellate review.

- *Defense lawyers failed to cross examine government witnesses to affirmatively elicit facts that would put the matter in context.  Lisa Mayer and Lily Cates were not "normal" clients.  Each had a history with Vilar that should have been demonstrated using unoffered government exhibits.*

Defense counsel failed to use available evidence to impeach, and to elicit

positive information, from Lily Cates and Lisa Mayer.   Specific failures are

discussed in the Vilar Brief (DOC 178, pp. 36-98, Exhibit A hereto), and in the

Reply Brief (DOC 271, appeal 10-521, Point II, p 29 et seq., Exhibit B).

As discussed there, 3500 material provided fertile grounds to cross examine

and put the case in a different light.  For example, 1) Cates' attorney Swanson did

not allege "fraud" in his complaint to the SEC; he sought rescission on the ground that Cates did not get the private placement memo before the investment.   2) Swanson did not say Cates was a client of Amerindo US.  As a former SEC lawyer himself, Swanson wanted the SEC to "help" Cates though she was an offshore client, and so he alleged in his letter to the SEC that Cates had  dealt with Vilar in New York.

3) Swanson had not disputed Vilar's claim to him that Cates' funds were in "technical escrow".  To the contrary, in one of his 3500 interviews prior to trial, Swanson agreed that his understanding of the term "escrow" used by Vilar did not mean that the funds had to be in a separate bank account.  The term conveyed the notion to Swanson that the funds were specified for the purpose.   As shown on Cates' client account statement (which the government failed to prove was itself a fraudulent statement (appeal, 729 F.2d 62)), the funds for the SBIC investment were designated for the next private equity venture that made market sense, and were in the meantime gaining interest.

In addition, there was evidence to rebut the claim that Lisa Mayer and others had relied on "false" GFRDA offering circulars in making the investments. Counsel obtained the (digital) files of Steven Kobre, brought in by Mr. Colton to help represent Gary Tanaka.  (Mr. Tanaka paid Mr. Kobre separately.).

In his files there was a June 17, 2005 Motion by the Mayers' lawyer Patrick

Begos, to file an amended counterclaim and "modify the caption".   The modification was adding as *party defendants* Mr. Tanaka and the offshore corporation in which the Mayer's offshore entities ("Daba, Inc." and "Aba, Inc.") had invested.   (Exhibit D hereto, Motion to Amend the Counterclaims, Index 603234/04, June 17, 2005).

Mr. Begos did not serve the papers on Gary Tanaka.   Trial counsel did not use the *absence* of an allegation that the Mayers had read or relied on the offering circular's description of a "mix" of investments made on behalf of GFRDA clients.

Defendants seek a hearing (and ask that counsel be appointed pursuant to the CJA to develop these 2255 issues.).

- *Defense counsel failed to defend against the allegation that, even if the SBIC investment was not a "sham", it was made through a company, Amerindo Panama, that was a "sham." The legitimacy of the Panama Company was supported by available evidence in SEC files showing that the SEC knew about Amerindo Panama for decades and had accepted limitations on administrative powers it claimed under the "conduct and effects" test. Counsel failed to develop this exculpatory evidence, which should have been used to examine SEC witnesses. It would have put the case in a whole new light;[15] counsel also failed to invoke section 30 of the Securities Exchange Act after the Monitor found defendants' operation of the US Advisory entity to be faultless, and left the case with offshore transactions conducted by defendants in their foreign business. Section 30(b) would have raised a jury issue at least.*

Defense counsel, unfamiliar with the offshore company, failed to find out from their clients about its operation, its assets, or its clients claims. Counsel allowed the prosecution to treat "Panama" as if it were but a fraudulent "arm" of an uncharged "Amerindo enterprise" which – the government claimed in opposition to the motion to suppress and in the press -- was a massive international enterprise that was "permeated with fraud."

When the Monitor determined that Amerindo US -- 98% of Amerindo's assets under management -- was clean and that all clients' funds accounted for (DOC 48, December 5, 2005, *SEC v. Amerindo* 05cv5231), defendants' counsel should have moved to dismiss remaining charges – all of which concerned, regardless of what Lily Cates "thought", a business conducted by Amerindo

---

[15] *Kyles v. Whitley*, 514 U.S. 419, 434-45 (1995) explained that "materiality" means that suppressed evidence "could reasonably be taken to put the whole case in a different light as to undermine confidence in the verdict."

Panama operating from the UK.   Counsel should have moved to dismiss, citing

30(b) of the Exchange Act (quoted below)[16]  at least as to GFRDA clients.  Even if

---

[16] Section 30(a) and (b), 15 U.S.C. 78dd(a), (b),  provide:

> SEC. 30. (a) It shall be unlawful for any broker or dealer, directly or
> indirectly, to make use of the mails or of any means or instrumentality
> of interstate commerce for the purpose of effecting on an exchange
> not within or subject to the jurisdiction of the United States, any
> transaction in any security the issuer of which is a resident of, or is
> organized under the laws of, or has its principal place of business in, a
> place within or subject to the jurisdiction of the United States, in
> contravention of such rules and regulations as the Commission may
> prescribe as necessary or appropriate in the public interest or for the
> protection of investors or to prevent the evasion of this title.

