**A New Trial Should Be Granted Under Federal Rule of Criminal Procedure 33, Or Alternatively 28 U.S.C.§ 2255 Based On Ineffective Assistant Of Counsel; While The Decision On A New Trial Can Be Made After Further Consideration Of These Arguments And Their Bases, At Least The Factual and Legal Claims Advanced By The Government Under 18 U.S.C. § 3553(a) Should Be Considered In Light of These Showings.**

**Defense Counsel Failed to Defend Against Charges That – After the Government Found Out That Lily Cates and Lisa Mayer Were *Not* Clients of Amerindo U.S. – Turned Into An Accusation That "Panama" Was "Dirty", That Lily Cates Didn't Know She Invested In Panama, That Any Panama Product Was A Sham And That "Amerindo" Money (Though Returned To All Amerindo U.S. Investors) Was "Lost" To Panama Investors; There Was No "Theft", No "Missing Money", No "ATGF Fraud"**

Defendants were arrested upon *ex parte* criminal complaints, and their Registered Advisory business Amerindo U.S. searched and shuttered by an *ex parte* all-records warrant, on May 25, 2005. This was based on a charge that through Amerindo U.S. defendants had "stolen" $ 5 million in "client funds" to fund personal expenses. The government believed that this was the "tip of [an] iceberg" of massive client thefts – a Ponzi scheme – because Amerindo U.S. was so prominent and successful. On May 27, 2005, with defendants still in jail awaiting detention hearings, *Bloomberg* reported the allegations: for *all* intents and purposes these accusations became cemented in stone.[15]

---

[15] **Amerindo's Vilar Charged With Stealing From Client**

May 27 (Bloomberg) -- Alberto Vilar, the multimillionaire New York money manager and benefactor to the world's leading opera and ballet centers, was arrested last night and charged by U.S. authorities with stealing $5 million in client funds, which he used to pay bills and continue his philanthropy.

The financier, who amassed a fortune of $950 million after leaving Cuba, is accused of using an investor's funds to make donations to Washington & Jefferson College in Washington, Pennsylvania, and for payments to caterers and

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-1

The government had charged *massive fraud and theft*.

These charges required a vigorous defense. Since "forfeiture" and "restitution" are penalties attending the client's criminal prosecution, a defense lawyer was obligated to know "the numbers" for the sentencing/penalty phase of this criminal case as well.

---

a dishwasher repair company, according to a complaint made public today in federal court in New York.

Vilar, 64, used the unidentified client's investment in 2002 as a ``piggy bank'' to pay personal expenses and make charitable contributions, without the knowledge, consent, or authorization of the victim,'' U.S. Postal Inspector Cynthia Fraterrigo said in the complaint.

 Gary Tanaka, Amerindo's co-founder and co-chief executive, who lives in London, was also charged today with stealing from investors and of using the funds to buy racehorses. Tanaka is being held without bail and will return to court June 3 for a hearing.

       ***

Amerindo had about $1.2 billion in assets under management as of July 15, 2004, according to the complaint.

``The charges are very serious and very well-founded,'' Assistant U.S. Attorney David Esseks said in court today. ``We fear that they are just the tip of the iceberg.''

       ***

`Staggering Amounts'

``This is a case which involves staggering amounts of money,'' U.S. Magistrate Judge Henry Pittman said, as he ordered Vilar held without bail until a hearing on May 31.

       ***

Amerindo was originally founded to invest money for pension funds and private individuals. In 1996, Vilar opened the Amerindo Technology Fund.

According to a registration filing Amerindo made to the Securities and Exchange Commission last July, the firm's clients included pension funds and foundations and did not include any individual investors.

51

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-2

None of the defense counsel were prepared for or recognized the critical importance of "the numbers". As was, and has been, apparent from the delays in returning investor funds in this case, defendants (and their investors) have been seriously prejudiced by counsels' failure to defend by failing to investigate their own clients' Amerindo Panama client accounts, actual client claims, and operations.

Otherwise -- as has happened -- the government would be able endlessly to argue "losses" of all client accounts, and the jury, and the court, would never see that the "failure to redeem" on time, which in fact became *the* theory of criminality at the time of sentence, [16] did not equate with "losses" of all client accounts, the "tip of [an] iceberg" of "losses", on which this prosecution was initiated.

The lawyers did not defend these allegations. Because the understandings pressed in the beginning of this case were *not* rebutted by any cogent defense, the government has been able to advance positions, purportedly under 18 U.S.C. 3553(a), asking for the same long custodial sentence, which positions are belied by evidence not used by defense counsel, but available to them. We discuss some of the "misconceptions" that plague the case to this day, sometimes (to try to keep this submission shorter) in the footnotes. For instance, this Court sustained an erroneous impression (which it stated at Tr. 30-31, March 14, 2014 Tr., SEC case) about ATGF investments, believing them to have been "fraudulent when in fact there was no fraud, no ATGF investor had *claimed* "fraud", but the Court was led to believe there was fraud because defense counsel did not rebut a last-minute sentencing submission made by the prosecutor two days

---

[16] This, in fact, was <u>the</u> theory of criminality on which the prosecutor relied at the prior sentencing (February 5, 2010 Tr. 44-45): "There is a difference, to be sure, between taking money under false pretenses as an investment advisor and ignoring one's fiduciary duty -- and taking the money and burning it, or spending it, or, you know, buying a yacht with it, whatever -- and not giving it back. But not giving it back, knowing that you have it, is a serious crime too.

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-3

before the prior sentencing (DOC 418-1 and 2, docketed by the Court on 2/4/10, the day before sentencing, per Order dated 2/4/10 (DOC 418)) (as well as the fact that the SEC keeps misleading about ""commingling," suggesting that it is "wrong" but never stating why or how it supposedly "caused" any loss or harm to investors;  commingling affects *traceability*, which is why the government (which does *not* raise any issue of "commingling" in its sentencing memorandum, but resorted to "substitute assets" for a *forfeiture* theory.  Commingling has nothing to do with "harm" in this case).

In Mr. Litt's pre-sentencing letter, the prosecutor disclaimed the integrity and conclusions of the David Ross report (filed on January 27, 2010 only after the December 14, 2009 argument on Guideline calculations, at which "credits against losses" became the theory.)  The Ross report was ineffectively *disclaimed* by defense counsel,[17] who failed to embrace the need for and utility

---

[17] Instead of endorsing or advocating the Ross report – which *supports* the defendants' claim that they preserved principal and (except for delayed redemptions) handled investor funds responsibly to maximize returns, defense counsel wanted only to distance himself from it (February 10, 2010 Tr. 10-11).  In a discussion at the Vilar sentence -- at which Mr. Tanaka was not even present -- Mr. Colton was asked about the report stated he had had nothing to do with it:

> THE COURT: All right. I'm not -- I don't think – if  the parties are in agreement that it's at least 42 which will make whole the victims who are identified at trial -- I'm not clear what it would do with respect to other stakeholders, other people who have a claim on the money -- then probably it doesn't make sense to delay. But at this point, I mean the government I thought was pretty clear, they don't know how many other people there might be who lay claim to this money. Right, Mr. Litt?

> MR. LITT: Not for certain, no.

> THE COURT: Right. And I really should be directing this to Mr. Colton, because it's your expert who opined I think on this subject.

> MR. COLTON: I need to clear up the record, your Honor. That was sent by Mr. Ross, who has been engaged by Mr. Tanaka. It was not sent by me, and it wasn't a legal expert in that sense. So, we weren't trying to backdoor an expert or anything

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-4

**A New Trial Should Be Granted Under Federal Rule of Criminal Procedure 33, Or Alternatively 28 U.S.C.§ 2255 Based On Ineffective Assistant Of Counsel; While The Decision On A New Trial Can Be Made After Further Consideration Of These Arguments And Their Bases, At Least The Factual and Legal Claims Advanced By The Government Under 18 U.S.C. § 3553(a) Should Be Considered In Light of These Showings.**

**Defense Counsel Failed to Defend Against Charges That – After the Government Found Out That Lily Cates and Lisa Mayer Were *Not* Clients of Amerindo U.S. – Turned Into An Accusation That "Panama" Was "Dirty", That Lily Cates Didn't Know She Invested In Panama, That Any Panama Product Was A Sham And That "Amerindo" Money (Though Returned To All Amerindo U.S. Investors) Was "Lost" To Panama Investors; There Was No "Theft", No "Missing Money", No "ATGF Fraud"**

Defendants were arrested upon *ex parte* criminal complaints, and their Registered Advisory business Amerindo U.S. searched and shuttered by an *ex parte* all-records warrant, on May 25, 2005. This was based on a charge that through Amerindo U.S. defendants had "stolen" $ 5 million in "client funds" to fund personal expenses. The government believed that this was the "tip of [an] iceberg" of massive client thefts – a Ponzi scheme – because Amerindo U.S. was so prominent and successful. On May 27, 2005, with defendants still in jail awaiting detention hearings, *Bloomberg* reported the allegations: for *all* intents and purposes these accusations became cemented in stone.[15]

---

[15] **Amerindo's Vilar Charged With Stealing From Client**

May 27 (Bloomberg) -- Alberto Vilar, the multimillionaire New York money manager and benefactor to the world's leading opera and ballet centers, was arrested last night and charged by U.S. authorities with stealing $5 million in client funds, which he used to pay bills and continue his philanthropy.

The financier, who amassed a fortune of $950 million after leaving Cuba, is accused of using an investor's funds to make donations to Washington & Jefferson College in Washington, Pennsylvania, and for payments to caterers and

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-1

The government had charged *massive fraud and theft*.

These charges required a vigorous defense. Since "forfeiture" and "restitution" are penalties attending the client's criminal prosecution, a defense lawyer was obligated to know "the numbers" for the sentencing/penalty phase of this criminal case as well.

---

a dishwasher repair company, according to a complaint made public today in federal court in New York.

Vilar, 64, used the unidentified client's investment in 2002 as a ``piggy bank'' to pay personal expenses and make charitable contributions, without the knowledge, consent, or authorization of the victim,'' U.S. Postal Inspector Cynthia Fraterrigo said in the complaint.

 Gary Tanaka, Amerindo's co-founder and co-chief executive, who lives in London, was also charged today with stealing from investors and of using the funds to buy racehorses. Tanaka is being held without bail and will return to court June 3 for a hearing.

      ***

Amerindo had about $1.2 billion in assets under management as of July 15, 2004, according to the complaint.

``The charges are very serious and very well-founded,'' Assistant U.S. Attorney David Esseks said in court today. ``We fear that they are just the tip of the iceberg.''

      ***

`Staggering Amounts'

``This is a case which involves staggering amounts of money,'' U.S. Magistrate Judge Henry Pittman said, as he ordered Vilar held without bail until a hearing on May 31.

      ***

Amerindo was originally founded to invest money for pension funds and private individuals. In 1996, Vilar opened the Amerindo Technology Fund.

According to a registration filing Amerindo made to the Securities and Exchange Commission last July, the firm's clients included pension funds and foundations and did not include any individual investors.

51

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-2

None of the defense counsel were prepared for or recognized the critical importance of "the numbers". As was, and has been, apparent from the delays in returning investor funds in this case, defendants (and their investors) have been seriously prejudiced by counsels' failure to defend by failing to investigate their own clients' Amerindo Panama client accounts, actual client claims, and operations.

Otherwise -- as has happened -- the government would be able endlessly to argue "losses" of all client accounts, and the jury, and the court, would never see that the "failure to redeem" on time, which in fact became *the* theory of criminality at the time of sentence, [16] did not equate with "losses" of all client accounts, the "tip of [an] iceberg" of "losses", on which this prosecution was initiated.

The lawyers did not defend these allegations. Because the understandings pressed in the beginning of this case were *not* rebutted by any cogent defense, the government has been able to advance positions, purportedly under 18 U.S.C. 3553(a), asking for the same long custodial sentence, which positions are belied by evidence not used by defense counsel, but available to them. We discuss some of the "misconceptions" that plague the case to this day, sometimes (to try to keep this submission shorter) in the footnotes. For instance, this Court sustained an erroneous impression (which it stated at Tr. 30-31, March 14, 2014 Tr., SEC case) about ATGF investments, believing them to have been "fraudulent when in fact there was no fraud, no ATGF investor had *claimed* "fraud", but the Court was led to believe there was fraud because defense counsel did not rebut a last-minute sentencing submission made by the prosecutor two days

---

[16] This, in fact, was <u>the</u> theory of criminality on which the prosecutor relied at the prior sentencing (February 5, 2010 Tr. 44-45): "There is a difference, to be sure, between taking money under false pretenses as an investment advisor and ignoring one's fiduciary duty -- and taking the money and burning it, or spending it or, you know, buying a yacht with it, whatever -- and not giving it back. But not giving it back, knowing that you have it, is a serious crime too.

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-3

before the prior sentencing (DOC 418-1 and 2, docketed by the Court on 2/4/10, the day before sentencing, per Order dated 2/4/10 (DOC 418)) (as well as the fact that the SEC keeps misleading about ""commingling," suggesting that it is "wrong" but never stating why or how it supposedly "caused" any loss or harm to investors;  commingling affects *traceability*, which is why the government (which does *not* raise any issue of "commingling" in its sentencing memorandum, but resorted to "substitute assets" for a *forfeiture* theory.  Commingling has nothing to do with "harm" in this case).

