

10/3/18

Gary A. Tanaka
46 Truesdale Lake Drive
South Salem, New York 10590

Hon. Richard J. Sullivan (sent by email for filing)
United States District Judge
Southern District of New York

    Re:  United States v Vilar and Tanaka --05 cr 621 (RJS)
           Opposition to substitute asset forfeiture.

Dear Judge Sullivan,

    Please excuse my absence of formal structure and legal formality incorporated in this, my *pro se* response. I write to oppose more "forfeiture" of funds for which I worked all my life, based on wild premises that the SEC and prosecutor proposed in 2005 that have been shown to be false. These accusations were not opposed by my trial lawyer. I have filed a 2255 motion showing this, which is now before this Court. We have shown in our 2255, in summary, the following.

    In 2005 I was arrested in this case and also charged with civil SEC violations for, supposedly, what my US advisory company did. (05cv5231, SEC complaint). My business partner and I (mostly my business partner, Alberto Vilar, but I have been "collateral damage") were pilloried in the press because the AUSA who "investigated" charged, in essence, that our high-profile international investment management firm had long ripped off clients and stolen all their money by telling them "blatant" "lies". They "feared" that *ALL* of the client money was lost and stolen.

    Days later, while Alberto and I were in jail waiting arraignments and bail, the prosecutor incredibly told the bail court (the magistrate and then Judge Baer), in essence, that they had not yet even seriously investigated, much less had just learned that there existed a Panama and UK company, and that the investor centered in the complaint, Lily Cates, might not even be a client of the US

company. They had "learned" that fact only after having actively participated in destroying the US company starting on the first day of the case. They had not even researched the Panama company documents duly filed with the SEC. If they had, they would have 'found' all the money was properly invested, where it was, and that all investor funds were in fact intact.

The government tried for a receiver and got a monitor. Six months later the monitor told the Court (Judge Swain) that the US company was 'clean' (DOC 48), that the books were fine, that the government's aggressive posture had already, and was continuing, to financially bleed our company dry, and that he, the monitor, should be discharged, with the funds returned to *US*, the principals. (December 2005 conference in the SEC case transcript).

Instead of doing this, in the absence of meaningful resistance from our lawyers, the government (both the DOJ and the SEC lawyers) kept trying to find justification and ex-post evidence for having perpetrated this "erroneous" damage.

In 2006 Judge Karas ruled that the highly-publicised raid and seizure by 19 armed agents in 2005 had been unconstitutional. There was no basis, he said, to conclude that the companies were "permeated with fraud"as charged. There were a handful of investors identified who claimed they had problems. No one, not even my lawyer, as yet ascertained the fact that all those investors were Panama clients. As of the trial in 2008, the government had not specified anything else was "wrong" beyond what it told Judge Karas in 2005. No one knew then (or seemed to care) that all the money was "there", frozen by the government and not accruing interest.

In its 14 August 2018 motion, the prosecutor (acting on the coattails of the tandem SEC-DOJ joint effort) wants to take the Amerindo excess assets remaining after *ALL* clients, institutional and private, have been entirely made whole in their investments once under our umbrella.

The prosecutors conveniently ignore two profound events: (1) at times over-"generous" payments to this pool of offshore clients, effected by the SEC when it coerced the receiver to use "unconventional" methodology – completely ignoring the Amerindo client records that the government had seized and which were in the

government's possession--then paying interest though the seized funds were not ever in our possession; and (2) the pending 2255 motion--the third filed on my behalf--by which we demonstrate that the "massive international fraud" thesis and conviction were based on inadequate investigation, false assumptions, *Brady* violations, and were predicated on overzealous prosecutorial misconduct premised on major mistakes.

With respect to "forfeiture" predicated on my trial lawyer's improper capitulation, I have disavowed my prior counsel's position many times since I realized what he did, without investigation and without my knowing consent, and did not do, as set forth in our 2255 motion. His failures led to this government application to grab remaining Amerindo assets which conveniently ignores many overhanging financial offsets that any determination of "excessive punishment" (a constitutional term my lawyer has discussed) should consider, such as the wanton destruction of Amerindo U.S., declared by the monitor in 2005 to have been an above-board 'clean' investment manager, an innocent victim (SEC case DOC 48), which was estimated to have value over $50 million in 2003 merger negotiations with Bear Stearns.

I wish to point out it is highly likely there have been, in addition, many other losses which have served to deplete the remaining asset pool 'excess' such as

(1) the mandated use of outside professionals with their commercially inflated-cost structures to source, to appraise and to liquidate mostly non-publicly traded portfolio assets while stone-walling any advice from Amerindo personnel, including myself, who initially negotiated for them in the venture capital markets,

(2) additional legal fees incurred by receiver Gazes in exploring and securing offshore assets because of his adversarial posture to Amerindo'.

(3) the loss of potential gain of the frozen investments that we could have achieved, but were prevented from achieving, for ourselves and our clients, because of these actions. While undoubtedly the present worth of the destroyed Amerindo U.S. would have greatly expanded to the present time, the appreciation value of the frozen $80+ million Amerindo portfolio can be calculated by applying the firm's outstanding documented 21+ % per annum investment performance. This Amerindo investment portfolio would be worth today in excess of $ ¼ billion

had the government not acted. This reflects the gains generated by investment in the firm's area of expertise, tech and biotech, during the robust past ten-year post 2009 bull market. (For example, Google, now up over 13 times since its IPO, was the largest single investment at the time of the firm's 2005 closing.)

