Vivian Shevitz
Attorney at Law
46 Truesdale Lake Drive
South Salem, New York 10590
914-763 2122
vivian@shevitzlaw.com

December 17, 2019

Hon. Richard J. Sullivan
United States Circuit Judge
40 Centre Street
New York, New York 10007

Re: United States v. Tanaka 05cr621 – and 05cv5231
Motion for reconsideration of 12/13/2019 Order (855)
denying vacatur of substitute asset forfeiture
concerning UK Pension account.

Dear Judge Sullivan:

This is a motion for reconsideration of the Order denying vacatur of the government request for additional substitute asset forfeiture.  This order was entered on the government's motion filed only four days before this Court, without waiting for objection or comment, adopted the government's proposed Order finding the asset forfeitable as a substitute asset.

The Court also challenged Gary Tanaka to file a request for CJA counsel on his own.  However, present counsel has reviewed the docket and sees she appeared in this case for Gary Tanaka at a previous time.  If Your Honor refuses to appoint me, or another CJA lawyer for Mr. Tanaka, I will represent him without current fee because he needs representation.   (If I must file a new notice of appearance, I will do so).

In response to the objection that this Court entered a substitute asset forfeiture order without giving defendants the requisite notice and

1

an opportunity to respond, this Court writes that Vivian Shevitz "point[ed] to no authority that requires Defendants to be heard in such matters."

I did not think it necessary to point to the Sixth Amendment,[1] but I now do so.  I also refer to *Luis v. United States*, 578 U.S. ___, 136 S. Ct. 108 (2016) (also discussing grounds for forfeiture, including tracing requirements).  Before a defendant is stripped of his assets in a *criminal* case by an in personam judgment -- the premise of the substitute asset forfeiture request by the government -- he is entitled to counsel.

Rule 32.2, further, states that an *ancillary* proceeding involving third party claims is "not part of the sentencing."  However, determining *whether* property – untainted property -- is subject to substitute asset forfeiture *is* part of the sentencing as to defendants.  The Constitution and rules do not allow cutting off defendants' rights to property before the sentencing requisites are met.

Since after an asset if forfeited under substitute asset provisions or forfeiture orders, a defendant cannot be a claimant, the only chance of a criminal defendant to oppose a substitute asset order is before it is entered.  Here, the government's affirmation consists of conclusory statements as to ownership and as to unavailability of other assets.  It is insufficient and in any event, the defendants should have an opportunity to dispute forfeiture before forfeiture is entered.

The Court also cited (with a "cf." designation) a summary order, *United States v. Rosario*, 111 F.3d 124 (2d Cir. 1997).   It is highly

---

[1] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

The policy of the Federal Defenders cannot change this.

unlikely that the Second Circuit (or any court) would do away with the right to counsel or to be heard, in an unpublished summary order.  And the Court in fact did not so hold.

In *Rosario*, the Court wrote one paragraph on the substitute asset forfeiture issue before the Court:

> With respect to appellant Rivera's argument that the district court's order forfeiting his substitute assets denied him his alleged right to a hearing ***so that he may contest that the seized assets were drug-tainted*** [emphasis added], we find that there is no requirement under 21 U.S.C. § 853(p) that the government demonstrate that substitute assets are traceable to criminal activity. The value of the assets became forfeited when appellant pled guilty to the criminal forfeiture count. The purpose of § 853(p) is to substitute non-tainted assets for tainted assets that are not able to be located for forfeiture. … [T]he district court properly determined that appellant was not entitled to a hearing on an issue the statute does not present.

The sole ground on which defendants sought a hearing in *Rosario* was thus the claim the seized assets could not be taken as substitute assets if they were not "drug-tainted."   That is not the claim in this case.

*Rosario* does not and cannot mean that there is never a basis to challenge a motion for substitute asset forfeiture.  The substitute asset forfeiture statute in fact sets out requisites for substitute asset forfeiture, which the government did not and cannot demonstrate.   Rule 32.2, entitled "Criminal Forfeiture," provides that the government must make showings before it can take substitute assets:

(e) Subsequently Located Property; Substitute Property.

