UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v-<br><br>ALBERTO WILLIAM VILAR, *et al.*,<br><br>Defendants.<br><br>PAUL MARCUS, *et al.*,<br><br>Petitioners. | No. 05-cr-621 (RJS)<br>ORDER |

RICHARD J. SULLIVAN, Circuit Judge:

Before the Court are the government's motions to dismiss several third-party petitions filed in connection with the Court's August 2, 2019 Preliminary Order of Forfeiture as to Substitute Assets (Doc. No. 802 ("Preliminary Forfeiture Order")) and the Court's December 9, 2019 Second Preliminary Order of Forfeiture as to Additional Assets (Doc. No. 848 ("Secondary Preliminary Forfeiture Order")). (Doc. Nos. 867, 902.) For the reasons discussed below, the government's motions are granted as to the petitions filed by Vivian Shevitz and Lauranne Christov, but denied as to the remaining petitions.

### I. Background

Beginning in 1986, criminal defendants Albert Vilar and Gary Tanaka carried out a fraudulent investment scheme in which they solicited millions of dollars, failed to invest the money as promised, and misappropriated the investment funds for their own benefit. Their crimes eventually caught up to them. In August 2006, Vilar and Tanaka were charged in a

twelve-count superseding indictment for crimes including conspiracy to commit securities fraud; securities, investment advisor, mail, and wire fraud; and money laundering.  (Doc. No. 133.)  A jury found Vilar guilty on all counts, and found Tanaka guilty of four counts.  (Doc. No. 329.) The Court later sentenced Vilar to 120 months' imprisonment, and sentenced Tanaka to 72 months' imprisonment.  (Doc. Nos. 753–54.)  In addition, the Court entered joint-and-several money judgments, ordering the defendants to pay restitution in the amount of $26,637,502.69 and forfeiture in the amount of $20,578,855.28.  (*Id.*; *see also* Doc. Nos. 682–84, 687.)

On August 2, 2019, the Court entered the Preliminary Forfeiture Order as to Substitute Assets valued at $12.9 million held in various JP Morgan Chase brokerage accounts.  (Doc. No. 802; *see also* Doc. No. 800 at 3.)  Before the Substitute Assets were made part of the forfeiture ancillary proceeding, they were part of the Receivership in the related civil action filed by the Securities and Exchange Commission ("SEC").  *See S.E.C. v. Amerindo Inv. Advisors Inc.*, No. 05-cr-621 (RJS), 2019 WL 3526590, at *5 (S.D.N.Y. Aug. 2, 2019).  The brokerage accounts were the only left-over assets after the claimants in the SEC action recovered their entire investment principal of $54,404,467 and an inflation adjustment of $13,849,639.  *Id.*  But Vilar and Tanaka still owed approximately $771,502 (plus interest) on their restitution judgment, and had not yet repaid their $20,578,855 forfeiture judgment.  (Doc. No. 800 at 3.)  In light of the SEC claimants' recovery, the limited remaining assets in the Receivership, and the outstanding money judgments in the criminal case, the Court granted the government's motion to move the Substitute Assets to the criminal case, recognizing that the claimants who alleged an ownership in the Substitute Assets would "be free to pursue their arguments in the context of the ancillary proceeding."  *Amerindo Inv. Advisors Inc.*, 2019 WL 3526590, at *4.

After the Court entered the Preliminary Forfeiture Order, it received third-party petitions from several claimants, including (i) Paul Marcus, The Deane J. Marcus Trust, The Steven E. Marcus Trust, The Cheryl Marcus-Podhaizer Trust and The Eve S. Marcus Children's Trust (collectively, the "Marcus Claimants") (Doc. No. 816); (ii) Vivian Shevitz (Doc. No. 826); (iii) John Preetzmann-Aggerholm (Doc. No. 829); (iv) E. Ronald Salvitti (Doc. No. 830); (v) Alfred Heitkonig (Doc. No. 828); (vi) Angelika Jordan (Doc. No. 841); and (vii) Lauranne Christov (Doc. Nos. 842–43).[1] While most of the petitioners assert claims to the Substitute Assets based on allegations that the assets are traceable to funds they entrusted to Vilar and Tanaka as part of the fraudulent investment scheme, Shevitz (Vilar's and Tanaka's former counsel in the SEC action) asserts an interest based on an attorney's charging lien, and Christov claims a right to the Substitute Assets on the ground that her husband won an "interim" arbitration award of about $1.2 million against Vilar and Amerindo Investment Advisors Inc. in connection with finder's fees owed on business unrelated to the conduct charged in the indictment. (Doc. No. 843 at 1–2.) Of the seven petitioners, only the Marcus Claimants were represented by counsel at the time the petitions were filed.

