UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

ALBERTO WILLIAM VILAR, *et al.*,

Defendants.

PAUL MARCUS, *et al.*,

Petitioners.

No. 05-cr-621 (RJS)
OPINION & ORDER

RICHARD J. SULLIVAN, Circuit Judge:

Before the Court are several third-party petitions brought pursuant to 21 U.S.C. § 853(n) (Doc. Nos. 816, 824, 828–30, 841) that seek to amend the Court's Preliminary Order of Forfeiture as to Substitute Assets (Doc. No. 802). For the reasons stated below, the petition brought by Lisa and Debra Mayer (together, the "Mayers") is GRANTED, and the remaining petitions are DENIED.

## I. Procedural History

Beginning in 1986, Alberto Vilar and Gary Tanaka ("Defendants") carried out a fraudulent investment scheme in which they solicited millions of dollars from investors that they then diverted for their own benefit. In August 2006, a grand jury in the Southern District of New York named Vilar and Tanaka in a twelve-count superseding indictment that charged them with conspiracy to commit securities fraud; securities, investment advisor, mail, and wire fraud; and money laundering. (Doc. No. 133.) After a lengthy trial, the jury found Vilar guilty on all counts and

found Tanaka guilty of three counts in the superseding indictment. The Court ultimately sentenced Vilar to 120 months' imprisonment and Tanaka to 72 months' imprisonment. (Doc. Nos. 753–54.) In addition, the Court entered joint-and-several money judgments, ordering Defendants to pay restitution to victims in the amount of $26,637,502.69 and forfeiture in the amount of $20,578,855.28. (*Id.*; *see also* Doc. Nos. 682–84, 687.)[1]

While the criminal case was proceeding, the Mayers filed civil fraud claims in New York state court against Defendants and two corporate entities they controlled. When those defendants failed to appear in the state action, the Mayers obtained a $19,133,299.78 judgment in August 2011. (*See* Doc. No. 824, Ex. C at 2–9.) The Mayers subsequently obtained two more judgments in March 2021, one for $2,530,909.21 against Vilar and the other for $759,489.30 against the two entities (*see id.*, Ex. C at 28–30), and another in October 2012 in the amount of $744,113.69 against Vilar and the two entities (*see id.*). Invoking those judgments, the Mayers served a restraining notice on J.P. Morgan Chase for five brokerage accounts linked to Vilar, Tanaka, and the entities named in the New York civil cases. (*See id.*, Ex. D at 14–15.) The Mayers later served an execution notice on J.P. Morgan Chase for those accounts (*see id.*, Ex. D at 16–18), prompting the Office of the New York City Sheriff to issue a sheriff's levy in the amount of $21,596,743.60 (*see id.*, Ex. D, at 19).

On August 2, 2019, the Court entered a Preliminary Order of Forfeiture as to Substitute Assets (the "Preliminary Forfeiture Order") that extended to (1) approximately $12,495,069.00 in funds held in the five J.P. Morgan Chase brokerage accounts and (2) approximately $273,611.89 in funds held by @Ventures Management, LLC (collectively, the "Substitute Assets"). (Doc. No.

[1] Vilar died in September 2021. (Doc. No. 970.) Because his criminal judgment was already final, it was not abated by his death. *See* 18 U.S.C. § 3613(b). Although the Preliminary Forfeiture Order as to Substitute Assets was not yet final and is thus abated as to Vilar, that abatement does not impact the ancillary proceedings because the orders independently forfeited Tanaka's interest in the assets. (Doc. No. 977.)