> (b) The provisions of this title or of any rule or regulation thereunder
> shall not apply to any person insofar as he transacts a business in
> securities without the jurisdiction of the United States, unless he
> transacts such business in contravention of such rules and regulations
> as the Commission may prescribe as necessary or appropriate to
> prevent the evasion of this title.

These statutes limiting the reach of SEC were discussed in *Morrison v. Nat'l Austl.
Bank Ltd.*, 561 U.S. 247 (2010), dismissing "possible interpretations of statutory
language [that] do not override the presumption against extraterritoriality. See
*Aramco, supra*, at 253, 111 S. Ct. 1227 ....."

Section 30, however, was not expressly decided in the *Morrison* case.  See
561 U.S. at 265 ("Subsection 30(a) contains what § 10(b) lacks: a clear statement
of extraterritorial effect. Its explicit provision for a specific extraterritorial
application would be quite superfluous if the rest of the Exchange Act already
applied to transactions on foreign exchanges--and its limitation of that application
to securities of domestic issuers would be inoperative. Even if that were not true,
when a statute provides for some extraterritorial application, the presumption
against extraterritoriality operates to limit that provision to its terms. See *Microsoft
Corp.* v. *AT&T Corp.*, 550 U.S. 437, 455-456... (2007). No one claims that § 30(a)
applies here.")

the trial court disagreed that the defense warranted dismissal as a matter of law, there would have been at least been a jury issue.

This was not an unknown defense position, despite the fact that *Morrison* was still percolating in the district courts.  Present counsel has seen a memorandum prepared by a lawyer working on the Vilar matter in 2006 for Hoffman & Pollok, who was aware of section 30(b).  Hoffman & Pollok was replaced by Mr. Vilar.

Successor trial counsel failed to defend the case under section 30(b), even though it became clear that all of the transactions at issue concerned "securities" created and issued by Amerindo Panama, administered through the UK.  Defendants should have had an opportunity for a jury determination of whether 30(b) applied.  This was, after all, a *criminal* case.

That litigation would have made a difference is a "probability".  Since the Second Circuit's decision in *United States v. Vilar*, it has issued rulings that appear 180 degrees different on the same issue interpreting *Morrison* and *Absolute Activist.* As discussed in the reply brief in the SEC case appeal, DOC 150, 14-2425 p.8, shortly after *Vilar* was decided by the Circuit, the Court of Appeals approved a ruling, by this Court, that was thoroughly inconsistent with *Vilar*'s holding. *City of Pontiac Policemen's and Fireman's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (purchase of securities on a foreign exchange by purchaser present in US *not* a domestic transaction).  And in *Parkcentral Global HUB Ltd. v.*

*Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014), which did not cite *Vilar*, the Court of Appeals took the position that *Absolute Activist*'s "irrevocable liability" test was not controlling, because the transactions were "so predominantly foreign as to be impermissibly extraterritorial."

In the SEC appeal, the SEC took the position that the difference between the inconsistent cases was that *this* case involves *private* foreign securities (in a foreign market), while *Pontiac* involved purchase of securities on a foreign exchange (cross-listed on a domestic exchange).)

If this was to be the difference, defendants' jury should have decided it. (Supreme Court nominee Judge Gorsuch has expressed views wary of deference to administrative interpretation, especially in cases, such as this, with criminal aspects. *See Gutierrez-Brizuela v. Lynch,* 834 F. 3d 1142 (10th Cir. 2016).)

Here, though Cates was not a U.S. client, the government claimed there should be criminal consequences because "L.C. was `confused'" by the fact that the names of the US and Panama corporations differed by a comma. In their brief on appeal, the government wrote that "defendants [named the corporations] in order to confuse investors…" (Gov. Brief, Doc. 250, 10-521, p.5).

There is no citation to the record.

The Vilar bail documents already established that in May 2005, the

*prosecutor*, not Lily Cates, was confused.[17]   In August 2005, the prosecutor

obtained a speedy trial exclusion so that he could get foreign documents to justify

the initial seizures and "prove" Cates should be treated as a US client, even though

she was not.

AUSA Litt reported that the government had seized documents and

computers in May 2005 from Amerindo U.S. on the theory that "L.C." was a

defrauded investor in Amerindo U.S.  Having found no documentary proof of that

"fact" Litt reported to the Court in August 2005: "Vilar has asserted that the

Victim was a client of Amerindo Panama, and the government "believes that the

Investor was solicited in, or from, the Amerindo UK office and invested in a

product purportedly offered by Amerindo Panama." (Letter, Marc Litt to Hon.

Kenneth M. Karas, August 2, 2005 pp.2-3, see DOC 671, pp 70-73.)