In Mr. Litt's pre-sentencing letter, the prosecutor disclaimed the integrity and conclusions of the David Ross report (filed on January 27, 2010 only after the December 14, 2009 argument on Guideline calculations, at which "credits against losses" became the theory.)  The Ross report was ineffectively *disclaimed* by defense counsel,[17] who failed to embrace the need for and utility

---

[17] Instead of endorsing or advocating the Ross report – which *supports* the defendants' claim that they preserved principal and (except for delayed redemptions) handled investor funds responsibly to maximize returns, defense counsel wanted only to distance himself from it (February 10, 2010 Tr. 10-11).  In a discussion at the Vilar sentence -- at which Mr. Tanaka was not even present -- Mr. Colton was asked about the report stated he had had nothing to do with it:

> THE COURT: All right. I'm not -- I don't think – if  the parties are in agreement that it's at least 42 which will make whole the victims who are identified at trial -- I'm not clear what it would do with respect to other stakeholders, other people who have a claim on the money -- then probably it doesn't make sense to delay. But at this point, I mean the government I thought was pretty clear, they don't know how many other people there might be who lay claim to this money. Right, Mr. Litt?

> MR. LITT: Not for certain, no.

> THE COURT: Right. And I really should be directing this to Mr. Colton, because it's your expert who opined I think on this subject.

> MR. COLTON: I need to clear up the record, your Honor. That was sent by Mr. Ross, who has been engaged by Mr. Tanaka. It was not sent by me, and it wasn't a legal expert in that sense. So, we weren't trying to backdoor an expert or anything

53

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-4

of this expert report because he did not investigate the Amerindo Panama assets and client claims.[18]  The report discussed sufficient assets in Amerindo Panama holdings (the four "linked" house trading accounts) to have paid back all investors as of the May 2005 shutdown date, and a disturbing dissipation of the assets by the lack of management of the private equities in the restrained Amerindo accounts since 2005.  There was a failure to hold JP Morgan to pay interest on the cash sums in those accounts (or to direct JP Morgan to sweep the funds into a market fund instead of letting JP Morgan keep the interest it earned), and the failure of active management, which could have increased the "pot" by responsible trading.

The failure of trial / sentencing to have advocated this position has caused substantial injury to all concerned.

Mr. Litt's sentencing reply of 2/3/10 (DOC 418-1) also alleged that though the government had not pursued (much less proven) "ATGF fraud", he *would* be able to find fraud on *perhaps* some 70 presumed ATGF clients if he had the time.  Broad allegations of "total

---

like that. It's somebody who wrote to the court, just so the record is clear, because I would not have put forth an expert report or any type of evidence in that fashion.

THE COURT: Mr. Ross.

MR. COLTON: I just wanted to make the record clear so that it didn't seem like it was something untoward being done by counsel.

If the court is saying that the difference between 42 and 48 is not going to be determinative – likely determinative -- then I think that's right, we should go forward in the normal course.

[18]  As stated in a recent *per curiam* decision summarily overturning a criminal conviction on *Strickland* grounds*:*  "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.  This was such a case."  *Hinton v. Alabama,* 134 S.Ct. 1081 (2014), *citing Harrington v. Richter*, 562 U. S. ___, 131 S.Ct. 770 (2011).

54

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-5

of this expert report because he did not investigate the Amerindo Panama assets and client claims.[18]  The report discussed sufficient assets in Amerindo Panama holdings (the four "linked" house trading accounts) to have paid back all investors as of the May 2005 shutdown date, and a disturbing dissipation of the assets by the lack of management of the private equities in the restrained Amerindo accounts since 2005.  There was a failure to hold JP Morgan to pay interest on the cash sums in those accounts (or to direct JP Morgan to sweep the funds into a market fund instead of letting JP Morgan keep the interest it earned), and the failure of active management, which could have increased the "pot" by responsible trading.

The failure of trial / sentencing to have advocated this position has caused substantial injury to all concerned.

Mr. Litt's sentencing reply of 2/3/10 (DOC 418-1) also alleged that though the government had not pursued (much less proven) "ATGF fraud", he *would* be able to find fraud on *perhaps* some 70 presumed ATGF clients if he had the time.  Broad allegations of "total

---

like that. It's somebody who wrote to the court, just so the record is clear, because I would not have put forth an expert report or any type of evidence in that fashion.

THE COURT: Mr. Ross.

MR. COLTON: I just wanted to make the record clear so that it didn't seem like it was something untoward being done by counsel.

If the court is saying that the difference between 42 and 48 is not going to be determinative – likely determinative -- then I think that's right, we should go forward in the normal course.

[18]  As stated in a recent *per curiam* decision summarily overturning a criminal conviction on *Strickland* grounds*:*  "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.  This was such a case."  *Hinton v. Alabama,* 134 S.Ct. 1081 (2014), *citing Harrington v. Richter*, 562 U. S. ___, 131 S.Ct. 770 (2011).

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-5

fraud" were made in that 2/3/10 sentencing reply. [19]   The accusations went unrebutted by defense

counsel, who did not and could not effectively respond:  "intuiting" that the SEC position was

---

[19] The prosecutor charged in his sentencing reply (DOC 418, pp.4-6):

> The Government pursued criminal charges against the defendants for defrauding investors with respect to Amerindo's GFRDA and SBIC investments. Those investors are owed approximately $21.9 million, plus interest. 3 [footnote content omitted] *(See* Gov't Sentencing Mem. at 80) .

> In addition, the Government is aware of a number of investors in Rhodes Capital whose investments were subsequently converted into GFRDAs or GFRDA-like products, and other investors who invested directly in Amerindo's Guaranteed Hedged Equity Fund (which bears a strong similarity to the GFRDA as reflected in the Fund's subscription agreement, attached hereto as Exhibit C) . 4

>> 4 The Government did not include these GFRDA-like investors in the restitution and forfeiture figures previously submitted to the Court because the Government did not have sufficient evidence that they were victims of the frauds of which defendants were convicted. To the extent the Government knows their identities, it intends to provide those individuals notice of any forfeited funds, and expects that they may file claims.

>> The Government will evaluate any such claims to determine whether it is appropriate to use forfeited assets, if any, to allow them to recoup some part of their Amerindo investment.

> ATGF Investors

> The Government did not pursue criminal charges with respect to the ATGF investment vehicle. As a consequence, the Government has not previously attempted to determine the existing shareholders of ATGF or their holdings as of the date of defendants' arrests. In the course of investigating this case, however, the Government has gathered some evidence about ATGF ....

The government then listed shareholders in the ATGF, the number of shares it believed were then held, which were limited in number, but prophesied that there were more "out there" who also could be claimants who "lost" money by reason of some undisclosed "fraud" concerning the ATGF investment:   "The data set forth above may represent only a small fraction of ATGF  investors.  As of July 16, 2004, there were reportedly a total of 73 investors in ATGF, approximately 50 of which are not accounted for in the above figures. *(See* Exhibit L, attached hereto, which Vilar provided to Bear, Stearns in the course of his efforts to sell Amerindo US) ."

Exhibit L was not a "list" of current investors "not accounted for".  It may have been a list dating from an earlier era of prior ATGF investors.   The point is, no one "knew."

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-6

Defense counsel did not respond to this "listing", or to the fact that there was no ATGF fraud in the first place.   Mr. Gazes has "found" (consistent with defendants' July 2012 payout proposal) that there were only some 30 Panama investors (some are family members who inherited accounts) remaining as of the date of the shutdown.   (SEC DOCS 355, 370 (universe of claimants total some 30-35 (including "family" claims).   Other Panama investors (who may have been named on the unexplained "Exhibit L", pointed to by the prosecutor, had been redeemed and repaid -- *including* Dextra, paid by Renata Tanaka in 2005, out of personal funds, once Amerindo was unable to access the accounts restrained "by JP Morgan" "working closely with" the US Attorney and SEC (GX 3582-16), turned over only at the trial, about which Mr. Petercsak was cross examined (Tr.3486):

Re: Amerindo Technology Growth Fund, Inc.- Standstill Demand

Dear Mr. Sexton:

I am writing on behalf of Bear, Stearns & Co. Inc. ("Bear Stearns") in response to your letter dated June 17, 2005 to Bear Stearns' Los Angeles office. While Bear Stearns is unable to confirm any purported investments by your clients in the Amerindo Technology Growth Fund, Inc., please be aware that Bear Stearns is working closely with both the United States Attorney's office and the Securities and Exchange Commission, as well as with the court-appointed monitor Robert Knuts, regarding the movement of funds from Amerindo accounts at Bear Stearns. No funds will be transferred or withdrawn from these accounts without first consulting them.

Sincerely,
BEAR, STEARNS & CO. INC.
/s/
David Petercsak

cc: Marc Litt, Esq. (United States Attorney's Office, via First Class Mail)
    Mark Salzberg, Esq. (Securities and Exchange Commission, via First Class Mail)
    Robert Knots, Esq. (Day, Berry & Howard LLP, via First Class Mail)
    Patrick Maloney, Esq.

*D. Petercsak*
**3582-16**

More "voluntary restraints" were "requested" by the SEC, as evidenced by this letter from Mark Salzberg to Morgan Stanley, written in October 2010:

October 7, 2010
                              Re: SEC v. Amerindo Investment Advisors Inc., et al.,
                              05-CV-5231 (LTS) (DFE) (S.D.N.Y.)
Dear Mr. Morningstar:

As we have discussed, I represent the plaintiff Securities and Exchange Commission in the above-referenced action. In the Amended Complaint in this action, the Commission alleges that defendants Alberto W. Vilar, Gary A. Tanaka, Amerindo Investment Advisors Inc., Amerindo Investment Advisors, Inc. and various affiliated entities violated the antifraud provisions of the federal securities laws.

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-7

"right" (or unchallengeable), he did not undertake to defend by learning (from his client and the Amerindo Panama /UK records in the government's possession) about the universe of ATGF clients, or claims, *or Amerindo Panama assets*.

The government did not undertake the investigation.  Defense counsel should have.  It *was* what the case is about.

If the Court got the wrong impression, so did the jury.   Ineffective assistance of counsel dominated this trial, and under *Strickland v. Washington*, 466 U.S. 668, 694 (1984),  a new trial should be ordered because of the "reasonable probability that but for [these errors of counsel] the result of the proceeding would have been different."

### The Mistaken Impressions Left By Defense Counsels' Failure To Rebut, As Pressed Now By the Government On This Resentencing

The government has taken some punitive positions purportedly under 18 U.S.C. 3553(a), pressing these positions, which defense counsel failed to defend by available – or "developable" evidence, to wit:

---

As you are aware, Messrs. Vilar and Tanaka were found guilty on twelve and three counts, respectively, in the parallel criminal action, United States v. Vilar, 05 Cr. 621 (RJS).

Following the convictions, Judge Sullivan entered a Post-Conviction Restraining Order as well as Forfeiture and Restitution Orders. The United States Attorney's  Office and the defendants are currently litigating the scope of the Forfeiture Order.

We understand that defendants and their affiliates have maintained and/or had discretion over brokerage accounts at Morgan Stanley & Co., Inc., and its related entities (collectively, "Morgan Stanley"). We request that Morgan Stanley promptly notify us if Vilar, Tanaka, or anyone acting or purporting to act on their behalf, attempts to execute securities transactions in, transfer securities from, or withdraw or transfer funds from any brokerage accounts at Morgan Stanley. This request is voluntary. We do, however, appreciate any assistance you can provide us as we pursue this action.

Sincerely,
 /s/
Mark D. Salzberg
Senior Counsel

[cc's omitted]

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-8

- Amerindo Panama was a "phony shell corporation" that "employed [a] confusing corporate name[] ... to mislead investors" (Gov Sentencing Letter March 31, 2014 p.9.

- ([B]ased on the trial record and Government's investigation) no GFRDA client invested with Amerindo Panama. Rather, the GFRDA clients invested with Amerindo U.S., and thereafter, the defendants unilaterally and without notice changed the letterhead used to communicate with GFRDA investors. .... (p.12) ... GFRDA clients are not and were not clients of Amerindo Panama .... The salutation "Dear Panama investors" was an "odd turn of phrase" because "(based on the trial record and Government's investigation) no GFRDA client invested with Amerindo Panama." .

  - Defendants would have stolen from institutional clients if they'd had the opportunity but "as was amply demonstrated at trial, they simply could not do so" because they were "greedy" (p.10)

- Defendants made "Efforts to Prevent The Return Of Investor Funds," failed to invest a single penny according to the terms of the GFRDA and SBIC programs; sought only to maximize payments to themselves; and did everything in their power to prevent the return of investor capital.

If *this* is what the trial record showed to the jury, then counsel's ineffectiveness is clear.