(4) the credit of business obligations owed to the firm at its shuttering, and the loss of employee assets of Amerindo US by the receiver's actions.

Our 2255 motion and other papers I have filed discusses the critical aspect of valuation of these assets that neither the government nor my own lawyer should have paid attention to. My partner and I were convicted of fraud without the knowledge by anyone, much less the jury that convicted us, that the assets would so greatly exceed the client obligations – which was surely a paramount consideration at least to any finding of "materiality" and "intent."

As Your Honor may recall, our defense counsel even downplayed this aspect. My own counsel, Glenn Colton, completely disavowed the report of David Ross, the expert I desperately retained at virtually the last minute (with funds borrowed from my family) and whose report had to be submitted directly to the Court because Mr. Colton declined to support me in this critical area. Mr. Ross's report began to quantify the Amerindo portfolio and if pursued would have shown that the funds being held were 'sufficient' in magnitude. The attitude of the prosecutor, Marc Litt--which he conveyed to Mr. Colton (who believed him) and to this Court -- was that none of this was of any consequence because Mr. Litt was confident that some greater fraud festered offshore in the Amerindo Technology Growth Fund (as to ATGF clients). Of course, we now know, this was to be later proved completely preposterous. ATGF clients have told the Court repeatedly there was no fraud. It has still meant nothing, because of our trial counsel's failings.

No one let me or my partner "participate" actively in our defense. My trial lawyer was seemingly so cowed of the government prosecutor that his maneuvers were designed to appease and to pander, but not to defend.

Our trial lawyers never fought back against *ANY* penalties, including forfeiture. They had not even investigated our company assets. Though he represented me in the SEC case, Mr. Colton did not even know that at the first

hearing in this SEC case, we were not present and not represented. He was not even aware that, when the SEC filed an amended complaint, it had secretly removed the primary allegation that the SBIC fund "did not exist." He did not protest when, at sentencing, the government kept arguing its same theories ad nauseum *DESPITE* the then overhanging Ross Report. My trial /sentencing lawyer instead praised the SEC at my first sentencing and even distanced himself from the Ross Report, as if there were something "wrong" in submitting it.

Alberto and I, who disagreed about many things, have always taken the position that the clients should be repaid their accounts. Now we have seen (only after the SEC insisted on a receiver to take our assets in the SEC case) that all the money was there, and in fact *ALL* our clients (not just the so-called "victims" who testified at trial) have recouped more than 100% of their account statements. If we had been allowed to be actively involved, or if our trial lawyers were effective, this would have been completed in 2005, same as the US clients were fully paid in 2005. (DOC 48).

The government's current effort also ignores all this and ignores the penalties and punishment already imposed. In 2009 SEC lawyer Mark Salzberg "invited" me into his office (without a lawyer) to tell me I should agree to sign off on civil penalties. I thought I had no choice. I did so. Then, there were additional civil penalties and criminal penalties. They are all for the very same conduct, where no one ever lost money.

In *Kokesh v. SEC*, 2017, (https://www.supremecourt.gov/opinions/16pdf/16-529_i426.pdf), the Supreme Court held that, notwithstanding "labels" which the SEC had convinced courts to accept for decades (like *Morrison)*, that in fact the SEC "remedies" *ARE* penalties. Furthermore, based on false "facts" these penalties have piled on.

I have tried to show this in the 2255 filed on my behalf. I have tried to get the government to take into account the massive wrongful *TAKING* of my conveniently overlooked US company.

No one has given me the respect of even commenting. Instead, everyone keeps acting as if the allegations in 2005--which were the only allegations tried, and not defended, at my 2008 trial--were accepted gospel. They were, and are not true. The 2255 shows that. *NO ONE* has disputed the lies and falsities that underlie this case. The 2255 reply shows that.

It is beyond my comprehension that the government of the United States, which interred my family in concentration camps in World War II (I was born in Minidoka, Idaho, after my parents were forced to relocate there and their property taken) would now continue to shamelessly seek to prematurely seize our remaining assets by ignoring my right to any possible relief through timely consideration of my 2255 motion.

I remember sitting at the argument of the summary judgment motion in the SEC case in December 2012, where Your Honor said that cases always proceed in this way. I understand that the "process" is important. I also understand that the 2255 motion is also a "process", and one guaranteed by the Constitution, by which to challenge ineffective assistance of counsel and government "mistakes".

I object to, in effect, being deprived of that process, that further encourages and promotes the government's initial, wrong, efforts. If the Court does not act then I will have been deprived of an effective constitutional remedy.

I ask the Court to decide the 2255, and return the remaining property to me. I don't think there is anything I did that should result in my being rendered penniless, and unable even to repay my mother for sacrificing significant funds to hire many in my defense--lawyers and to David Ross, after 13 years of prosecution, including six years of incarceration, the destruction of my blameless US advisory company, and the payment to all my Amerindo clients of 100% of their investments.

I join in the arguments of co-defendant Alberto Vilar.

/s/ _____

Gary A. Tanaka
28 September 2018