(1) In General. on the government's motion, the court may at any time enter an order of forfeiture or amend an existing order of forfeiture to include property that:

(A) is subject to forfeiture under an existing order of forfeiture <u>but was located and identified after that order was entered</u>; or

(B) <u>is substitute property that qualifies for forfeiture under an applicable statute.</u>

(2) Procedure. <u>If the government shows that the property is subject to forfeiture under Rule 32.2(e)(1),</u> the court must:

(A) enter an order forfeiting that property, or amend an existing preliminary or final order to include it;

Further, 21 USC 853 (p) requires that the government demonstrate that the "property" sought to be forfeited as *substitute* assets actually belongs to the defendant[2] (and that it demonstrate its right to hold and control the asset to subject it to substitute asset forfeiture).

---

[2] (p) Forfeiture of substitute property

(1) In general Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant—
(A) cannot be located upon the exercise of due diligence;
(B) has been transferred or sold to, or deposited with, a third party;
(C) has been placed beyond the jurisdiction of the court;
(D) has been substantially diminished in value; or
(E) has been commingled with other property which cannot be divided without difficulty.

(2) Substitute property
In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.

The government failed to make any such showings.

As to the requisites of Rule 32.2, the UK Pension Fund is not 'subsequently-located" property.  Unlike the *Luis* case, which dealt with a statute (18 USC 1345) by which other property could be forfeited in a health care fraud case, there is no other statute that would (or would have) rendered the UK Pension forfeitable as a separate asset.

The forfeiture order itself did not provide for forfeiture of the UK Pension account, nor could it.  The government did not include it in the forfeiture.  It is not the property of the defendants.

Nor does the government have title.  The only document or order by which the government could take title, is DOC 463 in 05cr621, the substitute asset forfeiture order of November 9, 2010.  It was vacated by the Court of Appeals in 2013.

AUSA Sharon Cohen Levin, then Chief of Forfeiture, had spoken about the possibility that the Substitute Asset forfeiture order could be vacated when discussing with Judge Swain, then presiding over the SEC case, how the government would pay all investors with forfeited funds, after a final order of forfeiture were to be entered.  SEC v. Amerindo (DOC 168, 9/23/2011 conference, 05cv5231).

Levin said then that, as a matter of property law, if the Order were to be vacated, the property would revert to the defendants (or in this case, the owner).  *Id*. DOC 168, p.12,    (AUSA Levin also explained that, if there were a final forfeiture, the government would give forfeited funds to the investors and satisfy restitution and pay non-"victims" as well (Tr. 5-6, 9/23/2011; p. 9 (discussing government's use-of-forfeited-funds-to-pay-all-Amerindo clients); p.10 (explaining that "[w]hen money is forfeited [pursuant to a final forfeiture order] it becomes property of the United States and under the forfeiture statute which is 28 U.S.C. Section 853, the Attorney General has a discretion to do certain things with forfeited property, and one of the things that the Attorney General has authority to do is he has the authority to remit it or to restore it to crime victims"; p.10 (explaining that the US Attorney had all the Amerindo

records, having done a search in the UK, "my office has most of the records".)

Ms. Levin further explained the property interests that allowed the government to take any asset, explaining that until there was a "final order" of forfeiture, the US did not have title or authority of manage any such asset.[3] She said that "until" a final order of forfeiture, the government did not have authority to take possession of the assets." (Tr. 17).

Since there was never any final order of forfeiture based on the 2010 forfeiture and the 2010 substitute asset forfeiture order and forfeiture order were vacated, the *U.S. did not and does not have authority to hold the UK Pension assets.* As a matter of property/forfeiture law, once the forfeiture order was vacated, "the defendants would get [should have gotten] their money or property back." (Tr.12).

Given these the forfeiture order *was* vacated, the UK Pension account (and the other accounts, improperly held) should have been

---

[3] AUSA Levin stated:

> What happened here was that we obtained a substitute asset order.  The court -- Judge Sullivan issued a money judgment for $54 million and additional assets that we've had restrained and we asked Judge Sullivan -- we applied an application to get a substitute asset order to order them forfeited.  Judge Sullivan entered that forfeiture order forfeiting the defendant's interest in the property but that left open the issue of third parties.
>
> So third parties had an opportunity to file a petition and that period has expired and we're prepared to go in and submit a final order of forfeiture and when we get that final order of forfeiture when Judge Sullivan issues it, the United States will have title to the property, will take possession of the property and will be, you know, have the authority to liquidate it or to do what is appropriate with respect to that.

released long ago. *Luis* and Due Process require it. See also *Hausler v. JP Morgan Chase*, 770 F.3d 207 (2d Cir. 2014) (dissecting forfeiture / seizure / attachment request by looking at actual property interests, and dismissing attachment). There is no basis to hold the UK property – an attachment – while the government conjures up ways to take it.