The government moved to dismiss each of these petitions pursuant to Federal Rule of Criminal Procedure 32.2(c)(1)(A) and Federal Rule of Civil Procedure 12(b)(1), arguing that the petitioners failed to allege a specific interest in the Substitute Assets and thus lacked standing to contest the forfeiture. (Doc. Nos. 867–68.) Several of the petitioners responded, including the Marcus Claimants, who pointed out that Second Circuit caselaw permits a district court to

---

[1] Although the Securities and Exchange Commission originally filed a petition, its petition was later withdrawn. (Doc. No. 860.) Lisa and Debra Mayer also filed a petition, which is predicated both on their investments with Vilar and Tanaka and a state judgment against the Vilar and Tanaka (Doc. No. 824), but the government did not move to dismiss their petition.

impose a constructive trust for defrauded investors, which would give rise to a legal interest sufficient to satisfy standing. (Doc. Nos. 872–75.)

On December 9, 2019, the Court entered the Second Preliminary Forfeiture Order as to Additional Assets, which identifies assets related to a brokerage account held in the name of the Trustees of the Amerindo Advisors (UK) Limited Retirement Benefits Scheme ("Pension Scheme"), which were then valued at $54,016,085 (Doc. No. 845 at 3) and are currently valued at $79,856,660 (Doc. No. 960 at 1). Following the Second Preliminary Forfeiture Order, the Court received petitions from (i) the Marcus Claimants (Doc. No. 878), (ii) Salvitti (Doc. No. 890), (iii) Heitkonig (Doc. No. 869), and (iv) Christov (Doc. Nos. 863, 865, 892, 967), with each petition raising substantially similar allegations as those asserted the first time around. The government likewise moves to dismiss these petitions, again arguing that the petitioners lack standing (Doc. Nos. 902, 903) and again prompting similar responses from the third-party petitioners (Doc. Nos. 904–907).[2]

On July 30, 2021, the Court heard oral argument on the government's motions. During the proceeding, the government noted that it would not object to vacating the Preliminary Forfeiture Order and returning the Substitute Assets to the Receivership, if the Court found that the third-party petitioners had standing based on a constructive-trust theory. (Doc. No. 968 at 36.)

On August 13, 2021, the Court received a proposed briefing schedule in a joint letter from the government and the Mayers, whose third-party petitions the government did not move to dismiss. According to that letter, neither party seeks discovery, and both are prepared to move forward with briefing and oral argument on the extent of the Mayers' interest in the assets

---

[2] The Pension Scheme Trustees, James Stableford, and the Mayers also filed petitions challenging the second order (Doc. Nos. 864, 882, 886–87), but the government has not moved to dismiss these petitions for lack of standing.

subject to the forfeiture orders. (Doc. No. 965.) Specifically, they propose simultaneously filing opening briefs within 60 days of the entry of this Order, simultaneously filing response briefs 30 days thereafter, and presenting oral argument 30 days after briefing concludes. The Marcus Claimants then filed a letter in response, noting that they have no objection to the proposed schedule. (Doc. No. 966.)

## II.     Analysis

Criminal forfeiture proceeds in two stages. *See generally* 21 U.S.C. § 853; Fed. R. Crim. P. 32.2. At stage one, before entering a preliminary order of forfeiture, the Court must "adjudicate the government's interest vis-à-vis the defendant 'without regard to any third party's interest in the property.'" *United States v. Daugerdas*, 892 F.3d 545, 549 (2d Cir. 2018) (quoting Fed. R. Crim. P. 32.2(b)(2)(A)). At stage two, before entering a final forfeiture order, the Court must "resolve[] any third-party petitioner's interests vis-à-vis the defendant," *id.*, with the government "stand[ing] in the defendant's shoes," *United States v. Egan*, 811 F. Supp. 2d 829, 838 (S.D.N.Y. 2011); *see also Daugerdas*, 892 F.3d at 549, 557. This case, of course, is currently at stage two.

During this stage, any third party who asserts "a legal interest in property which has been ordered forfeited to the United States" may "petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C § 853(n)(2). Such a petition initiates a quasi-civil, ancillary proceeding, in which the Court "'may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason.'" *United States v. Watts*, 786 F.3d 152, 161 (2d Cir. 2015) (quoting Fed. R. Crim. P. 32.2(c)(1)(A)); *see also Pacheco v. Serendensky*, 393 F.3d 348, 352 (2d Cir. 2004). "A motion to dismiss a third-party petition 'should be treated like a motion to dismiss a civil complaint under Federal Rule of Civil

5

Procedure 12(b).'" *Watts*, 786 F.3d at 161 (quoting *Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 241 (2d Cir. 2011)).  Accordingly, a court must take the facts alleged in the petition as true and determine if the petitioner plausibly alleged facts giving rise to a claim for relief.  *See Daugerdas*, 892 F.3d at 552; *Watts*, 786 F.3d 161.