802 at 3; Doc. No. 1023 at 11–12.) Prior to that date, the brokerage accounts were deemed to be part of the Receivership assets in a related civil action (the "Civil Action") filed by the Securities and Exchange Commission ("SEC") in 2005 against Vilar, Tanaka, and various entities they controlled. *See SEC v. Amerindo Inv. Advisors Inc.*, No. 05-cv-621 (RJS), 2019 WL 3526590, at *2–4 (S.D.N.Y. Aug. 2, 2019). (*See also* Doc. No. 769 at 3–4, 7; Civil Action Doc. No. 283 at 4–5.) In the Civil Action, the Court ultimately directed the court-appointed Receiver to distribute nearly $70 million to defrauded investors, comprised of investment principal in the amount of $54,404,467.83 and an inflation adjustment of $13,849,639.27. *See generally SEC v. Amerindo Inv. Advisors Inc.*, No. 05-cv-5231 (RJS), 2017 WL 3017504, at *1 (S.D.N.Y. July 14, 2017). In light of that distribution, which the Court found left the investors "whole," the Court granted the government's motion to move the brokerage accounts to the criminal case, recognizing that the claimants who alleged an ownership interest in them would "be free to pursue their arguments in the context of the ancillary proceeding." *Amerindo Inv. Advisors Inc.*, 2019 WL 3526590, at *4.

In August 2019, pursuant to 21 U.S.C. § 853, Rule 32.2(b)(6) of the Federal Rules of Criminal Procedure, and Rules G(4)(a)(iv)(C) and G(5)(a)(ii) of the Supplemental Rules for Certain Admiralty and Maritime Claims and Asset Forfeiture Actions, the government published notice of its intent to forfeit the Substitute Assets. (*See* Doc. No. 1025 at ¶ 2.) Additionally, the government sent direct notice of the Preliminary Forfeiture Order to approximately forty investor-claimants and creditors identified from the Civil Action. (*See id.* at ¶ 3.) Thereafter, the United States Marshals Service took custody of the five brokerage accounts, adding them to the @Ventures Management, LLC funds, which had been in the custody of the United States Marshals Service since 2009. (*See id.* at ¶¶ 4–6.)

In September and November 2019, numerous claimants filed petitions pursuant to 21 U.S.C. § 853(n) claiming legal interests in the Substitute Assets, including: (1) Paul Marcus, The Deane J. Marcus Trust, The Steven E. Marcus Trust, The Cheryl Marcus-Podhaizer Trust, and The Eve S. Marcus Children's Trust (collectively, the "Marcus Claimants") (Doc. No. 816); (2) the Mayers (Doc. No. 824); (3) Vivian Shevitz (Doc. No. 826); (4) Alfred Heitkonig (Doc. No. 828); (5) John Preetzmann-Aggerholm (Doc. No. 829); (6) E. Ronald Salvitti (Doc. No. 830); (7) Angelika Jordan (Doc. No. 841); and (8) Lauranne Christov (Doc. Nos. 842–43). Thereafter, pursuant to Federal Rule of Criminal Procedure 32.2(c)(1)(A) and Federal Rule of Civil Procedure 12(b)(1), the government moved to dismiss all the petitions – except the Mayers' petition – arguing that the petitioners failed to allege a specific interest in the Substitute Assets and thus lacked standing to contest the forfeiture. (Doc. Nos. 867–68.) Several of the petitioners responded, including the Marcus Claimants, who argued that a constructive trust for defrauded investors gave rise to a legal interest sufficient to satisfy standing. (Doc. Nos. 872–75.)

The Court heard oral argument on the government's motion to dismiss on July 30, 2021. (Doc. No. 968.) At the end of argument, the Court asked the parties to propose a schedule for the rest of the ancillary proceeding, including whether the parties intended to conduct discovery prior to proceeding with a final hearing. (Doc. No. 968 at 64–65.) The parties filed letters shortly thereafter, agreeing that no discovery was required and that the proceeding should be resolved through briefing and a non-evidentiary hearing. (Doc. Nos. 965–66).