On December 9, 2005 (05 cv 5231, Tr. 12/9/2005 DOC 531) defendants'

SEC lawyers -- Mr. Colton, whose retainer with Tanaka embraced representation

of both the SEC and DOJ cases, and Robert Leinwand, for Vilar -- were at a

hearing before Judge Swain to discuss the SEC's opposition to the Monitor's

---

[17] It was not "new information" that the prosecutor's original conception of probable cause was based on inadequate investigation.  At the Vilar's bail hearing before Judge Baer on June 3, 2005 the prosecutor said that after the search of the US office, prosecutors (and apparently the SEC officials responsible for the concurrent "investigation") had learned that there were no records of L.C's investment in the New York offices and that in fact there were other Amerindo entities with separate records. (Tr. 15-17). The prosecutor asked for more time to investigate for bail.

discharge.

As occurred at other crucially important points in this joint case – defendants Vilar and Tanaka were not told (or invited) to be present.   Thus they did not *hear* when, at that hearing (DOC 531 pp. 15-18), SEC lawyers there told Judge Swain that, though the Monitor found that Lily Cates and "victims" of GFRDA purchases were not Amerindo US clients, the SEC case should continue because "some people" *believed* they were Amerindo US clients and there were "ambiguities."

Counsel, who knew nothing about the Panama or for that matter the US businesses, did not defend.  (DOC 531 at 17).[18]

---

[18] DOC 531, Tr.17-18:

> [DEFENSE COUNSEL KOBRE]: Again, they have made allegations against Amerindo U.S. relating to fraud. There has been a report out. The report says that the clients have had their money returned to them. The monitor is saying there is no more activity ongoing. We do not see the justification for the commission saying that a monitor should be looking over how the company unwinds itself.

> [SEC COUNSEL]MS. LACKEY: I would like to make a comment on one 10 thing that Mr. Kobre has raised twice now and I think the monitor made very clear in his report, which is who Amerindo U.S. clients are. There is clearly one category of clients where there seems to be some agreement about who they are in terms of institutional clients. I believe the monitor stated in his report that there is another class of clients, such as LC, and if you look at our amended complaint you will see allegations about other ambiguities about who may or may not be clients of Amerindo U.S. That was something he did not undertake to engage to decide. I think that issue by no means has been resolved by the monitor's report.

Defense counsel did not even then ask for frozen funds to be released for the defendants to be able to pay fees without borrowing and to fund their own living expenses.

Nor did defense counsel inform Vilar or Tanaka of what went on at that hearing or discuss its significance to the case.

Instead of creating a defense theory based on the truth of the separateness of the defendants' businesses and the full reporting of Panama to the SEC since 1985, instead of invoking the law of extraterritoriality and the doctrine that even securities contracts can be broken without being considered criminally fraudulent, defense counsel went along with the prosecutor's definitions. The case would be defined by the purported "belief" of Lily Cates, a self-proclaimed dyslexic who did not read anything, that she was a client of Amerindo US. (The SEC was fine with terming her a client of Amerindo US; Cates was fine with having the ability to "shelter" her taxes through her third party payments. (See DOC 178 and 271,

---

[T]here is still a class of people out there who believe that they are clients of Amerindo U.S., reasonably believe that. It is still uncertain. This will be an issue that will be decided in the course of this litigation. But Amerindo U.S. continues to owe fiduciary obligations to those people if that is how the facts are found at the end of the day.

\*\*\*

MR. KOBRE: If I may have one final point as to that, your Honor. I think the issue that counsel I raising as to what is a client of Amerindo U.S., as counsel appropriately says, it is perhaps at the core of this litigation, something that will ultimately have to be resolved in this litigation and may I suggest may even be at the core of the criminal litigation as well.

36

appeal 10-521 (excerpted as Exhibits A and B), and supplemental Vilar appendices).

Counsel could have shown the government's "theory" of what Lily Cates "believed," was a "fact" made up to "justify" erroneous suppositions in the first place – a strange bolstering of the government's case by its adoption of the "victim's" mental state as the theory of criminal liability. The government's admission at the bail hearings (see DOCS 706 (May 27, 2005) and 704 (June 3, 2005 bail hearing) that they were just figuring out that Cates was an offshore client -- after starting a prosecution on the basis of her word that she had dealt with Alberto Vilar -- should have been pressed.

The government tried to show that defendants' use of Amerindo Panama was *meant* to "confuse" Lily Cates. It took the fact that Vilar engaged in obvious foot-dragging by directing Cates to write to Amerindo Panama, and posited that this showed that Amerindo Panama had been "false" in the first place.