### Amerindo Panama was not a shell, sham, non-existent, or fraudulent corporation.

(a)  The fact that Ian Gazes made himself the Receiver of Amerindo Panama (SEC v. Amerindo, 05 cv 5231, DOC 283-1 (5/30/13), also filed as DOC 354-4, Exhibit to Shevitz Declaration in Opposition to Disgorgement and Penalties), speaks volumes to the government's claim that Amerindo Panama was a shell or a sham.  Mr. Gazes controls tens of millions of dollars of moneys (he is still counting) invested in, and by, Amerindo Panama, that has always been "there" awaiting return (DOCS 355, 370, SEC case).  He has said that there are public and private equities in Amerindo Panama investment/trading accounts that have yet to be valued and that there should be a surplus.  For the government to repeat the allegation that the corporation that had preserved all of these funds was a "sham" or a "shell" is irresponsible.

58

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-9

(b)  As developed in the SEC case (through investigation of documents obtained by present counsel largely from prior counsels' files, while representing defendants in the SEC case that has "paralleled" this prosecution), [20]  the SEC well knew of the existence of Amerindo Panama, that it was a separate entity, and that its name "differed" from that of the U.S. entity by a "comma" (not to mention that it existed in a foreign jurisdiction).  In papers discussed in and attached to DOC 352, 353, 354  in the SEC case (papers submitted in opposition to the pending motion for disgorgement and penalties), [21]  the SEC was told all about Amerindo Panama, the

---

[20] The Court of Appeals itself looked to the SEC case (DOC 527, Appeal 10-521, p 20 n.11) in affirming the convictions.  It is perverse that the government ignores disclosures in filings in that case (though the prosecutors were given notice of the filings in the emailed courtesy copy" submissions) – and would punish the defendants as if they ran a "sham" operation in Panama despite the fact that this is a *de novo* sentencing proceeding where a court is required to consider "new" information.

[21] We quote excerpts from the Declaration in Opposition to the Motion for Disgorgement and Penalties, DOC 354, 05 cv 5231, and incorporate it and its related documents by reference:

> 7. Six months after this [the arrests of defendants, "take-down" of Amerindo U.S., and the installation of a Monitor] happened, the SEC's own Monitor issued a report concluding that everything was "clean" at Amerindo US. (DOC 48).

> 8. To the extent that the SEC sought to punish the defendants for "conducting" their Amerindo entities as an "enterprise" that could be considered one (US) concern, the "enterprise" notion is belied by the SEC's San Francisco file concerning the regulated entity, which (as documented since 1992) has recognized that Amerindo Panama (which predated the US Advisory) was a separate – and unregulated -- entity.

> 9. Attached as Exhibit A hereto is an excerpt from a 1992 letter written to the SEC's San Francisco office by the attorney for Amerindo U.S. In it Attorney Cohen explains that Amerindo Panama was and is an unregulated offshore entity and that its "requirements" were set by its (long time) investors.

> 10. Attached as Exhibit B is a copy of the first three pages of the January 21 1993 letter from the SEC to Amerindo US, seeking Panama records and explanations and resting on the "conduct and effects" test, in the SEC's File No. 801-24922. Also part of Exhibit B is a letter to the SEC, from Amerindo Panama, adopting a one-client pool, and notifying the SEC.

> 11. Attached as Exhibit C is an excerpt of a document request of the principals of Amerindo US, seeking documents and information of Amerindo Panama in connection with the then ongoing audit. By letter of January 14, 2005, the SEC, satisfied with the disclosure, "passed" Amerindo US once again. ....

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-10

defendants answered questions posed under the "conduct and effects" test, and after getting

answers to the limited questions about "Panama" within SEC's purview in the first place

(allocations of IPO's), the SEC (through its San Francisco regulatory office) *passed* Amerindo

U.S. in its audit, the last of which was begun in 2003 and concluded in January 2005 – just

months before the search and arrests.

(d) To support its innuendo that the Panama corporation never "existed at all" (DOC 666

p.5) (and/or that Ms. Cates had been "deceived," or for whatever purpose the government may be

advancing this claim now), the government points to "record evidence" that "Amerindo

Panama's `office' was a small, windowless space within Berguido's law firm that could fit no

---

We believe that the SEC did not "share" these regulatory files with the prosecutor before search
was conducted and the defendants arrested, nor, perhaps, before the indictment was returned. At
Mr. Vilar's first bail hearing, before Magistrate Judge Pitman on May 27, 2005, AUSA Esseks
told the court that the government had not yet reviewed the "the 100 boxes" taken out of the
Amerindo U.S. premises, but that that was the total of the government's information, along with
the witness interviews (Lily Cates) and the "investigation" by Postal Inspector Fratterigo
(outlines in the criminal complaints and the search warrant application). Mr. Esseks told the
judge that information was still "being gathered, if I understand, out of the office in London – the
Amerindo office in London and I think also the information is being gathered out of the
Amerindo office in San Francisco." This means, of course, that the prosecutors had *not* reviewed
the San Francisco regulatory files in which the exculpatory information was located.

Nor did the prosecutor turn over such files in discovery: they are not on the document
lists or in 3500 material. Present counsel located these regulatory files in file maintained by
Amerindo's SEC counsel only after she undertook representation. We suggest that there is a
*Brady* issue similar to that found in *United States v. Mahaffy,* 693 F.3d 113, 119 (2d Cir. 2012)
that resulted in the ordering of a new trial for *Brady* violations. The jury should have known
about the SEC knowledge and treatment of Amerindo Panama, and there should have been cross
examination of the SEC witnesses. Indeed, they should not be taking the positions they maintain
to this day about "Amerindo."

Of course defense counsel could have obtained SEC counsel's files on this matter in the
first place, but did not. This is another aspect of the failure of reasonable investigation that
warrants a finding of Constitutional ineffectiveness under *Strickland.*

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-11

more than two people. (Tr. 3180-84).[22]   The suggestion that the use of a "drop box" office address in Panama evidenced both "corruption" by the attorney in Panama who set up offshore corporations in Panama, and fraud on the part of the defendants, is naïve, but should have been countered at trial.

Legitimate corporations use "drop box" offices *even in the United States* (specifically, in Delaware), to minimize taxes, avoid (not evade) regulation, or to "ply" friendly courts.   A June 30 2012 article in New York Times' Business Day section, entitled *How Delaware Thrives as a Corporate Tax Haven*, http://www.nytimes.com/2012/07/01/business/how-delaware-thrives-as-a-corporate-tax-haven.html?_r=0 discusses at "humdrum office building" in Wilmington Delaware that is the legal address of some 285,000 separate businesses.   "Its occupants, on paper, include giants like American Airlines, Apple, Bank of America, Berkshire Hathaway, Cargill, Coca-Cola, Ford, General Electric, Google, JP Morgan Chase, and Wal-mart.  These companies," the article continues, "do business across the nation and around the world.  Here at 1209 North Orange, they simply have a dropbox."   While some use dropboxes for fraudulent activities, "[m]ost of the businesses incorporated here are legitimate and many are using all legal means to reduce their tax bills – something that most stockholders applaud."

---

[22] The government also says that a purported "lie" made in the letter to the SEC forming the basis of the section 1001 conviction against Mr. Vilar was "false", to wit, "that: (1) Cates had always been a client of Amerindo Panama"  (DOC 666 p. 4).  The 1001 count contained *three* specifications, not *four* (see Superseding Indictment S-3, DOC 133, filed 8/15/06, p. 33, listing specifications One through Three).  It was *not* alleged in that count, nor proven to a jury, that Lily Cates had *not* "always been a client of Amerindo Panama.   *No* Panama investor has taken the position that he/she/its entity had invested in the U.S. corporation and that he/she/it was not well aware that the investment was in an offshore money management /securities business. Edward Swanson did *not* allege that in his initial correspondence and communication with the SEC.  He alleged that Ms. Cates had always dealt with Alberto Vilar who was in New York.

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-12

Amerindo's Panama address was disclosed to the SEC, as noted, when it first registered the U.S. Advisory firm with the SEC (which came *after* the existence of the offshore entities) and continually, through the audit that resulted in a "pass" by the SEC in January 2005.  A drop-box location may roil the SEC and the US Attorney now, but it is part of business life, and its use does not denote fraud but rather an offshore presence (which after *Morrison* is understood to be off limits to U.S. regulation).   Counsel should have defended.

**Counsel Did Not Rebut The Notion Of "Theft" By Reason Of Withdrawal From One Linked Amerindo Panama "House Trading Account"**

In the very first pre-arrest criminal complaint against Alberto Vilar (DOC 138-4 filed 8/30/06 as a Franks motion Exhibit), the government theorized that defendants had "stolen" Cates' money because of the nearly contemporaneous withdrawals from the account into which her SBIC funds were placed initially.  Three years later, Bear Stearns' Nierva (and his 3500 material) dispelled the basis for the conclusion:  though not fully developed at trial where Nierva testified, Nierva explained the Bear Stearns, one of ten custody brokers and banks, offered "interchangeable" accounts as a "family" of accounts "rolled up together for margin purposes" with one tax ID, that they were commingled for trading, and all funds were fungible.

The use as a "family" – indeed the use of commingled funds -- effectuated more favorable margin trading, trading that *benefited* not only the ATGF investors, but the GFRD investors, who were relying on Amerindo' guarantee and the growing of the "pot" for future gains.  Counsel's failure to develop this "defense" has caused prejudice to the defendants.

Contrary to the government's accusation of theft by reason of the fact of withdrawal of money form the particular sub-account into which Cates' funds were initially deposited, Cates' deposit actually *"grew"* "the pot" available for margin trading, as witness Nierva stated in this 3500 material (undeveloped by trial counsel who thereby allowed the inference of "theft" to

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-13

stand unrebutted).  Nierva's 2008 statement (3500-3, page 3) was that even after the $5 million investment was "moved", "the $5 million is still working in the acct., here allowing them not to be on call; cash used to make margin purchases."

This would have been a dramatic defense to an unjustified charge of theft from a house account, the "other side" of which – the Amerindo accounting record kept track of, for clients whose investments were affected by trades in those house accounts.  Counsel should have developed this defense before, if not during, the trial, or at least before sentencing.  It is complicated, but it was, and is necessary to rebut the inference of "theft" or that "commingling" hurt the Panama investors.

Counsel's defense to the charge was limited to his questioning of SEC witness Wraga, of whom he elicited the concession that she had analyzed only a handful of Bear Stearns accounts as of the time of the trial and had 'no idea" of the universe of Amerindo assets or accounts used for investment trading, deposits, and redemptions (T.4685).  This left out half the story.  To allow the argument that transfers from one Amerindo subaccount at Bear revealed such thefts, allowed the government to treat Amerindo as if it had no accounting or tax departments, and as if account statements did not represent real credits in real accounts.  Counsel should have *shown* the "universe" – something the SEC receiver has not yet done.

Maxine Rye testified that surprisingly, no one from the government had even contacted the Amerindo back office between the 2005 shutdown (which affected, of course, Amerindo UK as well as the U.S. operation)  and the time of her deposition in September 2008 just before trial. Even then there was no inquiry about how accounting was done:  the sole focus of the inquiry

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-14

then had been on things like signature stamps and on the issue of how LOA's were made for the

trading to be accomplished.  Nothing was asked about accounting.[23]

　　To this day, the SEC receiver (and the SEC) have also refused to examine the Amerindo

Panama accounting records.  If they did – or if defense counsel had held the government to the

task of *proving* theft, which could occur only if there were no corresponding credit to Cates's

*account* statement after a withdrawal was made from a "trading account" that contained her, and

other investors', funds in a commingled pool – there is a reasonable probability that the outcome

would be different.

　　If nothing else, Lily Cates took interest in her account statements and "confirms", placing

handwritten notations on them (GX 105) at times she believed there was a discrepancy for the

back office to address.  While she did not understand the withdrawal from the linked Amerindo

---

[23] Although  Rye also testified that information from trades were allocated for client accounts, no one delved into the information about credits on client accounts from such trades.  Rye also stated that the names of accounts used for ATGF trading held at Bear Stearns included ATGF I, ATGF II, Techno Raquia, Olafson, Lily Cates, and M26 (Rye Tr. September 8, 2008, p. 47-48). The account called "Lily Cates" among this family account was *not* an account that actually belonged to Lily Cates, but rather was one of Amerindo's house accounts in which trades were made on a discretionary basis (as she wished).  Thus "cut and paste" signatures may have confused her (and her bond broker Eugene Ross), but they did not represent "thefts" – which is no doubt why the government never *charged*  the "cut and paste" transfers as separate crimes, but rather either as "parts of the conspiracy" or as "intertwined" events.

　　　Olafson, actually, was within the "102" family of accounts, but was not used for house trading.  Rather, it was a standalone account owned by Gary Tanaka and Renata Tanaka, funded exclusively with taxed funds from Mr. Tanaka's Sun Bank account.  The account called "Lily Cates" was among these house accounts because  "they were all on the same machine" in a "combined report."  Trades for the ATGF investors (and GFRDA investors, whose money was pooled for trading, as they were promised a fixed rate, not a particular portfolio, were made through a broker and "book[ed[ to the ATGF account.  The whole trade would then 'hit the Bear, Stearns account; the trades "were all part of that same big account but [traded by way of subaccounts".  Rye further testified that every day they would receive a list of trades, "with an account written as to which account a trade should be booked".  Trades inuring to the benefit of Lily Cates, therefore, would be "booked" as credits on Lily Cates investor account , and would appear on her statement.