There are other defects in the government's substitute asset forfeiture request. *If* the government thought it should have this asset, it should have included it in the first of this series of motions for substitute asset forfeiture. Serial substitute asset forfeiture motions for property that was not "subsequently located" is harassment.

Moreover, it cannot be determined in an ancillary proceeding *whether* the property is subject to forfeiture or how much of it. As has been litigated since 2011 -- when the UK Pension entity and its administrators began to  beg the government and this Court to release the frozen account, to limit the waste of that asset and allow it to comply with UK Pension laws, which was necessary after the bankruptcy procedings of Amerindo UK – this is a duly authorized, duly created UK Pension subject to the pension laws of the UK, not the United States. It is a stand-alone account, never externally funded,  never commingled, and is owned and should be administered/managed by its owner, the UK Pension Scheme entity, which has been excluded from managing or deriving the benefit of this property since it was *wrongfully frozen in 2005.* (See *Luis*, *supra,* which formalized the rule that substitute assets could not be seized or held prior to a forfeiture order that applies to that asset).

 Further, the government has not shown that the forfeiture order has not been satisfied already. Although defendants were excluded from the process while the Court put these workings under the SEC receivership, the government has indicated that over $62 million was already paid out *to all the Amerindo clients  (arbitrarily, and in excess of their final client statements) and others* (including receivership fees, etc), using the funds frozen since 2005.  The forfeiture / personal money judgment orders called for some $20 million in forfeiture (under a joint and several theory).  The debt has been paid.

The payment of over $62 million of investment funds certainly was not merely restitution, because the amount exceeds the sum of restitution to "victims", which pertained to only the witnesses who testified at trial. The original 2010 substitute asset forfeiture order (DOC 463) specifically stated that "the substitute assets" – which included all of the accounts that the Receiver and Court have used to pay all the Amerindo clients and the Receiver – "shall be applied towards the Money Judgments entered against the defendants." Thus, the personal money judgment has been paid off.

Together with the (unlawful) taking of defendants' substantial Amerindo US investment management firm (see DOC 48, 05cv5231, exonerating Amerindo US_(estimated at $50 million)), the amount defendants have lost to "forfeiture" is staggering.  Especially so given that (through Your Honor had stated he did not believe it) there were sufficient assets to pay everyone.

There has been *no* financial loss.  Any further taking of defendants' assets would further implicate the Eighth Amendment.

There are further international and Due Process aspects.   As AUSA Litt wrote before sentencing in 2010, "there is considerable additional uncertainty associated with the defendants' estimated $6 million share in a retirement trust because it is subject to the laws of UK retirement trusts" and would have to be litigated in the UK to take/ deal with that asset.

In 2013, this Court attempted to transfer management of the frozen assets to the Receiver in the "parallel" SEC civil case. It did so based on the fact that those frozen assets were frozen "substitute assets", held pursuant to the 2010 forfeiture orders.

Later in 2013, the Second Circuit vacated all the forfeiture orders.

There was then *no* legal basis for the government to hold any assets, and surely it should not have continued to hold <u>untainted</u> assets, which defendants continually claimed so that they could use them to defend against the government actions.  See *Luis*, *supra*.

8

Nonetheless, the Court allowed the Receiver and SEC (with the AUSA's approval, to hold the assets *qua* Receivership – though there has never been a basis on which the property right was properly placed in the receivership.

In 2011-12, the assets "transitioned" from the criminal case, *qua* substitute assets, to the SEC case, *qua* receivership assets based on their characterization as "substitute assets" in the criminal case. When the criminal case substitute-asset-restraint was necessarily lifted by virtue of the Second Circuit's vacatur of the "substitute asset forfeiture restraint", the property interest reverted to the defendants, or as in the case of the UK Pension Fund, to the Owner.

The government – and the Court -- have *wanted* the defendants to be stripped of their lifelong security even after learning that, contrary to the original understanding of the offense conduct, defendants had not stolen money. But wanting to bankrupt defendants, does not provide a basis to take their foreign untainted pension money, much less to do so in this U.S. Court.