To establish statutory standing to challenge a forfeiture order, "a petitioner must demonstrate that he has a legal interest in the forfeited property."  *Watts*, 786 F.3d at 161 (internal quotation marks and brackets omitted).  A legal "interest 'in' property must be an interest in a particular, specific asset, as opposed to a general interest in an entire forfeited estate or account."  *United States v. Ribadeneira*, 105 F.3d 833, 836 (2d Cir. 1997).  "State law determines a petitioner's legal interest in the property at issue."  *Willis Mgmt.*, 652 F.3d at 242.  Here, Shevitz and Christov fail to allege an interest in the property, while the remaining petitioners assert a valid claim to the property based on their investments with Vilar and Tanaka.

**A.     Shevitz and Christov**

Neither Shevitz nor Christov assert a legal interest in the specific assets subject to the forfeiture orders, as is necessary for standing purposes.  *See Ribadeneira*, 105 F.3d at 836.  Shevitz, who grounds her claim to the Substitute Assets on an alleged attorney's lien arising from her representation of Vilar and Tanaka in the SEC action, clearly lacks standing.  Because Shevitz only defended her clients' interests, without her services creating some fund or proceeds to which a lien can attach, there can be no lien here.  *See Petition of Rosenman & Colin*, 850 F.2d 57, 61 (2d Cir. 1988) ("An attorney who merely defends or protects his client's interest in property without obtaining an affirmative recovery is not entitled to a lien on the property that his client retains."); *United States v. J. H. W. & Gitlitz Deli & Bar, Inc.*, 499 F. Supp. 1010, 1014 (S.D.N.Y. 1980); *Desmond v. Socha*, 38 A.D.2d 22, 23–24 (N.Y. App. Div. 1971).  Recognizing

as much, Shevitz opted not to oppose the government's motion to dismiss her petition, and at oral argument, she expressly disclaimed any present interest in the Substitute Assets. (Doc. 968 at 43–44.)

Christov likewise cannot satisfy the standing requirements. She claims a right to the assets based solely on an "interim" arbitration award – an award that does not take effect unless the SEC issues a "no action letter," which Christov acknowledges has not issued. (Doc. No. 843 at 1–2; *see also* Doc. No. 967.) Without an enforceable judgment and having alleged no ties to the specific assets at issue here, Christov is at most a general creditor who lacks standing to contest forfeiture. *See Ribadeneira*, 105 F.3d at 836. Accordingly, though the Court is sympathetic to Christov's plight, the Court concludes that the government's motion to dismiss her petitions, as well as Shevitz's, must be granted.

**B.      Investment Petitioners**

The investors contend that they possess an interest in the specific assets subject to the forfeiture orders because their investments, or the proceeds of the sale of securities purchased with their invested funds, were used by Vilar and Tanaka to purchase the Substitute and Additional Assets. Essentially, the investors' theory is that their investments should be treated as part of a so-called constructive trust.[3] In general terms, "a constructive trust arises when, in the eyes of equity, a [person] is the true owner of the property at issue due to his right to the underlying assets from which it derives." *Watts*, 786 F.3d at 168 (internal quotation marks and

---

[3] Strictly speaking, only the Marcus Claimants have pressed the constructive-trust theory, and Salvitti's attorney stated at oral argument that Salvitti "is not necessarily seeking a constructive trust," arguing instead that Salvitti can directly trace his investments to the forfeiture assets. (Doc. No. 968 at 39–40.) Since the investors each allege an interest in the assets based on their investments, however, the Court will not dismiss the petitions for failure to articulate the constructive-trust theory. *Cf. Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (noting that the federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"). Moreover, as explained in greater detail below and as the government observed during oral argument, Vilar and Tanaka's commingling of investment funds means that "Salvitti's claim has to rise and fall on the same [constructive-trust] issue" impliedly raised by the other investors. (Doc. No. 968 at 37.)

alterations omitted).  Put differently, the assets of a constructive trust belong to the trust's beneficiaries, rather than a criminal defendant holding the trust's assets.  *See Willis Mgmt.*, 652 F.3d at 242; *United States v. Schwimmer*, 968 F.2d 1570, 1581–83 (2d Cir. 1992).  As a result, a petitioner who is the beneficiary of a constructive trust enjoys a "legal interest" in the trust's property for purposes of an ancillary proceeding.  *Willis Mgmt.*, 652 F.3d at 242; *see also Schwimmer*, 968 F.2d at 1572, 1581–83.  Consequently, "if applicable state law imposes a constructive trust in property in favor of a third party, the third party's interest is superior to the government's."  *Fed. Ins. Co. v. United States*, 882 F.3d 348, 371 (2d Cir. 2018).