In September 2021, the Court partially granted the government's motion to dismiss. As to the Shevitz and Christov petitions, the Court found that neither petitioner asserted a legal interest in the Substitute Assets and accordingly dismissed their petitions. *See United States v. Vilar*, No. 05-cr-621 (RJS), 2021 WL 4504699, at *1, 3–6 (S.D.N.Y. Sept. 30, 2021). With respect to

the remaining petitioners – the Marcus Claimants, the Mayers, Heitkonig, Preetzmann-Aggerholm, Salvitti, and Jordan – the Court concluded that each had plausibly alleged the existence of a constructive trust under New York law, which if proven would give them an interest in the Substitute Assets superior to the government's. *See id.* at *4–6. The Court therefore denied the government's motion to dismiss the petitions. Nevertheless, the Court cautioned the parties that the remaining petitioners would ultimately have the burden of establishing with evidence that the Substitute Assets were "traceable" to their invested funds, as is required to *prove* a constructive trust. *Id.* at *5–6 (noting that the question of traceability "was a close one"). The Court then directed the parties to submit another letter (1) indicating whether any party wished to conduct additional discovery as to traceability and (2) proposing an updated schedule for completing the ancillary proceeding. *See id.* at *6.

In July 2022, the government reported that it had conferred with petitioners, who again confirmed that none desired additional discovery or an evidentiary hearing in connection with their Substitute Assets claims. (Doc. No. 1016.) Instead, the parties agreed "that only final briefing and oral argument at the hearing [was] necessary prior to the Court's ruling on the remaining claims" in the ancillary proceeding. (*Id.* at 2.) To that end, the parties proposed, and the Court adopted, a briefing and hearing schedule under which the petitioners would file opening briefs by October 14, 2022; the government would respond by November 15, 2022; and the parties would appear for oral argument on December 15, 2022. (Doc. No. 1017).

In line with that schedule, the Mayers and Salvitti filed their respective briefs on October 14, 2022. (Doc. Nos. 1019–20). Somewhat inexplicably, the Marcus Claimants filed a motion for summary judgment in lieu of a brief, despite the Court's directive that it file a brief on the ultimate merits of their petition. (Doc. No. 1021.) The government then filed an opposition to summary

judgment on November 14, 2022, which opposed all of the third-party petitions other than the Mayers'. (Doc. Nos 1023–25). The Court also received a letter from non-attorney Michael M. Baldwin-Sotomayor on behalf of Angelika Jordan (Doc. No. 1029) and a letter from Alfred Heitkonig on behalf of himself and John Preetzmann-Aggerholm (Doc. No. 1027; *see also* Doc. No. 1030). The Court then heard oral argument on December 15, 2022, which – in line with the parties' agreement – was non-evidentiary and consisted solely of legal argument. (Doc. No. 1031 at 17, 59.)

## II. Legal Standard

"In certain criminal cases, Congress has authorized the government to seek forfeiture of a defendant's ill-gotten gains as part of the defendant's sentence." *McIntosh v. United States*, 601 U.S. 330, 333 (2024). Procedurally, criminal forfeiture unfolds in two stages. *See generally* 21 U.S.C. § 853; Fed. R. Crim. P. 32.2. At the first stage, before entering a preliminary order of forfeiture, the Court must "adjudicate the government's interest vis-à-vis the defendant 'without regard to any third party's interest in the property.'" *United States v. Daugerdas*, 892 F.3d 545, 549 (2d Cir. 2018) (quoting Fed. R. Crim. P. 32.2(b)(2)(A)). This generally requires the government to establish that the property at issue "constitute[s] or [is] derived from[] any proceeds" of the defendant's crime. 21 U.S.C. § 853(a)(1). But if the defendant consumed or disposed of the criminal proceeds, he may be ordered to forfeit any other "substitute property" that he owns, up to the value of his proceeds. *Id.* § 853(p)(1). Thus, the government may establish a superior interest in substitute property by demonstrating that the defendant caused the proceeds of his crime to become unavailable. *See* Fed. R. Crim. P. 32.2(e)(B); *see also* 21 U.S.C. § 853(p)(1) (identifying the statutory criteria for when substitute property becomes subject to forfeiture).