The government charged in the Superseding Indictment (DOC 133): "The defendants **named** Amerindo Panama in such a way to confuse investors about the identity of the investment advisor with which they were dealing. The only difference between the name of Amerindo Panama and that of Amerindo U.S. was the presence of a comma between the words `Advisors' and `Inc.'" (Indictment paragraph 2). [Emphasis added]

This ascription of motivation for *naming* the corporation was baseless, and corrosive. No witness said so. And *factually*, Amerindo Panama and Amerindo UK both existed, with their commas, years *before* the SEC registered Amerindo Investment Advisors Inc., the U.S. company. (The SEC San Francisco was full of information, including 1992 and 1993 letters, marked with "Privilege" Bates numbers, from and to SEC counsel Rick Cohen discussing the unusual inception of the offshore Amerindo businesses **before** establishment of the US business, and responding to the SEC's position that it could review certain information from the offshore business in connection with its US Advisory regulatory examinations. This and other documents – correspondence between the defendants' corporations and the SEC over the Advisory entity's lifetime – were not used by trial counsel nor produced by the SEC, are described at p.59, n.21, of the April 14, 2014 2255 (Exhibit C hereto), re-footnoted here).[19]

---

[19]We re-incorporate the documents attached to DOC 354, the Opposition to Disgorgement and Penalties in the SEC case, in the SEC case, and reiterate the description of exhibits as to SEC regulatory files:

    ***

    8. To the extent that the SEC sought to punish the defendants for "conducting" their Amerindo entities as an "enterprise" that could be considered one (US) concern, the "enterprise" notion is belied by the SEC's San Francisco file concerning the regulated entity, which (as documented since 1992) has recognized that Amerindo Panama (which predated the US Advisory) was a separate – and unregulated -- entity.

One such document discloses that the Panama office *commingled*. (See the document described in footnote 19's #10 as part of Exhibit B to defendants' opposition to disgorgement and penalties, a 1993 letter informing the SEC of the adoption by Amerindo Panama of a "one-client pool".

Moreover, the documents as a whole belied the nonsensical "comma" theory. Defense counsel should have introduced and prominently displayed SEC's 2003 letter-inquiry to Amerindo US, distinguishing between Amerindo Investment Advisers Inc., the US Regulated Investment Advisor, and the affiliated Panama entity, replete with a comma.

An attachment to the SEC's document request to Amerindo US, dated December 16, 2003, sought documents defined to include Amerindo Panama. It

---

9. Attached as Exhibit A hereto is an excerpt from a 1992 letter written to the SEC's San Francisco office by the attorney for Amerindo U.S. In it Attorney Cohen explains that Amerindo Panama was and is an unregulated offshore entity and that its "requirements" were set by its (long time) investors.

10. Attached as Exhibit B is a copy of the first three pages of the January 21 1993 letter from the SEC to Amerindo US, seeking Panama records and explanations and resting on the "conduct and effects" test, in the SEC's File No. 801-24922. Also part of Exhibit B is a letter to the SEC, from Amerindo Panama, adopting a one-client pool, and notifying the SEC.

11. Attached as Exhibit C is an excerpt of a document request of the principals of Amerindo US, seeking documents and information of Amerindo Panama in connection with the then ongoing audit. By letter of January 14, 2005, the SEC, satisfied with the disclosure, "passed" Amerindo US once again. ....

states in the definitional section (ECF DOC 139, p.8, filed 8/30/06):

> "AMERINDO" means Amerindo Investment Advisors Inc., its related corporations, ….

> "AMERINDO PANAMA" means Amerindo Investment Advisors, Inc., a Panamanian corporation ….

> The time period of the requested documents if from July 1, 1998 to the present.

>         ****

SEC witnesses who were not confused by the comma should have been called to testify that the SEC had known about the "comma", and despite that, had terminated and examination into Amerindo (and Panama) trades with "no enforcement action." (DOC 139 p.17, SEC's File No. 801-24922).

The documents from the SEC concerning the SEC's prior dealings with Amerindo Panama should have been turned over by the SEC, before the government acted on this 6-week investigation.   After all, SEC counsel Mark Salzberg was present at the Amerindo US offices on the day of the search, and it was his failure of investigation that resulted in the charges.

Yet, according to the bail transcripts, the SEC's San Francisco office's regulatory files, were unknown to the prosecutor at the time of the search.   As wrong as it was for the SEC to suppress Panama information, it was also ineffective for defense counsel to have failed to "call" the government on its wrongful besmirchment of the *fact* of Amerindo Panama.  It was ineffective to fail

to use this available information to rebut the government's attribution of "fraud" merely from using the name of an offshore company.   It is also inexplicable because defense counsel had already used the document from the SEC files, evidencing the "passing" of Amerindo US in its 2003-05 examination, in connection with the suppression proceedings.  (Licker Declaration in support of suppression, DOC 139).

There was no strategy − save "fear" of the Panama operational "unknowns" that the prosecutor was whispering to defense counsel was a can of worms to be avoided (even without knowing the *facts*)− for *not* showing SEC documents to the jury.