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-15

trading account, she had not questioned the amount on her account statement.  The Court of Appeals itself assumed the statement "correct" in affirming the mail fraud count; though the government had charged that the account statement was itself false, the jury was charged that the mailing itself need not have been a fraudulent statement.  (Opinion, DOC 527, pp. 38-42).

Defense counsel allowed continuation of the false inference of theft, erroneously discerned by Postal Inspector Fratterigo from her review of but one linked house account.  The failure to "correct" the erroneous view, was ineffective, and has caused prejudice.

The inference of "theft" is exacerbated by the constant SEC refrain in the "related" case that spills over onto this criminal case, that "commingling" of the accounts of Panamanian clients violates its rules.  Commingling may violate rules of US Advisory entities, which require segregated accounts, but it does not violate rules of foreign jurisdictions (or of mutual funds) where there are no rules specifically prohibiting commingling or requiring segregated accounts.  There is no rule applicable to Panama accounts cited anywhere and there is no showing how "commingling" caused any harm.

Further, GFRDA investors were actually informed here, to the extent they relied on offering circulars, that their funds *would* be placed in pooled accounts (which as they knew would maximize trading profits, to their benefit.)  See, e.g., GX 3035, a GFRDA circular, which states:  "Client deposit cash into a designated account in either their name or directly into the Amerindo International Venture Fund account at one of Amerindo's custodians in New York.  Amerindo's principal poled account for Fixed Deposits, the Amerindo International Fixed Venture Fund, is further sub-custodied at various New York City banks .... Amerindo guarantees to pay a fixed rate of interest typically for either twelve or twenty-four months.  Interest can be

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-16

paid quarterly directly to the client's deposit account or to any other account the client wishes. Fixed Deposit renewals are subject to renegotiation of the interest rate at maturity."

It seems clear, therefore that the *fact* of commingling may have made it impossible to *trace* (as Mr. Litt said in support of a substitute asset forfeiture); but it has nothing to do with an inability for the government to satisfy its burden of proving "losses," if any, or as a basis for concluding that the commingled money was stolen.  *Accord, e.g.,  Capital Management Select Fund Ltd. v. Bennett*, 680 F.3d 214, 220 (2d Cir. 2012) (securities and property deposited in accounts of RCM, an "unregulated offshore broker", were commingled in a fungible pool and were "part of the general cash reserves of the broker", "a practice ...common in the brokerage industry ...").

### The Securities Laws Do Not Apply To Defendants' Business In Panama and  London

Finally, as a matter of law, SEC rules under the Exchange Act do not apply to defendants who conducted their business in a foreign country.  So the Court in *Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. __, 130 S.Ct. 2869, 2874 (2010), has recognized, pointing to section 30(b) of the Exchange Act as one reason for rejecting the applicability of the Act extraterritoriality.   *See* section 30(b) of the Exchange Act, 15 U.S.C. 78dd(b), thus specifically states:  "The provisions of [the Exchange Act] or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States."[24]

---

[24] *Morrison* states that that provision excepts conduct perpetrated "in violation of regulations promulgated by the Securities and Exchange Commission `to prevent ... evasion of [the Act].' However, *Morrison* notes, there are *no* regulations promulgated under the Act by the SEC. Consequently it is impossible to infer any conduct purposefully committed in violation of any such non-existent regulations.

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-17

Ineffectively, trial counsel (and for that matter present counsel, who admits ineffectiveness in this regard) did not previously raise the *fact* (and legal defense) that the Exchange Act is expressly made inapplicable to defendants in connection with their foreign securities business.  We assert this defense, which counsel should have asserted at trial, here.

### Counsel Failed To Develop The Limited Defenses Raised in the Criminal Case – that the Disputes were Contract Claims That Should Not Have Been Handled as Criminal Matters.

Though counsel argued that the "disputes" between Lisa Mayer and/or Lily Cates and Amerindo (regardless of their "disputes" with Alberto Vilar personally) were civil matters, they merely *said* so, and did not use available evidence to *show* that this was so.

Mr. Colton ended his summation (Tr.5462) with a call to the jury to render a verdict "that sends this case back across the street with respect to Gary in terms of back into the contract case it should have been ...."  But ineffectively, neither he, nor Mr. Vilar's counsel, develop the evidence that *shows* that Mayers had settled the case with Amerindo and were accepting the fruits of the settlement up to the time Amerindo was shuttered.  This was ineffective.

Since counsel did not use the Amerindo Panama documents from which he should have argued the settlement, they were not "on the record".  However, in the now-pending Motion to Vacate the Mayer Judgment in State court, Mr. Tanaka developed the evidence that Neal Jacobson attached to his motion to disgorge – Amerindo Panama documents that were previously withheld from the defense (or not sought by prior defense counsel) – which show that the Mayers accepted the "fruits" of a settlement – and suggest that there are other documents evidencing the oral settlement among Amerindo Panama documents to which Mr. Tanaka has not had access (those not used by the receiver, but some of which were attached to Mr. Jacobson's Declaration on his motion to disgorge).

67

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-18

This is already lengthy. The arguments are made in the pending motion to vacate in State court. We respectfully refer this Court to the documents e-filed in the State court action, *Mayer v. Vilar*, 603234/2004, which resulted in statements by Justice Kornreich during the argument of the motion on April 1, 2014 that she may have "made a mistake" (see Transcript of argument, filed as DOC 421-1 in the SEC case and accompanying letter, DOC 420). (If the Court requests, counsel will provide the documents e-filed in that State case.)

Instead of merely *saying* to the jury that this was a contract claim, counsel should have demonstrated that, before Mr. Vilar made what appears to have been an erroneous decision to sue that Mayer for defamation in State court, the matter was being handled as a contract settlement. If – as is the case – counsel was defending on the basis that this was a contract case, it was ineffective to fail to develop the evidence that settlement sums were being paid out.

As to Lily Cates' claim, Mr. Vilar already suggested in his Reply Brief in the Court of Appeals (DOC 271, Second Circuit Appeal 10-521) that the government misconstrued Cates' claim as a "Fraud" claim based on the government's "investigation" into the fact that the SBA had not licensed the SBIC, the venture into which Cates made her investment – and that counsel's failure to develop the evidence that this was so, constituted ineffective assistance of counsel. (See Reply Brief, pp. 38-44). The Court of Appeals *explicitly* stated it was not reaching the ineffective assistance of counsel claim. (DOC 527, Appeal 10-521, p. 2, 51-52).

To save room here we refer to the argument in the Vilar Reply brief and incorporate it herein by reference. Citing documents that are included in the Vilar Supplemental Appendix, (see Reply Brief, DOC 271, ECF pp 50-51), we described how Ms. Cates' lawyer, Edward Swanson, had in fact characterized the matter as a contract dispute, during negotiation of which Mr. Vilar had made a counter offer for resolution, and that Ms. Cates' request was for rescission

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-19

of her purchase of the private venture on the basis that she had not received the Private Placement memo, not that she had been "defrauded." [25]  Further, in his last interview before trial (UGX-3505-15, 7/31/08), Swanson, asked what "escrow" meant, described the precise manner in which Vilar was holding and explained Cates' venture funds: "Escrow acct – defined by E.S. --- + ~ money should not be used for any other purpose until specified event or conditions met." (VSA 278).  In fact the money *was* designated for the Amerindo SBIC venture – which would have been the next round of private equity investment when the time was right to invest in start-ups – or at least a jury could so find if defense counsel had presented this information.

Finally, as to ineffectiveness in failing to advance the actual "contract defenses", as discussed in some of the papers filed in the SEC case (the only "live" case at the time), among documents obtained from Mr. Colton's files in 2013, are documents showing that the SEC *knew* that an SBA license was not an actual condition of the SBIC investment, and Carlos Castellanos should have been cross examined on this.  A 2-page document marked with a Bates number by the government during its "privilege" review, P00879 –P00880, was given to Mr. Colton *by* the prosecutors, but was not used by him (or Mr. Vilar's counsel) to rebut the notion that an SBA license was required.

The documents show an email communication between Kristen Kipp, of Amerindo, and Carlos Castellanos, who was a trial witness on the issue of the SBIC – and the fact that a license had not in fact been granted – in February 2003 (after Lily Cates' investment, which was in June

---

[25] " Cates' lawyer Swanson was a former SEC lawyer who knew what was real and what was not real. The very fact that he had not complained that this venture "never existed" in his string of communications with Vilar speaks volumes. He characterized the SBIC matter as a contract dispute, during negotiation of which Vilar made a counteroffer for a resolution. (VSA 245) (Swanson's communications are reprinted in the Government's Supplemental Appendix, SA-703-704 (GX-902), SA 705-706 (GX-903), SA 707-709 (GX-920), and SA-710-712 (GX-921); this correspondence was also attached to Swanson's initial complaint letter to AUSA Marc Litt. (VSA 240)).

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-20

2002).   By that email Ms. Kipp inquired of Carlos:  "... the SEC has come back with a request on further information regarding the SBIC fund.  Dana mentioned to me that you told her that there are 2 offering memorandums for the fund, can you let me know which one we should give them?  They also need the following  additional information:  (1) description of the entity; (2) current status; (3) types of clients; (4) manager and/or advisor; (5) fee structure; (6) type of investments; (7) any Reg D filings – it's not active so this doesn't pertain, correct?"

Mr. Castellanos responded to Kristen Kipp (P-00879):

Concerning the SBIC:
1. There is an Offering Memorandum dated March 4, 2002 that includes Matthew Fitzmaurice and is entitled "Amerindo SBIC Venture Fund LP". We should not give them that one.  There is an earlier version, dated October 1, 2001, entitled "Amerindo Venture Fund LP", which is the one they should have.  We are not hiding anything.  They are essentially the same, except that Fitzmaurice put himself in as lord and master of everything, and now he is no longer with the firm.

I have hard copies, but I am sure that either Rick Cohen or Patton Boggs in Washington have it in electronic form.

2. Description of the entity.  This is a venture capital fund for investing in expansion and late stage companies in technology and biotechnology that is seeking licensing as a Small Business Investment Company (SBIC) from the United States Small Business Administration (SBA) in Washington. The business form of the fund is a Delaware Limited Partnership which will ultimately have a General Partner (a special purpose company owned by Alberto Vilar and Gary Tanaka), private limited partners (to be determined) and the SBA as a preferred limited partner.  If licensed, the SBA would contribute in equity $2 for each $1 of private limited partner capital up to a total of $50 million in private limited partner capital.  Thus, the maximum size of the assets in the fund would be $150 million.

3. Current status.  The license application is nearing the final stages of review by the Investment Committee of the SBA.  It is impossible to predict the outcome or timing of their decision, but I am optimistic, as are Patton Boggs, and we should have a better idea of the outcome within 3 months.  The fund would not commence operations until the final decision from the the SBA is known.  If the license should be denied, the fund would raise capital and begin operations anyway.

4. Type of clients.  If you are referring to investors in the fund, they would consist of a mix of institutions and high net worth individuals.  In order for individuals to be allowed to invest, they must be accredited and qualified as defined by the SEC and the SBA.  If you are referring to the fund's investments, these would be mainly expansion and late stage companies strictly in Amerindo's universe, namely, electronic technology and biotechnology.

5. Manager and/or advisor.  Amerindo Investment Advisors Inc. will the fund's sole discretionary manager.

6. Fee Structure.  The manager will charge the fund a 2% p.a. asset management fee of the assets actually invested.  The General Partner will receive a carried interest of 20% of new profits, to be paid after statutory distributions have been made to the SBA and to the limited partners in accordance with SBA regulations.

7. Type of investments.  direct equity investments in expansion and late stage companies.

8. Any Reg D filings.  None.  The fund is not active.  It is still a work-in-progress.

Mr. Colton apparently missed this in his files, or did not understand its import.  It would have cast doubt on Lily Cates' assertion – or the government's conclusion – that any misstatement about the status of an SBA license had been "material".  It also would show the SEC's understanding of why Edward Swanson had not claimed "fraud".

70

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-21

**When The Government Pivoted To A Charge That Panama Was "Dirty", Defense Counsel Should Have Pivoted As Well**

In a letter dated August 5, 2005, the prosecutor asked for a speedy trial exclusion so that he could obtain documents from the UK:  He disclosed that, though the government had searched and seized documents in May 2005 from Amerindo U.S. on the theory that "L.C." was a defrauded investor in Amerindo U.S. (and consequently the government would finds records in the U.S. office premises), now:  "Vilar has asserted that the Victim was a client of Amerindo Panama [which is what Cates' account records, in the government's possession since *before* the search and arrests had shown[, and that the government "believes that the Investor was solicited in, or from, the Amerindo UK office and invested in a product purportedly offered by Amerindo Panama." (Letter, Marc Litt to Hon. Kenneth M. Karas, August 2, 2005 pp.2-3).