The Receiver understood that, even if the US wanted to take everything, including defendants' eventual beneficial interests in the UK pension asset, still, in his effort to satisfy the government (AUSA and SEC) and the Court's desire to bankrupt the defendants, he had to go to the UK to have a court ascertain, in a liquidation proceeding, everyone's right, title, and interest (if any) in the UK Pension account. By Motion dated 8/20/2015 (DOC 562), the Receiver explained to this Court that "one of the Defendant companies, Amerindo Advisors (UK) Ltd. ("Amerindo UK"), established the Amerindo Advisors (UK) Ltd. Ret. Benefits Scheme (the "Pension Scheme") for the benefit of certain employees of Amerindo UK." The Receiver wrote that he had been in touch with the administrators and attorney in the UK "since the inception of the Receiver's appointment requesting the liquidation of the Pension Scheme."

The Receiver wrote that he was advised that "under English law, the beneficiaries" of the "Pension Scheme" "cannot receive distributions

9

unless and until the Pension Scheme is liquidated." The Receiver wanted to see if there were any "clawbacks". (The UK government, however, which also investigated Amerindo UK after the US government forced this case upon the UK, and found the Scheme compliant and that the company should *not* be subjected to sanctions.)

Nor is the owner of the property subject to the desires of the United States government to superimpose punishment. The Amerindo Advisors (UK) Limited Retirement Benefits Scheme is a separate legal entity from the employer (Amerindo UK) or its members. Huw Davies, then the administrator, explained this in a 2011 letter to Judge Swain, and explained that JP Morgan had obstructed the entity from having the wherewithal to wind up the scheme. Davies explained there are "legislative consequences for such schemes in the event of insolvency of the sponsoring employer. UK Pension legislation "directs that the Scheme be wound up" and each member issued with an individual arrangement, in the UK, and pursuant to its laws.

Mr. Davies wrote: "Since the liquidation of the sponsoring employer Amerindo Advisers (UK) Limited in 2005 we have been trying without success to wind up the Scheme as required under UK Pension legislation.

Davies also explained that the two beneficiaries who are not defendants -- and the defendants, through their UK entity -- "have had control of their retirement benefits denied to them for almost 7 years." It is safe to say that the pension funds "are significantly disadvantaged by having lost the benefit of any active fund management since 2005."

That letter was written in 2011. It is now 8 years later. Thus the value of the fund has been further sapped since management rights have been unfairly taken from the owner.

In 2013, Mr. Davies filed a claim to the entire Amerindo UK Ltd. Retirement Benefit Account in the SEC receivership. (DOC 359-8, 05cv5231) It was ignored, even after the Court of Appeals vacated any legal basis to restrain this account (i.e., the 2010 substitute asset forfeiture order. When there was no further basis for restraint, this account should have been released. See *Luis*, supra. Continuing to hold

it today, continues to violate my clients' constitutional rights to be able to use the value of the assets to fund defense counsel and to live, as well as the  rights of the UK account owner.

In 2015, though this Court wrote that the UK Pension scheme was not a receivership asset (see 8/14/2015 order 561), nonetheless, instead of releasing the asset, the Court signed an order sought by the Receiver in the civil case, asking permission to retain Withers LLP "to serve `as solicitors in connection with the liquidation of the Amerindo Advisors (UK) Ltd. Ret. Benefits Scheme."   (Order, DOC 563, 8/21/2015, 05cv5231).   James Stableford, who is one of the four managing trustees of that pension scheme, and a UK resident, intervened.   He objected. (DOC 570, 572).

On September 25, 2015 (DOC 579, 05cv5231), the Receiver withdrew his application to retain UK counsel.  He stated that he was advised "that under U.K. Pension law there can be no distributions to plan participants absent closure of the plan." (Letter, n.1).

It is clear that the winding of the UK Pension Scheme is not something that can, or should, be done in the United States.  This is a matter of UK law and UK process.

Indeed, the owner of the UK Pension Fund, a UK entity, was apparently not served with notice of the government's "substitute asset forfeiture" request in this case.  If the US, or the Mayers, want to take defendants' interests, they have to go to the UK courts and await distributions to the defendants before there is anything to attach.  There is no property belonging to defendants to attach.

_____

The Court should vacate the substitute asset forfeiture order. There is no proper basis for the order.  At least there should be briefing before evaluating or granting the government's motion.

Very truly yours,
/s/
Vivian Shevitz

11