It is undisputed that New York's constructive-trust law applies here because that is the state in which the fraudulently-obtained assets were received and invested.  (Doc. No. 872 (Marcus Claimants' Br.); *see also* (Doc. No. 888 (Gov't Br.)); *United States v. Lacoff*, 446 F. App'x 311, 312 (2d Cir. 2011) (assessing state law whose application parties did not dispute).  New York law requires a litigant to establish six elements before a court may impose a constructive trust:  (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer of the subject *res* made in reliance on the promise; (4) unjust enrichment; (5) an inadequate legal remedy; and (6) the tracing of the litigant's property to the assets.  *See United States v. Coluccio*, 51 F.3d 337, 340 (2d Cir. 1995) (first four elements); *In re First Cent. Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004) ("New York courts have clarified that as an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate." (internal quotation marks and brackets omitted)); *Fed. Ins.*, 882 F.3d at 373 ("[A] constructive trust attaches only to the specific property appropriated from a claimant by the offender or that can be traceable thereto.").  Only the last two elements – the adequacy of a legal remedy and traceability – are at issue here.

### 1. Adequacy of a Legal Remedy

The government argues that the related SEC action provided an adequate legal remedy for the investors, since all investors recovered one hundred percent of their principal investment, as well as an adjustment for inflation. Although the Court again takes this opportunity to applaud the outstanding results achieved by the Receiver on behalf of investors, the Court nevertheless finds that the investors have plausibly alleged an ownership interest in the Substitute and Additional Assets.

It bears noting at the outset that the appointment of a receiver and the approval of the receiver's distribution plan sound in equity. *S.E.C. v. Malek*, 397 F. App'x 711, 713 (2d Cir. 2010) ("[A] federal receiver is appointed, under the district court's broad equitable discretion, to restore to a defrauded entity or defrauded persons that which was fraudulently diverted from its or their custody and control." (internal quotation marks omitted)); *Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 749 (2d Cir. 2013) (noting court's "equitable authority" in assessing distribution plan). Consequently, the existence of equitable remedies does not preclude the imposition of a constructive trust. *See Henness v. Hunt*, 272 A.D.2d 756, 758 (3d Dept. 2000) (explaining that, where the "only recourse would be the equitable remedy of restitution, . . . we cannot conclude as a matter of law that plaintiff has an adequate legal remedy.").

More importantly, the Court has already recognized that the adequacy of the investors' compensation remains unresolved. When the investors objected to transferring the $12.9 million of Receivership assets from the SEC action to the forfeiture proceeding in the criminal case, the Court postponed consideration of their objections as "premature," explaining that their "claims against the assets can and will be litigated in the context of the ancillary proceeding following entry of the preliminary order of forfeiture." *Amerindo Inv. Advisors Inc.*, 2019 WL 3526590, at

9

*4; *see also id.* ("As the government points out, the Claimants lack standing to oppose the forfeiture motion at this stage, and will be free to pursue their arguments in the context of the ancillary proceeding." (internal citation omitted)). Given these "outstanding issues regarding their claims, including their entitlement to the [Pension] Scheme Account," the investors' allegations of incomplete and inadequate recovery remain plausible. *Id.*

### 2. Traceability

The government further argues that constructive-trust treatment would be improper on the facts alleged here because the petitioners cannot trace their investment funds to the specific assets subject to the forfeiture orders. (*See, e.g.*, Doc. No. 888 at 4 (noting that investors "continue to point to allegations that the Substitute Assets *generally* are traceable to investor funds *generally*").) Although this question is a close one, the Court is persuaded that the investors have satisfied their burden at the pleading stage to "assert[] a plausible interest in forfeited property." *See Fed. Ins.*, 882 F.3d at 373.

Not surprisingly, the nature of Vilar and Tanaka's fraudulent scheme, which involved comingling the investors' funds and then "invest[ing] all of the money in volatile stocks," *S.E.C. v. Amerindo Inv. Advisors Inc.*, No. 05-cv-5231 (RJS), 2014 WL 2112032, at *2 (S.D.N.Y. May 6, 2014), complicates the tracing analysis. The comingling of funds makes it difficult, if not impossible, for any one investor – or even a subset of investors – to draw a straight line from specific investment money to particular assets. *See S.E.C. v. Amerindo Inv. Advisors Inc.*, No. 05-cv-5231 (RJS), 2017 WL 3017504, at *6 (S.D.N.Y. July 14, 2017).