At the second stage, before entering a final forfeiture order, the Court must "resolve[] any third-party petitioner's interests vis-à-vis the defendant," *Daugerdas*, 892 F.3d at 549, with the government "stand[ing] in the defendant's shoes," *United States v. Egan*, 811 F. Supp. 2d 829, 838 (S.D.N.Y. 2011). Any third party who wishes to assert "a legal interest in property which has been ordered forfeited to the United States" must make a timely claim and may "petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2). If a petitioner establishes by a preponderance of the evidence that "the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property," "the court shall amend the order of forfeiture in accordance with its determination" and return the seized property to the petitioner. *Id.* § 853(n)(6). "State law determines a petitioner's legal interest in the property at issue." *Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 242 (2d Cir. 2011). A legal "interest 'in' property must be an interest in a particular, specific asset, as opposed to a general interest in an entire forfeited estate or account." *United States v. Ribadeneira*, 105 F.3d 833, 836 (2d Cir. 1997). To that end, "general creditors" of a defendant – who by definition have only a generalized, unsecured interest in the defendant's estate – cannot establish a superior interest to that of the government. *Id.* at 837.

## III. Analysis

The Court previously determined at step one of the forfeiture analysis that Defendants obtained over $20 million in illicit proceeds from the fraud scheme, which were rendered unavailable by Defendants' diversion and consumption of those proceeds. (Doc. No. 802 at 2–3;

*see also* Doc. No. 462 at 13 n.5.) The Court also determined that Defendants had an ownership interest in "substitute property" – here, the Substitute Assets – as to which the government had a superior interest vis-à-vis Defendants. (Doc. No. 802 at 3.) As a result, the Court issued a preliminary order of future in the government's favor as to the Substitute Assets. (Doc. No. 802.)

That brings us to step two of the forfeiture process, where the dispositive question is whether the petitioners have demonstrated, by a preponderance of the evidence, that they have an interest in the Substitute Assets that is superior to that of the government. Having considered the third-party petitions brought here, the Court now issues the following findings of fact and conclusions of law in accordance with 21 U.S.C. § 853(n)(6).

**A.   Summary Judgment**

At the outset, the Court notes that the Marcus Claimants and the government incorrectly filed their briefs as a "motion for summary judgment" and an "opposition to summary judgment," respectively. (Doc. Nos. 1021, 1023–25.) As the Court stated in its August 2, 2022 order, the petitioners were to each file a brief on the ultimate merits of their respective petitions – meaning a brief explaining how each had shown by a preponderance of the evidence that it had a superior interest in the Substitute Assets than did the government. (Doc. No. 1017.) Nowhere did the Court indicate that summary judgment papers should be filed. Indeed, there was no need for summary judgment practice in this proceeding, given that the parties repeatedly agreed that no discovery or live testimony was necessary to resolve the outstanding petitions. (Doc. Nos. 965–66, 1016.) That is why the Court instructed the parties to file briefs – not summary judgment motions – on the merits of the outstanding petitions, and to appear for oral argument thereafter. (Doc. No. 1017.)

It bears noting that the only difference between summary judgment and a resolution of the ultimate merits of the petition is that the latter carries a lower standard of proof. That is, while

summary judgment would require the Marcus Claimants to prove that there is no genuine dispute of material fact that they are entitled to the Substitute Assets, *see* Fed. R. Civ. P. 56(a), the merits analysis simply requires the Marcus Claimants to prove the superiority of their claim vis-à-vis the defendants – with the government "stand[ing] in the defendant's shoes," *Egan*, 811 F. Supp. 2d at 838 – by a preponderance of the evidence. Because the preponderance-of-the-evidence standard is more favorable to the Marcus Claimants, the Court will simply construe the summary judgment papers filed by the Marcus Claimants and the government as briefs on the ultimate merits of the petitions to amend the Forfeiture Order, akin to the brief that the Mayers filed in compliance with the Court's order. (Doc. No. 1019.)