- ***The government knew that the SBIC was a real venture and that it did not require a license.  Trial counsel failed to show that between the first SEC complaint and its amendment, the SEC silently removed the allegation that the SBIC did not exist.***

Counsel also failed to use SEC evidence to rebut the notion that Vilar's "big lie" to Cates − a statement that Cates may have interpreted to mean that the SBA had licensed the venture -- was material to her decision to invest.  Counsel failed to use the *fact* that the Private Placement Memorandum (GX 265), in evidence but not discussed at the trial, had stated that the SBIC venture was a 10-year venture focusing on emerging tech businesses, and that it would "go" regardless of whether the SBA licensed it for matching funds or not.   Funds were still being gathered.

Cates wanted to co-invest with Vilar and Tanaka, and they were waiting in any event for opportunities to buy new companies when the market got better.

Moreover, the SEC *knew* that the SBIC investment was not a "sham" and did not have a requirement of an SBA license. This explains why the SEC silently removed the allegation in the first SEC complaint that the SBIC investment did not exist (Compare DOC 1, complaint, with DOC 44, amended complaint).

Neither defendant's lawyer noticed the change in the SEC complaints. The government continued to label the Amerindo Panama investments sham products. While Vilar may have been "inaccurate" about its ownership, as the jury found in convicting him under Count 12 for an intentional lie, he had not lied about the existence of the products in which his clients were investing.

A 2-page document marked with a Bates number by the government during its "privilege" review, P00879 –P00880 could have further revealed the SEC's knowledge of the investment. In February 2003, after Lily Cates had purchased the SBIC investment, there were email communications among Amerindo files, referring to inquiries made by Amerindo employees to Amerindo consultant Carlos Castellanos, a trial witness who was "running" the SBIC project for Amerindo.

By that email Ms. Kipp inquired of Carlos: "... the SEC has come back with a request on further information regarding the SBIC fund." According to the email – about which Castellano could have been questioned -- the information

42

sought by the SEC (the San Francisco regulatory office) and the private placement memo were in fact provided.    Castellanos testified as a witness, and could have confirmed this information.

Had counsel used this important document as a lead to cross examine SEC witnesses, or Carlos Castellanos, or even Lily Cates, or to ask for the SEC's file, the evidence would have cast doubt on Lily Cates' assertion – or the government's conclusion – that a "Vilar misstatement" about the status of an SBA license (or about any aspect of any investment that Cates made with Vilar over the years) had been "material".

Counsel's failure to correct the record and shift the focus from the "big lie" about the SBIC license status caused immeasurable and continuing harm to defendants.    Despite the fact that the SEC's amended complaint (DOC 44) quietly withdrew the inflammatory accusation that the SBIC investment did not exist, the prosecutor continued to argue it in summation.  ("... she hadn't really invested as a general partner or a limited partner, because the investment didn't really exist they had just stolen her money.  (Summation Tr.5322)).

The government repeated the allegation on appeal (10-521) and at the 2014 resentencing hearing.  The prosecutor argued that the SBIC venture to Cates must have been a "lie" because the investment was a "non-existent" venture (G.Brf. 110), "did not exist" (G.Brf. 112), and was "fictitious" (G.Brf. 114).    The

43

prosecutor wrote in its brief that at sentencing "Vilar's counsel [Jonathan Marks] conceded that the SBIC venture was a sham. (VA 114 ("Lily Cates gave Mr. Vilar $5 million, he said this was going into an SBIC fund which did not exist ...") (emphasis added). The Second Circuit referenced it at oral argument. There is no doubt that the failure to defend on this basis was damaging.

Further, the government *expanded* on the notion of "sham". As late as the resentencing of defendants in 2014 prosecutors argued (DOC 666, 05cr621, p5), that the Panama corporation never "existed at all". The prosecutor pointed to trial evidence that "Amerindo Panama's `office' was a small, windowless space within Fernando Berguido's law firm that could fit no more than two people. (Tr. 3180-84).

Recent confirmation hearing testimony of the current Secretary of the Treasury should dispose of the notion that windowless offices in Panama meant a "fake" investment opportunity (see http://www.reuters.com/article/us-usa-congress-mnuchin-idUSKBN1530KI, a Reuters article discussing Steve Mnuchin's testimony that his Anguilla-based company had no customers, employees, or offices in Anguilla). But in 2008, in the absence of such "common knowledge", trial counsel should have forcefully educated the jury about, and defended the

existence, and the legitimacy, of Amerindo Panama at the time.[20]

Not only could defense have cross-examined witness Stephen Gray, Amerindo's tax lawyer/tenant in the UK who advised offshore clients (T.4136-42) and who, according to his website, was an expert in cross-frontier transactions (see Vilar Brief DOC 178 p.51-52) ; not only did the SEC recognize Amerindo Panama for years, as noted, but – though the jury may not know this (since the "Panama Papers" had not yet been publicized) -- corporations use "drop box" offices *even in the United States* (specifically, in Delaware), to minimize taxes, avoid (not evade) regulation, or to "ply" friendly courts. A June 30 2012 article in New York Times' Business Day section, entitled *How Delaware Thrives as a Corporate Tax Haven*, http://www.nytimes.com/2012/07/01/business/how-delaware-thrives-as-acorporate-tax-haven.html?_r=0, discusses a "humdrum office building" in Wilmington Delaware that is the legal address of some 285,000 separate businesses." Its occupants, on paper, include giants like American Airlines, Apple, Bank of America, Berkshire Hathaway, Cargill, Coca-Cola, Ford, General Electric, Google, JP Morgan Chase, and Walmart. These companies, the article continues, "do business across the nation and around the world. Here at 1209 North Orange, they simply have a dropbox."      While some use dropboxes for fraudulent