The prosecutor repeated this "new information"  (actually not "new") [26] at a conference held before Judge Karas on August 11, 2005, when he convinced Judge Karas that  speedy trial exclusion was appropriate  (Tr. 8-9 ):

---

[26]     At Mr. Vilar's bail hearing before Judge Baer on June 3, 2005 the government told Judge Baer they had learned that there were no records of L.C's investment in the New York offices and that in fact there were other Amerindo entities with separate records. (Tr. 15-17).  The prosecutor said he needed just a little more time to find out what a "reasonable bail" would be – similarly to his statement in his Sentencing Reply (DOC 418) in February 2010 that the government did not (yet) know of "all" the investors or their "losses":

> Finally, over $3 million of that $5 million went to a bank in Luxembourg.  The government doesn't know who the account holder is in the bank account in Luxembourg, but that
> is another thing that gives us great concern, that there are overseas bank accounts over which Mr. Vilar has control or access to, and without more knowledge about that, it is difficult to assess.  It is impossible for the government to assess what an appropriate bail amount would be.
>   THE COURT:  You had a week to look.  You found no such records in any of the hundred boxes filled with records that you took out of his office?

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-22

THE COURT:  What is so relevant or important about getting the Amerindo U.K. documents?  I signed a letter.  There is some suggestion that, at least according to the government, the money from the victim that was supposed to be targeted to a certain investment but was not, is due to Amerindo Panama, and there may be some documentation in England of all this?  Do I have that right?

MR. LITT:  Yes.  Mr. Vilar has represented in letters both himself personally and through representatives that the victim identified as the victim in the indictment was an investor in Amerindo Panama.  It's also represented in that correspondence that, and we have other information to suggest that sort of the back office operations or the administrative functions of Amerindo Panama were

---

MR. LITT:  That's correct.  Let's be clear about the records.  There are several entities involved here.  One is Amerindo Investment Advisors Inc.  That is a United States corporation.

Then there is Amerindo Investment Advisors Inc., which turns out may be a Panamanian entity.  The books and records for the Panamanian entity may or may not be kept in New York.

THE COURT:  I am not arguing with you.  I am just trying to recollect what your colleague told me was going to happen if he had a few days to look at these books and records.

I certainly don't know what is in them and I am not interested in what is in there.  I just want to be sure it is fair to say you didn't find any of these foreign bank accounts or foreign accounts or statements thereof.

MR. LITT:  That's correct.  I was not here on Friday,  for which I apologize.  I doubt Mr. Esseks made a firm prediction of what would be found in documents he hadn't seen.

THE COURT:  He had no firm predictions.  He told me if  he had a few days, he would be able to find out whatever it  was, whatever he needed in order to produce the kind of bail I
allowed at the time.

MR. LITT:  We believe that many of the books and records that relate to the running of these accounts, Panamanian accounts, are done not in Panama and not in the United States, but in London, where there is another entity called Amerindo Investment Advisors U.K.  We don't have a hundred boxes in London.  We have a hundred boxes we have, and Ms. Necheles [Mr. Vilar's lawyer at the bail hearing] and the court are quite right, we did not find evidence in those hundred boxes of overseas bank accounts.

THE COURT:  As complicated as this mission may be, Mr. Litt, what is the government's proposal, if they have one?

MR. LITT:  The government's proposal is that the defendant give a picture, a true and complete picture of his financial assets.

THE COURT:  Until that time, we should keep him in jail?

MR. LITT:  We are unable to determine what an appropriate bond amount would be.

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-23

conducted in the United Kingdom at the Amerindo U.K. office, and therefore we have reason to believe that -- and we also have information that account statements were prepared for the victim in Amerindo U.K. and sent to the victim from Amerindo U.K.'s offices, and that other investors who invested in other things through Amerindo Panama got their information from employees and from documents prepared in the Amerindo U.K. office. That is our basis for believing that documents relevant to Amerindo Panama its operations, investments -- I should also add that Mr. Tanaka, who was an owner of Amerindo U.K. and was located in the Amerindo U.K. office, was responsible for directing the trading activities, as the government understands it, for all the Amerindo entities, Amerindo U.S. U.K., and Panama. So investments that were undertaken on behalf of -- securities that were bought and sold and investments made on behalf of Amerindo Panama investors were made and originated at Amerindo U.K. offices.

It's for all those reasons that we believe that there is information relevant to the victim, the victim's investment,  the operations more generally of Amerindo Panama, and the context there of the Amerindo U.K. office.

When the government pivoted to Panama and the UK, however, instead of defending on the basis that the defendants were not liable under the securities laws for foreign securities transactions, defense counsel stuck to the "normal" track, litigating privilege issues as the prosecutor set the agenda, instead of fighting back against charges emanating from extraterritorial excursion. (See DOC 84-17, 05 cr 621, Mr. Litt's letter to Judge Karas arguing that the government had acted quickly enough in pursuing extraterritorial "discovery" because after all, the defendants did not even have counsel in place between the time of arraignment and July, 2005, and that the government was anticipating a lengthy period of "privilege" review of documents, and so the case would not be tried for good while in any event.)

As we now are only too well aware, defense counsel's failure to raise "the *Morrison* issue" resulted in the affirmance of defendants' convictions under the Court of Appeals' interpretation of the "plain error" rule. Though the Supreme Court decided *Morrison* in 2010, the *Morrison* case was in fact being actively litigated in the Southern District of New York in

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-24

2004 (*In re National Australia Bank Securities Litigation,* 03 cv 6537 (BSJ)). Memoranda were filed, , albeit on the basis of "subject matter jurisdiction" under the "conduct and effects" test. The case was litigated before the Second Circuit, which issued an opinion in 2008. 547 F.3d 167. Despite the litigation and the Supreme Court ruling in 2010 jettisoning the application of the securities laws to the Bank operating in Australia, counsel (either unaware of the litigation or in ignorance of the significance of the pushback against expansion of the 'conduct and effects" test) failed to object to the applicability of the U.S. Securities laws to defendants' offshore business --leading to the devastating affirmance by the Court of Appeals.

Had counsel investigated the defendants' Panama operation as their clients were trying to explain, they would have learned that the SEC had stated in its 1993 letter to Amerindo that it was inquiring about Amerindo Panama under the "conduct and effects" test. (The letter is Exhibit "B" to the Declaration In Opposition to Disgorgement, filed in the SEC case, 2/7/14, DOC 354).

That the defense lawyers *allowed* these accusations (stemming for "Day One" in 2005) to go unrebutted at trial and at sentencing – despite their ability to have obtained Amerindo counsel's copies of the SEC filings and its papers --  constitutes ineffective assistance of counsel under *Strickland v. Washington,*, 466 U.S. 668 (1984), the principle of which was reiterated and applied most recently in a summary grant of *certiorari* and reversal in *Hinton v. Alabama,*   134 S.Ct. 1081 (2014) (defense counsel's performance fell as a matter of law below an "objective standard of reasonableness" because counsel failed to develop the only reasonable defense strategy; he did not know the law that would allow him to hire a "better" expert.)

74

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-25

## Counsel's Failures Caused Prejudice and Were Not "Strategic"

In a case where "losses" *still* drive the government's effort to sting defendants with a Guideline-approved sentence of 210-262 months, counsels' failure to have developed evidence of the value of the assets, as against the total amount of investor claims – or to have held the government to its burden of proof -- constituted ineffective assistance of counsel. Plainly assets and claims are "relevant." Indeed, they were "relevant" – as stated in this Court's order of 1/29/10 – "at a minimum" to the sentencing issue of 'severity' of the offense. Moreover, the assets – and what client money purchased – are also "relevant" to the issue of forfeiture. When a client is charged with an offense involving loss, restitution, and criminal forfeiture, a lawyer has the obligation to defend.

More to the point, *the jury* should have had this *evidence* of the amount of Amerindo Panama client claims, and the *evidence* that there are Amerindo-Panama held assets sufficient to have covered *all* investor claims as of the date that Amerindo was forcibly shuttered and defendants rendered incompetent to *pay* the investors, on May 25, 2005 -- as it bore on the *bona fides* of the Panama operation, and the intent of the defendants to "steal" (as opposed to negotiate through the rough spots of their business.)[27]

---

[27] Even had there been a "run on the bank" (likening Amerindo Panama to a "bank") on May 25, 2005, Amerindo could have liquidated assets and achieved a 100% (or near 100%) payout of current account claims – as the Receiver has now indicated, and the jury should have known this. It speaks volumes that, in fact, the assets would have covered investors' principal as of that date (though a fire sale might have made it less likely). JP Morgan would not be able to pay "all" clients' redemptions today, much less the $18 billion fine that it will soon have to pay, so it appears. A commercial bank takes in deposits (checking, savings, CDs etc) of all types, then lends it out to a range of borrowers (corporate, credit card, autos, overdrafts, etc.) Commercial banks like JPM are required to keep a certain percentage of the deposits as "reserves", which they use to meet customer demands for withdrawals. But they are not required to keep 100% because, as here, they operate with staggered maturities and redemption demands. (On April 8, 2014, it was reported that there are new regulations requiring "Big U.S. banks" to "boost capital" so that they can better cover customer demands. "The Basel III accord included both a leverage

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-26

Arguments made by defense counsel – that clients had *previously* made a lot of money – were *ineffective* to respond to the *actual* charges that defendants had "defrauded" the clients out of money, allegedly *lost* to them currently.

Of course before a defendant is entitled to relief under the Constitution for the ineffectiveness of trial/sentencing counsel, *Strickland* requires a showing that a lawyer's conduct in failing to present a defense – the *only* reasonable defense – is not a strategic choice. Unfortunately for his client Gary Tanaka and for Alberto Vilar, whose attorneys let Mr. Colton take the lead, Mr. Colton himself made statements evidencing that he was not "in tune with" the financial aspects of this case.  Neither counsel made submissions prior to the jury deliberations *or at any time* in the case about assets of the Panama company or client claims.

More telling, Mr. Colton made clear at the colloquy just after the jury was charged (Tr. 5634, quoted in the footnote)[28] that he did not *know* the law of criminal forfeiture, *asking* the

---

ratio and risk-based capital requirements, which take into account the riskiness of banks' assets."
http://www.reuters.com/article/2014/04/08/us-financial-regulations-leverage-idUSBREA3709B20140408 )    Today, if JP Morgan took in deposits of $10 million and lent out $9 million, it would not have liquid funds to facilitate every investor.  A simultaneous demand by every investor at the same moment to send $100 to their Aunt Maud in Florida would force the bank to default because it could not respond to such immediate heavy withdrawals in that it could not possibly call in to liquefy their outstanding loans overnight to meet such large unexpected depositor requests.

Here, the jury should have known that by 2005, over 75% of the Amerindo Panama GFDRA program was history, fully redeemed, owing to the cessation of the relationship with Steven Gray.  The offshore business was being further wound down because they were not marketed for new investor funds.  Amerindo's investors had staggered maturity dates (and there were no "stated capital" requirements for financial firms in Panama.)  Further, as the investors knew, Amerindo guaranteed the fixed deposits through their holdings in Amerindo U.S. as well as the Panama operation.

[28] MR. COLTON: Just a question. I frankly don't know the answer but I could research it. Does the jury typically get the forfeiture allegations in an indictment? Should we be  sending that back?

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-27

Court, accepting the prosecutor's "representation" about the state of the law, and what the best course of action for the defendants would be, and in effect *waiving* the defendants' right to have a jury *decide* the issue of "forfeitable proceeds."   *Asking the prosecutor* about forfeiture, and accepting his representation (contrary to Rule 32.2, which provides for a jury trial on forfeiture,) is not an adequate investigation and shows an ineffective lack of familiarity with the relevant law, which in this case required an investigation and analysis of the client claims and Amerindo assets.   Counsel did not undertake this analysis.   In fact counsel *disclaimed* the Ross report, submitted by Mr. Tanaka because Mr. Colton would not submit it.  (Sen Tr. 2/5/10 p.10).

If other evidence of a failure of a strategic reason on counsel's part is needed, we point to Mr. Colton's presentation at a Lawline CLE conference on July 1, 2011  on "parallel prosecutions" of criminal and SEC cases.  When a presenter was about to discuss asset forfeiture, and how it intersects with SEC freeze orders, another presenter stated he would be taking notes because he was confused about asset forfeiture.  Mr. Colton stated:  "[I]f I wasn't on camera I'd admit being confused about that too." (We can provide an excerpt of the .wav tape of that to-the-clients devastating admission to the Court; unfortunately Mr. Vilar's counsel were equally deficient  under Constitutional requirements.)

---

THE COURT: You know, I was going to ask you folks about why we didn't --
sometimes you ask a jury to deliberate and return a verdict on forfeiture, right?
MR. LITT: I don't believe that happens. First of all, it's an option within the
discretion of the defendants.  But I believe that is only the case where there is
specific property to be forfeited. And in this case, my recollection is, it's a money
judgment. [However, the money judgment is determined by the amount of the
proceeds forfeiture. ]  And that's part of a sentence if any, and that's determined
by the Court.
THE COURT: So shall we redact out the portions of the --
MR. LITT: I think it's fine to do so.
THE COURT: Can we do that?
MR. COLTON: I accept that representation ....   [Mr. Vilar's lawyer accepted it
too.]