Fortunately for the investors here, the law does not require such rigorous tracing. "Where a wrongdoer commingles the money of two or more persons . . . , the claimants have an interest in the mingled fund in proportion to their contributions to the fund." 5 William F.

Fratcher, *Scott on Trusts* § 519 (1987); *see also Schwimmer*, 968 F.2d at 1584 (directing the district court to "be guided by applicable rules concerning commingled funds" as articulated in *Scott on Trusts*). Based on their ownership interest, the claimants can enforce a constructive trust so long as they can follow their investments to the comingled funds and to any property acquired with, or profits resulting from, those comingled funds. *See* Fratcher, *supra*, § 519 ("As between the claimants and the wrongdoer or his creditors, the claimants are entitled to priority with respect to the fund and its traceable proceeds . . . , and therefore they share pro rata in the profits or the losses."); *see also* Restatement (Third) of Restitution and Unjust Enrichment §§ 58–59 (2011).[4]

With these principles in mind, the Court adheres to its earlier conclusion that the investors have alleged sufficient facts to support an inference that their funds are traceable to the Substitute Assets. *Amerindo Inv. Advisors Inc.*, 2017 WL 3017504, at *6 (quoting *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985)) (finding that although "[t]he Second Circuit has . . . strictly required the claimant to a constructive trust to 'trace his own property into a product in the hands of the wrongdoer[,]'" the Marcus Claimants "[c]learly . . . can do that – [and] so can the [other] investors . . . ."). Because "the stocks that comprise the Receiver's assets were purchased with the commingled funds of all investors," *id.*, it is more than plausible that the investors can trace their property to those assets, *see* Fratcher, *Scott on Trusts* § 519.

For similar reasons, the investors have a plausible basis for tracing the Pension Scheme's assets to their investments. Specifically, while the Marcus Claimants concede that they cannot presently "ascertain the precise portion" of the Pension Scheme "that can be traced back to funds

---

[4] As the government notes, *Schwimmer* rejected "a very relaxed tracing standard" of the sort that would allow a court to impose a constructive trust without *any* finding that the wrongdoer's property was connected to his wrongfully obtained commissions. 968 F.2d at 1583–84. Importantly, however, *Schwimmer* remanded to the district court for a "tracing inquiry" pursuant to the *Scott on Trust* principles outlined above. *See id.* at 1584.

11

invested" with Vilar and Tanaka, the Marcus Claimants nevertheless assert that the Pension Scheme's securities were "purchased with money they and other Claimants provided." (Doc. No. 878 ¶ 8.) And the Marcus Claimants have some evidence bolstering this assertion. Investors in the Amerindo Technology Growth Fund ("ATGF") received a March 31, 2005 report listing several publicly traded securities that Amerindo represented as being owned by the ATGF investors; despite these representations, those securities never appeared in the June 2005 ATGF account statements; instead, several of the "very same" securities appeared in the June 2005 account statements of the Pension Scheme. (Doc. No. 878 ¶¶ 16–18.) From these allegations, coupled with the nature of the fraudulent scheme, it is plausible to infer that Vilar and Tanaka rerouted the investors' money to purchase the securities held by the Pension Scheme. By extension, it also stands to reason that the other investments were likewise used to purchase Pension Scheme assets since the comingling of the investors' funds was central to the fraud scheme. For purpose of this motion to dismiss, that is enough. Of course, while the Court is satisfied at this stage that the investors have alleged "a plausible interest in [the] forfeited property," they ultimately "will need to establish what portion, if any, of the property . . . is actually traceable" to their investments. *Fed. Ins.*, 882 F.3d at 373.

### III.  Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED THAT the motions to dismiss the third-party petitions are GRANTED as to petitions filed by Shevitz and Christov, but are DENIED with respect to the remaining third-party petitions. In light of this determination, IT IS FURTHER ORDERED THAT, by October 15, 2021, the government and the remaining petitioners shall submit a joint letter indicating whether any party intends to request discovery in order to assess the traceability of the petitioners' funds to the Additional Assets, as well as

proposing an updated schedule for next steps in the litigation on the Second Preliminary Forfeiture Order.

The Clerk of Court is respectfully directed to terminate the motions pending at document numbers 867, 902, and 966.

SO ORDERED.

Dated:   September 30, 2021
         New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

13