**B.     Investor Petitions**

Turning to the merits of the investor petitions, the Marcus Claimants first argue that they have a superior interest in the Substitute Assets because they have a constructive trust over them. It is indeed true that where "applicable state law imposes a constructive trust in property in favor of a third party, the third party's interest is superior" to that of the government. *Fed. Ins. Co. v. United States*, 882 F.3d 348, 371 (2d Cir. 2018); *see also United States v. Schwimmer*, 968 F.2d 1570, 1581–83 (2d Cir. 1992). But "the law of constructive trust does not necessarily entitle every crime victim to priority over a defendant's other general creditors." *Fed Ins. Co.*, 882 F.3d at 371. Under New York law, which applies here, the Marcus Claimants must show six elements to establish a constructive trust over the Substitute Assets: (1) that the Marcus Claimants shared a confidential or fiduciary relationship with Defendants; (2) that Defendants made an express or implied promise to the Marcus Claimants; (3) that the Marcus Claimants transferred the subject res in reliance on the promise; (4) that Defendants were unjustly enriched; (5) that the Marcus Claimants lack an adequate legal remedy; and (6) that the Marcus Claimants can trace their

property to the Substitute Assets. *See United States v. Coluccio*, 51 F.3d 337, 340 (2d Cir. 1995) (first four elements); *In re First Cent. Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004) ("New York courts have clarified that as an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate." (alterations and internal quotation marks omitted)); *Fed. Ins.*, 882 F.3d at 373 ("[A] constructive trust attaches only to the specific property appropriated from a claimant by the offender or that can be traceable thereto."); *see also LMT Cap. Mgmt., LLC v. Gerardi*, 947 N.Y.S.3d 338 (1st Dep't 2012) (perhaps suggesting a seventh requirement that imposing a constructive trust must be equitable).

At issue here is the sixth element – whether the Marcus Claimants can trace their investments to the Substitute Assets. Traceability is governed by its own set of specific rules. As a general matter, "[w]here the property is simply money, which is fungible, the imposition of a trust requires the [claimant] to trace the funds sought to be recovered back to those that were stolen." *Fed. Ins. Co.*, 882 F.3d at 373. Things become more complicated when the defendant has "co[]mingled the money of two or more persons." 5 William F. Fratcher, *Scott on Trusts* § 519 (1987).[2] If the defendant still has possession of the comingled funds in monetary form, then "the claimants have an interest in the mingled fund in proportion to their contributions to the fund." *Id.* But if the defendant has used the comingled funds to purchase other assets, then the claimants are entitled to a pro rata share of those "traceable proceeds." Fratcher, *supra*, § 519 ("As between the claimants and the wrongdoer or his creditors, the claimants are entitled to priority with respect to the fund and its traceable proceeds . . ., and therefore they share pro rata in the profits or the losses."). To that end, any constructive trust would "extend[] only to the portion [of the purchased

[2] The Second Circuit has generally instructed lower courts to "be guided by applicable rules concerning co[]mingled funds" as articulated in *Scott on Trusts*. *Schwimmer*, 968 F.2d at 1584.

asset] traceable to the misappropriated funds." *Wilde v. Wilde*, 576 F. Supp. 2d 595, 605 (S.D.N.Y. 2008). The upshot is that a claimant who seeks a constructive trust on assets purportedly bought with comingled funds must show two elements of traceability: (1) that the asset was purchased with comingled funds including the claimant's, and (2) "what portion, if any, of the [asset] is actually traceable" to the comingled funds. *Fed. Ins. Co.*, 882 F.3d at 373.

The Marcus Claimants do not dispute that they have the burden of proving both elements of traceability. (Doc. No. ("Hearing Tr.") at 24, 41, 47, 69.) But the record reveals that the Marcus Claimants have not done so with respect to both elements of any of the accounts that make up the Substitute Assets.

With respect to the first element of traceability, the Marcus Claimants cannot show that two of the Substitute Asset accounts – JP Morgan Chase Account Nos. 102–15833 and 102-25612 – contain comingled investor funds to begin with. To be sure, the Court found in the Civil Action that "all investor funds [initially] went into a single account that was subsequently pilfered" by Defendants. (Civil Action Doc. No. 432 at 17.) But the Court never made factual findings as to which of the many financial accounts associated with Defendants (and their various companies) were filled with investor funds. (Doc. No. 364 at 2–4 (listing over two dozen companies, accounts, and other property interests in which Defendants had an ownership interest).) And while the Receiver did determine that investors funds made their way into several of those accounts, these two Substitute Asset accounts were not among them. (Civil Action Doc. No. 283 at 6.) Put simply, the Marcus Claimants offer no evidence to speak of that JP Morgan Chase Account Nos. 102–15833 and 102-25612 contain investor funds, which forecloses their bid for a constructive trust over those accounts.