---

[20] Petitioners are not arguing that counsel should have defended the *fact* of lying about the Panama operation to the SEC. There should be some penalty. It should not involve forfeiture.

activities, "[m]ost of the businesses incorporated here are legitimate and many are using all legal means to reduce their tax bills – something that most stockholders applaud."

Though Vilar may have wanted to distance himself from Panama, it was not because it was "dirty."  Rather, it was offshore, and the clients of Panama wanted to keep it secret.  Though it roiled the SEC, the jury should have known about the defendants' business operations and the background shown in the SEC's files.

- ***Counsel failed to investigate and present evidence of the contract modification defenses that actually existed and failed to establish the background of the Mayer disputes.***

In his summation Tanaka's counsel said he was confident that the jury would return a verdict "that sends this case back across the street with respect to Gary in terms of back into the contract case it should have been." (T.5462).

However, counsel failed to establish exactly what he meant by contract defenses, and failed to establish that Amerindo Panama clients had for the most part gone along with modifications, by which Tanaka could better keep the Company going for the future good of all offshore clients, the vast majority being friends, relatives, and long-time business associates.  Modifications were made and being made, and were being acted upon, negating materiality of the "mix" supposedly "promised" in the GFRDA circular, probably unread until some lawyer defended a contract claim.  (Indeed, the Mayers did not allege that they had

46

received or read any offering circular in their State counterclaim.  See Exhibit D hereto) But the jury did not know any details of this, and so convicted Tanaka as well as Vilar on fraud in connection with the sale of the GFRDA.

On rebuttal summation, the prosecutor pounced on the failure to produce evidence of the contract disputes (Tr.5488-89), stating:  "There was a lot of discussion about a contract dispute; this case really belongs across the street because it really is just a contract dispute. What does that come from? There's no evidence at all of any, any contract dispute between the defendants and the GFRDA victims. …"

Petitioners agree with the prosecutor's rebuttal summation.  Their counsel failed to submit evidence to demonstrate that contract disputes were being addressed through accords and satisfactions and modified payouts.

- ***The Mayers Contract Action***

The government and the Court have expressed understandable concern for the Mayer family.  The Court lays at Petitioners' feet the fact that poor Mayers were not paid in full when, after a fight between Lisa Mayer and her former boyfriend Alberto Vilar, the Mayers decided to effectuate a full redemption.

Here is what was not brought out:    In 2004, Alberto Vilar started a defamation action against the Mayers on behalf of himself and Amerindo US. *Amerindo US & Vilar v. Mayer*, NY. County, 063234/2004.

47

As reported in the *New York Daily News* on June 2, 2005 ("Ex-Lover sues billionaire investor over missing $11M"), Vilar had sued his ex-lover Lisa Mayer **before** this case erupted.   Vilar alleged in the complaint that Lisa Mayer was spreading "vicious falsehoods" designed to destroy his reputation as a market guru. A former FBI agent hired by the Mayers was going around to other Amerindo clients and informing them that Vilar was stealing from his clients.   Vilar's civil complaint alleged that the investigator's statements were defamatory:   "No funds had been stolen or were missing from Amerindo."

The 6/2/2005 *NY Daily News* article, published the day after the SEC began its case, also reported that "yesterday, the SEC sued Vilar, who is being held in lieu of $10 million bail, and asked a judge to appoint a temporary receiver."   It reported:   The SEC complaint identified the client "whose money was stolen as Lily Cates, who is also mentioned in Vilar's defamation lawsuit against the Mayers.   Vilar's court papers also alleged that **the Mayers' investigator had contacted Lily Cates, and he had told her [Cates] that funds had been stolen, and "he was searching for them in Vilar's personal accounts."**   (*id.*) (emphasis added).

The jury should have known that the Mayers prompted Lily Cates' fears of theft, were introduced by the Mayers.   By inducing fear in Lily Cates, the Mayers brought the house down.

The jury should also have learned of the concept of "efficient breach" of contract because it is True:  in the third year of a 3-year GFRDA investment, Amerindo told the Mayers that it would no longer pay the 11% interest rate.   The Mayers knew that they could not get a better deal in the low-interest market, and they did not really want to take a redemption.

In 1997, after Vilar broke up with Lisa Mayer (at the Tanakas' wedding), the Mayers had left Amerindo's management, and lost money.  They were happy to be taken back as clients.   There was really nowhere else to go to earn as much interest.  So in 2003, the Mayers negotiated.