77

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-28

We do not mean to imply "incompetence" of defense counsel generally, but even a "competent" lawyer has lapses.  It is not "about" the lawyer or his character.  It is about the right to *effective* representation in every case.  When lapses are of Constitutional proportions a defendant is entitled to a remedy under the Sixth Amendment and under *Strickland*.

Confusion, failure to prepare for the penalty, is not preparation for an effective defense.  Forfeiture is complicated, but it was, and is, a *sentence in this* case.  It is a sentence that *requires* analysis of the "property" of the defendant the government claims is "forfeitable' and that property's relationship to "offenses" and other characteristics.

In this case, which alleged that the clients were thieves, it *required* an analysis of client claims, and of the value of the securities they purchased (as the securities become the proceeds and must be valued).   It required an analysis even if solely related to the sentencing in this case.  Any determination of "forfeiture" would involve a determination (under *United States v Porcelli*, 865 F.3d 1365 (2d Cir. 1989)) of the value of defendants' hard work and business acumen in developing any "proceeds" that may have come into the business (and the value of the securities that were provided by Amerindo Panama in return for monetary "proceeds" – securities that *become* "the proceeds").   Plainly it was contrary to defendants' interests to *not* have a jury hear this important information.

It was not a "strategic" call.  It was the result of deficient investigation and inquiry.[29]

Counsel's representation was ineffective under *Strickland. Strickland*, 466 U.S. at 691

---

[29] There is another circumstance that warrants inquiry.  Among the unused/unoffered government exhibits present counsel has offered is UGX 3051, which raises questions about Mr. Colton's reason for essentially omitting a defense of Amerindo Panama or his client's operation of and interest in it.  UGX 3051 is a 1998 LOA to Bear Stearns authoring a wire transfer of $980,000.00 from the Techno Raquia account, 102-17995 to "Wilson Sonsini Goodrich & Rosati Trust Account" – Mr. Colton's firm at the time of his trial representation (after which Mr. Colton moved to the Sonnenschein firm).

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-29

("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); see also *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'") (*quoting .Strickland*, 466 U.S. at 690·91); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (defense counsel's failure to conduct pretrial discovery not a strategic decision because it was based on defense counsel's "mistaken belief' ...).

It warrants vacatur of the convictions and a new trial. There is clearly *prejudice*.

---

**AMERINDO INVESTMENT ADVISORS INC.**

One Embarcadero Center, Suite 2300
San Francisco, CA 94111-3162
Tel: (415) 362-4292
Fax: (415) 362-0533

15 December, 1998

43 Upper Grosvenor Street
London W1X 9PG
Tel: (0171) 629-2349
Fax: (0171) 493-5158

**BY FACSIMILE**

Monty Warmbrand
Specialist Clearance
Bear Stearns & Co. Inc.
1 Metrotech Center North
Fifth Floor
New York, NY 11201

Re: Techno Raquia - A/C # 102 - 17995

Dear Monty:

Please immediately send the following wire transfer:

Bank: Bank Of America
530 Lytton Avenue
Palo Alto, CA 94301

ABA #: 121-000-358

A/C #: 14843-00544

Account Name: Wilson Sonsinsi Goodrich & Rosati Trust Account

Reference: Centraul Corporation, J. Michael Arrington (Amerindo)

Amount: $980,000.00

This wire transfer represents a private placement investment in the above referenced entity. This will be returned to the account after the expected IPO in late 1999.

Please call me immediately in London on 011-44-171-629-2349 in case of any problems.

Sincerely Yours

JAMES STABLEFORD
Director

GOVERNMENT EXHIBIT
3051
05 CR 621 (RJS) (ID)

AUK-10-00002

79

**Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-30**

# CONCLUSION

The Court should vacate the convictions pursuant to Fed. R. Crim. P. 33 and the Sixth Amendment.

While it is considering this motion, the Court should sentence the defendants to the time they have served.

If the Court is inclined to keep Mr. Vilar in prison, Mr. Vilar requests the Court to recommend the Otisville camp.

Dated:  April 14, 2014

                              _____/s/_____
                              VIVIAN SHEVITZ
                              Attorney for Defendant
                                ALBERTO VILAR
                                And, On Motion For New Trial,
                                For GARY TANAKA
                              46 Truesdale Lake Drive
                              South Salem, New York 10590
                              (914) 763-2122
                              Vivian@shevitzlaw.com

Ying Stafford,
Of Counsel.

80

Exhibit C- April 2014 2255 (DOC 671, 05cr621), C-31

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------- x

ALBERTO VILAR and AMERINDO INVESTMENT  :
ADVISORS, INC.,                        :       Index No. 603234/04
                  Plaintiffs,       :       I.A.S. Part 54
                                       :       (Hon. S. W. Kornreich)
        – against –               :

EDWARD ADAMS, JR., LISA MAYER and DEBRA :        **MOTION TO MODIFY**
MAYER,                                 :        **CAPTION AND FOR LEAVE**
              Defendants.        :        **T O   A M E N D**
---------------------------------------------------------------------- x  **COUNTERCLAIMS**

LISA MAYER, DEBRA MAYER, DABA, INC. and :
ABA, INC.,                             :
          Counterclaim Plaintiffs,    :
                                       :
        – against –               :
                                       :
ALBERTO VILAR and AMERINDO INVESTMENT  :
ADVISORS, INC.,                        :
                                       :
         Counterclaim Defendants.     :
---------------------------------------------------------------------- x

C O U N S E L :

    PLEASE TAKE NOTICE that, upon the annexed Affirmation of Patrick W. Begos, dated June

17, 2005, Counterclaim Plaintiffs Lisa Mayer, Debra Mayer, Daba, Inc. and Aba, Inc., by their

attorneys, Begos & Horgan, LLP, will move this Court, Motion Support Office Courtroom, Room

130, at the Courthouse, 60 Centre Street, New York, New York, on June 27, 2005, at 9:30 a.m., for

an order: (a) modifying the caption following the dismissal of plaintiff's complaint; and (b) pursuant

to CPLR 3025(b), granting leave to amend their Counterclaims (denominated as an Amended

Complaint) as set forth in the proposed Amended Complaint annexed hereto; and (c) for such other

and further relief as the Court deems fair.

Dated:     Bronxville, New York
           June 17, 2005

                                        BEGOS & HORGAN, LLP

                                        By: _____
                                              Patrick W. Begos
                                        Attorneys for Counterclaim Plaintiffs
                                        7 Pondfield Road
                                        Bronxville, NY 10708
                                        (914) 961-4441

TO:   HELLER EHRMAN WHITE & McAULIFFE
      Attorneys for Plaintiff
      120 West 45th Street
      New York, NY 10036

2

Exhibit D-Mayer motion to amend, 6/17/05   D-2

KK1-0008000946

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
ALBERTO VILAR and AMERINDO INVESTMENT        :
ADVISORS, INC.,                               :         Index No. 603234/04
           Plaintiffs,                        :         I.A.S. Part 54
                                              :         (Hon. S. W. Kornreich)
     – against –                           :
                                              :
EDWARD ADAMS, JR., LISA MAYER and DEBRA      :         **A F F I R M A T I O N   O F**
MAYER,                                        :         **PATRICK W. BEGOS IN**
           Defendants.                        :         **SUPPORT OF MOTION TO**
-------------------------------------------------------------------x      **MODIFY CAPTION AND**
LISA MAYER, DEBRA MAYER, DABA, INC. and      :         **FOR LEAVE TO AMEND**
ABA, INC.,                                    :         **COUNTERCLAIMS**
          Counterclaim Plaintiffs,              :
                                              :
     – against –                           :
                                              :
ALBERTO VILAR and AMERINDO INVESTMENT        :
ADVISORS, INC.,                               :
                                              :
          Counterclaim Defendants.              :
-------------------------------------------------------------------x

      PATRICK W. BEGOS, an attorney licensed to practice in the Courts of this State, declares the

following to be true under penalty of perjury:

      1.     I am a member of the firm of Begos & Horgan, LLP, attorneys for Lisa Mayer, Debra

Mayer, Daba, Inc. and Aba, Inc. I submit this affirmation in support of their motion for an order: (a)

modifying the caption following the dismissal of plaintiff's complaint; and (b) pursuant to CPLR

3025(b), granting leave to amend their Counterclaims (denominated as an Amended Complaint) as

set forth in the proposed Amended Complaint annexed hereto; and (c) for such other and further

relief as the Court deems fair.

      2.     By order dated June 2, 2005 (**Exhibit A**), Amerindo withdrew its claims in full.

"Counterclaim plaintiffs" desire to pursue their claims against the "counterclaim defendants." I

KK-0008000947

request that the caption be amended to refer to my clients as "plaintiffs" and to "counterclaim defendants," as follows:

```
----------------------------------------------------------------x
LISA MAYER, DEBRA MAYER, DABA, INC. and    :
ABA, INC.,                                 :     Index No. 603234/04
                    Counterclaim Plaintiffs, :
                                           :
             – against –                   :
                                           :
ALBERTO VILAR, GARY TANAKA, AMERINDO       :
INVESTMENT ADVISORS, INC. (U.S.), AMERINDO :
INVESTMENT ADVISORS, INC.  (PANAMA),       :
                                           :
                    Counterclaim Defendants. :
----------------------------------------------------------------x
```

3.      Additionally, my clients wish to amend their claims, in order to: (a) add two new defendants, Gary Tanaka, and Amerindo Investment Advisors, Inc. (an alleged corporation allegedly registered in Panama); and (b) to add a new cause of action for fraud (**Exhibit B**).

4.      In their original counterclaims, my clients alleged, *inter alia*, that Amerindo Investment Advisors, Inc., a California corporation with offices in New York ("Amerindo-US"), had breached its obligations to to repay a Guaranteed Deposit investment in an amount in excess of $11 million. In their Reply, Amerindo-US and Vilar asserted that my clients' investments were with "a Panamanian affiliate of Amerindo ('Amerindo-Panama')" (Reply, ¶ 6). Though we dispute that Amerindo-US and Amerindo-Panama (collectively, "Amerindo") are separate entities, we need to add Amerindo-Panama as a defendant in order to insure that all potential responsible parties are before the Court.

2

Exhibit D-Mayer motion to amend, 6/17/05   D-4   KK1-0000000948

5.      Similarly, Gary Tanaka, who is Alberto Vilar's partner in Amerindo, also guaranteed Amerindo's debt (*see* Amended Complaint, ¶¶ 17-18). The claims against Tanaka and Vilar are largely identical. Therefore, for judicial economy, and to prevent the possibility of inconsistent judgments, we request leave to add claims against Tanaka to the action.

6.      Finally, in their reply, defendants have denied that they guaranteed the Guaranteed Deposits made by my clients. If that assertion is accurate, then my clients were defrauded by the defendants, who assured them that their Deposits were fully guaranteed. Therefore, we seek leave to add a Seventh Cause of Action, for fraud, against all defendants.

7.      I submit that the interests of justice, and judicial economy, are in favor of this proposed amendment, and I respectfully request that the Court grant leave to serve it.

Dated:      Bronxville, New York
            June 17, 2005

                                            _____
                                            Patrick W. Begos

3

Exhibit D-Mayer motion to amend, 6/17/05   D-5
KK1-0000000949

KK1-0002000950

Exhibit D-Mayer motion to amend, 6/17/05   D-6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Vilar

v.

Adams

INDIVIDUAL ASSIGNMENT PART _54_

~~STIPULATION~~ ORDER

INDEX NO. 603234/04

MOTION CALENDAR NO.

DATE

IT IS HEREBY ~~STIPULATED AND AGREED by and between the below-named attorney(s)~~ ORDERED as follows:

P to respond to discovery demands pursuant to order dat'd 4/15/05 w/20 days, to the extent possible given that P is presently in jail and is being investigated by the SEC and there is confusion as to availibility of some discovery requested. The parties are to confer on 6/30/05 at 9:30 to resolve remaining discovery issues including a possible preclusion order if D will be prevented from obtaining relevant discovery due to P's situation vis a vis criminal complaint and SEC investigation. P's hereby withdraw Tort claims in full.

_____
Attorney for Plaintiff

Date: 6/2/05

_____
Attorney for Defendant
PATRICK W. BEGOS, BEGOS MORGAN

So Ordered.

_____
Attorney for Defendant
ALAN S. LEWIS, O'CONNELL, FLAHERTY, GULLAGE; SKLARIN, ...

ENTER: _____
J.S.C.

SC-8G (rev 2/85)

Exhibit D-Mayer motion to amend, 6/17/05   D-8

KK1-0008000952

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

LISA MAYER, DEBRA MAYER, DABA, INC. and     :
ABA, INC.,                                  :
             Counterclaim Plaintiffs,     :   Index No. 603234/04
                                      :
             – against –                    :   **AMENDED    COMPLAINT**
                                      :
ALBERTO VILAR, GARY TANAKA, AMERINDO        :
INVESTMENT ADVISORS, INC. (U.S.), AMERINDO  :
INVESTMENT ADVISORS, INC. (PANAMA),         :
                                      :
             Counterclaim Defendants.     :

-------------------------------------------------------------------x

Plaintiffs, Lisa Mayer ("Lisa"), Debra Mayer ("Debra"), Daba, Inc. ("Daba") and Aba, Inc. ("Aba"), for their amended complaint, allege as follows:

1.    Lisa and Debra were, until approximately 2004, residents of Puerto Rico. In 2004, they established residency in Yonkers, New York.