By contrast, the Marcus Claimants do at least establish the first element of traceability for the remaining Substitute Asset accounts: JP Morgan Chase Account Nos. 102-17995, 102-01485, and 102-01495, and the @Ventures Management LLC account (together, the "Four Accounts"). As just mentioned, the Court found that Defendants in effect pooled together all investor funds, including those of the Marcus Claimants. (Civil Action Doc. No. 432 at 17.) And as the Receiver, Defendants, and the government all agree, those comingled "investor funds" ended up in the Four Accounts. (Civil Action Doc. No. 283 at 6 (Receiver report identifying the Four Accounts as containing investor funds); Doc. No. 503 at 7–8 (Defendants agreeing "that funds in various co[]mingled accounts . . . were used in connection with client investment activities," specifically including Account Nos. "102-7995," "102-0148[5]," "102-01495," and the "Ventures Management" account); Doc. No. 769 at 8 (Government arguing that Substitute Assets should be forfeited because "Defendants have repeatedly acknowledged that the proceeds they obtained from the defrauded . . . investors were co[]mingled with the funds of other investors in various Amerindo accounts," specifically including the Four Accounts).)[3] This evidence is sufficient to show that the Four Accounts include comingled funds that can be traced back to the Marcus Claimants' investments – the first element of traceability.

Even so, the Marcus Claimants offer no evidence indicating "what portion" of the Four Accounts consist of investor funds as opposed to funds from other sources. *Fed. Ins. Co.*, 882 F.3d at 373. They present no account records, deposit logs, or other documentation shedding light on where the funds in the Four Accounts originated. Instead, the Marcus Claimants speculate that the Four Accounts *exclusively* contain comingled investor funds because the Receiver determined

[3] The Receiver determined the Four Accounts contained "cash," "publicly traded securities, and "un-priced private securities," though he did not specify the exact makeup of each account. (Doc. No. 283 at 6.)

that they contained comingled investor funds. (Hearing Tr. at 14–15.) But containing *some* investor funds is not the same as containing *only* investor funds – and the Receiver was explicit that he could not determine "whether there has been comingling of different investor funds or comingling with *non-investor funds*" in the Four Accounts. (Doc. No. 283 at 6 (emphasis added); *see also id.* at 3 ("The Receiver does not have historical account information to determine the source and movement of funds held in the various accounts included in the Forfeited Assets.").) For all the parties know, Defendants also filled these accounts with large sums from "non-investor" sources, whether other business ventures, family members, or even their own holdings. (*Id.* at 6.) Because there is no evidence as to whether and the extent to which such non-investor funds were mixed into the Four Accounts, the Marcus Claimants have not established what portion of the accounts originated with their investments.

To be clear, the Marcus Claimants had a prime opportunity to determine the contents of the Four Accounts – and meet their tracing burden – by seeking discovery here. Yet even after the Court warned them that they "would need to establish" tracing through discovery, *Vilar*, 2023 WL 4504699, at *6, the Marcus Claimants twice confirmed that they did not wish to do so. (Doc. Nos. 966, 1016.) For whatever reason, the Marcus Claimants believed that they could prove traceability through briefing and oral argument alone. But the evidentiary holes in their claims cannot be plugged with case law. For instance, the Marcus Claimants point to *United States v. $2,350,000.00 In Lieu of One Parcel of Prop. Located at 895 Lake Ave. Greenwich, Conn.*, 718 F. Supp. 2d 215 (D. Conn. 2010), as somehow establishing that the Substitute Assets are traceable to their investments as a matter of law. But unlike the Marcus Claimants, the receiver-claimants in that case catalogued every deposit into the substitute property account and proved that all but six traced back to their comingled funds. *See id.* at 220. Because those receiver-claimants established the

exact portion of the account – 99.6% – traceable to their capital, the court found that they were entitled to a constructive trust over that exact portion. *See id.* at 219–20, 226 & n.4, 228. The Marcus Claimants, by contrast, have not identified a single deposit into the Four Accounts, much less specified whether those deposits traced back to their principal, Defendants' holdings, or some other "non-investor" source. (Doc. No. 283 at 6.)