According to the Mayers' State court complaint (Exhibit D), by letter dated January 28, 2003, Amerindo told the Mayers that, as to the third year, 2003, Amerindo Panama could "no longer … offer you an interest rate of 11 % per annum.  We propose an interest rate of 8 % per annum for a one-year investment." In the same letter, according to the Mayers' counterclaim-complaint, Amerindo informed that Amerindo would no longer be able to pay a monthly interest withdrawal of $50,000.  Amerindo proposed to pay the $96,000 monthly interest withdrawals, and proposed $50,000 monthly payments, as a temporary measure during the workout.

Begos denied that there had been an acceptance of "the proposal." But it is clear there was a modification of some sort, and there were discussions.

49

At trial, Lisa Mayer testified that she had **not** rejected the proposal for $50,000 monthly payments, while the workout was in progress – *i.e.*, "temporarily" (Tr.1179). But she said she did not accept the rest of the proposal, and in any event had accepted out of economic necessity.

It was also elicited, and should have been argued, that the Mayers in fact received from Amerindo $1 million in 2004, and $306,846 in 2005, and they were expecting another payment in late June, 2005 (See T.1293-97, 1377-87, 1473). If the Mayers had *not* accepted the proposed modification, then what was the purpose of those 2004 and 2005 payments? The jury should have been asked to decide whether the Mayers' acceptance of the fruits of the modification agreement, denoted acceptance.

Defense counsel should have argued that the payout was interrupted only by the untimely arrests of the defendants in May 2005 -- because that was their clients' true defense.

- ### *Efficient breach*

In Vilar's Appeal brief (DOC 178, p. 88 et seq.) Vilar discusses the concept of "efficient breach" of contract, which "is built into our system of contracts, with the understanding that people will sometimes intentionally break their contracts for no other reason than that it benefits them financially." *See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007). Like other hedge fund

managers at the time of the dot.com bubble and even more so in the 2007-08 crisis,
Vilar and Tanaka breached to make sure there would be stability in the event of a
"floodgate" of withdrawals, so to speak, to assure that Amerindo would have the
capital to move forward for the future of all clients (not "just" the Mayers, who
were in fact received millions of dollars in interest on the negotiated payout.)

- ***Counsel failed to rebut the notion of "theft" from Lily Cates by
  reason of withdrawal from one account that was inaccurately
  characterized by SEC examiner Wraga in 2005. Wraga should
  have been cross examined at trial.***

In the criminal complaint against Alberto Vilar (DOC 138-4 filed 8/30/06 as
a Franks motion Exhibit), the government theorized that defendants had "stolen"
Cates' money because of the nearly contemporaneous withdrawals from the
account into which her SBIC funds were placed initially.   Three years later, Bear
Stearns' Nierva (and his 3500 material, see 3529-3, Addendum F to the Appeal
Brief, 14-2425, SEC case) dispelled the basis for the conclusion of "theft" that had
been drawn by SEC Examiner Wraga, and posited in support of the SEC injunction
and receivership.  In 2008, Nierva explained to the government that Bear Stearns
offered "interchangeable" accounts as a "family" of accounts "rolled up together
for margin purposes" with one tax ID that they were commingled for trading, and
all funds were fungible.

The use as a "family" – indeed the use of commingled funds -- effectuated
more favorable margin trading, trading that *benefited* not only the ATGF investors,

but the GFRD investors, who were relying on Amerindo' guarantee and the growing of the "pot" for future gains.

Counsel's defense to the charge of "theft" was seemingly the limited questioning of SEC witness Wraga, of whom he elicited the concession that she had analyzed only a handful of Bear Stearns accounts as of the time of the trial and had 'no idea" of the universe of Amerindo assets or accounts used for investment trading, deposits, and redemptions (T.4685). .

Nierva *did* have "an idea" that Wraga's assessment of "theft" had not accounted for the linkage of the accounts or the maintenance of internal client accounting records.

Contrary to the government's accusation of theft, Cates' deposit actually *"grew"* "the pot" available for margin trading, per Nierva.  Nierva was asked whether he thought that defendants had taken Cates' $ 5 million. He said (3529-3, page 3) that even after the $5 million investment was "moved", "the $5 million is still working in the acct., here allowing them not to be on call; cash used to make margin purchases."   In other words, Cates' investment went to trades, which added to the value of her account pending completion of an SBIC vehicle, as Cates wanted.  No one seemed to have the Amerindo Panama internal accounting records that would have shown the exact transfers.  Cates' account statements in evidence, however, show the accumulation of interest on the SBIC investment.  Cates did not

complaint about that.  To allow the argument that transfers from one Amerindo subaccount at Bear revealed thefts, allowed the government to treat Amerindo as if it had no accounting or tax departments, and as if account statements did not represent real credits in real accounts.

Petitioners reiterate the arguments made in DOC 671 (Exhibit C hereto) and in previous submissions as if set forth herein.  Petitioners also point to the Receiver's statement in DOCUMENT 640, a 1/3/17 filing in 05cv5231 stating that all Amerindo clients have been paid and there is some $27 million in excess.

This was a "fraud" without any loss, and without any "theft."  People should have known.

- *Counsel failed to investigate facts necessary to properly defend the penalties.*

In a case where "losses" were what the government trumpeted to the press when defendants were arrested on May 26, 2005 – and where "losses" continued to drive sentencing, including restitution and forfeiture, counsels' failure to have investigated the value of the Amerindo Panama assets, as against the total amount of investor claims, is inexplicable.  Arguments made by defense counsel – that clients had *previously* made a lot of money – were *ineffective* to respond to the *actual* charges that defendants had "defrauded" the clients out of money, allegedly *lost* to them currently.

Neither counsel made submissions about forfeiture or restitution prior to the

jury deliberations.   After the evidence was closed, Mr. Colton *asked* what was *supposed to happen* in connection with "forfeiture." At Tr. 5634:  MR. COLTON: Just a question. I frankly don't know the answer but I could research it. Does the jury typically get the forfeiture allegations in an indictment?  Should we be sending that back?"[21]

Especially in a case with a substantial forfeiture threatened (and carried out), asking the prosecutor what should happen in a criminal forfeiture case after the evidence has been presented is not a Constitutionally acceptable "strategy" and warrants relief under *Strickland*.

There are indicia in the record, and outside of it, that Mr. Colton, in the lead, had *assumed* that – as the government charged – there was "no money" there, – or at least he believed that Mr. Litt could trot out additional "massive fraud"

---

[21] THE COURT: You know, I was going to ask you folks about why we didn't -- sometimes you ask a jury to deliberate and return a verdict on forfeiture, right?

MR. LITT: I don't believe that happens. First of all, it's an option within the discretion of the defendants. But I believe that is only the case where there is specific property to be forfeited. And in this case, my recollection is, it's a money judgment. [However, the money judgment is determined by the amount of the proceeds forfeiture.] And that's part of a sentence if any, and that's determined by the Court.
          ***
MR. COLTON: I accept that representation .... [Mr. Vilar's lawyer accepted it too.]

"victims" faster than the assets were recovered.

When present counsel began representing Vilar on the appeal, and then in connection with the substitute asset forfeiture litigation in the district court, counsel asked Mr. Tanaka's counsel (Mr. Dershowitz) whether he would be joining in the litigation concerning the erroneous forfeiture. Mr. Dershowitz said "no", because Mr. Colton had already taken the position in the trial court that forfeiture of all assets was "OK" and because, he said, Colton had said "there is no money there."[22]

As we know now, for sure (DOC 640, 05 cv 5231), there was plenty of money there. Advice given to Vilar and Tanaka about how to defend the case, undertaken with the "mistaken" "impression" that they had taken or dissipated the funds, was ineffective advice.

Not only did Mr. Colton and Mr. Marks *agree* to a restraining order as to *all* defendants' frozen assets (counsel did not explain the ramification of this to their clients), but at sentencing, Mr. Colton even *discredited* his own client's attempt to defend himself against false notions of "losses" through the "Ross report" (DOC 408).

Mr. Tanaka has explained that his counsel, Mr. Colton, ignored him when

---

[22] I declare under penalty of perjury that this is true. Appellate counsel for Mr. Tanaka did not raise ineffective assistance or challenge any of trial counsel's failures.

Tanaka urged Colton to have the offshore portfolios assets evaluated with an emphasis on the private equities.  Mr. Tanaka borrowed money to hire David Ross to evaluate the private equities.  After a 9-month valuation, Mr. Ross submitted the report to the Court.  It showed there would be sufficient funds to pay clients.

Instead of supporting his client's *legitimate* showing through expert Ross – something in which the Court was interested, at least as to 3553 factors (1/8/2010 order advising the government to value the assets) – when the Court mentioned the report (2/5/10 Tr.10), Mr. Colton, in Mr. Tanaka's absence, shockingly devalued its import, as quoted in the footnote. [23]  He said, in essence, "don't blame *me* for the report.  It was sent by Mr. Tanaka."

Counsel belittled the "finding" of $42-$48 million in assets in a case where

_____

[23] THE COURT:   Right. And I really should be directing this to Mr. Colton, because it's your expert who opined I think on this subject. MR. COLTON:    I need to clear up the record, your Honor.   That was sent by Mr. Ross, who has been engaged by Mr. Tanaka.   It was not sent by me, and it wasn't a legal expert in that sense. So, we weren't trying to backdoor an expert or anything like that.

It's somebody who wrote to the court, just so the record is clear, because I would not have put forth an expert report or any type of evidence in that fashion.

THE COURT:     Mr. Ross.

MR. COLTON:    I  just wanted to make the record clear so that it didn't seem like it was something untoward being done by counsel. If the court is saying that the difference between 42 and 48 is not going to be determinative – likely determinative -- then I think that's right, we should go forward in the normal course.