2.    Herbert Mayer, their father, is presently aged 83, is a retired, board-certified surgeon and lieutenant commander of the United States Public Health Service. He lived most of his life in Puerto Rico. His now-deceased wife, Mary Mayer, owned a significant part of a major Puerto Rico-based department store chain and shopping centers.

3.    Lisa and Debra are the daughters of Herbert and Mary.

4.    Daba and Aba are both corporations with a principal place of business in Nassau, Bahamas.

5.    Upon information and belief, Amerindo Investment Advisors, Inc. ("Amerindo-US") is a California corporation, licensed to do business in New York, with a place of business and registered agent in New York County.

Exhibit D-Mayer motion to amend, 6/17/05   D-9 KK1-0000000953

6.     Upon information and belief, Amerindo Investment Advisors, Inc. ("Amerindo-Panama") claims to be a corporation purporting to have its principal place of business in Panama.

7.     Amerindo-US and Amerindo-Panama (together referred to as "Amerindo") are owned and operated by Vilar and his partner, Gary Tanaka, and they commingle funds and operations. Amerindo-Panama and Amerindo-US are alter egos.

8.     Beginning in or about 1985, Lisa, Debra, Mary and Herbert (collectively, "Mayers"), began investing funds with Vilar and Amerindo.

9.     After the Mayer family department store chain was sold in 1988, Vilar began to increasingly ingratiate himself into the Mayer family. Among other things, he began to visit the Mayers frequently in Puerto Rico, continuously question them about their finances, and began a romantic relationship with Lisa.

10.    Through these and other efforts, Vilar undertook a confidential and/or fiduciary relationship with the Mayers. Vilar used this relationship, and a combination of promises, threats and intimidation, to gain control over an increasingly large proportion of their funds.

11.    As a result of Vilar's efforts, by the mid-1990's, defendants had possession of, and/or control over,  virtually all of the Mayers' funds.

12.    In or about 1993, defendants insisted that the Mayers restructure the ownership of the funds that Amerindo was managing. Specifically, Defendants instructed the Mayers to establish a trust with a company selected by Vilar – Private Trust Co. ("PTC"), based in the Bahamas – and to organize two Bahamian corporations to be owned by the trust.

13.    Under the structure set up by defendants, the corporations would "own" all or substantially all of the Mayers' assets that were being held by defendants. The Mayers complied with

2

KTT-0000060954

defendants' instructions, and allowed defendants to create the trust, the corporations, and to structure their assets accordingly. Daba and Aba are successors to the Bahamian corporations that defendants instructed the Mayers to form.

14.     Despite this structure, defendants continued to send interest payments on the funds owned by the Bahamian corporations directly to the Mayers at their home in Puerto Rico. Later, defendants imposed a more "circuitous" route for interest payments to be made.

**The Guaranteed Deposits**

15.     From the beginning of the Mayers' relationship with Vilar, the bulk of the funds defendants took control over were placed into fixed-rate deposits ("Guaranteed Deposits") that were guaranteed by defendants, jointly and severally. These Guaranteed Deposits were for a specific term (generally 1, 2 or 3 years), and earned a rate of interest that was fixed at the beginning of the term (generally in excess of 10% per annum).

16.     The Guaranteed Deposits were made pursuant to a Subscription Agreement that provided, *inter alia*, that "within thirty (30) days of the annual expiration date or renewal date of the Deposit Account, unless the Fixed Deposit has been renewed by mutual agreement, upon receipt of written demand from the undersigned, [Amerindo will] return to the undersigned the Deposit Account, together with interest accrued thereon[.]"

17.     Additionally, the Guaranteed Deposits included a written guarantee, pursuant to which each of Vilar, Tanaka and Amerindo "absolutely and unconditionally guarantee[d] the due payment by [Amerindo] of both the Funds [*i.e.*, principal] and a minimum annual return on the investment [at the agreed-upon fixed rate]"

3

Exhibit D-Mayer motion to amend, 6/17/05    D-11
KK1-0000000955

18.    In a letter dated May 18, 1998, Vilar "wr[o]te to confirm that the Guarantee for the Fixed Rate Deposit Account includes myself, Gary and the various Amerindo companies separate as guarantors. These include Amerindo Investment Advisors Inc., a California corporation and Amerindo Investment Advisors, Inc., a Panama corporation. These two companies comprise the bulk of the Amerindo group of companies and the $3 billion in assets that it manages."

19.    Typically, Amerindo made monthly payments of some or all of the interest earned on the Guaranteed Deposits.

20.    Vilar repeatedly advised the Mayers that the Guaranteed Deposits were "invested across a broad spectrum of the term structure of rates, grades and maturities," making it impossible to liquidate a Deposit before its maturity date.

21.    In September 2000, Amerindo advised the Mayers that "we will consolidate all your Fixed Rate Accounts as of September 30, 2000. The maturity date will be December 31, 2000, which is the maturity date of your largest account. Please be reminded that we require one month notice prior to the maturity date informing us of your wishes to re-invest or redeem."

22.    By letter dated December 26, 2000, Amerindo wrote to the Mayers to "remind you that your Fixed Rate Deposit Account in the total sum of $11,066,713.44 will mature on December 31, 2000. ... We are pleased to inform you that we are happy to re-new your Fixed Rate Deposit at a rate of 11% per annum, providing the investment will be for a period of three years. This is the most favorable rate we can offer. ... We are happy to continue to pay your interest on monthly basis should you still require this service. ... Please confirm in writing that you wish us to renew your Fixed Rate Deposit Account at the above rate. Should this not be acceptable *we would wire your full principal to the bank of your choice on January 2, 2001* [emphasis supplied]."

4

Exhibit D-Mayer motion to amend, 6/17/05   D-12

23.  By letter dated January 4, 2001, signed by Lisa, Debra and Herbert, the Mayers acknowledged the December 26 letter, and agreed to a Guaranteed Deposit in the principal amount of $11,066,713.44 at the rate of 11% per annum for three years. The Mayers' letter also stated: "Please confirm receipt of this faxed letter. Please send us to our home address in Puerto Rico by FedEx our new, updated original guarantee (signed by Alberto [Vilar] and Gary [Tanaka]) reflecting these changes[.]"

24.  By letter dated January 4, 2001, Amerindo confirmed that, pursuant to the Mayers' instructions, "we have renewed your Fixed Rate Deposit Account." Amerindo confirmed that: the Guaranteed Deposit was in the principal amount of $11,066,713.44; it would earn interest at "11% per annum, payable on a monthly basis"; and it would be for a period of three years. The letter confirmed that the monthly interest payment would be in the amount of $96,667.74.

25.  In that January 4, 2001 letter, Amerindo confirmed that "the investment will mature on December 31, 2003. We will require a written notice one month prior to maturity date informing us of your desire to redeem or re-new your investment."

26.  In that January 4, 2001 letter, Amerindo also stated: "We will send FedEx signed copies of your new agreement as soon as we obtain signatures from both principals [i.e., Vilar and Tanaka]."

27.  By letter dated January 28, 2003, Amerindo reneged on the terms of the Guaranteed Deposit, telling the Mayers that it was no longer able to pay the monthly interest it had previously committed to pay Specifically, it stated: "With regard to your monthly interest withdrawal we confirm that as a temporary measure a regular payment of $50,000.00 [would be made] in lieu of your monthly interest payment[.] ... In addition to the monthly payment we would endeavor to send

5

you additional sums of money whenever our cash flow situation allows for it. Those payments would be ad hock [sic] and they are intended to bring your total amount of interest payments up to date."

28.    In that same letter, Amerindo also advised the Mayers that it was also reneging on its commitment that the Guaranteed Deposit would earn interest at the rate of 11% per year. Specifically, it stated: "we are no longer able to offer you an interest rate of 11% per annum. We propose a rate of 8% per annum for a one-year investment. ... This would be effective from January 1, 2003 and your investment would mature on December 31, 2003."

29.    Amerindo also stated, in that same January 28, 2003 letter, that it has increased the principal balance of the Guaranteed Deposit to reflect a monthly interest payment that Amerindo did not make in 2002.

30.    Despite confirming the maturity date of the Guaranteed Deposit, and claiming that it was increasing the principal balance, Amerindo had no intention of paying the Mayers *any* of their principal on the maturity of the Deposit, but did not tell the Mayers about this part of its plan.

31.    By letter dated May 16, 2003, the Mayers advised defendants that they "urgently need[ed]" the sum of $850,000 from their investments in order to, *inter alia*, provide handicapped facilities for Herbert in their new home in Yonkers, which had been "certified as medically necessary to avoid catastrophic accidents," and also to satisfy mechanics liens on the property, and to "bring our nearly uninhabitable home to a liveable condition[.]"

32.    By letter dated August 18, 2003, Vilar refused to provide the Mayers any of their own funds, stating that Amerindo was "fortunate to have survived" the prior years, and suggesting that the Mayers consider "selling something in Puerto Rico" in order to raise funds.

Exhibit D-Mayer motion to amend, 6/17/05    D-14    KM-0000000958

33.    By letter also dated August 18, 2003, Gary Tanaka confirmed that Amerindo would not provide the Mayers any of their funds, making it clear that the Guaranteed Deposit was invested in a manner to "earn a specific yield precisely because they are on deposit for a fixed period of time." If Tanaka's statement were true, Amerindo should have had no problem returning the Mayers' entire principal balance when the Guaranteed Deposit matured. As will be discussed below, however, upon maturity of the Deposit, Amerindo claimed that it did not have the money.

34.    Significantly, given the allegations in the complaint that the Mayers' investments with Amerindo were devastated by the bear market of the early 2000's, Tanaka stated in his letter that, though Amerindo's "capital sustained considerable market losses during this period, ... your fixed deposits have hardly suffered." Of course, the Guaranteed Deposit "suffered" insofar as Amerindo breached its obligation to pay 11% interest, and then later refused to return any of the principal.

35.    By letter dated November 7, 2003 (*i.e.* more than thirty days before the Guaranteed Deposit matured), the Mayers and Daba notified Amerindo that they were redeeming the Guaranteed Deposit as of its maturity date, and provided instructions for Amerindo to wire the principal balance and accrued interest.

36.    Amerindo did not dispute the Mayers' right to redeem the Guaranteed Deposit, nor did it dispute that the Mayers had provided timely notice of redemption. Nonetheless, Amerindo ignored the redemption notice until December 19, 2003, at which time it told the Mayers, in writing, that "your decision is incredibly abrupt and insensitive to our lengthy relationship[.]" This is despite the fact that the Mayers had made clear to Amerindo months earlier that they needed their funds, and the fact that Amerindo knew, or should have known, that its breach of its commitment to pay 11% interest gave the Mayers every reason to take their money away from Amerindo.

7

Exhibit D-Mayer motion to amend, 6/17/05    D-15

KM-0000080959

37.     Amerindo also stated that it did not have the assets to repay the Guaranteed Deposit according to its terms: "the financial markets have not fully recovered, which makes redemption at par now an impossibility." It confirmed this later, stating: "your portfolio cannot immediately be redeemed at face value." Amerindo "offered" to allow the Mayers to "redeem [their] portfolio for the actual market values of the securities invested on [their] behalf," which Amerindo suggested would be about 45% less than the guaranteed balance. Thus, Amerindo confirmed that what Tanaka had previously told the Mayers in his August 18, 2003 memorandum was completely false.

38.     As discussed above, the Guaranteed Deposit was a fixed deposit, with payment of principal and 11% interest guaranteed by Amerindo, Vilar and Tanaka. Therefore, neither the gyrations in the financial markets, nor any losses Amerindo may have suffered on its own investments, affected their obligation to redeem the Guaranteed Deposit, in full, on its maturity.

39.     Indeed, Amerindo went so far as to take the Mayers to task for believing that Amerindo would live up to its obligations: "It is not clear to us how you would have expected your deposit to be redeemed in full at year-end[.]" Thus, Amerindo apparently was suggesting that its lack of integrity was so apparent that no one could reasonably expect it to live up to its undisputed obligations.

40.     Not yet done, Amerindo went on to suggest that the ownership structure that defendants had created for the Mayers years earlier might have been improper, and threatened that, if the Mayers insisted on redeeming, their identities would be disclosed, and "[m]aking such a disclosure would create enormous problems beyond description for you[.]"

41.     By letter dated December 29, 2003, the Mayers rejected Amerindo's excuses, disregarded Amerindo's threats, and reiterated their decision to redeem the Guaranteed Deposit.

8

KM-0000080960

Additionally, the Mayers reminded Amerindo that it had failed even to pay the installment of interest that had been due on December 25, 2003 and the balance of the accrued interest.

42.    In their December 29, 2003 letter, the Mayers also advised Amerindo: "We have expended a great deal of costly time, effort and planning in anticipation of the timely arrival of these funds. Your untimely response and failure to comply with our instructions will result in damages so enormous that it will defy description."

43.    In January, Amerindo sent the Mayers $271,373.21, purportedly representing the "balance" of interest due for 2003 "calculated as a straight 8% per annum" rather than at the 11% Amerindo, Vilar and Tanaka had guaranteed. Amerindo even claimed that the Mayers had "earned an additional $9,470.93 by not taking the full monthly interest payments" even though Amerindo had actually shortchanged the Mayers by some $330,000 by not honoring its commitment to pay 11% interest.

44.    By letter dated February 2, 2004, Amerindo reiterated its refusal to live up to the terms of the Guaranteed Deposit, and even advanced the remarkable assertion: "[a]s far as Amerindo is concerned, I feel that we have done an [*sic*] excellent work for you" despite the fact that Amerindo still refused to return the Mayers' $11 million; despite the fact that it had threatened them; and despite the fact that it had called them foolish for believing that Amerindo would live up to its obligations in the first place.

45.    In that letter, Amerindo proposed to redeem the Mayers' funds over a period of five years with interest on the unpaid portion accruing at 5% per annum. The Mayers, of course, rejected that proposal.

Exhibit D-Mayer motion to amend, 6/17/05   D-17   KM-0000000961

Account prepared by Amerindo as of December 31, 1997 described that this holding as "$200,000.02 Intouch Group Series D Preferred Stock (Stock Certificate at Registrar)"

51.    The Mayers asked Amerindo to issue a stock certificate in their name. Vilar responded by letter dated September 5, 1997, stating: "Your investment in intouch [*sic*] was made the way we make all of our private placement investments, which is that we effect a single globus purchase, and distribute the shares upon liquidation of the same to our private clients. ... We can request the Transfer Agent of the company to re-issue your pro-rata portion of our globus holding directly to you. This is a very slow process which can easily take six-to-twelve months to effect, plus some expense."

52.    Amerindo never arranged to have the Intouch stock reissued in the Mayers' name as it agreed to do.

53.    In a March 31, 1999 statement, Amerindo describe the Intouch holding as 243,902.43 "Series A preferred shares @ cost" with a purported value of $200,000. Amerindo continued to describe the Intouch holding in this manner through its most-recent statement in June 2004.

54.    Amerindo has never explained how "Series D Preferred Shares" became "Series A Preferred Shares," nor has it set forth the price of these shares.

55.    Once again, Amerindo has taken the Mayers' money, purportedly to invest, and then has refused to allow the Mayers access to their money or investments.

**Amerindo Technology Growth Fund**

56.    For many years, the Mayers have had funds (which funds are above and beyond, and separate from, the funds invested in the Guaranteed Deposit) invested in the Amerindo Technology Growth Fund ("ATGF").

Exhibit D-Mayer motion to amend, 6/17/05   D-18

57.   As of August 15, 2000, a Statement of Account issued by Amerindo showed that the Mayers owned 14,784.71 shares of ATGF, at a share price of $115.3904, for a total investment of $1,706,013.60. The same statement also showed that the Mayers were due $104,696.42 on account of a "$2.00 rebate on purchase of 52,348.21 shares of Amerindo Technology Growth Fund on 07.15.98."

58.   As of September 30, 2001, Amerindo asserted that the value of ATGF shares had declined to $20.0815.

59.   As of December 31, 2002, Amerindo asserted that the value of ATGF shares had declined to $14.0204.

60.   In a quarterly report issued July 28, 2003, Amerindo stated that its share price had increased 23.9% from March 31, 2003 to June 30, 2003 (from 14.5685 to 18.0473).

61.   In a letter dated February 2, 2004, Amerindo stated that the ATGF "had increased its value by 47.7% over the last year. In contrast, a Business Week article on Vilar in its July 5, 2004 edition stated that the ATGF had increased by 85% in 2003.

62.   As of June 30, 2004, Amerindo asserted that the value of the Mayers' ATGF shares were $23.0971, for a total value of $341,472.37 (plus the still-unpaid $104,696.42 rebate).

### AS A FIRST CAUSE OF ACTION
### (Breach of Contract)

63.   Plaintiffs repeat each allegation set forth in the preceding paragraphs.

64.   Defendants have breached the commitments they made in the Guaranteed Deposit by, *inter alia*: failing and refusing to credit the Deposit with the contracted-for interest of 11% per annum; failing and refusing to make monthly interest payments as agreed; failing and refusing to

12

refund the principal and accrued interest when the Deposit matured on December 31, 2003; and failing and refusing to refund those sums at any time thereafter.

65.    The Mayers, Daba and/or Aba have suffered damage as a result of defendants' breaches, in an amount to be determined at trial, but no less than $11,224,936.46, plus interest at a rate of at least 9% per annum after December 31, 2003.

66.    In addition, the Mayers, Daba and/or Aba have suffered incidental and consequential damages, in an amount to be determined at trial, as a result of defendants' breaches.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Conversion)

67.    Plaintiffs repeat each allegation set forth in the preceding paragraphs.

68.    Plaintiffs delivered possession of their funds, in an amount in excess of $11 million, to defendants.

69.    As of December 31, 2003, plaintiffs had legal ownership of the funds held in the Guaranteed Deposit, and/or an immediate superior right of possession to those funds.

70.    Defendants exercised an unauthorized dominion over those funds to the exclusion of plaintiffs' rights.

71.    Upon information and belief, Amerindo offered and sold Guaranteed Deposits to their customers by describing them as guaranteed investments that would promptly be repaid to the customer if demanded upon maturity.

72.    Defendants' conversion evinces a high degree of moral turpitude, and/or was actuated by evil or reprehensible motives

13

Exhibit D-Mayer motion to amend, 6/17/05   D-20
KK1-0060060964

73.    Defendants' conversion demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations.

74.    Defendants' conversion was directed at plaintiffs, but, upon information and belief, was part of a pattern directed at the public, and/or their customers at large, generally.

## AS A THIRD CAUSE OF ACTION
### (Violations of Section 349 of the New York General Business Law)

75.    Plaintiffs repeat each allegation set forth in the preceding paragraphs.

76.    Defendants have engaged in deceptive acts or practices in the conduct of their business, trade or commerce and/or in the furnishing of services within the State of New York.

77.    As a proximate result of the deceptive acts and practices described above, plaintiffs have suffered damages in an amount to be determined at trial.

78.    By reason of the foregoing, defendants are liable to plaintiffs for their damages plus their attorneys' fees.

## AS A FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

79.    Plaintiffs repeat each allegation set forth in the preceding paragraphs.

80.    Vilar assumed a confidential and/or fiduciary relationship with the Mayers given his longstanding relationship with the entire family; his romantic relationship with Lisa; his efforts in convincing the Mayers to repose sufficient trust and confidence in him to trust him with substantially all of their funds.

81.    Vilar's actions constituted a breach of his fiduciary duty.

82.    By reason of the foregoing breach of fiduciary duties, the Mayers have been damaged in an amount to be determined at trial.

14

Exhibit D-Mayer motion to amend, 6/17/05    D-21

KM-0060000965

## AS A FIFTH CAUSE OF ACTION
### (Accounting)

83.    Plaintiffs repeat each allegation set forth in the preceding paragraphs.

84.    Amerindo has failed to properly account to the Mayers, Daba and/or Aba for the Intouch

shares it purported bought on their behalf, and for the value of their ATGF investment.

85.    Plaintiffs are entitled to an accounting of the investments made on their behalf, and the

present value thereof.

## AS A SIXTH CAUSE OF ACTION
### (Breach of Contract)

86.    Plaintiffs repeat each allegation set forth in the preceding paragraphs.

87.    Amerindo has failed and refused to turn over to the Mayers, Daba and/or Aba the Intouch

Shares that it represents it purchased for them, or to account to them for the value of those shares.

88.    Plaintiffs have suffered damages, in an amount to be determined at trial, as a result of

Amerindo's breaches.

## AS A SEVENTH CAUSE OF ACTION
### (Fraud)

89.    Plaintiffs repeat each allegation set forth in the preceding paragraphs.

90.    Defendants made repeated representations to plaintiffs that the Guaranteed Deposits

were backed by the assets of each Amerindo entity, and were personally guaranteed by Vilar and

Tanaka. For example, in a letter dated May 18, 1998, Vilar, on behalf of himself and Amerindo,

"wr[o]te to confirm that the Guarantee for the Fixed Rate Deposit Account includes myself, Gary

and the various Amerindo companies separate as guarantors. These include Amerindo Investment

Advisors Inc., a California corporation and Amerindo Investment Advisors, Inc., a Panama

15

KK-0060060966

corporation. These two companies comprise the bulk of the Amerindo group of companies and the $3 billion in assets that it manages."

91.    At no time prior to this litigation did Amerindo or Vilar advise any of the plaintiffs that the guarantees for any existing, rolled-over or new Guaranteed Deposit had changed or been eliminated.

92.    When Amerindo advised the plaintiffs in late 2000 that their Guaranteed Deposit was maturing and could be rolled over into a new Deposit, it did not state that any new Deposit would not be guaranteed by Vilar, Tanaka, and "the various Amerindo companies."

93.    When the plaintiffs rolled over the Guaranteed Deposit that matured on December 31, 2000, they specifically insisted on being given a "new, updated original guarantee."

94.    Amerindo did not dispute that condition. Indeed, in a January 4, 2001 letter, Amerindo responded that the new, updated original guarantee would be forthcoming: "We will send FedEx signed copies of your new agreement as soon as we obtain signatures from both principals [*i.e.*, Vilar and Tanaka]."

95.    Defendants now claim that the Guaranteed Deposit made in January 2001 is not guaranteed by Vilar, Tanaka, or any Amerindo entity other than Amerindo-Panama.

96.    If the Guaranteed Deposit is *not* guaranteed, defendants intentionally misrepresented that the Guaranteed Deposit was guaranteed.

97.    If the Guaranteed Deposit is *not* guaranteed, defendants made a material omission by, *inter alia*, failing and refusing to advise plaintiffs of the alleged change before they rolled over their Deposit in January 2001.

16

KM-0060090967

98.    If the Guaranteed Deposit is *not* guaranteed, defendants actively concealed that alleged change by, *inter alia*, setting forth, in December 2000, the terms under which the maturing Deposit could be reinvested without disclosing any change in the guarantee; and by promising in January 2001: "We will send FedEx signed copies of your new agreement as soon as we obtain signatures from both principals."

99.    Defendants made such misrepresentation or omission, and/or actively concealed the truth, in order to induce plaintiffs to reinvest their Guaranteed Deposit, and to induce them to forego redeeming that Deposit. Specifically, and without limitation, defendants understood that, if the plaintiffs redeemed their Guaranteed Deposit in December 2000, the redemption would result in substantial losses for Defendants, and would interfere with Amerindo's efforts to recover assets lost in the preceding stock market decline.

100.    Plaintiffs reasonably relied on defendants' material representations and omissions. Specifically, and without limitation, plaintiffs would have redeemed the Deposit that matured in December 2000, and would not have rolled those funds into a new Deposit if they knew that the Deposit was not, and/or would not be, guaranteed.

101.    Plaintiffs have suffered injury that was proximately caused by this fraud, in an amount to be determined at trial, but no less than $11,224,936.46.

102.    Additionally, plaintiffs are entitled to punitive damages as a result of defendants' fraud.

WHEREFORE,  Plaintiffs demand judgment:

A.    On the First Cause of Action, awarding their damages, in an amount to be determined at trial, but no less than $11,224,936.46, plus interest at a rate of at least 9% per annum after December 31, 2003, plus incidental and consequential damages;

17

KKH-0060000968

B.   On the Second and Seventh Causes of Action, awarding their damages, in an amount to be determined at trial, but no less than $11,224,936.46, plus interest at a rate of at least 9% per annum after December 31, 2003, plus punitive damages in an amount to be determined at trial.

C.   On the Third Cause of Action, awarding their damages in an amount to be determined at trial, but no less than $11,224,936.46, plus their attorneys' fees;

D.   On the Fourth Cause of Action, awarding their damages in an amount to be determined at trial, but no less than $11,224,936.46, and directing Vilar to disgorge the profits he improperly made, and kept by virtue of his breach of his duties;

E.   On the Fifth and Sixth Causes of Action, directing defendants to account for, and pay over, the value of plaintiffs' investments in Intouch stock and ATGF; and

I..   Awarding such other and further relief as the Court deems fair.

Dated:   Bronxville, New York
         June 17, 2005

                         BEGOS & HORGAN, LLP


                         By:_____
                             Patrick W. Begos
                             Attorneys for Plaintiffs
                             7 Pondfield Road
                             Bronxville, NY 10708
                             (914) 961-4441


TO:  HELLER EHRMAN WHITE & McAULIFFE
     Attorneys for Plaintiff
     120 West 45th Street
     New York, NY 10036

Exhibit D-Mayer motion to amend, 6/17/05   D-25   KKK-0060080969