The Marcus Claimants thus have not met their burden in establishing a constructive trust over any of the Substitute Assets. And while the Marcus Claimants may have outstanding legal claims against Defendants, that leaves them as merely "general creditors" who, by definition, cannot prevail in a criminal forfeiture proceeding. *Ribadeneira*, 105 F.3d at 837; *see also id.* at 836 ("An interest 'in' property must be an interest in a particular, specific asset, as opposed to a general interest in an entire forfeited estate or account.").

Of the remaining Investor Petitioners, only Salvitti specifically alleges a constructive trust over the Substitute Assets. (Doc. No. 1020.) Salvitti's submission, however, merely endorses the Marcus Claimants' constructive trust argument – without explaining traceability at all – and must fail for the same reasons. As for Heitkonig, Preetzman-Aggerholm, and Jordan, none of these claimants even asserts a constructive trust, much less establishes the traceability requirement. They instead argue that they were not made whole by the Receiver in the Civil Action. (Doc. Nos. 1027, 1029–30.) But the fact that these petitioners have generic outstanding claims against Defendants means only that they are unsecured general creditors of Vilar and Tanaka. Their claims to the Substitute Assets therefore also fail. *See Ribadeneira*, 105 F.3d at 837.

### C. Mayer Petition

As for the Mayers, they claim to have an interest superior to the government in the five J.P. Morgan Chase brokerage accounts because they perfected a judgment lien on those accounts.[4] Whatever the merits of that argument, the government has conceded that "the Mayers hold a right, title[,] and interest in the Substitute Assets superior to that of the United States" and has executed a stipulated settlement with the Mayers to that effect. (Doc. No. 1010 at 6.) That is dispositive here. As a general matter, "the [g]overnment may by statute compromise claims in the context of a forfeiture." *In re W.R. Huff Asset Mgmt. Co.*, 409 F.3d 555, 564 (2d Cir. 2005) (citing 21 U.S.C. § 853(i)(2)). And because no other claimant has shown an interest superior to that of the government in these brokerage accounts, the government's settlement leaves the Mayers with an uncontested claim on the five J.P. Morgan Chase brokerage accounts. Although the Marcus Claimants' devote an inordinate portion of their brief to denigrating the Mayers' interests, those arguments are unpersuasive and ultimately of no moment: because the Marcus Claimants have failed to show a specific interest in the Substitute Assets, they lack "standing to contest the Order of Forfeiture" to begin with. *Ribadeneira*, 105 F.3d at 837.

Accordingly, in light of the government's concession that the Mayers have an interest superior to the government in the five J.P. Morgan Chase brokerage accounts, the Court grants the Mayers' petition to amend the Preliminary Order of Forfeiture as to Substitute Assets, entitling the Mayers to up to $12,495,069 of the funds that were previously held in those accounts.

---

[4] The Mayers conceded at oral argument that they do not assert a perfected lien against the @Ventures Management, LLC funds. (Doc. No. 1031 at 68.)

## IV. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED THAT the Mayers' petition under 21 U.S.C. § 853(n) is GRANTED, and the petitions of the remaining petitioners are DENIED. Accordingly, IT IS FURTHER ORDERED THAT, by September 27, 2024, the government shall submit (1) a draft stipulation and order acknowledging that the Mayers hold a superior interest in $12,495,069 of the assets and (2) a draft final order of forfeiture in favor of the United States for the remaining $273,611.89 of the assets. (Doc. No. 1023 at 7.)

SO ORDERED.

Dated: September 13, 2024
New York, New York

RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation